Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (___) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

---

[1]    The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

## Relief Requested[2]

1.      By this motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing the Debtors to (i) continue to operate their Cash Management System (as defined below) and maintain their existing Bank Accounts and Investment Accounts (each as defined below), (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms (as defined herein), and (iv) continue to perform Intercompany Transactions (as defined herein), and (b) granting related relief.  In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 25 days from the date hereof (the "Petition Date") to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]   A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Robert M. Caruso, Chief Restructuring Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously herewith.

4.      The bases for the relief requested herein are sections 105, 345, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 6003 and 6004, and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Rules</u>").

### <u>The Cash Management System</u>

5.      To facilitate the efficient operation of their businesses, the Debtors and their non-debtor affiliates use an integrated, centralized cash management system (the "<u>Cash Management System</u>") to collect, transfer, and disburse funds generated by their operations.  The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of approximately 68 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their businesses, the "<u>Bank Accounts</u>") and two investment accounts (the "<u>Investment Accounts</u>") owned by the Debtors and maintained with multiple banks (collectively, the "<u>Cash Management Banks</u>") including those Banks listed on **<u>Appendix 1</u>** annexed to each of **<u>Exhibit A</u>** and **<u>Exhibit B</u>** attached hereto, and reflected on the diagram of the Cash Management System attached hereto as **<u>Exhibit C</u>**.

6.      The Cash Management System is similar to systems commonly employed by businesses comparable in size and scale to the Debtors.  Indeed, large multinational businesses use integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple entities.  The Cash Management System is vital to the Debtors' ability to conduct their operations around the globe.  Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their businesses require prompt access to cash and accurate cash tracking.  The

Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.

## I.  The Bank Accounts and Flow of Funds

7.  The Cash Management System is tailored specifically to meet the Debtors' operating needs—enabling the Debtors to effectively and centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds, and facilitate the tracing of accurate account balances. These controls are critical given the significant volume of cash transactions managed through the Cash Management System each day.

8.  The Debtors' Cash Management System, generally, is organized around the following three businesses, each representing a major segment of the Debtors' operations: (a) the legacy Revlon business ("Revlon"), (ii) the Revlon professional business ("R-Pro"), and (iii) the Elizabeth Arden business ("Elizabeth Arden"). As of the Petition Date, the Cash Management System includes a total of 68 Bank Accounts and two Investment Accounts maintained by the Debtors. The Debtors hold their Bank Accounts at various entities across their organizational structure. A complete list of the Debtors' Bank Accounts is attached as **Appendix 1** to both **Exhibit A** and **Exhibit B**. The following is a table summarizing the Bank Accounts held by the Debtors:

| Entity Name | # of Bank Accounts |
|---|---|
| Elizabeth Arden, Inc. | 21 |
| Revlon Consumer Products Corporation | 16 |
| Revlon International - U.K. Branch | 5 |
| Revlon Canada Inc. | 5 |
| Elizabeth Arden (UK) Ltd. | 4 |
| Revlon (Puerto Rico) Inc. | 3 |
| Revlon Government Sales, Inc. | 2 |
| Elizabeth Arden (Canada) Limited | 2 |

| Entity Name | # of Bank Accounts |
|---|---|
| Roux Laboratories, Inc. | 2 |
| Revlon International Corporation | 1 |
| Elizabeth Arden Travel Retail, Inc. | 1 |
| Riros Corporation | 1 |
| Beautyge U.S.A., Inc. | 1 |
| Elizabeth Arden USC, LLC | 1 |
| Elizabeth Arden (Financing), Inc. | 1 |
| Revlon, Inc. | 1 |
| DF Enterprises, Inc. | 1 |
| Beautyge Brands USA, Inc. | 1 |
| FD Management, Inc. | 1 |

9.    The Debtors' Cash Management Banks are summarized in the following table:

| Cash Management Banks | # of Bank Account |
|---|---|
| Bank of America, N.A. | 28 |
| Citibank, N.A. | 20 |
| JP Morgan Chase Bank, N.A. | 5 |
| TD Bank, N.A. | 5 |
| Bank of New York Mellon | 3 |
| HSBC London | 3 |
| HSBC Dublin | 1 |
| SunTrust Bank | 1 |
| Barclays plc | 1 |
| Wells Fargo | 1 |
| **Investment Accounts** | |
| Goldman Sachs | 1 |
| Cowen & Company | 1 |

10.    Each of the Bank Accounts serve dedicated functions as described in the following

table:

| Accounts | Description of Accounts |
|---|---|
| *Treasury Account* | |
| **Revlon Treasury Account**<br><br>*Citibank Account ending 5426* | The Revlon account ending 5426 operates as the Debtors' main treasury account (the "Revlon Treasury Account"), which as described below interacts on a daily or periodic basis with the Revlon, R-Pro, and Elizabeth Arden accounts.  The Revlon Treasury Account receives transfers on a daily or periodic basis from the various collection and operating accounts.  Amounts in the Revlon Treasury Account are transferred on an as needed basis to the various disbursement and operating accounts to fund accounts payable and general operating |

| Accounts | Description of Accounts |
|---|---|
|  | expenditures.  At times, the Revlon Treasury Account will also disburse funds directly to third parties, including all third-party debt service payments.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $7,898,971 in the Revlon Treasury Account. |
| *Collection Accounts* |  |
| **Revlon Collection Accounts**<br><br>*Citibank Accounts ending 8751, 8735, 8743, 8786, 0259, 3729, 8807 & 5042*<br><br>*SunTrust Account ending 2922*<br><br>*Bank of New York Mellon Accounts ending 0697 & 0223* | Revlon maintains 11 collections accounts (the "<u>Revlon Collection Accounts</u>") that receive customer payments and other receipts paid to Revlon.  Any amounts in the Revlon Collection Accounts are swept on a daily basis to the account ending 8807 (the "<u>Revlon Master Collection Account</u>"), with the exception of the account ending 2922, which is subject to manual transfers.  Any amounts in the Revlon Master Collection Account are transferred on a periodic basis to the Revlon Treasury Account.  The Revlon Collection Accounts are held at Citibank, N.A. ("<u>Citibank</u>"), SunTrust Bank ("<u>SunTrust</u>"), and Bank of New York Mellon ("<u>BNYM</u>").<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $8,231,902 in the Revlon Collection Accounts. |
| **EA Collection Accounts**<br><br>*Bank of America Accounts ending 2755, 1472, 8935, 9552, 7884, 5981, 1100, 8427, 2490, 8546, 4916, 8640, 7583, 4260, 5635, 8988, & 6699* | Elizabeth Arden maintains 17 collections accounts (the "<u>EA Collection Accounts</u>") that receive customer payments and other receipts paid to Elizabeth Arden.  The EA Collection Accounts are held at Bank of America ("<u>BOA</u>").  Any amounts in the EA Collection Accounts are swept daily to the account ending 2755 (the "<u>EA Master Collection Account</u>"), with the exception of EA Collection Account ending 6699, which is manually transferred on a periodic basis to EA Operating Account ending 0623.  Any amount in the EA Master Collection Account is then manually transferred on a periodic basis to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $321,862 in the EA Master Collection Account. |
| **R-Pro Collection Account**<br><br>*JPM Account ending 3669* | R-Pro maintains one collection account (the "<u>R-Pro Collection Account</u>") that receives customer payments and other receipts paid to R-Pro.  The R-Pro Collection Account is held at JP Morgan Chase Bank, N.A. ("<u>JPM</u>").  Any amounts in the R-Pro Collection Account are manually transferred on a periodic basis to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $59,724 in the R-Pro Collection Account. |
| *Disbursement Accounts* |  |
| **Revlon Disbursement Accounts**<br><br>*Citibank Accounts ending 5397, 4291, 8815 & 5442* | Revlon maintains four disbursement accounts at Citibank (the "<u>Revlon Disbursement Accounts</u>") that are designated for payables related to (i) payroll (account ending 5397); (ii) employee health insurance obligations (account ending 4291); (iii) U.S. customs obligations (account ending 8815); and (iv) general accounts payable (account |

| Accounts | Description of Accounts |
|---|---|
| | ending 5442), including amounts in connection with the Debtors' Purchase Card Program.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $774,547 in the Revlon Disbursement Accounts. |
| **EA Disbursement Accounts**<br><br>*BOA Accounts ending 0045, 6177, 8127, 9054, 0977 & 4126* | Elizabeth Arden maintains one main disbursement account for checks ending 0045 (the "EA Disbursement Account").  The EA Disbursement Account is funded from the Revlon Treasury Account or the EA Operating Account on an as need basis, and such amounts are disbursed from the EA Disbursement Account to satisfy the general accounts payable of Elizabeth Arden.<br><br>As of the Petition Date, the Debtors maintain a balance of $0 in the main EA Disbursement Account.<br><br>Elizabeth Arden also maintains five other disbursement accounts (ending 6177, 8127, 9054, 0977 and 4126), which accounts are currently dormant and the Debtors are in the process of closing.  These accounts maintain a balance of $2,283. |
| **R-Pro Disbursement Accounts**<br><br>*JPM Accounts ending 8509 & 3509* | R-Pro maintains one main disbursement account ending 8509 (the "R-Pro Disbursement Account"), and one idled disbursement account ending 3509.   The R-Pro Disbursement Account is funded by the Revlon Treasury Account on an as needed basis, and such amounts are disbursed from the R-Pro Disbursement Account to satisfy the general accounts payable of R-Pro as well as provide funding to non-debtor affiliate accounts in Mexico on an as needed basis.<br><br>As of the Petition Date, the Debtors maintain a balance of $41,911 in the main R-Pro Disbursement Account. |
| *Intercompany Accounts* | |
| **EA Intercompany Accounts**<br><br>*BOA Accounts ending 2579 & 2587* | Elizabeth Arden maintains two accounts that are specifically dedicated to intercompany collections with respect to the Debtors' intellectual property licensing (the "EA Intercompany Accounts").  Amounts in these accounts are swept on a periodic basis into the EA Operating Account ending 0623 and manually transferred to either (i) the Revlon Treasury Account or (ii) the EA Disbursement Account to the extent necessary to satisfy outstanding accounts payable of Elizabeth Arden.<br><br>As of the Petition Date, the Debtors maintain a balance of $0 in the EA Intercompany Accounts. |
| *Operating Accounts* | |
| **Revlon Operating Accounts**<br><br>*Citibank Account ending 0122[3]* | Revlon maintains one operating account with Citibank, and another operating account with Wells Fargo (the "Revlon Operating Accounts"). The Revlon Operating Account at Wells Fargo was previously tied to |

