Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Proposed Counsel to the Debtors and Debtors in
Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REVLON, INC., *et al.*,[1] | ) | Case No. 22-10760 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES,**
**OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE**
**EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

---

[1] The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

## Relief Requested[2]

1.      By this motion, the Debtors seek entry of interim (the "Interim Order") and final orders (the "Final Order"), substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of their businesses, including payment of certain prepetition obligations related thereto, each subject to the caps and limits set forth herein, and (b) granting related relief.  In addition, the Debtors request that the Court (as defined herein) schedule a final hearing within approximately 25 days from the date hereof (the "Petition Date") to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[2]    A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Robert M. Caruso, Chief Restructuring Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously herewith.

4.     The bases for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules").

### The Debtors' Workforce

5.     As of the Petition Date, the Debtors employ approximately 2,823 employees working in both full- and part-time positions, including salaried and hourly employees, those that work on commission, administrative support staff, and other personnel.  Of these employees, approximately 2,453 are located in the United States (the "U.S. Employees"), and approximately 370 are located outside of the United States in Canada and the United Kingdom (the "Non-U.S. Employees" and, together with the U.S. Employees, the "Employees").

6.     The majority of the Employees are not represented by a labor union.  However, certain Debtors are party to the following collective bargaining agreements (each, a "CBA," and together, the "CBAs"), pursuant to which they maintain various programs and benefits on behalf of covered Employees: (a) Debtor Roux Laboratories, Inc. is party to a CBA with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, and its affiliated Local 6520; (b) Debtor Revlon Canada Inc. is party to a CBA with UNIFOR and its Local 323; and (c) Debtor Revlon Consumer Products Corporation is party to a CBA with the Edison IBEW Local Union No. 3.  Approximately 150 Employees are employed under the CBAs (the "Represented Employees," and Employees who are not Represented Employees, the "Non-Represented Employees").  By this motion, the Debtors seek the authority to continue to provide compensation and benefits to the Represented Employees pursuant to the CBAs, and to honor the

3

Debtors' obligations under the CBAs, all as further described in this motion, in the ordinary course of their businesses and consistent with past practice.[3]

7.      In addition to the Employees, the Debtors also periodically retain personnel as independent contractors (the "Independent Contractors") or temporary workers (the "Temporary Staff").  The Independent Contractors perform crucial roles for the Debtors' various businesses (*e.g.*, sourcing), while others perform discrete consulting services (*e.g.*, IT and marketing). Temporary Staff fulfill certain duties on both a short- and long-term basis including, among other things, warehouse duties and general office services.   The number of Temporary Staff and Independent Contractors fluctuates based on the Debtors' specific needs at any given time.

8.      The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Employees and provide the Debtors with the flexibility to adapt their work force to fluctuating labor needs.   Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' businesses that the Debtors cannot easily replace, particularly in the wake of the COVID-19 pandemic.  Without the services of these individuals, the Debtors' reorganization efforts will be threatened.

9.      The Employees, Independent Contractors, and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and support their families.   If the Debtors are unable to meet and sustain their payroll and benefits obligations as set forth herein, these workers may suffer significant financial harm and be forced to seek employment elsewhere. Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

---

[3]     Although the Debtors request authority to honor obligations relating to the CBAs, the Debtors do not seek, pursuant to this motion, to assume or affirm any contract, agreements, programs, or to agree to the applicability of any law related to the CBAs, and the Debtors reserve all rights with respect thereto.

## Employee Compensation and Benefits Programs

10.     To minimize the personal hardship the Employees could suffer if prepetition employee-related obligations are not paid when due or as expected, and to maintain stability in the Debtors' workforce during the administration of these chapter 11 cases, the Debtors seek the authority to: (a) pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other compensation, payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, and taxes), reimbursable expenses, health insurance, workers' compensation benefits, life insurance, short- and long-term disability coverage, non-insider severance, ordinary course non-insider bonus programs, retiree benefits and retirement and savings plans, and certain other benefits that the Debtors have historically provided in the ordinary course, all as more fully described herein (collectively, the "Employee Compensation and Benefits Programs"); and (b) pay all costs incidental to the Employee Compensation and Benefits Programs.

11.     The Debtors seek authority to pay the aggregate amounts related to prepetition amounts owed on account of the Employee Compensation and Benefits Programs set forth in the table below:

| Employee Compensation and Benefit Programs | Interim Amount | Final Amount |
|---|---|---|
| **Compensation, Deductions, and Payroll Taxes** | | |
| Unpaid Net Compensation | $1,000,000 | $1,000,000 |
| Temporary Staff Fees | $4,400,000 | $5,100,000 |
| Independent Contactors Obligations | $700,000 | $700,000 |
| Commissions | $50,000 | $50,000 |
| Non-Insider Non-Union Severance (Final Basis Only for former Employees) | $0 | $1,256,000 |
| Union Severance Program (Final Basis Only for former Employees) | $0 | $298,000 |
| Global Annual Bonus Program (Non-Insiders and Final Order Only) | $0 | TBD |

| **Employee Compensation and Benefit Programs** | **Interim Amount** | **Final Amount** |
|---|---|---|
| MCG Sales Bonus Program (Non-Insiders Only)[4] | $31,000 | $31,000 |
| Non-Insider Cash TIP (Non-Insiders and Final Order Only)[5] | $0 | $860,000 |
| Expenses | $220,000 | $220,000 |
| Concur Fees | $6,000 | $6,000 |
| Deductions | $200,000 | $200,000 |
| Employer Payroll Taxes | $100,000 | $3,300,000 |
| Employee Payroll Taxes | $400,000 | $400,000 |
| Payroll Processing Fees | $50,000 | $50,000 |
| **Employee Benefit Programs** | | |
| Medical Claims | $2,100,000 | $5,250,000 |
| Employer Medical Plan Expenses | $580,000 | $580,000 |
| Dental Claims | $140,000 | $350,000 |
| Employer Dental Plan Expenses | $38,000 | $38,000 |
| Supplemental Plans | $620,000 | $620,000 |
| U.S. FSA Employee Contributions | $45,000 | $45,000 |
| U.S. FSA Fees | $6,000 | $6,000 |
| Canadian FSA | $6,000 | $6,000 |
| Canadian FSA Fees | $6,000 | $6,000 |
| Standard Life and AD&D Insurance | $290,000 | $290,000 |
| U.S. Short-Term Disability Benefits | $430,000 | $430,000 |
| Canada Disability Benefits | $7,000 | $7,000 |
| Workers' Compensation Claims | $10,000 | $400,000 |
| Canadian Workers' Compensation Premiums | $3,000 | $3,000 |
| Business Travel Accident Insurance | $0 | $0 |
| Non-Represented Employee 401(k) Contributions | $640,000 | $640,000 |
| Non-Represented Employee 401(k) Match and Fees | $360,000 | $360,000 |
| Represented Employees 401(k) Plan | $6,000 | $156,000 |
| Canadian Savings Plan Employee Contributions | $12,000 | $12,000 |
| Canadian Savings Plan Match | $7,000 | $7,000 |
| U.K. Savings Plan | $40,000 | $40,000 |
| U.S. Qualified Pension Plans | $0 | $700,000 |
| U.S. Actuarial Fees | $30,000 | $30,000 |
| Union MEPP | $4,000 | $200,000 |
| Canadian Pension Plan | $6,000 | $6,000 |

---

[4]   The amounts listed in this table on account of the MCG Sales Bonus Program reflect the maximum amount payable on account of such program on the next payment date of July 15, 2022, and not prepetition amounts due as of the Petition Date.

[5]   The amounts listed in this table on account of the Non-Insider Cash TIP reflect the maximum amount payable on account of such program on the next payment date of June 30, 2023, and not prepetition amounts due as of the Petition Date.

| **Employee Compensation and Benefit Programs** | **Interim Amount** | **Final Amount** |
|---|---|---|
| U.K. Pension Plan | $30,000 | $30,000 |
| WTW Actuarial Fees | $38,000 | $38,000 |
| Time-Off Benefits | $0 | $650,000 |
| Additional Programs | $59,000 | $138,000 |
| **Total** | $12,670,000 | $24,509,000 |

12.     The Debtors are not seeking relief to pay any Employee Compensation and Benefits

Programs in excess of the statutory cap of $15,150 set forth in sections 507(a)(4) and 507(a)(5) of

the Bankruptcy Code (the "Priority Caps") on an interim basis.  However, the Debtors are seeking

the authority, but not direction, to pay any prepetition Employee Compensation and Benefits

Programs that may exceed the Priority Caps solely upon entry of the Final Order.  Subject to the

Court's approval, the Debtors intend to continue their applicable prepetition Employee

Compensation and Benefits Programs in the ordinary course.  Out of an abundance of caution, the

Debtors request confirmation of their right to modify, change, and discontinue any of their

Employee Compensation and Benefits Programs and to implement new programs, policies, and

benefits in the ordinary course during these chapter 11 cases in the Debtors' sole discretion and

without the need for further Court approval, subject to applicable law.

