Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTORS TO PAY PREPETITION CLAIMS OF (A)  LIEN CLAIMANTS,**
**(B) IMPORT CLAIMANTS, (C) 503(B)(9) CLAIMANTS, (D) FOREIGN VENDORS,**
**AND (E) CRITICAL VENDORS, (II) CONFIRMING ADMINISTRATIVE EXPENSE**
**PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully state as follows in support of this motion:

---

[1] The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955.  Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  One New York Plaza, New York, NY 10004.

## Relief Requested[2]

1.     By this motion, the Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing, but not directing, the Debtors to pay in the ordinary course of their businesses prepetition claims held by certain (i)  Critical Vendors, (ii) Foreign Vendors, (iii) Lien Claimants, (iv) Import Claimants, and (v) 503(b)(9) Claimants (each as defined below and, collectively, the "Vendor Claimants"), collectively, in an amount not to exceed $40.4 million on an interim basis and $79.4 million on a final basis, (b) confirming the administrative expense priority status of Outstanding Orders (as defined below), and (c) granting related relief.  In addition, the Debtors request that this Court schedule a final hearing within approximately 25 days from the date hereof (the "Petition Date") to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2.     The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

2     A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Robert M. Caruso, Chief Restructuring Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration"), filed contemporaneously herewith.

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The bases for the relief requested herein are section 105(a), 363, 503(b), 1107(a),
and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"),
Bankruptcy Rules 6003 and 6004, and Rule 9013-1(a) of the Local Bankruptcy Rules for the
Southern District of New York (the "Local Rules").

## Introduction

5.      The Debtors produce and sell over 8,000 stock keeping units ("SKUs") (*e.g.,*
lipsticks, eye pencils, creams, eyeshadows, mascaras, fragrances, etc.) using various unique
cosmetic technologies, equipment, and chemicals.  Many of these cosmetic products require 35 to
40 individual raw materials to manufacture.  The Debtors do not maintain large inventories of
these materials, and as a result, the inability to continuously source even one ingredient results in
the shutdown of production of all related SKUs.  As of the Petition Date, manufacturing facilities
in Oxford, North Carolina and Jacksonville, Florida have reduced production significantly and will
be required to shut down temporarily within two weeks due to a lack of inventory, at a time those
facilities need to be increasing production in time for the critical holiday and new product
development ("NPD") season.  A critical manufacturing facility of a Non-Debtor affiliate in
Mexico that supplies key products (including ColorSilk, fragrance, body mists, CND, Cutex, and
others) to the Debtors and their subsidiaries around the world has already temporarily closed due
to lack of inventory.

6.      If the Debtors are unable to acquire goods from the critical vendors to fulfill actual
and projected orders to support the holiday season and for their NPD launches (which has already
begun), the Debtors will experience a corresponding loss of revenues based on an inability to meet
existing demand.  If the Company cannot rapidly resume production, they will experience a loss

of at least $87 million in committed holiday sales and $94 million in NPD sales in Q4 alone, that
would be directly attributable to their inability to fulfill customer demand. Separately, the Debtors'
current "fill rate," a metric used to track the Debtors' ability to fulfill actual orders, is currently
less than 70% for certain channels, compared to an industry average of approximately 90%. In
other words, due primarily to their inability to source a sufficient and regular supply of raw
materials, the Debtors are currently unable to timely fill nearly one-third of customer demand for
their products. If the Debtors continue to fail to deliver their products to their customers—some
of the largest and most well-known retailers—on time and in full, there is a material risk that these
customers will simply fill capacity with goods from the Debtors' competitors—space which the
Debtors risk losing when retailers reset their annual shelf-space allocations in September 2022—
causing irreparable and potentially irreversible damage to the Debtors and their estates.

7.      The Debtors' production and sale of these products depends entirely on the
uninterrupted flow of materials, products, and other goods through their supply chain and
distribution network, including the purchase, import, storage, and shipment of the Debtors'
merchandise and other personal property. The vendors and suppliers that comprise the Debtors'
supply chain are located around the world. Goods sold by these vendors and suppliers require
substantial transport times to reach the Debtors. In recent months, global freight capacity has
become even more scarce due to incremental labor costs, increased demand, and the COVID
shutdown, resulting not only in increased costs to ship goods from overseas, but also in increased
shipping lead-times. In 2019, shipping components from China to the United States took the
Debtors four to six weeks from placement of an order, and cost approximately $2,000 per
container. Today, the same process takes eight to twelve weeks and costs four times more. The
result is that, even if the Debtors were able to switch to alternative suppliers for critical chemicals

and other components (which, with respect to the Vendor Claimants discussed herein, they are

not), there would be a significant (and devastating) lag created in their supply chain.

8.      In addition to the shipping lead-time issues, the Debtors would face substantial

operational delays in connection with the replacement of many of the Vendor Claimants.  Many

of the Debtors' goods are regulated by the FDA for human use, and the ingredients and chemicals

used in the Debtors' products undergo a lengthy and rigorous testing process, taking approximately

six months per item, to ensure their quality and safety.  Similarly, the containers (*e.g.,* lipstick

cartridges, fragrance glass, printed plastic, and paper board) in which the Debtors' finished goods

are packaged generally require specialized tooling and specifications such as molds and print plates

that could not be easily, quickly, or cheaply replicated with alternative suppliers.  While cost and

timing vary, the Debtors estimate that sourcing alternate supply of these packaging materials

would cost hundreds of thousands of dollars, and take six months or more, per item.

9.      The debtors are also high-volume users of nearly all of the ingredients and

components supplied by the Vendor Claimants.  Due to industry-wide constraints in many of the

products used by the Debtors in the manufacture of their goods, including resins, paper board

products, corrugated cardboard products, label substrates, and silicones, among others, the Debtors

would simply be unable to quickly source alternative supply of these goods at the volumes they

require without creating substantial supply chain disruption and attendant loss of manufacturing

capacity.

