**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVLON, INC., *et al.*,[1] | ) | Case No.  22-10760 (DSJ) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF ROBERT M. CARUSO,
## CHIEF RESTRUCTURING OFFICER, (I) IN SUPPORT OF FIRST DAY
## MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

I, Robert M. Caruso, pursuant to section 1746 of title 28 of the United States Code, hereby

declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director of Alvarez & Marsal North America, LLC (together with

certain affiliates, "A&M"), a restructuring advisory services firm with numerous offices

throughout the country.

2.      A&M has been retained by each of the above-captioned debtors and debtors in

possession (collectively, "Revlon" or the "Debtors" and, together with their non-Debtor affiliates,

the "Company").  As the leader of this engagement, I have independently reviewed, have become

familiar with, and have personal knowledge regarding the Debtors' day-to-day operations,

businesses, financial affairs, and books and records.  A list of the Debtors and their non-Debtor

---

[1]     The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor
entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of
the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A
complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing
agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these
Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

affiliates is attached as **Exhibit A**, and a chart reflecting the Debtors' corporate structure is attached as **Exhibit B**.

3.    I have over 30 years of restructuring experience, working with clients across a wide range of industries such as automotive, manufacturing, consumer products, gaming, and retail. Prior to joining A&M, I was a Senior Managing Director with the corporate finance/restructuring practice of FTI Consulting in Chicago, specializing in the restructuring of troubled companies. Earlier, I was a Partner with PricewaterhouseCoopers and a Managing Director with the corporate recovery services practice of KPMG. I hold a bachelor's degree in accountancy from the University of Illinois at Urbana-Champaign. I passed the Certified Public Accountant (CPA) exam in the State of Illinois and am a Certified Insolvency and Reorganization Advisor (CIRA).

4.    On the date hereof (the "Petition Date"), each of the Debtors commenced voluntary cases (these "Chapter 11 Cases") for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). I submit this declaration (this "Declaration") in support of the Debtors' voluntary petitions (the "Petitions"), and the Debtors' related requests for initial relief in the form of motions and applications (the "First Day Motions"), as well as to assist the Court and parties in interest in understanding the circumstances that led the Company to commence these Chapter 11 Cases. To that end, this Declaration provides background information about the Debtors' corporate history, business operations, capital structure, and recent challenges, and supports the Debtors' Petitions and the relief requested in the First Day Motions.

5.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge; information supplied to me by other employees of A&M and members of the Company's management, professionals, and advisors; my review of relevant documents; or

my opinion based upon my experience and knowledge of the Debtors' industry, operations, and financial condition. If called to testify, I could and would testify competently as to the facts set forth herein. I am authorized to submit this Declaration.

## I.    Preliminary Statement

6.    Revlon, Inc. is a global leader in the beauty industry, with a diverse portfolio of brands, including the iconic Revlon and Elizabeth Arden brands, spanning multiple beauty segments. The Company's portfolio consists of over 20 key brands associated with thousands of products sold in approximately 150 countries worldwide. The Company's leading position in the global beauty industry is a result of its extensive array of beauty offerings, including color cosmetics, fragrances, hair color, hair care, skin care, beauty tools, men's grooming products, deodorants, and other beauty care products, which it develops, manufactures, sells, and markets across the globe through a variety of distribution channels.

7.    As of the Petition Date, the Company's operations are generally organized into the following reportable segments:

(a)    Revlon: The Revlon segment is comprised of Revlon-branded color cosmetics and beauty tools products as well as the ColorSilk and Revlon Professional hair color and care franchises.

(b)    Elizabeth Arden: The Elizabeth Arden segment is comprised of the Company's Elizabeth Arden-branded products, including Ceramide, Prevage, and Eight Hour skincare franchises, as well as their portfolio of fragrances, including the Green Tea, White Tea, Red Door, and 5th Avenue fragrance lines.

(c)    Portfolio: The Company's Portfolio segment includes well-established multinational brands, including Almay, American Crew, CND, Creme of Nature, Cutex, Mitchum, and SinfulColors, as well as smaller regional brands.

(d)    Fragrances: The Company's Fragrance segment includes a collection of owned and licensed fragrance brands, including, among others, Juicy Couture, Britney Spears, Curve, John Varvatos, Christina Aguilera, and Elizabeth Taylor.

8.     The Debtors and their management team have successfully negotiated and implemented a series of strategic actions in recent years to address the Company's liabilities, grow its business, and execute on its business plan.  This work was premised on three main tenets: (i) optimizing the Company's global supply chain; (ii) enhancing the Company's in-market commercial execution; and (iii) reducing the Company's overhead costs and streamlining its operations, reporting structures, and business processes.  All of these efforts share the objectives of reducing costs, maximizing productivity, and improving profitability, cash flows, and liquidity.

9.     Notwithstanding these efforts and results, however, the Company was forced to commence these Chapter 11 Cases because its liquidity position has been significantly constrained since the onset of COVID-19, and has severely deteriorated recently in 2022.  Customer demand for Revlon's products and brands remains strong, and has in fact grown year-over-year in each year since 2020.  However, as described throughout this Declaration, industry headwinds and macroeconomic issues that have adversely affected the Debtors for years have significantly accelerated this year, principally due to the following:

- **Supply Chain**: global supply chain disruptions that began in 2020 have recently accelerated due to, among other reasons, the unexpected persistence of COVID-19, including lockdowns and other restrictions in key commercial hubs such as China, which have left the Debtors unable to procure sufficient volumes of raw materials to manufacture enough inventory to meet the significant consumer demand for their products;

- **Inventory**: the Company's inability to obtain and produce sufficient inventory due to supply chain constraints has in turn caused a decrease in revenue and a reduction in the Company's borrowing base under its US ABL Facility (as defined below);

- **Logistics and Labor**: even when the Debtors are able to acquire necessary raw materials to manufacture their products, shipping, freight, and logistics issues, as well as labor shortages affecting both the Company and its logistics providers, have delayed the process of manufacturing products into saleable inventory and delivering that inventory to market, and increased the cost of doing so;

- **Trade Credit**: due to the Debtors' liquidity challenges and significantly constrained ability to make payments to their vendors, coupled with increased competition for more limited supply from the Company's vendors, suppliers have been rapidly pulling the Company's trade credit and have increasingly demanded cash in advance;

- **Customer Issues**: because the Debtors have been unable to produce sufficient goods in recent months to meet strong customer demand, retailers have begun imposing fines on the Company for failure to deliver products "on time and in full";

- **Inflation**: inflation is rising too rapidly to allow increased procurement and manufacturing costs to be passed through to customers; and

- **Market Impacts**: significant volatility in the capital markets and tightening of credit markets have limited the Company's options to address its liquidity shortfall.

10.    Prior to the recent impact of these issues, the Company had been working proactively for years to address its capital structure, which, as of the Petition Date, consists of approximately $3.5 billion of secured and unsecured debt as follows:

| Instrument / Facility | Principal Outstanding |
|---|---|
| US ABL Facility | $289,000,000 |
| BrandCo Facilities | $1,878,019,219 |
| 2016 Term Loan Facility[2] | $870,116,570 |
| 2024 Unsecured Notes | $431,300,000 |
| Foreign ABTL Facility | $75,000,000 |
| **Total Indebtedness** | $3,543,435,789 |

11.    In 2020, the Company took several steps to address near-term debt maturities and provide liquidity to execute on its long-term business plan and to address the uncertainty caused by the COVID-19 pandemic.  On May 7, 2020, the Debtors and certain existing debtholders entered into a credit agreement that provided the Debtors with approximately $1,850 million of financing, known as the BrandCo Facilities, as further described and defined herein.  In November

---

[2]    The amount of principal outstanding under the 2016 Term Loan Facility is the subject of the ongoing Citibank Litigation between Citibank and lenders holding approximately $500 million in 2016 Term Loans.  The Principal Outstanding reflected in the table above reflects the entire amount of the 2016 Term Loan as it existed prior to the mistaken payment by Citibank.

2020, the Debtors completed an exchange offer for the Company's then-outstanding 2021 Unsecured Notes (as defined below), which, if left outstanding on November 15, 2020, could have caused the maturities of the Company's other funded debt, including the US ABL Facility, 2016 Term Loan Facility, and Foreign ABTL Facility (each as defined herein) to "spring" forward to that same date. By engaging in these transactions, the Company avoided this springing maturity and were able to continue to pursue its strategic initiatives to grow and strengthen its businesses.

12.     In March 2020, the COVID-19 pandemic and related shut-downs began to negatively impact the Debtors. Sales declined due to the forced closures of retailer locations and office spaces, and the imposition of quarantines, travel restrictions, import and export restrictions, and face mask mandates. Due to government-imposed stay-at-home orders, organizations and educational institutions cancelled in-person events, and beauty salons, spas, and department stores stopped serving clients, decreasing demand for the Company's products. Air travel and consumer traffic in key shopping and tourist areas around the globe plummeted. On a macro level, the world experienced a general slowdown of the global economy. Each of these factors contributed to a significant decline in net sales in a majority of the Company's business segments and regions.

13.     As the Company was confronting these challenges, a nearly $1 billion mistake by Citibank, N.A. ("Citibank"), the Administrative Agent for the 2016 Term Loans (as defined below) caused significant uncertainty and complexity for the Debtors' capital structure. On August 11, 2020, Citibank intended to process an approximately $7.8 million interest payment due to holders of the 2016 Term Loans, but instead paid the full principal and outstanding interest due on all of the 2016 Term Loans, in an amount totaling approximately $894 million, entirely by mistake. Citibank immediately sent recall notices to all 2016 Term Loan Lenders informing them of the error, but holders of approximately $500 million of the 2016 Term Loan declined to return the

funds.  Citibank, which had used its own funds to pay all but the $7.8 million interest payment, promptly sued those lenders and lost in the trial court following a bench trial (the "Citibank Litigation").  That ruling is now on appeal before the Second Circuit.  Oral argument was heard on September 29, 2021, and, as of the Petition Date, no opinion has been issued.

14.    Although Revlon is not a party to the Citibank Litigation, these events have created uncertainty for the Company, Citibank, and the lenders regarding who holds over 50% of the 2016 Term Loans, and I expect that uncertainty to persist until the Second Circuit issues a ruling on Citibank's appeal.  The Credit Agreement governing the 2016 Term Loans does not allow additional senior financing to be pursued out of court without the consent of a majority of the 2016 Term Loans, but the status of approximately $500 million of the $894 million in 2016 Term Loans remains unresolved.  As a result, the Company effectively has had, since August 2020, no 2016 Term Loans counterparty with which it can negotiate.

15.    Despite these extremely challenging and unprecedented difficulties, in late 2020 the Company was able to address its near-term balance sheet issues and saw a gradual rebound in its sales and revenue by mid-2021.  With the roll out of COVID-19 vaccinations and the easing of restrictions in the United States and other key markets around the globe, the Company saw a gradual rebound in consumer spending and consumption in 2021 and early 2022.  Due in large part to management's business optimization efforts, the Company was able to quickly capitalize on this opportunity and successfully grew customer demand in 2022.

16.    Demand for the Company's products since 2020 has been strong across segments. The Company finished 2021 with $292.9 million of adjusted EBITDA, up $52.8 million (21.9%) from 2020 ($240.1 million) and 10.0% from 2019 ($266.1 million).  In 2021, the Company generated $2,078.7 million in net sales, compared to $1,904.3 million in 2020 and $2,419.6 million

in 2019.  Through the first quarter of 2022, the Company generated $479.6 million in net sales, as compared to $445.0 million in 2021, $453.0 million in 2020, and $553.2 million in 2019 for the same period.

17.     On the heels of encouraging developments in the first quarter of 2022, the Company began working with Jefferies Finance LLC ("Jefferies") to commence a refinancing process, which was scheduled to begin in the second quarter of 2022. As part of this refinancing, Jefferies anticipated marketing a $500 million preferred equity security to help de-lever the Company.  In March 2022, the Company engaged in constructive dialogue with its Prepetition ABL Lender under the Tranche A Revolving Loans (MidCap Funding IV Trust ("MidCap")) and the lender under the Company's Foreign ABTL Facility (Blue Torch Finance LLC ("Blue Torch")).  The Company successfully negotiated amendments to the borrowing base under its US ABL Facility and Foreign ABTL Facility that temporarily increased its borrowing capacity by $10-15 million and $7 million, respectively.

18.     However, by late spring 2022, the economic environment began to change.  The Company was experiencing high demand for its products, but industry-wide global supply chain disruptions decreased the supply of, and intensified competition for, the many chemicals and other raw materials required by the Company to manufacture its products.  The Company's vendors, who would historically allow 30 to 75 days for payment after receipt of an invoice, began insisting on payment of outstanding amounts, implementing credit holds, and/or requiring cash in advance for new orders.  If the Company did not comply, they would simply sell their products to one of the many other willing buyers.  These vendor demands substantially impacted the Company's liquidity position.  Global labor shortages further burdened the Company and its suppliers with higher costs and delays in production and transportation, and global inflation rose at a rate faster

than the Company could pass the increased costs through to its customers. As a result of all of these issues, the Company experienced increasing challenges procuring the dozens of different components and ingredients needed to manufacture each one of its many products, and even where it could do so, substantially higher costs, delays, and payment requirements placed significant pressures on its business and liquidity. As a consequence of these supply chain and manufacturing challenges, the Company's ability to deliver completed products to its customers and generate revenue has been further constrained, negatively impacting sales and in some cases resulting in fines from the Company's customers for failing to provide required quantities of its products on time and in full.

19.     In the wake of the significant risks to its businesses discussed above, the Company had to determine whether to use dwindling liquidity to make upcoming interest payments of approximately $11 million on its 2016 Term Loan Facility and approximately $38 million on the BrandCo Facilities. The Company quickly engaged with the BrandCo Lenders, the Prepetition ABL Lenders, and the 2016 Term Loan Lenders (each as defined herein), with constructive formal and informal discussions with members of these groups or their advisors during May and June 2022. During these discussions, the Company responded to multiple rounds of high-priority diligence requests on an expedited timeline and proposed financings and transaction structures to bridge its liquidity needs out of court. However, a significant number of the Company's lenders were not willing to pursue any such transactions in the current environment. The Company then pivoted on a path to a restructuring, which the BrandCo Lenders were supportive of. BrandCo Lenders holding approximately 87% of the BrandCo Facilities have provided the Debtors with financing commitments to fund the Debtors' operations during the course of Chapter 11 Cases of $575 million, including $375 million available on an interim basis subject to Court approval. This

debtor-in-possession financing, together with the other first day relief discussed herein, will allow the Debtors to immediately and aggressively address the current crisis. The Debtors continue to engage with the lender groups in good faith and are appreciative of their efforts to date.

20.    As the Debtors' focus turned toward evaluating an in-court restructuring, the board of directors of Revlon, Inc. and Revlon Consumer Products Corporation ("RCPC" and, such Board of Directors, the "Board") determined that it was in the Debtors' best interests to make several governance changes throughout the Company, each of which were approved and implemented on June 15, 2022:

- **Appointment of Chief Restructuring Officer**: I was appointed as Chief Restructuring Officer to each of the Debtors to assist the Debtors with their chapter 11 filings and provide certain management services;

- **Appointment of Additional Independent Director**: one independent and disinterested Board member with significant restructuring experience, D.J. ("Jan") Baker, was appointed to the Board of Revlon, Inc.;

- **Formation of Restructuring Committee and Dissolution of Compensation Committee**: the Board of Revlon, Inc. formed a restructuring committee (the "Restructuring Committee") comprised of Alan S. Bernikow as Chair, E. Scott Beattie, Barry F. Schwartz, Victor Nichols, and Jan Baker. Pursuant to the resolutions establishing the Restructuring Committee, the Board delegated to the Restructuring Committee the full and exclusive power and authority of the Board to (i) carry out all key activities related to the Restructuring Matters (as defined herein), except for the power or authority to approve any "Significant Transactions," which include the adoption or implementation of any proposed (a) plan of reorganization of the Company and its subsidiaries, (b) sale of all or substantially all of the Company's assets or businesses, or (c) any other significant transaction or decision that the Restructuring Committee determines should be considered by the full Board; (ii) consider, negotiate, approve, authorize and act upon any matter, as determined by the Restructuring Committee, that certain creditors of the Company or any of its subsidiaries could potentially allege presents conflicts of interest between the Company and related entities; and (iii) exercise all powers previously delegated to the Compensation Committee, including those set forth in the Compensation Committee Charter that is posted to the Company's investor relations website as of the date of this Declaration. The Restructuring Committee is also delegated the full and exclusive power and authority of the Board to consider, negotiate, approve, authorize, and act upon alleged conflicts of interest between the Company and related entities. By the same resolutions,

the Board of Revlon, Inc. disbanded and dissolved the standing Compensation Committee;

- **Formation of Investigation Committee**: the Board of Revlon, Inc. formed an investigation committee (the "<u>Investigation Committee</u>") comprised of Jan Baker as the sole member. Pursuant to the resolutions establishing the Investigation Committee, the Board delegated to the Investigation Committee all of the power and authority of the Board to perform any and all internal audits, reviews, and investigations of the Company and its subsidiaries;

- **Appointment of Directors to the Board of RCPC**: the board of directors at RCPC (the "<u>RCPC Board</u>") appointed Alan S. Bernikow to serve as Chairman of the RCPC Board and appointed Jan Baker, E. Scott Beattie, and Victor Nichols as directors effective immediately upon the resignations of Ronald O. Perelman, Debra Perelman, and Ceci Kurzman from such board; and

- **Appointment of Restructuring Officer at BrandCos**: at each of the BrandCos (as defined herein), each a Debtor in these Chapter 11 Cases, Debtor Beautyge I, as sole Member of each of the BrandCos, appointed Steve Panagos as a Restructuring Officer and delegated to Mr. Panagos the full power and authority of the Member to (i) consider, negotiate, approve, authorize and act upon any matter that certain creditors of the BrandCos could potentially allege presents conflicts of interest between the BrandCos and related entities (the "<u>Alleged BrandCos Conflicts Matters</u>"); and (ii) carry out all key activities related to the Chapter 11 Cases of the BrandCos. The resolutions appointing Mr. Panagos as the Restructuring Officer specify that he does not have the power or authority to approve any "Significant Transactions," which include the adoption or implementation of any proposed (a) plan of reorganization of any BrandCo, (b) sale of all or substantially all of any BrandCo's assets or businesses, or (c) any other significant transaction or decision that he determines should be considered by the Member, except for any Significant Transaction that constitutes an Alleged BrandCos Conflicts Matter.

21.     The Debtors, with the goal of maximizing value for the benefit of all stakeholders, and in consultation with their advisors, elected to commence these Chapter 11 Cases to obtain funding for operations, stabilize their operations, conserve and manage liquidity, and effect a value maximizing restructuring. The Debtors are part of an enterprise with a long-standing commitment to providing glamour, excitement, and innovation through quality products at affordable prices. Under the oversight of this Court, the Debtors are confident they can withstand today's hardships,

address the Company's capital structure, and get back to the business of providing customers worldwide with iconic brands and beauty products.

## II.    Overview of the Debtors and Their Business

### A.    Corporate History

22.    The origins of the Revlon brand date back to 1932, when Charles Revson, Joseph Revson, and Charles Lachman created the first opaque nail polish formulated with pigments. New colors were developed each season to align with women's fashion trends, and in 1939 Revlon launched a range of lipsticks. What followed were years of significant growth and innovation. In 1961, Revlon launched its Super Lustrous franchise, establishing Revlon as a leader in bold color, and in 1991 the Company launched the ColorStay franchise, a breakthrough in longwear lip color. In 1985, MacAndrews & Forbes Holdings Inc. acquired a majority of Revlon and, a year later, took it private. Revlon remained a wholly-owned subsidiary of MacAndrews & Forbes until 1996, when approximately 15% of the Company was sold in an initial public offering. Revlon began trading on the New York Stock Exchange under the ticker symbol "REV."

23.    Today, Revlon is still synonymous with a bold, red lip, and the brand continues to innovate within its iconic Super Lustrous and ColorStay franchises. This imagery has been used in Revlon's advertisements throughout the years:



24.    Revlon has also been a brand of firsts with regard to breaking cultural norms in its advertising to promote its longstanding values of diversity and inclusion.  Revlon was the first beauty company to feature an African-American model in its advertising, with Naomi Sims in 1970.  When the brand launched its iconic Charlie fragrance in 1973, the advertising, featuring a woman in pants, was ground-breaking in its depiction of women's empowerment.  Revlon has always been a brand that promotes diversity, from its "Most Unforgettable Woman in the World" campaign in the 1980s to today's "Live Boldly" campaign, which celebrates women and the transformative power of beauty products.  Images from these campaigns, included below, were both innovative and impactful:

   

25.    The Company acquired Elizabeth Arden in 2016, which became a prominent brand on par with Revlon.  The Elizabeth Arden brand—which is comprised of an extensive portfolio including, among other things, products under the Elizabeth Arden name brand and designer and celebrity fragrances—has a similarly rich and storied history.

26.    Ms. Arden opened her first Red Door salon on Fifth Avenue in 1910 as the retreat of choice for luxury services ranging from massages to hair styling.  Ms. Arden introduced eye makeup to America, was the first to create travel-sized beauty products, was the first in the cosmetics industry to employ traveling saleswomen, and was the first to begin commercial beauty tutorials.  Ms. Arden was frequently at the forefront of history, including in 1912, when she

marched with the suffragettes. Many suffragettes wore red lipstick she supplied as a symbol of independence, strength, and solidarity. In 1946, Ms. Arden was the first businesswoman, and only the second woman, to be featured on the cover of Time magazine. Today, the Elizabeth Arden brand continues to deliver high quality product innovation and support Elizabeth Arden's legacy of empowering women all around the world.

  

27.    The Revlon and Elizabeth Arden portfolio of products and brands feature numerous household names, which have continued to grow in the years pre-dating 2020. In 2013, Revlon reacquired The Colomer Group, including the Revlon Professional business and the CND, American Crew, and Creme of Nature brands. In 2015 and 2016, Revlon acquired the rights to the Cutex brand in the United States and certain other countries, adding to its rights in the Cutex brand in certain other regions. The Company's brand equity and strong customer relationships enable it to offer a wide range of services to its customers. With a collective history dating back over a century, the Company intends to remain at the forefront of beauty products across the globe.

**B.    The Debtors' Operations**

28.    The Company conducts its business exclusively through its operating subsidiary, Debtor RCPC, and its subsidiaries. The Company's headquarters are in New York, New York. It is a multinational enterprise with worldwide operations, including material business operations in North America, Asia-Pacific, Europe, and South Africa. As of the Petition Date, the Debtors

employ approximately 2,824 people (collectively, the "Employees"), of whom approximately 2,369 are full-time and approximately 435 are part-time employees.  The Debtors are also party to collective bargaining agreements in both the United States and Canada.  Approximately 151 Employees are represented by unions.

29.     Delivering quality products across the world, and through various beauty channels, remains one of the most critical elements of success in the Company's industry.  Brand recognition in multiple sectors of the beauty industry establishes customer familiarity with the Revlon name and an understanding of its permanence in the industry.  To that end, the Debtors have concentrated on multiple business segments, each with a focus on particular types of customers.  Those segments are: (i) Revlon, (ii) Elizabeth Arden, (iii) Portfolio, and (iv) Fragrances.

(i)     Revlon

30.     The Company's Revlon segment includes cosmetics, hair color, hair care, and beauty tools.  These products are sold in the mass retail channel, large volume retailers, chain drug and food stores, e-commerce sites, department stores, professional hair and nail salons, one-stop shopping beauty retailers, and specialty cosmetics stores in the U.S. and internationally.

31.     Among the various key franchises within the Revlon segment are Revlon ColorStay, Revlon Super Lustrous, Revlon ColorSilk, and Revlon Professional, as well as various beauty tools, including nail, eye, and manicure and pedicure grooming tools, eye lash curlers, and a full line of makeup brushes under the Revlon brand name.  For its Revlon segment, the Company uses various digital marketing, television, and other advertising to reach customers.  Women including Halle Berry, Ciara, Gwen Stefani, Gal Gadot, Ashley Graham, Sofia Carson, Jessica Jung, Adwoa Aboah, Eniola Abioro, and Megan Thee Stallion have all been Revlon Brand Ambassadors in recent years.

32.     Revlon has continuously depicted the strength of women through its marketing, including in its most recent campaign, which encourages women to "Live Boldly" and express themselves with passion, optimism, strength, and style.  Revlon, as a Company and within its various segments, showcases the beauty of the everyday woman.  Depicted below is an example of Revlon's "Live Boldly" campaign, launched in 2018, as well as an image from the more recent ColorStay Longwear campaign in 2022:

 

(ii)    <u>Elizabeth Arden</u>

33.     In September 2016, Revlon acquired Elizabeth Arden in a deal that further increased the prestige of the Revlon name globally, and bolstered its growth potential in the industry (the "<u>Elizabeth Arden Acquisition</u>").  The addition of Elizabeth Arden, already an iconic name in its own right, opened the door for the Company's entry into new market segments and prestigious retailers and specialty stores, and brought prestige fragrances, skin care, and color cosmetics alongside the Revlon brand name.

34.     The financing for the Elizabeth Arden Acquisition brought additional funding to the Company and enabled it to repay certain of Revlon's and Elizabeth Arden's then-existing facilities.  Specifically, in connection with the Elizabeth Arden Acquisition, Debtor RCPC entered

into the 2016 Term Loan Facility (which refinanced existing term loans and provided additional funds to finance the Elizabeth Arden Acquisition) and the US ABL Facility and completed the issuance of the 2024 Unsecured Notes, each as defined below. RCPC used proceeds from these facilities and approximately $126.7 million of cash on hand to fund the Elizabeth Arden Acquisition, which included the refinancing of over $570 million of then-outstanding Elizabeth Arden debt and preferred equity obligations.

35.    The Elizabeth Arden segment markets, distributes, and sells fragrances, skin care, and color cosmetics primarily to prestige retailers, department and specialty stores, perfumeries, boutiques, e-commerce sites, the mass retail channel, travel retailers, and distributors. It also makes direct sales to consumers via its Elizabeth Arden-branded retail stores and its e-commerce business. With Elizabeth Arden, Revlon is uniquely positioned to compete in multiple markets in the beauty landscape, giving customers the choice of a full suite of products that range from beauty tools and deodorants to top of the line cosmetics and skin care. Moreover, with the acquisition of Elizabeth Arden, Revlon also propelled its digital and e-commerce footprint in China, where the Elizabeth Arden brand was already strong.

36.    The Company focuses on generating strong retailer and consumer demand across its key Elizabeth Arden brands. The brands include Elizabeth Arden Ceramide, Prevage, Eight Hour, SUPERSTART, Visible Difference, and Skin Illuminating in the Elizabeth Arden skin care brands; and Elizabeth Arden White Tea, Elizabeth Arden Red Door, Elizabeth Arden 5th Avenue, and Elizabeth Arden Green Tea in Elizabeth Arden fragrances. The Company uses social media and other digital mediums, including television and magazines, to market the Elizabeth Arden brand to customers.

37.     The Elizabeth Arden Acquisition propelled the Company to the forefront of the industry as a global beauty enterprise with tremendous opportunity for long-term growth and value creation.

(iii)   Portfolio

38.     The Company's Portfolio segment focuses on premium, specialty, and mass consumer products primarily found in mass retail locations, hair and nail salons, and professional salon distributors.   The segment includes brands such as: Almay and SinfulColors in color cosmetics; American Crew in men's grooming products; CND in nail polishes, gel nail color and nail enhancements; Cutex in nail care products; and Mitchum in antiperspirant deodorants.

39.     The Portfolio segment also includes a multi-cultural hair care line consisting of Creme of Nature, Lottabody, and Roux brand hair care products, which are sold in both professional salons and by retailers, primarily in the U.S.

40.     Depicted below are certain of the brands in the Portfolio segment:

ALMAY                        AMERICAN
                             CREW                        CND™

                                        CREME OF NATURE®


Cutex                        SINFULCOLORS®

(iv)    Fragrances

41.     The final segment involves the development, marketing, and distribution of certain owned and licensed fragrances.   The Company holds the number one position in the US Mass Fragrance market, marketing these products to retailers in the U.S. and internationally, including prestige retailers, specialty stores, e-commerce sites, the mass retail channel, travel retailers, and other international retailers.   Its fragrances include owned and licensed brands such as: (i) Juicy

Couture, John Varvatos, and AllSaints in prestige fragrances; (ii) Britney Spears, Elizabeth Taylor, Christina Aguilera, and Jennifer Aniston in celebrity fragrances; and (iii) Curve, Giorgio Beverly Hills, Ed Hardy, Charlie, Lucky Brand, ‹PS›, Alfred Sung, Halston, Geoffrey Beene, and White Diamonds in mass fragrances.

