Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Proposed Counsel for the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVLON, INC., *et al.*,[1] | ) | No. 22-22-10760 (___) |
| | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF STEVEN M. ZELIN IN SUPPORT OF THE DEBTORS' MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING, (B) USE CASH COLLATERAL, AND
(C) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE
CLAIMS, (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PREPETITION
LENDERS, (III) MODIFYING AUTOMATIC STAY, (IV) SCHEDULING A FINAL
HEARING, AND (V) GRANTING RELATED RELIEF**

I, Steven M. Zelin, pursuant to 28 U.S.C. § 1746, declare as follows:

---

[1] The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.kroll.com/revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

1.      I submit this declaration (the "Declaration") in support of the *Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Use Cash Collateral, (II) Granting Liens And Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection To Prepetition Secured Parties, (IV) Modifying Automatic Stay, (V) Scheduling A Final Hearing, And (VI) Granting Related Relief* (the "DIP Motion").  I am over the age of 18 years and authorized to submit this Declaration on behalf of the Debtors.

## Background and Qualifications

2.      I am a Partner, Global Head of the Restructuring and Special Situations Group ("RSSG"), Head of RSSG in the Americas, and a member of the management committee at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.  PJT is a leading global financial advisory firm with more than 800 employees in nine offices in the U.S., Europe, and Asia.  The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement.  PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies.

3.      I have worked as a restructuring advisor on a full-time basis since 1988, with over thirty-three (33) years of experience exclusively representing debtors, creditors, investors and other stakeholders in distressed transactions.  Prior to PJT's spinoff from The Blackstone Group ("Blackstone") on October 1, 2015, I was a Senior Managing Director in Blackstone's Restructuring & Reorganization Group, where I was employed for more than seventeen years.  I joined Blackstone in 1998 from Ernst & Young LLP ("E&Y"), where I was a partner in E&Y's Restructuring and Reorganization Group.  I have a Masters of Business Administration with a

concentration in finance from New York University's Stern School of Business and a Bachelor of Science in accounting from the University at Albany.

4.     Some of my most notable publicly-disclosed formal and informal restructuring matters include the following: AbitibiBowater, Inc.; Acosta, Inc.; American Axle & Manufacturing, Inc.; Caesars Entertainment Corporation; Clearwire Corporation; Cumulus Media, Inc.; Delphi Corporation; Energy Future Holdings; Enron Corporation; Entergy New Orleans; Envision Healthcare; Financial Oversight and Management Board (Puerto Rico); Ford Motor Company; FULLBEAUTY Brands Inc.; General Motors Corporation; The Goodyear Tire & Rubber Company; Houston Sports Authority; iHeartMedia, Inc.; Intelsat S.A.; Intrawest ULC; Jefferson County, Alabama; Kerzner International Holdings Limited; Lightsquared Inc.; Ligado Inc.; Marvel Entertainment Group, Inc.; Motorola (re: Iridium LLC); Pacific Gas & Electric; PHI, Inc.; R.H. Macy & Company; Samson Resources; SemGroup, L.P.; TerreStar Corporation/TerreStar Networks Inc.; Vencor, Inc.; Verso Paper Corporation; Walter Energy, Inc.; Washington Mutual, Inc.; and Xerox Corporation.

5.     PJT and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 proceedings.  PJT restructuring professionals (also in their former capacity as Blackstone employees) have been particularly active in large, complex and high-profile bankruptcies and restructurings, including, among others:  AbitibiBowater Inc.; Adelphia Communications Corporation; Arch Coal, Inc.; Caesars Entertainment Operating Corporation; Cengage Learning, Inc.; Cumulus Media Inc.; Delta Air Lines, Inc.; Deluxe Entertainment Services Group, Inc.; Dynegy Inc.; Edison Mission Energy; Energy Future Holdings Corporation; Enron Corporation; Excel Maritime Carriers, Ltd.; EXCO Resources, Inc.; Flag Telecom Holdings Limited; Flying J. Inc.; FULLBEAUTY Brands

