**Hearing Date: August 24, 2022 at 10:00 a.m., prevailing Eastern Time**
**Objection Deadline: August 19, 2022 at 4:00 p.m., prevailing Eastern Time**

Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (DSJ) |
| Debtors. | (Jointly Administered) |

**NOTICE OF DEBTORS' MOTION FOR ENTRY OF AN**
**ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN**

**PLEASE TAKE NOTICE** that on August 11, 2022, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Motion For Entry Of An Order Approving The Debtors' Key Employee Incentive Plan* (the "Motion"). A hearing (the "Hearing") on the Motion will be held on **August 24, at 10:00 a.m., prevailing Eastern Time**.

**PLEASE TAKE FURTHER NOTICE** that in accordance with General Order M-543 dated March 20, 2020, the Hearing will be conducted via Zoom videoconference. Parties wishing to appear at the Hearing, whether in a "live" or "listen only" capacity, must make an electronic appearance through the "eCourtAppearances" tab on the Court's website (https://www.nysb.uscourts.gov/content/judge-david-s-jones) no later than 4:00 p.m. on the business day before the Hearing (the "Appearance Deadline"). Following the Appearance

---

[1]    The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

Deadline, the Court will circulate by email the Zoom link to the Hearing to those parties who have made an electronic appearance. Parties wishing to appear at the Hearing must submit an electronic appearance through the Court's website by the Appearance Deadline and not by emailing or otherwise contacting the Court. Additional information regarding the Court's Zoom and hearing procedures can be found on the Court's website.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (each an "Objection") to the relief requested in the Motion shall: (a) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York; and (b) be served so as to be actually received by **August 19, 2022, at 4:00 p.m., prevailing Eastern Time** in a manner consistent with the *Revised Order (A) Establishing Certain Notice, Case Management, and Administrative Procedures and (B) Granting Related Relief* [Docket No. 279] and the procedures set forth therein as Exhibit 1 (the "Case Management Procedures"), including, but not limited to, by serving any Objection on the parties listed in paragraphs 22 and 34 of the Case Management Procedures.

**PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing. The Debtors will file an agenda before the Hearing, which may modify or supplement the Motion to be heard at the Hearing.

**PLEASE TAKE FURTHER NOTICE that *your rights may be affected*. You should read the Motion carefully and discuss it with your attorney, if you have one. If you do not have an attorney, you may wish to consult with one.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov, or (ii) from the Debtors' notice and claims agent, Kroll, at https://cases.ra.kroll.com/revlon/ or by calling (855) 631-5341 (toll free) for U.S. and Canada-based parties or +1 (646) 795-6968 for international parties. Note that a PACER password is needed to access documents on the Court's website.

*[Remainder of page intentionally left blank.]*

New York, New York
Dated:  August 11, 2022

/s/ Robert A. Britton
Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

**Hearing Date:  August 24, 2022 at 10:00 a.m., prevailing Eastern Time**
**Objection Deadline:  August 19, 2022 at 4:00 p.m., prevailing Eastern Time**

Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| REVLON, INC., *et al.*,[1] | Case No. 22-10760 (DSJ) |
| Debtors. | (Jointly Administered) |

### DEBTORS' MOTION FOR ENTRY OF AN
### ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully represent as follows in support of this motion (the "Motion"):

### Relief Requested

1.      By this Motion, the Debtors request entry of an order, substantially in the form attached hereto as **Exhibit A** (the "KEIP Order"), approving the Debtors' proposed key employee incentive plan, which provides for incentive awards for a limited group of the Debtors' eight most

---

[1]     The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  One New York Plaza, New York, NY 10004.

senior executives (the "KEIP Participants"). In support of this motion, the Debtors submit the declarations of (a) Douglas J. Friske, Managing Director at Willis Towers Watson US LLC ("WTW," and such declaration, the "Friske Declaration"), (b) Robert Caruso, Managing Director at Alvarez & Marsal North America, LLC ("A&M") and Chief Restructuring Officer of the Debtors (the "Caruso Declaration"), and (c) E. Scott Beattie, a Revlon, Inc. director and member of the Restructuring Committee (the "Beattie Declaration," and together with the Friske Declaration and the Caruso Declaration, the "KEIP Declarations"), each filed contemporaneously herewith.

## Introduction

2.    The Debtors' KEIP is a market-based variable compensation program that will appropriately incentivize the Debtors' senior-most management team to maximize the value of these estates. It is the product of substantial work by the Compensation Committee of the Debtors' Board prior to the Petition Date, and Restructuring Committee of the Debtors' Board after the Petition Date, in consultation with the Debtors' advisors, and of difficult five-week negotiations with the Ad Hoc Group of BrandCo Lenders and two weeks with the Committee. The Debtors provided substantial information to these constituencies regarding program design and cost, the financial metrics and targets necessary to earn awards under the KEIP program, and other relevant matters, and responded to multiple follow-up inquiries. As of the date hereof, as a result of these negotiations and substantial concessions made by the Debtors, the KEIP enjoys the support of both the Ad Hoc Group of BrandCo Lenders and the Committee, and the Committee recognizes the importance of stability of the Debtors' management team and the need to incentive them to help

the Debtors achieve the goals embodied by the KEIP metrics.[2]  Obtaining approval of the market-based KEIP as quickly as possible is essential, as the Debtors have lost two key members of their senior management team in recent weeks, with at least one of those members citing lack of market-based incentive compensation opportunities as a factor in her decision to leave.  Other members of the Debtors' senior management team are being actively pursued by recruiters and other companies.

3.      Since the outset of the COVID-19 pandemic, the Debtors have faced significant liquidity constraints that worsened exponentially in recent months leading up to the filing, largely because of supply chain issues that made it impossible for them to produce sufficient inventory to fill orders and the consequent impairment of their relationships with their vendors and customers. The Debtors commenced these Chapter 11 Cases to improve their liquidity, reorganize their capital structure, stabilize their supply chain and vendor and customer relationships, and strengthen their businesses.  All of this must be accomplished on a highly expedited timetable as the Debtors continue to confront the serious challenges that led to the bankruptcy, with little margin for error. Successfully navigating these challenges will ultimately maximize the value of the Debtors for their stakeholders.

4.      The KEIP is critical to achieving these challenging goals.  The KEIP Participants are the eight most senior executives of the Debtors.  They are responsible for every facet of the Debtors' worldwide operations, including its supply chain, sales and marketing, finance, workforce, legal risk and compliance, and product development.  Each of them will play an essential role in executing the Debtors' plan to increase liquidity, normalize supply chain

---

[2]    The Debtors have agreed that the Committee's support of the KEIP will not prejudice any rights the Committee may have in the future to object to other matters, including the Debtors' business plan and valuation.

relationships, and increase profitability and value.  In connection with the incurrence of their postpetition debtor-in-possession financing facility, the Debtors agreed to certain milestones for these Chapter 11 Cases, which are tight and will be challenging to meet.  And all of this must be done while juggling the demands of the Chapter 11 process itself.  The KEIP is critical to incentivizing the Debtors' management team to expend the enormous effort, dedication, and focus that will be needed to meet these challenging goals.

5.      It is critical to implement the KEIP promptly to ensure that the KEIP Participants remain focused on achieving the Debtors' goals without the stress of uncertainty regarding their personal compensation opportunities.  Even though the KEIP Participants have worked tirelessly to prepare the Debtors for these Chapter 11 Cases, the restrictions placed on the Debtors as a result of that very filing deprived the KEIP Participants of the opportunity to receive ordinary course annual cash bonuses and change of control protections, and have eliminated the incentivizing value of their equity-based compensation that was available to them before the Petition Date.  Today, almost two months into the Debtors' Chapter 11 Cases, the compensation earned by the Debtors' senior management is far less than that earned by their peers at the Debtors' competitors, and management has little certainty regarding what compensation opportunities may be approved for them or when that approval may be granted.

6.      Indeed, in just the past week, two of the eight original KEIP Participants gave notice or publicly announced that they will be leaving their roles; as discussed below, the Debtors request approval of their KEIP awards to keep their chief financial officer motivated prior to her departure as she transitions her role, and the authority to use the awards allocated to the President, Americas to compensate a successor in her position.  In today's labor market, each of the KEIP Participants has opportunities to find employment with non-bankrupt employers who can offer guaranteed,

market-competitive compensation opportunities without the burdens of uncertainty and increased workload created by the chapter 11 process.

7.      The terms of the KEIP reflect a more than reasonable exercise of the Debtors' business judgment.  The KEIP was developed over a period of months, beginning before the Debtors' chapter 11 filing, by the independent Compensation Committee of the Debtors' Board and, after the chapter 11 filing, the Restructuring Committee, together with the Debtors' highly experienced advisors, including its executive compensation advisors at WTW and its restructuring advisors at A&M.  WTW, which has consulted on hundreds of compensation programs, including bankruptcy compensation programs, analyzed the KEIP's design and cost in comparison to other bankruptcy-approved KEIPs and non-bankruptcy market compensation.  A&M, which is known for its financial advisory expertise for debtors in possession, further leveraged its knowledge of bankruptcy and the Debtors' operations to develop metrics for the KEIP that will result in valuable benefits for the Debtors' estates and that are difficult to attain.  The Restructuring Committee, which is composed of independent directors and is tasked with the duties of a compensation committee under public company regulations, met regularly with WTW and A&M to develop the KEIP, and reviewed market data and analyses regarding compensation levels, program structures, and incentive program costs of similarly situated companies.  After the commencement of the Debtors' Chapter 11 Cases, the Restructuring Committee continued to work with the Debtors' advisors to revise the KEIP in light of negotiations with the Debtors' key stakeholders, and on August 4, 2022, ultimately approved for the Debtors to seek approval of the proposed KEIP in this Court.

