Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| REVLON, INC., *et al.*,[1] | ) | Case No. 22-10760 (DSJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' OBJECTION TO THE MOTION OF THE AD HOC GROUP OF NON-INSIDER REVLON, INC. SHAREHOLDERS FOR ENTRY OF AN ORDER DIRECTING THE UNITED STATES TRUSTEE TO APPOINT AN OFFICIAL EQUITY COMMITTEE**

---

[1] The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955. Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/Revlon. The location of the Debtors' service address for purposes of these Chapter 11 Cases is: One New York Plaza, New York, NY 10004.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 5

ARGUMENT ............................................................................................................. 6

   I.    The Ad Hoc Equity Committee Does Not Meet Its Burden to  Establish
That an Official Equity Committee Is Necessary ..................................... 6

   II.   The Motion Fails to  Establish That an  Official Committee Is Necessary
for Adequate Representation of Shareholder Interests ........................... 9

      A.    Shareholder Interests Are Adequately Represented by  Revlon,
Inc.'s Board of Directors and the Debtors' Management Team ................ 9

      B.    Shareholder Interests Are Adequately Represented by  the Ad Hoc
Equity Committee ................................................................... 12

      C.    Shareholder Interests Are Adequately Represented by  MAFCO ............ 13

      D.    Shareholder Interests Are Aligned with  the Creditors' Committee......... 14

      E.    Shareholder Interests Are Aligned with  the 2016 Lenders ..................... 15

      F.    The Ad Hoc Equity Committee Fails to  Identify Any Issues It Is
Uniquely Situated to  Address ................................................. 16

   III.   The Motion Fails to  Establish a  Substantial Likelihood of a  Meaningful
Distribution to Equity Holders ............................................................. 18

   IV.   Other Factors Weigh Against Forming an Official Equity Committee at
This Time .............................................................................................. 21

      A.    The Other Factors Cited in the Motion Do Not Support
Appointment of an Official Equity Committee ....................................... 21

      B.    The Costs of an Official Equity Committee Are Not Justified ................ 22

      C.    Denial of the Motion Does Not Preclude Later Relief ............................ 23

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re All Island Truck Leasing Corp.*,
  546 B.R. 522 (Bankr. E.D.N.Y. 2016)......................................................................7

*In re Allied Holdings*, *Inc.*,
  No. 05-12515 (CRM), 2007 WL 7138349 (Bankr. N.D. Ga. Mar. 13, 2007).........13

*In re Beker Indus. Corp.*,
  55 B.R. 945 (Bankr. S.D.N.Y. 1985)......................................................................22

*Commodity Futures Trading Comm'n v. Weintraub*,
  471 U.S. 343 (1985)................................................................................................10

*In re Dana Corp.*,
  344 B.R. 35 (Bankr. S.D.N.Y. 2006)........................................................................6

*In re Eastman Kodak Co.*,
  No. 12-10202 ALG, 2012 WL 2501071 (Bankr. S.D.N.Y. 2012).................. *passim*

*In re Hertz. Corp, Second Modified Third Amended Joint Chapter 11 Plan of
  Reorganization of the Hertz Corporation and its Debtor Affiliates*,
  Case No. 20-11218 (MFW) (Bankr. D. Del. June 7, 2021)....................................24

*Iridium Operating LLC  v. Motorola, Inc.* (*In re Iridium Operating LLC*),
  373 B.R. 283, 332 (Bankr. S.D.N.Y. 2007).............................................................20

*In re Johns-Manville Corp.*,
  68 B.R. 155 (Bankr. S.D.N.Y. 1986)................................................................8, 22

*In re Leap Wireless Intern., Inc.*,
  295 B.R. 135 (Bankr. S.D. Cal. 2003)....................................................................20

*In re Northwestern Corp.*,
  No. 03-12872 (CGC), 2004 WL 1077913 (Bankr. D. Del. May 13, 2004)............19

*In re Oneida Ltd.*,
  No. 06-10489 (ALG), 2006 WL 1288576 (Bankr. S.D.N.Y. May 4, 2006)...............6, 7, 8, 12

*In re Penn Dixie Indus.*,
  9 B.R. 941 (Bankr. S.D.N.Y. 1981).................................................................8, 22

*In re Residential Capital, LLC*,
  480 B.R. 550 (Bankr. S.D.N.Y. 2012)......................................................................8

*In re Spansion, Inc.*,
    421 B.R. 151 (Bankr. D. Del. 2009) ...................................................................10, 13, 18, 22

*In re SunEdison, Inc.*,
    556 B.R. 94 (Bankr. S.D.N.Y. 2016) ............................................................... *passim*

*In re Texaco Inc.*,
    79 B.R. 560 (Bankr. S.D.N.Y. 1987) ......................................................................7

*VFB LLC* v. *Campbell Soup Co.*,
    2005 WL 2234606 at *26 (D. Del. Sept. 13, 2005) ................................................20

*Victor* v. *Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*,
    No. 95-1354 (PJW), 1996 WL 534853 (D. Del. Sept. 17, 1996) ...........................10

*In re Williams Commc'ns Grp.*,
    281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) ................................................... *passim*

## Statutes

11 U.S.C. § 502(a) .........................................................................................................17

11 U.S.C. § 503(b) .......................................................................................................4, 23

## Other Authorities

7 COLLIER ON BANKR. ¶ 1102.03[2][a] (16th ed.) .........................................................19

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
hereby submit this objection (the "Objection") to the motion of an ad hoc group of Revlon
shareholders (the "Ad Hoc Equity Committee"), filed on August 9, 2022 [Docket No. 348]
(the "Motion"), seeking an order directing appointment of an official committee of equity security
holders (an "Official Equity Committee") in these chapter 11 cases pursuant to section 1102(a)(2)
of Title 11 of the United States Code (the "Bankruptcy Code").  In support of this Objection, the
Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[1]

1.      Over a month ago, the Ad Hoc Equity Committee (which, at the time, held less than
two percent of Revlon's common shares) asked the United States Trustee to appoint an Official
Equity Committee.[2]  The U.S. Trustee declined.  Now, the Ad Hoc Equity Committee (which,
having sold nearly two-thirds of its Revlon shares in the past month, now holds less than one
percent of outstanding common shares) comes to this Court with the same request, arguing that
without the "imprimatur of official committee status," equity holders cannot meaningfully
participate in these Chapter 11 Cases "without disadvantage" and will suffer from "de facto
exclusion."  (Mot. ¶ 6.)  But simply desiring "official committee status" is not a sufficient basis
for appointing an Official Equity Committee.  Rather, court-directed appointment of an Official
Equity Committee is "extraordinary relief" and is only granted in instances in which such

---

[1]    Capitalized terms used but not defined herein will have the same meaning as in the First Day Declaration (as
defined below) or the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use
Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting
Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting
Related Relief* [Docket No. 330], as appropriate.

[2]    The Ad Hoc Equity Committee did so by submitting a nine-page letter to the U.S. Trustee (the "Letter") that
included factual and legal argument in favor of appointing an Official Equity Committee.  The Ad Hoc Committee
Letter is attached as Exhibit B to the Motion.

1

appointment is ***necessary*** to protect the interests of equity holders, not simply where such appointment may be "useful or appropriate." *In re SunEdison, Inc.*, 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016). Here, appointment of an Official Equity Committee is neither necessary nor even useful or appropriate. Accordingly, the Court should deny the Motion.

2.      Precedent and practice amply justify this conclusion. Caselaw instructs that the appointment of an equity committee should be rare, and only done in the exceptional circumstance where a movant can demonstrate ***both*** that (i) appointment of an equity committee is ***necessary***— not just useful—to adequately represent shareholders' interests ***and*** (ii) there is a substantial likelihood that equity holders will receive a meaningful distribution in the bankruptcy case. The Ad Hoc Equity Committee fails to carry its burden. This is not the rare case that justifies appointment of an Official Equity Committee for the following reasons (among many others).

3.      *First*, these Chapter 11 Cases include numerous well-funded parties with sophisticated counsel who either will directly represent the interests of equity holders or whose interests are aligned with shareholders' interests (and, thus, whose advocacy will benefit shareholders). Consider the following constituencies:

- the Debtors, with a fiduciary duty to maximize the value of their estates for the benefit of *all* stakeholders;

- the Ad Hoc Equity Committee itself, which purports to represent minority equity holders alone and has retained sophisticated bankruptcy counsel that has filed the Motion and already participated in these Chapter 11 Cases;

- MacAndrews and Forbes ("MAFCO"), the Debtors' majority (85%) equity holder, which is ably represented and clearly incentivized to maximize equity value;

- the Creditors' Committee, whose constituencies have a general alignment of interest with shareholders in seeking to maximize the value of the Debtors' estates for junior stakeholders, including investigating the very claims that the Ad Hoc Equity Committee raises in its Motion; and

- the 2016 Lenders (as defined below), whose interests align with shareholders insofar as they intend to carefully scrutinize certain of the claims raised in the Motion.

4.      *Second*, the Ad Hoc Equity Committee has not carried its burden to show that there is a substantial likelihood of a meaningful recovery for equity holders in these Chapter 11 Cases. The Ad Hoc Equity Committee merely points to the Debtors' current stock price and suggests that it means the Debtors have significant equity value.  While the Debtors have not come to a definitive view on reorganization value, it is abundantly clear that the Ad Hoc Equity Committee fails to consider other available market indications.  In this vein, the Debtors' unsecured notes—entitled to recover in full before equity under the absolute priority rule—are currently trading for as little as ten cents on the dollar, implying the opposite of the Ad Hoc Equity Committee's conclusion. The Ad Hoc Equity Committee makes no effort whatsoever to explain why this Court should disregard the market value of the Debtors' *debt* securities—as the Motion does completely—when examining Revlon's enterprise value, while crediting the Debtors' stock price without question. The burden is on the Ad Hoc Equity Committee to show a "substantial likelihood" of a "meaningful" recovery for equity, and it fails to carry it.

5.      *Third*, the other factors considered by courts when evaluating the appointment of equity committees also weigh against appointment of an Official Equity Committee.  Contrary to the Ad Hoc Equity Committee's assertions, the Debtors' common shares are not "widely held" (an

overwhelming majority of all common shares are held by one party, MAFCO), the complexity of these Chapter 11 Cases alone is not a sufficient basis upon which to appoint an Official Equity Committee, and the undoubtedly significant costs of an Official Equity Committee greatly outweigh any speculative benefit. As noted above, equity holders' interests run parallel with the interests of numerous other constituencies, many of which have counsel (and other professionals) already being paid for by the estates. To burden the estates with yet more professional fees would harm, not help, the constituents that the Ad Hoc Equity Committee purports to speak for.