---

[3]    The Citibank Account ending 0122 has been designated as the Adequate Assurance Account as defined in the *Debtors' Motion for Entry of an Order (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (B) Determining Adequate Assurance of Payment for Future Utility Services,*

| Accounts | Description of Accounts |
|---|---|
| *Wells Fargo Account ending 7175* | intercompany accounts that have been closed, and therefore has minimal activity. At this time the Revlon Operating Account at Citibank receives particular customer payments. Any amounts in the Revlon Operating Accounts are manually transferred to the Revlon Treasury Account on a periodic basis.<br><br>As of the Petition Date, the Debtors maintain a balance of $2,833 in the Revlon Operating Accounts |
| **EA Operating Account**<br><br>*BOA Account ending 0623* | Elizabeth Arden maintains one operating account with BOA (the "EA Operating Account"). As described above, the EA Operating Account receives intercompany collections from the EA Intercompany Accounts. The EA Operating Account is also the main disbursement account for ACH and wire payments. Any excess amounts in the EA Operating Account is transferred on a regular basis to the EA Master Collection Account and then manually transferred to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain a balance of $50,755 in the EA Operating Account. |
| **R-Pro Operating Accounts**<br><br>*JPM Account ending 1735* | R-Pro maintains one operating account with JPM (the "R-Pro Operating Account"). The R-Pro Operating Account receives certain customers' payments and, in some instances, funds the accounts payable of R-Pro. On a periodic basis, the funds in the R-Pro Operating Account are transferred to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain a balance of $52,576 in the R-Pro Operating Account. |
| *Collateral Accounts* | |
| **Revlon Collateral Account**<br><br>*JPM Account ending 7379* | Revlon maintains a deposit account at JPM where the funds in such account act as cash collateral in connection with letters of credit (each, an "L/C") issued by JPM for the benefit of certain Debtors (the "Revlon Collateral Account"). The Debtors and JPM are party to a certain assignment of deposit agreement with respect to the Revlon Collateral Account. To the extent any third-party beneficiary of a L/C issued by JPM draws on such L/C, JPM may access the JPM Collateral Account to recover the amount of the drawn L/C.<br><br>As of the Petition Date, the Debtors maintain a balance of $2,768,188 in the Revlon Collateral Account. |
| *Foreign Accounts* | |
| **Revlon Canadian Accounts**<br><br>*TD Bank Accounts ending 3008, 6715, 4633, 6909 & 3420* | Revlon's Canadian operations are supported by 5 accounts (the "Revlon Canadian Accounts") at TD Bank, N.A. ("TD Bank"). The Revlon Canadian Accounts include one main collections account (ending 3008) (the "Revlon Canadian Collections Account") and four disbursement accounts (the "Revlon Canadian Disbursement Accounts") related to |

*(C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief*, filed concurrently herewith.

| Accounts | Description of Accounts |
|---|---|
| | (i) payments to Concur Solutions, with respect to Debtors' reimbursable expense management program and invoice software (account ending 6715); (ii) payroll (account ending 4633); (iii) disbursements made in USD currency (account ending 6909) and (iv) disbursements made in CAD currency (account ending 3420). Any excess cash in the Revlon Canadian Collections Account is transferred periodically to the Revlon Treasury Account. As currency needs demand, funds are transferred from the Revlon Treasury Account to the Revlon Canadian Collections Account, and then funded to the various other Revlon Canadian Accounts, as applicable.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $3,753,743 in the Revlon Canadian Accounts. |
| **Revlon United Kingdom Accounts**<br><br>*Citibank Accounts ending 1012, 2373, 1020 & 8318*<br><br>*Barclays plc Account ending 7628* | Revlon's United Kingdom operations are supported by a main operating account (ending 1012) (the "Revlon UK Operating Account") denominated in GBP with two sub-accounts (ending 2373 and 1020) for effecting disbursements in different currencies (USD and Euro), and a separate disbursement account (ending 8318) for GBP disbursements (accounts ending 2373, 1020 and 8318 collectively, the "Revlon UK Disbursement Accounts"). The Revlon business also maintains a United Kingdom account at Barclays plc that receives customer payments that flow up to the Revlon UK Operating Account. Any excess cash in the Revlon UK Operating Account is transferred periodically to the Revlon Treasury Account via a non-debtor affiliate operating account in Spain. As needed, the Revlon Treasury Account also transfers funds to the Revlon UK Operating Account via the non-debtor affiliate operating Account in Spain, which in turn are transferred to the Revlon UK Disbursement Accounts to enable Revlon's United Kingdom operations to satisfy their accounts payable.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $413,146 in the Revlon UK Operating Account and Revlon UK Disbursement Accounts. |
| **EA Canadian Accounts**<br><br>*BOA Accounts ending 6219 & 6201* | Elizabeth Arden maintains two Canadian accounts: (i) one disbursement account (ending 6219) (the "EA Canadian Disbursement Account" and, collectively with the Revlon Disbursement Accounts, the EA Disbursement Accounts, the R-Pro Disbursement Accounts, the Revlon Canadian Disbursement Accounts and the Revlon UK Disbursement Accounts, the "Disbursement Accounts"); and (ii) one collections account (ending 6201) (the "EA Canadian Collection Account"). Collections from customer payments to the EA Canadian Collection Account are swept on a periodic basis to the EA Operating Account ending 0623, and then transferred to the Revlon Treasury Account on a regular basis. The EA Canadian Disbursement Account is funded on an as needed basis by the Revlon Treasury Account, and then disbursements from the EA Disbursement Account to satisfy accounts payable.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $1,659,731 in the EA Canadian Collection Account and EA Canadian Disbursement Account. |

| Accounts | Description of Accounts |
|---|---|
| **EA United Kingdom Accounts**<br><br>*HSBC Accounts ending 3405, 7556 8217 & 9135* | Elizabeth Arden's United Kingdom operations consist of four bank accounts. There are two operating accounts (ending 3405 held at HSBC Dublin, and ending 7556 held at HSBC London), which are denominated in EUR and facilitate the collection of customer receipts, vendor disbursements and intercompany transfers (collectively the "EA UK Operating Accounts").  There are also two sub-accounts (ending 8217 and 9135) for effecting disbursements in different currencies (GBP and EUR) (collectively the "EA UK Disbursement Accounts"). Funds from the EA United Kingdom Accounts are transferred on a periodic basis to the EA Operating Account ending 0623 via a non-debtor affiliate operating account in Switzerland, and then transferred to the Revlon Treasury Account on a regular basis.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $763,416 in the EA UK Operating Accounts and EA UK Disbursement Accounts. |
| *Puerto Rico Accounts* | |
| **Revlon Puerto Rico Accounts**<br><br>*Citibank Accounts ending 5584 & 5698*<br><br>*BNY Mellon Account ending 8036* | Revlon's Puerto Rico operations consist of a main operating account (ending 5584) (the "Revlon PR Operating Account") denominated in USD with two sub-accounts: (i) a collections account (ending 8036) (the "Revlon PR Collections Account"); and (ii) a disbursement account (ending 5698) (the "Revlon PR Disbursement Account" and, together with the Revlon PR Operating Account and the Revlon PR Collections Account, the "Revlon Puerto Rico Accounts"). Any excess cash in the Revlon PR Operating Account is transferred periodically to the Revlon Treasury Account.  As needed, the Revlon Treasury Account also transfers funds to the Revlon PR Operating Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $862,983 in the Revlon Puerto Rico Accounts. |
| *Investment Accounts* | |
| **Revlon Investment Accounts**<br><br>*Accounts ending 3753 & 5030* | Debtor Revlon Consumer Products Corporation currently maintains two investment accounts: one at Cowen & Company (ending 3753) and one at Goldman Sachs (ending 5030) (collectively, the "Investment Accounts").  The Investment Accounts are dormant, legacy accounts that the Debtors intend to close.  To the best of the Debtors' current knowledge and belief, the Debtors do not maintain funds in the Investment Accounts. |

## II.    Bank Fees

11.    In the ordinary course of their businesses, the Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (the "Bank Fees"), which average approximately $85,000 per month.  The Bank Fees for each month are paid in arrears and are automatically deducted from the Debtors' Bank Accounts as they

are assessed by their respective Cash Management Banks.  The Debtors estimate that they owe

their Cash Management Banks approximately $85,000 as of the Petition Date on account of Bank

Fees, the entirety of which will become due and payable within the first 25 days after the Petition

Date.  To ensure continued access to their Bank Accounts without disruption, the Debtors' seek

authority to pay any such due and owing Bank Fees, including prepetition Bank Fees, in the

ordinary course on a postpetition basis, consistent with historical practices.