**I.     Employee Compensation**

**A.     Unpaid Compensation**

13.     In the ordinary course of their businesses, the Debtors incur payroll obligations for

their Employees' salaries, wages, overtime, and other obligations (collectively, the "Employee

Compensation").  The Debtors have four pay cycles and pay Employees weekly, bi-weekly, semi-

monthly, or monthly, depending on the Employee's business segment and geographic location.

14.     The Debtors estimate that their historical average monthly Employee

Compensation on an aggregate basis is approximately $17,000,000.  The Debtors pay the majority

of the Employee Compensation via direct deposit through the electronic transfer of funds to the Employees' bank accounts, or by other electronic means.  As of the Petition Date, the Debtors estimate that they owe approximately $1,000,000, net of any deductions and withholdings, on account of accrued and unpaid Employee Compensation (the "Unpaid Compensation"), substantially all of which will come due within the first 25 days after the Petition Date.[6]

### B.    Temporary Staff Fees

15.    The Debtors engage Temporary Staff, who are not Employees, and pay fees for services provided by the Temporary Staff (the "Temporary Staff Fees") to approximately 20 temporary staffing agencies (the "Staffing Agencies"), based on periodic invoices submitted by the Staffing Agencies to the Debtors, which are processed through the Debtors' accounts payable system.  The Temporary Staff are not eligible to receive benefits under the Employee Benefits Programs.

16.    The Temporary Staff perform a wide variety of job functions, similar to those performed by the Employees, that are critical to the Debtors' business operations and the administration of these chapter 11 cases.  Use of temporary staff provided by the Staffing Agencies allows the Debtors to maintain a flexible workforce, and to quickly adjust their labor costs based on their labor needs.  Payment of the Temporary Staff Fees is vital to continue the retention of the Temporary Staff who are crucial to the Debtors' business operations and to maintain the Debtors' relationship with the Staffing Agencies that provide the Debtors with labor.

---

[6]    Additional Unpaid Compensation may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that the Debtors do in fact owe additional amounts to Employees. Accordingly, the Debtors seek the authority to pay their Employees and Temporary Staff any Unpaid Compensation in the ordinary course of their businesses and consistent with past practice, and to continue paying the Employee Compensation on a postpetition basis in the ordinary course of the Debtors' businesses.

17.     The Debtors incur a monthly average of approximately $3,000,000 on account of Temporary Staff Fees.  As of the Petition Date, the Debtors estimate that they owe approximately $5,100,000 on account of Temporary Staff Fees, approximately $4,400,000 of which will come due within the first 25 days after the Petition Date.

### C.     Independent Contractor Unpaid Compensation

18.     As noted above, the Debtors rely on Independent Contractors in the ordinary course of their businesses.  The Independent Contractors perform a wide range of services critical to the Debtors' operations, including, among other things, services relating to sourcing materials, marketing, and merchandising products.  The Employees rely on the support of the Independent Contractors to complete certain tasks in furtherance of the Debtors' businesses.  The Debtors believe the authority to continue paying their Independent Contractors is critical to maintaining and administering their estates.

19.     On average, the Debtors pay approximately $200,000 to the Independent Contractors on a monthly basis.  As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Independent Contractor obligations is approximately $700,000, substantially all of which will come due within the first 25 days after the Petition Date.

### D.     Commissions

20.     The Debtors offer eligible Employees in both the U.S. and the United Kingdom the opportunity to earn commissions (the "Commissions").  Generally, eligible Employees earn Commissions based on certain defined metrics.  Approximately 169 Employees are entitled to Commissions.  As of the Petition Date, the Debtors estimate that they owe such Employees approximately $50,000 in the aggregate on account of outstanding prepetition Commissions, substantially all of which will come due within the first 25 days after the Petition Date.  The amount

owed to any individual Employees on account of the Commissions does not exceed the Priority

Caps.

### E.    Non-Insider Severance

21.    In the ordinary course of their businesses, the Debtors maintain various severance

programs that apply to certain non-insider Employees (the "Non-Insider Severance Benefits").[7]

Under the Non-Insider Severance Benefits, eligible U.S. Employees may receive a minimum of 4

weeks of base pay and a maximum of up to 52 weeks of base pay upon termination based on their

job level and length of service with the Debtors.  By this motion, the Debtors do not request

authorization to make any severance payments to any "insider" as the term is defined in section

101(31) of the Bankruptcy Code in connection with the Non-Insider Severance Benefits.

Consequently, the Debtors submit that section 503(c)(2) of the Bankruptcy Code with respect to

severance payments to insiders does not apply to the relief requested herein.

22.    Severance for all Employees in Canada is determined pursuant to Canadian law.

Employees in Canada may be eligible for severance benefits if terminated involuntarily, and an

Employee's severance entitlements under Canadian law vary based on a range of factors, including

the Employee's length of service, position, and age, and may include payment for all compensation

and benefits provided to the Employee as of the date of termination.  Non-insider severance for

Employees in the United Kingdom is initially determined pursuant to local law, but may be

enhanced based on position and years of service.

23.    As of the Petition Date, approximately 14 former non-insider employees of the

Debtors may be eligible to receive prepetition Non-Insider Severance Benefits in the aggregate

---

[7]    The Debtors reserve the right to modify or terminate the Non-Insider Severance Benefits, consistent with past
practice, upon reasonable notice.

amount of approximately $1,256,000. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unpaid obligations related to the Non-Insider Severance Benefits under the Priority Cap is approximately $151,000. Of the approximately 14 former employees entitled to Non-Insider Severance Benefits, approximately 8 former employees are entitled to Non-Insider Severance Benefits that exceed the Priority Cap, and the aggregate amount of Non-Insider Severance Benefits that exceeds the Priority Cap owing to such former employees is approximately $1,105,000. By this motion, the Debtors are seeking the authority, but not direction, to pay prepetition Non-Insider Severance Benefits to former employees upon entry of the Final Order, and to otherwise honor the Non-Insider Severance Benefits with respect to Employees terminated postpetition in the ordinary course upon entry of the Interim Order.

24.    In addition, the Debtors' CBAs require severance to be made to terminated Represented Employees (the "Union Severance Program"). As of the Petition Date, the Debtors estimate that they owe approximately $298,000 on account of the Union Severance Program. By this motion, the Debtors are seeking the authority, but not direction, to pay prepetition amounts related to the Union Severance Program to former employees upon entry of the Final Order, and to otherwise continue to honor the Union Severance Program in the ordinary course upon entry of the Interim Order.

25.    For the avoidance of doubt, none of the Employees to be paid severance payments pursuant to the authority requested under the proposed interim or final order are insiders or former insiders. The Debtors believe it is important that they have the authority to honor their severance commitments. The Debtors believe that such authority is invaluable not only to maintain and boost the morale of their current workforce, but also to attract and retain new Employees.

### F.     Employee Incentive Programs (Non-Insiders Only)[8]

26.     As of the Petition Date, the Debtors maintain several incentive programs to motivate, reward, and retain certain of their Employees (each defined herein and collectively, the "Employee Incentive Programs").  To qualify for each of the Employee Incentive Programs, eligible Employees must be actively employed on the payment date.   The Debtors seek the authority to continue certain of the Employee Incentive Programs solely with respect to non-insider Employees, at their discretion, and in a manner consistent with their prepetition practices to retain valuable Employees and preserve Employee morale as the Debtors seek to implement a successful reorganization.

27.     The Debtors have historically maintained a long term incentive plan (the "LTIP") pursuant to which equity awards are granted to certain of their full-time Employees to incentivize Employees to achieve goals that support the Debtors' business strategy.  The LTIP grants equity-based compensation to approximately 96 eligible Employees, including insiders.  Awards granted under the LTIP may be subject to time-based vesting or tied to achievement of certain key performance metrics, such as adjusted EBITDA and cash generation, over multiple years.  For performance based awards, performance metrics are reviewed annually by the Chief Executive Officer and Chief Financial Officer, and approved by the Compensation Committee.  Awards under the LTIP are typically approved in March of each year and granted in the months following approval.  The Employee's award under the LTIP varies depending on the Employee's role and

---

[8]     The Debtors reserve the right to seek authority to modify, change, or discontinue the Employee Incentive Programs, and to institute new Employee incentive programs.  To the extent that the Debtors seek to grant future amounts pursuant to incentive and/or retention bonus programs, such requests will be made by a separate motion pursuant to proper notice and hearing with this Court.

level within the Company.  The Debtors are not, by this motion, seeking to continue or pay any amounts under the LTIP.

28.    In the ordinary course, the Debtors offer bonuses for their Employees based upon meeting certain financial and operating metrics.  The annual bonus program (the "Global Annual Bonus Program") applies to approximately 1,350 non-insider Employees across all Debtor entities. For the avoidance of doubt, the Debtors are not, by this motion, seeking to pay any amounts under the Global Annual Bonus Program with respect to insiders.  The amounts under the Global Annual Bonus Program are historically paid annually, and have been based on the achievement of target adjusted EBITDA and net sales metrics.  The next payment under the Global Annual Bonus Program is scheduled to be made on or before March 15, 2023.  Given the volatile nature of the Debtors' business during 2022, the Debtors have not yet set metrics for the Global Annual Bonus Program, but they expect to set metrics in line with any court-approved key employee incentive program.