10.      Like the vendors of materials that go directly into the manufacture of finished

products (the "Direct Procurements"), the Debtors also rely on certain specialized and highly

skilled vendors of marketing, advertising, and enterprise communication services, as well as in-

store merchandising services, that drive sales or facilitate the Debtors' operational capabilities (the

5

"Indirect Procurements").  The Debtors' Critical Vendors in this category include vendors that create promotional displays, digital advertising, and graphic designs.  These Critical Vendors are the backbone of the Debtors' brand support and marketing efforts.  The Debtors' current marketing vendors have developed a strong understanding of the Debtors' businesses, products, and marketing strategies.  As a result, replacing these vendors would take substantial lead times and cause distraction to the Debtors' management team at a critical juncture.  Additionally, the Debtors' current advertising vendors honor their historic rates on new projects.  The Debtors believe that replacement vendors would charge current, higher, market rates.  Ultimately, if the Debtors are unable to retain the services of their current critical marketing and advertising vendors, more money and time may be spent on replacement service providers that may not be able to successfully execute their marketing campaigns.

11.     Certain digital advertising platforms are crucial for the Debtors to reach their target customers in particular demographics.  These vendors simply cannot be replaced given their scale and influence in the market.  The digital platforms also provide the Debtors with unique and irreplaceable market data, as the Debtors are able to directly gauge and track consumer interest in particular products through the number of clicks on their advertised products.  Given the relatively small proportion of revenues the Debtors represent to these platforms, they could easily refuse business with the Debtors going forward for non-payment of prepetition amounts.

12.     Another significant category of Critical Vendors in the Indirect Procurement segment are vendors of information technology.  As with any company of the Debtors' scale, information technology and enterprise connectivity software are necessary for the operation of the Debtors' businesses.  These digital services allow the Debtors to store information to the cloud and communicate information among the Debtors' various businesses in an integrated manner.

13.    The Debtors' prepetition liquidity challenges have significantly hindered their ability to make on-time payments to the vast majority of their Vendor Claimants.  Poor payment history, coupled with substantial restrictions in supply for goods globally, has caused many of the Debtors' vendors to prioritize other customers who are able to pay more quickly and more reliably.  In recent months, these consistent issues have resulted in over 75% of the Debtors' Critical Vendors (a) cancelling trade credit with the Debtors, (b) cancelling the Debtors' outstanding purchase orders in favor of higher offers, and/or (c) placing the Debtors on cash on delivery or cash in advance terms as a result of substantial prepetition unpaid invoices.  In the last 72 hours alone, the Company received notice that approximately 30 additional vendors have either stopped shipping product to the Debtors or placed the Debtors on cash in advance terms.

14.    Given the current state of the Debtors' supply chain, discussed above, and strong competition for market share, it is critical that the Debtors' relationships with their existing vendors begin to normalize immediately, and within the first 30 days of this case, in order to stabilize the Debtors' operations, restart and ramp up manufacture of all of the Debtors' SKUs in anticipation of the critical Q4 holiday season, and maximize value for the benefit of all stakeholders.  The Debtors anticipate that the relief requested herein will lead directly to (a) increased liquidity through the provision of trade terms and (b) increased revenue as the Debtors are able to restart the manufacture of products that are currently not being produced, and fulfill orders that are not being filled, as a result of lack of supply.

15.    As of the Petition Date, the Debtors owe approximately $130 million in total accounts payable to the Debtors' trade creditors.  By this motion, the Debtors seek authority, but not direction, to pay only the amounts necessary to preserve and maximize the value of their estates in the reasonable exercise of their business judgment, not to exceed $40.4 million on an interim

7

basis and $79.4 million on a final basis on account of prepetition claims held by certain Vendor

Claimants and accrued in the ordinary course of their businesses (collectively, the "Vendor

Obligations").  Of these amounts, the relief sought per Vendor Claimant category on an interim

and final basis is as follows:

| Vendor Category | Interim Relief (mm) | Final Relief (mm) |
|---|---|---|
| Lienholder Claimants | $2 | $3 |
| Import Claimant | $1 | $1 |
| 503(b)(9) Claimants | $9 | $24 |
| Foreign Vendors | $8 | $11 |
| Elizabeth Arden UK Ltd. | $0.4 | $0.4 |
| Critical Vendors (Domestic) | $20 | $40 |
| **Total** | **$40.40** | **$79.40** |

16.    If granted the requested relief, the Debtors would only pay these amounts in

accordance with the agreed upon budget for the Debtors' postpetition financing facilities, and

subject to the limitations set forth in the proposed interim and final orders.  Rather than simply pay

the Vendor Obligations outright, subject to the Court's approval, the Debtors intend to negotiate

with the Critical Vendors to (a) require the reinstatement of normalized trade terms and (b)

negotiate compromises on the outstanding amount of prepetition payables in exchange for

payments of prepetition amounts.  Following these negotiations, the Debtors intend to apply their

business judgment and discretion on a case-by-case basis with respect to actual Vendor Obligations.[3]

## I.    Critical Vendors

17.    As discussed above, the Debtors' ability to deliver their products depends on their access to and relationships with a limited network of critical domestic and international vendors and suppliers who cannot be easily or quickly replaced.  As a direct result of the Debtors' current status with many of these vendors, most of these vendors have stopped supplying, or have threatened to stop supplying, critical ingredients and other components to the Debtors within the last six months, resulting in the shutdown of manufacturing operations.  In the last 72 hours alone, the Company received notice that approximately 30 additional vendors have either stopped shipping product to the Debtors or placed the Debtors on cash in advance terms.

18.    With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting procurement managers and operations personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, among other things, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' businesses as going-concerns.  In this process, the Debtors considered a variety of factors, including:

- the negative impact of not obtaining an individual component or material;

- whether a vendor is a sole-source, limited-source, or high-volume supplier

---

[3]    Notwithstanding the relief requested herein, the Debtors reserve all of their rights and remedies under the Bankruptcy Code and other applicable law to pursue any cause of action against any Vendor Claimants on account of, among other things, any violation of the automatic stay pursuant to section 362(a)(6) of the Bankruptcy Code.

of goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

- whether the Debtors would be able to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- whether replacing a vendor would create safety testing and regulatory delays;

- whether replacing a vendor would require expenditures and delay related to specialized tooling to manufacture the Debtors' products;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- whether the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether the vendor is currently refusing to supply the Debtors with product, or is refusing to do so without cash up front; and

- whether failure to pay a particular vendor could result in contraction of trade terms.

19.     Through this analysis, and as set forth in the First Day Declaration, the Debtors identified domestic vendors (collectively, the "Critical Vendors") that supply either (i) Direct Procurements or (ii) Indirect Procurements (collectively, the "Critical Products and Services")

that, in each case, are critical to their businesses and operations and fulfill one or more of the criteria listed above.