42.     Depicted below are certain of the brands included in the Fragrance segment:

BRITNEY SPEARS FRAGRANCES

Christina Aguilera FRAGRANCES

THE ELIZABETH TAYLOR FRAGRANCE COLLECTION

john varvatos

ALLSAINTS

Juicy Couture

(v)     Customer Contracts

43.     The Company's customers range from well-known retailers such as Walmart, CVS, Target, Macy's, Amazon, Walgreens, TJ Maxx, Marshalls, and Tmall, to specialty stores, perfumeries, and boutiques such as The Perfume Shop, Hudson's Bay, Shoppers Drug Mart, Myer, Douglas, and various international and travel retailers such as Nuance, Heinemann, and World Duty Free.

44.     Many of the Debtors' customers rely on individuals going into retail shops and directly purchasing products. The Debtors also maintain e-commerce websites where customers can purchase products and have third-party contracts with e-commerce companies, such as Amazon, where customers purchase products through those companies. As is customary in the industry, however, none of the Company's major customers are contractually obligated to continue purchasing products from the Company in the future. Many of the Debtors' retail customers make annual decisions regarding the retail space they will allocate to Revlon (and its competitors) in their stores in the third quarter each year; if the Company cannot demonstrate an ability to deliver

sufficient quantities of its products to its customers, that critical shelf space is at significant risk of being lost. It is therefore imperative that the Company maintains its position as an actual and perceived leader in the beauty industry.

(vi)   <u>Competition</u>

45.     The Company competes on a worldwide basis. In certain product categories, the Company is competing against numerous multinational manufacturers, while in others, the Company is competing against specialty stores, perfumeries, and e-commerce sites.

46.     The Company competes primarily by developing quality products; maintaining strong brand recognition; educating consumers, retail customers, and salon professionals about the benefits of the Company's products; offering attractive prices on products; and anticipating and responding to the changing demands in the beauty industry.

47.     In recent years, as consumer preferences have shifted from shopping in brick-and-mortar stores to online shopping, as accelerated by the COVID-19 pandemic, the Company's retail customers have experienced a decrease in sales. Consequently, there have been many closures of the brick-and-mortar retail stores in which the Company sells its products. While the Debtors are able to supplement their revenue with e-commerce sales, there is fierce competition in the digital market, including through social media channels. Moreover, it is still critical that the Company maintain a strong and visible presence in its brick-and-mortar retail channels. If the Company cannot supply products to its retail customers, it not only misses out on sales revenue, but that shelf space will be taken by the Company's competitors, which can threaten long term equity value.

48.     The Debtors also must be cognizant of, and adapt to, changing consumer preferences. The competitive environment in which the Debtors operate involves, among other things, a continual stream of new product offerings, a focus on marketing and advertising by

influencers, and various technological breakthroughs in the beauty industry, including the use of artificial intelligence to collect data on consumer preferences and buying behavior.

## III. The Company's Capital Structure

49. As of the Petition Date, the Debtors' principal non-contingent liabilities consist of outstanding funded debt under four credit facilities and one series of unsecured notes with an aggregate outstanding principal amount of approximately $3.5 billion (the "Prepetition Debt"), as summarized in the following chart:

| Instrument / Facility | Principal Outstanding |
|---|---|
| **US ABL Facility** | |
| Tranche A Revolving Loans | $109,000,000 |
| ABL FILO Term Loans | $50,000,000 |
| SISO Term Loan Facility | $130,000,000 |
| **Total US ABL Facility** | **$289,000,000** |
| **BrandCo Facilities** | |
| First Lien BrandCo Facility | $938,986,931 |
| Second Lien BrandCo Facility | $936,052,001 |
| Third Lien BrandCo Facility | $2,980,287 |
| **Total BrandCo Facilities** | **$1,878,019,219** |
| 2016 Term Loan Facility | $870,116,570[3] |
| Unsecured Notes | $431,300,000 |
| Foreign ABTL Facility | $75,000,000 |
| **Total Indebtedness** | **$3,543,435,789** |

50. A simplified corporate structure with capital structure overlay is presented in the following chart:

---

[3] The amount of principal outstanding under the 2016 Term Loan Facility is the subject of the ongoing Citibank Litigation between Citibank and lenders holding approximately $500 million in 2016 Term Loans. The Principal Outstanding reflected in the table above reflects the entire amount of the 2016 Term Loan as it existed prior to the mistaken payment by Citibank.



### A.    US ABL Facility

51.    As of the Petition Date, there is approximately $289 million outstanding under that certain Asset-Based Revolving Credit Agreement, dated as of September 7, 2016 (as modified from time to time, the "US ABL Credit Agreement" and, the senior secured asset-based credit facilities thereunder, the "US ABL Facility"), by and among RCPC and certain subsidiaries of RCPC, as borrowers (the "US ABL Facility Borrowers"), Revlon, Inc., as holdings ("Holdings"), MidCap, as administrative agent and collateral agent, and the lenders party thereto from time to time (collectively, the "Prepetition ABL Lenders").

52.    The US ABL Facility consists of (i) $109 million of Tranche A revolving loans (the "Tranche A Revolving Loans"), (ii) $130 million of senior secured second-in, second-out term loan facility (the "SISO Term Loans"), and (iii) $50 million of "first-in, last-out" Tranche B term loans (the "ABL FILO Term Loans").

53.      Pursuant to (i) that certain ABL Guarantee and Collateral Agreement, dated as of September 7, 2016 (as amended), among RCPC, as borrower, the subsidiary guarantors party thereto, and MidCap, as collateral agent, (ii) that certain Holdings ABL Guarantee and Pledge Agreement, dated as of September 7, 2016, among Revlon, Inc., and MidCap, as collateral agent, and (iii) certain other security documents, the US ABL Facility is guaranteed by certain of the domestic and foreign Debtors (the "US ABL Guarantors" and, together with the US ABL Facility Borrowers and Holdings, the "US ABL Loan Parties"), listed on **Exhibit D**, and is secured on (a) a first-priority basis by liens on certain assets of the US ABL Loan Parties, including accounts receivable, cash, inventory, deposit accounts and securities accounts (subject to certain limited exclusions), instruments (subject to certain limited exclusions), chattel paper, interests in material owned real property (including fixtures), equipment, and the proceeds and products of the foregoing (collectively, the "ABL Priority Collateral") and (b) a second-priority basis by liens on substantially all of the US ABL Loan Parties' assets not constituting ABL Priority Collateral (subject to certain customary exclusions), including equity pledges of 100% of the interests in domestic subsidiaries and 66% of the voting interests in first-tier foreign subsidiaries, intellectual property (excluding the Specified Brands (defined below)), general intangibles, and the proceeds and products of the foregoing (collectively, the "Term Loan Priority Collateral").

54.      The Tranche A Revolving Loans and the SISO Term Loans mature on the earliest of (i) May 7, 2024, (ii) 91 days prior to the earliest stated maturity date of the 2016 Term Loans, if any 2016 Term Loans are outstanding on such date, and (iii) the earliest stated maturity date of the ABL FILO Term Loans, if any ABL FILO Term Loans are outstanding on such date.

55.      The ABL FILO Term Loans mature on the earlier of (i) December 15, 2023 and (ii) six months after the maturity date of the Tranche A Revolving Loans.

56.     As of the Petition Date, the borrowing base for the US ABL Facilities was approximately $327 million and the aggregate outstanding balance of the Tranche A Revolving Loans, SISO Term Loans, and ABL FILO Term Loans was $289 million.

### B.     2016 Term Loan Facility

57.     As of the Petition Date, and subject to the ongoing Citibank Litigation, there is approximately $870.1 million outstanding under that certain Term Credit Agreement, dated as of September 7, 2016 (as modified from time to time, the "2016 Term Loan Credit Agreement" and, the senior secured term loan facility thereunder, the "2016 Term Loan Facility" and, the loans thereunder the "2016 Term Loans"), by and among RCPC, as borrower, Holdings, Citibank, as administrative agent and collateral agent, and the lenders party thereto from time to time (collectively, the "2016 Term Loan Lenders").

58.     Pursuant to (i) that certain Term Loan Guarantee and Collateral Agreement, dated as of September 7, 2016 (as amended), among RCPC, as borrower, and Citibank, as collateral agent, (ii) that certain Holdings Term Loan Guarantee and Pledge Agreement, dated as of September 7, 2016, among Revlon, Inc., as grantor, and Citibank, as collateral agent, and (iii) certain other security documents, the 2016 Term Loan Facility is guaranteed by the guarantors under the US ABL Facility, listed on **Exhibit E**, and is secured on (a) a first-priority basis by liens on the Term Loan Priority Collateral and (b) a second-priority basis by liens on the ABL Priority Collateral (collectively, the "2016 Term Loan Liens").

59.     The 2016 Term Loan Facility matures on (i) in the case of $839,948,303 of term loans (the "Non-Extended Term Loans"), September 7, 2023, and (ii) in the case of $30,168,267 of term loans, the earliest of (A) June 30, 2025, (B) September 7, 2023 if greater than $75 million of Non-Extended Term Loans remain outstanding on such date, and (C) May 2, 2024 if greater

than $100 million of the 2024 Unsecured Notes (as defined below) remain outstanding on such date.

### C.  BrandCo Facilities

60.    As of the Petition Date, there is approximately $1.88 billion in principal amount outstanding under that certain BrandCo Credit Agreement, dated as of May 7, 2020 (as modified from time to time, the "BrandCo Credit Agreement", and the closing date of such agreement, the "BrandCo Facilities Closing Date"), among RCPC, as borrower, Holdings, Jefferies, as administrative agent and collateral agent, and the lenders party thereto from time to time (the "BrandCo Lenders").

61.    Pursuant to the BrandCo Credit Agreement, the BrandCo Lenders provided the Company with (i) a senior secured term loan facility in an aggregate principal amount of $910 million, consisting of $815 million in new money financing, $65 million of loans incurred to refinance revolving loans under the 2016 Term Loan Facility, and certain fees and interest that have been capitalized (the "First Lien BrandCo Facility"); (ii) a senior secured term loan facility in an aggregate principal amount of up to $950 million, which refinanced an equivalent amount of 2016 Term Loans held by the BrandCo Lenders that funded the First Lien BrandCo Facility (the "Second Lien BrandCo Facility"); and (iii) a senior secured term loan facility in an aggregate principal amount outstanding on the BrandCo Facilities Closing Date of $3 million, which refinanced an equivalent amount of 2016 Term Loans held by certain BrandCo Lenders that consented to certain amendments to the 2016 Term Loan Credit Agreement (the "Third Lien BrandCo Facility" and, together with the First Lien BrandCo Facility and the Second Lien BrandCo Facility, the "BrandCo Facilities").

62.     Pursuant to that certain (i) Term Loan Guarantee and Collateral Agreement, dated as of May 7, 2020, among RCPC, as borrower, the subsidiary guarantors party thereto, and Jefferies, as *pari passu* collateral agent, (ii) that certain Holdings Term Loan Guarantee and Pledge Agreement, dated as of May 7, 2020, between Revlon, Inc. and Jefferies, as *pari passu* collateral agent, and (iii) certain other security documents, the BrandCo Facilities are guaranteed by the guarantors under the 2016 Term Loan Facility and the US ABL Facility and are secured on (a) a first-priority basis (*pari passu* with the 2016 Term Loan Liens) by liens on the Term Loan Priority Collateral, and (b) a second-priority basis (*pari passu* with the 2016 Term Loan Liens) by liens on the ABL Priority Collateral.

63.     In addition, pursuant to (i) that certain First Lien BrandCo Guarantee and Security Agreement, that certain Second Lien BrandCo Guarantee and Security Agreement, and that certain Third Lien BrandCo Guarantee and Security Agreement, each dated as of May 7, 2020, among the subsidiary guarantors party thereto and Jefferies, as administrative agent and first lien collateral agent, second lien collateral agent, or third lien collateral agent, as applicable, (ii) that certain First Lien BrandCo Stock Pledge Agreement, that certain Second Lien BrandCo Stock Pledge Agreement, and that certain Third Lien BrandCo Stock Pledge Agreement, each dated as of May 7, 2020, among RCPC, the subsidiary guarantors party thereto, and Jefferies, as first lien collateral agent, second lien collateral agent, or third lien collateral agent, as applicable, and (iii) certain other security documents, the BrandCo Facilities are guaranteed by 14 subsidiaries (the "<u>BrandCo Entities</u>"), as listed on **<u>Exhibit F</u>**, that are not obligors with respect to the 2016 Term Loan Facility, the US ABL Facility, and that hold certain intellectual property assets related to the Specified Brands (as defined below), and are secured by first priority liens on certain assets that are not collateral for the 2016 Term Loan Facility or US ABL Facility, including (a) substantially all assets

of the BrandCos Entities, including 100% of the equity interests in the BrandCos that hold the intellectual property assets (the "BrandCos"), and (b) 34% of the equity of certain first-tier foreign subsidiaries (collectively, the assets securing the BrandCo Facility, the "BrandCo Collateral").

64.     The BrandCos were established as special purpose entities to hold the following brands: American Crew, Elizabeth Arden, certain portfolio brands including Almay, CND, Mitchum, and three Multicultural Group brands (namely, Creme of Nature, Lottabody, Roux, and Fanci-Full) and certain owned fragrance brands including Charlie, Curve, Giorgio Beverly Hills, Halston, Jean Naté, Paul Sebastian, and White Shoulders (collectively, the "Specified Brands"), and, as part of the transactions carried out in connection with the BrandCo Facilities, the BrandCos licensed the Specified Brands, pursuant to licensing agreements (the "BrandCo Licenses"), to RCPC, which in turn sub-licensed the Specified Brands to certain other Debtors.  Pursuant to the BrandCo Licenses, RCPC remits royalty payments to the BrandCos on a monthly basis.  Each of the BrandCos is a Debtor in these Chapter 11 Cases.

65.     The BrandCo Facilities mature on the earlier of (i) June 30, 2025 and (ii) May 2, 2024 if greater than $100 million in aggregate principal amount of the 2024 Unsecured Notes (as defined below) remain outstanding on such date.

66.     As part of the business deal associated with the BrandCo Facilities, RCPC pays a monthly royalty to the BrandCos of 10% of the net sales of products made with their IP.  In 2021, RCPC paid the BrandCos approximately $94 million in royalties.**Intercreditor Agreements**

67.     The relative rights and priorities of the secured parties under the US ABL Facility, the 2016 Term Loan Facility, and the BrandCo Facilities are governed by three intercreditor agreements.

68.    Pursuant to that certain ABL Intercreditor Agreement, dated as of September 7, 2016, among MidCap, as ABL Agent, and Citibank, as Initial Term Loan Agent, as supplemented by that certain Intercreditor Joinder Agreement, dated as of May 7, 2020, among Jefferies, as New Term Loan Agent, and Citibank, as ABL Agent and Term Loan Agent (collectively, the "ABL Intercreditor Agreement"), the liens on the ABL Priority Collateral securing the 2016 Term Loan Facility and the BrandCo Facilities are junior to the liens on the ABL Priority Collateral securing the US ABL Facility, and the liens on the Term Loan Priority Collateral securing the US ABL Facility are junior to the liens on the Term Loan Priority Collateral securing the 2016 Term Loan Facility and the BrandCo Facilities.

69.    Pursuant to that certain Pari Passu Intercreditor Agreement, dated as of May 7, 2020, among Citibank, as Initial Credit Agreement Collateral Agent, and Jefferies, as Initial Other First Lien Collateral Agent (the "Pari Passu Intercreditor Agreement"), the liens on the ABL Priority Collateral and the Term Loan Priority Collateral securing the BrandCo Facilities are *pari passu* with the liens on the ABL Priority Collateral and the Term Loan Priority Collateral securing the 2016 Term Loan Facility.

70.    Pursuant to that certain Intercreditor Agreement, dated as of May 7, 2020, between Jefferies, as First Lien Collateral Agent, Jefferies, as Second Lien Collateral Agent, and Jefferies, as Third Lien Collateral Agent (the "BrandCo Intercreditor Agreement") as among the BrandCo Facilities, the First Lien BrandCo Facility is secured by the BrandCo Collateral on a first-priority basis, the Second Lien BrandCo Facility is secured by the BrandCo Collateral on a second-priority basis, and the Third Lien BrandCo Facility is secured by the BrandCo Collateral on a third-priority basis.

71.     **Exhibit G** summarizes the priorities set forth in the ABL Intercreditor Agreement, the Pari Passu Intercreditor Agreement, and the BrandCo Intercreditor Agreement with respect to the ABL Priority Collateral, the Term Loan Priority Collateral, and the BrandCo Collateral.

### E.    Foreign Asset-Based Term Facility

72.     As of the Petition Date, approximately $75 million was outstanding under that certain Asset-Based Term Loan Credit Agreement, dated as of March 2, 2021 (as amended, supplemented, or otherwise modified, the "Foreign ABTL Credit Agreement," and the asset-based term loan facility thereunder, the "Foreign ABTL Facility"), by and among Revlon Finance LLC, as the borrower (the "Foreign ABTL Borrower"), the Foreign ABTL Guarantors (as defined below), the lenders party thereto, and Blue Torch Finance LLC ("Blue Torch"), as administrative agent and collateral agent.

73.     The Obligations (as defined in the Foreign ABTL Credit Agreement) under the Foreign ABTL Facility are guaranteed by the following entities, as listed on **Exhibit H**: (i) certain foreign subsidiaries of RCPC organized in Australia, Bermuda, Germany, Italy, Spain, and Switzerland, (ii) the direct parent entities of each of the foregoing entities (not including Revlon, Inc. or RCPC) on a limited recourse basis, and (iii) certain subsidiaries of RCPC organized in Mexico (collectively, the "Foreign ABTL Guarantors" and, together with the Foreign ABTL Borrower, the "Foreign ABL Loan Parties").

74.     The Obligations under the Foreign ABTL Facility are secured on a first-priority basis by (i) liens on the equity of each Foreign ABTL Loan Party (other than the subsidiaries of RCPC organized in Mexico) and (ii) certain assets of the Foreign ABTL Guarantors, including inventory, accounts receivable, material bank accounts, and material intercompany indebtedness.

None of the Foreign ABL Loan Parties is a Debtor or an obligor under any of the US ABL Facility, 2016 Term Loan Facility, BrandCo Facilities, or Unsecured Notes (as defined below).

75.    The Foreign ABTL Facility is scheduled to mature on the earlier of (i) March 2, 2024 and (ii) a springing maturity date of August 1, 2023 if, on such date, any principal amount of 2016 Term Loans remains outstanding.

**F.    2024 Unsecured Notes**

76.    As of the Petition Date, there is approximately $431.3 million of unsecured note obligations consisting of the 6.25% Senior Notes due 2024 (the "2024 Unsecured Notes") issued and outstanding pursuant to that certain Indenture, dated August 4, 2016, by and among RCPC, as issuer, and the U.S. Bank National Association, as indenture trustee. The 2024 Unsecured Notes are senior, unsecured obligations of RCPC, and are guaranteed on a senior, unsecured basis by the guarantors under the 2016 Term Loan Facility and the US ABL Facility, excluding Revlon, Inc. and the foreign Debtors that are party to the US ABL Credit Agreement and 2016 Term Loan Agreement, as listed on **Exhibit I**. The 2024 Unsecured Notes mature on August 1, 2024.

**G.    Common Stock**

77.    Revlon is an indirect majority-owned subsidiary of MacAndrews & Forbes Incorporated (together with certain of its affiliates other than the Company, "MacAndrews & Forbes"). As of the Petition Date, Revlon has approximately 54,254,019 shares of Class A common stock, of which MacAndrews & Forbes Incorporated and certain of its affiliates own approximately 85.2%. As of the Petition Date, Revlon's common stock is listed on the NYSE under the symbol "REV."

      **H.**    **Cash**

78.    As of the Petition Date, the Debtors had approximately $12,860,362 of unrestricted cash on their balance sheet.

**IV.**    **Events Leading to the Commencement of These Chapter 11 Cases**

79.    Prior to the onset of the COVID-19 pandemic, the Debtors, like many other companies in the beauty industry, had experienced a prolonged period of declining customer demand. This general downturn worsened considerably during the COVID-19 pandemic, and although the Company has more recently experienced a rebound in sales and a turnaround in demand, it now faces challenges from supply chain disruptions and liquidity constraints that pose a substantial challenge for its ongoing operations.

      **A.**    **2020 Refinancing Efforts**

80.    In late 2019, the Debtors retained the services of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss") as legal advisor, and in early 2020, retained Jefferies (together with Paul, Weiss, the "Advisors") as investment banker, to assist the Company's management team and the Board in analyzing and evaluating various strategic alternatives with respect to the Company's capital structure issues. With the assistance of the Advisors, the Company explored several potential transactions intended to create a sustainable capital structure.

      (i)    The BrandCo Facilities

81.    In late 2019 into early 2020, the Company faced a significant risk related to the upcoming maturity on its 5.75% Senior Notes due 2021 pursuant to that certain Indenture, dated as of February 13, 2013, among RCPC, as issuer, the guarantors party thereto, and U.S. Bank National Association, as indenture trustee (the "2021 Unsecured Notes"). Each of the 2016 Term Loan Facility, the US ABL Facility, and the Foreign ABTL Facility included a springing maturity

that resulted in these facilities maturing 91 days inside the maturity date of the 2021 Unsecured Notes (i.e., November 16, 2020) if any of the 2021 Notes remained outstanding on such date and the Company could not meet a certain liquidity threshold.

82.     These debt maturities created a substantial risk that the Company's audited financial statements for the fiscal year ending December 31, 2019 would include a qualification from the Company's auditor as to the ability of the Company to continue as a going concern.  This qualification would have resulted in an event of default under the 2016 Term Loan Facility and the US ABL Facility, and cross-defaults across the Company's capital structure.

83.     To address this issue, the Company entered into negotiations with (i) Jefferies to provide sufficient financing to refinance the 2021 Unsecured Notes and (ii) an ad hoc group (the "Initial Ad Hoc Group") of lenders under the 2016 Term Loan Facility regarding a potential refinancing.  On February 13, 2020, the Initial Ad Hoc Group made a financing proposal to the Debtors that included many of the features of the BrandCo Facilities, including a new money facility secured by an exclusive first lien on the BrandCo Collateral, as well as pari passu liens on the remainder of the collateral securing the 2016 Term Loans, and a refinancing of the 2016 Term Loans held by the members of the Initial Ad Hoc Group.

84.     On March 9, 2020, as the deadline for filing the Company's annual financial statements approached and prior to consummating a transaction with the Initial Ad Hoc Group, the Debtors entered into a commitment letter with Jefferies to provide sufficient financing to refinance the 2021 Unsecured Notes.  With the risk of a going concern qualification in its 2020 financial statements addressed, the Company resumed negotiations with the Initial Ad Hoc Group. However, in mid-March of 2020, the emerging COVID-19 pandemic began to affect the Debtors' operations and the broader economy, and several members of the Initial Ad Hoc Group

(the "<u>Objecting Lenders</u>") left the group and entered into a lock-up agreement to block any transaction by the remaining members of the Initial Ad Hoc Group (the "<u>Supporting Lenders</u>") to provide the Debtors with incremental liquidity.

85.    On April 14, 2020, the Company entered into a financing commitment letter with the Supporting Lenders to provide for incremental financing.  All 2016 Term Loan Lenders were offered the opportunity to participate in the financing on an at least a pro rata basis based on their holdings of 2016 Term Loans.  However, the Objecting Lenders refused to participate in the financing and continued efforts to block any transaction.

86.    By April 23, 2020, the effects of the pandemic had placed great stress on the Debtors' businesses, and availability under the US ABL had almost completely evaporated.  With the prospects for a new money financing transaction uncertain, the Company entered into a new $65 million incremental revolving facility under the 2016 Term Loan Facility from the Supporting Lenders to give the Company immediate access to incremental liquidity.

87.    On May 1, 2020, the Supporting Lenders—who then held the majority of loans outstanding under the 2016 Term Loan Facility—and the Company agreed to the terms of the BrandCo Facilities, and on May 7, 2020, the BrandCo Facilities closed.  To establish the BrandCo Facilities, the Debtors exercised their rights under the 2016 Term Loan Credit Agreement, with the approval of the then-Required Lenders (as defined in the 2016 Term Loan Credit Agreement), to transfer the Specified Brands from the Debtors obligated on the 2016 Term Loan Facility to the BrandCos.  The BrandCos Entities then pledged their assets, including the Specified Brands, as collateral solely securing the BrandCo Facilities.  All existing lenders under the 2016 Term Loan Credit Agreement were invited to participate in the BrandCo Facilities on at least a pro rata basis. In connection with the closing, the 2016 Term Loan Credit Agreement and the US ABL Credit

Agreement were amended to, among other things, permit the Company's entry into the BrandCo Facilities and to extend the maturity date of the 2016 Term Loans for certain consenting lenders to June 30, 2025.

**B.    Impact of the COVID-19 Pandemic**

88.    In March 2020, governmental authorities in the United States and around the world imposed stay-at-home orders and non-essential businesses were ordered closed in an effort to abate the spread of the COVID-19 virus.  The Company immediately experienced a general decline in sales due to the imposition of mask mandates, quarantines, travel and transportation restrictions, import and export restrictions, and the closures of retail locations and office spaces, all of which would contribute to a general slowdown in the global economy.  There was a significant decline in air travel and consumer traffic in key shopping and tourist areas around the globe, which adversely affected the Company's travel retail business.  In North America, the Company's prestige channel was the hardest hit as department stores closed.

89.    Moreover, consumer purchases of certain of the Company's key cosmetic products decreased significantly.  Individuals who would have typically visited professional hair and nail salons, one-stop shopping beauty retailers, department stores, or similar cosmetic stores where the Debtors' products are sold could not do so due to mandated closures and shelter-in-place orders. The measures imposed by governmental authorities caused significant disruptions to the Company's business operations in the regions most impacted by COVID-19, including Asia, North America, and Europe.

90.    Because of these factors, the Company experienced declines in net sales and profits. In the first quarter of 2020, the negative impact of COVID-19 was seen across the board: as-reported net sales included approximately $54 million of estimated negative impacts associated

with COVID-19; operating losses were an additional $186 million compared to $23 million in 2019; and Adjusted EBITDA fell to $28 million, compared to $39 million during the prior year period.  Net sales also decreased in each business segment, primarily due to the impact of the pandemic, which led to an increase in cash usage.

      **C.**      **Citibank Litigation**

91.      As described above, Citibank serves as the Administrative Agent for the 2016 Term Loans.  In that role, Citibank distributes payments from the Company made under the 2016 Term Loan Credit Agreement to the 2016 Term Loan Lenders.  An interest payment of $7.8 million was to be paid on August 11, 2020 (the "August 2020 Interest Obligation"), and Revlon appropriately transferred the funds necessary to pay the August 2020 Interest Obligation to Citibank so that Citibank could remit the funds to the 2016 Term Loan Lenders.

92.      On August 11, 2020, Citibank mistakenly paid not only the August 2020 Interest Obligation with Revlon's funds, but also, using its own funds, paid the full outstanding principal remaining on the 2016 Term Loans in an amount of nearly $894 million (such excess payment, the "Mistaken Principal Payment").

93.      When it realized its error, Citibank promptly sent recall notices to the 2016 Term Loan Lenders, informing them that the Mistaken Principal Payment was made in error and that all funds paid to them on August 11, 2020 above their share of the August 2020 Interest Obligation were not owed under the 2016 Term Loan Credit Agreement.  Citibank requested that the 2016 Term Loan Lenders remit their portion of the Mistaken Principal Payment promptly.

94.      Many Term Loan Lenders returned their share of the Mistaken Principal Payment to Citibank (the "Returned Payment Lenders").  However, several 2016 Term Loan Lenders that

collectively held approximately $500 million in principal (such 2016 Term Loan Lenders, the "Mistaken Payment Lenders") declined to return the funds.

95.     On August 17, 2020, less than one week after the Mistaken Principal Payment, Citibank filed the first of three suits against the Mistaken Payment Lenders in the U.S. District Court for the Southern District of New York, seeking the return of their share of the Mistaken Principal Payment.[4]  Citibank argued that the Mistaken Payment Lenders had no right to the Mistaken Principal Payment, while the defendants claimed they were owed the money and had no notice that the payments were a mistake at the time they were made, which entitled them to keep the money under New York state law.  Notably—and inconsistently with the allegation that the Mistaken Payment Lenders believed they had been paid in full on August 11, 2021—UMB Bank, purporting to act in its alleged capacity as successor administrative agent to Citibank under the 2016 Term Loan Credit Agreement on behalf of the same Lenders, filed a separate Complaint on August 12, 2020 in the Southern District of New York against Revlon, Citibank, Jeffries, the BrandCo Lenders and others alleging that transactions giving rise to the BrandCo Facility had breached the 2016 Term Loan Credit Agreement and fraudulently transferred assets to the BrandCos.  The Company and other defendants disputed those claims, but they were never adjudicated because UMB withdrew that complaint without ever serving any of the defendants on November 6, 2020, and the Returned Payment Lenders did not pursue those claims.