Inc.; Genco Shipping & Trading Limited; Gibson Brands, Inc.; Global Crossing Ltd.; Houghton

Mifflin Harcourt Publishing Company; iHeartMedia, Inc.; Lee Enterprises Inc.; LightSquared Inc.;

Los Angeles Dodgers LLC; LyondellBasell Industries; NewPage Corporation; Noranda

Aluminum, Inc.; Patriot Coal Corporation; Quiksilver, Inc.; Rue21, Inc.; School Specialty, Inc.;

SemGroup; The Star Tribune Company; TerreStar Networks Inc.; Tribune Company; Walter

Energy, Inc.; W.R. Grace & Co.; and Winn-Dixie Stores, Inc.

6.      On or about July 6, 2020, the Debtors engaged PJT as their investment banker in

connection with the Debtors' capital structure and refinancing initiatives.  More recently, the

Debtors engaged PJT as their investment banker in connection with the Debtors' current

restructuring initiatives and preparation for these chapter 11 cases (the "Chapter 11 Cases").  In

that capacity, members of the PJT team and I have been directly involved in the matters leading

up to the Debtors' chapter 11 filings and in the negotiations regarding debtor-in-possession

financing.  I am not being specifically compensated for this testimony and PJT is receiving

compensation only as part of its engagement letter with the Debtors, which includes a capital

raising fee for certain financings arranged by PJT as set forth in its engagement letter, subject to

approval by this Court.[2]

7.      As further explained in the *Declaration of Robert Caruso, Chief Restructuring
Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2*
(the "First Day Declaration"), since PJT's amended engagement in May 2022 by the Debtors, PJT

has worked with the Debtors' management, financial staff and other professionals, including

---

[2]    In accordance with PJT's engagement letter, to the extent approved by this Court, in respect of any debtor-in-possession financing, PJT is entitled to be paid a fee equal to 0.50% of the aggregate amount of debt subject to any "roll-up" and 1.0% of the aggregate amount of any "new money" debtor-in-possession financing, provided that the fee in respect of the portion of any "new money" debtor-in-possession financing raised from existing debt or equity holders of the Company as of the Petition Date would be reduced by 50%.  Notwithstanding the above, PJT shall be entitled to a minimum capital raising fee of $1,500,000.00 per capital raise.

Alvarez & Marsal ("A&M"), the Debtors' restructuring advisor, with respect to the Debtors' evaluation of strategic and restructuring alternatives.  PJT's work in that regard has included, among other things, (i) analyzing the Debtors' liquidity and projected cash flows, (ii) understanding the Debtors' businesses, operations, properties and finances, (iii) reviewing and analyzing the Debtors' balance sheet and capital structure alternatives, (iv) providing strategic advice to the Debtors' board of directors and management, (v) participating in negotiations with the Debtors' existing lenders and other parties in interest, (vi) evaluating additional potential out-of-court financing transactions, (vii) soliciting,  negotiating, and analyzing debtor-in-possession financing proposals, and (viii) assisting the Debtors in connection with preparations for commencement of these chapter 11 cases, including work relating to the proposed DIP Facilities.

8.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the PJT team, the Debtors' management team and the Debtors' other advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions supported by my experience and knowledge.  If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

**The Debtors' Need for DIP Financing and Access to Cash Collateral**

9.      As soon as the Debtors determined that they needed to raise significant capital from external sources, other PJT professionals and I thereafter had a substantial number of discussions and meetings with the Debtors' management team and advisors regarding the quantum of the capital need and the potential forms that a financing or restructuring could take.  I am generally familiar with the Debtors' current liquidity and liquidity forecast.  I am also generally familiar with the cash flow forecasts prepared by the Debtors' management team and A&M.  I understand that these forecasts take into account anticipated cash receipts and disbursements during the

projected period and consider a number of factors, including, but not limited to, the effect of the chapter 11 filing on business operations, fees and interest expense associated with postpetition financing, professional fees, payroll costs, customer and vendor relationships, and other required operational payments. Based on those discussions and meetings, my experience in restructuring, and my familiarity with the Debtors, I believe the Debtors require immediate access to the DIP Facilities to meet their near-term working capital needs, address supply chain disruptions and stabilize their operations, and fund the costs of administering these Chapter 11 Cases as they negotiate and implement a value-maximizing restructuring transaction.