8.      The principal terms of the KEIP are set forth below and in the accompanying declaration of Mr. Friske.  The KEIP Participants will earn cash bonuses based on metrics that are

substantially identical to ones that have been routinely approved by bankruptcy courts—tested recurring EBITDA, tested cumulative operating net cash flow, and tested net sales—at levels tied to the business plan developed in connection with the Debtors' DIP Facilities. The KEIP program provides for escalating payouts if the Debtors achieve at least 90% of the amounts derived from the Business Plans. If the Debtors fall short of the 90% threshold, the KEIP pays out nothing. These core features of the KEIP appropriately align the incentives of the KEIP Participants with achieving the Debtors' strategic goals.

9.      The KEIP targets will be difficult to achieve. The DIP business plan provides for an exceedingly tight timetable for the Debtors to stabilize and turn around their business. The Debtors continue to encounter supply chain challenges, as vendors concerned about the Debtors' status in Chapter 11 demand significant assurances before agreeing to supply goods, or seek to negotiate critical vendor status. In the meantime, the Debtors must begin the production of products for the holiday season, which they must deliver to their customers by September or October. If the Debtors are unable to deliver such products on time, customers may decline to accept them, depriving the Debtors of revenue and marketing momentum during the critical holiday season. Thus, payouts under the KEIP are far from guaranteed. The KEIP Participants cannot expect to earn awards under the KEIP merely by engaging in business as usual.

10.      The cost of the KEIP is reasonable and consistent with historical and current market compensation practices and in light of current market conditions. The KEIP Participants will have the opportunity to earn aggregate total annual compensation (including both salary and target KEIP awards) slightly above the 50th percentile of total compensation of their peers.[3] The KEIP is also

---

[3]     Excludes market comparables for the current Chief Financial Officer and the Chief Supply Chain Officer, as discussed herein.

well within the range of incentive plans approved by bankruptcy courts. While the total cost of the KEIP is at the upper end of that range, the cost is reasonable in light of the size of the Debtors' business, and the impact of a very tight labor market and elevated compensation levels in New York City, where the Debtors are located. Aggregate compensation under the KEIP will represent a reduction of aggregate 2022 prepetition target compensation for the same executives of approximately 16%.[4]

11.    The Debtors therefore believe the KEIP will appropriately incentivize the KEIP Participants in compliance with the business judgment standard recognized by courts under sections 363 and 503(c) of the Bankruptcy Code.

12.    Accordingly, the Debtors respectfully request that the Court approve the terms of the KEIP as provided herein.

### Jurisdiction and Venue

13.    The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[4]    Excludes current Chief Financial Officer.

15.     The bases for the relief requested herein are sections 105, 363, 503, 1107, and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and Bankruptcy Rule 6004.

## Background

16.     On June 15, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

17.     No trustee or examiner has been appointed in these Chapter 11 Cases.  On June 24, 2022, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee") [Docket No. 121].

18.     A description of the Debtors' businesses, the reasons for commencing these Chapter 11 Cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Robert M. Caruso, Chief Restructuring Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration") [Docket No. 30].[5]

## The Key Employee Incentive Plan

### I.     Overview of the KEIP

19.     As the leaders of the Debtors' business operations, the KEIP Participants are critical to the Debtors' ability to effectively and efficiently oversee an orderly chapter 11 process that

---

[5]   The First Day Declaration was filed on the Petition Date and is incorporated herein by reference.  Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the First Day Declaration or the Wages Motion, as applicable.

maximizes value for all stakeholders.  Prior to the Petition Date, the Debtors maintained various annual cash- and equity-based incentive plans for the purpose of compensating the KEIP Participants in addition to their base salaries.  As part of the review of their compensation programs in light of these Chapter 11 Cases, the Debtors determined to discontinue the ordinary course incentives that the KEIP Participants received as part of the Debtors' prepetition compensation programs.  In order to restore the alignment of the KEIP Participants' compensation opportunities with the Debtors' operational and strategic goals and stakeholders' interests, the Debtors worked with their compensation consultant, WTW, and their restructuring advisor, A&M, to formulate a proposal for the KEIP, which was then refined over the course of discussions with certain stakeholders.  On August 4, 2022 the restructuring committee of Revlon, Inc.'s board of directors (the "Board," and such committee, the "Restructuring Committee") unanimously approved the Debtors seeking court approval of the KEIP in order to provide cash-based incentive compensation during the pendency of these Chapter 11 Cases to the KEIP Participants.  Beattie Declaration at ¶ 6.

20.    The KEIP is structured to tie incentive compensation to operational performance in these cases and to pay only to the extent meaningful performance is achieved.  The KEIP provides cash awards to the KEIP Participants based on the achievement of business performance as

measured by tested recurring EBITDA,[6] tested cumulative operating net cash flow,[7] and tested net sales[8] metrics.  The terms of the KEIP are further described below.

## II.     The KEIP Structure

### A.      The KEIP Participants

21.     Because of the scope of their authority as senior executives, including their budgetary authority, the KEIP Participants are "insiders" within the meaning of section 101(31) of the Bankruptcy Code.  They are the following eight members of the Debtors' executive leadership team.

---

[6]    The Debtors define tested recurring EBITDA as GAAP operating income, adjusted to exclude depreciation and amortization expense, non-cash stock-based compensation expense and restructuring and other adjustments, including "internal" and "external" non-recurring items, and excluding any reduction for normal course bonus accruals, the KEIP, the KERP or any residual expensing for equity awards.

[7]    The Debtors define tested cumulative operating net cash flow as the net cash flow set forth in the DIP Budget, excluding any expenses related to adequate assurances, DIP fees and interests, professional fees, the KEIP, the KERP, capital expenditures or normal course bonus accruals.

[8]    The Debtors define tested net sales as gross revenues from sales of products less expected product returns, trade discounts, and customer allowances.

| Name | Title / Position |
|------|------------------|
| Debra Perelman | President & Chief Executive Officer |
| Victoria Dolan[9] | Chief Financial Officer |
| Ely Bar-Ness | Chief Human Resources Officer |
| Thomas Cho | Chief Supply Chain Officer |
| Keyla Lazardi | Chief Scientific Officer |
| Andrew Kidd | EVP, General Counsel |
| President, Americas[10] | President, Americas |
| Martine Williamson | Chief Marketing Officer |

22.    The KEIP Participants are responsible for executing on the Debtors' strategic

direction and ensuring achievement of the Debtors' overall goals.  Specifically:

- The Debtors' President & Chief Executive Officer is responsible for ensuring that all members of the Debtors' leadership team are working effectively and cross-functionally to ensure and grow confidence in the organization and is responsible for advocating for the leadership team and ensuring that the day-to-day business plan through chapter 11 is one that the team has confidence that they can execute against;

- The Debtors' Chief Financial Officer is responsible for overseeing the Debtors' worldwide financial functions, including budget and planning, treasury, tax, investor relations, controllership, and enterprise-wide internal controls and compliance, developing business plans on a recurring, monthly basis for key stakeholders, and managing and executing on Debtors' financial performance goals, including delivery of top line results, working capital efficiencies, and operational efficiencies to support target margins;

- The Debtors' Chief Human Resources Officer is responsible for recruiting, managing and retaining the Debtors' entire global workforce and managing the benefits program globally, which requires a sophisticated skill-base and has only become more complicated in the bankruptcy context in light of transitions and departures, and is critical to execute on Debtors' overall goals;

---

[9]    As disclosed in the Form 8-K filed on August 9, 2022 by Revlon, Inc., Mrs. Dolan will be leaving her role as Chief Financial Officer effective as of September 30, 2022.  Based on that departure date, Mrs. Dolan will be eligible to receive a KEIP award, if earned, for the third quarter of 2022.  The Debtors do not currently have any intention to hire a replacement chief financial officer, and instead plan to hire an interim chief financial officer provided by A&M.  The interim chief financial officer provided by A&M will not be eligible for any awards under the KEIP.

[10]    As discussed herein, the current President, Americas has given the Debtors notice of her resignation.  The Debtors are currently searching for a replacement for this role.