6.     *Fourth*, because MAFCO holds the majority of all common shares, the Ad Hoc Equity Committee seeks an Official Equity Committee that would represent *minority shareholders*, but they fail to cite to any precedent for appointing a committee that would only look out for the interests of *some* shareholders. Rather, an Official Equity Committee would owe fiduciary duties to *all shareholders*, meaning that MAFCO would be the single largest beneficiary of its efforts.

7.     The Debtors submit that, instead of appointing an Official Equity Committee, the appropriate course, and the common approach in the Southern District, is to deny the Motion while allowing the Ad Hoc Equity Committee to continue participating in these Chapter 11 Cases as an ad hoc group, and leave to a later date whether their efforts are deserving of compensation under section 503(b) of the Bankruptcy Code. This Court should not presume now that an Official Equity Committee will make a "substantial contribution" to the Chapter 11 Cases or, as the Ad Hoc Equity Committee asserts, that any fees paid to advisors of an Official Equity Committee will be borne solely by equity holders (an assertion premised on a premature assumption that all creditors will be paid in full). Should those situations come to pass, this Court can then consider whether it is appropriate to burden the estates with the Ad Hoc Equity Committee's professional fees.

## BACKGROUND

8.     On June 15, 2022 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the instant cases (the "Chapter 11 Cases").  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

9.     No trustee or examiner has been appointed in the Chapter 11 Cases.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Bankruptcy Rules.   On June 24, 2022, the U.S. Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 121].

10.     Information regarding the Debtors' businesses, their capital and debt structure, and the events leading to the filing of the Chapter 11 Cases is contained in the *Declaration of Robert M. Caruso, Chief Restructuring Officer, (I) in Support of First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2* (the "First Day Declaration") [Docket No. 30].

11.     On July 12, 2022, the Ad Hoc Equity Committee submitted the Letter to the U.S. Trustee seeking the appointment of an Official Equity Committee.  At the invitation of the U.S. Trustee, the Debtors and the Creditors' Committee each advised the U.S. Trustee of their opposition to such formation. A copy of the Debtors' letter is attached hereto as Exhibit A.  On July 25, 2022, the U.S. Trustee officially declined to appoint an Official Equity Committee.  The Ad Hoc Equity Committee filed this Motion approximately two weeks later.

## ARGUMENT

### I.    The Ad Hoc Equity Committee Does Not Meet Its Burden to  Establish That an Official Equity Committee Is Necessary

12.    Caselaw instructs that the appointment of an official equity committee is the rare exception, as it is a disfavored and unusual remedy.  *See SunEdison*, 556 B.R. at 103 ("The appointment of official equity committees should be the rare exception.") (citing *In re Williams Commc'ns Grp.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002)); *see also In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071 at *2 (Bankr. S.D.N.Y. 2012) ("[T]here appears to be uniform recognition that such an appointment constitutes extraordinary relief and is the exception rather than the rule in chapter 11 cases."); *In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) ("The appointment of an additional committee under section 1102(a)(2) is considered 'extraordinary relief.'").  Court-directed appointment of official committees is governed by section 1102(a)(2), which provides in part that "[o]n request of a party in interest, the court may order the appointment of additional committee of creditors or equity security holders *if necessary to assure adequate representation* of creditors or equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added).  Courts have consistently held that this is an extremely high standard, "far more onerous than if the statue merely provided that a committee be useful."  *SunEdison*, 556 B.R. at 103 (citing *Eastman Kodak*, 2012 WL 2501071 at *2); *In re Oneida Ltd.*, No. 06-10489 (ALG), 2006 WL 1288576 at *1 (Bankr. S.D.N.Y. May 4, 2006).

13.    To meet this heavy burden, a movant seeking appointment of an official equity committee carries the burden to establish ***both*** that: (i) there is a "substantial likelihood" equity holders will receive a "meaningful distribution" in the case under a strict application of the absolute priority rule, ***and*** (ii) equity holders are unable to represent their interests in the bankruptcy case without an official committee. *Williams*, 281 B.R. at 223.  "The second factor is critical because,

6

in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interests without an official committee," typically, through individual representation or through an ad hoc committee.  *Id.*

14.    While a court's review of a U.S. Trustee's determination declining to appoint an Official Equity Committee is *de novo*, courts give "due consideration . . . to the views of the U.S. Trustee."  *Oneida*, 2006 WL 1288576 at *1; *In re Texaco Inc.*, 79 B.R. 560, 566 (Bankr. S.D.N.Y. 1987); *Eastman Kodak*, 2013 WL4413300 at *1 (Bankr. S.D.N.Y. 2013); 7 COLLIER ON BANKRUPTCY ¶ 1102.07 (16th ed. 2022) ("While the court is empowered to overrule the decision of the United States trustee not to appoint an additional committee, *the court should afford some deference to that decision*.") (emphasis added).  The U.S. Trustee, of course, "is charged with protecting the integrity of the bankruptcy system," *In re All Island Truck Leasing Corp.*, 546 B.R. 522, 525 (Bankr. E.D.N.Y. 2016) and is hardly a partisan for the Debtors, their management, or any particular stakeholder.  The U.S. Trustee rejected the Ad Hoc Committee's request less than one month ago, and the Ad Hoc Equity Committee has not identified any fact or circumstance that has changed.  Nothing *has* changed; an Official Equity Committee remains unnecessary.

15.    As detailed in Sections II and III below, the interests of equity holders are *well*-represented by several constituencies in these Chapter 11 Cases that have parallel interests, and the Ad Hoc Equity Committee fails to establish that there is a "substantial likelihood" that equity holders will receive a "meaningful distribution" in these cases under a strict application of the absolute priority rule.  As such, the Motion fails to establish the two foundational requirements under *Williams* for court-directed appointment of an Official Equity Committee.  Moreover, as

detailed in <u>Section IV</u>, several other factors weigh against the court-directed appointment of an Official Equity Committee.

16.    The unique facts of this case—in particular, MAFCO's ownership of a majority of all common shares—raises an additional flaw in the Motion.  An Official Equity Committee must be a fiduciary for *all* equity holders.  *In re Johns-Manville Corp.*, 68 B.R. 155, 160 (Bankr. S.D.N.Y. 1986) ("An equity committee has a fiduciary responsibility to equity holders"); *Oneida, Ltd*, 2006 W.L. 1288576 at *3 (same).  To this end, "committee members, individually and as a group," owe loyalty to "shareholders as a whole as opposed to dissident factions or particular classes or interests[.]"  *In re Penn Dixie Indus.*, 9 B.R. 941, 943 (Bankr. S.D.N.Y. 1981).  Here, the Ad Hoc Equity Committee attempts to justify its request on the ground that "*minority stockholders* require representation in these cases through an Official Equity Committee."  (Mot. ¶ 43 (emphasis added)).[3]  But there is no such thing as an official committee of *minority* equity holders.  Statutory committees, like an Official Equity Committee, must guide their actions so as to safeguard as much as possible "the rights of minority *as well as majority*" holders.  *In re Residential Capital, LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012) (emphasis added).  Acting as de facto counsel for individual minority shareholders, as the movants propose,  would "be an impermissible role for an official committee."  *Id.*  Thus, the overwhelming beneficiary of an Official Equity Committee would be MAFCO, which owns a majority of the Debtors' common shares and which is already represented in these Chapter 11 Cases.  *See Notice of Appearance* [Docket No. 123] (providing notice of Wachtell, Lipton, Rosen & Katz's appearance on behalf of MAFCO)  The question before the Court is whether *all shareholders*—not just *minority*

---

[3]    *See also id.* at ¶ 47 ("appointment of an Official Equity Committee [is necessary] so that the rights of existing minority shareholders are protected"); Letter at 4 (there is a "need for an Equity Committee to look out for the interests of minority shareholders [who] need a fiduciary").

*shareholders*—are adequately represented in those Chapter 11 Cases. As set forth below, shareholder interests are already adequately represented in these cases.

17.     Accordingly, for these reasons and those that follow, the Court should deny the Motion.

## II.    The Motion Fails to Establish That an Official Committee Is Necessary for Adequate Representation of Shareholder Interests

18.     The Ad Hoc Equity Committee bears the burden of establishing that an Official Equity Committee is "'*necessary*' to adequately represent equity's interests, 'a high standard that is far more onerous than if the statute merely provided that a committee be useful or appropriate.'" *In re SunEdison*, 556 B.R. at 103 (quoting *Eastman Kodak*, 2012 WL 2501071 at *2) (emphasis added). The focus is not on "whether the shareholders are 'exclusively' represented, but whether they are 'adequately' represented." *Williams*, 281 B.R. at 223 (internal citation omitted).

19.     The Ad Hoc Equity Committee argues in the Motion that *minority shareholders'* interests are not represented. To the contrary, *all* shareholder interests (including minority shareholder interests) are either directly represented by, or economically aligned with, at least *five* separate constituencies, as detailed below. Significantly, until the filing of a plan of reorganization, "[a]ll the other constituencies in [a chapter 11] case have the same goals as a [would-be] shareholders' committee—to maximize the value of the estate." *Eastman Kodak*, 2012 WL 2501071 at *2. Effective representation by any *one* of these constituencies is sufficient to defeat the Motion. Taken together, it is overwhelmingly clear that the Ad Hoc Equity Committee cannot meet its heavy burden.

### A.    Shareholder Interests Are Adequately Represented by Revlon, Inc.'s Board of Directors and the Debtors' Management Team

20.     The interests of equity holders (including minority equity holders) are already represented by the Board of Directors of Revlon, Inc. (the "<u>Board</u>") and the Debtors' management

9

team, each of which have fiduciary duties to maximize value for the benefit of the Debtors' estates as a whole. The focus on maximizing of value redounds to the benefit of creditors and equity holders alike. *See Commodity Futures Trading Comm'n* v. *Weintraub*, 471 U.S. 343, 355 (1985) (noting that "the fiduciary duty of the trustee runs to shareholders as well as to creditors . . . if a debtor remains in possession . . . the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.") (internal citation omitted).