### III.    The Debtors' Purchase Cards and Travel Cards

12.    As part of the Cash Management system, the Debtors have provided certain

employees with access to purchase cards (the "Purchase Cards"), travel cards and travel platinum

travel cards (together, the "Travel Cards") issued by American Express (collectively,

the "Purchase Card Program").  The Purchase Cards and Travel Cards are utilized for approved

business expenses and supplies incurred on behalf of the Debtors in the ordinary course of

business.  Costs incurred through use of the Travel Cards are paid directly by each employee and

subsequently reimbursed by the Debtors on a weekly basis.  Costs incurred through use of the

Purchase Cards are paid directly by the Debtors on a weekly basis.  On average, in the

twelve months leading up to the Petition Date, the Debtors accrued and paid approximately

$300,000 per month on account of the Purchase Card Program.  As of the Petition Date, the Debtors

estimate they owe approximately $350,000 on account of the Purchase Cards and Travel Cards.

The Debtors seek authority to continue the Purchase Card Program in the ordinary course on a

postpetition basis consistent with past practice and to pay any prepetition amounts related to the

Purchase Cards to avoid interrupted service.

### IV.    The Debtors' Existing Business Forms

13.    The Debtors use a variety of preprinted business forms, including checks,

letterhead, correspondence forms, invoices, and other business forms in the ordinary course of

their businesses (collectively, the "Business Forms").  The Debtors also maintain books and records to document their financial results and a wide array of necessary operating information, including their profits and expenses.  To avoid the distraction and unnecessary expense to their estates, the Debtors request authorization to continue using all of the Business Forms in existence before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required by the U.S. Trustee Guidelines (defined below).  The Debtors submit that once they have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labelled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labelled "Debtor in Possession."

## V.    The Debtors' Intercompany Transactions

14.    The Debtors operate as a global enterprise and in the ordinary course of their businesses, the Debtors maintain and engage in business relationships with each other and with their non-debtor affiliates (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims").[4]  The Intercompany Transactions cover several different categories, including, among other things, intercompany accounts receivable and accounts payable, and the payment of licensing fees or royalties among the Debtors and among Debtors and non-debtor affiliates.  For the avoidance of doubt for purposes of this Motion and the

---

[4]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  The continued performance of the ordinary course Intercompany Transactions are integral to ensuring the Debtors' ability to operate their businesses.

relief requested hereby, the Intercompany Transactions and the Cash Management System do not include dividends, return of capital or similar distributions.

15.     The Intercompany Transactions occur as part of the daily operation of the Cash Management System, and at any given time there may be Intercompany Claims owing between Debtors or between Debtors and non-debtor affiliates in connection with the receipt and disbursement of funds, including among the Debtors' Bank Accounts and non-Debtor foreign bank accounts, and there may be recognitions of offsets between Debtors or between Debtors and non-debtor affiliates.  For example, by the operation of the Cash Management System, the Debtors transfer funds out of the Revlon Treasury Account into various Disbursement Accounts and create intercompany balances among the Debtors.   Intercompany Transactions are an essential component of the Cash Management System.

16.     With respect to all Intercompany Transactions among the Debtors and non-debtor affiliates, the Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for Intercompany Transactions.   The Debtors' Intercompany Transactions are completely integrated within the Cash Management System.  Specifically, by operation of the Cash Management System and in the ordinary course of business, the Revlon Treasury Account interacts with all of the Debtors' affiliates outside of North America by transferring funds to, and receiving funds from, certain non-debtor affiliate operating accounts in Spain (for the Revlon business) and Switzerland (for the Elizabeth Arden business).  These non-debtor affiliate operating accounts exist only as intermediaries to transfer funds between the Revlon Treasury Account and the foreign affiliates.  If these Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors' estates.

17. To ensure each individual Debtor will not permanently fund the operations of any affiliate, the Debtors respectfully request that, pursuant to sections 503(b) and 364(c)(1) of the Bankruptcy Code, all Intercompany Claims against any Debtor by another Debtor arising after the Petition Date as a result of postpetition payments on account of ordinary course Intercompany Transactions be accorded administrative expense status. If Intercompany Claims are given administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors. Moreover, the Debtors request the authority to continue the Intercompany Transactions in a manner consistent with historical practices to enable the Debtors to smoothly transition into chapter 11 and ensure certain of the Debtors' revenue streams are not impacted. For the avoidance of doubt, except as otherwise provided in the DIP Order with respect to the Intercompany DIP Obligations, the Intercompany Claims shall be unsecured, and rank junior in priority to the DIP Obligations and the 507(c) Claims.[5] The relief requested herein will ensure that each Debtor receiving payments from another Debtor will continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors. For the avoidance of doubt, the Debtors do not seek authority to pay prepetition Intercompany Claims owed to non-Debtor affiliates.

---

[5]     The term "DIP Order" shall mean each interim and final order entered by the Court in respect of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "DIP Motion"), filed contemporaneously herewith. The terms "DIP Obligations" and the "507(b) Claims" each as used herein shall have the meaning ascribed to such terms in the DIP Orders. To the extent of any inconsistencies between this Motion or the relief requested or granted hereby, on the one hand, and the DIP Orders, on the other hand, the DIP Orders shall control.

**Basis for Relief**

I.      **The Court Should Approve the Debtors' Continued Use of the Cash Management System Because It Is Essential to the Debtors' Operations and Restructuring Efforts**

18.      The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, ensure the availability of funds when necessary, and reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the seamless operation of the Debtors' businesses and realize the benefits of the Cash Management System, the Debtors should be allowed to continue using the Cash Management System and should not be required to open new bank accounts.

19.      The U.S. Trustee Guidelines (as defined below) require debtors in possession to, among other things:  (a) close all existing bank accounts and open new debtor-in-possession bank accounts; (b) establish one debtor-in-possession account for all estate monies required for payment of taxes, including payroll taxes; (c) physically set aside all monies required by law to be withheld from employees or collected from others for taxes; (d) open a new set of books and records as of the commencement date of the case; (e) use new business forms indicating the debtor-in-possession status of the chapter 11 debtor; and (f) make all disbursements of estate funds by check with a notation representing the reason for the disbursement.  *See* Region 2 Guidelines for Debtors-in-Possession.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.  Strict enforcement of those guidelines in these chapter 11 cases, however, would severely disrupt

the ordinary financial operations of the Debtors by reducing efficiencies and causing unnecessary expenses.

20.    The continuation of the Cash Management System is nevertheless permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).    Bankruptcy courts routinely treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).    In addition, in granting such relief, courts recognize that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in relevant part*, 997 F.2d 1039, 1061 (3d Cir. 1993); *see also In re Frigitemp Corp.*, 34 B.R. 1000, 1010 (S.D.N.Y 1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985).    The requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (stating that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

21.    Here, requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations.    Importantly, the Cash Management System provides the Debtors with the ability to quickly create status reports on the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of

16

funds.  As a result, any disruption of the Cash Management System would have a severe and adverse effect on the Debtors' restructuring efforts.  Indeed, absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system would cause the Debtors' operations to grind to a halt, needlessly destroying the value of the Debtors' business enterprise.  By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.[6]  Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities.

22.     The Debtors respectfully submit that parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of prepetition obligations.  Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts without the prior approval of the Debtors' controller.  The Debtors will continue to work closely with the Banks to ensure that appropriate procedures are in place to prevent checks that were issued prepetition from being honored without the Court's approval.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

---

[6]     Notwithstanding the Debtors' use of a consolidated cash management system, the Debtors intend to calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor.

23.     Accordingly, the Debtors respectfully request that the Court authorize the continued use of the existing Cash Management System to facilitate the Debtors' transition into chapter 11.  Specifically, the Debtors respectfully request that the Court: (a) authorize the Cash Management Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of their businesses; (b) authorize each of the Cash Management Banks to receive, process, honor, and pay any and all checks, wire transfer, credit card, and other instructions, and drafts payable through, or drawn or directed on, such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, irrespective of whether such checks, drafts, wires, or credit card payments are dated prior to, on, or subsequent to the Petition Date; *provided* that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments; (c) to the extent a Cash Management Bank honors a prepetition check or other item drawn on any Bank Account at the direction of the Debtors, in a good faith belief that the Court has authorized such prepetition check or item to be honored, or as the result of a mistake made despite implementation of reasonable and customary item handling procedures, find that such bank will not be deemed to be liable to the Debtors, their estates; or any other party on account of such prepetition check or other item honored postpetition; and (d) authorize the Debtors to continue to pay any obligations incurred in connection with the Bank Accounts, including the Bank Fees, and further authorize the Cash Management Banks to chargeback returned items to the Bank Accounts, whether such items are dated prior to, on, or subsequent to the Petition Date, in the ordinary course of their businesses.

24.     In other large and complex chapter 11 cases, such as these, courts in this district routinely waive certain U.S. Trustee Guideline requirements and allow the continued use of cash

management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business. *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 1, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[7]

II.  **Payment of Fees and Prepetition Obligations Related to the Bank Accounts and Purchase Card Program Will Facilitate a Smooth Transition into Chapter 11 and Benefit the Estates**

25.  Courts in this district generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). In so doing, these courts have found that sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

---

[7]  Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

26.    Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs, Inc.*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

27.    Courts also may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) ("The 'doctrine of necessity' stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization."); *Ionosphere Clubs, Inc.*, 98 B.R. at 176 (holding that a court may authorize payments of prepetition obligations under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity")).