29.    The Debtors' sale bonus program (the "MCG Sales Bonus Program") recognizes sales managers and directors who have met certain financial and personal objectives metrics.  The payments under the MCG Sales Bonus Program are paid quarterly and trued up at the end of each year.  As of the Petition Date, approximately 6 Employees qualify for the MCG Sales Bonus Program.  Similar to the Global Annual Bonus Program, the Debtors are still working to set the metrics for the MCG Sales Bonus Program due to recent industry volatility.  The Debtors estimate that a maximum amount of approximately $31,000 will be payable to eligible non-insider Employees on the next expected payment under the MCG Sales Bonus Program of July 15, 2022.

30.    The Debtors believe that honoring their obligations under the Global Annual Bonus Program and the MCG Sales Bonus Program with respect to non-insiders constitutes ordinary

course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority, but not direction, to honor such obligations in the ordinary course to their non-insider Employees and to continue their Global Annual Bonus Program and the MCG Sales Bonus Program on a postpetition basis with respect to non-insider Employees. Honoring and maintaining the Global Annual Bonus Program and the MCG Sales Bonus Program in the ordinary course is integral to maintaining employee morale and ensuring the Debtors maintain a motivate workforce at this critical juncture.

### G. Retention Award Program

31.     The Debtors grant certain non-insider Employees cash- or equity-based retention awards pursuant to the Transition Incentive Plan (the "TIP"). The TIP is a cash- and equity-based retention award that was granted to approximately 52 non-insider Employees in June 2021 to retain specific key personnel. These Employees work in various departments and are crucial to the Debtors' operations. The awards under the TIP are subject to a two-year vesting schedule. Subject to the Employees' continued employment, approximately $860,000 will be payable to eligible non-insider Employees on the next scheduled payment date of June 30, 2023. For the avoidance of doubt, by this motion, the Debtors are seeking authority to pay amounts under and continue the TIP solely with respect to non-insiders and cash-based awards (the "Non-Insider Cash TIP").

32.     Similar to the Global Annual Bonus Program and the MCG Sales Bonus Program, the Debtors believe that honoring their obligations under the Non-Insider Cash TIP constitute an ordinary course transaction within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, does not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to honor such obligations to their non-insider Employees, and to continue the Non-Insider Cash TIP in the ordinary course on a postpetition basis. Again,

honoring and maintaining the Non-Insider Cash TIP in the ordinary course of business is integral to maintaining Employee morale and ensuring the Debtors maintain a motivated workforce at this critical juncture. For the avoidance of doubt, the Debtors will not make any payments under the Non-Insider Cash TIP to Employees that are "insiders" as that term is defined in section 101(13) of the Bankruptcy Code.

### H. Expenses

33. The Debtors reimburse their Employees for certain expenses incurred in the scope of their duties and pay fees related to tracking reimbursements (collectively, and as further explained herein, the "Expenses"). The Expenses are typically associated with costs related to travel but can include other work-related expenses. When an Employee uses his or her personal or corporate credit card or cash for necessary Expenses (the "Employee Reimbursable Expenses"), the Employee can either manually submit expense reports to the Debtors' corporate department or submit expense reports to Concur Technologies, Inc. ("Concur"), the Debtors' Employee Expense reporting firm. Employee Reimbursable Expenses to be paid by Concur are charged by Concur to the Debtors and subsequently paid by Concur to the Employee. As of the Petition Date, the Debtors estimate that there is approximately $220,000 outstanding on account of Employee Reimbursable Expenses, substantially all of which will come due within the first 25 days after the Petition Date.

34. In addition to reimbursing Employees for certain Expenses, Concur also provides Expense tracking. The Debtors pay Concur approximately $2,600 each month for these services (the "Concur Fees"). As of the Petition Date, the Debtors estimate that they owe approximately $6,000 on account of the Concur Fees, substantially all of which will come due within the first 25 days after the Petition Date.

I.        **Deductions and Payroll Taxes**

35.      During each applicable pay period, the Debtors deduct certain amounts from Employees' paychecks, including garnishments, child support and similar deductions, legally ordered deductions, union dues, and miscellaneous deductions (collectively, the "Deductions"), and forward such amounts to various third-party recipients.  For example, the Debtors deduct union dues from certain U.S. Employees' paychecks and forward those amounts to International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, and its affiliated Local 6520.

36.      On a monthly basis, the Debtors deduct approximately $2.4 million in the aggregate from Employees' paychecks on account of the Deductions.  As of the Petition Date, the Debtors estimate that they owe approximately $200,000 in accrued and unpaid Deductions, substantially all of which will come due within the first 25 days after the Petition Date.

37.      In addition to the Deductions, certain federal and state laws require that the Debtors withhold certain amounts from Employees' gross pay related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authorities.  The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance and Social Security and Medicare taxes (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, and local taxing authorities at the same time when the Debtors disburse Employees' payroll.  As of the Petition Date, the Debtors estimate that they owe approximately $3.3 million in accrued and unpaid Employer Payroll Taxes and approximately $400,000 in accrued and unpaid Employee Payroll Taxes.  Approximately $100,000 of such Employer Payroll Taxes and

16

substantially all of such Employee Payroll Taxes will come due within the first 25 days after the Petition Date.[9]

### J.    Payroll Processing Fees

38.    The Debtors contract with Ultimate Kronos Group Pro ("UKG") in the U.S. and Canada, and MHR in the U.K. as third-party payroll service providers that process and administer the Debtors' payroll and provide W-2 preparation services.  In the aggregate, the Debtors pay UKG approximately $210,000 in aggregate on a quarterly basis, and MHR approximately $6,000 on a monthly basis, on account of these services.  As of the Petition Date, the Debtors estimate they owe approximately $50,000 on account of prepetition payroll services (the "Payroll Processing Fees"), substantially all of which will come due within the first 25 days after the Petition Date.

### K.    Non-Employee Director Compensation

39.    Revlon, Inc.'s board of directors includes nine non-Employee directors (the "Non-Employee Directors") and one Employee director.   Three of the Non-Employee Directors receive $115,000 annually for their service on the board, five of the Non-Employee Directors receive $45,000 monthly for their service on the restructuring committee, and five of the Non-Employee Directors receive an additional $10,000 annually for their service on the audit or investigation committees (collectively, the "Non-Employee Director Fees").   No Non-Employee Director receives compensation for both their service on the board and for their service on the restructuring committee.   The remaining Non-Employee Director does not receive compensation for his service on the board.  As of the Petition Date, the Debtors estimate that they do not owe

---

[9]    In accordance with The Coronavirus, Aid, Relief and Economic Security Act, the Debtors deferred certain of their 2020 Employer Payroll Taxes and are continuing to make such payments.

any unpaid accrued Non-Employee Director Fees but intend to continue paying the Non-Employee Director Fees in the ordinary course of business on a postpetition basis.

## II.   Employee Benefits Programs

40.   The Debtors offer Employees and their dependents a comprehensive benefits package for medical, dental, and vision care coverage, and certain other benefits (collectively, and as described in more detail below, the "Employee Benefits Programs").   The Debtors are self-insured under certain of the Employee Benefits Programs and have Administrative Services Only ("ASO") arrangements with their carriers, which administer programs and process claims. In these circumstances, the debtors (a) remit monthly administrative fees (the "ASO Fees") to the carriers and (b) pay claims directly once they are processed by the carrier.   Unless stated otherwise, each program is subject to an ASO arrangement with the respective carrier.

41.   Each of the following Employee Benefits Programs is further described below:

- medical and prescription plans;

- dental and vision plans;

- flexible spending accounts;

- life and accidental death and dismemberment insurance;

- spousal and child life insurance;

- disability benefits;

- business travel accident insurance;

- time-off benefits;

- 401(k) plans; and

- other employee benefit plans and programs as described below.

### A.    Health Benefit Plans

42.    The Debtors offer eligible Employees the opportunity to participate in several health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Plans").  The Debtors seek to pay approximately $6.2 million on account of the prepetition expenses related to the Health Benefit Plans, approximately $2.9 million of which will come due within the first 25 days after the Petition Date.

#### 1.  Medical Plans

43.    The Debtors provide (a) three self-insured medical policies to eligible Non-Represented U.S. Employees administered by Aetna:  the silver plan, the gold plan, and the platinum plan; (b) self-insured prescription drug administered by CVS Caremark coverage to all eligible U.S. Employees covered under the Debtors' U.S. Medical Plans; and (c) insurance coverage for Represented Employees administered by United Health Services and Colonial Life & Accidental Insurance Company (collectively, the "U.S. Medical Plans").  The Debtors also provide critical illness insurance coverage (the "Critical Illness Insurance") through MetLife for Employees that participate in certain of the U.S. Medical Plans, and the Debtors are responsible for the premiums for such Employees.  Aetna also provides stop-loss insurance (the "Stop-Loss Insurance") to the Debtors for their self-insured medical and prescription plans for Non-Represented U.S. Employees in the event that any individual claim exceeds the deductible under the Stop-Loss Insurance.  Approximately 1,800 Employees participate in the U.S Medical Plans.