20.      The Critical Products and Services are the most essential to the Debtors' go-forward operations.  The Debtors obtain the Critical Products and Services from this limited number of highly-specialized vendors.

21.      In sum, the Debtors cannot afford a disruption to their flow of merchandise and the services that enable their monetization, or to the Debtors' general operations, at this critical juncture in these chapter 11 cases.  The Debtors rely on timely and frequent delivery of their Critical Products and Services and any interruptions would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, customer base, and market share.  Such harm would far outweigh the cost of payment of the Critical Vendor Claims.

## II.      Foreign Vendor Claims

22.      A critical component of the Debtors' supply chain involves business dealings with foreign vendors (collectively, the "Foreign Vendors"), located across the globe, including in Canada, the United Kingdom, the Netherlands, France, Norway, Colombia, Israel, Turkey, Australia, New Zealand, Iceland, Mexico, Spain, Japan, Switzerland, Chile, Belgium, China, Vietnam, Brazil, Singapore, Germany, South Africa and Italy, among other places.  Many of these critical Foreign Vendors supply products and services to the Debtors that are crucial to the Debtors' ongoing operations in both the U.S. and abroad.  In some instances, the Debtors represent a material portion of the Foreign Vendors' business.  Without any payment of past due amounts, the Foreign Vendors' go-forward business could fail, which in turn, will jeopardize the integrity of the Debtors' supply chain and their ability to meet customer orders.

23.     Foreign suppliers often have skeptical reactions to the United States bankruptcy process because many of them are unfamiliar with chapter 11 cases and the implications for the Debtors' on-going ability to do business and pay for goods while they are in chapter 11. Accordingly, nonpayment of prepetition claims may cause Foreign Vendors to take other precipitous actions, including delaying shipments until more certainty develops with respect to the Debtors' reorganization.

24.     Additionally, if prepetition claims held by the Foreign Vendors (the "Foreign Vendor Claims") are not paid, the Foreign Vendors may take action against the Debtors based upon an erroneous belief that Foreign Vendors are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code.  Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often a fruitless and costly exercise.  In the absence of enforcement of the automatic stay, the Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them.

25.     In light of these consequences, the Debtors believe that payment of Foreign Vendor Claims on the terms set forth herein is necessary to avoid disruption of the Debtors' operations during these chapter 11 cases.  The Debtors' estimate of the Foreign Vendor Claims pale in comparison to the potential damage to the Debtors' businesses if the Debtors were to experience significant delays in the shipment of products.  Therefore, the Debtors, their estates, and their stakeholders would benefit from the Debtors' payments to the Foreign Vendors.

26.     As of the Petition Date, the Debtors owe approximately $19 million on account of their foreign vendors' accounts payables.  By this Motion, the Debtors are seeking authority, but

not direction, to pay only $11 million of that amount on account of Foreign Vendors Claims, $8

million of which will become due within the first 25 days of these chapter 11 cases.

### III.    Critical UK Claims

27.    Debtor Elizabeth Arden (UK) Ltd. ("<u>EAUK</u>") owes approximately $400,000 on

account of prepetition claims to its vendors and other unsecured creditors.  As set forth in the Baird

Declaration, attached hereto as **Exhibit C**, upon the commencement of U.S. chapter 11

proceedings for EAUK, prepetition unsecured creditors of EAUK may exercise remedies against

EAUK up to and including the winding up of EAUK as an operating entity.  EAUK is the Debtors'

primary operating entity in the UK and it does not trade or otherwise carry on any business in the

United States.  Further, if any of its creditors are unpaid, there is risk that enforcement actions in

that jurisdiction can materiality impair the Debtors' operations.  The forced liquidation of EAUK

would cause irreparable harm to the Debtors' business because EAUK generates $60 million in

annual gross sales for the Debtors.  Losing that presence and stronghold in the UK would not only

be detrimental to the Elizabeth Arden brand, but to the Debtors as a whole.  Unlike a chapter 11

restructuring under the Bankruptcy  Code, a wind up under English insolvency law is a terminal

process, and EAUK may become subject to a validation order under which EAUK would not be

able to make any payments or dispose of any assets without the permission of the English court.

28.    While the commencement of recognition proceedings in the UK may prevent that

outcome, the cost of those proceedings would be far more than paying the approximately $400,000

to satisfy the outstanding prepetition obligations owed to EAUK's vendors.  All funds paid to

EAUK's creditors will be paid by EAUK, or by its non-debtor foreign affiliates. By this motion,

the Debtors seek authority, but not direction, to satisfy these claims in full upon entry of the

proposed Interim Order.

IV.    **The Lien Claimants**

29.    The Debtors' ability to deliver products in a timely manner is crucial to their financial performance and depends on a seamless interaction with various third-party service providers.    The Debtors depend on certain vendors to transport and store their products. After leaving overseas factories, the Debtors' products go to a consolidated ocean freight station or directly to port before sailing on freight vessels to receiving ports throughout the world.    The Debtors also depend on a variety of air freight carriers to transport their products. From the air and sea ports the products are delivered by truck to the Debtors' facilities across North America or to third-party warehouses (the "Warehouseman"), where products are stored until they are utilized to fulfill a retail, wholesale, or e-commerce customer order.    The Debtors also regularly use third-party delivery companies to transport certain products between their facilities, and to deliver finished goods directly to their customers' facilities.

30.    As discussed above, the Debtors utilize multiple carriers (collectively, the "Shippers" and together with the Warehouseman, the "Lien Claimants") to transport their merchandise (a) from the consolidator or the overseas facility to port facilities, (b) between facilities for the reassignment of goods, and (c) to the facilities of the Debtors' customers.  There is significant risk that if the Debtors stop all payments to the Lien Claimants, the Lien Claimants will discontinue shipping and warehousing services, and will refuse to release the Debtors' products.

31.    Under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession to secure payment of the charges or expenses incurred in connection with the lien charges, including shipping and storage charges (collectively,

the "Lien Charges").[4]  Accordingly, if the Lien Charges remain unpaid, the Lien Claimants are

likely to attempt to assert such possessory liens, and may refuse to deliver or release goods in their

possession until their claims are satisfied and their liens redeemed.  The Lien Claimants'

possession (and retention) of the Debtors' materials and products would disrupt the Debtors'

operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  The cost

of such disruption to the Debtors' estates would likely be greater than the applicable Lien Charges.