96.     A bench trial was held in the Citibank Litigation in December 2020 before the Honorable Jesse M. Furman in the Southern District of New York.  On February 16, 2021, Judge Furman issued a decision in favor of the Mistaken Payment Lenders, which Citibank promptly

---

[4]     Citibank ultimately filed three lawsuits against different Mistaken Payment Lenders.  These suits were consolidated in *In re Citibank August 11, 2020 Wire Transfers*, Case No. 1:20-cv-06539-JMF (S.D.N.Y.).

appealed.  The appeal was fully briefed on July 22, 2021, and argued before the Second Circuit on

September 29, 2021.

97.     As of the Petition Date, the Second Circuit has not yet issued a decision, which has

created substantial uncertainty regarding important aspects of the Debtors' capital structure,

including as to basic matters such as who controls a majority of the outstanding 2016 Term Loans.

The uncertainty engendered by these events has caused the Company significant and

unprecedented difficulty in managing its capital structure out of court.  As noted above, due to the

unresolved dispute over the Mistaken Principal Payment, the status of approximately $500 million

of the 2016 Term Loans (and claims relating to such loans) remains unclear.

### D.      Prepetition Financing Efforts

98.     As the COVID-19 pandemic rapidly escalated, the Company pivoted its focus to

preserving its existing liquidity position.  Beginning in the summer of 2020, and continuing

through shortly before the commencement of these Chapter 11 Cases, the Debtors implemented a

variety of strategic liquidity preservation initiatives and attempts to address their capital structure.

### (i)      The Exchange Transactions

99.     In the summer of 2020, the Debtors considered possible out-of-court exchange

transactions and open market purchase transactions relating to the 2021 Unsecured Notes in an

effort to address the November 2020 springing maturities of the Company senior secured

indebtedness that would occur if the 2021 Unsecured Notes had not been not retired by then.  The

Debtors launched an exchange offer in late July 2020 that was not successful and was allowed to

expire on September 14, 2020.  During this time, the Debtors and their advisors engaged with an

ad hoc group of BrandCo Lenders regarding the terms of an exchange offer for the 2021 Unsecured

Notes.  Through this engagement, the Debtors and certain of the BrandCo Lenders (the "TSA

Parties") entered into that certain Transaction Support Agreement, dated September 28, 2020 (the

"TSA"), pursuant to which the TSA Parties agreed to support an exchange of the 2021 Unsecured

Notes for (a) cash, (b) up to $75 million of newly issued Second Lien BrandCo Loans (the "New

2L BrandCo Loans"), and (c) up to $50 million of "first in, last out" loans under the US ABL

Facility (the "New FILO Loans"), among other things.  Additionally, the TSA contained a closing

condition that the Debtors maintain not less than $175 million of liquidity, after reducing available

liquidity by the aggregate principal amount of 2021 Unsecured Notes that would remain

outstanding after the contemplated exchange (the "Minimum Liquidity Threshold").

100.    On September 29, 2020, the Company commenced a second exchange offer

(the "Restructuring Exchange Offer").  Under the Restructuring Exchange Offer, holders of any

outstanding 2021 Unsecured Notes were offered the chance to tender them in exchange for (i) cash

or (ii) in certain cases, a combination of cash and a fixed amount of the New FILO Loans and New

2L BrandCo Loans.  Initially, the Restructuring Exchange Offer was conditioned on (i) 95%

participation of the aggregate outstanding principal amount of 2021 Unsecured Notes and (ii) the

receipt of all necessary consents from the exchanging holders of the 2021 Unsecured Notes to

eliminate substantially all of the restrictive covenants and certain events of default with respect to

the existing 2021 Unsecured Notes.

101.    On October 23, 2020, after extensive engagement with certain significant holders

of the 2021 Unsecured Notes, the Company amended the Restructuring Exchange Offer to further

incentivize noteholders to participate in that offer.  Rather than receiving a fixed amount of the

New FILO Loans and New 2L BrandCo Loans, tendering noteholders would receive their pro rata

share of the New FILO Loans and New 2L BrandCo Loans, and the Debtors removed the 95%

threshold.  Upon the expiration of the Restructuring Exchange Offer on November 10, 2020,

approximately 68.8% of the aggregate outstanding principal amount of the 2021 Unsecured Notes were validly tendered and not withdrawn (the "Tendered Notes").

102.    In connection with the Restructuring Exchange Offer, Debtor RCPC accepted $236 million in aggregate principal amount of 2021 Unsecured Notes tendered.  RCPC then (i) cancelled the tendered 2021 Unsecured Notes accepted for exchange, (ii) irrevocably instructed the trustee under the 2021 Unsecured Notes indenture to give a notice of optional redemption to redeem on December 14, 2020 (the "Redemption Date") the remaining $106.8 million of Notes at a price of 100% of their principal amount, plus interest accrued to, but not including, the Redemption Date and (ii)i irrevocably deposited a total of approximately $108.8 million of cash with the trustee under the Indenture to effect such redemption.  As a result, the 2021 Unsecured Notes Indenture and the 2021 Unsecured Notes were discharged in full effective on November 13, 2020.

(ii)    Helen of Troy License Agreement

103.    Having avoided the springing maturities with a successful out-of-court exchange, the Company next focused on additional liquidity preservation initiatives.  On December 22, 2020, certain of the Company's subsidiaries and Helen of Troy Limited ("Helen of Troy") entered into a Trademark License Agreement (the "HOT License Agreement") to combine and revise the existing licenses that were in place between the parties.  The HOT License Agreement granted Helen of Troy the exclusive right to use the "Revlon" brand in connection with the manufacture, marketing, sale, and distribution of certain hair and grooming products until December 31, 2060 (with three additional 20-year renewal periods) in exchange for a one-time, upfront cash fee of $72.5 million.

(iii)   March 2021 Refinancing Efforts

104.   During March 2021, the Company extended one, and refinanced another, of its maturing debt facilities.  First, on March 2, 2021, the Company refinanced its Foreign ABTL Facility in an agreement with Blue Torch as the collateral agent and administrative agent.  The refinancing upsized the Foreign ABTL Facility from $50 million to $75 million and extended the maturity from July 2021 to March 2, 2024.  The proceeds of the transaction were used for the refinancing and to fund the Company's ongoing liquidity needs.

105.   Second, on March 8, 2021, Debtor RCPC entered into Amendment No. 7 to the US ABL Facility ("Amendment No. 7").  Amendment No. 7, among other things, made certain amendments pursuant to which (i) the maturity date applicable to the "Tranche A" revolving loans under the US ABL Facility was extended from September 7, 2021 to June 8, 2023, (ii) the commitments under the Tranche A Loans were reduced from $400 million to $300 million, and (iii) a new $100 million senior secured second-in, second-out term loan facility maturing June 8, 2023 (the "SISO Term Loan Facility") was established.

(iv)   Further Amendment of US ABL Facility

106.   On May 7, 2021, RCPC entered into Amendment No. 8 to the US ABL Facility ("Amendment No. 8").  Under Amendment No. 8, among other things: (i) the maturity date applicable to the Tranche A Loans and SISO Term Loan Facility was extended from June 8, 2023 to May 7, 2024, subject to a springing maturity to the earlier of: (x) 91 days prior to the maturity of the 2016 Term Loans on September 7, 2023, to the extent such term loans are then outstanding, and (y) the earliest stated maturity of the ABL FILO Term Loans, to the extent such term loans are then outstanding; (ii) the commitments under the Tranche A Loans were reduced from $300 million to $270 million; and (iii) the commitments under the SISO Term Loans were upsized from

$100 million to $130 million.  At the same time, the Company also entered into a successor agent appointment and agency transfer agreement pursuant to which MidCap succeeded Citibank as the collateral agent and administrative agent for the US ABL Facility.

        (v)      <u>Increase of Borrowing Base under the US ABL Facility and Foreign ABTL Facility</u>

107.    On March 30, 2022, the Foreign ABTL Borrower entered into a first amendment to the Foreign ABTL Credit Agreement with Blue Torch to temporarily increase the borrowing base for one year.  The initial increase of the borrowing base was approximately $7 million.

108.    On March 31, 2022, RCPC entered into Amendment No. 9 ("<u>Amendment No. 9</u>") to the US ABL Facility.  Amendment No. 9, among other things, temporarily increased the borrowing base by up to $25 million until the earlier of (i) September 29, 2022 and (ii) the occurrence of an event of default or payment default.  During this period, Amendment No. 9 also established a reserve against availability under the US ABL Facility in the amount of $10 million until June 29, 2022 and $15 million thereafter (resulting in a net liquidity increase of $15 million until June 29, 2022 and $10 million thereafter until the end of the amendment period).

**E.    Cost-Cutting Measures**

109.    The Company has engaged in cost-cutting measures since 2018, when it first implemented an optimization program designed to further streamline the organization and reduce costs.  Beginning in March, the Company had to adjust their efforts in the face of the COVID-19 related liquidity strain on the Company, and began to focus on, among other things: (i) reducing brand support (commercial spend on licensed products), as a result of the abrupt decline in retail store traffic; (ii) monitoring the Company's sales and order flow and periodically scaling down operations and cancelling promotional programs; (iii) closely managing cash flow and liquidity

and prioritizing cash to minimize COVID-19's impact on the Company's production capabilities; and (iv) pursuing various organizational measures designed to reduce costs with respect to employee compensation.

110.    When the first wave of COVID-19 impacts dissipated, the Company refocused on its existing restructuring program (the "Revlon Global Growth Accelerator" or "RGGA"). Initially launched as a predecessor program in March 2020, and expanded in May 2021, the RGGA's objectives included right-sizing the Company's organization with the objectives of driving improved profitability, cash flow, and liquidity. The program was originally intended to continue through 2023, but was extended by an additional year in March 2022 to run through 2024. There are three major initiatives under RGGA: (i) focusing on strategic growth, which includes boosting organic sales growth behind the Company's strategic pillars of brands, markets, and channels; (ii) driving operating efficiencies and cost savings to fuel investments in revenue growth; and (iii) enhancing capabilities of employees to promote transformational change. The RGGA achieved its cash target in 2021, and was projected to deliver further reductions in cost.

111.    During the first quarter of 2022, the Company also implemented a mitigation plan that included reductions in commercial investments, proactive management of pricing to address inflation, reduction of discretionary departments, and targeted reductions in capital spend. This program, too, was intended to help provide the Company with sufficient liquidity to bridge it through these supply chain disruptions.

### F.    Market Conditions and Industry Headwinds

112.    Despite all of the Company's efforts to manage its financial position and liquidity, in recent months, the Company's operations have been negatively impacted in key ways.

113.    First and foremost, global supply chain disruptions have significantly challenged the Company's ability to manufacture products and bring them to market.  The Company's supply chain is complex, not least because the Debtors produce and sell over 8,000 stock keeping units ("SKUs").  Furthermore, many of the Company's cosmetics products require between 35 to 40 different ingredients and components to manufacture, and a failure to secure any one of those components will prevent manufacturing and distribution for the entire product.  For example, one tube of Revlon lipstick requires 35 to 40 raw materials and component parts, each of which is critical to bringing the product to market.  With shortages of necessary ingredients across the Company's portfolio, competition for any available materials is steep.  Even the Company's better-financed competitors are struggling to secure products.  However, because many of the Company's competitors have more cash on hand, they have been able to build more inventory in advance, invest in stocking up on components and raw materials, and pay up front or a premium where needed to secure additional supplies.  By contrast, the Debtors' liquidity challenges have caused them to fall further behind.  Even in instances where the Company has a valid purchase order with a vendor, many vendors have decommitted and declined to fill the order when presented with a higher offer by a third party.  This has forced the Company to buy materials on the spot-market, where costs are significantly higher.  These supply chain issues have also increased lead-times for the Company to bring its products to market.

114.    Second, shipping, freight, and logistics issues are also delaying the Debtors' ability to bring products to market, and imposing additional costs.  Many of the Company's raw materials are sourced from China, as the Company has over 40 suppliers in the country providing approximately 1,200 items (components, raw materials, finished goods, and works in progress).  Since the onset of the COVID-19 pandemic, China has followed a "zero-COVID" policy, which

imposes lockdowns in areas where even a handful of COVID cases are detected. These lockdowns—including the most recent lockdowns in April and May in Shanghai—often shut down manufacturing capabilities and restrict transportation in and from the affected areas, which creates additional strain on the Debtors' supply chain, especially because their timing and length cannot be predicted in advance. The transportation freeze has led to both truck shortages and, at times, the closure of entire ports. Not only can lockdowns sometimes prevent the Debtors obtaining timely goods at all, but when they are able to obtain substitute goods, they are often forced to pay higher prices. All of this has also increased costs for shipping, given the decrease in supply as a result of the lockdowns. For example, in 2019, the Company paid approximately $2,000 per container to get freight out of China and products would typically ship from China to the United States in four to six weeks. Today, the Company is paying approximately $8,000 per container and shipments to the United States are taking twice as long.

115.    Third, labor shortages and rising labor costs globally are affecting the Company, both in its manufacturing and transportation of goods. Suppliers are working with smaller labor forces; the trucking industry is also suffering a decline in available drivers—both of these result in increased costs, delays, and difficulties obtaining products. The Company is also dealing with these issues internally, as it seeks to maintain a sufficient workforce in the face of low unemployment rates and significantly rising wages.

116.    Fourth, inflation is rising at such a pace that the Company has had difficulties passing its increased costs onto customers. Because of both market standards and contractual provisions with retailers, within the U.S. market, the Company can increase prices only about one to two times in a given calendar year. Within the international market, however, the Company can typically only increase prices *once* at the beginning of the year—if prices are not raised at the

outset, it is nearly impossible for the Company to do so later.  Therefore, the Company has only been able to increase prices by approximately 3 to 4% in the U.S. market and an average of approximately 1% in the international markets.

117.    Fifth, cash constraints have created tensions with vendors.  Many of the Debtors' vendors have ceased providing ordinary trade credit and have begun requiring cash in advance and/or  prepayment on future orders before shipping any goods.  Vendors have also begun imposing credit holds when the Company is overdue for any amount, including as little as $500.  A credit hold is detrimental for the Company's business because it puts the Company at the back of the line to receive the goods that a vendor supplies.  In previous years, these vendors typically would have worked with the Company on prepayment plans or ways to avoid credit holds, but competition for components and raw materials is so fierce that suppliers are easily finding alternative purchasers.  Both increased prepayments and increased credit holds put immense pressure on the Company's cash and liquidity position.

118.    The cumulative result of these challenges is that the Company is currently unable to deliver sufficient quantities of goods to its key retail counterparties, and the current state of affairs is not sustainable; the Company is unable to procure supplies it needs, it cannot deliver in-demand products to customers, and it is facing increasing penalties from its customers due to its inability to meet "on-time, in full" ("OTIF") deliveries of its products, penalties which exceeded $1.2 million in the month of May alone.

119.    This inability to meet demand not only further depletes liquidity, but also threatens the stability of customer relationships at a critical time shortly before the annual procurement planning cycle in September 2022 for the Company's key customers, and the holiday season that takes place in Q4.  Each year in September, the Company's retail customers review and reset their

shelf space allocations for the following year, and do so in part based on the Company's prior performance and new product offerings in upcoming year. If the Company loses its share of retail space in September 2022 from its customers, that space will be allocated to its competitors, and may not be regained until the next cycle in September 2023, if ever. A long term absence or diminished brand presence would do significant harm to the Company, to the detriment of all of its stakeholders.

120.    The Company therefore needs more liquidity than ever to bring its products to the market, and at the same time, the supply chain delays have only exacerbated the liquidity challenges by reducing the Company's saleable products and inventory, which, in addition to the effects described above, in turn reduces the Company's ability to borrow under its US ABL Facility. The borrowing base under that facility is calculated based on specified "advance rates" against the liquidation value of, among other things, certain eligible inventory (including, among other things, raw materials, work-in-process inventory, and finished goods) and accounts receivable. Advance rates with respect to certain borrowing base assets are lower in the earlier stages of the production cycle—raw materials have a lower advance rate than work-in-process inventory, which have a lower advance rate than finished goods, which have a lower advance rate than the receivables generated when such finished goods are sold. Therefore, the earlier in the production cycle the Company experiences delays, the lower the advance rates the Company is able to obtain on its borrowing base assets. For example, when the Company experiences a delay in obtaining even a single component necessary for producing a given product, it is unable to convert the raw materials purchased to produce that product into finished goods, and ultimately to fulfill orders that would otherwise convert the finished goods into receivables. The substantial

negative impact of such delays in the production cycle on the Company's liquidity can be seen in
the Company's borrowing base calculations over the past few months.

### G. Governance

121.    As the Debtors began focusing on potential restructuring alternatives, the Board
determined that it was appropriate and in the Debtors' best interests to make a series of governance
changes throughout the Company, each of which were approved and implemented on June 15,
2022.

122.    *First*, the Board of Revlon, Inc. expanded its size and appointed one independent
and disinterested Board member with significant restructuring experience, Mr. D.J. ("Jan") Baker.
Mr. Baker has significant restructuring experience, having spent his legal career practicing in all
phases of both out-of-court recapitalizations and restructurings as well as in-court-reorganization
proceedings.

123.    *Second*, the Board of Revlon, Inc. formed the Restructuring Committee comprised
of Alan S. Bernikow, as Chair, E. Scott Beattie, Barry F. Schwartz, Victor Nichols, and Jan Baker.
The Restructuring Committee was established to assist the Company in its efforts to plan for and
assess potential strategic alternatives in connection with a potential restructuring and
reorganization of the Company and certain of its affiliates, including the prosecution of potential
chapter 11 cases by the Company and its subsidiaries (the "Restructuring Matters").  Pursuant to
the resolutions establishing the Restructuring Committee, the Restructuring Committee was
delegated the full and exclusive power and authority of the Board to carry out all key activities
related to the Restructuring Matters, except for the power or authority to approve any "Significant
Transactions," which is defined in such resolutions as "any proposed (a) plan of reorganization of
the Company and its subsidiaries, (b) sale of all or substantially all of the Company's assets or

businesses or (c) any other significant transaction or decision that the Restructuring Committee determines should be considered by the full Board." The resolutions establishing the Restructuring Committee also delegated to the Restructuring Committee the full and exclusive power and authority of the Board to consider, negotiate, approve, authorize and act upon "Alleged Conflicts Matters," which is defined in such resolutions as "any matter. . ., as determined by the Restructuring Committee, that certain creditors of the Company or any of its subsidiaries could potentially allege presents conflicts of interest between the Company and related entities." However, in delegating the Board's power and authority in respect of Alleged Conflicts Matters to the Restructuring Committee, the Board also specifically provided that Mr. Schwartz "shall not participate in, and shall recuse himself and abstain from, any consideration by the Restructuring Committee of any Alleged Conflicts Matters and any exercise by the Restructuring Committee of any [of its delegated power or authority in respect of Alleged Conflicts Matters]." Additionally, the resolutions establishing the Restructuring Committee also delegate to the Restructuring Committee all powers previously delegated to the Compensation Committee, including those set forth in the Compensation Committee Charter that is posted to the Company's investor relations website as of the date of this Declaration. By the same resolutions, the Board of Revlon, Inc. resolved to disband and dissolve the standing Compensation Committee of the Board.

124.   *Third*, the Board of Revlon, Inc. formed the Investigation Committee comprised of Jan Baker as the sole member. Pursuant to the resolutions establishing the Investigation Committee, the Board delegated to the Investigation Committee with all of the power and authority of the Board to (i) perform and any all internal audits, reviews and investigations of the Company and its subsidiaries, (ii) perform any and all work necessary to complete a special review being conducted by outside counsel (and originally commenced under the supervision of the Audit

Committee of the Board) of the Company's governance, financial transactions and business operations to assess the potential viability of legal claims that may be brought by various parties against the Board or the Company's controlling shareholder, (c) evaluate the appropriateness and necessity of any releases in a potential chapter 11 filing and plan of reorganization by the Company, and (d) take any and all other actions incident or ancillary to the foregoing or otherwise as the Investigation Committee determined to be advisable, appropriate, convenient or necessary to the performance of its duties and the discharge of its responsibilities.

125.   *Fourth*, effective immediately upon the resignations of Ronald O. Perelman, Debra Perelman, and Ceci Kurzman, the RCPC Board appointed Jan Baker, E. Scott Beattie, and Victor Nichols as directors.  By the same resolutions, the RCPC Board appointed Alan Bernikow as Chairman.

126.   *Lastly*, Debtor Beautyge I, as sole Member of each of the BrandCos, appointed Steven G. Panagos as Restructuring Officer at each of the BrandCos.  Mr. Panagos has significant restructuring experience, having spent his career leading companies through complex financial and operational restructurings and reorganizations.   Pursuant to the resolutions appointing the Restructuring Officer, Beautyge I delegated to the Restructuring Officer the full power and authority of the Member to (i) consider, negotiate, approve, authorize and act upon any Alleged BrandCo Conflicts Matters, and (ii) carry out all key activities related to the Chapter 11 Cases of the BrandCos.  The resolutions appointing Mr. Panagos as the Restructuring Officer specify that he does not have the power or authority to approve any "Significant Transactions," which include the adoption or implementation of any proposed (a) plan of reorganization of any BrandCo, (b) sale of all or substantially all of any BrandCo's assets or businesses, or (c) any other significant

transaction or decision that he determines should be considered by the Member, except for any Significant Transaction that constitutes an Alleged BrandCos Conflicts Matter.

### H.     Obtaining Necessary Liquidity to Fund the Chapter 11 Cases

127.     In the face of the issues laid out above, and given the need to preserve liquidity, the Company's management and the Advisors assessed the need for contingency planning and engaged in efforts to prepare the Debtors to commence chapter 11 cases.  A key aspect of these efforts was to engage with the Company's stakeholders, including the ABL Lenders and BrandCo Lenders regarding the Debtors' liquidity position, and the need for post-petition financing to enable the Debtors to fund any potential chapter 11 process.

128.     These hard fought and arm's-length negotiations resulted in the BrandCo Lenders and ABL Lenders willingness to provide financing to support the Debtors' chapter 11 process in the form of a senior secured post-petition asset-based revolving credit facility in the aggregate principal amount of $400 million (the "DIP ABL Facility") and a senior secured priming post-petition term loan credit facility in the aggregate principal amount of $575 million, with an incremental uncommitted facility in the amount of $450 million (the "DIP Term Loan Facility," and together with the DIP ABL Facilities, the "DIP Facilities").  The incremental uncommitted facility of $450 million can only be used to refinance or replace the DIP ABL Facility or the US ABL Facility.  After careful consideration, and with the support of the ABL Lenders and the BrandCo Lenders, the Debtors determined to commence these Chapter 11 Cases to preserve the enterprise's value and pursue a value maximizing restructuring for the benefit of all parties in interest.  Of the total amount of financing, $375 million would be immediately available on an interim basis, $300 million for critical vendors, working capital necessary to manage the Debtors' supply chain and manufacturing and distribution costs, paying employees as well as professional

fees and financing costs, paydown of the ABL Facility due to the reduction in the borrowing base and to account for additional reserves, amounts needed to provide funding for operations of foreign Non-Debtor Affiliates, and to continue to operate the business in the ordinary course, and $75 million to refinance the Foreign ABTL. By commencing these Chapter 11 Cases and obtaining postpetition financing, the Debtors will be able to stabilize operations while proactively engaging with key creditor constituencies to develop and implement their restructuring.

129.    The Company's need for significant and immediate liquidity is urgent. Without immediate additional financing in the form of the interim DIP financing requested, the Debtors project that they will be unable to pay essential costs required to continue operating as a going concern, resulting in immediate and irreparable harm to the Debtors' businesses, damaging all of the Debtors' stakeholders. Additionally, the Debtors require immediate cash because they are in critical need of raw materials necessary to continue their manufacturing operations. In recent months, the Company has drained funds from its foreign subsidiaries in an effort to address the US-based businesses' liquidity constraints. These foreign subsidiaries are normally profit centers, producing goods and generating cash that is ultimately repatriated and funneled back to the Company's main treasury account. Without the ability to recapitalize these foreign subsidiaries, they will be unable to return the typical value they will bring to the Company as a whole.

130.    As detailed above, disruptions to the Company's supply chain, coupled with the Company's tightening liquidity, have caused numerous suppliers to refuse to fill new orders, withdraw trade credit from the Company, or de-prioritize the Company's orders in favor of competitors that are willing to pre-pay or pay more promptly. Consequently, the Company cannot manufacture sufficient amounts of product to fill its customers' orders, causing it to lose revenue.

The demand for Revlon's products is strong and growing, but its business is only sustainable if the Company can source the goods it needs to manufacture its products.

131.    The Company's business is also seasonal, and many of the critical deadlines in the Company's supply cycle occur at the end of the year. The Company's retail customers typically determine their annual procurement plans in third quarter of each year. In addition, the greatest volume of the Company's sales takes place during the holiday season. The Company is therefore under a tremendous amount of pressure to generate sufficient inventory for the holidays, and, before the third quarter, demonstrate to its retail customers that the Company can meet its delivery obligations so that it does not lose critical retail shelf space to its competitors. In order to meet the critical demand that arises at the end of the calendar year, the Company is required to begin production on the vast quantity of its products months in advance.

132.    To accomplish this, the Company must have both the support of its critical vendors that supply each of the numerous components that go into the Debtors' many products, as well as the liquidity to pay such vendors. The Company has already been crippled by challenges caused by its tightening liquidity position. For example, two of the Company's domestic manufacturing facilities, in Oxford, North Carolina and Jacksonville, Florida, as well as its manufacturing facility at in Mexico, are currently temporarily closed or are within weeks of shutting down due to lack of supplies. If the Company cannot gain the trust of its customers in time for the 2023 procurement cycle, it will have very little ability to regain lost market share until 2024, as retailers will be committed to the Company's competitors until the next procurement cycle. Further, the Company's ability to regain lost market share will be placed at significant risk if they cannot maintain brand presence in stores during these Chapter 11 Cases and lose their shelf space to competitors.

133.    Due to the global nature of the Debtors' supply chain, it can take up to three months for new purchase orders to be filled before they can even be shipped, and as such, there will be a significant and unavoidable lag between when the orders are placed and the purchased goods are delivered.  Overall global supply chain issues have also led the Company's vendors to tighten trade terms by requiring prepayments for product, further straining the Company's liquidity.  In order to be competitive in the 2023 procurement cycle and 2022 holiday season for the reason described above, the Company must resume prompt and complete delivery of orders for key supplies at once, which means the Company's orders with vendors must be placed without delay.

134.    The size of the DIP Facility and the amount requested on an interim basis has been determined based on the rigorous analysis of myself and others at A&M, together with the Company's management team and other advisors.  The interim funding provided by the DIP Facility will allow the Debtor to honor approximately $180 million in the interim to critical vendors that provide the supplies necessary for the Debtors to immediately begin production, including $52 million of which will fund the procurement of supplies for international non-Debtor affiliates who are already experiencing trade contraction that is expected to worsen with the announcement of the filing.

135.    Should the DIP Facility be approved, including the interim request, the Company projects that it will generate $146 million EBITDA in third and fourth quarters of 2022, and $315 million in EBITDA during 2023, which will bring significant value for the benefit of the Company's stakeholders.  Without immediate financing, virtually all of that value will be lost, as the Company cannot be sustained as a going concern. In connection with developing the final and interim requests for DIP financing, the Debtors will be subject to a budget that is adequate to pay all administrative expenses due or accruing during the applicable period of time.

136.    Assuming court approval of the financing arrangements discussed above, the

Debtors commence these Chapter 11 Cases with available financing to implement their

restructuring strategy and support the costs of these chapter 11 cases, and are well-positioned to

begin negotiation with its constituencies to successfully emerge from chapter 11.  Despite the

current uncertain market conditions, the Debtors remain confident of their place in the industry,

their ability to endure the current challenges, and to remain at the forefront of the global beauty

industry.

## V.    Information Required by Local Bankruptcy Rule 1007-2

137.    Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors,

which I have provided in the exhibits attached hereto as **Schedule 1** through **Schedule 12**.

Specifically, these exhibits contain the following information with respect to the Debtors (on a

consolidated basis, unless otherwise noted):[5]

    (i)    **Schedule 1**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(3), Schedule 1
           provides the names and addresses of the members of, and attorneys for, any
           committee organized prior to the order for relief in these chapter 11 cases,
           and a brief description of the circumstances surrounding the formation of
           the committee and the date of the formation.

    (ii)   **Schedule 2**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(4), Schedule 2
           provides the following information with respect to each of the holders of
           the Debtors' twenty (20) largest unsecured claims, excluding claims of
           insiders: the creditors name; the address (including the number, street,
           apartment, or suite number, and zip code, if not included in the post office
           address); the telephone number; the name(s) of the person(s) familiar with
           the Debtors' account; the nature and approximate amount of the claim; and
           an indication of whether the claim is contingent, unliquidated, disputed, or
           partially secured.

---

[5]    The information contained in **Schedule 1** through **Schedule 12** attached to this declaration does not constitute
an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any
debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of
any such claim or debt.

(iii)    **Schedule 3**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(5), Schedule 3 provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the creditor's name; address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the claim; an estimate of the value of the collateral securing the claim; and an indication of whether the claim or lien is disputed at this time.