10.    As described more fully in the First Day Declaration, to avoid immediate and irreparable harm to their businesses, the Debtors need to demonstrate to their customers, vendors, and other business counterparties that they have adequate liquidity to operate their businesses in the ordinary course and to fund these Chapter 11 Cases.  These Chapter 11 Cases are occurring during the Debtors' peak working capital build period, when the Debtors need materials to (i) satisfy existing orders, as demand has been strong for the Company's products but liquidity has been insufficient to procure the needed materials to satisfy such demand, (ii) prepare for the upcoming holiday season (procurement lead times can be as long as six to nine months for certain materials), and (iii) preserve the Company's future EBITDA by making necessary investments prior to the 2023 procurement cycle, in which the Debtors' customers make annual shelf space allocation determinations in September and October of 2022. Based on my familiarity with the Debtors' operations and liquidity position, and my experience as a restructuring professional, I do not believe the Debtors can prudently operate their businesses or fund the costs of these Chapter 11 Cases solely with the use of existing cash collateral. Absent immediate access to the contemplated DIP financing proceeds, the Company will run out of money, resulting in the risk of

significant value destruction. Further, as described more fully in the First Day Declaration, the Debtors' efforts to address their capital structure and liquidity needs out-of-court were not successful. Accordingly, I believe that entry into the proposed DIP Facilities is necessary and will provide the Debtors the liquidity needed to continue to operate their businesses in the ordinary course and attempt to negotiate and consummate a value-maximizing restructuring.

### The Debtors' Efforts to Obtain Financing

11.     In March, April, and May 2022, the Debtors attempted to address the challenges posed by industry-wide global supply chain disruptions by pursuing a number of transactions to increase liquidity, including obtaining amendments to the US ABL Facility and the Foreign ABTL Facility, launching an "at-the-market" equity offering, and engaging in discussions with their existing lenders about (i) a further refinancing of the SISO tranche of the ABL Facility, and (ii) a potential deferral of interest associated with the BrandCo B-1 facility. While negotiations were continuing, however, it was determined that the funding needs of the Company had increased above what these contemplated transactions could provide. In response, the Debtors sought to obtain more significant out-of-court financing from the BrandCo Lenders through potential structures that could be implemented either with or without the consent of the Company's 2016 Term Loan Lenders, given that it was uncertain whether such consent could be attained. Certain BrandCo Lenders entered into non-disclosure agreements to evaluate potential structures, but they ultimately determined that they were unwilling to provide capital on an out-of-court basis, irrespective of whether consents could be attained. While these discussions were concluding, it was determined that the near-term funding needs of the Company had now grown in excess of $300 million, driven by disruptions in the global supply chain.

12.     Accordingly, the Debtors began discussions with certain of the Prepetition ABL Lenders represented by Proskauer Rose LLP (the "DIP ABL Lenders") and certain of the BrandCo