- The Debtors' Chief Supply Chain Officer is responsible for managing the Debtors' global supply chain and their relationships with their hundreds of international vendors, providing a critical nexus point amongst sales, marketing, and finance, overseeing a large organization of personnel, including manufacturing, and navigating the Debtors' businesses through significant global supply chain difficulties;

- The Debtors' EVP, General Counsel is responsible for managing the Debtors' legal risk and compliance across multiple jurisdictions, managing the chapter 11 process, overseeing corporate compliance programs such as corporate audit, and the negotiation of the Debtors' thousands of contracts, many of which are critical to the Debtors' businesses and support the Debtors' strategic direction, ensuring achievement of the Debtors' overall goals;

- The Debtors' Chief Scientific Officer is responsible for driving product innovation, working closely with marketing to ensure the successful promotion of new formulations which are scientifically sound, and executing on the Debtors' new product development targets included in the Debtors' long-term business plan, which ultimately drive sales and play a key role in the Debtors' customer relationships;

- The Debtors' President, Americas, is responsible for managing the Debtors' relationships with their hundreds of customers in North and South America, which is their largest market, and is ultimately responsible for directing the commercial relationship, including navigating retailer expectations, negotiating shelf space, advancing critically-important seasonal promotions and, ultimately, working to restore customer confidence in the Debtors and execute on their long-term business plan and maximize value during these Chapter 11 Cases; and

- The Debtors' Chief Marketing Officer is responsible for managing and executing on the Debtors' brand support programs and initiatives, ensuring global integration with the global sales team, and overseeing products and promotions in both the Americas and in other markets around the globe, including ensuring that the brands retain consistency cross-jurisdictionally, which ultimately drives brand value, customer favorability, customer loyalty, and sales.

Beattie Declaration at ¶ 16. The KEIP Participants also hold institutional knowledge critical to the Debtors' operations, and many have longstanding relationships with the Debtors' vendors and customers that would be difficult and expensive, if not impossible, to replace.

23.     Over the past three years, the KEIP Participants have shouldered additional responsibilities to manage their corporate debt, respond to the stresses of the COVID-19 pandemic, and prepare the Debtors' businesses for the chapter 11 filings.  In addition to their substantial day-to-day responsibilities, these executives have also seen their workloads expand significantly as a result of the commencement of these Chapter 11 Cases.  Specifically, among other things:

- The President & Chief Executive Officer regularly meets with and gives presentations to the Debtors' multiple key stakeholder groups in order to provide them with updates on the business, responds to diligence requests from such stakeholders who need information on the Debtors' businesses as the Debtors progress towards the formulation of a confirmable chapter 11 plan, leads the business planning process, oversees all aspects of the Debtors' Chapter 11 Cases, and leads the governance process with the Restructuring Committee, and is a conduit between management and the board in such process;

- The Chief Financial Officer also participates in regular meetings with stakeholders and responds to diligence requests, was and is intimately involved in the Debtors' negotiation of and compliance with their postpetition debtor-in-possession financing facility, is responsible for the review and final sign off on many reporting requirements imposed by the Bankruptcy Code, and needs to be adequately incentivized to continue to perform while transitioning her role to an interim chief financial officer;

- The Chief Human Resources Officer manages and addresses the concerns of the thousands of employees that make up the Debtors' workforce, maintains appropriate staffing throughout the Debtors' multinational businesses despite general unease and uncertainty of rank and file workers regarding the Debtors' bankruptcy, including by overseeing development of the Debtors' key employee retention program, and has also responded to numerous diligence requests both prepetition and postpetition relating to the Debtors' employees and various benefit programs;

- The Chief Supply Chain Officer is fielding increased inquiries from vendors and suppliers, who are critical to the Debtors' businesses and who have increased concerns about their business relationships with the Debtors as a result of the Debtors' chapter 11 filing, oversees the critical vendor negotiation and payment process, and oversees the Debtors' manufacturing facilities that must increase production on a compressed timeline to meet critical ship dates for the holiday season;

- The EVP, General Counsel ensures that the Debtors remain compliant with various legal schemes across multiple jurisdictions, including any legal

concerns that arise as result of the Debtors' bankruptcy, oversees all aspects of the Debtors' chapter 11 process, and is intimately involved in the negotiation and drafting of the Debtors' key pleadings;

- The Chief Scientific Officer is fielding increased inquiries from the Debtors' key external development and innovation partners, who are concerned about the impact of the Debtors' bankruptcy on the future of their partnerships, manages the payment of certain vendors, partners, and regulatory bodies on a constrained budget, which requires careful planning and prioritization in order to meet key business deadlines, and must navigate the Debtors' current supply chain difficulties and take such constraints into consideration when developing new products in line with the Debtors' new product launch timeline and business plan;

- The President, Americas is fielding increased inquiries from the Debtors' customers, and who, like vendors and suppliers, have increased concerns about their business relationships with the Debtors as a result of the Debtors' chapter 11 filing, and oversees all customers and customer program issues and negotiations; and

- The Chief Marketing Officer also manages the customer relationship by providing appropriate brand support, and has encountered additional difficulties reworking promotional plans and managing marketing-related vendors and talent, who are concerned about the impact of the Debtors' bankruptcy, on a constrained budget, while ensuring that sales hit their targets.

Caruso Declaration at ¶ 26. While increased responsibilities are inherent to the KEIP Participants' duties as leaders of a debtor-in-possession, the additional challenge these responsibilities pose should be factored into consideration of the KEIP Participants' ability to achieve performance goals and the importance of the compensation opportunities available to them.

**B.    KEIP Design and Structure**

24.    The KEIP contains the following primary design features:

- **Awards.** Each KEIP award will provide for a cash payment (to the extent earned based on actual performance) after the conclusion of each of the performance periods set forth below. Potential payments are based on achievement of specified performance metrics for each performance period.

- **Performance Periods.** Performance will be measured based on fiscal quarters commencing at the beginning of the third quarter of fiscal year 2022 and continuing through the end of the fourth quarter of fiscal year 2023.

- **Payment Dates:**  The KEIP will be paid in quarterly installments.  Subject to entry of the KEIP Order, any payment earned for any performance period will be made as soon as practicable after the end of such performance period.  Any payouts for the quarter in which the Debtors emerge from chapter 11 and any quarters thereafter will be paid by the reorganized Debtors.  Pro-rata amounts earned for the period prior to emergence for the quarter of emergence shall be placed into escrow on the effective date of any confirmed plan of reorganization.

- **Catch-up Feature.**  In addition to the quarterly measurement of metrics, performance will be measured on a cumulative basis at the end of each year and a "catch-up" payment (the "Catch-Up Payment") will be made to the extent the Debtors' aggregate performance and earned payouts based on annual performance exceed the quarterly payouts for such year to date.

- **Performance Metrics**.  KEIP payouts will be based on three performance metrics:  (i) tested recurring EBITDA weighted at 60 percent; (b) tested cumulative operating net cash flow weighted at 30 percent; and (c) tested net sales weighted at 10 percent.  The performance metrics are attached hereto as **Exhibit B**.  The performance metrics for the 2022 year are derived from the Debtors' business plan developed in connection with the Debtors' postpetition debtor-in-possession financing facility.  The performance metrics for the 2023 year will be derived from the higher of the Debtor's 2023 Business Plan or the DIP Business Plan.  The KEIP provides for the appropriate downward adjustment of performance metrics in the event of any sales of a portion of the Debtors' businesses during the duration of the KEIP.

- **Payout Ranges.**  The KEIP will provide for potential payments representing a range from 50 percent of target payment for threshold performance and up to 150 percent of target payment for maximum performance, except there will be no maximum payouts for the third and fourth quarters of 2022 (*i.e.* the highest payout for such quarters is the target amount).  Linear interpolation of the KEIP payment will be applied for achievement of performance metrics between the values shown below.  If the minimum threshold is not met participants will not get a payout under the KEIP.

- **Termination of Employment.**  If a KEIP Participant's employment is terminated without cause, by the KEIP Participant pursuant to limited good reason provisions, as applicable, or due to death or disability, the pro-rata portion of the KEIP payment for the quarter in which such termination of employment occurred will be paid based on actual performance measured at the end of the applicable performance period.  Such participants may also receive a pro-rata Catch-Up Payment for the year in which such termination of employment occurred based on actual performance measured at the end of the year.

- **Clawback.** With the exception of payments made to the current Chief Financial Officer for the third quarter of 2022, payments under the KEIP are subject to a 50% clawback, and in the case of the Chief Executive Officer, a 100% clawback, if a KEIP Participant's employment is terminated prior to the earlier of (a) the confirmation date of any plan confirmed in these Chapter 11 Cases, and (b) December 31, 2023, in each case for any reason other than termination by the Debtors without cause, by the KEIP Participant pursuant to limited good reason provisions, as applicable, or due to death or disability.