21.    The "usual presumption" is "that the Board will pay due (perhaps special) regard to the interests of shareholders." *Oneida Ltd*., WL 1288576 at *2. The existence of a functioning board of directors—as is the case here—"supports the inference that equity's interests will be adequately represented notwithstanding the absence of an official equity committee." *Eastman Kodak*, 2012 WL 2501071 at *2; *see also Victor* v. *Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*, No. 95-1354 (PJW), 1996 WL 534853 at *5 (D. Del. Sept. 17, 1996) (observing that equity holders seeking to form an equity committee had not provided any evidence that management was conflicted and "incapable of adequately representing non-insider shareholders"); *In re Spansion, Inc.*, 421 B.R. 151, 163 (Bankr. D. Del. 2009) ("It is expected that management would normally represent, among other interests, the interests of equity security holders.").

22.    In a misguided effort to show that the "usual presumption" that a debtor's board will adequately represent shareholder interests does not apply here, the Ad Hoc Equity Committee vaguely implies that the Board is somehow conflicted and therefore unable to properly discharge its duties. *First*, the Ad Hoc Equity Committee says that Mr. Perelman, who is the Chairman and CEO of MAFCO and also the Chairman of the Revlon Board, wears "different hats." (Mot. ¶ 5) But the Ad Hoc Equity Committee fails to explain how such "different hats" affect the Board's

ability to discharge its duties (to all stakeholders, including shareholders).    Mr. Perelman's presence on the board in no way inhibits the ability or willingness of the Board or management to honor their fiduciary responsibilities.

23.    *Second*, the Motion suggests, without any basis, that the chapter 11 process allows for a debtor's board and management to engage in self-interested behavior and collude with creditors at the expense of shareholders.  (*See* Mot. ¶¶ 41–43.)  But this is wrong.  In fact, as the legislative history cited by the Ad Hoc Equity Committee makes clear, the Bankruptcy Code was designed to build in "basic safeguards for public investors," without the need for an official equity committee in every case.  S. Rep. No. 95-989, at 9 (1978) reprinted in 1978 U.S.C.C.A.N. 5787, 5795.  Such features added by Congress in 1978 include the fair and equitable standard for plans of reorganization and special requirements for solicitation and acceptance of a plan by security holders.  *Id*.  These basic safeguards embedded in the Bankruptcy Code are designed to ensure a fair and equitable reorganization process for all constituencies.

24.    *Finally*, the Ad Hoc Equity Committee argues that the Board and management are unable to adequately represent equity holder interests because of purported factors that "may" incentivize the Debtors to engage with the Ad Hoc Group of BrandCo Lenders at the apparent expense of equity holders.  (*See* Mot. ¶ 43.)  In particular, the Ad Hoc Equity Committee suggests that the Board is somehow beholden to the Ad Hoc Group of BrandCo Lenders based on milestones and other provisions in the debtor in possession financing documentation (the "DIP Financing").  (*See id.* at ¶¶ 4, 43.)  To the contrary, the record at the final DIP hearing established that the DIP Financing was the product of a good-faith, arm's-length negotiation resulting in an agreement that is fair to all stakeholders.  Moreover, several other parties that are heavily invested in the outcome of this case, including, the Creditors' Committee, two different ad hoc groups of 2016 term loan

lenders (collectively, the "2016 Lenders"), and Citibank, N.A. ("Citibank"), are incentivized to ensure that the Debtors are not inappropriately "beholden" to the Ad Hoc Group of BrandCo Lenders.

25.    The Ad Hoc Equity Committee gets no further by pointing to *Oneida* as supposed precedent showing why the Board is unable to represent the interests of equity holders "in circumstances such as these." (*See* Mot. ¶ 46.)  The circumstances in *Oneida* are not even remotely similar to this case.  There, the debtors' board was controlled by the debtors' secured lenders, who had appointed six of the nine directors.  The company and those same lenders had proposed a plan that paid unsecured creditors *in full* while wiping out the equity.  The court therefore found that "under the unusual (perhaps unique) circumstances of this case," the "usual presumption that the Board will pay due" regard to shareholder interests was unrealistic, because the debtors were controlled by their lenders.  *Oneida*, 2006 WL 1288576 at *2.  Here, *none of the Debtors' lenders* (secured or unsecured) appointed any of the Board's directors.  Further, in *Oneida*, the court noted that, because the unsecured creditors were being paid in full under the terms of the prepackaged plan, there was *no* official committee of unsecured creditors, and therefore "the usual checks and balances [were] not present." *Id* at *3.  Here, the Creditors' Committee has already been appointed, has retained counsel and financial advisors, and has every incentive to maximize the value of the Debtors' estates.

### B. Shareholder Interests Are Adequately Represented by the Ad Hoc Equity Committee

26.    The Ad Hoc Equity Committee is currently represented by White & Case, LLP, which sent a nine-page letter to the United States Trustee, has attended many Court hearings, and filed the Motion.  "Given the quality of the legal talent" hired by the Ad Hoc Equity Committee, there is "no reason to conclude" that shareholder interests cannot be represented ably through an

unofficial, or *ad hoc*, committee. *See Eastman Kodak*, 2012 WL 2501071 at *3. The Ad Hoc Equity Committee "ha[s] already demonstrated their ability to organize and continue to participate in this case with skill and zeal . . ." *Williams*, 281 B.R. at 224.

27.    Indeed, "*in most cases*, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee" because they are able to participate through an ad hoc committee, as the Ad Hoc Equity Committee has already demonstrated here. *SunEdison*, 556 B.R. at 103 (citing *Williams*, 281 B.R. at 223) (emphasis added). Thus, as in "most cases," there "is no reason to conclude that [equity holders] cannot be represented ably through an unofficial, or *ad hoc*, committee." *Eastman Kodak*, 2012 WL 2501071 at *3.

28.    Contrary to its argument that it requires the "imprimatur" of official committee status to meaningfully participate in the Chapter 11 Cases "without disadvantage," (Mot. ¶ 6), the Ad Hoc Equity Committee appears to be "well organized, well represented by counsel, and adequate to the task of representing interests without 'official' status." *Spansion*, 421 B.R. at 163.

**C. Shareholder Interests Are Adequately Represented by MAFCO**

29.    As the Debtors' largest shareholder, MAFCO has every incentive to pursue value on behalf of all shareholders. In fact, insider shareholders are "just as interested in maintaining value as is the smallest public investor." *In re Allied Holdings*, *Inc.*, No. 05-12515 (CRM), 2007 WL 7138349 at *3 (Bankr. N.D. Ga. Mar. 13, 2007). Here, MAFCO has already demonstrated its intent to protect its equity interests by retaining sophisticated professional advisors—at its own expense—to ensure that equity interests are adequately represented. In other words, MAFCO is actively participating in the Chapter 11 Cases as a shareholder.

30.    As noted above, the Ad Hoc Equity Committee argues that MAFCO cannot represent the interests of shareholders due to the "many other hats" it purportedly wears in these

Chapter 11 Cases. (Mot. ¶ 45.) The assertion that MAFCO would not take every action reasonably necessary to preserve equity value, when it owns a majority of Revlon's outstanding equity, is irrational. The Ad Hoc Equity Committee's suggestion that MAFCO cannot adequately represent shareholder interests because some of its stock has been pledged as collateral for MAFCO's indebtedness is similarly baseless. Indeed, these allegations prove the opposite: if the pledged stock proves worthless, MAFCO's liability would *increase*, giving MAFCO extra incentive to maximize the value of Revlon's common stock in these Chapter 11 Cases. In short, vague, unfounded assertions of MAFCO's alternative interests are insufficient to support the appointment of an Official Equity Committee.

### D. Shareholder Interests Are Aligned with the Creditors' Committee

31.     Shareholder interests are closely aligned with those of the Creditors' Committee. Here, as in *Kodak*, the Creditors' Committee "has a duty to maximize value" of the Debtor's estates which will "inhere to the benefit of shareholders." *See Eastman Kodak*, 2012 WL 2501071 at *3; *see also SunEdison*, 566 B.R. at 103; *Williams*, 281 B.R. at 221-22. The Committee has already been appointed and has already retained sophisticated advisors. Thus, the presence and ongoing work of the Creditor's Committee further disproves the Ad Hoc Equity Committee's claims. *See SunEdison*, 566 B.R. at 103 (noting that an unsecured creditors committee "will 'adequately represent' any interest equity has in maximizing the value of the estate and insuring that it is properly managed"); *Williams*, 281 B.R. at 222 ("[T]he Creditors' Committee and Shareholders have similar interests with respect to investigation of [claims].").

32.     In attempting to minimize the role of the Creditors' Committee, and the obviously aligned interests it has in maximizing value, the Ad Hoc Equity Committee asserts—without any factual basis—that the Creditors' Committee would somehow "accept a strategy that provides the maximum recovery for its constituents in the short term" rather than "hold out for increased value

that inures to the benefit of equity holders over a longer period." (Mot. ¶ 44). This assertion is baseless: the Ad Hoc Equity Committee provides no evidence establishing a reasonable possibility that the Creditors' Committee could or would adopt positions or assert strategies that will provide for recoveries only through the unsecured creditor class, but nothing more. The Ad Hoc Equity Committee's argument presumes that matters of value and recovery can be precisely deployed by an estate fiduciary with a level of calculation that is belied by the complexity of these Chapter 11 Cases. The court in *Eastman Kodak* rejected precisely this argument:

> The shareholders wholly fail to support the position taken in their papers that the Creditors' Committee will cease to attempt to maximize value once the point is reached at which creditors will be paid in full—*as if it were possible to divine that point at this stage in the case*.

*See Eastman Kodak*, 2012 WL 2501071 at *3 (emphasis added). In its pursuit to maximize estate value to pay unsecured creditors in full, the Creditors' Committee will necessarily also be protecting the interests of equity holders who benefit from the Creditor' Committee's strategy to obtain the best outcome achievable. There is no basis to conclude that the Creditors' Committee's advocacy to maximize value will not also benefit equity holders.

### E. Shareholder Interests Are Aligned with the 2016 Lenders

33.    The two ad hoc groups comprising the 2016 Lenders made clear at the first day hearing that they are focused on some of the same issues that the Ad Hoc Equity Committee raises in its Motion, including the 2020 BrandCo transactions. It is of no relevance that the 2016 Lenders do not owe any fiduciary duties to equity, as the Ad Hoc Equity Committee argues. (Mot. ¶ 44.) The 2016 Lenders have expressly stated, on the record, a desire to investigate and bring potential challenges with respect to the 2020 BrandCo transactions. Accordingly, there is no reason for an additional official committee to be appointed to perform work that would be entirely duplicative.