28.    The Debtors' continued use of the Cash Management System will facilitate their transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition debts.  Certain payments to their

Cash Management Banks, such as the payment of prepetition Bank Fees and balances related to the Purchase Cards, will ensure the continued support of the Debtors' Cash Management Banks on a go-forward basis at this critical juncture of the Debtors' chapter 11 cases. Moreover, the Purchase Cards play a role in the efficient and effective operations of the Debtors' businesses.

29.     Courts in this district have regularly approved the payment of bank fees related to a debtor's cash management system and the continuation of prepetition employee purchase card programs employed in the ordinary course of a debtor's prepetition business. *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 1, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[8]

## III.    The Debtors Should Be Granted Authority to Use Existing Business Forms

30.     The Debtors submit that the continued use of the Business Forms will not prejudice parties in interest and such relief will avoid unnecessary expenses and administrative delays at this critical time. Furthermore, the Debtors' requested relief will not prejudice parties in interest because parties doing business with the Debtors undoubtedly will know of the Debtors' status as

---

[8]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

a debtor in possession. Thus, changing the Business Forms is unnecessary and unduly burdensome. Once the Debtors have exhausted their existing stock of Business Forms, however, they will ensure that any new Business Forms are clearly labeled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors will ensure that such electronic Business Forms are clearly labeled "Debtor in Possession."

31.     Courts in this district regularly permit debtors to use their prepetition check forms without the "debtor in possession" label in similar large and complex chapter 11 cases. *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 1, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[9]

## IV.   The Court Should Authorize the Debtors to Continue Performing Intercompany Transactions and Grant Administrative Priority Status to Postpetition Intercompany Claims

32.     At any given time, there may be balances due and owing between and among the Debtors and their non-debtor affiliates. These balances represent extensions of intercompany credit made in the ordinary course of the Debtors' businesses that are an essential component of

---

[9]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

the Cash Management System.  Thus, the Debtors respectfully request the authority to continue making all such Intercompany Transactions in the ordinary course of their businesses without the need for further Court order; *provided* that, for the avoidance of doubt, the Debtors do not seek authority to pay prepetition Intercompany Claims owed to non-Debtor affiliates.

33.     Courts routinely provide authority in other complex multi-debtor chapter 11 cases to continue ordinary course intercompany transactions.  *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 1, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[10]  Thus, the Debtors submit that this Court should authorize them to continue to perform under the Intercompany Transactions.

34.     The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions. The Debtors, moreover, will continue to maintain records of all Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls could be disrupted to the detriment of the Debtors and their stakeholders.

---

[10]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

35.     To ensure each individual Debtor will not fund—at the expense of its creditors—the operations of another Debtor, out of an abundance of caution, the Debtors respectfully request that all Intercompany Claims against a Debtor by another Debtor, as a result of postpetition payments on account of ordinary course Intercompany Transactions through the Cash Management System, be accorded administrative expense status pursuant to sections 503(b) and 364(b) of the Bankruptcy Code; *provided* that, except as otherwise provided in the DIP Order with respect to the Intercompany DIP Obligations, such Intercompany Claims shall be subject to and junior in priority to the DIP Obligations and the 507(b) Claims.  If Intercompany Claims among Debtors are accorded administrative expense status, each Debtor utilizing Debtor funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

36.     Administrative expense treatment for Intercompany Transactions, as requested herein, has been granted in other chapter 11 cases comparable to these chapter 11 cases. *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 1, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[11]

---

[11]   Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

37.    In addition, the Court should authorize the Debtors to preserve and exercise intercompany setoff rights among Debtors, including in connection with the postpetition Intercompany Transactions.  Section 553(a) of the Bankruptcy Code provides that "[e]xcept as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."  11 U.S.C. § 553(a).

38.    A creditor need only establish two elements before a setoff may be asserted— mutuality and timing.  *See Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re Bennett Funding Grp., Inc.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997), *aff'd,* 146 F.3d 136 (2d Cir. 1998); *see also Verco Indus. v. Spartan Plastics (In re Verco Indus.)*, 704 F.2d 1134, 1139 (9th Cir. 1983); *In re Lundell Farms*, 86 B.R. 582, 584 (Bankr. W.D. Wis. 1988).  Although courts have not uniformly defined the elements of mutuality, most courts require that the debts are owed between the same parties and in the same right or capacity.  *See* 5 Collier on Bankr. ¶ 553.03[3][a] & n.86 (16th ed. rev. 2012) (citing, *inter alia*, *Davidovich v. Welton (In re Davidovich)*, 901 F.2d 1533, 1537 (10th Cir. 1990); *Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.)*, 98 B.R. 243, 248 (Bankr. E.D. Va. 1989)).  Timing requires that both claims arise prepetition.  *See, e.g.*, *Packaging Indus. Grp., Inc. v. Dennison Mfg. Co. (In re Sentinel Prods. Corp.)*, 192 B.R. 41, 45 (Bankr. S.D.N.Y. 1996); *Scherling v. Hellman Elec. Corp. (In re Westchester Structures Inc.)*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995).  In addition, courts allow parties to offset claims postpetition in the same manner as a prepetition setoff, so long as the mutuality requirements are met.  *See, e.g.*, *United States v. Gordon Sel-Way, Inc. (In re Gordon Sel-Way, Inc.)*, 239 B.R. 741,

751–55 (E.D. Mich. 1999), *aff'd*, 270 F.3d 280 (6th Cir. 2001); *Mohawk Indus., Inc. v. United States (In re Mohawk Indus., Inc.)*, 82 B.R. 174, 179 (Bankr. D. Mass. 1987).

39.     The Cash Management System allows the Debtors to track all obligations owing between related entities and thereby ensures that all setoffs of Intercompany Transactions will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code. Therefore, the Debtors respectfully request that they be expressly authorized to set off postpetition obligations arising on account of Intercompany Transactions between a Debtor and another Debtor or between a Debtor and a non-debtor affiliate.

## V.     Cause Exists for Waving the Deposit and Investment Guidelines of Section 345 of the Bankruptcy Code and, to the Extent Necessary the U.S. Trustee Guidelines

40.     To the extent the Cash Management System does not strictly comply with section 345 of the Bankruptcy Code and/or the U.S. Trustee's Operating Guidelines and Financial Reporting Requirements for Debtors-in-Possession and Trustees (the "U.S. Trustee Guidelines"), the Debtors request a 45-day waiver of the requirements of section 345(b), subject to the Debtors' rights to seek further extensions thereof.

41.     Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code provides that the estate must require from the entity with which the money is deposited or invested a bond in favor of the United States secured by the undertaking of a corporate surety, "unless the court for cause orders otherwise."

42.     In determining whether the "for cause" standard has been met, the Court should

consider the "totality of the circumstances," utilizing the following factors:

a.     the sophistication of the debtor's business;

b.     the size of the debtor's business operations;

c.     the amount of the investments involved;

d.     the bank ratings (Moody's and Standard & Poor's) of the financial
institutions where the debtor in possession funds are held;

e.     the complexity of the case;

f.     the safeguards in place within the debtors own business of insuring the
safety of the funds;

g.     the debtor's ability to reorganize in the face of a failure of one or more of
the financial institutions;

h.     the benefit to the debtor;

i.     the harm, if any, to the debtor;

j.     the harm, if any, to the estate; and

k.     the reasonableness of the debtor's request for relief from Section 345(b)
requirements in light of the overall circumstances of the case.[12]

43.     Here, the majority of the Bank Accounts comply with Section 345(b) of the

Bankruptcy Code because such Bank Accounts are maintained at banks insured by federal

agencies, such as the Federal Deposit Insurance Corporation (the "FDIC").[13]  As of the Petition

Date, the Debtors maintained Bank Accounts at Citibank, TD Bank, JPM, BOA, Wells Fargo,

BNYM, and SunTrust, each of which is insured by the FDIC; however, the Bank Account held at

Barclays plc is not insured by the FDIC.  Additionally, Citibank, TD Bank, JPM, BOA, Wells

---

[12] *See In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

[13] *See* 11 U.S.C. § 345(b).

Fargo, and SunTrust are designated as authorized depositories by the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") pursuant to the U.S. Trustee Guidelines. BNYM and Barclays plc are not designated as authorized depositories pursuant to the U.S. Trustee Guidelines. Nevertheless, the Debtors believe that BNYM and Barclays plc are each well-capitalized and financially stable institutions and the Debtors therefore request that the Court waive the U.S. Trustee Guidelines in this respect. Further, as of the Petition Date, the only Bank Account held at Barclays plc holds less than $250,000.

44.     In addition to the above Bank Accounts, the Debtors also have two Investment Accounts, including one at Cowen & Company and one at Goldman Sachs. Neither of the Investment Accounts are FDIC insured. However, the Investment Accounts are dormant, legacy accounts that, to the best of the Debtors' information and belief, each had a $0.00 balance as of the Petition Date. The Debtors intend to close the Investment Accounts as soon as practicable.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

45.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied

the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

46.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Reservation of Rights

47.     Nothing contained in this Motion or any order granting the relief requested in this motion, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with any such order), is intended as or should be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

**Motion Practice**

48.     This motion includes citations to the applicable rules and statutory authorities upon

which the relief requested herein is predicated and a discussion of their application to this motion.

Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

**Notice**

49.     The Debtors will provide notice of this motion to: (a) the Office of the United States

Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims

against the Debtors (on a consolidated basis); (c) Proskauer Rose LLP, as counsel to MidCap

Funding IV Trust, in its capacity as (i) administrative agent and collateral agent under the Debtors'

prepetition asset-based lending facility, (ii) administrative agent and collateral agent under the

ABL DIP Facility, and (iii) ABL DIP Lender; (d) Morgan Lewis & Bockius LLP, as counsel to

Crystal Financial LLC, in its capacity as administrative agent for the SISO Term Loan; (e) Alter

Domus, in its capacity as administrative agent for the Tranche B; (f) Latham & Watkins, LLP, as

counsel to Citibank N.A., in its capacity as 2016 Term Loan Agent; (g) Quinn Emanuel Urquhart

& Sullivan, LLP, in its capacity as counsel to the putative 2016 Term Loan group; (h) Akin Gump

Strauss Hauer & Feld, LLP, in its capacity as counsel to an ad hoc group of 2016 Term Loan

lenders; (i) Paul Hastings LLP, as counsel to Jefferies Finance LLC, in its capacity as BrandCo

agent and DIP agent; (j) Davis Polk & Wardwell LLP and Kobre & Kim LLP, in their capacity as

counsel to the ad hoc group of Term Loan DIP lenders and BrandCo lenders; (k) King & Spalding,

LLP, in its capacity as counsel to Blue Torch Finance LLC, in its capacity as Foreign ABTL

Facility administrative agent; (l) U.S. Bank National Association, as indenture trustee for the

Debtors' pre-petition unsecured notes, and any counsel thereto; (m) the United States Attorney's

Office for the Southern District of New York; (n) the Internal Revenue Service; (o) the Securities

Exchange Commission; (p) the attorneys general for the states in which the Debtors operate; and

(q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

50.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated:  June 15, 2022

/s/ Paul M. Basta
_____
Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| REVLON, INC., *et al.*,[1] | ) | Case No. 22-10760 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM,
(B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO,
(C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM
INTERCOMPANY TRANSACTIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts and Investment Accounts, (ii) honor certain prepetition and postpetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions with each other and with a non-debtor affiliate consistent with historical practices, (b) scheduling a final hearing to consider approval of the Motion on a final basis, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the*

---

[1]   The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

*United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2022, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion must be filed with the Court on or before_____ p.m., prevailing Eastern Time, on _____, 2022.

3.      The Debtors are authorized, but not directed, to:  (a) continue operating the Cash Management System and honoring any prepetition obligations related to the use thereof, including any ordinary course Bank Fees; (b) designate, maintain, close, and continue to use on an interim basis their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit 1** hereto, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits; (d) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and (e) open new debtor in

2

possession Bank Accounts; *provided* that in the case of (a) through (e), such action is taken in the ordinary course of business and consistent with historical practices.

4.      The Debtors are authorized, but not directed, to continue using the Purchase Cards Program in the ordinary course of business and consistent with prepetition practices, including by paying prepetition and postpetition obligations outstanding with respect thereto, subject to the limitations of this Interim Order and any order of this Court granting the Wages Motion, and any other applicable interim and/or final orders of this Court.

5.      The Debtors are authorized, but not directed, on an interim basis, to continue utilizing the Bank Accounts in the ordinary course of their businesses and consistent with prepetition practices.

6.      To the extent any of the Debtors' Bank Accounts are not in compliance with section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines, the Debtors shall have until a date that is 45 days from the Petition Date, without prejudice to seeking an additional extension, to come into compliance with section 345(b) of the Bankruptcy Code and any of the U.S. Trustee's requirements or guidelines; *provided* that nothing herein shall prevent the Debtors or the U.S. Trustee from seeking further relief from the Court to the extent that an agreement cannot be reached.  The Debtors may obtain a further extension of the 45-day period referenced above by written stipulation with the U.S. Trustee and filing such stipulation on the Court's docket without the need for further Court order.

7.      For the banks at which the Debtors hold Bank Accounts that are party to a Uniform Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of this Interim Order, the Debtors shall (a) contact such bank, (b) provide such bank with each of the

Debtors' employer identification numbers, and (c) identify each of their Bank Accounts held at such bank as being held by a debtor in possession in the Debtors' bankruptcy cases.

8.        The Debtors are authorized, but not directed, to continue using, in their present form, the Business Forms, as well as checks and other documents related to the Bank Accounts existing immediately before the Petition Date, *provided*, *however*, that once the Debtors have exhausted their existing stock of Business Forms and checks, they shall ensure that any new Business Forms and checks are clearly labeled "Debtor in Possession" and *provided*, *further*, that with respect to any Business Forms and checks that are generated electronically, the Debtors shall ensure that such electronic Business Forms and checks are clearly labeled "Debtor in Possession."

9.        The Cash Management Banks at which the Bank Accounts are maintained are authorized to (a) continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business and consistent with historical practices, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wire transfers, and ACH transfers issued, whether before or after the Petition Date, and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and (b) debit the Debtors' accounts in the ordinary course of business and consistent with historical practices, without the need for further order of this Court for (i) all checks drawn on the Debtors' accounts which are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Debtors' accounts with such Cash Management Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date, and (iii) all applicable fees and expenses, including the Bank

4

Fees, associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the applicable Bank Accounts consistent with historical practice, and further, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and regardless of whether the returned items relate to prepetition or postpetition items or transfers, in each case in the ordinary course of business and consistent with historical practices.

10.     Any existing deposit agreements between or among the Debtors, the Cash Management Banks, and other parties shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by the Court, and the Debtors and the Cash Management Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and cash management procedures in the ordinary course of business, consistent with historical practices, including, without limitation, the opening and closing of bank accounts, subject to the terms and conditions of this Interim Order.

11.     The Debtors will instruct the Banks as to which checks, drafts, wire transfers (excluding any wire transfers that the Cash Management Banks are obligated to settle), or other items presented, issued, or drawn, shall not be honored.  Except for those checks, drafts, wires, or other ACH transfers that are authorized or required to be honored under an order of the Court, no Debtor shall instruct or request any Cash Management Bank to pay or honor any check, draft, or

5

other payment item issued on a Bank Account prior to the Petition Date but presented to such Cash

Management Bank for payment after the Petition Date.

12.     All banks maintaining any of the Bank Accounts that are provided with notice of

this Interim Order shall not honor or pay any bank payments drawn on the listed Bank Accounts

or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop

payment orders in accordance with the documents governing such Bank Accounts.

13.     Subject to the terms set forth herein, the Cash Management Banks may rely on the

representations of the Debtors with respect to whether any check, draft, wire, transfer, or other

payment order drawn or issued by the Debtors prior to the Petition Date should be honored

pursuant to this Interim Order or any other order of the Court, and such Cash Management Banks

shall not have any liability to any party for relying on such representations by the Debtors as

provided for herein, and no bank that honors a prepetition check or other item drawn on any

account that is the subject of this Interim Order at the direction of the Debtors to honor such

prepetition check or item, shall be deemed to be nor shall be liable to the Debtors, their estates, or

any other party on account of such prepetition check or other item being honored postpetition, or

otherwise deemed to be in violation of this Interim Order.

14.     The Debtor shall have twenty (20) business day after the entry of the Interim Order,

to serve a copy of this Interim Order on the Cash Management Banks.

15.     The Debtors are authorized, but not directed, to continue engaging in

Intercompany Transactions in connection with the Cash Management System in the ordinary

course of business and consistent with historical practices; *provided* that nothing in this Interim

Order shall authorize the payment of prepetition Intercompany Claims owed to non-Debtor

affiliates; *provided, further* that nothing in this Interim Order shall authorize payments to or for

the benefit of any direct or indirect equity holders of Revlon, Inc. The Debtors shall maintain current accurate and detailed records of all Intercompany Transactions, all payments on account of Intercompany Claims and all transfers of cash so that all transactions may be readily ascertained, traced, and recorded properly on applicable intercompany accounts (if any) and distinguished between prepetition and postpetition transactions for the purposes of determining administrative expense status. All postpetition payments from a Debtor to another Debtor under any Intercompany Transactions authorized hereunder that result in an Intercompany Claim are hereby accorded administrative expense status under sections 503(b) and 364(c)(1) of the Bankruptcy Code, which, except as otherwise provided in the DIP Order with respect to the Intercompany DIP Obligations, shall be unsecured and junior in priority to the DIP Obligations and the 507(b) Claims (each, as defined in the DIP Orders).

16. Subject to the terms hereof, the Debtors are authorized, but not directed, to open new bank accounts or close any existing Bank Accounts, as they may deem necessary and appropriate in their reasonable business judgment, in each case in the ordinary course of business and consistent with historical practices; *provided* that any new bank account shall be at a bank that is an authorized depository or at a bank that is willing to execute a Uniform Depository Agreement with the U.S. Trustee; *provided*, further, that the Debtors shall give notice to: (a) counsel to the Ad Hoc Group of BrandCo Lenders prior to the Debtors opening any new bank accounts or closing any existing Bank Accounts; and (b) the U.S. Trustee and any statutory committees appointed in these chapter 11 cases (if any), in each case within fifteen (15) days after opening any new bank account or closing any existing Bank Accounts. The relief granted in this Interim Order is extended to any new bank account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a "Bank Account," and to the bank at which such

account is opened, which bank shall be deemed a "Cash Management Bank." Nothing contained

in the Motion or this Interim Order shall be construed to (or authorize the Debtors to) (a) create or

perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the

Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any security

interest or lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

17.     *JP Morgan Letters of Credit*.   Pursuant to the Continuing Agreement for Standby

Letters of Credit, dated May 6, 2021, the Assignment of Deposits, dated October 20, 2020 and the

Amended and Restated Assignment of Deposits, dated June 7, 2021, in each case between Revlon

Consumer Products Corporation and JPMorgan Chase Bank, N.A. (together the "JPMC LC

Agreements"), JPMorgan Chase Bank, N.A. ("JPMC") has issued letters of credit in the aggregate

face amount of approximately $2,345,857.71 (the "JPMC LCs") for the account of one or more