44.    For Non-U.S. Employees, the Debtors provide (a) medical and vision coverage to approximately 135 Employees in Canada through Canada Life (the "Canada Medical Plans") and (b) medical coverage to approximately 34 Employees in the U.K. through Vitality Health (the "U.K. Medical Plan" and, together with the U.S. Medical Plans and Canada Medical Plans, the "Medical Plans").  The Debtors and the Employees share the cost of medical plan coverage,

and the amount borne by the Employee varies depending on which plan and coverage category the Employee selects. Under the U.S. Medical Plans for Non-Represented Employees, the Debtors also charge Employees for a (a) Tobacco surcharge for Employees who attest to using tobacco, and (b) spousal medical surcharge for Employees who are covering a spouse who has access to other employer-provided coverage.

45.     As self-insured medical plan providers under certain of the Medical Plans, the Debtors pay medical claims under such plans as such claims come due. Employee contributions are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund the payment of medical claims. As of the Petition Date, the Debtors estimate that they owe approximately $5,250,000 on account of prepetition medical claims, approximately $2.1 million of which will come due within the first 25 days after the Petition Date.

46.     The Debtors pay approximately $420,000 on account of administration fees and premiums for the Medical Plans, the Critical Illness Insurance, and the Stop-Loss Insurance each month (the "Employer Medical Plan Expenses"). The Debtors estimate that approximately $580,000 in Employer Medical Plan Expenses is owed as of the Petition Date, substantially all of which will come due within the first 25 days after the Petition Date.

### 2. Vision Plans

47.     The Debtors also offer eligible U.S. Non-Represented Employees the option to enroll into vision plans through Davis Vision (the "Davis Vision Plan"). Their Represented Employees may also enroll in vision plans through Unum Life Insurance Company and Colonial (together with the Davis Vision Plan, the "U.S. Vision Plans"). The Debtors do not make contributions to or pay any expenses on account of the U.S. Vision Plans, and the amount due on account of the U.S. Vision Plans is included in the cost of the Supplemental Plans below.

### 3. Dental Plans

48.     Finally, the Debtors offer full-time, eligible Non-Represented U.S. Employees self-insured dental plans administered by MetLife (the "MetLife Dental Plan"), and Represented Employees dental plans administered by Colonial (the "Colonial Dental Plan," and together with the MetLife Dental Plan, the "U.S. Dental Plans").  For both Non-Represented Employees and Represented Employees in Canada, the Debtors provide dental plans administered by Canada Life (the "Canada Dental Plans," and together with the U.S. Dental Plans, the "Dental Plans").

49.     The MetLife Dental Plan is self-insured, and as such, the Debtors pay dental claims of Employees covered by the MetLife Dental Plan as such claims come due.  Employee contributions to the Dental Plans are deducted directly from the respective Employee's paychecks and are held by the Debtors to fund the payment of dental claims.  As of the Petition Date, the Debtors estimate that they owe approximately $350,000 on account of prepetition dental claims under the MetLife Dental Plan, approximately $140,000 of which will come due within the first 25 days after the Petition Date.

50.     The Debtors pay approximately $19,000 on account of administration fees and premiums for the Dental Plans each month (the "Employer Dental Plan Expenses").  The Debtors estimate that approximately $38,000 in Employer Dental Plan Expenses is owed as of the Petition Date, substantially all of which will come due within the first 25 days after the Petition Date.

### B.     Supplemental Plans

51.     In addition to the Health Benefit Plans, Employees have the ability to enroll in the following supplemental plans (collectively, the "Supplemental Plans"), which are fully paid by the Employees:

- Critical illness insurance coverage provided by MetLife to eligible U.S. Non-Represented Employees.  U.S. Represented Employees are also provided critical illness insurance coverage through Colonial.

- Identity, financial, and privacy protection provided by IDLegal Shield to U.S. Non-Represented Employees.

- Cancer insurance through Colonial and Aflac for U.S. Represented Employees.

- Accident insurance through Colonial for U.S. Represented Employees.

- Pet protection through MetLife for U.S. Non-Represented Employees.

- Auto & home insurance through Farmers GroupSelect for U.S. Non-Represented Employees.

- Gym memberships are provided to U.S. Non-Represented Employees at the YMCA and to Non-U.S. Employees in the United Kingdom at Metabolics.

- Commuter benefits (the "Commuter Benefits") are provided to Non-Represented Employees through HealthEquity.

- Legal insurance (the "Group Legal Plan") is provided through MetLife for Non-Represented Employees.

52.     The Employee contributions to the Supplemental Plans are deducted directly from the respective Employee's paychecks.  The Debtors deduct approximately $190,000 per month on account of the Supplemental Plans, which proceeds are used to pay fees and premiums to the various Supplemental Plan providers.  The Debtors estimate that approximately $620,000 on account of the Supplemental Plans is unremitted as of the Petition Date, substantially all of which will come due within the first 25 days after the Petition Date.

### C.     Flexible Spending Accounts

53.     The Debtors provide U.S. Employees with two flexible spending account options to make pre-tax contributions through payroll deductions to pay for certain health and welfare needs (collectively, the "U.S. FSAs").  The two U.S. FSAs are (a) an FSA for eligible health care (medical, dental, and vision) expenses such as prescriptions and certain over-the-counter medications (the "Health Care FSA") and (b) an FSA for dependent care expenses (the "Dependent Care FSA").  The Debtors do not make contributions to the U.S. FSAs.  Currently, at the end of

the calendar year, Employees may carry an FSA balance of $570 over to the next year.  Employees

may not carry their Dependent Care FSA balances over to the next year.

54.  Historically, on a monthly basis, the Debtors deduct approximately $60,000 from

their Employee's paychecks on account of Employee contributions to the Health Care FSAs and

approximately $10,000 on account of Employee contributions to the Dependent Care FSAs.  As

of the Petition Date, the Debtors estimate that they owe approximately $45,000 in unremitted U.S.

FSA Employee contributions, substantially all of which will come due within the first 25 days after

the Petition Date.

55.  The U.S. FSAs are administered by HealthEquity.  The Debtors pay HealthEquity

a monthly administrative fee of approximately $3,000 on account of the U.S. FSAs.  HealthEquity

also administers the payment of premiums to former Employees on account of COBRA (as defined

herein).  As of the Petition Date, the Debtors owe approximately $6,000 in the aggregate in

outstanding administrative costs to HealthEquity on account of the U.S. FSAs and COBRA,

substantially all of which will come due within the first 25 days after the Petition Date.

56.  For Non-U.S. Employees, the Debtors provide Represented Employees in Canada

with a Health Care FSA through Canada Life (the "Canadian FSA").  As of the Petition Date, the

Debtors estimate that they owe approximately $6,000 on account of the Canadian FSA

contributions and approximately $6,000 in fees related to the Canadian FSA, substantially all of

which will come due within the first 25 days after the Petition Date.

**D.  Life and AD&D Insurance**

57.  For Non-Represented U.S. Employees, the Debtors provide basic life insurance,

accidental death and dismemberment insurance, supplemental life insurance, spousal life

insurance, and child life insurance, as well as post-retirement life insurance to sixteen former

employees, provided by Lincoln Financial Group, Prudential, and Mass Mutual (the "Non-

Represented U.S. Employee Insurance Benefits"). Represented U.S. Employees receive coverage for basic life, whole and term life insurance, spousal supplemental life insurance, and accidental death and dismemberment insurance by Colonial (together with the Non-Represented Employee Insurance Benefits, the "U.S. Standard Life and AD&D Insurance").

58.     For Non-U.S. Employees in Canada, the Debtors provide basic life insurance, accidental death and dismemberment insurance, and optional life and dependent life insurance, administered by Canada Life (the "Canada Standard Life and AD&D Insurance"). For Non-U.S. Employees in the U.K., the Debtors provide group life insurance through Genarali (the "U.K. Standard Life and AD&D Insurance," and together with the U.S. Standard Life and AD&D Insurance and the Canada Standard Life and AD&D Insurance, the "Standard Life and AD&D Insurance").

59.     The Debtors pay all of the expenses on account of the Standard Life and AD&D Insurance, which historically has cost approximately $90,000 per month. As of the Petition Date, the Debtors owe approximately $290,000 on account of the prepetition expenses related to the Standard Life and AD&D Insurance, substantially all of which will come due within the first 25 days after the Petition Date.

**E.     Disability Benefits**

60.     The Debtors provide eligible Non-Represented Employees in the United States and associates in its Oxford, North Carolina office (the "Oxford Associates") with short- and long-term disability benefits (collectively, the "U.S. Disability Benefits") plans through Lincoln Financial Group. Represented Employees are eligible for short- and long-term disability through Colonial. The short-term disability plans are provided at no cost for the eligible Employees, while the long-term disability plans are self-funded by the Employees.

61.     Under the short-term U.S. Disability Benefits program, in the event of a qualified non-work related illness or injury, Non-Represented Employees are entitled to 70% of base weekly earnings, Oxford Associates receive 70% of base salary, up to a weekly maximum of $600 for up to 180 days, and Represented Employees receive 60% of the weekly salary, up to a weekly maximum of $500 (the "U.S. Short-Term Disability Benefits").  The Debtors pay certain state mandated ASO Fees, as well as certain ASO Fees pursuant to the Family Medical Leave Act and the self-insured plans for Oxford Associates.