As of the Petition Date, the Debtors owe approximately $3 million on account of the Lien Charges

and claims held by the Lien Claimants, $2 million of which will come due and owing within 25

days after the Petition Date.

## V.    The Import Claimant

32.    As described in greater detail below, in the ordinary course of their businesses,

the Debtors import critical materials and products from suppliers around the world.  In connection

with the import of goods, the Debtors utilize a licensed custom broker (the "Import Claimant"),

who in turn pays various charges on behalf of the Debtors to clear customs, including customs

duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar

obligations (collectively, the "Import Charges").  In addition, the Debtors pay the Import Claimant

annual fees for their customs brokerage services (together with the Import Charges, the "Import

Expenses"), which services are integral to the Debtors' operations.  Absent such payment, parties

to whom the Debtors ultimately owe Import Charges may interfere with the transportation of the

imported goods.  Any interruption in the flow of imported goods will deprive the Debtors of

---

[4]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a
lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the date
of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal charges, and
for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their
sale pursuant to law."  U.C.C. § 7-307(a) (2003).

materials and products necessary to meet the needs of the Debtors' wholesale and online retail customers.  As of the Petition Date, the Debtors owe approximately $1 million  on account of prepetition claims held by the Import Claimant.

**VI.     The 503(b)(9) Claimants**

33.     The Debtors may have received in the ordinary course of their businesses certain goods from various foreign and domestic vendors (collectively, the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date.  As further described below, many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term executory contracts but, rather, the Debtors obtain inventory, goods, or other materials from such claimants on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims (each, a "503(b)(9) Claim").  Such refusal could negatively affect the Debtors' estates as the Debtors' businesses are dependent on the steady flow of goods through their supply chain.  As of the Petition Date, the Debtors owe approximately $24 million  on account of 503(b)(9) Claims, $9 million of which will come due and owing within 25 days after the Petition Date.

**VII.     Trade Terms Conditions.**

34.     Subject to the Court's approval, the Debtors intend to pay the Vendor Obligations as set forth herein.  In return for paying the Vendor Obligations either in full or in part, the Debtors propose that the Vendor Claimants be required to provide favorable trade terms for the postpetition procurement of goods and services from the Vendor Claimants.  Specifically, the Debtors seek authorization to condition payment of Vendor Obligations upon each Vendor Claimant's agreement to continue—or recommence—supplying goods and services to the Debtors in accordance with trade terms (including credit limits, pricing, timing of payments, availability, and

other terms) *at least* as favorable to the Debtors as those in place during the twelve months prior to the Petition Date, or on terms satisfactory to the Debtors in their reasonable discretion (the "Customary Terms").  The Debtors also intend to negotiate for discounts on prepetition payables in exchange for critical vendor payments.

35.      In addition, the Debtors request that if a payee, after receiving a payment under an order approving this motion, ceases to provide Customary Terms or to continue to provide goods to the Debtors, then the Debtors may, in their reasonable discretion, deem such payment to apply instead to any postpetition amount that may be owing to such payee or treat such payment as an avoidable unauthorized postpetition transfer of estate property.  A sample of a trade agreement with Customary Terms is attached herein as **Exhibit D**.

## VIII.   Outstanding Orders.

36.      Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors may have ordered goods which will not be delivered until after the Petition Date (collectively, the "Outstanding Orders").  To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.  To prevent any disruption to the Debtors' business operations and avoid unnecessary litigation, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of their businesses, subject to the limitations set forth in the interim order and final order.

## Basis for Relief

**I.    Payment of the Vendor Obligations as Provided Herein Is a Sound Exercise of the Debtors' Business Judgment and a Valid Exercise of the Debtors' Fiduciary Duties**

37.    Courts in this district generally acknowledge that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *Armstrong World Indus., Inc.* v. *James A. Phillips, Inc.* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).   In so doing, these courts have found that sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

38.    Pursuant to section 363(b) of the Bankruptcy Code, courts may authorize payment of prepetition obligations where a sound business purpose exists for doing so.  *See Ionosphere Clubs Inc.*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification); *see also James A. Phillips, Inc.*, 29 B.R. at 394-97 (relying upon section 363 as a basis to allow a contractor to pay the prepetition claims of suppliers who were potential lien claimants).  Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the pre-plan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.  The District Court for the Southern District of New York recently opined that deference to a debtor's business judgment decision to pay its critical vendors is "especially appropriate" where, absent such authority to do so, a debtor would need to spend significant time and resources to respond to hundreds of its vendors in open court.  *See In re Windstream Holdings Inc.*, No. 19-CV-4854 (CS) (S.D.N.Y April 3, 2020) [Docket No. 11].

39.     Courts also may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.   Section 105(a) codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).   Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses.  *See In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *see also In re Fin. News Network Inc.*, 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization); *Ionosphere Clubs*, 98 B.R. at 176 (holding that a court may authorize payments of prepetition obligations under section 105(a) of the Bankruptcy Code pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity")).

40.     The relief requested herein is appropriate and warranted under the circumstances. The authority to satisfy the Vendor Obligations in the initial days of these chapter 11 cases without disrupting the Debtors' operations will maintain the integrity of the Debtors' supply chain, facilitate the sale of inventory and the Debtors' accounts receivable collection, and allow the Debtors to efficiently administer these chapter 11 cases.  Failure to pay the Vendor Obligations could potentially destroy value that would otherwise inure to the benefit of the Debtors' estates. Where, as here, debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and other jurisdiction have routinely authorized payments similar to those described in this motion. *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr. S.D.N.Y. May 18, 2022); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL)

(Bankr. S.D.N.Y. June 10, 2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr.

S.D.N.Y. June 9, 2020); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr.

S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr.

S.D.N.Y. Aug. 7, 2019).[5]

41.     Allowing the Debtors to pay the Vendor Obligations as set forth herein is especially

appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11

of the Bankruptcy Code—preserving going concern value and maximizing the value of property

available to satisfy creditors. *See Bank of Am. Nat'l Trust Savs. Ass'n* v. *203 N. LaSalle St. P'Ship.*,

526 U.S. 434, 453 (1999).  Based on these circumstances, the Debtors submit that the relief

requested herein represents a sound exercise of the Debtors' business judgment, is necessary to

avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under

sections 105(a) and 363(b) of the Bankruptcy Code.