(iv)    **Schedule 4**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(6), Schedule 4 provides a summary of the Debtors' assets and liabilities.

(v)    **Schedule 5**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(7), Schedule 5 provides a summary of the publicly held securities of the Debtors.

(vi)    **Schedule 6**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(8), Schedule 6 provides the following information with respect to any property in possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity: the name; address; and telephone number of such entity and the court in which any proceeding relating thereto is pending.

(vii)    **Schedule 7**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(9), Schedule 7 provides a list of property **comprising** the premises owned, leased, or held under other arrangement from which the Debtors operate their business.

(viii)    **Schedule 8**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(10), Schedule 8 sets forth the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the U.S.

(ix)    **Schedule 9**.  Pursuant to Local Bankruptcy Rule 1007-2(a)(11), Schedule 9 provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

(x)    **Schedule 10**.   Pursuant to Local Bankruptcy Rule 1007-2(a)(12), Schedule 10 sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

(xi)    **Schedule 11**.  Pursuant to Local Bankruptcy Rule 1007-2(b)(1)- (2)(A), Schedule 11 provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders) and the estimated amounts to be paid to officers, equityholders, directors, and

financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

(xii)  **Schedule 12**.  Pursuant to Local Bankruptcy Rule 1007-2(b)(3), Schedule 12 provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the 30-day period following the filing of the chapter 11 cases, and any other information relevant to an understanding of the foregoing.

## VI.   **First Day Motions**

138.   Contemporaneously herewith, the Debtors have filed a number of First Day Motions in these Chapter 11 Cases seeking various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases. I have reviewed each of the First Day Motions listed on **Exhibit C** attached hereto, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully restructuring the Debtors' businesses.

139.   The First Day Motions seek authority to, among other things, obtain debtor-in-possession financing and use cash collateral on an interim basis, honor employee-related wage and benefits obligations, pay certain prepetition accounts payable claims in the ordinary course of business, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that the relief requested in the First Day Motions is also necessary to enable the Debtors to transition into Chapter 11 in a manner that avoids substantial disruption to the Debtors' operations and will preserve the value of the Debtors' enterprise for the benefit of all parties in interest.

140.    Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

141.    For the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these cases, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information, and belief as set forth in this Declaration, the foregoing is true and correct.

June 16, 2022                              /s/ Robert M. Caruso
                                        Name:  Robert M. Caruso
                                        Title:   Chief Restructuring Officer of Revlon, Inc.
                                        and certain of its subsidiaries.

## Exhibit A

### List of Debtors and non-Debtor Affiliates

#### Debtors

1. Revlon, Inc.
2. Revlon Consumer Products Corporation
3. Almay, Inc.
4. Art & Science, Ltd.
5. Bari Cosmetics, Ltd.
6. Beautyge Brands USA, Inc.
7. Beautyge U.S.A., Inc.
8. Charles Revson Inc.
9. Creative Nail Design, Inc.
10. Cutex, Inc.
11. DF Enterprises, Inc.
12. Elizabeth Arden (Financing), Inc.
13. Elizabeth Arden Investments, LLC
14. Elizabeth Arden NM, LLC
15. Elizabeth Arden Travel Retail, Inc.
16. Elizabeth Arden USC, LLC
17. Elizabeth Arden, Inc.
18. FD Management, Inc.
19. North America Revsale Inc.
20. OPP Products, Inc.
21. PPI Two Corporation
22. RDEN Management, Inc.
23. Realistic Roux Professional Products Inc.
24. Revlon Development Corp.
25. Revlon Government Sales, Inc.
26. Revlon International Corporation
27. Revlon Professional Holding Company LLC
28. Riros Corporation
29. Riros Group Inc.
30. RML, LLC
31. Roux Laboratories, Inc.
32. Roux Properties Jacksonville, LLC
33. SinfulColors Inc.
34. Beautyge II, LLC
35. BrandCo Almay 2020 LLC
36. BrandCo Charlie 2020 LLC
37. BrandCo CND 2020 LLC
38. BrandCo Curve 2020 LLC
39. BrandCo Elizabeth Arden 2020 LLC
40. BrandCo Giorgio Beverly Hills 2020 LLC
41. BrandCo Halston 2020 LLC
42. BrandCo Jean Nate 2020 LLC
43. BrandCo Mitchum 2020 LLC
44. BrandCo Multicultural Group 2020 LLC
45. BrandCo PS 2020 LLC
46. BrandCo White Shoulders 2020 LLC
47. Beautyge I (CAYMAN)
48. Elizabeth Arden (Canada) Limited (CANADA)
49. Elizabeth Arden (UK) Ltd. (UK)
50. Revlon Canada Inc. (CANADA)
51. Revlon (Puerto Rico) Inc. (PUERTO RICO)

#### Non-Debtor Subsidiaries

1. American Crew Dominicana, S.r.L. (DOMINICAN REPUBLIC)
2. Bainvest Beauty Limited (IRELAND)
3. Beautyge Andina S.A. (PERU)
4. Beautyge Beauty Group, S.L. (SPAIN)
5. Beautyge Brands France Holding SAS (FRANCE)
6. Beautyge Denmark A/S (DENMARK)
7. Beautyge France SAS (FRANCE)

8.  Beautyge Germany GmbH (GERMANY)
9.  Beautyge Italy S.p.A. (ITALY)
10. Beautyge Logistics Services, S.L. (SPAIN)
11. Beautyge Mexico S.A. de C.V. (MEXICO)
12. Beautyge Netherlands B.V. (NETHERLANDS)
13. Beautyge Participations, S.L. (SPAIN)
14. Beautyge Portugal-Produtos Cosmeticos e Profissionais, Lda. (PORTUGAL)
15. Beautyge Professional Limited (IRELAND)
16. Beautyge Rus Joint Stock Company (RUSSIA)
17. Beautyge Sweden AB (SWEDEN)
18. Beautyge, S.L. (SPAIN)
19. Comercializador a Brendola, S.r.L. (DOMINICAN REPUBLIC)
20. Elizabeth Arden (Denmark) ApS (DENMARK)
21. Elizabeth Arden (France) S.A. (FRANCE)
22. Elizabeth Arden (Netherlands) Holding B.V. (NETHERLANDS)
23. Elizabeth Arden (Norway) AS (NORWAY)
24. Elizabeth Arden (Shanghai) Cosmetics & Fragrances Trading Ltd. (CHINA)
25. Elizabeth Arden (Singapore) PTE. Ltd. (SINGAPORE)
26. Elizabeth Arden (South Africa) (PTY) Ltd. (SOUTH AFRICA)
27. Elizabeth Arden (Sweden) AB (SWEDEN)
28. Elizabeth Arden (Switzerland) Holding S.A.R.L. (SWITZERLAND)
29. Elizabeth Arden Cosmetics DO Brazil Ltda (BRAZIL)
30. Elizabeth Arden Espana S.L. (SPAIN)
31. Elizabeth Arden GmbH (GERMANY)
32. Elizabeth Arden International S.a.r.L. (SWITZERLAND)
33. Elizabeth Arden Korea Yuhan Hoesa (KOREA)
34. Elizabeth Arden Middle East FZCO (Dubai)
35. Elizabeth Arden SEA (HK) Ltd. (HONG KONG)
36. Elizabeth Arden SEA PTE. Ltd. (SINGAPORE)
37. Elizabeth Arden Trading B.V. (NETHERLANDS)
38. Europeenne de Products de Beaute, S.A.S. (FRANCE)
39. New Revlon Argentina, S.A. (ARGENTINA)
40. Produtos Cosmeticos de Revlon, S.A. (GUATEMALA)
41. Professional Beauty Services S.A. (LUXEMBOURG)
42. Promethean Insurance Limited (BERMUDA)
43. Revlon (Hong Kong) Limited (HONG KONG)
44. Revlon (Israel) Limited (ISRAEL)
45. Revlon (Shanghai) Limited (CHINA)
46. Revlon (Suisse) S.A. (SWITZERLAND)
47. Revlon Australia PTY Limited (AUSTRALIA)
48. Revlon B.V. (NETHERLANDS)
49. Revlon Beauty Products, S.L. (SPAIN)
50. Revlon China Holdings Limited (CAYMAN)
51. Revlon Finance LLC (DELAWARE)
52. Revlon Holdings B.V. (NETHERLANDS)
53. Revlon KK (JAPAN)

54. Revlon Ltda (BRAZIL)
55. Revlon Manufacturing Ltd. (BERMUDA)
56. Revlon Mauritius Ltd. (MAURITIUS)
57. Revlon New Zealand Limited (NEW ZEALAND)
58. Revlon Offshore Ltd. (BERMUDA)
59. Revlon Overseas Corporation, C.A. (VENEZUELA)
60. Revlon Pension Trustee Company (U.K.) Limited (UNITED KINGDOM)
61. Revlon South Africa (Proprietary) Limited (SOUTH AFRICA)
62. Revlon Trading (Shanghai) Co. Ltd. (CHINA)
63. Revlon, S.A. de C.V. (MEXICO)
64. RML Holdings, L.P. (BERMUDA)
65. Shanghai Revstar Cosmetics Marketing Services Limited (CHINA)
66. YAE Artistic Packings Industry Ltd. (ISRAEL)
67. YAE Press 2000 (1987) Ltd. (ISRAEL)

## **Exhibit B**

**Corporate Structure Chart**

# Revlon Structure Chart

As of May 2022





**Note:**

Ownership is 100% common equity unless otherwise stated.

**Endnotes:**

1.   Revlon, Inc. owns 5,260 common shares and 546 shares of Series A Preferred of Revlon Consumer Products Corporation.

2.   Roux Laboratories, Inc. owns 144,000 fixed shares and 552,764,201 variable shares, and Beautyge Participations, S.L. owns 1,030,524,919 variable shares of Beautyge Mexico, S.A. de C.V.

3.   Revlon International Corporation owns 987,242 Common Shares and 4,000,000 Preferred shares of Elizabeth Arden (Canada) Limited.

**Annotations:**

(A)   Incorporated as a Limited Liability Company.  Its Members are RCPC, RML, Revlon Suisse S.A., and Beautyge Beauty Group, S.L.  Revlon Consumer Products Corporation owns 1,000 Class A shares and 300 Class C shares of Revlon Professional Holding Company LLC.

(B)   Effective April 15, 2019, Elizabeth Arden (New Zealand) Limited amalgamated into Revlon New Zealand Limited.

(C)   Revlon Canada Inc. amalgamated with Colomer Canada, Ltd. on December 31, 2014 into a new legal entity also named Revlon Canada Inc.  In addition to RIC ownership/common shares, Beautyge Participations, S.L. owns 100,000 preference shares.

(D)   Class A Shares owned by Revlon BV (99.8%), Class B Shares owned by third parties (.2%).

(E)   As noted in the Company's 12/30/13 Form 8-K, the Company is in the process of exiting its operations in China and plans to liquidate these entities after satisfying its liabilities and other obligations.

(F)   In liquidation.

(G)   Share transfer of Elizabeth Arden (Australia) Pty Ltd. to Revlon Australia Pty Ltd. effective as of 10/1/2018.

(H)   Beautyge Beauty Brands USA, Inc. owns 999 shares and Brenda Morales (Local Counsel) owns 1 share (with Share Certificate blank endorsed).

(I)   Beautyge, S.L. and Professional Products, S.L. owns 999 shares and Brenda Morales (Local Counsel) owns 1 share (with Share Certificate blank endorsed).

(J)   RCPC owns .01%.

(K)   Beautyge Logistics Services, S.L., France Branch incorporated 9/11/2018.

(L)   Beautyge I is an Exempted Company incorporated in the Cayman Islands with Limited Liability.  Check-the-box election is effective as of 7/29/2019.

(M)   Agency for Elizabeth Arden International S.a.r.l.

(N)   Agency for Elizabeth Arden (Denmark) ApS

(O)   Elizabeth Taylor license.

(Q)   The remaining 40% shares are owned by Chalhoub Group Limited.

(R)   The remaining 40% shares are owned by Luxasia Ventures PTE LTD.

(S)   Elizabeth Arden International S.a.r.l., France Branch incorporated 2/24/2021

(T)   Bainvest Beauty Limited is in the process of being dissolved.

(U)   Effective May 3, 2022, Elizabeth Arden International Holding, Inc. merged with and into Revlon International Corporation.

## Exhibit C

**First Day Motions**

**Evidentiary Support for First Day Motions**

I.    **Debtors' Motion for Entry of an Order (A) Directing Joint Administration of the Debtors' Chapter 11 Cases and (B) Granting Related Relief ("Joint Administration Motion")**

1.    In the Joint Administration Motion, the Debtors seek entry of an order directing procedural consolidation and joint administration of their related chapter 11 cases and granting related relief.  The Debtors' operations are largely integrated and various Debtors play a role in other Debtors' capital structures through intercompany transactions.  Additionally numerous parties have interests in the  cases of multiple Debtors and many of the motions, applications, hearings, and orders that will arise in these chapter 11 cases will jointly affect each Debtor. Furthermore, virtually all of the Debtors are liable for the Debtors' funded debt.

2.    I believe the joint administration of these chapter 11 cases will not prejudice or adversely affect the rights of the Debtors' creditors because the relief sought herein is purely procedural and is not intended to affect substantive rights.  Because these chapter 11 cases involve fifty-one (51) Debtors, I understand that joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of this Court, render the completion of various administrative tasks less costly, and minimize the number of unnecessary delays.  Moreover, joint administration of these chapter 11 cases will reduce fees and costs by avoiding  duplicative filings, objections, and hearings, and will also allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

II.   **Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Prepare a Consolidated list of Creditors in Lieu of Submitting a Formatted Mailing Matrix and (B) File a Consolidated list of the Debtors' 50 largest Unsecured Creditors, (II)**

**Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, (III) Approving the Form and Manner of Notifying Creditors of Commencement of these Chapter 11 Cases, (IV) Waiving Requirement to File a List of Equity Holders, and (V) Granting Related Relief (the "Creditor Matrix Motion")**

3.      The Debtors, working together with their Proposed Claims and Noticing Agent have already have prepared a single, consolidated list of all the Debtors' creditors (the "Creditor Matrix") in electronic format.  In lieu of filing individual and reformatted creditor matrices for each Debtor that comply with the Bankruptcy Rules, the Debtors are prepared to submit to the Court and the U.S. Trustee both a redacted and an unredacted Creditor Matrix in electronic format (or make available in non-electronic form at such requesting party's sole cost and expense).

4.      Permitting the Debtors to file a consolidated Creditor Matrix, in lieu of filing separate and reformatted creditor matrices for each Debtor, is, in my opinion, warranted under the circumstances of these cases.   Indeed, because the Debtors estimate that there are thousands of potential creditors and other parties in interest in these chapter 11 cases, I believe that filing separate creditor matrices for each debtor would be a duplicative and burdensome task. Additionally, I understand that reformatting the existing Creditor Matrix into creditor matrices in accordance with the Creditor Matrix Procedures would be time-consuming and, more importantly, would greatly increase the risk of error.  As such, the I believe the Debtors' request to file the consolidated list of creditors as it is currently formatted and in accordance with the procedures outlined in the Creditor Matrix Motion is reasonable and warranted under the circumstances.

5.      Additionally, I respectfully submit that cause  exists to authorize the Debtors to redact the home addresses of the Debtors' individual creditors—many of whom are the Debtors'

employees—from the Creditor Matrix because such information could be used to perpetrate identity theft.

6.    The  Debtors propose that the Proposed Claims and Noticing Agent undertake all mailings directed by the Court or the U.S. Trustee or as required by applicable law.  I believe the Proposed Notice and Claims Agent's assistance with the mailing and preparation of creditor lists and notices will ease administrative burdens that otherwise would fall upon the Court and the U.S. Trustee.  With such assistance, the Debtors can file a computer-readable Creditor Matrix and also undertake all necessary mailings.

7.    Further, I believe that under the circumstances of these chapter 11 case, it is appropriate to waive the requirement to file a list of equity security holders within fourteen days after the petition date.  Under Bankruptcy Rules 1007(a)(3) and 2002(d), bankruptcy courts have authority to modify or waive these requirements.  Here, one of the Debtors, Revlon, Inc., is a public company and, as of the Petition Date, it had 58,005,142 shares of Common Stock outstanding.  The  Debtors submit that preparing a list of Equity Holders with last-known mailing addresses would be an extremely time consuming and expensive undertaking.

8.    Accordingly, I believe that the relief requested in the Creditor Matrix Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

III.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage, (C) Continue to Pay Brokerage Fees, (D) Honor the Terms of the Prepetition Premium Financing Agreement and Pay Premiums Thereunder, and (E) Enter into New Premium**

**Financing Agreements in the Ordinary Course of Business, and (II) Granting
Related Relief ("Insurance Motion")**

9.    I understand that, in the ordinary course of business, the Debtors maintain comprehensive insurance coverage through policies (the "Insurance Policies") that are administered by various third-party insurance carriers (the "Insurance Carriers") to protect the Debtors against adverse occurrences. The Insurance Policies provide coverage for, among other things, the Debtors' directors' and officers' liability, property, commercial general liability, general products liability, crime and fidelity, automobile, ocean marine cargo, network/privacy, business travel, surety bonds, cyber security, crime & fidelity, and foreign commercial liability.

A.    **Insurance Obligations**

10.    I understand the Debtors' Insurance Policies are held through the Debtors' ultimate non-debtor parent company, MacAndrews & Forbes Inc. ("MacAndrews"). I understand the Debtors generally pay the Insurance Carriers directly for their allocable portion of the premiums for such Insurance Policies, however, in the case of directors and officers liability Insurance Policies, the Debtors reimburse MacAndrews for their portion of the related premiums (such amounts, collectively with any applicable taxes and surcharges, the "Premiums"). Any payments that the Debtors remit to MacAndrews in respect of the Premiums are made pursuant to certain reimbursement agreements by and between Debtor Revlon Consumer Products Corporation and MacAndrews. As of the Petition Date, I understand the Debtors owe approximately $901,000 million in prepetition amounts on account of certain Premiums related to recent policy renewals or Premiums that are paid quarterly, of which $788,511 will come due and owing within the first 21days of these chapter 11 cases.

11.     I understand some of the Insurance Policies require the Debtors to pay a per incident deductible (each, a "Deductible").  For instance, one of the Debtors' property damage Insurance Policies carries a Deductible range between $25,000 to $2,000,000 per occurrence depending on the particular property at issue. The Debtors generally pay any owed Deductibles directly to the applicable Insurance Carrier.  Depending on the type of claim and the applicable Insurance Policy, the Debtors must ultimately pay up to the applicable Deductible threshold for each successful or settled claim against these particular Insurance Policies.  As of the Petition Date, the Debtors believe that they do not owe any Deductibles on account of prepetition claims under the Insurance Policies, but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

12.     The Debtors use ESIS as a third party administrator (the "Third Party Administrator") to assist in processing claims under the Insurance Policies.  The Third Party Administrator is engaged by MacAndrews in connection with the Insurance Policies, and the Debtors pay their proportional amount of any amounts owed directly to the Third Party Administrator  (the "Third Party Administrator Fees").  As of the Petition Date, the Debtors owe $85,000 on account of Third Party Administrator Fees, and estimate that approximately $80,000 in Third Party Administrator Fees will become due within 25 days after the Petition Date.

13.     In connection with the Insurance Policies, I understand the Debtors also obtain insurance brokerage services from certain insurance brokers (the "Brokers").  The Brokers assist the Debtors in obtaining comprehensive insurance coverage for their operations in the most cost effective manner, negotiating policy terms, provisions, and premiums, assisting the Debtors with claims, and providing ongoing support throughout the applicable policy periods.  The Debtors pay the Brokers fees for brokerage services (the "Brokerage Fees") in the ordinary course of

business.   As of the Petition Date, the Debtors do not anticipate remitting any Brokerage Fees separate from the Premium payments, but, out of an abundance of caution, the Debtors seek authority to satisfy any such prepetition obligations.

### B.    Premium Financing Agreements

14.    The Debtors also finance premiums under certain of their Insurance Policies (collectively, the "Financed Policies") because it is not economically advantageous for the Debtors to pay the premiums on the Financed Policies, in full, on a lump-sum, quarterly, or monthly basis. The Financed Policies include policies related to property liability and directors and officers liability.   In the ordinary course of their businesses, the Debtors finance the Premiums related to the property liability Insurance Policies pursuant to a premium financing agreement (the "Property Premium Financing Agreement") with First Insurance Funding ("First Insurance").   The Premiums related to directors and officers liability Insurance Policies are financed pursuant to a premium financing agreement between MacAndrews and First Insurance Funding (the "D&O Premium Financing Agreement" and, together with the Property Liability Premium Financing Agreement, the "Premium Financing Agreements").

15.    In consideration for First Insurance's obligations to pay the Debtors' Premiums on account of certain of the Financed Policies, the Property Premium Financing Agreement requires the Debtors to pay approximately $388,000 on the 25th of each month, with five monthly payments remaining as of the Petition Date.   The Debtors pay First Insurance directly for any amounts owed under the Property Premium Financing Agreement. By this motion, the Debtors seek authority to honor any amounts owed on account of the Property Premium Financing Agreement, $388,838 of which will become due within the first 25 days of these chapter 11 cases, and to continue honoring any amounts that become due and owing on account of the

Property Premium Financing Agreement in the ordinary course of their businesses to ensure uninterrupted coverage under the Insurance Policies.

16.    For the D&O Premium Financing Agreement, the Debtors reimburse MacAndrews pursuant to the terms of the applicable Reimbursement Agreements.  As of the Petition Date, the Debtors owe one remaining payment on account of their D&O Premium Financing Agreement in the amount of approximately $304,778, all of which will come due and owing within the first 25 days of these chapter 11 cases.

17.    The Debtors' obligations under the Premium Financing Agreements are secured by all sums payable to the applicable Debtor under the Financed Policies, including, among other things, any gross unearned premiums and any payment on account of loss that results in a reduction of unearned premiums in accordance with the terms of the Financed Policies.

18.    If the Debtors were unable to continue honoring their obligations under the Premium Financing Agreements, First Insurance may seek relief from the automatic stay to terminate the Financed Policies to recoup its losses. The Debtors could then be required to obtain replacement insurance on an expedited basis and likely at a significant cost to their estates. I believe the Debtors likely would face great hardship and increased costs if they were required to obtain replacement insurance and pay a lump-sum premium for the Financed Policies in advance. Even if the Financed Policies were not terminated, any interruption in the Debtors' payments could have a severe, adverse effect on the Debtors' ability to finance premiums for future policies.

19.    In addition, to the extent that the Premium Financing Agreement expires during the course of these chapter 11 cases, the Debtors seek authority to renew the Premium Financing Agreements without further Court approval. The Debtors respectfully submit that renewal of the

Premium Financing Agreement falls squarely within the ordinary course of the Debtors' businesses. To reduce the administrative burden, as well as to confirm their ability to satisfy one of their obligations of operating as debtors in possession, the Debtors seek the Court's authority now to renew the Premium Financing Agreement when and as necessary in the Debtors' business judgment. Additionally, the Debtors seek authority to enter into new premium financing agreements in the ordinary course of their businesses consistent with historical practices.

C.    **Necessity to Pay Insurance Obligations and Maintain Insurance Program**

20.    I believe that the Debtors' ability to pay the prepetition Premiums, Deductibles, Third Party Administrator Fees, and Broker's Fees related to the Insurance Policies is necessary to the Debtors continued and uninterrupted operations during these chapter 11 cases. Maintaining the Insurance Policies is, in my opinion, necessary to preserve the value of the Debtors' assets, thereby ensuring the adequate protection of the Debtors' property for all parties in interest, and to minimize exposure to risk. I further believe that honoring the Premium Financing Agreements is also necessary to maintaining the Insurance Policies, as failure to make the payments required under the Financing Agreements can trigger cancellation of certain Insurance Policies.

21.    I believe that maintaining the Insurance Policies enables the Debtors to avoid the incurrence of possibly significant liabilities, and therefore represents a sound exercise of their business judgment. The Insurance Policies protect the Debtors and other parties in interest from losses caused by casualty, natural disaster, fraud, or other unforeseen events. Accordingly, it my opinion that it is necessary for the Debtors to pay their prepetition obligations related to the Insurance Policies, including the Premiums, Deductibles, Third Party Administrator Fees, Broker's Fees, and obligations owed under the Financing Agreements, to ensure that the Debtors

are able to renew, supplement, or purchase insurance coverage on a postpetition basis in the ordinary course of business.

## IV.    **The Debtors' Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for Certain Transfer Of and Declarations of Worthlessness with Respect to Common Stock of Revlon, Inc.  and Claims Against the Debtors (the "NOL Motion")**

22.    The Debtors seek entry of interim and final orders authorizing the Debtors to establish procedures (the "Procedures") to protect the potential value of net operating loss carryforwards ("NOLs") and other tax benefits (collectively, the "Tax Attributes") of the Debtors for U.S. federal income tax purposes in connection with the reorganization of the Debtors.  The Debtors possess certain Tax Attributes, including, as of the Petition Date, federal NOL carryovers in the amount of approximately $762,800,000, disallowed business interest carryforwards of approximately $349,100,000, and total federal asset basis of approximately $1,500,000,000.

23.    By establishing the Procedures for monitoring acquisitions of Debtor Revlon Inc.'s common stock (the "Common Stock"), I believe that the Debtors can preserve their ability to seek the necessary relief if it appears that any such acquisition(s) may impair the Debtors' ability to utilize their Tax Attributes.  For purposes of the Procedures, a "Substantial Shareholder" shall mean any person (including any entity) that beneficially owns at least 2,610,232 shares of Common Stock (representing approximately 4.5% of all issued and outstanding shares of Common Stock); a "50% Shareholder" is any person or Entity that currently is or becomes a "50-percent shareholder" (within the meaning of section 382(g)(4)(D) of the IRC and the applicable Treasury Regulations); and an "Option" to acquire stock includes any contingent

purchase right, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest.

24.    The Tax Attributes are substantial, and I believe that any termination or limitation of the Tax Attributes, including during the first month of these chapter 11 cases, could cause significant and irreparable damage to the Debtors' estates and stakeholders.  The Debtors seek limited relief that will enable them to closely monitor certain transfers of Beneficial Ownership of Common Stock and certain worthless stock deductions with respect to Beneficial Ownership of Common Stock, so as to be in a position to act expeditiously to prevent such transfers or worthlessness deductions, if necessary, with the purpose of preserving the Tax Attributes.

25.    I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors. If no restrictions on trading or worthlessness deductions are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the Tax Attributes. I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process. I believe that the relief requested in the NOL Motion is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

**V.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain**

**Prepetition Obligations Related Thereto and (B) Granting Related Relief (the
"Customer Programs Motion")**

26.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and
final orders (a) authorizing the Debtors to maintain and administer their existing customer
programs (collectively, the "Customer Programs") and honor certain prepetition obligations
related thereto, and (b) granting related relief.

27.    The Debtors have historically provided certain incentives, discounts, and
accommodations to their customers to attract and maintain positive customer relationships in the
ordinary course of business.  These Customer Programs ensure customer and consumer
satisfaction, and promote the goodwill of the Debtors' business and the value of their brand.
These Customer Programs include the Market Development Fund, the Volume Discount
Program, the Coupon Program, and other customer programs described in the Customer
Programs Motion.

28.    In connection with the Coupon Program, When a customer redeems a valid
Coupon, the Coupon is processed and remitted through a third-party intermediary (the "Coupon
Processor") for reimbursement by the Debtors. The Coupon Processor pays the Retailer in the
amount of the redeemed Coupon, and the Debtors reimburse the Coupon Processor. Without the
Coupon Processor, the Debtors would not able to process any of their Coupons, which would
likely be declined at the point of sale.

29.    I believe this would adversely impact the Debtors' promotional strategy and tarnish
their goodwill with their customers. As of the Petition Date, the Coupon Processor is owed
approximately $2.7 million for its prepetition services, all of which became due prior to the
Petition Date.

30.    I understand the Coupon Processor, NCH Marketing Services, Inc., is owned by Vericast, which is a wholly-owned subsidiary of MacAndrews & Forbes. I understand the Debtors engagement with NCH Marketing Services, Inc. is, and has been, on an arms-length basis.

31.    Prior to the Petition Date, the Coupon Processor purported to terminate its agreement with the Debtors in accordance with its terms due to unpaid aging invoices. While the Debtors dispute and reserve all rights with respect to such termination, they request authorization, but not direction, to pay all prepetition amounts due to the Coupon Processor, subject to the Coupon Processor agreeing to provide its services to the Debtors on a post-petition basis on terms at least as favorable to the Debtors as the parties' ordinary course prepetition terms, and to continue honoring their obligations to the Coupon Processor in the ordinary course of their businesses.

32.    Additionally, the Debtors engage eight companies that develop, design, print, and distribute their Coupons (the "Coupon Developers").  In 2021, 1.9% of the Debtors' gross sales, or $50 million, was on account of products sold through redeemed Coupons. As of the Petition Date, the Coupon Developers are collectively owed approximately $3.6 million on account of their prepetition services, all of which will become due within the first 25 days of these chapter 11 cases. I believe without the services of the Coupon Developers, the Debtors will be unable to continue the uninterrupted distributions of promotional Coupons, which will adversely impact the Debtors' sales.