Lenders represented by Davis, Polk & Wardwell LLP and Centerview Partners LLC (the "BrandCo Ad Hoc Group") about potential financing for a chapter 11 process. The DIP ABL Lenders and the BrandCo Ad Hoc Group are particularly well-suited to provide such financing because it is my understanding that (i) the DIP ABL Lenders hold a majority of the obligations and commitments under the US ABL Facility, which has a first lien on the ABL Priority Collateral, (ii) the BrandCo Ad Hoc Group holds a majority of the obligations under the First Lien BrandCo Facility, which has a first lien on both the Term Loan Priority Collateral and the BrandCo Assets, and (iii) the BrandCo Ad Hoc Group is the Debtors' controlling creditor constituency, as it controls consent for any DIP financing transaction from all of the Debtors' secured term loans (through the BrandCo Intercreditor Agreement among the BrandCo Lenders and the BrandCo Pari Passu Intercreditor Agreement between the agent under the BrandCo Facilities and the agent under the 2016 Term Loan Credit Agreement).  It is my understanding that the Debtors have no material unencumbered assets and that the DIP ABL Lenders and the BrandCo Ad Hoc Group would not consent to the Debtors' incurrence of priming financing provided by any other party.  It is my understanding that, under the BrandCo Pari Passu Intercreditor Agreement, Citibank, the agent under the 2016 Term Loan Credit Agreement, cannot object to the DIP Facilities on the terms set forth in the DIP Order.  As a result, I believe that the DIP ABL Lenders and the BrandCo Ad Hoc Group are well-positioned financing sources for the liquidity required to prudently administer these Chapter 11 Cases, and that no other party is likely to be in a position to provide such financing on terms more favorable to the Debtors.

13.     In addition, contemporaneously with their discussion with the BrandCo Ad Hoc Group and DIP ABL Lenders, the Debtors also entered discussions with other stakeholders and certain of their related parties regarding potential financing for a chapter 11 process.  The Debtors

shared diligence materials (including proposed budgets and projections), and engaged in discussions regarding potential financing for a chapter 11 process with their stakeholders, but ultimately they did not receive any offer or combination of offers superior to the DIP Facilities from their stakeholders or any other party.

14.    In connection with their outreach to the DIP ABL Lenders and the BrandCo Ad Hoc Group, management and A&M undertook an analysis of the amount of postpetition financing required to operate the Debtors' businesses and pay administrative costs during the chapter 11 process.  Based on this analysis, the Debtors determined that they would require incremental liquidity of approximately $500 million to operate smoothly postpetition, satisfy all administrative costs and expenses, and make immediate investments (including with respect to ensuring that foreign, non-Debtor entities have access to sufficient liquidity to continue operating in the normal course) necessary to avoid material harm to go-forward EBITDA.  In addition, because an event of default would occur under the Foreign ABTL upon a chapter 11 filing by the Debtors and would otherwise jeopardize the Company's valuable non-US operations, the Debtors determined that they would need to either obtain a waiver of such event of default or refinance the Foreign ABTL, under which $75 million of loans are outstanding.  The Debtors' financing need would be greater still to the extent the BrandCo Lenders would not permit the BrandCos to release the proceeds of royalty payments (the "Royalty Payments") made to the BrandCos under an intercompany licensing agreement for intellectual property used in the Company's operations.  I understand that the Royalty Payments are variable depending on sales metrics but in the past have been approximately $8-9 million per month.  PJT relied on this analysis, along with its discussions with management and A&M, in its outreach to and conversations with potential financing providers.

15.     After arm's-length negotiations with the DIP ABL Lenders and the BrandCo Ad

Hoc Group, the Debtors were able to obtain the proposed (i) $400 million DIP ABL Facility,

available upon entry of an interim order approving the DIP ABL Facility, and (ii) $575 million

DIP Term Loan Facility, $375 million of which is available upon entry of an interim order

approving the DIP Term Loan Facility, in each case to finance:  (a) payments to trade vendors to

ameliorate supply chain disruptions and stabilize operations; (b) other working capital needs; (c)

fees and expenses associated with the DIP Facilities, (d) a "rollup" of the obligations and

commitments held by the DIP ABL Lenders under the US ABL Facility to allow the Debtors to

continue to access their working capital facility, and (e) the refinancing of the Foreign ABTL to

avoid an event of default that would risk precipitating damaging local-law insolvency proceedings

for the Company's non-US subsidiaries.  The BrandCo Ad Hoc Group also agreed to permit the

BrandCos to provide an Intercompany DIP Facility to the Company in the amount of the Royalty

Payments, providing further liquidity of potentially $8-9 million per month.  The DIP Facilities

are the Debtors' only viable source of funding, whether on an out-of-court or in-court basis, and

no other, better alternative, taken as a whole, is currently available to the Debtors under the

circumstances.