25.    If approved, the KEIP would provide aggregate (for all participants) threshold, target, and maximum opportunities of approximately $14,486,166, $28,972,332, and $36,015,415, respectively, over its 18-month duration.   The annual award opportunities available to KEIP Participants under the KEIP are summarized as follows:

| Individual KEIP Values on an Annual Basis | | | |
|---|---|---|---|
| Participant's Title | Threshold Award Opportunity | Target Award Opportunity | Maximum Award Opportunity[11] |
| President & Chief Executive Officer | $3,542,583 | $7,085,166 | $10,627,749 |
| Chief Financial Officer | See below paragraph. | | |
| Chief Human Resources Officer | $475,000 | $950,000 | $1,425,000 |
| Chief Supply Chain Officer | $1,100,000 | $2,200,000 | $3,300,000 |
| Chief Scientific Officer | $458,000 | $916,000 | $1,374,000 |
| EVP, General Counsel | $450,000 | $900,000 | $1,350,000 |
| President, Americas | $600,000 | $1,200,000 | $1,800,000 |
| Chief Marketing Officer | $417,500 | $835,000 | $1,252,500 |
| Total[12] | $7,043,083 | $14,086,166 | $21,129,249 |

The Debtors' current Chief Financial Officer, who has announced that she will be leaving her position with the Debtors, will be eligible for a KEIP award solely for the third quarter of 2022, to the extent she actually remains with the Debtors through the end of such quarter, in threshold and target quarterly opportunity amounts of $400,000 and $800,000, respectively, and will not be subject to the clawback once paid.

---

[11]   As noted above, there will be no payouts for amounts achieved above target for the third and fourth quarters of 2022.

[12]   Totals in the table exclude the amount awarded to the current Chief Financial Officer.

16

26.     The annal amounts shown above will be paid, to the extent earned, in installments on a quarterly basis. The KEIP program is designed to provide compensation opportunities for the KEIP Participants that partially reflects their expected compensation opportunities for the entirety of the 2022 and 2023 years. Beattie Declaration at ¶ 20. Under the Debtors' prepetition incentive programs for insiders, which are further described below, awards were paid or granted on an annual basis to align with annual compensation paid to similar positions at comparable companies. The KEIP Participants have not and will not receive any payment under the Global Annual Bonus Program for 2022, and the incentivizing value of their 2022 restricted stock grants has been eliminated. To offset the loss of the prepetition incentive structure and take account of the absence of incentive compensation through the first two quarters of 2022, the award opportunities for each of the first two payments under the KEIP (for the third and fourth quarters of 2022) are double the amount of the award opportunities for each of the quarterly payments for 2023.

## III.    The Reasonableness of the KEIP

### A.    The KEIP Participants' Prepetition Compensation

27.     Prior to the Petition Date, the Debtors maintained various annual cash- and equity-based incentive plans for the purpose of compensating both insider and non-insider employees in addition to their base salaries. Under the Debtors' prepetition incentive plans, including the LTIP and the Global Annual Bonus Program (the "Previous Incentive Plans"), each as defined and further described in the Wages Motion,[13] eligible employees received cash payments or equity awards based on the Debtors' financial performance, continued employment, and certain corporate metrics that measured how well the Debtors performed against goals that support the Debtors'

---

[13]   *See Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* [Docket No. 8] (the "Wages Motion").

strategic and financial priorities.  Under the LTIP and similar stock-based incentive programs, eligible employees received yearly grants of equity that were subject to time-based vesting or tied to achievement of certain key performance metrics, such as adjusted EBITDA and cash generation over multiple years.  Under the Global Annual Bonus Program, eligible employees were paid cash awards on an annual basis that were based on the achievement of certain targets such as adjusted EBITDA and net sales metrics.  Each of the KEIP Participants was historically eligible for awards under both the LTIP and the Global Annual Bonus Program.  Beattie Declaration at ¶ 19.

28.     As part of the review of their compensation programs in light of these Chapter 11 Cases, the Debtors decided to discontinue the Previous Incentive Plans for the KEIP Participants. Accordingly, the Debtors are not granting to the KEIP Participants any future awards under any of their prepetition cash- or equity-based compensation programs, other than base salary.  While the KEIP Participants were granted equity awards in 2022, that equity will not vest until March of 2023 and 2024, and the incentivizing value of such grants has been eliminated as a result of these Chapter 11 Cases.  Thus, these equity grants no longer serve to incentivize management and are no longer an effective method of executive compensation.

29.     The Previous Incentive Plans show the Debtors' historical practice of including a variable incentive component in the ordinary compensation of the Debtors' leadership team.  These employees have come to expect and rely upon the existence of such opportunities as a material and expected component of their total compensation, even if the amounts payable vary from year to year based on the Debtors' financial performance and each employee's individual performance. Beattie Declaration at ¶ 19.  For the 2022 year, prior to the commencement of these Chapter 11 Cases, the target awards under the Previous Incentive Programs represented, as an approximate percentage of total compensation:  88.19% for the President and Chief Executive Officer; 81.77%

for the Chief Financial Officer; 65.67% for the Chief Human Resources Officer; 78.97% for the

Chief Supply Chain Officer; 65.17% for the Chief Scientific Officer; 54.86% for the Executive

Vice President and General Counsel; 77.83% for the President, Americas; and 66.12% for the

Chief Marketing Officer.   Beattie Declaration at ¶ 21.   Without any variable incentive

compensation, the KEIP Participants would lose a significant percentage of their total

compensation opportunities and would not be appropriately incentivized to create value for the

Debtors estates.   The uncertainty regarding compensation opportunities, including the

implementation of the KEIP, has already impacted the Debtors' senior leadership team.   In the last

week, two of the eight original KEIP Participants – Victoria Dolan, the Chief Financial Officer,

and Heather Wallace, the President Americas – have given the Debtors notice of and/or publicly

announced their intention to leave their positions.   In leaving her role, Mrs. Wallace cited the lack

of certainty regarding her compensation opportunities, lack of severance as a result of the

bankruptcy, and general uncertainty regarding the bankruptcy's effect on her position as some of

the reasons for her departure.   Beattie Declaration at ¶ 14.   The loss of Mrs. Wallace in particular

means the loss of sensitive and critical information about and relationships with the Debtors' key

customers, which is a significant setback to the Debtors as they seek to execute on their business

plan ahead of the critical fourth quarter.[14]   Beattie Declaration at ¶ 14.   These issues highlight the

urgent necessity for the Debtors to immediately implement the KEIP, which will make up for

some, but not all, of the compensation opportunities available to the KEIP Participants under the

Previous Incentive Plans.

---

[14]   The Debtors reserve the right to hire a replacement President, Americas; to include any future President, Americas
in the KEIP program; and to make the potential award amounts set forth for Mrs. Wallace available to such
replacement for any periods he or she is employed.

### B.      The KEIP is Reasonable Based Historical and Current Market Compensation

30.     As part of the development of the KEIP and to ensure the reasonableness of its

terms, WTW compared the total compensation opportunities for the KEIP Participants, inclusive

of the target amounts under the KEIP, to relevant talent market pay.  Friske Declaration at ¶ 26.

Based on a review of the market compensation for the positions that the KEIP Participants hold,

the KEIP Participants will have the opportunity to earn based on performance, total target annual

compensation (composed of their salary and target KEIP awards) that is, in the aggregate, 9%

greater than the median amount.[15]  Friske Declaration at ¶ 27.  Excluding the current Chief

Financial Officer, the KEIP Participants' total compensation opportunities with the target KEIP

awards represent a reduction of between approximately 37% and 5% of 2022 prepetition target

total compensation for the KEIP Participants (with the exception of the EVP, General Counsel,

whose total compensation opportunity has increased), and aggregate reduction of approximately

16%.  Friske Declaration at ¶ 29.  The EVP, General Counsel's award opportunity was adjusted to

reflect his particular importance and anticipated duties in the restructuring effort, as well as the

drastic change to his role and duties shortly after starting his position at the Debtors only a month

prior to the Petition Date.  Beattie Declaration at ¶ 22.

31.     Without a KEIP or similar program providing variable incentive components in

their compensation, the KEIP Participants' total target compensation would be far less than their

peers'.  Specifically, the KEIP Participants' total compensation based on salary alone, as compared

---

[15]    The Chief Supply Chain Officer has been excluded from the market analysis because of a lack of comparable
data, as well as the unique supply chain challenges the Debtors are facing in the current business environment in
light of the effects of the COVID-19 pandemic.  Friske Declaration at ¶ 26.  A more complete description of the
Debtors' supply chain challenges and general global supply chain issues is set forth in the First Day Declaration
and the Caruso Declaration.  The current Chief Financial Officer has also been excluded from the aggregate
market comparison.  On an individual basis, her total annualized compensation (composed of her salary and
annualized target KEIP award of $1,600,000) is 8% below the median of market comparables for chief financial
officers.  Friske Declaration at ¶ 27.

to market compensation for the positions that the KEIP Participants hold, would be: 80% below the 25th percentile for the President and Chief Executive Officer; 63% the below 25th percentile for the Chief Financial Officer; 36% below the 25th percentile for the Chief Human Resources Officer; 8% below the 25th percentile for the Chief Scientific Officer; 40% below the 25th percentile for the Executive Vice President and General Counsel; 44% below the 25th percentile for the President, Americas; and 26% below the 25th percentile for the Chief Marketing Officer. Friske Declaration at ¶ 29.