15

### F. The Ad Hoc Equity Committee Fails to Identify Any Issues It Is Uniquely Situated to Address

34.     Given the number of constituencies actively participating in these Chapter 11 Cases, it is not surprising that the Ad Hoc Equity Committee fails to identify any issue that an Official Equity Committee would be uniquely and singularly incentivized to address. Indeed, other stakeholders with parallel interests are well suited to pursue each of the issues or potential sources of value raised by the Ad Hoc Equity Committee in its Motion.

35.     *First*, the Ad Hoc Equity Committee devotes particular attention to challenging the claims asserted by Citibank, which has alleged claims of equitable subrogation, and the Returning Lenders, which the Ad Hoc Equity Committee alleges had no obligation to return the Mistaken Payment, and therefore such return was a "gift." (*See* Mot. ¶¶ 29–34.) To be clear, this Motion is not the appropriate forum to address the merits of these claims. However, it is equally clear that these issues will be addressed *without* the appointment of an Official Equity Committee. The Ad Hoc Equity Committee argues that disallowing secured claims asserted under the 2016 Term Loan Credit Agreement "would minimize the secured claims of the Debtors and enhance recoveries for other *stakeholders*." (*Id*. at ¶ 34 (emphasis added).) Accepting that premise, the Debtors, the Creditors' Committee, certain 2016 Lenders, and MAFCO, among others, would all be equally incentivized to challenge such claims, provided that there is a colorable basis for doing so. The Ad Hoc Equity Committee fails to offer any argument whatsoever as to why an Official Equity Committee is necessary to pursue such challenges, and why such challenges would not be duplicative.

36.     *Second*, the Ad Hoc Equity Committee argues that disallowing certain claims related to the alleged use of talcum powder could result in increased equity value. (*Id*. at ¶ 35.) The Ad Hoc Equity Committee then insinuates that neither the Creditors' Committee (because two

16

of its members assert talc claims) nor the Debtors (solely because the claims were not discussed in the First Day Declaration) are able to adequately oppose these claims.  The Ad Hoc Committee's arguments amount to baseless conjecture:  a majority of members on the Creditors' Committee are not talc claimants, talc claims were not a primary driver of the Chapter 11 Cases, and the Debtors had no need to discuss such claims in the First Day Declaration.  While the Debtors take no position on the merits of such claims here, the Debtors, the Creditors' Committee, other unsecured creditors, and MAFCO are each incentivized (or, in the case of the Debtors and the Creditors Committee, duty-bound) to ensure that any meritless claims are disallowed.  Indeed, every party in interest has standing to object to claims, including any talc claims, filed against the Debtors in these Chapter 11 Cases.  *See* 11 U.S.C. § 502(a) (providing that a proof of claim is deemed allowed, "unless a party in interest" objects).  The suggestion that an Official Equity Committee is necessary to object to claims belies reality; there are many other constituencies with an economic interest in doing so, and the Ad Hoc Equity Committee is free to do so itself.

37.    *Finally*, the Ad Hoc Equity Committee suggests that an Official Equity Committee is necessary to push back against the Ad Hoc Group of BrandCo Lenders, who they claim "have significant control through the DIP's case controls, which may create incentives for the Debtors to align with the BrandCo lenders at the expense of equity."  (Mot. ¶ 4.)  As this Court is already aware, such concern is not lost on the Creditors' Committee or the 2016 Lenders, each of which have already indicated their intent to investigate, and potentially challenge, the Ad Hoc Group of BrandCo Lenders' claims.  Again, the Ad Hoc Equity Committee provides no argument for why an Official Equity Committee is necessary to address these purported concerns, or how an Official Equity Committee's efforts would not be entirely duplicative of other stakeholders' efforts.

38.     In short, the Ad Hoc Equity Committee has not carried its burden of showing that an Official Equity Committee is *necessary* to ensure the *adequate* representation of shareholder interests.  Indeed, the Ad Hoc Equity Committee has failed to point to *any* issue that an Official Equity Committee would be uniquely or singularly suited to prosecute to maximize the value of the Debtors' estates.

### III.    The Motion Fails to Establish a Substantial Likelihood of a Meaningful Distribution to Equity Holders

39.     The second foundational showing that *Williams* requires for a court-directed appointment of an Official Equity Committee is a "substantial likelihood" that equity holders in these Chapter 11 Cases will receive a "meaningful distribution."  *See Williams*, 281 B.R. at 223; *Eastman Kodak*, 2012 WL 2501071 at *1.  The Ad Hoc Equity Committee fails to make this showing, and instead seeks to invent its own standard.

40.     The Ad Hoc Equity Committee repeatedly asserts that the relevant standard is whether a debtor appears to be "hopelessly insolvent."  (Mot.  ¶ 24.)  But this is wrong.  The Ad Hoc Equity Committee cites *Williams* for this proposition, but this citation is misleading: while the court in *Williams found* that the "Debtors appear to be hopelessly insolvent," *id*. at 220,[4] it *held* that an official equity committee "should not be appointed unless equity holders establish that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule."  *Id.* at 223.  This holding is consistent with substantial precedent, which requires the movant seeking appointment of an Official Equity Committee to demonstrate a "substantial likelihood" that shareholders will receive a meaningful recovery.  *See, e.g.*, *Eastman Kodak*, 2012 WL 2501071 at *4; *SunEdison*, 556 B.R. at 103 (citing *Williams*, 281 B.R. at 223); *In re Spansion,*

---

[4]     In so finding, the court denied appointment of an official equity committee.

*Inc.*, 421 B.R. at 156 (same) *In re Northwestern Corp.*, No. 03-12872 (CGC), 2004 WL 1077913 at *2 (Bankr. D. Del. May 13, 2004) (same).  If there is not a substantial likelihood of a meaningful recovery for equity holders, the appointment of an Official Equity Committee creates an unreasonable risk that the estates would "bear the expense of negotiating with an Equity Committee over what appears to be a gift." *SunEdison*, 556 B.R. at 102–03 (citing cases).[5]

41.    The Ad Hoc Equity Committee's attempt to rewrite the applicable standard should be denied.  It is not the Debtors' burden to show that they are hopelessly insolvent; rather, it is the Ad Hoc Equity Committee's burden to show a "substantial likelihood" that shareholders will receive a "meaningful distribution."

42.    Turning from the relevant standard to the facts, the Ad Hoc Equity Committee argues that "***all available*** market indications show that there is significant positive shareholder value." (Mot. 13 (emphasis added)).  Again, this is wrong: "all available" market indications do not indicate positive shareholder value.[6]  The Ad Hoc Equity Committee simply chooses to ignore contradictory information.  As can be seen on the historical debt pricing chart attached as Exhibit 1 to the *Declaration of Scott Mates in Support of the Debtors' Objection to the Motion of the Ad Hoc Group of Non-Insider Revlon, Inc. Shareholders for Entry of an Order Directing the United States Trustee to Appoint an Official Equity Committee*, filed contemporaneously herewith, several series of the Debtors' secured and unsecured debt securities have been trading at significant

---

[5]    The Ad Hoc Equity Committee's citation to *Collier* similarly misleads.  The Ad Hoc Equity Committee cites *Collier* for the proposition that if a debtor appears solvent, "the presumption should be in favor of appointing an Official Equity Committee." (Mot. ¶ 24.)  In fact, *Collier* only suggests that, in cases when "the debtor is clearly solvent and there is no doubt that the interests of equity holders will be receiving value under a plan," appointment of an equity committee may be appropriate, but *Collier* also notes that "the solvency of the debtor should not be the only factor, or even the principal factor," in deciding whether to appoint an equity committee.  7 COLLIER ON BANKR. ¶ 1102.03[2][a] (16th ed.).

[6]    The Debtors have not come to a definitive view on reorganization value and reserve all rights with respect thereto.

discounts to par in the prior 90 days.  For example, the Debtors' Unsecured Notes are presently

trading at approximately ten cents on the dollar.  Courts have found a "steep discount" in the

trading prices of a debtor's funded indebtedness is powerful evidence that a movant has not carried

its burden of demonstrating a "substantial likelihood" of a "meaningful recovery" for shareholders.

*See Williams*, 281 B.R. at 221 (noting the "steep discount" at which the debtor's publicly held

bonds were being traded and denying appointment of equity committee); *SunEdison*, 556 B.R. at

105 (noting that debtors' debt securities traded at six cents on the dollar and denying appointment

of equity committee); *In re Leap Wireless Intern., Inc.*, 295 B.R. 135, 139 (Bankr. S.D. Cal. 2003)

(same).  Although information concerning the Debtors' debt securities is ascertainable and

routinely cited by courts, the Ad Hoc Equity Committee never mentions it.

43.     In failing to address this evidence, the Ad Hoc Equity Committee fails to carry its

burden.  The cases the Ad Hoc Equity Committee cites for the proposition that the stock price is

alone sufficient to indicate solvency do not support its position.  (Mot. ¶ 25.)  In fact, the Ad Hoc

Equity Committee's cases make specific reference to debt prices and other market evidence when

analyzing solvency.  *See Iridium Operating LLC* v. *Motorola, Inc.* (*In re Iridium Operating LLC*),

373 B.R. 283, 332 (Bankr. S.D.N.Y. 2007) (noting that the Debtor's "bonds generally traded at a

price at or near par value and this indicated that the bond market believed that" the Debtor was

solvent; *see also VFB LLC* v. *Campbell Soup Co.*, 2005 WL 2234606 at *26 (D. Del. Sept. 13,

2005) (noting that the stock price and "other contemporaneous market evidence of [the Debtor's]

worth" should be considered when evaluating solvency).

44.     Additionally, the Debtors' most recent Form 10-Q states that, as of June 30, 2022,

the Debtors reported, on a consolidated basis, a shareholder deficit of $2.34 billion.  Revlon, Inc.,

Quarterly Report (Form 10-Q) (August 9, 2022) at 2.  Again, despite such information being

readily available, and cited by courts in this context, the Ad Hoc Equity Committee fails to address this fact. *See, e.g.*, *Eastman Kodak*, 2012 WL 2501071 at *4 (noting that the debtor's most recent Form 10-K showed a significant shareholder deficit and denying appointment of official equity committee); *SunEdison*, 556 B.R. at 98 (same).