Debtors and the Debtors have provided cash collateral in the amount of approximately

$2,580,443.48 to JPMC (the "JPMC Cash Collateral").  The Debtors agree that JPMC is entitled

to Adequate Protection of its interest in the JPMC Cash Collateral and the Debtors are authorized

to provide such Adequate Protection in accordance with this paragraph of this Order.  The JPMC

Cash Collateral will (i) continue to be held by JPMC during the pendency of the Debtors Chapter

11 Cases in accordance with the terms of the JPMC LC Agreements, and (ii) continue to secure

all reimbursement obligations and the payment of fees, costs and expenses now or hereafter owing

to JPMC in respect of the JPMC LCs, all of which shall continue to accrue and be payable to JPMC

in accordance with the JPMC LC Agreements (collectively, the "JPMC LC Obligations").  JPMC

is hereby authorized to apply all or any portion of the JPMC Cash Collateral to the payment of the

JPMC LC Obligations from time to time without further notice to or consent by the Debtors or any

other party in interest and without further order of the Court.  Notwithstanding anything to the

contrary in this or any other Order, (a) JPMC's lien on the JPMC LC Cash Collateral shall not be

subject or subordinate to the Carve Out, the DIP Liens, the Adequate Protection Liens, the Prior

Permitted Liens or the Prepetition Liens, and (b) JPMC shall be entitled to an allowed

administrative expense claim in an amount equal to the JPMC LC Obligations (but limited to the

amount of the JPMC Cash Collateral) in each of the Cases and in any Successor Cases (the "JPMC

Adequate Protection Claim").  The JPMC Adequate Protection Claim shall be senior to all other

administrative claims (including the Carve Out, the DIP Superpriority Claim and the Prepetition

Superpriority Claims).  The JPMC Cash Collateral shall be returned to the Debtors upon (x) the

expiration of the JPMC LCs, (y) the provision to JPMC of a backup LC satisfactory to JPMC, or

(z) the return of the undrawn JPMC LCs.

18.     Nothing in this Interim Order authorizes the Debtors to accelerate any payments

not otherwise due.

19.     Notwithstanding anything to the contrary in this Interim Order, nothing contained

in the Motion or this Interim Order, and no action taken pursuant to such relief requested or granted

(including any payment made in accordance with this Interim Order), is intended as or shall be

construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim

against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver

of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a

promise or requirement to pay any particular claim; (d) an implication, admission or finding that

any particular claim is an administrative expense claim, other priority claim or otherwise of a type

specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume,

adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code;

(f) an admission as to the validity, priority, enforceability or perfection of any lien on, security

interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

20.     Notwithstanding the relief granted in this Interim Order, any payment made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any orders entered by the Court approving the Debtors' entry into any postpetition debtor-in-possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith.

21.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

22.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

23.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

25.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

### Debtor Bank Accounts

| | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 1 | Beautyge Brands USA, Inc. | JP Morgan | x3509 | R-Pro Disbursement Accounts | $100 |
| 2 | Beautyge U.S.A., Inc. | JP Morgan | x1735 | R-Pro Operating Accounts | $52,576 |
| 3 | DF Enterprises, Inc. | Bank of America | x2587 | EA Intercompany Accounts | – |
| 4 | Elizabeth Arden (Canada) Limited | Bank of America | x6201 | EA Canadian Accounts | – |
| 5 | Elizabeth Arden (Canada) Limited | Bank of America | x6219 | EA Canadian Accounts | $1,659,731 |
| 6 | Elizabeth Arden (Financing), Inc. | Bank of America | x0977 | EA Disbursement Accounts | $2,282 |
| 7 | Elizabeth Arden (UK) Ltd. | HBSC London | x9135 | EA United Kingdom Accounts | $580,565 |
| 8 | Elizabeth Arden (UK) Ltd. | HBSC London | x8217 | EA United Kingdom Accounts | – |
| 9 | Elizabeth Arden (UK) Ltd. | HBSC London | x7556 | EA United Kingdom Accounts | – |
| 10 | Elizabeth Arden (UK) Ltd. | HSBC Dublin | x3405 | EA United Kingdom Accounts | $182,851 |
| 11 | Elizabeth Arden Travel Retail, Inc. | Bank of America | x9054 | EA Disbursement Accounts | – |
| 12 | Elizabeth Arden USC, LLC | Bank of America | x4126 | EA Disbursement Accounts | – |
| 13 | Elizabeth Arden, Inc. | Bank of America | x6699 | EA Collection Accounts | $297,884 |
| 14 | Elizabeth Arden, Inc. | Bank of America | x0623 | EA Operating Account | $50,755 |
| 15 | Elizabeth Arden, Inc. | Bank of America | x6177 | EA Disbursement Accounts | – |
| 16 | Elizabeth Arden, Inc. | Bank of America | x8127 | EA Disbursement Accounts | $0 |
| 17 | Elizabeth Arden, Inc. | Bank of America | x7583 | EA Collection Accounts | – |
| 18 | Elizabeth Arden, Inc. | Bank of America | x8935 | EA Collection Accounts | – |
| 19 | Elizabeth Arden, Inc. | Bank of America | x5635 | EA Collection Accounts | – |
| 20 | Elizabeth Arden, Inc. | Bank of America | x5981 | EA Collection Accounts | – |
| 21 | Elizabeth Arden, Inc. | Bank of America | x8546 | EA Collection Accounts | – |

| | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 22 | Elizabeth Arden, Inc. | Bank of America | x2490 | EA Collection Accounts | – |
| 23 | Elizabeth Arden, Inc. | Bank of America | x7884 | EA Collection Accounts | – |
| 24 | Elizabeth Arden, Inc. | Bank of America | x8427 | EA Collection Accounts | – |
| 25 | Elizabeth Arden, Inc. | Bank of America | x9552 | EA Collection Accounts | – |
| 26 | Elizabeth Arden, Inc. | Bank of America | x1100 | EA Collection Accounts | – |
| 27 | Elizabeth Arden, Inc. | Bank of America | x1472 | EA Collection Accounts | – |
| 28 | Elizabeth Arden, Inc. | Bank of America | x4916 | EA Collection Accounts | – |
| 29 | Elizabeth Arden, Inc. | Bank of America | x8640 | EA Collection Accounts | – |
| 30 | Elizabeth Arden, Inc. | Bank of America | x4260 | EA Collection Accounts | – |
| 31 | Elizabeth Arden, Inc. | Bank of America | x8988 | EA Collection Accounts | – |
| 32 | Elizabeth Arden, Inc. | Bank of America | x0045 | EA Disbursement Accounts | – |
| 33 | Elizabeth Arden, Inc. | Bank of America | x2755 | EA Collection Accounts | $23,978 |
| 34 | FD Management, Inc. | Bank of America | x2579 | EA Intercompany Accounts | – |
| 35 | Revlon (Puerto Rico) Inc. | Citibank | x5584 | Revlon Puerto Rico Accounts | $736,793 |
| 36 | Revlon (Puerto Rico) Inc. | Citibank | x5698 | Revlon Puerto Rico Accounts | $124,004 |
| 37 | Revlon (Puerto Rico) Inc. | BNY Mellon | x8036 | Revlon Puerto Rico Accounts | $2,186 |
| 38 | Revlon Canada Inc. | TD Bank | x6715 | Revlon Canadian Accounts | $108,270 |
| 39 | Revlon Canada Inc. | TD Bank | x3008 | Revlon Canadian Accounts | $2,896,347 |
| 40 | Revlon Canada Inc. | TD Bank | x4633 | Revlon Canadian Accounts | $88,155 |
| 41 | Revlon Canada Inc. | TD Bank | x3420 | Revlon Canadian Accounts | $639,095 |
| 42 | Revlon Canada Inc. | TD Bank | x6909 | Revlon Canadian Accounts | $21,876 |
| 43 | Revlon Consumer Products Corporation | Citibank | x4291 | Revlon Disbursement Accounts | $68,144 |

| | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 44 | Revlon Consumer Products Corporation | Citibank | x8786 | Revlon Collection Accounts | $1,094,719 |
| 45 | Revlon Consumer Products Corporation | Citibank | x8807 | Revlon Collection Accounts | $2,673,771 |
| 46 | Revlon Consumer Products Corporation | Citibank | x8815 | Revlon Disbursement Accounts | $23,529 |
| 47 | Revlon Consumer Products Corporation | Citibank | x3729 | Revlon Collection Accounts | $809,109 |
| 48 | Revlon Consumer Products Corporation | Citibank | x0259 | Revlon Collection Accounts | – |
| 49 | Revlon Consumer Products Corporation | Citibank | x5042 | Revlon Collection Accounts | $3,129 |
| 50 | Revlon Consumer Products Corporation | Citibank | x5397 | Revlon Disbursement Accounts | $578,753 |
| 51 | Revlon Consumer Products Corporation | Citibank | x5426 | Revlon Treasury Account | $7,898,971 |
| 52 | Revlon Consumer Products Corporation | Citibank | x5442 | Revlon Disbursement Accounts | $104,120 |
| 53 | Revlon Consumer Products Corporation | BNY Mellon | x0223 | Revlon Collection Accounts | $3,198 |
| 54 | Revlon Consumer Products Corporation | Suntrust | x2922 | Revlon Collection Accounts | $3,553,065 |
| 55 | Revlon Consumer Products Corporation | Wells Fargo | x7175 | Revlon Operating Accounts | $2,833 |
| 56 | Revlon Consumer Products Corporation | JP Morgan | x7379 | Revlon Collateral Account | $2,768,188 |
| 57 | Revlon Consumer Products Corporation | Cowen & Company | x3753 | Revlon Investment Accounts | – |
| 58 | Revlon Consumer Products Corporation | Goldman Sachs | x5030 | Revlon Investment Accounts | – |
| 59 | Revlon Government Sales, Inc. | Citibank | x8751 | Revlon Collection Accounts | – |
| 60 | Revlon Government Sales, Inc. | BNY Mellon | x0697 | Revlon Collection Accounts | $94,912 |
| 61 | Revlon International - U.K. Branch | Citibank | x2373 | Revlon United Kingdom Accounts | $188 |
| 62 | Revlon International - U.K. Branch | Citibank | x1020 | Revlon United Kingdom Accounts | $28 |
| 63 | Revlon International - U.K. Branch | Citibank | x8318 | Revlon United Kingdom Accounts | $37,469 |
| 64 | Revlon International - U.K. Branch | Citibank | x1012 | Revlon United Kingdom Accounts | $354,384 |
| 65 | Revlon International - U.K. Branch | Barclays | x7628 | Revlon United Kingdom Accounts | $21,077 |
| 66 | Revlon International Corporation | Citibank | x8743 | Revlon Collection Accounts | – |