62.     As of the Petition Date, the Debtors owe approximately $430,000 on account of the U.S. Short-Term Disability Benefits, inclusive of the ASO Fees, substantially all of which will come due within the first 25 days after the Petition Date.

63.     If after 180 days of receiving U.S. Short-Term Disability Benefits an Employee still qualifies for U.S. Disability Benefits and has elected and contributes to the long-term disability benefit, then the Employee is entitled to continue receiving 60 percent of his or her base monthly salary, with a maximum monthly benefit of up to $15,000 for certain Employees, and up to $3,500 for Oxford Associates (collectively, the "U.S. Long-Term Disability Benefits").  The Debtors also provide up to $15,000 per month in individual disability insurance to certain Employees, using the Employee's after-tax dollars, through Covala (the "Executive Long-Term Disability Benefits," and together with the U.S. Long-Term Disability Benefits, the "Long-Term Disability Benefits").  The Debtors do not make contributions to or pay any expenses on account of the Long-Term Disability Benefits, and the amount due on account of the Long-Term Disability Benefits is included in the cost of the Supplemental Plans above.

64.     In Canada, eligible full-time Employees may enroll in short- and long-term disability benefits (the "Canada Disability Benefits").  The Canada Disability Benefits plans are

25

administered by Lifeworks and Canada Life for both Represented and Non-Represented Employees and are fully paid by the Employees. Employees contribute approximately $7,000 each month to the costs of the Canada Disability Benefits, which the Debtors deduct directly from the respective Employee's paychecks. As of the Petition Date, the Debtors owe approximately $7,000 on account of the Canada Disability Benefits, substantially all of which will come due within the first 25 days after the Petition Date.

### F. Workers' Compensation

65.     In the ordinary course of their businesses, the Debtors maintain workers' compensation insurance for their Employees at the statutorily required level for each state in which the Debtors have Employees (the "Workers' Compensation Program"). Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that could potentially disrupt the reorganization process.[10]

66.     The Debtors maintain a workers' compensation policy administered by Zurich American Insurance Company ("Zurich"). The Debtors pay a premium to Zurich for the workers' compensation policy on a monthly basis, based on the Debtors' estimated gross payroll for the applicable policy year.[11]    The Debtors must continue the claim assessment, determination,

---

[10]    The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of their businesses due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that may become necessary.

[11]    The Debtors do not seek relief to pay the premiums for the workers' compensation policy pursuant to this motion, but instead seek relief to pay such amounts pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to (a) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (b) Renew, Supplement, Modify, or Purchase Insurance Coverage, (c) Continue to Pay Brokerage Fees, (d) Honor the Terms of the Prepetition Premium Financing Agreement and Pay Premiums Thereunder, and (e) Enter into New Premium Financing Agreements in the Ordinary Course of Business, and (ii) Granting Related Relief*, filed concurrently herewith.

adjudication, and payment pursuant to the Workers' Compensation Program, without regard to whether such liabilities are outstanding before the Petition Date, to ensure that the Debtors comply with applicable workers' compensation laws and requirements.  There are approximately 1,440 open claims (the "Workers' Compensation Claims") under the Workers' Compensation Program, with claimed amounts totaling approximately $400,000.  As of the Petition Date, the Debtors estimate that they owe approximately $400,000 on account of the Workers' Compensation Claims, approximately $10,000 of which will come due within the first 25 days after the Petition Date. The Debtors seek authority to continue the Workers' Compensation Program, and to pay any amounts owed in connection with the Workers' Compensation Program, including any insurance premiums, in the ordinary course on a postpetition basis.

67.     Under Canadian law, the Debtors are required to maintain workers' compensation coverage administered by insurance boards set up by the applicable Canadian provinces to provide Canadian Employees with workers' compensation coverage for claims arising in the course of their employment with the Debtors (the "Canadian Workers' Compensation Program").  The Debtors pay monthly non-negotiable premiums (the "Canadian Workers' Compensation Premiums") calculated based on gross payroll.  The Debtors pay approximately $3,000 per month on account of the Canadian Workers' Compensation Premiums.  As of the Petition Date, the Debtors estimate that they owe approximately $3,000 on account of the Canadian Workers' Compensation Premiums, substantially all of which will come due within the first 25 days after the Petition Date.  The Debtors seek authority to continue the Canadian Workers' Compensation Program, and to pay any amounts owed in connection with the Canadian Workers' Compensation Program, including any Canadian Workers' Compensation Premiums, in the ordinary course on a postpetition basis.  It is critical that the Debtors be permitted to continue the Canadian Workers'

Compensation Program and to pay outstanding premiums because the failure to provide coverage may subject the Debtors and/or their officers to penalties.

### G.    Business Travel Accident Insurance

68.    The Debtors provide benefits to U.S. Non-Represented Employees who are injured or experience a medical emergency while traveling on a company-paid and approved business or relocation trip.  Specifically, the Debtors contract with Willis Towers Watson ("WTW") to provide Employees with business travel accident insurance (the "Business Travel Insurance"). The Debtors provide Business Travel Insurance to Employees at no cost and the Debtors pay all costs in full.  The Debtors pay approximately $46,000 per year to WTW for fees related to the Business Travel Insurance.  Although the Debtors believe that they do not owe WTW any amount on account of the Business Travel Insurance, they request the authority to pay any premium to the extent that it is later determined that any amounts are outstanding.

### H.    401(k) Plan

69.    The Debtors maintain a retirement savings plan for the benefit of certain of their full-time U.S. Employees with no minimum service requirement, and for certain of their part-time U.S. Employees, including temporary and seasonal Employees, who have worked a minimum of 1,000 hours over a 12-month period (the "Non-Represented Employees 401(k) Plan").  Empower Retirement ("Empower") administers the Non-Represented Employees 401(k) Plan.  U.S. Non-Represented Employees are automatically enrolled upon hire with a 6% contribution, and may either opt out or choose to contribute up to 25% of their compensation, on either a pre-tax basis, Roth after-tax basis, or a combination of both.  The Non-Represented Employees 401(k) Plan allows for salary deductions of eligible compensation, on either a pre-tax basis, Roth after-tax basis, or a combination of both, up to the limits set forth by the Internal Revenue Code. Approximately 1,710 Employees participate in the Non-Represented Employees 401(k) Plan.  The

Debtors deduct approximately $1.2 million each month for Employee contributions to the Non-Represented Employees 401(k) Plan. As of the Petition Date, the Debtors estimate that they own approximately $640,000 in unremitted Non-Represented Employees 401(k) Plan Employee contributions, substantially all of which will come due within the first 25 days after the Petition Date.

70.     With respect to the Non-Represented Employees 401(k) Plan, the Debtors match every dollar an eligible Non-Represented Employee contributes on either a pre-tax basis, Roth after-tax basis, or a combination of both, up to the first 6% of the Employees' compensation (the "Non-Represented Employees 401(k) Plan Match"). The Debtors contributed approximately $650,000 per month on account of the Non-Represented Employees 401(k) Plan Match. As of the Petition Date, the Debtors estimate that they owe approximately $360,000 on account of the Non-Represented Employees 401(k) Plan Match and administrative fees for the Non-Represented Employees 401(k) Plan, substantially all of which will come due within the first 25 days after the Petition Date.

71.     U.S. Represented Employees may elect to make pre-tax salary deductions negotiated by the Debtors as part of the CBAs (the "Represented Employees 401(k) Plan"). The Debtors contribute 4% of eligible earnings for all eligible U.S. Represented Employees for Represented Employees who have worked a minimum of 1,000 hours over a 12-month period. Participants may elect to defer up to 15% of their compensation. Approximately 50 Employees participate in the Represented Employees 401(k) Plan. The Debtors deduct approximately $10,000 each month on account of the Represented Employees 401(k) Plan. As of the Petition Date, the Debtors estimate that they owe approximately $156,000 on account of the Represented Employees

401(k) Plan Employee, approximately $6,000 of which will come due within the first 25 days after the Petition Date.

### I.     Foreign Savings Plans

72.     Certain Employees in Canada make contributions to various defined contribution plans administered by Desjardins Insurance and RBC Group Advantage (the "Canadian Savings Plans").  The Debtors deduct such amounts directly from the Employees' paychecks and are also required to make employer contributions and/or matches (the "Canadian Savings Plan Match") under the applicable plan documents.  The amount of the Employee's deduction and the Debtors' contribution and/or match vary based on the specific plan that an Employee participates in.

73.     The Debtors deduct approximately $24,000 each month on account of the Canadian Savings Plans.  As of the Petition Date, the Debtors estimate that they owe approximately $12,000 in unremitted Employee contributions on account of the Canadian Savings Plans and owe approximately $7,000 on account of the Canadian Savings Plan Match, substantially all of which will come due within the first 25 days after the Petition Date.