## II.    Failure to Make Timely Payment of the Lien Charges Would Threaten the Debtors' Ability to Operate and May Subject the Debtors' Assets to the Perfection of Liens

42.     As noted above, certain Lien Claimants may be entitled under applicable

non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their

possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an

attempt to secure payment of their prepetition claim.  Under section 362(b)(3) of the Bankruptcy

Code, the act of perfecting such liens, to the extent consistent with section 546(b) of the

Bankruptcy Code, is expressly excluded from the automatic stay.[6]  As a result, the Debtors

---

[5]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

[6]    *See* 11 U.S.C. § 546(b)(1)(providing that a debtor's lien avoidance powers "are subject to any generally applicable law that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection").

anticipate that certain of the Lien Claimants may assert or perfect liens, simply refuse to turn over goods in their possession, or stop performing their ongoing obligations. Even absent a valid lien, to the extent certain Lien Claimants have possession of the Debtors' inbound materials or products or outbound products, mere possession or retention would disrupt the Debtors' operations.

43.    Furthermore, paying the Lien Claimants should not impair unsecured creditor recoveries in these chapter 11 cases. In instances where the amount owed to Lien Claimants is less than the value of the goods that could be held to secure a shipping, such parties may be fully-secured creditors of the Debtors' estates. In such instances, payment now only provides such parties with what they might be entitled to receive under a plan of reorganization, only without any interest costs that might otherwise accrue during these chapter 11 cases. Conversely, all creditors will benefit from the seamless transition of the Debtors' operations into chapter 11 and the ultimate delivery and sale of the Debtors' products to their customers.

44.    Where debtors have shown that the payment of prepetition claims is critical to maximize the value of their estates, courts in this district and other jurisdictions have routinely authorized payments to shippers under similar circumstances. *See, e.g.*, *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y. Oct. 1, 2021) (authorizing payment of certain lien claimants' prepetition claims when lien claimants are able to assert possessory liens on the debtors' goods in the event of non-payment); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020 ); *In re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 7, 2019).

### III.    The Court Should Authorize the Payment of Import Expenses

45.    Further, most of the Import Expenses, if not all, would likely be paid in full under any plan of reorganization pursuant to section 507(a)(8) of the Bankruptcy Code, which provides eighth priority status to the claims of a governmental unit based on a customs duty arising out of the importation of certain merchandise.  Thus, payment of the Import Expenses as proposed in this motion merely accelerates the distribution that the import providers would receive in any event upon confirmation of a plan.  Therefore, granting this motion with respect to the Import Expenses may have no substantial effect on the relative distribution of the estates' assets.

46.    For these reasons, courts have authorized the payment of prepetition import claims under similar circumstances in recent retail chapter 11 cases.  *See, e.g.*, *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10, 2020); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (authorizing payment of customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar obligations to third party vendor); *In re BCBG Max Azria Glob. Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar.  29, 2017) (approving payment of import charges incurred in connection with transportation of merchandise).

### IV.    The Court Should Authorize the Payment of 503(b)(9) Claims

47.    Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.

48.     Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation.  As administrative claims incurred in the ordinary course of their businesses, the Debtors believe that they may be able to pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21–23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval.").  The timing of such payments also lies squarely within the Court's discretion. *See In re Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

49.     The Debtors' ongoing ability to obtain materials and products as provided herein is key to their reorganization and necessary to preserve the value of their estates.  Absent the payment of some 503(b)(9) Claims at the outset of these chapter 11 cases—which may merely accelerate the timing of payment and not the ultimate treatment of such claims—the Debtors could be denied access to materials and products necessary to maintain the Debtors' business operations and maximize the value of the Debtors' estates.

50.     Instead of satisfying all 503(b)(9) Claims after confirmation of a plan of reorganization (at which time such payments may be too late to benefit the Debtors' estates), the Debtors seek authority to pay some of these claims in the ordinary course of their businesses, while such payments can still induce 503(b)(9) Claimants to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  Failure to honor these claims in the ordinary course of their businesses may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  Such vendors could accelerate or eliminate favorable trade

terms. The payment of certain 503(b)(9) Claims is in the best interests of the Debtors' estates because favorable trade terms will prevent foreseeable disruptions to the Debtors' operations, and the Court's time and resources will not be burdened with numerous motions from individual vendors requesting payment on account of their administrative priority expense claims. Such costs and distractions could impair the Debtors' ability to stabilize their operations at this critical juncture to the detriment of all stakeholders.

51. For these reasons, courts in this district and others have regularly authorized the payment of claims arising under section 503(b)(9) of the Bankruptcy Code in the ordinary course of debtors' businesses. *See, e.g.*, *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (authorizing payment of section 503(b)(9) claims); *In re Aegean Marine Petroleum Network Inc.*, Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Nov. 9, 2018) (same); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (same); *In re Cenveo, Inc.*, Case No 18-22178 (RDD) (Bankr. S.D.N.Y. Mar. 8 2018) (same); *In re BCBG Max Ariza Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 29, 2017) (same).

## V.    The Court Should Authorize the Payment of the Foreign Vendor Claims and Critical Vendor Claims

52. As described above, the Debtors require a steady stream of products and services from their Critical Vendors and Foreign Vendors to ensure the continued operation of their businesses. The Debtors' failure to pay the Critical Vendor Claims and Foreign Vendor Claims as set forth herein could harm the Debtors' ability to obtain necessary supplies or services, including critical utilities services, prevent the Debtors from preserving favorable trade terms, and increase the likelihood for significant disruptions to the Debtors' operations. This failure could,

in turn, jeopardize numerous customer relationships and could significantly impair the value of the

Debtors' businesses.

53.    Indeed, reflecting the recognition that payment of prepetition claims of certain

critical vendors and foreign vendors, in fact, is both critical to a debtor's ability to preserve

going-concerns and maximize creditor recovery—thereby increasing prospects for a successful

reorganization—courts in this district routinely grant relief consistent to that which the Debtors

are seeking herein.  *See, e.g.*, *In re Pareterum Corporation*, Case No. 22-10615 (LGB) (Bankr.

S.D.N.Y. May 18, 2022); *In re ABC Carpet Co., Inc.*, Case No. 21-11591 (DSJ) (Bankr. S.D.N.Y.