33.    As part of the Customer Programs, several of the Debtors' larger online and brick-and-mortar Retailers, in addition to purchasing products from the Debtors as customers, also provide the Debtors promotional and marketing related goods and services (the "Retailer

Partnerships"). In addition to driving sales of the Debtors' products, these Retailer Partnerships are a means by which the Debtors maintain a mutually beneficial economic relationship with some of their most significant customers. Twenty such Retailers, in their capacities as customers, accounted for approximately 12% of the Debtors' gross revenue, or $335 million, in 2021. The Debtors' prepetition ordinary course practice with the Retailers typically entailed offsetting the amounts owed to their Retailers against amounts owed by them in their capacities as customers, rather than as cash outlays by the Debtors. The Debtors owe approximately $3.3 million on account of the Retailer Partnerships. I understand the Debtors do not anticipate making any cash payments on account of amounts owed to Retailers under the Retailer Partnerships given their ordinary course practice of offsetting these amounts, but it is possible that the some portion of that amount may be due in cash within the first 25 days of these chapter 11 cases if there is not an offsetable amount and, therefore, the debtors seek authority to pay such amounts in cash if necessary.

34.    I believe that continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates.  Customers and consumers alike expect and rely on the Customer Programs and may choose not to support the Debtors' business if the Customer Programs are discontinued.  As noted in the Customer Programs Motion, the customers and consumers are not obligated to continue doing business with the Debtors, and the Customer Programs provides added incentive for them to continue engaging with the Debtors.

35.    I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate their business in chapter 11.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**VI.**    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of (A) Lien Claimants, (B) Import Claimant, (C) 503(B)(9) Claimants, (D) Foreign Vendors, and (E) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "Vendors Motion")**

36.    Pursuant to the Vendors Motion, the Debtors seek authority to pay in the ordinary

course of their businesses prepetition claims held by certain critical and foreign vendors,

Elizabeth Arden UK Ltd. creditors, lienholder claimants, their import agent, and certain vendors

of goods received by the Debtors within 20 days prior to the petition date (collectively, the

"Vendor Claimants").

37.    Below is a summary of the interim and final relief the Debtors are seeking under

the Vendors Moton per category of Vendor Claimant:

| Vendor Category | Interim Relief *(mm)* | Final Relief *(mm)* |
|---|---|---|
| Lienholder Claimants | $2 | $3 |
| Import Claimants | $1 | $1 |
| 503(b)(9) Claimants | $9 | $24 |
| Foreign Vendors | $8 | $11 |
| Elizabeth Arden UK Ltd.[1] | $0.4 | $0.4 |
| Critical Vendors (Domestic) | $20 | $40 |
| **Total** | **$40.40** | **$79.40** |

---

[1]    This category only reflects Elizabeth Arden UK Ltd.'s creditors, all of whom are domestic, and does not reflect all of the creditors in the U.K. that the Debtors are requesting to pay in full.

38.   The Debtors produce and sell over 8,000 stock keeping units ("SKUs") (e.g., lipsticks, eye pencils, creams, eyeshadows, mascaras, fragrances, etc.) using various unique cosmetic technologies, equipment, and chemicals.  Many of these cosmetic products require 35 to 40 individual raw materials to manufacture.  The Debtors do not maintain large inventories of these materials, and as a result, the inability to continuously source even one ingredient results in the shutdown of production of all related SKUs.  As of the Petition Date, manufacturing facilities in Oxford, North Carolina and Jacksonville, Florida have reduced production significantly and will be required to shut down temporarily within two weeks due to a lack of inventory, at a time those facilities need to be increasing production in time for the critical holiday and new product development ("NPD") season.  A critical manufacturing facility of a Non-Debtor affiliate in Mexico that supplies key products (including ColorSilk, fragrance, body mists, CND, Cutex, and others) to the Debtors and their subsidiaries around the world has already temporarily closed due to lack of inventory.

39.   If the Debtors are unable to acquire goods from the critical vendors to fulfill actual and projected orders to support the holiday season and for their NPD launches (which has already begun), the Debtors will experience a corresponding loss of revenues based on an inability to meet existing demand.  If the Company cannot rapidly resume production, they will experience a loss of at least $87 million in committed holiday sales and $94 million in NPD sales in Q4 alone, that would be directly attributable to their inability to fulfill customer demand.  Separately, the Debtors' current "fill rate," a metric used to track the Debtors' ability to fulfill actual orders, is currently less than 70% for certain channels, compared to an industry average of approximately 90%.  In other words, due primarily to their inability to source a sufficient and regular supply of raw materials, the Debtors are currently unable to timely fill nearly one-third of customer

demand for their products.  If the Debtors continue to fail to deliver their products to their customers—some of the largest and most well-known retailers—on time and in full, there is a material risk that these customers will simply fill capacity with goods from the Debtors' competitors—space which the Debtors risk losing when retailers reset their annual shelf-space allocations in September 2022—causing irreparable damage to the Debtors and their estates, to the detriment of all stakeholders.

40.   The Debtors' production and sale of these products depends entirely on the uninterrupted flow of materials, products, and other goods through their supply chain and distribution network, including the purchase, import, storage, and shipment of the Debtors' merchandise and other personal property.  The vendors and suppliers that comprise the Debtors' supply chain are located around the world. Goods sold by these vendors and suppliers require substantial transport times to reach the Debtors.  In recent months, global freight capacity has been scarce, resulting not only in increased costs to ship goods from overseas, but also in increased shipping lead-times.  I understand that in 2019, shipping components from China to the United States took the Debtors four to six weeks from placement of an order and cost approximately $2,000 per container.  Today, the same process takes eight to twelve weeks and costs four times more.  The result is that, even if the Debtors were able to switch to alternative suppliers for critical chemicals and other components (which, with respect to the Vendor Claimants discussed herein, they are not), there would be a significant (and devastating) lag created in their supply chain.

41.   In addition to the shipping lead-time issues, I believe the Debtors would face substantial operational delays in connection with the replacement of many of the Vendor Claimants.  Many of the Debtors' goods are regulated by the FDA for human use, and the

ingredients and chemicals used in the Debtors' products undergo a lengthy and rigorous testing process, taking approximately six months per item, to ensure their quality and safety. Similarly, the containers (e.g., lipstick cartridges, fragrance glass, printed plastic, and paperboard) in which the Debtors' finished goods are packaged generally require specialized tooling and specifications such as molds and print plates that could not be easily, quickly, or cheaply replicated with alternative suppliers. While cost and timing vary, the Debtors estimate that sourcing alternate supply of these packaging materials would cost hundreds of thousands of dollars, and take six months or more, per item.

42.    The Debtors are also high-volume users of nearly all of the ingredients and components supplied by the Vendor Claimants. Due to industry-wide constraints in many of the products used by the Debtors in the manufacture of their goods, including resins, paper board products, corrugated cardboard products, label substrates, and silicones, among others, the Debtors would simply be unable to quickly source alternative supply of these goods at the volumes they require without creating substantial supply chain disruption and attendant loss of manufacturing capacity.

43.    Like the vendors of materials that go directly into the manufacture of finished products (the "Direct Procurements"), the Debtors also rely on certain specialized and highly skilled vendors of marketing, advertising, and enterprise communication services, as well as in-store merchandizing services, that drive sales or facilitate the Debtors' operational capabilities (the "Indirect Procurements"). The Debtors' Critical Vendors in this category include vendors that create promotional displays, digital advertising, and graphic designs. These Critical Vendors are the backbone of the Debtors' brand support and marketing efforts. The Debtors' current marketing vendors have developed a strong understanding of the Debtors' businesses, products,

and marketing strategies.  As a result, I believe replacing these vendors would take substantial lead times and cause distraction to the Debtors' management team at a critical juncture. Additionally, the Debtors' current advertising vendors honor their historic rates on new projects. It is the Debtors' belief that replacement vendors would charge current, higher, market rates. Ultimately, I believe if the Debtors are unable to retain the services of their current critical marketing and advertising vendors, more money and time may be spent on replacement service providers that may not be able to successfully execute their marketing campaigns.

44.   I believe certain digital advertising platforms are crucial for the Debtors to reach their target customers in particular demographics. These vendors simply cannot be replaced given their scale and influence in the market. The digital platforms also provide the Debtors with unique and irreplaceable market data, as the Debtors are able to directly gauge and track consumer interest in particular products through the number of clicks on their advertised products.  Given the relatively small proportion of revenues the Debtors represent to these platforms, I believe they could easily refuse business with the Debtors going forward for non-payment of prepetition amounts.

45.   I understand another significant category of Critical Vendors in the Indirect Procurement segment are vendors of information technology.  As with any company of the Debtors' scale, information technology and enterprise connectivity software are necessary for the operation of the Debtors' businesses. I believe these digital services allow the Debtors to store information to the cloud and communicate information among the Debtors' various businesses in an integrated manner.

46.   I understand the Debtors' prepetition liquidity challenges have significantly hindered their ability to make on-time payments to the vast majority of their Vendor Claimants.

Poor payment history, coupled with substantial restrictions in supply for goods globally, has caused many of the Debtors' vendors to prioritize other customers who are able to pay more quickly and more reliably. I understand that in recent months, these consistent issues have resulted in over 75% of the Debtors' Critical Vendors (a) cancelling trade credit with the Debtors, (b) cancelling the Debtors' outstanding purchase orders in favor of higher offers, and/or (c) placing the Debtors on cash on delivery or cash in advance terms as a result of substantial prepetition unpaid invoices. I understand that in the last week alone, over a dozen of the Debtors' vendors have notified them that they will only accept cash in advance for new orders.

47.    I believe that given the current state of the Debtors' supply chain, discussed above, and strong competition for market share, it is critical that the Debtors' relationships with their existing vendors  begin to normalize immediately, and within the first 30 days of this case, in order to stabilize the Debtors' operations, restart and ramp up manufacture of all of the Debtors' SKUs in anticipation of the critical Q4 holiday season, and maximize value for the benefit of all stakeholders.

48.    The relief requested in the Motion will lead directly to (a) increased liquidity through the provision of trade terms and (b) increased revenue as the Debtors are able to restart the manufacture of products that are currently not being produced, and fulfill orders that are not being filled, as a result of lack of supply.   In the absence of the interim relief requested, the Debtors will suffer immediate and irreparable injury. Payment of these sums have been accounted for in the Debtors' budgeting and forecasting process, and the budget will be adequate to pay all administrative expenses due or accruing during the period covered by such relief.

A. **Critical Vendor Claims**

49.   The Debtors' ability to deliver their products depends on their access to and relationships with a limited network of critical domestic and international vendors and suppliers who cannot be easily or quickly replaced.  As a direct result of the Debtors' current status with many of these vendors, most of these vendors have stopped supplying, or have threatened to stop supplying, critical ingredients and other components to the Debtors within the last six months, resulting in the shutdown of manufacturing operations.  In the last 72 hours alone, the Company received notice that approximately 30 additional vendors have either stopped shipping product to the Debtors or placed the Debtors on cash in advance terms.

50.   Employees of A&M, working at my direction, along with the Debtors and their other advisors have spent many hours reviewing and analyzing the Debtors' books and records, consulting procurement managers and operations personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practices to identify certain critical business relationships and suppliers of goods and services—the loss of which would immediately and irreparably harm their businesses, by, among other things, shrinking their market share, reducing enterprise value, and ultimately impairing the Debtors' businesses as going-concerns.  In this process, the Debtors considered a variety of factors, including:

- the negative impact of not obtaining an individual component or material;

- whether a vendor is a sole-source, limited-source, or high-volume supplier of goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and in a reasonable time;

- whether the Debtors would be able to continue operating while transitioning business to an alternative supplier, if available, and how long such a transition would take;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- whether replacing a vendor would create safety testing and regulatory delays;

- whether replacing a vendor would require expenditures and delay related to specialized tooling to manufacture the Debtors' products;

- whether an agreement exists by which the Debtors could economically compel a vendor to continue performing on prepetition terms;

- the degree to which replacement costs (including, pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor;

- whether the likelihood that a temporary break in the vendor's relationship with the Debtors could be remedied through use of the tools available in these chapter 11 cases;

- whether the vendor is currently refusing to supply the Debtors with product, or is refusing to do so without cash up front; and

- whether failure to pay a particular vendor could result in contraction of trade terms.

51.     Through this analysis, I understand the Debtors identified domestic vendors (collectively, the "Critical Vendors") that supply either (i) Direct Procurements or (ii) Indirect Procurements (collectively, the "Critical Products and Services") that, in each case, are critical to their businesses and operations and fulfill one or more of the criteria listed above.

52.     In sum, I believe the Debtors cannot afford a disruption to their flow of merchandise and the services that enable their monetization, or to the Debtors' general operations, at this critical juncture in these chapter 11 cases. The Debtors rely on timely and frequent delivery of their Critical Products and Services and any interruptions would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, customer base, and

market share.  I believe such harm would far outweigh the cost of payment of the Critical Vendor Claims.

**B.  Foreign Vendor Claims**

53.    I believe a critical component of the Debtors' supply chain involves business dealings with foreign vendors (collectively, the "Foreign Vendors"), located across the globe, including in Canada, the United Kingdom, the Netherlands, France, Norway, Colombia, Israel, Turkey, Australia, New Zealand, Iceland, Mexico, Spain, Japan, Switzerland, Chile, Belgium, China, Vietnam, Brazil, Singapore, Germany, South Africa and Italy, among other places.  Many of these critical Foreign Vendors supply products and services to the Debtors that are crucial to the Debtors' ongoing operations in both the U.S. and abroad.  In some instances, the Debtors represent a material portion of the Foreign Vendors' business.  I believe that without any payment of past due amounts, the Foreign Vendors' go-forward business could fail, which in turn, will jeopardize the integrity of the Debtors' supply chain and their ability to meet customer orders.

54.    Based on my experience, foreign suppliers often have skeptical reactions to the United States bankruptcy process because many of them are unfamiliar with chapter 11 cases and the implications for the Debtors' on-going ability to do business and pay for goods while they are in chapter 11.  Accordingly, I believe nonpayment of all prepetition claims may cause Foreign Vendors to take other precipitous actions, including delaying shipments until more certainty develops with respect to the Debtors' reorganization.

55.    Additionally, I understand that if prepetition claims held by the Foreign Vendors (the "Foreign Vendor Claims") are not paid, the Foreign Vendors may take action against the Debtors based upon an erroneous belief that Foreign Vendors are not subject to the automatic

stay provisions of section 362(a) of the Bankruptcy Code. Although I understand that the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often a fruitless and costly exercise. In the absence of enforcement of the automatic stay, I understand the Foreign Vendors could, among other things, initiate a lawsuit in a foreign court and obtain a judgment against the Debtors to collect prepetition amounts owed to them.

56.    In light of these consequences, I believe that payment of Foreign Vendor Claims on the terms set forth herein is necessary to avoid disruption of the Debtors' operations during these chapter 11 cases. I understand the Foreign Vendor Claims pale in comparison to the potential damage to the Debtors' businesses if the Debtors were to experience significant delays in the shipment of products. Therefore, I believe the Debtors, their estates, and their stakeholders would benefit from the Debtors' payments to the Foreign Vendors.

**C.  Critical UK Claims**

57.    As set forth in the Baird Declaration, I understand that EAUK is the Debtors' primary operating entity in the UK and that it does not trade or otherwise carry on any business in the United States, and further that if any of its creditors are unpaid, there is risk that enforcement actions in that jurisdiction can materiality impair and the Debtors' operations. Upon information and belief,  following review and conversation with management, the forced liquidation of EAUK would cause irreparable harm to the Debtors' business because EAUK generates $60 million in annual gross sales for the Debtors. I believe losing that presence and stronghold in the UK would not only be detrimental to the Elizabeth Arden brand, but to the Debtors as a whole.

**D.  Lienholder Claimants**

58.   The Debtors' ability to deliver products in a timely manner is crucial to their financial performance and depends on a seamless interaction with various third-party service providers.   The Debtors depend on certain vendors to transport and store their products. After leaving overseas factories, the Debtors' products go to a consolidated ocean freight station or directly to port before sailing on freight vessels to receiving ports throughout the world. From the air and sea ports the products are delivered by truck to the Debtors' facilities across North America or to third-party warehouses (the "Warehouseman"), where products are stored until they are utilized to fulfill a retail, wholesale, or e-commerce customer order. The Debtors utilize multiple carriers (collectively, the "Shippers" and together with the Warehouseman, the "Lien Claimants") to transport their merchandise (a) from the consolidator or the overseas facility to port facilities, (b) between facilities for the reassignment of goods, and (c) to the facilities of the Debtors' customers.   There is significant risk that if the Debtors stop all payments to the Lien Claimants, the Lien Claimants will discontinue shipping and warehousing services, and will refuse to release the Debtors' products, which will negatively impact the Debtors' revenues.

59.   I understand that under certain non-bankruptcy laws, the Lien Claimants may be able to assert liens on the goods in their possession to secure payment of the charges or expenses incurred in connection with the lien charges, including shipping and storage charges (collectively, the "Lien Charges").   I further understand that if the Lien Charges remain unpaid, the Lien Claimants are likely to attempt to assert such possessory liens, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed.   I believe the Lien Claimants' possession (and retention) of the Debtors' materials and products would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer

these chapter 11 cases, and the cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Charges.

### E.  Import Claimants

60.    In the ordinary course of their businesses, the Debtors import critical materials and products from suppliers around the world.  In connection with the import of goods, the Debtors utilize a licensed custom broker (the "Import Claimant"), who in turn pays various charges on behalf of the Debtors to clear customs, including customs duties, detention and demurrage fees, tariffs and excise taxes, freight forwarding, and other similar obligations (collectively, the "Import Charges").   In addition, the Debtors pay the Import Claimant annual fees for their customs brokerage services (together with the Import Charges, the "Import Expenses"), which services are integral to the Debtors' operations.  I believe that absent such payment, parties to whom the Debtors ultimately owe Import Charges may interfere with the transportation of the imported goods.  Any interruption in the flow of imported goods will deprive the Debtors of materials and products necessary to meet the needs of the Debtors' wholesale and online retail customers.

### F.  503(b)(9) Claimants

61.    I understand the Debtors have received in the ordinary course of their businesses certain goods from various foreign and domestic vendors (collectively, the "503(b)(9) Claimants") within the 20 day period immediately preceding the Petition Date.  The 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims.  Such refusal could negatively affect the Debtors' estates as the Debtors' businesses are dependent on the steady flow of goods through their supply chain.

62.   In light of these consequences, I believe that payment of Vendor Claimants on the terms set forth in the Vendors Motion is necessary to avoid disruption of the Debtors' operations during these chapter 11 cases.

63.   I believe that satisfying these obligations without interruption during the pendency of these chapter 11 cases is critical to preserving the value of the Debtors' estates. I believe that the relief requested is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Vendors Motion should be approved.

**VII.**  **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, and (II) Granting Related Relief (the "Cash Management Motion")**

64.   Pursuant to the Cash Management Motion, the Debtors seek interim and final orders (a) authorizing the Debtors to (i) continue to operate their existing cash management system (the "Cash Management System") and maintain their existing bank accounts (the "Bank Accounts") and investment accounts (the "Investment Accounts") listed on Exhibit A attached to the Cash Management Motion at the financial institutions identified thereon (collectively, the "Cash Management Banks"), (ii) honor certain prepetition obligations related thereto, (iii) maintain existing Business Forms, and (iv) continue to perform Intercompany Transactions, and (b) granting related relief.

**A.**     **The Debtors' Cash Management System**

65.   To facilitate the efficient operation of their businesses, the Debtors and their non-debtor foreign affiliates use the Cash Management System to collect, transfer, and disburse

funds generated by their operations. The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors and their non-debtor foreign affiliates to maintain control over the administration of approximately 68 Bank Accounts and two Investment Accounts owned by the Debtors and maintained with the Cash Management Banks.

66.    As described herein, I believe that any disruption to the Cash Management System would have an immediate adverse impact on and cause irreparable harm to the Debtors' businesses. Accordingly, to minimize the disruption caused by these chapter 11 cases and maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases.

## B.    Description of Bank Accounts

67.    The Debtors' Cash Management System, generally, is organized around the following three businesses, each representing a major segment of the Debtors' operations: (a) the legacy Revlon business ("Revlon"), (ii) the Revlon professional business ("R-Pro"), and (iii) the Elizabeth Arden business ("Elizabeth Arden"). As of the Petition Date, the Cash Management System includes a total of 69 Bank Accounts and four Investment Accounts maintained by the Debtors. The Debtors hold their Bank Accounts at various entities across their organizational structure. A general description of the Bank Accounts, transfers between such accounts, and their purpose in the Cash Management System is set forth in the following table:

| Accounts | Description of Accounts |
|---|---|
| *Treasury Account* | |
| **Revlon Treasury Account**<br><br>*Citibank Account ending 5426* | The Revlon account ending 5426 operates as the Debtors' main treasury account (the "Revlon Treasury Account"), which as described below interacts on a daily or periodic basis with the Revlon, R-Pro, and Elizabeth Arden accounts. The Revlon Treasury Account receives transfers on a daily or periodic basis from the various collection and operating accounts. Amounts in the Revlon Treasury Account are transferred on an as needed basis to the various disbursement and operating accounts to fund accounts payable and general operating |

| Accounts | Description of Accounts |
|---|---|
|  | expenditures. At times, the Revlon Treasury Account will also disburse funds directly to third parties, including all third-party debt service payments.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $7,898,971 in the Revlon Treasury Account. |
| **Collection Accounts** |  |
| **Revlon Collection Accounts**<br><br>*Citibank Accounts ending 8751, 8735, 8743, 8786, 0259, 3729, 8807 & 5042*<br><br>*SunTrust Account ending 2922*<br><br>*Bank of New York Mellon Accounts ending 0697 & 0223* | Revlon maintains 11 collections accounts (the "<u>Revlon Collection Accounts</u>") that receive customer payments and other receipts paid to Revlon. Any amounts in the Revlon Collection Accounts are swept on a daily basis to the account ending 8807 (the "<u>Revlon Master Collection Account</u>"), with the exception of the account ending 2922, which is subject to manual transfers. Any amounts in the Revlon Master Collection Account are transferred on a periodic basis to the Revlon Treasury Account. The Revlon Collection Accounts are held at Citibank, N.A. ("<u>Citibank</u>"), SunTrust Bank ("<u>SunTrust</u>"), and Bank of New York Mellon ("<u>BNYM</u>").<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $8,231,902 in the Revlon Collection Accounts. |
| **EA Collection Accounts**<br><br>*Bank of America Accounts ending 2755, 1472, 8935, 9552, 7884, 5981, 1100, 8427, 2490, 8546, 4916, 8640, 7583, 4260, 5635, 8988, & 6699* | Elizabeth Arden maintains 17 collections accounts (the "<u>EA Collection Accounts</u>") that receive customer payments and other receipts paid to Elizabeth Arden. The EA Collection Accounts are held at Bank of America ("<u>BOA</u>"). Any amounts in the EA Collection Accounts are swept daily to the account ending 2755 (the "<u>EA Master Collection Account</u>"), with the exception of EA Collection Account ending 6699, which is manually transferred on a periodic basis to EA Operating Account ending 0623. Any amount in the EA Master Collection Account is then manually transferred on a periodic basis to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $321,862 in the EA Master Collection Account. |
| **R-Pro Collection Account**<br><br>*JPM Account ending 3669* | R-Pro maintains one collection account (the "<u>R-Pro Collection Account</u>") that receives customer payments and other receipts paid to R-Pro. The R-Pro Collection Account is held at JP Morgan Chase Bank, N.A. ("<u>JPM</u>"). Any amounts in the R-Pro Collection Account are manually transferred on a periodic basis to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $59,724 in the R-Pro Collection Account. |
| **Disbursement Accounts** |  |
| **Revlon Disbursement Accounts**<br><br>*Citibank Accounts ending 5397, 4291, 8815 & 5442* | Revlon maintains four disbursement accounts at Citibank (the "<u>Revlon Disbursement Accounts</u>") that are designated for payables related to (i) payroll (account ending 5397); (ii) employee health insurance obligations (account ending 4291); (iii) U.S. customs obligations (account ending 8815); and (iv) general accounts payable (account |

| Accounts | Description of Accounts |
|---|---|
| | ending 5442), including amounts in connection with the Debtors' Purchase Card Program.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $774,547 in the Revlon Disbursement Accounts. |
| **EA Disbursement Accounts**<br><br>*BOA Accounts ending 0045, 6177, 8127, 9054, 0977 & 4126* | Elizabeth Arden maintains one main disbursement account for checks ending 0045 (the "EA Disbursement Account"). The EA Disbursement Account is funded from the Revlon Treasury Account or the EA Operating Account on an as need basis, and such amounts are disbursed from the EA Disbursement Account to satisfy the general accounts payable of Elizabeth Arden.<br><br>As of the Petition Date, the Debtors maintain a balance of $0 in the main EA Disbursement Account.<br><br>Elizabeth Arden also maintains five other disbursement accounts (ending 6177, 8127, 9054, 0977 and 4126), which accounts are currently dormant and the Debtors are in the process of closing. These accounts maintain a balance of $2,283. |
| **R-Pro Disbursement Accounts**<br><br>*JPM Accounts ending 8509 & 3509* | R-Pro maintains one main disbursement account ending 8509 (the "R-Pro Disbursement Account"), and one idled disbursement account ending 3509. The R-Pro Disbursement Account is funded by the Revlon Treasury Account on an as needed basis, and such amounts are disbursed from the R-Pro Disbursement Account to satisfy the general accounts payable of R-Pro as well as provide funding to non-debtor affiliate accounts in Mexico on an as needed basis.<br><br>As of the Petition Date, the Debtors maintain a balance of $41,911 in the main R-Pro Disbursement Account. |
| *Intercompany Accounts* | |
| **EA Intercompany Accounts**<br><br>*BOA Accounts ending 2579 & 2587* | Elizabeth Arden maintains two accounts that are specifically dedicated to intercompany collections with respect to the Debtors' intellectual property licensing (the "EA Intercompany Accounts"). Amounts in these accounts are swept on a periodic basis into the EA Operating Account ending 0623 and manually transferred to either (i) the Revlon Treasury Account or (ii) the EA Disbursement Account to the extent necessary to satisfy outstanding accounts payable of Elizabeth Arden.<br><br>As of the Petition Date, the Debtors maintain a balance of $0 in the EA Intercompany Accounts. |
| *Operating Accounts* | |
| **Revlon Operating Accounts** | Revlon maintains one operating account with Citibank, and another operating account with Wells Fargo (the "Revlon Operating Accounts"). The Revlon Operating Account at Wells Fargo was previously tied to intercompany accounts that have been closed, and therefore has minimal activity. At this time the Revlon Operating Account at Citibank receives |

| Accounts | Description of Accounts |
|---|---|
| *Citibank Account ending 0122[2]*<br><br>*Wells Fargo Account ending 7175* | particular customer payments.  Any amounts in the Revlon Operating Accounts are manually transferred to the Revlon Treasury Account on a periodic basis.<br><br>As of the Petition Date, the Debtors maintain a balance of $2,833 in the Revlon Operating Accounts |
| **EA Operating Account**<br><br>*BOA Account ending  0623* | Elizabeth Arden maintains one operating account with BOA (the "EA Operating Account").  As described above, the EA Operating Account receives intercompany collections from the EA Intercompany Accounts. The EA Operating Account is also the main disbursement account for ACH and wire payments. Any excess amounts in the EA Operating Account is transferred on a regular basis to the EA Master Collection Account and then manually transferred to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain a balance of $50,755 in the EA Operating Account. |
| **R-Pro Operating Accounts**<br><br>*JPM Account ending 1735* | R-Pro maintains one operating account with JPM (the "R-Pro Operating Account").  The R-Pro Operating Account receives certain customers' payments and, in some instances, funds the accounts payable of R-Pro. On a periodic basis, the funds in the R-Pro Operating Account are transferred to the Revlon Treasury Account.<br><br>As of the Petition Date, the Debtors maintain a balance of $52,576 in the R-Pro Operating Account. |
| *Collateral Accounts* | |
| **Revlon Collateral Account**<br><br>*JPM Account ending 7379* | Revlon maintains a deposit account at JPM where the funds in such account act as cash collateral in connection with letters of credit (each, an "L/C") issued by JPM for the benefit of certain Debtors (the "Revlon Collateral Account").  The Debtors and JPM are party to a certain assignment of deposit agreement with respect to the Revlon Collateral Account.  To the extent any third-party beneficiary of a L/C issued by JPM draws on such L/C, JPM may access the JPM Collateral Account to recover the amount of the drawn L/C.<br><br>As of the Petition Date, the Debtors maintain a balance of $2,768,188 in the Revlon Collateral Account. |
| *Foreign Accounts* | |
| **Revlon Canadian Accounts** | Revlon's Canadian operations are supported by 5 accounts (the "Revlon Canadian Accounts") at TD Bank, N.A. ("TD Bank").  The Revlon Canadian Accounts include one main collections account (ending 3008) |