### The DIP Facilities Were Negotiated At Arm's Length

16.     My team and I, along with the Debtors' other advisors, actively negotiated the terms

and provisions of the DIP Facilities on behalf of the Debtors over the last week, after efforts to

secure an out-of-court transaction failed.  During that time, the parties exchanged term sheets and

mark-ups, and negotiated terms in an effort to reach the best available material terms under the

circumstances described above.  Those terms are reflected in the DIP Facilities.

17.     The fees and rates to be paid under the proposed DIP Facilities were the subject of

arm's-length negotiation between the Debtors, the DIP ABL Lenders, and the BrandCo Ad Hoc

Group, are an integral component of the overall terms of the proposed DIP Facilities, and were required by the DIP ABL Lenders and the BrandCo Ad Hoc Group as consideration for the extension of postpetition financing. Moreover, the Debtors were unable to obtain other DIP financing on similar or more favorable terms. Under the current circumstances, I believe that the fees, rates, and other economics provided for in the DIP Facilities, taken as a whole, are reasonable and in the Debtors' best interests, particularly in light of the absence of any more favorable alternatives.

18. The DIP Term Loan Facility also contains certain milestones that the Debtors must meet throughout the Chapter 11 Cases. The milestones were negotiated by the BrandCo Ad Hoc Group as a condition to providing the DIP Term Loan Facility and should provide the Debtors with adequate time to negotiate and implement a value-maximizing restructuring. Accordingly, I believe that agreeing to include these milestones in the DIP Facilities is reasonable and in the Debtors' best interests.

### The DIP Facilities are Fair and Reasonable Under the Circumstances

19. Based on my experience with DIP financing transactions, as well as my involvement in the negotiation of the DIP Facilities and pursuit of alternative financing proposals, the DIP Facilities, taken as a whole, are the best and only reasonable financing option currently available to the Debtors under the circumstances. The proposed DIP Facilities will provide the Debtors with access to crucial liquidity at the outset of these Chapter 11 Cases needed to avoid immediate and irreparable harm to their businesses, and will allow the Debtors to maximize value by continuing operations with minimal disruption and capitalizing on the strong demand for their products from consumers and retailers.

20. The BrandCo Ad Hoc Group and the DIP ABL Lenders agreed to provide the DIP Facilities to the Debtors on terms that I consider, taken as a whole, to be reasonable in light of the

circumstances described above. As noted above, the DIP Facilities were the result of diligent efforts on the part of the Debtors and their advisors to ensure that the Debtors obtained financing that would enable the Debtors to continue to operate their businesses in the ordinary course and maximize the value of their estates.

21.     The DIP ABL Lenders and the BrandCo Ad Hoc Group expressly conditioned their DIP financing proposals on, among other things, customary forms of adequate protection, including replacement liens and superpriority status for adequate protection claims, payment of cash interest for the B-1 tranche of the BrandCo Facilities. In addition, the DIP ABL Lenders, as an express condition to providing ongoing access to the Company's working capital facility on a post-petition basis, insisted on a dollar for dollar "roll-up" of the Tranche A Revolving Secured Obligations and SISO Secured Obligations of the ABL Facility (all of which share a the same lien on their collateral) into the DIP ABL Facility. This roll-up seems reasonable under the circumstances because the Tranche A Revolving Secured Obligations and SISO Secured Obligations are oversecured.