32.    To further evaluate the reasonableness of the KEIP, WTW compared its structure and cost to comparable plans approved by bankruptcy courts. For bankruptcy comparables, WTW reviewed incentive plans approved by bankruptcy courts at 20 companies with prepetition revenues between approximately $1.0 billion and $4.0 billion and incentive plans that contained between one and 26 participants (the "KEIP Peer Group").[16] Friske Declaration at ¶ 17. The Debtors are relatively large as compared to the KEIP Peer Group, with prepetition revenues that approximate the 75th percentile of the KEIP Peer Group. Friske Declaration at ¶ 17. WTW's analysis found that the KEIP's metrics are substantially similar to key performance indicators used in other incentive compensation programs approved by bankruptcy courts. Friske Declaration at ¶¶ 19-21.

33.    WTW's analysis of the KEIP Peer Group shows an increase in the number of companies making prepaid retention payments to insiders prior to the commencement of a chapter 11 case in recent years, in addition to the adoption of a KEIP. WTW's analysis of

---

[16]    The KEIP Peer Group consisted of: Avaya, Inc., Bristow Group, Inc., California Resources Corporation, Claire's Inc., Cumulus Media Inc., FirstEnergy Solutions Corp., FTD Companies, Inc., Gander Mountain Company Inc., GenOn Energy, Gymboree Group, Inc., hhgregg, Inc., Intelsat S.A., LSC Communications, Inc., Mallinkrodt plc, Payless Inc., Purdue Pharma L.P., Real Industry, Inc., Stage Stores, Inc., Valaris plc, and Westinghouse Electric Company LLC. Friske Declaration at Appendix 1.

publicly-available data for the KEIP Peer Group found that almost half of the KEIP Peer Group had provided prepaid, prepetition retention awards to insiders.  Friske Declaration at ¶ 22.

34.    It is true that, on a total cost basis, the cost of the proposed KEIP is at the upper end of the range of observed cases of the KEIP Peer Group, when prepaid retention bonuses are included.  This reflects the absence of any 2022 cash-based bonus or incentive opportunities prior to the Petition Date; the fact that the Debtors need to provide two full years' worth of compensation opportunities to provide market competitive compensation opportunities; the location of the Debtors' principal place of business; and the impact of a very tight labor market on compensation practices.  Friske Declaration at ¶ 22.  Considered in light of these factors, the cost of the KEIP is reasonable.  As compared to the KEIP Peer Group, inclusive of any prepaid retention bonuses, the KEIP approximates the 81st percentile on an annualized (over an 18-month period) basis, and approximates the 80th percentile on an annualized (over an 18 month period) per participant basis.[17] Friske Declaration at ¶ 22.

35.    The cost of the Debtors' proposed KEIP is also driven by the Debtors' principal place of business.  The Debtors are headquartered in New York City, which has historically been a high-pay market compared to other areas that certain of the KEIP Peer Group may be headquartered.[18]  On average, salaries in New York City, where the Debtors are headquartered,

---

[17]    These figures show the KEIP's positioning inclusive of the current Chief Financial Officer's $800,000 target award for the third quarter of 2022.  Because WTW does not analyze the KEIPs approved for the KEIP Peer Group for variations in treatment of individual participants or to reflect the termination of approved KEIP participants, the Debtors have been advised that this comparison is most comparable to the KEIPs in the KEIP Peer Group.  However, WTW also analyzed the KEIP's position assuming (a) annualized compensation for the current Chief Financial Officer's third quarter 2022 award (i.e. a total $3,200,000 target award over the 18 month duration of the KEIP), and (b) only seven participants, excluding the award for the current Chief Financial Officer. The KEIP approximates the 82nd percentile on an annualized (over an 18 month period) per participant basis, assuming a $3,200,000 total cost for the current Chief Financial Officer, and approximates the 83rd percentile on an annualized (over an 18 month period) per participant basis excluding the current Chief Financial Officer. Friske Declaration at ¶ 22, note 6.

[18]    The members of the KEIP Peer Group were or are currently headquartered in the following locations:  Durham, North Carolina; Houston, Texas; Los Angeles, California; Hoffman Estates, Illinois; Atlanta, Georgia; Akron,

are approximately 20% higher than average for the United States as reported by the Economic Research Institute, Inc.  Friske Declaration at ¶ 24.  As discussed above, the Debtors are also competing in a very tight labor market – historically low unemployment rates have increased the competition for talent such as the KEIP Participants, and forced employers to offer higher salaries in order to remain competitive.[19]  The U.S. Bureau of Labor Statistics, which tracks an Employment Cost Index on a quarterly basis, shows a significant increase in the growth rate of employment cost for the past year in its table for Q1 2022, with the last five quarters having the highest quarterly growth rates in the past decade.[20]  On an annualized basis, the last four quarters have produced an aggregate cost increase of 4.4%, compared to 2.6% over the four quarters prior.[21]  Based on data tracked by WTW, total compensation for chief executive officers increased overall by approximately 8% in 2021, and is expected to continue to increase in 2022.  Friske Declaration at ¶ 24.

36.    The Debtors felt the effects of these shifts in the labor market even before the commencement of these Chapter 11 Cases.  Preceding these cases, the Debtors offered salary raises

---

Ohio; Downers Grove, Illinois; Saint Paul, Minnesota; San Francisco, California, Indianapolis, Indiana; McLean, Virginia; Warrenville, Illinois; Dublin, Ireland; Topeka, Kansas; Stamford, Connecticut; Beachwood, Ohio; London, United Kingdom; and Canonsburg, Pennsylvania.

[19]    *See* Wage Growth Tracker, Federal Reserve Bank of Atlanta, https://www.atlantafed.org/chcs/wage-growth-tracker (illustrating an increase in overall unweighted monthly wage growth from 3.2% in January 2017 to 6.1% in May 2022); Bureau of Labor Statistics, U.S. Department of Labor, Occupational Outlook Handbook, "The Employment Situation," https://www.bls.gov/news.release/pdf/empsit.pdf (indicating the decrease in the US unemployment rate from 4.8% in January 2017 to 3.6% in May 2022).

[20]    *See* Economic News Release, Table 1. Seasonally adjusted: Employment Cost Index for total compensation, by ownership, occupational group, and industry, Bureau of Labor Statistics, U.S. Department of Labor, https://www.bls.gov/news.release/eci.t01.htm (last visited July 18, 2022, 2:27 PM); Databases, Tables & Calculators by Subject, Bureau of Labor Statistics, U.S. Department of Labor, https://data.bls.gov/timeseries/CIS1010000000000Q (last visited July 18, 2022, 2:27 PM).

[21]    *See* Economic News Release, Table 1. Seasonally adjusted: Employment Cost Index for total compensation, by ownership, occupational group, and industry, Bureau of Labor Statistics, U.S. Department of Labor, https://www.bls.gov/news.release/eci.t01.htm (last visited July 18, 2022, 2:27 PM); Databases, Tables & Calculators by Subject, Bureau of Labor Statistics, U.S. Department of Labor, https://data.bls.gov/timeseries/CIS1010000000000Q (last visited July 18, 2022, 2:27 PM).

to retain their workforce, and were required to offer signing bonuses in order to remain competitive for key talent. Beattie Declaration at ¶ 18. Indeed, one KEIP Participant was offered a sign-on bonus that will not be paid as a result of the commencement of these Chapter 11 Cases. The Debtors have also had to offer higher salaries (on average 20% more than the salary paid to previous employees in the same role) to hire replacement talent for vacant roles. Beattie Declaration at ¶ 18.

37.    In light of these factors and the uncertainty created by the Chapter 11 Cases, the Debtors face a grave risk that KEIP Participants will leave. Many of the KEIP Participants have received calls from recruiters seeking to lure them away from their positions, and two of the original KEIP Participants have given notice or publicly announced their departure in the past week. Beattie Declaration at ¶ 14. The KEIP will assist the Debtors is avoiding the loss of additional critical senior personnel during this critical period.

### C.    The Performance Metrics Under the KEIP are Appropriately Incentivizing

38.    The target performance metrics under the KEIP for the third and fourth quarters of 2022 are derived from the business plan created by the Debtors' management team and A&M, in consultation with the Debtors' DIP Lenders, prior to the commencement of these Chapter 11 Cases in connection with sizing the Debtors' post-petition financing needs (the "DIP Business Plan"). Additionally, the targets for 2023 will be derived from the higher of the DIP Business Plan and the Debtor's 2023 business plan (the "2023 Business Plan, and together with the DIP Business Plan, the "Business Plans"), which will be developed in the fall of 2022, essentially setting the DIP Business Plan as a floor for the 2023 metrics. At the time the DIP Business Plan was developed, the effect that the Debtors' chapter 11 filings would have on their business operations and projections was highly uncertain, especially given the expedited manner in which the Debtors' Chapter 11 Cases were prepared and filed. Caruso Declaration at ¶ 21.