45.    The Ad Hoc Equity Committee fails to carry its burden of showing a "substantial likelihood" that equity holders will receive a meaningful distribution in these Chapter 11 Cases.

**IV.    Other Factors Weigh Against Forming an Official Equity Committee at This Time**

46.    When determining whether an official equity committee is necessary, courts generally consider certain additional factors, including: the number of shareholders, the complexity of the case, and the timing of the motion relative to the status of the chapter 11 case. *See Eastman Kodak*, 2012 WL 2501071 at *1; *Williams*, 281 B.R. at 220.

**A.    The Other Factors Cited in the Motion Do Not Support Appointment of an Official Equity Committee**

47.    The other factors discussed in the Motion—the complexity of the Chapter 11 Cases and the assertion that the Debtors' stock is widely held—do not support the appointment of an Official Equity Committee.  The Ad Hoc Equity Committee is incorrect in its assertion that the Debtors' common shares are widely held; but even if true, this would not be sufficient to outweigh the threshold question of necessity.  *See SunEdison*, 556 B.R. at 103 (denying equity committee "[n]otwithstanding the admitted complexities of the Debtors' cases and the number of outstanding common shares and holders of record[.]"); *Williams*, 281 B.R. at 223 ("[W]hile there is a large number of shareholders, not every case with such a large number will require an official equity committee.  Indeed, if Congress' intent was otherwise, it would have mandated the appointment of equity committees instead of leaving it within the discretion of the UST and the Court.") (internal citation omitted).

48.     The Ad Hoc Equity Committee points to the volume of trading on certain days since the Petition Date as evidence that the Debtors' shares are widely held. (Mot. ¶ 39.) But this argument misses the forest for the trees. As the Ad Hoc Equity Committee acknowledges, MAFCO owns 85.2% of all outstanding shares. Appointing an Official Equity Committee in these circumstances would be unnecessary (if not unprecedented) because MAFCO—already well represented and actively participating in these Cases as a shareholder—would be the primary beneficiary of any Official Equity Committee. *In re Johns-Manville Corp.*, 68 B.R. at 160 ("An equity committee has a fiduciary responsibility to equity holders"); *Penn Dixie*, 9 B.R. at 943 ("[C]ommittee members, individually and as a group," owe loyalty to "shareholders as a whole as opposed to dissident factions or particular classes or interests[.]"). Notably, the Ad Hoc Equity Committee holds *fewer than* 1% of all outstanding shares. Although the Ad Hoc Equity Committee insists—without any evidence—that numerous other parties have also indicated support for the appointment of an Official Equity Committee (Mot. 2 n.2) the Ad Hoc Committee's holdings have plummeted by almost two-thirds in the month since it was formed.[7] The fact that the Ad Hoc Equity Committee has sold nearly two-thirds of its common shares in the last month strongly suggests that its members do not truly believe that the common shares will receive "meaningful distributions" in the Chapter 11 Cases.

## B.  The Costs of an Official Equity Committee Are Not Justified

49.     The appointment of an Official Equity Committee undoubtedly carries with it significant costs, expenses, additional professionals, and delay. As such, a court must balance "the cost of an equity committee versus the concern for adequate representation." *Williams*, 281 B.R.

---

[7]     *Compare Verified Statement of White & Case LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 306] (reporting holdings of over one million shares) with Mot. 2 n.2 (reporting holdings of only approximately 375,000 shares at the time of filing, just over one week later).

at 220 (internal citations omitted); *see also Spansion*, 421 B.R. at 156.  Here, the Debtors' estates

should not be compelled to bear this hefty cost.  *See In re Beker Indus. Corp.*, 55 B.R. 945, 949

(Bankr. S.D.N.Y. 1985) (finding that, even if the requirements for appointment are met, additional

committees should not be appointed if "the cost of the additional committee sought significantly

outweighs the concern for adequate representation").

50.      Here, such costs would not only be substantial but duplicative.  The Debtors' other

stakeholders—several of whom are paid by the estates—already have numerous experienced

financial, legal, and other advisors that are actively involved in the cases and investigating the very

issues raised by the Ad Hoc Equity Committee.  Again, the Ad Hoc Equity Committee's failure to

point to any particular claim that it is uniquely suited to address—and that another constituency is

not similarly aligned on—proves that the costs of an Official Equity Committee would be

duplicative.

51.      Thus, the benefits of appointing an Official Equity Committee would be marginal,

if any.  Equity holders are already represented by at least five different constituencies, and the Ad

Hoc Equity Committee has not demonstrated a substantial likelihood that equity holders will

receive a meaningful distribution under the plan.  In similar situations, courts have concluded that

"[t]he costs that would result from appointment of an equity committee are substantial and cannot

be justified at this stage where equity's interests are represented by other constituencies seeking to

maximize the value of the estate and by a sophisticated ad hoc group of shareholders."  *See*

*Eastman Kodak*, 2012 WL 2501071 at \*4.

### C.  Denial of the Motion Does Not Preclude Later Relief

52.      Courts in this district have denied motions to appoint an official equity committee

while leaving open the possibility that an ad hoc equity committee could be awarded fees as an

administrative expense under section 503(b) of the Bankruptcy Code.  *See, e.g.*, *SunEdison*, 556

B.R. at 103 (noting that "*in most cases*, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.") (emphasis added). Here, as was the case in *Kodak*, "there is no reason to conclude that [equity holders] cannot be represented ably through an unofficial, or *ad hoc*, committee[,]" and if equity holders "make a substantial contribution to [the Debtors' reorganization], they can obtain compensation for their fees." *Eastman Kodak*, 2012 WL 2501071 at *3*.

53.    Later in the case, the Ad Hoc Equity Committee will have the opportunity to demonstrate that its actions benefitted the estate such that it is entitled to an administrative expense claim for its costs (assuming that the Ad Hoc Equity Committee can also demonstrate that payment of such expenses would truly be borne by equity holders, not creditors). Appointing an Official Equity Committee now would prematurely dictate those determinations at this stage in the case.

54.    The Ad Hoc Equity Committee cites the recent *Hertz* chapter 11 case as a similar instance where a purportedly "meme" stock resulted in significant distributions to equity holders. (Mot. ¶ 28 n.9.) But *Hertz* in fact highlights the prudence of the approach routinely adopted in this district. In *Hertz*, notwithstanding a positive stock value, no official equity committee was sought or appointed, and instead an ad hoc equity group advocated on behalf of all equity holders. Ultimately, the plan provided distributions to equity holders, and the ad hoc group's fees were paid as transaction expenses under plan. *See, e.g.*, *In re Hertz. Corp, Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor Affiliates*, Case No. 20-11218 (MFW) (Bankr. D. Del. June 7, 2021) [Docket No. 5178] at Art. XII.E. If anything, *Hertz* counsels that this motion should be denied.

*[Remainder of page intentionally left blank]*

24

## <u>CONCLUSION</u>

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the

Court deny the Motion.

New York, New York
Dated:  August 21, 2022

*/s/ Kyle J. Kimpler*

Paul M. Basta, Esq.
Alice Belisle Eaton, Esq.
Kyle J. Kimpler, Esq.
Robert A. Britton, Esq.
Brian Bolin, Esq.
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY  10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
pbasta@paulweiss.com
aeaton@paulweiss.com
kkimpler@paulweiss.com
rbritton@paulweiss.com
bbolin@paulweiss.com

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

## DEBTORS' LETTER TO THE U.S. TRUSTEE OPPOSING APPOINTMENT OF AN EQUITY COMMITTEE

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000

LLOYD K. GARRISON    (1946-1991)
RANDOLPH E. PAUL    (1946-1956)
SIMON H. RIFKIND    (1950-1995)
LOUIS S. WEISS    (1927-1950)
JOHN F. WHARTON    (1927-1977)

WRITER'S DIRECT DIAL NUMBER

(212) 373-3023

WRITER'S DIRECT FACSIMILE

(212) 492-0023

WRITER'S DIRECT E-MAIL ADDRESS

pbasta@paulweiss.com

UNIT 5201, FORTUNE FINANCIAL CENTER
5 DONGSANHUAN ZHONGLU
CHAOYANG DISTRICT, BEIJING 100020, CHINA
TELEPHONE (86-10) 5828-6300

SUITES 3601 – 3606 & 3610
36/F, GLOUCESTER TOWER
THE LANDMARK
15 QUEEN'S ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2846-0300

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, UNITED KINGDOM
TELEPHONE (44 20) 7367 1600

535 MISSION STREET, 24TH FLOOR
SAN FRANCISCO, CA 94105
TELEPHONE (628) 432-5100

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101

TORONTO-DOMINION CENTRE
77 KING STREET WEST, SUITE 3100
P.O. BOX 226
TORONTO, ONTARIO M5K 1J3
TELEPHONE (416) 504-0520

2001 K STREET, NW
WASHINGTON, DC 20006-1047
TELEPHONE (202) 223-7300

500 DELAWARE AVENUE, SUITE 200
POST OFFICE BOX 32
WILMINGTON, DE 19899-0032
TELEPHONE (302) 655-4410

MATTHEW W. ABBOTT
EDWARD T. ACKERMAN
JACOB A. ADLERSTEIN
JUSTIN ANDERSON
ALLAN J. ARFFA
JONATHAN H. ASHTOR
ROBERT A. ATKINS
SCOTT A. BARSHAY
PAUL M. BASTA
J. STEVEN BAUGHMAN
LYNN B. BAYARD
JOSEPH J. BIAL
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
BRIAN BOLIN
ANGELO BONVINO
ANDRE G. BOUCHARD*
GERALD BRANT
ROBERT A. BRITTON
DAVID W. BROWN
WALTER F. BROWN*
SUSANNA M. BUERGEL
JESSICA S. CAREY
DAVID CARMONA
GEOFFREY R. CHEPIGA
ELLEN N. CHING
WILLIAM A. CLAREMAN
LEWIS R. CLAYTON
YAHONNES CLEARY
REBECCA S. COCCARO
JAY COHEN
KELLEY A. CORNISH
CHRISTOPHER J. CUMMINGS
THOMAS V. DE LA BASTIDE III
MEREDITH R. DEARBORN*
ARIEL J. DECKELBAUM
KAREN L. DUNN
ALICE BELISLE EATON
ANDREW J. EHRLICH
GREGORY A. EZRING
ROSS A. FIELDSTON
ANDREW C. FINCH
BRAD J. FINKELSTEIN
BRIAN P. FINNEGAN
ROBERTO FINZI
PETER E. FISCH
HARRIS FISCHMAN
VICTORIA S. FORRESTER
HARRIS B. FREIDUS
MANUEL S. FREY
KENNETH A. GALLO
KENNETH E. GERTZMAN
ADAM M. GIVERTZ
SALVATORE GOGLIORMELLA
NEIL GOLDMAN
MATTHEW B. GOLDSTEIN
ROBERTO J. GONZALEZ*
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRIAN S. GRIEVE
UDI GROFMAN
NICHOLAS P. GROOMBRIDGE
BRUCE A. GUTENPLAN
MELINDA HAAG*
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
IAN M. HAZLETT
BRIAN S. HERMANN
JOSHUA HILL, JR.
MICHELE HIRSHMAN
JARRETT R. HOFFMAN
ROBERT HOLO
CHRISTOPHER HOPKINS
DAVID S. HUNTINGTON
AMRAN HUSSEIN
LORETTA A. IPPOLITO
WILLIAM A. ISAACSON*
JAREN JANGHORBANI
BRIAN M. JANSON
JEH C. JOHNSON
MATTHEW B. JORDAN
BRAD S. KARP
PATRICK N. KARSNITZ
JOHN C. KENNEDY
ROBERT A. KILLIP
BRIAN KIM
KYLE J. KIMPLER
JEFFREY L. KOCHIAN
ALEXIA D. KORBERG
ALAN W. KORNBERG