|  | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 67 | Revlon, Inc. | Citibank | x0122 | Revlon Operating Accounts | – |
| 68 | Riros Corporation | Citibank | x8735 | Revlon Collection Accounts | – |
| 69 | Roux Laboratories, Inc. | JP Morgan | x8509 | R-Pro Disbursement Accounts | $41,811 |
| 70 | Roux Laboratories, Inc. | JP Morgan | x3669 | R-Pro Collection Account | $59,724 |

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVLON, INC., *et al.*,[1] | ) Case No. 22-10760 (___) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO**
**(A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM,**
**(B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO,**
**(C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM**
**INTERCOMPANY TRANSACTIONS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts and Investment Accounts, (ii) honor certain prepetition and postpetition obligations related thereto, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform Intercompany Transactions with each other and with a non-debtor affiliate consistent with historical practices, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and

---

[1]  The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis only as set forth herein.

2.      The Debtors are authorized, but not directed, to: (a) continue operating the Cash Management System and honoring any prepetition obligations related to the use thereof, including any ordinary course Bank Fees; (b) designate, maintain, close, and continue to use on a final basis their existing Bank Accounts, including, but not limited to, the Bank Accounts identified on **Exhibit 1** hereto, in the names and with the account numbers existing immediately before the Petition Date; (c) deposit funds in, and withdraw funds from, the Bank Accounts by all usual means, including checks, wire transfers, ACH transfers, and other debits; (d) treat their prepetition Bank Accounts for all purposes as debtor in possession accounts; and (e) open new debtor-in-possession Bank Accounts; *provided*, that in the case of (a) through (e), such action is taken in the ordinary course of business and consistent with historical practices.

3.      The Debtors are authorized, but not directed, to continue using the Purchase Cards Program in the ordinary course of business and consistent with prepetition practices, including by

2

paying prepetition and postpetition obligations outstanding with respect thereto, subject to the

limitations of this Final Order and any order of this Court granting the Wages Motion, and any

other applicable interim and/or final orders of this Court.

4.      The Debtors are authorized, but not directed, to continue utilizing the Bank

Accounts in the ordinary course of their businesses and consistent with prepetition practices.

5.      To the extent any of the Debtors' Bank Accounts are not in compliance with

section 345(b) of the Bankruptcy Code or any of the U.S. Trustee's requirements or guidelines,

the Debtors shall have until a date that is 45 days from the Petition Date, without prejudice to

seeking an additional extension, to come into compliance with section 345(b) of the Bankruptcy

Code and any of the U.S. Trustee's requirements or guidelines; *provided* that nothing herein shall

prevent the Debtors or the U. S. Trustee from seeking further relief from the Court to the extent

that an agreement cannot be reached.  The Debtors may obtain a further extension of the 45-day

period referenced above by written stipulation with the U.S. Trustee and filing such stipulation on

the Court's docket without the need for further Court order.

6.      For the banks at which the Debtors hold Bank Accounts that are party to a Uniform

Depository Agreement with the U.S. Trustee, within fifteen (15) days of the date of entry of this

Final Order, the Debtors shall (a) contact such bank, (b) provide such bank with each of the

Debtors' employer identification numbers, and (c) identify each of their Bank Accounts held at

such bank as being held by a debtor in possession in the Debtors' bankruptcy cases.

7.      The Debtors are authorized, but not directed, to continue using, in their present

form, the Business Forms, as well as checks and other documents related to the Bank Accounts

existing immediately before the Petition Date; *provided*, *however*, that once the Debtors have

exhausted their existing stock of Business Forms and checks, they shall ensure that any new

Business Forms and checks are clearly labeled "Debtor in Possession" and *provided*, *further*, that with respect to any Business Forms and checks that are generated electronically, the Debtors shall ensure that such electronic Business Forms and checks are clearly labeled "Debtor in Possession."

8.     The Cash Management Banks at which the Bank Accounts are maintained are authorized to (a) continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business and consistent with historical practices, and to receive, process, honor, and pay, to the extent of available funds, any and all checks, drafts, wire transfers, and ACH transfers issued, whether before or after the Petition Date, and drawn on the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be, and (b) debit the Debtors' accounts in the ordinary course of business and consistent with historical practices, without the need for further order of this Court for (i) all checks drawn on the Debtors' accounts which are cashed at such Cash Management Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (ii) all checks or other items deposited in one of the Debtors' accounts with such Cash Management Bank prior to the Petition Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtor was responsible for such items prior to the Petition Date, and (iii) all applicable fees and expenses, including the Bank Fees, associated with the nature of the deposit and cash management services rendered to the Debtors, whether arising prepetition or postpetition, from the applicable Bank Accounts consistent with historical practice, and further, to charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such returned items were deposited or transferred prepetition or postpetition and

regardless of whether the returned items relate to prepetition or postpetition items or transfers, in each case in the ordinary course of business and consistent with historical practices.

9.      Any existing deposit agreements between or among the Debtors, the Cash Management Banks, and other parties shall continue to govern the postpetition cash management relationship between the Debtors and the Cash Management Banks, and all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect unless otherwise ordered by the Court, and the Debtors and the Cash Management Banks may, without further order of this Court, agree to and implement changes to the Cash Management System and cash management procedures in the ordinary course of business, consistent with historical practices, including, without limitation, the opening and closing of bank accounts, subject to the terms and conditions of this Final Order.

10.     The Debtors will instruct the Cash Management Banks as to which checks, drafts, wire transfers (excluding any wire transfers that the Banks are obligated to settle), or other items presented, issued, or drawn, shall not be honored.  Except for those checks, drafts, wires, or other ACH transfers that are authorized or required to be honored under an order of the Court, no Debtor shall instruct or request any Cash Management Bank to pay or honor any check, draft, or other payment item issued on a Bank Account prior to the Petition Date but presented to such Cash Management Bank for payment after the Petition Date.

11.     All banks maintaining any of the Bank Accounts that are provided with notice of this Final Order shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date for which the Debtors specifically issue timely stop payment orders in accordance with the documents governing such Bank Accounts.

12.     Subject to the terms set forth herein, the Cash Management Banks may rely on the representations of the Debtors with respect to whether any check, draft, wire, transfer, or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this Final Order or any other order of the Court, and such Cash Management Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein, and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Final Order at the direction of the Debtors to honor such prepetition check or item, shall be deemed to be nor shall be liable to the Debtors, their estates, or any other party on account of such prepetition check or other item being honored postpetition, or otherwise deemed to be in violation of this Final Order.

13.     As soon as practicable after entry of this Final Order, the Debtors shall serve a copy of this Final Order on the Banks.

14.     The Debtors are authorized, but not directed, to continue engaging in Intercompany Transactions in connection with the Cash Management System in the ordinary course of business and consistent with historical practices; *provided* that nothing in this Final Order shall authorize the payment of prepetition Intercompany Claims owed to non-Debtor affiliates. The Debtors shall maintain current accurate and detailed records of all Intercompany Transactions, all payments on account of Intercompany Claims and all transfers of cash so that all transactions may be readily ascertained, traced, and recorded properly on applicable intercompany accounts (if any) and distinguished between prepetition and postpetition transactions for the purposes of determining administrative expense status.  All postpetition payments from a Debtor to another Debtor under any Intercompany Transactions authorized hereunder that result in an Intercompany Claim are hereby accorded administrative expense status under sections 503(b) and 364(c)(1) of

6

the Bankruptcy Code, which, except as otherwise provided in the DIP Order with respect to the Intercompany DIP Obligations, shall be unsecured and junior in priority to the DIP Obligations and the 507(b) Claims (each, as defined in the DIP Orders).

15.     Subject to the terms hereof, the Debtors are authorized, but not directed, to open new bank accounts or close any existing Bank Accounts, as they may deem necessary and appropriate in their reasonable business judgment, in each case in the ordinary course of business and consistent with historical practices; *provided* that any new bank account shall be at a bank that is an authorized depository or at a bank that is willing to execute a Uniform Depository Agreement with the U.S. Trustee; *provided, further*, that the Debtors shall give notice to:  (a) counsel to the Ad Hoc Group of BrandCo Lenders prior to the Debtors opening any new bank accounts or closing any existing Bank Accounts; and (b) the U.S. Trustee and any statutory committees appointed in these chapter 11 cases (if any), in each case within fifteen (15) days after opening any new bank account or closing any existing Bank Accounts.  The relief granted in this Final Order is extended to any new bank account opened by the Debtors in the ordinary course of business after the date hereof, which account shall be deemed a "Bank Account," and to the bank at which such account is opened, which bank shall be deemed a "Cash Management Bank." Nothing contained in the Motion or this Final Order shall be construed to (or authorize the Debtors to) (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair the validity, priority, enforceability, or perfection of any security interest or lien or setoff right, in favor of any person or entity, that existed as of the Petition Date.