74.     Finally, with respect to Non-U.S. Employees in the United Kingdom, the Debtors provide a defined contribution savings plan (the "U.K. Savings Plan").  The Debtors deduct approximately $20,000 on account of the U.K. Savings Plan.  As of the Petition Date, the Debtors estimate that they owe approximately $40,000 on account of the U.K. Savings Plan, substantially all of which will come due within the first 25 days after the Petition Date.  By this motion, the Debtors request authorization to continue the Canadian Savings Plans and the U.K. Savings Plan on a postpetition basis, and to honor any prepetition obligations related thereto in the ordinary course of business.

### J.    U.S. Non-Qualified Plans

75.    The Debtors make contributions to four supplemental income plans for the benefit of certain former Employees:  (a) the Revlon Supplementary Retirement Plan (the "SERP"); (b) the Revlon Pension Equalization Plan (the "PEP"); (c) the Excess Savings Plan (the "ESP"); and (d) the Foreign Service Employees Pension Plan (the "FSEPP," and together with the SERP, the PEP, and the ESP, the "Supplemental Income Plans").  The SERP is a defined benefit plan that provides payments to plan participants in three annual installments and/or monthly annuity payments, each following separation from the Company.  The PEP is a defined benefit plan that provides a monthly annuity payment or lump sum to plan participants following separation from the Company.  The ESP is a defined contribution plan that allows plan participants to defer compensation in excess of Internal Revenue Code limitations that apply to deferrals under the Non-Represented Employees 401(k) Plan.  Empower acts as the administrator for the ESP, and the Debtors remit the Employee contributions that they deduct from Employee paychecks on account of the ESP to Empower to invest and hedge the Debtors' future obligations under the ESP.  The FSEPP is a nonqualified defined benefit pension plan which provides for monthly benefit payments four former non-U.S. employees who worked in locations outside of their home countries.

76.    The Supplemental Income Plans provide such payments to plan participants upon eligible termination or death circumstances and are funded through Company contributions.  The plans are maintained for the purpose of providing deferred compensation.  As of the Petition Date, there are approximately 189 retired Employees participating in the Supplemental Income Plans and approximately 97 active and vested Employees who are participating in the Supplemental Income Plans but who are not receiving benefits thereunder.  The Debtors estimate that payments on account of the Supplemental Income Plans are approximately $375,000 per month.

31

77.     In addition, the Debtors are party to individual separation agreements with approximately 13 retired Employees, pursuant to which the Debtors agreed to provide post-retirement supplemental income benefits (the "Special Arrangements").   Under the Special Arrangements, retired Employees or their beneficiaries receive annual or monthly annuity payments.   The Debtors estimate that payments on account of the Special Arrangements are approximately $124,000 per month.

78.     The Debtors are not seeking authority to pay any prepetition amounts on account of the Supplemental Income Plans or Special Arrangements pursuant to this Motion, but reserve all rights to seek such relief by separate motion.   However, the Debtors do request by this motion the authorization, but not direction, to honor any postpetition obligations related to the Supplemental Income Plans with respect to active Employees only, including by remitting postpetition contributions to Empower for investment, in the ordinary course of business.

### K.     U.S. Qualified Pension Plans

79.     The Debtors maintain certain qualified defined benefit plans: (a) the Revlon Employees' Retirement Plan ("RERP") for eligible U.S. Non-Represented Employees and (b) the Revlon-UAW Pension Plan (the "UAW Plan") for eligible Represented Employees (collectively, the "U.S. Qualified Pension Plans").   The U.S. Qualified Pension Plans provide current and future pension benefits to approximately 5,294 participants, approximately 596 of whom are current Employees, approximately 1,106 of whom are no longer employed by the Debtors and vested in their benefits, and approximately 3,590 of whom are retirees receiving payments (collectively, the "Pension Recipients").   The U.S. Pension Plans were amended to cease accruals after December 31, 2009 in the case of the RERP, and April 30, 2019 in the case of the UAW Plan.

80.     Assets for the U.S. Qualified Pension Plans are held in a trust for which Northern Trust Company is the trustee.   The Pension Recipients receive approximately $2.4 million in the

aggregate on a monthly basis under the U.S. Qualified Pension Plans from the trust. Payments to Pension Recipients are not drawn from the Debtors' cash on hand. The Debtors, however, make contributions as required. The Debtors are required to make a contribution of approximately $700,000 no later than the next contribution date of October 15, 2022.

81.     Under federal law, the Debtors are required to provide annual actuarial reports to the IRS for the U.S. Qualified Pension Plans. The Debtors have engaged Aon to provide such actuarial services, along with other services, related to both the Debtors' U.S. Qualified Pension Plans and for the Supplemental Income Plans. Certain of the fees paid to Aon are paid by the trust. As of the Petition Date, the Debtors estimate that they owe approximately $30,000 to Aon for its services in connection with the U.S. Qualified Pension Plans and the Supplemental Income Plans (the "U.S. Actuarial Fees"), substantially all of which will come due within the first 25 days after the Petition Date. By this motion, the Debtors request authorization to continue to honor any prepetition U.S. Actuarial Fees in the ordinary course of business, and to continue to honor such fees on a postpetition basis.

82.     The Debtors pay approximately $3.5 million in annual premiums to the Pension Benefit Guaranty Corporation (the "PBGC") from the trust. Payments are not drawn from the Debtors' cash on hand. By this motion, the Debtors request authorization, but not direction, to continue the U.S. Qualified Pension Plans on a postpetition basis, to remit the Unpaid PBGC Premiums, and to honor any other prepetition obligations related to the U.S. Qualified Pension Plans in the ordinary course of business.

83.     The Debtors were previously party to a qualified multiemployer defined benefit pension plan for certain former union employees (the "Union MEPP"). The Debtors withdrew from the Union MEPP in 2012 but must continue to make withdrawal liability payments of

approximately $4,000 per quarter. As of the Petition Date, the Debtors owe approximately $200,000 on account of such withdrawal liability payments for the Union MEPP, approximately $4,000 of which will come due within the first 25 days after the Petition Date. By this motion, the Debtors request authorization, but not direction, to honor any prepetition obligations related to the Union MEPP in the ordinary course of business.

### L.   Non-U.S. Pension Plans

84.   For Non-U.S. Employees located in Canada, the Debtors maintain the Affiliated Revlon Companies Employment Plan in Canada (the "Canadian Pension Plan"). The Canadian Pension Plan has both a defined benefit and a defined contribution component, and is sponsored by Debtor Revlon Canada Inc. and administered through Desjardins. The Debtors and eligible Employees each contribute 1% of the Employees' earnings under the defined contribution component.

85.   The Debtors historically maintained a statutorily defined benefit plan in the United Kingdom (the "U.K. Pension Plan") for non-U.S. employees located in the United Kingdom. No current Employees are members of the U.K. Pension Plan. In connection with the U.K. Pension Plan, the Debtors are responsible for: (a) additional contributions in the amount of £21,000 per month through June 2025, to address shortfalls under the U.K. Pension Plan; (b) administrative expenses in the amount of £25,000 per month, and (c) levies to the Pension Protection Fund, a U.K. statutory fund, after receipt of invoices from the Pension Protection Fund Board.

86.   As of the Petition Date, the Debtors estimate that they owe approximately $6,000 on account of the Canadian Pension Plan and approximately $30,000 on account of the U.K. Pension Plan, substantially all of which will come due within the first 25 days after the Petition Date. By this motion, the Debtors request authorization to continue the Canadian Pension Plan

and the U.K. Pension Plan on a postpetition basis, and to honor any prepetition obligations related thereto in the ordinary course of business.

87.    Actuarial services related to the Canadian Pension Plan and the U.K. Pension Plan are provided by Willis Towers Watson.  As of the Petition Date, the Debtors estimate that they owe approximately $38,000 to Willis Towers Watson for its services in connection with the Canadian Pension Plan and the U.K. Pension Plan (the "WTW Actuarial Fees"), substantially all of which will come due within the first 25 days after the Petition Date.  By this motion, the Debtors request authorization to continue to honor any prepetition WTW Actuarial Fees in the ordinary course of business, and to continue to honor such fees on a postpetition basis.

### M.    Retiree Health Coverage.

88.    In addition, the Debtors also offer one former employees, along with certain dependents, access to certain of the Debtors' current Health Benefit Plans and/or reimbursement for Medicare supplement insurance (the "Retiree Medical Coverage").  The amounts that the Debtors pay on account of the Retiree Medical Coverage are *de minimis*, and the amount due on account of Retiree Medical Coverage as of the Petition Date is included in the amounts due to on account of Employer Medical Plan Expenses.  By this motion, the Debtors request authorization to continue the Retiree Medical Coverage on a postpetition basis, and to honor any prepetition obligations related thereto in the ordinary course of business.

### N.    Time-Off Benefits

89.    The Debtors provide vacation time off between 15 to 35 days each calendar year to their full-time Employees and eligible part-time Employees as a paid time-off benefit ("Paid Time-Off").  The amount of Paid Time-Off available to a particular Employee and the rates at which Paid Time-Off is earned are generally determined by the Employee's length of service and employment classification.  When an Employee elects to take Paid Time-Off, that Employee is

paid his or her regular hourly or salaried rate.  Employees are allowed to carry over up to five or ten days of Paid Time-Off from year to year, depending on the Employee's position and subject to applicable law.