Oct. 1, 2021); *In re Centric Brands Inc.*, Case No. 20-22637 (SHL) (Bankr. S.D.N.Y. June 10,

2020); *In re Avianca Holdings S.A.*, Case No. 20-11133 (MG) (Bankr. S.D.N.Y. June 9, 2020); *In*

*re LSC Communications, Inc.*, Case No. 20-10950 (SHL) (Bankr. S.D.N.Y. May 12, 2020); *In re*

*Barneys New York, Inc.*, Case No. 19-36300 (CGM) (Bankr. S.D.N.Y. Aug. 7, 2019).

## VI.    The Court Should Confirm that Outstanding Orders Are Administrative Expense Priority Claims and that Payment of Such Claims Is Authorized

54.    Pursuant to section 503(b) of the Bankruptcy Code, most obligations that arise in

connection with the postpetition delivery of goods and services, including goods ordered

prepetition, are administrative expense priority claims because they benefit the estate postpetition.

*See* 11 U.S.C. § 503(b)(1)(A) (providing that the "actual [and] necessary costs and expenses of

preserving the estate" are administrative expenses); *see also In re John Clay & Co.*, 43 B.R. 797,

809–10 (Bankr. D. Utah 1984) (holding that goods ordered prepetition but delivered postpetition

are entitled to administrative priority).  Thus, the granting of the relief sought herein with respect

to the Outstanding Orders will not provide the suppliers with any greater priority than they would

otherwise have if the relief requested herein were not granted, and will not prejudice any other

party in interest.

55.     Absent such relief, however, the Debtors may be required to expend substantial time and effort reissuing the Outstanding Orders to provide the suppliers with assurance of such administrative priority.  Any disruption to the continuous and timely flow of goods to the Debtors could result in substantial delays in the Debtors' operations, which could lead to dissatisfied customers and reduced sales.  Accordingly, the Debtors submit that the Court should confirm the administrative expense priority status of the Outstanding Orders and should authorize the Debtors to pay the Outstanding Orders in the ordinary course of their businesses.

### Processing of Checks and Electronic Fund Transfers Should Be Authorized

56.     The Debtors have sufficient funds to pay any amounts described in this motion in the ordinary course of their businesses by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral and postpetition financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests that the Court has not authorized will be inadvertently made.  Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

57.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 25 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief

26

requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 25 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture. For the reasons discussed herein, the relief requested is necessary for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

58.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Reservation of Rights

59.    Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with any such order), is intended as or should be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay any particular claim, (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion, (e) a request or authorization

27

to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the
Bankruptcy Code, (f) an admission as to the validity, priority, enforceability or perfection of any
lien on, security interest in, or other encumbrance on property of the Debtors' estates, or (g) a
waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party
in interest against any person or entity under the Bankruptcy Code or any other applicable law.

### Motion Practice

60.     This motion includes citations to the applicable rules and statutory authorities upon
which the relief requested herein is predicated and a discussion of their application to this motion.
Accordingly, the Debtors submit that this motion satisfies Local Rule 9013-1(a).

### Notice

61.     The Debtors will provide notice of this motion to: (a) the Office of the United States
Trustee for the Southern District of New York; (b) the holders of the 50 largest unsecured claims
against the Debtors (on a consolidated basis); (c) Proskauer Rose LLP, as counsel to MidCap
Funding IV Trust, in its capacity as (i) administrative agent and collateral agent under the Debtors'
prepetition asset-based lending facility, (ii) administrative agent and collateral agent under the
ABL DIP Facility, and (iii) ABL DIP Lender; (d) Morgan Lewis & Bockius LLP, as counsel to
Crystal Financial LLC, in its capacity as administrative agent for the SISO Term Loan; (e) Alter
Domus, in its capacity as administrative agent for the Tranche B; (f) Latham & Watkins, LLP, as
counsel to Citibank N.A., in its capacity as 2016 Term Loan Agent; (g) Quinn Emanuel Urquhart
& Sullivan, LLP, in its capacity as counsel to the putative 2016 Term Loan group; (h) Akin Gump
Strauss Hauer & Feld, LLP, in its capacity as counsel to an ad hoc group of 2016 Term Loan
lenders; (i) Paul Hastings LLP, as counsel to Jefferies Finance LLC, in its capacity as BrandCo
agent and DIP agent; (j) Davis Polk & Wardwell LLP and Kobre & Kim LLP, in their capacity as

counsel to the ad hoc group of Term Loan DIP lenders and BrandCo lenders; (k) King & Spalding, LLP, in its capacity as counsel to Blue Torch Finance LLC, in its capacity as Foreign ABTL Facility administrative agent; (l) U.S. Bank National Association, as indenture trustee for the Debtors' pre-petition unsecured notes, and any counsel thereto; (m) the United States Attorney's Office for the Southern District of New York; (n) the Internal Revenue Service; (o) the Securities Exchange Commission; (p) the attorneys general for the states in which the Debtors operate; (q) any party that has requested notice pursuant to Bankruptcy Rule 2002, and (r) the Critical Vendors.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **No Prior Request**

62.    No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated:  June 15, 2022

/s/ *Paul M. Basta*
Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Proposed Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (___) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No. __** |

### INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO PAY PREPETITION CLAIMS OF (A) LIEN CLAIMANTS, (B) IMPORT CLAIMANT, (C) 503(B)(9) CLAIMANTS, (D) FOREIGN VENDORS, AND (E) CRITICAL VENDORS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"), (a) authorizing the Debtors to pay in the ordinary course of their businesses prepetition claims held by certain (i) Lien Claimants, (ii) Import Claimant, (iii) 503(b)(9) Claimants, (iv) Foreign Vendors, and (v) Critical Vendors, collectively, in an amount not to exceed $40.4 million on an interim basis, (b) confirming the administrative expense priority of outstanding orders, (c) setting a final hearing on the relief requested in the Motion on a final basis, and (d) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated

---

[1]  The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

January 31, 2012; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefore, it is HEREBY ORDERED THAT:

1.      The Motion is granted on an interim basis as set forth herein.

2.      The final hearing (the "Final Hearing") on the Motion shall be held on _____, 2022, at__:__ _.m., prevailing Eastern Time.  Any objections or responses to entry of a final order on the Motion must be filed with the Court on or before ____ p.m., prevailing Eastern Time, on _____, 2022.

3.      The Debtors are authorized, but not directed, in the reasonable exercise of their business judgment, to pay Vendor Obligations in an aggregate amount not to exceed $40.4 million on an interim basis.