---

[2]     The Citibank Account ending 0122 has been designated as the Adequate Assurance Account as defined in the *Debtors' Motion for Entry of an Order (A) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (B) Determining Adequate Assurance of Payment for Future Utility Services, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief*, filed concurrently herewith.

| Accounts | Description of Accounts |
|---|---|
| *TD Bank Accounts ending 3008, 6715, 4633, 6909 & 3420* | (the "<u>Revlon Canadian Collections Account</u>") and four disbursement accounts (the "<u>Revlon Canadian Disbursement Accounts</u>") related to (i) payments to Concur Solutions, with respect to Debtors' reimbursable expense management program and invoice software (account ending 6715); (ii) payroll (account ending 4633); (iii) disbursements made in USD currency (account ending 6909) and (iv) disbursements made in CAD currency (account ending 3420). Any excess cash in the Revlon Canadian Collections Account is transferred periodically to the Revlon Treasury Account. As currency needs demand, funds are transferred from the Revlon Treasury Account to the Revlon Canadian Collections Account, and then funded to the various other Revlon Canadian Accounts, as applicable.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $3,753,743 in the Revlon Canadian Accounts. |
| **Revlon United Kingdom Accounts**<br><br>*Citibank Accounts ending 1012, 2373, 1020 & 8318*<br><br>*Barclays plc Account ending 7628* | Revlon's United Kingdom operations are supported by a main operating account (ending 1012) (the "<u>Revlon UK Operating Account</u>") denominated in GBP with two sub-accounts (ending 2373 and 1020) for effecting disbursements in different currencies (USD and Euro), and a separate disbursement account (ending 8318) for GBP disbursements (accounts ending 2373, 1020 and 8318 collectively, the "<u>Revlon UK Disbursement Accounts</u>"). The Revlon business also maintains a United Kingdom account at Barclays plc that receives customer payments that flow up to the Revlon UK Operating Account. Any excess cash in the Revlon UK Operating Account is transferred periodically to the Revlon Treasury Account via a non-debtor affiliate operating account in Spain. As needed, the Revlon Treasury Account also transfers funds to the Revlon UK Operating Account via the non-debtor affiliate operating Account in Spain, which in turn are transferred to the Revlon UK Disbursement Accounts to enable Revlon's United Kingdom operations to satisfy their accounts payable.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $413,146 in the Revlon UK Operating Account and Revlon UK Disbursement Accounts. |
| **EA Canadian Accounts**<br><br>*BOA Accounts ending 6219 & 6201* | Elizabeth Arden maintains two Canadian accounts: (i) one disbursement account (ending 6219) (the "<u>EA Canadian Disbursement Account</u>" and, collectively with the Revlon Disbursement Accounts, the EA Disbursement Accounts, the R-Pro Disbursement Accounts, the Revlon Canadian Disbursement Accounts and the Revlon UK Disbursement Accounts, the "<u>Disbursement Accounts</u>"); and (ii) one collections account (ending 6201) (the "<u>EA Canadian Collection Account</u>"). Collections from customer payments to the EA Canadian Collection Account are swept on a periodic basis to the EA Operating Account ending 0623, and then transferred to the Revlon Treasury Account on a regular basis. The EA Canadian Disbursement Account is funded on an as needed basis by the Revlon Treasury Account, and then disbursements from the EA Disbursement Account to satisfy accounts payable. |

| Accounts | Description of Accounts |
|---|---|
| | As of the Petition Date, the Debtors maintain an aggregate balance of $1,659,731 in the EA Canadian Collection Account and EA Canadian Disbursement Account. |
| **EA United Kingdom Accounts**<br><br>*HSBC Accounts ending 3405, 7556 8217 & 9135* | Elizabeth Arden's United Kingdom operations consist of four bank accounts. There are two operating accounts (ending 3405 held at HSBC Dublin, and ending 7556 held at HSBC London), which are denominated in EUR and facilitate the collection of customer receipts, vendor disbursements and intercompany transfers (collectively the "EA UK Operating Accounts"). There are also two sub-accounts (ending 8217 and 9135) for effecting disbursements in different currencies (GBP and EUR) (collectively the "EA UK Disbursement Accounts"). Funds from the EA United Kingdom Accounts are transferred on a periodic basis to the EA Operating Account ending 0623 via a non-debtor affiliate operating account in Switzerland, and then transferred to the Revlon Treasury Account on a regular basis.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $763,416 in the EA UK Operating Accounts and EA UK Disbursement Accounts. |
| ***Puerto Rico Accounts*** | |
| **Revlon Puerto Rico Accounts**<br><br>*Citibank Accounts ending 5584 & 5698*<br><br>*BNY Mellon Account ending 8036* | Revlon's Puerto Rico operations consist of a main operating account (ending 5584) (the "Revlon PR Operating Account") denominated in USD with two sub-accounts: (i) a collections account (ending 8036) (the "Revlon PR Collections Account"); and (ii) a disbursement account (ending 5698) (the "Revlon PR Disbursement Account" and, together with the Revlon PR Operating Account and the Revlon PR Collections Account, the "Revlon Puerto Rico Accounts"). Any excess cash in the Revlon PR Operating Account is transferred periodically to the Revlon Treasury Account. As needed, the Revlon Treasury Account also transfers funds to the Revlon PR Operating Account.<br><br>As of the Petition Date, the Debtors maintain an aggregate balance of $862,983 in the Revlon Puerto Rico Accounts. |
| ***Investment Accounts*** | |
| **Revlon Investment Accounts**<br><br>*Accounts ending 3753 & 5030* | Debtor Revlon Consumer Products Corporation currently maintains two investment accounts: one at Cowen & Company (ending 3753) and one at Goldman Sachs (ending 5030) (collectively, the "Investment Accounts"). The Investment Accounts are dormant, legacy accounts that the Debtors intend to close. To the best of the Debtors' current knowledge and belief, the Debtors do not maintain funds in the Investment Accounts. |

68.    I believe that the Cash Management System is similar to those commonly employed by businesses comparable in size and scale to the Debtors.   Indeed, large businesses use

integrated systems to help control funds, ensure cash availability for each entity, and reduce administrative expenses by facilitating the movement of funds among multiple corporate entities. I therefore believe that the Cash Management System is vital to the Debtors' ability to conduct their daily operations, including receiving revenue and paying their vendors, employees, and stakeholders. Any disruption of the Cash Management System would accordingly be materially detrimental to the Debtors' operations.

     **C.**     <u>**Bank Fees**</u>

     69.     In the ordinary course of business, the Debtors incur periodic service charges and other fees in connection with the maintenance of the Cash Management System (the "<u>Bank Fees</u>"), which average approximately $85,000 per month. The Bank Fees for each month are paid in arrears and are automatically deducted from the Debtors' Bank Accounts as they are assessed by their respective Cash Management Banks. The Debtors estimate that they owe their Cash Management Banks approximately $85,000 as of the Petition Date on account of Bank Fees, the entirety of which will become due and payable within the first 25 days after the Petition Date. To maintain the integrity of their Cash Management System, I believe that it is necessary and appropriate for the Court to grant the Debtors authority to pay prepetition Bank Fees, in addition to any other Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business.

     **D.**     <u>**The Debtors' Purchaser Cards**</u>

     70.     As part of the Cash Management system, the Debtors have provided certain employees with access to purchase cards (the "<u>Purchase Cards</u>"), travel cards and travel platinum travel cards (together, the "<u>Travel Cards</u>") issued by American Express (collectively, the "<u>Purchase Card Program</u>"). The Purchase Cards and Travel Cards are utilized for approved

business expenses and supplies incurred on behalf of the Debtors in the ordinary course of business.  Costs incurred through use of the Travel Cards are paid directly by each employee and subsequently reimbursed by the Debtors on a weekly basis.  Costs incurred through use of the Purchase Cards are paid directly by the Debtors on a weekly basis.  On average, in the twelve months leading up to the Petition Date, the Debtors accrued and paid approximately $300,000 per month on account of the Purchase Card Program.  As of the Petition Date, the Debtors estimate they owe approximately $350,000 on account of the Purchase Cards and Travel Cards.  The Debtors seek authority to continue the Purchase Card Program in the ordinary course on a postpetition basis consistent with past practice and to pay any prepetition amounts related to the Purchase Cards to avoid interrupted service.

     **E.**       **<u>Business Forms</u>**

     71.    As part of their Cash Management System, the Debtors utilize a variety of preprinted business forms, including checks, letterhead, correspondence forms, invoices, and other business forms in the ordinary course of business (collectively, the "<u>Business Forms</u>").  To avoid the distraction and unnecessary expense to their estates, the Debtors request authorization to continue using all of the Business Forms in existence before the Petition Date, without reference to the Debtors' status as chapter 11 debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering new Business Forms as required by the U.S. Trustee Guidelines.  The Debtors submit that once they have exhausted their existing stock of Business Forms, they will ensure that any new Business Forms are clearly labelled "Debtor in Possession," and with respect to any Business Forms that exist or are generated electronically, the Debtors shall ensure that such electronic Business Forms are clearly labelled "Debtor in Possession."

**F.**    **Intercompany Transactions**

72.    The Debtors operate as a global enterprise and in the ordinary course of business, the Debtors maintain and engage in business relationships with each other and with their non-debtor affiliates (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims").[3]    The Intercompany Transactions cover a number of different categories, including, among other things, intercompany accounts receivable and accounts payable, they payment of licensing fees or royalties among the Debtors and among Debtors and non-debtor affiliates.

73.    These Intercompany Transactions occur as part of the daily operation of the Cash Management System, and at any given time there may be Intercompany Claims owing between Debtors or between Debtors and non-debtor affiliates in connection with the receipt and disbursement of funds, including among the Debtors' Bank Accounts and non-Debtor foreign bank accounts, and there may be recognitions of offsets between Debtors or between Debtors and non-debtor affiliates.    For example, by the operation of the Cash Management System, the Debtors transfer funds out of the Revlon Treasury Account into various Disbursement Accounts and create intercompany balances among the Debtors.    Each payment from a Debtor and each bookkeeping entry between Debtors and between Debtors and non-debtor affiliates on account of an Intercompany Transaction is an essential component of the Cash Management System.

---

[3]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.    Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.    The continued performance of the ordinary course Intercompany Transactions are integral to ensuring the Debtors' ability to operate their businesses.

74.     With respect to all Intercompany Transactions among the Debtors and non-debtor affiliates, the Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for Intercompany Transactions.   The Debtors' Intercompany Transactions are completely integrated within the Cash Management System.  Specifically, by operation of the Cash Management System and in the ordinary course of business, the Revlon Treasury Account interacts with all of the Debtors' affiliates outside of North America by transferring funds to, and receiving funds from, certain non-debtor affiliate operating accounts in Spain (for the Revlon business) and Switzerland (for the Elizabeth Arden business).  These non-debtor affiliate operating accounts exist only as intermediaries to transfer funds between the Revlon Treasury Account and the foreign affiliates.  If these Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors' estates.

75.     To ensure each individual Debtor will not permanently fund the operations of any affiliate, the Debtors respectfully request that, pursuant to sections 503(b) and 364(c)(1) of the Bankruptcy Code, all Intercompany Claims against any Debtor by another Debtor arising after the Petition Date as a result of postpetition payments on account of ordinary course Intercompany Transactions be accorded administrative expense status.  If Intercompany Claims are given administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors.  Moreover, the Debtors request the authority to continue the Intercompany Transactions in a manner consistent with historical practices to enable the Debtors to smoothly transition into chapter 11 and ensure certain of the Debtors' revenue

streams are not impacted. For the avoidance of doubt, except as otherwise provided in the DIP

Order with respect to the Intercompany DIP Obligations, the Intercompany Claims shall be

unsecured, and rank junior in priority to the DIP Obligations and the 507(c) Claims. The relief

requested herein will ensure that each Debtor receiving payments from another Debtor will

continue to bear ultimate repayment responsibility for its ordinary course Intercompany

Transactions, reducing the risk that these transactions would jeopardize the recoveries available

to the Debtors' creditors. For the avoidance of doubt, the Debtors do not seek authority to pay

prepetition Intercompany Claims owed to non-Debtor affiliates.

76.    The Debtors' intercompany activities represent a substantial and necessary portion

of the Debtors' business operations. As described herein, the Intercompany Transactions are an

essential and integral component of the Debtors' operations and centralized Cash Management

System.

### G.    Compliance of the Bank Accounts with Section 345(b) of the Bankruptcy Code and the U.S. Trustee Guidelines

77.    I understand that the majority of the Bank Accounts comply with Section 345(b) of

the Bankruptcy Code because such Bank Accounts are maintained at banks insured by federal

agencies, such as the Federal Deposit Insurance Corporation (the "FDIC").[4] As of the Petition

Date, the Debtors maintained Bank Accounts at Citibank, TD Bank, JPM, BOA, Wells Fargo,

BNYM, and SunTrust, each of which is insured by the FDIC; however, the Bank Account held

at Barclays plc is not insured by the FDIC. Additionally, Citibank, TD Bank, JPM, BOA, Wells

Fargo, and SunTrust are designated as authorized depositories by the U.S. Trustee pursuant to

the U.S. Trustee Guidelines. BNYM and Barclays plc are not designated as authorized

---

[4] *See* 11 U.S.C. § 345(b).

depositories pursuant to the U.S. Trustee Guidelines.  Nevertheless, the Debtors believe that Barclays plc is well-capitalized and financially stable institution and the Debtors therefore request that the Court waive the U.S. Trustee Guidelines in this respect.  Further, as of the Petition Date, the only Bank Account held at Barclays plc holds less than $250,000.

78.    In addition to the above Bank Accounts, the Debtors also have two Investment Accounts, including one at Cowen & Company and one at Goldman Sachs.  None of the Investment Accounts are FDIC insured.  However, the Investment Accounts are dormant, legacy accounts that, to the best of the Debtors' information and belief, each had a $0.00 balance as of the Petition Date.  The Debtors intend to close the Investment Accounts as soon as practicable.

### H.    Necessity of Cash Management System and Intercompany Transactions

79.    I believe that the Cash Management System constitutes an ordinary course and essential business practice of the Debtors, and is consistent with those utilized by corporate enterprises comparable to the Debtors in size and complexity.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to control corporate funds, to ensure the availability of funds when necessary, and to reduce costs and administrative expenses by facilitating the movement of funds and developing timely and accurate account balance information.  Thus, to ensure the seamless operation of the Debtors' businesses and to realize the benefits of the Cash Management System, I believe that the Debtors should be allowed to continue using the Cash Management System, including the payment of Bank Fees and the maintenance of the Purchase Card Program, and should not be required to open new bank accounts.

80.    Any disruption to the Debtors' current cash management procedures would impair the Debtors' ability to successfully administer these chapter 11 cases.  It would be time

consuming, difficult, and costly for the Debtors to establish an entirely new system of accounts and a new cash management system. The attendant delays from revising cash management procedures and redirecting receipts would create unnecessary pressure on the Debtors and their employees while they work to meet the other administrative obligations imposed by chapter 11. The Debtors will maintain records of all transfers within the Cash Management System to the same extent they were recorded by the Debtors before the Petition Date. As a result, the Debtors will be able to document and record the transactions occurring within the Cash Management System for the benefit of all parties in interest.

81.    Furthermore, I believe that the Debtors can achieve the goals of the U.S. Trustee Guidelines without closing their existing Bank Accounts and opening new ones. The Debtors can and will identify all prepetition checks and other forms of payment outstanding on the Petition Date and notify the appropriate bank not to pay such checks or obligations without proper authorization. The systems currently employed by the Debtors and the Banks are sufficient to ensure that prepetition obligations are not paid improperly. However, to avoid delays in payments to administrative creditors, to ensure a transition into chapter 11 with minimal disruption, and to aid in the Debtors' efforts to preserve and maximize the value of their assets, it is important that the Debtors be permitted to continue to maintain the Bank Accounts with the same account numbers following the Petition Date.

82.    By preserving business continuity and avoiding disruption and delay to the collection of the Debtors' receipts and making of disbursements that would necessarily result from closing the Bank Accounts and opening new accounts, I believe that all parties in interest, including employees, vendors, and customers, will be best served. The confusion that would

result absent the relief requested in the Cash Management Motion would ill serve the Debtors'

chapter 11 efforts.

83.     Given the discussion herein, if the Debtors are not permitted to maintain and utilize

their Bank Accounts and continue to use their existing checks as set forth herein, I believe it

would (a) disrupt the ordinary financial affairs and business operations of the Debtors, (b) delay

the administration of the Debtors' estates, (c) compromise the Debtors' internal controls and

accounting system, and (d) require the Debtors to spend funds unnecessarily to set up new

systems and open new accounts and print new checks.  Accordingly, I believe the relief requested

in the Cash Management Motion should be granted.

84.     Finally, the Intercompany Transactions are made between and among Debtors and

non-Debtor affiliates in the ordinary course as part of the Cash Management System.  Because

the Debtors engage in the Intercompany Transactions described herein on a regular basis and

such transactions are common among large enterprises similar to the Debtors, I believe that the

Intercompany Transactions are ordinary course transactions.

85. Moreover,  the  continued  performance  of  ordinary  course  Intercompany

Transactions and the payment of the Intercompany Claims arising therefrom is necessary to

ensure the Debtors' ability to operate their businesses during these chapter 11 cases.  If the

Intercompany Transactions were to be discontinued, the Cash Management System, related

administrative controls, and the Debtors' overall business operations would be disrupted, if not

halted in full, to the Debtors' and each of their estates' detriment.  Accordingly, I believe that

the  continued  performance  of  the  Intercompany  Transactions,  including  the  payment  of

postpetition Intercompany Claims that arise therefrom, is in the best interest of the Debtors'

estates and their creditors and, therefore, the Debtors should be permitted to continue such

performance and pay applicable claims.  Furthermore, I believe that granting administrative expense priority status to Intercompany Claims of non-Debtor affiliates on account of Intercompany Transactions will preserve substantial value and business relationships benefiting the Debtors' estates, prevent unnecessary disruptions to the Debtors' businesses, and ensure continued performance under the Debtors' prepetition business arrangements with their non-Debtor affiliates.

**VIII.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion")**

86.     Pursuant to the Wages Motion, the seek entry of interim and final orders (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of their businesses, including payment of certain prepetition obligations related thereto, each subject to the caps and limits set forth herein, and (b) granting related relief.

87.     As of the Petition Date, the Debtors employ approximately 2,823 employees working in both full- and part-time positions, including salaried and hourly employees, those that work on commission, administrative support staff, and other personnel.  Of these employees, approximately 2,453 are located in the United States (the "U.S. Employees"), and approximately 370 are located outside of the United States in Canada and the United Kingdom (the "Non-U.S. Employees" and, together with the U.S. Employees, the "Employees").

88.     In addition to the Employees, the Debtors also periodically retain personnel as independent contractors (the "Independent Contractors") or temporary workers (the "Temporary Staff").  The Independent Contractors perform crucial roles for the Debtors' various businesses

(*e.g.*, sourcing), while others perform discrete consulting services (*e.g.*, IT and marketing). Temporary Staff fulfill certain duties on both a short- and long-term basis including, among other things, warehouse duties and general office services.  The number of Temporary Staff and Independent Contractors fluctuates based on the Debtors' specific needs at any given time.

89.   The Independent Contractors and Temporary Staff are a critical supplement to the efforts of the Employees and provide the Debtors with the flexibility to adapt their work force to fluctuating labor needs.  Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' businesses that the Debtors cannot easily replace, particularly in the wake of the COVID-19 pandemic.  Without the services of these individuals, the Debtors' reorganization efforts will be threatened.

90.   The Employees, Independent Contractors, and Temporary Staff rely on their compensation and benefits to pay their daily living expenses and support their families.  If the Debtors are unable to meet and sustain their payroll and benefits obligations as set forth herein, these workers may suffer significant financial harm and be forced to seek employment elsewhere.  Consequently, the Debtors respectfully submit that the relief requested herein is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

91.   The Debtors seek authority to pay the aggregate amounts related to prepetition amounts owed on account of the Employee Compensation and Benefits Programs set forth in the table below:

| **Employee Compensation and Benefit Programs** | **Interim Amount** | **Final Amount** |
|---|---|---|
| **Compensation, Deductions, and Payroll Taxes** | | |
| Unpaid Net Compensation | $1,000,000 | $1,000,000 |
| Temporary Staff Fees | $4,400,000 | $5,100,000 |
| Independent Contactors Obligations | $700,000 | $700,000 |
| Commissions | $50,000 | $50,000 |

| Employee Compensation and Benefit Programs | Interim Amount | Final Amount |
|---|---|---|
| Non-Insider Non-Union Severance (Final Basis Only for former Employees) | $0 | $1,256,000 |
| Union Severance Program (Final Basis Only for former Employees) | $0 | $298,000 |
| Global Annual Bonus Program (Non-Insiders and Final Order Only) | $0 | TBD |
| MCG Sales Bonus Program (Non-Insiders Only)[5] | $31,000 | $31,000 |
| Non-Insider Cash TIP (Non-Insiders and Final Order Only)[6] | $0 | $860,000 |
| Expenses | $220,000 | $220,000 |
| Concur Fees | $6,000 | $6,000 |
| Deductions | $200,000 | $200,000 |
| Employer Payroll Taxes | $100,000 | $3,300,000 |
| Employee Payroll Taxes | $400,000 | $400,000 |
| Payroll Processing Fees | $50,000 | $50,000 |
| **Employee Benefit Programs** | | |
| Medical Claims | $2,100,000 | $5,250,000 |
| Employer Medical Plan Expenses | $580,000 | $580,000 |
| Dental Claims | $140,000 | $350,000 |
| Employer Dental Plan Expenses | $38,000 | $38,000 |
| Supplemental Plans | $620,000 | $620,000 |
| U.S. FSA Employee Contributions | $45,000 | $45,000 |
| U.S. FSA Fees | $6,000 | $6,000 |
| Canadian FSA | $6,000 | $6,000 |
| Canadian FSA Fees | $6,000 | $6,000 |
| Standard Life and AD&D Insurance | $290,000 | $290,000 |
| U.S. Short-Term Disability Benefits | $430,000 | $430,000 |
| Canada Disability Benefits | $7,000 | $7,000 |
| Workers' Compensation Claims | $10,000 | $400,000 |
| Canadian Workers' Compensation Premiums | $3,000 | $3,000 |
| Business Travel Accident Insurance | $0 | $0 |
| Non-Represented Employee 401(k) Contributions | $640,000 | $640,000 |
| Non-Represented Employee 401(k) Match and Fees | $360,000 | $360,000 |
| Represented Employees 401(k) Plan | $6,000 | $156,000 |
| Canadian Savings Plan Employee Contributions | $12,000 | $12,000 |
| Canadian Savings Plan Match | $7,000 | $7,000 |

---

[5]   The amounts listed in this table on account of the MCG Sales Bonus Program reflect the maximum amount payable on account of such program on the next payment date of July 15, 2022, and not prepetition amounts due as of the Petition Date.

[6]   The amounts listed in this table on account of the Non-Insider Cash TIP reflect the maximum amount payable on account of such program on the next payment date of June 30, 2023, and not prepetition amounts due as of the Petition Date.

| **Employee Compensation and Benefit Programs** | **Interim Amount** | **Final Amount** |
|---|---|---|
| U.K. Savings Plan | $40,000 | $40,000 |
| U.S. Qualified Pension Plans | $0 | $700,000 |
| U.S. Actuarial Fees | $30,000 | $30,000 |
| Union MEPP | $4,000 | $200,000 |
| Canadian Pension Plan | $6,000 | $6,000 |
| U.K. Pension Plan | $30,000 | $30,000 |
| WTW Actuarial Fees | $38,000 | $38,000 |
| Time-Off Benefits | $0 | $650,000 |
| Additional Programs | $59,000 | $138,000 |
| **Total** | $12,670,000 | $24,509,000 |

92.     The Debtors seek authority to pay the aggregate amounts related to prepetition amounts owed on account of the Employee Compensation and Benefits Programs set forth in the table below:

93.     I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and that absent the payment of the Employee compensation and benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these Chapter 11 Cases. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts—which may not even be possible given the overhang of these Chapter 11 Cases.

94.     I therefore believe that payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood to retain the Employees as the Debtors seek to operate their business in these Chapter 11 Cases. For these reasons, the relief requested in the Wages Motion is in the best interests of the Debtors, their creditors and all other parties-in-interest.

**IX.    Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Debtors to
Continue and Renew Their Surety Bond Program and (B) Granting Related Relief
(the "Surety Bond Motion")**

95.    By   the   Surety   Bond   Motion,   the   Debtors   seek   interim   and   final
orders(a) authorizing the Debtors to continue and renew their Surety Bond Program (as defined
herein)  in  the  ordinary  course  of  their  businesses  consistent  with  historical  practice,  and
(b) granting related relief.

96.    In the ordinary course of their businesses, certain statutes, rules, and regulations
require that the Debtors provide surety bonds to certain third parties, often to governmental units
or other public agencies, to secure the Debtors' payment or performance of certain obligations
(the "Surety  Bond  Program").    These  obligations  include,  among  other  things,  customs
liabilities.  For example, the Debtors are required to post a customs bond with the U.S. Customs
and Border Protection Bureau to ensure the Debtors' compliance with import duties, taxes, and
fees.  See 19 C.F.R. § 113.62.  Without the Surety Bond Program, the Debtors would not be able
to continue importing products across U.S. borders.  As is evident with their customs bonds, the
Surety Bond Program secures essential obligations necessary for the Debtors' global operations.
As  such,  failing  to  provide,  maintain,  or  timely  replace  their  surety  bonds  will  prevent  the
Debtors from undertaking essential functions related to their operations..

97.    The Debtors have outstanding surety bonds issued by Western Surety Company,
American Casualty Company of Reading, PA, Westchester Fire Insurance Company (Chubb),
Atlantic  Specialty  Insurance  Company,  and  Continental  Casualty  Company  (collectively,
the "Sureties").  The following table summarizes the surety bonds currently maintained by the
Debtors.

98.     The premiums for the surety bonds (the "Premiums") generally are determined and are paid by the Debtors on an annual basis.   As of the Petition Date, the Debtors owe approximately $15,000 on account of the Premiums, substantially all of which may come due within the first 25 days after the Petition Date.

99.     The Debtors obtain their surety bonds through their surety brokers Marsh, LLC ("Marsh") and C.A. Shea & Company and its affiliates (together with Marsh, the "Surety Brokers").  The Surety Brokers assist the Debtors in, among other things, obtaining the surety bonds and evaluating bond offerings.  They also help the Debtors with the procurement and negotiation of the surety bonds, enabling the Debtors to obtain the bonds on advantageous terms and at competitive rates.  The Debtors pay the Surety Brokers a commission for all brokerage services (the "Brokerage Fees"), which are generally paid as part of the premium payments for each surety bond.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Brokerage Fees.

100.    The Debtors must be able to provide financial assurance to state governments, regulatory agencies, and other third parties to continue their business operations during the chapter 11 process.  This requires the Debtors to maintain the existing Surety Bond Program, including, without limitation, by:   (a) paying surety bond premiums as they come due; (b) renewing or acquiring additional bonding capacity as needed in the ordinary course of their businesses; (c) requesting releases from duplicate bonding obligations; (d) canceling, revising, and/or supplementing surety bonds; (e) maintaining existing collateral; (f) posting new or additional collateral or issuing letters of credit; (g) replacing the Surety Brokers as may be necessary; and (h) executing other agreements in connection with the Surety Bond Program.