22.     The DIP ABL Lenders and the BrandCo Ad Hoc Group also insisted on postpetition priming liens on substantially all of their respective obligors' assets and postpetition liens on any of such loan parties' prepetition unencumbered assets as part of the collateral package securing the DIP Facilities. The DIP ABL Lenders required a "roll-up" of their oversecured prepetition loans under the US ABL Facility into the DIP ABL Facility.

23.     In addition to providing the Debtors with incremental liquidity, the DIP Facilities will provide the Debtors with access to the use of cash collateral on a consensual basis by virtue of the consent of the DIP ABL Lenders, which it is my understanding contractually prevents all other secured creditors from objecting under the terms of the ABL Intercreditor Agreement. Such

liquidity is anticipated to allow the Debtors to fund their businesses in the ordinary course during these Chapter 11 Cases, ensuring continued, uninterrupted operations and preserving the value of the estate for the benefit of all stakeholders.

24.     In sum, it is my professional opinion that the terms of the DIP Facilities, taken as a whole, are reasonable under the circumstances and were the product of good faith, arm's-length negotiations, and that the DIP Facilities will benefit all stakeholders in these Chapter 11 Cases by providing the Company with the necessary liquidity to fund operations, avoiding immediate harm to the Debtors' business that would occur if immediate financing were not available.  For all of the reasons included in this Declaration, I believe it is appropriate for the Court to approve the DIP Facilities and the use of cash collateral as contemplated by the DIP Motion.

**The DIP Facilities Provide Adequate Protection to Secured Creditors**

25.     I believe the Debtors have provided adequate protection sufficient to allow the DIP Facilities to prime the Debtors' prepetition capital structure for two reasons.  First, the BrandCo Ad Hoc Group has directed Jefferies, the administrative agent under the BrandCo Credit Agreement, to consent to the DIP Facilities on the terms set forth in the DIP Order.  Therefore, it is my understanding that the BrandCo Lenders who are not members of the BrandCo Ad Hoc Group and 2016 Term Loan Lenders cannot object to the DIP Facilities, as the BrandCo Intercreditor Agreement and BrandCo Pari Passu Intercreditor Agreement, respectively, contractually prevent them from doing so. Additionally, my understanding is that the DIP ABL Lenders have directed MidCap, the administrative agent under the US ABL Facility, to consent to the DIP Facilities on the terms set forth in the DIP Order.  The proposed order approving the DIP Facilities also provides the prepetition secured creditors with customary replacement liens and super-priority administrative expense claims to protect them against any diminution of their

interests in their collateral. In respect of the collateral that they share *pari passu*, the BrandCo Lenders and the 2016 Term Lenders will receive identical adequate protection packages. In respect of the BrandCo assets that support only the BrandCo Facilities, the BrandCo Lenders will also receive customary replacement liens and super-priority administrative expenses and, in return for their consent to permit the Intercompany DIP Facility, current payment of interest and reimbursement of reasonable expenses in connection with the chapter 11 proceedings.

26.     Second, the DIP Facilities provide adequate protection to all secured creditors, including the 2016 Term Loan Lenders, because the DIP Facilities will prevent a significant decline in the value of the 2016 Term Loan collateral. As discussed above and in the First Day Declaration, the Company requires an immediate infusion of liquidity in order to manage its supply chain and obtain the components necessary to manufacture its products. Without the DIP Facilities, the Debtors would soon be required to cease their manufacturing operations, undermining their business and ability to support the brands, the cumulative effect of which would be to eliminate EBITDA and, consequently, the value of the businesses that underpins the prepetition secured creditors' collateral. By contrast, the DIP Facilities will allow the Debtors to make immediate investments in their businesses necessary to continue to operate as a going concern, and maximize revenue and EBITDA during the 2022 holiday season and 2023 fiscal year. As discussed in the First Day Declaration, time is of the essence, as the Company's retail customers generally develop their annual business plans and determine product allocations in the third quarter for the upcoming year, and given that the critical holiday season occurs in the fourth quarter. If the Company is unable to demonstrate an ability to deliver products and services to its customers in the interim, the Company will be at material risk of losing customer allocations and shelf space to its direct competitors with no ability to regain those allocations for over a year, if ever. The value

destruction that scenario would entail would significantly harm the value of all of the Debtors' assets, including the collateral on which secured creditors are being primed.