39.     Since filing these Chapter 11 Cases, the Debtors have encountered several challenges that increase the difficulty of achieving the targets set forth in the DIP Business Plan. Specifically, the Debtors have found that their vendor relationships are increasingly strained, despite the protections offered by the Bankruptcy Code, as many individual vendors attempt to negotiate "critical vendor" status before supplying the Debtors with goods, adding additional delay to the Debtors' supply chain.  Other vendors are generally wary of the Debtors' status as debtors in possession, and require increased attention from the Debtors' management and employees before agreeing to supply the Debtors with goods, further adding to the delay.  These delays have led to a decrease in production at a critical time in the Debtors' annual business cycle.  In July and August, the Debtors begin the production of their holiday gift sets, which contain multiple different products and which make up a significant portion of the Debtors' revenue for the critical fourth quarter.  Typically such sets must be delivered to the Debtors' customers by September or October, as these customers want to receive them in advance of the holiday season in time for key sales events, such as Black Friday and Christmas.  The Debtors have already pushed out the production deadlines for such items past their typical timelines, and if the Debtors cannot deliver such products on schedule, the Debtors' customers may decline to accept such goods, denying the Debtors a critical revenue stream.  Caruso Declaration at ¶ 22.

40.     In light of the above, the Debtors believe it is appropriate to use the performance targets set forth in the DIP Business Plan as their KEIP performance targets for 2022, and they set an appropriate floor for the 2023 targets to ensure that the 2023 metrics will be adequately difficult to reach and thus incentivizing.  The additional challenges faced by the Debtors' businesses mean that attainment of such targets is not merely "business as usual," but will require the KEIP Participants' focus, hard work, and dedication to managing the Debtors' supply chain and their

relationships with their thousands of customers, vendors, and employees. Achievement of even the threshold amount, which is set at 90% of target, will be difficult given the issues faced by the Debtors. Attainment of the DIP Business Plan targets will also avoid the need for the Debtors to obtain additional postpetition financing, which would create additional strain on the Debtors' businesses given the complexity of their capital structure and the additional costs that would be incurred in connection therewith. Caruso Declaration at ¶ 23. Thus, the proposed performance metrics under the KEIP are appropriately incentivizing and present a challenge for the KEIP Participants to meet, and which, if met, would result in clear financial and operational benefits for the Debtors' estates and consequently their stakeholders.

## Basis for Relief

## I.    Section 503(c)(1) of the Bankruptcy Code is Inapplicable to the KEIP.

41.    Section 503(c)(1) of the Bankruptcy Code restricts payments made to "insiders of the debtor for the purpose of inducing such person to remain with the debtor's business"—*i.e.*, those insider plans that are essentially "pay to stay" plans. The Debtors recognize that the KEIP Participants are "insiders." But none of the KEIP payments are intended merely to induce the KEIP Participants to remain with the Debtors. Rather, all of the payments contemplated by the KEIP will be made only upon the satisfaction of difficult-to-attain, company-based performance targets.

42.    In this regard, the question is whether these plans are "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). This analysis recognizes that all compensation, to some degree, has a retentive element. *In re Glob. Home Prod., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) ("The fact . . . that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance."); *In re Dana Corp.*,

358 B.R. 567, 584 (Bankr. S.D.N.Y. 2006) ("However, as noted, this Court also opined that incentivizing plans with **some** components that arguably have a retentive effect do not necessarily violate section 503(c)."). Section 503(c) does not "foreclose a chapter 11 debtor from reasonably compensating employees, including 'insiders,' for their contribution to the debtors' reorganization." *In re Velo Holdings Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012). Rather, the focus remains on whether the plan is, on the whole, incentivizing in nature by demanding a "stretch" or a "reach" before an award opportunity is achieved. *In re Dana Corp.*, 358 B.R. at 581.

43.     Here, the Payments under the KEIP are primarily incentivizing in nature. The KEIP awards offer the KEIP Participants the opportunity to earn compensation at levels that are, in the aggregate, **below** the ordinary course, performance-based incentives that were offered by the Debtors prior to the Petition Date if, and only if, the Debtors meet difficult, performance-based metrics. The KEIP Participants are not paid in the event their employment is terminated without cause, by the KEIP Participant pursuant to limited good reason provisions, as applicable, or due to death or disability, other than for their actual performance prior to termination during the KEIP period. Nor are they paid for merely maintaining their employment for a certain time period. Instead, awards under the KEIP are paid only upon the accomplishment of specific company-wide performance targets designed to require appropriate reach without presenting unrealistic or unattainable goals. Furthermore, each of the metrics is a measure of the Debtors' financial and operational health, and improved performance on each metric will inure to the benefit of the Debtors' estates and their stakeholders. Caruso Declaration at ¶ 10. In other words, the KEIP Participants will not be eligible to obtain any award unless the Debtors' businesses as a whole meet or exceed specific performance metrics that are directly tied to company performance and value

creation.  *Cf. In re Hawker Beechcraft*, 479 B.R. at 315 (denying approval of awards where lower threshold attainable was so long as debtor did not encounter "any 'whoopsies'").  The Debtors and, in particular, the KEIP Participants, must perform in order for even a minimum award opportunity to be earned.

44.     As discussed above and in the Caruso Declaration, the Debtors' performance targets, as set by the Restructuring Committee in consultation with the Debtors' advisors, are tied to tested recurring EBITDA, tested cumulative operating net cash flow, and tested net sales, and were designed to be attainable but challenging in order to incentivize the KEIP Participants.  Specifically, the KEIP Participants must achieve the metrics in the face of challenges resulting from the global business environment and the commencement of these Chapter 11 Cases, including:  (a) global supply chain and labor issues that disproportionally impact a manufacturing and retail business of the Debtors' size and complexity; (b) transitioning the Debtors' substantial operations into chapter 11, including by addressing multi-jurisdictional concerns as a result of the global nature of the Debtors' operations; and (c) addressing the concerns of the Debtors' hundreds of vendors and customers resulting from the transition of the Debtors' businesses into formal restructuring proceedings.  Caruso Declaration at ¶ 27.

45.     The performance targets for the third and fourth quarters of 2022 under the KEIP are derived from the Debtors' projections for tested recurring EBITDA, tested cumulative operating net cash flow, and tested net sales as set forth in the DIP Business Plan.  Performance targets for the 2023 year will be derived from either the 2023 Business Plan or the DIP Business Plan, whichever is higher.  Thus, the 2023 metrics under the KEIP will be no lower than the amounts derived from the 2023 year in the DIP Business Plan.  Specifically, (a) threshold performance represents 90% of the amounts derived from the Business Plans; (b) target

performance represents 100% of the amounts derived from the Business Plans; and (c) maximum performance represents 120% of the amounts derived from the Business Plans. Caruso Declaration at ¶ 11. As discussed above, there will be no maximum award opportunities for the third and fourth quarters of 2022.

46.     There is a close nexus between the efforts of the management team and the operational performance metrics used in the KEIP—target tested recurring EBITDA levels, target cumulative operating net cash flow, and tested net sales. Some of the primary goals of the management team during these Chapter 11 Cases are to generate excess earnings and liquidity and to maximize net sales where possible. As further described in the Caruso Declaration, the KEIP Participants face substantial risks and challenges in the achievement of the KEIP performance metrics, including, among others: continuing supply chain disruptions and consequent liquidity challenges; customer challenges, including the loss of shelf space; ability to meet fourth quarter demand; ability to return to ordinary credit terms with vendors; and ability to sustain and grow demand for the Company's products in light of these challenges. Caruso Declaration at ¶ 27. As a result, generating substantial earnings and free cash flow and maximizing net sales in the current environment will require the management team to go above and beyond the normal demands of their jobs. The maximum levels under the KEIP would likely not be achieved without both a favorable operating environment and an outstanding effort by the management team. Achieving the threshold and target levels will likewise require substantial effort by the management team and a favorable environment. Caruso Declaration at ¶ 25.

47.     Thus, the Debtors submit that the KEIP metrics are primarily incentivizing in nature and appropriately motivate the KEIP Participants to accomplish difficult but attainable goals that

will ultimately benefit the Debtors' estates and increase the value of their businesses for the benefit

of all stakeholders.

## II.    Implementing the KEIP is a Sound Exercise of the Debtors' Business Judgment and is Permissible Under Sections 363(b) and 503(c)(3).

48.    The KEIP is governed by and satisfies the requirements of Section 503(c)(3) of the

Bankruptcy Code, which precludes "transfers or obligations that are outside the ordinary course of

business and not justified by the facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  The

"facts and circumstances of the case" test under section 503(c)(3) is "no different than the business

judgment standard under section 363(b)."  *See In re Borders Grp. Inc.*, 453 B.R. 459, 473 (Bankr.

S.D.N.Y. 2011); *In re Velo Holdings, Inc.*, 472 B.R. at 212.  Accordingly, the determination of

whether an incentive or retention plan is justified by the facts and circumstances of the case and

the analysis of whether the approval of such plan is a sound exercise of the debtor's business

judgment are the same.

49.    Section 363(b) of the Bankruptcy Code empowers the Court to allow the debtor, in

the exercise of its sound business judgment and after notice and a hearing, to "use, sell, or lease,

other than in the ordinary course of business, property of the estate."  *See* 11 U.S.C. § 363(b)(1).

Courts in the Second Circuit have held that a debtor's business judgment is "sound" where the

debtor has undertaken an informed decision to pursue an arm's-length transaction in pursuit of a

legitimate business goal.  *See In re Residential Capital, LLC*, 491 B.R. 73, 85-86 (Bankr. S.D.N.Y.