DANIEL J. KRAMER
BRIAN KRAUSE
CAITH KUSHNER
KAISA KUUSK
DAVID K. LAKHDHIR
GREGORY F. LAUFER
BRIAN C. LAVIN
XIAOYU GREG LIU
RANDY LUSKEY*
LORETTA E. LYNCH
JEFFREY D. MARELL
MARCO V. MASOTTI
DAVID W. MAYO
ELIZABETH M. McCOLM
JEAN M. McLOUGHLIN
ALVARO MEMBRILLERA
MARK F. MENDELSOHN
CLAUDINE MEREDITH-GOUJON
WILLIAM B. MICHAEL
JUDIE NG SHORTELL*
CATHERINE NYARADY
JANE B. O'BRIEN
BRAD R. OKUN
CRYSTAL L. PARKER
LINDSAY B. PARKS
MARK H. PARLEN
DANIELLE C. PERRHALL
CHARLES J. PESANT
JESSICA E. PHILLIPS*
AUSTIN S. POLLET?
VALERIE E. RADWANER
JEFFREY J. RECHER
CARL L. REISNER
LORIN L. REISNER
JEANNIE S. RHEE*
WALTER G. RICCIARDI
RICHARD A. ROSEN
ANDREW N. ROSENBERG
JUSTIN ROSENBERG
JACQUELINE P. RUBIN
RAPHAEL M. RUSSO
ELIZABETH M. SACKSTEDER
JEFFREY B. SAMUELS
PAUL L. SANDLER
AARON J. SCHLAPHOFF
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JOHN M. SCOTT
BRIAN SCRIVANI
KYLE T. SEIFRIED
KANNON K. SHANMUGAM*
SUHAN SHIM
CULLEN L. SINCLAIR
AUDRA J. SOLOWAY
SCOTT M. SONTAG
JOSHUA H. SOVEN*
MEGAN SPELMAN
SARAH STASNY
ERIC ALAN STONE
AIDAN SYNNOTT
BRETTE TANNENBAUM
RICHARD C. TARLOWE
DAVID TARR
MONICA K. THURMOND
DANIEL J. TOAL
LAURA C. TURANO
CONRAD VAN LOGGERENBERG
KRISHNA VEERARAGHAVAN
JEREMY M. VEIT
MICHAEL VOGEL
RAMY J. WAHBEH
JOHN WEBER
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
SAMUEL J. WELT
LINDSEY L. WIERSMA
STEVEN J. WILLIAMS
LAWRENCE I. WITDORCHIC
MARK B. WLAZLO
ADAM WOLLSTEIN
JULIA TARVER MASON WOOD
JENNIFER H. WU
JORDAN E. YARETT
KAYE N. YOSHINO
TONG YU
TRACEY A. ZACCONE
TAURIE M. ZEITZER
KEN ZIMAN
T. ROBERT ZOCHOWSKI, JR.

*NOT ADMITTED TO THE NEW YORK BAR

July 15, 2022

**By Email**

U.S. Department of Justice
Office of the United States Trustee
Southern District of New York
U.S. Federal Office Building
201 Varick Street, Suite 1006
New York, NY 10014
Attn:   Linda A. Riffkin, Esq.
        Brian Masumoto, Esq.

Re: *In re Revlon, Inc., et al.* Case No. 22-10760 (DSJ)

Dear Ms. Riffkin and Mr. Masumoto:

We represent Revlon, Inc. and certain of its subsidiaries (collectively, the "Debtors") in connection with their cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). We write at your invitation in response to the letter of Thomas E. Lauria, Esq. of White & Case LLP dated July 12,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

2022 (the "Shareholder Letter")[1] on behalf of certain common shareholders of Revlon, Inc. (the "Requesting Shareholders"). The Requesting Shareholders ask the U.S. Trustee to appoint an official committee of equity holders (an "Equity Committee") in the Chapter 11 Cases.

        The appointment of an Equity Committee is neither necessary nor appropriate in these Chapter 11 Cases. As caselaw instructs, appointment of an Equity Committee should be the "rare exception," *see In re Williams Communications Group, Inc.*, 281 B.R. 216 at 223 (Bankr. S.D.N.Y. 2002), and proponents must demonstrate that such appointment is "necessary" to adequately represent shareholders' interests, "a high standard that is a far more onerous than if the statute merely provided that such a committee be useful or appropriate." *See In re SunEdison, Inc.*, 556 B.R. 94 at 103 (Bankr. S.D.N.Y. 2016). The Requesting Shareholders fail to carry this significant burden.

        *First*, the interests of shareholders are well represented in the Chapter 11 Cases, and the Requesting Shareholders have failed to demonstrate otherwise. Indeed, these cases present the paradigm of appropriate checks and balances that provide shareholders with more than simply "adequate" representation, as evidenced by:

- The Debtors' Boards of directors (which include independent directors) and management seek to maximize value for all stakeholders, including shareholders. The Board includes members appointed by MacAndrew & Forbes, Inc. ("MAFCO"), which holds approximately 85% of the Debtor's common equity, and therefore there can be no question that the interests of shareholders are adequately considered by the Board when evaluating any significant transactions;

- MAFCO—separate and apart from its role on the Board—is an active participant in the Chapter 11 Cases, having already retained sophisticated professional advisors to advocate for MAFCO's interests *as a shareholder*;

- The recently appointed official committee of unsecured creditors (the "UCC"), and several ad hoc groups of lenders under certain of the Debtors' term loan facilities, are each taking active roles in the Chapter 11 Cases, with the UCC in particular seeking to maximize value. Each of the purported issues raised in the Shareholder Letter as supporting the appointment of an Equity Committee are already being addressed by these other parties; the Requesting Shareholders fail to raise any issue that an Equity Committee would be uniquely suited to address; and

- The Requesting Shareholders have already demonstrated their ability to adequately represent themselves without the need for an official committee.

---

[1]    Unless otherwise stated herein, capitalized terms have the same meaning as given to them in the Shareholder Letter.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

*Second*, the Requesting Shareholders have failed to satisfy their burden on valuation. Rather than grapple with the applicable legal standard, the Requesting Shareholders invent their own, and rely solely on the current trading price of the Debtors' common shares as evidence that equity holders are "in the money." Absent other evidence, which the Requesting Shareholders do not provide, the trading price of the Debtors' common shares, alone, is insufficient to meet the Requesting Shareholders' heavy burden. Notably, the Requesting Shareholders fail to address other relevant and publicly available information such as the fact that certain of the Debtors' *debt* securities trade at eight cents on the dollar and that the Debtors' most recent financial statements report a shareholder deficit.

*Third*, the Debtors' common shares are not "widely held," contrary to the Requesting Shareholders' assertions. Appointing an official committee on the facts of this case—where there is a single shareholder owning 85% of all shares—would be unnecessary. The overwhelming beneficiary of an Equity Committee's efforts would be the Debtors' controlling shareholder, MAFCO, which is already ably represented in these Chapter 11 Cases.

*Fourth*, the Requesting Shareholders' arguments in support of an Equity Committee—largely, that MAFCO may be subject to various unidentified claims that no other party has asserted—appears to be fundamentally at odds with the relief they seek. An Equity Committee would owe fiduciary duties to *all* shareholders; it is not the proper vehicle for one group of shareholders to obtain estate-funding for the prosecution of alleged claims against other shareholders.

*Finally*, the cost of an Equity Committee greatly outweighs any potential benefit. There are already numerous prominent stakeholders represented by sophisticated counsel, financial advisors, and other professionals, whose costs will be borne by the Debtors' estates. The efforts of an Equity Committee would be largely duplicative of the work that will be performed by these other professionals. As such, an Equity Committee would do little but add additional cost and complexity. For this reason, the more prudent course, adopted by most courts to consider the issue, is for the Requesting Shareholders to advocate for their interests as an *ad hoc* group, and leave to a later date whether their efforts are deserving of estate compensation under Section 503(b) of the Bankruptcy Code.

For these reasons, the Debtors respectfully request that the United States Trustee decline to appoint an Equity Committee.

## I. Applicable Legal Standard

Section 1102(a) of the Bankruptcy Code provides that the U.S. Trustee "may appoint additional committees of creditors or of equity holders as the United States trustee deems appropriate." 11 U.S.C. § 1102(a). As the language of the statute is permissive, the appointment of an additional committee is not mandatory, and the U.S. Trustee maintains discretion to deny such a request. *See Williams*, 281 B.R. at 219.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

In fact, the appointment of an equity committee is a disfavored and unusual remedy. *See SunEdison*, 556 B.R. at 103 (Bankr. S.D.N.Y. 2016) ("The appointment of official equity committees should be the rare exception."); *In re Eastman Kodak Co.*, No. 12-10202 ALG, 2012 WL 2501071 at *2 (Bankr. S.D.N.Y. 2012) ("[T]here appears to be uniform recognition that such an appointment constitutes extraordinary relief and is the exception rather than the rule in chapter 11 cases."); *In re Dana Corp.*, 344 B.R. 35 at 38 (Bankr. S.D.N.Y. 2006) ("The appointment of an additional committee under section 1102(a)(2) is considered 'extraordinary relief.'").