16.     Nothing in this Final Order authorizes the Debtors to accelerate any payments not otherwise due.

17.     Notwithstanding anything to the contrary in this Final Order, nothing contained in the Motion or this Final Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

18.     Notwithstanding the relief granted in this Final Order, any payment made or to be made by the Debtors pursuant to the authority granted herein shall be subject to and in compliance with any order entered by the Court approving the entry into any postpetition debtor-in-possession financing facility and any budget in connection therewith and/or authorizing the Debtors' use of cash collateral and any budget in connection therewith.

19.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

20.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

21.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

22.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1**

**Debtor Bank Accounts**

|  | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 1 | Beautyge Brands USA, Inc. | JP Morgan | x3509 | R-Pro Disbursement Accounts | $100 |
| 2 | Beautyge U.S.A., Inc. | JP Morgan | x1735 | R-Pro Operating Accounts | $52,576 |
| 3 | DF Enterprises, Inc. | Bank of America | x2587 | EA Intercompany Accounts | – |
| 4 | Elizabeth Arden (Canada) Limited | Bank of America | x6201 | EA Canadian Accounts | – |
| 5 | Elizabeth Arden (Canada) Limited | Bank of America | x6219 | EA Canadian Accounts | $1,659,731 |
| 6 | Elizabeth Arden (Financing), Inc. | Bank of America | x0977 | EA Disbursement Accounts | $2,282 |
| 7 | Elizabeth Arden (UK) Ltd. | HBSC London | x9135 | EA United Kingdom Accounts | $580,565 |
| 8 | Elizabeth Arden (UK) Ltd. | HBSC London | x8217 | EA United Kingdom Accounts | – |
| 9 | Elizabeth Arden (UK) Ltd. | HBSC London | x7556 | EA United Kingdom Accounts | – |
| 10 | Elizabeth Arden (UK) Ltd. | HSBC Dublin | x3405 | EA United Kingdom Accounts | $182,851 |
| 11 | Elizabeth Arden Travel Retail, Inc. | Bank of America | x9054 | EA Disbursement Accounts | – |
| 12 | Elizabeth Arden USC, LLC | Bank of America | x4126 | EA Disbursement Accounts | – |
| 13 | Elizabeth Arden, Inc. | Bank of America | x6699 | EA Collection Accounts | $297,884 |
| 14 | Elizabeth Arden, Inc. | Bank of America | x0623 | EA Operating Account | $50,755 |
| 15 | Elizabeth Arden, Inc. | Bank of America | x6177 | EA Disbursement Accounts | – |
| 16 | Elizabeth Arden, Inc. | Bank of America | x8127 | EA Disbursement Accounts | $0 |
| 17 | Elizabeth Arden, Inc. | Bank of America | x7583 | EA Collection Accounts | – |
| 18 | Elizabeth Arden, Inc. | Bank of America | x8935 | EA Collection Accounts | – |
| 19 | Elizabeth Arden, Inc. | Bank of America | x5635 | EA Collection Accounts | – |
| 20 | Elizabeth Arden, Inc. | Bank of America | x5981 | EA Collection Accounts | – |

|  | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 21 | Elizabeth Arden, Inc. | Bank of America | x8546 | EA Collection Accounts | – |
| 22 | Elizabeth Arden, Inc. | Bank of America | x2490 | EA Collection Accounts | – |
| 23 | Elizabeth Arden, Inc. | Bank of America | x7884 | EA Collection Accounts | – |
| 24 | Elizabeth Arden, Inc. | Bank of America | x8427 | EA Collection Accounts | – |
| 25 | Elizabeth Arden, Inc. | Bank of America | x9552 | EA Collection Accounts | – |
| 26 | Elizabeth Arden, Inc. | Bank of America | x1100 | EA Collection Accounts | – |
| 27 | Elizabeth Arden, Inc. | Bank of America | x1472 | EA Collection Accounts | – |
| 28 | Elizabeth Arden, Inc. | Bank of America | x4916 | EA Collection Accounts | – |
| 29 | Elizabeth Arden, Inc. | Bank of America | x8640 | EA Collection Accounts | – |
| 30 | Elizabeth Arden, Inc. | Bank of America | x4260 | EA Collection Accounts | – |
| 31 | Elizabeth Arden, Inc. | Bank of America | x8988 | EA Collection Accounts | – |
| 32 | Elizabeth Arden, Inc. | Bank of America | x0045 | EA Disbursement Accounts | – |
| 33 | Elizabeth Arden, Inc. | Bank of America | x2755 | EA Collection Accounts | $23,978 |
| 34 | FD Management, Inc. | Bank of America | x2579 | EA Intercompany Accounts | – |
| 35 | Revlon (Puerto Rico) Inc. | Citibank | x5584 | Revlon Puerto Rico Accounts | $736,793 |
| 36 | Revlon (Puerto Rico) Inc. | Citibank | x5698 | Revlon Puerto Rico Accounts | $124,004 |
| 37 | Revlon (Puerto Rico) Inc. | BNY Mellon | x8036 | Revlon Puerto Rico Accounts | $2,186 |
| 38 | Revlon Canada Inc. | TD Bank | x6715 | Revlon Canadian Accounts | $108,270 |
| 39 | Revlon Canada Inc. | TD Bank | x3008 | Revlon Canadian Accounts | $2,896,347 |
| 40 | Revlon Canada Inc. | TD Bank | x4633 | Revlon Canadian Accounts | $88,155 |
| 41 | Revlon Canada Inc. | TD Bank | x3420 | Revlon Canadian Accounts | $639,095 |
| 42 | Revlon Canada Inc. | TD Bank | x6909 | Revlon Canadian Accounts | $21,876 |

| | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 43 | Revlon Consumer Products Corporation | Citibank | x4291 | Revlon Disbursement Accounts | $68,144 |
| 44 | Revlon Consumer Products Corporation | Citibank | x8786 | Revlon Collection Accounts | $1,094,719 |
| 45 | Revlon Consumer Products Corporation | Citibank | x8807 | Revlon Collection Accounts | $2,673,771 |
| 46 | Revlon Consumer Products Corporation | Citibank | x8815 | Revlon Disbursement Accounts | $23,529 |
| 47 | Revlon Consumer Products Corporation | Citibank | x3729 | Revlon Collection Accounts | $809,109 |
| 48 | Revlon Consumer Products Corporation | Citibank | x0259 | Revlon Collection Accounts | – |
| 49 | Revlon Consumer Products Corporation | Citibank | x5042 | Revlon Collection Accounts | $3,129 |
| 50 | Revlon Consumer Products Corporation | Citibank | x5397 | Revlon Disbursement Accounts | $578,753 |
| 51 | Revlon Consumer Products Corporation | Citibank | x5426 | Revlon Treasury Account | $7,898,971 |
| 52 | Revlon Consumer Products Corporation | Citibank | x5442 | Revlon Disbursement Accounts | $104,120 |
| 53 | Revlon Consumer Products Corporation | BNY Mellon | x0223 | Revlon Collection Accounts | $3,198 |
| 54 | Revlon Consumer Products Corporation | Suntrust | x2922 | Revlon Collection Accounts | $3,553,065 |
| 55 | Revlon Consumer Products Corporation | Wells Fargo | x7175 | Revlon Operating Accounts | $2,833 |
| 56 | Revlon Consumer Products Corporation | JP Morgan | x7379 | Revlon Collateral Account | $2,768,188 |
| 57 | Revlon Consumer Products Corporation | Cowen & Company | x3753 | Revlon Investment Accounts | – |
| 58 | Revlon Consumer Products Corporation | Goldman Sachs | x5030 | Revlon Investment Accounts | – |
| 59 | Revlon Government Sales, Inc. | Citibank | x8751 | Revlon Collection Accounts | – |
| 60 | Revlon Government Sales, Inc. | BNY Mellon | x0697 | Revlon Collection Accounts | $94,912 |
| 61 | Revlon International - U.K. Branch | Citibank | x2373 | Revlon United Kingdom Accounts | $188 |
| 62 | Revlon International - U.K. Branch | Citibank | x1020 | Revlon United Kingdom Accounts | $28 |
| 63 | Revlon International - U.K. Branch | Citibank | x8318 | Revlon United Kingdom Accounts | $37,469 |
| 64 | Revlon International - U.K. Branch | Citibank | x1012 | Revlon United Kingdom Accounts | $354,384 |
| 65 | Revlon International - U.K. Branch | Barclays | x7628 | Revlon United Kingdom Accounts | $21,077 |

| | Entity | Bank Name | Account Number (last 4 digits) | Account Type | USD Equivalent Balance |
|---|---|---|---|---|---|
| 66 | Revlon International Corporation | Citibank | x8743 | Revlon Collection Accounts | – |
| 67 | Revlon, Inc. | Citibank | x0122 | Revlon Operating Accounts | – |
| 68 | Riros Corporation | Citibank | x8735 | Revlon Collection Accounts | – |
| 69 | Roux Laboratories, Inc. | JP Morgan | x8509 | R-Pro Disbursement Accounts | $41,811 |
| 70 | Roux Laboratories, Inc. | JP Morgan | x3669 | R-Pro Collection Account | $59,724 |

**Exhibit C**

**Cash Management System Diagram**