90.     The Debtors permit eligible full-time Employees and eligible part-time Employees to take certain paid leaves of absence for personal reasons, many of which are required by law. The Debtors pay full-time Employees and eligible part-time Employees for missed work time such as bereavement leave, jury duty, sick leave, and parental leave (the "Other Paid Leave"). Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

91.     The Debtors also provide most of their eligible Employees with up to sixteen weeks of unpaid parental leave following the birth or adoption of a child in accordance with the Family and Medical Leave Act, up to seventy weeks of parental and maternity or paternity leave under Quebec's Act Respecting Labour Standards, or up to sixty-three weeks of parental and pregnancy leave under Ontario's Employment Standards Act (collectively, the "Family Leave").   For Employees in the United Kingdom, the Debtors provide statutorily required sick pay and up to 12 weeks of paid leave at 50% of the Employee's basic pay based on the Employee's length of service with the Debtors (the "U.K. Sick Pay," and together with the Family Lave, Paid Time-Off, and Other Paid Leave, the "Time-Off Benefits").  As of the Petition Date, the Debtors estimate that they owe approximately $650,000 on account of Time-Off Benefits, substantially all of which will come due within the first 25 days after the Petition Date.  The Time-Off Benefits are included in the Debtors' ordinary payroll.  By this motion, the Debtors seek authority to pay any outstanding Time-Off Benefits and to continue offering and honoring Time-Off Benefits in the ordinary course of business on a postpetition basis.

92.    Certain states also require that employers such as the Debtors obtain Paid Family Leave insurance ("Paid Family Leave Insurance").  The Paid Family Leave Insurance is fully funded by the Debtors and provides wage replacement and job protection to Employees who require a leave of absence due to qualifying circumstances.  The Debtors' Paid Family Leave Insurance is administered by Lincoln Financial Group.  The premiums paid by the Debtors to Lincoln Financial Group on account of the Paid Family Leave Insurance are approximately $5,000 per month, and the amount due on account of the Paid Family Leave Insurance as of the Petition Date is included in the amounts due to Lincoln on account of their services in connection with the U.S. Short-Term Disability Benefits.

### O.    Additional Employee Programs

93.    In addition to the foregoing, the Debtors offer Employees the opportunity to participate in a range of ancillary benefits, including, but not limited to, the programs below (the "Additional Programs").  Each Additional Program has different requirements to qualify and is in addition to Employee Compensation and other benefits described herein.

- Sign-on Bonus.  Certain U.S. Employees are eligible to receive a bonus when they begin working for the Company (the "Sign-on Bonus Program").  As of the Petition Date, the Debtors estimate that they owe approximately $97,000 on account of the Sign-on Bonus Program, approximately $18,000 of which will come due within the first 25 day after the Petition Date.

- Additional U.S. Benefit Programs.  The Debtors also offer a range of additional ancillary benefits, including but not limited to, an employee assistance program, various allowances, tuition reimbursement, referral bonuses, contract completion bonuses, visa sponsorships, and relocation costs, for eligible U.S. Employees (the "Additional U.S. Benefit Programs").  The annual cost of the Additional U.S. Benefit Programs is approximately $300,000.  As of the Petition Date, the Debtors estimate that there is approximately $25,000 payable on account of the Additional U.S. Benefit Programs, substantially all of which will come due within the first 25 day after the Petition Date.

- Additional Canada Benefit Programs.  For Employees in Canada, the Debtors also offer a range of ancillary benefits, including but not limited to educational benefit for dependent children, family transportation benefit, occupational training benefit

37

for spouses, and a wheelchair benefit (the "Additional Canada Benefit Programs"). The annual cost of the Additional Canada Benefit Programs is approximately $88,000. As of the Petition Date, the Debtors estimate that there is approximately $8,000 payable on account of the Canada Benefit Programs, substantially all of which will come due within the first 25 day after the Petition Date.

- Additional U.K. Benefit Programs. For Employees in the United Kingdom, the Debtors offer a range of ancillary benefits, including but not limited to group income protection, death in service insurance, and study support (the "Additional U.K. Benefit Programs"). The annual cost of the Additional U.K. Benefit Programs is approximately $96,000. As of the Petition Date, the Debtors estimate that there is approximately $8,000 payable on account of the Additional U.K. Benefit Programs, substantially all of which will come due within the first 25 day after the Petition Date.

## III.   COBRA

94.     Pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), former Employees and their dependents who lose their health benefits have the right to choose to continue group health benefits provided by the Debtors' Health Benefit Plans for limited periods of time under certain circumstances such as voluntary or involuntary job loss, reduction in hours worked, transition between jobs, death, divorce, and other life events. Each month, certain former Employees pay either full or subsidized premiums for continuing their Health Benefits Plans through COBRA. As of the Petition Date, approximately 8 former Employees receive subsidized COBRA in connection with severance, and approximately 108 former Employees make full premium payments for coverage under COBRA. The Debtors' COBRA benefits are administered by HealthEquity. The administrative fees paid by the Debtors to HealthEquity for such services are approximately $700 per month, and the amount due on account of such services as of the Petition Date is included in the amounts due to HealthEquity on account of their services in connection with the U.S. FSAs.

**Basis for Relief**

I.  **Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Programs**

    A.  **Certain of the Employee Compensation and Benefits Are Entitled to Priority Treatment**

95.      Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the obligations under the Employee Compensation and Benefits Programs to priority treatment. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims, given priority under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, for (a) wages, salaries or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan).  To the extent that an Employee receives no more than $15,150 on account of claims entitled to priority, the relief sought with respect to such compensation only affects the timing of payments to Employees and should not affect the recoveries for general unsecured creditors.  Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.

    B.  **Payment of Certain Employee Compensation and Benefits Is Required by Law**

96.      The Debtors seek authority to pay the Deductions and Payroll Taxes to the appropriate third-party payees.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks.  Indeed, certain Deductions and Payroll Taxes are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf.  *See* 11 U.S.C. §§ 541(b)(1), (d).  Further, federal and state laws require

the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority.  26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell* v. *Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Deductions and Payroll Taxes may not be property of the Debtors' estates, the Debtors request authorization to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of their businesses.

97.     Similarly, state and foreign law require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these chapter 11 cases.

## II.     Payment of the Employee Compensation and Benefits Is Warranted Under Section 363(b)(1) of the Bankruptcy Code and the Doctrine of Necessity

98.     Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances.  *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc.* v. *James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  In so doing, these courts have found that sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

99.     Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also James A. Phillips, Inc.*, 29 B.R. at 397 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim."  *CoServ*, 273 B.R. at 497.

100.     Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.  *See In re C.A.F. Bindery, Inc*., 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization); *Ionosphere Clubs*, 98 B.R. at 176 (holding that a court may authorize payments of prepetition obligations under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity")).

101.     The Debtors submit that the payment of the Employee Compensation and Benefits Programs represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a) and 363(b) of the Bankruptcy Code.  Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the

operations of the Debtors' businesses to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their businesses and potentially diminishing stakeholder confidence in the Debtors' ability to successfully reorganize. The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to focus on stabilizing their businesses' operations. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefits, and related obligations, including the prepetition obligations pursuant to the Employee Compensation and Benefits Programs.

102.    In addition, the majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to satisfy their daily living expenses. Consequently, Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their obligations related thereto. Moreover, failure to satisfy such obligations will jeopardize Employee morale and loyalty at a time when Employee support is critical to the Debtors' businesses. Furthermore, if this Court does not authorize the Debtors to honor their various obligations under the insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. The loss of health care coverage will result in considerable anxiety for Employees (and likely attrition) at a time when the Debtors need such Employees to perform their jobs at peak efficiency.

103.    The importance of a Debtor's employees to its operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein.  *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re GTT Communications, Inc.*, Case No. 21-11880 (MEW) (MEW) (Bankr. S.D.N.Y. Nov. 30, 2021); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re GBG USA Inc.*, Case No. 21-11369 (MEW) (Bankr. S.D.N.Y. Sept. 1, 2021); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. July 17, 2020); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. June 23, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y June 17, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Sept. 4, 2019).[12]

104.    Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay any prepetition amounts accrued and unpaid on account of the Employee Compensation and Benefits Programs and to continue the Employee Compensation and Benefits Programs on a postpetition basis in the ordinary course of their businesses and consistent with past practices.

## III.    The Debtors Seek a Waiver of the Automatic Stay as It Applies to Workers' Compensation Claims

105.    Section 362(a)(1) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

106.    The Debtors seek authorization, under section 362(d) of the Bankruptcy Code, to permit Employees to proceed with their workers' compensation claims in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying the workers' compensation claims could have a detrimental effect on the Employee's financial well-being and Employee morale and lead to the departure of certain Employees who are critical at this juncture.  Such departures could cause a severe disruption in the Debtors' businesses to the detriment of all parties in interest.

**Processing of Checks and Electronic Fund Transfers Should Be Authorized**

107.    The Debtors expect to have sufficient funds to pay any amounts described in this motion in the ordinary course of their businesses by virtue of expected cash flows from the ongoing operations of their businesses and anticipated access to cash collateral and postpetition financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion; *provided that* sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

108.    Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."