4.      The Debtors are authorized, but not directed, in their sole discretion and in the reasonable exercise of their business judgement, to require that, as a condition to receiving any payment under this Interim Order, a payee maintain or apply, as applicable, Customary Terms and prepetition claim discounts.  The Debtors' reserve the right to require more favorable trade terms with any holder of a Vendor Obligation as a condition to payment of any prepetition claim.  If a payee, after receiving a payment under this Interim Order, ceases to provide Customary Terms or

2

to supply the Debtors, then the Debtors may, in their reasonable business judgment, deem such payment to apply instead to any postpetition amount that may be owing to such payee or treat such payment as an avoidable unauthorized postpetition transfer of property. Any party that accepts payment from the Debtors on account of a Vendor Obligation shall be deemed to have agreed to the terms and provisions of this Interim Order.

5.      Nothing in this Interim Order authorizes the Debtors to accelerate any payments not otherwise due.

6.      Notwithstanding anything to the contrary in this Interim Order, nothing contained in the Motion or this Interim Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Interim Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Interim Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. The rights of all parties in interest are expressly reserved.

7.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, whether such checks or other requests were submitted prior to, on, or after, the Petition Date, *provided* that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order without any duty of further inquiry and without liability for following the Debtors' instructions.

8.      All undisputed obligations related to the Outstanding Orders are granted administrative expense priority in accordance with Section 503(b)(1)(A) of the Bankruptcy Code.

9.      The Debtors are authorized, but not directed, to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with Vendor Obligations to the extent payment thereof is authorized pursuant to the relief granted herein.

10.     The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b).

11.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

12.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

13.     The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

14.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVLON, INC., *et al.*,[1] | ) Case No. 22-10760 (___) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO PAY
PREPETITION CLAIMS OF (A) LIEN CLAIMANTS, (B) IMPORT CLAIMANT,
(C) 503(B)(9) CLAIMANTS, (D) FOREIGN VENDORS, AND (E) CRITICAL VENDORS,
(II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY OF OUTSTANDING
ORDERS, AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of this final order (this "Final Order"), (a) authorizing the

Debtors to pay in the ordinary course of their businesses prepetition claims held by certain (i) Lien

Claimants, (ii) Import Claimant, (iii) 503(b)(9) Claimants, (iv) Foreign Vendors, and (v) Critical

Vendors, collectively, in an amount not to exceed $40.4 million on an interim basis and $79.4

million on a final basis, (b) confirming the administrative expense priority of outstanding orders,

and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day

Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference from the United States District Court for the*

*Southern District of New York*, dated January 31, 2012; and this Court having the power to enter

---

[1]   The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of
debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete
list of the debtor entities and the last four digits of their federal tax identification numbers is not provided
herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and
noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of
these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.        The Motion is granted on a final basis as set forth herein.

2.        The Debtors are authorized, but not directed, to pay the Vendor Obligations in an aggregate amount not to exceed $79.4 million on a final basis.

3.        Nothing in this Final Order authorizes the Debtor to accelerate any payments.

4.        The Debtors are authorized, but not directed, in their sole discretion and in the reasonable exercise of their business judgement, to require that, as a condition to receiving any payment under this Final Order, a payee maintain or apply, as applicable, Customary Terms and prepetition claim discounts.  The Debtors' reserve the right to require more favorable trade terms with any holder of a Vendor Obligation as a condition to payment of any prepetition claim.  If a payee, after receiving a payment under this Final Order, ceases to provide Customary Terms or to supply the Debtors, then the Debtors may, in their sole judgment, deem such payment to apply instead to any postpetition amount that may be owing to such payee or treat such payment as an avoidable unauthorized postpetition transfer of property.  Any party that accepts payment from the

Debtors on account of a Vendor Obligation shall be deemed to have agreed to the terms and provisions of this Final Order.

5.      Notwithstanding anything to the contrary in this Final Order, nothing contained in the Motion or this Final Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Final Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Final Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

6.      The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized and directed to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, whether such checks or other requests were submitted prior to, on, or after, the Petition Date, *provided* that sufficient funds are on deposit and standing in the Debtors' credit in the applicable bank accounts to cover such payments, and all such banks and financial

institutions are authorized to rely on the Debtors' designation of any particular check or electronic

payment request as approved by this Final Order without any duty of further inquiry and without

liability for following the Debtors' instructions.

7.    The Debtors are authorized, but not directed, to issue postpetition checks, or to

effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests

that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts

owed in connection with Vendor Obligations to the extent payment thereof is authorized pursuant

to the relief granted herein.

8.    All undisputed obligations related to the Outstanding Orders are granted

administrative expense priority in accordance with Section 503(b)(1)(A) of the Bankruptcy Code.

9.    Notice of the Motion as provided therein shall be deemed good and sufficient notice

of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied

by such notice.

10.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final

Order are immediately effective and enforceable upon its entry.

11.    The Debtors are authorized to take all reasonable actions necessary to effectuate

the relief granted in this Final Order in accordance with the Motion.

12.    This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Final Order.

New York, New York
Dated: _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

4

**Exhibit C**

**Baird Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*, [1] | Case No. 22-10760 (___) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF KEN BAIRD IN SUPPORT
### OF DEBTORS' MOTION FOR ENTRY OF INTERIM
### AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY
### PREPETITION CLAIMS OF (A)  LIEN CLAIMANTS, (B) IMPORT CLAIMANTS,
### (C) 503(B)(9) CLAIMANTS, (D) FOREIGN VENDORS,  AND (E) CRITICAL
### VENDORS, (II) CONFIRMING ADMINISTRATIVE EXPENSE PRIORITY
### OF OUTSTANDING ORDERS, AND (III) GRANTING RELATED RELIEF

I, Ken Baird, under penalty of perjury, declare as follows:

1.      I am a partner and Global Head of Restructuring in the international law firm, Freshfields Bruckhaus Deringer LLP.  I am a member of the International Insolvency Institute, a fellow of the Institute for Turnaround and a former president of the UK Insolvency Lawyers Association.  I am a solicitor and qualified to practice law in England.

2.      I have over 30 years of experience in complex cross border restructuring and bankruptcy cases, 26 of those as a partner. From 1999 to 2002, I was involved in the then ground-breaking reorganizations of the telecom companies ICO Global Communications and Flag Telecom, in both cases acting as English counsel to the debtors with respect to the non-U.S. aspects of their cross-border restructurings under chapter 11 of title 11 of the Bankruptcy Code, and parallel proceedings in the Cayman Islands and Bermuda.

---

[1]    The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955.  Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/Revlon.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

3.      From 2010 to 2016, I was also English counsel to the Canadian debtor in connection with the English law aspects of the *In re Nortel Networks, Inc.* bankruptcy. I have also acted extensively for creditor groups in the litigation flowing from the *In re Lehman Bros.* bankruptcy in the UK.

4.      More recently, I acted as English law counsel to the term loan lenders in connection with the *In re Paragon Offshore PLC* chapter 11 filing. I am also acting as English law counsel to the equity holders in *In re Nordic Aviation Capital*, which was recently confirmed.

5.      I am retained in this matter as lead counsel on the English law aspects of the proposed financial restructuring.

6.      This Declaration is made in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (a) Lien Claimants, (b) Import Claimants, (c) 503(B)(9) Claimants, (d) Foreign Vendors, and (e) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief*, which was filed contemporaneously herewith (the "Motion").[2]

7.      In the context of Elizabeth Arden (UK) Ltd.'s ("EAUK") voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Chapter 11 Cases" and the "Bankruptcy Court", respectively), I have been asked by the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel to Revlon, Inc. and its affiliates and subsidiaries (the "Debtors"), to opine on English law related issues regarding the ability of those creditors of EAUK (each, a "Relevant Creditor") to pursue remedies against EAUK in England, notwithstanding the Chapter 11 Cases.

8.      EAUK is a company incorporated in England. I am instructed that EAUK is the Debtors' primary operating entity in the UK and that it does not trade or otherwise carry on

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

any business in the United States.  I am instructed that no application will be made for recognition of the Chapter 11 Cases in England, and it is not clear that there would be a basis for seeking or obtaining such recognition in the circumstances.

9.      Any Relevant Creditor of EAUK with outstanding pre-petition debts could, as a matter of the jurisdiction of the English courts, seek to commence winding up proceedings against EAUK pursuant to English insolvency law on the grounds of insolvency.  If that creditor was owed a debt of £750.00 or more, they could issue a statutory demand prior to the winding up petition which, if not paid, would place the burden of proof on EAUK to demonstrate lack of insolvency.  This is likely to be highly complex where debts have fallen due, which cannot be paid, and there is a material risk that a winding up order would be made.

10.     Winding up is a terminal process, unlike the chapter 11 rescue process, and the business would be associated with the petition from an early stage—a winding up is a public process and the petition, in the ordinary course, is advertised.

11.     A petition for winding up also means that the relevant company becomes subject to a validation order regime whereby that company is unable to make any payments or dispose of its assets without the permission of the English court.  In my experience this quickly becomes unmanageable, and the mere presentation of a winding up petition may ultimately leave the company with no other option but to file.

12.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed on June 15, 2022

*/s/ Ken Baird*
Ken Baird

## Exhibit D

## Sample Trade Agreement with Customary Terms

## **Sample Trade Agreement**

Under the *Interim Order (I) Authorizing the Debtors to Pay Pre-petition Claims of (a) Lien Claimants, (b) Import Claimant, (c) 503(B)(9) Claimants, (d) Foreign Vendors, and (e) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* [Docket No. ____] (the "Interim Order"), as a condition to receiving any payment under the Interim Order, a payee must maintain or apply, as applicable, trade terms during the pendency of these chapter 11 cases that are at least as favorable as ordinary course trade terms existing prior to the Petition Date or otherwise satisfactory to the Debtors ("Customary Terms"). If a payee, after receiving a payment under the Interim Order, ceases to provide Customary Terms or refuses to supply the captioned debtors in the Interim Order (the "Debtors"), then the Debtors may, in their sole discretion, deem such payment to apply instead to any post-petition amount that may be owing to such payee or treat such payment as an avoidable unauthorized post-petition transfer of property.

For purposes of administering this trade program, as authorized by the Bankruptcy Court and in accordance with the terms of the Interim Order, the Debtors and [_____] ("Counterparty") agree as follows (the "Agreement"):

The estimated balance of all prepetition amounts due and owing to [Counterparty] in these chapter 11 cases (net of any setoffs, credits or discounts) (the "Trade Claim") is [_____].

The Debtors shall pay [Counterparty] [_____] (the Settlement Amount) upon acceptance of this letter agreement and [Counterparty] waives the right to any further recovery (including, but not limited to, any right to recover under 11 U.S.C. § 503(b)(9)) or distribution with regard to the Trade Claim.

[Counterparty] agrees to supply goods/services to the Debtors on [_____] day

payment terms, and the Debtors agree to pay [Counterparty] in accordance with such trade terms (the "Payment").

Any applicable open trade balance or credit line that [Counterparty] will extend to the Debtors for shipment of post-petition goods/services will be on an as needed basis and shall not be capped.

In consideration for the payment described herein, [Counterparty] agrees not to file against the Debtors, their estates, any other related person or entity, or any of the Debtors' respective assets or property (real or personal) any claim of lien (regardless of the statute or other legal authority upon which such claim or lien is asserted) related in any way to any remaining prepetition amounts allegedly owed to [Counterparty] by the Debtors for goods or services [Counterparty], provided to the Debtors prior to the Petition Date (such goods or services, "Prepetition Goods and Services"). Furthermore, if [Counterparty] has taken steps to file or assert any lien or liens for Prepetition Goods and Services prior to entering into this letter agreement, [Counterparty] agrees to take the necessary steps to remove such lien or liens as soon as possible.

After receipt of the Payment by [Counterparty], if [Counterparty] refuses to continue to supply goods or provide services to the Debtors in accordance with the Customary Terms for any reason other than mutual agreement of the Debtors and [Counterparty], the Debtors' breach of the Customary Terms or expiration of the Customary Terms in the ordinary course of business, then (i) any Trade Claim payment received by [Counterparty] may be deemed by the Debtors as an unauthorized post-petition transfer under section 549 of the Bankruptcy Code that the Debtors may either (a) recover in cash or (b) at the Debtors' option, apply against any outstanding administrative claim held by [Counterparty] and (ii) upon recovery of any Trade Claim payment, the corresponding prepetition claim will be reinstated in the amount recovered by the

2

Debtors.

Your execution of this Agreement and return of the same to the Debtors constitutes

an agreement by [Counterparty] and the Debtors.