101.    The nature of the Debtors' businesses and the extent of their operations make it necessary for the Debtors to maintain their Surety Bond Program on an ongoing and uninterrupted basis.  The nonpayment of any Surety Bond Obligations under the Surety Bond Program could result in the Issuers terminating or declining to renew their Surety Bonds or refusing to provide Surety Bonds to the Debtors in the future.  If any Surety Bonds lapse without renewal, or the Debtors are unable to obtain new Surety Bonds for certain purposes, the Debtors could default on various legal, regulatory, or contractual obligations, which could severely disrupt or otherwise idle the Debtors' operations to the detriment of all parties in interest.  For example, failure to maintain the required Surety Bonds could cause the Debtors to be in violation of their obligations under federal or state law.

| Debtor | Obligee | Surety | Policy Number | Nature of Bond | Approximate Aggregate Bond Amount |
|---|---|---|---|---|---|
| Revlon Puerto Rico Inc. | U.S. Customs and Border Protection | American Casualty Company of Reading, PA | 000113005 | Customs & Excise Tax | $50,000 |
| Revlon Consumer Products Corporation | U.S. Customs and Border Protection | Westchester Fire Insurance Company (Chubb) | 060106006 | Customs & Excise Tax | $200,000 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | 190808187 | Customs & Excise Tax | $500,000 |
| Revlon Consumer Products Corporation | U.S. Customs and Border Protection | Western Surety Company | 210708104 | Customs & Excise Tax | $1,700,000 |
| Revlon Consumer Products Corporation | US Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau | American Casualty Company of Reading, PA | 500814099 | Financial Guarantee | $2,100 |

| Debtor | Obligee | Surety | Policy Number | Nature of Bond | Approximate Aggregate Bond Amount |
|---|---|---|---|---|---|
| Revlon Consumer Products Corporation | US Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau | American Casualty Company of Reading, PA | 500814216 | License & Permit | $100,000 |
| Revlon Canada, Inc. | Canada Border Services Agency | Continental Casualty Company | 58636416 | Customs & Excise Tax | $13,008 |
| Revlon Canada, Inc. | Our Sovereign Lady the Queen, her heirs and successors, as represented by the Minister of National Revenue | Continental Casualty Company | 58636432 | Customs & Excise Tax | $1,592 |
| Roux Laboratories, Inc. | U.S. Customs and Border Protection | Atlantic Specialty Insurance Company (US) | 800043753 | Customs & Excise Tax | $200,000 |
| Revlon Consumer Products Corporation | U.S. Customs and Border Protection | American Casualty Company of Reading, PA | 940531012 | Customs & Excise Tax | $50,000 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14566 | Customs & Excise Tax | $628,733 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14567 | Customs & Excise Tax | $39,889 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14568 | Customs & Excise Tax | $116,452 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14569 | Customs & Excise Tax | $124,576 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14570 | Customs & Excise Tax | $2,058 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14571 | Customs & Excise Tax | $217,133 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14572 | Customs & Excise Tax | $289,452 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14573 | Customs & Excise Tax | $289,452 |

| Debtor | Obligee | Surety | Policy Number | Nature of Bond | Approximate Aggregate Bond Amount |
|---|---|---|---|---|---|
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14574 | Customs & Excise Tax | $11,378 |
| Elizabeth Arden Inc. | U.S. Customs and Border Protection | Western Surety Company | SEB14585 | Customs & Excise Tax | $129,576 |
|  |  |  |  | **Total** | **$4,665,399** |

102.     The nature of the Debtors' businesses and the extent of their operations make it necessary for the Debtors to maintain their Surety Bond Program on an ongoing and uninterrupted basis.  The nonpayment of any Surety Bond Obligations under the Surety Bond Program could result in the Issuers terminating or declining to renew their Surety Bonds or refusing to provide Surety Bonds to the Debtors in the future.  If any Surety Bonds lapse without renewal, or the Debtors are unable to obtain new Surety Bonds for certain purposes, the Debtors could default on various legal, regulatory, or contractual obligations, which could severely disrupt or otherwise idle the Debtors' operations to the detriment of all parties in interest.  For example, failure to maintain the required Surety Bonds could cause the Debtors to be in violation of their obligations under federal or state law.

103.     Accordingly, I believe that the continuation of the Surety Bond Program, the payment of postpetition obligations arising under the Surety Bond Program, and the posting of new or additional collateral in favor of the existing or any new issuers to secure any Surety Bonds in the Surety Bond Program, including in connection with either the maintenance or renewal of any existing Surety Bonds or the entry into new Surety Bonds, are therefore necessary to preserving the Debtors' businesses and the value of the Debtors' estates for all stakeholders.

104.    Furthermore, I believe that the Surety Bond Program is ordinary for the type, size, and nature of the Debtors' businesses, and is accordingly also consistent with the reasonable expectations of creditors, who would expect the Debtors to continue complying with their obligations under law.  Moreover, I believe that the Surety Bond Program is consistent with industry practice.  The Surety Bond Program has been a part of the Debtors' business operations for decades and all competitors in the Debtors' line of business would be expected to have similar surety bond programs in order to engage in international wholesale operations.

IX.    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief (the "Taxes and Fees Motion").**

105.    In the ordinary course of business, the Debtors collect and incur sales, use, excise, property, and other business, environmental, and regulatory taxes, fees, and assessments (collectively, the "Taxes and Fees").  The Debtors pay or remit Taxes and Fees to various federal, state, provincial, and local governments, including taxing and licensing authorities (collectively, the "Governmental Authorities"), reflected on a schedule attached to the Taxes and Fees Motion as Exhibit C, in accordance with applicable laws, regulations, and permits.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic transfers that are processed by their banks and other financial institutions.

106.    The Debtors estimate that approximately $28,009,600.00 in Taxes and Fees is outstanding as of the Petition Date or otherwise relates to the prepetition period and will become due and owing to the Governmental Authorities in the ordinary course after the Petition Date. The Debtors further estimate that approximately $14,711,000.00 in Taxes and Fees outstanding as of the Petition Date or otherwise relating to the prepetition period are or will become due to

the Governmental Authorities after the Petition Date and before a final hearing on the Taxes and

Fees Motion.

107.    The Debtors pay the Taxes and Fees on a periodic basis, remitting them to the

respective Authorities, landowner, or lessor semimonthly, monthly, quarterly, or annually,

depending on the nature and incurrence of a particular Tax or Fee.    The Debtors seek the

authority to pay Taxes and Fees that: (a) were incurred and became due prepetition but were not

paid prepetition, or were paid in an amount less than actually owed; (b) had prepetition payments

that were lost or otherwise not received in full; or (c) were incurred for prepetition periods and

become due after the Petition Date, up to an aggregate of $15 million. The Taxes and Fees are

summarized as follows:

108.    The following table contains a summary of the Taxes and Fees:

| Category | Description | Approximate Amount Due as of Petition Date | Approximate Amount Due Within 25 Days of Petition Date |
|---|---|---|---|
| Sales and Use, VAT, and GST Taxes | The Debtors incur liability to remit sales, use, gross receipts and related taxes in various states in connection with the sale of goods and services in those jurisdictions (collectively, the "Sales and Use, VAT, and GST Taxes").<br><br>Depending on the applicable jurisdiction, Sales and Use, VAT, and GST Taxes are due monthly, quarterly, semi annually, or annually.<br><br>The Debtors pay direct and indirect taxes and fees imposed by foreign Governmental Authorities that are required to conduct their businesses in the ordinary course. | $6,460,300.00 | $$4,347,400.00 |
| Real Property Taxes | The Debtors pay property taxes directly to Governmental Authorities on account of production plants, offices, work place locations, and any personal movable property that the | $2,898,800.00 | $1,435,900.00 |

| Category | Description | Approximate Amount Due as of Petition Date | Approximate Amount Due Within 25 Days of Petition Date |
|---|---|---|---|
| | Debtors use in the operation of their businesses (the "Real and Personal Property Taxes"). The Debtors pay Real and Personal Property Taxes to the relevant Governmental Authorities on a quarterly, semi-annual, or annual basis, depending on the applicable jurisdiction. | | |
| Income Taxes | The Debtors pay estimated annual foreign, federal, state, provincial, and local income taxes in advance on a quarterly, semi-annual, or annual basis (the "Income Taxes"). At this time, the Income Tax amounts set forth herein are estimates only and the Debtors' fiscal year 2022 taxable income has not yet been finally determined. | $9,557,700.00 | $5,496,000.00 |
| Other Taxes | The Debtors remit other taxes and fees required to operate their businesses in certain jurisdictions, including customs and duties, registration fees, mercantile taxes, commercial activity taxes, annual report fees, and for the avoidance of doubt, the NYC Commercial Rent Tax. | $9,092,800.00 | $3,431,700.00 |
| **Total** | | **$28,009,600.00** | **$14,711,000.00** |

109.     The Debtors believe that failing to remit or pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. *First*, failing to remit or pay certain of the Taxes and Fees likely would cause the Debtors to lose their ability to conduct business in certain jurisdictions. *Second*, the Governmental Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the chapter 11 process. *Third*, failing to remit or pay Taxes and Fees could potentially subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors'

restructuring. ***Fourth***, unremitted or unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business or the restructuring process. Moreover, the Debtors collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Governmental Authorities, and these funds may not constitute property of the Debtors' estates. Accordingly, the Debtors seek authority to pay the Taxes and Fees in the ordinary course of their businesses consistent with historic practice as set forth more fully herein.

110.    I believe the relief requested in the Taxes and Fees Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes and Fees Motion should be granted.

**X.      Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility (B) Determining Adequate Assurance of Payment for Future Utility Services, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief  (the "Utilities Motion")**

111.    In the ordinary course of business, the Debtors obtain water, sewer service, electricity, waste disposal, natural gas, telecommunications, internet, and other similar services (collectively, the "Utility Services") from many American and Canadian utility providers or their brokers (the "Utility Providers"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit B (the "Utility Providers List").

112.    On average, the Debtors pay approximately $828,000.00 each month for Utility Services, calculated as a historical average payment for a twelve-month period, which is

representative of the Debtors' ongoing obligations.  Accordingly, the Debtors estimate that their

cost for Utility Services during the next 30 days (not including any deposits to be paid) will be

approximately $828,000.00.  The Debtors estimate they do not have any amounts currently held

as security deposits with respect to any Utility Provider.  The Debtors intend to pay postpetition

obligations owed to the Utility Providers in the ordinary course of business and in a timely

manner.  I believe that cash held by the Debtors, the cash generated in the ordinary course of

business, and the funds received through the Debtors' proposed debtor-in-possession financing

facility will provide sufficient liquidity to pay the Utility Providers in the ordinary course of

business during these chapter 11 cases.

113.    To provide additional assurance of payment, the Debtors propose to establish a

segregated bank account (the "Adequate Assurance Account") and deposit $414,000.00

(the "Adequate Assurance Deposit") into such account to serve as adequate assurance of

payment ("Adequate Assurance").  This Adequate Assurance Deposit will be equal to one-half

of the Debtors' estimated monthly cost of the Utility Services, less any prepetition cash deposit

already held by a Utility Provider; provided, however, that such deposits may be adjusted by the

Debtors to account for the termination or discontinuance of any of the Utility Services.  In the

event that a Utility Provider believes that additional assurance is required, the Debtors have

proposed procedures in the Utilities Motion for determining additional Adequate Assurance, if

any (the "Proposed Adequate Assurance Procedures").

114.    I believe that the Adequate Assurance Deposit, in conjunction with the Debtors'

anticipated liquidity during these chapter 11 cases (together, the "Proposed Adequate

Assurance"), sufficiently insures the Utility Providers against any risk of nonpayment for future

Utility Services.  To the extent that any Utility Provider believes that additional assurance is

required, the Proposed Adequate Assurance Procedures, in my opinion, are reasonable and necessary to avoid a haphazard and chaotic process that could expose the Debtors to extortionate, last-minute demands under the threat of losing critical Utility Services.

115.    I believe the Proposed Adequate Assurance minimizes the risk of termination of the Utility Services, which could result in the Debtors' inability to operate their businesses to the detriment of all stakeholders.  In my opinion, preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, I believe any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their customers.  Such a result could, in my opinion, seriously jeopardize the Debtors' restructuring efforts and ultimately, the value of their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

**XI.    Debtors' Application For Entry Of An Order (I) Authorizing And Approving The Appointment Of Prime Clerk LLC As Claims And Noticing Agent And (II) Granting Related Relief (the "Claims Agent Retention Motion")**

116.    In the Claims Agent Retention Motion, the Debtors seek entry of an order (a) appointing Kroll Restructuring Administration LLC ("Kroll") as claims and noticing agent (the "Claims and Noticing Agent") for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases and (b) granting related relief.  I believe that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.  The terms of Kroll's retention are set forth in the Engagement Agreement attached to the Claims Agent Retention Motion as Exhibit C

(the "Engagement Agreement"); *provided* that Kroll is seeking approval solely of the terms and provisions as set forth in their application and the proposed order attached thereto.

**XII.**   **Debtors' Motion For Entry Of An Order (I) Extending Time To File Schedules Of Assets And Liabilities, Schedules Of Current Income And Expenditures, Schedules Of Executory Contracts And Unexpired Leases, Statements Of Financial Affairs, And Rule 2015.3 Financial Reports, And (II) Granting Related Relief (the "Extension Motion")**

117.     In the Extension Motion, the Debtors seek entry of an order (a) extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 45 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions, (b) extending the deadline by which the Debtors must file their initial reports of financial information with respect to entities in which the Debtors hold a controlling or substantial interest as set forth in Federal Rule of Bankruptcy Procedure 2015.3 (the "2015.3 Reports"), or to file a motion with the Court seeking a modification of such reporting requirements for cause, to the later of (i) 30 days after the meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (as defined herein) (the "341 Meeting") or (ii) 44 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions, and (c) granting related relief.

118.     I believe good cause exists for granting an extension of the time to file Schedules and Statements.   To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to the claims of the Debtors' numerous creditors, as well as the Debtors' many assets and agreements.   This information is voluminous and collecting it requires an enormous expenditure of time and effort on the part of the Debtors,

their employees, and their professional advisors in the near term. In my opinion, focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will maintain the stability of the Debtors' business operations and facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

119.    While the Debtors, with the help of their professional advisors, are working diligently and expeditiously on the preparation of the Schedules and Statements, resources have concentrated on the aforementioned objectives. Accordingly, the employees with the expertise to complete the Schedules and Statements have been significantly occupied by numerous other restructuring work streams in addition to their ordinary course duties as employees of the Debtors. I believe that the immense volume of information that must be assembled and compiled and the potentially hundreds of employee and professional hours required to complete the Schedules and Statements constitute good and sufficient cause for granting the requested extension of time. In addition, I understand that employee efforts during the initial postpetition period are critical, and the Debtors must devote their time and attention to business operations to maximize the value of the Debtors' estates during the first critical months.

120.    Due to the quantity of work necessary to complete the Schedules and Statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during this critical time, I understand that the Debtors will not be able to properly and accurately complete the Schedules and Statements within the required 14-day period. The Debtors anticipate, and I believe, that they will require the additional days to complete their Schedules and Statements.

**Exhibit D**

**US ABL Guarantors**

**Domestic Guarantors**

1. Revlon, Inc.
2. Revlon Consumer Products Corporation
3. Almay, Inc.
4. Art & Science, Ltd.
5. Bari Cosmetics, Ltd.
6. Beautyge Brands USA, Inc.
7. Beautyge U.S.A., Inc.
8. Charles Revson Inc.
9. Creative Nail Design, Inc.
10. Cutex, Inc.
11. DF Enterprises, Inc.
12. Elizabeth Arden (Financing), Inc.
13. Elizabeth Arden Investments, LLC
14. Elizabeth Arden NM, LLC
15. Elizabeth Arden Travel Retail, Inc.
16. Elizabeth Arden USC, LLC
17. Elizabeth Arden, Inc.
18. FD Management, Inc.
19. North America Revsale Inc.
20. OPP Products, Inc.
21. RDEN Management, Inc.
22. Realistic Roux Professional Products Inc.
23. Revlon Development Corp.
24. Revlon Government Sales, Inc.
25. Revlon International Corporation
26. Revlon Professional Holding Company LLC
27. Riros Corporation
28. Riros Group Inc.
29. Roux Laboratories, Inc.
30. Roux Properties Jacksonville, LLC
31. SinfulColors Inc.

**International Guarantors**

1. Elizabeth Arden (Canada) Limited (CANADA)
2. Elizabeth Arden (UK) Ltd. (UNITED KINGDOM)
3. Revlon Canada Inc. (CANADA)

## Exhibit E

### 2016 Term Loan Facility Guarantors

#### Domestic Guarantors

1. Revlon, Inc.
2. Revlon Consumer Products Corporation
3. Almay, Inc.
4. Art & Science, Ltd.
5. Bari Cosmetics, Ltd.
6. Beautyge Brands USA, Inc.
7. Beautyge U.S.A., Inc.
8. Charles Revson Inc.
9. Creative Nail Design, Inc.
10. Cutex, Inc.
11. DF Enterprises, Inc.
12. Elizabeth Arden (Financing), Inc.
13. Elizabeth Arden Investments, LLC
14. Elizabeth Arden NM, LLC
15. Elizabeth Arden Travel Retail, Inc.
16. Elizabeth Arden USC, LLC
17. Elizabeth Arden, Inc.
18. FD Management, Inc.
19. North America Revsale Inc.
20. OPP Products, Inc.
21. RDEN Management, Inc.
22. Realistic Roux Professional Products Inc.
23. Revlon Development Corp.
24. Revlon Government Sales, Inc.
25. Revlon International Corporation
26. Revlon Professional Holding Company LLC
27. Riros Corporation
28. Riros Group Inc.
29. Roux Laboratories, Inc.
30. Roux Properties Jacksonville, LLC
31. SinfulColors Inc.

#### International Guarantors

4. Elizabeth Arden (Canada) Limited (CANADA)
5. Elizabeth Arden (UK) Ltd. (UNITED KINGDOM)
6. Revlon Canada Inc. (CANADA)

**<u>Exhibit F</u>**

**BrandCos**

1.  Beautyge I
2.  Beautyge II, LLC
3.  BrandCo Almay 2020 LLC
4.  BrandCo Charlie 2020 LLC
5.  BrandCo CND 2020 LLC
6.  BrandCo Curve 2020 LLC
7.  BrandCo Elizabeth Arden 2020 LLC
8.  BrandCo Giorgio Beverly Hills 2020 LLC
9.  BrandCo Halston 2020 LLC
10. BrandCo Jean Nate 2020 LLC
11. BrandCo Mitchum 2020 LLC
12. BrandCo Multicultural Group 2020 LLC
13. BrandCo PS 2020 LLC
14. BrandCo White Shoulders 2020 LLC

**Exhibit G**

**Summary of**
**Collateral Priorities**

|  | ABL Priority Collateral | 2016 Term Loan Priority Collateral | BrandCo Collateral |
|---|---|---|---|
| **US ABL** | First | Second | N/A |
| **2016 Term Loan** | Second | First | N/A |
| **BrandCo Term Loan** | Second | First | First |
| **Foreign ABTL** | N/A | N/A | N/A |

## Exhibit H

### Foreign ABTL Guarantors

1. Beautyge Beauty Group, S.L. (SPAIN)
2. Beautyge Germany GmbH (GERMANY)
3. Beautyge Italy S.p.A. (ITALY)
4. Beautyge Logistics Services, S.L. (SPAIN)
5. Beautyge México, S.A. de C.V. (MEXICO)
6. Beautyge Participations S.L. (SPAIN)
7. Beautyge, S.L. (SPAIN)
8. Elizabeth Arden (Netherlands) Holding B.V. (NETHERLANDS)
9. Elizabeth Arden España, S.L. (SPAIN)
10. Elizabeth Arden GmbH (GERMANY)
11. Elizabeth Arden International S.a.r.L. (SWITZERLAND)
12. Revlon Australia PTY Ltd (AUSTRALIA)
13. Revlon Finance LLC (DELAWARE)
14. Revlon Holdings B.V (NETHERLANDS)
15. Revlon Manufacturing Ltd. (BERMUDA)
16. Revlon, S.A. de C.V. (MEXICO)
17. RML Holdings L.P. (BERMUDA)

## **Exhibit I**

### **2024 Unsecured Notes Guarantors**

1.  Revlon Consumer Products Corporation
2.  Almay, Inc.
3.  Art & Science, Ltd.
4.  Bari Cosmetics, Ltd.
5.  Beautyge Brands USA, Inc.
6.  Beautyge U.S.A., Inc.
7.  Charles Revson Inc.
8.  Creative Nail Design, Inc.
9.  Cutex, Inc.
10. DF Enterprises, Inc.
11. Elizabeth Arden (Financing), Inc.
12. Elizabeth Arden Investments, LLC
13. Elizabeth Arden NM, LLC
14. Elizabeth Arden Travel Retail, Inc.
15. Elizabeth Arden USC, LLC
16. Elizabeth Arden, Inc.
17. FD Management, Inc.
18. North America Revsale Inc.
19. OPP Products, Inc.
20. RDEN Management, Inc.
21. Realistic Roux Professional Products Inc.
22. Revlon Development Corp.
23. Revlon Government Sales, Inc.
24. Revlon International Corporation
25. Revlon Professional Holding Company LLC
26. Riros Corporation
27. Riros Group Inc.
28. Roux Laboratories, Inc.
29. Roux Properties Jacksonville, LLC
30. SinfulColors Inc.

## Schedule 1

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), provides the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in these chapter 11 cases, and a brief description of the circumstances surrounding the formation of the committee and the date of the formation.

| Prepetition Committee | Counsel | Members |
|---|---|---|
| The ad hoc group of 2020 BrandCo Term Loan Lenders | Davis Polk & Wardwell LLP | 140 SUMMER PARTNERS LP<br><br>ARES MANAGEMENT LLC<br><br>ANGELO, GORDON & CO., L.P.<br><br>DEUTSCHE BANK AG CAYMAN ISLANDS BRANCH<br><br>CYRUS CAPITAL PARTNERS, L.P.<br><br>DIAMETER CAPITAL PARTNERS LP<br><br>GLENDON CAPITAL MANAGEMENT, LP<br><br>KING STREET CAPITAL MANAGEMENT, L.P.<br><br>NUT TREE CAPITAL MANAGEMENT LP<br><br>OAK HILL ADVISORS, L.P. |
| The ad hoc group of 2016 Term Loan Lenders | Akin Gump Straus Hauer & Feld LLP | JP MORGAN ASSET MANAGEMENT<br><br>AEGON ASSET MANAGEMENT<br><br>NAPIER PARK GLOBAL CAPITAL<br><br>THE CARLYLE GROUP<br><br>CORRE PARTNERS<br><br>CASTLEKNIGHT MANAGEMENT<br><br>CIFC ASSET MANAGEMENT |

| | | PALOMA PARTNERS |
| | | BENEFIT STREET PARTNERS |
| | | ASSURED INVESTMENT MANAGEMENT |
| | | KKR & CO |
| The ad hoc group of ABL Lenders | Proskauer Rose LLP | MIDCAP FINANCIAL TRUST |
| | | ATHORA LUX INVEST S.C.SP. |
| | | APOLLO LINCOLN FIXED INCOME FUND, L.P. |
| | | APOLLO CENTRE STREET PARTNERSHIP, L.P. |
| | | CIBC BANK USA |
| The ad hoc group of SISO US ABL Lenders | Morgan Lewis & Bockius LLP | CRYSTAL FINANCIAL SPV LLC |
| | | SCP PRIVATE CREDIT INCOME FUND SPV LLC |
| | | SCP PRIVATE CREDIT INCOME BDC SPV LLC |
| | | SCP SF DEBT FUND L.P. |
| | | SCP PRIVATE CORPORATE LENDING FUND SPV, LLC |
| | | SCP CAYMAN DEBT MASTER FUND SPV LLC |
| | | CALLODINE COMMERCIAL FINANCE SPV, LLC |
| | | FIRST EAGLE ALTERNATIVE CAPITAL BDC, INC. |
| | | FIRST EAGLE DIRECT LENDING FUND IV, LLC |
| | | FIRST EAGLE DIRECT LENDING FUND IV CO-INVEST, LLC |
| | | FIRST EAGLE DIRECT LENDING LEVERED FUND IV SPV, LLC |

| | | |
|---|---|---|
| | | FIRST EAGLE DIRECT LENDING V-A, LLC |
| | | FIRST EAGLE DIRECT LENDING V-B, LLC |
| | | FIRST EAGLE DIRECT LENDING V-B SPV, LLC |
| | | FIRST EAGLE DIRECT LENDING V-C, SCSP |
| | | FIRST EAGLE CREDIT OPPORTUNITIES FUND |
| The ad hoc group of Litigating 2016 Term Loan Lenders | Quinn Emanuel Urquhart & Sullivan, LLP | BRIGADE CAPITAL MANAGEMENT, LP |
| | | HPS INVESTMENT PARTNERS, LLC |
| | | SYMPHONY ASSET MANAGEMENT LLC |
| | | BARDIN HILL LOAN MANAGEMENT LLC |
| | | GREYWOLF LOAN MANAGEMENT LP |
| | | ZAIS GROUP LLC |
| | | ALLSTATE INVESTMENT MANAGEMENT COMPANY |
| | | MEDALIST PARTNERS CORPORATE FINANCE LLC |
| | | TALL TREE INVESTMENT MANAGEMENT LLC |
| | | NEW GENERATION ADVISORS LLC |

## Schedule 2

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), provides the following information with respect to each of the holders of the Debtors' fifty (50) largest unsecured claims, excluding claims of insiders: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the telephone number, e-mail address, the name(s) of person(s) familiar with the debtor's account, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 1. | US Bank, National Association<br>Global Corporate Trust Services<br>60 Livingston Avenue<br>EP-MN-WS3C<br>St. Paul, MN  55107-2292<br>United States | Rick Prokosch<br>EMAIL - rick.prokosch@usbank.com<br>PHONE - 651- 466-3000<br>FAX - 651-466-7430 | 6.25% Senior Notes due 2024 | | $442,531,771 |
| 2. | Hawkins Parnell & Young LLP<br>303 Peachtree St. NE<br>Ste 4000<br>Atlanta, GA  30308-3243<br>United States | Eric Hawkins<br>Partner<br>EMAIL - ehawkins@hpylaw.com<br>PHONE - 312-667-8400<br>FAX - 877-566-1529 | Trade Payable | | $4,379,093 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 3. | Verescence North America Inc.<br>Verescene NA<br>900 Third Ave<br>4th Floor<br>New York, NY  10022<br>United States | Ashok Sudan<br>President<br>EMAIL - ashock.sudan@verescence.com<br>PHONE - 770- 385-3800 | Trade Payable | | $4,022,309 |
| 4. | Orange Die Cutting Corp<br>PO 2295 1 Favorite Ave<br>Newburgh, NY  12550<br>United States | Anthony Esposito<br>Chief Executive Officer<br>EMAIL - aesposito@orangepkg.com<br>PHONE - 845-562-0900<br>FAX - 845-562-1020 | Trade Payable | | $3,641,358 |
| 5. | NCH Marketing Services, Inc.<br>155 N. Pfingsten Road, Suite 200<br>Deerfield, IL  60015<br>United States | Scott Hansen<br>Chief Executive Officer<br>EMAIL - shansen@nchmarketing.com<br>PHONE - 915-772-3399<br>FAX - 847-317-0083 | Trade Payable | | $2,962,089 |
| 6. | International Flavors & Fragrances<br>600 State Highway 36<br>Hazlet, NJ  07730<br>United States | Andreas Fibig<br>Chief Executive Officer<br>EMAIL - andreas.fibig@iff.com<br>PHONE - 732-264-4500<br>FAX - 212-708-7132 | Trade Payable | | $2,877,814 |
| 7. | Tinuiti, Inc<br>121 S. 13Th Street<br>3rd Floor<br>Philadelphia, PA  19107<br>United States | Zach Morrison<br>Chief Executive Officer<br>EMAIL - zach.morrison@tinuiti.com<br>PHONE - 833-846-8484 | Trade Payable | | $2,419,449 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 8. | Englewood Lab, Inc<br>20 Campus Road<br>Totowa, NJ  07512<br>United States | Henry Cho<br>Chief Executive Officer<br>EMAIL - henry.c@englewoodlab.com<br>PHONE - 201-567-2267 | Trade Payable | | $2,337,795 |
| 9. | Givaudan Fragrances Corp<br>300 Waterloo Valley Road<br>Mt. Olive, NJ  07828<br>United States | Gilles Andrier<br>Chief Executive Officer<br>EMAIL - gilles.andrier@givaudan.com<br>PHONE - 973-576-9500 | Trade Payable | | $2,117,711 |
| 10. | Cass Information Systems Inc12444 Powerscourt Drive, 550St Louis, MO  63131United States | Eric H. BrunngraberChief Executive OfficerEMAIL - cmreardon@cassinfo.comPHONE - 314-506-5500 | Trade Payable | | $1,925,122 |
| 11. | Flywheel Digital LLC<br>Ascential Inc<br>1801 Porter St. 300<br>Baltimore, MD  21230<br>United States | Larry Pluimer<br>Chief Executive Officer<br>EMAIL - pluimerl@flywheeldigital.com<br>PHONE - 206-257-8207 | Trade Payable | | $1,884,047 |
| 12. | Schwan Cosmetics USA, Inc.<br>3202 Elam Farms Pkwy<br>Mufreesboro, TN  37127<br>United States | Tomás Espinosa<br>Chief Executive Officer<br>EMAIL - robin.gabriesheski@schwancosmeticsusa.com<br>PHONE - 615-396-9156<br>FAX - 615-867-9986 | Trade Payable | | $1,856,440 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 13. | Ancorotti Cosmetics<br>Via Dell'Industria 22<br>26013 Crema (Cr), Cremona,<br>Italy | Renato Ancorotti<br>Chief Executive Officer<br>EMAIL - rancorotti@ancorotticosmetics.com<br>PHONE - 3-738-768-1113 | Trade Payable | | $1,729,242 |
| 14. | VPI Holding Company LLC<br>Smolice 1L Hala F<br>Strykow,  95-010<br>Poland | Jamie Egasti<br>Executive Chairman<br>EMAIL - jamieegasti@vpi-inc.com<br>PHONE - 312-255-4800 | Trade Payable | | $1,607,336 |
| 15. | Array Canada Inc<br>45 Progress Ave.<br>Toronto, ON  M1P 2Y6<br>Canada | Jeffrey K. Casselman<br>Chief Executive Officer<br>EMAIL - jcasselman@arraymarketing.com<br>PHONE - 416-299-4865<br>FAX - 416-292-9759 | Trade Payable | | $1,478,924 |
| 16. | One NY Plaza Co LLC<br>250 Vesey Street<br>15th Floor<br>New York, NY  10281<br>United States | Jeremiah Larkin<br>Executive Vice President, Director of Leasing<br>EMAIL -<br>Jeremiah.Larkin@brookfieldproperties.com<br>PHONE - 212-417-7100 | Trade Payable | | $1,465,618 |
| 17. | Ibotta Inc<br>19957 Dept Ch, Ste 400<br>Palatine, IL  60055-9957<br>United States | Bryan Leach<br>Chief Executive Officer<br>EMAIL - bryan.leach@ibotta.com<br>PHONE - 720-984-2781 | Trade Payable | | $1,440,514 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 18. | Quotient Technology Inc<br>PO Box 204472<br>Dallas, TX 75320-4472<br>United States | Steven R. Boal<br>Chief Executive Officer<br>EMAIL - steven.boal@quotient.com<br>PHONE - 650-605-4600<br>FAX - 650-605-4600 | Trade Payable | | $1,408,335 |
| 19. | Commission Junction<br>4140 Solutions Center<br>Chicago, IL 60677-4001<br>United States | Mayuresh Kshetramade<br>Chief Executive Officer<br>EMAIL - mayureshkshetramade@cj.net<br>PHONE - 800-761-1072 | Trade Payable | | $1,405,103 |
| 20. | The Nielsen Company US LLC<br>675 6th Ave<br>New York, NY 10011<br>United States | David Kenny<br>Chief Executive Officer<br>EMAIL - david.kenny@nielsen.com<br>PHONE - 617-320-5767 | Trade Payable | | $1,361,652 |
| 21. | Fiabila USA Inc.<br>106 Iron Mountain Road<br>Mine Hill, NJ 07803<br>United States | Pierre Miasnik<br>Chief Executive Officer<br>EMAIL - pmiasnik@fiabila.com.<br>PHONE - 973-659-9510<br>FAX - 973-659-6504 | Trade Payable | | $1,357,227 |
| 22. | Salcedo, StephanieEstate of Theresa M. Garciac/o Dobs Legal LLP302 N Market StreetDallas, TX 75202United States | Amin M. OmarPartnerEMAIL - aomar@dobslegal.comPHONE - 214-722-5990 | Litigation Settlement | | $1,125,000 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 23. | Firmenich<br>250 Plainsboro Road<br>Plainsboro, NJ 08536<br>United States | Gilbert Ghostine<br>Chief Representative<br>EMAIL - kirra.thomas@firmenich.com<br>PHONE - 212-489-4800<br>FAX - 212-980-4312 | Trade Payable | | $1,220,239 |
| 24. | Shorewood Corporation of Canada Ltd.<br>PO Box 4232<br>Toronto, ON M5W 5P4<br>Canada | S Lawrence Davis<br>Chief Executive Officer<br>EMAIL - ldavis@shorewoodgrp.com<br>PHONE - 416-292-3990<br>FAX - 416-299-9627 | Trade Payable | | $1,198,038 |
| 25. | Premium Retail Services<br>618 Spirit Drive<br>Chesterfield, MO 63005<br>United States | Brian Travers<br>Chief Executive Officer<br>EMAIL - btravers@premiumretail.com<br>PHONE - 800-800-7318 | Trade Payable | | $1,065,274 |
| 26. | VMWARE, Inc.<br>3401 Hillview Ave.<br>Palo Alto, CA 94304<br>United States | Sumit Dhawan<br>President, Chief Customer Officer<br>EMAIL - sdhawan@vmware.com<br>PHONE - 408-221-5025 | Trade Payable | | $1,079,444 |
| 27. | Valassis Communications Inc<br>90469 Collection Center Drive<br>Chicago, IL 60693<br>United States | Victor Nichols<br>Chief Executive Officer<br>EMAIL - victor.nichols@uk.experian.com<br>PHONE - 866-250-9689 | Trade Payable | | $1,010,384 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 28. | Crystal Claire<br>165 Milner Ave<br>Scarborough, ON  M1S 4G7<br>Canada | Roger Hwang<br>Chief Executive Officer<br>EMAIL - rogerh@crystalclaire.com<br>PHONE - 416-421-1882<br>FAX - 416-421-5025 | Trade Payable | | $968,578 |
| 29. | Plastek Industries Inc<br>2425 West 23Rd St<br>Erie, PA  16506<br>United States | Dennis J Prischak<br>Chief Executive Officer<br>EMAIL - prischakd@plastekgroup.com<br>PHONE - 814-878-4400<br>FAX - 814-878-4499 | Trade Payable | | $925,237 |
| 30. | Kerr, Myriam And Kerr, Robert<br>c/o Simon Greenstone Panatier, PC<br>1201 Elm Street<br>Suite 3400<br>Dallas, TX  75270<br>United States | Tyson Gamble<br>Counsel<br>EMAIL - tgamble@sgptrial.com<br>PHONE - 214-276-7680 | Litigation Settlement | | $900,000 |
| 31. | Accenture International Limited<br>1 Grand Canal Square, Grand Canal H<br>Dublin,   D02 P820<br>Ireland | Julie Sweet<br>Chief Executive Officer<br>EMAIL - julie.sweet@accenture.com<br>PHONE - 917-452-4400<br>FAX - 917-527-9915 | Trade Payable | | $915,000 |
| 32. | Kolmar Laboratories<br>PO Box 12469<br>Newark, NJ  07101-3569<br>United States | Rob Theroux<br>Chief Executive Officer<br>EMAIL - robert.theroux@kdc-one.com<br>PHONE - 845-856-5311<br>FAX - 845-856-8831 | Trade Payable | | $912,472 |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 33. | Salesforce.com Inc. Salesforce Tower 415 Mission Street 3rd Floor San Francisco, CA 94105 United States | Marc Benioff Chief Executive Officer EMAIL - marc_benioff@salesforce.com | Trade Payable | | $875,269 |
| 34. | Beauty Care Professional Products Participations, S.A.33 Boulevard Prince Henri   L-1724Luxembourg | Emanuela BreroEMAIL - ebrero@cvc.com | Purchase Price Adjustment | Contingent, Unliquidated | Undetermined |
| 35. | Dassin, Gerald Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 36. | Dessen, Stanley Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 37. | Draper, Robert E. Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 38. | Engelman, Irwin Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 39. | Fellows, George Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |

|  | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 40. | Fox, William J.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 41. | Gedeon, Harvey<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 42. | Greff, Douglas<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 43. | Kretzman, Robert K.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 44. | Laurenti, Giorgio L.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 45. | Levin, Jerry W.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 46. | Nichols III, Wade H.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |
| 47. | Shapiro, Paul  E.<br>Address on file | Contact information on file | Non-Qualified Pension | Unliquidated | Undetermined |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|---|
| 48. | Pension Benefit Guaranty Corporation<br>PO 2295 1 Favorite Ave<br>N.W. Suite 340<br>Washington, DC, DC  20005-4026<br>United States | Patricia Kelly<br>Chief Financial Officer<br>EMAIL - kelly.patricia@pbgc.gov<br>PHONE - 703-448-0461<br>FAX - 202-326-4112 | Under Funded Pension Liability | Contingent, Unliquidated | Undetermined |
| 49. | Revlon Pension Trustee Company (U.K.) Limited<br>Greater London House<br>Hampstead Road<br>London,  NW1 7QX<br>United Kingdom | Contact information on file | Under Funded Pension Liability | Contingent, Unliquidated | Undetermined |
| 50. | Financial Services Regulatory Authority of Ontario<br>25 Sheppard Ave W Suite 100<br>Toronto, ON  M2N 6S6<br>Canada | Mark White<br>Chief Executive Officer<br>EMAIL - mark.white@fsrao.ca<br>PHONE - 202-974-6012 | Under Funded Pension Liability | Contingent, Unliquidated | Undetermined |

## Schedule 3

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), provides the following information with respect to each of the holders of the five largest secured claims against the Debtors: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

|  | Name of Creditor | Address | Amount of Claim (in millions) | Description of Collateral | Indicate if claim is contingent, unliquidated, or disputed |
|---|---|---|---|---|---|
| 1. | MidCap as administrative agent and collateral agent for the Prepetition ABL Lenders | Proskauer Rose LLP Eleven Times Square New York City, NY 10036 | $232.94 | Secured on a first-priority basis by liens on certain assets of the US ABL Loan Parties, including accounts receivable, cash, inventory, deposit accounts and securities accounts (subject to certain limited exclusions), instruments (subject to certain limited exclusions), chattel paper, interests in material owned real property (including fixtures), equipment, and the proceeds and products of the foregoing (collectively, the "ABL Priority Collateral"). Secured on a second-priority basis by liens on substantially all of the US ABL Loan Parties' assets not constituting ABL Priority Collateral (subject to certain customary exclusions), including equity pledges of 100% of the interests in domestic subsidiaries and 66% of the voting interests in first- |  |

| | | | | | |
|---|---|---|---|---|---|
| | | | | tier foreign subsidiaries, intellectual property (excluding the Specified Brands (defined below)), general intangibles, and the proceeds and products of the foregoing (collectively, the "Term Loan Priority Collateral"). | |
| 2. | Citibank, N.A. as administrative agent and collateral agent for the 2016 Term Loan Lenders | Latham & Watkins, LLP 885 3rd Avenue New York, NY 10022 | $874.3 | Secured on (a) a first-priority basis by liens on the Term Loan Priority Collateral and (b) a second-priority basis by liens on the ABL Priority Collateral. | |
| 3. | Jefferies Finance LLC as administrative agent and collateral agent for the BrandCo Lenders | Paul Hastings LLP 200 Park Avenue New York, NY 10166 | $1,884.8 | Secured by (a) substantially all assets of the BrandCos and equity pledges of the interests in the BrandCos, and (b) 34% of the equity of certain first-tier foreign subsidiaries.<br><br>Secured on (a) a first-priority basis (*pari passu* with the 2016 Term Loan Liens) by liens on the Term Priority Collateral, (b) a second-priority basis (*pari passu* with the 2016 Term Loan Liens) by liens on the ABL Priority Collateral. | |
| 4. | Alter Domus as administrative agent and collateral agent for the Prepetition ABL Lenders | Holland & Knight LLP 150 N. Riverside Plaza Suite 2700 Chicago, IL 60606 | $50.6 | Secured on a first-priority basis by liens on the ABL Priority Collateral.<br><br>Secured on a second-priority basis by liens on the "Term Loan Priority Collateral. | |

## **Schedule 4**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), provides a summary of the Debtors' assets and liabilities.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets<br>(Book Value as of 4/30/2022) | $2,328,093,000 |
| Total Liabilities<br>(Book Value as of 4/30/2022) | $4,441,707,000 |

## Schedule 5

Pursuant to Local Bankruptcy Rule 1007-2(a)(7), provides the number and classes of shares of stock, debentures or other securities of the debtor that are publicly held, and the number of holders thereof, listing separately those held by each of the debtor's officers and directors and the amounts so held.

### Outstanding Debt Securities

| Debt Security | Value Outstanding |
|---|---|
| 6.25% Senior Notes due 2024 | $442,531,770 |

### Outstanding Equity Securities

| Equity Security | Number of Outstanding Shares |
|---|---|
| Revlon Inc. Class A Common Stock | 54,254,019 |
| Revlon Consumer Products Corporation Common Stock | 5,260 |

## Schedule 6

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), provides a list of all of the debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

Certain property of the Debtors is likely to be in the possession of various other persons, including maintenance providers, shippers, common carriers, materialmen, custodians, public officers, mortgagees, pledges, assignees of rents, joint venturers, secured creditors, or agents. Through these arrangements, the Debtors' ownership interest is not affected. In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Schedule 7

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), provides a list of property comprising the premises owned, leased, or held under other arrangement from which the Debtors operate their business.[1]

| Property Address | City | State/Province/County | Country | Owned or Leased |
|---|---|---|---|---|
| 1590 South Gateway | Mississauga | Ontario | Canada | Leased |
| 2203 Promenade Blvd | Rogers | AR | United States | Leased |
| 2755 Dos Aarons Way | Vista | CA | United States | Leased |
| 540 Beautyrest Ave | Jacksonville | FL | United States | Leased |
| 701 San Marco Blvd | Jacksonville | FL | United States | Leased |
| 2210 Melson Avenue | Jacksonville | FL | United States | Owned |
| 5344 Overmeyer Drive | Jacksonville | FL | United States | Owned |
| 4591 International Drive | Orlando | FL | United States | Leased |
| 8200 Vineland Ave | Orlando | FL | United States | Leased |
| 880 Southwest 145th Ave | Pembroke Pines | FL | United States | Leased |
| 181 East Madison Ave | Chicago | IL | United States | Leased |
| 124 Grove Street | Franklin | MA | United States | Leased |
| 801 Nicollet Mall | Minneapolis | MN | United States | Leased |
| 1501 Williamsboro St | Oxford | NC | United States | Owned |
| 2121 RT. 27 | Edison | NJ | United States | Leased |
| The Mills at Jersey Gardens | Elizabeth | NJ | United States | Leased |
| 7400 Las Vegas Blvd South | Las Vegas | NV | United States | Leased |
| 498 Red Apple Ct | Central Valley | NY | United States | Leased |
| One New York Plaza | New York | NY | United States | Leased |
| 200 Park Ave South (6th & 7th Floor) | New York | NY | United States | Leased |
| 200 Park Ave South Retail | New York | NY | United States | Leased |

---

[1]    In addition to the parties listed in this Schedule, Debtors possess the following properties which are not currently being used for business operations:  200 First Stamford Place, CT, United States (Leased); 1111 Brickell Avenue, Miami, FL, United States (Leased); 2604 Sawgrass Mills Circle, Sunrise, FL, United States (Leased); 196 Coit Street, Irvington, NJ, United States (Leased); 200 Park Ave S, 6th & 7th Floors as well as Retail Space, New York, NY, United States (Leased).

| | | | | |
|---|---|---|---|---|
| Texas City Outlet 5885 Gulf Freeway, Suite 788 | Texas City | TX | United States | Leased |
| 1751 Blue Hills Drive | Roanoke | VA | United States | Leased |
| 131 Brand Ave | Salem | VA | United States | Leased |
| 141 Brand Ave | Salem | VA | United States | Leased |
| 143 Brand Ave | Salem | VA | United States | Leased |
| 145 Brand Ave | Salem | VA | United States | Leased |
| Westrow House 161 | Leeds | West Yorkshire | United Kingdom | Leased |
| Greater London House, Hampstead Road | London | Greater London | United Kingdom | Leased |
| 6 Diamond Way, Stone ST15 0SD | Staffordshire | Staffordshire | United Kingdom | Leased |

## Schedule 8

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), sets the location of the debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the debtor outside the territorial limits of the United States.

### Location of the Debtors' Substantial Assets

The Debtors operate their business in the ordinary course in the following locations: (1) The United States; (2) Australia; (3) Bermuda; (4) Germany; (5) Italy; (6) the Netherlands; (7) Spain; and (8) Switzerland.  Accordingly, the Debtors might have material assets in each location and each as applicable.  Further information will be provided in documents to be filed in these chapter 11 cases.

### Books and Records

While the debtors might have books and records in each of the locations listed above in which the debtor operates in the ordinary course, the Debtors' books and records are primarily located at 1 New York Plaza, New York, NY 10004.

## **Schedule 9**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), provides a list of the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent.

| **Entity** | **Counterparty** | **Nature of the Claim** | **Status** |
|---|---|---|---|
| Revlon, Inc. | Theresa M. Garcia | Litigation | Settled |

## Schedule 10

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), sets forth a list of the names of the individuals who comprise the debtor's existing senior management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Responsibility and Experience |
|---|---|---|---|
| Perelman, Debra G. | President, CEO & Director | 4 years | Ms. Debra G. Perelman, also known as Debbie, is President and Chief Executive Officer at Revlon, Inc. and Revlon Consumer Products Corporation since May 22, 2018. She was Chief Operating Officer of Revlon, Inc. and Revlon Consumer Products Corporation since January 28, 2018 until May 22, 2018. Ms. Perelman serves as President of M&F. She served as Executive Vice President of Strategy and New Business Development at MacAndrews & Forbes Holdings, Inc. Ms. Perelman served as the Executive Vice President of Strategy, Digital Content and New Business Development at Revlon Inc. from December 2017 until January 2018 under a secondment arrangement with MacAndrews & Forbes. Ms. Perelman served as an Executive Vice President of Strategy and New Business Development of MacAndrews & Forbes since 2014 until January 2018. Ms. Perelman served as Senior Vice President of Strategy and Innovation Division of MacAndrews & Forbes from 2008 to 2014. She joined MacAndrews & Forbes in 2004 as Vice President. She held various positions in corporate finance and brand marketing at Revlon, Inc. She serves as a Director of Revlon Consumer Products Corporation. She has been a Director at Revlon, Inc since June 2015. |
| Dolan, Victoria L. | Chief Financial Officer | 4 years | Ms. Victoria L. Dolan serves as Chief Financial Officer of Revlon Consumer Products Corp. since March 12, 2018. Ms. Dolan has been Chief Financial Officer at Revlon, Inc. since March 12, 2018. She served as Chief Transformation Officer of Colgate-Palmolive Company until 2018. Ms. Dolan served as Corporate Controller of Colgate-Palmolive Company from February 1, 2011 to October 1, 2017. Ms. Dolan served as Vice President of Colgate-Palmolive Company since February 1, 2011. Ms. Dolan served as Vice President of Finance and Strategic Planning of European Division at Colgate-Palmolive. She served as Vice President, Corporate Controller and Principal Accounting Officer of Colgate-Palmolive Company from February 2011 to July 2016. She served as a Vice President of Colgate-Europe/South Pacific at Colgate-Palmolive Co. Prior to joining Colgate-Palmolive in 2008, she served as an Executive Vice President of Finance and Chief Financial Officer of vacation ownership division at Marriott International, Inc. ('Marriott") and was responsible for the division's global finance and accounting as well as its asset management organization. |
| Cho, Thomas | Chief Supply Chain Operator | 10 months | Thomas Cho is Chief Supply Chain Operator at Revlon. In this role, he is responsible for end-to-end Global Supply Chain Operations, including supply chain strategy, planning, procurement, manufacturing, engineering, distribution and logistics for the Company's diverse brand portfolio across all channels and geographies. Mr. Cho brings 30 years of experience in aligning end to end supply chain, operations, research and development, manufacturing, procurement, planning, quality, logistics and customer service to drive efficiency and significant value creation. Prior to joining Revlon, Mr. Cho served in several senior level executive positions including Chief Operating Officer at PPI Beauty, Chief Operating Officer for Transcendia, Chief Supply Chain Officer at Mary Kay Cosmetics, and Chief Operating Officer at Cosmetic Essence Inc. Mr. Cho's broad leadership experience also includes executive positions at United |

| | | | |
|---|---|---|---|
| | | | Plastics Group, Trend Technologies and Space Systems Loral. Mr. Cho graduated with a bachelor's degree in International Business from San Jose State University. He served as an officer in the United States Army. |
| Lazardi, Keyla | Chief Scientific Officer | 4 years | Keyla joined Revlon with over 20 years of global experience in the consumer products and consumer health industries with an exceptional track record of delivering breakthrough innovation. She has worked in Asia, Europe, LA and the US. Most recently, Keyla held the position of R&D Vice President at e.l.f. Cosmetics, where she worked from April 2016 to February 2018. From February 2014 to March 2016, she held the position of R&D Vice President of Wellness and Health at Reckitt Benckiser. Ms. Lazardi received her PhD in Biochemistry from the Venezuelan Institute of Scientific Research. |
| Smith, Paul | Chief Information Officer | 2 months | Paul Smith is the Chief Information Officer at Revlon. Paul is Responsible for leading the Global IT team and strategy, including core infrastructure and platforms modernization, Digital transformation and optimizations through innovative technological solutions. Mr. Smith has 23 years of IT experience in multiple industries and is experienced at leading cross-functional IT teams to drive business growth and success. Prior to this role Mr. Smith has led the Global Application Delivery Team, Global Infrastructure Team and Information Security & Compliance teams. Paul has previously held IT leadership roles at New York & Company and Loehmann's. Paul is a graduate of South-East Derbyshire College, UK. |
| Yildiz, Beril | Chief Accounting Officer | 9 months | Beril Yildiz is the VP, Americas Finance, Corporate Controller and Chief Accounting Officer at Revlon. She joined Revlon in 2021 as the Corporate Controller and Chief Accounting Officer, and in 2022 added responsibility for overseeing Revlon's North America and Latin America Finance functions. Prior to Revlon, Beril was a finance executive at Colgate- Palmolive, where she worked in both New York and Hong Kong, and prior to Colgate, she spent over 10 years at PricewaterhouseCoopers. |
| Kidd, Andrew | Executive Vice President, General Counsel | 1 month | Mr. Kidd is Revlon's EVP, General Counsel. Prior to joining Revlon, he served as an Independent Director and legal consultant to institutional investors in the energy industry. During that time, Mr. Kidd served as an Independent Director in 10 engagements including Gulfport Energy, HighPoint Resources, Sheridan Production Partners I and Genon Americas, among others. Mr. Kidd served as the Chief Executive Officer, President and General Counsel of Samson Investment Company and Samson Resources Corporation from February 2016 through March 2017 and served on the Company's Executive Team as Senior Vice President and General Counsel from September 2013 through January 2016. From October 2011 to August 2013, he served as Partner and General Counsel of Anthem Energy, a private investment manager that develops and operates energy investments. Prior to joining Anthem, Mr. Kidd was Senior Vice President and General Counsel of Quantum Utility Generation, LLC, a power generation asset operator. From August 2004 to December 2008, Mr. Kidd was with Constellation Energy Group, Inc. ("CEG"), serving in various positions, including Deputy General Counsel of CEG, General Counsel of Constellation Energy Resources, the business organization representing CEG's customer supply, global commodities and portfolio management activities, and a member of the Board of Managers of Constellation Energy Partners LLC, a publicly traded exploration and production company that was previously sponsored by CEG. Earlier in his career, he served as Senior Vice President and Deputy General Counsel of El Paso Corporation and held various officer level positions at Covanta Energy, Inc. Mr. Kidd began his law career as an associate at DLA Piper in Baltimore, Maryland. Mr. Kidd received his Bachelor of Arts degree from Dartmouth College and his Juris Doctorate degree, with honors, from the University of Maryland |

| | | | School of Law, where he was an editor of the University of Maryland Law Review. |
|---|---|---|---|
| Ely, Bar-Ness | Chief Human Resources Officer | 3 years | Mr. Bar-Ness Ely serves as Chief Human Resources Officer at Revlon Inc. He is responsible for developing and executing global human resources strategy in support of the Company's business plan. Mr. Bar-Ness joined Revlon with over many years of global human resources experience across various industries including chemical, cosmetics and pharmaceuticals. Prior to Revlon, he served as the Global Human Resources Leader for Ashland Ingredients, a $4.5 billion division of Ashland, Inc. |
| Raso, Tracey | Managing Director, Revlon Pacific | 11 Years | Tracey Raso is the Managing Director of Revlon, Pacific region. She has been with the company since 2011 when she joined as Marketing Director. During this time Tracey has overseen considerable market share and sales growth on our core Revlon brands as well as the successful integration of the Elizabeth Arden business. Prior to Revlon, Tracey gained broad experience working with leading Global companies across multiple categories and channels within the Australian and New Zealand markets. She has held senior marketing roles in the Alcohol, Food and Beauty industries having worked at companies such as Diageo, Colgate- Palmolive, Kellogg's and Campbell Arnott's. Tracey is also the chair of Accord Australasia board, the industry body representing the hygiene, cosmetic and specialty products industry. Tracey holds a Bachelor of Commerce Degree from the University of NSW. |
| Wallace, Heather | President of Americas | 2 years | Ms. Heather Wallace serves as President of Americas at Revlon, Inc. since March 2020. Ms. Wallace has been Senior Vice President and General Manager, Beauty Care North America at Henkel AG & Co. KGaA since September 2018. Ms. Wallace served as Senior Vice President and General Manager of North America at Henkel Corporation since August 2019 until 2020 and served as its Regional Head, Beauty Care Retail since January 2020 until 2020. In addition, as the Regional Head of Beauty Care in North America, she served as a member of Henkel's North American leadership team and the global Beauty executive team. Ms. Wallace was most recently Henkel's Senior Vice President and General Manager, Retailer Brands North America, Laundry & Home Care. She will be based at Henkel's Consumer Products North American Headquarters in Stamford, Conn. Wallace has held senior sales, marketing and brand leadership positions at Henkel, starting as Director Retailer Brands. Prior to Henkel, Wallace spent many years at Novartis Consumer Health where she held various marketing and brand leadership roles. |
| Sankar, Ravi | Chief Transformation Officer | 4 Years | Ravi Sankar leads the company's multiyear transformation program as the Chief Transformation Officer. The Transformation Office will lead the implementation and execution of the Revlon Global Growth Acceleration (RGGA) program, driving Revlon towards sustained long-term growth and a stronger organizational capability. In his previous role with Revlon, he served as the Vice President, Finance and Business Operations., leading the 2018 Optimization Program, Global FP&A, Corporate Real Estate and Revlon's Shared Services operations. Before joining Revlon in 2018, Ravi had a long career with Colgate Palmolive Company in various leadership roles spanning the Middle East, Europe and North America as Finance Director, Division controller, and leading Colgate's global Finance transformation program. Ravi is a Chartered Accountant and a Graduate in Mathematics from Mahatma Gandhi University, India. |
| Waters, Charles | President, EMEA | 20 years | Charles Waters is the President of the EMEA region (Europe, Middle East and Africa). He is responsible for the sales, marketing, and all operations related to these regions. He has worked for Revlon for over 20 years across various roles and regions. Charles began his Revlon career in the Supply Chain function, and has since lead various business units and subsidiaries in several countries, including Spain, Portugal, Italy and Mexico. He was the Managing Director for Spain & Portugal, |

| | | | leading the Mass, Professional and Prestige businesses prior to his promotion as President of EMEA in 2020. Charles has a proven track record of delivering added value and growth to the company. Charles has lived in London and Mexico City, and now resides in Barcelona, Spain. He holds a bachelor's degree in Mechanical Engineering by the UPC (Polytechnic University of Catalonia) in Spain, and holds an MBA from the IESE Business School. |
|---|---|---|---|
| Williamson, Martine | Chief Marketing Officer | 1.5 years | Martine Williamson is the Chief Marketing Officer of Revlon. She is responsible for global strategic planning for our brands, including brand equity and architecture, local market NPD as well as driving global marketing excellence across the organization. Prior to Revlon, Martine was a Strategic Marketing Advisor at Topix Skincare, where she oversaw the strategy, brand visual identity, product portfolio and digital content for the relaunch of a premium skincare brand. Prior to this, Martine was the EVP and CMO at Glansaol, a beauty start-up where she completed the acquisition of three complementary brands: Laura Geller, Julep and Clark's Botanicals.  She also led the Laura Geller brand as the President and GM where she brought the brand to profitability while streamlining distribution and driving digital and e-commerce. Prior to these roles, Martine spent 15 years at Revlon, working in both the Global and U.S. Marketing teams across all color cosmetics categories.<br>Martine is a graduate of State University of New York College at Oswego. |

## Schedule 11

Pursuant to Local Bankruptcy Rules 1007-2(b)(1), 1007-2(b)(2)(A), and 1007-2(b)(2)(C), provides the estimated amount of payroll to the Debtors' employees (not including officers, directors, and equityholders), and the estimated amounts to be paid to officers, equityholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the Petition Date.

| Payments | Payment Amount ($ in millions) |
|---|---|
| Estimated amount of payment to the employees (exclusive of officers, directors, and stockholders)[2] | $15,984,000 |
| Estimated amount proposed to paid to officers, stockholders, and directors[3] | $600,000 |
| Estimated amount proposed to financial and business consultants retained by the Debtors | $190,000 |

---

[2]    Excludes "Insiders" as defined under section 503(c) of the Bankruptcy Code.
[3]    Includes wages/salaries only.

## Schedule 12

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), provides a schedule, for the 30-day period following the Petition Date, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

| Type | Amount ($ in millions) |
|---|---|
| Estimated Cash Receipts[1] | $66.1MM |
| Estimated Cash Disbursements | $276.4MM |
| Net Cash Gain (Loss) | ($210.3MM) |
| Accrued-Unpaid Obligations[2] | $163.5MM |
| Accrued-Unpaid Receivables[3] | $180.5MM |

---

[1]  Receipts include collections from customers and amounts repatriated from non-filing entities through July 15, 2022.

[2]  Estimated Debtor Accounts Payable as of July 15, 2022.

[3]  Estimated Debtor Net Accounts Receivable as of July 15, 2022.