27.     The benefits to the 2016 Term Loan Lenders' collateral at RCPC and its affiliates from such investments will be in excess of the $575 million in priming DIP Facilities, or the portion of the DIP Facilities that will ultimately be allocable to RCPC in any subsequent reorganization. As set forth in the First Day Declaration in paragraph 135, the DIP Facilities, if obtained, will result in $146 million of forecasted EBITDA in the second half of 2022 and $315 million of forecasted EBITDA in 2023, as compared with little or no EBITDA for the same period in the absence of the DIP Facilities. Without incurring priming liens in order to obtain access to the DIP Facilities, the Company will suffer significant degradation of the its EBITDA that will necessarily result in a significant decline in the value of the businesses and the 2016 Term Loan Lenders' collateral.

### The Need for Interim Relief

28.     The Debtors seek approval of the DIP Facilities, with access to $375 million of the $575 million facility to be made available on an interim basis. Obtaining interim approval with access to $375 million on the first day of these Chapter 11 Cases will allow the Debtors to address their urgent need to manage ongoing supply chain disruption, maintain adequate liquidity, and to communicate to their employees, vendors, and customers that the Debtors are entering chapter 11 on strong financial footing and will continue operating without interruption and avoid irreparable harm. Obtaining interim approval of the DIP Facilities will allow the Debtors to immediately begin making investments in their operating businesses that will result in substantial value creation for the Debtors and their stakeholders, and allow the Debtors to manage their supply chain in time for the holiday season and the third quarter retailer procurement cycle.

29.    Based on the Debtors' forecasts, approving the DIP Facilities at the outset of these cases will enable the Debtors to fund the ongoing operation of their businesses during the course of these Chapter 11 Cases.  Further, as discussed both above and in the First Day Declaration, critical and material value would be lost if the Debtors were only able to make new investments in their operating businesses upon final approval of the DIP Motion, as the benefit of such investments is critical now both to obtain supplies and manufacture new products in time for the critical holiday season and retail procurement planning cycle in the third quarter, and minimize the risk that the Debtors' competitors consume their share of needed components and shelf space among retail customers.

30.    Given the Debtors' current projections and the absence of meaningful unencumbered assets, immediate access to the DIP Facilities and use of cash collateral is necessary for continued operations, including to fund wages, salaries, and benefits of the Debtors' employees, procure necessary goods and services, maintain trade terms with the Debtors' vendors, make immediate investments necessary to avoid harm to go-forward EBITDA, finance the cost of these Chapter 11 Cases, and meet other working capital needs of the Debtors and their subsidiaries. Thus, I believe the Debtors could suffer immediate and irreparable harm to the value of their estates, to the detriment of all stakeholders, if the DIP Facilities are not approved.

31.    In the light of the foregoing and the facts and circumstances of these Chapter 11 Cases, I believe that the proposed DIP Facilities are in the best interests of the Debtors and their estates under the circumstances and should be approved in all respects.

**<u>Conclusion</u>**

32.    I believe that, absent the interim relief requested by the DIP Motion, the Debtors will suffer significant, and potentially permanent, impairment to their business operations to the material detriment of their stakeholders.  Under the circumstances, I believe that, through the

proposed DIP Facilities, (a) the Debtors will achieve the best outcome reasonably available at this time to address their liquidity needs while preserving value for all stakeholders and (b) the relief requested in the DIP Motion is in the best interests of the Debtors and their estates.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 16, 2022                                    /s/ Steven M. Zelin
New York, New York                                      Steven M. Zelin
                                                        Partner, PJT Partners LP