2013);  *In re Borders Grp. Inc.*, 453 B.R. at 473-474.  In examining whether compensation plans

satisfy section 503(c)(3) of the Bankruptcy Code, courts generally analyze the following factors:

     a.     Whether there is a reasonable relationship between the plan proposed and the results to be obtained (*i.e.*, whether the key employee will stay for as long as it takes for the debtor to reorganize or market its assets, or whether the plan is calculated to achieve the desired performance);

b.    Whether the cost of the plan is reasonable within the context of the debtor's assets, liabilities, and earning potential;

c.    Whether the scope of the plan is fair and reasonable or discriminates unfairly;

d.    Whether the plan is consistent with industry standards;

e.    Whether the debtor engaged in due diligence related to the need for the plan, the employees that needed to be incentivized, and what types of plans are generally applicable in a particular industry; and

f.    Whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

*See In re Dana Corp.*, 358 B.R. at 576-77.

A.    **The KEIP Satisfies the Foregoing Factors.**

50.    The proposed KEIP satisfies the *Dana II* factors.  First, there is a reasonable relationship between the proposed KEIP and the results to be obtained—namely increasing profitability, liquidity, and distributable value.  Tested recurring EBITDA provides an overall measure of the Debtors' financial and operational health and profitability, and as a metric that parties often look to in determining enterprise value, can drive increased valuation.  Caruso Declaration at ¶ 12.  Operating net cash flow provides a recognized measure of liquidity, which impacts whether or not the Debtors may need to incur additional postpetition financing, and captures working capital challenges that the Debtors will have to address.  Caruso Declaration at ¶ 14.  Tested net sales provides a measure of the Debtors' ability to execute on sales and reach demand in the market for their products, while taking the costs of such sales (*e.g.* discounts and other customer programs and refunds) into account to prevent excessive discounting in order to increase sales.  Caruso Declaration at ¶ 19.  No payments will be made if the threshold goals are not satisfied.  KEIP Participants can receive payments under the proposed KEIP only upon attaining performance levels that will contribute toward returns for the Debtors' creditors and a

successful reorganization.  Thus, the size of any earned KEIP award is directly linked to creditor recovery.  This incentive structure appropriately aligns KEIP Participant incentives with the end goal of maximizing the value achieved by the Debtors' creditors at the conclusion of these Chapter 11 Cases.

51.     Second, the cost of the KEIP is reasonable.  The cost of the KEIP resulted from careful planning by the Restructuring Committee and the Debtors' advisors, followed by difficult, arm's-length negotiations with the Debtors' secured lenders and careful consideration of the Debtors' budget.  As discussed above, WTW's analysis concluded that the KEIP is appropriate and falls within the range of court-approved KEIPs, as applicable, when compared against (a) the KEIP Participants' prepetition total target compensation, (b) market compensation for similar roles at comparable companies, and (c) amounts paid to KEIP participants as part of a court-approved KEIP plus any prepaid retention bonuses by similarly-sized comparable companies.  Friske Declaration at ¶¶ 22, 26-29.

52.     Third, the scope of the KEIP is fair and reasonable.  Upon consultation with their advisors, the Debtors selected the participants in the KEIP based on their positions, budgetary authority, managerial authority reporting structure, increased responsibilities, and historic eligibility for incentive-based compensation.  As discussed in detail above, each of the KEIP Participants provides necessary services to the Debtors' businesses, and plays a key role in driving the Debtors' overall operational and financial performance.  Providing performance-based award opportunities to the KEIP Participants, on the terms contemplated by the KEIP, aligns these employees' incentives with the Company's operational goals.

53.     Fourth, the KEIP is consistent with industry practice.  In developing the KEIP, WTW conducted a thorough analysis based on market data for companies of comparable size to

conclude that the proposed KEIP was an appropriate compensation structure for the KEIP Participants. Friske Declaration at ¶¶ 19-22, 26-29. Moreover, the Debtors, A&M, and WTW carefully considered the design of other debtors' incentive plans, including alternatives for performance metrics, and concluded that the metrics set by the proposed KEIP are appropriate. Lastly, WTW compared the cost of the awards under the KEIP against the KEIP Peer Group, and compared the total target compensation that would be received by the KEIP Participants if the KEIP is approved with market compensation for comparable positions. These analyses all concluded that the KEIP is reasonable based on the facts and circumstances of these Chapter 11 Cases. Friske Declaration at ¶ 18.

54.    Fifth, the Debtors performed considerable due diligence in formulating the KEIP. In developing the KEIP, the Debtors, in consultation with their advisors, considered the Debtors' prepetition compensation programs, the key drivers of the Debtors' successful restructuring, the critical functions of the KEIP Participants, and the increased workload required by these employees due to these bankruptcy cases. Friske Declaration; Beattie Declaration; Caruso Declaration. Additionally, A&M and WTW conducted a thorough analysis of the proposed metrics. Friske Declaration at ¶¶ 19-21; Caruso Declaration. Through their analysis, A&M found that the operating metrics for KEIP Participants represented an appropriately challenging incentive that was reasonably calculated to achieve the desired performance. Caruso Declaration at ¶¶ 21-28. Based on these analyses, the Debtors' advisors concluded that the proposed KEIP terms, compensation levels, and operating metrics were reasonable and support critical restructuring objectives.

55.    Sixth, the Debtors received independent counsel in developing the KEIP, obtained input from key creditor constituencies, and modified the KEIP to address concerns raised by

creditors.  The Debtors received the advice of each of WTW, A&M, and Paul, Weiss, Rifkind, Wharton & Garrison LLP in developing the KEIP, as discussed in detail above.  The Debtors have also shared information regarding the KEIP with the Ad Hoc Group of BrandCo Lenders and the Committee and engaged in negotiations with them.  As a result of negotiations with the Ad Hoc Group of BrandCo Lenders and the Committee, the Debtors agreed to:  (a) reduce the aggregate threshold, target, and maximum award amounts under the KEIP; (b) eliminate maximum payouts for the third and fourth quarters of 2022; (c) include a clawback in the event that a participant leaves (other than pursuant to limited good reason provisions, as applicable) or is terminated for cause prior to the earlier of (i) the confirmation date of any plan confirmed in these Chapter 11 Cases, and (ii) December 31, 2023; (d) include the tested net sales metric weighted at 10%; (e) reduce the tested cumulative operating net cash flow metric weighting from 40% to 30%; (f) remove a sale component of the program; (g) increase the threshold and maximum performance metrics from 80-88% and 115% to 90% and 120%, respectively; and (h) set the performance targets for the 2023 year based on the higher of the 2023 Business Plan or the DIP Business Plan. Beattie Declaration at ¶ 6.  The terms of the proposed KEIP are a result of this active dialogue between the Debtors, their advisors, and their key stakeholders, and as of the date hereof, both the Committee and the Ad Hoc Group of BrandCo Lenders support approval of the KEIP.  Because of this open engagement, the Debtors believe that the interests of their estates have been adequately protected and that the KEIP is justified by the facts and circumstances of these Chapter 11 Cases.

56.    The KEIP was designed following extensive input from, analysis by, and dialogue between the Company, WTW, A&M, and the Debtors' lenders to determine the necessity for a KEIP for the Debtors to remain competitive in the talent market, and to determine the appropriate metrics and compensation levels to incentivize the KEIP Participants to enhance the Debtors'

business performance.  The result of these analyses are that the proposed KEIP is properly designed

to compensate the KEIP Participants, and its metrics are directly linked to inputs that will

determine creditor recoveries.  Accordingly, the KEIP is justified by the facts and circumstances

in these Chapter 11 Cases and, thus, meets the standards of section 503(c)(3), and courts in this

district and elsewhere have routinely granted relief with respect to performance-based incentive

programs similar to that requested herein.  *See, e.g.*, *In re Frontier Comm'ns Corp.*, No. 20-22476

(RDD) (Bankr. S.D.N.Y. July 17, 2020) (approving a performance-based incentive program for

eight insider employees with a maximum total cost of approximately $16.1 million and a duration

of 12 months); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. June 30, 2020) (approving

a performance-based incentive program for six insider employees with a maximum total cost of

over $11.4 million and a duration of 9 months); *In re McDermott International, Inc.*, No. 20-31336

(DRJ) (Bankr. S.D. Tex. Feb. 24, 2020) (approving a performance-based incentive program for

thirteen employees with a maximum total cost of approximately $26.8 million and a duration of

12 months); *In re Windstream Holdings, Inc.* No. 19-22312 (RDD) (Bankr. S.D.N.Y. Jan. 21,

2020) (approving a performance-based incentive program for five employees with maximum total

cost of approximately $18.9 million and a duration of 12 months); *In re Windstream Holdings, Inc.*

No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 15, 2019) (approving a performance-based incentive

program for five employees with maximum total cost of over $17.6 million and a duration of 12

months); *In re iHeartMedia, Inc.*, No. 18-31274 (MI) (Bankr. S.D. Tex. Dec. 17, 2018) (approving

a performance-based incentive plan for 11 insider employees with a maximum total cost of

approximately $33.2 million and a duration of 12 months); *In re iHeartMedia, Inc.*, No. 18-31274

(MI) (Bankr. S.D. Tex. June 19, 2018) (approving a performance-based incentive plan for 11 insider

employees with a maximum total cost of approximately $24.9 million and a duration of 9 months).

**Waiver of Bankruptcy Rule 6004(h)**

57.     To implement the foregoing successfully, the Debtors request that the Court enter

an order providing that the Debtors have established cause to exclude the relief sought hereunder

from the 14-day stay period under Bankruptcy Rule 6004(h).

**Reservation of Rights**

58.     Nothing contained in this motion or any order granting the relief requested in this

motion, and no action taken pursuant to such relief requested or granted (including any payment

made in accordance with any such order), is intended as or should be construed or deemed to be:

(a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the

Bankruptcy Code or other applicable nonbankruptcy law, (b) a waiver of the Debtors' or any other

party in interest's right to dispute any claim on any grounds, (c) a promise or requirement to pay

any particular claim, (d) an implication, admission or finding that any particular claim is an

administrative expense claim, other priority claim or otherwise of a type specified or defined in

this motion or any order granting the relief requested by this motion, (e) a request or authorization

to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the

Bankruptcy Code, (f) an admission as to the validity, priority, enforceability or perfection of any

lien on, security interest in, or other encumbrance on property of the Debtors' estates, or (g) a

waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party

in interest against any person or entity under the Bankruptcy Code or any other applicable law.

**Notice**

59.     The Debtors will provide notice of this motion to: (a) the Office of the United States

Trustee for the Southern District of New York; (b) Proskauer Rose LLP, as counsel to MidCap

Funding IV Trust, in its capacity as (i) administrative agent and collateral agent under the Debtors'

prepetition asset-based lending facility, (ii) administrative agent and collateral agent under the

ABL DIP Facility, and (iii) ABL DIP Lender; (c) Morgan Lewis & Bockius LLP, as counsel to Crystal Financial LLC, in its capacity as administrative agent for the SISO Term Loan; (d) Alter Domus, in its capacity as administrative agent for the Tranche B; (e) Latham & Watkins, LLP, as counsel to Citibank N.A., in its capacity as 2016 Term Loan Agent; (f) Quinn Emanuel Urquhart & Sullivan, LLP, in its capacity as counsel to the putative 2016 Term Loan group; (g) Akin Gump Strauss Hauer & Feld, LLP, in its capacity as counsel to an ad hoc group of 2016 Term Loan lenders; (h) Paul Hastings LLP, as counsel to Jefferies Finance LLC, in its capacity as BrandCo agent and DIP agent; (i) Davis Polk & Wardwell LLP and Kobre & Kim LLP, in their capacity as counsel to the Ad Hoc Group of BrandCo Lenders; (j) U.S. Bank National Association, as indenture trustee for the Debtors' pre-petition unsecured notes, and any counsel thereto; (k) Brown Rudnick LLP, as counsel to the Committee; (l) the United States Attorney's Office for the Southern District of New York; (m) the Internal Revenue Service; (n) the Securities Exchange Commission; (o) the attorneys general for the states in which the Debtors operate; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

60.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

61.    WHEREFORE, the Debtors respectfully request entry of the KEIP Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

New York, New York
Dated:  August 11, 2022

/s/ *Robert A. Britton*
Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| REVLON, INC., *et al.*,[1] | ) Case No. 22-10760 (DSJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

### ORDER APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), approving the Debtors' key employee incentive plan (the "KEIP"), as more fully set forth in the Motion; and upon the Friske Declaration, the Caruso Declaration, and the Beattie Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases

---

[1]    The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

[2]    Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The KEIP is hereby approved in its entirety pursuant to sections 503(c)(3) and 363(b) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, to implement the KEIP on the terms and conditions set forth in the Motion and the KEIP Declarations, and to make the payments contemplated thereunder at the times specified in the Motion and the KEIP Declarations.

4.      The Debtors are authorized, but not directed, to pay all processing, administrative, and other fees associated with, and all costs and expenses incidental to, payments under the KEIP.

5.      With the exception of payments made to the current Chief Financial Officer for the third quarter of 2022, KEIP Participants must pay back 50% of any awards received under the KEIP, and in the case of the Chief Executive Officer, 100% of any awards received under the KEIP, if such KEIP Participant's employment is terminated prior to the earlier of (a) the confirmation date of any plan confirmed in these Chapter 11 Cases, and (b) December 31, 2023, in each case for any reason other than termination by the Debtors without cause, by the KEIP Participant pursuant to limited good reason provisions, as applicable, or due to death or disability.

6.      Any objection, reservation of rights, and/or other statement with respect to the Motion not resolved by the Debtors is hereby overruled on the merits.

7.      The Debtors may add a replacement participant(s) to the KEIP upon the resignation or the termination of any KEIP Participant.  Any replacement participants shall have substantially similar job functions as the departing KEIP Participant and such replacement participants shall not

be relatives of insiders without (a) approval of the Committee and the Ad Hoc Group of BrandCo Lenders, or (b) further Court order.

8.    The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

9.    Notwithstanding anything to the contrary in this Order, nothing contained in the Motion or this Order, and no action taken pursuant to such relief requested or granted (including any payment made in accordance with this Order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor, under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in the Motion or this Order; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  The rights of all parties in interest are expressly reserved.

10.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

11.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

12.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

13.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

New York, New York
Dated: _____, 2022

_____
THE HONORABLE DAVID S. JONES
UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**KEIP Performance Metrics**

The tested recurring EBITDA threshold, target, and maximum performance metrics for the 2022 performance periods are as follows:

| | Incentive Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | Thres. | Target | Max | Thres. | Target | Max |
| Q3 2022 | 37.7 | $41.9 | N/A | 90% | 100% | N/A |
| Q4 2022 | 109.4 | 121.6 | N/A | 90% | 100% | N/A |
| **H2 2022** | **147.1** | **163.5** | **N/A** | **90%** | **100%** | **N/A** |

The tested recurring EBITDA targets for 2023 derived from the DIP Business Plan, which will act as a floor for the 2023 KEIP metrics, are:

| | Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | Thres. | Target | Max | Thres. | Target | Max |
| Q1 2023 | 49.6 | 55.1 | 66.2 | 90% | 100% | 120% |
| Q2 2023 | 64.5 | 71.7 | 86.0 | 90% | 100% | 120% |
| Q3 2023 | 67.8 | 75.3 | 90.4 | 90% | 100% | 120% |
| Q4 2023 | 131.8 | 146.4 | 175.7 | 90% | 100% | 120% |
| **FY 2023** | **313.7** | **348.6** | **418.3** | **90%** | **100%** | **120%** |

The tested cumulative operating net cash flow threshold, target, and maximum performance metrics for the 2022 performance periods are as follows:

| | Incentive Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | Thres. | Target | Max | Thres. | Target | Max |
| Q3 2022 | (261.9) | (238.1) | N/A | 90% | 100% | N/A |
| Q4 2022 | 20.6 | 22.9 | N/A | 90% | 100% | N/A |

The tested cumulative operating net cash flow targets for 2023 derived from the DIP Business Plan, which will act as a floor for the 2023 KEIP metrics, are:

| | Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | Thres. | Target | Max | Thres. | Target | Max |
| Q1 2023 | 55.3 | 61.5 | 73.8 | 90% | 100% | 120% |
| Q2 2023 | 88.5 | 98.3 | 117.9 | 90% | 100% | 120% |
| Q3 2023 | 188.1 | 209.0 | 250.8 | 90% | 100% | 120% |
| Q4 2023 | 371.3 | 412.5 | 495.0 | 90% | 100% | 120% |

The tested net sales threshold, target, and maximum performance metrics for the 2022 performance periods are as follows:

| | Incentive Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | **Thres.** | **Target** | **Max** | **Thres.** | **Target** | **Max** |
| Q3 2022 | 418.7 | 465.3 | N/A | 90% | 100% | N/A |
| Q4 2022 | 582.4 | 647.1 | N/A | 90% | 100% | N/A |
| **H2 2022** | **1,001.1** | **1,112.4** | **N/A** | **90%** | **100%** | **N/A** |

The tested net sales targets for 2023 derived from the DIP Business Plan, which will act as a floor for the 2023 KEIP metrics, are:

| | Targets ($ in millions) | | | % of Target | | |
|---|---|---|---|---|---|---|
| | **Thres.** | **Target** | **Max** | **Thres.** | **Target** | **Max** |
| Q1 2023 | 435.8 | 484.3 | 581.1 | 90% | 100% | 120% |
| Q2 2023 | 441.4 | 490.5 | 588.6 | 90% | 100% | 120% |
| Q3 2023 | 465.7 | 517.5 | 620.9 | 90% | 100% | 120% |
| Q4 2023 | 632.2 | 702.4 | 842.9 | 90% | 100% | 120% |
| **FY 2023** | **1,975.1** | **2,194.6** | **2,633.5** | **90%** | **100%** | **120%** |