It is well settled that an Equity Committee should not be appointed unless equity holders establish that (i) there is a "substantial likelihood" that they will receive a "meaningful distribution" in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. *Williams*, 281 B.R. at 223. "The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interests without an official committee and can seek compensation if they make a substantial contribution in the case." *Id.*

These Chapter 11 Cases do not present the type of unusual circumstances that would justify such extraordinary relief.

## II. The Interests of Minority Equity Holders Are Adequately Represented

The Requesting Shareholders argue that minority shareholders' interests are not adequately represented and that a committee must be appointed to provide "a meaningful counterweight" against the interests of the Board, management, and the Debtors' controlling shareholder. This is incorrect. In fact, to the contrary, shareholder interests (including minority shareholder interests) are represented by at least *five* separate constituencies.

### A. Minority Equity Holders Are Adequately Represented by the Board and Management

The interests of equity holders (including minority equity holders) are already represented by the Debtors' board and management, who have a fiduciary duty to maximize value for *all* stakeholders. As the Requesting Shareholders recognize, a debtor's officers and directors have a duty to maximize the debtor's estates for the benefit of shareholders as well as creditors. Shareholder Letter at 4 (*citing Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 at 355 (1985)). Directors of an insolvent company continue to owe fiduciary duties to equity holders, and officers are expected to carry out the fiduciary responsibilities of a trustee. *See Commodity Futures*, 471 U.S. at 355 (noting that "the fiduciary duty of the trustee runs to shareholders are well as to creditors").

As such, "[t]he usual presumption [is] that the Board will pay due (perhaps special) regard to the interests of shareholders." *In re Oneida Ltd.*, WL

4

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1288576, No. 06-10489 at *2 (Bankr. S.D.N.Y. 2006). The existence of a functioning board of directors, as is the case here, "supports the inference that equity's interests will be adequately represented notwithstanding the absences of an official equity committee." *Eastman Kodak*, 2012 WL 2501071 at *2; *see also Victor* v. *Edison Bros. Stores (In re Edison Bros. Stores, Inc.)*, No. 95-1354 (PJW), No. 96-177-SLR, 1996, WL 534853 at *5 (D. Del. Sept. 17, 1996) (observing that equity holders seeking to form an equity committee had not provided any evidence that management was conflicted and "incapable of adequately representing non-insider shareholders"); *In re Spansion, Inc.*, 421 B.R. 151 at 163 (Bankr. D. Del. 2009) ("It is expected that management would normally represent, among other interests, the interests of equity security holders."). Here, the Debtors implemented certain governance changes before commencing these Chapter 11 Cases that further ensures the Board is able to fulfill its fiduciary duties to all stakeholders. *See* Declaration of Robert M. Caruso, Chief Restructuring Officer, In Support of First Day Motions filed on June 16, 2022 [Docket No. 30] at 10-11 (describing appointment of independent directors and formation of Restructuring Committee and Investigation Committee).

The Requesting Shareholders fail to rebut the inference and presumption that the Debtors' Board will adequately represent the interests of shareholders. They first imply that the Board is somehow conflicted, given that Mr. Perelman is the Chairman and CEO of MAFCO and also the Chairman of the Debtors' Board. Shareholder Letter at 5. This, however, defies common sense. As many courts plainly recognize, the presence of a material shareholder in the boardroom—such as Mr. Perelman's presence as Chairman of the Board—is evidence that the interests of shareholders will be considered during these Chapter 11 Cases. *See In re Allied Holdings, Inc.*, 2007 WL 7138349 at *3 (Bankr. N.D. Ga. 2007) (concluding that shareholders were adequately represented by the board of directors, who collectively held over 39% of the debtor's outstanding shares); *Edison Bros.*, WL 534853 at *15 (noting that insider shareholders are "just as interested in maintaining value as is the smallest public investor."); *see also Eastman Kodak*, 2012 WL 2501071 at *2 ("There is no reason to think that interests of shareholders will be ignored in these cases, particularly where Kodak's directors and officers own over 10 million shares of Kodak stock themselves.").

The Requesting Shareholders' cite *Oneida* to support their argument that Mr. Perelman's position on the Board somehow undermines the Board's ability to represent the interests of equity holders; but *Onieda* says no such thing. *See* Shareholder Letter at 5. There, the debtor's board was controlled (six of nine seats) by the debtor's secured lenders and the company and those same lenders had proposed a plan that paid unsecured creditors *in full* while wiping out the equity. The court appropriately noted that "under the unusual (perhaps unique) circumstances of this case," the "usual presumption that the Board will pay due" regard to the interests of shareholders was unrealistic. *Oneida*, WL 1288576 at *2. That is not the case here: *none of the Debtors' lenders* (secured or unsecured) have appointed directors to the Board. Further, in *Oneida*, the court noted that, because the unsecured creditors were being paid in full under the terms of the prepackaged plan, there was no active official committee of unsecured

5

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

creditors in the case, and therefore "the usual checks and balances [were] not present." *Id*. Again, this is not the case here, as the UCC has already been appointed, has retained counsel and financial advisors, and has every incentive to take necessary action to ensure the maximum value of the Debtors' estates.

The Requesting Shareholders next argue that the Board is unable to adequately represent equity holder interests because the Board is somehow beholden to the BrandCo Lenders based on the milestones in the debtor in possession financing that was approved on an interim basis at the first day hearing (the "DIP Financing"). That claim is baseless. As was demonstrated at the first day hearing, the DIP Financing is the product of an arm's-length negotiation that provides the Debtors with necessary liquidity to continue operating their businesses. Further, the presence of case milestones—a feature of almost every post-petition financing arrangement—cannot be a sufficient basis on which to conclude that a debtor is incapable of representing shareholders. In any event, other parties, namely, the UCC, two different ad hoc groups of 2016 term loan lenders (collectively, the "2016 Lenders"), and Citibank, N.A. ("Citibank"), are each able to contest the DIP Financing and ensure that the Debtors are not inappropriately "beholden" to the BrandCo Lenders. An Equity Committee's efforts in this regard would be entirely duplicative.

### B.  Minority Equity Holders Are Adequately Represented by MAFCO

As the largest shareholder, MAFCO has every incentive to pursue value on behalf of *all* shareholders. As discussed above, insider shareholders are "just as interested in maintaining value as is the smallest public investor." *Allied Holdings*, 2007 WL 7138349 at *3. Indeed, MAFCO has already demonstrated its intent to protect its equity interests by retaining sophisticated professional advisors—at its own expense—to ensure that such equity interests are adequately represented. In other words, MAFCO is *not* merely seeking to protect its interests vis-à-vis its role on the Board, but is instead actively participating in the Chapter 11 Cases *as a shareholder*.

The Requesting Shareholders' sole argument is that MAFCO is conflicted and therefore cannot represent the interests of minority shareholders. Shareholder Letter at 5. However, this argument is pure speculation: to the Debtors' knowledge, no party has alleged claims against MAFCO. The Requesting Shareholders merely suggest—without any factual basis—that MAFCO "*may* seek a release of potential estate claims in exchange for supporting a transaction that does not provide value to non-insider stockholders." Shareholder Letter at 2. The assertion of unidentified and vague claims, which is nothing more than mere attorney speculation, is insufficient to support the appointment of an Equity Committee.

Moreover, the Requesting Shareholders raise concerns about an intercreditor dispute arising from the 2020 BrandCo transactions. As demonstrated at the first day hearing, concerns about the 2020 BrandCo transactions are not unique to shareholders. Furthermore, if the Debtors are solvent—as the Requesting Shareholders

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

suggest—then this intercreditor dispute is of no moment: the 2016 Lenders would be paid in full and the intercreditor dispute would be resolved. Certainly, MAFCO and the UCC are incentivized to argue that the Debtors are solvent precisely because such outcome would allow for distributions to junior stakeholders and would obviate the very claims at which the Requesting Shareholders merely hint.

C. Minority Equity Holders are Adequately Represented by the UCC

The UCC has a duty to maximize value that would inhere to the benefit of all shareholders. *See Eastman Kodak Co*., 2012 WL 2501071 at *3; *SunEdison*, 566 B.R. at 103; *Williams*, 281 B.R. at 222. The UCC in this case has already been appointed and has already retained advisors who will, no doubt, carefully investigate the Debtors, the Debtors' capital structure and financial condition, the Debtors' business plan, and the Debtors' prepetition transactions. *Williams*, 281 B.R. at 222 ("The Creditors' Committee has a significant economic interest . . . in investigating [claims], notwithstanding its fiduciary obligation to do the same.").

The presence of the UCC significantly undermines the Requesting Shareholders' arguments. The crux of the Requesting Shareholders' arguments is that (i) the Debtors are somehow beholden to the BrandCo lenders due to the DIP Financing, and (ii) that the Debtors and MAFCO are conflicted due to purported claims arising from the 2020 BrandCo transactions. However, the UCC (amongst others) will almost certainly investigate and, if it deems appropriate, assert claims with respect to these very same issues. *Id.* ("[T]he Creditors' Committee and Shareholders have similar interests with respect to investigation of [claims].").

The Requesting Shareholders do not point to any issue that is unique to the interests of shareholders. They concede that the UCC will be incentivized to maximize value of the estate, but imply that the UCC would somehow "accept a strategy that provides the maximum recovery for its constituents in the short term" rather than "hold out for increased value that inures to the benefit of equity holders over a longer period." Shareholder Letter at 6. In pursuit of recoveries for unsecured creditors, it will be nearly impossible for the UCC to adopt positions and assert strategies that will provide for recoveries only through the unsecured creditor class, but nothing more. The Requesting Shareholders' argument that matters of value and recovery can be so precisely deployed by an estate fiduciary implies a level of calculation that is belied by the complexity of these Chapter 11 Cases. *See Eastman Kodak*, 2012 WL 2501071 at *3 ("The shareholders wholly fail to support the position taken in their papers that the creditors' committee will cease to attempt to maximize value once the point is reached at which creditors will be paid in full—*as if it were possible to divine that point at this stage in the case*.") (emphasis added). In its pursuit to maximize value for the estate to pay unsecured creditors in full, the UCC will necessarily also be protecting the interests of equity holders who benefit from the UCC's strategy to obtain the best outcome achievable. There is no basis to conclude that the UCC's advocacy to maximize value will not also benefit equity holders.

7

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

D. <u>Minority Equity Holders Are Adequately Represented by the 2016 Lenders</u>

While the 2016 Lenders cannot be expected to advocate on behalf of equity holders, they did make clear at the first day hearing that they were focused on many of the very issues, particularly the 2020 BrandCo transactions and the DIP Financing, that are raised in the Shareholder Letter. Importantly, there are already three separate groups purporting to represent the 2016 Lenders—the "Returning Lenders," the "Contingent Discharged for Value Lenders" and Citibank, each of which is represented by highly sophisticated advisors. Each of these separate creditor groups have explicitly communicated, on the record, a desire to investigate and bring these potential challenges. This is in addition to the UCC, who for the reasons stated above, will also investigate these potential claims. Accordingly, there is no reason for an additional committee to be appointed to ensure that estate causes of action and other matters are appropriately investigated.

E. <u>Minority Equity Holders Are Adequately Represented by the Requesting Shareholders</u>

The Requesting Shareholders are presently represented by White & Case, LLP, which sent the 9-page Shareholder Letter to the United States Trustee, and appears to have already spent considerable time familiarizing themselves with the Debtors' Chapter 11 Cases. Accordingly, the Requesting Shareholders "have already demonstrated their ability to organize and continue to participate in this case with skill and zeal . . ." *Williams*, 281 B.R. at 223.

The Shareholder Letter completely ignores the fact that the Requesting Shareholders are *already* adequately represented. Moreover, "given the quality of the legal talent" hired by the Requesting Shareholders, there is "no reason to conclude" that the Requesting Shareholders cannot be represented ably through an unofficial, or *ad hoc*, committee. *See Eastman Kodak*, 2012 WL 2501071 at *3. As many courts in this district have held, the Requesting Shareholders may continue to participate in the Bankruptcy Proceedings and are protected by the possibility of seeking a substantial contribution claim later for their professional fees and expenses under section 503(b) of the Bankruptcy Code if they make substantial contributions to these Chapter 11 Cases. *See, e.g.*, *Williams*, 281 B.R. at 223 (finding that "*in most cases*, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.") (emphasis added).

Thus, even if the Requesting Shareholders could show that the Debtors' board and management, MAFCO, the UCC, and the 2016 Lenders are not adequately representing the interests of equity holders—which they fail to do—the Requesting Shareholders are "well organized, well represented by counsel, and adequate to the task of representing interests without 'official' status." *Spansion*, 421 B.R. at 163.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

### III. The Requesting Shareholders Have Not Met Their Burden on Valuation

The Requesting Shareholders have not shown that there is a "substantial likelihood" the equity holders in these Chapter 11 Cases will receive a "meaningful distribution." *See Williams*, 281 B.R. at 223; *Eastman Kodak*, 2012 WL 2501071 at *1. They argue that "all available market indications show that there is a significant positive shareholder value," but the *sole* basis for this claim is the current stock price. Shareholder Letter at 6. The Requesting Shareholders have not presented any other evidence that there is a "substantial likelihood" of a meaningful equity distribution; for example, they have not performed any valuation analysis, not submitted any expert evidence, nor bothered to address contrary indications that are publicly available.

Although the Requesting Shareholders point to the current stock price, and acknowledge that the trading price of a security is "a useful indication" of valuation (Shareholder Letter at 6-7), the Requesting Shareholders ignore the current trading prices of the Debtors' *debt* securities. As can be seen on the historical debt pricing chart attached hereto as <u>Exhibit A</u>, several series of the Debtors' secured and unsecured debt securities have been trading at significant discounts to par in the prior 60 days. For example, the Debtors' 2024 Senior Unsecured Notes have been trading at approximately eight cents on the dollar. *See SunEdison*, 556 B.R. at 105 (noting that debtors' debt securities traded at six cents on the dollar and denying appointment of equity committee); *Williams*, 281 B.R. at 221 (same); *In re Leap Wireless Intern., Inc.*, 295 B.R. 135 at 139 (Bankr. S.D. Cal. 2003) (same). Although information concerning the Debtors' debt securities is easily ascertainable, and routinely cited by courts, the Requesting Shareholders do not address this fact.

Relatedly, the Debtors' most recent Form 10-Q states that, as of March 31, 2022, the Debtors reported, on a consolidated basis, a shareholder deficit of $2.08 billion (before the Debtors incurred additional obligations under the DIP Financing). Again, despite such information being readily available, and consistently cited by courts in this context, the Requesting Shareholders do not address this fact. *See, e.g., Eastman Kodak*, 2012 WL 2501071 at *4 (noting that the debtor's most recent Form 10-K showed a significant shareholder deficit and denying appointment of official equity committee); *SunEdison*, 556 B.R. at 98 (same).

Given the information that is publicly available today, the Requesting Shareholders cannot satisfy their burden of showing a "substantial likelihood" that equity holders will receive a meaningful distribution in these Chapter 11 Cases.

Of course, the Requesting Shareholders may renew their request in the future should circumstances change and the record clearly demonstrate a substantial likelihood of a meaningful distribution under the plan. *See Eastman Kodak*, 2012 WL 2501071 at *4 ("If future developments change any of these conclusions, the Shareholders may renew their motion for an official committee at that time, but at this point, their motion must be denied.").

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

## IV. The Debtors' Stock Is Not Widely Held

The Requesting Shareholders argue that the Debtors' common shares are widely held and point to the volume of trading over the past 10 days as evidence. Shareholder Letter at 7. But this argument misses the forest for the trees. As the Requesting Shareholders acknowledge, MAFCO owns 85.2% of all outstanding shares, and has already retained sophisticated counsel to represent it in these Chapter 11 Cases. Appointing an Equity Committee in these circumstances would be unnecessary since the MAFCO—already well represented and actively participating in these Cases as a shareholder—would be the primary beneficiary of any Equity Committee. Notably, the Requesting Shareholders hold *fewer than* 2% of all outstanding shares.

Moreover, any Equity Committee would be a fiduciary for *all* equity holders. *See In re Gadzooks, Inc.*, 352 B.R. 796, 811–12 (Bankr. N.D. Tex. 2006). Accordingly, an official committee must guide its actions so as to safeguard as much as possible "the rights of the minority *as well as the majority*." *In re Residential Capital, LLC*, 480 B.R. 550 559 (Bankr S.D.N.Y. 2012) (emphasis added). Here, for purposes of requesting an Equity Committee, the Requesting Shareholders emphasize their view that MAFCO is subject to various unidentified claims that no other party has raised. This strategy calls into question the very relief they seek. An ad hoc committee should not be given official status, plus estate funding, if its purpose is simply to pursue claims against similarly situated stakeholders. *See id.* at 558–59 (acting as a de facto counsel for individual stakeholders would "be an impermissible role for an official committee.")

## V. The Costs of an Official Equity Committee Are Not Justified

A court must "balance the cost of an equity committee versus the concern for adequate representation." *Williams*, 281 B.R. at 220 (internal citations omitted); *see also Spansion*, 421 B.R. at 156. The appointment of an Equity Committee raises cost concerns because such appointments are "closely followed by applications to retain attorneys and accountants." *Id.*

Here, the costs would be both substantial and duplicative. The Requesting Shareholders have retained White & Case as counsel, and they would likely seek to retain other professionals, including a financial advisor. The Debtors' other stakeholders already have numerous reputable financial, legal, and other advisors that are actively involved in the cases. Each of these groups of advisors has already commenced extensive diligence on the Debtors, including those engaged by the UCC, which will be paid for by the Debtors' estates. As previously discussed, these other stakeholders, and in particular the UCC, will already be investigating the very issues raised by the Requesting Shareholders. Thus, an Equity Committee would not only add a substantial cost burden to the Debtors' estates, but much of the cost would be for work that is entirely duplicative of what other professionals are already completing.

The benefits of appointing an Equity Committee would be marginal, if any. Equity holders are already represented by at least five different constituencies, and

10

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

there is not a substantial likelihood that equity holders will receive a meaningful distribution under the plan.  In similar situations, courts have concluded that "[t]he costs that would result from appointment of an equity committee are substantial and cannot be justified at this stage where equity's interests are represented by other constituencies seeking to maximize the value of the estate and by a sophisticated ad hoc group of shareholders."  *See Eastman Kodak*, 2012 WL 2501071 at *4.

A more prudent course of action—routinely adopted by courts in this district—is to encourage ad hoc equity committees to participate in the case, while leaving the question of whether the estate should fund such efforts to later in the case. *See id.* at *3; *SunEdison*, 556 B.R. at 105; *Williams*, 281 B.R. at 223-24.  At that time, it will be clear to the court and other parties in interest whether the Requesting Shareholders' efforts truly resulted in meaningful distributions to equity holders, or whether the payment of their counsel's fees would only dilute creditor recoveries. Appointing an Equity Committee now inappropriately hard wires that determination, allocating the risk entirely to the estate's creditors in the event that equity holders do not receive meaningful distributions under the plan.

Given the multitude of legal, financial, and other advisors already actively engaged in these Chapter 11 Cases, many of whose fees and expenses will be paid for by the Debtors' estates, the Debtors submit that the cost of adding another group of professionals is unwarranted and unnecessary, especially given that there is no demonstrable evidence of any benefit in doing so.

For the reasons stated above, the Debtors respectfully request that the United States Trustee deny the Requesting Shareholders' request and decline to appoint an Equity Committee.

Very truly yours,

/s/ *Paul M. Basta*
Paul M. Basta
Partner

cc:    Alice Belisle Eaton, Esq.
       Kyle J. Kimpler, Esq.
       Robert A. Britton, Esq.
       Brian Bolin, Esq.
       Robert J. Stark, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

## **EXHIBIT A**

Confidential

# Revlon Historical Debt Pricing
*Prior 60 Days as of 7/13/22*



Source: Bloomberg; IHS Markit.
Note: Pricing for BrandCo Tranches and 2016 Term Loans per IHS Markit. Pricing for 2024 Unsecured Notes per Bloomberg. Pricing may reflect matrix prices and/or quote midpoints, rather than executed trades. Pricing not shown for ABL Facilities, BrandCo Tranche B-3, FILO, Foreign ABTL, and Spanish Government Loan.