For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

109.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

110.    Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with any such order), is intended as or should be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in

this motion or any order granting the relief requested by this motion, (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates, or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.

## **Motion Practice**

111.    This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated and a discussion of their application to this motion. Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

## **Notice**

112.    The Debtors will provide notice of this motion to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Proskauer Rose LLP, as counsel to MidCap Funding IV Trust, in its capacity as (i) administrative agent and collateral agent under the Debtors' prepetition asset-based lending facility, (ii)  administrative agent and collateral agent under the ABL DIP Facility, and (iii) ABL DIP Lender; (d) Morgan Lewis & Bockius LLP, as counsel to Crystal Financial LLC, in its capacity as administrative agent for the SISO Term Loan; (e) Alter Domus, in its capacity as administrative agent for the Tranche B; (f) Latham & Watkins, LLP, as counsel to Citibank N.A., in its capacity as 2016 Term Loan Agent; (g) Quinn Emanuel Urquhart & Sullivan, LLP, in its capacity as counsel to the putative 2016 Term Loan group; (h) Akin Gump Strauss Hauer & Feld, LLP, in its capacity as counsel to an ad hoc group of 2016 Term Loan lenders; (i) Paul Hastings LLP, as counsel to Jefferies Finance LLC, in its capacity as BrandCo agent and DIP agent; (j) Davis Polk & Wardwell LLP and Kobre & Kim LLP, in their capacity as

counsel to the ad hoc group of Term Loan DIP lenders and BrandCo lenders; (k) King & Spalding, LLP, in its capacity as counsel to Blue Torch Finance LLC, in its capacity as Foreign ABTL Facility administrative agent; (l) U.S. Bank National Association, as indenture trustee for the Debtors' pre-petition unsecured notes, and any counsel thereto; (m) the United States Attorney's Office for the Southern District of New York; (n) the Internal Revenue Service; (o) the Securities Exchange Commission; (p) the attorneys general for the states in which the Debtors operate; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

113.    No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A and Exhibit B**, respectively, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated:  June 15, 2022

*/s/ Paul M. Basta*
Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| REVLON, INC., *et al.*,[1] | ) |
| | ) Case No. 22-10760 (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) **Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING
THE DEBTORS TO (A) PAY PREPETITION
EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION,
AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE
EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to (i) pay certain prepetition employee wages, salaries, other compensation, and reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, (b) scheduling a final hearing to consider approval of the Motion on a final basis, and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having found that venue of this proceeding and the Motion

---

[1]   The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that

the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate

under the circumstances and no other notice need be provided; and this Court having reviewed the

Motion and having heard the statements in support of the relief requested therein at a hearing

before this Court (the "Hearing"); and this Court having determined that the legal and factual bases

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and

upon all of the proceedings had before this Court; and after due deliberation and sufficient cause

appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____,

2022, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order

on the Motion must be filed with the Court on or before _____p.m., prevailing Eastern Time, on

_____, 2022.

3.      The Debtors are authorized, but not directed, to continue and/or modify, change, or

discontinue the Employee Compensation and Benefits Programs (other than the LTIP and as set

forth below) all in accordance with historical practice and to honor and pay, in the ordinary course

and in accordance with the Debtors' prepetition policies and prepetition practices, any obligations

on account of the Employee Compensation and Benefits Programs, irrespective of whether such

obligations arose prepetition or postpetition; *provided that*, for the avoidance of doubt, the Debtors

will not pay any outstanding prepetition or postpetition claims with respect to the Employee

Reimbursable Expenses in advance of the date they come due.

4.      Nothing herein shall be deemed to authorize the payment of any prepetition amounts above the Priority Cap with respect to prepetition amounts owed on account of the Employee Compensation and Benefits Programs, except upon further order of this Court.

5.      The Debtors shall not make any payments to their Employees on account of the Non-Insider Cash TIP pursuant to this Interim Order; *provided* that nothing herein shall prejudice the Debtors' ability obtain such relief pursuant to the Final Order.

6.      The Debtors shall not make any payments to former employees on account of Non-Insider Severance Benefits pursuant to this Interim Order; *provided* that nothing herein shall prejudice the Debtors' ability obtain such relief pursuant to the Final Order.

7.      Before making any initial payments to any Employee under the Non-Insider Severance Benefits the Debtors shall provide five days' advance notice to the U.S. Trustee and the Ad Hoc Group of BrandCo Lenders of (a) the title of the Employee, (b) the amount of the payment to such Employee, and (c) the proposed payment date.  The Debtors shall supplement such notice to the U.S. Trustee and the Ad Hoc Group of BrandCo Lenders with five days' advance notice solely with respect to any additional recipients on an ongoing basis.

8.      Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due.

9.      Nothing in this Interim Order should be construed as approving any transfer pursuant to 11 U.S.C. § 503(c), and a separate motion will be filed for any requests that are governed by section 503(c); *provided* that nothing herein shall prejudice the Debtors' ability to seek approval for such relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

10.      No payment to any employee may be made to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code.  This Interim Order does not implicitly or

explicitly approve any bonus plan, incentive plan, severance plan or other plan covered by section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval for such relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

11.     The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to any insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court.

12.     Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of their businesses and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program.  Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

13.     Notwithstanding anything to the contrary in this Interim Order, nothing contained in the Motion or this Interim Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that

4

any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

14.    The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, whether such checks or other requests were submitted prior to, on, or after, the Petition Date, provided that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.

15.    The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Employee Compensation and Benefits Programs to the extent payment thereof is authorized pursuant to the relief granted herein.

16.    The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

17.      Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

18.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

19.      The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

20.      The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVLON, INC., *et al.*,[1] | ) Case No. 22-10760 (___) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re:  Docket No. __** |

**FINAL ORDER (I) AUTHORIZING**
**THE DEBTORS TO (A) PAY PREPETITION**
**EMPLOYEE WAGES, SALARIES, OTHER COMPENSATION,**
**AND REIMBURSABLE EMPLOYEE EXPENSES AND (B) CONTINUE**
**EMPLOYEE BENEFITS PROGRAMS AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"), (a) authorizing the Debtors to (i) pay certain prepetition employee wages, salaries, other compensation, and reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto, and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that

---

[1]   The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955.  Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  One New York Plaza, New York, NY 10004.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted on a final basis as set forth herein.

2.      The Debtors are authorized, but not directed, to continue and/or modify, change, or discontinue the Employee Compensation and Benefits Programs (other than the LTIP and as set forth below), all in accordance with historical practice and to honor and pay, in the ordinary course and in accordance with the Debtors' prepetition policies and prepetition practices, any obligations on account of the Employee Compensation and Benefits Programs, irrespective of whether such obligations arose prepetition or postpetition.

3.      Before making any initial payments to any Employee under the Non-Insider Severance Benefits the Debtors shall provide five days' advance notice to the U.S. Trustee and the Ad Hoc Group of BrandCo Lenders of (a) the title of the Employee, (b) the amount of the payment to such Employee, and (c) the proposed payment date. The Debtors shall supplement such notice to the U.S. Trustee and the Ad Hoc Group of BrandCo Lenders with five days' advance notice solely with respect to any additional recipients on an ongoing basis.

4.      Nothing in this Final Order authorizes the Debtors to accelerate any payments not otherwise due.

5.      Nothing in this Final Order should be construed as approving any transfer pursuant to 11 U.S.C. § 503(c), and a separate motion will be filed for any requests that are governed by section 503(c); *provided* that nothing herein shall prejudice the Debtors' ability to seek approval for such relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

6.      No payment to any employee may be made to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code.  This Final Order does not implicitly or explicitly approve any bonus plan, incentive plan, severance plan or other plan covered by section 503(c) of the Bankruptcy Code; *provided* that nothing herein shall prejudice the Debtors' ability to seek approval for such relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

7.      The Debtors shall not make any non-ordinary course bonus, incentive, or severance payments to any insiders (as such term is defined in section 101(31) of the Bankruptcy Code) without further order of this Court.

8.      Pursuant to section 362(d) of the Bankruptcy Code, (a) Employees are authorized to proceed with their workers' compensation claims in the appropriate judicial or administrative forum under the Workers' Compensation Program, and the Debtors are authorized to pay all prepetition amounts relating thereto in the ordinary course of their businesses and (b) the notice requirements pursuant to Bankruptcy Rule 4001(d) with respect to clause (a) are waived. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program and any such claims must be pursued in accordance with the applicable Workers' Compensation Program.  Payment on account of any recoveries obtained in connection with a claim brought pursuant to this paragraph is limited to the terms and conditions of the applicable Workers' Compensation Program, including with regard to any policy limits or caps.

3

9.      Notwithstanding anything to the contrary in this Final Order, nothing contained in the Motion or this Final Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

10.     The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, whether such checks or other requests were submitted prior to, on, or after, the Petition Date, provided that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic

payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

11.     The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the Employee Compensation and Benefits Programs to the extent payment thereof is authorized pursuant to the relief granted herein.

12.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

14.     The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

15.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE