**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| REVLON, INC., *et al.*,[1] | ) | Case No. 22-10760 (DSJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF FILING OF SIXTH PLAN SUPPLEMENT

**PLEASE TAKE NOTICE THAT** on March 16, 2023, Revlon, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") filed the plan supplement (the "First Plan Supplement") [Docket No. 1614] in support of the *Second Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1613] (as modified, amended, or supplemented from time to time, the "Plan").[2]

**PLEASE TAKE FURTHER NOTICE THAT** on March 29, 2023, the Debtors filed a second plan supplement (the "Second Plan Supplement") [Docket No. 1706] in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on March 31, 2023, the Debtors filed a third plan supplement (the "Third Plan Supplement") [Docket No. 1734] in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on April 3, 2023, the Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] (the "Confirmation Order"), confirming the *Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1727].

**PLEASE TAKE FURTHER NOTICE THAT** on April 13, 2023, the Debtors filed a fourth plan supplement (the "Fourth Plan Supplement") [Docket No. 1801] in support of the Plan.

---

[1]     The last four digits of Debtor Revlon, Inc.'s tax identification number are 2955.  Due to the large number of debtor entities in these Chapter 11 Cases, for which the Court has granted joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' Voting and Claims Agent at https://cases.ra.kroll.com/Revlon.  The location of the Debtors' service address for purposes of these Chapter 11 Cases is:  55 Water St., 43rd Floor, New York, NY 10041-0004.

[2]     Capitalized terms not otherwise defined herein shall have the same meanings set forth in the Plan or Disclosure Statement, as applicable.

**PLEASE TAKE FURTHER NOTICE THAT** on April 14, 2023, the Debtors filed the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1802].

**PLEASE TAKE FURTHER NOTICE THAT** on April 24, 2023, the Debtors filed a fifth plan supplement (the "Fifth Plan Supplement") [Docket No. 1841] in support of the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** on May 1, 2023, the Debtors filed the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860].

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this *Sixth Plan Supplement for the Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Sixth Plan Supplement," and together with the First Plan Supplement, the Second Plan Supplement, the Third Plan Supplement, the Fourth Plan Supplement, and the Fifth Plan Supplement, the "Plan Supplement") in support of the Plan, which includes the form of the following documents:

| | |
|---|---|
| **Exhibit A-1** | Limited Liability Company Agreement |
| **Exhibit A-2** | Blackline comparison to Limited Liability Company Agreement as filed on April 24, 2023 |
| **Exhibit A-3** | Certificate of Formation |
| **Exhibit D** | Identities of the Initial Members of the Reorganized Holdings Board |
| **Exhibit E** | Description of Transaction Steps |
| **Exhibit F-1** | First Lien Exit Facilities Credit Agreement |
| **Exhibit F-2** | Blackline comparison to First Lien Exit Facilities Credit Agreement as filed on March 16, 2023 |
| **Exhibit G** | Exit ABL Facility Credit Agreement |
| **Exhibit I-1** | New Warrant Agreement |
| **Exhibit I-2** | Blackline comparison to New Warrant Agreement as filed on April 13, 2023 |
| **Exhibit L-1** | PI Settlement Fund Agreement |
| **Exhibit L-2** | Blackline comparison to PI Settlement Fund Agreement as filed on March 31, 2023 |
| **Exhibit N-1** | GUC Trust Agreement |
| **Exhibit N-2** | Blackline comparison to GUC Trust Agreement as filed on March 31, 2023 |

**PLEASE TAKE FURTHER NOTICE THAT** all parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein at any time before the Effective Date of the Plan, or any such other date as may be provided for under the Plan or by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kroll Restructuring Administration, LLC, the Voting and Claims Agent retained by the Debtors in

these Chapter 11 Cases (the "<u>Voting and Claims Agent</u>"), by: (i) calling the Debtors' restructuring hotline at +1 (855) 631-5341 (toll free) or +1 (646) 795-6968; (ii) visiting the Debtors' restructuring website at: <u>https://cases.ra.kroll.com/Revlon</u>; and/or (iii) writing to Revlon, Inc. Ballot Processing, c/o Kroll Restructuring Administration, LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232.  You may also obtain copies of any pleadings filed in these Chapter 11 Cases for a fee via PACER at <u>http://www.nysb.uscourts.gov</u>.

| | |
|---|---|
| New York, New York<br>Dated:  May 1, 2023 | <u>/s/ Robert A. Britton</u><br>Paul M. Basta<br>Alice Belisle Eaton<br>Kyle J. Kimpler<br>Robert A. Britton<br>Brian Bolin<br>Sean A. Mitchell<br>**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Telephone: (212) 373-3000<br>Facsimile: (212) 757-3990<br>pbasta@paulweiss.com<br>aeaton@paulweiss.com<br>kkimpler@paulweiss.com<br>rbritton@paulweiss.com<br>bbolin@paulweiss.com<br>smitchell@paulweiss.com<br><br>*Counsel to the Debtors and Debtors in Possession* |

## **Exhibit A-1**

### **Limited Liability Company Agreement**

This **Exhibit A-1** contains the Limited Liability Company Agreement for Reorganized Holdings.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit A-1**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

THE LIMITED LIABILITY COMPANY INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION AND (OTHER THAN SHARES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY SECTION 1145 UNDER THE BANKRUPTCY CODE (SUBJECT TO CERTAIN EXCEPTIONS UNDER APPLICABLE LAW) OR, AS DETERMINED BY THE BOARD, ANOTHER EXEMPTION SUCH THAT THE TRANSFER OF SUCH SHARES IS NOT RESTRICTED UNDER U.S. FEDERAL SECURITIES LAW) MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE FEDERAL, STATE OR FOREIGN SECURITIES LAWS.   IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**of**

**REVLON GROUP HOLDINGS LLC**

**dated as of**

**May [2], 2023**

# TABLE OF CONTENTS

**Page**

### Article I
#### DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1    *Definitions* ...................................................................................2
Section 1.2    *Interpretation* ............................................................................12

### Article II
#### ORGANIZATION

Section 2.1    *Formation of Company* .............................................................12
Section 2.2    *Name* ........................................................................................13
Section 2.3    *Purpose* ....................................................................................13
Section 2.4    *Powers* ......................................................................................13
Section 2.5    *Principal Place of Business* ......................................................13
Section 2.6    *Registered Office and Registered Agent* ...................................13
Section 2.7    *Term* .........................................................................................13
Section 2.8    *No State-Law Partnership; Tax Status*......................................13
Section 2.9    *Title to Company Assets* ...........................................................14
Section 2.10   *Non-Voting Equity Securities* ...................................................14

### Article III
#### MEMBERS; BENEFICIAL OWNERS; ADDITIONAL OWNERS; SHARES

Section 3.1    *Members; Beneficial Owners; Binding Nature of this Agreement* ...........14
Section 3.2    *Shares; DTC*.............................................................................16
Section 3.3    *Issuance of Additional Equity Securities; No Capital Contributions* ........17
Section 3.4    *Preemptive Rights* ....................................................................17
Section 3.5    *Book-Entry-Only System; Global Securities*..............................20
Section 3.6    *Liability of Owners and Members*..............................................22
Section 3.7    *Fully Paid and Non-Assessable Nature of Equity Securities* ....................22

### Article IV
#### FISCAL YEAR

Section 4.1    *Fiscal Year* ...............................................................................22

### Article V
#### DISTRIBUTIONS

Section 5.1    *Interest*......................................................................................23
Section 5.2    *No Right to Withdraw* ...............................................................23
Section 5.3    *Distributions*.............................................................................23
Section 5.4    *Withholding* ..............................................................................23

# TABLE OF CONTENTS
(continued)

**Page**

### Article VI
#### MANAGEMENT OF THE COMPANY

Section 6.1    *Management by the Board of Managers* ...................................................24
Section 6.2    *Board of Managers* ....................................................................................24
Section 6.3    *Actions Requiring Approval of the Board* ................................................27
Section 6.4    *Matters Requiring Approval by the Owners* ............................................29
Section 6.5    *Matters Relating to Owners* ......................................................................29
Section 6.6    *Officers* .....................................................................................................29
Section 6.7    *Waiver of Corporate Opportunities* .........................................................30
Section 6.8    *Waivers; Burden of Proof* ........................................................................30

### Article VII
#### MATTERS RELATING TO AN IPO; REGISTRATION RIGHTS

Section 7.1    *Conversion to a Corporate Form Upon an IPO* ........................................31
Section 7.2    *Registration Rights Agreement* ................................................................32
Section 7.3    *IPO Lock Up Agreement* ..........................................................................32
Section 7.4    *Strategic Transaction / IPO Review* .........................................................32

### Article VIII
#### REPRESENTATIONS AND WARRANTIES

Section 8.1    *Representations and Warranties* ...............................................................32

### Article IX
#### TRANSFERS

Section 9.1    *Transfers Generally* ..................................................................................33
Section 9.2    *Tag-Along Rights* .....................................................................................34
Section 9.3    *Drag-Along Rights* ...................................................................................36
Section 9.4    *Additional Conditions to Tag-Along Sales and/or Drag-Along Sales* .......39
Section 9.5    *Conditions Applicable to All Transfers* ....................................................40

### Article X
#### INDEMNIFICATION AND EXCULPATION

Section 10.1    *Indemnification and Exculpation* ...........................................................42
Section 10.2    *Insurance* ...............................................................................................43
Section 10.3    *Rights to Rely on Legal Counsel, Accountants; Other Matters* ................43

# TABLE OF CONTENTS

(continued)

**Page**

### Article XI
BOOKS OF ACCOUNT; INFORMATION RIGHTS; CONFIDENTIALITY

Section 11.1   *Maintenance of Books; Reports* ................................................................ 44
Section 11.2   *Confidentiality* ........................................................................................ 46

### Article XII
DURATION AND TERMINATION OF COMPANY

Section 12.1   *Events Causing Dissolution and Winding Up* ........................................... 48
Section 12.2   *Liquidation and Winding Up* .................................................................... 48
Section 12.3   *Certificate of Formation* .......................................................................... 49
Section 12.4   *Waiver of Partition* .................................................................................. 49
Section 12.5   *Termination of the Agreement* .................................................................. 49

### Article XIII
GENERAL

Section 13.1    *Choice of Law* ...................................................................................... 49
Section 13.2    *Forum, Venue and Jurisdiction* ............................................................... 49
Section 13.3    *Notices* ................................................................................................. 50
Section 13.4    *Further Action* ...................................................................................... 52
Section 13.5    *Amendment; Waiver* ............................................................................... 52
Section 13.6    *Headings* .............................................................................................. 53
Section 13.7    *Counterparts* ......................................................................................... 53
Section 13.8    *Severability* .......................................................................................... 53
Section 13.9    *Binding Agreement; No Third Party Beneficiaries* .................................. 53
Section 13.10   *Assignment* ........................................................................................... 53
Section 13.11   *Reliance by Third Parties* ...................................................................... 53
Section 13.12   *No Partition* .......................................................................................... 54
Section 13.13   *Non-Recourse* ....................................................................................... 54

Exhibit A       Global Security
Exhibit B       Form of Registration Rights Agreement

Annex A         Owner Governance Matters

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## REVLON GROUP HOLDINGS LLC

This Amended and Restated Limited Liability Company Agreement (this "**Agreement**") of Revlon Group Holdings LLC is made and entered into as of May [2], 2023 ("**Effective Date**"), by and among (i) Revlon Group Holdings LLC, a Delaware limited liability company (the "**Company**"), (ii) any Person who shall hereafter become a party hereto, and a member of the Company, as set forth herein (each Person in clause (ii), a "**Direct Owner**", and collectively, the "**Direct Owners**"), (iii) each Person who is deemed to be a party to this Agreement as a Beneficial Owner (but not as a Direct Owner) pursuant to the Plan of Reorganization, (iv) any other Person who shall hereafter become or be deemed to become a party hereto as a Beneficial Owner (but not as a Direct Owner) as set forth herein (such Beneficial Owners as referenced in clauses (iii) and (iv), together with the Direct Owners, collectively, the "**Owners**"), and (v) Cede & Co. (as defined below), a member of the Company (Cede & Co. and each Direct Owner, a "**Member**", and collectively, the "**Members**").

## RECITALS:

WHEREAS, Revlon, Inc. and certain affiliated debtors filed the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1802] in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on March 31, 2023;

WHEREAS, on April 3, 2023, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] (the "**Confirmation Order**");

WHEREAS, on May 1, 2023, the Debtors filed the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] (as may be amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "**Plan of Reorganization**");

WHEREAS, a Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware on April 12, 2023, and the Company has been formed and is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of April 21, 2023 (the "**Original Agreement**");

WHEREAS, pursuant to the Original Agreement, Amulet Cay, L.L.C. and AG REV HoldCo, LLC were each issued one (1) share of the Company (the "**Initial Shares**") as the initial members of the Company;

WHEREAS, the Owners party hereto as of the date hereof have each received Shares (as hereinafter defined) either as a direct registered holder or as a holder of Beneficial Interests (as

1

defined below), as applicable, pursuant to the Plan of Reorganization (including pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization) in connection therewith) and the Confirmation Order;

WHEREAS, as of the Effective Date, each Person entitled to receive Shares pursuant to the terms of the Plan of Reorganization and the Confirmation Order is (i) entitled to, and permitted only to, receive Shares through DTC (as defined below), and (ii) deemed a party to this Agreement as a "Beneficial Owner" without the requirement to execute this Agreement;

WHEREAS, all Persons who after the date hereof are issued Shares (or Beneficial Interests in respect of newly issued Shares, as applicable) or receive Shares (or Beneficial Interests, as applicable) pursuant to a Transfer from an existing Owner shall be deemed to be parties to this Agreement without the need to sign a joinder to this Agreement (subject to Section 9.5(c)); and

WHEREAS, the Owners and Members desire to establish in this Agreement certain rights and obligations of the parties relating to the governance of the Company and certain other matters, as set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein made and intending to be legally bound, effective as of the Effective Date, the parties hereby amend and restate the Original Agreement in its entirety and enter into this Agreement in order to set forth certain agreements and understandings regarding the Company:

## ARTICLE I
### DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1    *Definitions*.  As used in this Agreement, the following terms shall have the following meanings:

"**Accelerated Buyer**" has the meaning set forth in Section 3.4(e).

"**Accelerated Sale Notice**" has the meaning set forth in Section 3.4(e).

"**Accredited Investor**" means an accredited investor as defined in Regulation D promulgated under the Securities Act.

"**Act**" means the Delaware Limited Liability Company Act, as amended or superseded from time to time.

"**Affiliate**" means, with reference to a specified Person, a Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the specified Person, including any venture capital, private equity or other investment fund or account that is controlled by one or more general partners or managing members of, or shares the same management company, investment advisor or manager (or similar entity with discretionary authority) with, such Person, and the term "Affiliated" shall have the correlative meaning.  The Company and its Subsidiaries and controlled Affiliates shall

not be considered Affiliates of any Member or any Owner or of any Member's Affiliates or Owner's Affiliates for purposes of this Agreement.

"**Aggregate Undiluted Shares**" means, as of any given date, the aggregate number of issued and outstanding Shares as of such date, excluding the Excluded Shares.

"**Agreement**" has the meaning set forth in the preamble.

"**Applicable Law**" means, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decisions, decrees or orders of any Governmental Authority applicable to such Person.

"**Asset Sale**" has the meaning assigned to such term in the definition of Company Sale.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Beneficial Interest**" means, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Shares it Beneficially Owns.

"**Beneficial Owner**" means any Person owning a securities entitlement with respect to Shares registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly (disregarding the third sentence of Section 3.1(a)) through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account. "**Beneficially Owns**" and "**Beneficially Owned**" shall have the correlative meanings.

"**Board**" has the meaning set forth in Section 6.2(a).

"**Board Committee**" has the meaning set forth in Section 6.2(h).

"**Board of Managers**" has the meaning set forth in Section 6.2(a).

"**Business Day**" means any day other than (a) Saturday and Sunday in New York, New York, and (b) any other day on which banks located in New York, New York are required or authorized by law to remain closed.

"**Cede & Co.**" means Cede & Co., as nominee for DTC, or such other nominee as may be selected by DTC, as nominee for DTC, which is the registered holder of the Shares under this Agreement on behalf of the Beneficial Owners.

"**Certificate of Formation**" has the meaning set forth in Section 2.1.

"**CEO Manager**" has the meaning set forth in Section 6.2(a).

"**Chairman**" has the meaning set forth in Section 6.2(g).

3

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commission**" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"**Committee Designated Managers**" has the meaning set forth in Section 6.2(b).

"**Communication**" has the meaning set forth in Section 11.2(b).

"**Company**" has the meaning set forth in the recitals.

"**Company Preemptive Offer Notice**" has the meaning set forth in Section 3.4(c).

"**Company Sale**" means (i) the occurrence of a merger, consolidation, share exchange, business combination or other sale involving the Company and its Subsidiaries or similar corporate transaction involving the Company and its Subsidiaries, whether or not the Company is the surviving entity in any such transaction, other than a transaction which would result in the voting power of the securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or owning entity) at least a majority of the voting power of the securities of the Company or such surviving or owning entity immediately after such transaction (any transaction referred to in this clause (i), a "**Business Combination**"), (ii) any Transfer of all (but not less than all) of the outstanding Shares in any transaction or series of related transactions (any transaction or series of related transactions referred to in this clause (ii), a "**Share Sale**") or (iii) any direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company followed by a distribution of the proceeds ("**Asset Sale**").

"**Competitor**" means (i) any Person that owns or operates assets primarily used in, or that designs, develops, produces, offers for sale or sells products in, the cosmetics, hair color, hair care, fragrances, skincare, or beauty care products businesses (collectively, "**Beauty Companies**") or any Affiliate of such Person, (ii) any Person (together with its Related Persons) that directly or indirectly (A) holds equity interests in any Beauty Company where such equity interests collectively represent greater than 50% of the asset value, or account for greater than 50% of the revenue of, such Person, or (B) controls (as such term has the meaning set forth in the definition of "Affiliate") any Beauty Company or (iii) any other Person as determined from time to time and posted to the Datasite that the Board determines in good faith poses a material competitive risk to the Company or any of its Subsidiaries; *provided* that (1) in the case of clause (i), that no Person who has a passive interest in a Beauty Company shall be deemed to be a Competitor of the Company so long as such Person is not involved in the management of or otherwise provides advice or services to such Beauty Company and has not designated, or does not have the right to designate, any member or non-voting observer of the board of directors (or similar governing body) of such Beauty Company and (2) in the case of clauses (i) or (ii), the Board (excluding the vote of any Manager appointed by, or otherwise affiliated with, a Competitor (as defined without giving effect to this proviso) may determine in good faith that a Person that would be a Competitor pursuant to the foregoing clauses (i) or (ii) shall be deemed to not be a Competitor, notwithstanding clauses (i) or (ii) of this definition.

4

"**Confidential Information**" means all confidential or proprietary information about the Company, its direct and indirect Subsidiaries or any of their respective businesses, including financial statements, reports, and the terms (but not the existence) of this Agreement, and any confidential or proprietary information about the Company, its Subsidiaries or any of their respective businesses to which an Owner or Member is provided access. Notwithstanding the foregoing, Confidential Information shall not include any information that (i) is generally available, or is made generally available, to the public other than as a result of a direct or indirect disclosure by the relevant Owner or Member, or (ii) becomes available to the relevant Owner or Member on a non-confidential basis without breaching any confidentiality obligations to the Company or its Subsidiaries from a source other than the Company or any of its Subsidiaries, or any of their respective Representatives, successors or assigns.

"**Confirmation Order**" has the meaning set forth in the recitals.

"**Control**", "**Controls**", "**Controlling**" or "**Controlled**" means in the case of any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies and/or decision making of such Person, whether through the ownership of voting securities, by contract, operation of law or otherwise.

"**Convertible Securities**" has the meaning assigned to such term in the definition of Equity Securities.

"**Covered Person**" means (i) each Manager, director or officer of the Company or any of its Subsidiaries and each former Manager, director or officer of the Company or any of its Subsidiaries, (ii) Cede & Co. and each employee, authorized signatory, partner, member, manager, agent or other Representative of Cede & Co. or of an Affiliate of Cede & Co., as applicable, and (iii) each Owner and each Member and each former Owner and former Member, and each of their respective Representatives.

"**Credit Agreement**" means that certain Term Credit Agreement, dated as of May 2, 2023, among Revlon Intermediate Holdings IV LLC, a Delaware corporation (as the borrower thereunder), Revlon Intermediate Holdings III, the financial institutions or other entities from time to time parties thereto and Jefferies Finance LLC, as administrative agent and collateral agent thereunder, as may be amended, restated, supplemented, waived or otherwise modified from time to time, and including any credit agreement entered into in replacement thereof.

"**Datasite**" has the meaning set forth in Section 11.1(d).

"**Depository**" or "**DTC**" shall mean The Depository Trust Company, New York, New York, or such other depository of Shares as may be selected by the Company as specified herein.

"**Depository Agreement**" means the Blanket Issuer Letter of Representations (including the riders thereto) from the Company to DTC, dated as of April 24, 2023, as the same may be amended or supplemented from time to time.

"**Designating Key Owners**" mean, as of any relevant date of determination, (i) if three or more Key Owner Committee Members each have an Undiluted Ownership Percentage of at least 10%, then the three Key Owner Committee Members whose Undiluted Ownership Percentage is

5

the highest, or (ii) if two (but not more than two) Key Owner Committee Members each have an Undiluted Ownership Percentage of at least 10%, then each of such two Key Owner Committee Members. For the avoidance of doubt, if at the relevant date of determination only one Key Owner Committee Member has (or no Key Owner Committee Member has) an Undiluted Ownership Percentage of at least 10%, there shall be no Designating Key Owners.

"**Designating Key Owner Termination Date**" means the earliest date from and after the Effective Date on which there are less than two Key Owner Committee Members with an Undiluted Ownership Percentage of at least 10%.

"**Direct Owner**" has the meaning set forth in the preamble. For the avoidance of doubt, each Direct Owner is a Member of the Company.

"**Disproportionately Affected Owner**" has the meaning set forth in <u>Section 13.5</u>.

"**Dissolution Event**" has the meaning set forth in Section <u>12.1</u>.

"**Drag-Along Agents**" has the meaning set forth in <u>Section 9.3</u>.

"**Drag-Along Rights**" has the meaning set forth in <u>Section 9.3</u>.

"**Drag-Along Sale**" has the meaning set forth in <u>Section 9.3</u>.

"**Drag-Along Sale Notice**" has the meaning set forth in <u>Section 9.3</u>.

"**Drag-Along Sellers**" has the meaning set forth in <u>Section 9.3</u>.

"**Dragged Person**" has the meaning set forth in <u>Section 9.3</u>.

"**Dragging Seller**" has the meaning set forth in <u>Section 9.3</u>.

"**DTC Participants**" means, collectively, the participants for which DTC holds and provides asset servicing.

"**Effective Date**" has the meaning set forth in the preamble.

"**Equity Securities**" means (i) any LLC Interests, Shares, capital stock, partnership, membership or limited liability company interests or other equity interests (including other classes, groups or series thereof having such relative rights, powers, duties, obligations and liabilities as may from time to time be established by the Board or other relevant governing body, including rights, powers, duties, obligations and liabilities different from, senior to or more favorable than existing classes, groups and series of Shares, capital stock, partnership, membership or limited liability company interests or other equity interests, and including any profits interests), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Shares, capital stock, partnership interests, membership or limited liability company interests or other equity interests (collectively, "**Convertible Securities**"), and (iii) warrants, options or other rights to purchase or otherwise acquire Shares,

6

capital stock, partnership interests, membership or limited liability company interests or other equity interests (collectively, "**Options**").

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time of reference.

"**Excluded Shares**" means (i) any Shares issued upon the exercise of any Warrants and (ii) any Shares issued pursuant to the Management Incentive Plan or any other compensation or incentive plan approved by the Board.

"**First Annual Meeting**" means the first annual meeting of Owners that occurs after the Effective Date in accordance with Section 2.2 of Annex A hereto.

"**Fiscal Year**" has the meaning set forth in Section 4.1.

"**Global Security**" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A.

"**Governmental Authority**" means any U.S. or non-U.S. federal, state, county, local or municipal government (or similar authority), or political subdivision thereof, any governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court or administrative tribunal.

"**Held of Record**" or "**held of record**" shall have the same definition as set forth in Rule 12g5-l under the Exchange Act, or any successor provision.  "**Hold of Record**", "**Holder of Record**" and "**Holders of Record**" (including when such terms are used without capitalization) shall have correlative meanings.

"**Indemnified Losses**" has the meaning set forth in Section 10.1(a).

"**Independent Manager**" means (i) with respect to any person who is a Manager designated by the Key Owner Committee Members or the Designating Key Owners, as applicable, that such person is neither an employee nor an Affiliate of any Key Owner Committee Member or Designating Key Owner or any of their respective Related Persons, and has no, and has had no, relationship with any Key Owner Committee Member or Designating Key Owner or with any of their respective Related Persons which is material to that person's ability to be independent from such Key Owner Committee Member or Designating Key Owner in connection with the duties as Independent Manager, (ii) with respect to any other Manager (other than the CEO Manager), a Manager that is independent from: (A) the Company pursuant to the standard for independence under the rules of the New York Stock Exchange (as if such rules applied to the Company); and (B) each (a) Owner that holds (together with its Related Persons) more than one percent (1%) of the issued and outstanding Shares, and (b) Person that has an outstanding loan to the Company or its Subsidiaries (together with each Owner of more than one percent (1%) of the issued and outstanding Shares, the "**Interested Parties**"), which Manager shall not have a material relationship with any Interested Party, as determined by the Board in good faith, including, but not limited to, serving or formerly serving (within the last

three years) as an employee, director, officer or partner of an Interested Party, being an immediate family member of a current or former (within the last three years) employee, director, officer or partner of an Interested Party, receiving in excess of $120,000 of direct compensation from an Interested Party in any of the last three years, or having a financial interest in an Interested Party.

"**Indirect Participants**" means, collectively, any U.S. and non-U.S. securities, brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly.

"**Initial Shares**" has the meaning set forth in the recitals.

"**IPO**" means an Initial Public Offering (as defined in the Registration Rights Agreement).

"**Joinder**" means a written undertaking in customary form pursuant to which a Member or Owner, as applicable, acknowledges and agrees that such Member or Owner is bound by the terms and conditions of this Agreement, including making the applicable representations and warranties set forth in <u>Section 8.1</u>.

"**Key Owner Committee Members**" means each of (i) Angelo, Gordon & Co. L.P., (ii) Glendon Capital Management L.P., (iii) King Street Capital Management, L.P., and (iv) Nut Tree Capital Management, LP.; <u>provided</u> that each Owner that is a Key Owner Committee Member shall automatically cease to be a Key Owner Committee Member at such time as the Undiluted Ownership Percentage of such Key Owner Committee Member is less than the lesser of (i) 7% or (ii) 66 2/3% of the Undiluted Ownership Percentage of such Key Owner Committee Member as of the date of this Agreement.  For the avoidance of doubt, when a Key Owner Committee Member ceases to be a Key Owner Committee Member as a result of such Key Owner Committee Member's Undiluted Ownership falling below the applicable threshold set forth in the preceding sentence, any subsequent increase of such Key Owner Committee Member's Undiluted Ownership Percentage above the applicable threshold will not result in such Person again becoming a Key Owner Committee Member.

"**Key Owner Committee Termination Date**" means the first to occur of (i) such time as the Key Owner Committee Members and their Related Persons hold in the aggregate less than 40% of the Aggregate Undiluted Shares, (ii) such time as the Key Owner Committee Members determine that the "Key Owner Committee Termination Date" has occurred and (iii) the 18-month anniversary of the Effective Date; <u>provided</u> that, if the Key Owner Committee Termination Date has not occurred as of the Testing Date, and either of the events described in the foregoing clauses (i) or (ii) occurs on or after the Testing Date and on or before the date of the First Annual Meeting, then the Key Owner Committee Termination Date shall be deferred and shall be deemed to have occurred on the day after the date of the First Annual Meeting.

"**Key Owner Designated Managers**" has the meaning set forth in Section <u>6.2(b)</u>.

"**LLC Interests**" means the limited liability company interests in the Company, including the Shares and any other limited liability company interests in the Company issued in accordance with the terms set forth in Article <u>III</u>.

8

"**Lockup Period**" has the meaning set forth in Section 7.3.

"**Malfeasance**" means, with respect to any Covered Person, gross negligence, fraud or willful misconduct of such Covered Person, or material breach of this Agreement by such Covered Person.

"**Management Incentive Plan**" means the initial management incentive compensation program to be established and implemented by the Board after the Effective Date.

"**Manager**" has the meaning set forth in Section 6.2(a).

"**Member**" has the meaning set forth in the preamble.

"**Non-Employee Person**" has the meaning set forth in Section 6.7.

"**Notice**" has the meaning set forth in Section 13.3.

"**Offered Securities**" has the meaning set forth in Section 3.5(a).

"**Options**" has the meaning assigned to such term in the definition of Equity Securities.

"**Original Agreement**" has the meaning set forth in the recitals.

"**Owner**" has the meaning set forth in the preamble.

"**Ownership Statement**" has the meaning set forth in Section 3.1(d).

"**Person**" means any individual or entity, including any exempted company, exempted limited partnership, private limited company, corporation, partnership, limited partnership, limited liability company, trust, charitable trust or other legal entity, whether organized in the United States or another jurisdiction, or any unincorporated association, or Governmental Authority.

"**Plan of Reorganization**" has the meaning set forth in the recitals.

"**Preemptive Rights Holder**" has the meaning set forth in Section 3.4(a).

"**Prospective Buyer**" shall mean any Person proposing to purchase or otherwise acquire Shares from a Tag-Along Seller.

"**Prospective Drag Purchaser**" has the meaning set forth in Section 9.3.

"**Registration Rights Agreement**" means the Registration Rights Agreement substantially in the form attached hereto as Exhibit B.

"**Related Party Transaction**" means any contract, agreement, transaction or other arrangement (whether written or unwritten) between the Company or any of its Subsidiaries, on the one hand, and (i) any Person (together with its Related Persons) directly or indirectly owning, controlling or holding the power to vote (including pursuant to a contract, agreement,

9

arrangement or other understanding), 5% or more of the outstanding Shares or other Equity Securities, or any officer, director or Affiliate of any such person or such person's Related Persons, (ii) any officer or Manager (or equivalent) of the Company or any of its Subsidiaries or any Affiliate of any of the foregoing persons (excluding any compensation arrangements approved by the Board or a Board Committee), or (iii) any members of the "immediate family" (as such terms are respectively defined in Rule 16a-1 of the Securities Exchange Act of 1934) of any of the persons referenced in clause (i) or clause (ii), on the other hand; provided, that it shall not include any contract, agreement, transaction or other arrangement that is solely between the Corporation and/or any one or more of its wholly-owned Subsidiaries.

"**Related Persons**" means, with respect to a Person, and without duplication, (i) such Person's Affiliates and (ii) any fund, account, investment vehicle or co-investment vehicle that is controlled, managed, advised or sub-advised by such Person or any of its Affiliates or the same investment manager, advisor or sub-advisor as such Person or any Affiliate of such investment manager, advisor or sub-advisor.

"**Representatives**" means, with respect to any Person, any of such Person's Affiliates, managers, partners, shareholders, members, trustees, officers, employees, agents, counsel, advisors, directors, auditors, custodians, contractors, engineers and similar representatives. For purposes of this Agreement, the Owners shall not be deemed Representatives of one another.

"**Rule 144**" means Rule 144 (or any successor provisions) under the Securities Act.

"**Secondary Indemnitors**" has the meaning set forth in Section 10.1(d).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shares**" has the meaning set forth in Section 3.2(b).

"**Emergence Share Transfer**" means the transfer of Shares on the Effective Date in accordance with the Plan of Reorganization, including on account of Allowed OpCo Term Loan Claims (as defined in the Plan of Reorganization) and Allowed 2020 Term B-2 Loan Claims (as defined in the Plan of Reorganization) and pursuant to the Equity Rights Offering (including the Backstop Commitment Agreement) (in each case as defined in the Plan of Reorganization).

"**Subsidiary**" means, with respect to any Person, any other Person that is Controlled, directly or indirectly, by such Person. Unless the context indicates otherwise, "Subsidiary" refers to a Subsidiary of the Company. For the avoidance of doubt, neither the Company nor its Subsidiaries will be treated as a Subsidiary of any Owner or Member or Affiliate of such Owner or Member.

"**Tag-Along Notice**" has the meaning set forth in Section 9.2(a)(i).

"**Tag-Along Notice Period**" has the meaning set forth in Section 9.2(b).

"**Tag-Along Offer**" has the meaning set forth in Section 9.2(a)(i).

"**Tag-Along Portion**" means, with respect to any given Owner and any given Tag-Along Sale, the aggregate number of Shares of the Owner on the date of the Tag-Along Notice *multiplied by* a fraction, the numerator of which is the number of Shares proposed to be sold in the Tag-Along Sale by the Tag-Along Seller and the denominator of which is the aggregate number of Shares of the Tag-Along Seller on the date of the Tag-Along Notice.

"**Tag-Along Response Notice**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Tag-Along Right**" has the meaning set forth in <u>Section 9.2(b)</u>.

"**Tag-Along Sale**" has the meaning set forth in <u>Section 9.2(a).</u>

"**Tag-Along Seller**" has the meaning set forth in <u>Section 9.2(a)</u>.

"**Tagging Person**" has the meaning set forth in <u>Section 9.2(a)(ii)</u>.

"**Term**" has the meaning set forth in <u>Section 2.7</u>.

"**Testing Date**" means the date that is sixty-five (65) days prior to the first anniversary of the date of this Agreement.

"**Transfer**" means a transfer by any Person of the Shares in any form, including pursuant to a sale, assignment, conveyance, pledge, encumbrance, hypothecation or other disposition of all or any part of a Share or any interest therein (including pursuant to any direct or indirect participation right, total return swap or other arrangement that transfers an economic interest in the Shares). For the avoidance of doubt, the term "Transfer" includes a transfer of Shares by a Beneficial Owner through DTC.  The term "Transfer" will include a direct or indirect transfer (or series of related direct or indirect transfers) of any interest in an Owner if the value of the Shares held (directly or indirectly) by the Owner constitutes more than ten percent (10%) of the value being transferred disregarding any cash, cash equivalents and marketable securities involved in such transfer.

"**Transfer Costs**" has the meaning set forth in <u>Section 9.5(d)</u>.

"**Undiluted Ownership Percentage**" means, with respect to any Owner or group of Owners, (i) the number of Shares (excluding Excluded Shares) owned by such Owner (together with its Related Persons) or group of Owners  (together with their Related Persons) as of any date of calculation *divided by* (ii) the Aggregate Undiluted Shares outstanding as of such date of calculation, expressed as a percentage.

"**Warrant**" or "**Warrants**" means those certain warrants of the Company issued pursuant to, and subject to the terms and conditions of, the Warrant Agreement.

"**Warrant Agreement**" means that certain Warrant Agreement dated as of May 2, 2023 between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent, as it may be amended or amended and restated from time to time.

Section 1.2    *Interpretation*.    All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement. All Exhibits, Annexes and Schedules annexed or attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent in writing and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Any references to a statute include the rules and regulations promulgated thereunder in effect from time to time. References to a Person are also to its permitted successors and assigns. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The term "good faith" as used in this Agreement shall mean subjective good faith as understood under Delaware law. It is recognized that references to "Members and Owners", "Members and Direct Owners" and similar references include an overlap of Persons.

## ARTICLE II
### ORGANIZATION

Section 2.1    *Formation of Company*.    The Company was duly formed upon the filing of the certificate of formation of the Company with the Secretary of State of the State of Delaware on April 12, 2023, which certificate sets forth the information required by Section 18-201 of the Act (the "**Certificate of Formation**").    The formation of the Company as a limited liability company under the Act, and all actions taken by the person, as an "authorized person" of the Company within the meaning of the Act, who executed and filed the Certificate of Formation are hereby adopted and ratified.    This Agreement constitutes the "limited liability company agreement" of the Company within the meaning of the Act.    This Agreement shall govern the relationship of the Owners and the Members, except to the extent a provision of this Agreement is expressly prohibited under the Act, and shall be binding upon each Owner and Member (including a Person who becomes an Owner or Member pursuant to a Transfer permitted by this Agreement) whether or not such Owner or Member has executed this Agreement.    If any provision of this Agreement is prohibited under the Act, this Agreement shall be considered amended to the least degree possible in order to make such provision effective under the Act. Each Manager or its designee is hereby designated as an "authorized person" of the Company within the meaning of the Act and is hereby authorized and directed to file any necessary amendments to the Certificate of Formation in the office of the Secretary of State of the State of

12

Delaware and such other documents as may be required or appropriate under the Act or the laws of any other jurisdiction in which the Company may conduct business or own property. The Shares and any other Equity Securities of the Company shall constitute personal property of the owner thereof for all purposes and an Owner or Member has no interest in specific Company property.

Section 2.2    *Name*.  The name of the limited liability company is "Revlon Group Holdings LLC".  The Board may change the name of the Company or adopt such trade or fictitious names for use by the Company as the Board may from time to time determine; <u>provided</u> such name contains the words "Limited Liability Company," the abbreviation "L.L.C." or the designation "LLC." All business of the Company shall be conducted under such names and title to all assets or property owned by the Company shall be held in such names.

Section 2.3    *Purpose.*  Subject to the other terms of this Agreement, as applicable, the purpose and nature of the business to be conducted by the Company shall be to engage directly in, or enter into or form any corporation, partnership, joint venture, limited liability company or other arrangement to engage indirectly in, any business activity that lawfully may be conducted by a limited liability company organized pursuant to the Act and, in connection therewith, to exercise all of the rights and powers conferred upon the Company pursuant to the agreements relating to such business activity.

Section 2.4    *Powers*.  Subject to the other terms of this Agreement, as applicable, the Company shall be empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described in Section 2.3. Notwithstanding anything in this Agreement to the contrary, nothing set forth herein shall be construed as authorizing the Company to take or engage in any action forbidden by law to a limited liability company organized under the laws of the State of Delaware.

Section 2.5    *Principal Place of Business*.  The Company shall maintain an office and principal place of business at such place or places as the Board may determine from time to time.

Section 2.6    *Registered Office and Registered Agent*.  The name of the Company's registered agent for service of process shall be Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building Suite 104, City of Wilmington, 19810, County of New Castle. The registered agent and the registered office of the Company may be changed from time to time by the Board.

Section 2.7    *Term*.  The term of existence of the Company (the "**Term**") shall continue until the Company is terminated, dissolved or liquidated in accordance with this Agreement and the Act.

Section 2.8    *No State-Law Partnership; Tax Status*.  The Members and Owners intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Owner be a partner or joint venturer of any other Member or Owner by virtue of this Agreement, and neither this Agreement nor any other document entered into by the Company, any Member or any Owner relating to the subject matter hereof shall be construed to

13

suggest otherwise. The Members and Owners intend that the Company shall be treated as a corporation for U.S. federal and, if applicable, state or local income tax purposes. The Company shall file an election on Internal Revenue Service Form 8832 to elect to be treated as a corporation for U.S. federal income tax purposes, and the Company and its Members and Owners are authorized to take any and all actions in connection therewith. Each Member and Owner and the Company shall (i) file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and (ii) not take any action inconsistent with such treatment.

Section 2.9    *Title to Company Assets*.  All Company assets, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member or Beneficial Owner individually, shall have any direct ownership interest in such property.

Section 2.10    *Non-Voting Equity Securities*.  The Company shall not issue any non-voting Equity Securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; provided, however, that the foregoing restriction (i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company; (ii) shall not have any further force or effect beyond that required under Section 1123(a)(6) of the Bankruptcy Code; and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

ARTICLE III
MEMBERS; BENEFICIAL OWNERS; ADDITIONAL OWNERS; SHARES

Section 3.1    *Members; Beneficial Owners; Binding Nature of this Agreement*.  (a) A Person shall be admitted as a Member and shall become bound by the terms of this Agreement if such Person purchases or otherwise acquires any Shares in accordance with the provisions of this Article III and holds them directly in accordance with Section 3.2(c).  A Person shall become bound by the terms of this Agreement as a Beneficial Owner if such Person purchases or otherwise acquires any Shares and holds them indirectly in accordance with Section 3.2(c). For purposes of this Agreement, and except as the context otherwise requires, Shares that are "held directly" are held by the Members, as the registered owners of the Shares, and Shares that are "held indirectly" are held through DTC, on behalf of the Beneficial Owners and similar terms such as "hold directly" or "hold indirectly" will be construed accordingly. Pursuant to the Plan of Reorganization, each Person that is entitled to receive Shares pursuant to the terms of the Plan of Reorganization (including Shares issued pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization)) is automatically deemed to have accepted the terms of this Agreement (in its capacity as a Member or Beneficial Owner, as applicable) and is automatically deemed to be a party hereto as a Member or Beneficial Owner, as applicable as if, and with the same effect as if, such Person had delivered a duly executed counterpart signature page to this Agreement, in each case, without any further action by any party.  For the avoidance of doubt, no further approval of the Board, any Member, any Beneficial Owner or any other Person shall be required with respect to the foregoing. Notwithstanding anything to the contrary in this Section 3.1(a), Cede & Co. shall automatically be admitted as a Member upon its acquisition of Shares regardless of whether Cede & Co. signs this Agreement.

14

(b)     Each Person that becomes a Member or a Beneficial Owner after the Effective Date shall be automatically admitted as a Member or a Beneficial Owner, as applicable, upon such Person's acquisition of Shares (whether direct or indirect) without the need to execute this Agreement or a joinder hereto, and shall have all the rights, and be subject to all the obligations, set forth in this Agreement with respect to Members and Beneficial Owners, as applicable, and as provided under the Act.  The Company shall at all times make this Agreement available to each Member and Beneficial Owner on the Datasite and shall deliver or transmit a copy of this Agreement to a Member or Beneficial Owner upon written request (email being sufficient), and each Person that becomes a Member or a Beneficial Owner after the Effective Date shall be deemed to have received this Agreement and to have made the representations and warranties set forth in Section 8.1.

(c)     Under the Plan of Reorganization, in order for a Person entitled to receive Shares under the Plan of Reorganization (including pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization)) to in fact receive those Shares, such Person may be required to take certain actions or provide certain information as set forth in the Plan of Reorganization. The following will apply with respect to any such Person who has not taken the requisite steps as of the date hereof: the Shares to which such Person is entitled will be reserved, but not issued unless and until such Person (or its Representative) takes the requisite actions or provides the information as set forth in the Plan of Reorganization. If the Person (or its Representative) takes the requisite actions and provides the requisite information, as applicable, prior to the time that in accordance with the Plan of Reorganization such Person's entitlement to such Shares is forfeited, then at the time such Person takes the requisite actions or provides the requisite information, as applicable, (i) the applicable Shares will be issued by the Company to such Person (or, if applicable, such Person will receive such Shares through DTC), (ii) on the date of issuance such Person will receive any distributions that would have been paid on the relevant Shares on or prior to such date had the relevant Shares been issued as of the date hereof and (iii) with respect to any distribution with a record date prior to the issue date of the relevant Shares and a payment date after the issue date, such Person will receive such distribution on the applicable payment date regardless of the fact that the Shares were not outstanding on the relevant record date. If such Person (or its Representative) does not take such requisite actions or provide such requisite information in accordance with the Plan of Reorganization prior to the forfeiture of the entitlement to the relevant Shares as set forth in the Plan of Reorganization, (i) such Shares will not be issued to such Person, (ii) such Person shall be entitled to no rights or benefits in respect thereof under this Agreement or otherwise, and (iii) such Person will never have been, and shall not be, a member of the Company, Member or Owner in respect of the Shares it was entitled to receive under the Plan of Reorganization.  Notwithstanding anything in this Agreement to the contrary, during the period between the date hereof and the date of issuance of the relevant Shares (or the forfeiture of the entitlement thereto, as applicable), such Person will have no rights or benefits under this Agreement or otherwise but will be required to comply with the relevant terms of this Agreement, including Section 9.3.

(d)     The Company shall be entitled to request from time to time as is reasonably necessary that any Owner (or applicable group of Owners, as the case may be) provide to the Company reasonably satisfactory evidence of its or their then-present ownership of Shares (an "**Ownership Statement**") in order to verify the applicability of the rights, obligations or eligibility of such Owner or Owners under this Agreement (including in

15

connection with effecting the rights, obligations or eligibility of Owners under Section 3.4, Article VII, Section 9.2, Section 9.3 or Annex A), it being understood that the exercise of any applicable rights by any Owner (or applicable group of Owners, as the case may be) shall be subject to the Company being reasonably satisfied that any applicable ownership threshold or other applicable ownership requirement has been met.  To the extent an Owner does not submit (or cause to be submitted) a reasonably satisfactory Ownership Statement within twenty (20) Business Days (or such earlier date as is determined by the Company under the circumstances, which date provides a reasonable opportunity for Owners to receive such request and submit an Ownership Statement) of the Company's distribution of such request on the Datasite, the Company shall be entitled to treat such Owner as not owning the applicable number or percentage of Shares for purposes of any relevant determination under this Agreement.  The Company may conclusively rely upon any Ownership Statement provided under this Agreement. The information provided under this Section 3.1(d) shall be treated by the Company, including each member of the Board, as strictly confidential, and such holdings information shall not be shared with any other Member or Owner unless consented to in writing by such Owner.

(e)    For the avoidance of doubt, in accordance with Section 18-210 of the Act, each Member and Owner hereby expressly waives any and all appraisal rights with respect to its limited liability company interest in the Company.

Section 3.2    *Shares; DTC*.  (a) The limited liability company interests of the Company will be represented by one or more classes of LLC Interests. The total number and type of LLC Interests will be determined by the Board.

(b)    As of the Effective Date, (i) the Company is authorized to issue one (1) class of LLC Interests, which is designated as "Common Shares" (the "**Shares**"), (ii) after giving effect to the issuance of Shares pursuant to the Plan of Reorganization, the initial aggregate number of Shares outstanding is 50,000,000 and (iii) the Warrants issued and outstanding pursuant to the Warrant Agreement are exercisable for an aggregate of not more than 6,657,224 Shares. The Company shall be authorized to issue an unlimited number of Shares, subject to the terms and conditions of this Agreement. On the Effective Date, immediately following the Emergence Share Transfer, the Initial Shares are deemed to have been cancelled.

(c)    Unless required by law, the Shares will initially be uncertificated and in book-entry form, provided that the Board may determine, at any time that some or all of the Shares or other Equity Securities may be certificated at the option of the Member or Direct Owner. Unless otherwise approved by the Board, all Shares of the Company held (directly or indirectly) by a Member or Owner will be reflected as electronic book-entry interests through the facilities of DTC and will transfer only via electronic book-entry form through the facilities of DTC.  No Person (other than such Person as may be designated by DTC as nominee for DTC) shall become a Direct Owner after the Effective Date without the approval of the Board. Notwithstanding the foregoing, (A) the Board may determine to permit one or more Members or Owners (x) that are not otherwise eligible to hold Shares through DTC to do so (and otherwise waive the foregoing requirements); provided that any such permission granted by the Board shall be applied on a consistent basis to all similarly situated Members or Owners. With respect to such Shares held through DTC, the Beneficial Interests of the Beneficial Owner and not the registered owner (i.e., Cede & Co.) will, except insofar as the context may otherwise require, be

16

determinative for purposes of complying with the terms and conditions of this Agreement (including compliance with provisions relating to Transfers set forth in Article IX hereof). For the sake of clarity, Transfers of Beneficial Interests by Beneficial Owners shall be subject to the terms and conditions Article IX that are otherwise applicable to Members.

(d)    Notwithstanding anything to the contrary in this Agreement, the Board shall, subject always to the Act and any other Applicable Law and regulations and the facilities and requirements of any relevant system concerned (including DTC), have power to implement any arrangements, in its absolute discretion, it may deem reasonably appropriate in relation to the evidencing of title to and Transfer of the Shares (or Beneficial Interests or other interests therein), and to the extent such arrangements are so implemented, no provision of this Agreement shall apply or have effect to the extent that it is in any respect inconsistent with the holding or Transfer of Shares in uncertificated form.

Section 3.3    *Issuance of Additional Equity Securities; No Capital Contributions*.  (a) None of the Members or the Owners is required to make capital contributions (and this Agreement shall not be amended to include required capital contributions). Subject to compliance with Section 3.4, the Board shall have the right to cause the Company to create and/or issue Equity Securities from time to time, including additional classes, groups or series of Equity Securities having such relative rights, powers, duties, obligations and liabilities as may be established by the Board, including rights, powers, duties, obligations and liabilities different from, senior to or more favorable than existing classes, groups and series of Equity Securities. In furtherance of the foregoing, but subject to compliance with Section 3.4, the Board shall have the right to amend and update this Agreement to reflect the terms and/or issuance of such additional Equity Securities, in each case without the approval or consent of any other Person. The Board shall have the right to determine the consideration payable to the Company in connection with the issuance of any Equity Securities (if any).  In connection with the issuance of any Equity Securities, subject to Section 13.5, the Board may authorize additional restrictions on, and/or grant additional rights to, the holders (direct or indirect) of such Equity Securities pursuant to agreements entered into in connection with the issuance of such Equity Securities (including vesting provisions, restrictions on transfer, and redemption or repurchase rights and obligations) in addition to the restrictions, conditions, and rights under this Agreement.

(b)    Subject in all cases to the preemptive rights granted pursuant to Section 3.4 hereof, the Board will be authorized, without the need to obtain the consent or approval of any Person, including any Member or Owner (but subject to Section 13.5), to authorize and implement (and adopt any amendment to this Agreement to effectuate) the issuance of additional Equity Securities pursuant to this Section 3.3.

Section 3.4    *Preemptive Rights*.

(a)    *Grant of Preemptive Rights.*  Except for issuances of Equity Securities as set forth in Section 3.4(b), and subject to compliance with Section 9.5, if the Board authorizes the sale of any Equity Securities of the Company or of any Subsidiary of the Company, or any Subsidiary of the Company proposes to sell any new Equity Securities of such Subsidiary or of any other Subsidiary of the Company, to any Person for cash (the "**Offered Securities**"), the Company shall, or shall cause the applicable Subsidiary to, offer to sell to each Owner who is an

17

Accredited Investor and who holds (directly or indirectly), together with its Related Persons, Shares representing an Undiluted Ownership Percentage of at least two percent (2.0%) (a "**Preemptive Rights Holder**") as of the close of business on the record date determined by the Board (which record date shall be no more than twenty (20) Business Days prior to, nor later than, the date of the Company Preemptive Offer Notice (as defined below), a portion of such Offered Securities equal to (i) the amount of the Offered Securities proposed to be sold, *multiplied by* (ii) a fraction, the numerator of which is the total number of Shares held (directly or indirectly) by the Preemptive Rights Holder and the denominator of which is the total number of Shares held (directly or indirectly) by all of the Preemptive Rights Holders. The Company shall request Ownership Statements from all Owners in order to determine the Owners that qualify as Preemptive Rights Holders.

(b)     *Exceptions to Preemptive Rights*.    Notwithstanding anything in this Agreement to the contrary, the preemptive rights granted to the Preemptive Rights Holders in Section 3.4(a) shall not apply to the offer or sale of any of the following Equity Securities:

(i)     The Warrants and Shares issued in accordance with the Plan of Reorganization (including any such Warrants or Shares issued after the Effective Date) including, for the avoidance of doubt, Shares in respect of the Backstop Commitment Premium or the Equity Subscription Rights (in each case as defined in the Plan of Reorganization);

(ii)     Equity Securities issued upon the conversion or exercise or exchange of any options, warrants (including the Warrants), or other securities convertible into, or exercisable or exchangeable for, Equity Securities, that are outstanding on the Effective Date or are issued after the Effective Date in compliance with the provisions of this Section 3.4 (including any issuance to which Section 3.4(a) does not apply by virtue of any other sub-clause in this Section 3.4(b));

(iii)     Equity Securities issued pursuant to the Management Incentive Plan or any other employee benefit or incentive plan that, in each case, has been approved by the Board;

(iv)     Equity Securities issued to a third party as consideration in any business combination or acquisition transaction involving the Company or any Subsidiary or in any joint venture or strategic partnership in each case, that shall have been approved by the Board;

(v)     Equity Securities issued pursuant to an IPO;

(vi)     Equity Securities issued in connection with any Share split, Share dividend or other distribution on account of any Shares, any reverse split or any recapitalization, reorganization or reclassification of the Company or any of its Subsidiaries, in each case to the extent such issuance is made on a *pro rata* basis to all holders of Shares;

(vii)     Equity Securities issued as a *bona-fide* "equity kicker" to a lender (or its Affiliated designee) in connection with any incurrence of indebtedness from a lender, or to any other vendor, customer or consultant in the ordinary course of business; and

18

(viii)   Equity Securities issued by a Subsidiary of the Company to the Company or to any of its other wholly owned Subsidiaries.

(c)     *Exercise of Preemptive Rights*.   In order to exercise preemptive rights under this Section 3.4, a Preemptive Rights Holder must deliver an irrevocable written notice to the Company describing such Preemptive Rights Holder's election to purchase all or any portion (as specified by the Preemptive Rights Holder) of the Offered Securities offered to such Preemptive Rights Holder hereunder within fifteen (15) Business Days after receipt of written notice from the Company (the "**Company Preemptive Offer Notice**") describing in reasonable detail (i) the Offered Securities to be offered, (ii) the purchase price and other material terms with respect to such offering, and (iii) the number of Offered Securities such Preemptive Rights Holder is eligible to purchase pursuant to this Section 3.4; provided, however, that in the event that a Preemptive Rights Holder fails to deliver on a timely basis an irrevocable written notice to the Company to purchase all or any portion of the Offered Securities offered to such Preemptive Rights Holder, or delivers such an irrevocable written notice and subsequently fails to purchase the Offered Securities set forth in such irrevocable written notice, such Offered Securities shall first be offered for a period of ten (10) Business Days to all other Preemptive Rights Holders that fully exercised their rights under this Section 3.4 and purchased the applicable Offered Securities. Such reoffer of Offered Securities to Preemptive Rights Holders shall be repeated until all Offered Securities have been purchased or no Preemptive Rights Holder elects to further exercise its rights.

(d)     *Issuances Subsequent to Offering Period*.   Upon the expiration of the 25-Business Day offering period (and any reoffer period as provided in Section 3.4(c)) described in Section 3.4(c) and during the one hundred eighty (180) calendar days following such expiration, the Company or the applicable Subsidiary shall be entitled to offer and sell any Offered Securities which the Preemptive Rights Holders have not elected to purchase to any Person or Persons (i) at a price not less than, and on other terms and conditions no more favorable to such Person or Persons in the aggregate than, the prices, terms and conditions offered to the Preemptive Rights Holders, and (ii) and on other terms and conditions no less favorable to the Company.  Any Equity Securities offered or sold by the Company or the applicable Subsidiary after such 180-day period must be reoffered to the Preemptive Rights Holders pursuant to the terms of this Section 3.4.

(e)     *Accelerated Sales*.   Notwithstanding anything to the contrary contained herein, the Company may issue Equity Securities in accordance with Section 3.3 to any purchaser (an "**Accelerated Buyer**") without first complying with the provisions of this Section 3.4 if the Board, acting in good faith, determines it is in the best interest of the Company to consummate such issuance without having first complied with such provisions; provided, that in connection with any such issuance, the Company shall give the Preemptive Rights Holders written notice of such issuance within 5 Business Days after the occurrence of such issuance, which notice (an "**Accelerated Sale Notice**") shall describe in reasonable detail (a) the material terms and conditions of the issuance of the Offered Securities to the Accelerated Buyer, including the number or amount and description of the Equity Securities issued, the issuance date, the purchase price per share, and the name and address of the Accelerated Buyer and (b) the rights of the Preemptive Rights Holders to purchase the Offered Securities, pursuant to this paragraph, in connection with such issuance.  In the event of any such issuance of Offered

Securities to an Accelerated Buyer, each Preemptive Rights Holder shall have the right, at any time during the fifteen (15) Business Days following receipt of the Accelerated Sale Notice, to elect to purchase the Offered Securities in an amount equal to the amount of such Offered Securities it would have been entitled to purchase if the sale to the Accelerated Buyer had instead been completed without regard to this Section 3.4.  If one or more such Preemptive Rights Holders exercise the election to make a purchase, the Company or applicable Subsidiary shall give effect to each such exercise by either (i) requiring that the Accelerated Buyer sell down a portion (or, if necessary, all) of its Equity Securities, or (ii) issuing additional Offered Securities to such Preemptive Rights Holders, or a combination of (i) and (ii), so long as such action effectively provides such Preemptive Rights Holders with the same percentage ownership interest in the relevant Equity Securities it would have received had this paragraph not been utilized.

(f)    *Assignment*.  A Preemptive Rights Holder may assign its Offered Securities to any Affiliate (whether or not an Owner) that agrees to be bound by the provisions of this Agreement applicable to the Preemptive Rights Holder by executing a Joinder (which may, at the Company's election, be on a "click-through" basis).

Section 3.5    *Book-Entry-Only System; Global Securities*.

(a)    *Global Security*. The Company will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for Shares. The Shares deposited with DTC will be represented by one or more Global Securities (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Shares will be issued. The Global Security shall be in the form attached hereto as Exhibit A or described therein and shall represent such Shares as shall be specified therein, and may provide that it shall represent the aggregate amount of outstanding  Shares from time to time endorsed thereon and that the aggregate amount of outstanding Shares represented thereby may from time to time be increased or decreased.  As of the Effective Date, without the need for any action or consent of any Person, including the Board, one or more Global Securities shall be issued reflecting the number of Shares to be issued to Cede & Co. as of the Effective Date. Any Global Security shall be executed by an officer on behalf of the Company. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of outstanding Shares represented thereby shall be made in such manner and upon instructions given by the Board as specified in the Depository Agreement.

(b)    *Legend.* Any Global Security issued to DTC or its nominee shall bear a legend substantially to the following effect: "Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("**DTC**"), to the Company or its agent for registration of transfer, exchange, or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is required by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein."

20

(c)    *Beneficial Owners.* As provided in the Depository Agreement, upon the settlement date of any creation, transfer or redemption of Shares of a Beneficial Owner, the Depository will credit or debit, on its book-entry registration and transfer system, the number of Shares so created, transferred or redeemed to the accounts of the appropriate DTC Participants. Holders of Beneficial Interests in Shares will be limited to DTC Participants, Indirect Participants and persons holding Beneficial Interests through DTC Participants and Indirect Participants. Beneficial Owners will be shown on, and the transfer of Beneficial Ownership by Beneficial Owners will be effected only through, in the case of DTC Participants, records maintained by the Depository and, in the case of Indirect Participants and Beneficial Owners holding through a DTC Participant or an Indirect Participant, through those records or the records of the relevant DTC Participants. Beneficial Owners are expected to receive from or through the broker or bank that maintains the account through which the Beneficial Owner has purchased or sold Shares a written confirmation relating to their purchase or sale of Shares.

(d)    *Reliance on Procedures.* So long as Cede & Co., as nominee of DTC, is the registered owner of Shares, references herein to the registered or record owners of such Shares shall mean Cede & Co. and shall not mean the Beneficial Owners of such Shares. Beneficial Owners of Shares will not be entitled to have such Shares registered in their names, will not receive or be entitled to receive physical delivery of certificates in definitive form and will not be considered the record or registered holder of such Shares under this Agreement. Accordingly, except as the Company may otherwise determine, to exercise any rights of a holder of Shares under this Agreement, a Beneficial Owner must rely on the procedures of DTC and, if such Beneficial Owner is not a DTC Participant, on the procedures of each DTC Participant or Indirect Participant through which such Beneficial Owner holds its interests. The Board understands that under existing industry practice, if the Board requests any action of a Beneficial Owner, or a Beneficial Owner desires to take any action that DTC, as the record owner of all outstanding Shares of such Beneficial Owner, is entitled to take, DTC will notify the DTC Participants regarding such request, such DTC Participants will in turn notify each Indirect Participant holding Shares through it, with each successive Indirect Participant continuing to notify each person holding Shares through it until the request has reached the Beneficial Owner, and in the case of a request or authorization to act being sought or given by a Beneficial Owner, such request or authorization is given by the Beneficial Owner and relayed back to the Board through each Indirect Participant and DTC Participant through which the Beneficial Owner's interest in the Shares is held.

(e)    *Communication between the Board and the Beneficial Owners.* As described above, the Board will recognize DTC or its nominee as the registered owner of Shares registered in the name of Cede & Co. or as otherwise instructed by DTC as described in Section 3.5(a) hereof for all purposes except as expressly set forth in this Agreement. Conveyance of all notices, statements and other communications to Beneficial Owners of Shares deposited with DTC will be effected as follows. Pursuant to the Depository Agreement, DTC is required to make available to the Company upon request and for a fee to be charged to the Company a listing of the Share holdings of each DTC Participant. The Company shall inquire of each such DTC Participant as to the number of Beneficial Owners holding Shares, directly or indirectly, through such DTC Participant. The Company shall provide each such DTC Participant with sufficient copies of such notice, statement or other communication, in such form, number and at such place as such DTC Participant may reasonably request, in order that such notice, statement

21

or communication may be transmitted by such DTC Participant, directly or indirectly, to such Beneficial Owners. In addition, the Company shall pay to each such DTC Participant an amount as reimbursement for the expenses attendant to such transmittal, all subject to applicable statutory and regulatory requirements. Notwithstanding the foregoing, the Company may communicate with Beneficial Owners as set forth in Section 13.3.

(f)    *Distributions*. Distributions pursuant to Section 5.3 shall be made to DTC or its nominee, Cede & Co., as the registered owner of the relevant Shares. The Board expects that DTC or its nominee, upon receipt of any payment of distributions in respect of the relevant Shares, shall credit immediately DTC Participants' accounts with payments in amounts proportionate to their respective Beneficial Interests in Shares as shown on the records of DTC or its nominee. The Board also expects that payments by DTC Participants to Indirect Participants and Beneficial Owners held through such DTC Participants and Indirect Participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers in bearer form or registered in a "street name," and will be the responsibility of such DTC Participants and Indirect Participants. Neither the Board nor the Company will have any responsibility or liability for any aspects of the records relating to or notices to Beneficial Owners, or payments made on account of beneficial ownership interests in the relevant Shares, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or for any other aspect of the relationship between DTC and the DTC Participants or the relationship between such DTC Participants and the Indirect Participants and Beneficial Owners owning through such DTC Participants or Indirect Participants or between or among the Depository, any Beneficial Owner and any person by or through which such Beneficial Owner is considered to hold Shares indirectly.

(g)    *Successor Depository*. If a successor to DTC shall be employed as hereunder, the Board shall establish procedures acceptable to such successor with respect to the matters addressed in this Section 3.5.

Section 3.6    *Liability of Owners and Members*.  Except as otherwise provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither Owners nor Members shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Owner, as the case may be.

Section 3.7    *Fully Paid and Non-Assessable Nature of Equity Securities*. All Shares issued on the Effective Date, and all other Shares and other Equity Securities issued pursuant to, and in accordance with, the requirements of this Agreement shall be duly issued, fully paid and non-assessable.

## ARTICLE IV
### FISCAL YEAR

Section 4.1    *Fiscal Year.*  The fiscal year of the Company (the "**Fiscal Year**") shall be a calendar year ending December 31 or such other fiscal year as may be determined by the Board.

ARTICLE V
DISTRIBUTIONS

Section 5.1    *Interest*.  No interest shall be paid to any Member or Owner on account of its interest in the Company.

Section 5.2    *No Right to Withdraw*.  Except in connection with the Transfer of Shares in accordance with the terms of this Agreement such that the Transferring Member or Owner no longer holds any Shares, no Member or Owner shall have any right to voluntarily resign or otherwise withdraw from the Company without the prior written consent of the Board. A resigning Member or Owner shall only be entitled to receive amounts approved by the Board on the terms and conditions set forth by such Board. A resigning Member or Owner shall not be entitled to a distribution of the fair value of its Shares under Section 18-604 of the Act.

Section 5.3    *Distributions*.

(a)    The Board may, from time to time, declare and authorize payment of distributions to the Members, which distributions may be paid in cash, property or securities of the Company.

(b)    All distributions shall be made on a *pro rata* basis among Members based on the Shares held by such Members (it being understood that the treatment of distributions to Cede & Co. are addressed in Section 3.5(f)), subject to the provisions of law and this Agreement, out of funds or amounts legally available therefor, at such times and to the Members of record on such dates as the Board may, from time to time, determine in accordance with this Agreement and Applicable Law.  Amounts distributable to any Member will be subject to offset to the extent of any obligation owed by such Member to the Company. As of the date hereof, there are no Members other than Cede & Co.

(c)    Neither Members nor Owners shall be entitled to receive any distributions from the Company, whether in respect of the fair value of its Shares or otherwise, except as expressly provided in this Agreement or under the Act.

Section 5.4    *Withholding*.  The Company is authorized to deduct or withhold from distributions to the Members and to pay over to any federal, state, local or foreign governmental authority any amounts which it reasonably determines may be required to be so deducted or withheld pursuant to the Code or any provisions of any Applicable Law.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any distribution to any Member (including any interest, penalties and expenses incurred in respect thereof) shall be treated as amounts distributed to such Member pursuant to this Article for all purposes under this Agreement, and shall reduce the amount otherwise distributable to such Member. If the Company intends to deduct or withhold from a distribution otherwise payable to any Member, it shall notify such Member of its intention to deduct or withhold, which notice shall include a statement of the amounts it intends to deduct or withhold in respect of making of such distribution and the applicable provision of law requiring the Company to withhold or deduct, in each case twenty (20) days prior to such distribution. The Company shall reasonably cooperate with such Member to reduce or eliminate such deduction or withholding.

23

ARTICLE VI

MANAGEMENT OF THE COMPANY

Section 6.1    *Management by the Board of Managers*.    (a) Except as otherwise expressly provided in this Agreement, the business and affairs of the Company shall be managed by or under the direction of the Board.  No Member or Owner, by virtue of such Member's or Owner's status as such, shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into, execute or deliver contracts on behalf of, or to otherwise bind, the Company. In addition to the powers that now or hereafter can be granted to managers under the Act and to all other powers granted under any other provision of this Agreement, the Board shall have full power and authority to do, and to direct the officers of the Company or other designees to do, all things and on such terms as it determines to be necessary, convenient or appropriate to conduct the business of the Company, to exercise all powers, and to effectuate the purposes, set forth in Section 2.3, including adopting and maintaining the Management Incentive Plan and making all determinations with respect thereto, such as identifying participants, determining forms of award, approving individual allocations and providing for other terms and conditions under the Management Incentive Plan (provided that any Equity Securities granted or issued under the Management Incentive Plan shall, regardless of the time of grant or issue of such Equity Interests, dilute all Members and Owners equally and ratably).

(b)    The Managers shall constitute "managers," within the meaning of the Act. The Board shall have the power and authority to delegate to one or more other Persons the Board's rights and powers to manage and control the business and affairs, or any portion thereof, of the Company, including to delegate to officers, agents and employees of the Company and its Subsidiaries and any other Person and may authorize the Company, any Manager, officer, agent, employee, or any other Person to enter into any document on behalf of the Company and perform the obligations of the Company thereunder. Any such delegation may be revoked by the Board at any time. No Manager shall have the authority to individually exercise its powers as a "manager" under the Act unless expressly authorized pursuant to the terms of this Agreement or by the Board.

Section 6.2    *Board of Managers*.

(a)    *Constitution; Fiduciary Duties*.   A board of managers (the "**Board**" or "**Board of Managers**") shall be constituted for the Company.  The Board shall consist of seven (7) managers (each, a "**Manager**" and collectively, the "**Managers**"), of whom (i) one shall be the individual that is the Chief Executive Officer of the Company at the relevant time (the "**CEO Manager**") and (ii) six shall be Independent Managers selected in accordance with Section 6.2(b).  The Managers, in their capacities as managers of the Company, shall have fiduciary duties to the Company, the Members and the Owners to the same extent as the fiduciary duties that the directors of a Delaware corporation owe to a corporation and its stockholders. Notwithstanding any provision herein or in Sections 18-1001 or 18-1002 of the Act to the contrary, to the full extent permitted by law, Owners shall have the same rights to bring derivative actions with respect to the Company as a beneficial owner of shares of a Delaware corporation would have with respect to such a corporation under applicable Delaware law. For the avoidance of doubt, termination, resignation or other removal of the individual then serving

24

as Chief Executive Officer shall automatically result in the deemed resignation from the Board of such individual from the position of CEO Manager, and the appointment of a new Chief Executive Officer shall automatically result in the deemed appointment to the Board of such new Chief Executive Officer as the CEO Manager.

(b)   *Selection of Independent Managers.*

(i)   Prior to the Key Owner Committee Termination Date, six individuals shall be designated by the Key Owner Committee Members to serve as Independent Managers (the "**Committee Designated Managers**") (it being understood that the occurrence of the Key Owner Committee Termination Date shall not require the Committee Designated Managers to resign as Managers except as otherwise provided in Section 6.2(b)(iii)).

(ii)   After the Key Owner Committee Termination Date:

(A) So long as the Designating Key Owner Termination Date has not occurred, (x) two individuals shall be designated by the Designating Key Owners to serve as Independent Managers (the "**Key Owner Designated Managers**") and (y) four individuals shall be elected by the Owners to serve as Independent Managers in accordance with Annex A; and

(B) After the Designating Key Owner Termination Date, six individuals shall be elected by the Owners to serve as Independent Managers in accordance with Annex A (it being understood that the occurrence of the Designating Key Owner Termination Date shall not require the Key Owner Designated Managers to resign as Managers).

(iii)   The Managers as of the date hereof are Debra Perelman (in her capacity as the CEO Manager), Elizabeth A. Smith, Martin Brok, Timothy McLevish, Hans Melotte and Paul Pressler, with one vacancy. Promptly following the Key Owner Committee Termination Date (and so long as the Designating Key Owner Termination Date has not occurred), the Designating Key Owners shall designate two of the then-current Managers (other than the CEO Manager) as Managers who shall not be eligible to be nominated pursuant to Section 6.2(b)(ii)(A)(y), with the effect that, after the Key Owner Committee Termination Date and so long as the Designating Key Owner Termination Date has not occurred, such individuals (and each of their respective successors) (if any) may be removed and replaced at any time by the Designating Key Owners.

(iv)   All acts or decisions of the Key Owner Committee Members shall require the approval of Key Owner Committee Members (together with their Related Persons) holding at least 70% of the aggregate number of Shares (excluding Excluded Shares) held by all Key Owner Committee Members (together with their Related Persons).  All acts or decisions of the Designating Key Owners shall require approval of Designating Key Owners (together with their Related Persons) holding at least a majority of the aggregate number of Shares (excluding Excluded Shares) held by all Designating Key Owners (together with their Related Persons).

25

(v)    For the avoidance of doubt, the Manager designation rights of the Key Owner Committee Members pursuant to Section 6.2(b)(i) and of the Designating Key Owners pursuant to Section 6.2(b)(ii)(A)(x) (and the related rights pursuant to Section 6.2(c) in the case of removal or vacancies) are contractual rights of the Key Owner Committee Members and the Designating Key Owners, as applicable, and are not subject to any vote of any other Owners.

(vi)    The Company shall be entitled to request from time to time as determined by the Company that each Key Owner Committee Member or each Designating Key Owner, as applicable, provide to the Company reasonably satisfactory evidence of its then-present ownership of Shares in order to verify the applicable of the rights of such Key Owner Committee Member or Designating Key Owner under this Agreement.

(c)    *Vacancies; Removal*.  Any Committee Designated Manager or any Key Owner Designated Manager may be removed and replaced, with or without cause and for any reason or no reason at any time, by (and only by) the Key Owner Committee Members or the Designating Key Owners, as applicable.  A Manager may also resign of his or her own volition at any time, by written notice to the Company. In the event of any vacancy on the Board, such vacancy shall be filled (i) in the case of a vacancy of a Committee Designated Manager or Key Owner Designated Manager, by the Key Owner Committee Members or the Designating Key Owners, as applicable, and (ii) in the case of any other vacancy, by the Board.  Independent Managers elected by the Owners in accordance with Annex A may be removed in accordance with Annex A.

(d)    *Meetings of the Board of Managers*.

(i)    Meetings of the Board shall be held at least once per fiscal quarter of the Company on such dates and at such places and times as may be determined by the Board. Special meetings of the Board may be called by the Chairman or by any two (or more) Managers on at least 72 hours' prior written notice (which includes e-mail).  The Chairman shall preside at all meetings of the Board at which he or she is present and shall exercise such powers and perform such other duties as shall be determined from time to time by the Board; provided, that if the Chairman is absent from any such meeting, any vice Chairman designated by the Board shall preside over such meeting.

(ii)    Meetings of the Board may be held by telephone conference or other communications equipment by means of which all participating Managers can simultaneously hear each other during the meeting.

(e)    *Quorum; Action by the Board; Action by Written Consent*.  No action may be taken at a meeting of the Board unless a majority of the Managers in office are present in person or as otherwise permitted in Section 6.2(d).  At any meeting of the Board at which a quorum is present, an action undertaken by Managers representing a simple majority of the Managers present shall be the action of the Board.  Any action required or permitted to be taken by the Board may be taken without a meeting, if consent to such action is delivered in writing or via electronic transmission (as defined in the Act) by such number of Managers that would be required if such action were voted on at a meeting of the Board attended by all Managers. Such

26

written consent or a record of such electronic transmission shall be filed with the records of the Board.

(f)    *Compensation of Managers; Expenses*.    The Board shall have the authority (as an expense of the Company) to fix the compensation of Managers (other than the CEO Manager or any Manager that is an employee of the Company or any of its Subsidiaries, who shall not receive additional compensation for serving as a Manager).  No such payment shall preclude any Manager from serving the Company in any other capacity and receiving compensation therefor.  The Company shall pay all reasonable out-of-pocket expenses incurred by each Manager in connection with attending regular and special meetings of the Board and any Board Committee on which the Manager is a member, and any such meetings of the board of directors or equivalent body of any Subsidiary of the Company and any committee thereof, in each case, on which the Manager is a member.

(g)    *Chairman of the Board*. The Board shall select a Manager (other than the CEO Manager) to serve as the Chairman of the Board (the "**Chairman**") from time to time, having such responsibilities as are determined by the Board; provided that at any time that the Designating Key Owners have the right to select the Key Owner Designated Managers, the Designating Key Owners shall have the right to select the Manager that shall be designated as the Chairman (which may be a Key Owner Designated Manager or another Manager (other than the CEO Manager), as determined by the Designating Key Owners).

(h)    *Board Committees.*    The Board may designate one (1) or more Board committees (each, a "**Board Committee**") consisting of one (1) or more Managers, which, to the extent provided in such designation, shall have and may exercise, subject to the provisions of this Agreement, the powers and authority granted hereunder. Such Board Committee or Board Committees shall have such name or names as may be determined from time to time by the Board.  A majority of all the members of any such Board Committee may determine its action and fix the time and place, if any, of its meetings and specify what notice thereof, if any, shall be given, unless the Board shall otherwise provide. The Board shall have power to change the members of any such Board Committee at any time, to fill vacancies, and to discharge any such Board Committee, either with or without cause, at any time.

Section 6.3    *Actions Requiring Approval of the Board*.

(a)    General. The Company shall not take any action, and shall cause each of its Subsidiaries not to, and shall not permit any of its Subsidiaries to, take any action with respect to any of the following matters without prior approval of the Board:

(i)    any entry by the Company or any of its Subsidiaries into new lines of business;

(ii)    the declaration of any dividend on or the making of any distribution with respect to, or the redemption, repurchase or other acquisition of, any Equity Securities of the Company or any of its Subsidiaries, except for redemptions, repurchases or other acquisitions of securities pursuant to the terms of the Management Incentive Plan or any

27

officer, director, employee or service provider compensation arrangements approved by the Board;

(iii) any creation, incurrence, assumption or guarantee of any indebtedness for borrowed money in excess of $25,000,000 in the aggregate (excluding any borrowings under the ABL Facility (as defined in the Credit Agreement) in the ordinary course of business up to the amount of the commitments under the ABL Facility that are in effect as of the Effective Date) or, other than as required pursuant to the Credit Agreement or the ABL Facility, the creation or imposition of any lien on any material assets of the Company or any of its Subsidiaries;

(iv) any (A) merger, consolidation, reorganization (including conversion), recapitalization or any other business combination (including a Business Combination or Asset Sale) involving the Company or any of its Subsidiaries (but, in the case of a Drag-Along Sale, only to the extent set forth in Section 9.3(a)) (other than mergers, consolidations, reorganizations, conversions or recapitalizations solely between and/or among the Company and/or any wholly owned Subsidiaries of the Company), (B) acquisition or disposition of assets or liabilities that are material to the Company and its Subsidiaries taken as a whole, or (C) sale of all or substantially all of the assets of the Company and its Subsidiaries (but, in the case of a Drag-Along Sale, only to the extent set forth in Section 9.3(a)) (other than sales solely between and/or among the Company and/or wholly owned Subsidiaries of the Company);

(v) approval of an IPO (including the registration statement in connection therewith);

(vi) any issuance of Equity Securities, other than (x) upon exercise or conversion of (A) any Warrants or (B) any Equity Securities (in accordance with their terms) the issuance of which was previously approved by the Board or (y) the Equity Securities described in Section 3.4(b)(i).

(vii) any liquidation, dissolution, commencement of bankruptcy or similar proceedings with respect to the Company or any of its Subsidiaries (other than any liquidation or dissolution of wholly owned Subsidiaries of the Company that do not have any assets or liabilities other than as may be *de minimis* in nature or amount);

(viii) any hiring or termination of employment or service of the Chief Executive Officer or any other member of senior management of the Company or any of its Subsidiaries;

(ix) any determination of compensation, benefits, perquisites and other incentives for the Chief Executive Officer and other senior management of the Company or any of its Subsidiaries and the approval or amendment of any plans or agreements in connection therewith;

(x) any adoption of, or amendment or modification to, any compensation plan, management incentive plan (including the Management Incentive Plan) or employee benefits plan;

(xi)    any grant of equity incentives to senior management or service providers;

(xii)    settling of any litigation not covered by insurance with a settlement amount in excess of $1,000,000 in any settlement or series of related settlements, or initiating any material litigation;

(xiii)    any selection or removal of the Company's principal auditor;

(xiv)    any approval of the annual business plan, annual budget or long-term strategic plan of the Company or any of its Subsidiaries or any material amendment thereto; or

(xv)    any amendment or modification of this Agreement.

(b)    Related Party Transactions.    The entry into, consummation, amendment, modification (including by waiver) or termination of any Related Party Transaction shall require the approval of a majority of the Managers present at a meeting at which a quorum is present, provided that any Manager Affiliated with, the counterparty to such Related Party Transaction or such party's Related Persons, or otherwise having a material interest in the Related Party Transaction that is unique as compared to the interests of Members and Owners in general, shall not be entitled to vote for purposes of such approval; *provided*, *however*, that no such approval shall be required for (x) any Related Party Transaction if such Related Party Transaction is, in the good faith determination of the Board, on terms and conditions that are equal to or more beneficial to the Company than the terms and conditions pursuant to which an independent third party would provide the goods or perform the services that are the subject of the Related Party Transaction or (y) any acquisition of Equity Securities pursuant to Section 3.4 or any acquisition of any debt securities pursuant to preemptive rights that are granted that are substantially similar to the rights under Section 3.4.

Section 6.4    *Matters Requiring Approval by the Owners*.    The Company shall not take any action without the approval of the Owners to the extent such action would require the prior approval of the stockholders of a Delaware corporation pursuant to and in accordance with the Delaware General Corporation Law if the Company were a Delaware corporation; provided that the foregoing shall not apply to (i) the appointment, removal or replacement of any Committee Designated Manager or any Key Owner Designated Manager, or (ii) a Drag-Along Sale.

Section 6.5    *Matters Relating to Owners*.    The Company shall comply with the provisions of Annex A attached hereto.

Section 6.6    *Officers*.    The Board may, at its discretion, appoint officers of the Company at any time to conduct, or to assist the Board in the conduct of, the day-to-day business and affairs of the Company.    The officers of the Company shall include a Chief Executive Officer, President, a Secretary, one or more Assistant Secretaries, a Treasurer and any other officers as the Board may elect from time to time.    The officers shall serve at the pleasure of the Board subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. The officers shall exercise such powers and perform

29

such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Board, but subject in all instances to the supervision and control of the Board. The officers shall have such authority to sign checks, instruments and other documents on behalf of the Company as may be delegated to them by the Board.  Officers, in their capacities as officers of the Company, shall have fiduciary duties to the Company, the Members and the Owners to the same extent as the fiduciary duties that the officers of a Delaware corporation owe to a corporation and its stockholders.

Section 6.7    *Waiver of Corporate Opportunities*.  Each of the Company, the Members and the Owners recognizes that one or more Persons, including the Managers (other than the CEO Manager), any of the Members or any of the Owners (but excluding any employees of the Company or any of its Subsidiaries) (collectively, "**Non-Employee Persons**") have or may in the future have other business interests, activities and investments or opportunities with respect thereto, some of which may be in conflict or competition with the business of the Company, and that such Non-Employee Persons are entitled to carry on such other business interests, activities and investments and/or compete with the Company or pursue such opportunities, even if such interests, activities and investments are adverse to the interests of the Company or one or more of its Members or Owners, and shall have no obligation to present any such opportunities to the Company or any other Person (except to the extent that such opportunity was presented to a Manager expressly in such Person's capacity as a Manager). Neither the Company, its Subsidiaries, the other Members and Owners nor any other Person shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company or any of its Subsidiaries, by a Non-Employee Person (or any of their Affiliates or any other Person with which such Non-Employee Person is acting) shall not be deemed wrongful or improper or constitute a breach of any duty or obligation (contractual, fiduciary or otherwise). Each of the Non-Employee Persons, in their sole discretion, may offer an opportunity to participate in any such business or venture to any Person, including any Members or Owners or their respective Affiliates without any duty or obligation to any other Person. The taking by any such Non-Employee Person (or its Affiliates or any other Person with which such Non-Employee Person is acting), or the offering or other transfer by any such Non-Employee Person to another Person, of any potential business opportunity shall not constitute or be construed or interpreted as (a) a breach or violation of any duty (contractual, fiduciary or otherwise, including any duty under this Agreement or any other Applicable Law) or (b) receipt by any such Non-Employee Person or its Affiliates or other Persons with which it is acting of an improper benefit, or an improper personal benefit, in money, property, services or otherwise. This Section 6.7 is being adopted notwithstanding any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise.

Section 6.8    *Waivers; Burden of Proof.*

(a)    Each Covered Person (other than any Covered Person who is a Manager or officer of the Company or an officer or director (or equivalent) of any of its Subsidiaries) shall, to the maximum extent permitted by the Act and other Applicable Law, owe no duties (including fiduciary duties) to the Members, the Owners, the Company or any other Person bound by this Agreement, notwithstanding anything to the contrary existing at law, in equity or otherwise; provided, however, that the foregoing shall not eliminate the implied contractual covenant of

good faith and fair dealing and nothing in this Agreement shall preclude any Member or Owner from bringing an action alleging a breach of the implied contractual covenant of good faith and fair dealing or any breach of this Agreement.

(b)        To the fullest extent permitted by law, and notwithstanding any other provision of this Agreement or any duty that would otherwise exist at law or in equity, the parties hereto agree that (i) in any proceeding relating to the determination of whether a Covered Person has met its duties under this Agreement or any Applicable Law, there shall be a presumption that such Covered Person has met such duties and (ii) any Person bringing or prosecuting any action, suit or proceeding directly in such Person's own right or in the name or on behalf of the Company, the Member or the Owner (or any other Person that may have standing to bring or prosecute such action, suit or proceeding) challenging any determination or action, or decision not to act, of a Covered Person, will bear the burden of proving that such duties were not met.

(c)        To the fullest extent permitted by law, and notwithstanding any other provision of this Agreement or any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise, each Member and Owner (other than any Member or Owner who is a Manager or officer or director (or equivalent) of the Company or any of its Subsidiaries), in each case, acting in such capacity, in the exercise of its rights, powers and duties hereunder, may act and make decisions in the best interest of such Person, which may not be in the best interests of, and may be different from, in addition to, or adverse to, the Members, the Owners and any other Person bound by this Agreement. This <u>Section 6.8</u> is being adopted notwithstanding any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise.

## ARTICLE VII
### MATTERS RELATING TO AN IPO; REGISTRATION RIGHTS

Section 7.1      *Conversion to a Corporate Form Upon an IPO*.  Upon a determination by the Board to effect an IPO, the Board, at the Company's expense shall take such actions as are necessary to structure the IPO in the manner determined appropriate by the Board, including effecting a conversion of the Company (directly or indirectly) to corporate form; <u>provided</u> that notwithstanding any provision of this Agreement to the contrary, the Board may take any of the foregoing actions without any vote of the Members or Owners.  In connection with such IPO, each Member holding Shares or other Equity Securities will be entitled to receive a number of shares of common stock or other Equity Securities of the IPO "vehicle" selling Equity Securities in the IPO such that if the Company liquidated and distributed its assets in accordance with <u>Article XII</u> immediately following such IPO, such Member (including as nominee for Beneficial Owners) would, in the aggregate in respect of such Shares or other Equity Securities, be entitled to receive the same percentage of the total proceeds as it (including as nominee for Beneficial Owners) would have been entitled to receive in a liquidation and distribution of the Company's assets pursuant to <u>Article XII</u> immediately prior to such IPO (determined without giving effect to any actions or steps taken to effect or facilitate such IPO pursuant to this Section 7.1) and (ii) such IPO shall be effected in a manner that treats Owners of the same class of Shares or other Equity Securities the same with such differences as may be necessary to give effect to vesting and other contingencies or differences with respect to any Shares or other Equity Securities.

31

Section 7.2    *Registration Rights Agreement*.    In connection with, and substantially concurrently with the closing of, an IPO, the Company and each Owner of Registrable Securities (as defined in the Registration Rights Agreement) shall enter into the Registration Rights Agreement.  The provisions of this <u>Section 7.3</u> shall survive termination of this Agreement.

Section 7.3    *IPO Lock Up Agreement*.    In connection with an IPO, each Member or Owner holding (directly or indirectly) any Shares (or the applicable security to be sold in the IPO) (a) shall not effect any public sale or distribution, including any sale pursuant to Rule 144, of Registrable Securities (as defined in the Registration Rights Agreement) (except as part of the IPO) during the period beginning seven (7) days prior to the effective date of the applicable registration statement until the earlier of (i) such time as the Company and the lead managing underwriter shall agree and (ii) one hundred eighty (180) days, and (b) shall enter into such customary "lock up" agreements as are requested by the Company and the underwriter(s) in the IPO.  In connection with an IPO described in clauses (ii) and (iii) of the definition thereof, except with the written consent of the underwriters managing such IPO, no Member or Owner shall effect any sale or distribution (including sales pursuant to Rule 144) of Equity Securities of the Company, or any securities convertible into or exchangeable or exercisable for such Equity Securities, during the seven (7) days prior to and the one hundred and eighty (180)-day period beginning on the date of closing of such IPO (the "**Lockup Period**"), except as part of such offering; <u>provided</u>, that (i) such Lockup Period restrictions are applicable on substantially similar terms to all of the Company's executive officers and directors, (ii) to the extent any Member or Owner is granted a release or waiver from the restrictions contained in this <u>Section 7.3</u>, then all Members and Owners shall be automatically granted a release or waiver from the restrictions contained in this Section <u>7.3</u>, on substantially the same terms as and on a *pro rata* basis with, the Members and/or Owners to which such release or waiver is granted, and (iii) except in connection with an IPO, nothing herein will prevent any Member or Owner from making a distribution of Equity Securities to any of its partners, members or stockholders thereof or a transfer of Equity Securities to a Related Person that is otherwise in compliance with applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section <u>7.3</u>. Each Member and Owner agrees to execute a customary lock-up agreement in favor of the Company's underwriters to such effect and, the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section <u>7.3</u>.  The provisions of this Section <u>7.3</u> shall survive termination of this Agreement.

Section 7.4    *Strategic Transaction / IPO Review*.    Not later than the second anniversary of the Effective Date, the Board shall initiate a strategic review of potential strategic transactions for the Company, including the possibility of an IPO. For the avoidance of doubt, the Board is not precluded from initiating such review or seeking such strategic transactions prior to such date and is not obligated to effectuate a strategic transaction (including an IPO) by any specific date.

ARTICLE VIII
REPRESENTATIONS AND WARRANTIES

Section 8.1    *Representations and Warranties*.    Each Owner as of the Effective Date and each Person that becomes a Member or Owner after the Effective Date (including pursuant to a Transfer of Shares), represents and warrants (or is deemed to represent and warrant) to the Company, that such Owner or Person: (A) has received (or otherwise had made available to it),

read and understands this Agreement, (B) acknowledges and understands that such Owner or Person shall have all the rights, and be subject to all the obligations, set forth in this Agreement with respect to Members and Owners and as provided under the Act, as if such Owner or Person had directly executed this Agreement as a party, (C) ratifies and confirms each and every Article, Section and provision of this Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale). Furthermore, each such Member, Owner and Person represents and warrants (or is deemed to represent and warrant) to the Company that the Agreement constitutes the legal, valid, and binding obligation of such owner or person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.

## ARTICLE IX
### TRANSFERS

Section 9.1    *Transfers Generally.*

(a)    Each Member and Owner understands and agrees that the Shares have not been registered under the Securities Act nor registered or qualified under any state or foreign securities laws. No Owner shall Transfer such Shares (or solicit any offers in respect of any Transfer of such Shares), except in compliance with the Securities Act, any applicable state or foreign securities laws and the restrictions on Transfer contained in this Article IX.

(b)    Until the Company otherwise becomes obligated to file reports under each of (x) Section 13 of the Exchange Act and (y) Section 15(d) of the Exchange Act (or upon receipt of prior written approval from the Board), no Owner shall Transfer any of such Owner's Shares to any other Person to the extent such Transfer would cause the Company to have, including as a result of passage of time and giving effect to the exercise of all Options and Convertible Securities, in excess of, to the extent the Company is obligated to file reports under Section 15(d) but not Section 13 of the Exchange Act, (a) 1,950 Holders of Record (or four-hundred-fifty (450) or more Holders of Record who are not Accredited Investors), calculated in accordance with Section 12(g) of the Exchange Act (or fifty (50) fewer than such other numbers of Holders of Record or shareholders as may subsequently be set forth in Section 12(g), or any successor provision, from time to time of the Exchange Act, as the minimum number of Holders of Record or shareholders for a class of capital stock to be required to be registered under Section 12 of the Exchange Act), or (b) to the extent the Company is not currently obligated, including due to a suspension of such requirement, to file reports under either of Section 13 or Section 15(d) of the Exchange Act, two-hundred-fifty (250) Holders of Record, calculated in accordance with Section 15(d) of the Exchange Act (or fifty (50) fewer than such other numbers of shareholders as may subsequently be set forth in Section 15(d), or any successor provision, from time to time of the Exchange Act, as the minimum number of Holders of Record or shareholders for a class of capital stock to require reporting under Section 15(d) of the Exchange Act). The Company and any transfer agent for the Shares shall be entitled to enforce this provision (including by denying any requested Transfer of Shares). The Company and any transfer agent for the Shares shall determine the number of Holders of Record from time to time in consultation with Company counsel in order to give full effect to the restriction set forth in this Section 9.1(b). For the avoidance of doubt, this Section 9.1(b) shall not apply to a Transfer of Shares in an IPO.

33

(c)     Notwithstanding anything to the contrary in this Agreement, no Owner shall Transfer any Shares (i) to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion) or (ii) if such Transfer would cause the Company to become subject to the registration requirements of the Investment Company Act of 1940, as amended.

(d)     Each Owner Transferring any Shares as permitted by this Agreement shall use its reasonable best efforts to provide or cause to be provided to any prospective transferee of such Owner (subject to Section 11.1(e)) a copy of this Agreement (including by such proposed transferee receiving access to this Agreement pursuant to the Datasite).

(e)     To the fullest extent permitted by Applicable Law, any Transfer not in compliance with the provisions of this Agreement shall be void *ab initio*.

Section 9.2    *Tag-Along Rights*. (a) Subject to Section 9.2(i) and Section 9.5, if one or more Owners that (collectively with their Related Persons) hold at least a majority of the outstanding Shares (collectively, the "**Tag-Along Seller**") propose to Transfer at least a majority of the outstanding Shares, in one transaction or a series of related transactions, to any Prospective Buyer(s) (a "**Tag-Along Sale**") other than a Transfer to a transferee that is a Related Person of the transferor, then:

(i)     the Tag-Along Seller shall deliver a written notice of the terms and conditions of such proposed Transfer (the "**Tag-Along Notice**") to the Company (which Tag-Along Notice shall include an Ownership Statement from the Tag-Along Seller certifying as to the Tag-Along Seller's ownership of at least a majority of the outstanding Shares), and the Company shall promptly (and in any event within ten (10) Business Days following receipt thereof) deliver or cause to be delivered a copy of the Tag-Along Notice to each Owner (other than the Tag-Along Seller), which Tag-Along Notice shall offer each such Owner the opportunity to participate in such Transfer in accordance with this Section 9.2 (the "**Tag-Along Offer**"); and

(ii)     each of the Owners (other than the Tag-Along Seller) may elect, at its option, to participate in the proposed Transfer in accordance with this Section 9.2 (each such electing Owner, a "**Tagging Person**").

(b)     The Tag-Along Notice shall identify (i) the number of Shares proposed to be sold by the Tag-Along Seller, (ii) the aggregate number of Shares owned by the Tag-Along Seller and its Related Persons, (iii) the per Share consideration to be paid in such Tag-Along Sale, and (iv) all other material terms and conditions of the Tag-Along Offer, including the form of the proposed sale agreement, if any, and the date of the proposed Tag-Along Sale, if known.  From the date of the Tag-Along Notice, each Tagging Person shall have the right (a "**Tag-Along Right**"), exercisable by notice (the "**Tag-Along Response Notice**") given to the Tag-Along Seller within fifteen (15) Business Days after the date of the Tag-Along Notice (the "**Tag-Along Notice Period**"), to request that the Tag-Along Seller include in the proposed Transfer the number of Shares that such Tagging Person elects to include in the Tag-Along Sale (which shall not exceed the Tagging Person's Tag-Along Portion of Shares and which shall be subject to reduction in accordance with Section 9.2(f)).  Each Tag-Along Response Notice shall include

34

appropriate instructions for payment or delivery of the aggregate consideration for the Shares that the relevant Tagging Person is proposing to include in such Tag-Along Sale.  Each Tagging Person that exercises its Tag-Along Rights hereunder shall deliver to the Tag-Along Seller, with its Tag-Along Response Notice, any evidence of ownership of the Shares of such Tagging Person to be included in the Tag-Along Sale reasonably required by the proposed transferee together with a limited power-of-attorney authorizing the Tag-Along Seller to execute transaction-related documents and Transfer such Shares on the terms set forth in the Tag-Along Notice and such other documents as the Tag-Along Seller may reasonably request to facilitate such Transfer.  Delivery of the Tag-Along Response Notice with such evidence of ownership and limited power-of-attorney shall constitute an irrevocable acceptance of the Tag-Along Offer by such Tagging Persons, subject to the provisions of this Section 9.2 and Section 9.4.

(c)    If, at the end of a 120-day period after the end of the Tag-Along Notice Period (which 120-day period shall be extended if any of the transactions contemplated by the Tag-Along Offer are subject to regulatory approval until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than 180 days following the end of the Tag-Along Notice Period), the Tag-Along Seller has not completed the Transfer of all Shares proposed to be sold by the Tag-Along Seller and all Tagging Persons (but subject to reduction of such number of Shares in accordance with Section 9.2(f)) on substantially the same terms and conditions set forth in the Tag-Along Notice, then the Tag-Along Seller shall (i) return to each Tagging Person the limited power-of-attorney and all applicable instruments that such Tagging Person delivered pursuant to Section 9.2(a) and any other documents in the possession of the Tag-Along Seller executed by the Tagging Persons in connection with the proposed Tag-Along Sale, and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Shares shall continue in effect.

(d)    Concurrently with the consummation of the Tag-Along Sale, the Tag-Along Seller shall (i) notify the Tagging Persons thereof, (ii) remit to each Tagging Person the aggregate consideration for the Shares of such Tagging Person Transferred pursuant thereto (but subject to reduction for any applicable escrows or holdbacks and any transaction expenses as determined in Section 9.2), with the cash portion of the purchase price paid in accordance with the instructions in the applicable Tag-Along Response Notice and (iii) promptly after the consummation of such Tag-Along Sale, furnish such other evidence of the completion and the date of completion of such Transfer and the terms thereof as may be reasonably requested by the Tagging Persons.

(e)    If upon the expiration of the Tag-Along Notice Period any Owner entitled to elect to participate in the Tag-Along Sale shall not have elected to participate, such Owner shall be deemed to have irrevocably waived its rights under this Section 9.2 with respect to the Transfer of any Shares pursuant to such Tag-Along Sale.

(f)    If the aggregate number of Shares of all Tagging Persons and the Tag-Along Seller proposed to be included in the Tag-Along Sale exceeds the number of Shares to be sold to the Prospective Buyer in such Tag-Along Sale, the Tag-Along Seller's and each Tagging Person's number of Shares to be included in the Tag-Along Sale shall be reduced on a *pro rata* basis determined based on (i) the number of Shares proposed to be included by such Owner *multiplied by* (ii) a fraction the numerator of which is the number of Shares that can be sold to

35

the Prospective Buyer in the Tag-Along Sale and the denominator of which is the total number of Shares proposed to be included by all Owners.

(g)     Subject to Section 9.2(h), the Tag-Along Seller shall Transfer, on behalf of itself and each Tagging Person, the Shares subject to the Tag-Along Offer and elected to be Transferred pursuant to this Section 9.2 on the terms and conditions set forth in the Tag-Along Notice within one hundred twenty (120) days (or such longer period as extended under Section 9.2(b)) after the end of the Tag-Along Notice Period.

(h)     Notwithstanding anything contained in this Section 9.2, if the Transfer of Shares pursuant to Section 9.2 is not consummated for whatever reason there shall be no liability on the part of the Tag-Along Seller to the Tagging Persons or any other Person (other than the obligation to return any limited powers-of-attorney and other documentation received by the Tag-Along Seller).  The decision to effect or abandon a Transfer of Shares pursuant to this Section 9.2 by the Tag-Along Seller is in the sole and absolute discretion of the Tag-Along Seller as are the terms of the Tag-Along Sale except, in the case of such terms, as otherwise set forth in this Section 9.2 or Section 9.4.  For the avoidance of doubt, the Tag-Along Seller may not sell any of its Shares in a Tag-Along Sale unless the purchaser buys the applicable Shares of the Tagging Persons in accordance with this Section 9.2.

(i)     The provisions of this Section 9.2 shall not apply to any proposed Transfer of any Shares by the Tag-Along Seller (A) pursuant to Section 9.3, or (B) to a Related Person of the Tag-Along Seller.

Section 9.3    *Drag-Along Rights*.

(a)     Subject to Section 9.4, if any Owner(s) holding (directly or indirectly) at least a majority of the aggregate number of Shares then issued and outstanding (collectively, the "**Dragging Seller**") agree to a *bona fide* arms'-length negotiated Company Sale to one or more purchasers that are not Related Persons of the Dragging Seller for consideration payable in cash and/or freely tradeable and marketable securities (a "**Prospective Drag Purchaser**", and such Company Sale, a "**Drag-Along Sale**"), then the Dragging Seller may, at its option, exercise the rights set forth in this Section 9.3 ("**Drag-Along Rights**"); provided that prior to the Key Owner Committee Termination Date, a Drag-Along Sale shall require approval of the Board.

(b)     Exercise.  If the Dragging Seller wishes to exercise the Drag-Along Rights contained in this Section 9.3, then the Dragging Seller shall deliver a written notice (the "**Drag-Along Sale Notice**") to the Company (which Drag-Along Sale Notice shall include an Ownership Statement from the Dragging Seller certifying as to the Dragging Seller's ownership of at least a majority of the aggregate number of Shares then issued and outstanding) at least thirty (30) Business Days prior to the consummation of the Company Sale transaction, and the Company shall deliver a copy of such Drag-Along Sale Notice to each Owner other than the Dragging Seller (each, a "**Dragged Person**" and, together with the Dragging Seller, collectively, the "**Drag-Along Sellers**") promptly (and in any event within ten (10) Business Days following receipt thereof).  The Drag-Along Sale Notice shall set forth the principal terms and conditions of the proposed Company Sale, including (a) the form and structure of the proposed Company Sale, (b) the consideration to be received in the proposed Company Sale for the Shares

36

(including, if applicable, the formula by which such consideration is to be determined and the payment terms, including a description of any freely tradeable and marketable securities), (c) the name and address of the Prospective Drag Purchaser(s), (d) if known, the proposed date for the Company Sale, (e) the name of each Drag-Along Agent (as defined below) and (f) all other material terms and conditions of the Drag-Along Sale.  Except to the extent waived by the party entitled to such consideration or as required by law, each Dragged Person shall receive the same form and amount of consideration per Share to be received by the Dragging Seller for the Shares in the Drag-Along Sale.  If any holders of Shares are given an option as to the form and amount of consideration to be received, all holders of Shares will be given the same option other than to the extent prohibited by law.   Unless otherwise agreed by each Drag-Along Seller, any consideration consisting of freely tradeable and marketable securities shall be allocated among the Drag-Along Sellers *pro rata* based upon the aggregate amount of consideration to be received by such Drag-Along Sellers.

(c)     Subject to the provisions of Section 9.4, each Dragged Person shall be required to participate in the Drag-Along Sale on the terms and conditions set forth in the Drag-Along Sale Notice.  Each Drag-Along Seller shall vote (including acting by written consent, if requested) in favor of such Drag-Along Sale if any vote is held or requested in connection therewith and shall participate in such Drag-Along Sale as described in this Section 9.3.  In furtherance of the provisions of this Section 9.3, each Dragged Person (on behalf of itself and its successors, heirs, legal representatives, and permitted assigns and transferees) hereby (i) irrevocably appoints each of the individuals identified as a "Drag-Along Agent" in the Drag-Along Sale Notice as his, her or its agent and attorney-in-fact (the "**Drag-Along Agents**") (with full power of substitution) to execute all agreements, instruments and certificates and take all action necessary to effectuate any Drag-Along Sale as contemplated under this Section 9.3 (including to Transfer such Dragged Person's Shares on the terms set forth in the Drag-Along Sale Notice), (ii) grants to each Drag-Along Agent a proxy (which shall be deemed to be coupled with an interest and to be irrevocable) to vote (including acting by written consent, if requested) all Shares having voting power held by such Person and exercise any consent rights applicable thereto in favor of any such Drag-Along Sale as provided in this Section 9.3; provided, however, that the Drag-Along Agents shall not exercise such powers-of-attorney or proxies with respect to any such Person unless such Person refuses or fails to comply with its obligations under this Section 9.3 within such period of time as may be reasonably specified by the Dragging Seller and (iii) agrees to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to any Drag-Along Sale.  Except as otherwise provided in this Agreement, each Dragged Person hereby revokes any and all previous proxies with respect to such Shares (except as otherwise provided in this Agreement) and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any Shares, deposit any of its Shares into a voting trust or enter into any other agreement, arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of such Shares, in each case, with respect to any of the matters set forth herein.  Each Dragged Person hereby covenants with the Company and the Dragging Seller: (a) to vote in opposition to any other proposal that could delay or impair the ability of the Company to consummate the Drag-Along Sale; (b) subject to Section 9.4, to execute and deliver all related documentation and take such other action in support of the Drag-Along Transaction as shall reasonably be requested by the Company or the Dragging Seller in order to carry out the terms and provisions of this Section 9.3, including

37

executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, Share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents;. If a Dragged Person should fail to deliver such documentation to the Dragging Seller, the Company (subject to reversal under Section 9.3(d)) shall cause the books and records of the Company to show that such Shares are bound by the provisions of this Section 9.3(a) and that such Shares shall be deemed to be Transferred to the Prospective Drag Purchaser at the closing of the Drag-Along Sale. For the avoidance of doubt, the Shares issued pursuant to the Warrants, including any Shares that may be issued as a result of the consummation of a Drag-Along Sale, will be deemed to be subject to the provisions of this Section 9.3.

(d)     The Dragging Seller shall have a period of one hundred twenty (120) days from the date of the Drag-Along Sale Notice to consummate the Drag-Along Sale on the terms and conditions set forth in such Drag-Along Sale Notice, provided that, if such Drag-Along Sale is subject to regulatory approval, such 120-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than 180 days following the date of the Drag-Along Sale Notice. If the Drag-Along Sale shall not have been consummated during such period, the Dragging Seller shall return to each of the Dragged Persons all applicable instruments such Dragged Persons delivered for Transfer pursuant hereto, together with any other documents in the possession of the Dragging Seller executed by the Dragged Persons in connection with such proposed Transfer, and all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Shares held (directly or indirectly) by the Dragged Persons shall again be in effect.

(e)     Concurrently with the consummation of the Drag-Along Sale pursuant to this Section 9.3, the Dragging Seller shall give notice thereof to the Dragged Persons, shall remit to each of the Dragged Persons that have surrendered the applicable instruments the total consideration (the cash portion of which is to be paid in accordance with such Dragged Person's instructions for payment) for the Shares of such Dragged Person Transferred pursuant to this Section 9.3 hereto (but subject to reduction for any applicable escrows or holdbacks and any transaction expenses as determined in Section 9.4) and shall furnish such other evidence of the completion and time of completion of the Drag-Along Sale and the terms thereof as may be reasonably requested by such Dragged Persons.

(f)     Notwithstanding anything contained in this Section 9.3, there shall be no liability on the part of the Dragging Seller to the Dragged Persons (other than the obligation to return the applicable instruments and documentation received by the Dragging Seller as set forth in Section 9.3(d)) or any other Person if the Drag-Along Sale pursuant to this Section 9.3 is not consummated for whatever reason, regardless of whether the Dragging Seller has delivered a Drag-Along Sale Notice. The decision to effect a Drag-Along Sale pursuant to this Section 9.3 by the Dragging Seller shall be in the sole and absolute discretion of the Dragging Seller as are the terms of the Drag-Along Sale except, in the case of such terms, as otherwise set forth in this Section 9.3 or Section 9.4.

(g)     No Other Consideration. No Drag-Along Seller nor any of its Related Persons (which, for the avoidance of doubt, will not include any member of management or any

38

employee of the Company or any Subsidiary thereof) shall receive any direct or indirect consideration in connection with a Company Sale to which this Section 9.3 applies (including by way of fees, consulting arrangements or a non-compete payment) other than (i) consideration received in exchange for its Shares on the terms described in the Drag-Along Sale Notice, (ii) reimbursement of expenses on a *pro rata* basis (based on the consideration being received for the Shares) and (iii) customary arrangements that would not reasonably be considered as a means to circumvent the provisions of this Section 9.3(g), such as the indemnification of Managers.

(h)    The Drag-Along Seller may effect the Drag-Along Sale by means of a Business Combination, Share Sale or Asset Sale or a combination thereof.

Section 9.4    *Additional Conditions to Tag-Along Sales and/or Drag-Along Sales*. Notwithstanding anything contained in Section 9.2 or 9.3, the rights and obligations of the Tagging Persons to participate in a Tag-Along Sale under Section 9.2 or a Dragged Person to participate in a Drag-Along Sale under Section 9.3 are subject to the following conditions:

(a)    in the event the consideration to be paid in exchange for Shares pursuant to Section 9.2(d) includes any securities that are unregistered and a Member or Owner participating in such Tag-Along Sale (other than the Tag-Along Seller or Dragging Seller) is not an Accredited Investor, the Tag-Along Seller shall cause to be paid to such Member or Owner in lieu thereof an amount in cash equal to the fair market value of the securities (as determined by the Board) that such Member or Owner would otherwise receive as of the date of the issuance of such securities in such Transfer;

(b)    no Tagging Person or Dragged Person, as the case may be, shall be obligated to pay any fees or expenses (other than its own) incurred in connection with any consummated or unconsummated Tag-Along Sale or any consummated or unconsummated Drag-Along Sale, except each Tagging Person or Dragged Person, as the case may be, may be obligated to bear its *pro rata* share (based on the consideration paid for the Shares Transferred) of the reasonable documented out-of-pocket fees and expenses incurred by the Tag-Along Seller or the Drag-Along Seller in connection with a consummated Tag-Along Sale or Drag-Along Sale to the extent such fees and expenses are incurred for the benefit of all Tagging Persons or Dragged Persons, as the case may be, and are not otherwise paid by the Company or another Person; and

(c)    in connection with any Tag-Along Sale or Drag-Along Sale, no Tagging Person or Dragged Person shall be required to (x) agree to a non-compete, non-solicit or other restrictive covenants or agreements (other than customary confidentiality obligations), (y) enter into a lock-up provision with respect to any freely tradeable and marketable securities received as consideration in a Drag-Along Sale, or (z) make any representation or warranty with respect to such Transfer other than with respect to customary "fundamental" matters relating to such Tagging Person or Dragged Person, including its organizational status, authority, its participation in the transaction, the number of Shares owned, its unencumbered ownership of its Shares and noncontravention of other material agreements (but not, for the avoidance of doubt, with respect to the Company) and shall not otherwise be liable for any indemnity obligation (other than severally in connection with any such representation and warranty it makes as to itself) that is not provided by escrow, purchase price adjustment, indemnity holdback or similar mechanism;

39

provided, that the aggregate amount of liability described in this clause in connection with any Tag-Along Sale or Drag-Along Sale shall not exceed the lesser of (i) such Tagging Person or Dragged Person's *pro rata* portion of any such liability, to be determined in accordance with such Tagging Person or Dragged Person's portion of the aggregate proceeds received in connection with such transaction and (ii) the net proceeds received by such Tagging Person or Dragged Person in connection with such transaction, other than, in each case, in the case of actual and intentional fraud of such Tagging Person or Dragged Person.

Section 9.5    *Conditions Applicable to All Transfers*.Notwithstanding anything to the contrary in Section 3.3 or otherwise in this Agreement, no Transfer of Shares shall be recognized by the Company unless (i) such Transfer would not require registration under the Securities Act or violate any provisions of any applicable securities law or other Applicable Law; (ii) such Transfer would not violate either this Agreement or the laws, rules or regulations of any state or any Governmental Authority applicable to the transferor, the transferee or such Transfer; or (iii) such Transfer was not made to a Person who is the subject of any pending bankruptcy or insolvency proceedings, or to a Person who is a minor or who otherwise lacks legal capacity. For the avoidance of doubt, the term "Transfer" includes a transfer of Shares through DTC.

(b)    The direct transferee (i.e., a transferee that holds the Shares directly after the Transfer and after taking into account Section 3.2(c) and not simply a Beneficial Interest therein) of any Shares Transferred in accordance with this Article IX shall be admitted as a Member and shall be bound by this Agreement as a Member and Direct Owner. Any indirect transferee (i.e., a transferee that holds a Beneficial Interest in the Shares after the Transfer and after taking into account Section 3.2(c)) of Shares in accordance with this Article IX shall be bound by this Agreement as a Beneficial Owner.

(c)    Notwithstanding anything to the contrary in this Agreement, a transferee in a Transfer not prohibited by this Agreement shall execute and deliver a Joinder to the Company (which may, at the Company's election, be on a "click-through" basis); provided that whether or not a Joinder is executed and delivered by a transferee, to the fullest extent permitted by Applicable Law, such transferee shall be deemed to have made the representations and warranties to the Company set forth in Section 8.1 and to have become an Owner and be deemed to be subject to the terms and conditions of this Agreement applicable to Owners. Notwithstanding the foregoing or anything in this Agreement to the contrary, a transferor of Shares will not be relieved of any liability for a breach of the Transfer provisions hereunder.

(d)    Except as otherwise set forth in this Agreement, a transferring Member (other than Cede & Co.) or Owner will bear all costs for filing fees, applications, transfer, gains, stamp or similar taxes in connection with a Transfer by such Member or Owner (other than pursuant to a Drag-Along Sale) (collectively, "**Transfer Costs**"), and shall indemnify and hold harmless the Company for any such Transfer Costs; provided that all other costs and expenses related to Transfers, including relating to lender approvals or consents and other costs incurred by the Company (including by legal counsel to the Company) shall be borne by the Company.

(e)    All Shares issued to any Person that are certificated shall bear a legend (if certificated), or be evidenced by notations in a book entry system including a legend, in substantially the following form:

"THE SHARES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE, DISPOSITION, TRANSFER AND VOTING AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF REVLON GROUP HOLDINGS LLC (THE "COMPANY"), DATED AS OF MAY 2, 2023 AS MAY BE AMENDED AND MODIFIED FROM TIME TO TIME (THE "AGREEMENT"). UNLESS OTHERWISE APPROVED BY THE BOARD OF MANAGERS OF THE COMPANY, THE SHARES ARE REQUIRED TO BE HELD AND CLEARED THROUGH DTC. NO REGISTRATION OR TRANSFER OF SUCH SHARES WILL BE MADE ON THE BOOKS AND RECORDS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SHARES A COPY OF THE AGREEMENT CONTAINING THE ABOVE REFERENCED RESTRICTIONS UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(f)    All Shares issued by the Company, unless such Shares were issued in reliance on the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code or, as determined by the Board, another exemption such that the Transfer of such Shares is not restricted under U.S. federal securities law shall be evidenced by notations on the certificate, if any, representing such Shares or in the applicable book entry system including a legend in substantially the following form:

"THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAW OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS. AS A CONDITION TO ANY TRANSFER, THE COMPANY RESERVES THE RIGHT TO REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION IS NOT REQUIRED."

(g)    As a condition precedent to any Transfer of Shares bearing a restricted Securities Act legend, the Company may require an opinion of legal counsel reasonably satisfactory to it that registration under the Securities Act is not required; provided, the Company shall treat all similarly situated Owners and Members equally regarding whether to require an opinion. The Company can take such actions as it deems necessary to ensure compliance with the Securities Act, including establishing one or more separate CUSIP numbers for Shares that may be restricted under U.S. federal securities law. Taking into account Applicable Law, the Company shall use commercially reasonable efforts (at the Company's sole cost and expense) to remove the legend set forth in Section 9.5(f) above from Shares bearing the same from and after one (1) year following the issuance of such Shares.

41

(h)     The Board may make any necessary modifications to the legends set forth in Section 9.5(e) and Section 9.5(f) for such legends to comply with Applicable Law and to achieve the purpose and intent of the Transfer restrictions set forth herein. If any Shares cease to be subject to any and all restrictions on Transfer set forth in this Agreement, the Board, upon the written request of the holder thereof, shall amend the notations in the book entry system (or, if certificated, issue to such holder a new certificate) evidencing such Shares accordingly.

(i)     Transfers of Shares and admission of transferees as Members or Direct Owners or Beneficial Owners in accordance with this Article IX shall not be considered to be a Related Party Transaction, regardless of the identity of the transferor or transferee.

ARTICLE X
INDEMNIFICATION AND EXCULPATION

Section 10.1    *Indemnification and Exculpation.*

(a)     To the fullest extent permitted by law, the Company shall indemnify, hold harmless and defend each Covered Person from and against any and all losses, claims, damages, liabilities, whether joint or several, expenses (including legal fees and expenses), judgments, fines and amounts paid in settlement (collectively, "**Indemnified Losses**"), incurred or suffered by such Covered Person, as a party or otherwise, in connection with any threatened, pending or completed claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, whether formal or informal, and whether or not by or in the right of the Company, arising out of or in connection with any act or omission, or alleged act or omission, performed or omitted to be performed by such Covered Person in connection with or in any way related to the business or the operation of the Company or any Subsidiary of the Company, unless it is determined in a final, non-appealable judgment of a court of competent jurisdiction that the Indemnified Losses were the result of such Covered Person's Malfeasance. Notwithstanding the foregoing, other than any claim to enforce its rights under this Article X, the Company shall not be obligated to indemnify any Covered Person in connection with any action, suit or proceeding initiated by such Covered Person unless the initiation of such action, suit or proceeding is approved by the Board.

(b)     No Covered Person shall be liable to the Company or to any Owner or Member for any loss or damage sustained by the Company or any Owner or Member, unless it is determined in a final, non-appealable judgment of a court of competent jurisdiction that the loss or damage shall have been the result of such Covered Person's Malfeasance. The negative disposition of any claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, whether formal or informal, and whether by or in the right of the Company, by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Covered Person acted in a manner contrary to the standard set forth in the previous sentence.

(c)     To the fullest extent permitted by Applicable Law, costs and expenses (including attorneys' fees and expenses) incurred by a Covered Person in defending or otherwise participating in any claim, demand, action, suit or proceeding subject to this Section shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or

proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount in the event it is ultimately determined that the Covered Person is not entitled to be indemnified therefor pursuant to this Section 10.1.

(d)    The Company hereby acknowledges that certain of the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more other Persons (but not including any such other Person to the extent such Person would have an obligation to provide indemnification, advancement of expenses and/or insurance pursuant to a contractual obligation to the Company or any of its Subsidiaries) (collectively, the "**Secondary Indemnitors**"), which may include Persons who employ a Covered Person or of which a Covered Person is a partner or member or whose respective Affiliates, affiliated investment funds, managed funds and management companies, if applicable, have such Covered Person as a partner or member.  The Company hereby agrees (i) that it is the indemnitor of first resort in respect of the matters in this Section 10.1 (i.e., the Company's obligations to each Covered Person are primary and any obligation of the Secondary Indemnitors to advance expenses and/or provide indemnification for the same expenses and liabilities incurred by Covered Persons are secondary) and (ii) that it shall be required to advance the full amount of expenses incurred by Covered Persons and shall be liable for the full amount of any Indemnified Losses to the extent legally permitted and as required by the terms of this Agreement or any other agreement between the Company and the relevant Covered Person, without regard to any rights that such Covered Person may have against any Secondary Indemnitor.  The Company further agrees that no advancement or payment by any Secondary Indemnitor shall affect the foregoing and that any relevant Secondary Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery of the relevant Covered Persons against the Company.  The Company and each Covered Person agree that the Secondary Indemnitors are express third party beneficiaries of this Section 10.1.

(e)    The indemnification provided by this Section 10.1 shall be in addition to any other rights to which any Covered Person may be entitled under this Agreement or any other agreement with the Company or any other Person, as a matter of law or otherwise, and shall inure to the benefit of the heirs, legal representatives, successors, assigns and administrators of the Covered Person.

Section 10.2    *Insurance*.  The Company may purchase and maintain insurance on behalf of any Person who is or was a Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a Manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under Applicable Law or this Article X.

Section 10.3    *Rights to Rely on Legal Counsel, Accountants; Other Matters*.

(a)    No Covered Person shall be liable, responsible or accountable in damages or otherwise to the Company or any Owner or Member for any performance or omission to perform any acts in reliance on the advice of accountants or legal counsel for the Company.

43

(b)     The Company may, by action of its Board, provide indemnification to such of the officers, Managers, directors, managers, employees, agents or other representatives of the Company and its Subsidiaries, and such other Persons as the Board may determine, in each case, to such extent and to such effect as the Board shall determine to be appropriate.

(c)     Neither the amendment nor repeal of this Article X, nor, to the fullest extent permitted by the Act, any modification of law, shall adversely affect any right or protection of any Person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

(d)     The indemnification obligations set forth in this Article X shall survive the termination of this Agreement.

## ARTICLE XI
### BOOKS OF ACCOUNT; INFORMATION RIGHTS; CONFIDENTIALITY

Section 11.1   *Maintenance of Books; Reports.*

(a)     The Board shall maintain, or cause to be maintained, at the principal office of the Company (or such other place determined by the Board) appropriate books and records with respect to the Company's business.  Any books and records maintained by or on behalf of the Company in the regular course of its business, including the records of the Members and the Owners of the Shares, books of account and records of Company proceedings, may be kept on, or be in the form of, computer disks, hard drives, magnetic tape, photographs, micrographics or any other information storage device; provided, that the books and records so maintained are convertible into clearly legible written form within a reasonable period of time.  The books and records of the Company shall be maintained, for financial reporting purposes, as determined by the Board.

(b)     To the fullest extent permitted under Applicable Law, the Owners and Members hereby waive any right to obtain any information (including books, records and other documents) from the Company and, pursuant to Section 18-305(g) of the Act, the Owners and Members shall only have such rights to obtain information relating to the Company (including books, records and other documents) as expressly provided in Section 11.1(c)).

(c)     Financial Information. Notwithstanding Section 11.1(b), Members and Owners (in each case other than Competitors) shall have access to, or be provided with, the following; provided, that (A) prior to the receipt by any Member or Owner of any of the documents set forth in clauses (i) through (iii) below or access to the call described in clause (iv) below, such Member or Owner shall have delivered to the Company (x) a customary non-disclosure agreement (which may be on a "click-through" basis) in a form reasonably acceptable to the Board and (y) a Joinder or other acknowledgement in writing (which may, at the Company's election, be on a "click-through" basis) that such Member or Owner has received a copy of this Agreement and acknowledges that it is bound by the terms and conditions of this Agreement (including among others all applicable restrictions on Transfers and the provisions of

Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2) as an "Owner" and (B) the documents set forth in clauses (i) through (iii) below shall be provided pursuant to the Datasite):

       (i)    within 90 days after the end of each Fiscal Year, commencing with the fiscal year ending December 31, 2023, (A) a copy of the audited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form the figures as of the end of and for the previous year, in each case in accordance with GAAP, and (B) a management's discussion and analysis of the material operational and financial developments during such Fiscal Year;

       (ii)    within 45 days (or 75 days, in the case of the fiscal quarters of the Company ending March 31, 2023 and June 30, 2023) after the end of each of the first three quarterly periods of each Fiscal Year of the Company, commencing with the fiscal quarter ending March 31, 2023, (A) the unaudited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, in each case in accordance with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal quarter;

       (iii)    whether or not the Company is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, within 5 Business Days from the occurrence of the relevant event, information substantially similar to the information that would have been required to be reported on a Current Report on Form 8-K if the Company were subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, under any of the following items of Form 8-K: Item 1.01 (Entry into a Material Definitive Agreement), Item 2.02 (Termination of a Material Definitive Agreement), Item 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisitions or Dispositions of Assets), Item 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), Item 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), Item 4.01 (Changes in Registrant's Certifying Accountant), Item 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), Item 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers) (but in this case only as it relates to the appointment or departure of any Manager or the Chief Executive Officer or Chief Financial Officer of the Company); and

       (iv)    a quarterly "earnings call" which shall take place as promptly as reasonably practicable after the distribution of the financial statements for the applicable quarter, which shall include a reasonable opportunity for questions from Owners; provided, that the Company shall provide the date and dial-in information for such call and post such information to the Datasite at least three (3) days prior to such call.

45

(d)    The Company shall satisfy its obligations under Section 11.1(c)(i) through Section 11.1(c)(i) by providing each Owner access to a confidential website such as Intralinks or Epiq and timely posting such information on such website (the "**Datasite**"), which Datasite will be accessible as promptly as practicable following the Effective Date.

(e)    <u>Information to Prospective Purchasers</u>.  A Member or Owner (including a Tag-Along Seller or a Dragging Seller) may provide the information provided pursuant to Section 11.1(c)(i) through Section 11.1(c)(i) or any other Confidential Information to any *bona fide* prospective purchasers (other than Competitors (except in the case of a Drag-Along Sale)) as follows: the Member or Owner will give notice (or cause notice to be delivered) to the Company of the proposed transferees and the Company will then send to the prospective purchaser by e-mail or other electronic communication a link to a website or other portal from which the applicable information and a copy of this Agreement may be accessed subject to (i) the execution by the prospective purchaser and the Company of a customary non-disclosure agreement in favor of the Company in a form reasonably acceptable to the Board (which may, at the Company's election, be on a "click-through" basis) and (ii) an acknowledgement in writing (which may, at the Company's election, be on a "click-through" basis) from such prospective purchaser that such prospective purchaser has received a copy of this Agreement and acknowledges that such prospective purchaser will be bound by the terms and conditions of this Agreement (including among others all applicable restrictions on Transfers and the provisions of Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2) as an "Owner" if such prospective purchaser acquires any Shares whether or not it executes a Joinder.

(f)    The Board may authorize the Company to make such information available as the Board approves to one or more Owners or Members and Related Persons as determined by the Board, and the fact that information was not provided to any such Owner or Member and Related Persons will not entitle the other Owners or Members to the same information.

(g)    Upon the request of any Key Owner Committee Member or Designating Key Owner from time to time, the Company shall make available in the Datasite all information that would constitute material non-public information that has been provided by the Company to such Key Owner Committee Member or Designating Key Owner or their respective Representatives and that is not otherwise in the Datasite or publicly available.

Section 11.2    *Confidentiality*.

(a)    *General*.  Except as permitted pursuant to a written consent provided by the Company, each Owner, Member and their respective Affiliates shall, during the term of this Agreement and for eighteen (18) months thereafter, keep the Confidential Information confidential and use the Confidential Information only in connection with the transactions contemplated by this Agreement, its investment in the Company, and exercising and enforcing its rights under this Agreement; <u>provided</u> that nothing herein shall prevent any Owner, Member or their respective Affiliates from disclosing Confidential Information:

(i)      to the extent required or requested by any order of any court or administrative agency, or as may be required by Applicable Law in response to any summons or subpoena or in connection with any litigation;

(ii)     to the extent required by Applicable Law or by the regulations, rules or policies of any applicable regulatory or self-regulatory body;

(iii)    to the extent necessary in connection with the exercise of any remedy hereunder or as may be necessary in a claim in aid of arbitration, or to obtain urgent measures or protection, or for enforcement of an arbitral award;

(iv)     to such Owner's or Member's (or its Related Persons') Representatives that need to know such information and whom such Owner, Member or Related Person, as applicable, shall instruct to observe the terms of this <u>Section 11.2</u>;

(v)      as may be required in connection with an audit by any taxing authority;

(vi)     in accordance with <u>Section 11.1(e)</u>; and

(vii)    to the extent required to be included in tax returns or financial statements (including footnotes thereto) or other required governmental filings or provided in connection with general examinations of such Person not specifically related to the ownership of Shares;

provided that, in the case of sub-sections <u>(i)</u>, <u>(ii)</u> and <u>(v)</u>, such Owner or Member shall (with any costs and expenses related thereto to be the sole responsibility of the Company) (A) notify the Company of the proposed disclosure as far in advance of such disclosure as is reasonably practicable and legally permissible, (B) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment when and if available, (C) limit the disclosure to that required by law and, to the extent permitted under Applicable Law, ensure that the name, address and all other identifying information of the other Owners and Members and their respective Affiliates shall first be redacted, removed or omitted as appropriate, (D) to the extent practicable, take into account the comments of the Company in respect of such disclosure, (E) reasonably cooperate with the Company in protecting against disclosure, and (F) take reasonable efforts to obtain assurances that confidential treatment will be accorded to the disclosed Confidential Information; and <u>provided</u>, <u>further</u>, that notwithstanding anything to the contrary in this Agreement, each Owner and each Member (and any employee, representative, or other agent of such Owner or Member) may disclose to any and all Persons, without limitation of any kind, information regarding the U.S. federal tax treatment and tax structure of the transactions contemplated by this Agreement; <u>provided</u>, however, that information regarding the U.S. federal tax treatment and tax structure of the transactions contemplated by this Agreement shall not include the name, address or other identifying information of the other Owners and Members and their respective Affiliates.

(b)      *Press Release; Communications*.    Any general notices, releases, statements or communications to the general public or the press relating to this Agreement and/or

47

any related documents and/or, to the extent related thereto, the Members and Owners and/or their Affiliates, and/or the transactions contemplated by any of the foregoing and/or the business or management of the Company, shall be made only at such times and in such manner as determined by the Board; <u>provided</u> that an Owner or Member may disclose to third parties that it is a Member or Owner of the Company.

<div align="center">ARTICLE XII
DURATION AND TERMINATION OF COMPANY</div>

Section 12.1    *Events Causing Dissolution and Winding Up*.  The Company shall be dissolved only upon the occurrence of any of the following events ("**Dissolution Event**"):

(a)    an election to dissolve the Company by the Board that is approved by the affirmative vote of a majority of the votes cast on the matter by the Members;

(b)    the final decree of judicial dissolution of the Company under Section 18-802 of the Act; and

(c)    the Company ceasing to have any Members, unless a Person is admitted as a Member to the Company and the Company is continued without dissolution in accordance with the Act.

The bankruptcy, insolvency or dissolution of an Owner or Member, as applicable, shall not, in and of itself, cause the Owner or Member, as applicable, to cease to be an Owner or Member, as applicable, of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Section 12.2    *Liquidation and Winding Up*. Upon the occurrence of a Dissolution Event, the Company shall be liquidated and the Board (or other Person designated by the Board or a decree of court) shall wind up the affairs of the Company.  In such case, the Board (or such other Person designated by the Board or a decree of court) shall have the authority, in its sole and absolute discretion, to sell the Company's assets and properties or distribute them in kind. The Board or other Person winding up the affairs of the Company shall promptly proceed to the liquidation of the Company. In proceeding with the winding-up process, it is the Members' and Owners' objective that the winding-up process for the Company shall be completed within three years following the sale of the Company's last asset (assuming that the Company and its Subsidiaries are not then parties to any outstanding litigation which has not been resolved). In a liquidation, the assets and property of the Company shall be distributed in the following order of priority:

(a)    to creditors of the Company, including Members and Owners who are creditors, to the extent otherwise permitted by Applicable Law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

(b)    the balance, if any, to each Member on a *pro rata basis* among Members (based on Shares held directly, it being understood that the treatment of distributions to Cede &

<div align="center">48</div>

Co. are addressed in Section 3.5(f)), subject to the preferential or other rights of any Members of other Equity Securities then outstanding.

Section 12.3    *Certificate of Formation*.  Upon the completion of the winding up of the Company, including the distribution of Company cash and property as provided in Section 12.2 in connection with the liquidation of the Company, the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware shall be canceled and such other actions as may be necessary to terminate the Company's existence shall be taken by the Board or such other Person winding up the affairs of the Company.

Section 12.4    *Waiver of Partition*.  To the maximum extent permitted by Applicable Law, each Owner and Member hereby waives any right to partition of the Company property.

Section 12.5    *Termination of the Agreement* .  All provisions of this Agreement shall terminate upon the earlier to occur of (i) termination of the Company in accordance with Applicable Law or (ii) the consummation of an IPO of the Company (or its successor entity pursuant to Section 7.1), except as expressly provided otherwise herein (including in Section 7.2, Section 7.3, Section 10.3(d), and Section 11.2) and no termination will relieve any Party of any liability or any breach prior to termination.

## ARTICLE XIII
### GENERAL

Section 13.1    *Choice of Law*.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

Section 13.2    *Forum, Venue and Jurisdiction*.

(a)    Except as otherwise set forth in Section 6.8, each Member and each Owner:

(i)    irrevocably agrees that, unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any claims, suits, actions or proceedings (A) arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce the provisions of this Agreement or the duties, obligations or liabilities among Members or Owners or of Members or Owners to the Company, or the rights or powers of, or restrictions on, the Owners, Members or the Company), (B) brought in a derivative manner on behalf of the Company, (C) asserting a claim of breach of a duty owed by any Manager, officer or other employee of the Company or any Covered Person, (D) asserting a claim arising pursuant to any provision of the Act or (E) asserting a claim governed by the internal affairs doctrine, in each case regardless of whether such claims, suits, actions or proceedings sound in contract, tort, fraud or otherwise, are based on common law, statutory, equitable, legal or other grounds, or are derivative or direct claims; provided, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or

49

proceedings for lack of subject matter jurisdiction, such claims, suits, actions or proceedings may be brought in another state or federal court sitting in the State of Delaware;

(ii)    irrevocably submits, unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware in connection with any such claim, suit, action or proceeding; provided, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or proceedings for lack of subject matter jurisdiction, it irrevocably submits to the exclusive jurisdiction of any state or federal court sitting in the State of Delaware;

(iii)    irrevocably agrees not to, and irrevocably waives any right to, assert in any such claim, suit, action or proceeding that it is not personally subject to the jurisdiction of the Court of Chancery of the State of Delaware (unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum) or of any other court to which proceedings in the Court of Chancery of the State of Delaware may be appealed (unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum); provided, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or proceedings for lack of subject matter jurisdiction, then it irrevocably agrees not to, and irrevocably waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of any state or federal court sitting in the State of Delaware, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper; and

(iv)    consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices hereunder, and agrees that such services shall constitute good and sufficient service of process and notice thereof; provided, that nothing in this Section 13.2 shall affect or limit any right to serve process in any other manner permitted by Applicable Law.

(b)    *Specific Enforcement.* Each party acknowledges that the remedies at law of the other parties for a breach or threatened breach of this Agreement may be inadequate and, in recognition of this fact, any party, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to seek equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

(c)    *Waiver of Jury Trial.*    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.3    *Notices.*    Any notice, demand, request, report, information or document (each, a "**Notice**") required or permitted to be given or made to a Member or Owner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or

50

when sent by first class United States mail or by other means of written communication to the Member or Owner at the address set forth in the Company records or to Cede & Co. at the address set forth in its signature page to this Agreement, as applicable (provided that if a Notice is delivered to Cede & Co., the Company shall post a copy of such Notice to the Datasite on the same day as delivery to Cede & Co.). Any Notice or payment shall be deemed conclusively to have been given or made to the Member or Owner, and any obligation to give such Notice or to make such payment shall be deemed conclusively to have been fully satisfied, upon sending of such Notice or payment to the Member or Owner of such Shares at its address as shown on the records of the Company or to Cede & Co. (provided that if a Notice is delivered to Cede & Co., the Company shall post a copy of such Notice to the Datasite on the same day as delivery to Cede & Co.) at the address set forth in its signature page to this Agreement (or, in the case of access via the Internet as set forth in the following sentence, upon sending the e-mail set forth in the following sentence), regardless of any claim of any Person who may have an interest in such Shares by reason of any assignment or otherwise. Notwithstanding the foregoing, any such Notice shall be deemed given or made if it is made available via the Datasite (including if access is available only by the Member or Owner agreeing to a customary non-disclosure agreement on a "click-through" basis) and e-mail notice of such availability is sent to the Member or Owner at the e-mail address set forth in the Company records. An affidavit or certificate of making or giving of any Notice or payment in accordance with the provisions of this <u>Section 13.3</u> executed by the Company, a Manager or the mailing organization shall be *prima facie* evidence of the giving or making of such Notice or payment.  If any Notice or payment addressed to a Member or Owner at the address appearing on the books and records of the Company is returned by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver it, such Notice or payment and any subsequent Notice or payment shall be deemed to have been duly given or made without further mailing (until such time as such Member or Owner, or another Person notifies the Company of a change in the address of such Member or Owner) if they are available for the Members or Owners at the principal office of the Company for a period of one year from the date of the giving or making of such Notice or payment to the other Members and Owners. If the e-mail notice of access via the Datasite is properly sent in accordance with the sentence two sentences above and the e-mail is not received (and regardless of whether a "bounce back" message is received), such Notice and any subsequent Notices shall be deemed to have been duly given or made without further e-mailing (until such time as such Member, Owner or another Person notifies the Company of a change in the e mail address of such Member or Owner.) if they are available for the Members and Owners at the principal office of the Company for a period of one year from the date of the giving or making of such Notice to the other Members and Owners.

Any notice to the Company shall be deemed given if received by the Company at the principal office of the Company designated pursuant to Section <u>2.5</u>. The Board may rely on and shall be protected in relying on any notice or other document from a Member, Owner or other Person if believed by it to be genuine. The terms "in writing," "written communications," "written notice" and words of similar import shall be deemed satisfied under this Agreement by use of e-mail and other forms of electronic communication. Notwithstanding the foregoing, if the Shares are issued through DTC, such Notices will also be given or made concurrently to the indirect holders of such Shares through the Datasite.

Section 13.4   *Further Action*.   The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 13.5   *Amendment; Waiver*.

(a)   Except as otherwise specifically provided herein, this Agreement may be amended, restated or modified from time to time only with the prior written consent of the Company and Owners holding not less than a majority of the Shares then outstanding; provided, that (i) any amendment, restatement or modification to any of Section 3.4 (Preemptive Rights), Section 3.6 (Liability of Owners and Members), Section 6.7 (Waiver of Corporate Opportunities), Section 6.8 (Waivers; Burden of Proof), Article IX (Transfers), Article X (Indemnification and Exculpation), Section 11.1(c) (Financial Information), Section 11.1(e) (Information to Prospective Purchasers) or to any of the defined terms in Section 1.1 (Definitions) that are defined or used in any of the foregoing Sections or Articles to the extent used in any of the foregoing Sections or Articles, shall require the consent of the Company and Owners holding not less than two-thirds of the Shares then outstanding; (ii) any amendment, restatement or modification of this Agreement that adversely affects the rights of any Key Owner Committee Member (prior to the Key Owner Committee Termination Date) or Designating Key Owner (prior to the Designating Key Owner Termination Date) shall require the prior written consent of such Key Owner Committee Member or Designating Key Owner, as applicable, (iii) any amendment, restatement or modification that materially and adversely affects a particular Owner (in its capacity as an owner of Shares) (a "**Disproportionately Affected Owner**") in a manner disproportionate to the manner in which it affects other Owners (in their capacities as owners of Shares) shall also require the prior written consent of such Disproportionately Affected Owner (provided that if any amendment, restatement or modification materially and adversely affects a group of Disproportionately Affected Owners in a similar manner, such amendment, restatement or modification shall for purposes of this clause (iii) require only the prior written consent of Disproportionately Affected Owners holding not less than two-thirds of the Shares held by such Disproportionately Affected Owners), (iv) any amendment, restatement or modification of any clause of this Section 13.5, or any other provision of the Agreement, that provides for the approval of a given Owner or group of Owners or approval by at least a specified percentage of Shares held by Owners shall also require approval of that Owner or group of Owners or at least that specified percentage of Shares held by Owners, as applicable.

(b)   Unless expressly set forth herein, no provision of this Agreement may be waived except pursuant to a written instrument signed by the party or parties hereto against whom enforcement of such waiver is sought; provided that the Company shall not waive compliance of any obligation of any Member or Owner to the Company under this Agreement unless the Company waives compliance of such obligation for all similarly situated Members or Owners on a *pro rata* basis. The waiver by any party of any provision of this Agreement is effective only in the instance and only for the purpose that it is given and does not operate and is not to be construed as a further or continuing waiver of such provision or as a waiver of any other provision.   No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 13.6    *Headings*.  The headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof.

Section 13.7    *Counterparts*.  This Agreement may be executed in several counterparts, each of which be deemed an original but all of which shall constitute one and the same instrument.    An electronic PDF or electronic signature of an executed counterpart of this Agreement shall be deemed an original. For the avoidance of doubt, a Person's execution and delivery of this Agreement by electronic signature and electronic transmission, including via DocuSign or other similar method, shall constitute the execution and delivery of a counterpart of this Agreement by or on behalf of such Person and shall bind such Person to the terms of this Agreement.    This  Agreement  and  any  additional  information  incidental  hereto  may  be maintained as electronic records.  At the request of any party, each other party will re-execute original forms thereof and deliver them to the requesting party.  No party will raise the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

Section 13.8    *Severability*.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is held to be illegal, invalid or unenforceable for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by Applicable Law and, in any event, such illegality, invalidity or unenforceability shall not affect the legality, validity or enforceability of the remainder of this Agreement, provided, however, that the Owners and Members shall negotiate in good faith to amend this Agreement to modify any such illegal, invalid or unenforceable provision in order to carry out the Owners' and Members' intent and agreement as embodied herein to the maximum extent permitted by law.

Section 13.9    *Binding Agreement; No Third Party Beneficiaries*.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement (other than pursuant to Section 6.8 and Article X hereof).

Section 13.10 *Assignment*.  Except as specifically provided herein, no party under this Agreement may assign its rights and obligations hereunder without the prior written consent of the Board; provided, however that upon a Transfer by a Member or Owner of its ownership of Shares in compliance with this Agreement, its rights and obligations under this Agreement to the extent related to such Shares will be assigned to and assumed by the transferee but no such assignment and assumption will release any transferor or Member or Owner of any liability for any prior breach of the Agreement or of its obligations under Section 13.3.

Section 13.11 *Reliance by Third Parties*.  Notwithstanding anything to the contrary in this Agreement, any Person dealing with the Company shall be entitled to assume that the Board and any officer authorized by the Board to act on behalf of and in the name of the Company has full power and authority to encumber, sell or otherwise use in any manner any and all assets of the Company and to enter into any authorized contracts on behalf of the Company, and such Person shall be entitled to deal with the Board or any officer as if it were the Company's sole party in interest, both legally and beneficially. In no event shall any Person dealing with the

53

Board or any officer or their respective representatives be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expediency of any act or action of the Board or any officer or their respective representatives. Each and every certificate, document or other instrument executed on behalf of the Company by the Board or any officer or their respective representatives shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (a) at the time of the execution and delivery of such certificate, document or instrument, this Agreement was in full force and effect, (b) the Person executing and delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Company and (c) such certificate, document or instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Company.

Section 13.12 *No Partition*.  Except as otherwise expressly provided in this Agreement, each of the Owners and Members in such capacity hereby irrevocably waives any right or power that such Owners or Members might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any Applicable Law, or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation or termination of the Company.  Each of the Owners and Members has been induced to enter into this Agreement in reliance upon the waivers set forth in this Section 13.12, and without such waivers, no Owner or Member would have entered into this Agreement.  No Owner or Member shall have any interest in any specific assets of the Company.

Section 13.13 *Non-Recourse*.  Notwithstanding anything to the contrary contained in this Agreement, recourse for the payment or performance of the obligations of any Member or Owner under the terms of this Agreement shall be limited solely to the Member or Owner and no direct or indirect member, partner, shareholder, principal, officer, Manager, employee or affiliate of a Member or Owner shall have any personal liability for the payment or performance of any obligations under this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

54

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**REVLON GROUP HOLDINGS LLC**


By: _____
Name: Matthew Kvarda
Title:   Interim Chief Financial Officer

EXHIBIT A

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SHARES
-IN-

## REVLON GROUP HOLDINGS LLC

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE, DISPOSITION, TRANSFER AND VOTING AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF REVLON GROUP HOLDINGS LLC (THE "COMPANY"), DATED AS OF MAY 2, 2023, AS MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME (THE "AGREEMENT"). UNLESS OTHERWISE APPROVED BY THE BOARD OF MANAGERS OF THE COMPANY, THE SHARES ARE REQUIRED TO BE HELD AND CLEARED THROUGH DTC. NO REGISTRATION OR TRANSFER OF SUCH SHARES WILL BE MADE ON THE BOOKS AND RECORDS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SHARES A COPY OF THE AGREEMENT CONTAINING THE ABOVE REFERENCED RESTRICTIONS UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the number of limited liability company interests in REVLON GROUP HOLDINGS LLC, a Delaware limited liability company (the "Company").

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The Company may deem and treat the person in whose name this Certificate is registered upon the books of the Company as the owner hereof for all purposes and the Company shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed in its name by the manual or facsimile signature of one of its authorized signatories.

**REVLON GROUP HOLDINGS LLC**

By: _____
Name:
Title:

<u>Exhibit B</u>
<u>Form of Registration Rights Agreement</u>

## FORM OF REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "*Agreement*") is made and entered into as of [●], [●], by and among Revlon Group Holdings LLC, a Delaware limited liability company (the "*Company*"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto.

WHEREAS, the Company and certain affiliated debtors filed the Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on March 31, 2023, which was confirmed by the United States Bankruptcy Court for the Southern District of New York on April 3, 2023 (as may be amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "*Plan*"); and

WHEREAS, the Plan provides that the Company may enter into registration rights agreements; and

WHEREAS, the Company and the Holders (as defined below) are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.     **Definitions.** Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in Section 16(c).

"*Affiliate*" means, with respect to any Person, or any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person). For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of management of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Recitals.

"*Alternative IPO Entity*" has the meaning set forth in Section 2(i).

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

"*beneficially own*" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company or any authorized committee thereof.

"*Bought Deal*" has the meaning set forth in Section 8(a).

"*Business Day*" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are authorized or required by law to be closed.

"*Commission*" means the Securities and Exchange Commission.

"*Company*" has the meaning set forth in the Preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the one law firm selected by the Holders holding a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Offering, the one law firm selected by the Majority Holders.

"*Demand Registration*" has the meaning set forth in Section 5(a).

"*Demand Registration Request*" has the meaning set forth in Section 5(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Form S-1*" means Form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"*Form S-3*" means Form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

2

"*Form S-4*" means Form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

"*Form S-8*" means Form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"*FINRA*" has the meaning set forth in <u>Section 10</u>.

"*Grace Period*" has the meaning set forth in <u>Section 7(a)(B)</u>.

"*Holder*" or "*Holders*" means any holder of Registrable Securities that is also a party signatory to this Agreement, other than the Company, and their respective assignees and/or transferees permitted hereunder. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in <u>Section 12(c)</u>.

"*Indemnifying Party*" has the meaning set forth in <u>Section 12(c)</u>.

"*Initial Public Offering*" means (i) an initial direct listing of the Reorganized Revlon Common Shares or any equity interest of any successor to, or Affiliate of, the Company formed for the purpose of pursuing an initial public offering or any other Alternative IPO Entity (such equity interests, together with any equity interests referenced in clause (iii) below, "*Successor Equity*") that results in such Reorganized Revlon Common Shares or Successor Equity being listed on the New York Stock Exchange or the Nasdaq Stock Market LLC, (ii) an underwritten offering which is an initial public offering of the Reorganized Revlon Common Shares or Successor Equity pursuant to an effective Registration Statement filed under the Securities Act that results in such Reorganized Revlon Common Shares or Successor Equity being listed on the New York Stock Exchange or the Nasdaq Stock Market LLC (which excludes, among others, a registration of Reorganized Revlon Common Shares or Successor Equity (A) pursuant to a registration statement on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee equity plan or other employee benefit arrangement), (B) pursuant to a registration statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), or (C) in connection with any dividend reinvestment or similar plan), or (iii) the closing of a business combination (in the form of a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination) with or into a special purpose acquisition company or "blank-check" company (or a subsidiary thereof) (collectively, a "*SPAC*") after which the Reorganized Revlon Common Shares, the common equity securities of the SPAC or a subsidiary thereof, or any other Successor Equity are listed on the New York Stock Exchange or the Nasdaq Stock Market LLC.

"*Initial Shelf Expiration Date*" has the meaning set forth in <u>Section 2(f)</u>.

"*Initial Shelf Registration Statement*" has the meaning set forth in <u>Section 2(a)</u>.

"*Lockup Period*" has the meaning set forth in <u>Section 11(a)</u>.

"*Losses*" has the meaning set forth in <u>Section 12(a)</u>.

"*Majority Holders*" means, with respect to any Underwritten Offering, the Holders holding a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*Opt-Out Notice*" has the meaning set forth in <u>Section 8(e)</u>.

"*Other Holder*" has the meaning set forth in <u>Section 8(b)</u>.

"*Participating Holder*" has the meaning set forth in <u>Section 2(j)</u>.

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in <u>Section 8(a)</u>.

"*Piggyback Offering*" has the meaning set forth in <u>Section 8(a)</u>.

"*Plan*" has the meaning set forth in the Recitals.

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, all Reorganized Revlon Common Shares issued to any Holder or to any Affiliate or Related Fund of any Holder, either directly or pursuant to a transfer or assignment and any additional Reorganized Revlon Common Shares acquired by any Holder, Affiliate or Related Fund of any Holder, including in connection with open market or other purchases or acquisitions, after the Plan Effective Date, (b) any additional Reorganized Revlon

Common Shares paid, issued or distributed to any Holder or to any Affiliate or Related Fund of any Holder in respect of any such securities by way of a stock dividend, stock split or distribution, or in connection with a combination of securities, and any security into which such Reorganized Revlon Common Shares shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, bonus issue, exchange, distribution, other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) and (b) above, in each case, beneficially owned by any Holder; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (i) the date on which such securities are sold or disposed of pursuant to an effective Registration Statement, (ii) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act, (iii) the date on which such securities shall have been otherwise transferred and are represented by certificates or book entries not bearing a legend restricting transfer, (iv) with respect to Holders beneficially holding, together with their Related Funds and Affiliates, three percent (3.0%) or less of the outstanding Reorganized Revlon Common Shares, the date on which such securities can be sold pursuant to Rule 144 (or any similar provision then in effect) under the Securities Act without limitation thereunder on volume or manner of sale and without the need for current public information required by Rule 144(c)(1), or (v) the date on which such securities cease to be outstanding; *provided further*, *however*, that, except as described above, Registrable Securities shall not otherwise cease to constitute Registrable Securities due solely to the fact that such securities may be sold without restriction by the Commission.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including, without limitation, any Shelf Registration Statement), amendments and supplements to such registration statements, including post-effective amendments, all exhibits and documents incorporated by reference or deemed to be incorporated by reference in such registration statements.

"*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised, sub-advised, managed or co-managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager.

"*Related Party*" has the meaning set forth in Section 16(e).

"*Reorganized Revlon Common Shares*" means the equity securities of the Company.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or

regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 144A*" means Rule 144A promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" has the meaning set forth in Section 2(j).

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*SPAC*" has the meaning set forth in the definition of "Initial Public Offering."

"*Successor Equity*" has the meaning set forth in the definition of "Initial Public Offering."

"*Trading Day*" means a day during which trading in the Reorganized Revlon Common Shares occurs in the Trading Market, or if the Reorganized Revlon Common Shares are not listed on a Trading Market, a Business Day.

"*Trading Market*" means whichever of the New York Stock Exchange, the NYSE MKT, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital Market, or the OTC Markets Group marketplace on which the Reorganized Revlon Common Shares are listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in Section 14.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in Section 2(h).

2.    **Initial Shelf Registration.**

(a)    Following the completion of an Initial Public Offering, the Company shall prepare a Shelf Registration Statement (as may be amended from time to time, the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein pursuant to Section 2(b) and Section 2(j). Promptly, and no later than ten (10) Business Days following the date that is the later of (i) one hundred eighty (180) days after the completion of an Initial Public Offering and (ii) the expiration of any lockup agreement with the underwriters in such Initial Public Offering, the Company shall file the Initial Shelf Registration Statement with the Commission, *provided, however*, that the Company shall not be required to file or cause to be declared effective the Initial Shelf Registration Statement unless Holders request, in accordance with Section 2(j), the inclusion in the Initial Shelf Registration Statement of Registrable Securities constituting at least twenty-five percent (25%) of all Registrable Securities, and such Holders otherwise timely comply with the requirements of this Agreement with respect to the inclusion of such Registrable Securities in the Initial Shelf Registration Statement.

(b)    The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided, however*, that with respect to any Registration Statement to be filed in connection with this Agreement, the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(c)    Upon the request of any Holder whose Registrable Securities are not included in the Initial Shelf Registration Statement at the time of such request, the Company shall use commercially reasonable efforts to amend the Initial Shelf Registration Statement to include the Registrable Securities of such Holder if the rules and regulations of the Commission would permit the addition of such Registrable Securities to the Initial Shelf Registration Statement; provided that the Company shall not be required to amend the Initial Shelf Registration Statement more than once during any 180-day period.

(d)    Within five (5) Business Days after receiving a request pursuant to Section 2(c), the Company shall give written notice of such request to all other Holders of Registrable Securities and shall include in such amendment all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) Business Days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and

effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)     The Initial Shelf Registration Statement shall be on Form S-1; *provided*, *however*, that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall use commercially reasonable efforts to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed as soon as reasonably practicable thereafter.

(f)     The Company shall use commercially reasonable efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable after filing (and, for the avoidance of doubt, shall use commercially reasonable efforts to respond to outstanding comments of the Commission relating to such Shelf Registration Statement as quickly as practicable) and shall use its reasonable best efforts to keep such Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by Holders on Form S-3 and (B) has filed such Registration Statement with the Commission and which is effective and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "*Initial Shelf Expiration Date*").

(g)     If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law (other than any Form 8-K required to be filed under Item 2.02 or 7.01 thereof), any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

(h)     Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an "*Underwritten Takedown*"), in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the

Holders in such "takedown" shall have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such "takedown" represent all of the Registrable Securities outstanding at the time of such "takedown."

(i)     In the event that the Company elects to effect an underwritten registered offering or a direct listing of equity securities of any subsidiary, parent or other successor entity of the Company, or to effect, directly or indirectly, a merger, capital stock exchange, asset acquisition, asset sale, stock purchase, reorganization, redomestication or other transaction, with or into a special purpose acquisition company, "blank-check" company, holding company or other Person (each of the foregoing, an "*Alternative IPO Entity*" and collectively, "*Alternative IPO Entities*"), rather than receiving registration rights with respect to Reorganized Revlon Common Shares, the parties shall cause the Alternative IPO Entity to enter into an agreement with the Holders that provides the Holders with registration rights with respect to equity securities of the Alternative IPO Entity (whether common stock, ordinary shares or similar, in which event references to "*Reorganized Revlon Common Shares*" will be read *mutatis mutandis* as such securities) that such Holders beneficially own that are substantially the same as, and in any event no less favorable in the aggregate to, the registration rights provided in this Agreement.

(j)     Other than any Holder that indicates to the Company in writing that it does not wish to be named as a "selling stockholder" in such Initial Shelf Registration Statement, each Holder agrees to furnish to the Company a completed questionnaire in the form attached hereto as Exhibit B (a "*Selling Stockholder Questionnaire*") in accordance with the final paragraph of Section 9, including, for the avoidance of doubt, the number of Registrable Securities that it wishes to include for registration on such Initial Shelf Registration Statement (any holder that returns such Selling Stockholder Questionnaire in accordance with Section 9, a "*Participating Holder*"). At least three (3) Business Days before filing the Initial Shelf Registration Statement, the Company will furnish to each Participating Holder a copy of a draft of the Selling Stockholder and Plan of Distribution sections (with respect to the Plan of Distribution section, only to the extent there have been any material changes to the form thereof attached hereteo as Exhibit A) for review and approval, which approval shall not be unreasonably withheld or delayed, and any objections to such draft disclosures must be lodged within two (2) Business Days of such Participating Holder's receipt thereof.

(k)     All Registrable Securities owned or acquired by any Holder or any of its Affiliates or Related Funds shall be aggregated together for the purpose of determining the availability of any right under this Agreement.

3.     **Subsequent Shelf Registration Statements**

(a)     After (i) the Effective Date of the Initial Shelf Registration Statement and prior to the Initial Shelf Expiration Date and (ii) for so long as any Registrable Securities remain outstanding, the Company shall use commercially reasonable efforts to (A) become eligible and/or maintain its eligibility to register the Registrable Securities on

Form S-3 after the Initial Shelf Expiration Date, and (B) meet the requirements of General Instruction VII of Form S-1 after the Initial Shelf Expiration Date.

(b)    After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, the Company shall use commercially reasonable efforts to (A) be eligible and/or to maintain its eligibility to register the Registrable Securities on Form S-3, and (B) meet the requirements of General Instruction VII of Form S-1.

(c)    After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, if there is not an effective Registration Statement which includes the Registrable Securities that are currently outstanding, the Company shall (i) if the Company is eligible to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-3 and use commercially reasonable efforts to cause such Registration Statement to be declared effective as promptly as practicable or, (ii) if the Company is not eligible at such time to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-1 and use commercially reasonable efforts to cause such Registration Statement to be declared effective as promptly as practicable.

(d)    For so long as any Registrable Securities covered by such Shelf Registration Statement on Form S-1 remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law (other than any Form 8-K required to be filed under Item 2.02 or 7.01 thereof), any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) such Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that, in each case, these obligations remain subject to the Company's rights under Section 7 of this Agreement.

4.    **[Reserved]**

5.    **Demand Registration**

(a)    At any time after the completion of an Initial Public Offering, any Holder or group of Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act (each, a "*Demand Registration*"). The Company will file a Registration Statement covering such Holder's or Holders' Registrable Securities requested to be registered, and shall use commercially reasonable efforts to cause such Registration Statement to be declared effective, as promptly as practicable and no later than sixty (60)

days after it receives such request; *provided*, *however*, that the Company will not be required to file a Registration Statement pursuant to this Section 5(a):

> (A)    unless (i) the number of Registrable Securities requested to be registered on such Registration Statement equals at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders pursuant to such Registration Statement have an anticipated aggregate gross offering price (before deducting underwriting discounts and commissions) of at least $50 million, disregarding any Registrable Securities subject to clause (B) below;

> (B)    with respect to any Registrable Securities requested to be registered that are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of such Registrable Securities requested to be registered; and

> (C)    if a registration statement filed by the Company shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days preceding the date such Demand Registration Request is made.

Notwithstanding anything to the contrary in this Agreement, the Company shall not be obligated to effect more than five such Demand Registrations; *provided, however* that a Demand Registration shall not be considered made for purposes hereof unless the requested Registration Statement has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested (subject to any reduction under Section 6(c) hereof).

(b)    A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution. If at the time the Demand Registration Request is made the Company appears, based on public information available to such Holder or Holders, eligible to use Form S-3 for the offer and sale of the Registrable Securities, the Holder or Holders making such request may request that the registration be in the form of a Shelf Registration Statement (for the avoidance of doubt, the Company shall not be under the obligation to file a Shelf Registration on Form S-3 if, upon the advice of its counsel, it is not eligible to make such a filing).

(c)    The Company may satisfy its obligations under Section 5(a) hereof by amending (to the extent permitted by applicable law and the rules and regulations of the Commission) any registration statement previously filed by the Company under the Securities Act and not yet declared effective by the Commission, so that such amended registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a Demand Registration Request has been properly made under this Section 5. If

the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 5(a) hereof; *provided, however*, that the Effective Date of the amended registration statement, as amended pursuant to this Section 5(c), shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 5(e) hereof.

(d)    Within five (5) Business Days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders of Registrable Securities and shall, subject to the provisions of Section 6(c) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) Business Days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)    The Company will use commercially reasonable efforts to keep a Registration Statement that has become effective as contemplated by this Section 5 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)    in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)    in the case of a Shelf Registration Statement, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however*, that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Shelf Registration Statement, if any Registrable Securities covered by such Shelf Registration Statement remain unsold, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect; *provided further, however*, that if any Shelf Registration Statement was initially declared effective on Form S-3 and, prior to the date determined pursuant to Section 5(e)(B), the Company becomes ineligible to use Form S-3, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which the Company did not have an effective Registration Statement covering unsold Registrable Securities initially registered on such Shelf Registration Statement.

(f)    The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 5(a).

(g)    If a Registration Statement filed pursuant to this Section 5 is a Shelf Registration Statement, then upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such underwritten "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such "takedown" represent all of the Registrable Securities outstanding at the time of such "takedown."

(h)    A Demand Registration may also be in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such underwritten Demand Registration shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such underwritten Demand Registration shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such underwritten Demand Registration represent all of the Registrable Securities outstanding at the time of such underwritten Demand Registration.

6.    **Procedures for Underwritten Offerings.**

The following procedures shall govern Underwritten Offerings pursuant to Section 2(h) or Section 5(g), whether in the case of an Underwritten Takedown or otherwise.

(a)    (i) The Majority Holders, with the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown, and (ii) the Company shall select one or more investment

banking firms of national standing to be the managing underwriter or underwriters for any other Underwritten Offering, with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided, however*, that the underwriting agreement is in customary form and reasonably acceptable to the Company and the Majority Holders and *provided further, however*, that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(c)    Notwithstanding anything to the contrary herein, if the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities or other Reorganized Revlon Common Shares permitted to be registered is such as to materially adversely affect the success of such Underwritten Offering, the number of Registrable Securities or other Reorganized Revlon Common Shares to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *third*, the Company shall reduce the number of Registrable Securities to be included by Holders on a pro rata basis based on the total number of Registrable Securities requested by the Holders to be included in the Underwritten Offering.

(d)    Within five (5) Business Days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 6(c) hereof, include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) Business Days after the Company's giving of such notice; *provided*, *however*, that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered.

(e)    The Company will not be required to undertake an Underwritten Offering pursuant to Section 2(h) or Section 5(g) if the Company has undertaken an Underwritten Offering, whether for its own account or pursuant to this Agreement, within the one hundred eighty (180) days preceding the date of the request to the Company for such Underwritten Offering.

14

(f)     Notwithstanding anything to the contrary in this Agreement, the Company shall not be obligated to effect more than three such Underwritten Offerings; *provided* that an Underwritten Offering shall not be considered made for purposes of this Section 6(f) unless it has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included subject to any reduction under Section 6(c) hereof.

7.     **Grace Periods.**

(a)     Notwithstanding anything to the contrary herein—

(A)     the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission, suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 2(h) or Section 5(g), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 5(a) or Section 6(f) and the Company shall pay all reasonable and documented registration expenses in connection with such registration; and

(B)     at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (A) and/or a delay described in this clause (B), a "*Grace Period*").

(b)     The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided* that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use commercially reasonable efforts to terminate a Grace Period as promptly as reasonably practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

15

(c)     The duration of any one Grace Period shall not exceed forty-five (45) days, and the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed ninety (90) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (i) of Section 7(b) and shall end on and include the later of the date the Holders receive the notice referred to in clause (iii) of Section 7(b) and the date referred to in such notice. In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

8.     **Piggyback Registration**

(a)     If at any time, and from time to time, the Company proposes to—

(A)     file a registration statement under the Securities Act with respect to an underwritten offering of Reorganized Revlon Common Shares of the Company or any securities convertible or exercisable into Reorganized Revlon Common Shares (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto or (iii) another form not available for registering the Registrable Securities for sale to the public), whether or not for its own account; or

(B)     conduct an underwritten offering constituting a "takedown" of a class of Reorganized Revlon Common Shares or any securities convertible or exercisable into Reorganized Revlon Common Shares registered under a shelf registration statement previously filed by the Company;

the Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to each Holder at least five (5) Business Days before the anticipated filing date (*provided* that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "*Bought Deal*"), such Piggyback Notice shall be given not less than two (2) Business Days prior to the expected date of commencement of marketing efforts). Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities and any proposed managing underwriter of such securities and shall offer the Holders the opportunity to register or offer such amount of Registrable Securities as each Holder may reasonably request on the same terms and conditions as the registration or offering of the other securities being registered thereunder (a "*Piggyback Offering*"). Subject to Section 8(b), the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within three (3) Business Days after the date the Piggyback Notice is given (*provided* that in the case of a Bought Deal, such written requests for inclusion must be received within one (1) Business Day after the date the Piggyback Notice is given); *provided, however,* that in the case of the filing of a registration statement, such Registrable Securities are not

16

otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, but in such case, the Company shall include such Registrable Securities in such underwritten offering if the Shelf Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be offered (without regard to the limitations on participation in Underwritten Offerings set forth in Section 2(h)); *provided further, however*, that in the case of an underwritten offering in the form of a "takedown" under a Shelf Registration Statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(b)      The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on substantially the same terms and conditions as any similar securities, if any, of the Company. Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering (such other holders, the "*Other Holders*") propose to include in such offering is such as to materially adversely affect the price, timing or distribution of such underwritten offering, then:

(A)      if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering: (i) *first*, all securities to be offered by the Company; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by all Other Holders;

(B)      if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders entitled to participate therein, allocated pro rata among such Holders on the basis of the amount of securities requested to be included therein by each such Holder; (iii) *third*, up to the full amount of securities proposed to be included in the registration by the Company; and (iv) *fourth,* up to the full amount of securities requested to be included in such Piggyback Offering by the Other Holders entitled to participate therein, allocated pro rata among such Other Holders on the basis of the amount of securities requested to be included therein by each such Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the success of such Piggyback Offering.

(c)      If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)      Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw from that registration, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

(e)      Notwithstanding the foregoing, any Holder may deliver written notice (an "*Opt-Out Notice*") to the Company at any time requesting that such Holder not receive notice from the Company of any proposed registration or offering; *provided, however*, that such Holder may later revoke any such Opt-Out Notice in writing.

9.    **Registration Procedures.**

If and when the Company is required to effect any registration under the Securities Act as provided in this Agreement, the Company shall use commercially reasonable efforts to:

(a)      prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use commercially reasonable efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)      prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as (i) all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein, or (ii) such Registration Statement is withdrawn in accordance with the terms of this Agreement;

(c)      (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto (except for any amendment or supplement as a result of the filing of a periodic report, current report or any other document required to be filed by the Company under the Exchange Act), at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement prepared in connection with an Underwritten Offering pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and the underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act; *provided* that as a condition to being provided any confidential information, any such Holder gaining access to information regarding the Company pursuant to this Section 9(c) shall agree to enter into a customary confidentiality agreement with the Company.

(d)      notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed (except for any supplement as a result of the filing of a periodic report, current report or any other document required to be filed by the Company under the Exchange Act);

(e)      with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)      (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or Blue Sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)      subject to Section 9(f) of this Agreement, cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)      with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed

(A)      opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

(B)      "comfort" letter, dated the date of the underwriting agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and any other underwriters,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

20

(i)      notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish (at the Company's expense) to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (subject to Section 7(f) of this Agreement);

(j)      notify the Holders of Registrable Securities included in such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)      advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use commercially reasonable efforts to obtain the withdrawal of such order;

(l)      otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(m)      provide (i) and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof and (ii) a CUSIP and ISIN number for all Registrable Securities no later than the Effective Date;

(n)      enter into such customary agreements (including an underwriting agreement in customary form) and take such other customary actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or

21

facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing at least one (1) executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested in an Underwritten Offering; *provided*, *however*, that the Company shall have no obligation to participate in more than three (3) such "road shows" requested hereunder in any twelve (12)-month period, such participation shall not unreasonably interfere with the business operations of the Company and the Company shall have no obligation to participate in more than one (1) such "road show" during any ninety (90) day period;

(o)     if reasonably requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Securities provided to the Company in writing by the managing underwriters and the Holders holding a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(p)     cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least five (5) Business Days prior to any sale of Registrable Securities to the underwriters;

(q)     cause all Registrable Securities included in a Registration Statement to be listed on a Trading Market on which similar securities issued by the Company are then listed, if at all, or quoted; and

(r)     otherwise use commercially reasonable efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least fifteen (15) Trading Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, in the form of the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Trading Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling security-holder in the Registration

Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as reasonably requested by the Company and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with Section 6(b). If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this Section 9 will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

10.    **Registration Expenses.**  All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts, fees or selling commissions or broker or similar commissions or fees (which shall be borne by Participating Holders on a pro rata basis), or transfer taxes of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees and expenses (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Reorganized Revlon Common Shares are then listed for trading, if any, or quoted, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company and any reasonable and documented fees and disbursements of counsel for the underwriters or Holders in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the underwriters or the Holders, as applicable) and (C) if not previously paid by the Company in connection with an issuer filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) all reasonable and documented expenses of any Persons in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any free writing prospectus and any amendments or supplements thereto, any underwriting agreements, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders holding a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) reasonable and documented fees and disbursements of counsel for the Company, (v) the reasonable and documented fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires

such insurance, (vii) all rating agency fees, if any, and any fees associated with making the Registrable Securities eligible for trading through The Depository Trust Company, and (viii) reasonable and documented fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company will pay the reasonable fees and disbursements of Counsel to the Holders, including, for the avoidance of doubt, any reasonable and documented expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder or any Underwritten Offering.

11. **Lockups.**

(a)     In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no Holder shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities during the seven (7) days prior to, and the ninety (90)-day period (or such lesser period as the underwriters may agree) beginning on the date of, the final prospectus filed in connection with such offering (as such period may be waived by the underwriters, the "*Lockup Period*"), except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its executive officers and directors as reasonably requested by the underwriters, and reasonably acceptable to the Majority Holders; *provided* that the Lockup Period shall include customary carve-outs, including that nothing herein will prevent any Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a) and so long as no public disclosure of such distribution is made. Each Holder agrees to execute a customary lockup agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 11(a). The provisions of this Section 11(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

(b)     In connection with any Underwritten Offering, the Company shall not effect any public sale or distribution of any of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the managing underwriter or underwriters, during the Lockup Period, except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Majority Holders. The Company agrees to execute a customary lockup agreement in favor of the underwriters in any relevant offering to such effect and, in any event, that the underwriters in any relevant offering shall be third party beneficiaries of this Section 11(b). Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to

registrations on Form S-4 or Form S-8 or any successor thereto or as part of any registration of securities of offering and sale to employees, directors or consultants of the Company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

12.    **Indemnification.**

(a)    <u>Indemnification by the Company</u>. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable and documented attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 9(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated and defined in Section 16(c) below, but only if and to the extent that following the receipt of the Advice, the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have. Paragraph (a) of this Section shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

(b)    <u>Indemnification by Holders</u>. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents

or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 9(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 16(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

(c)     _Conduct of Indemnification Proceedings_. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "_Indemnified Party_"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "_Indemnifying Party_") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with the defense thereof; _provided_, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party in its ability to defend such action.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded

26

parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder.

(d)     Contribution. If a claim for indemnification under Section 12(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 12(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 12(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or


alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13. **Section 4(a)(7), Rule 144 and Rule 144A; Other Exemptions.** With a view to making available to the Holders of Registrable Securities the benefits of Section 4(a)(7) of the Securities Act, Rule 144 and Rule 144A and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will use commercially reasonable efforts to, (i) if it is subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder, or, (ii) if it is not subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, make available information necessary to comply with Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A, if available, with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time, or (y) any other rules or regulations now existing or hereafter adopted by the Commission. Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

14. **Transfer of Registration Rights.** Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee, including any Affiliate or Related Fund of any Holder; *provided*, that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement (including through the execution of a joinder hereto); and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned and provide the amount of any other capital stock of the Company beneficially owned by such transferee or assignee; *provided further*, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

15.    **Further Assurances.** Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

16.    **Miscellaneous.**

(a)    <u>Remedies</u>. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)    <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement.

(c)    <u>Discontinued Disposition</u>. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in Section 9(i), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)    <u>Number of Registrable Securities Outstanding</u>. In order to determine the number of Registrable Securities outstanding at any time, and subject to <u>Section 2(k)</u> in all respects, upon the reasonable written request of the Company to Holders, each Holder shall promptly, and in any event within ten (10) Business Days of receipt of such request, inform the Company of the number of Registrable Securities that such Holder owns and that the Company may conclusively rely upon any certificate provided under this Agreement for the purpose of determining the number of such Registrable Securities.

(e)    <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each of the Holders and the Company agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Holder's former, current or future direct or indirect equity holders, controlling persons, shareholders, directors, officers, employees, agents, Affiliates, members, financing

29

sources, managers, general or limited partners or assignees (each, a "*Related Party*" and collectively, the "*Related Parties*"), in each case other than the current or former Holders or any of their respective assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of the the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this <u>Section 16(e)</u> shall relieve or otherwise limit the liability of the Company or any current or former Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(f)    <u>Preservation of Rights</u>. From and after the date of this Agreement, the Company shall not file or have declared effective a registration statement for any equity securities (other than a registration statement in connection with an Initial Public Offering that is substantially contemporaneous to the entering into of this Agreement) or on Form S-8, or any successor of such form, or a registration statement relating solely to the offer and sale to the Company's directors or employees pursuant to any employee stock plan or other employee benefit plan or arrangement) before the Initial Shelf Registration Statement is declared effective.  From and after the date of this Agreement, the Company shall not enter into any agreement with any current or future holder of any securities of the Company that would allow such current or future holder to require the Company to include securities in the Initial Shelf Registration Statement, or in any Piggyback Offering on a basis that is on parity with or superior to, the Piggyback Offering rights granted to the Holders pursuant to <u>Section 8</u> of this Agreement.

(g)    <u>No Inconsistent Agreements</u>. The Company has not entered, as of the date hereof, and the Company shall not enter, after the date of this Agreement, into any agreement with respect to its securities which is inconsistent with or grants registration rights that have parity with or are more favorable than the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof.

(h)    <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided*, *however*, that any party may give a waiver as to itself; *provided further, however*, that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; *provided further*, *however*, that the definitions of "Holders"and "Registrable Securities" in Section 1 and this Section 16(h) may not be amended, modified or supplemented, or waived unless in writing and signed by Holders holding 66 2/3% of all Registrable Securities at such time; and *provided further*, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such

offering shall have been commenced, having elected to participate in such offering. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders holding a majority of the Registrable Securities outstanding at such time to which such waiver or consent relates; *provided, however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence. No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof. No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(i)    Notices. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile or email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) at the following address (or at such other address as may be specified by like notice):

(A)    If to the Company:

Revlon Group Holdings LLC
55 Water St.
New York, New York 10041-00004
Attn:  Andrew Kidd, EVP, General Counsel
       Matthew Kvarda, Interim Chief Financial Officer

Email: Andrew.kidd@revlon.com
       Mkvarda@alvarezandmarsal.com

with a copy (which shall not constitute notice) to:
[●]
Facsimile: [●]
Attention: [●]
Email:    [●]

(B)    If to the Holders (or to any of them), to the address set forth on its signature page hereto (including any joinder hereto) or such other address as may be designated in writing hereafter by such Holder.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(j)      <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy). In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company, agreeing to be bound by its terms. Subject to <u>Section 2(i)</u> hereof, no assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holders holding 66 2/3% of all Registrable Securities at such time; *provided, further*, *however*, that no such assignment or delegation that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder (other than an assignment in connection with the reincorporation of the Company or its businesses in another jurisdiction).

(k)      <u>Execution and Counterparts</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(l)      <u>Governing Law; Venue</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York. Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement, shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City. The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts. Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum. The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(m)    <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(n)    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(o)    <u>Descriptive Headings; Interpretation; No Strict Construction</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation". The use of the words "or," "either" or "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(p)    <u>Entire Agreement</u>. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(q)    <u>Termination</u>. The obligations of the Company and of any Holder, other than those obligations contained in Section 12 and this Section 16, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**REVLON GROUP HOLDINGS LLC**

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.

HOLDERS:

**[Holder Name]**

By: _____
        Name:
        Title:

**EXHIBIT A**

**[Plan of Distribution to come]**

**EXHIBIT B**

**[Selling Stockholder Questionnaire to come]**

Annex A

Owner Governance Matters

## Annex A – Owner Governance Matters

For purposes of this Annex only, references herein to the Agreement shall be deemed to mean the Agreement excluding the terms of this Annex. In the event of any conflict between the terms of the Agreement and the terms of the Annex, the terms of the Agreement shall govern.

References in this Annex to any Section shall mean references to Sections of this Annex A, unless the context indicates otherwise.

Terms used in this Annex A that are not otherwise defined in this Annex A shall have the meanings assigned to such terms in the Agreement.

## ARTICLE I

## DEFINITIONS

1.1     "Derivative" means any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions and borrowed or loaned shares) that has been entered into, directly or indirectly, by or on behalf of the Proponent or any Owner Associated Person with respect to, Shares or other Equity Securities, the effect or intent of which is to (i) mitigate loss, (ii) manage risk or benefit of share price changes or (iii) increase or decrease the voting power of the Proponent or any Owner Associated Person.

1.2     "Managers" means Independent Managers (as defined in the Agreement).

1.3     "Nominating Owners" shall have the meaning as set forth in Section 3.1(b).

1.4     "Notice of Business" shall have the meaning as set forth in Section 2.2(c).

1.5     "Notice of Nomination" shall have the meaning as set forth in Section 3.1(c).

1.6     "Notice Record Date" shall have the meaning as set forth in Section 2.4(a).

1.7     "Office of the Company" means the executive office of the Company or any other offices at any other place or places where the Company is qualified to do business, as the Board may establish for purposes hereof.

1.8     "Proponent" shall have the meaning as set forth in Section 2.2(d)(i).

1.9     "Owner Associated Person" means with respect to any Owner, (i) any other beneficial owner of Shares or other Equity Securities that are owned by such Owner and (ii) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Owner or such beneficial owner.

1.10    "Owner Business" shall have the meaning as set forth in Section 2.2(b).

1.11    "Owner Information" shall have the meaning as set forth in Section 2.2(d)(iii).

1.12    "Owner Nominees" shall have the meaning as set forth in Section 3.1(b).

1.13    "Voting Commitment" shall have the meaning as set forth in Section 3.2.

1.14    "Voting Record Date" shall have the meaning as set forth in Section 2.4(a).

<div align="center">

**ARTICLE II**

**OWNERS**

</div>

2.1    Place of Meetings.  Meetings of Owners may be held at such place, if any, either within or outside the State of Delaware, or by means of remote communication, as may be designated by the Board from time to time.  Participation by an Owner in a remote meeting shall constitute presence in person at such meeting.

2.2    Annual Meetings; Owner Proposals.

(a)    A meeting of Owners for the election of Managers and other business shall be held annually at such date and time as may be designated by the Board from time to time (but, in any event, no later than thirty (30) days after each anniversary of the Effective Date; *provided*, that the First Annual Meeting shall not be held earlier than May 2, 2024.

(b)    At an annual meeting of the Owners, only business (other than business relating to the nomination, appointment or election of Managers, which is governed by Article III) that has been properly brought before the Owner meeting in accordance with the procedures set forth in this Section 2.2 shall be conducted.  To be properly brought before a meeting of Owners, such business must be brought before the meeting by or at the direction of the Board or any authorized committee thereof or by an Owner who (i) was an Owner of the Company when the notice required by this Section 2.2 is delivered to the Secretary of the Company and at the time of the meeting, (ii) is entitled to vote at the meeting and (iii) complies with the notice and other provisions of this Section 2.2.  Subject to Section 2.2(i), and except with respect to nominations or elections of Managers, which are governed by Section 3.1, Section 2.2(b) is the exclusive means by which an Owner may bring business before an annual meeting of Owners.  Any business brought before an annual meeting in accordance with Section 2.2(b) is referred to as "Owner Business".

(c)    Subject to Section 2.2(i), at any annual meeting of Owners, all proposals of Owner Business must be made by timely written notice given by or on behalf

<div align="center">2</div>

of an Owner (the "Notice of Business") and must otherwise be a proper matter for Owner action.  To be timely, the Notice of Business must be delivered personally or mailed to, and received at the Office of the Company, addressed to the Secretary of the Company, by no earlier than one-hundred-twenty (120) days and no later than ninety (90) days before the first anniversary of the date of the prior year's annual meeting of Owners; provided, however, that (i) if the annual meeting of Owners is advanced by more than thirty (30) days, or (subject to Section 2.2(a)) delayed by more than sixty (60) days, from the first anniversary of the prior year's annual meeting of Owners or (ii) in the case of the Company's First Annual Meeting, the notice by the Owner to be timely must be received (A) no earlier than one-hundred-twenty (120) days before such annual meeting and (B) no later than the later of ninety (90) days before such annual meeting and the tenth (10th) day after the day on which the notice of such annual meeting was first made by mail or through the Datasite.  In no event shall an adjournment, postponement or deferral, or the making of an announcement in respect thereof, commence a new time period (or extend any time period) for the giving of the Notice of Business.

(d)     The Notice of Business must set forth:

(i)     the name and address of each Owner proposing Owner Business (the "Proponent"), as it appears on the Company's books;

(ii)     the name and address of any Owner Associated Person;

(iii)     as to each Proponent and any Owner Associated Person, (A) the number of Shares and other Equity Securities directly or indirectly held by the Proponent or Owner Associated Person, (B) the date(s) such Shares and other Equity Securities were acquired, (C) a description of any agreement, arrangement or understanding, direct or indirect, with respect to such Owner Business between or among the Proponent, any Owner Associated Person or any others (including their names) acting in concert with any of the foregoing, (D) a description of any Derivative, (E) a description in reasonable detail of any proxy (including revocable proxies), contract, arrangement, understanding or other relationship pursuant to which the Proponent or any Owner Associated Person has a right to vote any Shares or other Equity Securities, (F) any rights to dividends or distributions on the Shares or other Equity Securities owned beneficially by the Proponent or any Owner Associated Person that are separated or separable from the underlying Shares or other Equity Securities, (G) any proportionate interest in Shares, other Equity Securities or Derivatives held, directly or indirectly, by a general or limited partnership in which the Proponent or any Owner Associated Person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner and (H) any performance-related fees (other than an asset-based fee) that the Proponent or any Owner Associated Person is entitled to that is based on any increase or decrease in the value of Shares or Derivatives thereof, if any, as of the date of such notice.  The information specified in Section 2.2(d)(i) to Section 2.2(d)(iii) is referred to as "Owner Information";

3

(iv)     a representation that each Proponent is an Owner of Shares or, if applicable, other Equity Securities entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to propose such Owner Business,

(v)     a brief description of the Owner Business desired to be brought before the annual meeting, the text of the proposal (including the text of any resolutions proposed for consideration and, if such business includes a proposal to amend the Agreement or this Annex, the language of the proposed amendment) and the reasons for conducting such Owner Business at the meeting;

(vi)     any material interest of each Proponent and any Owner Associated Person in such Owner Business;

(vii)     a representation as to whether the Proponent intends (A) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Company's Shares or other Equity Securities (if applicable) required to approve or adopt such Owner Business or (B) otherwise to solicit proxies from Owners in support of such Owner Business;

(viii)     all other information that would be required to be filed with the Commission if the Proponents or Owner Associated Persons were participants in a solicitation subject to Section 14 of the Exchange Act; and

(ix)     a representation that the Proponents shall provide any other information reasonably requested by the Company.

(e)     The Proponents shall provide any other information reasonably requested by the Company within ten (10) Business Days after receipt of such request.

(f)     In addition, the Proponent shall affirm as true and correct the information provided to the Company in the Notice of Business or at the Company's request pursuant to Section 2.2(e) (and shall update or supplement such information as needed so that such information shall be true and correct) as of (i) the record date for the meeting, (ii) the date that is ten (10) calendar days before the first anniversary date of the Company's proxy statement and/or notice of annual meeting distributed to Owners in connection with the previous year's annual meeting and (iii) the date that is ten (10) Business Days before the later of the annual meeting or any adjournment or postponement thereof. Such affirmation, update and/or supplement must be delivered personally or mailed to, the Office of the Company, addressed to the Secretary of the Company, by no later than (x) five (5) Business Days after the applicable date specified in clause (i) or (ii) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (y) not later than seven Business Days before the date for the annual meeting (in the case of the affirmation, update and/or supplement required to be made as of ten (10) Business Days before the annual meeting or any adjournment or postponement thereof).

4

(g)     The person presiding over the meeting shall, acting in good faith, have the power, with respect to any Owner Business attempted to be introduced at a meeting by resolution or proposal made by an Owner, to determine and declare at the meeting, that such business was not properly brought before the meeting in accordance with the procedures set forth in this Section 2.2, and, if such Owner Business was not properly brought in accordance with such procedures, to exclude the consideration of any such business at the meeting.

(h)     If the Proponent (or a qualified representative of the Proponent) does not appear at the meeting of Owners to present the Owner Business, then such business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Company.  For purposes of this Section 2.2, to be considered a qualified representative of the Owner, a person must be a duly authorized officer, manager or partner of such Owner or must be authorized by a writing executed by such Owner or an electronic transmission delivered by such Owner to act for such Owner as proxy at the meeting of Owners and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of Owners.

(i)     The notice requirements of this Section 2.2 shall be deemed satisfied with respect to Owner proposals that have been properly brought under Rule 14a-8 of the Exchange Act (as if Rule 14a-8 were applicable to the Company) and that are included in a proxy statement that has been prepared by the Company to solicit proxies for such annual meeting.

2.3     Special Meetings.  Special meetings of Owners, for any purpose or purposes, unless otherwise prescribed by Applicable Law, may be called at any time upon no less than 10 days and no more than 90 days prior notice (which notice will be posted to the Datasite) by the Board or by Owners holding a majority of the Shares (who shall demand such special meeting by written notice given to the Chief Executive Officer or Chairman specifying the purpose or purposes of such meeting), and may not be called by any other person or persons.  Business transacted at any special meeting of Owners shall be limited to the purposes stated in the notice of such meeting (which purposes shall, in the case of a special meeting called by holders of Shares in accordance with the prior sentence, be limited to the purposes set forth in their written notice and, for the avoidance of doubt, such holders need not comply with Sections 2.2(c)–2.2(h)) in connection therewith.

2.4     Record Date.

(a)     For the purpose of determining the Owners entitled to notice of any meeting (including a special meeting) of Owners or any adjournment thereof, unless otherwise required by Applicable Law or the Agreement, the Board may fix a record date (the "Notice Record Date"), which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ninety (90) or less than ten (10) days before the date of such meeting.  The Notice Record

5

Date shall also be the record date for determining the Owners entitled to vote at such meeting unless the Board determines, at the time it fixes such Notice Record Date, that a later date on or before the date of the meeting shall be the date for making such determination (the "Voting Record Date").  For the purposes of determining the Owners entitled to receive payment of any dividend or other distribution or allotment of any rights, exercise any rights in respect of any change, conversion or exchange of Shares or other Equity Securities or take any other lawful action, unless otherwise required by the Agreement or by Applicable Law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ninety (90) days prior to such action.

(b)    If no such record date under Section 2.4(a) is fixed:

(i)    The record date for determining Owners entitled to notice of and to vote at a meeting of Owners shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and

(ii)    When a determination of Owners entitled to notice of or to vote at any meeting of Owners has been made as provided in this Section 2.3, such determination shall apply to any adjournment thereof, unless the Board fixes a new Voting Record Date for the adjourned meeting, in which case the Board shall also fix such Voting Record Date or a date earlier than such date as the new Notice Record Date for the adjourned meeting.

2.5    Notice of Meetings of Owners.  Whenever Owners are required or permitted to take any action at a meeting under the provisions of Applicable Law, this Annex or the Agreement, notice shall be given stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which Owners and proxy holders may be deemed to be present in person and vote at such meeting, the Notice Record Date and the Voting Record Date, if such date is different from the Notice Record Date, and the purposes for which the meeting is called.  Unless otherwise provided by these By-laws or Applicable Law, notice of any meeting shall be given, not less than ten (10) nor more than ninety (90) days before the date of the meeting, to each Owner entitled to vote at such meeting as of the Notice Record Date.  If mailed, such notice shall be deemed to be given when deposited in the U.S. mail, with postage prepaid, directed to the Owner at his or her address as it appears on the records of the Company; provided, that the Company shall post a copy of such notice to the Datasite.  An affidavit of the Secretary, an Assistant Secretary or the transfer agent of the Company that the notice required by this Section 2.5 has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.  If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if (x) the time and place thereof are announced at the meeting at which the adjournment is taken and (y) details on such adjourned meeting are posted to the Datasite.  Any business that might have been transacted at the meeting as originally called may be transacted at the adjourned meeting.

6

If, however, the adjournment is for more than thirty (30) days or, if after the adjournment a new Notice Record Date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Owner entitled to vote at the meeting. If, after the adjournment, a new Voting Record Date is fixed for the adjourned meeting, the Board shall fix a new Notice Record Date in accordance with Section 2.4(b)(ii) hereof and shall give notice of such adjourned meeting to each Owner entitled to vote at such meeting as of the Notice Record Date.

2.6    Waivers of Notice. Whenever the giving of any notice to Owners is required by Applicable Law, the Agreement or this Annex, a written waiver, signed by the Owner entitled to notice, or a waiver by electronic transmission by such Owner, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice. Attendance by an Owner at a meeting shall constitute a waiver of notice of such meeting except when the Owner attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened. Neither the business to be transacted at, nor the purposes of, any regular or special meeting of the Owners need be specified in any waiver of notice.

2.7    Quorum of Owners; Adjournment. Except as otherwise provided by the Agreement or this Annex, at each meeting of Owners, the presence in person or represented by proxy of the holders of a majority of the voting power of all outstanding Shares entitled to vote at the meeting of Owners shall constitute a quorum for the transaction of any business at such meeting. In the absence of a quorum, the holders of a majority of the voting power of the Shares present in person or represented by proxy at any meeting of Owners, including an adjourned meeting, or the person presiding over the meeting may adjourn such meeting to another time and place. Shares of the Company belonging to the Company or to another Person, if a majority of the Shares entitled to vote in the election of Managers of such other Person is held, directly or indirectly, by the Company, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Company to vote Shares held by it in a fiduciary capacity.

2.8    Voting; Proxies. Except as may otherwise be provided in the Agreement, this Annex or by Applicable Law, each holder of Shares, as such, shall be entitled to one vote for each Share held by such holder on all matters on which Owners generally are entitled to vote. At any meeting of Owners, all matters other than the election of Managers (which shall be governed by Article III), except as otherwise provided by the Agreement or this Annex or any Applicable Law, shall be decided by the affirmative vote of a majority of the voting power of Shares present in person or represented by proxy and entitled to vote thereon. Each Owner entitled to vote at a meeting may authorize another person or persons to act for such Owner by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an

7

irrevocable power.  An Owner may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or by delivering a new duly authorized proxy bearing a later date.  Except as specifically contemplated by this Annex or by the Agreement, all Owners shall be treated in a *pari passu* fashion

   2.9 Voting Procedures and Inspectors at Meetings of Owners.  The Board, in advance of any meeting of Owners, shall appoint one or more inspectors, who may be employees of the Company, to act at the meeting and make a written report thereof.  The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall (a) ascertain the number of Shares outstanding and the voting power of each, (b) determine the Shares represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (e) certify their determination of the number of Shares represented at the meeting and their count of all votes and ballots.  The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties.  Unless otherwise provided by the Board, the date and time of the opening and the closing of the polls for each matter upon which the Owners will vote at a meeting shall be determined by the person presiding at the meeting and shall be announced at the meeting.  No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by an Owner shall determine otherwise.  In determining the validity and counting of proxies and ballots cast at any meeting of Owners, the inspectors may consider such information as is permitted by Applicable Law.  No person who is a candidate for office at an election may serve as an inspector at such election.

   2.10 Conduct of Meetings.  The Board may adopt such rules and procedures for the conduct of Owner meetings as it deems appropriate.  At each meeting of Owners, the Chief Executive Officer or, in the absence of the Chief Executive Officer, the Chairman or, if the Chairman is absent, any officer of the Company designated by the Board shall preside over the meeting.  Except to the extent inconsistent with the rules and procedures as adopted by the Board, the person presiding over the meeting of Owners shall have the right and authority to convene, adjourn and reconvene the meeting from time to time, to prescribe such additional rules and procedures and to do all such acts as, in the judgment of such person, are appropriate for the proper conduct of the meeting.  Such rules and procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, (a) the establishment of an agenda or order of business for the meeting, (b) rules and procedures for maintaining order at the meeting and the safety of those present, (c) limitations on attendance at or participation in the

8

meeting to Owners of the Company, their duly authorized and constituted proxies and such other persons as the person presiding over the meeting shall determine, (d) restrictions on entry to the meeting after the time fixed for the commencement thereof and (e) limitations on the time allotted to questions or comments by participants. The order of business at all meetings of Owners shall be as determined by the person presiding over the meeting. The person presiding over any meeting of Owners, in addition to making any other determinations that may be appropriate to the conduct of the meeting, may in good faith determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine in good faith at the advice of counsel (which may be internal counsel), he or she shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered. Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of Owners shall not be required to be held in accordance with the rules of parliamentary procedure. The Secretary or, in his or her absence, one of the Assistant Secretaries, shall act as secretary of the meeting. If none of the officers above designated to act as the person presiding over the meeting or as secretary of the meeting shall be present, a person presiding over the meeting or a secretary of the meeting, as the case may be, shall be designated by the Board and, if the Board has not so acted, in the case of the designation of a person to act as secretary of the meeting, designated by the person presiding over the meeting.

2.11 <u>Written Consent</u>.  Unless prohibited by Applicable Law or the Agreement, any action that is required or permitted to be taken by the Owners at a meeting may be taken without a meeting if a consent in writing setting forth the action so taken is signed by Owners having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Shares entitled to vote thereon were present and voted. The action shall be effective on the date when the last signature is placed on the consent or at such earlier time as is set forth therein. Such consent, which shall have the same effect as a vote of the Owners, shall be filed with the minutes of the Company. If action is taken by less than unanimous consent of the Owners, prompt notice of the taking of such action without a meeting shall be given to those who have not consented in writing and the Company shall post a copy of such written consent, with appropriate redactions, to the Datasite. For the purpose of determining the Owners entitled to take an action by written consent without a meeting, the Board may fix a record date for such purpose, which date shall not be more than ninety (90) days before the date of such written consent.

2.12 *Certain Procedures*.  The Board may adopt such rules and procedures as it deems reasonably appropriate to effectuate and administer the intent of the provisions of this Article II.

9

# ARTICLE III

## MANAGERS

3.1    Nominations of Managers.

(a)    Subject to Section 3.1(j), only persons who are nominated in accordance with the procedures set forth in this Section 3.1 are eligible for election as Managers.

(b)    Subject to Section 3.1(j), nominations of persons for election to the Board may only be made at a meeting properly called for the election of Managers and only (i) by or at the direction of the Board or any committee thereof or (ii) by an Owner who (A) was an Owner of the Company when the notice required by this Section 3.1 is delivered to the Secretary of the Company and at the time of the meeting, (B) is entitled to vote for the election of Managers at the meeting and (C) complies with the notice and other provisions of this Section 3.1. Subject to Section 3.1(j), Section 3.1(b)(ii) is the exclusive means by which an Owner may nominate a person for election to the Board. Persons nominated in accordance with Section 3.1(b)(ii) are referred to as "Owner Nominees". An Owner nominating persons for election to the Board is referred to as the "Nominating Owner".

(c)    Subject to Section 3.1(j), all nominations of Owner Nominees must be made by timely written notice given by or on behalf of an Owner (the "Notice of Nomination"). To be timely, the Notice of Nomination must be delivered personally or mailed to the Office of the Company, addressed to the attention of the Secretary of the Company, by the following dates:

(i)    in the case of the nomination of an Owner Nominee for election to the Board at an annual meeting of Owners, no earlier than one-hundred-twenty (120) days and no later than ninety (90) days before the first anniversary of the date of the prior year's annual meeting of Owners; provided, however, that (A) if the annual meeting of Owners is advanced by more than thirty (30) days, or delayed (subject to Section 2.2(a)) by more than sixty (60) days, from the first anniversary of the prior year's annual meeting of Owners or (B) in the case of the Company's First Annual Meeting, the notice by the Owner to be timely must be received (1) no earlier than one-hundred-twenty (120) days before such annual meeting and (2) no later than the later of forty-five (45) days before such annual meeting and the tenth (10th) day after the day on which the notice of such annual meeting was first made by mail and via the Datasite; provided, further, that in the case of the First Annual Meeting only, if as of the Testing Date the Key Owner Committee Termination Date has not occurred, then all nominations of Owner Nominees shall be deemed automatically withdrawn as of the Testing Date, and

(ii)    in the case of the nomination of an Owner Nominee for election to the Board at a special meeting of Owners, no earlier than one-hundred-twenty

10

(120) days before and no later than the later of ninety (90) days before such special meeting and the tenth (10th) day after the day on which the notice of such special meeting was first made by mail or via the Datasite.

(d)     In no event shall an adjournment, postponement or deferral, or disclosure of an adjournment, postponement or deferral (including via the Datasite), of an annual or special meeting commence a new time period (or extend any time period) for the giving of the Notice of Nomination.

(e)     The Notice of Nomination shall set forth:

(i)     the Owner Information with respect to each Nominating Owner and Owner Associated Person (except that references to the "Proponent" in Section 2.2(d)(i)to Section 2.2(d)(iii) shall instead refer to the "Nominating Owner" for purposes of this Section 3.1(e)(i));

(ii)     a representation that each Owner nominating an Owner Nominee is a holder of Shares entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to propose such nomination;

(iii)     all information regarding each Owner Nominee and Owner Associated Person that would be required to be disclosed in a solicitation of proxies subject to Section 14 of the Exchange Act, the written consent of each Owner Nominee to being named in a proxy statement as a nominee and to serve if elected and a completed signed questionnaire, representation and agreement required by Section 3.2;

(iv)     a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among a Nominating Owner, Owner Associated Person or their respective associates, or others acting in concert therewith, including all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K if the Nominating Owner, Owner Associated Person or any person acting in concert therewith, were the "registrant" for purposes of such rule and the Owner Nominee were a director or executive of such registrant;

(v)     a representation as to whether the Nominating Owners intends (A) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Company's outstanding Shares required to approve the nomination or (B) otherwise to solicit proxies from Owners in support of such nomination;

(vi)     all other information that would be required to be filed with the Commission if the Nominating Owners and Owner Associated Person were participants in a solicitation subject to Section 14 of the Exchange Act; and

(vii)     a representation that the Nominating Owners shall provide any other information reasonably requested by the Company.

11

(f)      The Nominating Owners shall also provide any other information reasonably requested by the Company within ten (10) Business Days after such request.

(g)      In addition, the Nominating Owner shall affirm as true and correct the information provided to the Company in the Notice of Nomination or at the Company's request pursuant to Section 3.1(f) (and shall update or supplement such information as needed so that such information shall be true and correct) as of (i) the record date for the meeting, (ii) the date that is ten (10) calendar days before the first anniversary date of the Company's proxy statement released to Owners in connection with the previous year's annual meeting (in the case of an annual meeting) or fifty (50) days before the date of the meeting (in the case of a special meeting) and (iii) the date that is ten (10) Business Days before the date of the meeting or any adjournment or postponement thereof.  Such affirmation, update and/or supplement must be delivered personally or mailed to, and received at the Office of the Company, addressed to the Secretary of the Company, by no later than (A) five (5) Business Days after the applicable date specified in clause (i) or (ii) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (B) not later than seven (7) Business Days before the date for the meeting (in the case of the affirmation, update and/or supplement required to be made as of ten (10) Business Days before the meeting or any adjournment or postponement thereof).

(h)      The person presiding over the meeting shall, if the facts warrant, determine in good faith on the advice of counsel (which may be internal counsel) and declare to the meeting, that the nomination was not made in accordance with the procedures set forth in this Section 3.1, and, if he or she should so determine in good faith on the advice of counsel (which may be internal counsel), he or she shall so declare to the meeting and the defective nomination shall be disregarded.

(i)      If the Owner (or a qualified representative of the Owner) does not appear at the applicable Owner meeting to nominate the Owner Nominees, such nomination shall be disregarded and such business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Company.  For purposes of this Section 3.1, to be considered a qualified representative of the Owner, a person must be a duly authorized officer, manager or partner of such Owner or must be authorized by a writing executed by such Owner or an electronic transmission delivered by such Owner to act for such Owner as proxy at the meeting of Owners and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of Owners.

(j)      Nothing in this Section 3.1 shall be deemed to affect the Manager appointment rights of the Key Owner Committee Members or the Designating Key Owners as set forth in the Agreement (and in the case of the exercise of such designation rights compliance with this Section 3.1 shall not be required).  For the avoidance of doubt, Managers appointed by the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key

12

Owner Termination Date pursuant to the Agreement shall not be considered "Owner Nominees".

        3.2    Nominee Qualifications.  To be eligible to be a nominee for election or reelection as a Manager, the Owner Nominee must deliver (in accordance with the time periods prescribed for delivery of notice under Section 3.1) to the Secretary at the Office of the Company (a) a completed and signed written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request); (b) information as necessary to permit the Board to determine if each Owner Nominee (i) is an Independent Manager, (ii) is not or has not been, within the past three years, an officer or director or equivalent of a "competitor", as defined in Section 8 of the Clayton Antitrust Act of 1914, as amended, or (iii) is not a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in a criminal proceeding within the past ten (10) years; (c) a written representation and agreement (in the form provided by the Secretary upon written request) that such person (i) is not and will not become a party to (A) any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person will act or vote as a Manager on any issue or question (a "Voting Commitment") that has not been disclosed to the Company or (B) any Voting Commitment that could limit or interfere with such person's ability to comply with such person's fiduciary duties as a Manager under Applicable Law, (ii) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Company with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a Manager that has not been disclosed, (iii) will comply with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading and other policies and guidelines of the Company that are applicable to Managers and (iv) currently intends to serve as a Manager for the full term for which he or she is standing for election; and (d) such person's written consent to being named as an Owner Nominee and to serving as a Manager if elected.

        3.3    Vacancies.  Subject to the rights of the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key Owner Termination Date pursuant to the Agreement, any vacancies occurring in the Board may be filled for the period until the next annual meeting of Owners by the affirmative votes of a majority of the remaining members of the Board, although less than a quorum, or a sole remaining Manager.  A Manager so elected shall be elected to hold office until the earlier of the expiration of the term of office of the Manager whom he or she has replaced, a successor is elected and qualified or the Manager's death, resignation, disqualification or removal.  If there is a vacancy in the seat of a Manager that is designated by the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key Owner Termination Date, as applicable, pursuant to the Agreement, and the Key Owner Committee Members or the Designating Key

13

Owners, as applicable, have proposed a replacement to fill such vacancy, the first order of business at the next meeting of the Board will be to fill such vacancy with such proposed replacement.

3.4    Term and Election of Managers.  Each Manager shall hold office until a successor is duly elected (or appointed, as applicable) or until the Manager's earlier death, resignation, disqualification or removal.   Except as provided in the Agreement (including with respect to Committee Designated Managers and Key Owner Designated Managers), and subject to Section 3.3 with respect to the filling of vacancies, each Manager shall be elected by the vote of a plurality of the votes cast with respect to the Managers at any meeting for the election of Managers at which a quorum is present.

3.5    Removal.  Any Manager (other than any Committee Designated Manager or Key Owner Designated Manager) may be removed, with or without cause, by the affirmative vote of Owners holding of a majority of the Shares outstanding.

3.6    Certain Procedures.   The Board may adopt such rules and procedures as it deems reasonably appropriate to effectuate and administer the intent of the provisions of this Article III.

14

## Exhibit A-2

**Blackline comparison to Limited Liability Company Agreement as filed on
April 24, 2023**

DRAFT 4/20/23

THE LIMITED LIABILITY COMPANY INTERESTS EVIDENCED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES LAWS OF ANY STATE OR FOREIGN JURISDICTION AND (OTHER THAN SHARES ISSUED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY SECTION 1145 UNDER THE BANKRUPTCY CODE (SUBJECT TO CERTAIN EXCEPTIONS UNDER APPLICABLE LAW) OR, AS DETERMINED BY THE BOARD, ANOTHER EXEMPTION SUCH THAT THE TRANSFER OF SUCH SHARES IS NOT RESTRICTED UNDER U.S. FEDERAL SECURITIES LAW) MAY NOT BE SOLD OR TRANSFERRED WITHOUT COMPLIANCE WITH APPLICABLE FEDERAL, STATE OR FOREIGN SECURITIES LAWS. IN ADDITION, TRANSFER OR OTHER DISPOSITION OF THE INTERESTS IS RESTRICTED AS PROVIDED IN THIS AGREEMENT.

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT[1]**

**of**

**REVLON GROUP HOLDINGS LLC**

**dated as of**

**April   May [2], 2023**

---

[1] This draft remains subject to ongoing discussions, review and revision.

# TABLE OF CONTENTS

**Page**

Article I
DEFINITIONS AND RULES OF CONSTRUCTION

| | | |
|---|---|---|
| Section 1.1 | *Definitions* | 2 |
| Section 1.2 | *Interpretation* | ~~11~~12 |

Article II
ORGANIZATION

| | | |
|---|---|---|
| Section 2.1 | *Formation of Company* | 12 |
| Section 2.2 | *Name* | ~~12~~13 |
| Section 2.3 | *Purpose* | ~~12~~13 |
| Section 2.4 | *Powers* | ~~12~~13 |
| Section 2.5 | *Principal Place of Business* | 13 |
| Section 2.6 | *Registered Office and Registered Agent* | 13 |
| Section 2.7 | *Term* | 13 |
| Section 2.8 | *No State-Law Partnership; Tax Status* | 13 |
| Section 2.9 | *Title to Company Assets* | ~~13~~14 |
| Section 2.10 | *Non-Voting Equity Securities* | ~~13~~14 |

Article III
MEMBERS; BENEFICIAL OWNERS; ADDITIONAL OWNERS; SHARES

| | | |
|---|---|---|
| Section 3.1 | *Members; Beneficial Owners; Binding Nature of this Agreement* | 14 |
| Section 3.2 | *Shares; DTC* | 16 |
| Section 3.3 | *Issuance of Additional Equity Securities; No Capital Contributions* | 17 |
| Section 3.4 | *Preemptive Rights* | 17 |
| Section 3.5 | *Book-Entry-Only System; Global Securities* | 20 |
| Section 3.6 | *Liability of Owners and Members* | 22 |
| Section 3.7 | *Fully Paid and Non-Assessable Nature of Equity Securities* | 22 |

Article IV
FISCAL YEAR

| | | |
|---|---|---|
| Section 4.1 | *Fiscal Year* | 22 |

Article V
DISTRIBUTIONS

| | | |
|---|---|---|
| Section 5.1 | *Interest* | ~~22~~23 |
| Section 5.2 | *No Right to Withdraw* | ~~22~~23 |
| Section 5.3 | *Distributions* | 23 |
| Section 5.4 | *Withholding* | 23 |

# TABLE OF CONTENTS
(continued)

**Page**

Article VI
MANAGEMENT OF THE COMPANY

Section 6.1    *Management by the Board of Managers* .................................................. ~~23~~24
Section 6.2    *Board of Managers* ......................................................................................... 24
Section 6.3    *Actions Requiring Approval of the Board* ............................................... 27
Section 6.4    *Matters Requiring Approval by the Owners* ........................................... 29
Section 6.5    *Matters Relating to Owners* ....................................................................... 29
Section 6.6    *Officers* ............................................................................................................. 29
Section 6.7    *Waiver of Corporate Opportunities* ......................................................... 30
Section 6.8    *Waivers; Burden of Proof* ........................................................................... 30

Article VII
MATTERS RELATING TO AN IPO; REGISTRATION RIGHTS

Section 7.1    *Conversion to a Corporate Form Upon an IPO* ....................................... 31
Section 7.2    *Registration Rights Agreement* ................................................................. ~~31~~32
Section 7.3    *IPO Lock Up Agreement* .............................................................................. ~~31~~32
Section 7.4    *Strategic Transaction / IPO Review* ......................................................... 32

Article VIII
REPRESENTATIONS AND WARRANTIES

Section 8.1    *Representations and Warranties* ............................................................... 32

Article IX
TRANSFERS

Section 9.1    *Transfers Generally* ..................................................................................... 33
Section 9.2    *Tag-Along Rights* .......................................................................................... 34
Section 9.3    *Drag-Along Rights* ....................................................................................... 36
Section 9.4    *Additional Conditions to Tag-Along Sales and/or Drag-Along Sales* ... 39
Section 9.5    *Conditions Applicable to All Transfers* .................................................. 40

Article X
INDEMNIFICATION AND EXCULPATION

Section 10.1   *Indemnification and Exculpation* ............................................................. 42
Section 10.2   *Insurance* ........................................................................................................ 43
Section 10.3   *Rights to Rely on Legal Counsel, Accountants; Other Matters* ......... 43

# TABLE OF CONTENTS
(continued)

**Page**

### Article XI
BOOKS OF ACCOUNT; INFORMATION RIGHTS; CONFIDENTIALITY

| | | |
|---|---|---|
| Section 11.1 | *Maintenance of Books; Reports* | 44 |
| Section 11.2 | *Confidentiality* | 46 |

### Article XII
DURATION AND TERMINATION OF COMPANY

| | | |
|---|---|---|
| Section 12.1 | *Events Causing Dissolution and Winding Up* | 48 |
| Section 12.2 | *Liquidation and Winding Up* | 48 |
| Section 12.3 | *Certificate of Formation* | ~~48~~49 |
| Section 12.4 | *Waiver of Partition* | 49 |
| Section 12.5 | *Termination of the Agreement* | 49 |

### Article XIII
GENERAL

| | | |
|---|---|---|
| Section 13.1 | *Choice of Law* | 49 |
| Section 13.2 | *Forum, Venue and Jurisdiction* | 49 |
| Section 13.3 | *Notices* | 50 |
| Section 13.4 | *Further Action* | ~~51~~52 |
| Section 13.5 | *Amendment; Waiver* | ~~51~~52 |
| Section 13.6 | *Headings* | ~~52~~53 |
| Section 13.7 | *Counterparts* | ~~52~~53 |
| Section 13.8 | *Severability* | 53 |
| Section 13.9 | *Binding Agreement; No Third Party Beneficiaries* | 53 |
| Section 13.10 | *Assignment* | 53 |
| Section 13.11 | *Reliance by Third Parties* | 53 |
| Section 13.12 | *No Partition* | 54 |
| Section 13.13 | *Non-Recourse* | 54 |

| | |
|---|---|
| Exhibit A | Global Security |
| Exhibit B | Form of Registration Rights Agreement |

| | |
|---|---|
| Annex A | Owner Governance Matters |

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
## OF
## REVLON GROUP HOLDINGS LLC

This Amended and Restated Limited Liability Company Agreement (this "**Agreement**") of Revlon Group Holdings LLC is made and entered into as of ~~April~~May [~~—~~2], 2023 ("**Effective Date**"), by and among (i) Revlon Group Holdings LLC, a Delaware limited liability company (the "**Company**"), (ii) any Person who shall hereafter become a party hereto, and a member of the Company, as set forth herein (each Person in clause (ii), a "**Direct Owner**", and collectively, the "**Direct Owners**"), (iii) each Person who is deemed to be a party to this Agreement as a Beneficial Owner (but not as a Direct Owner) pursuant to the Plan of Reorganization, (iv) any other Person who shall hereafter become or be deemed to become a party hereto as a Beneficial Owner (but not as a Direct Owner) as set forth herein (such Beneficial Owners as referenced in clauses (iii) and (iv), together with the Direct Owners, collectively, the "**Owners**"), and (v) Cede & Co. (as defined below), a member of the Company (Cede & Co. and each Direct Owner, a "**Member**", and collectively, the "**Members**").

## RECITALS:

WHEREAS, Revlon, Inc. and certain affiliated debtors filed the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1802] in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") on March 31, 2023;

WHEREAS, on April 3, 2023, the Bankruptcy Court entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] (the "**Confirmation Order**");

WHEREAS, ~~Revlon, Inc. and certain affiliated debtors~~on May 1, 2023, the Debtors filed the *Revised* Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code ~~Case~~[Docket No. ~~22-10760 (DSJ)~~1860] (as may be amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "**Plan of Reorganization**")~~on [    ], 2023, which was confirmed by the United States Bankruptcy Court for the Southern District of New York on April 3, 2023 by the order of such Court confirming such Plan of Reorganization [Docket No. [•]] (the "**Confirmation Order**")~~;[2]

WHEREAS, a Certificate of Formation of the Company was filed with the Secretary of State of the State of Delaware on ~~[    ]~~April 12, 2023, and the Company has been formed and is currently governed by that certain Limited Liability Company Agreement of the Company, dated as of ~~[    ]~~April 21, 2023 (the "**Original Agreement**");

---

[2] ~~Recitals subject to further revision to reflect emergence structure.~~

1

WHEREAS, pursuant to the Original Agreement, [        ] was~~Amulet Cay, L.L.C. and AG REV HoldCo, LLC were each~~ issued [one (1~~])~~ share of the Company (the "**Initial ~~Share~~Shares**") as the initial ~~sole member~~members of the Company;

WHEREAS, the Owners party hereto as of the date hereof have each received Shares (as hereinafter defined) either as a direct registered holder or as a holder of Beneficial Interests (as defined below), as applicable, pursuant to the Plan of Reorganization (including pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization) in connection therewith) and the Confirmation Order;

WHEREAS, as of the Effective Date, each Person entitled to receive Shares pursuant to the terms of the Plan of Reorganization and the Confirmation Order is (i) entitled to, and permitted only to, receive Shares through DTC (as defined below), and (ii) deemed a party to this Agreement as a "Beneficial Owner" without the requirement to execute this Agreement;

WHEREAS, all Persons who after the date hereof are issued Shares (or Beneficial Interests in respect of newly issued Shares, as applicable) or receive Shares (or Beneficial Interests, as applicable) pursuant to a Transfer from an existing Owner shall be deemed to be parties to this Agreement without the need to sign a joinder to this Agreement (subject to ~~Section 9.5(c)~~Section 9.5(c)); and

WHEREAS, the Owners and Members desire to establish in this Agreement certain rights and obligations of the parties relating to the governance of the Company and certain other matters, as set forth herein.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein made and intending to be legally bound, effective as of the Effective Date, the parties hereby amend and restate the Original Agreement in its entirety and enter into this Agreement in order to set forth certain agreements and understandings regarding the Company:

ARTICLE I
DEFINITIONS AND RULES OF CONSTRUCTION

Section 1.1    *Definitions*.  As used in this Agreement, the following terms shall have the following meanings:

"**Accelerated Buyer**" has the meaning set forth in ~~Section 3.4(e)~~Section 3.4(e).

"**Accelerated Sale Notice**" has the meaning set forth in ~~Section 3.4(e)~~Section 3.4(e).

"**Accredited Investor**" means an accredited investor as defined in Regulation D promulgated under the Securities Act.

"**Act**" means the Delaware Limited Liability Company Act, as amended or superseded from time to time.

"**Affiliate**" means, with reference to a specified Person, a Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common

2

Control with, the specified Person, including any venture capital, private equity or other investment fund or account that is controlled by one or more general partners or managing members of, or shares the same management company, investment advisor or manager (or similar entity with discretionary authority) with, such Person, and the term "Affiliated" shall have the correlative meaning.  The Company and its Subsidiaries and controlled Affiliates shall not be considered Affiliates of any Member or any Owner or of any Member's Affiliates or Owner's Affiliates for purposes of this Agreement.

"**Aggregate Undiluted Shares**" means, as of any given date, the aggregate number of issued and outstanding Shares as of such date, excluding the Excluded Shares.

"**Agreement**" has the meaning set forth in the preamble.

"**Applicable Law**" means, with respect to any Person, all provisions of laws, statutes, ordinances, rules, regulations, permits, certificates, judgments, decisions, decrees or orders of any Governmental Authority applicable to such Person.

"**Asset Sale**" has the meaning assigned to such term in the definition of Company Sale.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Beneficial Interest**" means, with respect to any Beneficial Owner, the securities entitlement held by such Beneficial Owner in the Shares it Beneficially Owns.

"**Beneficial Owner**" means any Person owning a securities entitlement with respect to Shares registered to Cede & Co. (or such other nominee as may be selected by DTC), as nominee for DTC, which securities entitlement is held directly or indirectly (disregarding the third sentence of ~~Section 3.1(a)~~Section 3.1(a)) through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account. "**Beneficially Owns**" and "**Beneficially Owned**" shall have the correlative meanings.

"**Board**" has the meaning set forth in ~~Section 6.2(a)~~Section 6.2(a).

"**Board Committee**" has the meaning set forth in ~~Section 6.2(h)~~Section 6.2(h).

"**Board of Managers**" has the meaning set forth in ~~Section 6.2(a)~~Section 6.2(a).

"**Business Day**" means any day other than (a) Saturday and Sunday in New York, New York, and (b) any other day on which banks located in New York, New York are required or authorized by law to remain closed.

"**Cede & Co.**" means Cede & Co., as nominee for DTC, or such other nominee as may be selected by DTC, as nominee for DTC, which is the registered holder of the Shares under this Agreement on behalf of the Beneficial Owners.

"**Certificate of Formation**" has the meaning set forth in ~~Section 2.1~~Section 2.1.

"**CEO Manager**" has the meaning set forth in Section 6.2(a).

"**Chairman**" has the meaning set forth in ~~Section 6.2(g)~~Section 6.2(g).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commission**" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act.

"**Committee Designated Managers**" has the meaning set forth in ~~Section 6.2(b)~~Section 6.2(b).

"**Communication**" has the meaning set forth in ~~Section 11.2(b)~~Section 11.2(b).

"**Company**" has the meaning set forth in the recitals.

"**Company Preemptive Offer Notice**" has the meaning set forth in ~~Section 3.4(c)~~Section 3.4(c).

"**Company Sale**" means (i) the occurrence of a merger, consolidation, share exchange, business combination or other sale involving the Company and its Subsidiaries or similar corporate transaction involving the Company and its Subsidiaries, whether or not the Company is the surviving entity in any such transaction, other than a transaction which would result in the voting power of the securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or owning entity) at least a majority of the voting power of the securities of the Company or such surviving or owning entity immediately after such transaction (any transaction referred to in this clause (i), a "**Business Combination**"), (ii) any Transfer of all (but not less than all) of the outstanding Shares in any transaction or series of related transactions (any transaction or series of related transactions referred to in this clause (ii), a "**Share ~~Transfer~~Sale**") or (iii) any direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company followed by a distribution of the proceeds ("**Asset Sale**").

"**Competitor**" means (i) any Person that owns or operates assets ~~involved in the~~primarily used in, or that designs, develops, produces, offers for sale or sells products in, the cosmetics, hair color, hair care, fragrances, skincare, or beauty care products businesses (collectively, "**Beauty Companies**") or any Affiliate of such Person, (ii) any Person (together with its Related Persons) that directly or indirectly (A) holds equity interests in any Beauty Company where such equity interests collectively represent greater than 50% of the asset value, or account for greater than 50% of the revenue, of such Person, or (B) controls (as such term has the meaning set forth in the definition of "Affiliate") any Beauty Company or (iii) any other Person as determined from

4

time to time and posted to the Datasite that the Board determines in good faith poses a material competitive risk to the Company or any of its Subsidiaries; *provided* that (1) in the case of clause (i), that no Person who has a passive interest in a Beauty Company shall be deemed to be a Competitor of the Company so long as such Person is not involved in the management of or otherwise provides advice or services to such Beauty Company and has not designated, or does not have the right to designate, any member or non-voting observer of the board of directors (or similar governing body) of such Beauty Company and (2) in the case of clauses (i) or (ii), the Board (excluding the vote of any Manager appointed by, or otherwise affiliated with, a Competitor (as defined without giving effect to this proviso) may determine in good faith that a Person that would be a Competitor pursuant to the foregoing clauses (i) or (ii) shall be deemed to not be a Competitor, notwithstanding clauses (i) or (ii) of this definition.

"**Confidential Information**" means all confidential or proprietary information about the Company, its direct and indirect Subsidiaries or any of their respective businesses, including financial statements, reports, and the terms (but not the existence) of this Agreement, and any confidential or proprietary information about the Company, its Subsidiaries or any of their respective businesses to which an Owner or Member is provided access. Notwithstanding the foregoing, Confidential Information shall not include any information that (i) is generally available, or is made generally available, to the public other than as a result of a direct or indirect disclosure by the relevant Owner or Member, or (ii) becomes available to the relevant Owner or Member on a non-confidential basis without breaching any confidentiality obligations to the Company or its Subsidiaries from a source other than the Company or any of its Subsidiaries, or any of their respective Representatives, successors or assigns.

"**Confirmation Order**" has the meaning set forth in the recitals.

"**Control**", "**Controls**", "**Controlling**" or "**Controlled**" means in the case of any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies and/or decision making of such Person, whether through the ownership of voting securities, by contract, operation of law or otherwise.

"**Convertible Securities**" has the meaning assigned to such term in the definition of Equity Securities.

"**Covered Person**" means (i) each Manager, director or officer of the Company or any of its Subsidiaries and, after the date hereof, each former Manager, director or officer of the Company or any of its Subsidiaries, (ii) Cede & Co. and each employee, authorized signatory, partner, member, manager, agent or other Representative of Cede & Co. or of an Affiliate of Cede & Co., as applicable, and (iii) each Owner and each Member and each former Owner and former Member, and each of their respective Representatives.

"**Credit Agreement**" means that certain Term Credit Agreement, dated as of [•]May 2, 2023, among Revlon Consumer Products CorporationIntermediate Holdings IV LLC, a Delaware corporation (as the borrower thereunder), the CompanyRevlon Intermediate Holdings III, the financial institutions or other entities from time to time parties thereto and Jefferies Finance LLC, as administrative agent and collateral agent thereunder, as may be amended, restated,

supplemented, waived or otherwise modified from time to time, and including any credit agreement entered into in replacement thereof.

"**Datasite**" has the meaning set forth in ~~Section 11.1(d)~~Section 11.1(d).

"**Depository**" or "**DTC**" shall mean The Depository Trust Company, New York, New York, or such other depository of Shares as may be selected by the Company as specified herein.

"**Depository Agreement**" means the Blanket Issuer Letter of Representations (including the riders thereto) from the Company to DTC, dated as of [       ]April 24, 2023, as the same may be amended or supplemented from time to time.

"**Designating Key Owners**" mean, as of any relevant date of determination, (i) if three or more Key Owner Committee Members each have an Undiluted Ownership Percentage of at least 10%, then the three Key Owner Committee Members whose Undiluted Ownership Percentage is the highest, or (ii) if two (but not more than two) Key Owner Committee Members each have an Undiluted Ownership Percentage of at least 10%, then each of such two Key Owner Committee Members.  For the avoidance of doubt, if at the relevant date of determination only one Key Owner Committee Member has (or no Key Owner Committee Member has) an Undiluted Ownership Percentage of at least 10%, there shall be no Designating Key Owners.

"**Designating Key Owner Termination Date**" means the earliest date from and after the Effective Date on which there are less than two Key Owner Committee Members with an Undiluted Ownership Percentage of at least 10%.

"**Direct Owner**" has the meaning set forth in the preamble.  For the avoidance of doubt, each Direct Owner is a Member of the Company.

"**Disproportionately Affected Owner**" has the meaning set forth in ~~Section 13.5~~Section 13.5.

"**Dissolution Event**" has the meaning set forth in ~~Section 12.1~~Section 12.1.

"**Drag-Along Agents**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Drag-Along ~~Sale Notice~~Rights**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Drag-Along Sale**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Drag-Along ~~Sellers~~Sale Notice**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Drag-Along ~~Rights~~Sellers**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Dragged Person**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Dragging Seller**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**DTC Participants**" means, collectively, the participants for which DTC holds and provides asset servicing.

"**Effective Date**" has the meaning set forth in the preamble.

"**Equity Securities**" means (i) any LLC Interests, Shares, capital stock, partnership, membership or limited liability company interests or other equity interests (including other classes, groups or series thereof having such relative rights, powers, duties, obligations and liabilities as may from time to time be established by the Board or other relevant governing body, including rights, powers, duties, obligations and liabilities different from, senior to or more favorable than existing classes, groups and series of Shares, capital stock, partnership, membership or limited liability company interests or other equity interests, and including any profits interests), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Shares, capital stock, partnership interests, membership or limited liability company interests or other equity interests (collectively, "**Convertible Securities**"), and (iii) warrants, options or other rights to purchase or otherwise acquire Shares, capital stock, partnership interests, membership or limited liability company interests or other equity interests (collectively, "**Options**").

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any similar federal statute, and the rules and regulations of the Commission thereunder, all as the same shall be in effect at the time of reference.

"**Excluded Shares**" means (i) any Shares issued upon the exercise of any Warrants and (ii) any Shares issued pursuant to the Management Incentive Plan or any other compensation or incentive plan approved by the Board.

"**First Annual Meeting**" means the first annual meeting of Owners that occurs after the Effective Date in accordance with Section [ ]2.2 of Annex A hereto.

"**Fiscal Year**" has the meaning set forth in ~~Section 4.1~~Section 4.1.

"**Global Security**" means the global certificate or certificates issued to DTC as provided in the Depository Agreement, each of which shall be in substantially the form attached hereto as Exhibit A.

"**Governmental Authority**" means any U.S. or non-U.S. federal, state, county, local or municipal government (or similar authority), or political subdivision thereof, any governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court or administrative tribunal.

"**Held of Record**" or "**held of record**" shall have the same definition as set forth in Rule 12g5-1 under the Exchange Act, or any successor provision. "**Hold of Record**", "**Holder of Record**" and "**Holders of Record**" (including when such terms are used without capitalization) shall have correlative meanings.

"**Indemnified Losses**" has the meaning set forth in ~~Section 10.1(a)~~Section 10.1(a).

7

"**Independent Manager**" means (i) with respect to any person who is a Manager designated by the Key Owner Committee Members or the Designating Key Owners, as applicable, that such person is neither an employee nor an Affiliate of any Key Owner Committee Member or Designating Key Owner or any of their respective Related Persons, and has no, and has had no, relationship with any Key Owner Committee Member or Designating Key Owner or with any of their respective Related Persons which is material to that person's ability to be independent from such Key Owner Committee Member or Designating Key Owner in connection with the duties as Independent Manager, (ii) with respect to any other Manager (other than the CEO Manager), a Manager that is independent from: (A) the Company pursuant to the standard for independence under the rules of the New York Stock Exchange (as if such rules applied to the Company); and (B) each (a) Owner that holds (together with its Related Persons) more than one percent (1%) of the issued and outstanding Shares, and (b) Person that has an outstanding loan to the Company or its Subsidiaries (together with each Owner of more than one percent (1%) of the issued and outstanding Shares, the "**Interested Parties**"), which Manager shall not have a material relationship with any Interested Party, as determined by the Board in good faith, including, but not limited to, serving or formerly serving (within the last three years) as an employee, director, officer or partner of an Interested Party, being an immediate family member of a current or former (within the last three years) employee, director, officer or partner of an Interested Party, receiving in excess of $120,000 of direct compensation from an Interested Party in any of the last three years, or having a financial interest in an Interested Party.

"**Indirect Participants**" means, collectively, any U.S. and non-U.S. securities, brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly.

"**Initial Shares**" has the meaning set forth in the recitals.

"**IPO**" means an Initial Public Offering (as defined in the Registration Rights Agreement).

"**Joinder**" means a written undertaking in customary form pursuant to which a Member or Owner, as applicable, acknowledges and agrees that such Member or Owner is bound by the terms and conditions of this Agreement, including making the applicable representations and warranties set forth in ~~Section 8.1~~Section 8.1.

"**Key Owner Committee Members**" means each of (i) Angelo, Gordon & Co. L.P., (ii) Glendon Capital Management L.P., (iii) King Street Capital Management, L.P., and (iv) Nut Tree Capital Management, LP.; provided that each Owner that is a Key Owner Committee Member shall automatically cease to be a Key Owner Committee Member at such time as the Undiluted Ownership Percentage of such Key Owner Committee Member is less than the lesser of (i) 7% or (ii) 66 2/3% of the Undiluted Ownership Percentage of such Key Owner Committee Member as of the date of this Agreement.  For the avoidance of doubt, when a Key Owner Committee Member ceases to be a Key Owner Committee Member as a result of such Key Owner Committee Member's Undiluted Ownership falling below the applicable threshold set forth in the preceding sentence, any subsequent increase of such Key Owner Committee

Member's Undiluted Ownership Percentage above the applicable threshold will not result in such Person again becoming a Key Owner Committee Member.

"**Key Owner Committee Termination Date**" means the first to occur of (i) such time as the Key Owner Committee Members and their Related Persons hold in the aggregate less than 40% of the Aggregate Undiluted Shares, (ii) such time as the Key Owner Committee Members determine that the "Key Owner Committee Termination Date" has occurred and (iii) the 18-month anniversary of the Effective Date; provided that, if the Key Owner Committee Termination Date has not occurred as of the Testing Date, and either of the events described in the foregoing clauses (i) or (ii) occurs on or after the Testing Date and on or before the date of the First Annual Meeting, then the Key Owner Committee Termination Date shall be deferred and shall be deemed to have occurred on the day after the date of the First Annual Meeting.

"**Key Owner Designated Managers**" has the meaning set forth in ~~Section 6.2(b)~~Section 6.2(b).

"**LLC Interests**" means the limited liability company interests in the Company, including the Shares and any other limited liability company interests in the Company issued in accordance with the terms set forth in ~~Article III~~Article III.

"**Lockup Period**" has the meaning set forth in ~~Section 7.3~~Section 7.3.

"**Malfeasance**" means, with respect to any Covered Person, gross negligence, fraud or willful misconduct of such Covered Person, or material breach of this Agreement by such Covered Person.

"**Management Incentive Plan**" means the initial management incentive compensation program to be established and implemented by the Board after the Effective Date.

"**Manager**" has the meaning set forth in ~~Section 6.2(a)~~Section 6.2(a).

"**Member**" has the meaning set forth in the preamble.

"**Non-Employee Person**" has the meaning set forth in ~~Section 6.7~~Section 6.7.

"**Notice**" has the meaning set forth in ~~Section 13.3~~Section 13.3.

"**Offered Securities**" has the meaning set forth in ~~Section 3.5(a)~~Section 3.5(a).

"**Options**" has the meaning assigned to such term in the definition of Equity Securities.

"**Original Agreement**" has the meaning set forth in the recitals.

"**Owner**" has the meaning set forth in the preamble.

"**Ownership Statement**" has the meaning set forth in ~~Section 3.1(e)~~Section 3.1(d).

"**Person**" means any individual or entity, including any exempted company, exempted limited partnership, private limited company, corporation, partnership, limited partnership,

limited liability company, trust, charitable trust or other legal entity, whether organized in the United States or another jurisdiction, or any unincorporated association, or Governmental Authority.

"**Plan of Reorganization**" has the meaning set forth in the recitals.

"**Preemptive Rights Holder**" has the meaning set forth in ~~Section 3.4(a)~~Section 3.4(a).

"**Prospective Buyer**" shall mean any Person proposing to purchase or otherwise acquire Shares from a Tag-Along Seller.

"**Prospective Drag Purchaser**" has the meaning set forth in ~~Section 9.3~~Section 9.3.

"**Registration Rights Agreement**" means the Registration Rights Agreement substantially in the form attached hereto as Exhibit B.

"**Related Party Transaction**" means any contract, agreement, transaction or other arrangement (whether written or unwritten) between the Company or any of its Subsidiaries, on the one hand, and (i) any Person (together with its Related Persons) directly or indirectly owning, controlling or holding the power to vote (including pursuant to a contract, agreement, arrangement or other understanding), 5% or more of the outstanding Shares or other Equity Securities, or any officer, director or Affiliate of any such person or such person's Related Persons, (ii) any officer or Manager (or equivalent) of the Company or any of its Subsidiaries or any Affiliate of any of the foregoing persons (excluding any compensation arrangements approved by the Board or a Board Committee), or (iii) any members of the "immediate family" (as such terms are respectively defined in Rule 16a-1 of the Securities Exchange Act of 1934) of any of the persons referenced in clause (i) or clause (ii), on the other hand; provided, that it shall not include any contract, agreement, transaction or other arrangement that is solely between the Corporation and/or any one or more of its wholly-owned Subsidiaries.

"**Related Persons**" means, with respect to a Person, and without duplication, (i) such Person's Affiliates and (ii) any fund, account, investment vehicle or co-investment vehicle that is controlled, managed, advised or sub-advised by such Person or any of its Affiliates or the same investment manager, advisor or sub-advisor as such Person or any Affiliate of such investment manager, advisor or sub-advisor.

"**Representatives**" means, with respect to any Person, any of such Person's Affiliates, managers, partners, shareholders, members, trustees, officers, employees, agents, counsel, advisors, directors, auditors, custodians, contractors, engineers and similar representatives. For purposes of this Agreement, the Owners shall not be deemed Representatives of one another.

"**Rule 144**" means Rule 144 (or any successor provisions) under the Securities Act.

"**Secondary Indemnitors**" has the meaning set forth in ~~Section 10.1(d)~~Section 10.1(d).

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shares**" has the meaning set forth in ~~Section 3.2(b)~~Section 3.2(b).

"**Emergence Share ~~Distribution~~Transfer**" means the transfer of Shares on the Effective Date in accordance with the Plan of Reorganization, including on account of Allowed OpCo Term Loan Claims (as defined in the Plan of Reorganization) and Allowed 2020 Term B-2 Loan Claims (as defined in the Plan of Reorganization) and pursuant to the Equity Rights Offering (including the Backstop Commitment Agreement) (in each case as defined in the Plan of Reorganization).

"**Subsidiary**" means, with respect to any Person, any other Person that is Controlled, directly or indirectly, by such Person. Unless the context indicates otherwise, "Subsidiary" refers to a Subsidiary of the Company.  For the avoidance of doubt, neither the Company nor its Subsidiaries will be treated as a Subsidiary of any Owner or Member or Affiliate of such Owner or Member.

"**Tag-Along Notice**" has the meaning set forth in ~~Section 9.2(a)(i)~~Section 9.2(a)(i).

"**Tag-Along Notice Period**" has the meaning set forth in Section 9.2(b).

"**Tag-Along Offer**" has the meaning set forth in ~~Section 9.2(a)(i)~~Section 9.2(a)(i).

"**Tag-Along Portion**" means, with respect to any given Owner and any given Tag-Along Sale, the aggregate number of Shares of the Owner on the date of the Tag-Along Notice *multiplied by* a fraction, the numerator of which is the number of Shares proposed to be sold in the Tag-Along Sale by the Tag-Along Seller and the denominator of which is the aggregate number of Shares of the Tag-Along Seller on the date of the Tag-Along Notice.

"**Tag-Along ~~Right~~Response Notice**" has the meaning set forth in ~~Section 9.2(b)~~Section 9.2(b).

"**Tag-Along ~~Sale~~Right**" has the meaning set forth in ~~Section 9.2(a)~~Section 9.2(b).

"**Tag-Along ~~Notice Period~~Sale**" has the meaning set forth in ~~Section 9.2(b)~~Section 9.2(a).

"~~**Tag-Along Response Notice**~~" ~~has the meaning set forth in Section 9.2(b).~~

"**Tag-Along Seller**" has the meaning set forth in ~~Section 9.2(a)~~Section 9.2(a).

"**Tagging Person**" has the meaning set forth in ~~Section 9.2(a)(ii)~~Section 9.2(a)(ii).

"**Term**" has the meaning set forth in ~~Section 2.7~~Section 2.7.

"**Testing Date**" means ~~[___], 2024~~the date that is sixty-five (65) days prior to the first anniversary of the date of this Agreement.

"**Transfer**" means a transfer by any Person of the Shares in any form, including pursuant to a sale, assignment, conveyance, pledge, encumbrance, hypothecation or other disposition of all

11

or any part of a Share or any interest therein (including pursuant to any direct or indirect participation right, total return swap or other arrangement that transfers an economic interest in the Shares). For the avoidance of doubt, the term "Transfer" includes a transfer of Shares by a Beneficial Owner through DTC.  The term "Transfer" will include a direct or indirect transfer (or series of related direct or indirect transfers) of any interest in an Owner if the value of the Shares held (directly or indirectly) by the Owner constitutes more than ten percent (10%) of the value being transferred disregarding any cash, cash equivalents and marketable securities involved in such transfer.

"**Transfer Costs**" has the meaning set forth in ~~Section 9.5(d)~~Section 9.5(d).

"**Undiluted Ownership Percentage**" means, with respect to any Owner or group of Owners, (i) the number of Shares (excluding Excluded Shares) owned by such Owner (together with its Related Persons) or group of Owners  (together with their Related Persons) as of any date of calculation *divided by* (ii) the Aggregate Undiluted Shares outstanding as of such date of calculation, expressed as a percentage.

"**Warrant**" or "**Warrants**" means those certain warrants of the Company issued pursuant to, and subject to the terms and conditions of, the Warrant Agreement.

"**Warrant Agreement**" means that certain Warrant Agreement dated as of ~~[          ]~~May 2, 2023 between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent, as it may be amended or amended and restated from time to time.

Section 1.2    *Interpretation*.    All references herein to "Articles," "Sections" and "Paragraphs" shall refer to corresponding provisions of this Agreement. All Exhibits, Annexes and Schedules annexed or attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Annex or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term.  Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent in writing and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Any references to a statute include the rules and regulations promulgated thereunder in effect from time to time. References to a Person are also to its permitted successors and assigns. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. The term "good

faith" as used in this Agreement shall mean subjective good faith as understood under Delaware law. It is recognized that references to "Members and Owners", "Members and Direct Owners" and similar references include an overlap of Persons.

## ARTICLE II
### ORGANIZATION

Section 2.1    *Formation of Company*.  The Company was duly formed upon the filing of the certificate of formation of the Company with the Secretary of State of the State of Delaware on April 12, 2023, which certificate sets forth the information required by Section 18-201 of the Act (the "**Certificate of Formation**").  The formation of the Company as a limited liability company under the Act, and all actions taken by the person, as an "authorized person" of the Company within the meaning of the Act, who executed and filed the Certificate of Formation are hereby adopted and ratified.  This Agreement constitutes the "limited liability company agreement" of the Company within the meaning of the Act.  This Agreement shall govern the relationship of the Owners and the Members, except to the extent a provision of this Agreement is expressly prohibited under the Act, and shall be binding upon each Owner and Member (including a Person who becomes an Owner or Member pursuant to a Transfer permitted by this Agreement) whether or not such Owner or Member has executed this Agreement.  If any provision of this Agreement is prohibited under the Act, this Agreement shall be considered amended to the least degree possible in order to make such provision effective under the Act. Each Manager or its designee is hereby designated as an "authorized person" of the Company within the meaning of the Act and is hereby authorized and directed to file any necessary amendments to the Certificate of Formation in the office of the Secretary of State of the State of Delaware and such other documents as may be required or appropriate under the Act or the laws of any other jurisdiction in which the Company may conduct business or own property.  The Shares and any other Equity Securities of the Company shall constitute personal property of the owner thereof for all purposes and an Owner or Member has no interest in specific Company property.

Section 2.2    *Name*.  The name of the limited liability company is "Revlon Group Holdings LLC".  The Board may change the name of the Company or adopt such trade or fictitious names for use by the Company as the Board may from time to time determine; provided such name contains the words "Limited Liability Company," the abbreviation "L.L.C." or the designation "LLC." All business of the Company shall be conducted under such names and title to all assets or property owned by the Company shall be held in such names.

Section 2.3    *Purpose.*  Subject to the other terms of this Agreement, as applicable, the purpose and nature of the business to be conducted by the Company shall be to engage directly in, or enter into or form any corporation, partnership, joint venture, limited liability company or other arrangement to engage indirectly in, any business activity that lawfully may be conducted by a limited liability company organized pursuant to the Act and, in connection therewith, to exercise all of the rights and powers conferred upon the Company pursuant to the agreements relating to such business activity.

Section 2.4    *Powers*.  Subject to the other terms of this Agreement, as applicable, the Company shall be empowered to do any and all acts and things necessary, appropriate, proper,

13

advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described in ~~Section 2.3~~Section 2.3. Notwithstanding anything in this Agreement to the contrary, nothing set forth herein shall be construed as authorizing the Company to take or engage in any action forbidden by law to a limited liability company organized under the laws of the State of Delaware.

Section 2.5    *Principal Place of Business*.  The Company shall maintain an office and principal place of business at such place or places as the Board may determine from time to time.

Section 2.6    *Registered Office and Registered Agent*.  The name of the Company's registered agent for service of process shall be ~~[The Corporation Trust Company, and the address of the Company's registered agent and the address of the Company's registered office in the State of Delaware shall be Corporation Trust Center, 1209 Orange Street,~~Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building Suite 104, City of Wilmington, ~~Delaware 19801]³.~~19810, County of New Castle. The registered agent and the registered office of the Company may be changed from time to time by the Board.

Section 2.7    *Term*.  The term of existence of the Company (the "**Term**") shall continue until the Company is terminated, dissolved or liquidated in accordance with this Agreement and the Act.

Section 2.8    *No State-Law Partnership; Tax Status*.  The Members and Owners intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Owner be a partner or joint venturer of any other Member or Owner by virtue of this Agreement, and neither this Agreement nor any other document entered into by the Company, any Member or any Owner relating to the subject matter hereof shall be construed to suggest otherwise. The Members and Owners intend that the Company shall be treated as a corporation for U.S. federal and, if applicable, state or local income tax purposes.  The Company shall file an election on Internal Revenue Service Form 8832 to elect to be treated as a corporation for U.S. federal income tax purposes, and the Company and its Members and Owners are authorized to take any and all actions in connection therewith. Each Member and Owner and the Company shall (i) file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and (ii) not take any action inconsistent with such treatment.

Section 2.9    *Title to Company Assets*.  All Company assets, whether real or personal, tangible or intangible, shall be deemed to be owned by the Company, and no Member or Beneficial Owner individually, shall have any direct ownership interest in such property.

Section 2.10    *Non-Voting Equity Securities*.  The Company shall not issue any non-voting Equity Securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code; <u>provided</u>, however, that the foregoing restriction (i) shall have such force and effect only for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Company; (ii) shall not have any further force or effect beyond that required under Section 1123(a)(6) of the

---

³ ~~To be confirmed upon formation.~~

Bankruptcy Code; and (iii) may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

ARTICLE III
MEMBERS; BENEFICIAL OWNERS; ADDITIONAL OWNERS; SHARES

Section 3.1    *Members; Beneficial Owners; Binding Nature of this Agreement*.  (a) A Person shall be admitted as a Member and shall become bound by the terms of this Agreement if such Person purchases or otherwise acquires any Shares in accordance with the provisions of this Article IIIArticle III and holds them directly in accordance with Section 3.2(c)Section 3.2(c).  A Person shall become bound by the terms of this Agreement as a Beneficial Owner if such Person purchases or otherwise acquires any Shares and holds them indirectly in accordance with Section 3.2(c)Section 3.2(c).  For purposes of this Agreement, and except as the context otherwise requires, Shares that are "held directly" are held by the Members, as the registered owners of the Shares, and Shares that are "held indirectly" are held through DTC, on behalf of the Beneficial Owners and similar terms such as "hold directly" or "hold indirectly" will be construed accordingly.  Pursuant to the Plan of Reorganization, each Person that is entitled to receive Shares pursuant to the terms of the Plan of Reorganization (including Shares issued pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization)) is automatically deemed to have accepted the terms of this Agreement (in its capacity as a Member or Beneficial Owner, as applicable) and is automatically deemed to be a party hereto as a Member or Beneficial Owner, as applicable as if, and with the same effect as if, such Person had delivered a duly executed counterpart signature page to this Agreement, in each case, without any further action by any party.  For the avoidance of doubt, no further approval of the Board, any Member, any Beneficial Owner or any other Person shall be required with respect to the foregoing. Notwithstanding anything to the contrary in this Section 3.1(a)Section 3.1(a), Cede & Co. shall automatically be admitted as a Member upon its acquisition of Shares regardless of whether Cede & Co. signs this Agreement.

(b)    Each Person that becomes a Member or a Beneficial Owner after the Effective Date shall be automatically admitted as a Member or a Beneficial Owner, as applicable, upon such Person's acquisition of Shares (whether direct or indirect) without the need to execute this Agreement or a joinder hereto, and shall have all the rights, and be subject to all the obligations, set forth in this Agreement with respect to Members and Beneficial Owners, as applicable, and as provided under the Act.  The Company shall at all times make this Agreement available to each Member and Beneficial Owner on the Datasite and shall deliver or transmit a copy of this Agreement to a Member or Beneficial Owner upon written request (email being sufficient), and each Person that becomes a Member or a Beneficial Owner after the Effective Date shall be deemed to have received this Agreement and to have made the representations and warranties set forth in Section 8.1Section 8.1.

(c)    Under the Plan of Reorganization, in order for a Person entitled to receive Shares under the Plan of Reorganization (including pursuant to the Equity Rights Offering (as defined in the Plan of Reorganization)) to in fact receive those Shares, such Person may be required to take certain actions or provide certain information as set forth in the Plan of Reorganization. The following will apply with respect to any such Person who has not taken the requisite steps as of the date hereof: the Shares to which such Person is entitled will be reserved,

15

but not issued unless and until such Person (or its Representative) takes the requisite actions or provides the information as set forth in the Plan of Reorganization. If the Person (or its Representative) takes the requisite actions and provides the requisite information, as applicable, prior to the time that in accordance with the Plan of Reorganization such Person's entitlement to such Shares is forfeited, then at the time such Person takes the requisite actions or provides the requisite information, as applicable, (i) the applicable Shares will be issued by the Company to such Person (or, if applicable, such Person will receive such Shares through DTC), (ii) on the date of issuance such Person will receive any distributions that would have been paid on the relevant Shares on or prior to such date had the relevant Shares been issued as of the date hereof and (iii) with respect to any distribution with a record date prior to the issue date of the relevant Shares and a payment date after the issue date, such Person will receive such distribution on the applicable payment date regardless of the fact that the Shares were not outstanding on the relevant record date. If such Person (or its Representative) does not take such requisite actions or provide such requisite information in accordance with the Plan of Reorganization prior to the forfeiture of the entitlement to the relevant Shares as set forth in the Plan of Reorganization, (i) such Shares will not be issued to such Person, (ii) such Person shall be entitled to no rights or benefits in respect thereof under this Agreement or otherwise, and (iii) such Person will never have been, and shall not be, a member of the Company, Member or Owner in respect of the Shares it was entitled to receive under the Plan of Reorganization. Notwithstanding anything in this Agreement to the contrary, during the period between the date hereof and the date of issuance of the relevant Shares (or the forfeiture of the entitlement thereto, as applicable), such Person will have no rights or benefits under this Agreement or otherwise but will be required to comply with the relevant terms of this Agreement, including ~~Section 9.3~~Section 9.3.

(d)    The Company shall be entitled to request from time to time as is reasonably necessary that any Owner (or applicable group of Owners, as the case may be) provide to the Company reasonably satisfactory evidence of its or their then-present ownership of Shares (an "**Ownership Statement**") in order to verify the applicability of the rights, obligations or eligibility of such Owner or Owners under this Agreement (including in connection with effecting the rights, obligations or eligibility of Owners under ~~Section 3.4, Article VII, Section 9.2, Section 9.3~~ Section 3.4, Article VII, Section 9.2, Section 9.3 or Annex A), it being understood that the exercise of any applicable rights by any Owner (or applicable group of Owners, as the case may be) shall be subject to the Company being reasonably satisfied that any applicable ownership threshold or other applicable ownership requirement has been met. To the extent an Owner does not submit (or cause to be submitted) a reasonably satisfactory Ownership Statement within twenty (20) Business Days (or such earlier date as is determined by the Company under the circumstances, which date provides a reasonable opportunity for Owners to receive such request and submit an Ownership Statement) of the Company's distribution of such request on the Datasite, the Company shall be entitled to treat such Owner as not owning the applicable number or percentage of Shares for purposes of any relevant determination under this Agreement. The Company may conclusively rely upon any Ownership Statement provided under this Agreement. The information provided under this ~~Section 3.1(e)~~Section 3.1(d) shall be treated by the Company, including each member of the Board, as strictly confidential, and such holdings information shall not be shared with any other Member or Owner unless consented to in writing by such Owner.

(e)    For the avoidance of doubt, in accordance with Section 18-210 of the Act, each Member and Owner hereby expressly waives any and all appraisal rights with respect to its limited liability company interest in the Company.

Section 3.2    *Shares; DTC.*  (a) The limited liability company interests of the Company will be represented by one or more classes of LLC Interests. The total number and type of LLC Interests will be determined by the Board.

(b)    As of the Effective Date, (i) the Company is authorized to issue one (1) class of LLC Interests, which is designated as "Common Shares" (the "**Shares**"), (ii) after giving effect to the issuance of Shares pursuant to the Plan of Reorganization, the initial aggregate number of Shares outstanding is [●]50,000,000 and (iii) the Warrants issued and outstanding pursuant to the Warrant Agreement are exercisable for an aggregate of not more than [●]6,657,224 Shares. The Company shall be authorized to issue an unlimited number of Shares, subject to the terms and conditions of this Agreement. On the Effective Date, immediately following the ~~issuance of the Shares and the~~Emergence Share ~~Distribution~~Transfer, the Initial ~~Share is~~Shares are deemed to have been cancelled.

(c)    Unless required by law, the Shares will initially be uncertificated and in book-entry form, provided that the Board may determine, at any time that some or all of the Shares or other Equity Securities may be certificated at the option of the Member or Direct Owner. Unless otherwise approved by the Board, all Shares of the Company held (directly or indirectly) by a Member or Owner will be reflected as electronic book-entry interests through the facilities of DTC and will transfer only via electronic book-entry form through the facilities of DTC.  No Person (other than such Person as may be designated by DTC as nominee for DTC) shall become a Direct Owner after the Effective Date without the approval of the Board. Notwithstanding the foregoing, (A) the Board may determine to permit one or more Members or Owners (x) that are not otherwise eligible to hold Shares through DTC to do so (and otherwise waive the foregoing requirements); provided that any such permission granted by the Board shall be applied on a consistent basis to all similarly situated Members or Owners. With respect to such Shares held through DTC, the Beneficial Interests of the Beneficial Owner and not the registered owner (i.e., Cede & Co.) will, except insofar as the context may otherwise require, be determinative for purposes of complying with the terms and conditions of this Agreement (including compliance with provisions relating to Transfers set forth in ~~Article IX~~Article IX hereof). For the sake of clarity, Transfers of Beneficial Interests by Beneficial Owners shall be subject to the terms and conditions ~~Article IX~~Article IX that are otherwise applicable to Members.

(d)    Notwithstanding anything to the contrary in this Agreement, the Board shall, subject always to the Act and any other Applicable Law and regulations and the facilities and requirements of any relevant system concerned (including DTC), have power to implement any arrangements, in its absolute discretion, it may deem reasonably appropriate in relation to the evidencing of title to and Transfer of the Shares (or Beneficial Interests or other interests therein), and to the extent such arrangements are so implemented, no provision of this Agreement shall apply or have effect to the extent that it is in any respect inconsistent with the holding or Transfer of Shares in uncertificated form.

17

Section 3.3    *Issuance of Additional Equity Securities; No Capital Contributions*.   (a) None of the Members or the Owners is required to make capital contributions (and this Agreement shall not be amended to include required capital contributions). Subject to compliance with ~~Section 3.4~~Section 3.4, the Board shall have the right to cause the Company to create and/or issue Equity Securities from time to time, including additional classes, groups or series of Equity Securities having such relative rights, powers, duties, obligations and liabilities as may be established by the Board, including rights, powers, duties, obligations and liabilities different from, senior to or more favorable than existing classes, groups and series of Equity Securities. In furtherance of the foregoing, but subject to compliance with ~~Section 3.4~~Section 3.4, the Board shall have the right to amend and update this Agreement to reflect the terms and/or issuance of such additional Equity Securities, in each case without the approval or consent of any other Person. The Board shall have the right to determine the consideration payable to the Company in connection with the issuance of any Equity Securities (if any).  In connection with the issuance of any Equity Securities, subject to ~~Section 13.5~~Section 13.5, the Board may authorize additional restrictions on, and/or grant additional rights to, the holders (direct or indirect) of such Equity Securities pursuant to agreements entered into in connection with the issuance of such Equity Securities (including vesting provisions, restrictions on transfer, and redemption or repurchase rights and obligations) in addition to the restrictions, conditions, and rights under this Agreement.

(b)    Subject in all cases to the preemptive rights granted pursuant to ~~Section 3.4~~Section 3.4 hereof, the Board will be authorized, without the need to obtain the consent or approval of any Person, including any Member or Owner (but subject to ~~Section 13.5~~Section 13.5), to authorize and implement (and adopt any amendment to this Agreement to effectuate) the issuance of additional Equity Securities pursuant to this ~~Section 3.3~~Section 3.3.

Section 3.4    *Preemptive Rights*.

(a)    *Grant of Preemptive Rights.*  Except for issuances of Equity Securities as set forth in ~~Section 3.4(b)~~Section 3.4(b), and subject to compliance with ~~Section 9.5~~Section 9.5, if the Board authorizes the sale of any Equity Securities of the Company or of any Subsidiary of the Company, or any Subsidiary of the Company proposes to sell any new Equity Securities of such Subsidiary or of any other Subsidiary of the Company, to any Person for cash (the "**Offered Securities**"), the Company shall, or shall cause the applicable Subsidiary to, offer to sell to each Owner who is an Accredited Investor and who holds (directly or indirectly), together with its Related Persons, Shares representing an Undiluted Ownership Percentage of at least two percent (2.0%) (a "**Preemptive Rights Holder**") as of the close of business on the record date determined by the Board (which record date shall be no more than twenty (20) Business Days prior to, nor later than, the date of the Company Preemptive Offer Notice (as defined below), a portion of such Offered Securities equal to (i) the amount of the Offered Securities proposed to be sold, *multiplied by* (ii) a fraction, the numerator of which is the total number of Shares held (directly or indirectly) by the Preemptive Rights Holder and the denominator of which is the total number of Shares held (directly or indirectly) by all of the Preemptive Rights Holders. The Company shall request Ownership Statements from all Owners in order to determine the Owners that qualify as Preemptive Rights Holders.

(b)   *Exceptions to Preemptive Rights*.   Notwithstanding anything in this Agreement to the contrary, the preemptive rights granted to the Preemptive Rights Holders in ~~Section 3.4(a)~~Section 3.4(a) shall not apply to the offer or sale of any of the following Equity Securities:

(i)   The Warrants and Shares issued in accordance with the Plan of Reorganization (including any such Warrants or Shares issued after the Effective Date) including, for the avoidance of doubt, Shares ~~issued pursuant to~~in respect of the Backstop Commitment Premium or the Equity Subscription Rights (in each case as defined in the Plan of Reorganization);

(ii)   Equity Securities issued upon the conversion or exercise or exchange of any options, warrants (including the Warrants), or other securities convertible into, or exercisable or exchangeable for, Equity Securities, that are outstanding on the Effective Date or are issued after the Effective Date in compliance with the provisions of this ~~Section 3.4~~Section 3.4 (including any issuance to which ~~Section 3.4(a)~~Section 3.4(a) does not apply by virtue of any other sub-clause in this ~~Section 3.4(b)~~Section 3.4(b));

(iii)   Equity Securities issued pursuant to the Management Incentive Plan or any other employee benefit or incentive plan that, in each case, has been approved by the Board;

(iv)   Equity Securities issued to a third party as consideration in any business combination or acquisition transaction involving the Company or any Subsidiary or in any joint venture or strategic partnership in each case, that shall have been approved by the Board;

(v)   Equity Securities issued pursuant to an IPO;

(vi)   Equity Securities issued in connection with any Share split, Share dividend or other distribution on account of any Shares, any reverse split or any recapitalization, reorganization or reclassification of the Company or any of its Subsidiaries, in each case to the extent such issuance is made on a *pro rata* basis to all holders of Shares;

(vii)   Equity Securities issued as a *bona-fide* "equity kicker" to a lender (or its Affiliated designee) in connection with any incurrence of indebtedness from a lender, or to any other vendor, customer or consultant in the ordinary course of business; and

(viii)   Equity Securities issued by a Subsidiary of the Company to the Company or to any of its other wholly owned Subsidiaries.

(c)   *Exercise of Preemptive Rights*.   In order to exercise preemptive rights under this ~~Section 3.4~~Section 3.4, a Preemptive Rights Holder must deliver an irrevocable written notice to the Company describing such Preemptive Rights Holder's election to purchase all or any portion (as specified by the Preemptive Rights Holder) of the Offered Securities offered to such Preemptive Rights Holder hereunder within fifteen (15) Business Days after receipt of written notice from the Company (the "**Company Preemptive Offer Notice**") describing in reasonable detail (i) the Offered Securities to be offered, (ii) the purchase price and

19

other material terms with respect to such offering, and (iii) the number of Offered Securities such Preemptive Rights Holder is eligible to purchase pursuant to this ~~Section 3.4~~Section 3.4; provided, however, that in the event that a Preemptive Rights Holder fails to deliver on a timely basis an irrevocable written notice to the Company to purchase all or any portion of the Offered Securities offered to such Preemptive Rights Holder, or delivers such an irrevocable written notice and subsequently fails to purchase the Offered Securities set forth in such irrevocable written notice, such Offered Securities shall first be offered for a period of ten (10) Business Days to all other Preemptive Rights Holders that fully exercised their rights under this ~~Section 3.4~~Section 3.4 and purchased the applicable Offered Securities. Such reoffer of Offered Securities to Preemptive Rights Holders shall be repeated until all Offered Securities have been purchased or no Preemptive Rights Holder elects to further exercise its rights.

(d)     *Issuances Subsequent to Offering Period*.   Upon the expiration of the 25-Business Day offering period (and any reoffer period as provided in ~~Section 3.4(c)~~Section 3.4(c)) described in ~~Section 3.4(c)~~Section 3.4(c) and during the one hundred eighty (180) calendar days following such expiration, the Company or the applicable Subsidiary shall be entitled to offer and sell any Offered Securities which the Preemptive Rights Holders have not elected to purchase to any Person or Persons (i) at a price no less than, and on other terms and conditions no more favorable to such Person or Persons in the aggregate than, the prices, terms and conditions offered to the Preemptive Rights Holders, and (ii) and on other terms and conditions no less favorable to the Company.  Any Equity Securities offered or sold by the Company or the applicable Subsidiary after such 180-day period must be reoffered to the Preemptive Rights Holders pursuant to the terms of this ~~Section 3.4~~Section 3.4.

(e)     *Accelerated Sales.*  Notwithstanding anything to the contrary contained herein, the Company may issue Equity Securities in accordance with ~~Section 3.3~~Section 3.3 to any purchaser (an "**Accelerated Buyer**") without first complying with the provisions of this ~~Section 3.4~~Section 3.4 if the Board, acting in good faith, determines it is in the best interest of the Company to consummate such issuance without having first complied with such provisions; provided, that in connection with any such issuance, the Company shall give the Preemptive Rights Holders written notice of such issuance within 5 Business Days after the occurrence of such issuance, which notice (an "**Accelerated Sale Notice**") shall describe in reasonable detail (a) the material terms and conditions of the issuance of the Offered Securities to the Accelerated Buyer, including the number or amount and description of the Equity Securities issued, the issuance date, the purchase price per share, and the name and address of the Accelerated Buyer and (b) the rights of the Preemptive Rights Holders to purchase the Offered Securities, pursuant to this paragraph, in connection with such issuance.  In the event of any such issuance of Offered Securities to an Accelerated Buyer, each Preemptive Rights Holder shall have the right, at any time during the fifteen (15) Business Days following receipt of the Accelerated Sale Notice, to elect to purchase the Offered Securities in an amount equal to the amount of such Offered Securities it would have been entitled to purchase if the sale to the Accelerated Buyer had instead been completed without regard to this ~~Section 3.4~~Section 3.4.  If one or more such Preemptive Rights Holders exercise the election to make a purchase, the Company or applicable Subsidiary shall give effect to each such exercise by either (i) requiring that the Accelerated Buyer sell down a portion (or, if necessary, all) of its Equity Securities, or (ii) issuing additional Offered Securities to such Preemptive Rights Holders, or a combination of (i) and (ii), so long as such action effectively provides such Preemptive Rights Holders with the same percentage

ownership interest in the relevant Equity Securities it would have received had this paragraph not been utilized.

(f)      *Assignment*.    A Preemptive Rights Holder may assign its Offered Securities to any Affiliate (whether or not an Owner) that agrees to be bound by the provisions of this Agreement applicable to the Preemptive Rights Holder by executing a Joinder (which may, at the Company's election, be on a "click-through" basis).

Section 3.5      *Book-Entry-Only System; Global Securities*.[4]

(a)      *Global Security*. The Company will enter into the Depository Agreement pursuant to which DTC will act as a securities depository for Shares. The Shares deposited with DTC will be represented by one or more Global Securities (which may be a book entry security or consist of one or more certificates as required by DTC), which will be registered in the name of Cede & Co., as nominee for DTC or as DTC shall otherwise direct, and deposited with, or on behalf of, DTC. No other certificates evidencing such Shares will be issued. The Global Security shall be in the form attached hereto as <u>Exhibit A</u> or described therein and shall represent such Shares as shall be specified therein, and may provide that it shall represent the aggregate amount of outstanding  Shares from time to time endorsed thereon and that the aggregate amount of outstanding Shares represented thereby may from time to time be increased or decreased.  As of the Effective Date, without the need for any action or consent of any Person, including the Board, one or more Global Securities shall be issued reflecting the number of Shares to be issued to Cede & Co. as of the Effective Date. Any Global Security shall be executed by an officer on behalf of the Company. Any endorsement of a Global Security to reflect the amount, or any increase or decrease in the amount, of outstanding Shares represented thereby shall be made in such manner and upon instructions given by the Board as specified in the Depository Agreement.

(b)      *Legend.* Any Global Security issued to DTC or its nominee shall bear a legend substantially to the following effect: "Unless this certificate is presented by an authorized representative of The Depository Trust Company, a New York corporation ("**DTC**"), to the Company or its agent for registration of transfer, exchange, or payment, and any certificate issued is registered in the name of Cede & Co. or in such other name as is requested by an authorized representative of DTC (and any payment is made to Cede & Co. or to such other entity as is required by an authorized representative of DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL inasmuch as the registered owner hereof, Cede & Co., has an interest herein."

(c)      *Beneficial Owners.* As provided in the Depository Agreement, upon the settlement date of any creation, transfer or redemption of Shares of a Beneficial Owner, the Depository will credit or debit, on its book-entry registration and transfer system, the number of Shares so created, transferred or redeemed to the accounts of the appropriate DTC Participants. Holders of Beneficial Interests in Shares will be limited to DTC Participants, Indirect Participants and persons holding Beneficial Interests through DTC Participants and Indirect Participants. Beneficial Owners will be shown on, and the transfer of Beneficial Ownership by

[4] ~~Subject to revision after Depository Agreement is prepared.~~

Beneficial Owners will be effected only through, in the case of DTC Participants, records maintained by the Depository and, in the case of Indirect Participants and Beneficial Owners holding through a DTC Participant or an Indirect Participant, through those records or the records of the relevant DTC Participants. Beneficial Owners are expected to receive from or through the broker or bank that maintains the account through which the Beneficial Owner has purchased or sold Shares a written confirmation relating to their purchase or sale of Shares.

(d)    *Reliance on Procedures*. So long as Cede & Co., as nominee of DTC, is the registered owner of Shares, references herein to the registered or record owners of such Shares shall mean Cede & Co. and shall not mean the Beneficial Owners of such Shares. Beneficial Owners of Shares will not be entitled to have such Shares registered in their names, will not receive or be entitled to receive physical delivery of certificates in definitive form and will not be considered the record or registered holder of such Shares under this Agreement. Accordingly, except as the Company may otherwise determine, to exercise any rights of a holder of Shares under this Agreement, a Beneficial Owner must rely on the procedures of DTC and, if such Beneficial Owner is not a DTC Participant, on the procedures of each DTC Participant or Indirect Participant through which such Beneficial Owner holds its interests. The Board understands that under existing industry practice, if the Board requests any action of a Beneficial Owner, or a Beneficial Owner desires to take any action that DTC, as the record owner of all outstanding Shares of such Beneficial Owner, is entitled to take, DTC will notify the DTC Participants regarding such request, such DTC Participants will in turn notify each Indirect Participant holding Shares through it, with each successive Indirect Participant continuing to notify each person holding Shares through it until the request has reached the Beneficial Owner, and in the case of a request or authorization to act being sought or given by a Beneficial Owner, such request or authorization is given by the Beneficial Owner and relayed back to the Board through each Indirect Participant and DTC Participant through which the Beneficial Owner's interest in the Shares is held.

(e)    *Communication between the Board and the Beneficial Owners*. As described above, the Board will recognize DTC or its nominee as the registered owner of Shares registered in the name of Cede & Co. or as otherwise instructed by DTC as described in ~~Section 3.5(a)~~Section 3.5(a) hereof for all purposes except as expressly set forth in this Agreement. Conveyance of all notices, statements and other communications to Beneficial Owners of Shares deposited with DTC will be effected as follows. Pursuant to the Depository Agreement, DTC is required to make available to the Company upon request and for a fee to be charged to the Company a listing of the Share holdings of each DTC Participant. The Company shall inquire of each such DTC Participant as to the number of Beneficial Owners holding Shares, directly or indirectly, through such DTC Participant. The Company shall provide each such DTC Participant with sufficient copies of such notice, statement or other communication, in such form, number and at such place as such DTC Participant may reasonably request, in order that such notice, statement or communication may be transmitted by such DTC Participant, directly or indirectly, to such Beneficial Owners. In addition, the Company shall pay to each such DTC Participant an amount as reimbursement for the expenses attendant to such transmittal, all subject to applicable statutory and regulatory requirements. Notwithstanding the foregoing, the Company may communicate with Beneficial Owners as set forth in ~~Section 13.3~~Section 13.3.

(f)     *Distributions*. Distributions pursuant to ~~Section 5.3~~Section 5.3 shall be made to DTC or its nominee, Cede & Co., as the registered owner of the relevant Shares. The Board expects that DTC or its nominee, upon receipt of any payment of distributions in respect of the relevant Shares, shall credit immediately DTC Participants' accounts with payments in amounts proportionate to their respective Beneficial Interests in Shares as shown on the records of DTC or its nominee. The Board also expects that payments by DTC Participants to Indirect Participants and Beneficial Owners held through such DTC Participants and Indirect Participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers in bearer form or registered in a "street name," and will be the responsibility of such DTC Participants and Indirect Participants. Neither the Board nor the Company will have any responsibility or liability for any aspects of the records relating to or notices to Beneficial Owners, or payments made on account of beneficial ownership interests in the relevant Shares, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests or for any other aspect of the relationship between DTC and the DTC Participants or the relationship between such DTC Participants and the Indirect Participants and Beneficial Owners owning through such DTC Participants or Indirect Participants or between or among the Depository, any Beneficial Owner and any person by or through which such Beneficial Owner is considered to hold Shares indirectly.

(g)     *Successor Depository*. If a successor to DTC shall be employed as hereunder, the Board shall establish procedures acceptable to such successor with respect to the matters addressed in this ~~Section 3.5~~Section 3.5.

Section 3.6    *Liability of Owners and Members*.  Except as otherwise provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and neither Owners nor Members shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Owner, as the case may be.

Section 3.7    *Fully Paid and Non-Assessable Nature of Equity Securities*. All Shares issued on the Effective Date, and all other Shares and other Equity Securities issued pursuant to, and in accordance with, the requirements of this Agreement shall be duly issued, fully paid and non-assessable.

ARTICLE IV
FISCAL YEAR

Section 4.1    *Fiscal Year*.  The fiscal year of the Company (the "**Fiscal Year**") shall be a calendar year ending December 31 or such other fiscal year as may be determined by the Board.

ARTICLE V
DISTRIBUTIONS

Section 5.1    *Interest*.  No interest shall be paid to any Member or Owner on account of its interest in the Company.

23

Section 5.2    *No Right to Withdraw*.  Except in connection with the Transfer of Shares in accordance with the terms of this Agreement such that the Transferring Member or Owner no longer holds any Shares, no Member or Owner shall have any right to voluntarily resign or otherwise withdraw from the Company without the prior written consent of the Board. A resigning Member or Owner shall only be entitled to receive amounts approved by the Board on the terms and conditions set forth by such Board. A resigning Member or Owner shall not be entitled to a distribution of the fair value of its Shares under Section 18-604 of the Act.

Section 5.3    *Distributions*.

(a)    The Board may, from time to time, declare and authorize payment of distributions to the Members, which distributions may be paid in cash, property or securities of the Company.

(b)    All distributions shall be made on a *pro rata* basis among Members based on the Shares held by such Members (it being understood that the treatment of distributions to Cede & Co. are addressed in ~~Section 3.5(f)~~Section 3.5(f)), subject to the provisions of law and this Agreement, out of funds or amounts legally available therefor, at such times and to the Members of record on such dates as the Board may, from time to time, determine in accordance with this Agreement and Applicable Law.  Amounts distributable to any Member will be subject to offset to the extent of any obligation owed by such Member to the Company. As of the date hereof, there are no Members other than Cede & Co.

(c)    Neither Members nor Owners shall be entitled to receive any distributions from the Company, whether in respect of the fair value of its Shares or otherwise, except as expressly provided in this Agreement or under the Act.

Section 5.4    *Withholding*.  The Company is authorized to deduct or withhold from distributions to the Members and to pay over to any federal, state, local or foreign governmental authority any amounts which it reasonably determines may be required to be so deducted or withheld pursuant to the Code or any provisions of any Applicable Law.  All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any distribution to any Member (including any interest, penalties and expenses incurred in respect thereof) shall be treated as amounts distributed to such Member pursuant to this Article for all purposes under this Agreement, and shall reduce the amount otherwise distributable to such Member. If the Company intends to deduct or withhold from a distribution otherwise payable to any Member, it shall notify such Member of its intention to deduct or withhold, which notice shall include a statement of the amounts it intends to deduct or withhold in respect of making of such distribution and the applicable provision of law requiring the Company to withhold or deduct, in each case twenty (20) days prior to such distribution. The Company shall reasonably cooperate with such Member to reduce or eliminate such deduction or withholding.

ARTICLE VI
MANAGEMENT OF THE COMPANY

Section 6.1    *Management by the Board of Managers*.    (a) Except as otherwise expressly provided in this Agreement, the business and affairs of the Company shall be managed

24

by or under the direction of the Board.  No Member or Owner, by virtue of such Member's or Owner's status as such, shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into, execute or deliver contracts on behalf of, or to otherwise bind, the Company. In addition to the powers that now or hereafter can be granted to managers under the Act and to all other powers granted under any other provision of this Agreement, the Board shall have full power and authority to do, and to direct the officers of the Company or other designees to do, all things and on such terms as it determines to be necessary, convenient or appropriate to conduct the business of the Company, to exercise all powers, and to effectuate the purposes, set forth in ~~Section 2.3~~Section 2.3, including adopting and maintaining the Management Incentive Plan and making all determinations with respect thereto, such as identifying participants, determining forms of award, approving individual allocations and providing for other terms and conditions under the Management Incentive Plan (provided that any Equity Securities granted or issued under the Management Incentive Plan shall, regardless of the time of grant or issue of such Equity Interests, dilute all Members and Owners equally and ratably).

(b)    The Managers shall constitute "managers," within the meaning of the Act. The Board shall have the power and authority to delegate to one or more other Persons the Board's rights and powers to manage and control the business and affairs, or any portion thereof, of the Company, including to delegate to officers, agents and employees of the Company and its Subsidiaries and any other Person and may authorize the Company, any Manager, officer, agent, employee, or any other Person to enter into any document on behalf of the Company and perform the obligations of the Company thereunder. Any such delegation may be revoked by the Board at any time. No Manager shall have the authority to individually exercise its powers as a "manager" under the Act unless expressly authorized pursuant to the terms of this Agreement or by the Board.

Section 6.2    *Board of Managers*.

(a)    *Constitution; Fiduciary Duties*.  A board of managers (the "**Board**" or "**Board of Managers**") shall be constituted for the Company.  The Board shall consist of seven (7) managers (each, a "**Manager**" and collectively, the "**Managers**"), of whom (i) one shall be the individual that is the Chief Executive Officer of the Company at the relevant time (the "**CEO Manager**") and (ii) six shall be Independent Managers selected in accordance with ~~Section 6.2(b)~~Section 6.2(b).  The Managers, in their capacities as managers of the Company, shall have fiduciary duties to the Company, the Members and the Owners to the same extent as the fiduciary duties that the directors of a Delaware corporation owe to a corporation and its stockholders. Notwithstanding any provision herein or in Sections 18-1001 or 18-1002 of the Act to the contrary, to the full extent permitted by law, Owners shall have the same rights to bring derivative actions with respect to the Company as a beneficial owner of shares of a Delaware corporation would have with respect to such a corporation under applicable Delaware law. For the avoidance of doubt, termination, resignation or other removal of the individual then serving as Chief Executive Officer shall automatically result in the deemed resignation from the Board of such individual from the position of CEO Manager, and the appointment of a new Chief Executive Officer shall automatically result in the deemed appointment to the Board of such new Chief Executive Officer as the CEO Manager.

25

(b)    *Selection of Independent Managers.*

(i)    Prior to the Key Owner Committee Termination Date, six individuals shall be designated by the Key Owner Committee Members to serve as Independent Managers (the "**Committee Designated Managers**") (it being understood that the occurrence of the Key Owner Committee Termination Date shall not require the Committee Designated Managers to resign as Managers except as otherwise provided in ~~Section 6.2(b)(iii)~~Section 6.2(b)(iii)).

(ii)    After the Key Owner Committee Termination Date:

(A) So long as the Designating Key Owner Termination Date has not occurred, (x) two individuals shall be designated by the Designating Key Owners to serve as Independent Managers (the "**Key Owner Designated Managers**") and (y) four individuals shall be elected by the Owners to serve as Independent Managers in accordance with Annex A; and

(B) After the Designating Key Owner Termination Date, six individuals shall be elected by the Owners to serve as Independent Managers in accordance with Annex A (it being understood that the occurrence of the Designating Key Owner Termination Date shall not require the Key Owner Designated Managers to resign as Managers).

(iii)    The Managers as of the date hereof are ~~[          ]~~Debra Perelman (in ~~such person's~~her capacity as the CEO Manager), ~~[          ], [          ], [          ], [          ], and [          ]⁵~~Elizabeth A. Smith, Martin Brok, Timothy McLevish, Hans Melotte and Paul Pressler, with one vacancy. Promptly following the Key Owner Committee Termination Date (and so long as the Designating Key Owner Termination Date has not occurred), the Designating Key Owners shall designate two of the then-current Managers (other than the CEO Manager) as Managers who shall not be eligible to be nominated pursuant to ~~Section 6.2(b)(ii)~~Section 6.2(b)(ii)(A)(y), with the effect that, after the Key Owner Committee Termination Date and so long as the Designating Key Owner Termination Date has not occurred, such individuals (and each of their respective successors) (if any) may be removed and replaced at any time by the Designating Key Owners.

(iv)    All acts or decisions of the Key Owner Committee Members shall require the approval of Key Owner Committee Members (together with their Related Persons) holding at least 70% of the aggregate number of Shares (excluding Excluded Shares) held by all Key Owner Committee Members (together with their Related Persons).  All acts or decisions of the Designating Key Owners shall require approval of Designating Key Owners (together with their Related Persons) holding at least a majority of the aggregate number of Shares (excluding Excluded Shares) held by all Designating Key Owners (together with their Related Persons).

---

⁵ ~~The six non-CEO managers to be determined by the Required Consenting 2020 B-2 Lenders.~~

(v)     For the avoidance of doubt, the Manager designation rights of the Key Owner Committee Members pursuant to ~~Section 6.2(b)(i)~~Section 6.2(b)(i) and of the Designating Key Owners pursuant to ~~Section 6.2(b)(ii)~~Section 6.2(b)(ii)(A)(x) (and the related rights pursuant to ~~Section 6.2(c)~~Section 6.2(c) in the case of removal or vacancies) are contractual rights of the Key Owner Committee Members and the Designating Key Owners, as applicable, and are not subject to any vote of any other Owners.

(vi)     The Company shall be entitled to request from time to time as determined by the Company that each Key Owner Committee Member or each Designating Key Owner, as applicable, provide to the Company reasonably satisfactory evidence of its then-present ownership of Shares in order to verify the applicable of the rights of such Key Owner Committee Member or Designating Key Owner under this Agreement.

(c)     *Vacancies; Removal*.  Any Committee Designated Manager or any Key Owner Designated Manager may be removed and replaced, with or without cause and for any reason or no reason at any time, by (and only by) the Key Owner Committee Members or the Designating Key Owners, as applicable.  A Manager may also resign of his or her own volition at any time, by written notice to the Company.  In the event of any vacancy on the Board, such vacancy shall be filled (i) in the case of a vacancy of a Committee Designated Manager or Key Owner Designated Manager, by the Key Owner Committee Members or the Designating Key Owners, as applicable, and (ii) in the case of any other vacancy, by the Board.  Independent Managers elected by the Owners in accordance with <u>Annex A</u> may be removed in accordance with <u>Annex A</u>.

(d)     *Meetings of the Board of Managers*.

(i)     Meetings of the Board shall be held at least once per fiscal quarter of the Company on such dates and at such places and times as may be determined by the Board.  Special meetings of the Board may be called by the Chairman or by any two (or more) Managers on at least 72 hours' prior written notice (which includes e-mail).  The Chairman shall preside at all meetings of the Board at which he or she is present and shall exercise such powers and perform such other duties as shall be determined from time to time by the Board; <u>provided</u>, that if the Chairman is absent from any such meeting, any vice Chairman designated by the Board shall preside over such meeting.

(ii)     Meetings of the Board may be held by telephone conference or other communications equipment by means of which all participating Managers can simultaneously hear each other during the meeting.

(e)     *Quorum; Action by the Board; Action by Written Consent*.  No action may be taken at a meeting of the Board unless a majority of the Managers in office are present in person or as otherwise permitted in ~~Section 6.2(d)~~Section 6.2(d).  At any meeting of the Board at which a quorum is present, an action undertaken by Managers representing a simple majority of the Managers present shall be the action of the Board.  Any action required or permitted to be taken by the Board may be taken without a meeting, if consent to such action is delivered in writing or via electronic transmission (as defined in the Act) by such number of Managers that would be required if such action were voted on at a meeting of the Board attended by all

27

Managers. Such written consent or a record of such electronic transmission shall be filed with the records of the Board.

(f)    *Compensation of Managers; Expenses*.    The Board shall have the authority (as an expense of the Company) to fix the compensation of Managers (other than the CEO Manager or any Manager that is an employee of the Company or any of its Subsidiaries, who shall not receive additional compensation for serving as a Manager).    No such payment shall preclude any Manager from serving the Company in any other capacity and receiving compensation therefor.    The Company shall pay all reasonable out-of-pocket expenses incurred by each Manager in connection with attending regular and special meetings of the Board and any Board Committee on which the Manager is a member, and any such meetings of the board of directors or equivalent body of any Subsidiary of the Company and any committee thereof, in each case, on which the Manager is a member.

(g)    *Chairman of the Board*. The Board shall select a Manager (other than the CEO Manager) to serve as the Chairman of the Board (the "**Chairman**") from time to time, having such responsibilities as are determined by the Board; provided that at any time that the Designating Key Owners have the right to select the Key Owner Designated Managers, the Designating Key Owners shall have the right to select the Manager that shall be designated as the Chairman (which may be a Key Owner Designated Manager or another Manager (other than the CEO Manager), as determined by the Designating Key Owners).

(h)    *Board Committees.*    The Board may designate one (1) or more Board committees (each, a "**Board Committee**") consisting of one (1) or more Managers, which, to the extent provided in such designation, shall have and may exercise, subject to the provisions of this Agreement, the powers and authority granted hereunder. Such Board Committee or Board Committees shall have such name or names as may be determined from time to time by the Board.    A majority of all the members of any such Board Committee may determine its action and fix the time and place, if any, of its meetings and specify what notice thereof, if any, shall be given, unless the Board shall otherwise provide. The Board shall have power to change the members of any such Board Committee at any time, to fill vacancies, and to discharge any such Board Committee, either with or without cause, at any time.

Section 6.3    *Actions Requiring Approval of the Board*.

(a)    General.  The Company shall not take any action, and shall cause each of its Subsidiaries not to, and shall not permit any of its Subsidiaries to, take any action with respect to any of the following matters without prior approval of the Board:

(i)    any entry by the Company or any of its Subsidiaries into new lines of business;

(ii)    the declaration of any dividend on or the making of any distribution with respect to, or the redemption, repurchase or other acquisition of, any Equity Securities of the Company or any of its Subsidiaries, except for redemptions, repurchases or other acquisitions of securities pursuant to the terms of the Management Incentive Plan or any

28

officer, director, employee or service provider compensation arrangements approved by the Board;

(iii)   any creation, incurrence, assumption or guarantee of any indebtedness for borrowed money in excess of $25,000,000 in the aggregate (excluding any borrowings under the ABL Facility (as defined in the Credit Agreement) in the ordinary course of business up to the amount of the commitments under the ABL Facility that are in effect as of the Effective Date) or, other than as required pursuant to the Credit Agreement or the ABL Facility, the creation or imposition of any lien on any material assets of the Company or any of its Subsidiaries;

(iv)   any (A) merger, consolidation, reorganization (including conversion), recapitalization or any other business combination (including a Business Combination or Asset Sale) involving the Company or any of its Subsidiaries (but, in the case of a Drag-Along Sale, only to the extent set forth in ~~Section 9.3(a)~~Section 9.3(a)) (other than mergers, consolidations, reorganizations, conversions or recapitalizations solely between and/or among the Company and/or any wholly owned Subsidiaries of the Company), (B) acquisition or disposition of assets or liabilities that are material to the Company and its Subsidiaries taken as a whole, or (C) sale of all or substantially all of the assets of the Company and its Subsidiaries (but, in the case of a Drag-Along Sale, only to the extent set forth in ~~Section 9.3(a)~~Section 9.3(a)) (other than   sales solely between and/or among the Company and/or wholly owned Subsidiaries of the Company);

(v)   approval of an IPO (including the registration statement in connection therewith);

(vi)   any issuance of Equity Securities, other than (x) upon exercise or conversion of (A) any Warrants or (B) any Equity Securities (in accordance with their terms) the issuance of which was previously approved by the Board or (y) the Equity Securities described in Section 3.4(b)(i).

(vii)   any liquidation, dissolution, commencement of bankruptcy or similar proceedings with respect to the Company or any of its Subsidiaries (other than any liquidation or dissolution of wholly owned Subsidiaries of the Company that do not have any assets or liabilities other than as may be *de minimis* in nature or amount);

(viii)   any hiring or termination of employment or service of the Chief Executive Officer or any other member of senior management of the Company or any of its Subsidiaries;

(ix)   any determination of compensation, benefits, perquisites and other incentives for the Chief Executive Officer and other senior management of the Company or any of its Subsidiaries and the approval or amendment of any plans or agreements in connection therewith;

29

(x)    any adoption of, or amendment or modification to, any compensation plan, management incentive plan (including the Management Incentive Plan) or employee benefits plan;

(xi)    any grant of equity incentives to senior management or service providers;

(xii)    settling of any litigation not covered by insurance with a settlement amount in excess of $1,000,000 in any settlement or series of related settlements, or initiating any material litigation;

(xiii)    any selection or removal of the Company's principal auditor;

(xiv)    any approval of the annual business plan, annual budget or long-term strategic plan of the Company or any of its Subsidiaries or any material amendment thereto; or

(xv)    any amendment or modification of this Agreement.

(b)    <u>Related Party Transactions</u>.  The entry into, consummation, amendment, modification (including by waiver) or termination of any Related Party Transaction shall require the approval of a majority of the Managers present at a meeting at which a quorum is present, provided that any Manager Affiliated with, the counterparty to such Related Party Transaction or such party's Related Persons, or otherwise having a material interest in the Related Party Transaction that is unique as compared to the interests of Members and Owners in general, shall not be entitled to vote for purposes of such approval; *provided*, *however*, that no such approval shall be required for (x) any Related Party Transaction if such Related Party Transaction is, in the good faith determination of the Board, on terms and conditions that are equal to or more beneficial to the Company than the terms and conditions pursuant to which an independent third party would provide the goods or perform the services that are the subject of the Related Party Transaction or (y) any acquisition of Equity Securities pursuant to ~~Section 3.4~~Section 3.4 or any acquisition of any debt securities pursuant to preemptive rights that are granted that are substantially similar to the rights under ~~Section 3.4~~Section 3.4.

Section 6.4    *Matters Requiring Approval by the Owners*.  The Company shall not take any action without the approval of the Owners to the extent such action would require the prior approval of the stockholders of a Delaware corporation pursuant to and in accordance with the Delaware General Corporation Law if the Company were a Delaware corporation; <u>provided</u> that the foregoing shall not apply to (i) the appointment, removal or replacement of any Committee Designated Manager or any Key Owner Designated Manager, or (ii) a Drag-Along Sale.

Section 6.5    *Matters Relating to Owners*.  The Company shall comply with the provisions of <u>Annex A</u> attached hereto.

Section 6.6    *Officers*.  The Board may, at its discretion, appoint officers of the Company at any time to conduct, or to assist the Board in the conduct of, the day-to-day business and affairs of the Company.  The officers of the Company shall include a Chief Executive Officer, ~~[President,]~~ a Secretary, one or more Assistant Secretaries, a Treasurer and any other

30

officers as the Board may elect from time to time.  The officers shall serve at the pleasure of the Board subject to all rights, if any, of an officer under any contract of employment. Any individual may hold any number of offices. The officers shall exercise such powers and perform such duties as are typically exercised by similarly titled officers in a corporation and as shall be determined from time to time by the Board, but subject in all instances to the supervision and control of the Board. The officers shall have such authority to sign checks, instruments and other documents on behalf of the Company as may be delegated to them by the Board.  Officers, in their capacities as officers of the Company, shall have fiduciary duties to the Company, the Members and the Owners to the same extent as the fiduciary duties that the officers of a Delaware corporation owe to a corporation and its stockholders.

Section 6.7    *Waiver of Corporate Opportunities*.  Each of the Company, the Members and the Owners recognizes that one or more Persons, including the Managers (other than the CEO Manager), any of the Members or any of the Owners (but excluding any employees of the Company or any of its Subsidiaries) (collectively, "**Non-Employee Persons**") have or may in the future have other business interests, activities and investments or opportunities with respect thereto, some of which may be in conflict or competition with the business of the Company, and that such Non-Employee Persons are entitled to carry on such other business interests, activities and investments and/or compete with the Company or pursue such opportunities, even if such interests, activities and investments are adverse to the interests of the Company or one or more of its Members or Owners, and shall have no obligation to present any such opportunities to the Company or any other Person (except to the extent that such opportunity was presented to a Manager expressly in such Person's capacity as a Manager).  Neither the Company, its Subsidiaries, the other Members and Owners nor any other Person shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company or any of its Subsidiaries, by a Non-Employee Person (or any of their Affiliates or any other Person with which such Non-Employee Person is acting) shall not be deemed wrongful or improper or constitute a breach of any duty or obligation (contractual, fiduciary or otherwise). Each of the Non-Employee Persons, in their sole discretion, may offer an opportunity to participate in any such business or venture to any Person, including any Members or Owners or their respective Affiliates without any duty or obligation to any other Person. The taking by any such Non-Employee Person (or its Affiliates or any other Person with which such Non-Employee Person is acting), or the offering or other transfer by any such Non-Employee Person to another Person, of any potential business opportunity shall not constitute or be construed or interpreted as (a) a breach or violation of any duty (contractual, fiduciary or otherwise, including any duty under this Agreement or any other Applicable Law) or (b) receipt by any such Non-Employee Person or its Affiliates or other Persons with which it is acting of an improper benefit, or an improper personal benefit, in money, property, services or otherwise. This ~~Section 6.7~~Section 6.7 is being adopted notwithstanding any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise.

Section 6.8        *Waivers; Burden of Proof.*

(a)        Each Covered Person (other than any Covered Person who is a Manager or officer of the Company or an officer or director (or equivalent) of any of its Subsidiaries) shall, to the maximum extent permitted by the Act and other Applicable Law, owe no duties (including fiduciary duties) to the Members, the Owners, the Company or any other Person bound by this Agreement, notwithstanding anything to the contrary existing at law, in equity or otherwise; provided, however, that the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing and nothing in this Agreement shall preclude any Member or Owner from bringing an action alleging a breach of the implied contractual covenant of good faith and fair dealing or any breach of this Agreement.

(b)        To the fullest extent permitted by law, and notwithstanding any other provision of this Agreement or any duty that would otherwise exist at law or in equity, the parties hereto agree that (i) in any proceeding relating to the determination of whether a Covered Person has met its duties under this Agreement or any Applicable Law, there shall be a presumption that such Covered Person has met such duties and (ii) any Person bringing or prosecuting any action, suit or proceeding directly in such Person's own right or in the name or on behalf of the Company, the Member or the Owner (or any other Person that may have standing to bring or prosecute such action, suit or proceeding) challenging any determination or action, or decision not to act, of a Covered Person, will bear the burden of proving that such duties were not met.

(c)        To the fullest extent permitted by law, and notwithstanding any other provision of this Agreement or any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise, each Member and Owner (other than any Member or Owner who is a Manager or officer or director (or equivalent) of the Company or any of its Subsidiaries), in each case, acting in such capacity, in the exercise of its rights, powers and duties hereunder, may act and make decisions in the best interest of such Person, which may not be in the best interests of, and may be different from, in addition to, or adverse to, the Members, the Owners and any other Person bound by this Agreement. This ~~Section 6.8~~Section 6.8 is being adopted notwithstanding any duty (including any fiduciary duty) that would otherwise exist at law, in equity or otherwise.

ARTICLE VII
MATTERS RELATING TO AN IPO; REGISTRATION RIGHTS

Section 7.1    *Conversion to a Corporate Form Upon an IPO.*  Upon a determination by the Board to effect an IPO, the Board, at the Company's expense shall take such actions as are necessary to structure the IPO in the manner determined appropriate by the Board, including effecting a conversion of the Company (directly or indirectly) to corporate form; provided that notwithstanding any provision of this Agreement to the contrary, the Board may take any of the foregoing actions without any vote of the Members or Owners.  In connection with such IPO, each Member holding Shares or other Equity Securities will be entitled to receive a number of shares of common stock or other Equity Securities of the IPO "vehicle" selling Equity Securities in the IPO such that if the Company liquidated and distributed its assets in accordance with ~~Article XII~~Article XII immediately following such IPO, such Member (including as nominee for Beneficial Owners) would, in the aggregate in respect of such Shares or other Equity Securities,

32

be entitled to receive the same percentage of the total proceeds as it (including as nominee for Beneficial Owners) would have been entitled to receive in a liquidation and distribution of the Company's assets pursuant to ~~Article XII~~Article XII immediately prior to such IPO (determined without giving effect to any actions or steps taken to effect or facilitate such IPO pursuant to this ~~Section 7.1~~Section 7.1) and (ii) such IPO shall be effected in a manner that treats Owners of the same class of Shares or other Equity Securities the same with such differences as may be necessary to give effect to vesting and other contingencies or differences with respect to any Shares or other Equity Securities.

Section 7.2    *Registration Rights Agreement*.  In connection with, and substantially concurrently with the closing of, an IPO, the Company and each Owner of Registrable Securities (as defined in the Registration Rights Agreement) shall enter into the Registration Rights Agreement.   The provisions of this ~~Section 7.3~~Section 7.3 shall survive termination of this Agreement.

Section 7.3    *IPO Lock Up Agreement*.  In connection with an IPO, each Member or Owner holding (directly or indirectly) any Shares (or the applicable security to be sold in the IPO) (a) shall not effect any public sale or distribution, including any sale pursuant to Rule 144, of Registrable Securities (as defined in the Registration Rights Agreement) (except as part of the IPO) during the period beginning seven (7) days prior to the effective date of the applicable registration statement until the earlier of (i) such time as the Company and the lead managing underwriter shall agree and (ii) one hundred eighty (180) days, and (b) shall enter into such customary "lock up" agreements as are requested by the Company and the underwriter(s) in the IPO.  In connection with an IPO described in clauses (ii) and (iii) of the definition thereof, except with the written consent of the underwriters managing such IPO, no Member or Owner shall effect any sale or distribution (including sales pursuant to Rule 144) of Equity Securities of the Company, or any securities convertible into or exchangeable or exercisable for such Equity Securities, during the seven (7) days prior to and the one hundred and eighty (180)-day period beginning on the date of closing of such IPO (the "**Lockup Period**"), except as part of such offering; provided, that (i) such Lockup Period restrictions are applicable on substantially similar terms to all of the Company's executive officers and directors, (ii) to the extent any Member or Owner is granted a release or waiver from the restrictions contained in this ~~Section 7.3~~Section 7.3, then all Members and Owners shall be automatically granted a release or waiver from the restrictions contained in this ~~Section 7.3~~Section 7.3, on substantially the same terms as and on a *pro rata* basis with, the Members and/or Owners to which such release or waiver is granted, and (iii) except in connection with an IPO, nothing herein will prevent any Member or Owner from making a distribution of Equity Securities to any of its partners, members or stockholders thereof or a transfer of Equity Securities to a Related Person that is otherwise in compliance with applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this ~~Section 7.3~~Section 7.3. Each Member and Owner agrees to execute a customary lock-up agreement in favor of the Company's underwriters to such effect and, the Company's underwriters in any relevant offering shall be third party beneficiaries of this ~~Section 7.3~~Section 7.3.    The provisions of this ~~Section 7.3~~Section 7.3 shall survive termination of this Agreement.

Section 7.4    *Strategic Transaction / IPO Review*.  Not later than the second anniversary of the Effective Date, the Board shall initiate a strategic review of potential strategic transactions

33

for the Company, including the possibility of an IPO. For the avoidance of doubt, the Board is not precluded from initiating such review or seeking such strategic transactions prior to such date and is not obligated to effectuate a strategic transaction (including an IPO) by any specific date.

ARTICLE VIII
REPRESENTATIONS AND WARRANTIES

Section 8.1   *Representations and Warranties*.   Each Owner as of the Effective Date and each Person that becomes a Member or Owner after the Effective Date (including pursuant to a Transfer of Shares), represents and warrants (or is deemed to represent and warrant) to the Company, that such Owner or Person: (A) has received (or otherwise had made available to it), read and understands this Agreement, (B) acknowledges and understands that such Owner or Person shall have all the rights, and be subject to all the obligations, set forth in this Agreement with respect to Members and Owners and as provided under the Act, as if such Owner or Person had directly executed this Agreement as a party, (C) ratifies and confirms each and every Article, Section and provision of this Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale).   Furthermore, each such Member, Owner and Person represents and warrants (or is deemed to represent and warrant) to the Company that the Agreement constitutes the legal, valid, and binding obligation of such owner or person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.

ARTICLE IX
TRANSFERS

Section 9.1   *Transfers Generally*.

(a)   Each Member and Owner understands and agrees that the Shares have not been registered under the Securities Act nor registered or qualified under any state or foreign securities laws.   No Owner shall Transfer such Shares (or solicit any offers in respect of any Transfer of such Shares), except in compliance with the Securities Act, any applicable state or foreign securities laws and the restrictions on Transfer contained in this ~~Article IX~~Article IX.

(b)   Until the Company otherwise becomes obligated to file reports under each of (x) Section 13 of the Exchange Act and (y) Section 15(d) of the Exchange Act (or upon receipt of prior written approval from the Board), no Owner shall Transfer any of such Owner's Shares to any other Person to the extent such Transfer would cause the Company to have, including as a result of passage of time and giving effect to the exercise of all Options and Convertible Securities, in excess of, to the extent the Company is obligated to file reports under Section 15(d) but not Section 13 of the Exchange Act, (a) 1,950 Holders of Record (or four-hundred-fifty (450) or more Holders of Record who are not Accredited Investors), calculated in accordance with Section 12(g) of the Exchange Act (or fifty (50) fewer than such other numbers of Holders of Record or shareholders as may subsequently be set forth in Section 12(g), or any successor provision, from time to time of the Exchange Act, as the minimum number of Holders of Record or shareholders for a class of capital stock to be required to be registered under Section 12 of the Exchange Act), or (b) to the extent the Company is not currently obligated, including due to a suspension of such requirement, to file reports under

either of Section 13 or Section 15(d) of the Exchange Act, two-hundred-fifty (250) Holders of Record, calculated in accordance with Section 15(d) of the Exchange Act (or fifty (50) fewer than such other numbers of shareholders as may subsequently be set forth in Section 15(d), or any successor provision, from time to time of the Exchange Act, as the minimum number of Holders of Record or shareholders for a class of capital stock to require reporting under Section 15(d) of the Exchange Act). The Company and any transfer agent for the Shares shall be entitled to enforce this provision (including by denying any requested Transfer of Shares). The Company and any transfer agent for the Shares shall determine the number of Holders of Record from time to time in consultation with Company counsel in order to give full effect to the restriction set forth in this ~~Section 9.1(b)~~Section 9.1(b). For the avoidance of doubt, this ~~Section 9.1(b)~~Section 9.1(b) shall not apply to a Transfer of Shares in an IPO.

(c)     Notwithstanding anything to the contrary in this Agreement, no Owner shall Transfer any Shares (i) to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion) or (ii) if such Transfer would cause the Company to become subject to the registration requirements of the Investment Company Act of 1940, as amended.

(d)     Each Owner Transferring any Shares as permitted by this Agreement shall use its reasonable best efforts to provide or cause to be provided to any prospective transferee of such Owner (subject to ~~Section 11.1(e)~~Section 11.1(e)) a copy of this Agreement (including by such proposed transferee receiving access to this Agreement pursuant to the Datasite).

(e)     To the fullest extent permitted by Applicable Law, any Transfer not in compliance with the provisions of this Agreement shall be void *ab initio*.

Section 9.2     *Tag-Along Rights*. (a) Subject to Section ~~9.2(i)~~9.2(i) and Section ~~9.5~~9.5, if one or more Owners that (collectively with their Related Persons) hold at least a majority of the outstanding Shares (collectively, the "**Tag-Along Seller**") propose to Transfer at least a majority of the outstanding Shares, in one transaction or a series of related transactions, to any Prospective Buyer(s) (a "**Tag-Along Sale**") other than a Transfer to a transferee that is a Related Person of the transferor, then:

(i)     the Tag-Along Seller shall deliver a written notice of the terms and conditions of such proposed Transfer (the "**Tag-Along Notice**") to the Company (which Tag-Along Notice shall include an Ownership Statement from the Tag-Along Seller certifying as to the Tag-Along Seller's ownership of at least a majority of the outstanding Shares), and the Company shall promptly (and in any event within ten (10) Business Days following receipt thereof) deliver or cause to be delivered a copy of the Tag-Along Notice to each Owner (other than the Tag-Along Seller), which Tag-Along Notice shall offer each such Owner the opportunity to participate in such Transfer in accordance with this ~~Section 9.2~~Section 9.2 (the "**Tag-Along Offer**"); and

(ii)     each of the Owners (other than the Tag-Along Seller) may elect, at its option, to participate in the proposed Transfer in accordance with this ~~Section 9.2~~Section 9.2 (each such electing Owner, a "**Tagging Person**").

35

(b)    The Tag-Along Notice shall identify (i) the number of Shares proposed to be sold by the Tag-Along Seller, (ii) the aggregate number of Shares owned by the Tag-Along Seller and its Related Persons, (iii) the per Share consideration to be paid in such Tag-Along Sale, and (iv) all other material terms and conditions of the Tag-Along Offer, including the form of the proposed sale agreement, if any, and the date of the proposed Tag-Along Sale, if known. From the date of the Tag-Along Notice, each Tagging Person shall have the right (a "**Tag-Along Right**"), exercisable by notice (the "**Tag-Along Response Notice**") given to the Tag-Along Seller within fifteen (15) Business Days after the date of the Tag-Along Notice (the "**Tag-Along Notice Period**"), to request that the Tag-Along Seller include in the proposed Transfer the number of Shares that such Tagging Person elects to include in the Tag-Along Sale (which shall not exceed the Tagging Person's Tag-Along Portion of Shares and which shall be subject to reduction in accordance with ~~Section 9.2(f)~~Section 9.2(f)).  Each Tag-Along Response Notice shall include appropriate instructions for payment or delivery of the aggregate consideration for the Shares that the relevant Tagging Person is proposing to include in such Tag-Along Sale. Each Tagging Person that exercises its Tag-Along Rights hereunder shall deliver to the Tag-Along Seller, with its Tag-Along Response Notice, any evidence of ownership of the Shares of such Tagging Person to be included in the Tag-Along Sale reasonably required by the proposed transferee together with a limited power-of-attorney authorizing the Tag-Along Seller to execute transaction-related documents and Transfer such Shares on the terms set forth in the Tag-Along Notice and such other documents as the Tag-Along Seller may reasonably request to facilitate such Transfer.  Delivery of the Tag-Along Response Notice with such evidence of ownership and limited power-of-attorney shall constitute an irrevocable acceptance of the Tag-Along Offer by such Tagging Persons, subject to the provisions of this ~~Section 9.2 and Section 9.4~~Section 9.2 and Section 9.4.

(c)    If, at the end of a 120-day period after the end of the Tag-Along Notice Period (which 120-day period shall be extended if any of the transactions contemplated by the Tag-Along Offer are subject to regulatory approval until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than 180 days following the end of the Tag-Along Notice Period), the Tag-Along Seller has not completed the Transfer of all Shares proposed to be sold by the Tag-Along Seller and all Tagging Persons (but subject to reduction of such number of Shares in accordance with ~~Section 9.2(f)~~Section 9.2(f) on substantially the same terms and conditions set forth in the Tag-Along Notice, then the Tag-Along Seller shall (i) return to each Tagging Person the limited power-of-attorney and all applicable instruments that such Tagging Person delivered pursuant to ~~Section 9.2(a)~~Section 9.2(a) and any other documents in the possession of the Tag-Along Seller executed by the Tagging Persons in connection with the proposed Tag-Along Sale, and (ii) all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Shares shall continue in effect.

(d)    Concurrently with the consummation of the Tag-Along Sale, the Tag-Along Seller shall (i) notify the Tagging Persons thereof, (ii) remit to each Tagging Person the aggregate consideration for the Shares of such Tagging Person Transferred pursuant thereto (but subject to reduction for any applicable escrows or holdbacks and any transaction expenses as determined in ~~Section 9.2~~Section 9.2), with the cash portion of the purchase price paid in accordance with the instructions in the applicable Tag-Along Response Notice and (iii) promptly after the consummation of such Tag-Along Sale, furnish such other evidence of the completion

36

and the date of completion of such Transfer and the terms thereof as may be reasonably requested by the Tagging Persons.

(e)    If upon the expiration of the Tag-Along Notice Period any Owner entitled to elect to participate in the Tag-Along Sale shall not have elected to participate, such Owner shall be deemed to have irrevocably waived its rights under this ~~Section 9.2~~Section 9.2 with respect to the Transfer of any Shares pursuant to such Tag-Along Sale.

(f)    If the aggregate number of Shares of all Tagging Persons and the Tag-Along Seller proposed to be included in the Tag-Along Sale exceeds the number of Shares to be sold to the Prospective Buyer in such Tag-Along Sale, the Tag-Along Seller's and each Tagging Person's number of Shares to be included in the Tag-Along Sale shall be reduced on a *pro rata* basis determined based on (i) the number of Shares proposed to be included by such Owner *multiplied by* (ii) a fraction the numerator of which is the number of Shares that can be sold to the Prospective Buyer in the Tag-Along Sale and the denominator of which is the total number of Shares proposed to be included by all Owners.

(g)    Subject to ~~Section 9.2(h)~~Section 9.2(h), the Tag-Along Seller shall Transfer, on behalf of itself and each Tagging Person, the Shares subject to the Tag-Along Offer and elected to be Transferred pursuant to this ~~Section 9.2~~Section 9.2 on the terms and conditions set forth in the Tag-Along Notice within one hundred twenty (120) days (or such longer period as extended under ~~Section 9.2(b)~~Section 9.2(b)) after the end of the Tag-Along Notice Period.

(h)    Notwithstanding anything contained in this ~~Section 9.2~~Section 9.2, if the Transfer of Shares pursuant to ~~Section 9.2~~Section 9.2 is not consummated for whatever reason there shall be no liability on the part of the Tag-Along Seller to the Tagging Persons or any other Person (other than the obligation to return any limited powers-of-attorney and other documentation received by the Tag-Along Seller).  The decision to effect or abandon a Transfer of Shares pursuant to this ~~Section 9.2~~Section 9.2 by the Tag-Along Seller is in the sole and absolute discretion of the Tag-Along Seller as are the terms of the Tag-Along Sale except, in the case of such terms, as otherwise set forth in this ~~Section 9.2 or Section 9.4~~Section 9.2 or Section 9.4.  For the avoidance of doubt, the Tag-Along Seller may not sell any of its Shares in a Tag-Along Sale unless the purchaser buys the applicable Shares of the Tagging Persons in accordance with this ~~Section 9.2~~Section 9.2.

(i)    The provisions of this ~~Section 9.2~~Section 9.2 shall not apply to any proposed Transfer of any Shares by the Tag-Along Seller (A) pursuant to ~~Section 9.3~~Section 9.3, or (B) to a Related Person of the Tag-Along Seller.

Section 9.3    *Drag-Along Rights*.

(a)    Subject to ~~Section 9.4~~Section 9.4, if any Owner(s) holding (directly or indirectly) at least a majority of the aggregate number of Shares then issued and outstanding (collectively, the "**Dragging Seller**") agree to a *bona fide* arms'-length negotiated Company Sale to one or more purchasers that are not Related Persons of the Dragging Seller for consideration payable in cash and/or freely tradeable and marketable securities (a "**Prospective Drag Purchaser**", and such Company Sale, a "**Drag-Along Sale**"), then the Dragging Seller may, at

37

its option, exercise the rights set forth in this ~~Section 9.3~~Section 9.3 ("**Drag-Along Rights**"); provided that prior to the Key Owner Committee Termination Date, a Drag-Along Sale shall require approval of the Board.

(b)    Exercise.  If the Dragging Seller wishes to exercise the Drag-Along Rights contained in this ~~Section 9.3~~Section 9.3, then the Dragging Seller shall deliver a written notice (the "**Drag-Along Sale Notice**") to the Company (which Drag-Along Sale Notice shall include an Ownership Statement from the Dragging Seller certifying as to the Dragging Seller's ownership of at least a majority of the aggregate number of Shares then issued and outstanding) at least thirty (30) Business Days prior to the consummation of the Company Sale transaction, and the Company shall deliver a copy of such Drag-Along Sale Notice to each Owner other than the Dragging Seller (each, a "**Dragged Person**" and, together with the Dragging Seller, collectively, the "**Drag-Along Sellers**") promptly (and in any event within ten (10) Business Days following receipt thereof).  The Drag-Along Sale Notice shall set forth the principal terms and conditions of the proposed Company Sale, including (a) the form and structure of the proposed Company Sale, (b) the consideration to be received in the proposed Company Sale for the Shares (including, if applicable, the formula by which such consideration is to be determined and the payment terms, including a description of any freely tradeable and marketable securities), (c) the name and address of the Prospective Drag Purchaser(s), (d) if known, the proposed date for the Company Sale, (e) the name of each Drag-Along Agent (as defined below) and (f) all other material terms and conditions of the Drag-Along Sale.  Except to the extent waived by the party entitled to such consideration or as required by law, each Dragged Person shall receive the same form and amount of consideration per Share to be received by the Dragging Seller for the Shares in the Drag-Along Sale.  If any holders of Shares are given an option as to the form and amount of consideration to be received, all holders of Shares will be given the same option other than to the extent prohibited by law.  Unless otherwise agreed by each Drag-Along Seller, any consideration consisting of freely tradeable and marketable securities shall be allocated among the Drag-Along Sellers *pro rata* based upon the aggregate amount of consideration to be received by such Drag-Along Sellers.

(c)    Subject to the provisions of ~~Section 9.4~~Section 9.4, each Dragged Person shall be required to participate in the Drag-Along Sale on the terms and conditions set forth in the Drag-Along Sale Notice.  Each Drag-Along Seller shall vote (including acting by written consent, if requested) in favor of such Drag-Along Sale if any vote is held or requested in connection therewith and shall participate in such Drag-Along Sale as described in this ~~Section 9.3~~Section 9.3.  In furtherance of the provisions of this ~~Section 9.3~~Section 9.3, each Dragged Person (on behalf of itself and its successors, heirs, legal representatives, and permitted assigns and transferees) hereby (i) irrevocably appoints each of the individuals identified as a "Drag-Along Agent" in the Drag-Along Sale Notice as his, her or its agent and attorney-in-fact (the "**Drag-Along Agents**") (with full power of substitution) to execute all agreements, instruments and certificates and take all action necessary to effectuate any Drag-Along Sale as contemplated under this ~~Section 9.3~~Section 9.3 (including to Transfer such Dragged Person's Shares on the terms set forth in the Drag-Along Sale Notice), (ii) grants to each Drag-Along Agent a proxy (which shall be deemed to be coupled with an interest and to be irrevocable) to vote (including acting by written consent, if requested) all Shares having voting power held by such Person and exercise any consent rights applicable thereto in favor of any such Drag-Along Sale as provided in this ~~Section 9.3~~Section 9.3; provided, however, that the Drag-Along Agents

38

shall not exercise such powers-of-attorney or proxies with respect to any such Person unless such Person refuses or fails to comply with its obligations under this ~~Section 9.3~~Section 9.3 within such period of time as may be reasonably specified by the Dragging Seller and (iii) agrees to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to any Drag-Along Sale.  Except as otherwise provided in this Agreement, each Dragged Person hereby revokes any and all previous proxies with respect to such Shares (except as otherwise provided in this Agreement) and shall not hereafter, unless and until this Agreement terminates, purport to grant any other proxy or power of attorney with respect to any Shares, deposit any of its Shares into a voting trust or enter into any other agreement, arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of such Shares, in each case, with respect to any of the matters set forth herein.  Each Dragged Person hereby covenants with the Company and the Dragging Seller: (a) to vote in opposition to any other proposal that could delay or impair the ability of the Company to consummate the Drag-Along Sale; (b) subject to ~~Section 9.4~~Section 9.4, to execute and deliver all related documentation and take such other action in support of the Drag-Along Transaction as shall reasonably be requested by the Company or the Dragging Seller in order to carry out the terms and provisions of this ~~Section 9.3~~Section 9.3, including executing and delivering instruments of conveyance and transfer, and any purchase agreement, merger agreement, indemnity agreement, escrow agreement, consent, waiver, governmental filing, Share certificates duly endorsed for transfer (free and clear of impermissible liens, claims and encumbrances) and any similar or related documents;.  If a Dragged Person should fail to deliver such documentation to the Dragging Seller, the Company (subject to reversal under ~~Section 9.3(d)~~Section 9.3(d)) shall cause the books and records of the Company to show that such Shares are bound by the provisions of this ~~Section 9.3(a)~~Section 9.3(a) and that such Shares shall be deemed to be Transferred to the Prospective Drag Purchaser at the closing of the Drag-Along Sale.  For the avoidance of doubt, the Shares issued pursuant to the Warrants, including any Shares that may be issued as a result of the consummation of a Drag-Along Sale, will be deemed to be subject to the provisions of this ~~Section 9.3~~Section 9.3.

(d)    The Dragging Seller shall have a period of one hundred twenty (120) days from the date of the Drag-Along Sale Notice to consummate the Drag-Along Sale on the terms and conditions set forth in such Drag-Along Sale Notice, provided that, if such Drag-Along Sale is subject to regulatory approval, such 120-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than 180 days following the date of the Drag-Along Sale Notice. If the Drag-Along Sale shall not have been consummated during such period, the Dragging Seller shall return to each of the Dragged Persons all applicable instruments such Dragged Persons delivered for Transfer pursuant hereto, together with any other documents in the possession of the Dragging Seller executed by the Dragged Persons in connection with such proposed Transfer, and all the restrictions on Transfer contained in this Agreement or otherwise applicable at such time with respect to such Shares held (directly or indirectly) by the Dragged Persons shall again be in effect.

(e)    Concurrently with the consummation of the Drag-Along Sale pursuant to this ~~Section 9.3~~Section 9.3, the Dragging Seller shall give notice thereof to the Dragged Persons, shall remit to each of the Dragged Persons that have surrendered the applicable instruments the total consideration (the cash portion of which is to be paid in accordance with such Dragged Person's instructions for payment) for the Shares of such Dragged Person Transferred pursuant

39

to this ~~Section 9.3~~Section 9.3 hereto (but subject to reduction for any applicable escrows or holdbacks and any transaction expenses as determined in ~~Section 9.4~~Section 9.4) and shall furnish such other evidence of the completion and time of completion of the Drag-Along Sale and the terms thereof as may be reasonably requested by such Dragged Persons.

(f)    Notwithstanding anything contained in this ~~Section 9.3~~Section 9.3, there shall be no liability on the part of the Dragging Seller to the Dragged Persons (other than the obligation to return the applicable instruments and documentation received by the Dragging Seller as set forth in ~~Section 9.3(d)~~Section 9.3(d)) or any other Person if the Drag-Along Sale pursuant to this ~~Section 9.3~~Section 9.3 is not consummated for whatever reason, regardless of whether the Dragging Seller has delivered a Drag-Along Sale Notice.  The decision to effect a Drag-Along Sale pursuant to this ~~Section 9.3~~Section 9.3 by the Dragging Seller shall be in the sole and absolute discretion of the Dragging Seller as are the terms of the Drag-Along Sale except, in the case of such terms, as otherwise set forth in this ~~Section 9.3 or Section 9.4~~Section 9.3 or Section 9.4.

(g)    <u>No Other Consideration</u>.  No Drag-Along Seller nor any of its Related Persons (which, for the avoidance of doubt, will not include any member of management or any employee of the Company or any Subsidiary thereof) shall receive any direct or indirect consideration in connection with a Company Sale to which this ~~Section 9.3~~Section 9.3 applies (including by way of fees, consulting arrangements or a non-compete payment) other than (i) consideration received in exchange for its Shares on the terms described in the Drag-Along Sale Notice, (ii) reimbursement of expenses on a *pro rata* basis (based on the consideration being received for the Shares) and (iii) customary arrangements that would not reasonably be considered as a means to circumvent the provisions of this ~~Section 9.3(g)~~Section 9.3(g), such as the indemnification of Managers.

(h)    The Drag-Along Seller may effect the Drag-Along Sale by means of a Business Combination, Share ~~Transfer~~Sale or Asset Sale or a combination thereof.

Section 9.4    *Additional Conditions to Tag-Along Sales and/or Drag-Along Sales*. Notwithstanding anything contained in ~~Section 9.2 or 9.3~~Section 9.2 or 9.3, the rights and obligations of the Tagging Persons to participate in a Tag-Along Sale under ~~Section 9.2~~Section 9.2 or a Dragged Person to participate in a Drag-Along Sale under ~~Section 9.3~~Section 9.3 are subject to the following conditions:

(a)    in the event the consideration to be paid in exchange for Shares pursuant to ~~Section 9.2(d)~~Section 9.2(d) includes any securities that are unregistered and a Member or Owner participating in such Tag-Along Sale  (other than the Tag-Along Seller or Dragging Seller) is not an Accredited Investor, the Tag-Along Seller shall cause to be paid to such Member or Owner in lieu thereof an amount in cash equal to the fair market value of the securities (as determined by the Board) that such Member or Owner would otherwise receive as of the date of the issuance of such securities in such Transfer;

(b)    no Tagging Person or Dragged Person, as the case may be, shall be obligated to pay any fees or expenses (other than its own) incurred in connection with any consummated or unconsummated Tag-Along Sale or any consummated or unconsummated

40

Drag-Along Sale, except each Tagging Person or Dragged Person, as the case may be, may be obligated to bear its *pro rata* share (based on the consideration paid for the Shares Transferred) of the reasonable documented out-of-pocket fees and expenses incurred by the Tag-Along Seller or the Drag-Along Seller in connection with a consummated Tag-Along Sale or Drag-Along Sale to the extent such fees and expenses are incurred for the benefit of all Tagging Persons or Dragged Persons, as the case may be, and are not otherwise paid by the Company or another Person; and

    (c)    in connection with any Tag-Along Sale or Drag-Along Sale, no Tagging Person or Dragged Person shall be required to (x) agree to a non-compete, non-solicit or other restrictive covenants or agreements (other than customary confidentiality obligations), (y) enter into a lock-up provision with respect to any freely tradeable and marketable securities received as consideration in a Drag-Along Sale, or (z) make any representation or warranty with respect to such Transfer other than with respect to customary "fundamental" matters relating to such Tagging Person or Dragged Person, including its organizational status, authority, its participation in the transaction, the number of Shares owned, its unencumbered ownership of its Shares and noncontravention of other material agreements (but not, for the avoidance of doubt, with respect to the Company) and shall not otherwise be liable for any indemnity obligation (other than severally in connection with any such representation and warranty it makes as to itself) that is not provided by escrow, purchase price adjustment, indemnity holdback or similar mechanism; provided, that the aggregate amount of liability described in this clause in connection with any Tag-Along Sale or Drag-Along Sale shall not exceed the lesser of (i) such Tagging Person or Dragged Person's *pro rata* portion of any such liability, to be determined in accordance with such Tagging Person or Dragged Person's portion of the aggregate proceeds received in connection with such transaction and (ii) the net proceeds received by such Tagging Person or Dragged Person in connection with such transaction, other than, in each case, in the case of actual and intentional fraud of such Tagging Person or Dragged Person.

    Section 9.5    *Conditions Applicable to All Transfers*.Notwithstanding anything to the contrary in ~~Section 3.3~~Section 3.3 or otherwise in this Agreement, no Transfer of Shares shall be recognized by the Company unless (i) such Transfer would not require registration under the Securities Act or violate any provisions of any applicable securities law or other Applicable Law; (ii) such Transfer would not violate either this Agreement or the laws, rules or regulations of any state or any Governmental Authority applicable to the transferor, the transferee or such Transfer; or (iii) such Transfer was not made to a Person who is the subject of any pending bankruptcy or insolvency proceedings, or to a Person who is a minor or who otherwise lacks legal capacity. For the avoidance of doubt, the term "Transfer" includes a transfer of Shares through DTC.

    (b)    The direct transferee (i.e., a transferee that holds the Shares directly after the Transfer and after taking into account ~~Section 3.2(c)~~Section 3.2(c) and not simply a Beneficial Interest therein) of any Shares Transferred in accordance with this ~~Article IX~~Article IX shall be admitted as a Member and shall be bound by this Agreement as a Member and Direct Owner. Any indirect transferee (i.e., a transferee that holds a Beneficial Interest in the Shares after the Transfer and after taking into account ~~Section 3.2(c)~~Section 3.2(c)) of Shares in accordance with this ~~Article IX~~Article IX shall be bound by this Agreement as a Beneficial Owner.

(c)     Notwithstanding anything to the contrary in this Agreement, a transferee in a Transfer not prohibited by this Agreement shall execute and deliver a Joinder to the Company (which may, at the Company's election, be on a "click-through" basis); provided that whether or not a Joinder is executed and delivered by a transferee, to the fullest extent permitted by Applicable Law, such transferee shall be deemed to have made the representations and warranties to the Company set forth in ~~Section 8.1~~Section 8.1 and to have become an Owner and be deemed to be subject to the terms and conditions of this Agreement applicable to Owners. Notwithstanding the foregoing or anything in this Agreement to the contrary, a transferor of Shares will not be relieved of any liability for a breach of the Transfer provisions hereunder.

(d)     Except as otherwise set forth in this Agreement, a transferring Member (other than Cede & Co.) or Owner will bear all costs for filing fees, applications, transfer, gains, stamp or similar taxes in connection with a Transfer by such Member or Owner (other than pursuant to a Drag-Along Sale) (collectively, "**Transfer Costs**"), and shall indemnify and hold harmless the Company for any such Transfer Costs; provided that all other costs and expenses related to Transfers, including relating to lender approvals or consents and other costs incurred by the Company (including by legal counsel to the Company) shall be borne by the Company.

(e)     All Shares issued to any Person that are certificated shall bear a legend (if certificated), or be evidenced by notations in a book entry system including a legend, in substantially the following form:

"THE SHARES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE, DISPOSITION, TRANSFER AND VOTING AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF REVLON GROUP HOLDINGS LLC (THE "COMPANY"), DATED AS OF [~~          ~~]MAY 2, 2023 AS MAY BE AMENDED AND MODIFIED FROM TIME TO TIME (THE "AGREEMENT"). UNLESS OTHERWISE APPROVED BY THE BOARD OF MANAGERS OF THE COMPANY, THE SHARES ARE REQUIRED TO BE HELD AND CLEARED THROUGH DTC. NO REGISTRATION OR TRANSFER OF SUCH SHARES WILL BE MADE ON THE BOOKS AND RECORDS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SHARES A COPY OF THE AGREEMENT CONTAINING THE ABOVE REFERENCED RESTRICTIONS UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS."

(f)     All Shares issued by the Company, unless such Shares were issued in reliance on the exemption from registration under the Securities Act provided by Section 1145 of the Bankruptcy Code or, as determined by the Board, another exemption such that the Transfer of such Shares is not restricted under U.S. federal securities law shall be evidenced by notations on the certificate, if any, representing such Shares or in the applicable book entry system including a legend in substantially the following form:

"THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE

42

SECURITIES LAW OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS. AS A CONDITION TO ANY TRANSFER, THE COMPANY RESERVES THE RIGHT TO REQUIRE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, THAT SUCH REGISTRATION IS NOT REQUIRED."

(g)     As a condition precedent to any Transfer of Shares bearing a restricted Securities Act legend, the Company may require an opinion of legal counsel reasonably satisfactory to it that registration under the Securities Act is not required; provided, the Company shall treat all similarly situated Owners and Members equally regarding whether to require an opinion. The Company can take such actions as it deems necessary to ensure compliance with the Securities Act, including establishing one or more separate CUSIP numbers for Shares that may be restricted under U.S. federal securities law. Taking into account Applicable Law, the Company shall use commercially reasonable efforts (at the Company's sole cost and expense) to remove the legend set forth in ~~Section 9.5(f)~~Section 9.5(f) above from Shares bearing the same from and after one (1) year following the issuance of such Shares.

(h)     The Board may make any necessary modifications to the legends set forth in ~~Section 9.5(e) and Section 9.5(f)~~Section 9.5(e) and Section 9.5(f) for such legends to comply with Applicable Law and to achieve the purpose and intent of the Transfer restrictions set forth herein. If any Shares cease to be subject to any and all restrictions on Transfer set forth in this Agreement, the Board, upon the written request of the holder thereof, shall amend the notations in the book entry system (or, if certificated, issue to such holder a new certificate) evidencing such Shares accordingly.

(i)     Transfers of Shares and admission of transferees as Members or Direct Owners or Beneficial Owners in accordance with this ~~Article IX~~Article IX shall not be considered to be a Related Party Transaction, regardless of the identity of the transferor or transferee.

<div align="center">ARTICLE X</div>
<div align="center">INDEMNIFICATION AND EXCULPATION</div>

Section 10.1    *Indemnification and Exculpation.*

(a)     To the fullest extent permitted by law, the Company shall indemnify, hold harmless and defend each Covered Person from and against any and all losses, claims, damages, liabilities, whether joint or several, expenses (including legal fees and expenses), judgments, fines and amounts paid in settlement (collectively, "**Indemnified Losses**"), incurred or suffered by such Covered Person, as a party or otherwise, in connection with any threatened, pending or completed claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, whether formal or informal, and whether or not by or in the right of the Company, arising out of or in connection with any act or omission, or alleged act or omission, performed or

<div align="center">43</div>

omitted to be performed by such Covered Person in connection with or in any way related to the business or the operation of the Company or any Subsidiary of the Company, unless it is determined in a final, non-appealable judgment of a court of competent jurisdiction that the Indemnified Losses were the result of such Covered Person's Malfeasance. Notwithstanding the foregoing, other than any claim to enforce its rights under this ~~Article X~~Article X, the Company shall not be obligated to indemnify any Covered Person in connection with any action, suit or proceeding initiated by such Covered Person unless the initiation of such action, suit or proceeding is approved by the Board.

(b)    No Covered Person shall be liable to the Company or to any Owner or Member for any loss or damage sustained by the Company or any Owner or Member, unless it is determined in a final, non-appealable judgment of a court of competent jurisdiction that the loss or damage shall have been the result of such Covered Person's Malfeasance. The negative disposition of any claim, demand, action, suit or proceeding, whether civil, criminal, administrative or investigative, whether formal or informal, and whether by or in the right of the Company, by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Covered Person acted in a manner contrary to the standard set forth in the previous sentence.

(c)    To the fullest extent permitted by Applicable Law, costs and expenses (including attorneys' fees and expenses) incurred by a Covered Person in defending or otherwise participating in any claim, demand, action, suit or proceeding subject to this Section shall be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount in the event it is ultimately determined that the Covered Person is not entitled to be indemnified therefor pursuant to this ~~Section 10.1~~Section 10.1.

(d)    The Company hereby acknowledges that certain of the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by one or more other Persons (but not including any such other Person to the extent such Person would have an obligation to provide indemnification, advancement of expenses and/or insurance pursuant to a contractual obligation to the Company or any of its Subsidiaries) (collectively, the "**Secondary Indemnitors**"), which may include Persons who employ a Covered Person or of which a Covered Person is a partner or member or whose respective Affiliates, affiliated investment funds, managed funds and management companies, if applicable, have such Covered Person as a partner or member. The Company hereby agrees (i) that it is the indemnitor of first resort in respect of the matters in this ~~Section 10.1~~Section 10.1 (i.e., the Company's obligations to each Covered Person are primary and any obligation of the Secondary Indemnitors to advance expenses and/or provide indemnification for the same expenses and liabilities incurred by Covered Persons are secondary) and (ii) that it shall be required to advance the full amount of expenses incurred by Covered Persons and shall be liable for the full amount of any Indemnified Losses to the extent legally permitted and as required by the terms of this Agreement or any other agreement between the Company and the relevant Covered Person, without regard to any rights that such Covered Person may have against any Secondary Indemnitor. The Company further agrees that no advancement or payment by any Secondary Indemnitor shall affect the foregoing and that any relevant Secondary Indemnitors shall be subrogated to the extent of such advancement or payment to all of the rights of recovery of the relevant Covered Persons against

44

the Company. The Company and each Covered Person agree that the Secondary Indemnitors are express third party beneficiaries of this ~~Section 10.1~~Section 10.1.

(e)    The indemnification provided by this ~~Section 10.1~~Section 10.1 shall be in addition to any other rights to which any Covered Person may be entitled under this Agreement or any other agreement with the Company or any other Person, as a matter of law or otherwise, and shall inure to the benefit of the heirs, legal representatives, successors, assigns and administrators of the Covered Person.

Section 10.2    *Insurance*. The Company may purchase and maintain insurance on behalf of any Person who is or was a Manager, officer, employee or agent of the Company, or is or was serving at the request of the Company as a Manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss incurred by such person in any such capacity or arising out of such Person's status as such, whether or not the Company would have the power to indemnify such Person against such liability under Applicable Law or this ~~Article X~~Article X.

Section 10.3    *Rights to Rely on Legal Counsel, Accountants; Other Matters*.

(a)    No Covered Person shall be liable, responsible or accountable in damages or otherwise to the Company or any Owner or Member for any performance or omission to perform any acts in reliance on the advice of accountants or legal counsel for the Company.

(b)    The Company may, by action of its Board, provide indemnification to such of the officers, Managers, directors, managers, employees, agents or other representatives of the Company and its Subsidiaries, and such other Persons as the Board may determine, in each case, to such extent and to such effect as the Board shall determine to be appropriate.

(c)    Neither the amendment nor repeal of this ~~Article X~~Article X, nor, to the fullest extent permitted by the Act, any modification of law, shall adversely affect any right or protection of any Person granted pursuant hereto existing at, or arising out of or related to any event, act or omission that occurred prior to, the time of such amendment, repeal, adoption or modification (regardless of when any proceeding (or part thereof) relating to such event, act or omission arises or is first threatened, commenced or completed).

(d)    The indemnification obligations set forth in this ~~Article X~~Article X shall survive the termination of this Agreement.

ARTICLE XI
BOOKS OF ACCOUNT; INFORMATION RIGHTS; CONFIDENTIALITY

Section 11.1    *Maintenance of Books; Reports*.

(a)    The Board shall maintain, or cause to be maintained, at the principal office of the Company (or such other place determined by the Board) appropriate books and records with respect to the Company's business. Any books and records maintained by or on behalf of the Company in the regular course of its business, including the records of the Members and the Owners of the Shares, books of account and records of Company proceedings, may be kept on,

45

or be in the form of, computer disks, hard drives, magnetic tape, photographs, micrographics or any other information storage device; provided, that the books and records so maintained are convertible into clearly legible written form within a reasonable period of time.  The books and records of the Company shall be maintained, for financial reporting purposes, as determined by the Board.

(b)    To the fullest extent permitted under Applicable Law, the Owners and Members hereby waive any right to obtain any information (including books, records and other documents) from the Company and, pursuant to Section 18-305(g) of the Act, the Owners and Members shall only have such rights to obtain information relating to the Company (including books, records and other documents) as expressly provided in Section 11.1(c)).

(c)    Financial Information.  Notwithstanding ~~Section 11.1(b)~~Section 11.1(b), Members and Owners (in each case other than Competitors) shall have access to, or be provided with, the following; provided, that (A) prior to the receipt by any Member or Owner of any of the documents set forth in clauses (i) through (iii) below or access to the call described in clause (iv) below, such Member or Owner shall have delivered to the Company (x) a customary non-disclosure agreement (which may be on a "click-through" basis) in a form reasonably acceptable to the Board and (y) a Joinder or other acknowledgement in writing (which may, at the Company's election, be on a "click-through" basis) that such Member or Owner has received a copy of this Agreement and acknowledges that it is bound by the terms and conditions of this Agreement (including among others all applicable restrictions on Transfers and the provisions of ~~Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2~~Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2) as an "Owner" and (B) the documents set forth in clauses (i) through (iii) below shall be provided pursuant to the Datasite):

(i)    [within [90]] days after the end of each Fiscal Year, commencing with the fiscal year ending December 31, [2023], (A) a copy of the audited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form the figures as of the end of and for the previous year, in each case, in accordance with GAAP, and (B) a management's discussion and analysis of the material operational and financial developments during such Fiscal Year;

(ii)    within 45 days [(or 75 days, in the case of the fiscal ~~quarter~~quarters of the Company ending March 31, 2023 and June 30, 2023)] after the end of each of the first three quarterly periods of each Fiscal Year of the Company, commencing with the fiscal quarter ending [●]March 31, [2023], (A) the unaudited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, in each case in accordance with GAAP (subject to normal year-end audit

46

adjustments and the lack of complete footnotes) and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal quarter]⁶;

(iii)    whether or not the Company is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, within 5 Business Days from the occurrence of the relevant event, information substantially similar to the information that would have been required to be reported on a Current Report on Form 8-K if the Company were subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, under any of the following items of Form 8-K: Item 1.01 (Entry into a Material Definitive Agreement), Item 2.02 (Termination of a Material Definitive Agreement), Item 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisitions or Dispositions of Assets), Item 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), Item 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), Item 4.01 (Changes in Registrant's Certifying Accountant), Item 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review), Item 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers) (but in this case only as it relates to the appointment or departure of any Manager or the Chief Executive Officer or Chief Financial Officer of the Company); and

(iv)    a quarterly "earnings call" which shall take place as promptly as reasonably practicable after the distribution of the financial statements for the applicable quarter, which shall include a reasonable opportunity for questions from Owners; provided, that the Company shall provide the date and dial-in information for such call and post such information to the Datasite at least three (3) days prior to such call.

(d)    The Company shall satisfy its obligations under ~~Section 11.1(c)(i)~~Section 11.1(c)(i) through ~~Section 11.1(c)(ii)~~Section 11.1(c)(i) by providing each Owner access to a confidential website such as Intralinks or Epiq and timely posting such information on such website (the "**Datasite**"), which Datasite will be accessible as promptly as practicable following the Effective Date.

(e)    Information to Prospective Purchasers.  A Member or Owner (including a Tag-Along Seller or a Dragging Seller) may provide the information provided pursuant to ~~Section 11.1(c)(i)~~Section 11.1(c)(i) through ~~Section 11.1(c)(ii)~~Section 11.1(c)(i) or any other Confidential Information to any *bona fide* prospective ~~transferees~~purchasers (other than Competitors (except in the case of a Drag-Along Sale)) as follows: the Member or Owner will give notice (or cause notice to be delivered) to the Company of the proposed transferees and the Company will then send to the prospective purchaser by e-mail or other electronic communication a link to a website or other portal from which the applicable information and a copy of this Agreement may be accessed subject to (i) the execution by the prospective purchaser and the Company of a customary non-disclosure agreement in favor of the Company in a form reasonably acceptable to the Board (which may, at the Company's election, be on a

---

⁶ ~~To be conformed to any changes to equivalent Credit Agreement provisions.~~

"click-through" basis) and (ii) an acknowledgement in writing (which may, at the Company's election, be on a "click-through" basis) from such prospective purchaser that such prospective purchaser has received a copy of this Agreement and acknowledges that such prospective purchaser will be bound by the terms and conditions of this Agreement (including among others all applicable restrictions on Transfers and the provisions of ~~Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2~~Article VII, Article VIII, Article IX, Section 11.1(e), and Section 11.2) as an "Owner" if such prospective purchaser acquires any Shares whether or not it executes a Joinder.

(f)    The Board may authorize the Company to make such information available as the Board approves to one or more Owners or Members and Related Persons as determined by the Board, and the fact that information was not provided to any such Owner or Member and Related Persons will not entitle the other Owners or Members to the same information.

(g)    Upon the request of any Key Owner Committee Member or Designating Key Owner from time to time, the Company shall make available in the Datasite all information that would constitute material non-public information that has been provided by the Company to such Key Owner Committee Member or Designating Key Owner or their respective Representatives and that is not otherwise in the Datasite or publicly available.

Section 11.2    *Confidentiality*.

(a)    *General*.  Except as permitted pursuant to a written consent provided by the Company, each Owner, Member and their respective Affiliates shall, during the term of this Agreement and for eighteen (18) months thereafter, keep the Confidential Information confidential and use the Confidential Information only in connection with the transactions contemplated by this Agreement, its investment in the Company, and exercising and enforcing its rights under this Agreement; provided that nothing herein shall prevent any Owner, Member or their respective Affiliates from disclosing Confidential Information:

(i)    to the extent required or requested by any order of any court or administrative agency, or as may be required by Applicable Law in response to any summons or subpoena or in connection with any litigation;

(ii)    to the extent required by Applicable Law or by the regulations, rules or policies of any applicable regulatory or self-regulatory body;

(iii)    to the extent necessary in connection with the exercise of any remedy hereunder or as may be necessary in a claim in aid of arbitration, or to obtain urgent measures or protection, or for enforcement of an arbitral award;

(iv)    to such Owner's or Member's (or its Related Persons') Representatives that need to know such information and whom such Owner, Member or Related Person, as applicable, shall instruct to observe the terms of this ~~Section 11.2~~Section 11.2;

        (v)     as may be required in connection with an audit by any taxing authority;

        (vi)    in accordance with ~~Section 11.1(e)~~Section 11.1(e); and

        (vii)   to the extent required to be included in tax returns or financial statements (including footnotes thereto) or other required governmental filings or provided in connection with general examinations of such Person not specifically related to the ownership of Shares;

provided that, in the case of sub-sections ~~(i)~~(i), ~~(ii)~~(ii) and ~~(v)~~(v), such Owner or Member shall (with any costs and expenses related thereto to be the sole responsibility of the Company) (A) notify the Company of the proposed disclosure as far in advance of such disclosure as is reasonably practicable and legally permissible, (B) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment when and if available, (C) limit the disclosure to that required by law and, to the extent permitted under Applicable Law, ensure that the name, address and all other identifying information of the other Owners and Members and their respective Affiliates shall first be redacted, removed or omitted as appropriate, (D) to the extent practicable, take into account the comments of the Company in respect of such disclosure, (E) reasonably cooperate with the Company in protecting against disclosure, and (F) take reasonable efforts to obtain assurances that confidential treatment will be accorded to the disclosed Confidential Information; and provided, further, that notwithstanding anything to the contrary in this Agreement, each Owner and each Member (and any employee, representative, or other agent of such Owner or Member) may disclose to any and all Persons, without limitation of any kind, information regarding the U.S. federal tax treatment and tax structure of the transactions contemplated by this Agreement; provided, however, that information regarding the U.S. federal tax treatment and tax structure of the transactions contemplated by this Agreement shall not include the name, address or other identifying information of the other Owners and Members and their respective Affiliates.

        (b)    *Press Release; Communications*.  Any general notices, releases, statements or communications to the general public or the press relating to this Agreement and/or any related documents and/or, to the extent related thereto, the Members and Owners and/or their Affiliates, and/or the transactions contemplated by any of the foregoing and/or the business or management of the Company, shall be made only at such times and in such manner as determined by the Board; provided that an Owner or Member may disclose to third parties that it is a Member or Owner of the Company.

## ARTICLE XII
### DURATION AND TERMINATION OF COMPANY

Section 12.1  *Events Causing Dissolution and Winding Up*.  The Company shall be dissolved only upon the occurrence of any of the following events ("**Dissolution Event**"):

        (a)    an election to dissolve the Company by the Board that is approved by the affirmative vote of a majority of the votes cast on the matter by the Members;

(b)     the final decree of judicial dissolution of the Company under Section 18-802 of the Act; and

(c)     the Company ceasing to have any Members, unless a Person is admitted as a Member to the Company and the Company is continued without dissolution in accordance with the Act.

The bankruptcy, insolvency or dissolution of an Owner or Member, as applicable, shall not, in and of itself, cause the Owner or Member, as applicable, to cease to be an Owner or Member, as applicable, of the Company and, upon the occurrence of such an event, the business of the Company shall continue without dissolution.

Section 12.2   *Liquidation and Winding Up*.  Upon the occurrence of a Dissolution Event, the Company shall be liquidated and the Board (or other Person designated by the Board or a decree of court) shall wind up the affairs of the Company.  In such case, the Board (or such other Person designated by the Board or a decree of court) shall have the authority, in its sole and absolute discretion, to sell the Company's assets and properties or distribute them in kind. The Board or other Person winding up the affairs of the Company shall promptly proceed to the liquidation of the Company. In proceeding with the winding-up process, it is the Members' and Owners' objective that the winding-up process for the Company shall be completed within three years following the sale of the Company's last asset (assuming that the Company and its Subsidiaries are not then parties to any outstanding litigation which has not been resolved). In a liquidation, the assets and property of the Company shall be distributed in the following order of priority:

(a)     to creditors of the Company, including Members and Owners who are creditors, to the extent otherwise permitted by Applicable Law, in satisfaction of the liabilities of the Company (whether by payment or the making of reasonable provision for payment thereof); and

(b)     the balance, if any, to each Member on a *pro rata basis* among Members (based on Shares held directly, it being understood that the treatment of distributions to Cede & Co. are addressed in ~~Section 3.5(f)~~Section 3.5(f)), subject to the preferential or other rights of any Members of other Equity Securities then outstanding.

Section 12.3   *Certificate of Formation*.  Upon the completion of the winding up of the Company, including the distribution of Company cash and property as provided in ~~Section 12.2~~Section 12.2 in connection with the liquidation of the Company, the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware shall be canceled and such other actions as may be necessary to terminate the Company's existence shall be taken by the Board or such other Person winding up the affairs of the Company.

Section 12.4   *Waiver of Partition*.  To the maximum extent permitted by Applicable Law, each Owner and Member hereby waives any right to partition of the Company property.

Section 12.5   *Termination of the Agreement* .  All provisions of this Agreement shall terminate upon the earlier to occur of (i) termination of the Company in accordance with

50

Applicable Law or (ii) the consummation of an IPO of the Company (or its successor entity pursuant to ~~Section 7.1~~Section 7.1), except as expressly provided otherwise herein (including in ~~Section 7.2, Section 7.3, Section 10.3(d), and Section 11.2~~Section 7.2, Section 7.3, Section 10.3(d), and Section 11.2) and no termination will relieve any Party of any liability or any breach prior to termination.

ARTICLE XIII
GENERAL

Section 13.1  *Choice of Law*.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

Section 13.2  *Forum, Venue and Jurisdiction*.

(a)     Except as otherwise set forth in ~~Section 6.8~~Section 6.8, each Member and each Owner:

(i)     irrevocably agrees that, unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any claims, suits, actions or proceedings (A) arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce the provisions of this Agreement or the duties, obligations or liabilities among Members or Owners or of Members or Owners to the Company, or the rights or powers of, or restrictions on, the Owners, Members or the Company), (B) brought in a derivative manner on behalf of the Company, (C) asserting a claim of breach of a duty owed by any Manager, officer or other employee of the Company or any Covered Person, (D) asserting a claim arising pursuant to any provision of the Act or (E) asserting a claim governed by the internal affairs doctrine, in each case regardless of whether such claims, suits, actions or proceedings sound in contract, tort, fraud or otherwise, are based on common law, statutory, equitable, legal or other grounds, or are derivative or direct claims; <u>provided</u>, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or proceedings for lack of subject matter jurisdiction, such claims, suits, actions or proceedings may be brought in another state or federal court sitting in the State of Delaware;

(ii)     irrevocably submits, unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware in connection with any such claim, suit, action or proceeding; <u>provided</u>, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or proceedings for lack of subject matter jurisdiction, it irrevocably submits to the exclusive jurisdiction of any state or federal court sitting in the State of Delaware;

(iii)     irrevocably agrees not to, and irrevocably waives any right to, assert in any such claim, suit, action or proceeding that it is not personally subject to the jurisdiction of the Court of Chancery of the State of Delaware (unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum) or of any

other court to which proceedings in the Court of Chancery of the State of Delaware may be appealed (unless the Company (through the approval of the Board) consents in writing to the selection of an alternative forum); <u>provided</u>, that if and only if the Court of Chancery of the State of Delaware dismisses any such claims, suits, actions or proceedings for lack of subject matter jurisdiction, then it irrevocably agrees not to, and irrevocably waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of any state or federal court sitting in the State of Delaware, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper; and

(iv)    consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address in effect for notices hereunder, and agrees that such services shall constitute good and sufficient service of process and notice thereof; <u>provided</u>, that nothing in this ~~Section 13.2~~<u>Section 13.2</u> shall affect or limit any right to serve process in any other manner permitted by Applicable Law.

(b)    *Specific Enforcement.* Each party acknowledges that the remedies at law of the other parties for a breach or threatened breach of this Agreement may be inadequate and, in recognition of this fact, any party, without posting any bond, and in addition to all other remedies that may be available, shall be entitled to seek equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy that may then be available.

(c)    *Waiver of Jury Trial*.    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.3    *Notices*.  Any notice, demand, request, report, information or document (each, a "**Notice**") required or permitted to be given or made to a Member or Owner under this Agreement shall be in writing and shall be deemed given or made when delivered in person or when sent by first class United States mail or by other means of written communication to the Member or Owner at the address set forth in the Company records or to Cede & Co. at the address set forth in its signature page to this Agreement, as applicable (provided that if a Notice is delivered to Cede & Co., the Company shall post a copy of such Notice to the Datasite on the same day as delivery to Cede & Co.). Any Notice or payment shall be deemed conclusively to have been given or made to the Member or Owner, and any obligation to give such Notice or to make such payment shall be deemed conclusively to have been fully satisfied, upon sending of such Notice or payment to the Member or Owner of such Shares at its address as shown on the records of the Company or to Cede & Co. (provided that if a Notice is delivered to Cede & Co., the Company shall post a copy of such Notice to the Datasite on the same day as delivery to Cede & Co.) at the address set forth in its signature page to this Agreement (or, in the case of access via the Internet as set forth in the following sentence, upon sending the e-mail set forth in the following sentence), regardless of any claim of any Person who may have an interest in such Shares by reason of any assignment or otherwise. Notwithstanding the foregoing, any such

Notice shall be deemed given or made if it is made available via the Datasite (including if access is available only by the Member or Owner agreeing to a customary non-disclosure agreement on a "click-through" basis) and e-mail notice of such availability is sent to the Member or Owner at the e-mail address set forth in the Company records. An affidavit or certificate of making or giving of any Notice or payment in accordance with the provisions of this ~~Section 13.3~~Section 13.3 executed by the Company, a Manager or the mailing organization shall be *prima facie* evidence of the giving or making of such Notice or payment.  If any Notice or payment addressed to a Member or Owner at the address appearing on the books and records of the Company is returned by the United States Postal Service marked to indicate that the United States Postal Service is unable to deliver it, such Notice or payment and any subsequent Notice or payment shall be deemed to have been duly given or made without further mailing (until such time as such Member or Owner, or another Person notifies the Company of a change in the address of such Member or Owner) if they are available for the Members or Owners at the principal office of the Company for a period of one year from the date of the giving or making of such Notice or payment to the other Members and Owners. If the e-mail notice of access via the Datasite is properly sent in accordance with the sentence two sentences above and the e-mail is not received (and regardless of whether a "bounce back" message is received), such Notice and any subsequent Notices shall be deemed to have been duly given or made without further e-mailing (until such time as such Member, Owner or another Person notifies the Company of a change in the e mail address of such Member or Owner.) if they are available for the Members and Owners at the principal office of the Company for a period of one year from the date of the giving or making of such Notice to the other Members and Owners.

Any notice to the Company shall be deemed given if received by the Company at the principal office of the Company designated pursuant to ~~Section 2.5~~Section 2.5. The Board may rely on and shall be protected in relying on any notice or other document from a Member, Owner or other Person if believed by it to be genuine. The terms "in writing," "written communications," "written notice" and words of similar import shall be deemed satisfied under this Agreement by use of e-mail and other forms of electronic communication. Notwithstanding the foregoing, if the Shares are issued through DTC, such Notices will also be given or made concurrently to the indirect holders of such Shares through the Datasite.

Section 13.4  *Further Action*.  The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

Section 13.5  *Amendment; Waiver*.

(a)  Except as otherwise specifically provided herein, this Agreement may be amended, restated or modified from time to time only with the prior written consent of the Company and Owners holding not less than a majority of the Shares then outstanding; <u>provided</u>, that (i) any amendment, restatement or modification to any of ~~Section 3.4~~Section 3.4 (Preemptive Rights), ~~Section 3.6~~Section 3.6 (Liability of Owners and Members), ~~Section 6.7~~Section 6.7 (Waiver of Corporate Opportunities), ~~Section 6.8~~Section 6.8 (Waivers; Burden of Proof), ~~Article IX~~Article IX (Transfers), ~~Article X~~Article X (Indemnification and Exculpation), ~~Section 11.1(c)~~Section 11.1(c)  (Financial Information), ~~Section 11.1(e)~~Section 11.1(e) (Information to Prospective Purchasers) or to any of the defined terms in ~~Section 1.1~~Section 1.1

(Definitions) that are defined or used in any of the foregoing Sections or Articles to the extent used in any of the foregoing Sections or Articles, shall require the consent of the Company and Owners holding not less than two-thirds of the Shares then outstanding; (ii) any amendment, restatement or modification of this Agreement that adversely affects the rights of any Key Owner Committee Member (prior to the Key Owner Committee Termination Date) or Designating Key Owner (prior to the Designating Key Owner Termination Date) shall require the prior written consent of such Key Owner Committee Member or Designating Key Owner, as applicable, (iii) any amendment, restatement or modification that materially and adversely affects a particular Owner (in its capacity as an owner of Shares) (a "**Disproportionately Affected Owner**") in a manner disproportionate to the manner in which it affects other Owners (in their capacities as owners of Shares) shall also require the prior written consent of such Disproportionately Affected Owner (provided that if any amendment, restatement or modification materially and adversely affects a group of Disproportionately Affected Owners in a similar manner, such amendment, restatement or modification shall for purposes of this clause (iii) require only the prior written consent of Disproportionately Affected Owners holding not less than two-thirds of the Shares held by such Disproportionately Affected Owners), (iv) any amendment, restatement or modification of any clause of this ~~Section 13.5~~Section 13.5, or any other provision of the Agreement, that provides for the approval of a given Owner or group of Owners or approval by at least a specified percentage of Shares held by Owners shall also require approval of that Owner or group of Owners or at least that specified percentage of Shares held by Owners, as applicable.

(b)     Unless expressly set forth herein, no provision of this Agreement may be waived except pursuant to a written instrument signed by the party or parties hereto against whom enforcement of such waiver is sought; provided that the Company shall not waive compliance of any obligation of any Member or Owner to the Company under this Agreement unless the Company waives compliance of such obligation for all similarly situated Members or Owners on a *pro rata* basis. The waiver by any party of any provision of this Agreement is effective only in the instance and only for the purpose that it is given and does not operate and is not to be construed as a further or continuing waiver of such provision or as a waiver of any other provision.  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

Section 13.6    *Headings*.  The headings of the articles, sections and subsections of this Agreement are inserted for convenience of reference only and shall not be deemed to constitute a part hereof or affect the interpretation hereof.

Section 13.7    *Counterparts*.  This Agreement may be executed in several counterparts, each of which be deemed an original but all of which shall constitute one and the same instrument.   An electronic PDF or electronic signature of an executed counterpart of this Agreement shall be deemed an original. For the avoidance of doubt, a Person's execution and delivery of this Agreement by electronic signature and electronic transmission, including via DocuSign or other similar method, shall constitute the execution and delivery of a counterpart of this Agreement by or on behalf of such Person and shall bind such Person to the terms of this Agreement.   This  Agreement  and  any  additional  information  incidental  hereto  may  be

maintained as electronic records. At the request of any party, each other party will re-execute original forms thereof and deliver them to the requesting party. No party will raise the use of a facsimile machine or other electronic transmission as a defense to the formation or enforceability of a contract and each party forever waives any such defense.

Section 13.8    *Severability*.  Every term and provision of this Agreement is intended to be severable.  If any term or provision hereof is held to be illegal, invalid or unenforceable for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by Applicable Law and, in any event, such illegality, invalidity or unenforceability shall not affect the legality, validity or enforceability of the remainder of this Agreement, provided, however, that the Owners and Members shall negotiate in good faith to amend this Agreement to modify any such illegal, invalid or unenforceable provision in order to carry out the Owners' and Members' intent and agreement as embodied herein to the maximum extent permitted by law.

Section 13.9    *Binding Agreement; No Third Party Beneficiaries*.  This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and successors and nothing herein, express or implied, is intended to or shall confer upon any other Person, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement (other than pursuant to ~~Section 6.8 and Article X~~Section 6.8 and Article X hereof).

Section 13.10    *Assignment*.  Except as specifically provided herein, no party under this Agreement may assign its rights and obligations hereunder without the prior written consent of the Board; provided, however that upon a Transfer by a Member or Owner of its ownership of Shares in compliance with this Agreement, its rights and obligations under this Agreement to the extent related to such Shares will be assigned to and assumed by the transferee but no such assignment and assumption will release any transferor or Member or Owner of any liability for any prior breach of the Agreement or of its obligations under ~~Section 13.3~~Section 13.3.

Section 13.11    *Reliance by Third Parties*.  Notwithstanding anything to the contrary in this Agreement, any Person dealing with the Company shall be entitled to assume that the Board and any officer authorized by the Board to act on behalf of and in the name of the Company has full power and authority to encumber, sell or otherwise use in any manner any and all assets of the Company and to enter into any authorized contracts on behalf of the Company, and such Person shall be entitled to deal with the Board or any officer as if it were the Company's sole party in interest, both legally and beneficially. In no event shall any Person dealing with the Board or any officer or their respective representatives be obligated to ascertain that the terms of this Agreement have been complied with or to inquire into the necessity or expediency of any act or action of the Board or any officer or their respective representatives. Each and every certificate, document or other instrument executed on behalf of the Company by the Board or any officer or their respective representatives shall be conclusive evidence in favor of any and every Person relying thereon or claiming thereunder that (a) at the time of the execution and delivery of such certificate, document or instrument, this Agreement was in full force and effect, (b) the Person executing and delivering such certificate, document or instrument was duly authorized and empowered to do so for and on behalf of the Company and (c) such certificate, document or

55

instrument was duly executed and delivered in accordance with the terms and provisions of this Agreement and is binding upon the Company.

Section 13.12 *No Partition*.  Except as otherwise expressly provided in this Agreement, each of the Owners and Members in such capacity hereby irrevocably waives any right or power that such Owners or Members might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any Applicable Law, or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation or termination of the Company.  Each of the Owners and Members has been induced to enter into this Agreement in reliance upon the waivers set forth in this ~~Section 13.12~~Section 13.12, and without such waivers, no Owner or Member would have entered into this Agreement.  No Owner or Member shall have any interest in any specific assets of the Company.

Section 13.13 *Non-Recourse*.  Notwithstanding anything to the contrary contained in this Agreement, recourse for the payment or performance of the obligations of any Member or Owner under the terms of this Agreement shall be limited solely to the Member or Owner and no direct or indirect member, partner, shareholder, principal, officer, Manager, employee or affiliate of a Member or Owner shall have any personal liability for the payment or performance of any obligations under this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**REVLON GROUP HOLDINGS LLC**

By: _____

Name: Matthew Kvarda

Title:   Interim Chief Financial Officer

## EXHIBIT A

FORM OF GLOBAL CERTIFICATE
-EVIDENCING-
SHARES
-IN-

## REVLON GROUP HOLDINGS LLC

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUIRED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO VARIOUS CONDITIONS INCLUDING CERTAIN RESTRICTIONS ON ANY OFFER, SALE, DISPOSITION, TRANSFER AND VOTING AS SET FORTH IN THE AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF REVLON GROUP HOLDINGS LLC (THE "COMPANY"), DATED AS OF [————]MAY 2, 2023, AS MAY BE AMENDED OR AMENDED AND RESTATED FROM TIME TO TIME (THE "AGREEMENT"). UNLESS OTHERWISE APPROVED BY THE BOARD OF MANAGERS OF THE COMPANY, THE SHARES ARE REQUIRED TO BE HELD AND CLEARED THROUGH DTC. NO REGISTRATION OR TRANSFER OF SUCH SHARES WILL BE MADE ON THE BOOKS AND RECORDS OF THE COMPANY UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE COMPANY WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF SUCH SHARES A COPY OF THE AGREEMENT CONTAINING THE ABOVE REFERENCED RESTRICTIONS UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

This is to certify that CEDE & CO. is the owner and registered holder of this Certificate evidencing the ownership of the number of limited liability company interests in REVLON GROUP HOLDINGS LLC, a Delaware limited liability company (the "Company").

At the request of the registered holder this Certificate may be exchanged for one or more Certificates issued to the registered holder in such denominations as the registered holder may request.

The Company may deem and treat the person in whose name this Certificate is registered upon the books of the Company as the owner hereof for all purposes and the Company shall not be affected by any notice to the contrary.

**IN WITNESS WHEREOF**, the Company has caused this Certificate to be executed in its name by the manual or facsimile signature of one of its authorized signatories.

**REVLON GROUP HOLDINGS LLC**

By:   _____
Name:
Title:

Exhibit B
Form of Registration Rights Agreement

~~Privileged & Confidential~~
~~Attorney Work Product~~

## FORM OF REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "*Agreement*") is made and entered into as of [●], [●], by and among Revlon Group Holdings LLC, a Delaware limited liability company (the "*Company*"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto.

WHEREAS, the Company and certain affiliated debtors filed the Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code on March 31, 2023, which was confirmed by the United States Bankruptcy Court for the Southern District of New York on April 3, 2023 (as may be amended, supplemented, or otherwise modified from time to time, including all exhibits, schedules, supplements, appendices, annexes, and attachments thereto, the "*Plan*"); and

WHEREAS, the Plan provides that the Company may enter into registration rights agreements; and

WHEREAS, the Company and the Holders (as defined below) are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.    **Definitions.** Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in Section 16(c).

"*Affiliate*" means, with respect to any Person, or any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person). For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person means the possession, directly or indirectly (including through one or more intermediaries), of the power or authority to direct or cause the direction of management of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Recitals.

"*Alternative IPO Entity*" has the meaning set forth in Section 2(i).

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

"*Bankruptcy Code*" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as may be amended from time to time.

"*beneficially own*" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company or any authorized committee thereof.

"*Bought Deal*" has the meaning set forth in Section 8(a).

"*Business Day*" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are authorized or required by law to be closed.

"*Commission*" means the Securities and Exchange Commission.

"*Company*" has the meaning set forth in the Preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the one law firm selected by the Holders holding a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Offering, the one law firm selected by the Majority Holders.

"*Demand Registration*" has the meaning set forth in Section 5(a).

"*Demand Registration Request*" has the meaning set forth in Section 5(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Form S-1*" means Form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

2

"*Form S-3*" means Form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

"*Form S-4*" means Form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

"*Form S-8*" means Form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"*FINRA*" has the meaning set forth in Section 10.

"*Grace Period*" has the meaning set forth in Section 7(a)(B).

"*Holder*" or "*Holders*" means any holder of Registrable Securities that is also a party signatory to this Agreement, other than the Company, and their respective assignees and/or transferees permitted hereunder. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in Section 12(c).

"*Indemnifying Party*" has the meaning set forth in Section 12(c).

"*Initial Public Offering*" means (i) an initial direct listing of the Reorganized Revlon Common Shares or any equity interest of any successor to, or Affiliate of, the Company formed for the purpose of pursuing an initial public offering or any other Alternative IPO Entity (such equity interests, together with any equity interests referenced in clause (iii) below, "*Successor Equity*") that results in such Reorganized Revlon Common Shares or Successor Equity being listed on the New York Stock Exchange or the Nasdaq Stock Market LLC, (ii) an underwritten offering which is an initial public offering of the Reorganized Revlon Common Shares or Successor Equity pursuant to an effective Registration Statement filed under the Securities Act that results in such Reorganized Revlon Common Shares or Successor Equity being listed on the New York Stock Exchange or the Nasdaq Stock Market LLC (which excludes, among others, a registration of Reorganized Revlon Common Shares or Successor Equity (A) pursuant to a registration statement on Form S-8 (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee equity plan or other employee benefit arrangement), (B) pursuant to a registration statement on Form S-4 (or similar form that relates to a transaction subject to Rule 145 under the Securities Act or any successor rule thereto), or (C) in connection with any dividend reinvestment or similar plan), or (iii) the closing of a business combination (in the form of a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination) with or into a special purpose acquisition company or "blank-check" company (or a subsidiary thereof) (collectively, a "*SPAC*") after which the Reorganized Revlon Common Shares, the common equity securities of the SPAC or a subsidiary thereof, or any other Successor Equity are listed on the New York Stock Exchange or the Nasdaq Stock Market LLC.

"*Initial Shelf Expiration Date*" has the meaning set forth in <u>Section 2(f)</u>.

"*Initial Shelf Registration Statement*" has the meaning set forth in <u>Section 2(a)</u>.

"*Lockup Period*" has the meaning set forth in <u>Section 11(a)</u>.

"*Losses*" has the meaning set forth in <u>Section 12(a)</u>.

"*Majority Holders*" means, with respect to any Underwritten Offering, the Holders holding a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*Opt-Out Notice*" has the meaning set forth in <u>Section 8(e)</u>.

"*Other Holder*" has the meaning set forth in <u>Section 8(b)</u>.

"*Participating Holder*" has the meaning set forth in <u>Section 2(j)</u>.

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in <u>Section 8(a)</u>.

"*Piggyback Offering*" has the meaning set forth in <u>Section 8(a)</u>.

"*Plan*" has the meaning set forth in the Recitals.

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, all Reorganized Revlon Common Shares issued to any Holder or to any Affiliate or Related

Fund of any Holder, either directly or pursuant to a transfer or assignment and any additional Reorganized Revlon Common Shares acquired by any Holder, Affiliate or Related Fund of any Holder, including in connection with open market or other purchases or acquisitions, after the Plan Effective Date, (b) any additional Reorganized Revlon Common Shares paid, issued or distributed to any Holder or to any Affiliate or Related Fund of any Holder in respect of any such securities by way of a stock dividend, stock split or distribution, or in connection with a combination of securities, and any security into which such Reorganized Revlon Common Shares shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, bonus issue, exchange, distribution, other reorganization, charter amendment or otherwise and (c) any options, warrants or other rights to acquire, and any securities received as a dividend or distribution in respect of, any of the securities described in clauses (a) and (b) above, in each case, beneficially owned by any Holder; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (i) the date on which such securities are sold or disposed of pursuant to an effective Registration Statement, (ii) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act, (iii) the date on which such securities shall have been otherwise transferred and are represented by certificates or book entries not bearing a legend restricting transfer, (iv) with respect to Holders beneficially holding, together with their Related Funds and Affiliates, three percent (3.0%) or less of the outstanding Reorganized Revlon Common Shares, the date on which such securities can be sold pursuant to Rule 144 (or any similar provision then in effect) under the Securities Act without limitation thereunder on volume or manner of sale and without the need for current public information required by Rule 144(c)(1), or (v) the date on which such securities cease to be outstanding; *provided further*, *however*, that, except as described above, Registrable Securities shall not otherwise cease to constitute Registrable Securities due solely to the fact that such securities may be sold without restriction by the Commission.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including, without limitation, any Shelf Registration Statement), amendments and supplements to such registration statements, including post-effective amendments, all exhibits and documents incorporated by reference or deemed to be incorporated by reference in such registration statements.

"*Related Fund*" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised, sub-advised, managed or co-managed by such Person, by any Affiliate of such Person, or, if applicable, such Person's investment manager.

"*Related Party*" has the meaning set forth in Section 16(e).

"*Reorganized Revlon Common Shares*" means the [equity securities] of the Company.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 144A*" means Rule 144A promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" has the meaning set forth in Section 2(j).

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*SPAC*" has the meaning set forth in the definition of "Initial Public Offering."

"*Successor Equity*" has the meaning set forth in the definition of "Initial Public Offering."

"*Trading Day*" means a day during which trading in the Reorganized Revlon Common Shares occurs in the Trading Market, or if the Reorganized Revlon Common Shares are not listed on a Trading Market, a Business Day.

"*Trading Market*" means whichever of the New York Stock Exchange, the NYSE MKT, the Nasdaq Global Select Market, the Nasdaq Global Market, the Nasdaq Capital

Market, or the OTC Markets Group marketplace on which the Reorganized Revlon Common Shares are listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in <u>Section 14</u>.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in <u>Section 2(h)</u>.

2.    **Initial Shelf Registration.**

(a)    Following the completion of an Initial Public Offering, the Company shall prepare a Shelf Registration Statement (as may be amended from time to time, the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein pursuant to <u>Section 2(b)</u> and <u>Section 2(j)</u>. Promptly, and no later than ten (10) Business Days following the date that is the later of (i) one hundred eighty (180) days after the completion of an Initial Public Offering and (ii) the expiration of any lockup agreement with the underwriters in such Initial Public Offering, the Company shall file the Initial Shelf Registration Statement with the Commission, *provided, however*, that the Company shall not be required to file or cause to be declared effective the Initial Shelf Registration Statement unless Holders request, in accordance with Section 2(j), the inclusion in the Initial Shelf Registration Statement of Registrable Securities constituting at least twenty-five percent (25%) of all Registrable Securities, and such Holders otherwise timely comply with the requirements of this Agreement with respect to the inclusion of such Registrable Securities in the Initial Shelf Registration Statement.

(b)    The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided, however*, that with respect to any Registration Statement to be filed in connection with this Agreement, the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(c)    Upon the request of any Holder whose Registrable Securities are not included in the Initial Shelf Registration Statement at the time of such request, the Company shall use commercially reasonable efforts to amend the Initial Shelf Registration Statement to include the Registrable Securities of such Holder if the rules and regulations of the Commission would permit the addition of such Registrable Securities to the Initial Shelf Registration Statement; provided that the Company shall not be required to amend the Initial Shelf Registration Statement more than once during any 180-day period.

(d)    Within five (5) Business Days after receiving a request pursuant to Section 2(c), the Company shall give written notice of such request to all other Holders of

Registrable Securities and shall include in such amendment all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within fifteen (15) Business Days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)       The Initial Shelf Registration Statement shall be on Form S-1; *provided, however,* that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall use commercially reasonable efforts to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed as soon as reasonably practicable thereafter.

(f)       The Company shall use commercially reasonable efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable after filing (and, for the avoidance of doubt, shall use commercially reasonable efforts to respond to outstanding comments of the Commission relating to such Shelf Registration Statement as quickly as practicable) and shall use its reasonable best efforts to keep such Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by Holders on Form S-3 and (B) has filed such Registration Statement with the Commission and which is effective and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "*Initial Shelf Expiration Date*").

(g)       If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law (other than any Form 8-K required to be filed under Item 2.02 or 7.01 thereof), any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided, however,* that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

(h)       Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an

"*Underwritten Takedown*"), in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such "takedown" represent all of the Registrable Securities outstanding at the time of such "takedown."

(i)    In the event that the Company elects to effect an underwritten registered offering or a direct listing of equity securities of any subsidiary, parent or other successor entity of the Company, or to effect, directly or indirectly, a merger, capital stock exchange, asset acquisition, asset sale, stock purchase, reorganization, redomestication or other transaction, with or into a special purpose acquisition company, "blank-check" company, holding company or other Person (each of the foregoing, an "*Alternative IPO Entity*" and collectively, "*Alternative IPO Entities*"), rather than receiving registration rights with respect to Reorganized Revlon Common Shares, the parties shall cause the Alternative IPO Entity to enter into an agreement with the Holders that provides the Holders with registration rights with respect to equity securities of the Alternative IPO Entity (whether common stock, ordinary shares or similar, in which event references to "*Reorganized Revlon Common Shares*" will be read *mutatis mutandis* as such securities) that such Holders beneficially own that are substantially the same as, and in any event no less favorable in the aggregate to, the registration rights provided in this Agreement.

(j)    Other than any Holder that indicates to the Company in writing that it does not wish to be named as a "selling stockholder" in such Initial Shelf Registration Statement, each Holder agrees to furnish to the Company a completed questionnaire in the form attached hereto as Exhibit B (a "*Selling Stockholder Questionnaire*") in accordance with the final paragraph of Section 9, including, for the avoidance of doubt, the number of Registrable Securities that it wishes to include for registration on such Initial Shelf Registration Statement (any holder that returns such Selling Stockholder Questionnaire in accordance with Section 9, a "*Participating Holder*"). At least three (3) Business Days before filing the Initial Shelf Registration Statement, the Company will furnish to each Participating Holder a copy of a draft of the Selling Stockholder and Plan of Distribution sections (with respect to the Plan of Distribution section, only to the extent there have been any material changes to the form thereof attached hereteo as Exhibit A) for review and approval, which approval shall not be unreasonably withheld or delayed, and any objections to such draft disclosures must be lodged within two (2) Business Days of such Participating Holder's receipt thereof.

(k)    All Registrable Securities owned or acquired by any Holder or any of its Affiliates or Related Funds shall be aggregated together for the purpose of determining the availability of any right under this Agreement.

3.    **Subsequent Shelf Registration Statements**

(a)     After (i) the Effective Date of the Initial Shelf Registration Statement and prior to the Initial Shelf Expiration Date and (ii) for so long as any Registrable Securities remain outstanding, the Company shall use commercially reasonable efforts to (A) become eligible and/or maintain its eligibility to register the Registrable Securities on Form S-3 after the Initial Shelf Expiration Date, and (B) meet the requirements of General Instruction VII of Form S-1 after the Initial Shelf Expiration Date.

(b)     After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, the Company shall use commercially reasonable efforts to (A) be eligible and/or to maintain its eligibility to register the Registrable Securities on Form S-3, and (B) meet the requirements of General Instruction VII of Form S-1.

(c)     After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, if there is not an effective Registration Statement which includes the Registrable Securities that are currently outstanding, the Company shall (i) if the Company is eligible to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-3 and use commercially reasonable efforts to cause such Registration Statement to be declared effective as promptly as practicable or, (ii) if the Company is not eligible at such time to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-1 and use commercially reasonable efforts to cause such Registration Statement to be declared effective as promptly as practicable.

(d)     For so long as any Registrable Securities covered by such Shelf Registration Statement on Form S-1 remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law (other than any Form 8-K required to be filed under Item 2.02 or 7.01 thereof), any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) such Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading (or in the case of any prospectus, in light of the circumstances such statements were made), and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that, in each case, these obligations remain subject to the Company's rights under Section 7 of this Agreement.

4.     **[Reserved]**

5.     **Demand Registration**

(a)     At any time after the completion of an Initial Public Offering, any Holder or group of Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act (each, a "*Demand Registration*"). The Company will file a Registration

Statement covering such Holder's or Holders' Registrable Securities requested to be registered, and shall use commercially reasonable efforts to cause such Registration Statement to be declared effective, as promptly as practicable and no later than sixty (60) days after it receives such request; *provided*, *however*, that the Company will not be required to file a Registration Statement pursuant to this Section 5(a):

       (A)    unless (i) the number of Registrable Securities requested to be registered on such Registration Statement equals at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders pursuant to such Registration Statement have an anticipated aggregate gross offering price (before deducting underwriting discounts and commissions) of at least $50 million, disregarding any Registrable Securities subject to clause (B) below;

       (B)    with respect to any Registrable Securities requested to be registered that are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of such Registrable Securities requested to be registered; and

       (C)    if a registration statement filed by the Company shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days preceding the date such Demand Registration Request is made.

Notwithstanding anything to the contrary in this Agreement, the Company shall not be obligated to effect more than five such Demand Registrations; *provided, however* that a Demand Registration shall not be considered made for purposes hereof unless the requested Registration Statement has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested (subject to any reduction under Section 6(c) hereof).

       (b)    A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution. If at the time the Demand Registration Request is made the Company appears, based on public information available to such Holder or Holders, eligible to use Form S-3 for the offer and sale of the Registrable Securities, the Holder or Holders making such request may request that the registration be in the form of a Shelf Registration Statement (for the avoidance of doubt, the Company shall not be under the obligation to file a Shelf Registration on Form S-3 if, upon the advice of its counsel, it is not eligible to make such a filing).

       (c)    The Company may satisfy its obligations under Section 5(a) hereof by amending (to the extent permitted by applicable law and the rules and regulations of the Commission) any registration statement previously filed by the Company under the Securities Act and not yet declared effective by the Commission, so that such amended

registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a Demand Registration Request has been properly made under this Section 5. If the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 5(a) hereof; *provided, however*, that the Effective Date of the amended registration statement, as amended pursuant to this Section 5(c), shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 5(e) hereof.

(d)     Within five (5) Business Days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders of Registrable Securities and shall, subject to the provisions of Section 6(c) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) Business Days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)     The Company will use commercially reasonable efforts to keep a Registration Statement that has become effective as contemplated by this Section 5 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)     in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)     in the case of a Shelf Registration Statement, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however*, that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Shelf Registration Statement, if any Registrable Securities covered by such Shelf Registration Statement remain unsold, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect; *provided further, however*, that if any Shelf Registration Statement was initially declared effective on Form S-3 and, prior to the date determined pursuant to <u>Section 5(e)(B)</u>, the Company becomes ineligible to use Form S-3, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which the Company did

12

not have an effective Registration Statement covering unsold Registrable Securities initially registered on such Shelf Registration Statement.

(f)    The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 5(a).

(g)    If a Registration Statement filed pursuant to this Section 5 is a Shelf Registration Statement, then upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such underwritten "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such "takedown" represent all of the Registrable Securities outstanding at the time of such "takedown."

(h)    A Demand Registration may also be in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (x) (i) the number of securities included in such underwritten Demand Registration shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such underwritten Demand Registration shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $50 million; or (y) the number of securities included in such underwritten Demand Registration represent all of the Registrable Securities outstanding at the time of such underwritten Demand Registration.

6.    **Procedures for Underwritten Offerings.**

The following procedures shall govern Underwritten Offerings pursuant to Section 2(h) or Section 5(g), whether in the case of an Underwritten Takedown or otherwise.

(a)    (i) The Majority Holders, with the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), shall select one or more

investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown, and (ii) the Company shall select one or more investment banking firms of national standing to be the managing underwriter or underwriters for any other Underwritten Offering, with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)     All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided, however*, that the underwriting agreement is in customary form and reasonably acceptable to the Company and the Majority Holders and *provided further, however*, that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(c)     Notwithstanding anything to the contrary herein, if the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities or other Reorganized Revlon Common Shares permitted to be registered is such as to materially adversely affect the success of such Underwritten Offering, the number of Registrable Securities or other Reorganized Revlon Common Shares to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *third*, the Company shall reduce the number of Registrable Securities to be included by Holders on a pro rata basis based on the total number of Registrable Securities requested by the Holders to be included in the Underwritten Offering.

(d)     Within five (5) Business Days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 6(c) hereof, include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within five (5) Business Days after the Company's giving of such notice; *provided, however*, that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered.

(e)     The Company will not be required to undertake an Underwritten Offering pursuant to Section 2(h) or Section 5(g) if the Company has undertaken an Underwritten Offering, whether for its own account or pursuant to this Agreement, within the one

14

hundred eighty (180) days preceding the date of the request to the Company for such Underwritten Offering.

(f)    Notwithstanding anything to the contrary in this Agreement, the Company shall not be obligated to effect more than three such Underwritten Offerings; *provided* that an Underwritten Offering shall not be considered made for purposes of this Section 6(f) unless it has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included subject to any reduction under Section 6(c) hereof.

7.    **Grace Periods.**

(a)    Notwithstanding anything to the contrary herein—

(A)    the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission, suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 2(h) or Section 5(g), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 5(a) or Section 6(f) and the Company shall pay all reasonable and documented registration expenses in connection with such registration; and

(B)    at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (A) and/or a delay described in this clause (B), a "*Grace Period*").

(b)    The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided* that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use commercially reasonable efforts to terminate a Grace Period as promptly as

reasonably practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

(c)     The duration of any one Grace Period shall not exceed forty-five (45) days, and the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed ninety (90) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (i) of Section 7(b) and shall end on and include the later of the date the Holders receive the notice referred to in clause (iii) of Section 7(b) and the date referred to in such notice. In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

8.     **Piggyback Registration**

(a)     If at any time, and from time to time, the Company proposes to—

(A)     file a registration statement under the Securities Act with respect to an underwritten offering of Reorganized Revlon Common Shares of the Company or any securities convertible or exercisable into Reorganized Revlon Common Shares (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto or (iii) another form not available for registering the Registrable Securities for sale to the public), whether or not for its own account; or

(B)     conduct an underwritten offering constituting a "takedown" of a class of Reorganized Revlon Common Shares or any securities convertible or exercisable into Reorganized Revlon Common Shares registered under a shelf registration statement previously filed by the Company;

the Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to each Holder at least five (5) Business Days before the anticipated filing date (*provided* that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "*Bought Deal*"), such Piggyback Notice shall be given not less than two (2) Business Days prior to the expected date of commencement of marketing efforts). Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities and any proposed managing underwriter of such securities and shall offer the Holders the opportunity to register or offer such amount of Registrable Securities as each Holder may reasonably request on the same terms and conditions as the registration or offering of the other securities being registered thereunder (a "*Piggyback Offering*"). Subject to Section 8(b), the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within three (3) Business Days after the date the Piggyback Notice is given (*provided* that

16

in the case of a Bought Deal, such written requests for inclusion must be received within one (1) Business Day after the date the Piggyback Notice is given); *provided*, *however*, that in the case of the filing of a registration statement, such Registrable Securities are not otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, but in such case, the Company shall include such Registrable Securities in such underwritten offering if the Shelf Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be offered (without regard to the limitations on participation in Underwritten Offerings set forth in Section 2(h)); *provided further*, *however*, that in the case of an underwritten offering in the form of a "takedown" under a Shelf Registration Statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(b)     The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on substantially the same terms and conditions as any similar securities, if any, of the Company. Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering (such other holders, the "*Other Holders*") propose to include in such offering is such as to materially adversely affect the price, timing or distribution of such underwritten offering, then:

(A)     if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering: (i) *first*, all securities to be offered by the Company; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by all Other Holders;

(B)     if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders entitled to participate therein, allocated pro rata among such Holders on the basis of the amount of securities requested to be included therein by each such Holder; (iii) *third*, up to the full amount of securities proposed to be included in the registration by the Company; and (iv) *fourth,* up to the full amount of securities requested to be included in such Piggyback Offering by the Other Holders entitled to participate therein, allocated pro rata among such Other Holders on the basis of the amount of securities requested to be included therein by each such Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the success of such Piggyback Offering.

(c)    If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)    Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw from that registration, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

(e)    Notwithstanding the foregoing, any Holder may deliver written notice (an "*Opt-Out Notice*") to the Company at any time requesting that such Holder not receive notice from the Company of any proposed registration or offering; *provided, however*, that such Holder may later revoke any such Opt-Out Notice in writing.

9.    **Registration Procedures.**

If and when the Company is required to effect any registration under the Securities Act as provided in this Agreement, the Company shall use commercially reasonable efforts to:

(a)    prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use commercially reasonable efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as (i) all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained

herein, or (ii) such Registration Statement is withdrawn in accordance with the terms of this Agreement;

(c)      (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto (except for any amendment or supplement as a result of the filing of a periodic report, current report or any other document required to be filed by the Company under the Exchange Act), at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement prepared in connection with an Underwritten Offering pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and the underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act; *provided* that as a condition to being provided any confidential information, any such Holder gaining access to information regarding the Company pursuant to this Section 9(c) shall agree to enter into a customary confidentiality agreement with the Company.

(d)      notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed (except for any supplement as a result of the filing of a periodic report, current report or any other document required to be filed by the Company under the Exchange Act);

(e)      with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such

19

seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)      (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or Blue Sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)      subject to Section 9(f) of this Agreement, cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)      with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed

(A)      opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

(B)      "comfort" letter, dated the date of the underwriting agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and any other underwriters,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such

financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)    notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish (at the Company's expense) to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (subject to Section 7(f) of this Agreement);

(j)    notify the Holders of Registrable Securities included in such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)    advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use commercially reasonable efforts to obtain the withdrawal of such order;

(l)    otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 promulgated thereunder and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(m)    provide (i) and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective

Date thereof and (ii) a CUSIP and ISIN number for all Registrable Securities no later than the Effective Date;

(n)    enter into such customary agreements (including an underwriting agreement in customary form) and take such other customary actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing at least one (1) executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested in an Underwritten Offering; *provided*, *however*, that the Company shall have no obligation to participate in more than three (3) such "road shows" requested hereunder in any twelve (12)-month period, such participation shall not unreasonably interfere with the business operations of the Company and the Company shall have no obligation to participate in more than one (1) such "road show" during any ninety (90) day period;

(o)    if reasonably requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Securities provided to the Company in writing by the managing underwriters and the Holders holding a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(p)    cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least five (5) Business Days prior to any sale of Registrable Securities to the underwriters;

(q)    cause all Registrable Securities included in a Registration Statement to be listed on a Trading Market on which similar securities issued by the Company are then listed, if at all, or quoted; and

(r)    otherwise use commercially reasonable efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least fifteen (15) Trading Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, in the form of the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Trading Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling security-holder in the Registration Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as reasonably requested by the Company and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with <u>Section 6(b)</u>. If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this <u>Section 9</u> will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

  10. **<u>Registration Expenses.</u>** All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts, fees or selling commissions or broker or similar commissions or fees (which shall be borne by Participating Holders on a pro rata basis), or transfer taxes of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees and expenses (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the Reorganized Revlon Common Shares are then listed for trading, if any, or quoted, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company and any reasonable and documented fees and disbursements of counsel for the underwriters or Holders in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the underwriters or the Holders, as applicable) and (C) if not previously paid by the Company in connection with an issuer filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) all reasonable and documented expenses of any Persons in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any free writing prospectus and any amendments or supplements thereto, any underwriting agreements, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement

(including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders holding a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) reasonable and documented fees and disbursements of counsel for the Company, (v) the reasonable and documented fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, (vii) all rating agency fees, if any, and any fees associated with making the Registrable Securities eligible for trading through The Depository Trust Company, and (viii) reasonable and documented fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement. In addition, the Company will pay the reasonable fees and disbursements of Counsel to the Holders, including, for the avoidance of doubt, any reasonable and documented expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder or any Underwritten Offering.

11.    **Lockups.**

(a)    In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no Holder shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities during the seven (7) days prior to, and the ninety (90)-day period (or such lesser period as the underwriters may agree) beginning on the date of, the final prospectus filed in connection with such offering (as such period may be waived by the underwriters, the "*Lockup Period*"), except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its executive officers and directors as reasonably requested by the underwriters, and reasonably acceptable to the Majority Holders; *provided* that the Lockup Period shall include customary carve-outs, including that nothing herein will prevent any Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a) and so long as no public disclosure of such distribution is made. Each Holder agrees to execute a customary lockup agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 11(a). The provisions of this Section 11(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.

(b)    In connection with any Underwritten Offering, the Company shall not effect any public sale or distribution of any of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, without prior written

consent from the managing underwriter or underwriters, during the Lockup Period, except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Majority Holders. The Company agrees to execute a customary lockup agreement in favor of the underwriters in any relevant offering to such effect and, in any event, that the underwriters in any relevant offering shall be third party beneficiaries of this Section 11(b). Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to registrations on Form S-4 or Form S-8 or any successor thereto or as part of any registration of securities of offering and sale to employees, directors or consultants of the Company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

12.   **Indemnification.**

(a)   <u>Indemnification by the Company</u>. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable and documented attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 9(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated and defined in Section 16(c) below, but only if and to the extent that following the receipt of the Advice, the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by

the Holders, and shall be in addition to any liability which the Company may otherwise have. Paragraph (a) of this Section shall not apply with respect to taxes other than any taxes that represent losses, claims, damages, etc. arising from any non-tax claim.

(b)     Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 9(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 16(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

(c)     Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with the defense thereof; *provided*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that

26

such failure shall have materially and adversely prejudiced the Indemnifying Party in its ability to defend such action.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder.

(d)    Contribution. If a claim for indemnification under Section 12(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent,

27

knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this <u>Section 12(d)</u> were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this <u>Section 12(d)</u>, no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13.    **Section 4(a)(7), Rule 144 and Rule 144A; Other Exemptions.** With a view to making available to the Holders of Registrable Securities the benefits of Section 4(a)(7) of the Securities Act, Rule 144 and Rule 144A and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will use commercially reasonable efforts to, (i) if it is subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder, or, (ii) if it is not subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, make available information necessary to comply with Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A, if available, with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time, or (y) any other rules or regulations now existing or hereafter adopted by the Commission. Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

14.    **Transfer of Registration Rights.** Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee, including any Affiliate or Related Fund of any Holder; *provided*, that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement (including through the execution of a joinder hereto); and (c) the Company is given written notice by such

Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned and provide the amount of any other capital stock of the Company beneficially owned by such transferee or assignee; *provided further*, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

15.    **Further Assurances.** Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

16.    **Miscellaneous.**

(a)    <u>Remedies</u>. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)    <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement.

(c)    <u>Discontinued Disposition</u>. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in Section 9(i), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)    <u>Number of Registrable Securities Outstanding</u>. In order to determine the number of Registrable Securities outstanding at any time, and subject to <u>Section 2(k)</u> in all respects, upon the reasonable written request of the Company to Holders, each Holder shall promptly, and in any event within ten (10) Business Days of receipt of such request, inform the Company of the number of Registrable Securities that such Holder owns and

that the Company may conclusively rely upon any certificate provided under this Agreement for the purpose of determining the number of such Registrable Securities.

(e)　　No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Holders may be partnerships or limited liability companies, each of the Holders and the Company agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any of the Holder's former, current or future direct or indirect equity holders, controlling persons, shareholders, directors, officers, employees, agents, Affiliates, members, financing sources, managers, general or limited partners or assignees (each, a "*Related Party*" and collectively, the "*Related Parties*"), in each case other than the current or former Holders or any of their respective assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable Proceeding, or by virtue of any applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of the the Holders under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; provided, however, nothing in this Section 16(e) shall relieve or otherwise limit the liability of the Company or any current or former Holder, as such, for any breach or violation of its obligations under this Agreement or such agreements, documents or instruments.

(f)　　Preservation of Rights. From and after the date of this Agreement, the Company shall not file or have declared effective a registration statement for any equity securities (other than a registration statement in connection with an Initial Public Offering that is substantially contemporaneous to the entering into of this Agreement) or on Form S-8, or any successor of such form, or a registration statement relating solely to the offer and sale to the Company's directors or employees pursuant to any employee stock plan or other employee benefit plan or arrangement) before the Initial Shelf Registration Statement is declared effective. From and after the date of this Agreement, the Company shall not enter into any agreement with any current or future holder of any securities of the Company that would allow such current or future holder to require the Company to include securities in the Initial Shelf Registration Statement, or in any Piggyback Offering on a basis that is on parity with or superior to, the Piggyback Offering rights granted to the Holders pursuant to Section 8 of this Agreement.

(g)　　No Inconsistent Agreements. The Company has not entered, as of the date hereof, and the Company shall not enter, after the date of this Agreement, into any agreement with respect to its securities which is inconsistent with or grants registration rights that have parity with or are more favorable than the rights granted to the Holders in this Agreement or otherwise conflicts with the provisions hereof.

(h)　　Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided*,

*however*, that any party may give a waiver as to itself; *provided further, however*, that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; *provided further*, *however*, that the definitions of "Holders"and "Registrable Securities" in Section 1 and this Section 16(h) may not be amended, modified or supplemented, or waived unless in writing and signed by Holders holding 66 2/3% of all Registrable Securities at such time; and *provided further*, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders holding a majority of the Registrable Securities outstanding at such time to which such waiver or consent relates; *provided*, *however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence. No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof. No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(i)      <u>Notices</u>. All notices and other communications in connection with this Agreement shall be in writing and shall be deemed given if delivered personally, sent via electronic facsimile or email (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) at the following address (or at such other address as may be specified by like notice):

(A)      If to the Company:

Revlon Group Holdings LLC
55 Water St.
New York, New York 10041-00004
Attn:  Andrew Kidd, EVP, General Counsel
        Matthew Kvarda, Interim Chief Financial Officer

Email: Andrew.kidd@revlon.com
        Mkvarda@alvarezandmarsal.com

with a copy (which shall not constitute notice) to:
[●]
Facsimile: [●]
Attention: [●]
Email:     [●]

(B)     If to the Holders (or to any of them), to the address set forth on its signature page hereto (including any joinder hereto) or such other address as may be designated in writing hereafter by such Holder.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(j)     <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy). In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company, agreeing to be bound by its terms. Subject to <u>Section 2(i)</u> hereof, no assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holders holding 66 2/3% of all Registrable Securities at such time; *provided, further, however*, that no such assignment or delegation that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder (other than an assignment in connection with the reincorporation of the Company or its businesses in another jurisdiction).

(k)     <u>Execution and Counterparts</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

(l)     <u>Governing Law; Venue</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York. Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement, shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.

The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts. Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum. The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(m)    <u>Waiver of Jury Trial</u>. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(n)    <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(o)    <u>Descriptive Headings; Interpretation; No Strict Construction</u>. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation". The use of the words "or," "either" or "any" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(p)     Entire Agreement. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(q)     Termination. The obligations of the Company and of any Holder, other than those obligations contained in Section 12 and this Section 16, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**REVLON GROUP HOLDINGS LLC**

By:  _____

      Name:

      Title:

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.

<div align="right">HOLDERS:</div>

**[Holder Name]**

By: _____
      Name:
      Title:

**EXHIBIT A**

**[Plan of Distribution to come]**

Privileged & Confidential
Attorney Work Product

**EXHIBIT B**

**[Selling Stockholder Questionnaire to come]**

Annex A

[*To be inserted when finalized*]

Owner Governance Matters

<span style="color:red">Draft 4/20/23</span>

<u>Annex A – Owner Governance Matters</u>

For purposes of this Annex only, references herein to the Agreement shall be deemed to mean the Agreement excluding the terms of this Annex. In the event of any conflict between the terms of the Agreement and the terms of the Annex, the terms of the Agreement shall govern.

References in this Annex to any Section shall mean references to Sections of this Annex A, unless the context indicates otherwise.

Terms used in this Annex A that are not otherwise defined in this Annex A shall have the meanings assigned to such terms in the Agreement.

**ARTICLE I**

**DEFINITIONS**

1.1    "<u>Derivative</u>" means any agreement, arrangement or understanding (including any derivative or short positions, profit interests, options, hedging transactions and borrowed or loaned shares) that has been entered into, directly or indirectly, by or on behalf of the Proponent or any Owner Associated Person with respect to, Shares or other Equity Securities, the effect or intent of which is to (i) mitigate loss, (ii) manage risk or benefit of share price changes or (iii) increase or decrease the voting power of the Proponent or any Owner Associated Person.

1.2    "<u>Managers</u>" means Independent Managers (as defined in the Agreement).

1.3    "<u>Nominating Owners</u>" shall have the meaning as set forth in <u>Section 3.1(b)</u>.

1.4    "<u>Notice of Business</u>" shall have the meaning as set forth in <u>Section 2.2(c)</u>.

1.5    "<u>Notice of Nomination</u>" shall have the meaning as set forth in <u>Section 3.1(c)</u>.

1.6    "<u>Notice Record Date</u>" shall have the meaning as set forth in <u>Section 2.4(a)</u>.

1.7    "<u>Office of the Company</u>" means the executive office of the Company or any other offices at any other place or places where the Company is qualified to do business, as the Board may establish for purposes hereof.

1.8    "<u>Proponent</u>" shall have the meaning as set forth in <u>Section 2.2(d)(i)</u>.

1.9    "<u>Owner Associated Person</u>" means with respect to any Owner, (i) any other beneficial owner of Shares or other Equity Securities that are owned by such Owner

and (ii) any person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Owner or such beneficial owner.

1.10    "Owner Business" shall have the meaning as set forth in Section 2.2(b).

1.11    "Owner Information" shall have the meaning as set forth in Section 2.2(d)(iii).

1.12    "Owner Nominees" shall have the meaning as set forth in Section 3.1(b).

1.13    "Voting Commitment" shall have the meaning as set forth in Section 3.2.

1.14    "Voting Record Date" shall have the meaning as set forth in Section 2.4(a).

## ARTICLE II

## OWNERS

2.1    Place of Meetings.  Meetings of Owners may be held at such place, if any, either within or outside the State of Delaware, or by means of remote communication, as may be designated by the Board from time to time.  Participation by an Owner in a remote meeting shall constitute presence in person at such meeting.

2.2    Annual Meetings; Owner Proposals.

(a)    A meeting of Owners for the election of Managers and other business shall be held annually at such date and time as may be designated by the Board from time to time (but, in any event, no later than thirty (30) days after each anniversary of the Effective Date; *provided*, that the First Annual Meeting shall not be held earlier than [●].¹May 2, 2024.

(b)    At an annual meeting of the Owners, only business (other than business relating to the nomination, appointment or election of Managers, which is governed by Article III) that has been properly brought before the Owner meeting in accordance with the procedures set forth in this Section 2.2 shall be conducted.  To be properly brought before a meeting of Owners, such business must be brought before the meeting by or at the direction of the Board or any authorized committee thereof or by an Owner who (i) was an Owner of the Company when the notice required by this Section 2.2 is delivered to the Secretary of the Company and at the time of the meeting, (ii) is entitled to vote at the meeting and (iii) complies with the notice and other provisions of

---

¹ NTD: To insert one year from Effective Date.

this Section 2.2.  Subject to Section 2.2(i), and except with respect to nominations or elections of Managers, which are governed by Section 3.1, Section 2.2(b) is the exclusive means by which an Owner may bring business before an annual meeting of Owners.  Any business brought before an annual meeting in accordance with Section 2.2(b) is referred to as "Owner Business".

(c)    Subject to Section 2.2(i), at any annual meeting of Owners, all proposals of Owner Business must be made by timely written notice given by or on behalf of an Owner (the "Notice of Business") and must otherwise be a proper matter for Owner action.  To be timely, the Notice of Business must be delivered personally or mailed to, and received at the Office of the Company, addressed to the Secretary of the Company, by no earlier than one-hundred-twenty (120) days and no later than ninety (90) days before the first anniversary of the date of the prior year's annual meeting of Owners; provided, however, that (i) if the annual meeting of Owners is advanced by more than thirty (30) days, or (subject to Section 2.2(a)) delayed by more than sixty (60) days, from the first anniversary of the prior year's annual meeting of Owners or (ii) in the case of the Company's First Annual Meeting, the notice by the Owner to be timely must be received (A) no earlier than one-hundred-twenty (120) days before such annual meeting and (B) no later than the later of ninety (90) days before such annual meeting and the tenth (10th) day after the day on which the notice of such annual meeting was first made by mail or through the Datasite.  In no event shall an adjournment, postponement or deferral, or the making of an announcement in respect thereof, commence a new time period (or extend any time period) for the giving of the Notice of Business.

(d)    The Notice of Business must set forth:

(i)    the name and address of each Owner proposing Owner Business (the "Proponent"), as it appears on the Company's books;

(ii)    the name and address of any Owner Associated Person;

(iii)    as to each Proponent and any Owner Associated Person, (A) the number of Shares and other Equity Securities directly or indirectly held by the Proponent or Owner Associated Person, (B) the date(s) such Shares and other Equity Securities were acquired, (C) a description of any agreement, arrangement or understanding, direct or indirect, with respect to such Owner Business between or among the Proponent, any Owner Associated Person or any others (including their names) acting in concert with any of the foregoing, (D) a description of any Derivative, (E) a description in reasonable detail of any proxy (including revocable proxies), contract, arrangement, understanding or other relationship pursuant to which the Proponent or any Owner Associated Person has a right to vote any Shares or other Equity Securities, (F) any rights to dividends or distributions on the Shares or other Equity Securities owned beneficially by the Proponent or any Owner Associated Person that are separated or separable from the underlying Shares or other Equity Securities, (G) any proportionate interest in Shares, other Equity Securities or Derivatives held, directly or indirectly, by a

3

general or limited partnership in which the Proponent or any Owner Associated Person is a general partner or, directly or indirectly, beneficially owns an interest in a general partner and (H) any performance-related fees (other than an asset-based fee) that the Proponent or any Owner Associated Person is entitled to that is based on any increase or decrease in the value of Shares or Derivatives thereof, if any, as of the date of such notice.  The information specified in <u>Section 2.2(d)(i)</u> to <u>Section 2.2(d)(iii)</u> is referred to as "<u>Owner Information</u>";

          (iv)     a representation that each Proponent is an Owner of Shares or, if applicable, other Equity Securities entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to propose such Owner Business,

          (v)     a brief description of the Owner Business desired to be brought before the annual meeting, the text of the proposal (including the text of any resolutions proposed for consideration and, if such business includes a proposal to amend the Agreement or this Annex, the language of the proposed amendment) and the reasons for conducting such Owner Business at the meeting;

          (vi)     any material interest of each Proponent and any Owner Associated Person in such Owner Business;

          (vii)     a representation as to whether the Proponent intends (A) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Company's Shares or other Equity Securities (if applicable) required to approve or adopt such Owner Business or (B) otherwise to solicit proxies from Owners in support of such Owner Business;

          (viii)     all other information that would be required to be filed with the Commission if the Proponents or Owner Associated Persons were participants in a solicitation subject to Section 14 of the Exchange Act; and

          (ix)     a representation that the Proponents shall provide any other information reasonably requested by the Company.

          (e)     The Proponents shall provide any other information reasonably requested by the Company within ten (10) Business Days after receipt of such request.

          (f)     In addition, the Proponent shall affirm as true and correct the information provided to the Company in the Notice of Business or at the Company's request pursuant to <u>Section 2.2(e)</u> (and shall update or supplement such information as needed so that such information shall be true and correct) as of (i) the record date for the meeting, (ii) the date that is ten (10) calendar days before the first anniversary date of the Company's proxy statement and/or notice of annual meeting distributed to Owners in connection with the previous year's annual meeting and (iii) the date that is ten (10) Business Days before the later of the annual meeting or any adjournment or postponement thereof.  Such affirmation, update and/or supplement must be delivered

personally or mailed to, the Office of the Company, addressed to the Secretary of the Company, by no later than (x) five (5) Business Days after the applicable date specified in clause (i) or (ii) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (y) not later than seven Business Days before the date for the annual meeting (in the case of the affirmation, update and/or supplement required to be made as of ten (10) Business Days before the annual meeting or any adjournment or postponement thereof).

(g)     The person presiding over the meeting shall, acting in good faith, have the power, with respect to any Owner Business attempted to be introduced at a meeting by resolution or proposal made by an Owner, to determine and declare at the meeting, that such business was not properly brought before the meeting in accordance with the procedures set forth in this Section 2.2, and, if such Owner Business was not properly brought in accordance with such procedures, to exclude the consideration of any such business at the meeting.

(h)     If the Proponent (or a qualified representative of the Proponent) does not appear at the meeting of Owners to present the Owner Business, then such business shall not be transacted, notwithstanding that proxies in respect of such vote may have been received by the Company.  For purposes of this Section 2.2, to be considered a qualified representative of the Owner, a person must be a duly authorized officer, manager or partner of such Owner or must be authorized by a writing executed by such Owner or an electronic transmission delivered by such Owner to act for such Owner as proxy at the meeting of Owners and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of Owners.

(i)     The notice requirements of this Section 2.2 shall be deemed satisfied with respect to Owner proposals that have been properly brought under Rule 14a-8 of the Exchange Act (as if Rule 14a-8 were applicable to the Company) and that are included in a proxy statement that has been prepared by the Company to solicit proxies for such annual meeting.

2.3     Special Meetings.  Special meetings of Owners, for any purpose or purposes, unless otherwise prescribed by Applicable Law, may be called at any time upon no less than 10 days and no more than 90 days prior notice (which notice will be posted to the Datasite) by the Board or by Owners holding a majority of the Shares (who shall demand such special meeting by written notice given to the [President] [CEO]Chief Executive Officer or Chairman specifying the purpose or purposes of such meeting), and may not be called by any other person or persons.  Business transacted at any special meeting of Owners shall be limited to the purposes stated in the notice of such meeting (which purposes shall, in the case of a special meeting called by holders of Shares in accordance with the prior sentence, be limited to the purposes set forth in

5

their written notice and, for the avoidance of doubt, such holders need not comply with Sections 2.2(c)–2.2(h)) in connection therewith.

2.4  Record Date.

(a)  For the purpose of determining the Owners entitled to notice of any meeting (including a special meeting) of Owners or any adjournment thereof, unless otherwise required by Applicable Law or the Agreement, the Board may fix a record date (the "Notice Record Date"), which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ninety (90) or less than ten (10) days before the date of such meeting.  The Notice Record Date shall also be the record date for determining the Owners entitled to vote at such meeting unless the Board determines, at the time it fixes such Notice Record Date, that a later date on or before the date of the meeting shall be the date for making such determination (the "Voting Record Date").  For the purposes of determining the Owners entitled to receive payment of any dividend or other distribution or allotment of any rights, exercise any rights in respect of any change, conversion or exchange of Shares or other Equity Securities or take any other lawful action, unless otherwise required by the Agreement or by Applicable Law, the Board may fix a record date, which record date shall not precede the date on which the resolution fixing the record date was adopted by the Board and shall not be more than ninety (90) days prior to such action.

(b)  If no such record date under Section 2.4(a) is fixed:

(i)  The record date for determining Owners entitled to notice of and to vote at a meeting of Owners shall be at the close of business on the day next preceding the day on which notice is given or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and

(ii)  When a determination of Owners entitled to notice of or to vote at any meeting of Owners has been made as provided in this Section 2.3, such determination shall apply to any adjournment thereof, unless the Board fixes a new Voting Record Date for the adjourned meeting, in which case the Board shall also fix such Voting Record Date or a date earlier than such date as the new Notice Record Date for the adjourned meeting.

2.5  Notice of Meetings of Owners.  Whenever Owners are required or permitted to take any action at a meeting under the provisions of Applicable Law, this Annex or the Agreement, notice shall be given stating the place, if any, date and hour of the meeting, the means of remote communication, if any, by which Owners and proxy holders may be deemed to be present in person and vote at such meeting, the Notice Record Date and the Voting Record Date, if such date is different from the Notice Record Date, and the purposes for which the meeting is called.  Unless otherwise provided by these By-laws or Applicable Law, notice of any meeting shall be given, not less than ten (10) nor more than ninety (90) days before the date of the meeting, to each

6

Owner entitled to vote at such meeting as of the Notice Record Date.  If mailed, such notice shall be deemed to be given when deposited in the U.S. mail, with postage prepaid, directed to the Owner at his or her address as it appears on the records of the Company; provided, that the Company shall post a copy of such notice to the Datasite.  An affidavit of the Secretary, an Assistant Secretary or the transfer agent of the Company that the notice required by this Section 2.5 has been given shall, in the absence of fraud, be prima facie evidence of the facts stated therein.  If a meeting is adjourned to another time or place, notice need not be given of the adjourned meeting if (x) the time and place thereof are announced at the meeting at which the adjournment is taken and (y) details on such adjourned meeting are posted to the Datasite.  Any business that might have been transacted at the meeting as originally called may be transacted at the adjourned meeting.  If, however, the adjournment is for more than thirty (30) days or, if after the adjournment a new Notice Record Date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Owner entitled to vote at the meeting.  If, after the adjournment, a new Voting Record Date is fixed for the adjourned meeting, the Board shall fix a new Notice Record Date in accordance with Section 2.4(b)(ii) hereof and shall give notice of such adjourned meeting to each Owner entitled to vote at such meeting as of the Notice Record Date.

2.6    Waivers of Notice.  Whenever the giving of any notice to Owners is required by Applicable Law, the Agreement or this Annex, a written waiver, signed by the Owner entitled to notice, or a waiver by electronic transmission by such Owner, whether before or after the event as to which such notice is required, shall be deemed equivalent to notice.  Attendance by an Owner at a meeting shall constitute a waiver of notice of such meeting except when the Owner attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting has not been lawfully called or convened.  Neither the business to be transacted at, nor the purposes of, any regular or special meeting of the Owners need be specified in any waiver of notice.

2.7    Quorum of Owners; Adjournment.  Except as otherwise provided by the Agreement or this Annex, at each meeting of Owners, the presence in person or represented by proxy of the holders of a majority of the voting power of all outstanding Shares entitled to vote at the meeting of Owners shall constitute a quorum for the transaction of any business at such meeting.  In the absence of a quorum, the holders of a majority of the voting power of the Shares present in person or represented by proxy at any meeting of Owners, including an adjourned meeting, or the person presiding over the meeting may adjourn such meeting to another time and place.  Shares of the Company belonging to the Company or to another Person, if a majority of the Shares entitled to vote in the election of Managers of such other Person is held, directly or indirectly, by the Company, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Company to vote Shares held by it in a fiduciary capacity.

7

2.8    <u>Voting; Proxies</u>.    Except as may otherwise be provided in the Agreement, this Annex or by Applicable Law, each holder of Shares, as such, shall be entitled to one vote for each Share held by such holder on all matters on which Owners generally are entitled to vote.    At any meeting of Owners, all matters other than the election of Managers (which shall be governed by <u>Article III</u>), except as otherwise provided by the Agreement or this Annex or any Applicable Law, shall be decided by the affirmative vote of a majority of the voting power of Shares present in person or represented by proxy and entitled to vote thereon.    Each Owner entitled to vote at a meeting may authorize another person or persons to act for such Owner by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.    A proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.    An Owner may revoke any proxy that is not irrevocable by attending the meeting and voting in person or by delivering to the Secretary a revocation of the proxy or by delivering a new duly authorized proxy bearing a later date.    Except as specifically contemplated by this Annex or by the Agreement, all Owners shall be treated in a *pari passu* fashion

2.9    <u>Voting Procedures and Inspectors at Meetings of Owners</u>.    The Board, in advance of any meeting of Owners, shall appoint one or more inspectors, who may be employees of the Company, to act at the meeting and make a written report thereof.    The Board may designate one or more persons as alternate inspectors to replace any inspector who fails to act.    If no inspector or alternate is able to act at a meeting, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting.    Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.    The inspectors shall (a) ascertain the number of Shares outstanding and the voting power of each, (b) determine the Shares represented at the meeting and the validity of proxies and ballots, (c) count all votes and ballots, (d) determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors and (e) certify their determination of the number of Shares represented at the meeting and their count of all votes and ballots.    The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of their duties. Unless otherwise provided by the Board, the date and time of the opening and the closing of the polls for each matter upon which the Owners will vote at a meeting shall be determined by the person presiding at the meeting and shall be announced at the meeting.    No ballot, proxies, votes or any revocation thereof or change thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery of the State of Delaware upon application by an Owner shall determine otherwise.    In determining the validity and counting of proxies and ballots cast at any meeting of Owners, the inspectors may consider such information as is permitted by Applicable Law.    No person who is a candidate for office at an election may serve as an inspector at such election.

2.10  Conduct of Meetings.    The Board may adopt such rules and procedures for the conduct of Owner meetings as it deems appropriate.    At each meeting of Owners, the [President] [CEO]Chief Executive Officer or, in the absence of the [President] [CEO]Chief Executive Officer, the Chairman or, if the Chairman is absent, any officer of the Company designated by the Board shall preside over the meeting.    Except to the extent inconsistent with the rules and procedures as adopted by the Board, the person presiding over the meeting of Owners shall have the right and authority to convene, adjourn and reconvene the meeting from time to time, to prescribe such additional rules and procedures and to do all such acts as, in the judgment of such person, are appropriate for the proper conduct of the meeting.    Such rules and procedures, whether adopted by the Board or prescribed by the person presiding over the meeting, may include, (a) the establishment of an agenda or order of business for the meeting, (b) rules and procedures for maintaining order at the meeting and the safety of those present, (c) limitations on attendance at or participation in the meeting to Owners of the Company, their duly authorized and constituted proxies and such other persons as the person presiding over the meeting shall determine, (d) restrictions on entry to the meeting after the time fixed for the commencement thereof and (e) limitations on the time allotted to questions or comments by participants.    The order of business at all meetings of Owners shall be as determined by the person presiding over the meeting.    The person presiding over any meeting of Owners, in addition to making any other determinations that may be appropriate to the conduct of the meeting, may in good faith determine and declare to the meeting that a matter or business was not properly brought before the meeting and if such presiding person should so determine in good faith at the advice of counsel (which may be internal counsel), he or she shall so declare to the meeting and any such matter or business not properly brought before the meeting shall not be transacted or considered.    Unless and to the extent determined by the Board or the person presiding over the meeting, meetings of Owners shall not be required to be held in accordance with the rules of parliamentary procedure. The Secretary or, in his or her absence, one of the Assistant Secretaries, shall act as secretary of the meeting.    If none of the officers above designated to act as the person presiding over the meeting or as secretary of the meeting shall be present, a person presiding over the meeting or a secretary of the meeting, as the case may be, shall be designated by the Board and, if the Board has not so acted, in the case of the designation of a person to act as secretary of the meeting, designated by the person presiding over the meeting.

2.11  Written Consent.    Unless prohibited by Applicable Law or the Agreement, any action that is required or permitted to be taken by the Owners at a meeting may be taken without a meeting if a consent in writing setting forth the action so taken is signed by Owners having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Shares entitled to vote thereon were present and voted.    The action shall be effective on the date when the last signature is placed on the consent or at such earlier time as is set forth therein.    Such consent, which shall have the same effect as a vote of the Owners, shall be filed with the minutes of the Company.    If action is taken by less than

9

unanimous consent of the Owners, prompt notice of the taking of such action without a meeting shall be given to those who have not consented in writing and the Company shall post a copy of such written consent, with appropriate redactions, to the Datasite. For the purpose of determining the Owners entitled to take an action by written consent without a meeting, the Board may fix a record date for such purpose, which date shall not be more than ninety (90) days before the date of such written consent.

2.12 *Certain Procedures*.    The Board may adopt such rules and procedures as it deems reasonably appropriate to effectuate and administer the intent of the provisions of this Article II.

<div align="center">

**ARTICLE III**

**MANAGERS**

</div>

3.1    Nominations of Managers.

(a)    Subject to Section 3.1(j), only persons who are nominated in accordance with the procedures set forth in this Section 3.1 are eligible for election as Managers.

(b)    Subject to Section 3.1(j), nominations of persons for election to the Board may only be made at a meeting properly called for the election of Managers and only (i) by or at the direction of the Board or any committee thereof or (ii) by an Owner who (A) was an Owner of the Company when the notice required by this Section 3.1 is delivered to the Secretary of the Company and at the time of the meeting, (B) is entitled to vote for the election of Managers at the meeting and (C) complies with the notice and other provisions of this Section 3.1. Subject to Section 3.1(j), Section 3.1(b)(ii) is the exclusive means by which an Owner may nominate a person for election to the Board. Persons nominated in accordance with Section 3.1(b)(ii) are referred to as "Owner Nominees".  An Owner nominating persons for election to the Board is referred to as the "Nominating Owner".

(c)    Subject to Section 3.1(j), all nominations of Owner Nominees must be made by timely written notice given by or on behalf of an Owner (the "Notice of Nomination").  To be timely, the Notice of Nomination must be delivered personally or mailed to the Office of the Company, addressed to the attention of the Secretary of the Company, by the following dates:

(i)    in the case of the nomination of an Owner Nominee for election to the Board at an annual meeting of Owners, no earlier than one-hundred-twenty (120) days and no later than ninety (90) days before the first anniversary of the date of the prior year's annual meeting of Owners; provided, however, that (A) if the annual meeting of Owners is advanced by more than thirty (30) days, or delayed (subject to Section 2.2(a)) by more than sixty (60) days, from the first anniversary of the prior year's annual

<div align="center">10</div>

meeting of Owners or (B) in the case of the Company's First Annual Meeting, the notice by the Owner to be timely must be received (1) no earlier than one-hundred-twenty (120) days before such annual meeting and (2) no later than the later of forty-five (45) days before such annual meeting and the tenth (10th) day after the day on which the notice of such annual meeting was first made by mail and via the Datasite; provided, further, that in the case of the First Annual Meeting only, if as of the Testing Date the Key Owner Committee Termination Date has not occurred, then all nominations of Owner Nominees shall be deemed automatically withdrawn as of the Testing Date, and

(ii)    in the case of the nomination of an Owner Nominee for election to the Board at a special meeting of Owners, no earlier than one-hundred-twenty (120) days before and no later than the later of ninety (90) days before such special meeting and the tenth (10th) day after the day on which the notice of such special meeting was first made by mail or via the Datasite.

(d)    In no event shall an adjournment, postponement or deferral, or disclosure of an adjournment, postponement or deferral (including via the Datasite), of an annual or special meeting commence a new time period (or extend any time period) for the giving of the Notice of Nomination.

(e)    The Notice of Nomination shall set forth:

(i)    the Owner Information with respect to each Nominating Owner and Owner Associated Person (except that references to the "Proponent" in Section 2.2(d)(i) to Section 2.2(d)(iii) shall instead refer to the "Nominating Owner" for purposes of this Section 3.1(e)(i));

(ii)    a representation that each Owner nominating an Owner Nominee is a holder of Shares entitled to vote at the meeting and intends to appear in person or by proxy at the meeting to propose such nomination;

(iii)    all information regarding each Owner Nominee and Owner Associated Person that would be required to be disclosed in a solicitation of proxies subject to Section 14 of the Exchange Act, the written consent of each Owner Nominee to being named in a proxy statement as a nominee and to serve if elected and a completed signed questionnaire, representation and agreement required by Section 3.2;

(iv)    a description of all direct and indirect compensation and other material monetary agreements, arrangements and understandings during the past three years, and any other material relationships, between or among a Nominating Owner, Owner Associated Person or their respective associates, or others acting in concert therewith, including all information that would be required to be disclosed pursuant to Rule 404 promulgated under Regulation S-K if the Nominating Owner, Owner Associated Person or any person acting in concert therewith, were the "registrant" for

11

purposes of such rule and the Owner Nominee were a director or executive of such registrant;

(v)     a representation as to whether the Nominating Owners intends (A) to deliver a proxy statement and form of proxy to holders of at least the percentage of the Company's outstanding Shares required to approve the nomination or (B) otherwise to solicit proxies from Owners in support of such nomination;

(vi)     all other information that would be required to be filed with the Commission if the Nominating Owners and Owner Associated Person were participants in a solicitation subject to Section 14 of the Exchange Act; and

(vii)     a representation that the Nominating Owners shall provide any other information reasonably requested by the Company.

(f)     The Nominating Owners shall also provide any other information reasonably requested by the Company within ten (10) Business Days after such request.

(g)     In addition, the Nominating Owner shall affirm as true and correct the information provided to the Company in the Notice of Nomination or at the Company's request pursuant to <u>Section 3.1(f)</u> (and shall update or supplement such information as needed so that such information shall be true and correct) as of (i) the record date for the meeting, (ii) the date that is ten (10) calendar days before the first anniversary date of the Company's proxy statement released to Owners in connection with the previous year's annual meeting (in the case of an annual meeting) or fifty (50) days before the date of the meeting (in the case of a special meeting) and (iii) the date that is ten (10) Business Days before the date of the meeting or any adjournment or postponement thereof.  Such affirmation, update and/or supplement must be delivered personally or mailed to, and received at the Office of the Company, addressed to the Secretary of the Company, by no later than (A) five (5) Business Days after the applicable date specified in clause (i) or (ii) of the foregoing sentence (in the case of the affirmation, update and/or supplement required to be made as of those dates), and (B) not later than seven (7) Business Days before the date for the meeting (in the case of the affirmation, update and/or supplement required to be made as of ten (10) Business Days before the meeting or any adjournment or postponement thereof).

(h)     The person presiding over the meeting shall, if the facts warrant, determine in good faith on the advice of counsel (which may be internal counsel) and declare to the meeting, that the nomination was not made in accordance with the procedures set forth in this <u>Section 3.1</u>, and, if he or she should so determine in good faith on the advice of counsel (which may be internal counsel), he or she shall so declare to the meeting and the defective nomination shall be disregarded.

(i)     If the Owner (or a qualified representative of the Owner) does not appear at the applicable Owner meeting to nominate the Owner Nominees, such nomination shall be disregarded and such business shall not be transacted,

12

notwithstanding that proxies in respect of such vote may have been received by the Company. For purposes of this Section 3.1, to be considered a qualified representative of the Owner, a person must be a duly authorized officer, manager or partner of such Owner or must be authorized by a writing executed by such Owner or an electronic transmission delivered by such Owner to act for such Owner as proxy at the meeting of Owners and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, at the meeting of Owners.

(j)     Nothing in this Section 3.1 shall be deemed to affect the Manager appointment rights of the Key Owner Committee Members or the Designating Key Owners as set forth in the Agreement (and in the case of the exercise of such designation rights compliance with this Section 3.1 shall not be required). For the avoidance of doubt, Managers appointed by the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key Owner Termination Date pursuant to the Agreement shall not be considered "Owner Nominees".

3.2     Nominee Qualifications. To be eligible to be a nominee for election or reelection as a Manager, the Owner Nominee must deliver (in accordance with the time periods prescribed for delivery of notice under Section 3.1) to the Secretary at the Office of the Company (a) a completed and signed written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made (which questionnaire shall be provided by the Secretary upon written request); (b) information as necessary to permit the Board to determine if each Owner Nominee (i) is an Independent Manager, (ii) is not or has not been, within the past three years, an officer or director or equivalent of a "competitor", as defined in Section 8 of the Clayton Antitrust Act of 1914, as amended, or (iii) is not a named subject of a pending criminal proceeding (excluding traffic violations and other minor offenses) or has been convicted in a criminal proceeding within the past ten (10) years; (c) a written representation and agreement (in the form provided by the Secretary upon written request) that such person (i) is not and will not become a party to (A) any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person will act or vote as a Manager on any issue or question (a "Voting Commitment") that has not been disclosed to the Company or (B) any Voting Commitment that could limit or interfere with such person's ability to comply with such person's fiduciary duties as a Manager under Applicable Law, (ii) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Company with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a Manager that has not been disclosed, (iii) will comply with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading and other policies and guidelines of the Company that are applicable to Managers and (iv) currently intends to serve as a Manager for the full term for which he

13

or she is standing for election; and (d) such person's written consent to being named as an Owner Nominee and to serving as a Manager if elected.

3.3    <u>Vacancies</u>.  Subject to the rights of the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key Owner Termination Date pursuant to the Agreement, any vacancies occurring in the Board may be filled for the period until the next annual meeting of Owners by the affirmative votes of a majority of the remaining members of the Board, although less than a quorum, or a sole remaining Manager.  A Manager so elected shall be elected to hold office until the earlier of the expiration of the term of office of the Manager whom he or she has replaced, a successor is elected and qualified or the Manager's death, resignation, disqualification or removal.  If there is a vacancy in the seat of a Manager that is designated by the Key Owner Committee Members prior to the Key Owner Committee Termination Date or the Designating Key Owners prior to the Designating Key Owner Termination Date, as applicable, pursuant to the Agreement, and the Key Owner Committee Members or the Designating Key Owners, as applicable, have proposed a replacement to fill such vacancy, the first order of business at the next meeting of the Board will be to fill such vacancy with such proposed replacement.

3.4    <u>Term and Election of Managers</u>.  Each Manager shall hold office until a successor is duly elected (or appointed, as applicable) or until the Manager's earlier death, resignation, disqualification or removal.  Except as provided in the Agreement (including with respect to Committee Designated Managers and Key Owner Designated Managers), and subject to <u>Section 3.3</u> with respect to the filling of vacancies, each Manager shall be elected by the vote of a plurality of the votes cast with respect to the Managers at any meeting for the election of Managers at which a quorum is present.

3.5    <u>Removal</u>.  Any Manager (other than any Committee Designated Manager or Key Owner Designated Manager) may be removed, with or without cause, by the affirmative vote of Owners holding of a majority of the Shares outstanding.

3.6    <u>Certain Procedures</u>.  The Board may adopt such rules and procedures as it deems reasonably appropriate to effectuate and administer the intent of the provisions of this <u>Article III</u>.

14

## Exhibit A-3

### Certificate of Formation

This **Exhibit A-3** contains the Certificate of Formation for Reorganized Holdings.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit A-3**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "REVLON GROUP HOLDINGS
LLC", FILED IN THIS OFFICE ON THE TWELFTH DAY OF APRIL, A.D.
2023, AT 1:13 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

7402671  8100

SR# 20231408173

Authentication: 203125748

Date: 04-12-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

**CERTIFICATE OF FORMATION**

**OF**

**REVLON GROUP HOLDINGS LLC**

**April 12, 2023**

State of Delaware
Secretary of State
Division of Corporations
Delivered  01:13 PM 04/12/2023
FILED  01:13 PM 04/12/2023
SR 20231408173 - File Number 7402671

This Certificate of Formation of Revlon Group Holdings LLC (the "**Company**") is being duly executed and filed by Kelsey D. Stevens, as an authorized person, to form a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act (6 *Del. C.* §18-201, *et seq.*).

FIRST:  The name of the limited liability company formed hereby is Revlon Group Holdings LLC.

SECOND:  The address of the registered office of the Company in the State of Delaware is c/o Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building Suite 104, City of Wilmington, 19810, County of New Castle.

THIRD:  The name and address of the registered agent for service of process on the Company in the State of Delaware is Corporate Creations Network Inc., 3411 Silverside Road Tatnall Building Suite 104, City of Wilmington, 19810, County of New Castle.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first written above.

By: *Kelsey D. Stevens*
Name:    Kelsey D. Stevens
Title:     Authorized Person

*[Signature Page to Certificate of Formation – Revlon Group Holdings LLC]*

## Exhibit D

**Identities of the Initial Members of the Reorganized Holdings Board**

This **Exhibit D** contains the Identities of the Initial Members of the Reorganized Holdings Board.

Pursuant to Article IV.H of the Plan, as of the Effective Date, the term of the current members of the boards of directors of each Debtor shall expire, and the New Boards shall be appointed in accordance with the New Organizational Documents of each Reorganized Debtor. The members of the Reorganized Holdings Board immediately following the Effective Date have been determined and selected by the Required Consenting 2020 B-2 Lenders. Except as otherwise provided in the Plan, the Confirmation Order, the Plan Supplement, or the New Organizational Documents, the officers of the Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of the Reorganized Debtors on the Effective Date. Except to the extent a Reorganized Debtor will be member managed after the Effective Date, the members of the boards for each Debtor other than Holdings immediately before the Effective Date, as applicable, shall serve as the initial members of the New Subsidiary Boards on the Effective Date.

Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and may be replaced or removed in accordance with such New Organizational Documents.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit D**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

The Consenting 2020 BrandCo B-2 Lenders have selected the following individuals to serve on the Reorganized Holdings Board as of the Effective Date:

| Name | Biography and Affiliations |
| --- | --- |
| **Martin Brok** | Martin Brok is an accomplished executive with over three decades of experience leading brands and retailers. Mr. Brok is currently an Operating Partner at Advent International and founder and Chief Executive Officer of mb Capital. He recently served as Global President and Chief Executive Officer of Sephora, where he reinvigorated growth and transformed the region-centered organization into a global beauty powerhouse. Prior to joining Sephora, Mr. Brok led Starbucks' Europe, Middle East and Africa business, successfully repositioning the company in the region. |

| | |
|---|---|
| | Previously, he served in various leadership roles at Nike, Inc., including Chief Operating Officer of Nike's Direct-to-Consumer business. Before that, he worked for many years at Burger King Holdings, Inc. and The Coca-Cola Company. He currently serves on the board of directors of Self Esteem Brands LLC. |
| **Timothy McLevish** | Timothy (Tim) McLevish is a senior corporate finance executive and board member with deep experience in large-scale, complex, and global consumer businesses. He has over 20 years of Chief Financial Officer experience at five public companies, including Carrier Corporation, Walgreens Boots Alliance, Inc., Kraft Foods Group, Inc., Ingersoll-Rand Corporation, and Mead Corporation. Mr. McLevish previously worked at Touche Ross & Co. after beginning his career in General Mills' accounting department. He is a former member of the boards of directors of Conagra Brands, Inc., Kennametal, Inc., Lamb Weston Holdings, Inc., R.R. Donnelley & Sons Company, URS Corporation, and US Foods, Inc. |
| **Hans Melotte** | Hans Melotte is an international business leader with more than 30 years of operating experience across the consumer products, retail, and health care industries. He brings a unique combination of global P&L accountability with deep leadership expertise across supply chain, procurement, and sustainability. Most recently, he served as President of Starbucks' Global Channel Development business, leading the brand experience outside of the company's retail stores in 85 global markets. Previously, he served as Starbucks' Chief Supply Chain Officer and interim Chief Technology Officer. Prior to joining Starbucks, he spent 20 years at Johnson & Johnson in multiple regions, including as Chief Procurement Officer. He began his career at Procter & Gamble and PricewaterhouseCoopers. |
| **Debra G. Perelman** | Debra (Debbie) G. Perelman has served as the Company's President and Chief Executive Officer since May 2018, as a Director of the Company since June 2015 and as a Director of Products Corporation from May 2018 to June 2022. Ms. Perelman served as a member of the Company's Compensation Committee until January 2018. Prior to her appointment as CEO, Ms. Perelman served as the Company's Chief Operating Officer from January 2018 until May 2018. She also served as the Company's EVP Strategy, Digital Content and New Business Development from December 2017 until January 2018 under a secondment arrangement with MacAndrews & Forbes. From 2014 until December 2017, Ms. Perelman also served as Executive Vice President, Strategy and New Business Development of MacAndrews & Forbes, a diversified holding company, which she joined in 2004 as Vice President. Prior to joining MacAndrews & Forbes, Ms. Perelman held various positions at the Company in corporate finance and brand marketing. Ms. Perelman is also the co- |

| | |
|---|---|
| | founder and serves as a member of the Board of Child Mind Institute, and is on Mastercard's CPG Innovate Steering Committee. |
| **Paul Pressler** | Paul Pressler is an accomplished executive and board member with diverse experience in retail, consumer products, leisure and hospitality, and e-commerce. Mr. Pressler currently serves as Chairman of the board of eBay Inc. He recently served as an Operating Partner at Clayton, Dublier & Rice Inc., where he helped invest in and manage portfolio companies across the consumer and retail sectors. Before joining Clayton, Dublier & Rice, Mr. Pressler served as President and Chief Executive Officer of Gap, Inc. Previously, he worked for 15 years at the Walt Disney Company, ultimately serving as Chairman of Walt Disney Parks and Resorts. In addition to eBay, he currently serves on the boards of directors of MOD Superfast Pizza, LLC and Wilsonart, LLC, and previously served on the boards of directors of AssuraMed Holding, Inc., Avon Products, Inc., David's Bridal, Inc., Gap, Inc., OpenTable, Inc., and SiteOne Landscape Supply, Inc. |
| **Elizabeth A. Smith** | Elizabeth (Liz) A. Smith is an executive and board chair with deep turnaround experience. She most recently served as Executive Chairman and Chief Executive Officer of Bloomin' Brands, Inc., leading the company from challenging times to a successful IPO within three years. Prior to joining Bloomin' Brands, Ms. Smith served as the President of Avon Products, Inc., where she re-engineered the company's innovation strategy, cost structure, operating process, and infrastructure. Previously, she worked for 14 years at Kraft Foods, Inc., ultimately serving as Group VP and President of its U.S. Beverages and Grocery Sectors. She currently serves on the boards of directors of Brown-Forman Corporation and Hilton Worldwide Holdings, Inc., and previously served as Chair of the Federal Reserve Bank of Atlanta and a director of Carter's, Inc., Gap, Inc. and Staples, Inc. |

## Exhibit E

### Description of Transaction Steps

This **Exhibit E** contains the Description of Transaction Steps.  This Exhibit E replaces in its entirety the Exhibit E filed as part of the Third Plan Supplement.  The Description of Transaction Steps shall set forth the material components of the Restructuring Transactions and a description of the steps to be carried out to effectuate the Restructuring Transactions in accordance with the Plan, including the reorganization of the Reorganized Debtors and the issuance of New Common Stock, the New Warrants and the Equity Subscription Rights, the incurrence of the Exit Facilities, and the other distributions under the Plan, through the Chapter 11 Cases, the Plan, or any Definitive Documents, and the intended tax treatment of such steps.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit E**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.



# Revlon, Inc.
# Chapter 11 Emergence
## Transaction Steps Memorandum

**Tax structuring paper**

May 1, 2023

# Abbreviated Pre-transaction structure



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.



# Transaction Steps

# Step 1.1: Satisfaction of Intercompany Claims & Interests

**1.1** The Debtors will (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Required Consenting BrandCo Lenders) capitalize, set off, write off, contribute or distribute to other Debtors or their subsidiaries, or take any such other actions as the Debtors may consider advisable to eliminate, in whole or in part, certain receivables owing by and between the Debtors or their subsidiaries.

*Such actions may occur prior to, or in due course after, the Emergence Date.*



**Notes:**
All defined terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.


© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 1.2: Cancellation of the Revlon Canada, Inc. Preferred Shares Owned by Beautyge Participations, S.L.

**1.2** Beautyge Participations, S.L. owns 100,000 preferred shares issued from Revlon Canada Inc. Revlon Canada Inc. and Beautyge Participations, S.L. enter into a surrender agreement for the cancellation of the Revlon Canada Inc. preferred shares owned by Beautyge Participations, S.L. for no consideration.

*The cancellation contemplated by this step will be effective the day before the Emergence Date.*



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.



# Steps 1.3 - 1.5: Cancellation of BrandCo Claims and BrandCo IP Contribution Agreements; Revision of BrandCo Licensing Agreements

**1.3** Any Intercompany Interests of the OpCo Debtors arising solely from the 2019 and/or 2020 BrandCo IP transactions are cancelled and released for no consideration [not depicted].

**1.4** All remaining Intercompany Claims held by any BrandCo Entity against any OpCo Debtor or by any OpCo Debtor against any BrandCo Entity are deemed settled pursuant to the Plan, and are cancelled, extinguished, and discharged, and are of no further force or effect. In addition, existing Brandco IP contribution agreements will (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Required Consenting BrandCo Lenders) be cancelled, and existing BrandCo licensing agreements will (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Required Consenting BrandCo Lenders) be revised.

**1.5** All other Intercompany Claims and Interests are reinstated unless otherwise determined by the Debtors (with the consent (not to be unreasonably withheld, conditioned or delayed) of the Required Consenting BrandCo Lenders) pursuant to, and in accordance with, the Plan [not depicted].

*The transactions contemplated by these steps will be effective as of the Emergence Date.*



 © 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Steps 2.1 - 2.4: Conversion of RCPC; Guarantee and Assumption of Certain Obligations

**2.1** Holdings forms Revlon NewCo LLC, a wholly-owned Delaware limited liability company ("**LLC**") that elects to be treated as a corporation for U.S. federal income tax purposes [not depicted].

*Revlon NewCo LLC was formed on April 11, 2023. See Step 10.1 for the entity classification election.*

**2.2** Holdings contributes 100% of the RCPC stock to Revlon NewCo in exchange for 100% of the Revlon NewCo LLC membership interests. At the same time, Revlon NewCo LLC agrees to be a guarantor on all Claims against RCPC except to the extent (i) no consideration is to be paid to holders of Claims in respect of such Claims pursuant to the Plan, (ii) such Claims are Reinstated pursuant to Steps 6.1 or 6.2, (iii) such Claims will be satisfied in full after the Emergence Date by any Reorganized Debtor pursuant to Steps 6.1, 6.2, or 6.3, or (iv) such Claims are assumed by any Reorganized Debtor pursuant to the Plan.

**2.3** RCPC converts from a C corporation to an LLC treated as an entity disregarded as separate from Revlon NewCo LLC for U.S. federal income tax purposes ("**RCP LLC**").

*Steps 2.1 through 2.3 are collectively intended to be treated as an "F reorganization" for U.S. federal income tax purposes.*

**2.4** Revlon NewCo LLC assumes (i) liability for all Claims against RCP LLC and its subsidiary Debtors, except to the extent (A) no consideration is to be paid to holders of Claims in respect of such Claims pursuant to the Plan, (B) such Claims are Reinstated pursuant to Steps 6.1 or 6.2, (C) such Claims will be satisfied in full after the Emergence Date by any Reorganized Debtor pursuant to Steps 6.1, 6.2, or 6.3, or (D) such Claims are assumed by any Reorganized Debtor pursuant to the Plan and (ii) any obligation of Holdings, RCPC and its subsidiary Debtors to fund an increase to the GUC Trust / PI Fund Operating Reserve in an aggregate amount of up to $1 million for good cause shown by the GUC Administrator (the "**Operating Reserve Funding Obligation**") [not depicted]. Revlon NewCo LLC also assumes any obligation of Holdings to fund any amounts required to be paid in respect of a Claim pursuant to the Plan that is (a) Reinstated pursuant to Steps 6.1 or 6.2, (b) satisfied in full after the Emergence Date by any Reorganized Debtor pursuant to Steps 6.1, 6.2, or 6.3, or (c) assumed by any Reorganized Debtor pursuant to the Plan (the "**Reorganized Debtor Funding Obligation**") [not depicted].

*The assumption of liabilities in Step 2.4 is intended to be treated as capital contributions down the chain for U.S. federal income tax purposes.*



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Steps 2.5 – 2.7: Transfer of Holdings Assets and Liabilities to RCP LLC

**2.5** All Claims, including all Other General Unsecured Claims and Subordinated Claims, against RCP LLC and its subsidiary Debtors are released for no consideration to the extent not (i) reinstated pursuant to Steps 6.1 or 6.2, (ii) satisfied in full after the Emergence Date by any Reorganized Debtor pursuant to Steps 6.1, 6.2, or 6.3, or (iii) assumed by any Reorganized Debtor pursuant to the Plan [not depicted].

**2.6** Holdings contributes all remaining assets to Revlon NewCo LLC, including its interest in the Retained Preference Actions but excluding the Revlon NewCo LLC membership interests. Revlon NewCo LLC contributes such assets (other than interests in the Retained Preference Actions) to RCP LLC.

**2.7** RCP LLC and its subsidiary Debtors transfer their interests in the Retained Preference Actions to Revlon NewCo.

*Step 2.7 is intended to be treated as distributions up the chain for U.S. federal income tax purposes.*

*The transactions contemplated by steps 2.2-2.7 are expected to be effective on the Emergence Date.*



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.


© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 3.1: Formation of Revlon Group Holdings LLC and subsidiaries

**3.1** One or more representatives of the creditors form Revlon Group Holdings LLC, a Delaware LLC, and Revlon Group Holdings LLC issues one membership interest to each such representative (collectively, the "**Initial Shares**"). Revlon Group Holdings LLC forms Revlon Intermediate Holdings II LLC, a wholly-owned Delaware LLC. Revlon Intermediate Holdings II LLC forms Revlon Intermediate Holdings III LLC, a wholly-owned Delaware LLC. Revlon Intermediate Holdings III LLC, forms Revlon Intermediate Holdings IV LLC, a wholly-owned Delaware LLC. Revlon Intermediate Holdings IV LLC, forms Revlon Intermediate Holdings V LLC, a wholly-owned Delaware LLC. Revlon Intermediate Holdings V LLC, forms Revlon Intermediate Holdings VI LLC, a wholly-owned Delaware LLC.

*Revlon Group Holdings LLC is "Reorganized Holdings" pursuant to the Plan, and is the issuer of New Common Stock, Equity Subscription Rights, and the New Warrants. The entity formations described in this step occurred on April 12, 2023, with the exception of Revlon Intermediate Holdings V LLC and Revlon Intermediate Holdings VI LLC which were formed April 26, 2023. Revlon Intermediate Holdings IV LLC is the "Borrower" under the Take-Back Facility, the Incremental New Money Facility and the Exit ABL Facility (for purposes of the applicable loan documentation as well as the First Lien Exit Facilities Term Sheet and the Debt Commitment Letter).*



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Steps 3.2 – 3.3: Issuance of New Money Facility and Exit ABL Facility

**3.2** Revlon Intermediate Holdings IV LLC issues (i) term loans in an aggregate principal amount of $298 million under the Incremental New Money Facility to the Debt Commitment Parties in exchange for cash and (ii) term loans in an aggregate principal amount of $6 million to the Debt Commitment Parties in satisfaction of the obligations under the Debt Commitment Letter to pay the Closing Date Backstop Commitment Premium (as defined in the Debt Commitment Letter).

**3.3** Revlon Intermediate Holdings IV LLC enters into the Exit ABL Facility and makes an initial draw of $150 million, net of commitment fees.

*The transactions contemplated by these steps will be effective on the Emergence Date.*

*For administrative convenience only, all cash will travel via letter of direction – see step 3.9*



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Steps 3.4 – 3.8: Issuance and Contributions of Securities, Right to Equity Rights Offering and Backstop Proceeds

**3.4** Revlon Group Holdings LLC issues (a) the New Common Stock, (b) Equity Subscription Rights, and (c) New Warrants and contributes such instruments, together with the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) as a contribution to capital to Revlon Intermediate Holdings II LLC.

**3.5** Revlon Intermediate Holdings II LLC contributes (a) New Common Stock, (b) Equity Subscription Rights, (c) the New Warrants, and (d) the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) as a contribution to capital to Revlon Intermediate Holdings III LLC.

**3.6** Revlon Intermediate Holdings III LLC contributes (a) New Common Stock, (b) Equity Subscription Rights, (c) the New Warrants, and (d) the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) as a contribution to capital to Revlon Intermediate Holdings IV LLC.

**3.7** Revlon Intermediate Holdings IV LLC issues the Take-Back Term Loans in an aggregate principal amount of $1,097 million under the Take-Back Term Loan Facility and contributes (a) such Take-Back Term Loans, (b) New Common Stock, (c) Equity Subscription Rights, (d) the New Warrants, (e) the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares), and (f) the cash proceeds from Incremental New Money Facility and Exit ABL Facility issued in Steps 3.2 and 3.3 as a contribution to capital to Revlon Intermediate Holdings V LLC.

**3.8** Revlon Intermediate Holdings V LLC contributes (a) New Common Stock, (b) Equity Subscription Rights, (c) the New Warrants, (d) Take-Back Term Loans, (e) the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares), and (f) the cash proceeds from Incremental New Money Facility and Exit ABL Facility issued in Steps 3.2 and 3.3 as a contribution to capital to Revlon Intermediate Holdings VI LLC.

*The transactions contemplated by these steps will be effective on the Emergence Date.*

*For administrative convenience only, New Common Stock, Equity Subscription Rights, New Warrants, Take-Back Term Loans, cash, and the right to cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) will travel via letter of direction – see step 3.9*



**Notes:**
**[1]** All ownership is 100%, unless otherwise noted.
**[2]** Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 3.9: Transfer of RCP Membership Interests

**3.9** Revlon NewCo LLC transfers 100% of the membership interests in RCP LLC and the right to 18.77% of any Retained Preference Action Net Proceeds to Revlon Intermediate Holdings VI LLC in exchange for New Common Stock, Equity Subscription Rights, New Warrants, Take-Back Term Loans in a principal amount of $1,097 million under the Take-Back Term Loan Facility, the cash proceeds from the Incremental New Money Facility and $102 million of the cash proceeds from the Exit ABL Facility initial draw, the right to the cash proceeds from the Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) and Revlon Intermediate Holdings VI LLC's assumption of the Operating Reserve Funding Obligation, Reorganized Debtor Funding Obligation, and any liability for any costs incurred in connection with winding up Revlon NewCo LLC and Revlon, Inc. in accordance with Step 11.1 hereof (such liability, the "**Winding Up Obligation**").

*A Letter of Direction will be entered into between Revlon Group Holdings LLC, Revlon Intermediate Holdings II LLC, Revlon Intermediate Holdings III LLC, Revlon Intermediate Holdings IV LLC, Revlon Intermediate Holdings V LLC, Revlon Intermediate Holdings VI LLC, Revlon NewCo LLC and RCP LLC pursuant to which, for administrative convenience only, the parties will direct all cash flows arising on the Emergence Date (including inbound wires in respect of the Incremental New Money Facility, Exit ABL Facility, Equity Rights Offering (including, for the avoidance of doubt, with respect to the Reserved Shares and any Unsubscribed Shares) as well as outbound wires in satisfaction of Claims pursuant to the Plan) to be administered through a bank account owned by RCP LLC (with RCP LLC acting as paying agent on behalf of the other parties to such Letter of Direction). Pursuant to the same Letter of Direction, for administrative convenience only, the parties will also direct Revlon Group Holdings LLC to issue the New Common Stock, Equity Subscription Rights and New Warrants directly to those holders of Claims entitled to receive such instruments pursuant to the Plan and the parties will also direct Revlon Intermediate Holdings IV LLC to issue the Take-Back Term Loans directly to those holders of Claims entitled to receive such loans pursuant to the Plan.*

*The transaction contemplated by this step will be effective on the Emergence Date.*

*This Step 3.9 is intended to be treated as a taxable transaction for U.S. federal and applicable state and local income tax purposes.*



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.


© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 4: Satisfaction of OpCo Term Loan Claims and 2020 Term B-2 Loan Claims; Exercise of Equity Backstop

**4.1** Revlon NewCo LLC transfers (A) $56.0 million in cash; (B) 18.0% of the New Common Stock; and (C) 18.0% of the Equity Subscription Rights to Holders of Allowed OpCo Term Loan Claims in satisfaction of such Claims. Whether a Holder receives cash or New Common Stock / Equity Subscription Rights will depend on whether such Holder makes or is deemed to make the Class 4 Equity Election. Simultaneously, some or all Holders of Allowed OpCo Term Loan Claims exercise Equity Subscription Rights and receive shares of New Common Stock from Revlon Group Holdings LLC in exchange for cash paid to Revlon NewCo LLC [not depicted].

**4.2** Holders of Allowed 2020 Term B-2 Loan Claims receive 82.0% of New Common Stock and 82.0% of the Equity Subscription Rights in satisfaction of the Allowed 2020 Term B-2 Loan Claims. Simultaneously, some or all Holders of Allowed 2020 Term B-2 Loan Claims exercise Equity Subscription Rights and receive shares of New Common Stock from Revlon Group Holdings LLC in exchange for cash paid to Revlon NewCo LLC [not depicted].

**4.3** Each Equity Commitment Party purchases from Revlon Group Holdings LLC its Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Shares and its Direct Allocation Percentage (as defined in the Backstop Commitment Agreement) of the Reserved Shares in exchange for cash paid to Revlon NewCo LLC, and Revlon Group Holdings LLC transfers the Unsubscribed Shares and the Direct Allocation Shares to each Equity Commitment Party.

**4.4** Revlon Group Holdings LLC transfers New Common Stock to Equity Commitment Parties in satisfaction of the obligation to pay the Backstop Commitment Premium under the Backstop Commitment Agreement.

**4.5** The Initial Shares are canceled for no consideration [not depicted].

*The transactions contemplated by these steps will be effective on the Emergence Date.*

**Notes:**
The equity percentages noted above are prior to and subject to dilution by any new common stock issued in connection with the Equity Rights Offering, any MIP awards, and / or upon the exercise of the New Warrants.

**Holdings**

**Revlon NewCo LLC**

Holders of OpCo Term Loan Claims

4.1

$56.0 million cash, New Common Stock & Equity Subscription Rights

Cash

4.2

Cash

New Common Stock & Equity Subscription Rights

Holders of 2020 Term B-2 Loan Claims

Creditor Representatives

4.3

Cash

**Revlon Group Holdings LLC**

4.4

New Common Stock (payment of Backstop Commitment Premium)

Equity Commitment Parties

4.3

Unsubscribed Shares & Direct Allocation Shares



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 5: Satisfaction of Unsecured Note Claims

**5.1** Revlon NewCo LLC transfers the New Warrants to Holders of Allowed Unsecured Notes Claims in satisfaction of such Claims.

*The transaction contemplated by this step will be effective on the Emergence Date.*



    © 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 6: Satisfaction of Other Secured Claims, Other Priority Claims, and Unclassified Claims

**6.1** Revlon NewCo LLC, the applicable Debtor, or the applicable Reorganized Debtor, as the case may be, transfers to Holders of Allowed Other Secured Claims owing by such entity such recovery as may be permitted under the Plan in full satisfaction of such Claims. Alternatively, the applicable Debtor, or the applicable Reorganized Debtor, as the case may be, reinstate such claims rendering them unimpaired.

**6.2** Revlon NewCo LLC, the applicable Debtor, or the applicable Reorganized Debtor, as the case may be, transfers to Holders of Allowed Other Priority Claims owing by such entity such recovery as may be permitted under the Plan in full satisfaction of such Claims.

**6.3** Revlon NewCo LLC, the applicable Debtor, or the applicable Reorganized Debtor, as the case may be, transfers to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed ABL DIP Facility Claims, Allowed Term DIP Facility Claims, and any fees due and owing to the U.S. Trustee at the time of Confirmation ("**Unclassified Claims**") owing by such entity such recovery as may be permitted under the Plan in full satisfaction of such Claims.

*Transactions contemplated by these steps will be effective on or after the Emergence Date as provided by the Plan.*




© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 7: Satisfaction of FILO ABL Claims

**7.1**  Revlon NewCo LLC transfers cash to Holders of Allowed FILO ABL Claims in full satisfaction of such Claims.

*The transaction contemplated by this step will be effective on the Emergence Date.*





© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 8: Satisfaction of 2020 Term B-1 Loan Claims

**8.1** Revlon NewCo LLC transfers Take-Back Term Loans to Holders of 2020 Term B-1 Loan Claims in satisfaction of such Claims.

*The transaction contemplated by this step will be effective on the Emergence Date.*




© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 9.1 - 9.4: Satisfaction of Talc Personal Injury Claims, Non-Qualified Pension Claims, Trade Claims and Other General Unsecured Claims (collectively, "Class 9 Holders")

**9.1** Revlon NewCo LLC transfers $15.9 million and the right to receive 36.10% of any Retained Preference Action Net Proceeds to the PI Settlement Fund in respect of Allowed Talc Personal Injury Claims. Amounts will be disbursed from the PI Settlement Fund to Holders of Allowed Talc Personal Injury Claims as soon as reasonably practicable in satisfaction of such Claims.

**9.2** Revlon NewCo LLC transfers $8.7 million cash and the right to receive 19.86% of the Retained Preference Action Net Proceeds to the GUC Trust in respect of Allowed Non-Qualified Pension Claims. Amounts will be disbursed from the GUC Trust to Holders of Allowed Non-Qualified Pension Claims as soon as reasonably practicable in satisfaction of such Claims.

**9.3** Revlon NewCo LLC transfers $11.1 million cash and the right to receive 25.27% of the Retained Preference Action Net Proceeds to the GUC Trust in respect of Allowed Trade Claims. Amounts will be disbursed from the GUC Trust to Holders of Allowed Trade Claims as soon as reasonably practicable in satisfaction of such Claims.

**9.4** Revlon NewCo LLC is released from any further liability in respect to Class 9 Claims [not depicted].



*The PI Settlement Fund is expected to be treated as a "Qualified Settlement Fund" for US federal income tax purposes. The GUC Trust is expected to be treated as a "liquidating trust" for US federal income tax purposes; provided that the GUC Administrator may elect to treat some or all of the GUC Trust Assets as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9.*

*Step 9.4 and the transfers by Revlon NewCo LLC described in steps 9.1-9.3 will be effective on the Emergence Date.*

Note: 18.77% of the Retained Preference Action Net Proceeds will be remitted back to Revlon Intermediate Holdings VI LLC.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 9.5 and 9.6: Funding of GUC Trust / PI Fund Operating Reserve

**9.5**  Revlon NewCo LLC transfers approximately $3.4 million in cash to the GUC Trust / PI Fund Operating Reserve and Revlon NewCo LLC transfers the Retained Preference Actions to the GUC Trust.

**9.6**  After the Emergence Date, as when and to the extent required by the Plan, Revlon Intermediate Holdings VI LLC will fund additional amounts to the GUC Trust / PI Fund Operating Reserve [not depicted].

*The transfers contemplated by step 9.5 will be effective on the Emergence Date. The transfers contemplated in step 9.6 will occur after the Emergence Date as and to the extent provided in the Plan.*




© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 10: Certain U.S. Federal Income Tax Elections

**10.1** Revlon NewCo LLC, Revlon Group Holdings LLC, Revlon Intermediate Holdings II LLC, Revlon Intermediate Holdings III LLC, Revlon Intermediate Holdings IV LLC, Revlon Intermediate Holdings V LLC, and Revlon Intermediate Holdings VI LLC each make an election pursuant to Treas. Reg. § 301.7701-3 to be treated as corporations for U.S. federal income tax purposes, effective as of formation. *The check-the-box elections for all such entities other than Revlon Intermediate Holdings V LLC and Revlon Intermediate Holdings VI LLC have been filed. Check-the-box elections for Revlon Intermediate Holdings V LLC and Revlon Intermediate Holdings VI LLC will be filed after the Emergence Date and within 75 days of formation.*

**10.2** Revlon Group Holdings LLC will elect to be treated as the parent of a consolidated group pursuant to Treas. Reg. § 1.1502-75 and all of Revlon Group Holdings LLC's direct and indirect domestic subsidiaries consent to be members of Revlon Group Holdings LLC's consolidated group for U.S. federal income tax purposes [not depicted]. *Such elections and consents must be filed with Revlon Group Holdings LLC's first U.S. federal income tax return.*

**10.3** Section 338(h)(10) elections may be made on all or some of RCP LLC's domestic direct or indirect subsidiaries that are treated as corporations for U.S. federal income tax purposes [not depicted]. *Any Section 338(h)(10) elections must be filed by the 15th day of the 9th month after the Emergence Date.*

**10.4** Section 338(g) elections may be made on all or some of RCP LLC's foreign direct or indirect subsidiaries that are treated as corporations for U.S. federal income tax purposes [not depicted]. *Any Section 338(g) elections must be filed by the 15th day of the 9th month after the Emergence Date.*

**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.





© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 11: Liquidation of Holdings and Revlon NewCo LLC

**11.1** Holdings and Revlon NewCo LLC wind up operations and liquidate for legal and tax purposes.

*A plan of liquidation will be adopted by each of Holdings and Revlon NewCo LLC on the Emergence Date. Liquidation of each entity is expected to be completed as soon as practicable after the Emergence Date.*



**Notes:**

**[1]** All ownership is 100%, unless otherwise noted.

**[2]** Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Step 12: Contribution to RCP LLC

**12.1** Revlon Intermediate Holdings VI LLC contributes $43 million to RCP LLC as a contribution to capital.

*The transaction contemplated by this step is expected to be effective on the Emergence Date.*

*For administrative convenience only, all cash will travel via letter of direction – see step 3.9*



**Notes:**
**[1]** All ownership is 100%, unless otherwise noted.
**[2]** Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Final Structure (Bruno's)



**Notes:**
[1] All ownership is 100%, unless otherwise noted.
[2] Abbreviated structure shown.



© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

# Disclaimer

In preparing this advice, we considered tax authorities that are subject to change, retroactively, prospectively, or both, and any such changes could affect the conclusions stated herein. This advice is based on the completeness and accuracy of any one or more of the facts, assumptions, and client representations on which we relied, relating to the matters to which this advice is addressed. Unless separately agreed in writing, we will not update our advice for subsequent changes or modifications to the law, regulations, or to the judicial and administrative interpretations thereof, nor to take into account your correcting, updating, or providing new or additional facts or information you supplied or any assumptions on which we relied in preparing our advice.

The advice or other information in this document was prepared for the sole benefit of KPMG's client and may not be relied upon by any other person or organization. KPMG accepts no responsibility or liability in respect of this document to any person or organization other than KPMG's client.


© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.





**kpmg.com/socialmedia**

The information contained herein is of a general nature and is not intended to address the circumstances of any particular individual or entity. Although we endeavor to provide accurate and timely information, there can be no guarantee that such information is accurate as of the date it is received or that it will continue to be accurate in the future. No one should act upon such information without appropriate professional advice after a thorough examination of the particular situation.

© 2023 KPMG LLP, a Delaware limited liability partnership and a member firm of the KPMG global organization of independent member firms affiliated with KPMG International Limited, a private English company limited by guarantee. All rights reserved.

The KPMG name and logo are trademarks used under license by the independent member firms of the KPMG global organization.

## **Exhibit F-1**

### **First Lien Exit Facilities Credit Agreement**

This **Exhibit F-1** contains the First Lien Exit Facilities Credit Agreement.  Pursuant to Article IV.A.1 of the Plan, on the Effective Date, the Reorganized Debtors shall enter into the First Lien Exit Facilities Documents, including the First Lien Exit Facilities Credit Agreement, for the First Lien Exit Facilities.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit F-1**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

*Execution Copy*

---

TERM CREDIT AGREEMENT

among

REVLON INTERMEDIATE HOLDINGS IV LLC,
as the Borrower,

REVLON INTERMEDIATE HOLDINGS III LLC,
as Holdings,

THE LENDERS PARTY HERETO and

JEFFERIES FINANCE LLC,
as Administrative Agent and Collateral Agent

Dated as of May [2], 2023

JEFFERIES FINANCE LLC,
as Lead Arranger and Bookrunner

---

## TABLE OF CONTENTS

Page

SECTION I.    DEFINITIONS ................................................................................................ 2

    1.1    Defined Terms ................................................................................... 2
    1.2    Other Definitional Provisions ......................................................... 53
    1.3    Pro Forma Calculations ................................................................... 56
    1.4    Exchange Rates; Currency Equivalents ........................................... 57
    1.5    [Reserved] ........................................................................................ 57
    1.6    Covenants ......................................................................................... 57
    1.7    Divisions .......................................................................................... 58
    1.8    Interest Rates ................................................................................... 58

SECTION II.    AMOUNT AND TERMS OF COMMITMENTS .......................................... 59

    2.1    Term Commitments .......................................................................... 59
    2.2    Procedures for Borrowing ................................................................ 59
    2.3    Repayment of Initial Term Loans .................................................... 60
    2.4    [Reserved] ........................................................................................ 60
    2.5    [Reserved] ........................................................................................ 60
    2.6    [Reserved] ........................................................................................ 60
    2.7    [Reserved] ........................................................................................ 60
    2.8    Repayment of Loans ........................................................................ 60
    2.9    Fees, Premiums and Discounts ........................................................ 61
    2.10    Prepayment Premium ...................................................................... 61
    2.11    Optional Prepayments ..................................................................... 62
    2.12    Mandatory Prepayments .................................................................. 62
    2.13    Conversion and Continuation Options ............................................. 65
    2.14    Minimum Amounts and Maximum Number of SOFR Tranches ...... 66
    2.15    Interest Rates and Payment Dates ................................................... 66
    2.16    Computation of Interest and Fees .................................................... 67
    2.17    Inability to Determine Rates; Benchmark Replacement Setting ...... 67
    2.18    Pro Rata Treatment and Payments ................................................... 69
    2.19    Requirements of Law ....................................................................... 70
    2.20    Taxes ................................................................................................ 72
    2.21    Indemnity ......................................................................................... 74
    2.22    Illegality ........................................................................................... 75
    2.23    Change of Lending Office ................................................................ 75
    2.24    Replacement of Lenders ................................................................... 75
    2.25    [Reserved] ........................................................................................ 76
    2.26    Extension of Term Loans ................................................................. 76
    2.27    Defaulting Lenders .......................................................................... 79

SECTION III.    [RESERVED] ............................................................................................... 80

SECTION IV.    REPRESENTATIONS AND WARRANTIES.................................................. 80

4.1    Financial Condition ................................................................. 80
4.2    No Change ............................................................................ 80
4.3    Existence; Compliance with Law ............................................ 80
4.4    Corporate Power; Authorization; Enforceable Obligations ............ 81
4.5    No Legal Bar ........................................................................ 81
4.6    No Material Litigation ........................................................... 82
4.7    No Default ........................................................................... 82
4.8    Ownership of Property; Liens ................................................. 82
4.9    Intellectual Property .............................................................. 82
4.10   Taxes .................................................................................. 82
4.11   Federal Regulations .............................................................. 82
4.12   ERISA and Canadian Pension Plans ........................................ 82
4.13   Investment Company Act ....................................................... 83
4.14   Subsidiaries ......................................................................... 83
4.15   Environmental Matters .......................................................... 83
4.16   Accuracy of Information, etc. .................................................. 83
4.17   Security Documents .............................................................. 84
4.18   Solvency ............................................................................. 85
4.19   Anti-Terrorism ..................................................................... 85
4.20   Use of Proceeds ................................................................... 85
4.21   Labor Matters ...................................................................... 85
4.22   [Reserved] ........................................................................... 85
4.23   Sanctions ............................................................................. 85
4.24   Anti-Corruption Compliance .................................................. 85
4.25   Beneficial Ownership Certification .......................................... 86

SECTION V.    CONDITIONS PRECEDENT ................................................. 86

5.1    Conditions to Closing Date ..................................................... 86
5.2    Conditions to Each Extension of Credit After Closing Date ........... 89

SECTION VI.         AFFIRMATIVE COVENANTS ...................................... 90

6.1    Financial Statements ............................................................. 90
6.2    Certificates; Other Information ............................................... 91
6.3    Payment of Taxes .................................................................. 92
6.4    Conduct of Business; Maintenance of Existence; Compliance with Requirements
       of Law ................................................................................. 92
6.5    Maintenance of Property; Insurance ......................................... 92
6.6    Inspection of Property; Books and Records; Discussions ............... 93
6.7    Notices ................................................................................ 94
6.8    Additional Collateral, etc. ...................................................... 94
6.9    Use of Proceeds ................................................................... 99
6.10   Post-Closing ........................................................................ 100
6.11   [Reserved] ........................................................................... 100
6.12   Line of Business ................................................................... 100
6.13   [Reserved] ........................................................................... 100
6.14   Changes in Jurisdictions of Organization; Name ........................ 100

6.15    Additional Beneficial Ownership Certification ................................................ 100
6.16    People with Significant Control Regime ............................................................ 100
6.17    Canadian Defined Benefit Pension Plan Reporting ........................................ 100

SECTION VII.          NEGATIVE COVENANTS ........................................................ 100

7.1     [Reserved] .......................................................................................................... 100
7.2     Indebtedness ....................................................................................................... 100
7.3     Liens ................................................................................................................... 104
7.4     Fundamental Changes ........................................................................................ 109
7.5     Dispositions of Property .................................................................................... 110
7.6     Restricted Payments .......................................................................................... 113
7.7     Investments ........................................................................................................ 115
7.8     Prepayments, Etc. of Indebtedness; Amendments ........................................... 119
7.9     Transactions with Affiliates .............................................................................. 121
7.10    Sales and Leasebacks ........................................................................................ 123
7.11    Changes in Fiscal Periods ................................................................................. 123
7.12    Negative Pledge Clauses ................................................................................... 123
7.13    Clauses Restricting Subsidiary Distributions ................................................... 125
7.14    Limitation on Hedge Agreements ...................................................................... 127
7.15    Amendment of Company Tax Sharing Agreement ............................................ 127
7.16    Canadian Defined Benefit Pension Plans ......................................................... 127

SECTION VIIA.  HOLDINGS NEGATIVE COVENANTS ............................................ 127

SECTION VIII.         EVENTS OF DEFAULT ........................................................... 127

8.1     Events of Default ............................................................................................... 127

SECTION IX.          THE AGENTS ....................................................................... 132

9.1     Appointment ...................................................................................................... 132
9.2     Delegation of Duties .......................................................................................... 133
9.3     Exculpatory Provisions ...................................................................................... 133
9.4     Reliance by the Agents ...................................................................................... 133
9.5     Notice of Default ............................................................................................... 134
9.6     Non-Reliance on Agents and Other Lenders ..................................................... 134
9.7     Indemnification .................................................................................................. 134
9.8     Agent in Its Individual Capacity ....................................................................... 135
9.9     Successor Agents ............................................................................................... 135
9.10    Certain Collateral Matters ................................................................................. 136
9.11    Agents May File Proofs of Claim ...................................................................... 137
9.12    Lead Arranger and Bookrunner.. ....................................................................... 137
9.13    Appointment of Collateral Agent as Security Trustee. ..................................... 137

SECTION X.   MISCELLANEOUS ...................................................................... 140

10.1    Amendments and Waivers ................................................................................. 140
10.2    Notices; Electronic Communications ................................................................ 144

iii

| | | |
|---|---|---|
| 10.3 | No Waiver; Cumulative Remedies | 146 |
| 10.4 | Survival of Representations and Warranties | 146 |
| 10.5 | Payment of Expenses; Indemnification | 146 |
| 10.6 | Successors and Assigns; Participations and Assignments | 148 |
| 10.7 | Adjustments; Set off | 152 |
| 10.8 | Counterparts | 153 |
| 10.9 | Severability | 153 |
| 10.10 | Integration | 153 |
| 10.11 | GOVERNING LAW | 153 |
| 10.12 | Submission to Jurisdiction; Waivers | 153 |
| 10.13 | Acknowledgments | 155 |
| 10.14 | Confidentiality | 155 |
| 10.15 | Release of Collateral and Guarantee Obligations; Subordination of Liens | 157 |
| 10.16 | Accounting Changes | 158 |
| 10.17 | WAIVERS OF JURY TRIAL | 159 |
| 10.18 | USA PATRIOT ACT | 159 |
| 10.19 | [Reserved] | 160 |
| 10.20 | Interest Rate Limitation | 160 |
| 10.21 | Payments Set Aside | 160 |
| 10.22 | Electronic Execution of Assignments and Certain Other Documents | 160 |
| 10.23 | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 160 |
| 10.24 | Hypothecary Representative | 161 |
| 10.25 | Emergence Date Transaction Steps | 161 |

SCHEDULES:

| | |
|---|---|
| 1.1A | Consolidated EBITDA Add-Backs |
| 2.1A | Initial Cashless Term Commitments |
| 2.1B | Initial Funded Term Commitments |
| 4.8 | Real Property |
| 4.14 | Subsidiaries |
| 4.17 | UCC Filing Jurisdictions |
| 6.10 | Post-Closing Matters |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.5(q) | Permitted Dispositions |
| 7.6(i) | Permitted Restricted Payments |
| 7.7 | Existing Investments |
| 7.7(h) | Permitted Investments |
| 7.9 | Transactions with Affiliates |
| 7.12 | Existing Negative Pledge Clauses |
| 7.13 | Clauses Restricting Subsidiary Distributions |

EXHIBITS:

| | |
|---|---|
| A-1 | Form of Guarantee and Collateral Agreement |
| A-2 | Form of Canadian Collateral Agreement |
| B | Form of Compliance Certificate |

iv

| | |
|---|---|
| C | Form of Closing Certificate |
| D | Form of Assignment and Assumption |
| E | Form of Committed Loan Notice |
| F | Form of Exemption Certificate |
| G | Form of Solvency Certificate |
| H | [Reserved] |
| I | Form of Prepayment Option Notice |
| J | Form of Term Loan Note |
| K | [Reserved] |
| L | Form of ABL Intercreditor Agreement |
| M | Form of Mortgage |

TERM CREDIT AGREEMENT, dated as of May [2], 2023, among Revlon Intermediate Holdings IV LLC, a Delaware limited liability company (the "Company" or the "Borrower"), Revlon Intermediate Holdings III LLC, a Delaware limited liability company ("Holdings"), solely for purposes of Section VIIA, the financial institutions or other entities from time to time parties to this Agreement (the "Lenders") and Jefferies Finance LLC, as Administrative Agent and Collateral Agent.

WITNESSETH:

WHEREAS, on June 15, 2022, Revlon, Inc. ("Revlon Holdings"), a Delaware corporation, Revlon Consumer Products Corporation, a Delaware corporation ("RCPC"), and certain of RCPC's Subsidiaries (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (such court, the "Bankruptcy Court"; and each such case of RCPC and each other Debtor, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") and continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Revlon Holdings, in its capacity as foreign representative on behalf of the Debtors' estates, filed an application with the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada under Part IV of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended, to recognize the Chapter 11 Cases as "foreign main proceedings" and grant certain customary related relief (the "Recognition Proceedings");

WHEREAS, on April 3, 2023 the Bankruptcy Court entered the Confirmation Order (as defined herein) approving the Restructuring Plan (as defined herein) of the Debtors, and concurrently with the making (and/or deemed making) of the Initial Term Loans hereunder, the effective date with respect to the Restructuring Plan has occurred. The Confirmation Order was recognized and given full force and effect in Canada pursuant to an order in the Recognition Proceedings granted on April 21, 2023 (the "Plan Recognition Order");

WHEREAS, pursuant to the terms of the Restructuring Plan, the holders of Allowed 2020 Term B-1 Loan Claims (as defined in the Restructuring Plan) are entitled to receive on account of such claims, among other things, Initial Term Loans provided for hereunder in the aggregate principal amount of $1,096,527,422.58;

WHEREAS, in accordance with the Restructuring Plan, the Borrower will transfer a portion of the proceeds of the Initial Term Loans in respect of the Initial Funded Term Commitments to Revlon Intermediate Holdings V LLC, a Delaware limited liability company, which will distribute such proceeds in accordance with the Restructuring Plan;

WHEREAS, in each case in accordance with the Restructuring Plan and as set forth herein, (i) the Initial Term Loans in respect of the Initial Cashless Term Commitments will initially be deemed made by Revlon Intermediate Holdings V LLC, (ii) Revlon Intermediate Holdings V LLC will immediately thereafter contribute and assign such Initial Term Loans to Revlon Intermediate Holdings VI LLC, (iii) Revlon Intermediate Holdings VI LLC will immediately thereafter transfer and assign such Initial Term Loans to Revlon NewCo, LLC and (iv) Revlon NewCo, LLC will immediately thereafter distribute and assign such Initial Term Loans to the Lenders with Initial Cashless Term Commitments; and

WHEREAS, by execution and delivery of this Agreement and the other Loan Documents and entry of the Confirmation Order in respect of the Debtors, Holdings and the Subsidiary Guarantors, as applicable,

1

agree to guarantee the Obligations, and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, the Collateral, on and subject to the terms and priorities set forth in the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other Loan Documents, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I.    DEFINITIONS

1.1    <u>Defined Terms</u>.  As used in this Agreement, the terms listed in this <u>Section 1.1</u> shall have the respective meanings set forth in this <u>Section 1.1</u>.

"<u>ABL Designated Banking Services Obligations</u>": as defined in the ABL Intercreditor Agreement.

"<u>ABL Designated Additional Obligations</u>": as defined in the ABL Intercreditor Agreement.

"<u>ABL Designated Swap Obligations</u>": as defined in the ABL Intercreditor Agreement.

"<u>ABL Documents</u>": the collective reference to the ABL Facility Agreement and any other document, agreement and instrument executed and/or delivered in connection therewith or relating thereto, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"<u>ABL Facility</u>": the asset-based revolving credit facility made available to the Borrower pursuant to the ABL Facility Agreement.

"<u>ABL Facility Agreement</u>": the Asset-Based Revolving Credit Agreement, dated as of May 2, 2023, among the Borrower, Holdings, the lenders from time to time party thereto and MidCap Funding IV Trust, as administrative agent and collateral agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"<u>ABL Facility First Priority Collateral</u>":  as defined in the ABL Intercreditor Agreement.

"<u>ABL Intercreditor Agreement</u>":  the ABL Intercreditor Agreement, dated as of the Closing Date, among the Borrower, Holdings, the Subsidiary Guarantors, the Collateral Agent, the collateral agent under the ABL Documents and the other parties from time to time party thereto, substantially in the form of <u>Exhibit L</u>, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"<u>ABL Loan</u>": any loan made pursuant to the ABL Facility.

"<u>ABR</u>":  for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate plus 1.00%.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate, respectively.  If the ABR is being used as an alternate rate of interest pursuant to <u>Section 2.17</u> (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to <u>Section 2.17(b)</u>), then the ABR shall be the greater of <u>clause (a)</u> and <u>(b)</u> above and shall be determined without

2

reference to underlined clause (c) above.  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"ABR Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Accounting Changes":  as defined in Section 10.16.

"Adjusted Term SOFR Rate": an interest rate per annum equal to Term SOFR for such Interest Period; provided that, if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Administrative Agent":  Jefferies Finance LLC, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, in either case whether by contract or otherwise. For purposes of this Agreement and the other Loan Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.

"Affiliate Lender": any Lender (whether individually or among its Affiliates) that holds, directly or indirectly, more than 30% of the then outstanding Capital Stock of Holdings having ordinary voting power.

"Agent Fee Letter": the Agent Fee Letter dated as of May 2, 2023, among the Borrower and the Administrative Agent.

"Agents":  the collective reference to the Collateral Agent, the Administrative Agent, the Lead Arranger and the Bookrunner.

"Agreed Purposes":  as defined in Section 10.14.

"Agreement":  this Term Credit Agreement, as amended, restated, supplemented, waived or otherwise modified from time to time.

"Anti-Corruption Law":  the United States Foreign Corrupt Practices Act of 1977, as amended, the Corruption of Foreign Public Officials Act (Canada), as amended, the U.K. Bribery Act 2010, or any applicable law or regulation implementing the OECD Convention on Combatting Bribery of Foreign Public Officials.

"Applicable Margin":  (a) with respect to Initial Term Loans that are ABR Loans, 5.875% and (b) with respect to Initial Term Loans that are SOFR Loans, 6.875%.

"Applicable Premium":  as defined in Section 2.10.

3

"<u>Applicable Threshold Price</u>": as defined in the definition of "Dutch Auction".

"<u>Approved Fund</u>":  as defined in <u>Section 10.6(b)</u>.

"<u>Asset Sale</u>":  any Disposition of Property or exclusive licenses or series of related Dispositions of Property or exclusive licenses by the Borrower or any of its Subsidiaries (a) under <u>Section 7.5(e)</u>, <u>(f)</u>, <u>(k)</u> or <u>(p)</u>, or (b) not otherwise permitted under <u>Section 7.5</u>.

"<u>Asset Sale Trigger Date</u>":  as defined in <u>Section 2.12(b)</u>.

"<u>Assignee</u>":  as defined in <u>Section 10.6(b)</u>.

"<u>Assignment and Assumption</u>":  an Assignment and Assumption, substantially in the form of <u>Exhibit D</u> or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"<u>Auction Amount</u>": as defined in the definition of "Dutch Auction".

"<u>Auction Assignment and Acceptance</u>": as defined in the definition of "Dutch Auction".

"<u>Auction Manager</u>": the party appointed by the Required Lenders, which may be the Administrative Agent or another financial institution or advisor.

"<u>Auction Notice</u>": as defined in the definition of "Dutch Auction".

"<u>Auction Offeror</u>": as defined in the definition of "Dutch Auction".

"<u>Available Amount</u>":  as at any date, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to, without duplication:

(a)        [reserved]; <u>plus</u>

(b)        an amount (which amount shall not be less than zero) equal to 50% of the Consolidated Net Income of the Borrower for the period (taken as one accounting period) from June 30, 2023 to the end of the Borrower's most recently ended fiscal quarter for which financial statements have been delivered pursuant to <u>Section 6.1</u>; <u>plus</u>

(c)        [reserved]; <u>plus</u>

(d)        (i) the cumulative amount of cash proceeds from (x) the sale of Capital Stock (other than Disqualified Capital Stock) of the Borrower, Holdings or any Parent Company (y) capital contributions, in each case, after the Closing Date, which proceeds have been contributed as common equity to the capital of the Borrower and not previously applied for a purpose other than use in the Available Amount, in each case, other than any Excluded Contribution Amount, and (ii) Capital Stock (other than Disqualified Capital Stock) of Holdings, the Borrower or any Parent Company issued upon conversion of Indebtedness (other than Indebtedness that is contractually subordinated to the Obligations in right of payment) of the Borrower or any Subsidiary owed to a person other than the Borrower or a Subsidiary not previously applied for a purpose other than use in the Available Amount; <u>provided</u>, that this <u>clause (d)</u> shall exclude sales of Capital Stock financed as contemplated by <u>Section 7.7(g)</u> and any amounts used to finance the payments or distributions in respect of any Junior Financing pursuant to <u>Section 7.8</u>; <u>plus</u>

4

(e)        [reserved]; plus

(f)        [reserved]; plus

(g)        [reserved]; plus

(h)        [reserved]; plus

(i)        an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in cash or Cash Equivalents by the Borrower or any of its Subsidiaries after the Closing Date in respect of any Investments made pursuant to Section 7.7(v)(ii); plus

(j)        Declined Amounts not otherwise used to make any Investment, Restricted Payment or payment or distribution made in respect of any Junior Financing not from the Available Amount; minus

(k)        any amounts thereof used to make Investments pursuant to Section 7.7(v)(ii) after the Closing Date prior to such time; minus

(l)        the cumulative amount of Restricted Payments made pursuant to Section 7.6(b) prior to such time; minus

(m)       any amount thereof used to make payments or distributions in respect of Junior Financings pursuant to Section 7.8(a)(i) (other than payments made with proceeds from the issuance of Capital Stock that were excluded from the calculation of the Available Amount pursuant to clause (d) above);

provided that, notwithstanding anything to the contrary, in no event shall the Restructuring Transactions (as defined in the Restructuring Plan) result in an increase of the Available Amount.

"Available Tenor": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.17.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

5

"Bankruptcy Code": Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court": as defined in the recitals hereto.

"Benchmark": initially, Term SOFR; provided that, if a replacement of the Benchmark has occurred pursuant to Section 2.17, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.17.

"Benchmark Replacement": for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)    the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable currency at such time and (b) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment": with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable currency at such time.

"Benchmark Replacement Date": the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

6

(2)        in the case of clause (3) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event": with respect to any Benchmark, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period": with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17 and (y) ending at the

time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17.

"Beneficial Ownership Certification": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Benefited Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors": (a) with respect to a corporation or company, the board of directors of the corporation or company or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the board of directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Bookrunner": Jefferies Finance LLC, in its capacity as sole bookrunner.

"Borrower":  as defined in the preamble hereto.

"Borrower Materials": as defined in Section 10.2(c).

"Borrowing": Loans made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"BrandCo(s)":  each of  (i) Beautyge II, LLC, a Delaware limited liability company, (ii) BrandCo Almay 2020 LLC, a Delaware limited liability company, (iii) BrandCo Charlie 2020 LLC, a Delaware limited liability company, (iv) BrandCo CND 2020 LLC, a Delaware limited liability company, (v) BrandCo Curve 2020 LLC, a Delaware limited liability company, (vi) BrandCo Elizabeth Arden 2020 LLC, a Delaware limited liability company, (vii) BrandCo Giorgio Beverly Hills 2020 LLC, a Delaware limited liability company, (viii) BrandCo Halston 2020 LLC, a Delaware limited liability company, (ix) BrandCo Jean Nate 2020 LLC, a Delaware limited liability company, (x) BrandCo Mitchum 2020 LLC, a Delaware limited liability company, (xi) BrandCo Multicultural Group 2020 LLC, a Delaware limited liability company, (xii) BrandCo PS 2020 LLC, a Delaware limited liability company, (xiii) BrandCo White Shoulders 2020 LLC, a Delaware limited liability company and (xiv) each other Subsidiary of BrandCo Cayman Holdings acquired, formed or otherwise existing after the Closing Date.

"BrandCo Cayman Holdings":  Beautyge I, an exempted company incorporated in the Cayman Islands.

"BrandCo Entities":  each BrandCo and BrandCo Cayman Holdings.

"<u>Business</u>":  the business activities and operations of the Borrower and/or its Subsidiaries on the Closing Date, after giving effect to the Transactions.

"<u>Business Day</u>":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Administrative Agent's office is located; <u>provided</u> that, with respect to any Borrowing, prepayment or interest election with respect to any SOFR Loan, the term "Business Day" shall mean any day that is a U.S. Government Securities Business Day.

"<u>Calculation Date</u>":  as defined in <u>Section 1.3(a)</u>.

"<u>Canadian Anti-Money Laundering & Anti-Terrorism Legislation</u>": the Criminal Code (Canada), the Proceeds of Crime Act and any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto.

"<u>Canadian Bankruptcy and Insolvency Law</u>": any federal or provincial Canadian law from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtor, including the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Winding up and Restructuring Act (Canada), the Canada Business Corporations Act, the Business Corporations Act (Ontario) and any other applicable corporations legislation.

"<u>Canadian Blocked Person</u>": any Person whose property or interests in property are blocked or subject to blocking pursuant to, or as described in, any Canadian Economic Sanctions and Export Control Laws.

"<u>Canadian Collateral Agreement</u>": the Canadian Collateral Agreement, dated as of the Closing Date among Revlon Canada Inc., Elizabeth Arden (Canada) Limited, each other Grantor (as defined therein) from time to time party thereto and the Collateral Agent substantially in the form of <u>Exhibit A-2</u>, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"<u>Canadian Defined Benefit Pension Plan</u>": a Canadian Pension Plan which contains a "defined benefit provision," as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"<u>Canadian Economic Sanctions and Export Control Laws</u>": any Canadian laws, regulations or orders governing transactions in controlled goods or technologies or dealings with countries, entities, organizations, or individuals subject to economic sanctions and similar measures, including, without limitation, the Special Economic Measures Act (Canada), the United Nations Act, (Canada), the Justice for Victims of Corrupt Foreign Officials Act (Canada), the Freezing Assets of Corrupt Foreign Officials Act (Canada), Part II.1 of the Criminal Code (Canada) and the Export and Import Permits Act (Canada), and any related regulations.

"<u>Canadian Multi-employer Plan</u>": a Canadian Pension Plan that constitutes a "multi-employer pension plan," as defined in Section 8500(i) of the Income Tax Regulations (Canada).

"<u>Canadian Pension Plans</u>": any plan, program or arrangement that is a pension plan that is required to be registered under any applicable Canadian federal, provincial or territorial pension legislation, whether or not registered under any such laws, and includes a "registered pension plan", as that term is defined in subsection 248(1) of the Income Tax Act (Canada) which plan is sponsored, administered or contributed to, or required to be contributed to, by any Loan Party or under which any Loan Party has any actual or potential liability, but for certainty does not include Canadian Multi-employer Plans or plans

9

established by statute, which shall include the Canada Pension Plan maintained by the government of Canada and the Quebec Pension Plan maintained by the Province of Quebec.

"Capital Expenditures":  for any period, with respect to any Person, (a) the additions to property, plant and equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person, and other capital expenditures of such Person that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP and (b) Capital Lease Obligations incurred by such Person; provided, that in any event the term "Capital Expenditures" shall exclude:  (i) any Permitted Acquisition and any other Investment permitted hereunder; (ii) any expenditures to the extent financed with any Reinvestment Deferred Amount or the proceeds of any Disposition or Recovery Event that are not required to be applied to prepay Term Loans; (iii) expenditures for leasehold improvements for which such Person is reimbursed in cash or receives a credit; (iv) capital expenditures to the extent they are made with the proceeds of equity contributions (other than in respect of Disqualified Capital Stock) made to the Borrower after the Closing Date; (v) capitalized interest in respect of operating or capital leases; (vi) the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; and (vii) any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, provided, that for the purposes of this definition, "GAAP" shall mean, subject to Section 10.16, generally accepted accounting principles in the United States as in effect on the Closing Date.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock or authorized share capital of a corporation or company, and any and all equivalent ownership interests in a Person (other than a corporation).

"Cash Equivalents":

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America or Canada (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America or Canada, as applicable), in each case maturing within 18 months from the date of acquisition thereof;

(b)    certificates of deposit, time deposits and Eurodollar time deposits with maturities of 18 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 18 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus at the date of acquisition thereof in excess of $250,000,000;

(c)    repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)    commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and maturing within 18 months after the date of acquisition and Indebtedness and preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 18 months or less from the date of acquisition;

(e)    readily marketable direct obligations issued by or directly and fully guaranteed or insured by any state of the United States or any political subdivision thereof or any province of Canada or any public instrumentality thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 18 months or less from the date of acquisition;

(f)    marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 18 months after the date of creation or acquisition thereof;

(g)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(h)    (x) such local currencies in those countries in which the Borrower and its Subsidiaries transact business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (g) or otherwise customarily utilized in countries in which the Borrower and its Subsidiaries operate for short term cash management purposes; and

(i)    Investments in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in clauses (a) through (h) of this definition.

"Cash Management Obligations": obligations in respect of any overdraft or other liabilities arising from treasury, depository and cash management services, credit or debit card, or any automated clearing house transfers of funds.

"Cayman Pledge Agreement": an equitable mortgage over the shares of BrandCo Cayman Holdings dated as of the Closing Date entered into between Beautyge Brands U.S.A., Inc. and the Collateral Agent.

"Certificated Security":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a non-US Guarantor), as the context may require.

"Chapter 11 Cases": as defined in the recitals hereto.

"Charges":  as defined in Section 10.20.

"Chattel Paper":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as the context may require.

"Closing Date":  May 2, 2023.

11

"Code":  the Internal Revenue Code of 1986, as amended from time to time (unless otherwise indicated).

"Collateral":  all the "Collateral" as defined in any Security Document and all other property that is subject to any Lien in favor of the Secured Parties and/or the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties to secure the Obligations pursuant to any Security Document.

"Collateral Agent":  Jefferies Finance LLC, in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents and any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Commitment":  as to any Lender, its Initial Term Commitment.

"Committed Loan Notice": a request by the Borrower in accordance with the terms of Section 2.2 and substantially in the form of Exhibit E or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent).

"Committed Reinvestment Amount":  as defined in the definition of "Reinvestment Prepayment Amount".

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with any Loan Party within the meaning of Section 4001 of ERISA or is part of a group that includes any Loan Party and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Company":  as defined in the preamble hereto.

"Company Tax Sharing Agreement": the Tax Sharing Agreement, dated as of the Closing Date, among RCP LLC, the Company, certain of its Subsidiaries, Revlon NewCo, Revlon Holdings and Mafco, as amended, supplemented or otherwise modified from time to time in accordance with the provisions of Section 7.15.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Confidential Information":  as defined in Section 10.14.

"Confirmation Order":  the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] which have been entered by the Bankruptcy Court on April 3, 2023.

"Conforming Changes": with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of

"Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.21 and other technical, administrative or operational matters) that the Administrative Agent decides in its reasonable discretion may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides in its reasonable discretion that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines in its reasonable discretion and in consultation with the Borrower that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consolidated Current Assets":  with respect to any Person at any date, in accordance with GAAP, the total consolidated current assets on a consolidated balance sheet of such Person and its Subsidiaries *less* any cash and Cash Equivalents.

"Consolidated Current Liabilities":  with respect to any Person at any date, in accordance with GAAP, the total current liabilities on a consolidated balance sheet of such Person and its Subsidiaries *less* any short-term borrowings and the current portion of any long-term Indebtedness.

"Consolidated EBITDA":  of any Person for any period, shall mean the Consolidated Net Income of such Person and its Subsidiaries for such period ***plus***, without duplication and, except with respect to clause (n) of this definition, if applicable, to the extent deducted in calculating such Consolidated Net Income for such period, the sum of:

(a)	provisions for taxes based on income (or similar taxes in lieu of income taxes), profits, capital (or equivalents), including federal, foreign, state, local, franchise, excise and similar taxes and foreign withholding taxes paid or accrued during such period (including penalties and interest related to taxes or arising from tax examinations);

(b)	Consolidated Net Interest Expense and, to the extent not reflected in such Consolidated Net Interest Expense, any net losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk or foreign exchange rate risk, amortization or write-off of debt discount and debt issuance costs and commissions, premiums, discounts and other fees and charges associated with Indebtedness (including commitment, letter of credit and administrative fees and charges with respect to the Facilities and the ABL Facility);

(c)	depreciation and amortization expense and impairment charges (including deferred financing fees, original issue discount, amortization of convertible notes and other convertible debt instruments, capitalized software expenditures, amortization of intangibles (including goodwill), organization costs and amortization of unrecognized prior service costs, and actuarial losses related to pensions, and other post-employment benefits);

(d)	subject to the Shared EBITDA Cap, all management, monitoring, consulting and advisory fees, and due diligence expense and other transaction fees and expenses and related expenses paid (or any accruals related to such fees or related expenses) (including by means of a dividend) during such period;

(e)	subject to the Shared EBITDA Cap, any extraordinary, unusual or non-recurring charges (including post-emergence ECIP and employee retention programs solely for the balance of calendar year

13

2023), expenses or losses (including (x) losses on the books of such Person in respect of sales of assets outside of the ordinary course of business that do not have a negative impact on cash flows for such periods, (y) restructuring and integration costs or reserves, including any retention and severance costs, costs associated with office and facility openings, closings and consolidations, relocation costs, contract termination costs, future lease commitments, excess pension charges and other non-recurring business optimization expenses and legal and settlement costs, and (z) any expenses in connection with the Transactions);

(f)      any other non-cash expenses or losses (other than the accrual of expenses in the ordinary course) including non-cash stock compensation expense, but excluding any such items (i) in respect of which cash was paid in a prior period or will be paid in a future period or (ii) which represent the reversal in such period of any accrual of, or reserve for, anticipated cash charges in any prior period where such accrual or reserve is no longer required, all as determined on a consolidated basis;

(g)      subject to the Shared EBITDA Cap, transaction costs, fees and expenses (other than in respect of the Transactions) (in each case whether or not any transaction is actually consummated) (including those with respect to any amendments or waivers of the Loan Documents or the ABL Documents, and those payable in connection with the sale of Capital Stock, recapitalization, the incurrence of Indebtedness permitted by Section 7.2, transactions permitted by Section 7.4, Dispositions permitted by Section 7.5, or any Permitted Acquisition or other Investment permitted by Section 7.7);

(h)      accruals and reserves that are established or adjusted within twelve months after the Closing Date and that are so required to be established or adjusted as a result of adoption or modification of accounting policies;

(i)      subject to the Shared EBITDA Cap, all costs and expenses incurred in defending, settling and compromising any pending or threatened litigation claim, action or legal dispute in such period;

(j)      subject to the Shared EBITDA Cap, charges, losses, lost profits, expenses or write-offs to the extent indemnified or insured by a third party, including expenses covered by indemnification provisions in any Qualified Contract or any agreement in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment permitted by Section 7.7, in each case, to the extent that coverage has not been denied (other than any such denial that is being contested by the Borrower and/or its Subsidiaries in good faith) and so long as such amounts are actually reimbursed to such Person and its Subsidiaries in cash within six months after the related amount is first added to Consolidated EBITDA pursuant to this clause (j) (and to the extent not so reimbursed within six months, such amount not reimbursed shall be deducted from Consolidated EBITDA during the next measurement period); it being understood that such amount may subsequently be included in Consolidated EBITDA in a measurement period to the extent of amounts actually reimbursed);

(k)      any fees, expenses and other transaction costs (whether or not such transactions were consummated) set forth on Schedule 1.1A which are incurred through the Closing Date in connection with fresh start accounting, the Chapter 11 Cases, the Transactions, the Restructuring Plan and the transactions contemplated thereby, and any additional amounts in respect of any such fees, expenses and other transaction costs as may be mutually determined and agreed in good faith by and between the Borrower and the administrative agent in respect of the ABL Facility;

(l)      net realized losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized losses from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized gains from related Hedge Agreements);

14

(m)        (i) any net realized loss resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized loss resulting in such period from currency translation losses related to currency re-measurements of Indebtedness and (iii) the amount of loss resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(n)        the amount of expected cost savings and other operating improvements and synergies reasonably identifiable and reasonably supportable (as determined by the Borrower or any Restricted Subsidiary in good faith) to be realized as a result of the Transactions, any acquisition or Disposition (including the termination or discontinuance of activities constituting such business), any Investment, operating expense reductions, operating improvements, restructurings, cost savings initiatives, operational changes or similar initiatives or transactions (including resulting from any head count reduction or closure of facilities) taken or committed to be taken during such (or any prior) period (in each case calculated on a pro forma basis as though such cost savings and other operating expense reductions, operating improvements and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions to the extent already included in the Consolidated Net Income for such period; provided, that (i) (A) such cost savings, operating improvements and synergies are reasonably anticipated to result from such actions and (B) actions resulting in such operating expense reductions or other operating improvements, synergies or cost savings are reasonably anticipated to have commenced within 18 months and (ii) no cost savings shall be added pursuant to this clause (n) to the extent already included in clause (e) above with respect to such period;

*minus*, to the extent reflected as income or a gain in the statement of such Consolidated Net Income for such period, the sum, without duplication, of:

(A)        the amount of cash received in such period in respect of any non-cash income or gain in a prior period (to the extent such non-cash income or gain previously increased Consolidated Net Income in a prior period);

(B)        net realized gains relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized gains from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized losses from related Hedge Agreements);

(C)        (i) any net realized gain resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized gain resulting in such period from currency translation gains related to currency re-measurements of Indebtedness and (iii) the amount of gain resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(D)        any (i) extraordinary, unusual or non-recurring income or gains (including gains on sales of assets outside of the ordinary course of business) and (ii) actuarial gains).

With respect to each joint venture or minority investee of the Borrower or any of its Subsidiaries, for purposes of calculating Consolidated EBITDA, the amount of EBITDA (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes (without duplication of amounts already included in Consolidated Net Income) shall equal the product of (x) the Borrower's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) the EBITDA (calculated in accordance with this definition) of such joint venture or minority investee, in each case to the extent such Borrower or Subsidiary actually

15

receives any such dividends, return of capital or similar distributions during such period and not in excess thereof.

Unless otherwise qualified, all references to "Consolidated EBITDA" in this Agreement shall refer to Consolidated EBITDA of the Borrower.

Notwithstanding anything to the contrary in the Loan Documents, for purposes of calculating Consolidated EBITDA for any Test Period that includes any of the fiscal quarters ending on the dates set forth in the table below, Consolidated EBITDA for such fiscal quarter shall be as set forth on such table (such amounts, the "Historical EBITDA Amounts"):

| Fiscal Quarter Ending | Consolidated EBITDA |
|---|---|
| September 30, 2022 | $50,400,000 |
| December 31, 2022 | $101,200,000 |
| March 31, 2023 | 77,000,000, as such amount shall be updated as mutually agreed in good faith by and between the Borrower and the administrative agent in respect of the ABL Facility |

"Consolidated Net Income": of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided, that in calculating Consolidated Net Income of the Borrower and its consolidated Subsidiaries for any period:

(a)     the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or is merged into, amalgamated or consolidated with the Borrower or any of its Subsidiaries shall be excluded;

(b)     the income (or loss) of any Person that is not a subsidiary of such Person, or that is accounted for by the equity method of accounting shall be excluded, except to the extent of dividends, return of capital or similar distributions actually received by such Person or its Subsidiaries (which dividends, return of capital and distributions shall be included in the calculation of Consolidated Net Income);

(c)     (i) any net unrealized gains and losses resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments) and (ii) any net unrealized gains and losses resulting in such period from currency translation losses (or similar charges) related to currency re-measurements of Indebtedness or other liabilities or from currency fluctuations, in each case shall be excluded;

(d)     any net unrealized gains and losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net unrealized gain and losses from exchange rate fluctuations on intercompany balances and balance sheet items) shall be excluded;

16

(e)     the cumulative effect of a change in accounting principles during such period shall be excluded;

(f)     non-cash interest expense resulting from the application of Accounting Standards Codification Topic 470-20 "Debt—Debt with Conversion Options—Recognition" shall be excluded;

(g)     any charges resulting from the application of FASB ASC 805 "Business Combinations," FASB ASC 350 "Intangibles—Goodwill and Other," FASB ASC 360-10-35-15 "Impairment or Disposal of Long-Lived Assets," FASB ASC 480-10-25-4 "Distinguishing Liabilities from Equity—Overall—Recognition" or FASB ASC 820 "Fair Value Measurements and Disclosures" shall be excluded;

(h)     effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such person and its subsidiaries) in component amounts required or permitted by GAAP, resulting from the application of purchase accounting or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(i)     any income (or loss) for such period attributable to the early extinguishment or buy-back of indebtedness, Hedge Agreements or other derivative instruments shall be excluded;

(j)     any non-cash charges for deferred tax asset valuation allowances shall be excluded;

(k)     any other non-cash charges (including goodwill or asset impairment charges), expenses or losses, including write-offs and write-downs (including in respect of unamortized debt issuance costs and deferred financing fees) and any non-cash cost related to the termination of any employee pension benefit plan (except to the extent such charges, expenses or losses represent an accrual of or reserve for cash expenses in any future period or an amortization of a prepaid cash expense paid in a prior period) shall be excluded;

(l)     non-cash stock-based and other equity-based compensation expenses (including those realized or resulting from stock option plans, employee benefit plans, post-employment benefit plans, grants of sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights) shall be excluded;

(m)     the Transaction Costs shall be excluded;

(n)     any losses in respect of equity earnings for such period (other than in respect of losses from equity in affiliates) shall be excluded; and

(o)     the consolidated net income (or loss) of any Person or Properties constituting a division or line of business of any business entity, division or line of business or fixed asset, in each case, Disposed of, abandoned, closed or discontinued by Holdings, the Borrower or any of the Subsidiaries during such period other than in the ordinary course of business, shall be excluded for such period (assuming the consummation of such Disposition or such designation, as the case may be, occurred on the first day of such period).

Unless otherwise qualified, all references to "Consolidated Net Income" in this Agreement shall refer to Consolidated Net Income of the Borrower.

"<u>Consolidated Net Interest Expense</u>":  of any Person for any period, (a) the sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries, <u>plus</u> (ii) all cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Capital Stock of such Person made during such period, <u>minus</u> (b) the sum of (i) total cash interest income of such Person and its Subsidiaries for such period (excluding any interest income earned on receivables due from customers), in each case determined in accordance with GAAP, <u>plus</u> (ii) any one time financing fees (to the extent included in such Person's consolidated interest expense for such period), including, with respect to the Borrower, those paid in connection with the Loan Documents or in connection with any amendment thereof.  Unless otherwise qualified, all references to "<u>Consolidated Net Interest Expense</u>" in this Agreement shall refer to Consolidated Net Interest Expense of the Borrower and its Subsidiaries.  For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments actually made or received by the Borrower or any Subsidiary with respect to interest rate Hedge Agreements.

"<u>Consolidated Net Total Leverage</u>":  at any date, (a) the aggregate principal amount of all Funded Debt of the Borrower and its Subsidiaries on such date, <u>minus</u> (b) Unrestricted Cash of the Loan Parties on such date, in each case determined on a consolidated basis in accordance with GAAP.

"<u>Consolidated Net Total Leverage Ratio</u>":  as of any date of determination, the ratio of (a) Consolidated Net Total Leverage on such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently ended Test Period.

"<u>Consolidated Total Assets</u>":  at any date, the total assets of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower and its Subsidiaries for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to <u>Section 6.1</u>, or prior to the first such delivery, delivered under <u>Section 5.1(r)</u>, determined on a <u>pro</u> <u>forma</u> basis.

"<u>Consolidated Working Capital</u>":  at any date, the difference of (a) Consolidated Current Assets on such date <u>minus</u> (b) Consolidated Current Liabilities on such date; <u>provided</u>, that, for purposes of calculating Excess Cash Flow, increases or decreases in Consolidated Working Capital shall be calculated without regard to changes in the working capital balance as a result of non-cash increases or decreases thereof that will not result in future cash payments or receipts or cash payments or receipts in any previous period, in each case, including any changes in Consolidated Current Assets or Consolidated Current Liabilities as a result of (i) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent, (ii) the effects of purchase accounting and (iii) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under Hedge Agreements.

"<u>Contractual Obligation</u>":  as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"<u>Corresponding Tenor</u>":  with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"<u>Daily Simple SOFR</u>":  for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple

SOFR" for syndicated business loans; <u>provided</u>, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"<u>Debt Fund Affiliate</u>": any Affiliate of a Person that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which such Person does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such Affiliate.

"<u>Debtor Relief Laws</u>": the Bankruptcy Code of the United States of America, the Insolvency Act 1986 (UK) (as amended), and all other liquidation, monitorship, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, restructuring plan, voluntary arrangement, administration or similar debtor relief laws of the United States, the United Kingdom or other applicable jurisdictions from time to time in effect, including Canadian Bankruptcy and Insolvency Laws.

"<u>Debtors</u>": as defined in the recitals hereto.

"<u>Declined Amount</u>":  as defined in <u>Section 2.12(f)</u>.

"<u>Default</u>":  any of the events specified in <u>Section 8.1</u>, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"<u>Defaulting Lender</u>": any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans or (ii) pay over to any Loan Party any other amount required to be paid by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent or the Borrower in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrower, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied; <i>provided</i> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's or the Borrower's, as applicable, receipt of such certification in form and substance satisfactory to the Borrower or the Administrative Agent, as applicable, or (d) has become, or is a direct or indirect Subsidiary of any Person that is, the subject of (i) a Bail-In Action or (ii) a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business or assets appointed for it, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating

19

its consent to, approval of, or acquiescence in, any such proceeding or appointment; *provided* that, none of the foregoing events or circumstances under this clause (ii) shall result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of the foregoing clauses shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender.

"<u>Designated Jurisdiction</u>": any country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Iran, Syria, Cuba, North Korea, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, and the Crimea and non-government controlled areas of the Zaporizhzhia and Kherson regions of Ukraine).

"<u>Designated Non-cash Consideration</u>": the Fair Market Value of non-cash consideration received by the Borrower or one of its Subsidiaries in connection with a Disposition that is so designated as Designated Non-cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation, less the amount of cash and Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration within 180 days of receipt thereof.

"<u>Designation Date</u>": as defined in <u>Section 2.26(f)</u>.

"<u>Disclosure Statement Date</u>": the date of approval by the Bankruptcy Court of the disclosure statement delivered in connection with the Restructuring Plan, which date is September 20, 2022.

"<u>Discount Range</u>": as defined in the definition of "Dutch Auction".

"<u>Disinterested Director</u>": as defined in <u>Section 7.9</u>.

"<u>Disposition</u>": with respect to any Property, any sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer, exclusive license or other disposition thereof, in each case, to the extent the same constitutes a complete sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer or other disposition, as applicable. The terms "<u>Dispose</u>" and "<u>Disposed of</u>" shall have correlative meanings.

"<u>Disqualified Capital Stock</u>": Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Capital Stock), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of each of <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u>, prior to the date that is 91 days after the Latest Maturity Date in effect on the date such Capital Stock is issued (other than (i) upon payment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) or (ii) upon a "change in control"; <u>provided</u>, that any payment required pursuant to this <u>clause (ii)</u> is subject to the prior repayment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) that are then accrued and payable and the termination of the Commitments); <u>provided</u>, <u>further</u>, <u>however</u>, that if such Capital Stock is issued to any employee or

to any plan for the benefit of employees of Holdings, the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings, the Borrower or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"Disqualified Institution": (i) those institutions identified by the Borrower in writing to the Administrative Agent prior to the Closing Date and (ii) business competitors of Holdings and its Subsidiaries identified by Borrower in writing to the Administrative Agent from time to time and, in the case of clauses (i) and (ii) any known Affiliates readily identifiable by name (other than, in the case of clause (ii), any Debt Fund Affiliates).  A list of the Disqualified Institutions will be posted by the Administrative Agent on the Platform and available for inspection by all Lenders.  Any designation of Disqualified Institutions by the Borrower at any time after the Closing Date in accordance with the foregoing shall not apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Facility.

"Do not have Unreasonably Small Capital": the Borrower and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern for the period from the Closing Date through the Latest Maturity Date.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any direct or indirect Subsidiary that (i) is organized under the laws of any jurisdiction within the United States and (ii) is not a direct or indirect Subsidiary of a Foreign Subsidiary; provided that, for all purposes of this Agreement and the other Loan Documents, each BrandCo Entity shall be treated as a Domestic Subsidiary (unless such BrandCo Entity ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"Dutch Auction": an auction whereby any Lender may, at any time, assign all or a portion of its Term Loans on a non-pro rata basis to Holdings or one of its Subsidiaries (the "Auction Offeror") in accordance with the procedures set forth below or such other procedures as may be agreed between the Administrative Agent and the Borrower from time to time, pursuant to an offer made available to all Lenders on a pro rata basis, subject to the limitations set forth in Section 10.6(h):

(a)    Notice Procedures.  In connection with each Dutch Auction, the Auction Offeror will notify the Auction Manager (for distribution to the Lenders) of the Term Loans that will be the subject of the Dutch Auction by delivering to the Auction Manager a written notice in form and substance reasonably satisfactory to the Auction Manager (an "Auction Notice"). Each Auction Notice shall contain (i) the maximum principal amount of Term Loans the Auction Offeror is willing to purchase (by assignment) in the Dutch Auction (the "Auction Amount"), which shall be no less than $10,000,000 or an integral multiple of $1,000,0000 in excess of thereof, (ii) the range of discounts to par (the "Discount Range"), expressed as a range of prices per $1,000 of Term Loans, at which the Auction Offeror would be willing to purchase Term Loans in the Dutch Auction and (iii) the date on which the Dutch Auction will conclude, on which date Return Bids (as defined below) will be due at the time provided in the Auction Notice (such time, the "Expiration Time"), as such date and time may be extended upon notice by the Auction Offeror to the Auction Manager not less than 24 hours before the original Expiration Time. The Auction Manager will deliver a copy of the auction procedures documentation (the "Offer Documents") for such Dutch Auction to each Lender promptly following completion thereof.

21

(b)    Reply Procedures.  In connection with any Dutch Auction, each Lender holding Term Loans wishing to participate in such Dutch Auction shall, prior to the Expiration Time, provide the Auction Manager with a notice of participation in form and substance reasonably satisfactory to the Auction Manager (the "Return Bid") to be included in the Offer Documents, which shall specify (i) a discount to par that must be expressed as a price per $1,000 of Term Loans (the "Reply Price") within the Discount Range and (ii) the principal amount of Term Loans, in an amount not less than $2,000,000, that such Lender is willing to offer for sale at its Reply Price (the "Reply Amount"); provided that each Lender may submit a Reply Amount that is less than the minimum amount and incremental amount requirements described above only if the Reply Amount equals the entire amount of the Term Loans held by such Lender at such time. A Lender may only submit one Return Bid per Dutch Auction, but each Return Bid may contain up to three component bids (or such other amount as may be determined by the Auction Manager), each of which may result in a separate Qualifying Bid (as defined below) and each of which will not be contingent on any other component bid submitted by such Lender resulting in a Qualifying Bid.  In addition to the Return Bid, a participating Lender must execute and deliver, to be held by the Auction Manager, an assignment and acceptance in the form included in the Offer Documents which shall be in form and substance reasonably satisfactory to the Auction Manager (the "Auction Assignment and Acceptance").  The Auction Offeror will not purchase any Term Loans at a price that is outside of the applicable Discount Range, nor will any Return Bids (including any component bids specified therein) submitted at a price that is outside such applicable Discount Range be considered in any calculation of the Applicable Threshold Price (as defined below).

(c)    Acceptance Procedures.  Based on the Reply Prices and Reply Amounts received by the Auction Manager, the Auction Manager, in consultation with the Auction Offeror, will calculate the lowest purchase price (the "Applicable Threshold Price") for the Dutch Auction within the Discount Range for the Dutch Auction that will allow the Auction Offeror to complete the Dutch Auction by purchasing the full Auction Amount (or such lesser amount of Term Loans for which the Auction Manager has received Qualifying Bids).  If the Applicable Threshold Price is not equal to the lowest Reply Price received pursuant to the Return Bids, the Auction Offeror shall be entitled, at its election, to either (i) complete the Dutch Auction at the Applicable Threshold Price or (ii) withdraw the Dutch Auction. In the case of clause (i) above, the Auction Offeror shall purchase (by assignment) Term Loans from each Lender whose Return Bid is within the Discount Range and contains a Reply Price that is equal to or less than the Applicable Threshold Price (each, a "Qualifying Bid"). All Term Loans included in Qualifying Bids received at a Reply Price lower than the Applicable Threshold Price will be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration. If a Lender has submitted a Return Bid containing multiple component bids at different Reply Prices, then all Term Loans of such Lender offered in any such component bid that constitutes a Qualifying Bid with a Reply Price lower than the Applicable Threshold Price shall also be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration.

(d)    Proration Procedures. In the case of clause (c)(i) above, all Term Loans offered in Return Bids (or, if applicable, any component bid thereof) constituting Qualifying Bids equal to the Applicable Threshold Price will be purchased at a purchase price equal to the Applicable Threshold Price; provided that if the aggregate principal amount of all Term Loans for which Qualifying Bids have been submitted in any given Dutch Auction equal to the Applicable Threshold Price would exceed the remaining portion of the Auction Amount (after deducting all Term Loans purchased below the Applicable Threshold Price), the Borrower shall purchase the Term Loans for which the Qualifying Bids submitted were at the Applicable Threshold Price ratably based on the respective principal amounts offered and in an aggregate amount up to the amount necessary to

complete the purchase of the Auction Amount. For the avoidance of doubt, no Return Bids (or any component thereof) will be accepted above the Applicable Threshold Price.

(e)    <u>Notification Procedures</u>. The Auction Manager will calculate the Applicable Threshold Price no later than the third Business Day after the date that the Return Bids were due. The Auction Manager will insert the amount of Term Loans to be assigned and the applicable settlement date determined by the Auction Manager in consultation with the Auction Offeror onto each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid. Upon written request of the submitting Lender, the Auction Manager will promptly return any Auction Assignment and Acceptance received in connection with a Return Bid that is not a Qualifying Bid.

(f)    <u>Additional Procedures</u>.

(i)    Once initiated by an Auction Notice, the Auction Offeror may withdraw a Dutch Auction by written notice to the Auction Manager (x) in the circumstances described in <u>clause (c)(i)</u> above or (y) no later than 24 hours before the original Expiration Time so long as no Qualifying Bids have been received by the Auction Manager at or prior to the time the Auction Manager receives such written notice from the Auction Offeror. Any Return Bid (including any component bid thereof) delivered to the Auction Manager may not be modified, revoked, terminated or cancelled; *provided* that a Lender may modify a Return Bid at any time prior to the Expiration Time solely to reduce the Reply Price included in such Return Bid. However, a Dutch Auction shall become void if the Auction Offeror fails to satisfy one or more of the conditions to the purchase of Term Loans set forth in, or to otherwise comply with the provisions of <u>Section 10.6</u> of this Agreement. The purchase price for all Term Loans purchased in a Dutch Auction shall be paid in cash by the Auction Offeror directly to the respective assigning Lender on a settlement date as determined by the Auction Manager in consultation with the Auction Offeror (which shall be no later than ten (10) Business Days after the date Return Bids are due), along with accrued and unpaid interest (if any) on the applicable Term Loans up to the settlement date. The Auction Offeror shall execute each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid.

(ii)    All questions as to the form of documents and validity and eligibility of Term Loans that are the subject of a Dutch Auction will be determined by the Auction Manager, in consultation with the Auction Offeror, and the Auction Manager's determination will be conclusive, absent manifest error. The Auction Manager's interpretation of the terms and conditions of the Offer Document, in consultation with the Auction Offeror, will be final and binding.

(iii)    None of the Auction Manager, any other Agent or any of their respective Affiliates assumes any responsibility for the accuracy or completeness of the information concerning Holdings, its Subsidiaries or any of their Affiliates contained in the Offer Documents or otherwise or for any failure to disclose events that may have occurred and may affect the significance or accuracy of such information.

(iv)    The Auction Manager acting in its capacity as such under a Dutch Auction shall be entitled to the benefits of the provisions of <u>Section 9</u> and <u>Section 10.5</u> of this Agreement to the same extent as if each reference therein to the "Loan Documents" were a reference to the Offer Documents, the Auction Notice and Auction Assignment and

23

Acceptance and each reference therein to the "Transactions" were a reference to the transactions contemplated hereby.

(v)    The procedures listed in clauses (a) through (f) above shall not require Holdings or any of its Subsidiaries to initiate any Dutch Auction, nor shall any Lender be obligated to participate in any Dutch Auction.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws":  any and all laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including principles of common law) of any international authority, foreign government, the United States, or any state, provincial, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, the preservation or protection of the environment, natural resources or human health and safety (as  related to Releases of or exposure to Materials of Environmental Concern), as have been, are now, or at any time hereafter are, in effect.

"Environmental Liability":  any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, to the extent arising from or relating to:  (a) non-compliance with any Environmental Law or any permit, license or other approval required thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release or threatened Release of any Materials of Environmental Concern, (e) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (f) any contract, agreement or other consensual arrangement pursuant to which any Environmental Liability under clause (a) through (e) above is assumed or imposed.

"Equity Issuance":  any issuance by the Borrower or any Subsidiary of its Capital Stock in a public or private offering.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Escrow Agent": Delaware Trust Company, in its capacity as Escrow Agent.

"Escrow Agreement":  the Escrow Agreement, dated as of April 27, 2023 by and among the Borrower, each of the depositors party thereto and Delaware Trust Company as Escrow Agent.

24

"Escrow Entity": any direct or indirect Subsidiary of the Borrower formed solely for the purposes of issuing any bonds, notes, term loans, debentures or other debt.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default": any of the events specified in Section 8.1; provided, that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow": for any Excess Cash Flow Period of the Borrower, an amount (not less than zero) equal to the amount by which, if any:

(a) the sum, without duplication, of:

(i) Consolidated Net Income of the Borrower for such Excess Cash Flow Period;

(ii) the amount of all non-cash charges (including depreciation, amortization, deferred tax expense and equity compensation expenses) deducted in arriving at such Consolidated Net Income;

(iii) the amount of the decrease, if any, in Consolidated Working Capital for such Excess Cash Flow Period (excluding any decrease in Consolidated Working Capital relating to leasehold improvements for which the Borrower or any of its Subsidiaries is reimbursed in cash or receives a credit);

(iv) the aggregate net amount of non-cash loss on the Disposition of Property by the Borrower and its Subsidiaries during such Excess Cash Flow Period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income; and

(v) to the extent not otherwise included in determining Consolidated Net Income, the aggregate amount of cash receipts for such period attributable to Hedge Agreements or other derivative instruments;

exceeds

(b) the sum, without duplication (including, in the case of clauses (ii) and (viii) below, duplication across periods (provided, that all or any portion of the amounts referred to in clauses (ii) and (viii) below with respect to a period may be applied in the determination of Excess Cash Flow for any subsequent period to the extent such amounts did not previously result in a reduction of Excess Cash Flow in any prior period)) of:

(i) the amount of all non-cash gains or credits to the extent included in arriving at such Consolidated Net Income (including credits included in the calculation of deferred tax assets and liabilities) and cash charges to the extent excluded from Consolidated Net Income pursuant to the last sentence thereof;

(ii) the aggregate amount (A) actually paid by the Borrower and its Subsidiaries in cash during such Excess Cash Flow Period (or, at the Borrower's election, after such Excess Cash Flow Period but prior to the time of determination of Excess Cash

Flow for such Excess Cash Flow Period, and excluding any amounts paid during such Excess Cash Flow Period which the Borrower elected to apply to the calculation in a prior Excess Cash Flow Period) on account of Capital Expenditures and Permitted Acquisitions and (B) committed during such Excess Cash Flow Period to be used to make Capital Expenditures or Permitted Acquisitions which in either case have been actually made or consummated or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such Excess Cash Flow Period (in each case under this clause (ii) other than to the extent any such Capital Expenditure or Permitted Acquisition is made (or, in the case of the preceding clause (B), is expected at the time of determination to be made) with the proceeds of new long-term Indebtedness or an Equity Issuance or with the proceeds of any Reinvestment Deferred Amount), in each case to the extent not already deducted from Consolidated Net Income;

(iii)     the aggregate amount of all regularly scheduled principal payments and all prepayments of Indebtedness (including the Term Loans) of the Borrower and its Subsidiaries made during such Excess Cash Flow Period and, at the option of the Borrower, all prepayments of Indebtedness made (or committed to be made by irrevocable written notice) after such Excess Cash Flow Period but prior to the time of determination of Excess Cash Flow for the applicable Excess Cash Flow Period, and excluding any amounts paid during such Excess Cash Flow Period which the Borrower elected to apply to the calculation in a prior Excess Cash Flow Period (other than, in each case, (x) in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder, (y) to the extent any such prepayments are the result of the incurrence of additional indebtedness and (z) optional prepayments of the Term Loans and optional prepayments of ABL Loans to the extent not accompanied by permanent optional reductions of the applicable commitments);

(iv)     the amount of the increase, if any, in Consolidated Working Capital for such Excess Cash Flow Period (excluding any increase in Consolidated Working Capital relating to leasehold improvements for which the Borrower or any of its Subsidiaries is reimbursed in cash or receives a credit);

(v)     the aggregate net amount of non-cash gain on the Disposition of Property by the Borrower and its Subsidiaries during such Excess Cash Flow Period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income;

(vi)     Transaction Costs and fees and expenses incurred in connection with any Permitted Acquisition or Investment permitted by Section 7.7, any Equity Issuance, any incurrence of Indebtedness permitted by Section 7.2, any Restricted Payment permitted by Section 7.6 and any Disposition permitted by Section 7.5 (in each case, whether or not consummated), in each case to the extent not already deducted from Consolidated Net Income;

(vii)     purchase price adjustments and earnouts paid, in each case to the extent not already deducted from Consolidated Net Income, or received, in each case to the extent not already included in arriving at Consolidated Net Income, in connection with any acquisition or Investment consummated prior to the Closing Date, any Permitted Acquisition or any other acquisition or Investment permitted under Section 7.7;

26

(viii)    (A) the net amount of Permitted Acquisitions and Investments made in cash during such period pursuant to paragraphs (a)(ii), (a)(iii), (d), (f), (k), (l), (v), (x) and (hh) of Section 7.7 (to the extent, in the case of clause (x), such Investment relates to Restricted Payments permitted under Section 7.6(c)(ii), (e), (f)(iii) or (h)) or, at the option of the Borrower, committed during such period to be used to make Permitted Acquisitions and Investments pursuant to such paragraphs of Section 7.7 which have been actually made or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such period (but excluding Investments among the Borrower and its Subsidiaries) and (B) permitted Restricted Payments made in cash or subject to a binding agreement (or, in the case of Restricted Payments described in Section 7.6(c)(i) or (c)(ii)(A), (B) or (C), reasonably expected to be paid in cash), in each case by the Borrower during such period and permitted Restricted Payments made by any Subsidiary to any Person other than the Borrower or any of the Subsidiaries during such period, in each case, to the extent permitted by Section 7.6(c)(i), (c)(ii), (e), (f)(iii) or (h), in each case to the extent not already deducted from Consolidated Net Income; provided, that the amount of Restricted Payments made pursuant to Section 7.6(e) and deducted pursuant to this clause (viii) shall not exceed $12,500,000 in any Excess Cash Flow Period;

(ix)    the amount (determined by the Borrower) of such Consolidated Net Income which is mandatorily prepaid or reinvested pursuant to Section 2.12(b) (or as to which a waiver of the requirements of such Section applicable thereto has been granted under Section 10.1) prior to the date of determination of Excess Cash Flow for such Excess Cash Flow Period as a result of any Asset Sale or Recovery Event, in each case to the extent not already deducted from Consolidated Net Income;

(x)    (A) the aggregate amount of any premium or penalty actually paid in cash that is required to be made in connection with any prepayment of Indebtedness made (or committed to be made by irrevocable written notice) during the applicable Excess Cash Flow Period or, at the option of the Borrower, after the end of such Excess Cash Flow Period but prior to the time of calculation of Excess Cash Flow, in each case to the extent not already deducted from Consolidated Net Income and (B) to the extent included in determining Consolidated Net Income, the aggregate amount of any income (or loss) for such period attributable to the early extinguishment of Indebtedness, Hedge Agreements or other derivative instruments;

(xi)    cash payments by the Borrower and its Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Subsidiaries other than Indebtedness, in each case to the extent not already deducted from Consolidated Net Income;

(xii)    the aggregate amount of (I) expenditures actually made by the Borrower and its Subsidiaries in cash during such period (including expenditures for the payment of financing fees), in each case, to the extent not deducted during a prior period and (II) expenditures committed during such Excess Cash Flow Period to be made for which a binding agreement exists as of the time of determination of Excess Cash Flow for such Excess Cash Flow Period, in each such case, to the extent that such expenditures are not expensed during such period and are not deducted in calculating Consolidated Net Income;

(xiii)    cash expenditures in respect of Hedge Agreements or other derivative instruments during such period to the extent not deducted in arriving at such Consolidated Net Income;

27

(xiv)    the amount of taxes (including penalties and interest) paid in cash in such period or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, including the amount of any distributions pursuant to Sections 7.6(c)(i), (ii)(A), (B) and (C);

(xv)    the amount of cash payments made in respect of pensions and other post-employment benefits in such period, in each case to the extent not deducted in determining Consolidated Net Income;

(xvi)    payments made in respect of the minority equity interests of third parties in any non-wholly owned Subsidiary in such period, including pursuant to dividends declared or paid on Capital Stock held by third parties (or other distributions or return of capital) in respect of such non-wholly-owned Subsidiary, in each case to the extent not deducted in determining Consolidated Net Income;

(xvii)    the amount representing accrued expenses for cash payments (including with respect to retirement plan obligations) that are not paid in cash in such Excess Cash Flow Period, in each case to the extent not deducted in determining Consolidated Net Income; provided, that such amounts will be added to Excess Cash Flow for the following fiscal year to the extent not paid in cash and deducted from Consolidated Net Income during such following fiscal year;

(xviii)    to the extent not otherwise deducted in calculating Consolidated Net Income, cash used to pay deferred acquisition consideration (including earn outs), except to the extent such cash is from proceeds of Indebtedness, Equity Issuances or other proceeds that would not be included in Consolidated Net Income; and

(xix)    the aggregate amounts of cash payments made during such fiscal year pursuant to any long term incentive plan of the Borrower or any of its Subsidiaries or any related agreement to the extent not otherwise deducted in calculating Consolidated Net Income.

"Excess Cash Flow Application Amount":  with respect to any Excess Cash Flow Period, the product of (a) 50% times (b) the Excess Cash Flow for such Excess Cash Flow Period.

"Excess Cash Flow Application Date":  as defined in Section 2.12(c).

"Excess Cash Flow Period":  each fiscal year of the Borrower beginning with the fiscal year ending December 31, 2024.

"Exchange Act": the Securities Exchange Act of 1934, as amended.

"Excluded Account": as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"Excluded Collateral":  as defined in Section 6.8(e); provided that the Borrower may designate in a written notice to the Administrative Agent any asset not to constitute "Excluded Collateral", whereupon the Borrower shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired.

28

"Excluded Contribution Amount": the aggregate amount of Net Cash Proceeds received by the Borrower from Equity Issuances (other than from any of its Subsidiaries or from Disqualified Capital Stock) or capital contributions after the Closing Date, minus the aggregate amount of (i) any Investments made pursuant to Section 7.7(dd) (net of any return of capital in respect of such Investment or deemed reduction in the amount of such Investment), (ii) any Restricted Payment made pursuant to Section 7.6(g) and (iii) any payments made pursuant to Section 7.8(a)(ii), in each case made during the period commencing on the Closing Date through and including the date of usage of such Excluded Contribution Amount in reliance thereon (without taking account of the intended usage of the Excluded Contribution Amount as of such date), designated as an Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which such Net Cash Proceeds are received by the Borrower, as the case may be, and which are excluded from the calculation of the Available Amount.

"Excluded Equity Securities": (i) to the extent applicable law requires that any Subsidiary issue directors' qualifying shares, such shares or nominee or other similar shares, (ii) Capital Stock of any first-tier Foreign Subsidiary or any Foreign Subsidiary Holding Company in excess of 66% of the voting Capital Stock of such entity, (iii) any Capital Stock of any Foreign Subsidiary that is not a first-tier Foreign Subsidiary, (iv) any Capital Stock in joint ventures or other entities in which the Loan Parties directly own 50% or less of the Capital Stock and (v) any other Capital Stock owned on or acquired after the Closing Date (other than Capital Stock in a wholly owned Subsidiary) in accordance with this Agreement but only in the case of this clause (v) if, and to the extent that, and for so long as granting a security interest or other Liens therein would violate applicable law or regulation or a shareholder agreement or other Contractual Obligation (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable, and other applicable law) binding on such Capital Stock and not created in contemplation of such acquisition.

"Excluded Real Property":  (a) any Real Property that is subject to a Lien expressly permitted by Section 7.3(j) (solely to the extent that the Indebtedness secured by such Lien would prohibit a Lien on such Real Property to secure the Obligations) or Section 7.3(g) (solely to the extent securing Indebtedness under Sections 7.2(c) or 7.2(t)), (b) any Real Property with respect to which, in the reasonable judgment of the Borrower and the Administrative Agent, the cost of providing a mortgage on such Real Property in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom, (c) the Melson Avenue Property and the New Jersey Property, unless either such property is subject to a Lien securing the ABL Facility, in which case such property shall not be Excluded Real Property, and (d) any Real Property to the extent providing a mortgage on such Real Property would (i) result in material adverse tax consequences to Holdings or the Borrower or any of its Subsidiaries as reasonably determined by the Borrower (provided, that any such designation of Real Property as Excluded Real Property shall be subject to the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed)), (ii) violate any applicable Requirement of Law, (iii) be prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code) to the extent such prohibition was not created in contemplation of a mortgage on such Real Property or (iv) give any other party (other than a Loan Party or a wholly-owned Subsidiary) to any contract, agreement, instrument or indenture governing such Real Property the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law) to the extent such right was not created in contemplation of a mortgage on such Real Property; provided that the Borrower may designate in a written notice to the Administrative Agent any Real Property not to constitute "Excluded Real Property", whereupon the Borrower shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired.

"Excluded Subsidiary":  any Subsidiary that is

(a)       [reserved],

(b)       not wholly owned directly by the Borrower or one or more of its wholly owned Subsidiaries,

(c)       an Immaterial Subsidiary,

(d)       a Foreign Subsidiary Holding Company,

(e)       established or created pursuant to Section 7.7(p) and meeting the requirements of the proviso thereto; provided, that such Subsidiary shall only be an Excluded Subsidiary for the period, as contemplated by Section 7.7(p),

(f)       a Subsidiary that is (i) prohibited by any applicable Requirement of Law from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities but only if, and to the extent that, and for so long as, such prohibition remains in effect and applicable to such Subsidiary, or (ii) which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee or grant any Lien unless, such consent, approval, license or authorization has been received but only if, and to the extent that, and for so long as such consent, approval, license or authorization has not been received and continues to be required,

(g)       a Subsidiary that is prohibited from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities by any Contractual Obligation in existence on the Closing Date (or, in the case of any newly-acquired Subsidiary, in existence at the time of acquisition thereof but not entered into in contemplation thereof) and not created in contemplation of such guarantee, provided, that this clause (g) shall not be applicable if (1) the other party to such Contractual Obligation is a Loan Party or a wholly-owned Subsidiary of the Borrower or (2) consent has been obtained to provide such guarantee or such prohibition is otherwise no longer in effect,

(h)       a Subsidiary with respect to which a guarantee by it of, or granting a Lien on its assets to secure obligations in respect of, the Facilities could reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any related provision) to Holdings or the Borrower or any of its Subsidiaries, as reasonably determined in good faith by the Borrower in consultation with the Administrative Agent,

(i)       a Permitted Joint Venture,

(j)       subject to the proviso below, any Foreign Subsidiary or any Domestic Subsidiary of a Foreign Subsidiary that is not a Subsidiary Guarantor as of the Closing Date,

(k)       not-for-profit subsidiaries, or

(l)       any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences of guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom;

provided, that (x) if a Subsidiary executes the Guarantee and Collateral Agreement as a "Guarantor," then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guarantee and Collateral Agreement as a "Guarantor" in accordance with the terms hereof and thereof), (y) the Borrower may designate in a written notice to the Administrative Agent a Subsidiary not to constitute an "Excluded Subsidiary" whereupon such Subsidiary shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired; provided further that no Loan Party that is a Loan Party on the Closing Date may be designated an Excluded Subsidiary and each such Loan Party shall remain a Guarantor hereunder unless all of its equity or all or substantially all of its assets is Disposed of in a Disposition permitted by Section 7.5 and (z) in no event shall any Subsidiary that (A) is a Subsidiary Guarantor as of the Closing Date (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder) or (B) is a guarantor under the ABL Facility constitute an "Excluded Subsidiary" under the Loan Documents and no such Subsidiary may be designated an "Excluded Subsidiary" following the Closing Date and each such Subsidiary shall remain a Guarantor hereunder (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (i) net income Taxes (however denominated), net profits Taxes, franchise Taxes, and branch profits Taxes (and net worth Taxes and capital Taxes imposed in lieu of net income Taxes), in each case, (A) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, if such Recipient is a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (B) as a result of a present or former connection between such Recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) any U.S. federal withholding Taxes (including backup withholding) imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Commitment or this Agreement pursuant to a law in effect on the date on which (A) such Recipient becomes a party to this Agreement (other than pursuant to an assignment requested by the Borrower under Section 2.24) or (B) if such Recipient is a Lender, such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or, if such Recipient is a Lender, to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with paragraphs (e) or (g), as applicable, of Section 2.20 and (iv) any withholding Taxes imposed under FATCA.

"Existing Loans": as defined in Section 2.26(a).

"Existing Tranche": as defined in Section 2.26(a).

"Expiration Time": as defined in the definition of "Dutch Auction".

"Extended Loans": as defined in Section 2.26(a).

"Extended Tranche": as defined in Section 2.26(a).

"Extending Lender": as defined in Section 2.26(b).

"Extension": as defined in Section 2.26(b).

"Extension Amendment":  as defined in Section 2.26(c).

"Extension Date":  as defined in Section 2.26(d).

"Extension Election":  as defined in Section 2.26(b).

"Extension Request":  as defined in Section 2.26(a).

"Extension Series":  all Extended Loans that are established pursuant to the same Extension Amendment (or any subsequent Extension Amendment to the extent such Extension Amendment expressly provides that the Extended Loans provided for therein are intended to be part of any previously established Extension Series) and that provide for the same interest margins and amortization schedule.

"Extraordinary Receipts":  an amount equal to (a) any cash payments or proceeds (including permitted Investments) received (directly or indirectly) by or on behalf of the Borrower or any of its Subsidiaries not in the ordinary course of business (and other than consisting of Net Cash Proceeds from an Asset Sale or any Recovery Event or in connection with any issuance or sale of debt securities or instruments or the incurrence of Indebtedness) in respect of (i) pension plan reversions, (ii) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than receipts from settlements with customers and any portion thereof that represents out-of-pocket losses by the Borrower or any of its Subsidiaries) and (iii) indemnity payments to the extent such indemnity payments are not payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries and to the extent such proceeds exceed the loss, damages, fees, costs and expenses incurred by or actual remediation and replacement costs of the Borrower and its Subsidiaries in connection with any such matter, minus (b) any selling and settlement costs and out-of-pocket expenses (including reasonable broker's fees or commissions and legal fees) and any taxes paid or reasonably estimated to be payable by the Borrower or any of its Subsidiaries (after taking into account any tax credits or deductions actually realized by the Borrower or any of its Subsidiaries with respect to the transactions described in clause (a) of this definition) in connection with or as a result of the transactions described in clause (a) of this definition; provided that no cash payment or proceeds calculated in accordance with the foregoing shall constitute Extraordinary Receipts in any fiscal year until the aggregate amount of all such cash payments and proceeds in such fiscal year shall exceed, together with the aggregate amount received by the Borrower or any of its Subsidiaries of all Net Cash Proceeds pursuant to clause (a) of the definition thereof in such fiscal year, $5,000,000 (with any amount below $5,000,000 in any fiscal year being carried forward to subsequent fiscal years) (and thereafter only such cash payments and proceeds in excess of such amount (including any amounts carried forward from prior fiscal years) shall constitute Extraordinary Receipts).

"Extraordinary Receipts Trigger Date":  as defined in Section 2.12(d).

"Facility":  each of (a) the Initial Term Loans (the "Initial Term Facility") and (b) any Refinancing Term Loans of the same Tranche; it being understood that, as of the Closing Date, the only Facility is the Initial Term Facility (and the extensions of credit thereunder), and thereafter, the term "Facility" may include any other Tranche of Commitments and the extensions of credit thereunder.

"Fair Market Value":  with respect to any asset, Property (including any Capital Stock of any Person) or Investment, the fair market value thereof as determined in good faith by the Borrower, the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset; provided that with respect to any such asset determined to have a Fair Market Value in excess of (i) $10,000,000, such Fair Market Value shall be determined in good faith by the board of directors or, pursuant to a specific delegation of authority by such board of directors or a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower which is selling or

32

owns such asset and (ii) $25,000,000, such Fair Market Value shall be determined by (x) a nationally recognized investment banking firm which determination shall be documented in a letter delivered to the Administrative Agent stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or (y) a written valuation of such asset from a recognized independent third party appraiser reasonably acceptable to the Administrative Agent.

"Fair Value": the amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements (together with any law implementing such agreements).

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided, that if the Federal Funds Effective Rate is less than zero, it shall be deemed to be zero hereunder for all instances.

"Fixed Basket": as defined in Section 1.6.

"Fixed Basket Item or Event": as defined in Section 1.6.

"Floor": the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to any Benchmark. With respect to the Adjusted Term SOFR Rate, the "Floor" shall be 1.00%.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary in accordance with clause (i) of such definition and each direct or indirect Subsidiary of another Foreign Subsidiary; provided that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary.

"Foreign Subsidiary Holding Company": any Subsidiary of the Borrower which is a Domestic Subsidiary substantially all of the assets of which consist of the Capital Stock (or Capital Stock and Indebtedness) of one or more Foreign Subsidiaries; provided that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary Holding Company.

"Funded Debt": with respect to any Person, all Indebtedness of such Person of the types described in clauses (a), (b)(i), (e), (g)(ii), (h) or, to the extent related to Indebtedness of the types described in the preceding clauses (but without duplication), (d) of the definition of "Indebtedness", in each case, to the extent reflected as indebtedness on such Person's balance sheet.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority":  any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities exchange, any self-regulatory organization (including the National Association of Insurance Commissioners) and any supranational bodies (including the European Union and the European Central Bank).

"Guarantee":  collectively, the guarantee made by the Guarantors under the Guarantee and Collateral Agreement in favor of the Secured Parties, together with each other guarantee delivered pursuant to Section 6.8.

"Guarantee and Collateral Agreement":  the Term Loan Guarantee and Collateral Agreement, dated as of the Closing Date, among Holdings, the Borrower, each Subsidiary Guarantor from time to time party thereto and the Collateral Agent, substantially in the form of Exhibit A, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets or any Investment permitted under this Agreement.  The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

34

"<u>Hedge Agreements</u>":  all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by the Borrower or any Subsidiary; <u>provided</u>, that no phantom stock, deferred compensation or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of its Subsidiaries shall be a Hedge Agreement.

"<u>Holdings</u>": as defined in the introductory paragraph of this Agreement.

"<u>Immaterial Subsidiary</u>":  PPI Two Corporation, a Delaware corporation, and RML, LLC, a Delaware limited liability company.

"<u>Incremental New Money Commitment Letter</u>": that certain Backstop Commitment Letter, dated as of January 17, 2023, by and among Revlon Consumer Products Corporation, as the company, and the entities party thereto as Backstop Parties (as defined therein), as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"<u>Indebtedness</u>": of any Person,  without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by (i) bonds (excluding surety bonds), debentures, notes or similar instruments, and (ii) surety bonds, (c) all obligations of such Person for the deferred purchase price of Property or services already received, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) [reserved], (g) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Agreement) and (ii) in respect of bankers' acceptances and (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock of such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference <u>plus</u> accrued and unpaid dividends; <u>provided</u>, that Indebtedness shall not include (A) trade and other payables, accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out and other contingent obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (E) obligations owing under any Hedge Agreements or in respect of Cash Management Obligations.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof (or provides for reimbursement to such Person).

"<u>Indebtedness for Borrowed Money</u>":  (a) to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments and (ii) Capital Lease Obligations, (b) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations) and (c) Hedge Agreements; <u>provided</u>, that the Obligations shall not constitute Indebtedness for Borrowed Money.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Indemnitee": as defined in Section 10.5.

"Initial Cashless Term Commitment": as to any Initial Term Lender, the obligation of such Initial Term Lender to be deemed to have made an Initial Term Loan to the Borrower pursuant to Section 2.1(a)(i) in the principal amount set forth under the heading "Initial Cashless Term Commitment" opposite such Initial Term Lender's name on Schedule 2.1A to this Agreement. The aggregate principal amount of the Initial Cashless Term Commitments as of the Closing Date is $1,096,527,422.58.

"Initial Funded Term Commitment": as to any Initial Term Lender, the obligation of such Initial Term Lender to make an Initial Term Loan to the Borrower pursuant to Section 2.1(a)(ii) in the principal amount set forth under the heading "Initial Funded Term Commitment" opposite such Initial Term Lender's name on Schedule 2.1B to this Agreement. The aggregate principal amount of the Initial Funded Term Commitments as of the Closing Date is $275,000,000.

"Initial Term Commitment": an Initial Cashless Term Commitment or an Initial Funded Term Commitment, as the context may require.

"Initial Term Facility": as defined in the definition of "Facility."

"Initial Term Lenders": each Lender that holds an Initial Term Loan or an Initial Term Commitment.

"Initial Term Loans": the Loans made (and/or deemed to have been made) to the Borrower on the Closing Date pursuant to Section 2.1(a).

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Instrument": as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, domain names, trade secrets, patents, patent licenses, trademarks, trademark licenses, trade names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreements": collectively, the ABL Intercreditor Agreement and any Other Intercreditor Agreement.

36

"Interest Payment Date": (a) with respect to any SOFR Loan, (i) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, (ii) in the case of a SOFR Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and (iii) in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter.

"Interest Period": as to any SOFR Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter (in each case for so long as such period is available for such SOFR Borrowing), as the Borrower may elect; provided, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Investments": as defined in Section 7.7.

"IRS": the United States Internal Revenue Service.

"Junior Financing": as defined in Section 7.8.

"Junior Financing Documentation": any documentation governing any Junior Financing.

"Latest Maturing Term Loans": at any date of determination, the Tranche (or Tranches) of Term Loans maturing later than all other Term Loans outstanding on such date.

"Latest Maturity Date": at any date of determination, the latest maturity date or termination date applicable to any Loan or Commitment hereunder at such time.

"Lead Arranger": Jefferies Finance LLC, in its capacity as sole lead arranger.

"LCA Election": as defined in Section 1.2(h).

"LCA Test Date": as defined in Section 1.2(h).

"Lenders": as defined in the preamble hereto.

"Liabilities": the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the Closing Date after giving effect to the consummation of the Transactions determined in accordance with GAAP consistently applied.

"Lien": any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition": any acquisition, including by way of merger, amalgamation or consolidation, by one or more of the Borrower and its Subsidiaries of any assets, business

37

or Person permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Subsidiary in writing to the Administrative Agent and Lenders.

"Liquidity": at any time, the sum of (i) all Unrestricted Cash of the Borrower and its Subsidiaries and (ii) the aggregate indebtedness permitted to be borrowed under the ABL Facility Agreement and any other then-existing revolving credit facility or line of credit of the Borrower and its Subsidiaries.

"Loan":  any loan made (or deemed made) by any Lender pursuant to this Agreement.

"Loan Documents":  the collective reference to this Agreement, the Intercreditor Agreements, the Security Documents, the Agent Fee Letter and the Notes (if any), together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"Loan Parties":  the Borrower and each Subsidiary Guarantor.

"Mafco": MacAndrews & Forbes Incorporated and its successors.

"Majority Facility Lenders":  with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans outstanding under such Facility (or, in the case of any Facility, prior to any termination of the Commitments under such Facility, the holders of more than 50% of the aggregate Commitments and Term Loans under such Facility); provided, however, that determinations of the "Majority Facility Lenders" shall exclude any Commitments or Loans held by Defaulting Lenders.

"Mandatory Prepayment Date":  as defined in Section 2.12(f).

"Material Adverse Effect": any event, development, occurrence, circumstance, effect, condition, result, state of facts or change (collectively, an "**Event**") after September 20, 2022, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of Holdings and its Subsidiaries, taken as a whole, (b) the material rights and remedies available to the Agents or the Lenders, taken as a whole, or (c) the ability of Holdings and its Subsidiaries, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement or the other Loan Documents,  in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the Closing Date in global, national or regional political conditions (including acts of war, terrorism or natural disasters) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Borrower and its Subsidiaries operate; (ii) any changes after the Closing Date in applicable law or generally accepted accounting principles, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, including, without limitation, the Restructuring Transactions (as defined in the Restructuring Plan); (iv) changes in the market price or trading volume of the claims or equity or debt securities of Holdings and its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) acts of God, including any natural (including weather-related) or man-made event or disaster, epidemic, pandemic or disease outbreak (including the COVID-19 virus or any strain, mutation or variation thereof); or (vi) any failure by Holdings and its Subsidiaries to meet any internal or published projection for any period (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to other clauses contained in

this definition); <u>provided</u> that the exceptions set forth in clauses (i), (ii) and (v) of this definition shall apply to the extent that such Event is disproportionately adverse to Holdings and its Subsidiaries, taken as a whole, as compared to other companies comparable in size and scale to Holdings and its Subsidiaries operating in the industries in which Holdings and its Subsidiaries operate.

"Material Intellectual Property":  any Intellectual Property that is material to, or otherwise required for the operation of, the Business.

"Material Real Property":  (a) any Real Property located in the United States and owned in fee by the Borrower or any Subsidiary Guarantor on the Closing Date having an estimated Fair Market Value exceeding $10,000,000, (b) any after-acquired Real Property located in the United States owned by a Loan Party having a gross purchase price exceeding $10,000,000 at the time of acquisition and (c) any Real Property that is subject to a Lien securing the ABL Facility.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined, listed or regulated as hazardous, toxic (or words of similar regulatory intent or meaning) under any Environmental Law, or that are regulated pursuant to Environmental Law or which may give rise to any Environmental Liability.

"Maximum Rate":  as defined in Section 10.20.

"Melson Avenue Property":  the real property owned and held in fee title by Roux Laboratories, Inc. located at 2210 Melson Avenue, Jacksonville, Duval County, Florida.

"Minimum Extension Condition":  as defined in Section 2.26(g).

"Moody's":  Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mortgage":  any mortgage, deed of trust, hypothec, assignment of leases and rents or other similar document delivered on or after the Closing Date in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, with respect to Mortgaged Properties, each substantially in the form of Exhibit M or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Borrower (taking into account the law of the jurisdiction in which such mortgage, deed of trust, hypothec or similar document is to be recorded), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Mortgaged Properties":  all Material Real Property owned by the Borrower or any Subsidiary Guarantor that is, or is required to be, subject to a Mortgage pursuant to the terms of this Agreement.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event occurring on or after the Closing Date, (I) the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) received by any Loan Party or any Subsidiary and (II) the proceeds in the form of cash and Cash Equivalents

received by any Loan Party or any Subsidiary from any sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in connection with any such Asset Sale or Recovery Event, net of (i) (x) selling expenses, attorneys' fees, accountants' fees, investment banking fees, brokers' fees and consulting fees, (y) the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder (including because the asset sold is removed from a borrowing base supporting such Indebtedness) on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and (z) other customary fees and expenses actually incurred by any Loan Party or any Subsidiary in connection therewith; (ii) Taxes paid or reasonably estimated to be payable by any Loan Party or any Subsidiary as a result thereof (or, without duplication, any Restricted Payments permitted to be paid pursuant to Section 7.6(c) arising as a result thereof) and, without duplication, any tax distribution that may be required as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); (iii) the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (ii) above) (A) associated with the assets that are the subject of such event and (B) retained by the Borrower or any of its Subsidiaries, provided, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such event occurring on the date of such reduction and (iv) the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or any Domestic Subsidiary as a result thereof and (b) in connection with any Equity Issuance or issuance or sale of debt securities or instruments or the incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith; provided that no proceeds calculated in accordance with the foregoing clause (a) shall constitute Net Cash Proceeds in any fiscal year until the aggregate amount of all such proceeds, together with the aggregate amount received by the Borrower or any of its Subsidiaries of all cash payments or proceeds calculated in accordance with the definition of Extraordinary Receipts, shall exceed $5,000,000 (with any amount below $5,000,000 in any fiscal year being carried forward to subsequent fiscal years) (and thereafter only such cash payments and proceeds in excess of such amount (including any amounts carried forward from prior fiscal years) shall constitute Net Cash Proceeds).

"New Jersey Property": the real property owned and held in fee title by Revlon Consumer Products LLC located at 196-199 Coit St., Irvington, Essex County, New Jersey.

"New Subsidiary": as defined in Section 7.2(t).

"Non-Defaulting Lender": any Lender other than a Defaulting Lender.

"Non-Excluded Subsidiary": any Subsidiary of the Borrower which is not an Excluded Subsidiary.

"Non-Extending Lender": as defined in Section 2.26(e).

"Non-Guarantor Subsidiary": any Subsidiary of the Borrower which is not a Subsidiary Guarantor.

"Non-US Guarantor": any Guarantor not organized under the laws of any jurisdiction within the United States.

"Non-US Lender": as defined in Section 2.20(e).

40

"<u>Not Otherwise Applied</u>":  with reference to any proceeds of any transaction or event or of Excess Cash Flow or the Available Amount that is proposed to be applied to a particular use or transaction, that such amount (a) was not required to prepay Loans pursuant to <u>Section 2.12</u> and (b) has not previously been (and is not simultaneously being) applied to anything other than such particular use or transaction.

"<u>Note</u>":  any promissory note evidencing any Loan, which promissory note shall be in the form of <u>Exhibit J</u>, or such other form as agreed upon by the Administrative Agent and the Borrower.

"<u>Obligations</u>":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding) the Loans, and all other obligations and liabilities of the Borrower to the Agents or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Agents or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise and including all indemnity claims of the Lenders pursuant to <u>Section 10.5</u>.

"<u>OFAC</u>":  the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Offer Documents</u>":  as defined in the definition of "Dutch Auction".

"<u>Other Intercreditor Agreement</u>":  an intercreditor agreement, (a) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a pari passu basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a pari passu basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Administrative Agent, and (b) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a junior priority basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a junior basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Administrative Agent.

"<u>Other Taxes</u>":  any and all present or future stamp, court, intangible, recording, filing or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"<u>Pari Passu Replacement Agreement</u>":  as defined in <u>Section 10.1(h)</u>.

"<u>Parent Company</u>":  any entity that directly or indirectly has beneficial ownership of 100% of the total voting power of the voting stock of Holdings.

"<u>Participant</u>":  as defined in <u>Section 10.6(c)(i)</u>.

"<u>Participant Register</u>":  as defined in <u>Section 10.6(c)(iii)</u>.

41

"Payment Recipient": as defined in Section 9.12(a).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Periodic Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Permitted Acquisition":  (a) any acquisition or other Investment approved by the Required Lenders, (b) any acquisition or other Investment made solely with the Net Cash Proceeds of any substantially concurrent Equity Issuance or capital contribution (other than Disqualified Capital Stock) and such Equity Issuance or capital contribution is Not Otherwise Applied or (c) any acquisition, in a single transaction or a series of related transactions, of a majority controlling interest in the Capital Stock, or all or substantially all of the assets, of any Person, or of all or substantially all of the assets constituting a division, product line or business line of any Person, in each case to the extent the applicable acquired company or assets engage in or constitute a Permitted Business or Related Business Assets, so long as in the case of any acquisition described in this clause (c), no Event of Default shall be continuing immediately after giving pro forma effect to such acquisition.

"Permitted Business":  (i) the Business or (ii) any business that is a natural outgrowth or a reasonable extension, development or expansion of any such Business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing.

"Permitted Investors":  the collective reference to (i) Glendon Capital Management L.P., Angelo, Gordon & Co., L.P., Nut Tree Capital Management, LP, Oak Hill Advisors, L.P. and King Street Capital Management, L.P., (ii) any controlled Affiliates or accounts, investment vehicles (including any co-invest vehicles) or funds, advised, co-advised, managed or co-managed by any Person listed in the foregoing clause (i), (iii) the members of management of any Parent Company, Holdings or any of its Subsidiaries that have ownership interests in any Parent Company or Holdings as of the Closing Date, (iv) the directors of Holdings or any of its Subsidiaries or any Parent Company as of the Closing Date and (v) the members of any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of which any Person described in clause (i), (ii), (iii) or (iv) of this definition is a member; provided that, in the case of such group and without giving effect to the existence of such group or any other group, Persons who are either Persons described in clause (i), (ii), (iii) or (iv) of this definition have aggregate beneficial ownership of more than 50% of the total voting power of the voting stock of the Borrower, Holdings or any Parent Company.

"Permitted Joint Venture":  as defined in Section 7.7(n).

"Permitted Refinancing":   with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness (or of a prior Permitted Refinancing of Indebtedness); provided, that any such refinancing, replacement, modification, refunding, renewal or extension of Indebtedness effected pursuant to a clause in Section 7.2 or 7.3 in reliance on the term "Permitted Refinancing" must comply with the following conditions:

(a)    there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses and by an amount equal to any existing commitment unutilized thereunder and as otherwise permitted under the applicable clause of Section 7.2);

(b)    the Weighted Average Life to Maturity of such Indebtedness is greater than or equal to the Weighted Average Life to Maturity of the Indebtedness being refinanced (other than a

42

shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced) and such Indebtedness shall not have a final maturity earlier than the maturity date of the Indebtedness being refinanced;

(c)      immediately after giving effect to such refinancing, replacement, refunding, renewal or extension, no Event of Default shall be continuing;

(d)      neither the Borrower nor any Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, modifications, refundings, renewals or extensions except to the extent that such Person was (or would have been required to be) such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, replaced, refunded, renewed or extended; provided, that this clause (d) shall not apply to a Permitted Refinancing permitted under Section 7.2(aa), so long as all such obligors with respect to such Permitted Refinancing also guarantee the Obligations;

(e)      any Liens securing such Permitted Refinancing shall be limited to the assets or property that secured the Indebtedness being refinanced; provided, that Liens in respect of assets or property granted as a result of the operation of after-acquired property clauses shall be permitted to the extent any such assets or property secured (or would have secured) the Indebtedness the subject of the Permitted Refinancing; provided, further, that this clause (e) shall not apply to a Permitted Refinancing permitted under Section 7.2(aa), so long as all such assets or property securing such Permitted Refinancing are also subject to Liens securing the Obligations;

(f)      to the extent the Indebtedness being refinanced is subject to the ABL Intercreditor Agreement or an Other Intercreditor Agreement, to the extent that it is secured by the Collateral, the Permitted Refinancing shall be subject to the ABL Intercreditor Agreement or Other Intercreditor Agreement, as applicable, on terms no less favorable to the Lenders, taken as a whole (as determined in good faith by the Borrower); and

(g)      except as otherwise permitted by this definition of "Permitted Refinancing", the covenants and events of default applicable to such Permitted Refinancing shall be not materially more restrictive, taken as a whole, to the Borrower and its Subsidiaries than the covenants and events of default contained in customary agreements governing similar indebtedness in light of prevailing market conditions at the time of such Permitted Refinancing (as determined in good faith by the Borrower).

"Permitted Refinancing Obligations":  any Indebtedness (which Indebtedness may be unsecured or secured by the Collateral on a pari passu or, at the Borrower's option, junior basis with the Liens securing the Obligations) in accordance with Sections 7.2 and 7.3, including customary bridge financings and any debt securities, in each case issued or incurred by the Borrower or a Guarantor to refinance, extend, renew, replace, modify or refund Indebtedness (and, if such Indebtedness consists of revolving loans, to pro rata reduce the associated revolving commitments) and/or Commitments incurred under this Agreement and the Loan Documents and to pay fees, discounts, accrued interest, premiums and expenses in connection therewith; provided, that, in the case of Indebtedness incurred to refinance any Term Loans (and to pay fees, discounts, premiums and expenses in connection therewith) which is incurred otherwise than under this Agreement (any such Indebtedness, "Refinancing Debt"), such Refinancing Debt:

(a)      shall not be guaranteed by any Person that is not a Guarantor;

43

(b)      shall be unsecured or secured by the Collateral on a pari passu or, at the Borrower's option, junior basis with the Liens securing the Obligations;

(c)      shall not be secured (to the extent secured) by any Lien on any asset of any Loan Party that does not also secure the Obligations;

(d)      if secured by Collateral, such Indebtedness (and all related obligations) either shall be incurred under this Agreement on a senior secured pari passu basis with the other Obligations or shall be subject to the terms of an Other Intercreditor Agreement;

(e)      (i) shall have a final maturity no earlier than the maturity date of the Indebtedness being refinanced and shall have a Weighted Average Life to Maturity not shorter than the Weighted Average Life to Maturity of the Indebtedness being refinanced (other than an earlier maturity date and/or shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for an earlier maturity date than the maturity date of the Indebtedness being refinanced or a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced) and (ii) any such Indebtedness that is a revolving credit facility shall not mature prior to the maturity date of the revolving commitments being replaced;

(f)      shall not be subject to amortization prior to the final maturity thereof or any mandatory redemption or prepayment provisions (except customary asset sale, recovery event and change of control provisions), except to the extent any such mandatory redemption or prepayment is required or permitted to be applied on a not less than pro rata basis to the Term Loans and any other Refinancing Debt that, in each case, are secured on a pari passu basis with the Liens securing the Obligations prior to or concurrently with the application to such Permitted Refinancing Obligations;

(g)      except as otherwise permitted by this definition of "Permitted Refinancing Obligations", all terms (other than with respect to pricing, fees and optional prepayments, which terms shall be as agreed by the Borrower and the applicable lenders) applicable to such Refinancing Debt shall be substantially identical to, or (when taken as a whole, as shall be determined in good faith by the Borrower) less favorable to the lenders providing such Refinancing Debt than those applicable to such Indebtedness being refinanced, other than for any covenants and other terms applicable solely to any period after the Latest Maturity Date; and

(h)      there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses).

"Person": an individual, partnership, corporation, company, limited liability company, unlimited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability, including a Multiemployer Plan. For greater certainty, "Plan" shall not include a Canadian Pension Plan.

44

"<u>Platform</u>": as defined in <u>Section 10.2(c).</u>

"<u>Pledged Securities</u>":  as defined in the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or any other equivalent term in the other Security Documents, as the context may require.

 "<u>Pledged Stock</u>":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, or any other equivalent term in the other Security Documents, as the context may require.

"<u>PPSA</u>": the Personal Property Security Act (Ontario); provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (a) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario or (b) the Civil Code of Québec, then "PPSA" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"<u>Prepayment Option Notice</u>":  as defined in <u>Section 2.12(f)</u>.

"<u>Present Fair Salable Value</u>": the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"<u>Prime Rate</u>": the "U.S. Prime Lending Rate" published in The Wall Street Journal; <u>provided</u> that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent); each change in the Prime Rate shall be effective on the date such change is publicly announced as effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"<u>Proceeding</u>": as defined in <u>Section 10.5(d)</u>.

"<u>Proceeds of Crime Act</u>": the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), including all regulations thereunder, as amended.

"<u>Property</u>":  any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"<u>Public Information</u>": as defined in <u>Section 10.2(c)</u>.

"<u>Public Lender</u>":  as defined in <u>Section 10.2(c)</u>.

"<u>Qualified Capital Stock</u>":  any Capital Stock that is not Disqualified Capital Stock.

"<u>Qualified Contract</u>": any new intellectual property license entered into by the Borrower or any of its Subsidiaries in respect of any brand so long as an officer of the Borrower has certified to the

45

Administrative Agent that the revenues generated by such license in the next succeeding 12 months would reasonably be expected to exceed $40,000,000.

"Ratio Basket": as defined in Section 1.6.

"Ratio Basket Item or Event": as defined in Section 1.6.

"RCP LLC": Revlon Consumer Products LLC, a Delaware limited liability company and successor to RCPC.

"RCPC": as defined in the preamble hereto.

"Real Property": collectively, all right, title and interest of the Borrower or any of its Subsidiaries in and to any and all parcels of real property owned or leased by the Borrower or any such Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Recipient": (a) any Lender, (b) the Administrative Agent and (c) the Collateral Agent, as applicable.

"Recovery Event": any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Subsidiary, in an amount for each such event exceeding $5,000,000.

"Refinanced Term Loans": as defined in Section 10.1(c).

"Refinancing Debt": as defined in the definition of "Permitted Refinancing Obligations".

"Refinancing Term Loans": as defined in Section 10.1(c).

"Register": as defined in Section 10.6(b)(iv).

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds or Extraordinary Receipts, as applicable, received by any Loan Party or any Subsidiary thereof for its own account in connection therewith that are not applied to prepay the Term Loans pursuant to Section 2.12 as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": the receipt of Net Cash Proceeds from any Asset Sale or Recovery Event or Extraordinary Receipts, as applicable, occurring after the Closing Date in respect of which a Loan Party has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice signed on behalf of any Loan Party by a Responsible Officer stating that such Loan Party (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event or Extraordinary Receipts, as applicable to acquire property or make investments used or useful in a Permitted Business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount (or the relevant portion thereof, as contemplated by clause (ii) of the definition of "Reinvestment Prepayment Date") relating thereto less any amount contractually committed by the applicable Loan Party (directly or indirectly through a Subsidiary) prior to the relevant Reinvestment

46

Prepayment Date to be expended prior to the relevant Trigger Date (a "Committed Reinvestment Amount"), or actually expended prior to such date, in each case to acquire assets or make investments useful in a Permitted Business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (i) the date occurring 15 months after such Reinvestment Event and (ii) with respect to any portion of a Reinvestment Deferred Amount, the date that is five Business Days following the date on which any Loan Party or any Subsidiary thereof shall have determined not to acquire assets or make investments useful in a Permitted Business with such portion of such Reinvestment Deferred Amount.

"Related Business Assets":  assets (other than cash and Cash Equivalents) used or useful in a Permitted Business; provided, that any assets received by the Borrower or a Subsidiary in exchange for assets transferred by the Borrower or a Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Subsidiary.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Person": as defined in Section 10.5.

"Release":  any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"Relevant Governmental Body": the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Replaced Lender":  as defined in Section 2.24.

"Reply Amount": as defined in the definition of "Dutch Auction".

"Reply Price": as defined in the definition of "Dutch Auction".

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by the PBGC in accordance with the regulations thereunder.

"Representatives":  as defined in Section 10.14.

"Required Lenders":  at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the aggregate Commitments then in effect and unpaid principal amount of the Term Loans then outstanding; provided, however, that determinations of the "Required Lenders" shall exclude any Commitments or Loans held by Defaulting Lenders or any Affiliate Lender.

"Requirement of Law":  as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or

determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resolution Authority": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer":  any officer at the level of Vice President or higher of the relevant Person or, with respect to financial matters, the Chief Financial Officer, Treasurer, Controller or any other Person in the Treasury Department at the level of Vice President or higher of the relevant Person.

"Restricted Payments":  as defined in Section 7.6.

"Restructuring Plan": the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] and all exhibits, supplements, appendices, and schedules thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"Restructuring Support Agreement": that certain Restructuring Support Agreement, dated as of December 19, 2022 (including all exhibits, annexes, and schedules thereto), by and among the Debtors, certain of the Lenders and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the Closing Date pursuant to the terms thereof.

"Return Bid": as defined in the definition of "Dutch Auction".

"Revlon Holdings": as defined in the preamble hereto.

"Revlon NewCo": Revlon NewCo, LLC, a Delaware limited liability company.

"S&P":  Standard & Poor's Ratings Group, Inc., or any successor to the rating agency business thereof.

"Sanction(s)": any international economic sanction administered or enforced by the U.S. government, including OFAC and the U.S. Department of State, the United Nations Security Council, the European Union, the government of Canada or any agency thereof (including sanctions imposed pursuant to any Canadian Economic Sanctions and Export Laws) or His Majesty's Treasury of the United Kingdom.

"SEC":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Section 2.26 Additional Amendment":  as defined in Section 2.26(c).

"Secured Parties":  collectively, the Lenders, the Administrative Agent, the Collateral Agent, any other holder from time to time of any of the Obligations and, in each case, their respective successors and permitted assigns.

"Securities Act":  the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security":  as defined in the Guarantee and Collateral Agreement or the PPSA, as applicable.

48

"<u>Security Documents</u>":   the collective reference to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement and all other security documents (including any Mortgages) hereafter delivered to the Administrative Agent or the Collateral Agent purporting to grant a Lien on any Property of any Loan Party to secure the Obligations.

"<u>Shared EBITDA Cap</u>": an amount when combined with adjustments pursuant to <u>clauses (d)</u>, <u>(e)</u>, <u>(g)</u>, <u>(i)</u> and <u>(j)</u> of the definition of Consolidated EBITDA not to exceed (i) $50,000,000 in any Test Period ending on or after June 30, 2023 through June 30, 2024 and (ii) $30,000,000 for each Test Period thereafter.

"<u>Single Employer Plan</u>":   any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability.

"<u>SOFR</u>": a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>": the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Borrowing</u>": a Borrowing comprised of SOFR Loans.

"<u>SOFR Loan</u>": any Loan bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate in accordance with the provisions of <u>Section II</u>, other than pursuant to <u>clause (c)</u> of the definition of "ABR".

"<u>Solvent</u>":   with respect to the Borrower and its Subsidiaries, as of any date of determination, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole Do not have Unreasonably Small Capital; and (iv) the Borrower and its  Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

"<u>Specified Existing Tranche</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Stated Maturity</u>":   with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the re-purchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"<u>Subsidiary</u>":   as to any Person, a corporation, partnership, company, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership, company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; <u>provided</u>, that any joint venture that is not required to be consolidated with the Borrower and its consolidated Subsidiaries in accordance with GAAP

49

shall not be deemed to be a "Subsidiary" for purposes hereof; provided further, that Beautyge Rus Joint Stock Company shall be deemed not to be a Subsidiary of the Borrower so long as any Sanctions are imposed on Russia and the Borrower and its Subsidiaries do not exercise control over such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower; provided that, notwithstanding anything herein to the contrary, a "Permitted Joint Venture" shall not be deemed to be a Subsidiary of the Borrower.

"Subsidiary Guarantors":  (a) each Domestic Subsidiary (other than any Excluded Subsidiary), (b) Elizabeth Arden (Canada) Limited, a corporation incorporated under the Canada Business Corporations Act, (c) Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, (d) Revlon Canada Inc., a corporation amalgamated under the Canada Business Corporations Act, (e) each of the BrandCo Entities and (f) any other Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.

"Successor Borrower":  as defined in Section 7.4(j).

"Successor Holdings":  as defined in Section VIIA.

"Taxes":  all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, fines, additions to tax or penalties applicable thereto.

"Term Loans":  the Initial Term Loans, Extended Loans and/or Refinancing Term Loans in respect of either of the foregoing, as the context may require.

"Term Maturity Date":  (a) with respect to the Initial Term Loans, the fifth anniversary of the Closing Date (or as otherwise provided in Section 2.26 for any Extended Tranche), (b) with respect to any Extended Loans, the maturity date set forth in the applicable Extension Amendment and (c) with respect to any Tranche of Refinancing Term Loans, the maturity date set forth in the applicable amendment pursuant to Section 10.1(c); provided that, in each case of clauses (a), (b) and (c), if such date is not a Business Day, the Term Maturity Date will be the next succeeding Business Day.

"Term Prepayment Amount":  as defined in Section 2.12(f).

"Term SOFR":

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Administrator": CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate": the forward-looking term rate based on SOFR.

"Test Period":  on any date of determination, the period of four consecutive fiscal quarters of the Borrower (in each case taken as one accounting period) most recently ended on or prior to such date for which financial statements have been or are required to be delivered pursuant to Section 6.1, or prior to the first such delivery, delivered under Section 5.1(r).

"Tranche":   with respect to Term Loans or commitments, refers to whether such Term Loans or commitments are (a) the Initial Term Loans, (b) Extended Loans (of the same Extension Series) or (c) Refinancing Term Loans with the same terms and conditions made on the same day.

"Transaction Costs": as defined in the definition of "Transactions."

"Transactions": each of the following transactions:

(a)      the execution, delivery and performance of the Loan Documents;

(b)      the borrowing (and/or deemed borrowing) of the Initial Term Loans on the Closing Date;

(c)      the use of the proceeds thereof;

(d)      the execution, delivery and performance of the ABL Documents, the extensions of credit thereunder on the Closing Date and the use of proceeds thereof;

(e)      the Restructuring Transactions (as defined in the Restructuring Plan);

(f)      the payment of all fees, costs and expenses incurred in connection with the transactions described in the foregoing provisions of this definition (the "Transaction Costs"); and

(g)      the other transactions contemplated by the Loan Documents or the Restructuring Plan.

51

"Trigger Date": an Asset Sale Trigger Date or Extraordinary Receipts Trigger Date, as applicable.

"Type": when used in respect of any Loan or Borrowing, the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include the Term SOFR and the ABR.

"U.S. Government Securities Business Day": any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"UK Debenture": the English law debenture to be entered into by and among the UK Loan Parties and the Collateral Agent.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Loan Parties": Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, and any other Loan Party that is incorporated in England and Wales.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"UK Security Agreements": (i) the UK Debenture and (ii) any other security agreements or documents governed by English law executed and delivered by any Loan Party in connection with this Agreement.

"Unadjusted Benchmark Replacement":  the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" or "U.S.":  the United States of America.

"Unrestricted Cash": as at any date of determination, the aggregate amount of cash and Cash Equivalents included in the cash accounts that would be listed on the consolidated balance sheet of the Borrower and its Subsidiaries as at such date, to the extent such cash and Cash Equivalents are not (a) subject to a Lien securing any Indebtedness or other obligations, other than (i) the Obligations or (ii) any such other Indebtedness that is subject to any Intercreditor Agreement or (b) classified as "restricted" (unless so classified solely because of any provision under the Loan Documents or any other agreement or instrument governing other Indebtedness that is subject to any Intercreditor Agreement governing the application thereof or because they are subject to a Lien securing the Obligations or other Indebtedness that is subject to any Intercreditor Agreement).

"US Lender":  as defined in Section 2.20(g).

"USA Patriot Act":  as defined in Section 10.18.

"<u>Weighted Average Life to Maturity</u>": when applied to any Indebtedness at any date, the number of years obtained by <u>dividing</u> (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; <u>by</u> (b) the then outstanding principal amount of such Indebtedness.

"<u>Will be able to pay their Liabilities as they mature</u>":  for the period from the Closing Date through the Latest Maturity Date, the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions will have sufficient assets, credit capacity and cash flow to pay their Liabilities as those Liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by the Borrower and its Subsidiaries as reflected in the projected financial statements and in light of the anticipated credit capacity.

"<u>Write-Down and Conversion Powers</u>": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority  under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    <u>Other Definitional Provisions</u>.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Subsidiaries not defined in <u>Section 1.1</u> and accounting terms partly defined in <u>Section 1.1</u>, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and <u>Section,</u> <u>Schedule</u> and <u>Exhibit</u> references are to this Agreement unless otherwise specified.

(d)    The term "license" shall include sub-license.  The term "documents" includes any and all documents whether in physical or electronic form.

(e)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)     Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(g)     In connection with any action being taken in connection with a Limited Condition Acquisition, for purposes of determining compliance with any provision of this Agreement which requires that no Default, Event of Default or specified Event of Default, as applicable, has occurred, is continuing or would result from any such action, as applicable, at the option of the Borrower pursuant to an LCA Election such condition shall be deemed satisfied so long as no Default, Event of Default or specified Event of Default, as applicable, exists on the date the definitive agreements for such Limited Condition Acquisition are entered into after giving pro forma effect to such Limited Condition Acquisition and the actions to be taken in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if such Limited Condition Acquisition and other actions had occurred on such date. For the avoidance of doubt, if the Borrower has exercised its option under the first sentence of this clause (g), and any Default or Event of Default occurs following the date the definitive agreements for the applicable Limited Condition Acquisition were entered into and prior to the consummation of such Limited Condition Acquisition, any such Default or Event of Default shall be deemed not to have occurred or be continuing solely for purposes of determining whether any action being taken in connection with such Limited Condition Acquisition is permitted hereunder.

(h)     In connection with any action being taken solely in connection with a Limited Condition Acquisition, for purposes of:

(i)     determining compliance with any provision of this Agreement which requires the calculation of the Consolidated Net Total Leverage Ratio; or

(ii)     testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated Total Assets);

(i)     in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "LCA Test Date"), and if, after giving pro forma effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the most recent four consecutive fiscal quarters ending prior to the LCA Test Date for which consolidated financial statements of the Borrower are available, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded as a result of fluctuations in any such ratio or basket, including due to fluctuations in Consolidated Total Assets of the Borrower or the Person subject to such Limited Condition Acquisition, at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations.  If the Borrower has

54

made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or basket availability with respect to the incurrence of Indebtedness or Liens, or the making of Restricted Payments, mergers, the conveyance, lease or other transfer of all or substantially all of the assets of the Borrower, the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be calculated on a pro forma basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any Incurrence of Indebtedness and the use of proceeds thereof) have been consummated; provided that the calculation of Consolidated Net Income (and any defined term a component of which is Consolidated Net Income) shall not include the Consolidated Net Income of the Person or assets to be acquired in any Limited Condition Acquisition for usages other than in connection with the applicable transaction pertaining to such Limited Condition Acquisition until such time as such Limited Condition Acquisition is actually consummated.

(j)        Any references in this Agreement to "Obligations" or "Lenders" (or any similar terms) in the phrase "pari passu basis with the Liens securing the Obligations" or "pari passu with the Liens of the Lenders" (or any similar phrases) or in the phrase "secured on a junior basis with the Liens securing the Obligations" or "junior to the Liens of the Lenders" (or any similar phrases) shall, in each case, be deemed to refer to the Obligations in effect on the Closing Date (i.e., the Initial Term Loans) or the Initial Term Lenders, as applicable, and any other Indebtedness or commitments incurred under this Agreement that is intended to be secured on a pari passu basis with the liens securing the Initial Term Loans or the Initial Term Lenders, as applicable. Any references in this Agreement to "junior or pari passu to the Liens of the lenders under the ABL Facility Agreement" (or any similar phrases) shall, in each case, be deemed to refer to the Liens of such lenders with respect to the ABL Facility First Priority Collateral.

(k)        In this Agreement, (i) any term defined herein by reference to the UCC shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the PPSA, the Bills of Exchange Act (Canada) and the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Administrative Agent, (ii) all references in this Agreement to the United States Copyright Office or the United States Patent and Trademark Office shall be deemed to refer also to the Canadian Intellectual Property Office and/or the applicable divisions thereof, (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, (v) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal, provincial and territorial securities laws in Canada, (vi) all references to "state or federal bankruptcy laws" shall be deemed to refer also to any bankruptcy or insolvency laws in effect in Canada or under Canadian law, and (vii) all calculations of collateral values and Dollar amounts which utilize amounts expressed in Canadian Dollars shall be made using the Dollar equivalent in Dollars of such Canadian Dollar amounts in accordance with the Administrative Agent's customary banking and conversion.

(l)        For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property", (iii)

"tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest" and "mortgage" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the UCC or the PPSA or otherwise shall be deemed to include publication under the Civil Code of Québec, (vii) all references to "perfection of" or "perfected" Liens shall be deemed to include a reference to the "opposability" of such Liens to third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall be deemed to include a "mandatary", (xi) "joint and several" shall be deemed to include "solidary", (xii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiii) "beneficial ownership" shall be deemed to include "ownership on behalf of another as mandatary", (xiv) "easement" shall be deemed to include "servitude", (xv) "survey" shall be deemed to include "certificate of location and plan", and (xvi) "fee simple title" shall be deemed to include "absolute ownership". The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated hereunder or relating hereto, including notices, may also be drawn up in the English language only. Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en la langue anglaise seulement.

1.3    Pro Forma Calculations.  (i) Any calculation to be determined on a "pro forma" basis, after giving "pro forma" effect to certain transactions or pursuant to words of similar import and (ii) the Consolidated Net Total Leverage Ratio, in each case, shall be calculated as follows (subject to the provisions of Section 1.2):

(a)    for purposes of making the computation referred to above, in the event that the Borrower or any of its Subsidiaries incurs, assumes, guarantees, redeems, retires, defeases or extinguishes any Indebtedness or enters into, terminates or cancels a Qualified Contract, other than the completion thereof in accordance with its terms, subsequent to the commencement of the period for which such ratio is being calculated but on or prior to or substantially concurrently with or for the purpose of the event for which the calculation is made (a "Calculation Date"), then such calculation shall be made giving pro forma effect to such incurrence, assumption, guarantee, redemption, retirement, defeasance or extinguishment of Indebtedness or entry into, termination or cancellation of such Qualified Contract (other than the completion thereof in accordance with its terms) as if the same had occurred at the beginning of the applicable Test Period; provided, that the aggregate amount of revenues (and related assets) included in such pro forma calculation for any Test Period pursuant to this clause 1.3(a) with respect to Qualified Contracts shall not exceed $50,000,000 in revenues (and any such related assets); provided, further, that for purposes of making the computation of the Consolidated Net Total Leverage for the computation of the Consolidated Net Total Leverage Ratio, the Consolidated Net Total Leverage shall be the Consolidated Net Total Leverage as of the date the relevant action is being taken giving pro forma effect to any redemption, retirement or extinguishment of Indebtedness in connection with such event; and

(b)    for purposes of making the computation referred to above, if any Investments (including the Transactions), brand acquisitions or Dispositions are made (or committed to be made pursuant to a definitive agreement) subsequent to the commencement of the period for which such calculation is being made but on or prior to or simultaneously with the relevant Calculation Date, then such calculation shall be made giving pro forma effect to such Investments, brand acquisitions and Dispositions as if the same had occurred at the beginning of the applicable Test Period in a manner consistent, where applicable, with the pro forma adjustments set forth in clause (o) of the definition of "Consolidated Net Income". If since the beginning of such period any Person that subsequently became a Subsidiary or was

56

merged or amalgamated with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have made any Investment, brand acquisitions or Disposition that would have required adjustment pursuant to this provision, then such calculation shall be made giving pro forma effect thereto for such Test Period as if such Investment, brand acquisitions or Disposition had occurred at the beginning of the applicable Test Period.

1.4    <u>Exchange Rates; Currency Equivalents</u>.  If any basket is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates. For purposes of determining the Consolidated Net Total Leverage Ratio, amounts denominated in a currency other than Dollars will be converted to Dollars for the purposes of calculating the Consolidated Net Total Leverage Ratio, at the exchange rate as of the date of calculation, and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Hedge Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

1.5    [Reserved].

1.6    <u>Covenants</u>.  For purposes of determining compliance with <u>Section VII</u> (other than <u>Section 7.6</u> or <u>Sections 7.2(i)</u> or <u>7.2(aa)</u>), in the event that an item or event (or any portion thereof) meets the criteria of one or more of the categories described in a particular covenant contained in <u>Section VII</u> (other than <u>Section 7.6</u> or <u>Sections 7.2(i)</u> or <u>7.2(aa)</u>), the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify (as if incurred at such later time) such item or event (or any portion thereof) and may include the amount and type of such item or event (or any portion thereof) in one or more of the relevant clauses or subclauses, in each case, within such covenant and will be entitled to include such item or event (or any portion thereof) only in one of the relevant clauses or subclauses (or any portion thereof).  In the case of an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that does not rely on criteria based on the Consolidated Net Total Leverage Ratio (any such item or event, a "<u>Fixed Basket Item or Event</u>" and any such clause, subclause or any portion thereof, a "<u>Fixed Basket</u>") substantially concurrently with an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that relies on criteria based on such financial ratios or tests (any such item or event, a "<u>Ratio Basket Item or Event</u>" and any such clause, subclause or any portion thereof, a "<u>Ratio Basket</u>"), such Ratio Basket Item or Event shall be treated as having been incurred or existing pursuant only to such Ratio Basket without giving pro forma effect to any such Fixed Basket Item or Event (other than a Fixed Basket Item or Event that relies on the term "Permitted Refinancing" or "Permitted Refinancing Obligations") incurred pursuant to or otherwise included in a Fixed Basket substantially concurrently with such Fixed Basket Item or Event when calculating the amount that may be incurred or existing pursuant to any such Ratio Basket. Furthermore, (A) for purposes of <u>Section 7.2</u>, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, in the case of such Indebtedness incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness), on the date that such Indebtedness was incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable exchange rate on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of accrued interest, fees, underwriting

discounts, premiums and other costs and expenses incurred in connection with such refinancing, (B) for purposes of Sections 7.3, 7.5, 7.6 and 7.7, the amount of any Liens, Dispositions, Restricted Payments and Investments, as applicable, denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, (C) for purposes of any calculation under Sections 7.2 and 7.3, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with Section 7.2 or 7.3, but for so long as such Indebtedness is outstanding or in effect, the entire committed amount of such Indebtedness then in effect shall be included in any calculations under Sections 7.2 and 7.3, (D) any cash proceeds of Indebtedness shall be excluded as Unrestricted Cash and not netted for purposes of calculating any financial ratios and tests with respect to any substantially concurrent incurrence of a Ratio Basket Item or Event pursuant to a Ratio Basket and (E) any Fixed Basket Item or Event incurred pursuant to or otherwise included pursuant to a Fixed Basket based on Consolidated Total Assets shall be calculated based upon the Consolidated Total Assets at the time of such incurrence (it being understood that a Default shall be deemed not to have occurred solely to the extent that the Consolidated Total Assets after the time of such incurrence declines).

1.7    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

1.8    Interest Rates.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION II.    AMOUNT AND TERMS OF COMMITMENTS

2.1    Term Commitments.

(a)    Subject to the terms and conditions hereof (i) to give effect to the full and final satisfaction of the 2020 Term B-1 Loan Claims (as defined in the Restructuring Plan) in accordance with the Restructuring Plan, each Initial Term Lender with an Initial Cashless Term Commitment as of the Closing Date shall (A) be automatically deemed to have made a Term Loan in Dollars to the Borrower on the Closing Date in an amount equal to the amount of the Initial Cashless Term Commitment of such Lender and (B) be bound by the provisions of this Agreement as a Lender hereunder and shall have the obligations of a Lender hereunder by its acceptance of the benefits of this Agreement and the other Loan Documents, and be deemed to have executed and delivered this Agreement, regardless of whether such Lender has executed and delivered a signature page hereto and (ii) each Initial Term Lender with an Initial Funded Term Commitment as of the Closing Date severally agrees to make a term loan in Dollars to the Borrower on the Closing Date in an amount which will not exceed the Initial Funded Term Commitment of such Lender.  On the Closing Date, all 2020 Term B-1 Loan Claims held by each Initial Term Lender will automatically be deemed satisfied, compromised, settled, released and discharged in full pursuant to an in accordance with the Restructuring Plan.  The Initial Term Loans deemed made pursuant to clause (i) above of this Section 2.1(a) shall be made without any actual funding and, notwithstanding anything to the contrary herein and in accordance with the Restructuring Plan, shall initially be deemed made by Revlon Intermediate Holdings V LLC, Revlon Intermediate Holdings V LLC will immediately thereafter be deemed to contribute and assign such Initial Term Loans to Revlon Intermediate Holdings VI LLC, Revlon Intermediate Holdings VI LLC will immediately thereafter be deemed to transfer and assign such Initial Term Loans to Revlon NewCo and such Initial Term Loans shall immediately thereafter be deemed to have been assigned and distributed by Revlon NewCo on the Closing Date to each Initial Term Lender with an Initial Cashless Term Commitment as of the Closing Date in accordance with the Restructuring Plan.  After giving effect to this Section 2.1(a) and the payment of discounts and premiums pursuant to Section 2.9(a), the aggregate outstanding principal amount of Initial Term Loans shall be $1,400,506,261.43.  The aggregate outstanding principal amount of the Initial Term Loans for all purposes of this Agreement and the other Loan Documents shall be the stated principal amount thereof outstanding from time to time.

(b)    The Initial Term Loans may from time to time be SOFR Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.13.

(c)    The Initial Term Commitment of each Initial Term Lender shall be automatically and permanently reduced to $0 upon the making (or deemed making) of such Initial Term Lender's Initial Term Loans pursuant to Section 2.1(a) on the Closing Date.

2.2    Procedures for Borrowing.

(a)    Each Borrowing (including, for the avoidance of doubt, each Borrowing (and/or deemed Borrowing) of Initial Term Loans on the Closing Date) shall be made upon irrevocable notice by the Borrower to the Administrative Agent.  Each such notice must be in writing and must be received by the Administrative Agent not later than (i) in the case of SOFR Loans, 12:00 Noon (New York City time) three Business Days prior to the requested Borrowing Date (or, solely in the case of the Initial Term Loans borrowed (and/or deemed to be borrowed) on the Closing Date, one Business Day prior to the Closing Date) or (ii) in the case of ABR Loans, 11:00 a.m. (New York City time) on the requested Borrowing Date.  Each notice by the Borrower pursuant to this Section 2.2(a) shall be delivered to the Administrative Agent in the form of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Committed Loan Notice shall specify (i) the requested date of the Borrowing, (ii) the

principal amount of Loans to be borrowed, (iii) the Type of Loans to be borrowed and (iv) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as ABR Loans. If the Borrower requests a Borrowing of SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, the Borrower will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its ratable share of the applicable Loans. Each Lender shall (except with respect to the Initial Term Loans to be deemed to have been made on the Closing Date in respect of such Lender's Initial Cashless Term Commitment) make (or cause the Escrow Agent to make) the amount of its Loan available to the Administrative Agent in same day funds at the Funding Office not later than (i) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of SOFR Loans or (ii) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of ABR Loans. Upon satisfaction of the applicable conditions set forth in Section 5.2 (or, with respect to any Borrowing on the Closing Date, set forth in Section 5.1), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower.

(c)    Except as otherwise provided herein, a SOFR Loan may be continued or converted only on the last day of an Interest Period for such SOFR Loan unless the Borrower pays the amount due under Section 2.21 in connection therewith. During the existence of an Event of Default which is continuing, at the election of the Required Lenders, no Loans may be requested as, converted to or continued as SOFR Loans.

2.3    Repayment of Initial Term Loans. The Initial Term Loans of each Initial Term Lender shall be payable in consecutive quarterly installments on the last Business Day of each March, June, September and December, commencing on September 30, 2025,in an amount equal to (a) with respect to each such calendar quarter ending on or prior to September 30, 2027, an amount equal to one half of one percent (0.50%) of the stated principal amount of the Initial Term Loans funded (and/or deemed to have been funded) on the Closing Date and (b) with respect to each calendar quarter ending after September 30, 2027 and prior to the Term Maturity Date, an amount equal to one quarter of one percent (0.25%) of the stated principal amount of the Initial Term Loans funded (and/or deemed to have been funded) on the Closing Date (which installments shall, to the extent applicable, be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.18(b) or reduced proportionately, to the extent applicable, if an Extension Request with respect to the Initial Term Loans is consummated as provided in the applicable Extension Amendment), with the remaining balance thereof payable on the Term Maturity Date.

2.4    [Reserved].

2.5    [Reserved].

2.6    [Reserved].

2.7    [Reserved].

2.8    Repayment of Loans.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender, the principal amount of each outstanding Term Loan of such Lender made (or deemed to have been made) to the Borrower in installments according to the amortization schedule set forth in Section 2.3 and on the Term Maturity Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8.1). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the date made until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(b)(iv), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal, interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(c) shall, to the extent permitted by applicable law, be presumptively correct absent demonstrable error of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.9    Fees, Premiums and Discounts.

(a)    The Borrower agrees to pay to the Administrative Agent, for the account of each Lender with an Initial Funded Term Commitment, the premiums and discounts in the amounts, on the date or dates and in the manner set forth in the Incremental New Money Commitment Letter and the First Lien Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement); provided that any such discounts and premiums shall be paid in-kind in the form of additional Initial Term Loans in the amounts set forth for each Lender as set forth in Schedule 2.1B.

(b)    The Borrower agrees to pay (x) to the Administrative Agent the fees in the amounts and on the dates as set forth in the Agent Fee Letter and (y) such other fees, discounts and premiums as agreed in writing to be paid by the Borrower to the Lenders (after giving effect to clause (a) above).

2.10    Prepayment Premium. With respect to each repayment or prepayment of Initial Term Loans under Section 2.11 and/or Section 2.12, any other repayment or prepayment of Initial Term Loans upon maturity (scheduled or otherwise), any acceleration of the Initial Term Loans and/or the other Obligations with respect thereto (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law (including any deemed repayment or satisfaction in connection therewith)) and/or any mandatory assignment of the Initial Term Loans of a non-consenting Lender pursuant to Section 2.24, whether in full or in part, in each case, on or prior to the second anniversary of the Closing Date, the Borrower shall be required to pay an amount equal to 1.00% of the amount of the Initial Term Loans repaid,

61

prepaid, accelerated or assigned (the "Applicable Premium"), in each case, concurrently with such repayment, prepayment, acceleration or assignment. For the avoidance of doubt, it is understood and agreed that, if any Initial Term Loans are accelerated or otherwise become due prior to the Term Maturity Date applicable thereto and prior to the second anniversary of the Closing Date, in each case whether in full or in part (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law), the Applicable Premium will also automatically be due and payable as though such Initial Term Loans were being repaid, prepaid or assigned and shall constitute part of the Obligations with respect to such Initial Term Loans. For the avoidance of doubt, the Applicable Premium shall also be due and payable if, prior to the second anniversary of the Closing Date (i) the Initial Term Loans (or any notes representing the Initial Term Loans) are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by another means and/or (ii) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Obligations (and/or this Agreement or the notes evidencing any Obligations) in any insolvency proceeding or other proceeding pursuant to any Debtor Relief Laws, foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by other means or the making of a distribution of any kind in any insolvency proceeding or under any Debtor Relief Law to the Administrative Agent, for the account of the Initial Term Lenders, in full or partial satisfaction of the Obligations occurs. The parties to this Agreement expressly acknowledge and accept the provisions of Section 10.12(e) concerning the Applicable Premium.

2.11    Optional Prepayments.

(a)    The Borrower may at any time and from time to time prepay the Tranches of Term Loans (subject to Section 2.11(b) below), in whole or in part, without premium or penalty except as specifically provided in Section 2.10, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, (i) three Business Days prior thereto in the case of SOFR Loans and (ii) one Business Day prior thereto in the case of ABR Loans, which notice shall specify (x) the date and amount of prepayment, (y) the Tranche or Tranches of Term Loans that such prepayment is in respect of and (z) whether the prepayment is of SOFR Loans or ABR Loans; provided, that if a SOFR Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (provided, that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with accrued interest to such date on the amount prepaid. Partial prepayments of Term Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof, and in each case shall be subject to the provisions of Section 2.18.

(b)    In connection with any optional prepayments by the Borrower of the Term Loans pursuant to Section 2.11(a), such prepayment shall be applied to the then outstanding Tranches of Term Loans being prepaid on a pro rata basis.

2.12    Mandatory Prepayments.

(a)    Unless the Required Lenders shall otherwise agree, if any Indebtedness (excluding any Indebtedness permitted to be incurred in accordance with Section 7.2 (other than Permitted Refinancing Obligations)) shall be incurred by the Borrower or any Subsidiary, an amount equal to 100% of the Net

Cash Proceeds thereof shall be applied not later than one Business Day after the date of receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in Section 2.12(e).

(b)      Unless the Required Lenders shall otherwise agree, if on any date the Borrower or any Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale or Recovery Event (except to the extent such Asset Sale or Recovery Event, as applicable, relates to any ABL Facility First Priority Collateral so long as such ABL Facility First Priority Collateral secures the ABL Facility), then, unless a Reinvestment Notice shall be delivered to the Administrative Agent in respect thereof, such Net Cash Proceeds shall be applied not later than 10 Business Days after such date toward the prepayment of the Term Loans as set forth in Section 2.12(e); provided, that, notwithstanding the foregoing, (i) in the event any Asset Sale giving rise to any such Reinvestment Notice consisted solely of Collateral, all of such Net Cash Proceeds shall be applied to acquire property or make investments used or useful in a Permitted Business constituting Collateral, (ii) no Reinvestment Notice may be submitted with respect to Net Cash Proceeds in excess of, together with the amount of Extraordinary Receipts for which a Reinvestment Notice has been delivered in accordance with the second proviso of Section 2.12(d), in the aggregate during the term of this Agreement, $100,000,000, (iii) if a Reinvestment Notice has been delivered to the Administrative Agent, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event on the applicable Reinvestment Prepayment Date and (iii) on the date (the "Trigger Date") that is six months after any such Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the portion of any Committed Reinvestment Amount with respect to the relevant Reinvestment Event not actually expended by such Trigger Date.

(c)      Unless the Required Lenders shall otherwise agree, if, for any Excess Cash Flow Period, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply an amount equal to (A) the Excess Cash Flow Application Amount, minus (B) the aggregate amount of all prepayments of ABL Loans during such Excess Cash Flow Period to the extent accompanied by permanent optional reductions of the applicable commitments, and all optional prepayments of Term Loans during such Excess Cash Flow Period (excluding any such optional prepayments during such Excess Cash Flow Period which the Borrower elected to apply to the calculation pursuant to this paragraph (c) in a prior Excess Cash Flow Period) and, at the option of the Borrower, optional prepayments of Term Loans after such Excess Cash Flow Period but prior to the time of the Excess Cash Flow Application Date, in each case other than to the extent any such prepayment is funded with the proceeds of long-term Indebtedness, toward the prepayment of Term Loans as set forth in Section 2.12(e), in each case of this clause (B), to the extent not deducted in accordance with clause (b)(iii) of the definition of "Excess Cash Flow". Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than ten days after the date on which the financial statements referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Lenders.

(d)      Unless the Required Lenders shall otherwise agree, if, on any date, the Borrower or any Subsidiary shall for its own account receive any Extraordinary Receipts, then, unless a Reinvestment Notice shall be delivered to the Administrative Agent in respect thereof, such Extraordinary Receipts shall be applied not later than ten Business Days after such date toward the prepayment of the Loans as set forth in Section 2.12(e); provided, that, notwithstanding the foregoing, (i) if a Reinvestment Notice has been delivered to the Administrative Agent, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event on the applicable Reinvestment Prepayment Date and (ii) on the date (the "Extraordinary Receipts Trigger Date") that is six months after any such Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the portion of any Committed Reinvestment Amount with respect to the relevant Reinvestment Event not actually expended by such Extraordinary Receipts

Trigger Date; provided further that no Reinvestment Notice may be submitted with respect to Extraordinary Receipts in excess of, together with the amount of Net Cash Proceeds for which a Reinvestment Notice has been delivered in accordance with Section 2.12(b)(ii), $100,000,000 in the aggregate during the term of this Agreement.

(e)     Amounts to be applied in connection with prepayments of Term Loans pursuant to this Section 2.12 shall, subject to the terms of each Intercreditor Agreement, be applied to the prepayment of the Term Loans in accordance with Section 2.18(b) until paid in full.  In connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to this Section 2.12, such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans and (to the extent required by the terms thereof) may be applied, along with such prepayments of Term Loans, to purchase, redeem or repay any other Indebtedness secured by the Collateral on a pari passu basis with the Liens securing the Obligations pursuant to one or more Other Intercreditor Agreements, pursuant to the agreements governing such other Indebtedness, on not more than a pro rata basis with respect to such prepayments of Term Loans.  Each prepayment of the Term Loans under this Section 2.12 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(f)     Notwithstanding anything to the contrary in Section 2.12 or 2.18, with respect to the amount of any mandatory prepayment pursuant to Section 2.12(b), (c) or (d) (such amount, the "Term Prepayment Amount"), the Borrower may, in its sole discretion, in lieu of applying such amount to the prepayment of Term Loans as provided in paragraph (e) above, not later than 12:00 p.m. (New York City time) on the Business Day prior to the date specified in this Section 2.12 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Lender (which, for avoidance of doubt, includes each Extending Lender) a notice (each, a "Prepayment Option Notice") as described below.  As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Lender a Prepayment Option Notice, which shall be in the form of Exhibit I (or such other form approved by the Administrative Agent and the Borrower), and shall include an offer by the Borrower to prepay, on the date (each a "Mandatory Prepayment Date") that is ten Business Days after the date of the Prepayment Option Notice, the Term Loans of such Lender by an amount equal to the portion of the Term Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans. Each Lender may reject all or a portion of its Term Prepayment Amount by providing written notice to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York City time) five Business Days after such Lender's receipt of the Prepayment Option Notice (which notice shall specify the principal amount of the Term Prepayment Amount to be rejected by such Lender) (such rejected amounts collectively, the "Declined Amount"); provided, that any Lender's failure to so reject such Term Prepayment Amount shall be deemed an acceptance by such Lender of such Prepayment Option Notice and the amount to be prepaid in respect of Term Loans held by such Lender (each such Lender, an "Accepting Lender").  On the Mandatory Prepayment Date, the Borrower shall pay to the Accepting Lenders (A) the aggregate amount necessary to prepay that portion of the outstanding Term Loans in respect of which such Accepting Lenders have (or are deemed to have) accepted prepayment as described above and (B) concurrently with the prepayment described in the preceding clause (A), the Declined Amount on a pro rata basis among such Accepting Lenders.  To the extent that any Accepting Lender rejects all or any portion of its pro rata share of such Declined Amount, any such Declined Amount so rejected may be used by the Borrower for any purpose not prohibited by this Agreement.

(g)     [Reserved].

(h)     Notwithstanding any other provisions of this Section 2.12, (A) to the extent that any or all of the Net Cash Proceeds of any Asset Sale by a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) (a "Foreign Asset Sale") or the Net

64

Cash Proceeds of any Recovery Event with respect to a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) (a "Foreign Recovery Event"), in each case giving rise to a prepayment event pursuant to Section 2.12(b) or (d), or Excess Cash Flow derived from a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) giving rise to a prepayment event pursuant to Section 2.12(c), are or is prohibited, restricted or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.12 but may be retained by the applicable Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) so long, but only so long, as the applicable local law will not permit or restricts repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds or Excess Cash Flow is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds or Excess Cash Flow will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof including, without duplication, any repatriation costs associated with repatriation of such proceeds from the applicable recipient to the Borrower) to the repayment of the Term Loans in accordance with this Section 2.12 and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Cash Proceeds of any Foreign Asset Sale or any Foreign Recovery Event or any Excess Cash Flow derived from a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) could reasonably be expected to result in a material adverse tax consequence (taking into account any foreign tax credit or benefit, in the Borrower's reasonable judgment, expected to be realized in connection with such repatriation) with respect to such Net Cash Proceeds or Excess Cash Flow, the Net Cash Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), provided, that, in the case of this clause (B), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.12 (or fifteen months after the date such Excess Cash Flow would have been so required to be applied if it were Net Cash Proceeds), (x) the Borrower shall apply an amount equal to such Net Cash Proceeds or Excess Cash Flow to such reinvestments or prepayments as if such Net Cash Proceeds or Excess Cash Flow had been received by the Borrower rather than such Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds or Excess Cash Flow had been repatriated (or, if less, the Net Cash Proceeds or Excess Cash Flow that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds or Excess Cash Flow shall be applied to the repayment of Indebtedness of a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), in each case, other than as mutually agreed by the Borrower and the Administrative Agent.

2.13    Conversion and Continuation Options.

(a)    The Borrower may elect from time to time to convert SOFR Loans made to the Borrower to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date; provided, that if any such SOFR Loan is so converted on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21.  The Borrower may elect from time to time to convert ABR Loans made to the Borrower to SOFR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which

notice shall specify the length of the initial Interest Period therefor); provided, that no such ABR Loan under a particular Facility may be converted into a SOFR Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any SOFR Loan may be continued as such by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 and no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed continuation date, of the length of the next Interest Period to be applicable to such Loans; provided, that if any such SOFR Loan is so continued on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21; provided, further, that no such SOFR Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations; provided, further, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph such SOFR Loans shall be automatically continued as SOFR Loans having an Interest Period of one month's duration on the last day of such then-expiring Interest Period and (ii) if such continuation is not permitted pursuant to the preceding proviso, such SOFR Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period; provided, further, that if the Borrower wishes to, and is otherwise permitted to, request SOFR Loans having an Interest Period other than one, three or six months in duration as provided in the definition of "Interest Period," the applicable notice must be received by the Administrative Agent not later than 11:00 a.m. four Business Days prior to the requested date of such Borrowing, conversion or continuation, whereupon the Administrative Agent shall give prompt notice to the appropriate Lenders of such request and determine whether the requested Interest Period is acceptable to all of them. Not later than 11:00 a.m., three Business Days before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.14     Minimum Amounts and Maximum Number of SOFR Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of SOFR Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that no more than six SOFR Tranches shall be outstanding at any one time.

2.15     Interest Rates and Payment Dates.

(a)     Each SOFR Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day plus the Applicable Margin.

(b)     Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)     Interest shall be payable by the Borrower in immediately available funds in arrears on each applicable Interest Payment Date and, in any event, on the Term Maturity Date, except with respect to interest payable pursuant to Section 2.15(d) which shall be payable in immediately available funds by the Borrower from time to time on demand.

66

(d)    If all or a portion of the principal amount of any Loan, interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall, unless otherwise agreed by the Required Lenders, automatically bear interest at a rate per annum equal to the rate applicable to SOFR Loans with an Interest Period of one month plus 2.00% from the date of such nonpayment until such amount is paid in full (after as well as before judgment); provided, that no amount shall accrue or be payable pursuant to this Section 2.15(d) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Such interest shall be payable in cash by the Borrower from time to time on demand.

2.16    Computation of Interest and Fees.

(a)    Interest and fees and any amounts owed pursuant to Section 10.5(c) payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest on ABR Loans (except for ABR computations in respect of clause (c) of the definition thereof) shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of the Adjusted Term SOFR Rate.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of demonstrable error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a) and Section 2.15(b).

2.17    Inability to Determine Rates; Benchmark Replacement Setting.

(a)    Subject to clauses (b) through (f) of this Section 2.17, if, on or prior to the first day of any Interest Period for any SOFR Loan, (i) the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof, or (ii) the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that the Adjusted Term SOFR Rate for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (ii), at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (A) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.21. Subject to clauses (b) through (f) of this Section 2.17, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without

67

reference to clause (c) of the definition of "ABR" until the Administrative Agent revokes such determination.

(b)    Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(c)    Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.17(e) and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.17, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.17.

(e)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a

68

Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)    Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

2.18    Pro Rata Treatment and Payments.

(a)    Except as expressly otherwise provided herein (including as expressly provided in Sections 2.12, 2.19, 2.20, 2.21, 2.22, 2.24, 2.26, 2.27, 10.5, 10.6 and 10.7), each payment (other than prepayments) in respect of principal or interest in respect of any Tranche of Term Loans and each payment in respect of fees payable hereunder with respect to the Term Loans of such Tranche shall be applied to the amounts of such obligations owing to the Lenders of such Tranche, pro rata according to the respective amounts then due and owing to such Lenders.

(b)    Each mandatory prepayment of the Term Loans shall be allocated among the Tranches of Term Loans then outstanding pro rata, in each case except as affected by the opt-out provision under Section 2.12(f); provided, that at the request of the Borrower, in lieu of such application to the Term Loans on a pro rata basis among all Tranches of Term Loans, such prepayment may be applied to any Tranche of Term Loans so long as the maturity date of such Tranche of Term Loans precedes the maturity date of each other Tranche of Term Loans then outstanding or, in the event more than one Tranche of Term Loans shall have an identical maturity date that precedes the maturity date of each other Tranche of Term Loans then outstanding, to such Tranches on a pro rata basis; provided, further, that in connection with a mandatory prepayment under Section 2.12(a) in connection with the incurrence of Permitted Refinancing Obligations, such prepayment shall be allocated to the Tranches refinanced by such Permitted Refinancing Obligations (but to the Loans within such Tranches on a pro rata basis).  Each optional prepayment of the Term Loans shall be applied to the remaining installments of each outstanding Tranche of Term Loans on a pro rata basis as specified by the Borrower (and absent such specification, in direct order of maturity). Each mandatory prepayment of the Term Loans shall be applied to the remaining installments of each outstanding Tranche of Term Loans on a pro rata basis in direct order of maturity.  Amounts repaid or prepaid on account of the Term Loans may not be reborrowed.

(c)    [Reserved].

(d)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees, the Applicable Premium or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 3:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Funding Office, in immediately available funds.  Any payment received by the Administrative Agent after 3:00 p.m., New York City time may be considered received on the next Business Day in the Administrative Agent's sole discretion.  The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the SOFR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next

69

succeeding Business Day.  If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be presumptively correct in the absence of demonstrable error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to SOFR Loans with an Interest Period of one month, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any Defaulting Lender.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.19     Requirements of Law.

(a)     Except with respect to Indemnified Taxes, Excluded Taxes and Other Taxes, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the Closing Date:

(i)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by any office of such Lender that is not otherwise included in the determination of the Adjusted Term SOFR Rate hereunder;

70

(ii)    shall subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liability or capital attributable thereto; or

(iii)    shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender or other Recipient, by an amount which such Lender or other Recipient reasonably deems to be material, of making, converting into, continuing or maintaining SOFR Loans (in each case hereunder), or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within thirty Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.19, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any entity controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such entity's capital as a consequence of its obligations hereunder to a level below that which such Lender or such entity could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such entity's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such entity for such reduction.

(c)    A certificate prepared in good faith as to any additional amounts payable pursuant to this Section 2.19 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of demonstrable error.  Notwithstanding anything to the contrary in this Section 2.19, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.19 for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided, that if the circumstances giving rise to such claim have a retroactive effect, then such 180-day period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section 2.19 shall survive the termination of this Agreement and the payment of the Obligations.  Notwithstanding the foregoing, the Borrower shall not be obligated to make payment to any Lender with respect to penalties, interest and expenses if written demand therefor was not made by such Lender within 180 days from the date on which such Lender makes payment for such penalties, interest and expenses.

(d)    Notwithstanding anything in this Section 2.19 to the contrary, solely for purposes of this Section 2.19, (i) the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date.

2.20    Taxes.

(a)    Except as otherwise provided in this Agreement or as required by law, all payments made by or on account of the Borrower or any Loan Party under this Agreement and the other Loan Documents to any Recipient under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes. If applicable law requires withholding or deduction of any Tax from any such payment, the Borrower, any other Loan Party or other withholding agent shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. If any Indemnified Taxes or Other Taxes are required to be deducted or withheld from any such payments, the amounts so payable to the applicable Recipient shall be increased to the extent necessary so that after deduction or withholding of such Indemnified Taxes and Other Taxes (including Indemnified Taxes or Other Taxes attributable to amounts payable under this Section 2.20(a)) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, the Borrower or any Loan Party under this Agreement and the other Loan Documents shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Taxes are payable by the Borrower or any Loan Party under this Agreement or the other Loan Documents, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower or Loan Party showing payment thereof if such receipt is obtainable, or, if not, such other evidence of payment as may reasonably be required by the Administrative Agent or such Lender.

(d)    The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes, including any amounts payable pursuant to this Section 2.20, payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any incremental Taxes and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered to the Borrower by a Recipient (with a copy to the Administrative Agent if applicable) shall be conclusive absent manifest error.

(e)    Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "Non-US Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) (A) (i) two accurate and complete copies of IRS Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, (ii) in the case of a Non-US Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F and two accurate and complete copies of IRS Form W-8BEN or W-8BEN-E, or any subsequent versions or successors to such forms, in each case properly completed and duly executed by such Non-US Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents, or (iii) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (i) and (ii) above, provided that if the Non-US Lender is a partnership, and one or more of the partners is claiming portfolio interest treatment, the certificate in the form of Exhibit F may be provided by such Non-US Lender on behalf of such partners) and (B) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be

72

prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.  Such forms shall be delivered by each Non-US Lender on or about the date it becomes a party to this Agreement (or, in the case of any Participant, on or about the date such Participant purchases the related participation).  In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.  Each Non-US Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Non-US Lender is not legally able to deliver provided that it shall promptly notify the Borrower and the Administrative Agent in writing of such inability.

(f)      [reserved]

(g)      Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "US Lender") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, or any subsequent versions or successors to such form and certify that such Lender is not subject to backup withholding.  Such forms shall be delivered by each US Lender on or about the date it becomes a party to this Agreement.  In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.  Each US Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(h)      If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid under this Section 2.20 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such indemnifying party, upon the request of such Recipient, agrees to repay the amount paid over to the indemnifying party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority other than any such penalties, interest or other charges resulting from the gross negligence or willful misconduct of the relevant Recipient (as determined by a final and non-appealable judgment of a court of competent jurisdiction)) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority; provided, further, that such Recipient shall, at the indemnifying party's request, provide a copy of any notice of assessment or other evidence of the requirement to pay such refund received from the relevant Governmental Authority (provided that the Recipient may delete any information therein that it deems confidential).  This paragraph shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.  In no event will any Recipient be required to pay any amount to an indemnifying party the payment of which would place such Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

(i)      [reserved]

73

(j)       If a payment made to a Lender under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 2.20(j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(k)       To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting the provisions of this Section 2.20, each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (k).

(l)       The agreements in this Section 2.20 shall survive the termination of this Agreement and payment of the Loans and all other amounts payable under any Loan Document, the resignation of the Administrative Agent and any assignment of rights by, or replacement of, any Lender.

(m)       For purposes of this Section 2.20, for the avoidance of doubt, applicable law includes FATCA.

2.21       Indemnity.  Other than with respect to Taxes, which shall be governed solely by Section 2.20, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (other than lost profits, including the loss of the interest rate margin) that such Lender actually sustains or incurs as a consequence of (a) any failure by the Borrower in making a borrowing of, conversion into or continuation of SOFR Loans after the Borrower has given notice requesting the same in accordance with the provisions of this Agreement, (b) any failure by the Borrower in making any prepayment of or conversion from SOFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment, conversion or continuation of SOFR Loans on a day that is not the last day of an Interest Period with respect thereto.  A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this Section 2.21 submitted to the Borrower by any Lender shall be presumptively correct in the absence of demonstrable error.  This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22    <u>Illegality</u>.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the Closing Date, shall make it unlawful for any Lender to make or maintain SOFR Loans as contemplated by this Agreement, such Lender shall promptly give notice thereof to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make SOFR Loans, continue SOFR Loans as such and convert ABR Loans to SOFR Loans shall be suspended during the period of such illegality and (b) such Lender's Loans then outstanding as SOFR Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a SOFR Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to <u>Section 2.21</u>.

2.23    <u>Change of Lending Office</u>.  Each Lender agrees that, upon the occurrence of any event giving rise to payments of additional amounts pursuant to of <u>Section 2.19</u>, <u>2.20(a)</u> or <u>2.22</u> with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) that would, in the Lender's judgment, avoid or minimize any amounts payable pursuant to such Sections (including by designating another lending office for any Loans affected by such event with the object of avoiding the consequences of such event); <u>provided</u>, that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage or unreimbursed cost or expense; <u>provided</u>, <u>further</u>, that nothing in this <u>Section 2.23</u> shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to <u>Section 2.19</u>, <u>2.20(a)</u> or <u>2.22</u>. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation or assignment.

2.24    <u>Replacement of Lenders</u>.  The Borrower shall be permitted to (a) replace with a financial entity or financial entities or (b) prepay or terminate the Loans or Commitments, as applicable, of any Lender (each such Lender, a "<u>Replaced Lender</u>") that (i) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority, in each case, pursuant to <u>Section 2.19</u>, <u>2.20</u> or <u>2.21</u> (to the extent a request made by a Lender pursuant to the operation of <u>Section 2.21</u> is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to <u>Section 2.22</u>, (ii) is a Disqualified Institution or a Defaulting Lender, or (iii) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required Lenders; <u>provided</u>, that:

(a)    such replacement does not conflict with any Requirement of Law;

(b)    the replacement financial entity or financial entities shall purchase, at par, all Loans and other amounts owing to such Replaced Lender on or prior to the date of replacement;

(c)    the Borrower shall be liable to such Replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any SOFR Loan owing to such Replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto;

(d)    the replacement financial entity or financial entities, (x) if not already a Lender, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such replacement financial institution of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to <u>Section 10.6(b)(i)(2)</u> and (y) shall pay (unless otherwise paid by the Borrower) any processing and recordation fee required under <u>Section 10.6(b)(ii)(2)</u>;

(e)    the Administrative Agent and any replacement financial entity or entities shall execute and deliver, and such Replaced Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Assumption to effect such substitution;

(f)    the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated;

(g)    in respect of a replacement pursuant to clause (iii) above, the replacement financial entity or financial entities shall consent to such amendment or waiver;

(h)    any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the Replaced Lender;

(i)    if such replacement, prepayment or termination is in connection with a waiver or amendment with respect to any Loan Document prior to the second anniversary of the Closing Date, the Borrower or the replacement Lender shall pay the Replaced Lender a fee equal to the Applicable Premium of the aggregate principal amount of its Term Loans required to be assigned, prepaid or terminated pursuant to this Section 2.24, calculated as if such amount was being prepaid under Section 2.11; and

(j)    in the case of any such replacement resulting from a requirement that the Borrower pay additional amounts pursuant to Section 2.19, 2.20 or 2.21, such replacement will result in a reduction in such payments thereafter.

Prepayments pursuant to this Section 2.24 (i) shall be accompanied by accrued and unpaid interest on the principal amount so prepaid up to the date of such prepayment and (ii) shall not be subject to the provisions of Section 2.18.  In connection with any such replacement under this Section 2.24, if the Replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Assumption and/or such other documentation and (b) the date as of which all obligations of the Borrower owing to the Replaced Lender relating to the Loans and participations so assigned shall be paid in full to such Replaced Lender, then such Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption and/or such other documentation as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Replaced Lender, and the Administrative Agent shall record such assignment in the Register.

2.25    [Reserved].

2.26    Extension of Term Loans.

(a)    The Borrower may at any time and from time to time request that all or a portion of the Term Loans of one or more Tranches existing at the time of such request (each, an "Existing Tranche", and the Term Loans of such Tranche, the "Existing Loans") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of any Existing Tranche (any such Existing Tranche which has been so extended, an "Extended Tranche"; and the Term Loans of such Extended Tranches, the "Extended Loans") and to provide for other terms consistent with this Section 2.26; provided, that (i) any such request shall be made by the Borrower to all Lenders with Term Loans with a like maturity date (whether under one or more Tranches) on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Term Loans) and (ii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower in its sole discretion.  In order to

76

establish any Extended Tranche, the Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Existing Tranche) (an "Extension Request") setting forth the proposed terms of the Extended Tranche to be established, which terms shall be substantially similar to those applicable to the Existing Tranche from which they are to be extended (the "Specified Existing Tranche"), except (x) all or any of the final maturity or termination dates of such Extended Tranches may be delayed to later dates than the final maturity or termination dates of the Specified Existing Tranche, (y)(A) the interest margins with respect to the Extended Tranche may be higher or lower than the interest margins for the Specified Existing Tranche and/or (B) additional fees may be payable to the Lenders providing such Extended Tranche in addition to or in lieu of any increased margins contemplated by the preceding clause (A) and/or (C) prepayment premiums may be different and (z) in the case of an Extended Tranche, so long as the Weighted Average Life to Maturity of such Extended Tranche would be no shorter than the remaining Weighted Average Life to Maturity of the Specified Existing Tranche, amortization rates with respect to the Extended Tranche may be higher or lower than the amortization rates for the Specified Existing Tranche, in each case to the extent provided in the applicable Extension Amendment; provided, that, notwithstanding anything to the contrary in this Section 2.26 or otherwise, assignments and participations of Extended Tranches shall be governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions applicable to Term Loans set forth in Section 10.6.  No Lender shall have any obligation to agree to have any of its Existing Loans converted into an Extended Tranche pursuant to any Extension Request.  Any Extended Tranche shall constitute a separate Tranche of Loans from the Specified Existing Tranches and from any other Existing Tranches (and any other Extended Tranches so established on such date).

(b)        The Borrower shall provide the applicable Extension Request at least 10 Business Days (or such shorter period as the Administrative Agent may agree to) prior to the date on which Lenders under the applicable Existing Tranche or Existing Tranches are requested to respond.  Any Lender (an "Extending Lender") wishing to have all or a portion of its Specified Existing Tranche converted into an Extended Tranche shall notify the Administrative Agent (each, an "Extension Election") on or prior to the date specified in such Extension Request of the amount of its Specified Existing Tranche that it has elected to convert into an Extended Tranche.  In the event that the aggregate amount of the Specified Existing Tranche subject to Extension Elections exceeds the amount of Extended Tranches requested pursuant to the Extension Request, the Specified Existing Tranches subject to Extension Elections shall be converted to Extended Tranches on a pro rata basis based on the amount of Specified Existing Tranches included in each such Extension Election.  In connection with any extension of Loans pursuant to this Section 2.26 (each, an "Extension"), the Borrower shall agree to such procedures regarding timing, rounding and other administrative adjustments to ensure reasonable administrative management of the credit facilities hereunder after such Extension, as may be established by, or acceptable to, the Administrative Agent and the Borrower, in each case acting reasonably to accomplish the purposes of this Section 2.26.

(c)        Extended Tranches shall be established pursuant to an amendment (an "Extension Amendment") to this Agreement (which may include amendments to provisions related to maturity, interest margins, prepayment premiums or fees referenced in clauses (x) and (y) of Section 2.26(a), or, in the case of Extended Tranches, amortization rates referenced in clause (z) of Section 2.26(a), and which, in each case, except to the extent expressly contemplated by the last sentence of this Section 2.26(c) and notwithstanding anything to the contrary set forth in Section 10.1, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Tranches established thereby) executed by the Loan Parties, the Administrative Agent, and the Extending Lenders.  Subject to the requirements of this Section 2.26 and without limiting the generality or applicability of Section 10.1 to any Section 2.26 Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "Section 2.26 Additional Amendment") to this Agreement and the other Loan Documents; provided, that

77

such Section 2.26 Additional Amendments do not become effective prior to the time that such Section 2.26 Additional Amendments have been consented to (including pursuant to consents applicable to holders of any Extended Tranches provided for in any Extension Amendment) by such of the Lenders, Loan Parties and other parties (if any) as may be required in order for such Section 2.26 Additional Amendments to become effective in accordance with Section 10.1; provided, further, that no Extension Amendment may provide for (i) any Extended Tranche to be secured by any Collateral or other assets of any Loan Party that does not also secure the Existing Tranches or be guaranteed by any Person other than the Guarantors and (ii) so long as any Existing Tranches are outstanding, any mandatory or voluntary prepayment provisions that do not also apply to the Existing Tranches (other than Existing Tranches (as in effect prior to the applicable Extension Amendment) secured on a junior basis by the Collateral or ranking junior in right of payment, which shall be subject to junior prepayment provisions) on at least a pro rata basis (nor otherwise provide for more favorable prepayment treatment for Extending Tranches than such Existing Tranches as contemplated by Section 2.12).    Notwithstanding anything to the contrary in Section 10.1, any such Extension Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the reasonable judgment of the Borrower and the Administrative Agent, to effect the provisions of this Section 2.26; provided, that the foregoing shall not constitute a consent on behalf of any Lender to the terms of any Section 2.26 Additional Amendment.

(d)    Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Tranche is converted to extend the related scheduled maturity or termination date(s) in accordance with Section 2.26(a) above (an "Extension Date"), in the case of the Specified Existing Tranche of each Extending Lender, the aggregate principal amount of such Specified Existing Tranche shall be deemed reduced by an amount equal to the aggregate principal amount of the Extended Tranche so converted by such Lender on such date, and such Extended Tranches shall be established as a separate Tranche from the Specified Existing Tranche and from any other Existing Tranches (and any other Extended Tranches so established on such date).

(e)    If, in connection with any proposed Extension Amendment, any Lender declines to consent to the applicable extension on the terms and by the deadline set forth in the applicable Extension Request (each such other Lender, a "Non-Extending Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Extending Lender, replace such Non-Extending Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.6 (with the assignment fee and any other costs and expenses to be paid by the Borrower or the assignee in such instance) all of its rights and obligations under this Agreement to one or more assignees; provided, that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; provided, further, that the applicable assignee shall have agreed to provide Extended Loans on the terms set forth in such Extension Amendment; provided, further, that all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned (including pursuant to Section 2.21 (as though Section 2.21 were applicable) and any premiums payable pursuant to Section 2.10) shall be paid in full by the assignee Lender to such Non-Extending Lender concurrently with such Assignment and Assumption.    In connection with any such replacement under this Section 2.26, if the Non-Extending Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption by the later of (A) the date on which the replacement Lender executes and delivers such Assignment and Assumption and (B) the date as of which all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned shall be paid in full to such Non-Extending Lender, then such Non-Extending Lender shall be deemed to have executed and delivered such Assignment and Assumption as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption on behalf of such Non-Extending Lender.

78

(f)        Following any Extension Date, with the written consent of the Borrower, any Non-Extending Lender may elect to have all or a portion of its Existing Loans deemed to be an Extended Loan under the applicable Extended Tranche on any date (each date a "Designation Date") prior to the maturity or termination date of such Extended Tranche; provided, that such Lender shall have provided written notice to the Borrower and the Administrative Agent at least 10 Business Days prior to such Designation Date (or such shorter period as the Administrative Agent may agree in its reasonable discretion); provided, further, that no greater amount shall be paid by or on behalf of the Borrower or any of its Affiliates to any such Non-Extending Lender as consideration for its extension into such Extended Tranche than was paid to any Extending Lender as consideration for its Extension into such Extended Tranche.  Following a Designation Date, the Existing Loans held by such Lender so elected to be extended will be deemed to be Extended Loans of the applicable Extended Tranche, and any Existing Loans held by such Lender not elected to be extended, if any, shall continue to be "Existing Loans" of the applicable Tranche.

(g)        With respect to all Extensions consummated by the Borrower pursuant to this Section 2.26, (i) such Extensions shall not constitute optional or mandatory payments or prepayments for purposes of Sections 2.11 and 2.12 and (ii) no Extension Request is required to be in any minimum amount or any minimum increment, provided, that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Request in the Borrower's sole discretion and which may be waived by the Borrower) of Existing Loans of any or all applicable Tranches be extended.  The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this Section 2.26 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Request) and hereby waive the requirements of any provision of this Agreement (including Sections 2.8, 2.11 and 2.12) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.26.

2.27    Defaulting Lenders.

(a)        Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(b)        Defaulting Lender Waterfall.  Any payment of principal, interest or other amounts (other than the payment of default interest under Section 2.15(d), which in each case shall be applied pursuant to the provisions of that Section) received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section VIII or otherwise) shall be applied by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent pursuant to Section 9.7; second, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released in order to satisfy such

79

Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to be held as security in a cash collateral account pursuant to this Section 2.27(b) shall be deemed paid to and redirected by such Defaulting Lender and shall satisfy the Borrower's payment obligation in respect thereof in full, and each Lender irrevocably consents hereto.

SECTION III.   [RESERVED]

SECTION IV.   REPRESENTATIONS AND WARRANTIES

       To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants (as to itself and each of its Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date (after giving effect to the Transactions) and on the date of each borrowing of Loans hereunder that:

       4.1   Financial Condition.  The audited consolidated balance sheet of Revlon Holdings and its consolidated Subsidiaries as at December 31, 2022, and the related statements of income, stockholders' equity and of cash flows for the fiscal year ended on such date, reported on by and accompanied by an unqualified (except as stated therein) report from KPMG LLP, present fairly in all material respects the financial condition of Revlon Holdings and its consolidated Subsidiaries as at such dates and the results of their operations, their cash flows and their changes in stockholders' equity for the fiscal year then ended.  All such financial statements, including the related schedules and notes thereto and year-end adjustments, have been prepared in accordance with GAAP (except as otherwise noted therein).

       4.2   No Change.  Since the Disclosure Statement Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

       4.3   Existence; Compliance with Law. Each of the Borrower and its Subsidiaries (other than any Immaterial Subsidiaries) (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where applicable, the equivalent status (if any) in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) has the corporate or other organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or other entity and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the

80

failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

4.4    Corporate Power; Authorization; Enforceable Obligations.

(a)    Each Loan Party has the corporate or other organizational power and authority to execute and deliver, and perform its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect. Each Loan Party has taken all necessary corporate or other action to authorize the execution and delivery of, and the performance of its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    No consent or authorization of, filing with, or notice to, any Governmental Authority is required to be obtained or made by any Loan Party for the extensions of credit hereunder or such Loan Party's execution and delivery of, or performance of its obligations under, or validity or enforceability of, this Agreement or any of the other Loan Documents to which it is party, as against or with respect to such Loan Party, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) consents, authorizations, filings and notices the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (iii) the filings referred to in Section 4.17.

(c)    Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. Assuming the due authorization of, and execution and delivery by, the parties thereto (other than the applicable Loan Parties), this Agreement constitutes, and each other Loan Document upon execution and delivery by each Loan Party that is a party thereto will constitute, a legal, valid and binding obligation of each such Loan Party, as applicable, that is a party thereto, enforceable against each such Loan Party, as applicable, in accordance with its terms (provided, that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries, only to the extent enforceability thereof is governed by the Uniform Commercial Code or the PPSA, as applicable), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing.

4.5    No Legal Bar.  Assuming the consents, authorizations, filings and notices referred to in Section 4.4(b) are obtained or made and in full force and effect, the execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties thereto, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of (i) the Borrower or (ii) except as would not reasonably be expected to have a Material Adverse Effect, any other Loan Party, (b) except as would not reasonably be expected to have a Material Adverse Effect, violate any Requirement of Law binding on Holdings, the Borrower or any of its Subsidiaries, (c) except as would not reasonably be expected to have a Material Adverse Effect, violate any Contractual Obligation of Holdings, the Borrower or any of its Subsidiaries or (d) except as would not have a Material Adverse Effect, result in or require the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens permitted by Section 7.3).

81

4.6    <u>No Material Litigation</u>.    Other than the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect.

4.7    <u>No Default</u>.    No Default or Event of Default has occurred and is continuing.

4.8    <u>Ownership of Property; Liens</u>.    Each of the Borrower and its Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all of its Real Property, and good title to, or a valid leasehold interest in, all of its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Real Property or other Property is subject to any Lien, except as permitted by the Loan Documents. <u>Schedule 4.8</u> sets forth a correct and complete list of all Material Real Property (other than Excluded Real Property) as of the Closing Date.

4.9    <u>Intellectual Property</u>.    Each of the Borrower and its Subsidiaries owns, or has a valid license or right to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens, except as permitted by the Loan Documents and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  To the Borrower's knowledge, neither the Borrower nor any of its Subsidiaries is infringing, misappropriating, diluting or otherwise violating any Intellectual Property rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect.  The Borrower and its Subsidiaries take all reasonable actions that in the exercise of their reasonable business judgment should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.10    <u>Taxes</u>.    Each of the Borrower and its Subsidiaries (a) has filed or caused to be filed all federal, state, provincial and other Tax returns that are required to be filed and (b) has paid or caused to be paid all taxes shown to be due and payable on said returns and all other taxes, fees or other charges imposed on it or on any of its Property by any Governmental Authority (other than (i) any returns or amounts that are not yet due or (ii) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the Borrower or such Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

4.11    <u>Federal Regulations</u>.    No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for any purpose that violates the provisions of the regulations of the Board.

4.12    <u>ERISA and Canadian Pension Plans.</u>

(a)    Except as set forth on <u>Schedule 4.12</u> or as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect:  (i) neither a Reportable Event nor a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA has occurred during the five-year period prior to the date on which this representation is made with respect to any Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan, and each Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has complied with the applicable provisions of ERISA, the Code and the Pension Benefits Act (Ontario) and other applicable federal or provincial laws, as applicable; (ii) no termination of a Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen on the assets of any Loan Party or any other Commonly Controlled Entity, during such five-year period; the present value of all accrued benefits under each Single Employer Plan and Canadian

Pension Plan (based on those assumptions used to fund such Plans and Canadian Pension Plan) did not, as of January 1, 2021, exceed the value of the assets of such Single Employer Plan or Canadian Pension Plan allocable to such accrued benefits; (iii) no Loan Party or any other Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; (iv) no Loan Party or any other Commonly Controlled Entity would become subject to any liability under ERISA if such Loan Party or such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made; (v) no Multiemployer Plan is Insolvent or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and (v) as of the Closing Date, no Canadian Pension Plan is a Canadian Multi-employer Plan.

(b)     The Borrower and its Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any Plan which is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained or contributed to by a Commonly Controlled Entity (other than the Borrower and its Subsidiaries) merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect.

4.13     <u>Investment Company Act</u>.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

4.14     <u>Subsidiaries</u>.  The Subsidiaries listed on <u>Schedule 4.14</u> constitute all the Subsidiaries of the Borrower at the Closing Date.  <u>Schedule 4.14</u> sets forth as of the Closing Date the name and jurisdiction of incorporation of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party.

4.15     <u>Environmental Matters</u>.  Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, (A) none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any pending or threatened Environmental Liability and (B) to Borrower's knowledge, there are no existing facts or circumstances (including any presence or Release of Materials of Environmental Concern at any Real Property or any real property formerly owned or operated by Borrower or its Subsidiaries) that are reasonably likely to give rise to any Environmental Liability of Borrower or any of its Subsidiaries.

4.16     <u>Accuracy of Information, etc.</u> As of the Closing Date, no statement or written information (excluding the projections and <u>pro forma</u> financial information referred to below) contained in this Agreement, any other Loan Document or any certificate furnished to the Administrative Agent or the Lenders or any of them (in their capacities as such), by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, including the Transactions, when taken as a whole, contained as of the date such statement, information or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the projections and <u>pro forma</u> financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods

covered by such financial information may differ from the projected results set forth therein by a material amount.

    4.17    <u>Security Documents</u>.

    (a)    The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under Article 9 of the UCC (including any proceeds of any such item of Collateral). The Canadian Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under the PPSA (including any proceeds of any such item of Collateral). The Cayman Pledge Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral).

    (b)    The UK Security Agreements are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral).

    (c)    In the case of (i) the Pledged Securities described in any Security Document (other than Excluded Collateral), when any stock, shares or share certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the ABL Intercreditor Agreement) together with any proper indorsements executed in blank and such other actions have been taken with respect to the Pledged Securities of Foreign Subsidiaries as are required under the applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary (it being understood that no such actions under applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary shall be required by any Loan Document other than a registration of a financing statement or similar registration) and the terms of the relevant Security Document and (ii) the other Collateral described in the Security Documents (other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified on <u>Schedule 4.17</u> and other filings are filed or registered, as applicable, in the applicable offices or system of registration (or, in the case of other Collateral not in existence on the Closing Date, such other offices or system of registration as may be appropriate) (which financing statements have been duly completed and executed (as applicable) and delivered to the Collateral Agent) and such other filings as are specified on <u>Schedule 4.17</u> are made (or, in the case of other Collateral not in existence on the Closing Date, such other filings as may be appropriate), the Collateral Agent shall have a fully perfected first priority Lien (or, with respect to the ABL Facility First Priority Collateral, a fully perfected second priority lien) in such Collateral (including any proceeds of any item of such Collateral) described in the Security Documents to which the Collateral Agent is a party (to the extent a security interest in such Collateral can be perfected through the filing of such documents and financing statements in the offices specified on <u>Schedule 4.17</u> (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and the other filings specified on <u>Schedule 4.17</u> (or, in the case of other Collateral not in existence on the Closing Date, such other filings or system of registration as may be appropriate), and through the delivery of the Pledged Securities required to be delivered pursuant to the ABL Intercreditor Agreement or any Other Intercreditor Agreement), as security for the Obligations, in each case prior in right to the Lien of any other Person (except (A) in the case of Collateral other than Pledged Securities that comprise stock of wholly-owned Subsidiaries, Liens permitted by <u>Section 7.3</u> and (B) Liens having priority by operation of law) to the extent required by the Security Documents.

(d)      Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to Section 6.8(b) or Section 6.10(b), such Mortgage shall be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on the Mortgaged Property described therein and proceeds thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing; and when such Mortgage is filed in the recording office designated by the Borrower and all relevant mortgage taxes and recording charges are duly paid, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Party in such Mortgaged Property and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case subject only to Liens permitted by Section 7.3 or other encumbrances or rights permitted by the relevant Mortgage.

4.18    Solvency.  As of the Closing Date, the Borrower and its Subsidiaries are (on a consolidated basis), and immediately after giving effect to the Transactions to occur on the Closing Date and immediately following the application of the proceeds of each Loan made (or deemed to have been made) on the Closing Date will be, Solvent.

4.19    Anti-Terrorism.  As of the Closing Date, Holdings, the Borrower and its Subsidiaries are in compliance with the USA Patriot Act and Canadian Anti-Money Laundering & Anti-Terrorism Legislation, except as would not reasonably be expected to have a Material Adverse Effect.

4.20    Use of Proceeds.  The Borrower will use the proceeds of the Loans solely in compliance with Section 6.9 of this Agreement.

4.21    Labor Matters.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower or such Subsidiary, as applicable.

4.22    [Reserved].

4.23    Sanctions.  No Loan Party (i) is currently the target of any Sanctions or (ii) is located or residing in or organized under the laws of any Designated Jurisdiction, (iii) is or has been (within the previous five years) engaged in any transaction with any Person who is now or was then the target of Sanctions or who is located, residing in or organized under the laws of any Designated Jurisdiction, in each case, in violation of any applicable Sanctions or (iv) is a Person that constitutes a Canadian Blocked Person. No Loan, nor the proceeds from any Loan, has been or will be used by any Loan Party, directly or knowingly indirectly, to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, residing in or organized under the laws of any Designated Jurisdiction or who is the target of any Sanctions, or in any other manner that will, in each case, result in any violation by any party hereto (including any Lender, the Administrative Agent, the Lead Arranger or the Bookrunner) of Sanctions.

4.24    Anti-Corruption Compliance.  The Borrower and each of its Subsidiaries (and all Persons acting on behalf of the Borrower and each of its Subsidiaries) are in compliance with applicable Anti-Corruption Laws and has implemented and maintains in effect policies and procedures reasonably designed to facilitate continued compliance.  No part of the proceeds of the Loans has been or will be used

85

by the Borrower or its Subsidiaries, directly or indirectly, for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law.  Notwithstanding the foregoing, the representations given in this Section 4.24 shall not be made by nor apply to any Person that qualifies as a corporation that is registered or incorporated under the laws of Canada or any province thereof and that carries on business in whole or in part in Canada within the meaning of Section 2 of the Foreign Extraterritorial Measures (United States) Order, 1992 passed under the Foreign Extraterritorial Measures Act (Canada) in so far as such representations would result in a violation of or conflict with the Foreign Extraterritorial Measures Act (Canada) or any similar law.

4.25    Beneficial Ownership Certification.  As of (a) the Closing Date, the information included in the Beneficial Ownership Certification delivered pursuant to Section 5.1(i)(B) is true and correct in all respects and (b) as of the date delivered, the information included in each Beneficial Ownership Certification delivered pursuant to Section 6.16 is true and correct in all respects.

SECTION V.    CONDITIONS PRECEDENT

5.1    Conditions to Closing Date.  The effectiveness of this Agreement and the agreement of each Initial Term Lender to make the initial extension of credit requested to be made (or to be deemed to be made) by it on the Closing Date is subject to the satisfaction (or waiver), prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Credit Agreement; Guarantee and Collateral Agreement and other Security Documents.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by Holdings and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor party thereto, (iii) the UK Security Documents, executed by the relevant Subsidiary Guarantor party thereto, (iii) the Canadian Collateral Agreement, executed by each Subsidiary Guarantor party thereto, (iv) the ABL Intercreditor Agreement, executed and delivered by Holdings, the Borrower, each Subsidiary Guarantor, the Collateral Agent and the collateral agent under the ABL Documents and (v) the Cayman Pledge Agreement executed by Beautyge Brands U.S.A., Inc.

(b)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to any of the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) on the Closing Date.

(c)    Borrowing Notice.  The Administrative Agent shall have received a Committed Loan Notice from the Borrower with respect to the Initial Term Loans (including, for the avoidance of doubt, with respect to the Initial Terms Loans to be deemed to be made on the Closing Date pursuant to Section 2.1(a)(i) of this Agreement) in accordance with Section 2.2.

(d)    Fees.  (i) The Borrower shall have paid all fees, premiums and discounts due and payable under the Incremental New Money Commitment Letter and the First Lien Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement), (ii) the Administrative Agent (A) shall have received all fees, discounts and premiums due and payable on or prior to the Closing Date in respect of the Initial Term Facility and (B) to the extent invoiced at least two Business Days prior to the Closing Date (or such later date as the Borrower may reasonably agree), shall have been reimbursed for all reasonable and documented out-of-pocket expenses (including the reasonable fees, charges and disbursements of (i) Davis

86

Polk & Wardwell LLP, counsel to the Lenders, (ii) Goodmans LLP, Canadian counsel to the Lenders and (iii) Paul Hastings LLP, counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(e)    Legal Opinion.  The Administrative Agent and each Lender shall have received an executed legal opinion of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, special New York counsel to the Loan Parties, (ii) Osler, Hoskin and Harcourt LLP, special Canadian counsel to the Loan Parties, (iii) Walkers (Cayman) LLP, special Cayman Islands counsel to the Loan Parties and (iv) Davis Polk & Wardwell London LLP, special English counsel to the Administrative Agent and the Lenders, in each case, dated as of the Closing Date, addressed to the Agents and the Lenders, and in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(f)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(g)    Closing Certificate.  The Administrative Agent shall have received a certificate of the Borrower, dated as of the Closing Date, substantially in the form of Exhibit C.

(h)    Secretary / Director Certificates.  Such certificates of good standing (to the extent such concept exists) from the applicable secretary of state or registrar of the state of organization or jurisdiction of incorporation of each Loan Party , certificates of resolutions or board resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date.

(i)    USA Patriot Act; Proceeds of Crime Act; Beneficial Ownership Certification.  The Administrative Agent and the Lenders shall have received from the Borrower and each of the Loan Parties, at least 2 Business Days prior to the Closing Date, (A) all documentation and other information reasonably requested by the Administrative Agent or any Lender no less than 7 calendar days prior to the Closing Date that the Administrative Agent or any such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Proceeds of Crime Act and (B) a Beneficial Ownership Certification in relation to the Borrower and each Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation.

(j)    Filings.  Except as set forth on Schedule 6.10, there shall have been delivered to the Collateral Agent in proper form for filing (x) each Uniform Commercial Code and PPSA financing statement and each intellectual property security agreement to be filed with the U.S. Patent and Trademark Office and the U.S. Copyright Office or the Canadian Intellectual Property Office, as applicable, in each case as required by the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as the case may be,  in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected Lien (or, with respect to the ABL Facility First Priority Collateral, a fully perfected second priority Lien) on the Collateral described therein and (y) each Uniform Commercial Code and PPSA financing statement and each intellectual property security agreement to be filed with the U.S. Patent and Trademark Office, the U.S. Copyright Office and the Canadian Intellectual Property Office, in each case as required by the Security Documents (other than the Guarantee and Collateral Agreement or the Canadian Collateral Agreement) in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected Lien on the Collateral described therein.

(k)    Pledged Stock; Stock Powers.  Except as set forth on Schedule 6.10, the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) shall have received the certificates, if any, representing the shares of Pledged Stock held by a Loan Party pledged pursuant to the Guarantee and Collateral Agreement, Canadian Collateral Agreement, any UK Security Agreement or the Cayman Pledge Agreement (as applicable), together with an undated stock power or share transfer instrument for each such certificate executed in blank by a duly authorized officer/director of the pledgor thereof.

(l)    Solvency Certificate.  The Administrative Agent shall have received a solvency certificate signed by the chief financial officer on behalf of the Borrower, substantially in the form of Exhibit G, after giving effect to the Transactions or, at the Borrower's option, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing.

(m)    Restructuring Plan Effective Date; Confirmation Order.    (i) All conditions precedent to the confirmation and effectiveness of the Restructuring Plan, as set forth in the Restructuring Plan, shall have been satisfied or waived in accordance with the terms thereof, (ii) the Borrower shall have delivered to the Administrative Agent and the Lenders a docketed copy of the Confirmation Order and (iii) the effective date under the Restructuring Plan shall have occurred (or occur contemporaneously with the Closing Date).

(n)    Equity Rights Offering.  The Equity Rights Offering (as defined in the Plan) shall have been consummated on terms consistent in all respects with the Restructuring Support Agreement, and Holdings shall have received gross proceeds in an amount no less than $670,000,000 from such Equity Rights Offering *minus* the amount of any reduction thereof as set forth in the Restructuring Support Agreement.

(o)    Material Adverse Effect. Since the Disclosure Statement Date, there shall not have occurred any event, change, occurrence or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(p)    Approvals.  The Borrower and the other Loan Parties shall have received all approvals, consents, licenses and permits required in connection with the Facilities, which approvals, consents, licenses and permits remain in full force and effect.

(q)    UK Loan Party Approvals. The Administrative Agent shall have received, in the case of the UK Loan Party, a certificate from a director of that UK Loan Party attaching and certifying that the following documents are correct, complete and in full force and effect and have not been amended or superseded as at the date of this Agreement: (i) a copy of the organizational documents of that UK Loan Party; (ii) a copy of a resolution of the board of directors of that UK Loan Party; and (iii) a copy of a resolution signed by all the holders of the issued shares in that UK Loan Party.

(r)    Financial Statements.  The Administrative Agent and the Lenders shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of Revlon, Inc. and its Subsidiaries for the fiscal year ended December 31, 2022, (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Revlon, Inc. and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Closing Date and (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 30 days before the Closing Date.

(s)    Lien Searches. The Collateral Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code or PPSA financing statements will be made to evidence or perfect security interests required to be evidenced or perfected, and such search shall reveal no liens on any of the assets of the Loan Parties, except for Liens permitted by Section 7.3 or liens to be discharged on or prior to the Closing Date.

(t)    No Litigation. Other than the Chapter 11 Cases, as of the Closing Date, there shall not be any litigation, action, suit, investigation or other arbitral, administrative or judicial proceeding pending or known by a Loan Party to be threatened against any Loan Party drawing into question any transaction contemplated by the Loan Documents, or that could reasonably be expected to have a Material Adverse Effect on the Loan Parties and their Subsidiaries, taken as a whole.

(u)    ABL Facility. The ABL Facility Agreement and the other ABL Documents shall have become effective, and the sum of Excess Availability under (and as defined in) the ABL Facility Agreement and cash and Cash Equivalents held by Holdings and its Subsidiaries shall be no less than $200,000,000.

Notwithstanding anything herein to the contrary, to the extent that any security interest in the intended Collateral or any deliverable related to the perfection of security interests in the intended Collateral (other than any Collateral the security interest in which may be perfected by the filing of a Uniform Commercial Code or PPSA financing statement or the possession of stock certificates) is not or cannot be provided and/or perfected on the Closing Date (1) without undue burden or expense or (2) after the Borrower's use of commercially reasonable efforts to do so, then the provision and/or perfection of such security interest(s) or deliverable shall not constitute a condition precedent to the effectiveness of this Agreement and the making (or deemed making) of the initial extension of credit on the Closing Date; provided, that the Borrower hereby agrees to deliver, or cause to be delivered, such documents and instruments, or take or cause to be taken such other actions, in each case, as may be required to create and/or perfect such security interests within sixty (60) days after the Closing Date (subject to extensions approved by the Administrative Agent in its reasonable discretion).

5.2    Conditions to Each Extension of Credit After Closing Date. The agreement of each Lender to make any Loan hereunder on any date after the Closing Date is subject to the satisfaction (or waiver) of the following conditions precedent:

(a)    Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date;

(b)    No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date; and

(c)    Borrowing Notice. In the case of a borrowing of any Loans, the Administrative Agent shall have received a Committed Loan Notice from the Borrower in accordance with Section 2.2.

Each borrowing of a Loan by the Borrower hereunder after the Closing Date shall constitute a representation and warranty by the Borrower as of the date of such borrowing that the conditions contained in this Section 5.2 have been satisfied.

89

SECTION VI.  AFFIRMATIVE COVENANTS

The Borrower (on behalf of itself and each of its Subsidiaries (other than any Permitted Joint Venture)) hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall, and shall cause (except in the case of the covenants set forth in <u>Section 6.1</u>, <u>Section 6.2</u>, and <u>Section 6.7</u>) each of its Subsidiaries (other than any Permitted Joint Venture) to:

6.1    <u>Financial Statements</u>.  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on the Platform):

(a)    within 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2023, (i) a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form the figures as of the end of and for the previous year, reported on without qualification, exception or explanatory paragraph as to "going concern" or arising out of the scope of the audit (other than any such exception or explanatory paragraph (but not qualification) that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity of any Indebtedness occurring within one year from the time such report is delivered), by KPMG LLP or other independent certified public accountants of nationally recognized standing and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal year; and

(b)    within 45 days (or 75 days, in the case of the fiscal quarters of the Borrower ending March 31, 2023 and June 30, 2023) after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2023, (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth, in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal quarter.

All such financial statements shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in <u>clause (b)</u>, for customary year-end adjustments and the absence of complete footnotes).  Any financial statements or other deliverables required to be delivered pursuant to this <u>Section 6.1</u> and any financial statements or reports required to be delivered pursuant to <u>clause (d)</u> of <u>Section 6.2</u> shall be deemed to have been furnished to the Administrative Agent on the date that (i) such financial statements or deliverable (as applicable) are posted on the SEC's website at www.sec.gov or the website for the Borrower and (ii) the Administrative Agent has been provided written notice of such posting.

Documents required to be delivered pursuant to this <u>Section 6.1</u> may also be delivered by posting such documents electronically with written notice of such posting to the Administrative Agent, which notice may be provided via electronic mail, and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on the Platform.

6.2    <u>Certificates; Other Information</u>.  Furnish to the Administrative Agent for delivery to each Lender or, in the case of <u>clause (e)</u>, to the relevant Lender (in each case, which may be delivered via posting on the Platform):

(a)    each Borrowing Base Certificate (as defined in the ABL Facility Agreement) concurrent with the delivery thereof under the ABL Facility Agreement;

(b)    concurrently with the delivery of any financial statements pursuant to <u>Section 6.1</u>, commencing with delivery of financial statements for the first period ending after the Closing Date, (i) a Compliance Certificate of a Responsible Officer on behalf of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing except as specified in such certificate and (ii) to the extent not previously disclosed to the Administrative Agent, (x) a description of any Default or Event of Default that occurred, (y) a description of any new Subsidiary and of any change in the name or jurisdiction of organization of any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date) to the extent not previously disclosed pursuant to <u>Section 6.8</u> and (z) solely in the case of financial statements delivered pursuant to <u>Section 6.1(a)</u>, a listing of any registrations of or applications for Intellectual Property (other than domain names) by any Loan Party filed since the last such report, together with a listing of any intent-to-use applications for trademarks or service marks for which a statement of use or an amendment to allege use has been filed since the last such report;

(c)    not later than 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2023, a consolidated forecast for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income);

(d)    promptly after the same become publicly available, copies of all financial statements and material reports that Holdings sends to the holders of any class of its publicly traded debt securities or  public equity securities (except for those provided solely to the Permitted Investors), in each case to the extent not already provided pursuant to <u>Section 6.1</u> or any other clause of this <u>Section 6.2</u>;

(e)    promptly, such additional financial and other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request to the extent such additional financial or other information is reasonably available to, or can be reasonably obtained by, the Borrower; and

(f)    within a reasonable period following the delivery of any financial statements pursuant to <u>Section 6.1</u>, dial-in details in respect of a conference call with Lenders (which may be satisfied by a call with holders of Holdings' or any Parent Company's publicly listed debt or equity securities attended by any Lender) and during which representatives from the Borrower will be available to discuss the details of the relevant financial statements and otherwise address additional matters in a manner consistent with Revlon Holdings' or the Borrower's past practice.

Notwithstanding anything to the contrary in this <u>Section 6.2</u>, (a) none of the Borrower or any of its Subsidiaries will be required to disclose any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information and (b)

unless such material is identified in writing by the Borrower as "Public" information, the Administrative Agent shall deliver such information only to "private-side" Lenders (i.e., Lenders that have affirmatively requested to receive information other than Public Information).

Documents required to be delivered pursuant to this <u>Section 6.2</u> may be delivered by posting such documents electronically and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website or (ii) on which such documents are posted on the Borrower's behalf on the Platform.

6.3    <u>Payment of Taxes</u>.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

6.4    <u>Conduct of Business; Maintenance of Existence; Compliance with Requirements of Law</u>.  (a) Preserve and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by <u>Section 7.4</u> or except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law (including ERISA, Environmental Laws, and the USA Patriot Act and the Proceeds of Crime Act) except to the extent that failure to comply therewith would not reasonably be expected to have a Material Adverse Effect; <u>provided</u>, that with respect to Environmental Laws, none of the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.5    <u>Maintenance of Property; Insurance</u>.

(a)    Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, the Canadian Intellectual Property Office or any corresponding office or agency in any other applicable jurisdiction, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration for the Intellectual Property owned by the Borrower or its Subsidiaries, including filing of applications for renewal, affidavits of use and affidavits of incontestability, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(c)    Maintain insurance with financially sound and reputable insurance companies on all its Property that is necessary in, and material to, the conduct of business by the Borrower and its Subsidiaries, taken as a whole, in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and use its commercially reasonable efforts to ensure that all such material insurance policies shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) name the Collateral Agent (or, in the case of the ABL Facility First Priority Collateral, the collateral agent

under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) as additional insured party or loss payee.

(d)    With respect to any Mortgaged Properties, if at any time the area in which the Premises (as defined in the Mortgages, if any) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Collateral Agent may from time to time reasonably require, and otherwise to ensure compliance with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

6.6    Inspection of Property; Books and Records; Discussions.

(a)    Keep proper books of records and accounts in a manner to allow financial statements to be prepared in conformity with GAAP (or, with respect to Subsidiaries organized outside of the United States, the local accounting standards applicable to the relevant jurisdiction; provided, that, to the extent that any such Subsidiary is permitted to prepare financial statements in accordance with different local accounting standards, such Subsidiary shall continue to apply the local accounting standard applied as of the Closing Date (as such standard may be updated or revised from time to time and, for the avoidance of doubt, with any discretions, judgments and elections afforded by such local accounting standard, including any changes in the application of such discretions, judgments and elections as such Subsidiary shall determine) except to the extent of changes between local accounting standards required by applicable law or regulation).

(b)    Permit representatives designated by the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon reasonable notice and at such reasonable times during normal business hours (provided, that (i) such visits shall be limited to no more than one such visit per calendar year at each facility, and (ii) such visits by the Administrative Agent or its designee shall be at the Administrative Agent's expense, except in the case of the foregoing clauses (i) and (ii) during the continuance of an Event of Default).

(c)    Permit representatives designated by the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers of the Borrower and its Subsidiaries upon reasonable notice and at such reasonable times during normal business hours (provided, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions, (ii) such discussions shall be coordinated by the Administrative Agent, and (iii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

(d)    Permit representatives of the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with its independent certified public accountants to the extent permitted by the internal policies of such independent certified public accountants upon reasonable notice and at such reasonable times during normal business hours (provided, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions and (ii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

Notwithstanding anything to the contrary in this Section 6.6, none of the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of

93

Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information.

6.7    Notices.  Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Administrative Agent of:

(a)    the occurrence of any Default or Event of Default;

(b)    any litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)    the occurrence of any Reportable Event, where there is any reasonable likelihood of the imposition of liability on any Loan Party as a result thereof that would reasonably be expected to have a Material Adverse Effect; and

(d)    any other development or event that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth in reasonable detail the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

6.8    Additional Collateral, etc.

(a)    With respect to any Property (other than Excluded Collateral) located in the United States (or, with respect to Property of any Non-US Guarantor, any Property (other than Excluded Collateral) located in the jurisdiction of formation of such Non-US Guarantor or any other jurisdiction in which such Non-US Guarantor has previously granted a security interest to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party) having a value, individually or in the aggregate, of at least $10,000,000 acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than (i) any interests in Real Property and any Property described in paragraph (c) or paragraph (d) of this Section 6.8, (ii) any Property subject to a Lien expressly permitted by Section 7.3(g) or 7.3(y), and (iii) Instruments, Certificated Securities, Securities and Chattel Paper, which are referred to in the last sentence of this paragraph (a)) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly (A) give notice of such Property to the Collateral Agent and execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, UK Security Agreements, the Cayman Pledge Agreement or such other documents as the Collateral Agent reasonably requests to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in such Property and (B) take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Loan Documents and with the priority required by Section 4.17) in such Property (with respect to Property of a type owned by the Borrower or any Subsidiary Guarantor as of the Closing Date to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or other Security Documents or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $10,000,000 payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security, Security or Chattel Paper (or, if more than $10,000,000 in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments,

94

Certificated Securities, Securities or Chattel Paper), such Instrument, Certificated Security, Security or Chattel Paper shall be promptly delivered to the Collateral Agent indorsed in a manner reasonably satisfactory to the Collateral Agent to be held as Collateral pursuant to this Agreement (or, in the case of any such Collateral that is ABL Facility First Priority Collateral, delivered to the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement).

(b)      With respect to any fee interest in any Material Real Property acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than Excluded Real Property, unless such Excluded Real Property is subject to a Lien securing the ABL Facility):

(i)      give notice of such acquisition to the Collateral Agent and, if requested by the Collateral Agent (at the direction of the Required Lenders) or the Borrower, execute and deliver a Mortgage (subject to liens permitted by Section 7.3 or other encumbrances or rights permitted by the relevant Mortgage) in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such Real Property (provided that no Mortgage shall be obtained if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such Mortgage are excessive in relation to the value of the security to be afforded thereby);

(ii)     (A) if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), with respect to any Mortgage, provide the Lenders with (1) a lenders' title insurance policy with extended coverage covering such Real Property in an amount equal to the purchase price (if applicable) or the Fair Market Value of the applicable Material Real Property, as determined in good faith by the Borrower and reasonably acceptable to the Administrative Agent, and (2) for real property located in the U.S., an ALTA survey or such survey alternatives (including, without limitation, an express map), or for real property situated in Canada a survey in form and substance acceptable to the Collateral Agent, of such Real Property, together with a surveyor's certificate unless the title insurance policy referred to above shall not contain an exception for any matter shown by a survey (except to the extent an existing survey has been provided and specifically incorporated into such title insurance policy or if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such survey are excessive in relation to the value of the security to be afforded thereby), each in form and substance reasonably satisfactory to the Collateral Agent, and (B) provide to the Administrative Agent evidence of flood hazard insurance if any portion of the improvements on the owned Material Real Property is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the improvements; provided, however, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and

(iii)    if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), deliver to the Collateral Agent customary legal opinions regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters reasonably requested by the Collateral Agent (at the Direction of the Required Lenders), which opinions shall be in form and substance reasonably satisfactory to the Collateral Agent.

(c)      Except as otherwise contemplated by Section 7.7(p), with respect to (x) any new Domestic Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary

that becomes a Non-Excluded Subsidiary) by the Borrower or any Subsidiary Guarantor or (y) any other Subsidiary that the Borrower elects to designate as not constituting an "Excluded Subsidiary" pursuant to clause (y) of the proviso to the definition thereof, promptly:

       (i)     give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent or the Borrower, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, UK Security Agreements, the Cayman Pledge Agreement or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary that is owned by the Borrower or such Subsidiary Guarantor (as applicable);

       (ii)    deliver to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement), the certificates, if any, representing such Capital Stock (other than Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Subsidiary Guarantor (as applicable); and

       (iii)   cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and, where applicable, the Canadian Collateral Agreement and/or the UK Security Agreement, the Cayman Pledge Agreement and (B) (x) to take such actions reasonably necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Collateral described in the Guarantee and Collateral Agreement, Canadian Collateral Agreement, the UK Security Agreement or the Cayman Pledge Agreement with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in the same type of Collateral as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreement or the Cayman Pledge Agreement or by law or as may be reasonably requested by the Collateral Agent and (y) comply with the provisions of Section 6.8(b) with respect to any Material Real Property (other than Excluded Real Property) owned by such new Subsidiary.

Without limiting the foregoing, if the aggregate Consolidated Total Assets or annual consolidated revenues of any Subsidiary listed in the definition of "Immaterial Subsidiary" hereunder shall at any time exceed 1.0% of Consolidated Total Assets or 1.0% of annual consolidated revenues, respectively, of the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), the Borrower shall promptly, (x) rescind the designation as "Immaterial Subsidiary" of such Subsidiary so that, after giving effect thereto, the aggregate Consolidated Total Assets or annual consolidated revenues, as applicable, of all Subsidiaries so designated (and which designations have not been rescinded) shall not exceed 1.0% of Consolidated Total Assets or 1.0% of annual consolidated revenues, respectively, of the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), as applicable, and (y) to the extent not already effected, (A) cause each affected Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Subsidiary to take such actions to pledge such Capital Stock to the extent required by, and otherwise in accordance with, the Guarantee and Collateral Agreement or the Canadian Collateral Agreement and execute and deliver the documents and

96

other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Collateral.

(d)        Except as otherwise contemplated by Section 7.7(p), with respect to any new first-tier Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any Subsidiary Guarantor, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement and/or any UK Security Agreement or Canadian Collateral Agreement or Cayman Pledge Agreement as the Collateral Agent reasonably deems necessary or reasonably advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary (other than any Excluded Collateral) that is owned by the Borrower or such Subsidiary Guarantor (as applicable) and (ii) deliver to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) the certificates, if any, representing such Capital Stock (other than any Excluded Collateral), together with undated stock powers/share transfer instruments, in blank, executed and delivered by a duly authorized officer or director of the Borrower or such Subsidiary Guarantor (as applicable).

(e)        Notwithstanding anything in this Section 6.8 or any Security Document to the contrary, (i) other than with respect to Intellectual Property, neither Holdings nor the Borrower nor any of its Restricted Subsidiaries shall be required to take any actions in order to create or perfect the security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties under the laws of any jurisdiction outside the United States (unless, in the case of any Non-US Guarantor, such jurisdiction is the jurisdiction of organization for such Non-US Guarantor or such Non-US Guarantor has previously granted a security interest in such jurisdiction to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party); provided, that notwithstanding anything herein to the contrary, any actions required to be taken under non-United States law for the purpose of perfecting non-United States Intellectual Property shall be limited to those set forth on Schedule 6.10, (ii) no control agreement shall be required with respect to (x) any Excluded Account or (y) any other Deposit Accounts (as defined in the Guarantee and Collateral Agreement) for which control agreements are not required under Section 5.3 of the Guarantee and Collateral Agreement and (iii) no Liens shall be required to be pledged or created with respect to any of the following (other than with respect to any floating charge granted by a UK Loan Party) (collectively, the "Excluded Collateral"):

(A)        (y) motor vehicles or other assets subject to certificates of title or (z) any "intent-to-use" application for registration of a trademark or service mark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(B)        any property or asset to the extent that such grant of a security interest is prohibited or effectively restricted by any applicable law (only so long as such prohibition exists) or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws (only so long as such consent requirement exists);

(C)        any Excluded Accounts and any Excluded Equity Securities;

(D)    (w) any assets owned on or acquired after the Closing Date, to the extent that, and for so long as, taking such actions would violate applicable law or regulation (after giving effect to Section 9-406(d), 9-407(a), 9-408 or 9-409 of the Uniform Commercial Code and other applicable law), (x) any assets acquired before or after the Closing Date, to the extent that and for so long as such grant would violate an enforceable Contractual Obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets, (y) any assets (1) owned on the Closing Date or (2) acquired after the Closing Date, in each case in this clause (y), securing Indebtedness of the type permitted pursuant to Section 7.2(c) (or other Indebtedness permitted under Section 7.2(d), 7.2(j), 7.2(t) or 7.2(v) if such Indebtedness is of the type that is contemplated by Section 7.2(c)) that is secured by a Lien permitted by Section 7.3 so long as the documents governing such Lien do not permit the pledge of such assets to the Collateral Agent, or (z) any lease, license or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements, or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate, breach or invalidate such lease, license or agreement or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or applicable law, other than proceeds and receivables thereof, and only for so long such prohibition exists and to the extent such prohibition was not creation in contemplation of such grant;

(E)    (x) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences (including as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) as reasonably determined in good faith by the Borrower, or (y) any assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein outweigh the value of the security afforded thereby;

(F)    any leasehold interest in Real Property (and any fixtures relating thereto) and any fixtures relating to any owned Real Property to the extent that the Collateral Agent is not otherwise entitled to a security interest with respect to such owned Real Property under the terms of this Agreement; and

(G)    any owned Real Property other than Material Real Property, but in any event excluding any Excluded Real Property.

(f)    Notwithstanding the foregoing, to the extent any new Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to an acquisition permitted by Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it substantially contemporaneously with the closing of such merger transaction, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective merger transaction shall be required to so comply within ten Business Days (or such longer period as the Administrative Agent shall agree, at the direction of the Required Lenders)).

(g)    From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as

98

the Collateral Agent may reasonably request for the purposes implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the benefit of the Secured Parties, has a perfected Lien pursuant hereto or thereto, including filing any financing or continuation statements or financing statement amendments under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created thereby; provided, that the Loan Parties shall use commercially reasonable efforts to deliver landlord lien waivers, estoppels or collateral access letters if such landlord lien waivers, estoppels or collateral access letters are required or provided under the ABL Documents. Notwithstanding the foregoing, the provisions of this Section 6.8 shall not apply to assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby. The Administrative Agent may grant extensions of time or waivers of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents.

(h)    Notwithstanding the foregoing, if (a) the Borrower or any Subsidiary acquires any Material Real Property (other than Excluded Real Property) or (b) the Required Lenders or Administrative Agent shall have notified the Borrower in writing that they have or it has a reasonable belief that either the Borrower or any of its Subsidiaries is in breach of its obligations under Section 6.4 (to the extent applicable to Environmental Law or Releases of Materials of Environmental Concern), then the Borrower shall deliver within 60 days after the Required Lenders or the Administrative Agent, as applicable, requests therefor or such longer period as the Administrative Agent shall agree, at the Borrower's cost and expense, an environmental assessment report, in the case of clause (b) above of a scope reasonably appropriate to address the subject of the Required Lenders' or the Administrative Agent's, as applicable, reasonable belief that such a breach exists, prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent, indicating the presence or absence of Materials of Environmental Concern or noncompliance with Environmental Law and the estimated cost of any compliance, response or other corrective action to address any identified Materials of Environmental Concern, to the extent required by Environmental Law, or noncompliance on such properties. Without limiting the generality of the foregoing, if the Administrative Agent reasonably determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower (which report would be addressed to the Borrower), and the Borrower hereby grants and agrees to cause any Subsidiary that owns or leases any property described in such request to grant the Administrative Agent, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment on behalf of the Borrower. By virtue of the foregoing, the Borrower does not intend to waive the attorney-client privilege with respect to any information or advice provided by the environmental consulting firm.

6.9    Use of Proceeds. The proceeds of (i) the Initial Term Loans deemed to have been made on the Closing Date pursuant to Section 2.1(a)(i) shall be used to effect the Transactions in accordance with the Restructuring Plan, (ii) the Initial Term Loans funded on the Closing Date pursuant to Section 2.1(a)(ii) shall be used to make payments and distributions under the Restructuring Plan and for general corporate purposes of the Borrower and its Subsidiaries not otherwise prohibited by this Agreement and (iii) any other Loans incurred after the Closing Date shall be used for general corporate purposes of the Borrower and its Subsidiaries not otherwise prohibited by this Agreement.

6.10    <u>Post-Closing</u>.

(a)    Satisfy the requirements set forth on Schedule 6.10(a), on or before the date set forth opposite such requirements or such later date as consented to by the Administrative Agent in its reasonable discretion.

(b)    With respect to any Material Real Property identified in Schedule 4.8, satisfy the requirements set forth in Section 6.8 within 90 days of the Closing Date or such later date as consented to by the Administrative Agent in its reasonable discretion.

6.11    [Reserved].

6.12    <u>Line of Business</u>.  Continue to operate solely as a Permitted Business.

6.13    [Reserved].

6.14    <u>Changes in Jurisdictions of Organization; Name</u>.  Provide prompt written notice to the Collateral Agent of any change of name or change of jurisdiction of organization of any Loan Party, and deliver to the Collateral Agent all additional executed financing statements, financing statement amendments and other documents reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests to the extent provided for in the Security Documents.

6.15    <u>Additional Beneficial Ownership Certification</u>.  At least five (5) days prior to any Person becoming a Borrower, if requested by any Lender, the Borrower (including, for the avoidance of doubt, any Successor Borrower) shall cause any such Person that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation and has not previously delivered a Beneficial Ownership Certification to deliver a Beneficial Ownership Certification to the Administrative Agent and the Lenders.

6.16    <u>People with Significant Control Regime</u>.  (a) Each Loan Party shall, within the relevant timeframe, comply with any notice it receives pursuant to Part 21A of the Companies Act 2006 (UK) from any company incorporated in the United Kingdom whose shares are the subject of a Lien in favor of the Administrative Agent, and (b) promptly provide the Administrative Agent with a copy of that notice.

6.17    <u>Canadian Defined Benefit Pension Plan Reporting</u>.  Furnish to the Administrative Agent, promptly after filing, a copy of the most recently filed actuarial valuation report in respect of any Canadian Defined Benefit Pension Plan.

SECTION VII.  NEGATIVE COVENANTS

The Borrower hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall not, and shall not permit any of its Subsidiaries (other than any Permitted Joint Venture) to:

7.1    [Reserved].

7.2    <u>Indebtedness</u>.  Create, issue, incur, assume, or permit to exist any Indebtedness, except:

100

(a)    Indebtedness of the Borrower and any of its Subsidiaries pursuant to this Agreement and any other Loan Document;

(b)    unsecured Indebtedness of the Borrower or any of its Subsidiaries owing to the Borrower or any of its Subsidiaries, provided, that any such Indebtedness owing by a non-Loan Party to a Loan Party is permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof); provided, further, that such Indebtedness of the Borrower or any of its Subsidiaries owing to a Loan Party may be secured by Liens permitted pursuant to Section 7.3(ff);

(c)    (i) Capital Lease Obligations, and Indebtedness of the Borrower or any of its Subsidiaries incurred to finance or reimburse the cost of the acquisition, development, construction, purchase, lease, repair, addition or improvement of any property (real or personal), equipment or other assets used or useful in a Permitted Business, whether such property, equipment or assets were originally acquired directly or as a result of the purchase of any Capital Stock of any Person owning such property, equipment or assets, in an aggregate outstanding principal amount for this clause (i) not to exceed the sum of (A) the greater of (x) 10.0% of Consolidated Total Assets, at the time of incurrence and (y) 10.0% of Consolidated Total Assets as of the Closing Date plus (B) $7,500,000, plus (C) for each period of twelve consecutive months after December 31, 2022, an additional $7,500,000 and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (c)(i) above;

(d)    (i) Indebtedness outstanding or incurred pursuant to facilities outstanding on the Closing Date (after giving effect to the Transactions) or committed to be incurred pursuant to a definitive agreement as of such date and, in each case, up to the aggregate principal amounts listed on Schedule 7.2(d) and any Permitted Refinancing thereof and (ii) Indebtedness incurred in connection with transactions permitted under Section 7.10 and any Permitted Refinancing thereof;

(e)    Guarantee Obligations (i) by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred; provided that any Subsidiary that is not a Guarantor providing such Guarantee Obligations with respect to Indebtedness of the Borrower in reliance on this clause (e) shall also provide a Guarantee with respect to the Obligations on a pari passu basis, (ii) by the Borrower or any Subsidiary Guarantor of obligations of Holdings, any Non-Guarantor Subsidiary or joint venture or other Person that is not a Subsidiary to the extent permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof), (iii) by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary; and (iv) by any Non-Guarantor Subsidiary of the obligations of any other Person that is not a Subsidiary to the extent permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof);

(f)    Indebtedness of the Borrower or any of its Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)    Indebtedness consisting of Hedge Agreements permitted pursuant to Section 7.14;

(h)    Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting, ordinary course deferred purchase price, purchase price adjustment or other similar arrangements and other contingent obligations in respect of the Transactions and other acquisitions or Investments permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof) (both before or after any liability associated therewith becomes fixed), including any such obligations which may exist on the Closing Date as a result of acquisitions consummated prior to the Closing Date;

101

(i)      Indebtedness of the Borrower and any of its Subsidiaries constituting (i) Permitted Refinancing Obligations and (ii) Permitted Refinancings in respect of Indebtedness incurred pursuant to the preceding clause (i);

(j)      (i) Indebtedness of the Borrower or any other Loan Party in an aggregate principal amount (for the Borrower and all such Loan Parties) not to exceed $150,000,000 at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (j)(i) above; provided that (A) proceeds of Indebtedness incurred pursuant to this Section 7.2(j) shall not be used for liability management purposes, (B) no more than $25,000,000 of such Indebtedness incurred pursuant to this clause (j) may be secured by Collateral on a pari passu basis with the Liens securing the Obligations and (C) to the extent secured, such Indebtedness incurred pursuant to this clause (j) may only be secured pursuant to Section 7.3(g);

(k)      (i) Indebtedness of Non-Guarantor Subsidiaries that are Foreign Subsidiaries under local bilateral credit facilities for working capital and general corporate purposes, in an aggregate principal amount, for purposes of this clause (k)(ii), not to exceed $50,000,000 at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (k)(i) and clause (k)(ii) above; provided that the aggregate principal amount of Indebtedness incurred under this Section 7.2(k) shall reduce the aggregate principal amount of Indebtedness that may be secured by Liens incurred pursuant to Section 7.3(cc)(B) on a dollar-for-dollar basis;

(l)      Indebtedness of the Borrower or any of its Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid, customs, government, VAT, duty, tariff, appeal and surety bonds, completion guarantees, and other obligations of a similar nature, in each case in the ordinary course of business;

(m)      Indebtedness incurred by the Borrower or any of its Subsidiaries arising from agreements providing for indemnification related to sales, leases or other Dispositions of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary;

(n)      Indebtedness supported by a letter of credit issued under the ABL Facility Agreement (or any other revolving credit or letter of credit facility permitted by this Section 7.2), including in respect of unpaid reimbursement obligations relating thereto, in a principal amount not in excess of the stated amount of such letter of credit;

(o)      Indebtedness issued in lieu of cash payments of Restricted Payments permitted by Section 7.6 (other than by reference to Section 7.2 or any clause thereof);

(p)      [reserved];

(q)      Indebtedness of the Borrower or any Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business or otherwise consistent with industry practice;

(r)      Indebtedness (i) owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business and (ii) in the form of pension and retirement liabilities not constituting an Event of Default, to the extent constituting Indebtedness;

102

(s)    (i) Guarantee Obligations made in the ordinary course of business; provided, that such Guarantee Obligations are not of Indebtedness for Borrowed Money, (ii) Guarantee Obligations in respect of lease obligations of the Borrower and its Subsidiaries, (iii) Guarantee Obligations in respect of Indebtedness of joint ventures; provided, that the aggregate principal amount of any such Guarantee Obligations under this sub-clause (iii) shall not exceed the greater of (A) $25,000,000 and (B) 0.83% of Consolidated Total Assets at the time of such incurrence, at any time outstanding, (iv) Guarantee Obligations in respect of Indebtedness permitted by clause (r)(ii) above and (v) Guarantee Obligations by the Borrower or any of its Subsidiaries of any Subsidiary's purchase obligations under supplier agreements and in respect of obligations of or to customers, distributors, franchisees, lessors, licensees and sublicensees; provided, that such Guarantee Obligations are not of Indebtedness for Borrowed Money;

(t)    (x) Indebtedness (including pursuant to any factoring arrangements) of any Person that becomes a Subsidiary or is merged with or into the Borrower or any of its Subsidiaries after the Closing Date (a "New Subsidiary") or that is associated with assets being purchased or otherwise acquired, in each case, as part of an acquisition, merger or consolidation or amalgamation or other Investment not prohibited hereunder; provided, that (A) such Indebtedness exists at the time such Person becomes a Subsidiary or is acquired, merged, consolidated or amalgamated by, with or into the Borrower or such Subsidiary or when such assets are acquired and is not created in contemplation of or in connection with such Person becoming a Subsidiary or with such merger (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such Person becoming a Subsidiary or to facilitate such merger) or such asset acquisition and (B) neither the Borrower nor any of its Subsidiaries (other than the applicable New Subsidiary and its Subsidiaries) shall provide security or any guarantee therefor and (y) Permitted Refinancings of the Indebtedness referred to in clause (x) of this paragraph (t);

(u)    (i) Indebtedness incurred to finance any acquisition or Investment permitted under Section 7.7 to the extent (A) unsecured at all times during the term of this Agreement and (B) in an aggregate outstanding principal amount for all such Indebtedness under this clause (u)(i) not to exceed the greater of (x) $50,000,000 and (y) 1.5% of Consolidated Total Assets at the time of such incurrence, at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (u)(i) above;

(v)    [reserved];

(w)    (i) Indebtedness representing deferred compensation or stock-based compensation to employees of Holdings, any Parent Company, the Borrower or any Subsidiary incurred in the ordinary course of business and (ii) Indebtedness consisting of obligations of the Borrower or any Subsidiary under deferred compensation or other similar arrangements incurred in connection with the Transactions and any Investment permitted hereunder;

(x)    Indebtedness issued by the Borrower or any of its Subsidiaries to the officers, directors and employees of Holdings, any Parent Company, the Borrower or any Subsidiary of the Borrower or their respective estates, trusts, family members or former spouses, in lieu of or combined with cash payments to finance the purchase of Capital Stock of Holdings, any Parent Company or the Borrower, in each case, to the extent such purchase is permitted by Section 7.6;

(y)    Indebtedness (and Guarantee Obligations in respect thereof) in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(z)    (i) Indebtedness of the Borrower or any of its Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in

103

the ordinary course of business and (ii) Indebtedness of the Borrower or any of its Subsidiaries to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including in respect of intercompany self-insurance arrangements);

(aa)    (i) Indebtedness of the Borrower and any of its Subsidiaries under the ABL Facility Agreement in an aggregate outstanding principal amount not to exceed the greater of (x) $350,000,000 and (y) the Borrowing Base (as defined in the ABL Facility Agreement on the Closing Date) and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (aa)(i) above;

(bb)    Indebtedness to any Person (other than an Affiliate of the Borrower) in respect of the undrawn portion of the face amount of or unpaid reimbursement obligations in respect of letters of credit not issued under the ABL Facility Agreement for the account of the Borrower or any of its Subsidiaries in an aggregate amount at any one time outstanding not to exceed (x) $20,000,000, plus (y) an additional $30,000,000 to the extent that the amounts incurred under this clause (y) are offset or secured by a counterpart deposit, compensating balance or a pledge of cash deposits;

(cc)    (i) unsecured Indebtedness of the Borrower or a Subsidiary Guarantor to Holdings, any Parent Company or any Affiliate of the Borrower, Holdings or any Parent Company in an aggregate principal amount at any time outstanding not to exceed $75,000,000; provided, that (x) such Indebtedness is subordinated in right of payment of the Obligations, (y) the maturity date thereof shall not be earlier than the Latest Maturity Date in effect at the time such Indebtedness is incurred and (z) such Indebtedness shall not require the payment of cash interest prior to the Latest Maturity Date in effect at the time such Indebtedness is incurred and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (cc)(i) above;

(dd)    Indebtedness designated as ABL Designated Additional Obligations, ABL Designated Banking Services, ABL Designated L/C Obligations or ABL Designated Swap Obligations in accordance with the ABL Facility; and

(ee)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations described in clauses (a) through (cc) above.

To the extent that any Indebtedness incurred under Section 7.2(c), (d), (i), (j), (k), (t), (u), (aa) or (cc) is refinanced in a Permitted Refinancing under clause (ii) or other clause of the relevant foregoing Section, then the aggregate outstanding principal amount of such Permitted Refinancing shall be deemed to utilize the related basket under the relevant foregoing Section on a dollar for dollar basis (it being understood that a Default shall be deemed not to have occurred solely to the extent that the incurrence of a Permitted Refinancing would cause the permitted amount under such Section to be exceeded and such excess shall be permitted hereunder).

7.3    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)    Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings; provided, that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, to the extent required by GAAP;

104

(b)      landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or  that are being contested in good faith by appropriate proceedings;

(c)      (i) pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens incurred in the ordinary course of business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries in respect of such obligations;

(d)      deposits and other Liens to secure the performance of bids, government, trade and other similar contracts (other than for Indebtedness for Borrowed Money), leases, subleases, statutory or regulatory obligations, surety, judgment and appeal bonds, performance bonds and other obligations of a like nature and liabilities to insurance carriers incurred in the ordinary course of business;

(e)      (i) Liens and encumbrances shown as exceptions in the title insurance policies insuring the Mortgages, and (ii) easements, zoning restrictions, rights-of-way, leases, licenses, covenants, conditions, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)      Liens (i) in existence on the Closing Date (after giving effect to the Transactions) listed on Schedule 7.3(f) (or to the extent not listed on such Schedule 7.3(f), where the Fair Market Value of the Property to which such Lien is attached is less than $10,000,000), in each case securing the obligations that such Liens secured on the Closing Date and any replacements, refinancings and extensions thereof, (ii) securing Indebtedness permitted by Section 7.2(d) and (iii) created after the Closing Date in connection with any refinancing, refundings, or renewals or extensions thereof permitted by Section 7.2(d); provided, that no such Lien is spread to cover any additional Property of the Borrower or any of its Subsidiaries after the Closing Date unless such Lien utilizes a separate basket under this Section 7.3;

(g)      (i) Liens securing Indebtedness of the Borrower or any of its Subsidiaries incurred pursuant to Sections 7.2(c), 7.2(e), and 7.2(i) (provided that no such Liens securing debt pursuant to Section 7.2(i) shall apply to any other Property of the Borrower or any of its Subsidiaries that is not Collateral (or does not concurrently become Collateral) unless such Lien utilizes a separate basket under this Section 7.3) and Sections 7.2(j), 7.2(k), 7.2(r), 7.2(s), 7.2(t) and 7.2(v); provided, that (A) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(k), such Liens do not at any time encumber any Property of the Borrower or any Subsidiary Guarantor, (B) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(r), such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance, (C) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(t)(x), such Liens exist at the time that the relevant Person becomes a Subsidiary or such assets are acquired and are not created in contemplation of or in connection with such Person becoming a Subsidiary or the acquisition of such assets (except to the extent such Liens secure Indebtedness which refinanced other secured Indebtedness to facilitate such Person becoming a Subsidiary or to facilitate the merger, consolidation or amalgamation or other acquisition of assets referred to in such Section 7.2(t)(x)), (D) in the case of Liens securing Guarantee Obligations pursuant to Section 7.2(e), the underlying obligations are secured by a Lien permitted to be incurred pursuant to this Agreement and (ii) any extension, refinancing, renewal or replacement of the Liens described in clause (i) of this Section 7.3(g) in whole or in part; provided, that such extension, renewal or replacement shall be limited to all or a part of the property which secured (or was permitted to secure) the Lien so extended, renewed or replaced (plus improvements on such property, if any) and (E) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(j), no more than $25,000,000 of such Indebtedness may be secured by the Collateral

105

on a pari passu basis with the Liens securing the Obligations, and no such Liens shall apply to any other Property of the Borrower or any of its Subsidiaries that is not Collateral;

(h)     Liens created pursuant to the Loan Documents or any other Lien securing all or a portion of the Obligations or any obligations in respect of a Permitted Refinancing thereof in accordance with Section 7.2;

(i)     Liens arising from judgments in circumstances not constituting an Event of Default under Section 8.1(h);

(j)     Liens on Property or assets acquired pursuant to an acquisition permitted under Section 7.7 (and the proceeds thereof) or assets of a Subsidiary in existence at the time such Subsidiary is acquired pursuant to an acquisition permitted under Section 7.7 and not created in contemplation thereof and Liens created after the Closing Date in connection with any refinancing, refundings, replacements or renewals or extensions of the obligations secured thereby permitted hereunder, provided, that no such Lien is spread to cover any additional Property (other than other Property of such Subsidiary or the proceeds or products of the acquired assets or any accessions or improvements thereto and after-acquired property, subjected to a Lien pursuant to terms existing at the time of such acquisition) after the Closing Date (unless such Lien utilizes a separate basket under this Section 7.3);

(k)     (i) Liens on Property of Non-Guarantor Subsidiaries securing Indebtedness or other obligations not prohibited by this Agreement to be incurred by such Non-Guarantor Subsidiaries and (ii) Liens securing Indebtedness or other obligations of the Borrower or any of its Subsidiaries in favor of any Loan Party;

(l)     receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(m)     Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(n)     Liens arising out of consignment or similar arrangements for the sale by the Borrower and its Subsidiaries of goods through third parties in the ordinary course of business or otherwise consistent with past practice;

(o)     Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with an Investment permitted by Section 7.7;

(p)     Liens deemed to exist in connection with Investments permitted by Section 7.7(b) that constitute repurchase obligations;

(q)     Liens upon specific items of inventory, equipment or other goods and proceeds of the Borrower or any of its Subsidiaries arising in the ordinary course of business securing such Person's obligations in respect of bankers' acceptances and letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory, equipment or other goods;

(r)     Liens (i) on cash deposits securing any Hedge Agreements permitted hereunder, and not for speculative purposes, in an aggregate amount not to exceed $10,000,000 at any time outstanding or (ii) securing Hedge Agreements of the Borrower and its Subsidiaries entered into in the ordinary course of business for the purpose of providing foreign exchange for their respective operating requirements or of hedging interest rate or currency exposure, and not for speculative purposes;

106

(s)     any interest or title of a lessor under any leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and any financing statement filed in connection with any such lease;

(t)     Liens on cash and Cash Equivalents (including the net proceeds of the incurrence of Indebtedness) used to defease or to satisfy and discharge or redeem or repurchase Indebtedness, provided, that such defeasance or satisfaction and discharge or redemption or repurchase is not prohibited hereunder;

(u)     (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with distributors, clients, customers, vendors or suppliers of the Borrower or any of its Subsidiaries in the ordinary course of business, (ii) other Liens securing cash management obligations in the ordinary course of business and (iii) Liens encumbering reasonable and customary initial deposits and margin deposits in respect of, and similar Liens attaching to, commodity trading accounts and other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(v)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(w)     Liens on Capital Stock in joint ventures and other non-wholly owned entities securing obligations of such joint venture or entity and options, put and call arrangements, rights of first refusal and similar rights relating to Capital Stock in joint ventures and other non-wholly owned entities;

(x)     Liens securing obligations in respect of trade-related letters of credit permitted under Section 7.2 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(y)     other Liens with respect to obligations the principal amount of which do not exceed $25,000,000, at any time outstanding;

(z)     licenses, sublicenses, cross-licensing or pooling of, or similar arrangements with respect to, Intellectual Property granted by the Borrower or any of its Subsidiaries which do not interfere in any material respect with the ordinary conduct of the business of the Borrower or such Subsidiary and are not otherwise materially adverse to the interest of the Lenders;

(aa)    Liens arising from precautionary UCC financing statement filings (or other similar filings in non-U.S. jurisdictions) regarding leases, subleases, licenses or consignments, in each case, entered into by the Borrower or any of its Subsidiaries;

(bb)    Liens on cash and Cash Equivalents (and the related escrow accounts) in connection with the issuance into (and pending the release from) escrow of, any Permitted Refinancing Obligations, any Indebtedness permitted under Section 7.2 and, in each case, any Permitted Refinancing thereof;

(cc)    (A) Liens on the Collateral securing (i) Indebtedness incurred pursuant to Section 7.2(aa), (ii) ABL Designated Banking Services Obligations, (iii) ABL Designated Swap Obligations, (iv) ABL Designated L/C Obligations and (iv) ABL Designated Additional Obligations and (B) Liens on assets of Foreign Subsidiaries securing Indebtedness incurred pursuant to Section 7.2(aa) for

working capital and general corporate purposes, provided that (x) the aggregate principal amount of Indebtedness secured by any such Liens shall reduce the aggregate principal amount of Indebtedness that may be incurred pursuant to Section 7.2(k) and (y) all obligors with respect to such Indebtedness incurred pursuant to this Section 7.3(cc)(B) shall also guarantee the Obligations; provided, further, that any such Liens on such Collateral incurred pursuant to this Section 7.3 (cc) shall be subject to the ABL Intercreditor Agreement;

(dd)    (i) zoning or similar laws or rights reserved to or vested in any Governmental Authority to control or regulate the use of any real property and (ii) Liens in favor of the United States of America for amounts paid by the Borrower or any of its Subsidiaries as progress payments under government contracts entered into by them (provided, that no such Lien described in this clause (ii) shall encumber any Collateral);

(ee)    any extension, renewal or replacement of any Liens permitted by this Section 7.3; provided, that the Liens permitted by this clause (ee) shall not extend to or cover any additional Indebtedness (other than applicable Permitted Refinancings) or property (other than the proceeds or products thereof or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms no broader than the equivalent terms existing at the time of such extension, renewal or replacement, and other than a substitution of like property) unless such Lien uses a separate basket under this Section 7.3;

(ff)    Liens in favor of the Borrower or any Subsidiary Guarantor securing Indebtedness permitted under Section 7.2(b); provided, that to the extent such Liens are on the Collateral such Liens shall be junior to the Liens on the Collateral securing the Obligations and subject to an Other Intercreditor Agreement;

(gg)    Liens on inventory or equipment of the Borrower or any Subsidiary granted in the ordinary course of business to the Borrower's or such Subsidiary's (as applicable) distributor, vendor, supplier, client or customer at which such inventory or equipment is located;

(hh)    other Liens incidental to the conduct of business of the Borrower and its Subsidiaries or the ownership of any of their assets not incurred in connection with Indebtedness, which Liens do not in any case materially detract from the value of the Property subject thereto or interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(ii)    [reserved];

(jj)    [reserved];

(kk)    Liens on cash deposits in respect of Indebtedness permitted under Section 7.2(n) or 7.2(bb); provided, that, with respect to Indebtedness permitted under Section 7.2(bb)(y), the amount of any such deposit does not exceed the amount of the Indebtedness such cash deposits secures;

(ll)    [reserved]; and

(mm)    Liens on all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations permitted to be incurred pursuant to Sections 7.2(a) through (cc) and the subject of any Lien permitted pursuant to clauses (a) through (ll) above.

7.4    <u>Fundamental Changes</u>.  Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

(a)    (i) any Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, the Borrower (<u>provided</u>, that the Borrower shall be the continuing or surviving corporation) or (ii) any Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, any Subsidiary Guarantor (<u>provided</u>, that (x) a Subsidiary Guarantor shall be the continuing or surviving corporation or (y) substantially simultaneously with such transaction, the continuing or surviving corporation shall become a Subsidiary Guarantor and the Borrower shall comply with <u>Section 6.8</u> in connection therewith);

(b)    any Non-Guarantor Subsidiary may be merged or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary that is a Subsidiary;

(c)    any Subsidiary may Dispose of all or substantially all of its assets upon voluntary liquidation or otherwise to any Loan Party;

(d)    any Non-Guarantor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Non-Guarantor Subsidiary that is a Subsidiary or to Holdings;

(e)    Dispositions permitted by <u>Section 7.5</u> (other than <u>Section 7.5(c)</u>) and any merger, dissolution, liquidation, consolidation, amalgamation, investment or Disposition, the purpose of which is to effect a Disposition permitted by <u>Section 7.5</u> (other than <u>Section 7.5(c)</u>), may be consummated;

(f)    any Investment expressly permitted by <u>Section 7.7</u> (other than <u>Section 7.7(o)</u>) may be structured as a merger, consolidation or amalgamation;

(g)    the Borrower and its Subsidiaries may consummate the Transactions;

(h)    any Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interest of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Subsidiary is a Loan Party, any assets or business of such Subsidiary not otherwise Disposed of or transferred in accordance with <u>Section 7.4</u> or <u>7.5</u> or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Loan Party after giving effect to such liquidation or dissolution;

(i)    any Escrow Entity may be merged with and into the Borrower or any Subsidiary (<u>provided</u> that the Borrower or such Subsidiary shall be the continuing or surviving entity); and

(j)    if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, any Person may be merged, amalgamated or consolidated with or into the Borrower, <u>provided</u>, that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "<u>Successor Borrower</u>"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, (3) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee and Collateral Agreement confirmed that its guarantee thereunder

109

shall apply to any Successor Borrower's obligations under this Agreement, (4) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant to clause (3), (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to clause (3) and (6) the Successor Borrower shall deliver to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to Section 5.1(e) (it being understood that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement).

       7.5    Dispositions of Property.  Dispose of any of its owned Property (including receivables) whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock (other than directors' qualifying shares) to any Person, except:

       (a)    (i) the Disposition of surplus, obsolete, damaged or worn out Property (including scrap and byproducts) in the ordinary course of business, Dispositions of Property (other than Intellectual Property) no longer used or useful or economically practicable to maintain in the conduct of the business of the Borrower and other Subsidiaries in the ordinary course and Dispositions of Property necessary in order to comply with applicable Requirements of Law or licensure requirements (as determined by the Borrower in good faith), (ii) the sale of defaulted receivables in the ordinary course of business, (iii) abandonment, cancellation or Disposition of any Intellectual Property in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith) and (iv) sales, leases or other Dispositions of inventory determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business;

       (b)    (i) the sale of inventory or other Property (other than Intellectual Property) in the ordinary course of business, (ii) the cross-licensing, pooling, sublicensing or licensing of, or similar arrangements (including Disposition of marketing rights) with respect to, Intellectual Property in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), and (iii) the contemporaneous exchange, in the ordinary course of business, of Property (other than Material Intellectual Property) for Property of a like kind, to the extent that the Property received in such exchange is of a Fair Market Value equivalent to the Fair Market Value of the Property exchanged (provided, that after giving effect to such exchange, the Fair Market Value of the Property of any Loan Party subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

       (c)    Dispositions permitted by Section 7.4 (other than Section 7.4(e));

       (d)    the sale or issuance of (i) any Subsidiary's Capital Stock to any Loan Party and (ii) the Capital Stock of any Non-Guarantor Subsidiary  that is a Subsidiary to any other Non-Guarantor Subsidiary that is a Subsidiary or to Holdings;

       (e)    any Disposition of assets; provided, that if (i) the total value of the assets subject to such Disposition is in excess of $20,000,000, it shall be for Fair Market Value, (ii) at least 75% of the total consideration received by the Borrower and its Subsidiaries is in the form of cash or Cash Equivalents, (iii) no Event of Default then exists or would result from such Disposition (except if such Disposition is made pursuant to an agreement entered into at a time when no Event of Default exists), and (iv) the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

provided, however, that for purposes of clause (ii) above, the following shall be deemed to be cash: any Designated Non-cash Consideration received by the Borrower or any of its Subsidiaries in such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (e) that is at that time outstanding, not to exceed the greater of (I) $75,000,000 and (II) 2.0% of Consolidated Total Assets at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value);

(f)      (i) any Recovery Event; provided, that the requirements of Section 2.12(b) are complied with in connection therewith and (ii) any event that would constitute a Recovery Event but for the Dollar threshold set forth in the definition thereof;

(g)      the leasing, licensing, occupying pursuant to occupancy agreements or sub-leasing of Property that would not materially interfere with the required use of such Property by the Borrower or its Subsidiaries;

(h)      the transfer for Fair Market Value of Property (including Capital Stock of Subsidiaries) to another Person in connection with a joint venture arrangement with respect to the transferred Property; provided, that such transfer is permitted under Section 7.7(k) or (v) and (ii) for the avoidance of doubt, this clause (h) shall be subject to the limitations on Investments in the last paragraph of Section 7.7;

(i)      the sale or discount, in each case without recourse and in the ordinary course of business, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(j)      transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(k)      the Disposition of any Immaterial Subsidiary;

(l)      [reserved];

(m)      the transfer of Property (i) by the Borrower or any Subsidiary Guarantor to any other Loan Party or (ii) from a Non-Guarantor Subsidiary to (A) any Loan Party; provided, that the portion (if any) of such Disposition made for more than Fair Market Value shall constitute an Investment and comply with Section 7.7 or (B) any other Non-Guarantor Subsidiary that is a Subsidiary;

(n)      the Disposition of cash and Cash Equivalents (or the foreign equivalent of Cash Equivalents) in the ordinary course of business;

(o)      (i) Liens permitted by Section 7.3 (other than by reference to Section 7.5 or any clause thereof), (ii) Restricted Payments permitted by Section 7.6 (other than by reference to Section 7.5 or any clause thereof), (iii) Investments permitted by Section 7.7 (other than by reference to Section 7.5 or any clause thereof) and (iv) sale and leaseback transactions permitted by Section 7.10 (other than by reference to Section 7.5 or any clause thereof);

(p)        Dispositions of Investments in joint ventures and other non-wholly owned entities to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements, shareholder agreements and similar binding arrangements; provided that the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

(q)        (i) Dispositions set forth on Schedule 7.5(q) and (ii) any Disposition that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Disposition is not more disadvantageous to the Lenders than the Dispositions set forth on Schedule 7.5(q), as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such Disposition, or (B) the Required Lenders have consented to such Disposition (such consent not to be unreasonably withheld (in the good faith determination of the Lenders));

(r)        the unwinding of Hedge Agreements permitted hereunder pursuant to their terms;

(s)        the Disposition of assets acquired pursuant to or in order to effectuate a Permitted Acquisition which assets are (i) obsolete or (ii) not used or useful to the core or principal business of the Borrower and the Subsidiaries;

(t)        Dispositions made on the Closing Date to consummate the Transactions;

(u)        [reserved];

(v)        [reserved];

(w)        the sale of services, or the termination of any other contracts, in each case in the ordinary course of business;

(x)        [reserved];

(y)        [reserved];

(z)        Dispositions of Property to the extent that (i)(A) such Property is exchanged for credit against the purchase price of similar replacement Property or (B) the proceeds of such Disposition are applied to the purchase price of such replacement Property and (ii) to the extent such Property constituted Collateral, such replacement Property constitutes Collateral as well;

(aa)        any Disposition of Property that represents a surrender or waiver of a contract right or settlement, surrender or release of a contract or tort claim; and

(bb)        Dispositions of Property between or among the Borrower and/or its Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (aa) above.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any Capital Stock of any Loan Party is permitted to be disposed of under this Section 7.5, such Disposition shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and continues to be a Loan Party) and (ii) none of the Borrower or its Subsidiaries shall

112

sell, assign, convey, transfer, license or otherwise dispose of any of its Material Intellectual Property (or the Capital Stock of any Loan Party which owns any Material Intellectual Property) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this <u>Section 7.5</u> or <u>Section 7.7</u>, or (B) for Fair Value and on arm's length terms in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under <u>Section 7.5(e)</u> or <u>(p)</u>.

7.6    <u>Restricted Payments</u>.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of the Borrower or such Subsidiary (collectively, "<u>Restricted Payments</u>"), except that:

(a)    (i) any Subsidiary may make Restricted Payments to any Loan Party and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b)    the Borrower or any Subsidiary may make Restricted Payments in an aggregate amount not to exceed the Available Amount; <u>provided</u>, that (A) no Event of Default is continuing or would result therefrom and (B) the Consolidated Net Total Leverage Ratio shall not exceed 5.00 to 1.00 on a <u>pro forma</u> basis as of the end of the most recently ended Test Period at the time of such Restricted Payment;

(c)    the Borrower or any Subsidiary may make, without duplication, Restricted Payments to Holdings or any Parent Company to permit Holdings or such Parent Company to pay (A) franchise and similar taxes and other fees and expenses in connection with the maintenance of its (or any Parent Company's) existence and its (or any Parent Company's) direct or indirect ownership of the Borrower, (B) so long as the Borrower or any of its Subsidiaries is a member of a consolidated, combined, unitary or similar group of which Holdings or any Parent Company is the parent for U.S. federal, state or local tax purposes, Holdings' or such Parent Company's federal, state or local taxes, as applicable; <u>provided</u>, that in each case the amount of such payments with respect to any fiscal year does not exceed the amount that the Borrower and such Subsidiaries would have been required to pay in respect of such taxes for such fiscal year were the Borrower and such Subsidiaries a consolidated or combined group of which the Borrower was the common parent, less any amounts paid directly by Borrower and such Subsidiaries with respect to such Taxes after taking into account any net operating loss carryovers or other attributes of the Borrower and such Subsidiaries; (C) Taxes of Holdings or any Parent Company arising in connection with the Restructuring Transactions; (D) customary fees, salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, their current and former officers and employees and members of their Board of Directors, (E) ordinary course corporate operating expenses and other fees and expenses required to maintain its corporate existence, (F) fees and expenses to the extent permitted under <u>Section 7.9(b)(i)</u>, (G) reasonable fees and expenses incurred in connection with any debt or equity offering by Holdings or any Parent Company, to the extent the proceeds thereof are (or, in the case of an unsuccessful offering, were intended to be) used for the benefit of the Borrower and its Subsidiaries, whether or not completed and (H) reasonable fees and expenses in connection with compliance with reporting and public and limited company obligations under, or in connection with compliance with, federal or state laws (including securities laws, rules and regulations, securities exchange rules and similar laws, rules and regulations) or under this Agreement or any other Loan Document;

(d)    the Borrower may make Restricted Payments in the form of Capital Stock of the Borrower;

113

(e)      the Borrower and any of its Subsidiaries may make Restricted Payments to, directly or indirectly, purchase the Capital Stock of Holdings, the Borrower, any Parent Company or any Subsidiary from present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary upon the death, disability, retirement or termination of the applicable officer, director, consultant, agent or employee or pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement; provided, that the aggregate amount of payments under this clause (e) in any fiscal year of the Borrower shall not exceed the sum of (i) $10,000,000 in any fiscal year, plus (ii) any proceeds received from key man life insurance policies, plus (iii) any proceeds received by Holdings, the Borrower, or any Parent Company during such fiscal year from sales of the Capital Stock of Holdings, the Borrower, or any Parent Company to directors, officers, consultants or employees of Holdings, the Borrower, or any Parent Company or any Subsidiary in connection with permitted employee compensation and incentive arrangements; provided, that any Restricted Payments permitted (but not made) pursuant to sub-clause (i), (ii) or (iii) of this clause (e) in any prior fiscal year may be carried forward to any subsequent fiscal year (subject to an annual cap of no greater than $20,000,000), and provided, further, that cancellation of Indebtedness owing to the Borrower or any Subsidiary by any member of management of Holdings, any Parent Company, the Borrower or any Subsidiary in connection with a repurchase of the Capital Stock of the Borrower, Holdings or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.6;

(f)      the Borrower and its Subsidiaries may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, (i) non-cash repurchases of Capital Stock deemed to occur upon exercise of stock options or similar equity incentive awards, if such Capital Stock represents a portion of the exercise price of such options or similar equity incentive awards, (ii) tax payments on behalf of present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary in connection with noncash repurchases of Capital Stock pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement of Holdings, the Borrower, any Parent Company or any Subsidiary, (iii) make-whole or dividend-equivalent payments to holders of vested stock options or other Capital Stock or to holders of stock options or other Capital Stock at or around the time of vesting or exercise of such options or other Capital Stock to reflect dividends previously paid in respect of Capital Stock of the Borrower, Holdings or any Parent Company and (iv) payments under a Dutch Auction conducted in accordance with the procedures set forth in this Agreement;

(g)      the Borrower may make Restricted Payments in an amount not to exceed the Excluded Contribution Amount within 90 days of receipt thereof, so long as, with respect to any such Restricted Payments, no Event of Default shall have occurred and be continuing or would result therefrom;

(h)      the Borrower may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, payments in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Capital Stock of any such Person;

(i)      [reserved];

(j)      to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted (other than by reference to Section 7.6 or any clause thereof) by any provision of Sections 7.4, 7.5, 7.7 and 7.9;

(k)      (i) any non-wholly owned Subsidiary of the Borrower may declare and pay cash dividends to its equity holders generally so long as the Borrower or its respective Subsidiary which owns the equity interests in the Subsidiary paying such dividend receives at least its proportional share thereof (based upon its relative holding of the equity interests in the Subsidiary paying such dividends and taking into account the relative preferences, if any, of the various classes of equity interest of such Subsidiary), and (ii) any non-wholly owned Subsidiary of the Borrower may make Restricted Payments to one or more of its equity holders (which payments need not be proportional) in lieu of or to effect an earnout so long as (x) such payment is in the form of such Subsidiary's Capital Stock and (y) such Subsidiary continues to be a Subsidiary after giving effect thereto;

(l)      the Borrower and its Subsidiaries may make Restricted Payments on or after the Closing Date to consummate the Transactions;

(m)      so long as no Event of Default under Section 8.1(a) or 8.1(f) has occurred and is continuing, the Borrower may make Restricted Payments to Holdings or any Parent Company to enable it to make payments to any Parent Company in respect of expenses or indemnification payments on terms reasonably acceptable to the Administrative Agent;

(n)      the payment of dividends and distributions within 60 days after the date of declaration thereof, if at the date of declaration of such payment, such payment would have been permitted pursuant to another clause of this Section 7.6;

(o)      [reserved];

(p)      [reserved]; and

(q)      provided that no Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments in respect of reasonable fees and expenses incurred in connection with any successful or unsuccessful debt or equity offering or any successful or unsuccessful acquisition or strategic transaction of Holdings or any Parent Company.

7.7      Investments.  Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other similar investment in, any other Person (all of the foregoing, "Investments"), except:

(a)      (i) extensions of trade credit in the ordinary course of business, (ii) loans, advances and promotions made to distributors, customers, vendors and suppliers in the ordinary course of business or in accordance with market practices, (iii) purchases and acquisitions of inventory, supplies, materials and equipment, purchases of contract rights, accounts and chattel paper, purchases of put and call foreign exchange options to the extent necessary to hedge foreign exchange exposures or foreign exchange spot and forward contracts, purchases of notes receivable or licenses of Intellectual Property, in each case in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments, (iv) Investments among the Borrower and its Subsidiaries in connection with the sale of inventory and parts in the ordinary course of business and (v) purchases and acquisitions of Intellectual Property or purchases of contract rights or licenses of Intellectual Property, in each case, in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments;

115

(b)      Investments in Cash Equivalents (or the foreign equivalent of Cash Equivalents) and Investments that were Cash Equivalents (or the foreign equivalent of Cash Equivalents) when made;

(c)      Investments arising in the ordinary course of business in connection with (i) the incurrence of Indebtedness permitted by Section 7.2 (other than by reference to Section 7.7 or any clause thereof) to the extent arising as a result of Indebtedness among the Borrower or any of its Subsidiaries and Guarantee Obligations permitted by Section 7.2 (other than by reference to Section 7.7 or any clause thereof) and payments made in respect of such Guarantee Obligations, (ii) the forgiveness or conversion to equity of any Indebtedness permitted by Section 7.2 (other than by reference to Section 7.7 or any clause thereof) and (iii) guarantees by the Borrower or any of its Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness;

(d)      loans and advances to employees, consultants or directors of any Parent Company, Holdings or any of its Subsidiaries in the ordinary course of business in an aggregate amount (for the Borrower and all of its Subsidiaries) not to exceed $10,000,000 (excluding (for purposes of such cap) tuition advances, travel and entertainment expenses, but including relocation advances) at any one time outstanding;

(e)      Investments (i) (other than those relating to the incurrence of Indebtedness permitted by Section 7.7(c)) by the Borrower or any of its Subsidiaries in the Borrower or any Person that, prior to such Investment, is a Loan Party (or is a Subsidiary that becomes a Loan Party in connection with such Investment), (ii) by the Borrower or any Subsidiary Guarantor in any Non-Guarantor Subsidiaries so long as such Investment is part of a series of Investments by Subsidiaries in other Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Loan Parties, (iii) comprised solely of equity purchases or contributions by the Borrower or any of its Subsidiaries in any other Subsidiary made for tax purposes, so long as the Borrower provides to the Administrative Agent evidence reasonably acceptable to the Administrative Agent that, after giving pro forma effect to such Investments, the granting, perfection, validity and priority of the security interest of the Secured Parties in the Collateral, taken as a whole, is not impaired in any material respect by such Investment and (iv) existing on the Closing Date in any Non-Guarantor Subsidiary;

(f)      Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a Subsidiary or a part of a Subsidiary; provided, that (i) immediately before and after giving effect to any such Permitted Acquisition, no Event of Default shall have occurred and be continuing and (ii) the aggregate amount of consideration paid by the Borrower and its Subsidiaries in connection with Permitted Acquisitions of Persons other than Loan Parties and of Property that does not become Collateral shall not exceed $50,000,000;

(g)      loans by the Borrower or any of its Subsidiaries to the employees, officers or directors of any Parent Company, Holdings or any of its Subsidiaries in connection with management incentive plans (provided, that such loans represent cashless transactions pursuant to which such employees, officers or directors directly (or indirectly) invest the proceeds of such loans in the Capital Stock of Holdings or a Parent Company);

(h)      (i) Investments set forth on Schedule 7.7(h) and (ii) any Investment that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Investment is not more disadvantageous to the Lenders than the Investments set forth on Schedule 7.7(h), as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such

116

Investment, or (B) the Required Lenders have consented to such Investment (such consent not to be unreasonably withheld (in the good faith determination of the Lenders));

(i)      Investments (including debt obligations) received in the ordinary course of business by the Borrower or any of its Subsidiaries in connection with (w) the bankruptcy or reorganization of suppliers, vendors, distributors, clients, customers and other Persons, (x) settlement of delinquent obligations of, and other disputes with, suppliers, vendors, distributors, clients, customers and other Persons arising in the ordinary course of business, (y) endorsements for collection or deposit and (z) customary trade arrangements with suppliers, vendors, distributors, clients and customers, including consisting of Capital Stock of clients and customers issued to the Borrower or any Subsidiary in consideration for goods provided and/or services rendered;

(j)      Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(k)      Investments in existence on, or pursuant to legally binding written commitments in existence on, the Closing Date (after giving effect to the Transactions) and listed on Schedule 7.7 and, in each case, any extensions, renewals or replacements thereof, so long as the amount of any Investment made pursuant to this clause (k) is not increased (other than pursuant to such legally binding commitments);

(l)      Investments of the Borrower or any of its Subsidiaries under Hedge Agreements permitted hereunder;

(m)      Investments of any Person existing, or made pursuant to binding commitments in effect at the time such Person becomes a Subsidiary or consolidates, amalgamates or merges with the Borrower or any of its Subsidiaries (including in connection with a Permitted Acquisition); provided, that such Investment was not made in anticipation of such Person becoming a Subsidiary or of such consolidation, amalgamation or merger;

(n)      Investments in joint ventures in connection with strategic partnerships or expansions of business lines, in each case, for bona fide business purposes, in an aggregate amount not to exceed $20,000,000 (any such joint venture, a "Permitted Joint Venture");

(o)      to the extent constituting Investments, transactions expressly permitted (other than by reference to this Section 7.7 or any clause thereof) under Sections 7.4, 7.5, 7.6 and 7.8;

(p)      Subsidiaries of the Borrower may be established or created, if (i) to the extent such new Subsidiary is a Domestic Subsidiary, the Borrower and such Subsidiary comply with the provisions of Section 6.8(c) and (ii) to the extent such new Subsidiary is a Foreign Subsidiary, the Borrower complies with the provisions of Section 6.8(d); provided, that, in each case, to the extent such new Subsidiary is created solely for the purpose of consummating a merger, consolidation, amalgamation or similar transaction pursuant to an acquisition permitted by this Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any consideration contributed to it substantially contemporaneously with the closing of such transactions, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective transaction shall be required to so comply within ten Business Days or such longer period as the Administrative Agent shall agree);

(q)      Investments arising directly out of the receipt by the Borrower or any of its Subsidiaries of non-cash consideration for any sale of assets permitted under Section 7.5 (other than by reference to Section 7.7 or any clause thereof);

117

(r)      (i) Investments resulting from pledges and deposits referred to in Sections 7.3(c) and (d) and (ii) cash earnest money deposits made in connection with Permitted Acquisitions or other Investments permitted under this Section 7.7;

(s)      Investments in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) consisting of (i) the licensing, sublicensing, cross-licensing, pooling or contribution of, or similar arrangements with respect to, Intellectual Property, in each case, in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), and (ii) the transfer or licensing of non-U.S. Intellectual Property to a Foreign Subsidiary in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith);

(t)      Investments made on the Closing Date to consummate the Transactions;

(u)      Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(v)      Investments in an aggregate amount not to exceed the sum of (i)(A) $75,000,000 minus (B) the aggregate amount of any prepayment, redemption, purchase, defeasance or other satisfaction prior to the scheduled maturity of any Junior Financing pursuant to Section 7.8(a)(iv), plus (ii) so long as no Event of Default shall have occurred and be continuing, an amount equal to the Available Amount; provided, that Investments made by any Loan Party pursuant to this clause (v) shall not be in the form of Material Intellectual Property (or of Capital Stock of Subsidiaries owning Material Intellectual Property) in any Non-Guarantor Subsidiary;

(w)      advances of payroll payments to employees, or fee payments to directors or consultants, in the ordinary course of business;

(x)      Investments constituting loans or advances in lieu of Restricted Payments permitted pursuant to Section 7.6;

(y)      [reserved];

(z)      [reserved];

(aa)     Investments to the extent that payment for such Investments is made solely by the issuance of Capital Stock (other than Disqualified Capital Stock) of Holdings (or any Parent Company) to the seller of such Investments;

(bb)     [reserved];

(cc)     [reserved];

(dd)     the Borrower or any of its Subsidiaries may make Investments in an amount not to exceed the Excluded Contribution Amount within 90 days of the receipt thereof, so long as, with respect to any such Investments, no Event of Default shall have occurred and be continuing or would result therefrom;

(ee)     [reserved];

(ff)    the Borrower or any of its Subsidiaries may make Investments in prepaid expenses, negotiable instruments held for collection and lease and utility and worker's compensation deposits provided to third parties in the ordinary course of business;

(gg)    [reserved]; and

(hh)    Investments in (i) open-market purchases of common stock of Holdings and (ii) any other Investment available to highly compensated employees under any "excess 401-(k) plan" of the Borrower (or any of its Domestic Subsidiaries, as applicable), in each case to the extent necessary to permit the Borrower (or such Domestic Subsidiary, as applicable) to satisfy its obligations under such "excess 401-(k) plan" for highly compensated employees; provided, however, that the aggregate amount of such purchases and other Investments under this Section 7.7(hh) together with any Restricted Payments made as permitted under Section 7.6(e) does not exceed the amounts set forth in such section.

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this Section 7.7, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested). Notwithstanding anything in this Agreement to the contrary and in addition to the foregoing, from and after the Closing Date, Investments by Loan Parties in Subsidiaries that are not Guarantors (including at the time of designation as a non-Loan Party) shall not exceed at any time (x) $25,000,000 (provided that (i) to the extent any such Investment is not in cash, the Fair Market Value of such investment shall be determined by a third party financial advisor of nationally recognized standing and (ii) this paragraph shall not apply to (x) Investments in connection with the sale of inventory and parts in the ordinary course of business and consistent with past practice or (y) Investments made pursuant to Sections 7.7(a), (c)(ii) (provided that the forgiveness or conversion to equity of any Indebtedness pursuant to such Section 7.7(c)(ii) shall not be deemed to reduce the amount of any Investment made in connection with the incurrence of such Indebtedness), (c)(iii), (e), (f), (g), (h), (m), (n), (o), (s), (aa) and (dd)), plus (y) the amount of such Investments made pursuant to Section 7.7(v).  For the avoidance of doubt, this paragraph shall not restrict Investments in existence on the Closing Date.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any Capital Stock of any Loan Party is permitted to be subject to an Investment under this Section 7.7, such Investment shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and continues to be a Loan Party) and (ii) none of the Borrower or its Subsidiaries shall make any Investment that constitutes a sale, assignment, conveyance, transfer, license or other disposition of any of its Material Intellectual Property (or the Capital Stock of any Loan Party which owns any Material Intellectual Property) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this Section 7.5 or Section 7.7, or (B) for Fair Value and on arm's length terms in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under Section 7.5(e) or (p).

7.8    Prepayments, Etc. of Indebtedness; Amendments.

(a)    Optionally prepay, redeem, purchase, defease or otherwise satisfy prior to the day that is 90 days before the scheduled maturity thereof in any manner the principal amount of (x) any Indebtedness that is expressly subordinated by contract in right of payment to the Obligations, (y) (I) any Indebtedness incurred pursuant to Section 7.2 (a), (i), (t) and (v) that is secured by all or any part of the Collateral or (II) any other Indebtedness incurred pursuant to Section 7.2 that is secured by all or a material

part of the Collateral, in each case of clauses (I) and (II), on a junior basis relative to the Obligations, but is not also secured by any substantial part of the Collateral on a pari passu or senior basis relative to the Obligations or (z) any Indebtedness incurred pursuant to Section 7.2 that is unsecured (collectively, "Junior Financing") (it being understood, for the avoidance of doubt, that (1) payments of regularly scheduled interest and principal on all of the foregoing shall be permitted and (2) the term "Junior Financing" does not include any Indebtedness under (A) the ABL Facility Agreement or any other Indebtedness subject to the ABL Intercreditor Agreement or (B) this Agreement), or make any payment in violation of any subordination terms of any Junior Financing Documentation, except:

(i)       a prepayment, redemption, purchase, defeasance or other satisfaction of Junior Financing made in an amount not to exceed the Available Amount; provided, that immediately before and immediately after giving pro forma effect to such prepayment, redemption, purchase, defeasance or other satisfaction, no Event of Default shall have occurred and be continuing; provided, further, that use of the Available Amount pursuant to this clause (i) shall be subject to the requirement that immediately after giving effect to any such prepayment, redemption, purchase, defeasance or other satisfaction, the Consolidated Net Total Leverage Ratio shall not exceed 5.00 to 1.00 on a pro forma basis as of the end of the most recently ended Test Period;

(ii)       the conversion of any Junior Financing to Capital Stock (other than Disqualified Capital Stock) or the prepayment, redemption, purchase, defeasance or other satisfaction of Junior Financing in an amount not to exceed the Excluded Contribution Amount (other than Disqualified Capital Stock);

(iii)       the prepayment, redemption, purchase, defeasance or other satisfaction of any Junior Financing with any Permitted Refinancing thereof;

(iv)       the prepayment, redemption, purchase, defeasance or other satisfaction prior to the day that is 90 days before the scheduled maturity of any Junior Financing, in an aggregate amount not to exceed (i) $75,000,000 minus (ii) the aggregate amount of Investments made pursuant to Section 7.7(v);

(v)       the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness incurred or assumed pursuant to Section 7.2(t);

(vi)       the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness to consummate the Transactions;

(vii)       the prepayment, redemption, purchase, defeasance or other satisfaction of any intercompany indebtedness (A) owing by a Loan Party to another Loan Party, (B) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Subsidiary that is Non-Guarantor Subsidiary and (C) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Loan Party; and

(viii)       the termination, cancellation, setoff or forgiveness of any intercompany indebtedness outstanding on the Closing Date if the Borrower reasonably determines that such termination, cancellation, setoff or forgiveness occurs in connection with a tax optimization of the Borrower and its Subsidiaries;

provided, that, notwithstanding the foregoing, the Borrower shall not, and shall not permit any of its Subsidiaries to repurchase any Junior Financing of the Borrower (other than pursuant to Section 7.8(a)(vi), 7.8(a)(vii) or 7.8(a)(viii)) prior to the date that is 105 days or more prior to the stated maturity thereof,

except to the extent that the Borrower and its Subsidiaries have Liquidity of at least $200,000,000, after giving pro forma effect to such prepayment, redemption, purchase, defeasance or other satisfaction.

(b)    amend or modify the documentation in respect of any Junior Financing in a manner, taken as a whole (as shall be determined by the Borrower in good faith), that would be materially adverse to the Lenders; provided, that nothing in this Section 7.8(b) shall prohibit the refinancing, replacement, extension or other similar modification of any Indebtedness to the extent otherwise permitted by Section 7.2.

7.9    Transactions with Affiliates.

(a)    Enter into any transaction or series of transactions, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate thereof (other than among Loan Parties or among non-Loan Parties) involving aggregate payments or consideration in excess of $20,000,000 unless such transaction is (1) otherwise not prohibited under this Agreement and (2) upon terms materially no less favorable when taken as a whole to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; provided with respect to any such transaction involving aggregate payments or consideration in excess of $25,000,000, the Borrower shall deliver to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view.

(b)    Notwithstanding the foregoing, the Borrower and its Subsidiaries may:

(i)    pay to Holdings or any Parent Company and any of their Affiliates fees, indemnities and expenses in connection with the Transactions and disclosed to the Administrative Agent prior to the Closing Date;

(ii)    enter into any transaction with an Affiliate that is not prohibited by the terms of this Agreement to be entered into by Holdings, the Borrower or its Subsidiaries;

(iii)    make any Restricted Payment permitted pursuant to Section 7.6 (other than by reference to Section 7.9 or any clause thereof) or any Investment permitted pursuant to Section 7.7;

(iv)    perform their obligations pursuant to the Transactions;

(v)    enter into transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business subject to compliance with this Section 7.9(b);

(vi)    without being subject to the terms of this Section 7.9, enter into any transaction with any Person which is an Affiliate of Holdings or the Borrower only by reason of such Person and Holdings or the Borrower, as applicable, having common directors;

(vii)    issue Capital Stock to any direct or indirect owner of Holdings (including any Parent Company), or any director, officer, employee or consultant thereof;

(viii)    enter into the transactions allowed pursuant to Section 10.6;

(ix)    enter into transactions set forth on Schedule 7.9 and any amendment thereto or replacement thereof so long as such amendment or replacement is not materially more

121

disadvantageous to the Lenders when taken as a whole as compared to the applicable agreement as in effect on the Closing Date as reasonably determined in good faith by the Borrower;

(x)    make any Disposition permitted pursuant to Section 7.5(b)(ii) or Section 7.5(q);

(xi)    enter into and perform their respective obligations under the terms of the Company Tax Sharing Agreement in effect on the Closing Date, or any amendments thereto that do not increase the Borrower's or any Subsidiary Guarantor's obligations thereunder in consultation with the Administrative Agent at the direction of the Required Lenders;

(xii)    enter into any transaction with an officer, director, manager, employee or consultant of Holdings, any Parent Company, the Borrower or any of its Subsidiaries (including compensation or employee benefit arrangements with any such officer, director, manager, employee or consultant) in the ordinary course of business and not otherwise prohibited by the terms of this Agreement;

(xiii)    make payments to Holdings, any Parent Company, the Borrower, any Subsidiary or any Affiliate of any of the foregoing for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments, to the extent the amount thereof either individually or collectively with any related payments exceeds $20,000,000, shall be subject to compliance with this Section 7.9(b) and the opinion delivery requirement of the proviso in Section 7.9(a);

(xiv)    enter into any transaction in which the Borrower or any Subsidiary, as the case may be, delivers to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view and meets the requirements of this Section 7.9;

(xv)    enter into any transaction with an Affiliate in which the consideration paid by the Borrower or any Subsidiary consists only of Capital Stock of Holdings;

(xvi)    enter into transactions with customers, clients, suppliers, or purchasers or sellers of goods or services that are Affiliates, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Subsidiaries, as determined in good faith by the Board of Directors or the senior management of the Borrower or Holdings, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xvii)    [reserved]; and

(xviii)    engage in any transaction in the ordinary course of business between the Borrower or a Subsidiary and its own employee stock option plan that is approved by the Borrower or such Subsidiary in good faith.

For the avoidance of doubt, this Section 7.9 shall not restrict or otherwise apply to employment, benefits, compensation, bonus, retention and severance arrangements with, and payments of compensation or benefits (including customary fees, expenses and indemnities) to or for the benefit of, current or former employees, consultants, officers or directors of Holdings or the Borrower or any of its Subsidiaries in the ordinary course of business.

For purposes of this Section 7.9, any transaction with any Affiliate shall be deemed to have satisfied the standard set forth in clause (a)(2) hereof if such transaction is approved by a majority of the Disinterested Directors of the Board of Directors of the Borrower or such Subsidiary, as applicable. "Disinterested Director": with respect to any Person and transaction, a member of the Board of Directors of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding Capital Stock of the Borrower, Holdings or any Parent Company or any options, warrants or other rights in respect of such Capital Stock.

7.10    Sales and Leasebacks. Enter into any arrangement with any Person providing for the leasing or licensing or similar arrangement by the Borrower or any of its Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Subsidiaries, except for (i) any such arrangement entered into in the ordinary course of business of the Borrower or any of its Subsidiaries, (ii) sales or transfers by the Borrower or any of its Subsidiaries to any Loan Party, (iii) sales or transfers by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary that is a Subsidiary and (iv) any such arrangement with a Person that is not an Affiliate of the Borrower to the extent that the Fair Market Value of such Property does not exceed $100,000,000, in the aggregate for all such arrangements.

7.11    Changes in Fiscal Periods. Permit the fiscal year of the Borrower to end on a day other than December 31; provided, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

7.12    Negative Pledge Clauses. Enter into any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement, other than:

(a)    this Agreement, the other Loan Documents and any Intercreditor Agreement;

(b)    any agreements governing Indebtedness and/or other obligations secured by a Lien permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets subject to such Liens permitted by this Agreement);

(c)    software and other Intellectual Property licenses pursuant to which such Loan Party is the licensee of the relevant software or Intellectual Property, as the case may be (in which case, any prohibition or limitation shall relate only to the assets subject to the applicable license);

(d)    Contractual Obligations incurred in the ordinary course of business which (i) limit Liens on the assets that are the subject of the applicable Contractual Obligation or (ii) contain customary provisions restricting the assignment, transfer or pledge of such agreements;

(e)    any agreements regarding Indebtedness or other obligations of any Non-Guarantor Subsidiary not prohibited under Section 7.2 (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

(f)    prohibitions and limitations in effect on the Closing Date and listed on Schedule 7.12;

(g)    customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(h)    customary provisions restricting the subletting, assignment, pledge or other transfer of any lease governing a leasehold interest;

(i)    customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses, sublicenses, cross license, pooling and similar agreements not prohibited hereunder;

(j)    any agreement in effect at the time any Person becomes a Subsidiary of the Borrower or is merged with or into the Borrower or a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Borrower or a party to such merger;

(k)    restrictions imposed by applicable law or regulation or license requirements;

(l)    restrictions in any agreements or instruments relating to any Indebtedness permitted to be incurred by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancing Obligations and indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) (i) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances contained in this Agreement (as determined in good faith by the Borrower) or (ii) if such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to create and maintain the Liens on the Collateral pursuant to the Security Documents;

(m)    restrictions in respect of Indebtedness secured by Liens permitted by Sections 7.3(g) and 7.3(y) relating solely to the assets or proceeds thereof secured by such Indebtedness;

(n)    customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(o)    restrictions arising in connection with cash or other deposits not prohibited hereunder and limited to such cash or other deposit;

(p)    the ABL Facility and the ABL Documents;

(q)    restrictions and conditions that arise in connection with any Dispositions permitted by Section 7.5; provided, however, that such restrictions and conditions shall apply only to the property subject to such Disposition;

(r)    [reserved]; and

(s)    the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (a) through (r) above, provided, that the restrictions and conditions contained in such amendments, modifications, restatements,

124

renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.13    <u>Clauses Restricting Subsidiary Distributions</u>.    Enter into any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any of its Subsidiaries or (b) make Investments in the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of or consisting of:

(i)    this Agreement or any other Loan Documents and under any Intercreditor Agreement, or any other agreement entered into pursuant to any of the foregoing;

(ii)    provisions limiting the Disposition of assets or property in asset sale agreements, stock sale agreements and other similar agreements, which limitation is in each case applicable only to the assets or interests the subject of such agreements but which may include customary restrictions in respect of a Subsidiary in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(iii)    customary net worth provisions contained in Real Property leases entered into by the Borrower and its Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower to meet its ongoing payment obligations hereunder or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement;

(iv)    agreements related to Indebtedness permitted by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancing Obligations and indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) to the extent that (x) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Borrower) or (y) such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(v)    licenses, sublicenses, cross-licensing or pooling by the Borrower and its Subsidiaries of, or similar arrangements with respect to, Intellectual Property in the ordinary course of business and to the extent not otherwise materially disadvantageous to the Lenders (in which case such restriction shall relate only to such Intellectual Property);

(vi)    Contractual Obligations incurred in the ordinary course of business which include customary provisions restricting the assignment, transfer  or pledge thereof;

(vii)    customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(viii)    customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

(ix)    customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses and similar agreements not prohibited hereunder;

(x)    any agreement in effect at the time any Person becomes a Subsidiary or is merged with or into the Borrower or any Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary or a party to such merger;

(xi)    encumbrances or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)    encumbrances or restrictions imposed by applicable law, regulation or customary license requirements;

(xiii)    [reserved];

(xiv)    any agreement in effect on the Closing Date and described on Schedule 7.13;

(xv)    restrictions or conditions imposed by any obligations secured by Liens permitted pursuant to Section 7.3 (other than obligations in respect of Indebtedness), if such restrictions or conditions apply only to the property or assets securing such obligations and such encumbrances and restrictions are customary for similar obligations in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(xvi)    the ABL Documents;

(xvii)    [reserved];

(xviii)    restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Borrower or any of its Subsidiaries is a party entered into in the ordinary course of business; provided, that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Subsidiary that are the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Subsidiary or the assets or property of any other Subsidiary; and

(xix)    the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (i) through (xviii) above, provided, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

126

7.14    <u>Limitation on Hedge Agreements</u>.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes.

7.15    <u>Amendment of Company Tax Sharing Agreement</u>.  Amend, modify, change, waive, cancel or terminate any term or condition of the Company Tax Sharing Agreement in a manner adverse to the interests of the Company or the Lenders without the prior written consent of the Required Lenders.

7.16    <u>Canadian Defined Benefit Pension Plans</u>.  Except as disclosed in Schedule 7.16, no Loan Party shall (a) establish, sponsor, maintain, contribute to, participate in or have any liability or obligation under or arising from any Canadian Defined Benefit Pension Plan, without the prior written consent of the Administrative Agent, or (b) consummate any transaction that would result in any Person not already a Subsidiary becoming a Subsidiary if such Person sponsors, maintains or contributes to, participates in or has any liability or obligation under one or more Canadian Defined Benefit Pension Plans, without the prior written consent of the Administrative Agent.

## SECTION VIIA. HOLDINGS NEGATIVE COVENANTS

Holdings hereby covenants and agrees with each Lender that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), unless the Required Lenders shall otherwise consent in writing, (a) Holdings will not create, incur, assume or permit to exist any Lien on any Capital Stock of the Borrower held by Holdings other than Liens created under the Loan Documents or Liens not prohibited by <u>Section 7.3</u> and (b) Holdings shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence; <u>provided</u>, that Holdings may merge with any other person so long as no Default has occurred and is continuing or would result therefrom and (i) Holdings shall be the surviving entity or (ii) if the surviving entity is not Holdings (such other person, "<u>Successor Holdings</u>"), (A) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, and (C) Successor Holdings shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to <u>Section 5.1(e)</u> (it being understood that if the foregoing are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement).

## SECTION VIII. EVENTS OF DEFAULT

8.1    <u>Events of Default</u>.  If any of the following events shall occur and be continuing:

(a)    The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof, or (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof;

(b)    Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall in either case

127

prove to have been inaccurate in any material respect (or if qualified by materiality, in any respect) and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished;

(c)     The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely with respect to maintaining the existence of the Borrower) or Section VII or Holdings shall default in the observance or performance of any agreement contained in Section VIIA;

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8.1), and such default shall continue unremedied (i) for a period of six Business Days if such breach relates to the terms or provisions of Section 6.7(a), (ii) for a period of ten days if such breach relates to the terms or provisions of Section 6.13 or (iii) for a period of 30 days, in each case, after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default;

(e)     The Borrower or any of its Subsidiaries (other than any Permitted Joint Venture) shall:

(i)     default in making any payment of any principal of any Indebtedness for Borrowed Money (excluding the Loans) on the scheduled or original due date with respect thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created;

(ii)     default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or

(iii)     default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness for Borrowed Money to become due prior to its Stated Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder;

provided, that:

(A)     a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $50,000,000, and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; and

(B)     this paragraph (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other Disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other Disposition is not prohibited hereunder and under the documents providing for such

128

Indebtedness, or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof;

provided, further, that no Event of Default under this clause (e) shall arise or result from:

(1) any default under any financial maintenance covenant contained in the ABL Facility Agreement to the extent that such default does not also result in the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) causing with the giving of notice if required, such Indebtedness to become due prior to its Stated Maturity;

(2) any change of control (or similar event) under any other Indebtedness for Borrowed Money that is triggered due to the Permitted Investors (as defined herein) obtaining the requisite percentage contemplated by such change of control provision, unless both (x) such Indebtedness for Borrowed Money shall become due and payable or shall otherwise be required to be repaid, repurchased, redeemed or defeased, whether at the option of any holder thereof or otherwise and (y) at such time, the Borrower and/or its Subsidiaries would not be permitted to repay such Indebtedness for Borrowed Money in accordance with the terms of this Agreement; or

(3) any event or circumstance related to any Immaterial Subsidiary;

(f)    (i)    Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings or the Borrower or any of its Subsidiaries (other than any Immaterial Subsidiary (whether or not then designated as such)) shall make a general assignment for the benefit of its creditors;

(ii)    there shall be commenced against Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days;

(iii)    there shall be commenced against Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against substantially all of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof;

(iv)    Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall consent to or approve of, or acquiesce in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(v)      Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)      (i)      the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture) shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan;

(ii)      a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA, whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of any Loan Party or any other Commonly Controlled Entity;

(iii)      a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA;

(iv)      any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA;

(v)      any Loan Party or any other Commonly Controlled Entity shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency of, a Multiemployer Plan; or

(vi)      any other event or condition shall occur or exist with respect to a Plan; or

(vii)      any Canadian Defined Benefit Pension Plan shall terminate without the prior written consent of the Administrative Agent or the institution of proceedings by any Governmental Authority to terminate a Canadian Defined Benefit Pension Plan or have a replacement administrator appointed to administer a Canadian Defined Benefit Pension Plan where, at the time of such termination or appointment, there exists a material wind up deficit in a Canadian Defined Benefit Pension Plan; or

(viii)      any Lien arises (except for contribution amounts not yet due) in connection with such Plan or Canadian Pension Plan;

and in each case in clauses (i) through (viii) above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in any liability of the Borrower or any of its Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(h)      One or more final judgments or decrees shall be entered against the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) pursuant to which the Borrower and any such Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $50,000,000 or more (net of any amounts which are covered by insurance or an effective indemnity), and all such judgments

or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof;

(i)    Subject to <u>Schedule 6.10</u>, any limitations expressly set forth herein and the exceptions set forth in the applicable Security Documents:

(i)    any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Guarantor not to be a legal, valid and binding obligation of any party thereto;

(ii)    any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent (or, in the case of the ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement or otherwise or to file UCC continuation statements or PPSA financing change statements or (y) such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer; or

(iii)    the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations.

(j)    [Reserved].

(k)    (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or

(ii)    for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than the greater of (x) 50% of the then outstanding voting securities having ordinary voting power of Holdings and (y) the percentage of the then outstanding voting securities having ordinary voting power of Holdings owned, directly or indirectly, beneficially (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) by the Permitted Investors (it being understood that if any such person or group includes one or more Permitted Investors, the outstanding voting securities having ordinary voting power of Holdings directly or indirectly owned by the Permitted Investors that are part of such person or group shall not be treated as being owned by such person or group for purposes of determining whether this <u>clause (y)</u> is triggered);

131

then, and in any such event, (A) if such event is an Event of Default specified in <u>clause (i)</u> or <u>(ii)</u> of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Applicable Premium) shall immediately become due and payable, and (B) if such event is any other Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Applicable Premium) to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this <u>Section 8.1</u> or otherwise in any Loan Document, presentment, demand and protest of any kind are hereby expressly waived by the Borrower.

SECTION IX.   THE AGENTS

9.1      <u>Appointment</u> Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents and each such Lender irrevocably authorizes each such Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably incidental thereto, including the authority to enter into any Intercreditor Agreement (or joinder thereto) and any Extension Amendment.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents and the duties of the Agents shall be mechanical and administrative in nature.  Without limiting the generality of the foregoing, the Lenders hereby irrevocably authorize and instruct the Administrative Agent to, without any further consent of any Secured Party, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the ABL Intercreditor Agreement and any Other Intercreditor Agreement with the collateral agent or other representatives of the holders of Indebtedness that is expressly permitted to be secured by a Lien on the Collateral under this Agreement (including with respect to the priority of such Lien) and, to the extent applicable, the ABL Intercreditor Agreement, and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  The Lenders irrevocably agree that (x) the Agents may rely exclusively on a certificate of a Responsible Officer of the Borrower as to whether any such other Liens are permitted and (y) the ABL Intercreditor Agreement and any Other Intercreditor Agreement entered into by the applicable Agent shall be binding on the Lenders, and each Lender hereby agrees that it will take no actions contrary to the provisions of any Intercreditor Agreement.

Without limiting the aforesaid powers of the Agents, for the purposes of holding any hypothec granted to the Attorney (as defined below) pursuant to the laws of the Province of Quebec to secure the prompt payment and performance of any and all Obligations by any Loan Party, each of the Secured Parties hereby irrevocably appoints and authorizes the Collateral Agent and, to the extent necessary, ratifies the appointment and authorization of the Collateral Agent, to act as the hypothecary representative of the creditors as contemplated under Article 2692 of the Civil Code of Quebec (in such capacity, the "Attorney"), and to enter into, to take and to hold on their behalf, any hypothec, any benefit, and to exercise such powers and duties that are conferred upon the Attorney under any such hypothec. In such capacity, the Attorney shall: (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney pursuant to any such hypothec and applicable law, and (b) benefit from and be subject to all provisions hereof with respect to the Collateral Agent mutatis mutandis, including, without limitation, all such

provisions with respect to the liability or responsibility to and indemnification by the Secured Parties and the Loan Parties. Any person who becomes a Secured Party shall be deemed to have consented to and confirmed the Attorney as the hypothecary representative of the Secured Parties and to have ratified, as of the date it becomes a Secured Party, all actions taken by the Attorney in such capacity. The substitution of the Collateral Agent pursuant to the provisions of this Article VIII also shall constitute the substitution of the Attorney.

9.2    Delegation of Duties.    Each Agent may execute any of its duties under the applicable Loan Documents by or through any of its branches, agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.    Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.    Each Agent and any such agent or attorney-in-fact may perform any and all of its duties by or through their respective Related Persons.    The exculpatory provisions of this Section shall apply to any such agent or attorney-in-fact and to the Related Persons of each Agent and any such agent or attorney-in-fact, and shall apply to their respective activities as Agent.

9.3    Exculpatory Provisions.    Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder or the creation, perfection or priority of any Lien purported to be created by the Security Documents or the value or the sufficiency of any Collateral.    The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party, nor shall any Agent be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability that is not subject to indemnification under Section 10.5 or that is contrary to any Loan Document or applicable law.    If either Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining.    Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against either Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

9.4    Reliance by the Agents.    The Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agents.    Each Agent may deem and treat the payee of any Note as the owner thereof

133

for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  In determining compliance with any conditions hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan.

       9.5    <u>Notice of Default</u>.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders.  The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility); <u>provided</u>, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

       9.6    <u>Non-Reliance on Agents and Other Lenders</u>.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

       9.7    <u>Indemnification</u>.  The Lenders severally agree to indemnify each Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the

payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this Section 9.7 shall survive the payment of the Loans and all other amounts payable hereunder. Notwithstanding anything to the contrary set forth herein, no Agent shall be required to take, or to omit to take, any action hereunder or under the Loan Documents unless, upon demand, such Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to such Agent, any other Secured Party) against all liabilities, costs and expenses that, by reason of such action or omission, may be imposed on, incurred by or asserted against such Agent or any of its directors, officers, employees and agents. This Section 9.7 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

9.8    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9    Successor Agents.

(a)    Subject to the appointment of a successor as set forth herein, any Agent may resign upon 30 days' notice to the Lenders, the other Agent, and, unless a Default or Event of Default then exists, the Borrower, effective upon appointment of a successor Agent.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint a successor agent for the Lenders, which successor agent shall (unless an Event of Default with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor Agent shall have been so appointed by the Required Lenders with such consent of the Borrower and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lenders and with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) appoint a successor Administrative Agent and/or Collateral Agent, as the case may be, with the qualifications set forth above.  After any retiring Agent's resignation as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)    If no successor Agent has been appointed pursuant to clause (a) above by the 45th day after the date such notice of resignation was given by or to such Agent, as applicable, such Agent's resignation shall become effective and all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Agent in accordance with Section 9.9(a) above, as applicable; provided that, in the case of any possessory Collateral held by any Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall

135

continue to hold such possessory Collateral until such time as a successor Agent is appointed pursuant to this <u>Section 9.9</u>.

(c)     Any resignation by the Administrative Agent pursuant to this <u>Section 9</u> shall also constitute its resignation as Collateral Agent.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent and (ii) the retiring Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.

(d)     Upon a resignation of an Agent pursuant to this <u>Section 9.9</u>, such Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this <u>Section 9</u> (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as Agent.

9.10     <u>Certain Collateral Matters</u>.

(a)     The Agents are hereby irrevocably authorized by each of the Lenders to effect any release or subordination of Liens or Guarantee Obligations contemplated by <u>Section 10.15</u>. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 9.10(a)</u>.

(b)     Each Lender authorizes and directs the Collateral Agent to enter into or join (x) the Security Documents, the ABL Intercreditor Agreement and any Other Intercreditor Agreement for the benefit of the Lenders and the other Secured Parties and (y) any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to the Security Documents, the ABL Intercreditor Agreement and any Other Intercreditor Agreement in connection with the incurrence by any Loan Party of Indebtedness pursuant to this Agreement, as applicable or to permit such Indebtedness to be secured by a valid, perfected lien.

(c)     Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents to which it is a party, which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents and in the case of the ABL Intercreditor Agreement (or any Other Intercreditor Agreement) to take all actions (and execute all documents) required or deemed advisable by it in accordance with the terms thereof.

(d)     The Collateral Agent shall not have any obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this <u>Section 9.10</u> or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence

136

or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

9.11    <u>Agents May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, to the maximum extent permitted by applicable law, each Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether either Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)    to file a proof of claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under <u>Sections 2.9</u> and <u>10.5</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agents and, if either Agent shall consent to the making of such payments directly to the Lenders, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under <u>Sections 2.9</u> and <u>10.5</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize such Agent to vote in respect of the claim of any Lender or in any such proceeding.

9.12    <u>Lead Arranger and Bookrunner</u>.  <u>Neither the Lead Arranger nor the Bookrunner shall have any duties or responsibilities hereunder in their respective capacities.</u>

9.13    <u>Appointment of Collateral Agent as Security Trustee</u>.

(a)    For the purposes of any Liens or Collateral created under the UK Security Agreements, the following additional provisions shall apply.

(b)    In this Article 9, the following expressions have the following meanings:

"<u>Appointee</u>" means any receiver, administrator or other insolvency officer appointed in respect of any Loan Party or its assets.

"<u>Charged Property</u>" means the assets of the Loan Parties subject to a security interest under the UK Security Agreements.

"<u>Delegate</u>" means any delegate, agent, attorney or co-trustee appointed by the Collateral Agent (in its capacity as security trustee).

(c)       The Secured Parties appoint the Collateral Agent to hold the security interests constituted by the UK Security Agreements on trust for the Secured Parties on the terms of the Loan Documents and the Collateral Agent accepts that appointment.

(d)       The Collateral Agent, its subsidiaries and associated companies may each retain for its own account and benefit any fee, remuneration and profits paid to it in connection with (i) its activities under the Loan Documents; and (ii) its engagement in any kind of banking or other business with any Loan Party.

(e)       Nothing in this Agreement constitutes the Collateral Agent as a trustee or fiduciary of, nor shall the Collateral Agent have any duty or responsibility to, any Loan Party.

(f)       The Collateral Agent shall have no duties or obligations to any other person except for those which are expressly specified in the Loan Documents or mandatorily required by applicable law.

(g)       The Collateral Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to exercise and perform all or any of the duties, rights, powers and discretions vested in it by the UK Security Agreements and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(h)       The Collateral Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the Collateral Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the Collateral Agent thinks fit and with such of the duties, rights, powers and discretions vested in the Collateral Agent by the UK Security Agreements as may be conferred by the instrument of appointment of that person.

(i)       The Collateral Agent shall notify the Secured Parties of the appointment of each Appointee (other than a Delegate).

(j)       The Collateral Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate or Appointee in connection with its appointment.  All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement, as paid or incurred by the Collateral Agent.

(k)       Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together "Rights") of the Collateral Agent (in its capacity as security trustee) under this Agreement, the Intercreditor Agreements and the UK Security Agreements, and each reference to the Collateral Agent (where the context requires that such reference is to the Collateral Agent in its capacity as security trustee) in the provisions of this Agreement, the Intercreditor Agreements and the UK Security Agreements which confer Rights shall be deemed to include a reference to each Delegate and each Appointee.

(l)       Each Secured Party confirms its approval of the UK Security Agreements and authorizes and instructs the Collateral Agent: (i) to execute and deliver the UK Security Agreements; (ii) to exercise the rights, powers and discretions given to the Collateral Agent (in its capacity as security trustee) under or in connection with the UK Security Agreements together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the Collateral Agent (in its capacity as security trustee) on behalf of the Secured Parties under the UK Security Agreements.

(m)    The Collateral Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(n)    Each other Secured Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by a UK Security Agreement and accordingly authorizes: (a) the Collateral Agent to hold such security interest in its sole name (or in the name of any Delegate) as trustee for the Secured Parties; and (b) the Land Registry (or other relevant registry) to register the Collateral Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(o)    Except to the extent that a UK Security Agreement otherwise requires, any moneys which the Collateral Agent receives under or pursuant to a UK Security Agreement may be: (a) invested in any investments which the Collateral Agent selects and which are authorized by applicable law; or (b) placed on deposit at any bank or institution (including the Collateral Agent) on terms that the Collateral Agent thinks fit, in each case in the name or under the control of the Collateral Agent, and the Collateral Agent shall hold those moneys, together with any accrued income (net of any applicable Tax) to the order of the Lenders, and shall pay them to the Lenders on demand.

(p)    On a disposal of any of the Charged Property which is permitted under the Loan Documents, the Collateral Agent shall (at the cost of the Loan Parties) execute any release of the UK Security Agreements or other claim over that Charged Property and issue any certificates of non-crystallisation of floating charges that may be required or take any other action that the Collateral Agent considers desirable.

(q)    The Collateral Agent shall not be liable for (i) any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by a UK Security Agreement; (ii) any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by a UK Security Agreement; (iii) the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Loan Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Loan Document; or (iv) any shortfall which arises on enforcing a UK Security Agreement.

(r)    The Collateral Agent shall not be obligated to (i) obtain any authorization or environmental permit in respect of any of the Charged Property or a UK Security Agreement; (ii) hold in its own possession a UK Security Agreement, title deed or other document relating to the Charged Property or a UK Security Agreement; (iii) perfect, protect, register, make any filing or give any notice in respect of a UK Security Agreement (or the order of ranking of a UK Security Agreement); or (iv) require any further assurances in relation to a UK Security Agreement.

(s)    In respect of any UK Security Agreement, the Collateral Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property; or (ii) make any enquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

(t)    In respect of any UK Security Agreement, the Collateral Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or inadequacy of any insurance; or (ii) the failure of the Collateral Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required Lenders have requested it to do so in writing and the Collateral Agent has failed to do so within fourteen (14) days after receipt of that request.

(u)    Every appointment of a successor Collateral Agent under a UK Security Agreement shall be by deed.

(v)    Section 1 of the Trustee Act 2000 (UK) shall not apply to the duty of the Collateral Agent in relation to the trusts constituted by this Agreement.

(w)    In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 (UK) or the Trustee Act 2000 (UK), the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000 (U.K.).

(x)    The perpetuity period under the rule against perpetuities if applicable to this Agreement and any UK Security Agreement shall be 80 years from the Closing Date.

(y)    For the avoidance of doubt, any benefit, right, power and discretion and the benefit of every exculpation afforded to the Collateral Agent applies equally to it as security trustee of the security interests constituted by the UK Security Agreements.

SECTION X.    MISCELLANEOUS

10.1    <u>Amendments and Waivers</u>.

(a)    Except to the extent otherwise expressly set forth in this Agreement (including <u>Sections</u> <u>2.26</u>, <u>7.11</u> and <u>10.16</u>) or the applicable Loan Documents, neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this <u>Section 10.1</u>.

The Required Lenders and each Loan Party party to the relevant Loan Document may, subject to the acknowledgment of the Administrative Agent, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding, deleting or otherwise modifying any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Agents or the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders or the Administrative Agent may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; <u>provided</u>, <u>however</u>, that no such waiver and no such amendment, supplement or modification shall:

(A)    forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date or reduce the amount of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest, fee or premium payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this <u>clause (A)</u>) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly and adversely affected thereby, which such consent of each Lender directly and adversely affected thereby shall be sufficient to effect such waiver without regard for a Required Lender consent;

(B)      amend, modify or waive any provision of <u>paragraph (a)</u> of this <u>Section 10.1</u> without the written consent of all Lenders;

(C)      reduce any percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (except as provided in <u>Section 7.4(j)</u>), release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders (except as expressly permitted hereby (including pursuant to <u>Section 7.4</u> or <u>7.5</u>) or by any Security Document);

(D)      amend, modify or waive any provision of paragraph (a) or (b) of <u>Section 2.18</u> of this Agreement or <u>Section 6.6</u> of the Guarantee and Collateral Agreement without the written consent of all Lenders directly and adversely affected thereby;

(E)      [reserved];

(F)      reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility, which consent shall be sufficient to effect such waiver under the applicable Facility without regard for a Required Lender consent;

(G)      amend, modify or waive any of the rights or duties of any Agent under this Agreement or any other Loan Document without the written consent of such Agent;

(H)      modify the requirement in Section 10.6(h) (or any other provision of any Loan Document that has the effect of modifying) to conduct a Dutch Auction open to all lenders of the same Tranche on a pro rata basis or the provisions of <u>Section 10.6(h)(i)</u> or <u>(h)(iv)</u>, in each case, without the written consent of each Lender;

(I)      release all or substantially all of the value of the Guarantees of the Guarantors, or limit their liability in respect of such Guarantees, without the written consent of each Lender;

(J)      [reserved]; or

(K)      prior to an Event of Default under <u>Section 8.1(f)</u>, amend or modify any term or provision of any Loan Document to permit the issuance or incurrence of any Indebtedness for borrowed money (including any exchange of existing Indebtedness that results in another class of Indebtedness for borrowed money, but excluding (A) Indebtedness that is expressly permitted by this Agreement as in effect on the Closing Date to be senior to the applicable Tranche of Obligations and/or to be secured by a Lien that is senior to the Lien securing such Tranche of Obligations and (B) for the avoidance of doubt, any "debtor-in-possession" facility (or similar financing under applicable law)) with respect to which (x) the Liens on the Collateral securing the Obligations of any Tranche would be subordinated or (y) all or any portion of the Obligations of any Tranche would be subordinated in right of payment (any such other Indebtedness to which such Liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "<u>Senior Indebtedness</u>"), in each case without the written consent of each Lender of such Tranche directly and adversely affected thereby, unless each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the amount of Obligations that are adversely affected thereby held by each Lender) of the Senior Indebtedness on the same terms

141

(other than bona fide backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "Ancillary Fees") as offered to all other providers (or their Affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their Affiliates) in connection with providing the Senior Indebtedness;

provided, further, that, notwithstanding anything herein to the contrary, the Loans held by an Affiliated Lender shall be disregarded in both the numerator and denominator and for all other purposes in the calculation or determination of any Lender vote (and, in the case of a plan of reorganization shall be deemed to have voted its interest in the Term Loans in the same proportion as the other Lenders) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph); provided, further, that, in any event and without limiting the foregoing, the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary herein, any amendment, modification, waiver or other action which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any such Defaulting Lender may not be increased or extended, the maturity of the Loans of any such Defaulting Lender may not be extended, the rate of interest on any of such Loans may not be reduced and the principal amount of any of such Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any such Defaulting Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Defaulting Lender than it is to, other affected Lenders shall require the consent of such Defaulting Lender.

(b)    Notwithstanding the foregoing, this Agreement may be amended with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement (it being understood that no Lender shall have any obligation to provide or to commit to provide all or any portion of any such additional credit facility) and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately, after the effectiveness of any such amendment (or amendment and restatement), the Lenders holding such credit facilities in any determination of the Required Lenders and Majority Facility Lenders, as applicable.

(c)    In addition, notwithstanding the foregoing, this Agreement may be amended, with the written consent of the Administrative Agent (not to be unreasonably withheld, delayed or conditioned),

142

the Borrower and the Lenders providing the relevant Refinancing Term Loans (as defined below), as may be necessary or appropriate, in the opinion of the Borrower and the Administrative Agent, to provide for the incurrence of Permitted Refinancing Obligations under this Agreement in the form of a new Tranche of Term Loans hereunder ("Refinancing Term Loans"), which Refinancing Term Loans will be used to refinance all or any portion of the outstanding Term Loans of any Tranche ("Refinanced Term Loans"); provided, that:

(i)      the aggregate principal amount of such Refinancing Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans (plus accrued interest, fees, discounts, premiums and expenses);

(ii)      except as otherwise permitted by this clause (c) and the definition of the term "Permitted Refinancing Obligations" (including with respect to maturity and amortization), all terms applicable to such Refinancing Term Loans shall be substantially identical to, or (when taken as a whole, as shall be determined in good faith by the Borrower) less favorable to the Lenders providing such Refinancing Term Loans than, those applicable to such Refinanced Term Loans, other than for any covenants and other terms applicable solely to any period after the Latest Maturity Date; and

(iii)      The Borrower shall notify the Administrative Agent of the date on which the Borrower proposes that such Refinancing Term Loans shall be made, which shall be a date not less than 10 Business Days (or such shorter period as the Administrative Agent may agree to) after the date on which such notice is delivered to the Administrative Agent; provided, that no such Refinancing Term Loans shall be made, and no amendments relating thereto shall become effective, unless the Borrower shall deliver or cause to be delivered, to the extent reasonably requested by the Administrative Agent, customary legal opinions and certified copies of the resolutions or other applicable corporate action of each applicable Loan Party approving its entry into the relevant documents and the transactions contemplated thereby.

(d)      Each Lender hereunder (a) consents to the subordination of the Liens securing the Obligations on the terms set forth in the ABL Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the ABL Intercreditor Agreement, when applicable, on behalf of such Lender. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third party beneficiaries of such provisions and the ABL Intercreditor Agreement.

(e)      Furthermore, notwithstanding the foregoing, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, mistake, omission, defect, or inconsistency, in each case, in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement or any other Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof; it being understood that posting such amendment electronically on the Platform to the Required Lenders shall be deemed adequate receipt of notice of such amendment.

(f)      Furthermore, notwithstanding the foregoing, this Agreement may be amended, supplemented or otherwise modified in accordance with Sections 2.26, 7.11 and 10.16.

(g)      [Reserved].

143

(h)     The Lenders hereby agree that the Borrower may elect at any time after the Closing Date to replace the ABL Facility Agreement with a revolving credit facility or other debt agreement (a "Pari Passu Replacement Agreement") that would be treated as an "ABL Facility Agreement" (as defined in and for the purposes of the applicable provisions of this Agreement) but that would not be asset-based and would be secured by all the Collateral on a pari passu basis with the Obligations that are secured on a first-lien basis pursuant to an Other Intercreditor Agreement, provided that the aggregate principal amount thereunder is permitted by Section 7.2(aa). The Lenders hereby further agree that in connection with the establishment of a Pari Passu Replacement Agreement, this Agreement, the Guarantee and Collateral Agreement and the other Loan Documents may be amended, amended and restated, modified or supplemented to reflect such Pari Passu Replacement Agreement, in each case by the Administrative Agent (or Collateral Agent, as applicable) and the Borrower, but without the consent of any Lender.

10.2    Notices; Electronic Communications.

(a)     All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or posted to the Platform, or three Business Days after being deposited in the mail, postage prepaid, hand delivered or, in the case of telecopy notice, when sent (except in the case of a telecopy notice not given during normal business hours (New York time) for the recipient, which shall be deemed to have been given at the opening of business on the next Business Day for the recipient), addressed as follows in the case of the Borrower or the Agents, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such Person or at such other address as may be hereafter notified by the respective parties hereto:

The Borrower:

Revlon Intermediate Holdings IV LLC
55 Water St., 43rd Floor
New York, New York 10041-0004
Attention: Matt Kvarda, Interim Chief Financial Officer
Telephone: (310) 980-8529
Email: mkvarda@alvarezandmarsal.com

Agents:

Jefferies Finance LLC,
as Administrative Agent and each Collateral Agent
Jefferies Finance LLC
520 Madison Avenue
New York, New York 10022
Email: JFin.Notices@Jefferies.com
Attn: Revlon - Account Manager
Fax: (212) 284-3444

With a copy (which shall not constitute notice) to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attn: Kristopher Villareal
Email: krisvillareal@paulhastings.com
Telephone: (212) 318-6005

provided, that any notice, request or demand to or upon the Agents, the Lenders or the Borrower shall not be effective until received.

144

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by posting to the Platform or by any electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  Any Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications.

(c)    The Borrower, each Agent and each Lender hereby acknowledges that (i) Holdings, the Borrower and/or the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (ii) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive information other than information that is publicly available, or not material with respect to Holdings, the Borrower or its Subsidiaries, or their respective securities, for purposes of the United States Federal and state securities laws (collectively, "Public Information").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that is Public Information and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 10.14); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided, that there is no requirement that the Borrower identify any such information as "PUBLIC."

(d)    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Persons (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party or any of its Related Persons; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)    Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to such other

Person.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirements of Law, including United States Federal securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain information other than Public Information.

(f)    The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices of borrowing) believed in good faith by the Administrative Agent to be given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.3    No Waiver; Cumulative Remedies.

(a)    No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.1 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (i) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 10.7(b) (subject to the terms of Section 10.7(a)), or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses; Indemnification.  Except with respect to Taxes which are addressed in Section 2.20, the Borrower agrees:

(a)    to pay or reimburse each Agent and each Lender for all of its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation,

execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of a single firm of counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction as may reasonably be necessary in connection with collateral matters) in connection with all of the foregoing;

(b)        to pay or reimburse each Lender and each Agent for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in <u>Section 10.5(a)</u> above (including all such costs and expenses incurred in connection with any legal proceeding, including any proceeding under any Debtor Relief Law or in connection with any workout or restructuring), including the documented fees and disbursements of (i) a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for the Agents and (ii) a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for the Lenders, taken as a whole and, in the event of an actual or perceived conflict of interest, where the Agent or Lender affected by such conflict informs the Borrower and thereafter retains its own counsel, one additional counsel for each Lender or Agent or group of Lenders or Agents subject to such conflict;

(c)        upon request from any Lender who is a depositor under the Escrow Agreement, to pay to such Lender an amount equal to the interest on the amount that such Lender has deposited with the Escrow Agent pursuant to the Escrow Agreement for the period from the date of such deposit through (but excluding) the Closing Date, calculated at the interest rate that is applicable on the Closing Date to the Initial Term Loans made (or deemed made) on the Closing Date; and

(d)        to pay, indemnify or reimburse each Lender, each Agent, the Lead Arranger, the Bookrunner and their respective Affiliates, and their respective partners that are natural persons, members that are natural persons, officers, directors, employees, trustees, advisors, agents and controlling Persons (each, an "<u>Indemnitee</u>") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding (any of the foregoing, a "<u>Proceeding</u>") relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents referred to in <u>Section 10.5(a)</u> above and the transactions contemplated hereby and thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the reasonable fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this <u>clause (d)</u>, collectively, the "<u>Indemnified Liabilities</u>");

provided, that, the Borrower shall not have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities have resulted from (i) the gross negligence or willful misconduct of such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (ii) a material breach of the Loan Documents by such Indemnitee or its Related Persons (but not an Agent Indemnitee or Related Person of an Agent Indemnitee)  as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (iii) disputes solely among Indemnitees or their Related Persons and not arising from any act or omission by Holdings, Borrower or any of its Subsidiaries (it being

understood that this paragraph shall not apply to the indemnification of an Agent or a Lead Arranger in a suit involving an Agent or Lead Arranger, in each case, in its capacity as such, unless such suit has resulted from the gross negligence or willful misconduct of such Agent or Lead Arranger as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto)) or (iv) any settlement of any Proceeding effected without the Borrower's consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with the Borrower's written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, the Borrower shall indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this Section 10.5.

No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other material distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

For purposes hereof, a "Related Person" of an Indemnitee means (i) if the Indemnitee is any Agent or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Agent and its Affiliates and their respective officers, directors, employees, agents and controlling Persons; provided, that solely for purposes of Section 9, references to each Agent's Related Persons shall also include such Agent's trustees and advisors, and (ii) if the Indemnitee is any Lender or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Lender and its Affiliates and their respective officers, directors, employees, agents and controlling Persons. All amounts due under this Section 10.5 shall be payable promptly after receipt of a reasonably detailed invoice therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Borrower at the address thereof set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.

The agreements in this Section 10.5 shall survive repayment of the Obligations.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than in accordance with Section 7.4(j)) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) subject to Sections 2.24 and 2.26(e), no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, in compliance with applicable law, assign (other than to any Disqualified Institution or a natural person) to one or more assignees including Holdings or any Subsidiary to the extent contemplated by Sections 10.6(h) (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed, it being understood that it shall be deemed reasonable for the Borrower to withhold such consent in respect of a prospective Lender if the Borrower reasonably believes such prospective Lender would constitute a Disqualified Institution) of:

148

(1)      the Borrower; provided, that no consent of the Borrower shall be required (x) for an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund (other than a Defaulting Lender) or (y) if an Event of Default has occurred and is continuing; provided, further, that a consent under this clause (1) shall be deemed given if the Borrower shall not have objected in writing to a proposed assignment within ten Business Days after receipt by it of a written notice thereof from the Administrative Agent; and

(2)      the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund (other than a Defaulting Lender).

(ii)      Subject to Sections 2.24 and 2.26(e), assignments shall be subject to the following additional conditions:

(1)      except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of (I) the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or (II) if earlier, the "trade date" (if any) specified in such Assignment and Assumption) shall not be less than $1,000,000 unless the Borrower and the Administrative Agent otherwise consent; provided, that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8.1(a) or 8.1(f) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent and the Borrower (or, at the Borrower's request, manually) together with a processing and recordation fee of $3,500 to be paid by either the applicable assignor or assignee (which fee may be waived or reduced in the sole discretion of the Administrative Agent); provided, that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(3)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and all applicable tax forms.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (I) a Lender, (II) an Affiliate of a Lender, (III) an entity or an Affiliate of an entity that administers or manages a Lender or (IV) an entity or an Affiliate of an entity that is the investment advisor to a Lender.  Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(iii)      Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Assumption, the Assignee thereunder shall be a party hereto and, to the extent of the Loans and Commitments assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the

149

case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be subject to the obligations under and entitled to the benefits of Sections 2.19, 2.20, 2.21, 10.5 and 10.14). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section 10.6 (and will be required to comply therewith), other than any sale to a Disqualified Institution, which shall be null and void.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent demonstrable error for such purposes), notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee (except as contemplated by Sections 2.24 and 2.26(e)), the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder) and all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this Section 10.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     (i)     Any Lender may, without the consent of or notice to any Person, in compliance with applicable law, sell participations (other than to any Disqualified Institution) to one or more banks or other entities (a "Participant"), in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to the proviso to the second sentence of Section 10.1(a) and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section 10.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.19, 2.20 and 2.21 (if such Participant agrees to have related obligations thereunder (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.6. Notwithstanding the foregoing, no Lender shall be permitted to sell participations under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.19, 2.20 or 2.21 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts.  No Participant shall be entitled to the benefits of Section 2.20 unless such Participant complies with Section 2.20(e), (g) or (j), as (and to the extent) applicable, as if such Participant were a Lender (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender).

(iii)    Each Lender that sells a participation, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a register on which it enters the name and addresses of each Participant, and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (it its capacity as such) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

(f)    The Borrower may prohibit any assignment if it would require the Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction and the Borrower shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee to determine whether any such filing or qualification is required or whether any assignment is otherwise in accordance with applicable law.

(g)    [Reserved]:

(h)    Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Term Loans of any Tranche hereunder to Holdings or any of its Subsidiaries, but only if:

(i)    such assignment is made pursuant to a Dutch Auction open to all Lenders of the same Tranche on a pro rata basis;

(ii)    no Default or Event of Default shall have occurred and be continuing before or immediately after giving effect to such assignment;

(iii)    the relevant Auction Offeror shall represent and warrant, as of the date of the launch of the Dutch Auction and on the date of any such assignment, that it does not have any material non-public information that has not been disclosed to the Lenders generally (other than to the extent any such Lender does not wish to receive material non-public information with respect to Holdings or its Subsidiaries or any of their respective securities) prior to such date; and

(iv)    immediately and automatically, without any further action on the part of Holdings or any of its Subsidiaries, any Lender, the Administrative Agent or any other Person, upon the effectiveness of such assignment of Term Loans from a Lender to the relevant Auction Offeror, such Term Loans and all rights and obligations as a Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and such Auction Offeror shall neither obtain nor have any rights as a Lender hereunder or under the other Loan Documents by virtue of such assignment.

(i)    Except as provided in Sections 10.6(h), none of Holdings or any of its Subsidiaries may acquire by assignment, participation or otherwise any right to or interest in any of the Commitments or Loans hereunder (and any such attempted acquisition shall be null and void).

(j)    [Reserved].

(k)    Notwithstanding anything to the contrary contained herein, the replacement of any Lender pursuant to Section 2.24 or 2.26(e) shall be deemed an assignment pursuant to Section 10.6(b) and shall be valid and in full force and effect for all purposes under this Agreement.

(l)    Any assignor of a Loan or Commitment or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or purchaser of such participation in the relevant Assignment and Assumption or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution.  None of the Agents shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

10.7    Adjustments; Set off.

(a)    Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the

152

purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this <u>Section 10.7</u> shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including prepayments received pursuant to <u>Sections 10.6(h)</u>) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; <u>provided</u>, that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or electronic (i.e., "pdf" or "tiff") transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    <u>Integration</u>.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

10.11    <u>GOVERNING LAW</u>.  **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.**

10.12    <u>Submission to Jurisdiction; Waivers</u>.  Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "<u>New York Supreme Court</u>"), and the United States District Court for the Southern District of New York (the "<u>Federal District Court</u>" and, together with the New York Supreme Court, the "<u>New York Courts</u>"), and appellate courts from either of them; <u>provided</u>, that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or

153

taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this <u>Section 10.12</u> would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

(b)      consents that any such action or proceeding may be brought in the New York Courts and appellate courts from either of them, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in <u>Section 10.2</u> or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law;

(e)      expressly acknowledges and agrees, to the fullest extent it may lawfully do so, that (i) if the payment of any Initial Term Loans is accelerated or any Initial Term Loans otherwise become due and payable (including prior to the Term Maturity Date applicable thereto), including as a result of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), in each case, prior to the second anniversary of the Closing Date, the Applicable Premium with respect to such Initial Term Loans will also be due and payable as though such Initial Term Loans were otherwise redeemed or repaid, prepaid or mandatorily assigned prior to the second anniversary of the Closing Date, and in all cases the Applicable Premium shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each applicable Lender's lost profits as a result thereof, (ii) such Applicable Premium (x) shall be presumed to be the liquidated damages sustained by each such Lender as the result any redemption (including prior to the Term Maturity Date applicable to such Initial Term Loans) and (y) is reasonable under the circumstances currently existing, (iii) such Applicable Premium shall also be payable in the event that any Initial Term Loans are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means, (iv) THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE APPLICABLE PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION INCLUDING WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION PURSUANT TO ANY INSOLVENCY PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAW, (v) such Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (vi) such Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (vii) there has been a course of conduct between the applicable Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay such Applicable Premium, (viii) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this <u>clause (e)</u> and otherwise in this Agreement and (ix) the Borrower's agreement to pay the Applicable Premium to applicable Lenders as herein described is a material inducement to such Lenders to make the Initial Term Loans; and

154

(f)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 10.12 any special, exemplary, punitive or consequential damages (provided, that such waiver shall not limit the indemnification obligations of the Loan Parties to the extent such special, exemplary, punitive or consequential damages are included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under Section 10.5).

10.13   Acknowledgments.  The Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      neither the Agents nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders;

(d)      no advisory or agency relationship between it and any Agent or Lender (in their capacities as such) is intended to be or has been created in respect of any of the transactions contemplated hereby,

(e)      the Agents and the Lenders, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship,

(f)      the Borrower is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents,

(g)      each of the Agents and the Lenders is engaged in a broad range of transactions that may involve interests that differ from the interests of the Borrower and none of the Agents or the Lenders has any obligation to disclose such interests and transactions to the Borrower by virtue of any advisory or agency relationship, and

(h)      none of the Agents or the Lenders (in their capacities as such) has advised the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including the validity, enforceability, perfection or avoidability of any aspect of any of the transactions contemplated hereby under applicable law, including the Bankruptcy Code or any consents needed in connection therewith), and none of the Agents or the Lenders (in their capacities as such) shall have any responsibility or liability to the Borrower with respect thereto and the Borrower has consulted with its own advisors regarding the foregoing to the extent it has deemed appropriate.

To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.14   Confidentiality.  Each of the Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished,

155

directly or indirectly, by or on behalf of the Borrower or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby (including any potential amendments, modifications or waivers, or any request therefor), whether furnished before or after the Closing Date ("Confidential Information"), as strictly confidential and not to use Confidential Information for any purpose other than evaluating the Transactions and negotiating, making available and administering this Agreement (the "Agreed Purposes").  Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except:

(1)　　　to its partners that are natural persons, members that are natural persons, directors, officers, employees, counsel, advisors, trustees and Affiliates (collectively, the "Representatives"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential, with the applicable Agent or Lender responsible for the breach of this Section 10.14 by such Representatives as if they were party hereto);

(2)　　　to any pledgee referred to in Section 10.6(d) and prospective Lenders and Participants in connection with the secondary trading of the Facilities and Commitments and Loans hereunder (excluding any Disqualified Institution), in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14;

(3)　　　to any party or prospective party (or their advisors) to any swap, derivative or similar transaction under which payments are made by reference to the Borrower and the Obligations, this Agreement or payments hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14;

(4)　　　upon the request or demand of any Governmental Authority having or purporting to have jurisdiction over it;

(5)　　　in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, provided, that in the case of clauses (4) and (5), the disclosing Agent or Lender, as applicable, agrees, to the extent practicable and not prohibited by applicable Requirements of Law, to notify the Borrower prior to such disclosure and cooperate with the Borrower in obtaining an appropriate protective order (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority);

(6)　　　to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facilities;

(7)　　　information that has been publicly disclosed other than in breach of this Section 10.14;

(8)　　　to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or in connection with examinations or audits of such Lender;

(9)        to the extent reasonably required or necessary, in connection with the exercise of any remedy under the Loan Documents; provided, that each Agent and Lender uses commercially reasonable efforts to ensure that such information is kept confidential in connection with such exercise of remedies and the recipient is informed of the confidential nature of the information;

(10)        to the extent the Borrower has consented to such disclosure in writing;

(11)        to any other party to this Agreement;

(12)        to the extent that such information is received from a third party that is not, to such Agent or Lender's knowledge, subject to contractual or fiduciary confidentiality obligations owing to the Borrower and its Affiliates and their Related Parties;

(13)        to the extent that such information is independently developed by such Agent or Lender; or

(14)        by the Administrative Agent to the extent reasonably required or necessary to obtain a CUSIP for any Loans or Commitment hereunder, to the CUSIP Service Bureau.

Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and/or its Affiliates and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement.  All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.  Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this Section 10.14 shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

10.15    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)        Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents (including by way of merger and including any assets transferred to a Subsidiary that is not a Loan Party in a transaction permitted by this Agreement) or any Loan Party becoming an Excluded Subsidiary (other than pursuant to clause (b) of the definition thereof or ceasing to be a Subsidiary (as used in this Section 10.15, "ceasing to be a Subsidiary" with respect to any Loan Party shall mean that no Loan Party or Affiliate thereof shall have retained any direct or indirect equity interests in such Person), all Liens and Guarantees on such assets or all assets of such Excluded Subsidiary or former Subsidiary shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender) execute and deliver all releases reasonably necessary or desirable (i) to evidence the release of Liens created in any Collateral being Disposed of in such Disposition (including any assets of any Loan Party that becomes an Excluded Subsidiary) or of such Excluded Subsidiary or former Subsidiary, as applicable, (ii) to provide notices of the termination of the assignment of any Property for which an assignment had been

157

made pursuant to any of the Loan Documents which is being Disposed of in such Disposition or of such Excluded Subsidiary or former Subsidiary, as applicable, and (iii) to release the Guarantee and any other obligations under any Loan Document of any Person being Disposed of in such Disposition or which becomes an Excluded Subsidiary or former Subsidiary, as applicable; *provided*, that to the extent the Property being so Disposed of has a Fair Market Value in excess of $25,000,000, the Borrower shall deliver a certificate of a Responsible Officer certifying that the Disposition is permitted by the Loan Documents. Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to the Borrower or any of its Subsidiaries) or of a Loan Party which becomes an Excluded Subsidiary or former Subsidiary, as applicable, shall no longer be deemed to be repeated once such Property is so Disposed of.   In addition, upon the reasonable request of the Borrower in connection with (A) any Lien of the type permitted by Section 7.3(g) on Excluded Collateral to secure Indebtedness to be incurred pursuant to Section 7.2(c) (or pursuant to Section 7.2(d), 7.2(j), or 7.2(v) if such Indebtedness is of the type that is contemplated by Section 7.2(c)) if the holder of such Lien so requires, (B) any Lien securing Indebtedness pursuant to Section 7.2(t)(x) if the holder of such Lien so requires and pursuant to Section 7.2(t)(y) if the holder of such Lien so requires and if the holder of the applicable Indebtedness being refinanced also so requires, and in each case to the extent constituting Excluded Collateral, (C) any Lien of the type permitted by Sections 7.3(o), 7.3(r)(i), 7.3(t) or 7.3(bb), in each case, to the extent the obligations giving rise to such permitted Lien prohibit (or require the release of) the security interest of the Collateral Agent thereon, or Section 7.3(kk) to the extent constituting Excluded Collateral, or (D) the ownership of joint ventures or other entities qualifying under clause (iv) of the definition of Excluded Equity Securities, the Collateral Agent shall execute and deliver all releases necessary or desirable to evidence that no Liens exist on such Excluded Collateral under the Loan Documents.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent or indemnification obligations not then due) have been paid in full and all Commitments have terminated or expired, upon the request of the Borrower, all Liens and Guarantee Obligations under any Loan Documents shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be contingent or indemnification obligations not then due.  Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Liens permitted under Section 7.3(g) securing Indebtedness incurred pursuant to Section 7.2(c), the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to subordinate the Lien on any Collateral to any such Lien permitted by Section 7.3(g).

10.16   Accounting Changes.  In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial ratios, covenants, standards or terms in this Agreement, then following notice either from the Borrower to the Administrative Agent or from the Administrative Agent to the Borrower (which the Administrative Agent shall give at the request of the Required Lenders), the Borrower and the Administrative Agent agree to enter into

negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition and covenant capacities shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  If any such notices are given then, regardless of whether such notice is given prior to or following such Accounting Change, until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders and have become effective, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  Any amendment contemplated by the prior sentence shall become effective upon the consent of the Required Lenders, it being understood that a Lender shall be deemed to have consented to and executed such amendment if such Lender has not objected in writing within five Business Days following receipt of notice of execution of the applicable amendment by the Borrower and the Administrative Agent, it being understood that the posting of an amendment referred to in the preceding sentence electronically on the Platform to the Lenders shall be deemed adequate receipt of notice of such amendment.  "<u>Accounting Changes</u>" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC, in each case, occurring after the Closing Date.  Without limiting the foregoing, for purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of Accounting Standards Update No. 2016-02 Leases (Topic 842).

10.17   <u>WAIVERS OF JURY TRIAL</u>.  **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND FOR ANY COUNTERCLAIM THEREIN.**

10.18   <u>USA PATRIOT ACT AND CANADIAN ANTI-MONEY LAUNDERING & ANTI-TERRORISM LEGISLATION</u>. (a) The Administrative Agent and each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107 56 (signed into law October 26, 2001)) (the "<u>USA Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of such Loan Parties and other information that will allow the Administrative Agent or such Lender to identify the Loan Parties in accordance with the USA Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender or Agent reasonably promptly upon request from such Lender or Agent.

(b) The Administrative Agent and its successors and assigns may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations and regulations, and they hereby notify the Borrower and each of its Subsidiaries that in order to comply with such legislation, rules and regulations, they may be, among other things, required to obtain, verify and record information pertaining to the Borrower and its Subsidiaries, which information may relate to, among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, and corporate shareholders of Holdings and the Subsidiaries. Each of Holdings and the Borrowers agree to take promptly such actions and to promptly provide, upon reasonable request, such information, access to information and certifications regarding Holdings and the Subsidiaries that are required to enable the Administrative Agent and its successors and assigns to comply with such Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "**know your customer**" rules and regulations. In addition, and to the extent they are required at law to do so, each of Holdings and the Borrowers agree

159

to promptly comply with its obligations under Canadian Anti-Money Laundering & Anti-Terrorism Legislation.

10.19    [Reserved].

10.20    Interest Rate Limitation.  Notwithstanding anything in this Agreement to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.20 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

10.21    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.22    Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other notices of borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected

Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(A)    a reduction in full or in part or cancellation of any such liability;

(B)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)    the variation of the terms of such liability  in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

10.24    <u>Hypothecary Representative</u>.  Without limiting the generality of any provisions of this Agreement, each Lender hereby appoints and designates the Administrative Agent (or any successor thereto) as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) of the Administrative Agent and the Lenders for the purposes of holding any security granted by any Loan Party under the laws of the Province of Québec as security for any indebtedness or other obligation of any Loan Party and, in such capacity, the Administrative Agent shall hold any such security granted under the laws of the Province of Québec as such hypothecary representative in the exercise of the rights conferred thereunder. The execution by the Administrative Agent, as such hypothecary representative, prior to the date hereof of any deeds of hypothec or other documents is hereby ratified and confirmed. Each assignee Lender that becomes party to this Agreement, by becoming a party to this Agreement, shall be deemed to have ratified and confirmed the appointment of the Administrative Agent (or any successor thereto) as hypothecary representative. In the event of the resignation of the Administrative Agent and appointment of a successor Administrative Agent, such successor Administrative Agent shall also act as the hypothecary representative (without any further act or formality being required to effect such replacement). The Administrative Agent, as such hypothecary representative, shall benefit from and be subject to all provisions hereof with respect to the Administrative Agent, mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to an indemnification by each Lender, and shall be entitled to delegate from time to time any of its powers or duties under any deed of hypothec granted in favour of the Administrative Agent, as such hypothecary representative, on such terms and conditions as it may determine from time to time.

10.25    <u>Emergence Date Transaction Steps</u>.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, the funding (or deemed funding) of the Loans, premiums and discounts hereunder and under the other Loan Documents shall be made in accordance with the Transaction Steps Memorandum included in the Restructuring Plan.

161

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

REVLON INTERMEDIATE HOLDINGS IV LLC,
as Borrower


By: _____
      Name:
      Title:


REVLON INTERMEDIATE HOLDINGS III LLC (solely for purposes of Section VIIA),
as Holdings


By:
Name:
Title:


REVLON INTERMEDIATE HOLDINGS V LLC,


By: _____
      Name:
      Title:


REVLON INTERMEDIATE HOLDINGS VI LLC,


By: _____
      Name:
      Title:


REVLON NEWCO, LLC,


By: _____
      Name:
      Title:


[Signature Page to Exit Term Credit Agreement (Revlon)]

[Signature Page to Exit Term Credit Agreement (Revlon)]

Jefferies Finance LLC,
as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

[Signature Page to Exit Term Credit Agreement (Revlon)]

[●],
as a Lender


By: _____
    Name:
    Title:

[Signature Page to Exit Term Credit Agreement (Revlon)]

**<u>Exhibit F-2</u>**

**Blackline comparison to First Lien Exit Facilities Credit Agreement as filed on March 16, 2023**

*Execution Copy*

TERM CREDIT AGREEMENT

among

[REVLON ~~CONSUMER PRODUCTS CORPORATION~~]INTERMEDIATE HOLDINGS IV LLC,
as the Borrower,

[~~REVLON, INC.~~],

REVLON INTERMEDIATE HOLDINGS III LLC,
as Holdings,

THE LENDERS PARTY HERETO and

[JEFFERIES FINANCE LLC],
as Administrative Agent and Collateral Agent

Dated as of May [●2], 2023

JEFFERIES FINANCE LLC,
as Lead Arranger and Bookrunner

TABLE OF CONTENTS

Page

SECTION I.      DEFINITIONS ............................................................... 1 2

1.1      Defined Terms ...................................................................... 1 2
1.2      Other Definitional Provisions ............................................ 53
1.3      Pro Forma Calculations ...................................................... 56
1.4      Exchange Rates; Currency Equivalents ............................. 56 57
1.5      [Reserved] ............................................................................ 57
1.6      Covenants ............................................................................. 57
1.7      Divisions .............................................................................. 58
1.8      Interest Rates ....................................................................... 58

SECTION II.      AMOUNT AND TERMS OF COMMITMENTS ................ 58 59

2.1      Term Commitments .............................................................. 58 59
2.2      Procedures for Borrowing .................................................. 59
2.3      Repayment of Initial Term Loans ...................................... 60
2.4      [Reserved] ............................................................................ 60
2.5      [Reserved] ............................................................................ 60
2.6      [Reserved] ............................................................................ 60
2.7      [Reserved] ............................................................................ 60
2.8      Repayment of Loans ........................................................... 60
2.9      Fees, Premiums and Discounts .......................................... 61
2.10     Prepayment Premium .......................................................... 61
2.11     Optional Prepayments ......................................................... 62
2.12     Mandatory Prepayments ..................................................... 62
2.13     Conversion and Continuation Options .............................. 65
2.14     Minimum Amounts and Maximum Number of SOFR Tranches ... 66
2.15     Interest Rates and Payment Dates ..................................... 66
2.16     Computation of Interest and Fees ..................................... 66 67
2.17     Inability to Determine Rates; Benchmark Replacement Setting ... 66 67
2.18     Pro Rata Treatment and Payments ..................................... 68 69
2.19     Requirements of Law ........................................................... 70
2.20     Taxes ..................................................................................... 71 72
2.21     Indemnity ............................................................................. 74
2.22     Illegality ............................................................................... 74 75
2.23     Change of Lending Office ................................................... 74 75
2.24     Replacement of Lenders ..................................................... 74 75
2.25     [Reserved] ............................................................................ 76
2.26     Extension of Term Loans. ................................................... 76
2.27     Defaulting Lenders .............................................................. 78 79

SECTION III.      [RESERVED] .............................................................. 79 80

SECTION IV.      REPRESENTATIONS AND WARRANTIES .................. 79 80

i

4.1     Financial Condition ............................................................................... ~~79~~80
4.2     No Change ............................................................................................. 80
4.3     Existence; Compliance with Law ......................................................... 80
4.4     Corporate Power; Authorization; Enforceable Obligations ................. ~~80~~81
4.5     No Legal Bar ......................................................................................... 81
4.6     No Material Litigation .......................................................................... ~~81~~82
4.7     No Default ............................................................................................. ~~81~~82
4.8     Ownership of Property; Liens ............................................................... ~~81~~82
4.9     Intellectual Property ............................................................................. ~~81~~82
4.10    Taxes ..................................................................................................... 82
4.11    Federal Regulations .............................................................................. 82
4.12    ERISA and Canadian Pension Plans ..................................................... 82
4.13    Investment Company Act ...................................................................... ~~82~~83
4.14    Subsidiaries ........................................................................................... ~~82~~83
4.15    Environmental Matters .......................................................................... 83
4.16    Accuracy of Information, etc. ............................................................... 83
4.17    Security Documents .............................................................................. ~~83~~84
4.18    Solvency ................................................................................................ ~~84~~85
4.19    Anti-Terrorism ...................................................................................... ~~84~~85
4.20    Use of Proceeds .................................................................................... ~~84~~85
4.21    Labor Matters ........................................................................................ 85
4.22    [Reserved] ............................................................................................. 85
4.23    Sanctions ............................................................................................... 85
4.24    Anti-Corruption Compliance ................................................................ 85
4.25    Beneficial Ownership Certification ...................................................... ~~85~~86

SECTION V.      CONDITIONS PRECEDENT ......................................................... ~~85~~86

5.1     Conditions to Closing Date ................................................................... ~~85~~86
5.2     Conditions to Each Extension of Credit After Closing Date ............... 89

SECTION VI.          AFFIRMATIVE COVENANTS ................................................ ~~89~~90

6.1     Financial Statements ............................................................................. ~~89~~90
6.2     Certificates; Other Information ............................................................. ~~90~~91
6.3     Payment of Taxes .................................................................................. 92
6.4     Conduct of Business; Maintenance of Existence; Compliance with Requirements
        of Law .................................................................................................... 92
6.5     Maintenance of Property; Insurance ..................................................... 92
6.6     Inspection of Property; Books and Records; Discussions ..................... 93
6.7     Notices ................................................................................................... ~~93~~94
6.8     Additional Collateral, etc. ..................................................................... 94
6.9     Use of Proceeds .................................................................................... 99
6.10    ~~I~~Post-Closing ........................................................................................ ~~99~~100
6.11    [Reserved] ............................................................................................. ~~99~~100
6.12    Line of Business ................................................................................... ~~99~~100
6.13    ~~Credit Ratings~~[Reserved] ..................................................................... 100
6.14    Changes in Jurisdictions of Organization; Name ................................. 100
6.15    Additional Beneficial Ownership Certification .................................... 100

6.16    People with Significant Control Regime .................................................. 100
6.17    Canadian Defined Benefit Pension Plan Reporting .............................. 100

SECTION VII.          NEGATIVE COVENANTS .................................................. 100

7.1     [reservedReserved] ................................................................................. 100
7.2     Indebtedness ........................................................................................... 100
7.3     Liens ....................................................................................................... 105104
7.4     Fundamental Changes ............................................................................ 109
7.5     Dispositions of Property ........................................................................ 111110
7.6     Restricted Payments .............................................................................. 113
7.7     Investments ............................................................................................ 116115
7.8     Prepayments, Etc. of Indebtedness; Amendments ................................ 120119
7.9     Transactions with Affiliates .................................................................. 121
7.10    Sales and Leasebacks ............................................................................ 123
7.11    Changes in Fiscal Periods ..................................................................... 123
7.12    Negative Pledge Clauses ....................................................................... 124123
7.13    Clauses Restricting Subsidiary Distributions ....................................... 125
7.14    Limitation on Hedge Agreements ......................................................... 127
7.15    Amendment of Company Tax Sharing Agreement ................................ 127
7.16    Canadian Defined Benefit Pension Plans .............................................. 127

SECTION VIIA.  HOLDINGS NEGATIVE COVENANTS ...................................... 127

SECTION VIII.         EVENTS OF DEFAULT ...................................................... 128127

8.1     Events of Default ................................................................................... 128127

SECTION IX.          THE AGENTS .................................................................... 132

9.1     Appointment ........................................................................................... 132
9.2     Delegation of Duties .............................................................................. 133
9.3     Exculpatory Provisions .......................................................................... 133
9.4     Reliance by the Agents .......................................................................... 134133
9.5     Notice of Default .................................................................................... 134
9.6     Non-Reliance on Agents and Other Lenders ......................................... 135134
9.7     Indemnification ...................................................................................... 135134
9.8     Agent in Its Individual Capacity ........................................................... 135
9.9     Successor Agents .................................................................................... 135
9.10    Certain Collateral Matters ..................................................................... 136
9.11    Agents May File Proofs of Claim ......................................................... 137
9.12    Lead Arranger and Bookrunner.. ........................................................... 140137
9.13    Appointment of AdministrativeCollateral Agent as Security Trustee. .... 140137

SECTION X.          MISCELLANEOUS ............................................................. 143140

10.1    Amendments and Waivers ..................................................................... 143140
10.2    Notices; Electronic Communications .................................................... 147144
10.3    No Waiver; Cumulative Remedies ......................................................... 150146

iii

10.4    Survival of Representations and Warranties .................................... ~~150~~146
10.5    Payment of Expenses; Indemnification ........................................... ~~150~~146
10.6    Successors and Assigns; Participations and Assignments ................. ~~152~~148
10.7    Adjustments; Set off ................................................................... ~~156~~152
10.8    Counterparts ............................................................................... ~~157~~153
10.9    Severability ................................................................................ ~~157~~153
10.10   Integration ................................................................................. ~~157~~153
10.11   GOVERNING LAW ...................................................................... ~~157~~153
10.12   Submission to Jurisdiction; Waivers ............................................ ~~157~~153
10.13   Acknowledgments ....................................................................... ~~158~~155
10.14   Confidentiality ............................................................................ ~~159~~155
10.15   Release of Collateral and Guarantee Obligations; Subordination of Liens ........ ~~161~~157
10.16   Accounting Changes .................................................................... ~~162~~158
10.17   WAIVERS OF JURY TRIAL .......................................................... ~~163~~159
10.18   USA PATRIOT ACT ..................................................................... ~~163~~159
10.19   [Reserved] .................................................................................. ~~163~~160
10.20   Interest Rate Limitation ............................................................... ~~163~~160
10.21   Payments Set Aside ..................................................................... ~~164~~160
10.22   Electronic Execution of Assignments and Certain Other Documents ...... ~~164~~160
10.23   Acknowledgement and Consent to Bail-In of Affected Financial Institutions ..... ~~164~~160
10.24   Hypothecary Representative ......................................................... 161
10.25   Emergence Date Transaction Steps ............................................... 161

SCHEDULES:

1.1A        Consolidated EBITDA Add-Backs
2.1A        Initial Cashless Term Commitments
2.1B        Initial Funded Term Commitments
4.8         Real Property
4.14        Subsidiaries
4.17        UCC Filing Jurisdictions
6.10      ~~[~~  Post-Closing Matters~~]¹~~
7.2(d)      Existing Indebtedness
7.3(f)      Existing Liens
7.5(q)      Permitted Dispositions
7.6(i)      Permitted Restricted Payments
7.7         Existing Investments
7.7(h)      Permitted Investments
7.9         Transactions with Affiliates
7.12        Existing Negative Pledge Clauses
7.13        Clauses Restricting Subsidiary Distributions

EXHIBITS:

A-1    Form of Guarantee and Collateral Agreement
A-2    Form of Canadian Collateral Agreement

¹ ~~NTD: to be included if applicable.~~

B        Form of Compliance Certificate
C        Form of Closing Certificate
D        Form of Assignment and Assumption
E        Form of Committed Loan Notice
F        Form of Exemption Certificate
G        Form of Solvency Certificate
H        [Reserved]
I        Form of Prepayment Option Notice
J        Form of Term Loan Note
K        [Reserved]
L        Form of ABL Intercreditor Agreement
M        Form of Mortgage

TERM CREDIT AGREEMENT, dated as of May [●2], 2023, among [REVLON CONSUMER PRODUCTS CORPORATION], a [Revlon Intermediate Holdings IV LLC, a Delaware corporation]limited liability company (the "Company" or the "Borrower"), [REVLON, INC.], a [Revlon Intermediate Holdings III LLC, a Delaware corporation]limited liability company ("Holdings"), solely for purposes of Section VIIA, the financial institutions or other entities from time to time parties to this Agreement (the "Lenders") and [Jefferies Finance LLC], as Administrative Agent and Collateral Agent.

WITNESSETH:

WHEREAS, on June 15, 2022, Holdings, the BorrowerRevlon, Inc. ("Revlon Holdings"), a Delaware corporation, Revlon Consumer Products Corporation, a Delaware corporation ("RCPC"), and certain of the Borrower'sRCPC's Subsidiaries (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District forof New York (such court, the "Bankruptcy Court"; and each such case of the BorrowerRCPC and each other Debtor, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") and continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Revlon Holdings, in its capacity as foreign representative on behalf of the Debtors' estates, filed an application with the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada under Part IV of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended, to recognize the Chapter 11 Cases as "foreign main proceedings" and grant certain customary related relief (the "Recognition Proceedings");

WHEREAS, on [●]April 3, 2023 the Bankruptcy Court entered the Confirmation Order (as defined herein) approving the Restructuring Plan (as defined herein) of the Debtors, and concurrently with the making (and/or deemed making) of the Initial Term Loans hereunder, the effective date with respect to the Restructuring Plan has occurred. The Confirmation Order was recognized and given full force and effect in Canada pursuant to an order in the Recognition Proceedings granted on April 21, 2023 (the "Plan Recognition Order");

WHEREAS, pursuant to the terms of the Restructuring Plan, the holders of Allowed 2020 Term B-1 Loan Claims (as defined in the Restructuring Plan) are entitled to receive on account of such claims, among other things, Initial Term Loans provided for hereunder in the aggregate principal amount of $[●]1,096,527,422.58; and

WHEREAS, in accordance with the Restructuring Plan, the Borrower will transfer a portion of the proceeds of the Initial Term Loans in respect of the Initial Funded Term Commitments to Revlon Intermediate Holdings V LLC, a Delaware limited liability company, which will distribute such proceeds in accordance with the Restructuring Plan;

WHEREAS, in each case in accordance with the Restructuring Plan and as set forth herein, (i) the Initial Term Loans in respect of the Initial Cashless Term Commitments will initially be deemed made by Revlon Intermediate Holdings V LLC, (ii) Revlon Intermediate Holdings V LLC will immediately thereafter contribute and assign such Initial Term Loans to Revlon Intermediate Holdings VI LLC, (iii) Revlon Intermediate Holdings VI LLC will immediately thereafter transfer and assign such Initial Term Loans to Revlon NewCo, LLC and (iv) Revlon NewCo, LLC will immediately thereafter

distribute and assign such Initial Term Loans to the Lenders with Initial Cashless Term Commitments; and

WHEREAS, by execution and delivery of this Agreement and the other Loan Documents and entry of the Confirmation Order in respect of the Debtors, Holdings and the Subsidiary Guarantors, as applicable, agree to guarantee the Obligations, and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, the Collateral, on and subject to the terms and priorities set forth in the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other Loan Documents, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

SECTION I.    DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Designated Banking Services Obligations": as defined in the ABL Intercreditor Agreement.

["ABL Designated Specified Additional Obligations": as defined in the ABL Intercreditor Agreement.]

"ABL Designated Swap Obligations": as defined in the ABL Intercreditor Agreement.

"ABL Documents": the collective reference to the ABL Facility Agreement and any other document, agreement and instrument executed and/or delivered in connection therewith or relating thereto, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"ABL Facility": the asset-based revolving credit facility made available to the Borrower pursuant to the ABL Facility Agreement.

"ABL Facility Agreement": the Asset-Based Revolving Credit Agreement, dated as of [●]May 2, 2023, among the Borrower, [the local borrowing subsidiaries party thereto,] Holdings, the lenders and issuing lenders from time to time party thereto and [●]MidCap Funding IV Trust, as administrative agent and collateral agent, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"ABL Facility First Priority Collateral":  as defined in the ABL Intercreditor Agreement.

"ABL Intercreditor Agreement":  the ABL Intercreditor Agreement, dated as of the Closing Date, among the Borrower, Holdings, the Subsidiary Guarantors, the Collateral Agent, the collateral agent under the ABL Documents and the other parties from time to time party thereto, substantially in the form of Exhibit L, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"ABL Loan": any loan made pursuant to the ABL Facility.

"ABR":  for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted Term SOFR Rate ~~for a one month Interest Period as published two (2) U.S. Government Securities Business Days prior to such day plus 1.00%; provided that, for purposes of this definition, the Adjusted Term SOFR Rate for any day shall be based on the Term SOFR Reference Rate at approximately 5:00 a.m. Chicago time on such day (or any amended publication time for the Term SOFR Reference Rate, as specified by the Term SOFR Administrator in the Term SOFR Reference Rate methodology)~~plus 1.00%.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate, respectively.  If the ABR is being used as an alternate rate of interest pursuant to Section 2.17 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.17(b)), then the ABR shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"ABR Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Accounting Changes":  as defined in Section 10.16.

"Adjusted Term SOFR Rate": an interest rate per annum equal to Term SOFR for such Interest Period; provided that, if the Adjusted Term SOFR Rate as so determined would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"Administrative Agent":  ~~[Jefferies Finance LLC]~~, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate":  ~~[~~as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, in either case whether by contract or otherwise.~~][~~ For purposes of this Agreement and the other Loan Documents, Jefferies LLC and its Affiliates shall be deemed to be Affiliates of Jefferies Finance LLC and its Affiliates.~~]~~

"Affiliate Lender": any Lender (whether individually or among its ~~affiliates~~Affiliates) that holds ~~over~~, directly or indirectly, more than 30% of the then outstanding ~~voting securities~~Capital Stock of Holdings having ordinary voting power ~~of Holdings~~.

"Agent Fee Letter":  the Agent Fee Letter dated as of ~~[●]~~May 2, 2023, among the Borrower and the Administrative Agent.

"Agents":  the collective reference to the Collateral Agent, the Administrative Agent, the Lead Arranger and the Bookrunner.

3

"Agreed Purposes":  as defined in Section 10.14.

"Agreement":  this Term Credit Agreement, as amended, restated, supplemented, waived or otherwise modified from time to time.

"Anti-Corruption Law":  the United States Foreign Corrupt Practices Act of 1977, as amended, the Corruption of ~~Public~~ Foreign Public Officials Act (Canada), as amended, the U.K. Bribery Act 2010, or any applicable law or regulation implementing the OECD Convention on Combatting Bribery of Foreign Public Officials.

"Applicable Margin":  (a) with respect to Initial Term Loans that are ABR Loans, 5.875% and (b) with respect to Initial Term Loans that are SOFR Loans, 6.875%.

"Applicable Premium":  as defined in Section 2.10.

"Applicable Threshold Price":  as defined in the definition of "Dutch Auction".

"Approved Fund":  as defined in Section 10.6(b).

~~[~~"Asset Sale":  any Disposition of Property or exclusive licenses or series of related Dispositions of Property or exclusive licenses by the Borrower or any of its Subsidiaries ~~[~~(a) under Section 7.5(e), (f), (k) or (p), or (b) not otherwise permitted under Section 7.5]², ~~in each case, which yields Net Cash Proceeds in excess of $20,000,000.]~~

"Asset Sale Trigger Date":  as defined in Section 2.12(b).

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit D or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Auction Amount": as defined in the definition of "Dutch Auction".

"Auction Assignment and Acceptance": as defined in the definition of "Dutch Auction".

"Auction Manager": the party appointed by the Required Lenders, which may be the Administrative Agent or another financial institution or advisor.

"Auction Notice": as defined in the definition of "Dutch Auction".

"Auction Offeror": as defined in the definition of "Dutch Auction".

"Available Amount":  as at any date, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to, without duplication:

(a)       [reserved]; plus

---

² ~~NTD: Subject to ongoing Lender review.~~

4

(b)     an amount (which amount shall not be less than zero) equal to 50% of the Consolidated Net Income of the Borrower for the period (taken as one accounting period) from [●]June 30, 2023 to the end of the Borrower's most recently ended fiscal quarter for which financial statements have been delivered pursuant to Section 6.1; plus

(c)     [reserved]; plus

(d)     (i) the cumulative amount of cash proceeds from (x) the sale of Capital Stock (other than Disqualified Capital Stock) of the Borrower or, Holdings or any Parent Company (y) capital contributions, in each case, after the Closing Date, which proceeds have been contributed as common equity to the capital of the Borrower and not previously applied for a purpose other than use in the Available Amount, in each case, other than any Excluded Contribution Amount, and (ii) Capital Stock (other than Disqualified Capital Stock) of Holdings or, the Borrower or any Parent Company issued upon conversion of Indebtedness (other than Indebtedness that is contractually subordinated to the Obligations in right of payment) of the Borrower or any Subsidiary owed to a person other than the Borrower or a Subsidiary not previously applied for a purpose other than use in the Available Amount; provided, that this clause (d) shall exclude sales of Capital Stock financed as contemplated by Section 7.7(g) and any amounts used to finance the payments or distributions in respect of any Junior Financing pursuant to Section 7.8; plus

(e)     [reserved]; plus

(f)     [reserved]; plus

(g)     [reserved]; plus

(h)     [reserved]; plus

(i)     an amount equal to any returns (including dividends, interest, distributions, returns of principal, profits on sale, repayments, income and similar amounts) actually received in cash or Cash Equivalents by the Borrower or any of its Subsidiaries after the Closing Date in respect of any Investments made pursuant to Section 7.7(v)(ii); plus

(j)     Declined Amounts not otherwise used to make any Investment, Restricted Payment or payment or distribution made in respect of any Junior Financing not from the Available Amount; minus

(k)     any amounts thereof used to make Investments pursuant to Section 7.7(v)(ii) after the Closing Date prior to such time; minus

(l)     the cumulative amount of Restricted Payments made pursuant to Section 7.6(b) prior to such time; minus

(m)     any amount thereof used to make payments or distributions in respect of Junior Financings pursuant to Section 7.8(a)(i) (other than payments made with proceeds from the issuance of Capital Stock that were excluded from the calculation of the Available Amount pursuant to clause (d) above);

provided that, notwithstanding anything to the contrary, in no event shall the Restructuring Transactions (as defined in the Restructuring Plan) result in an increase of the Available Amount.

"Available Tenor": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to clause (e) of Section 2.17.

"Bail-In Action": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation": (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bankruptcy Code": Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"Bankruptcy Court": as defined in the recitals hereto.

"Benchmark": initially, Term SOFR; provided that, if a replacement of the Benchmark has occurred pursuant to Section 2.17, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to clause (b) of Section 2.17.

"Benchmark Replacement": for any Available Tenor, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1) the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

(2) the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent [and the Borrower][3] as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for syndicated credit facilities denominated in the applicable currency at such time and (b) the related Benchmark Replacement Adjustment.

---

[3] NTD: Subject to Agent review.

If the Benchmark Replacement as determined pursuant to clause (1) or (2) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment": with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent [and the Borrower] for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for syndicated credit facilities denominated in the applicable currency at such time.

"Benchmark Replacement Date": the earliest to occur of the following events with respect to the then-current Benchmark:

(1)      in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)      in the case of clause (3) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative _provided_ that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event": with respect to any Benchmark, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)      a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, _provided_ that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

7

(2)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)      a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period": with respect to any Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17 and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.17.

"Beneficial Ownership Certification": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation": 31 C.F.R. § 1010.230.

"Benefited Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors": (a) with respect to a corporation or company, the board of directors of the corporation or company or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the board of directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"Bookrunner": Jefferies Finance LLC, in its capacity as sole bookrunner.

"Borrower":  as defined in the preamble hereto.

"Borrower Materials": as defined in Section 10.2(c).

"Borrowing": Loans made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"BrandCo(s)":  ~~means~~ each of  (i) Beautyge II, LLC, a Delaware limited liability company, (ii) BrandCo Almay 2020 LLC, a Delaware limited liability company, (iii) BrandCo Charlie 2020 LLC, a Delaware limited liability company, (iv) BrandCo CND 2020 LLC, a Delaware limited liability company, (v) BrandCo Curve 2020 LLC, a Delaware limited liability company, (vi) BrandCo Elizabeth Arden 2020 LLC, a Delaware limited liability company, (vii) BrandCo Giorgio Beverly Hills 2020 LLC, a Delaware limited liability company, (viii) BrandCo Halston 2020 LLC, a Delaware limited liability company, (ix) BrandCo Jean Nate 2020 LLC, a Delaware limited liability company, (x) BrandCo Mitchum 2020 LLC, a Delaware limited liability company, (xi) BrandCo Multicultural Group 2020 LLC, a Delaware limited liability company, (xii) BrandCo PS 2020 LLC, a Delaware limited liability company, (xiii) BrandCo White Shoulders 2020 LLC, a Delaware limited liability company and (~~xii~~xiv) each other Subsidiary of BrandCo Cayman Holdings acquired, formed or otherwise existing after the Closing Date.

"BrandCo Cayman Holdings":  Beautyge I, an exempted company incorporated in the Cayman Islands.

"BrandCo Entities":  each BrandCo and BrandCo Cayman Holdings.

~~"BrandCo Permitted Liens":  (a) Liens arising under law or pursuant to documentation governing permitted accounts in connection with each BrandCo's cash management in the ordinary course and (b) Liens on assets of the BrandCo Entities permitted pursuant to Section 7.3(y).~~

"Business":  the business activities and operations of the Borrower and/or its Subsidiaries on the Closing Date, after giving effect to the Transactions.

"Business Day":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Administrative Agent's office is located; provided that, with respect to any Borrowing, prepayment or interest election with respect to any SOFR Loan, the term "Business Day" shall mean any day that is a U.S. Government Securities Business Day.

"Calculation Date":  as defined in Section 1.3(a).

"Canadian Anti-Money Laundering & Anti-Terrorism Legislation": the Criminal Code (Canada), the Proceeds of Crime Act and any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto.

"Canadian Bankruptcy and Insolvency Law": any federal or provincial Canadian law from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtor, including the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Winding up and Restructuring Act

9

(Canada), the Canada Business Corporations Act, the Business Corporations Act (Ontario) and any other applicable corporations legislation.

"Canadian Blocked Person": any Person whose property or interests in property are blocked or subject to blocking pursuant to, or as described in, any Canadian Economic Sanctions and Export Control Laws.

"Canadian Collateral Agreement": the Canadian Collateral Agreement, dated as of the Closing Date among Revlon Canada Inc., Elizabeth Arden (Canada) Limited, each other Grantor (as defined therein) from time to time party thereto and the Collateral Agent substantially in the form of Exhibit A-2, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Canadian Defined Benefit Pension Plan": a Canadian Pension Plan which contains a "defined benefit provision," as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"Canadian Economic Sanctions and Export Control Laws": any Canadian laws, regulations or orders governing transactions in controlled goods or technologies or dealings with countries, entities, organizations, or individuals subject to economic sanctions and similar measures, including, without limitation, the Special Economic Measures Act (Canada), the United Nations Act, (Canada), the Justice for Victims of Corrupt Foreign Officials Act (Canada), the Freezing Assets of Corrupt Foreign Officials Act (Canada), Part II.1 of the Criminal Code (Canada) and the Export and Import Permits Act (Canada), and any related regulations.

"Canadian ~~Multiemployer~~Multi-employer Plan": a Canadian Pension Plan that constitutes a "multi-employer pension plan," as defined in Section 8500(i) of the Income Tax Regulations (Canada).

"Canadian Pension Plans": any plan, program or arrangement that is a pension plan that is required to be registered under any applicable Canadian federal, provincial or territorial pension legislation, whether or not registered under any such laws, and includes a "registered pension plan", as that term is defined in subsection 248(1) of the Income Tax Act (Canada) which plan is sponsored, administered or contributed to, or required to be contributed to, by any Loan Party or under which any Loan Party has any actual or potential liability., but for certainty does not include Canadian Multi-employer Plans or plans established by statute, which shall include the Canada Pension Plan maintained by the government of Canada and the Quebec Pension Plan maintained by the Province of Quebec.

"Capital Expenditures":  for any period, with respect to any Person, (a) the additions to property, plant and equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person, and other capital expenditures of such Person that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP and (b) Capital Lease Obligations incurred by such Person; provided, that in any event the term "Capital Expenditures" shall exclude:  (i) any Permitted Acquisition and any other Investment permitted hereunder; (ii) any expenditures to the extent financed with any Reinvestment Deferred Amount or the proceeds of any Disposition or Recovery Event that are not required to be applied to prepay Term Loans; (iii) expenditures for leasehold improvements for which such Person is reimbursed in cash or receives a credit; (iv) capital expenditures to the extent they are made with the proceeds of equity contributions (other than in respect of Disqualified Capital Stock) made to the Borrower after the Closing Date; (v) capitalized interest in respect of operating or capital leases; (vi) the book value of any asset owned to the

extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; and (vii) any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP, provided, that for the purposes of this definition, "GAAP" shall mean, subject to Section 10.16, generally accepted accounting principles in the United States as in effect on [December 15, 2018]the Closing Date.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock or authorized share capital of a corporation or company, and any and all equivalent ownership interests in a Person (other than a corporation).

"Cash Equivalents":

(a)     direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America or Canada (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America or Canada, as applicable), in each case maturing within 18 months from the date of acquisition thereof;

(b)     certificates of deposit, time deposits and eurodollarEurodollar time deposits with maturities of 18 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 18 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus at the date of acquisition thereof in excess of $250,000,000;

(c)     repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clauses (a) and (b) above entered into with any financial institution meeting the qualifications specified in clause (b) above;

(d)     commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and maturing within 18 months after the date of acquisition and Indebtedness and preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 18 months or less from the date of acquisition;

(e)     readily marketable direct obligations issued by or directly and fully guaranteed or insured by any state of the United States or any political subdivision thereof or any province of Canada or any public instrumentality thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 18 months or less from the date of acquisition;

(f)     marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P

shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 18 months after the date of creation or acquisition thereof;

(g)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(h)    (x) such local currencies in those countries in which the Borrower and its Subsidiaries transact business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (g) or otherwise customarily utilized in countries in which the Borrower and its Subsidiaries operate for short term cash management purposes; and

(i)    Investments in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in clauses (a) through (h) of this definition.

"Cash Management Obligations":  obligations in respect of any overdraft or other liabilities arising from treasury, depository and cash management services, credit or debit card, or any automated clearing house transfers of funds.

"Cayman Pledge Agreement": an equitable mortgage over the shares of BrandCo Cayman Holdings dated as of the Closing Date entered into between Beautyge Brands U.S.A., Inc. and the Collateral Agent.

"Certificated Security":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a non-US Guarantor), as the context may require.

"Chapter 11 Cases": as defined in the recitals hereto.

"Charges":  as defined in Section 10.20.

"Chattel Paper":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as the context may require.

"Closing Date":  [●]May 2, 2023.

"Code":  the Internal Revenue Code of 1986, as amended from time to time (unless otherwise indicated).

"Collateral":  all the "Collateral" as defined in any Security Document and all other property that is subject to any Lien in favor of the Secured Parties and/or the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties to secure the Obligations pursuant to any Security Document.

"Collateral Agent":  [●]Jefferies Finance LLC, in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents and any of its successors and permitted assigns in such capacity in accordance with Section 9.9.

"Commitment":  as to any Lender, its Initial Term Commitment.

"Committed Loan Notice": a request by the Borrower in accordance with the terms of Section 2.2 and substantially in the form of Exhibit E or another form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent).

"Committed Reinvestment Amount": as defined in the definition of "Reinvestment Prepayment Amount".

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with any Loan Party within the meaning of Section 4001 of ERISA or is part of a group that includes any Loan Party and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"Company": as defined in the preamble hereto.

"Company Tax Sharing Agreement": the Tax Sharing Agreement, dated as of the Closing Date, among ~~Holdings~~RCP LLC, the Company, certain of its Subsidiaries, Revlon NewCo, Revlon Holdings and Mafco, as amended, supplemented or otherwise modified from time to time in accordance with the provisions of Section 7.15.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"Confidential Information": as defined in Section 10.14.

"Confirmation Order": [●].the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] which have been entered by the Bankruptcy Court on April 3, 2023.

"Conforming Changes" ~~means.~~: with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.21 and other technical, administrative or operational matters) that the Administrative Agent decides [in its reasonable discretion] may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides [in its reasonable discretion] that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines [in its reasonable discretion and in consultation with the Borrower] that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is

13

reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).[4]

"Consolidated Current Assets":  with respect to any Person at any date, in accordance with GAAP, the total consolidated current assets on a consolidated balance sheet of such Person and its Subsidiaries *less* any cash and Cash Equivalents.

"Consolidated Current Liabilities":  with respect to any Person at any date, in accordance with GAAP, the total current liabilities on a consolidated balance sheet of such Person and its Subsidiaries *less* any short-term borrowings and the current portion of any long-term Indebtedness.

["Consolidated EBITDA":  of any Person for any period, shall mean the Consolidated Net Income of such Person and its Subsidiaries for such period ***plus***, without duplication and, if applicable, except with respect to ~~clauses~~clause (f) and ~~(s~~n) of this definition, if applicable, to the extent deducted in calculating such Consolidated Net Income for such period, the sum of:

~~(a)~~ (a)  provisions for taxes based on income (or similar taxes in lieu of income taxes), profits, capital (or equivalents), including federal, foreign, state, local, franchise, excise and similar taxes and foreign withholding taxes paid or accrued during such period (including penalties and interest related to taxes or arising from tax examinations);

~~(b)~~ (b)  Consolidated Net Interest Expense and, to the extent not reflected in such Consolidated Net Interest Expense, any net losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk or foreign exchange rate risk, amortization or write-off of debt discount and debt issuance costs and commissions, premiums, discounts and other fees and charges associated with Indebtedness (including commitment, letter of credit and administrative fees and charges with respect to the Facilities, and the ABL Facility ~~[and the Foreign ABTL Facility]~~);

~~(c)~~ (c)  depreciation and amortization expense and impairment charges (including deferred financing fees, original issue discount, amortization of convertible notes and other convertible debt instruments, capitalized software expenditures, amortization of intangibles (including goodwill), organization costs and amortization of unrecognized prior service costs, and actuarial losses related to pensions, and other post-employment benefits);

~~(d)~~ (d)  subject to the Shared EBITDA Cap, all management, monitoring, consulting and advisory fees, and due diligence expense and other transaction fees and expenses and related expenses paid (or any accruals related to such fees or related expenses) (including by means of a dividend) during such period ~~up to an amount not to exceed $[10,000,000] in such period~~;

~~(e) Subject~~(e)  subject to the Shared EBITDA Cap, any extraordinary, unusual or non-recurring charges (including post-emergence ECIP and employee retention programs solely for the balance of calendar year 2023), expenses or losses (including (x) losses on the books of such Person in respect of sales of assets outside of the ordinary course of business that do not have a negative impact on cash flows for such periods, (y) restructuring and integration costs or reserves, including any retention and severance costs, costs associated with office and facility openings, closings and consolidations, relocation costs, contract termination costs, future lease commitments, excess pension charges and other non-recurring

---

[4] ~~NTD: Subject to Agent review.~~

business optimization expenses and legal and settlement costs, and (z) any expenses in connection with the Transactions);

(f)   any other non-cash expenses or losses (other than the accrual of expenses in the ordinary course) including non-cash stock compensation expense, but excluding any such items (i) in respect of which cash was paid in a prior period or will be paid in a future period or (ii) which represent the reversal in such period of any accrual of, or reserve for, anticipated cash charges in any prior period where such accrual or reserve is no longer required, all as determined on a consolidated basis;

(f) to the extent covered by insurance and actually reimbursed, or, so long as such person has made a determination that there exists reasonable evidence that such amount will in fact be reimbursed by the insurer and only to the extent that such amount is (x) not denied by the applicable carrier in writing within 180 days and (y) in fact reimbursed within 365 days following the date of such evidence (with a deduction for any amount so added back to the extent not so reimbursed within such 365 days), expenses with respect to liability or casualty events or business interruption;

(g) [reserved];

(h) (g)   subject to the Shared EBITDA Cap, transaction costs, fees and expenses (other than in respect of the Transactions) (in each case whether or not any transaction is actually consummated) (including those with respect to any amendments or waivers of the Loan Documents, or the ABL Documents [or the Foreign ABTL Documents], and those payable in connection with the sale of Capital Stock, recapitalization, the incurrence of Indebtedness permitted by Section 7.27.2, transactions permitted by Section 7.47.4, Dispositions permitted by Section 7.57.5, or any Permitted Acquisition or other Investment permitted by Section 7.77.7);

(i) (h)   accruals and reserves that are established or adjusted within twelve months after the Closing Date and that are so required to be established or adjusted in accordance with GAAP or as a result of adoption or modification of accounting policies;

(j) (i)   subject to the Shared EBITDA Cap, all costs and expenses incurred in defending, settling and compromising any pending or threatened litigation claim, action or legal dispute up to an amount not to exceed $[15,000,000] in such period;

(k) (j)   subject to the Shared EBITDA Cap, charges, losses, lost profits, expenses or write-offs to the extent indemnified or insured by a third party, including expenses covered by indemnification provisions in any Qualified Contract or any agreement in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment permitted by Section 7.77.7, in each case, to the extent that coverage has not been denied (other than any such denial that is being contested by the Borrower and/or its Subsidiaries in good faith) and so long as such amounts are actually reimbursed to such Person and its Subsidiaries in cash within one yearsix months after the related amount is first added to Consolidated EBITDA pursuant to this clause (kj) (and to the extent not so reimbursed within one yearsix months, such amount not reimbursed shall be deducted from Consolidated EBITDA during the next measurement period); it being understood that such amount may subsequently be included in Consolidated EBITDA in a measurement period to the extent of amounts actually reimbursed;

(l) costs of surety bonds of such Person and its Subsidiaries in connection with financing activities;

15

(m) costs associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith;

(n) (k)  any fees, expenses and other transaction costs (whether or not such transactions were consummated) set forth on Schedule 1.1A which are incurred through [●], 202[●]the Closing Date in connection with fresh start accounting, the Chapter 11 Cases, the Transactions, the Restructuring Plan and the transactions contemplated thereby, and any additional amounts in respect of any such fees, expenses and other transaction costs as may be mutually determined and agreed in good faith by and between the Borrower and the administrative agent in respect of the ABL Facility;

(o) earn-out, contingent compensation and similar obligations incurred in connection with any acquisition or other investment and paid (if not previously accrued) or accrued;

(p) (l)  net realized losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized losses from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized gains from related Hedge Agreements);

(q) subject to the Shared EBITDA Cap, costs, charges, accruals, reserves or expenses attributable to cost savings initiatives, operating expense reductions, transition, opening and pre-opening expenses, business optimization, management changes, restructurings and integrations (including inventory optimization programs, software and other intellectual property development costs, costs related to the closure or consolidation of facilities and curtailments, costs related to entry into new markets, consulting fees, signing costs, retention or completion bonuses, relocation expenses, severance payments, and modifications to pension and post-retirement employee benefit plans, new systems design and implementation costs and project startup costs) or other fees relating to any of the foregoing;

(r) (m)  (i) any net realized loss resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized loss resulting in such period from currency translation losses related to currency re-measurements of Indebtedness and (iii) the amount of loss resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(s) cash receipts (or any netting arrangements resulting in reduced cash expenses) not included in Consolidated EBITDA in any period to the extent non-cash gains relating to such receipts were deducted in the calculation of Consolidated EBITDA pursuant to the below for any previous period and not added back;

(n)  the amount of expected cost savings and other operating improvements and synergies reasonably identifiable and reasonably supportable (as determined by the Borrower or any Restricted Subsidiary in good faith) to be realized as a result of the Transactions, any acquisition or Disposition (including the termination or discontinuance of activities constituting such business), any Investment, operating expense reductions, operating improvements, restructurings, cost savings initiatives, operational changes or similar initiatives or transactions (including resulting from any head count reduction or closure of facilities) taken or committed to be taken during such (or any prior) period (in each case calculated on a pro forma basis as though such cost savings and other operating expense reductions, operating improvements and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions to the extent already

16

included in the Consolidated Net Income for such period; provided, that (i) (A) such cost savings, operating improvements and synergies are reasonably anticipated to result from such actions and (B) actions resulting in such operating expense reductions or other operating improvements, synergies or cost savings are reasonably anticipated to have commenced within 18 months and (ii) no cost savings shall be added pursuant to this clause (n) to the extent already included in clause (e) above with respect to such period;

*minus*, to the extent reflected as income or a gain in the statement of such Consolidated Net Income for such period, the sum, without duplication, of:

(A)    the amount of cash received in such period in respect of any non-cash income or gain in a prior period (to the extent such non-cash income or gain previously increased Consolidated Net Income in a prior period);

(B)    net realized gains relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized gains from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized losses from related Hedge Agreements);

(C)    (i) any net realized gain resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized gain resulting in such period from currency translation gains related to currency re-measurements of Indebtedness and (iii) the amount of gain resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(D)    any (i) extraordinary, unusual or non-recurring income or gains (including gains on sales of assets outside of the ordinary course of business) and (ii) actuarial gains~~;~~).

~~provided, that for purposes of calculating Consolidated EBITDA of the Borrower and its Subsidiaries for any period, the Consolidated EBITDA of any Person or Properties constituting a division or line of business of any business entity, division or line of business, in each case, acquired by Holdings, the Borrower or any of the Subsidiaries during such period and assuming any synergies and other operating improvements to the extent determined by the Borrower in good faith to be reasonably anticipated to be realizable within 12 months following such acquisition, or of any Subsidiary designated as a Subsidiary during such Period, shall be included on a pro forma basis for such period (but assuming the consummation of such acquisition or such designation, as the case may be, occurred on the first day of such period) subject to the Shared EBITDA Cap.~~ With respect to each joint venture or minority investee of the Borrower or any of its Subsidiaries, for purposes of calculating Consolidated EBITDA, the amount of EBITDA (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes (without duplication of amounts already included in Consolidated Net Income) shall equal the product of (x) the Borrower's or such Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) the EBITDA (calculated in accordance with this definition) of such joint venture or minority investee, in each case to the extent such Borrower or Subsidiary actually receives any such dividends, return of capital or similar distributions during such period and not in excess thereof.

Unless otherwise qualified, all references to "Consolidated EBITDA" in this Agreement shall refer to Consolidated EBITDA of the Borrower.[5]

~~"Consolidated Net First Lien Leverage": at any date, (a) the aggregate principal amount of all senior secured Funded Debt of the Borrower and its Subsidiaries on such date that is secured by a lien on the Collateral (unless the lien securing such Funded Debt is junior or subordinated to the liens of both the Lenders and the lenders under the ABL Facility Agreement), minus (b) Unrestricted Cash of the Loan Parties on such date, in each case determined on a consolidated basis in accordance with GAAP.~~

Notwithstanding anything to the contrary in the Loan Documents, for purposes of calculating Consolidated EBITDA for any Test Period that includes any of the fiscal quarters ending on the dates set forth in the table below, Consolidated EBITDA for such fiscal quarter shall be as set forth on such table (such amounts, the "Historical EBITDA Amounts"):

| Fiscal Quarter Ending | Consolidated EBITDA |
|---|---|
| September 30, 2022 | $50,400,000 |
| December 31, 2022 | $101,200,000 |
| March 31, 2023 | 77,000,000, as such amount shall be updated as mutually agreed in good faith by and between the Borrower and the administrative agent in respect of the ABL Facility |

~~"Consolidated Net First Lien Leverage Ratio": as of any date of determination, the ratio of (a) Consolidated Net First Lien Leverage on such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently ended Test Period.~~

"Consolidated Net Income": of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided, that in calculating Consolidated Net Income of the Borrower and its consolidated Subsidiaries for any period:

(a)    the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary or is merged into, amalgamated or consolidated with the Borrower or any of its Subsidiaries shall be excluded;

(b)    the income (or loss) of any Person that is not a subsidiary of such Person, or that is accounted for by the equity method of accounting shall be excluded, except to the extent of dividends, return of capital or similar distributions actually received by such Person or its Subsidiaries (which dividends, return of capital and distributions shall be included in the calculation of Consolidated Net Income);

(c)    (i) any net unrealized gains and losses resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments) and (ii) any net unrealized gains and losses resulting in such period from currency translation losses (or similar charges) related to currency

---

re-measurements of Indebtedness or other liabilities or from currency fluctuations, in each case shall be excluded;

(d)    any net unrealized gains and losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net unrealized gain and losses from exchange rate fluctuations on intercompany balances and balance sheet items) shall be excluded;

(e)    the cumulative effect of a change in accounting principles during such period shall be excluded;

(f)    non-cash interest expense resulting from the application of Accounting Standards Codification Topic 470-20 "Debt—Debt with Conversion Options—Recognition" shall be excluded;

(g)    any charges resulting from the application of FASB ASC 805 "Business Combinations," FASB ASC 350 "Intangibles—Goodwill and Other," FASB ASC 360-10-35-15 "Impairment or Disposal of Long-Lived Assets," FASB ASC 480-10-25-4 "Distinguishing Liabilities from Equity—Overall—Recognition" or FASB ASC 820 "Fair Value Measurements and Disclosures" shall be excluded;

(h)    effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such person and its subsidiaries) in component amounts required or permitted by GAAP, resulting from the application of purchase accounting or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(i)    any income (or loss) for such period attributable to the early extinguishment or buy-back of indebtedness, Hedge Agreements or other derivative instruments shall be excluded;

(j)    any non-cash charges for deferred tax asset valuation allowances shall be excluded;

(k)    any other non-cash charges (including goodwill or asset impairment charges), expenses or losses, including write-offs and write-downs (including in respect of unamortized debt issuance costs and deferred financing fees) and any non-cash cost related to the termination of any employee pension benefit plan (except to the extent such charges, expenses or losses represent an accrual of or reserve for cash expenses in any future period or an amortization of a prepaid cash expense paid in a prior period) shall be excluded;

(l)    non-cash stock-based and other equity-based compensation expenses (including those realized or resulting from stock option plans, employee benefit plans, post-employment benefit plans, grants of sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights) shall be excluded;

(m)    the Transaction Costs shall be excluded;

(n)    any losses in respect of equity earnings for such period (other than in respect of losses from equity in affiliates) shall be excluded; and

(o)    the consolidated net income (or loss) of any Person or Properties constituting a division or line of business of any business entity, division or line of business or fixed asset, in

19

each case, Disposed of, abandoned, closed or discontinued by Holdings, the Borrower or any of the Subsidiaries during such period other than in the ordinary course of business, shall be excluded for such period (assuming the consummation of such Disposition or such designation, as the case may be, occurred on the first day of such period).

Unless otherwise qualified, all references to "Consolidated Net Income" in this Agreement shall refer to Consolidated Net Income of the Borrower.

"Consolidated Net Interest Expense":  of any Person for any period, (a) the sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries, plus (ii) all cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Capital Stock of such Person made during such period, minus (b) the sum of (i) total cash interest income of such Person and its Subsidiaries for such period (excluding any interest income earned on receivables due from customers), in each case determined in accordance with GAAP, plus (ii) any one time financing fees (to the extent included in such Person's consolidated interest expense for such period), including, with respect to the Borrower, those paid in connection with the Loan Documents or in connection with any amendment thereof.  Unless otherwise qualified, all references to "Consolidated Net Interest Expense" in this Agreement shall refer to Consolidated Net Interest Expense of the Borrower and its Subsidiaries.  For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments actually made or received by the Borrower or any Subsidiary with respect to interest rate Hedge Agreements.

"Consolidated Net Secured Leverage": at any date, (a) the aggregate principal amount of all senior secured Funded Debt of the Borrower and its Subsidiaries on such date, minus (b) Unrestricted Cash of the Loan Parties on such date, in each case determined on a consolidated basis in accordance with GAAP.

"Consolidated Net Secured Leverage Ratio": as of any date of determination, the ratio of (a) Consolidated Net Secured Leverage on such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently ended Test Period.

"Consolidated Net Total Leverage":  at any date, (a) the aggregate principal amount of all Funded Debt of the Borrower and its Subsidiaries on such date, minus (b) Unrestricted Cash of the Loan Parties on such date, in each case determined on a consolidated basis in accordance with GAAP.

"Consolidated Net Total Leverage Ratio":  as of any date of determination, the ratio of (a) Consolidated Net Total Leverage on such date to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently ended Test Period.

"Consolidated Total Assets": at any date, the total assets of the Borrower and its Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower and its Subsidiaries for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to Section 6.1, or prior to the first such delivery, delivered under Section 5.1(r), determined on a pro forma basis.

"Consolidated Working Capital":  at any date, the difference of (a) Consolidated Current Assets on such date minus (b) Consolidated Current Liabilities on such date; provided, that, for purposes of calculating Excess Cash Flow, increases or decreases in Consolidated Working Capital shall be calculated without regard to changes in the working capital balance as a result of non-cash increases or decreases thereof that will not result in future cash payments or receipts or cash payments or receipts in

20

any previous period, in each case, including any changes in Consolidated Current Assets or Consolidated Current Liabilities as a result of (i) any reclassification in accordance with GAAP of assets or liabilities, as applicable, between current and noncurrent, (ii) the effects of purchase accounting and (iii) the effect of fluctuations in the amount of accrued or contingent obligations, assets or liabilities under Hedge Agreements.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Corresponding Tenor": with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"Daily Simple SOFR": for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"Debt Fund Affiliate" ~~means~~:  any Affiliate of a Person that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which such Person does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such Affiliate.

"Debtor Relief Laws": the Bankruptcy Code of the United States of America, the Insolvency Act 1986 (UK) (as amended), and all other liquidation, monitorship, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, restructuring plan, voluntary arrangement, administration or similar debtor relief laws of the United States, the United Kingdom or other applicable jurisdictions from time to time in effect, including Canadian Bankruptcy and Insolvency Laws.

"Debtors": as defined in the recitals hereto.

"Declined Amount":  as defined in Section 2.12(f).

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender": any Lender that (a) has failed, within two (2) Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans or (ii) pay over to any Loan Party any other amount required to be paid by it hereunder, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (b) has notified the Administrative Agent or the Borrower in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on

21

such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after request by the Administrative Agent or the Borrower, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans under this Agreement, unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable Default or Event of Default, shall be specifically identified in such writing) has not been satisfied; *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon the Administrative Agent's or the Borrower's, as applicable, receipt of such certification in form and substance satisfactory to the Borrower or the Administrative Agent, as applicable, or (d) has become, or is a direct or indirect Subsidiary of any Person that is, the subject of (i) a Bail-In Action or (ii) a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business or assets appointed for it, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such capacity, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment; *provided* that, none of the foregoing events or circumstances under this clause (ii) shall result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of the foregoing clauses shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender.

"<u>Designated Jurisdiction</u>": any country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Iran, Syria, Cuba, North Korea, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, and the Crimea and non-government controlled areas of the Zaporizhzhia and Kherson regions of Ukraine).

"<u>Designated Non-cash Consideration</u>": the Fair Market Value of non-cash consideration received by the Borrower or one of its Subsidiaries in connection with a Disposition that is so designated as Designated Non-cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation, less the amount of cash and Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration within 180 days of receipt thereof.

"<u>Designation Date</u>": as defined in <u>Section 2.26(f)</u>.

"<u>Disclosure Statement Date</u>": the date of approval by the Bankruptcy Court of the disclosure statement delivered in connection with the Restructuring Plan, which date is September 20, 2022.

"<u>Discount Range</u>": as defined in the definition of "Dutch Auction".

"<u>Disinterested Director</u>": as defined in <u>Section 7.9</u>.

"<u>Disposition</u>":  with respect to any Property, any sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer, exclusive license or other disposition thereof, in each case, to the extent the same constitutes a complete sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer or other disposition, as applicable.  The terms "<u>Dispose</u>" and "<u>Disposed of</u>" shall have correlative meanings.

"<u>Disqualified Capital Stock</u>":  Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Capital Stock), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of each of <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u>, prior to the date that is 91 days after the Latest Maturity Date in effect on the date such Capital Stock is issued (other than (i) upon payment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) or (ii) upon a "change in control"; <u>provided</u>, that any payment required pursuant to this <u>clause (ii)</u> is subject to the prior repayment in full of the Obligations (other than indemnification and other contingent obligations not yet due and owing) that are then accrued and payable and the termination of the Commitments); <u>provided</u>, <u>further</u>, <u>however</u>, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of Holdings, the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings, the Borrower or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"<u>Disqualified Institution</u>":  (i) those institutions identified by the Borrower in writing to the Administrative Agent prior to the Closing Date and (ii) business competitors of Holdings and its Subsidiaries identified by Borrower in writing to the Administrative Agent from time to time and, in the case of <u>clauses (i)</u> and <u>(ii)</u> any known Affiliates readily identifiable by name (other than, in the case of clause <u>clause</u> (ii), any Debt Fund Affiliates).  A list of the Disqualified Institutions will be posted by the Administrative Agent on the Platform and available for inspection by all Lenders.  Any designation of Disqualified Institutions by the Borrower at any time after the Closing Date in accordance with the foregoing shall not apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Facility.

"<u>Do not have Unreasonably Small Capital</u>": the Borrower and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern for the period from the Closing Date through the Latest Maturity Date.

"<u>Dollars</u>" and "<u>$</u>":  dollars in lawful currency of the United States.

"<u>Domestic Subsidiary</u>":  any direct or indirect Subsidiary that (i) is organized under the laws of any jurisdiction within the United States and (ii) is not a direct or indirect Subsidiary of a Foreign Subsidiary; <u>provided</u> that, for all purposes of this Agreement and the other Loan Documents, each BrandCo Entity shall be treated as a Domestic Subsidiary (unless such BrandCo Entity ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"<u>Dutch Auction</u>": an auction whereby any Lender may, at any time, assign all or a portion of its Term Loans on a non-pro rata basis to Holdings or one of its Subsidiaries (the "<u>Auction</u>

23

Offeror") in accordance with the procedures set forth below or such other procedures as may be agreed between the Administrative Agent and the Borrower from time to time, pursuant to an offer made available to all Lenders on a pro rata basis, subject to the limitations set forth in Section 10.6(h):

(a)      Notice Procedures.  In connection with each Dutch Auction, the Auction Offeror will notify the Auction Manager (for distribution to the Lenders) of the Term Loans that will be the subject of the Dutch Auction by delivering to the Auction Manager a written notice in form and substance reasonably satisfactory to the Auction Manager (an "Auction Notice"). Each Auction Notice shall contain (i) the maximum principal amount of Term Loans the Auction Offeror is willing to purchase (by assignment) in the Dutch Auction (the "Auction Amount"), which shall be no less than $10,000,000 or an integral multiple of $1,000,0000 in excess of thereof, (ii) the range of discounts to par (the "Discount Range"), expressed as a range of prices per $1,000 of Term Loans, at which the Auction Offeror would be willing to purchase Term Loans in the Dutch Auction and (iii) the date on which the Dutch Auction will conclude, on which date Return Bids (as defined below) will be due at the time provided in the Auction Notice (such time, the "Expiration Time"), as such date and time may be extended upon notice by the Auction Offeror to the Auction Manager not less than 24 hours before the original Expiration Time. The Auction Manager will deliver a copy of the auction procedures documentation (the "Offer Documents") for such Dutch Auction to each Lender promptly following completion thereof.

(b)      Reply Procedures.  In connection with any Dutch Auction, each Lender holding Term Loans wishing to participate in such Dutch Auction shall, prior to the Expiration Time, provide the Auction Manager with a notice of participation in form and substance reasonably satisfactory to the Auction Manager (the "Return Bid") to be included in the Offer Documents, which shall specify (i) a discount to par that must be expressed as a price per $1,000 of Term Loans (the "Reply Price") within the Discount Range and (ii) the principal amount of Term Loans, in an amount not less than $2,000,000, that such Lender is willing to offer for sale at its Reply Price (the "Reply Amount"); provided that each Lender may submit a Reply Amount that is less than the minimum amount and incremental amount requirements described above only if the Reply Amount equals the entire amount of the Term Loans held by such Lender at such time. A Lender may only submit one Return Bid per Dutch Auction, but each Return Bid may contain up to three component bids (or such other amount as may be determined by the Auction Manager), each of which may result in a separate Qualifying Bid (as defined below) and each of which will not be contingent on any other component bid submitted by such Lender resulting in a Qualifying Bid.  In addition to the Return Bid, a participating Lender must execute and deliver, to be held by the Auction Manager, an assignment and acceptance in the form included in the Offer Documents which shall be in form and substance reasonably satisfactory to the Auction Manager (the "Auction Assignment and Acceptance").  The Auction Offeror will not purchase any Term Loans at a price that is outside of the applicable Discount Range, nor will any Return Bids (including any component bids specified therein) submitted at a price that is outside such applicable Discount Range be considered in any calculation of the Applicable Threshold Price (as defined below).

(c)      Acceptance Procedures.  Based on the Reply Prices and Reply Amounts received by the Auction Manager, the Auction Manager, in consultation with the Auction Offeror, will calculate the lowest purchase price (the "Applicable Threshold Price") for the Dutch Auction within the Discount Range for the Dutch Auction that will allow the Auction Offeror to complete the Dutch Auction by purchasing the full Auction Amount (or such lesser amount of Term Loans for which the Auction Manager has received Qualifying Bids).  If the Applicable Threshold Price is not equal to the lowest Reply Price received pursuant to the Return Bids, the Auction Offeror

24

shall be entitled, at its election, to either (i) complete the Dutch Auction at the Applicable Threshold Price or (ii) withdraw the Dutch Auction. In the case of <u>clause (i)</u> above, the Auction Offeror shall purchase (by assignment) Term Loans from each Lender whose Return Bid is within the Discount Range and contains a Reply Price that is equal to or less than the Applicable Threshold Price (each, a "<u>Qualifying Bid</u>"). All Term Loans included in Qualifying Bids received at a Reply Price lower than the Applicable Threshold Price will be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration. If a Lender has submitted a Return Bid containing multiple component bids at different Reply Prices, then all Term Loans of such Lender offered in any such component bid that constitutes a Qualifying Bid with a Reply Price lower than the Applicable Threshold Price shall also be purchased at a purchase price equal to the applicable Reply Price and shall not be subject to proration.

(d)    <u>Proration Procedures</u>. In the case of <u>clause (c)(i)</u> above, all Term Loans offered in Return Bids (or, if applicable, any component bid thereof) constituting Qualifying Bids equal to the Applicable Threshold Price will be purchased at a purchase price equal to the Applicable Threshold Price; *provided* that if the aggregate principal amount of all Term Loans for which Qualifying Bids have been submitted in any given Dutch Auction equal to the Applicable Threshold Price would exceed the remaining portion of the Auction Amount (after deducting all Term Loans purchased below the Applicable Threshold Price), the Borrower shall purchase the Term Loans for which the Qualifying Bids submitted were at the Applicable Threshold Price ratably based on the respective principal amounts offered and in an aggregate amount up to the amount necessary to complete the purchase of the Auction Amount. For the avoidance of doubt, no Return Bids (or any component thereof) will be accepted above the Applicable Threshold Price.

(e)    <u>Notification Procedures</u>. The Auction Manager will calculate the Applicable Threshold Price no later than the third Business Day after the date that the Return Bids were due. The Auction Manager will insert the amount of Term Loans to be assigned and the applicable settlement date determined by the Auction Manager in consultation with the Auction Offeror onto each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid. Upon written request of the submitting Lender, the Auction Manager will promptly return any Auction Assignment and Acceptance received in connection with a Return Bid that is not a Qualifying Bid.

(f)    <u>Additional Procedures</u>.

(i)    Once initiated by an Auction Notice, the Auction Offeror may withdraw a Dutch Auction by written notice to the Auction Manager (x) in the circumstances described in <u>clause (c)(i)</u> above or (y) no later than 24 hours before the original Expiration Time so long as no Qualifying Bids have been received by the Auction Manager at or prior to the time the Auction Manager receives such written notice from the Auction Offeror. Any Return Bid (including any component bid thereof) delivered to the Auction Manager may not be modified, revoked, terminated or cancelled; *provided* that a Lender may modify a Return Bid at any time prior to the Expiration Time solely to reduce the Reply Price included in such Return Bid. However, a Dutch Auction shall become void if the Auction Offeror fails to satisfy one or more of the conditions to the purchase of Term Loans set forth in, or to otherwise comply with the provisions of <u>Section 10.6</u> of this Agreement.  The purchase price for all Term Loans purchased in a Dutch Auction shall be paid in cash by the Auction Offeror directly to the respective assigning Lender on a settlement date as determined by the Auction Manager in

25

consultation with the Auction Offeror (which shall be no later than ten (10) Business Days after the date Return Bids are due), along with accrued and unpaid interest (if any) on the applicable Term Loans up to the settlement date. The Auction Offeror shall execute each applicable Auction Assignment and Acceptance received in connection with a Qualifying Bid.

(ii)    All questions as to the form of documents and validity and eligibility of Term Loans that are the subject of a Dutch Auction will be determined by the Auction Manager, in consultation with the Auction Offeror, and the Auction Manager's determination will be conclusive, absent manifest error. The Auction Manager's interpretation of the terms and conditions of the Offer Document, in consultation with the Auction Offeror, will be final and binding.

(iii)    None of the Auction Manager, any other Agent or any of their respective Affiliates assumes any responsibility for the accuracy or completeness of the information concerning Holdings, its Subsidiaries or any of their Affiliates contained in the Offer Documents or otherwise or for any failure to disclose events that may have occurred and may affect the significance or accuracy of such information.

(iv)    The Auction Manager acting in its capacity as such under a Dutch Auction shall be entitled to the benefits of the provisions of Section 9 and Section 10.5 of this Agreement to the same extent as if each reference therein to the "Loan Documents" were a reference to the Offer Documents, the Auction Notice and Auction Assignment and Acceptance and each reference therein to the "Transactions" were a reference to the transactions contemplated hereby.

(v)    The procedures listed in clauses (a) through (f) above shall not require Holdings or any of its Subsidiaries to initiate any Dutch Auction, nor shall any Lender be obligated to participate in any Dutch Auction.

"EEA Financial Institution": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environmental Laws":  any and all laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including principles of common law) of any international authority, foreign government, the United States, or any state, provincial, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, the preservation or protection of the environment, natural resources or human health and safety (as related to

Releases of or exposure to Materials of Environmental Concern), as have been, are now, or at any time hereafter are, in effect.

"Environmental Liability":  any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, to the extent arising from or relating to:  (a) non-compliance with any Environmental Law or any permit, license or other approval required thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release or threatened Release of any Materials of Environmental Concern, (e) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (f) any contract, agreement or other consensual arrangement pursuant to which any Environmental Liability under clause (a) through (e) above is assumed or imposed.

"Equity Issuance":  any issuance by the Borrower or any Subsidiary of its Capital Stock in a public or private offering.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Escrow Agent": Delaware Trust Company, in its capacity as Escrow Agent.

"Escrow Agreement":  the Escrow Agreement, dated as of April 27, 2023 by and among the Borrower, each of the depositors party thereto and Delaware Trust Company as Escrow Agent.

"Escrow Entity":  any direct or indirect Subsidiary of the Borrower formed solely for the purposes of issuing any bonds, notes, term loans, debentures or other debt.

"EU Bail-In Legislation Schedule": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default":  any of the events specified in Section 8.1; provided, that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow":  for any Excess Cash Flow Period of the Borrower, an amount (not less than zero) equal to the amount by which, if any:

(a)    the sum, without duplication, of:

(i)    Consolidated Net Income of the Borrower for such Excess Cash Flow Period;

(ii)    the amount of all non-cash charges (including depreciation, amortization, deferred tax expense and equity compensation expenses) deducted in arriving at such Consolidated Net Income;

(iii)    the amount of the decrease, if any, in Consolidated Working Capital for such Excess Cash Flow Period (excluding any decrease in Consolidated Working Capital

27

relating to leasehold improvements for which the Borrower or any of its Subsidiaries is reimbursed in cash or receives a credit);

(iv)    the aggregate net amount of non-cash loss on the Disposition of Property by the Borrower and its Subsidiaries during such Excess Cash Flow Period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income; and

(v)    to the extent not otherwise included in determining Consolidated Net Income, the aggregate amount of cash receipts for such period attributable to Hedge Agreements or other derivative instruments;

exceeds

(b)    the sum, without duplication (including, in the case of clauses (ii) and (viii) below, duplication across periods (provided, that all or any portion of the amounts referred to in clauses (ii) and (viii) below with respect to a period may be applied in the determination of Excess Cash Flow for any subsequent period to the extent such amounts did not previously result in a reduction of Excess Cash Flow in any prior period)) of:

(i)    the amount of all non-cash gains or credits to the extent included in arriving at such Consolidated Net Income (including credits included in the calculation of deferred tax assets and liabilities) and cash charges to the extent excluded from Consolidated Net Income pursuant to the last sentence thereof;

(ii)    the aggregate amount (A) actually paid by the Borrower and its Subsidiaries in cash during such Excess Cash Flow Period (or, at the Borrower's election, after such Excess Cash Flow Period but prior to the time of determination of Excess Cash Flow for such Excess Cash Flow Period, and excluding any amounts paid during such Excess Cash Flow Period which the Borrower elected to apply to the calculation in a prior Excess Cash Flow Period) on account of Capital Expenditures and Permitted Acquisitions and (B) committed during such Excess Cash Flow Period to be used to make Capital Expenditures or Permitted Acquisitions which in either case have been actually made or consummated or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such Excess Cash Flow Period (in each case under this clause (ii) other than to the extent any such Capital Expenditure or Permitted Acquisition is made (or, in the case of the preceding clause (B), is expected at the time of determination to be made) with the proceeds of new long-term Indebtedness or an Equity Issuance or with the proceeds of any Reinvestment Deferred Amount), in each case to the extent not already deducted from Consolidated Net Income;

(iii)    the aggregate amount of all regularly scheduled principal payments and all prepayments of Indebtedness (including the Term Loans) of the Borrower and its Subsidiaries made during such Excess Cash Flow Period and, at the option of the Borrower, all prepayments of Indebtedness made (or committed to be made by irrevocable written notice) after such Excess Cash Flow Period but prior to the time of determination of Excess Cash Flow for the applicable Excess Cash Flow Period, and excluding any amounts paid during such Excess Cash Flow Period which the Borrower elected to apply to the calculation in a prior Excess Cash Flow Period (other than, in each case, (x) in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder, (y) to the extent any such

28

prepayments are the result of the incurrence of additional indebtedness and (z) optional prepayments of the Term Loans and optional prepayments of ABL Loans to the extent not accompanied by permanent optional reductions of the applicable commitments);

(iv)    the amount of the increase, if any, in Consolidated Working Capital for such Excess Cash Flow Period (excluding any increase in Consolidated Working Capital relating to leasehold improvements for which the Borrower or any of its Subsidiaries is reimbursed in cash or receives a credit);

(v)    the aggregate net amount of non-cash gain on the Disposition of Property by the Borrower and its Subsidiaries during such Excess Cash Flow Period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income;

(vi)    Transaction Costs and fees and expenses incurred in connection with any Permitted Acquisition or Investment permitted by Section 7.7, any Equity Issuance, any incurrence of Indebtedness permitted by Section 7.2, any Restricted Payment permitted by Section 7.6 and any Disposition permitted by Section 7.5 (in each case, whether or not consummated), in each case to the extent not already deducted from Consolidated Net Income;

(vii)    purchase price adjustments and earnouts paid, in each case to the extent not already deducted from Consolidated Net Income, or received, in each case to the extent not already included in arriving at Consolidated Net Income, in connection with any acquisition or Investment consummated prior to the Closing Date, any Permitted Acquisition or any other acquisition or Investment permitted under Section 7.7;

(viii)    (A) the net amount of Permitted Acquisitions and Investments made in cash during such period pursuant to paragraphs (a)(ii), (a)(iii), (d), (f), (k), (l), (v), (x) and (hh) of Section 7.7 (to the extent, in the case of clause (x), such Investment relates to Restricted Payments permitted under Section 7.6(c)(ii), (e), (f)(iii) or (h)) or, at the option of the Borrower, committed during such period to be used to make Permitted Acquisitions and Investments pursuant to such paragraphs of Section 7.7 which have been actually made or for which a binding agreement exists as of the time of determination of Excess Cash Flow for such period (but excluding Investments among the Borrower and its Subsidiaries) and (B) permitted Restricted Payments made in cash or subject to a binding agreement (or, in the case of Restricted Payments described in Section 7.6(c)(i) or (c)(ii)(A), (B) or (C), reasonably expected to be paid in cash), in each case by the Borrower during such period and permitted Restricted Payments made by any Subsidiary to any Person other than the Borrower or any of the Subsidiaries during such period, in each case, to the extent permitted by Section 7.6(c)(i), (c)(ii), (e), (f)(iii) or (h), in each case to the extent not already deducted from Consolidated Net Income; provided, that the amount of Restricted Payments made pursuant to Section 7.6(e) and deducted pursuant to this clause (viii) shall not exceed $12,500,000 in any Excess Cash Flow Period;

(ix)    the amount (determined by the Borrower) of such Consolidated Net Income which is mandatorily prepaid or reinvested pursuant to Section 2.12(b) (or as to which a waiver of the requirements of such Section applicable thereto has been granted under Section 10.1) prior to the date of determination of Excess Cash Flow for such

Excess Cash Flow Period as a result of any Asset Sale or Recovery Event, in each case to the extent not already deducted from Consolidated Net Income;

(x)      (A) the aggregate amount of any premium or penalty actually paid in cash that is required to be made in connection with any prepayment of Indebtedness made (or committed to be made by irrevocable written notice) during the applicable Excess Cash Flow Period or, at the option of the Borrower, after the end of such Excess Cash Flow Period but prior to the time of calculation of Excess Cash Flow, in each case to the extent not already deducted from Consolidated Net Income and (B) to the extent included in determining Consolidated Net Income, the aggregate amount of any income (or loss) for such period attributable to the early extinguishment of Indebtedness, Hedge Agreements or other derivative instruments;

(xi)     cash payments by the Borrower and its Subsidiaries during such period in respect of long-term liabilities of the Borrower and its Subsidiaries other than Indebtedness, in each case to the extent not already deducted from Consolidated Net Income;

(xii)    the aggregate amount of (I) expenditures actually made by the Borrower and its Subsidiaries in cash during such period (including expenditures for the payment of financing fees), in each case, to the extent not deducted during a prior period and (II) expenditures committed during such Excess Cash Flow Period to be made for which a binding agreement exists as of the time of determination of Excess Cash Flow for such Excess Cash Flow Period, in each such case, to the extent that such expenditures are not expensed during such period and are not deducted in calculating Consolidated Net Income;

(xiii)   cash expenditures in respect of Hedge Agreements or other derivative instruments during such period to the extent not deducted in arriving at such Consolidated Net Income;

(xiv)    the amount of taxes (including penalties and interest) paid in cash in such period or tax reserves set aside or payable (without duplication) in such period to the extent they exceed the amount of tax expense deducted in determining Consolidated Net Income for such period, including the amount of any distributions pursuant to Sections 7.6(c)(i), (ii)(A), (B) and (C);

(xv)     the amount of cash payments made in respect of pensions and other post-employment benefits in such period, in each case to the extent not deducted in determining Consolidated Net Income;

(xvi)    payments made in respect of the minority equity interests of third parties in any non-wholly owned Subsidiary in such period, including pursuant to dividends declared or paid on Capital Stock held by third parties (or other distributions or return of capital) in respect of such non-wholly-owned Subsidiary, in each case to the extent not deducted in determining Consolidated Net Income;

(xvii)   the amount representing accrued expenses for cash payments (including with respect to retirement plan obligations) that are not paid in cash in such Excess Cash Flow Period, in each case to the extent not deducted in determining Consolidated Net Income; provided, that such amounts will be added to Excess Cash Flow for the

30

following fiscal year to the extent not paid in cash and deducted from Consolidated Net Income during such following fiscal year;

(xviii)  to the extent not otherwise deducted in calculating Consolidated Net Income, cash used to pay deferred acquisition consideration (including earn outs), except to the extent such cash is from proceeds of Indebtedness, Equity Issuances or other proceeds that would not be included in Consolidated Net Income; and

(xix)  the aggregate amounts of cash payments made during such fiscal year pursuant to any long term incentive plan of the Borrower or any of its Subsidiaries or any related agreement to the extent not otherwise deducted in calculating Consolidated Net Income.

"Excess Cash Flow Application Amount":  with respect to any Excess Cash Flow Period, the product of (a) 50% times (b) the Excess Cash Flow for such Excess Cash Flow Period.

"Excess Cash Flow Application Date":  as defined in Section 2.12(c).

"Excess Cash Flow Period":  each fiscal year of the Borrower beginning with the fiscal year ending December 31, 2024.

"Exchange Act": the Securities Exchange Act of 1934, as amended.

"Excluded Account": as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"Excluded Collateral":  as defined in Section 6.8(e); provided that the Borrower may designate in a written notice to the Administrative Agent any asset not to constitute "Excluded Collateral", whereupon the Borrower shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired.

"Excluded Contribution Amount": the aggregate amount of Net Cash Proceeds received by the Borrower from Equity Issuances (other than from any of its Subsidiaries or from Disqualified Capital Stock) or capital contributions after the Closing Date, minus the aggregate amount of (i) any Investments made pursuant to Section 7.7(dd) (net of any return of capital in respect of such Investment or deemed reduction in the amount of such Investment), (ii) any Restricted Payment made pursuant to Section 7.6(g) and (iii) any payments made pursuant to Section 7.8(a)(ii), in each case made during the period commencing on the Closing Date through and including the date of usage of such Excluded Contribution Amount in reliance thereon (without taking account of the intended usage of the Excluded Contribution Amount as of such date), designated as an Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which such Net Cash Proceeds are received by the Borrower, as the case may be, and which are excluded from the calculation of the Available Amount.

"Excluded Equity Securities": (i) to the extent applicable law requires that any Subsidiary issue directors' qualifying shares, such shares or nominee or other similar shares, (ii) Capital Stock of any first-tier Foreign Subsidiary or any Foreign Subsidiary Holding Company in excess of 66% of the voting Capital Stock of such entity, (iii) any Capital Stock of any Foreign Subsidiary that is not a first-tier Foreign Subsidiary, (iv) any Capital Stock in joint ventures or other entities in which the Loan Parties directly own 50% or less of the Capital Stock, and (v) [reserved] and (vi) any other Capital Stock

31

owned on or acquired after the Closing Date (other than Capital Stock in a wholly owned Subsidiary) in accordance with this Agreement but only in the case of this clause (viv) if, and to the extent that, and for so long as granting a security interest or other Liens therein would violate applicable law or regulation or a shareholder agreement or other Contractual Obligation (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable, and other applicable law) binding on such Capital Stock and not created in contemplation of such acquisition.

"Excluded Real Property":  (a) any Real Property that is subject to a Lien expressly permitted by Section 7.3(j) (solely to the extent that the Indebtedness secured by such Lien would prohibit a Lien on such Real Property to secure the Obligations) or Section 7.3(g) (solely to the extent securing Indebtedness under Sections 7.2(c) or 7.2(t)), (b) any Real Property with respect to which, in the reasonable judgment of the Borrower and the Administrative Agent, the cost of providing a mortgage on such Real Property in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom and, (c) the Melson Avenue Property and the New Jersey Property, unless either such property is subject to a Lien securing the ABL Facility, in which case such property shall not be Excluded Real Property, and (d) any Real Property to the extent providing a mortgage on such Real Property would (i) result in material adverse tax consequences to Holdings or the Borrower or any of its Subsidiaries as reasonably determined by the Borrower (provided, that any such designation of Real Property as Excluded Real Property shall be subject to the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed)), (ii) violate any applicable Requirement of Law, (iii) be prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code) to the extent such prohibition was not created in contemplation of a mortgage on such Real Property or (iv) give any other party (other than a Loan Party or a wholly-owned Subsidiary) to any contract, agreement, instrument or indenture governing such Real Property the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law) to the extent such right was not created in contemplation of a mortgage on such Real Property; provided that the Borrower may designate in a written notice to the Administrative Agent any Real Property not to constitute "Excluded Real Property", whereupon the Borrower shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired.

"Excluded Subsidiary": any Subsidiary (other than a BrandCo Entity) that is

(a)    [reserved],

(b)    not wholly owned directly by the Borrower or one or more of its wholly owned Subsidiaries,

(c)    an Immaterial Subsidiary,

(d)    a Foreign Subsidiary Holding Company,

(e)    established or created pursuant to Section 7.7(p) and meeting the requirements of the proviso thereto; provided, that such Subsidiary shall only be an Excluded Subsidiary for the period, as contemplated by Section 7.7(p),

(f)    a Subsidiary that is (i) prohibited by any applicable Requirement of Law from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities, or but only if, and to the extent that, and for so long as, such prohibition remains in effect and applicable to such Subsidiary, or (ii) which would require governmental (including regulatory)

32

consent, approval, license or authorization to provide a guarantee or grant any Lien unless, such consent, approval, license or authorization has been received, but only if, and to the extent that, and for so long as such consent, approval, license or authorization has not been received and continues to be required,

(g)    a Subsidiary that is prohibited from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities by any Contractual Obligation in existence on the Closing Date (or, in the case of any newly-acquired Subsidiary, in existence at the time of acquisition thereof but not entered into in contemplation thereof) and not created in contemplation of such guarantee, provided, that this clause (g) shall not be applicable if (1) the other party to such Contractual Obligation is a Loan Party or a wholly-owned Subsidiary of the Borrower or (2) consent has been obtained to provide such guarantee or such prohibition is otherwise no longer in effect,

(h)    a Subsidiary with respect to which a guarantee by it of, or granting a Lien on its assets to secure obligations in respect of, the Facilities could reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any related provision) to Holdings or the Borrower or any of its Subsidiaries, as reasonably determined in good faith by the Borrower in consultation with the Administrative Agent,

(i)    [reserved]a Permitted Joint Venture,

(j)    subject to the proviso below, any Foreign Subsidiary or any Domestic Subsidiary of a Foreign Subsidiary that is not a Subsidiary Guarantor as of the Closing Date,

(k)    [reserved]not-for-profit subsidiaries, or

(l)    any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences of guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom;

provided, that (x) if a Subsidiary executes the Guarantee and Collateral Agreement as a "Guarantor," then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guarantee and Collateral Agreement as a "Guarantor" in accordance with the terms hereof and thereof), (y) the Borrower may designate in a written notice to the Administrative Agent a Subsidiary not to constitute an "Excluded Subsidiary" whereupon such Subsidiary shall be obligated to comply with the applicable requirements of Section 6.8 as if it were newly acquired; provided further that no Loan Party that is a Loan Party on the Closing Date may be designated an Excluded Subsidiary and each such Loan Party shall remain a Guarantor hereunder unless all of its equity or all or substantially all of its assets is Disposed of in a Disposition permitted by Section 7.5 and (z) in no event shall any Subsidiary that (A) is a Subsidiary Guarantor as of the Closing Date (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder) or (B) is a guarantor under the ABL Facility constitute an "Excluded Subsidiary" under the Loan Documents. and no such Subsidiary may be designated an "Excluded Subsidiary" following the Closing Date and each such Subsidiary shall remain a Guarantor hereunder (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"Excluded Taxes": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (i) net income Taxes

(however denominated), net profits Taxes, franchise Taxes, and branch profits Taxes (and net worth Taxes and capital Taxes imposed in lieu of net income Taxes), in each case, (A) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, if such Recipient is a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (B) as a result of a present or former connection between such Recipient and the jurisdiction of the Governmental Authority imposing such Tax or any political subdivision or taxing authority thereof or therein (other than a connection arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document), (ii) any U.S. federal withholding Taxes (including backup withholding) imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Commitment or this Agreement pursuant to a law in effect on the date on which (A) such Recipient becomes a party to this Agreement (other than pursuant to an assignment requested by the Borrower under <u>Section 2.24</u>) or (B) if such Recipient is a Lender, such Lender changes its lending office, except in each case to the extent that, pursuant to <u>Section 2.20</u>, amounts with respect to such Taxes were payable either to such Recipient's assignor immediately before such Recipient became a party hereto or, if such Recipient is a Lender, to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with paragraphs (e) or (g), as applicable, of <u>Section 2.20</u> and (iv) any withholding Taxes imposed under FATCA.

"<u>Existing Loans</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Existing Tranche</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Expiration Time</u>":  as defined in the definition of "Dutch Auction".

"<u>Extended Loans</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Extended Tranche</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Extending Lender</u>":  as defined in <u>Section 2.26(b)</u>.

"<u>Extension</u>":  as defined in <u>Section 2.26(b)</u>.

"<u>Extension Amendment</u>":  as defined in <u>Section 2.26(c)</u>.

"<u>Extension Date</u>":  as defined in <u>Section 2.26(d)</u>.

"<u>Extension Election</u>":  as defined in <u>Section 2.26(b)</u>.

"<u>Extension Request</u>":  as defined in <u>Section 2.26(a)</u>.

"<u>Extension Series</u>":   all Extended Loans that are established pursuant to the same Extension Amendment (or any subsequent Extension Amendment to the extent such Extension Amendment expressly provides that the Extended Loans provided for therein are intended to be part of any previously established Extension Series) and that provide for the same interest margins and amortization schedule.

"<u>Extraordinary Receipts</u>":  an amount equal to (a) any cash payments or proceeds (including permitted Investments) received (directly or indirectly) by or on behalf of the Borrower or any

of its Subsidiaries not in the ordinary course of business (and other than consisting of Net Cash Proceeds from an Asset Sale or any Recovery Event or in connection with any issuance or sale of debt securities or instruments or the incurrence of Indebtedness) in respect of (i) pension plan reversions, (ii) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than receipts from settlements with customers and any portion thereof that represents out-of-pocket losses by the Borrower or any of its Subsidiaries), and (iii) indemnity payments to the extent such indemnity payments are not payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries and to the extent such proceeds exceed the loss, damages, fees, costs and expenses incurred by or actual remediation and replacement costs of the Borrower and its Subsidiaries in connection with any such matter and (v) [any purchase price adjustment received in connection with any purchase agreement to the extent not constituting Net Cash Proceeds], minus (b) any selling and settlement costs and out-of-pocket expenses (including reasonable broker's fees or commissions and legal fees) and any taxes paid or reasonably estimated to be payable by the Borrower or any of its Subsidiaries (after taking into account any tax credits or deductions actually realized by the Borrower or any of its Subsidiaries with respect to the transactions described in clause (a) of this definition) in connection with or as a result of the transactions described in clause (a) of this definition; [provided that no cash payment or proceeds calculated in accordance with the foregoing shall constitute Extraordinary Receipts in any fiscal year until the aggregate amount of all such cash payments and proceeds in such fiscal year shall exceed $[_____], together with the aggregate amount received by the Borrower or any of its Subsidiaries of all Net Cash Proceeds pursuant to clause (a) of the definition thereof in such fiscal year, $5,000,000 (with any amount below $5,000,000 in any fiscal year being carried forward to subsequent fiscal years) (and thereafter only such cash payments and proceeds in excess of such amount (including any amounts carried forward from prior fiscal years) shall constitute Extraordinary Receipts)].

"Extraordinary Receipts Trigger Date":  as defined in Section 2.12(d).

"Facility":  each of (a) the Initial Term Loans (the "Initial Term Facility") and (b) any Refinancing Term Loans of the same Tranche; it being understood that, as of the Closing Date, the only Facility is the Initial Term Facility (and the extensions of credit thereunder), and thereafter, the term "Facility" may include any other Tranche of Commitments and the extensions of credit thereunder.

"Fair Market Value":  with respect to any asset, Property (including any Capital Stock of any Person) or Investment, the fair market value thereof as determined in good faith by the Borrower, the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset; provided that with respect to any such asset determined to have a Fair Market Value in excess of (i) $[10,000,000], such Fair Market Value shall be determined in good faith by the board of directors or, pursuant to a specific delegation of authority by such board of directors or a designated senior executive officer, of the Borrower, or the Subsidiary of the Borrower which is selling or owns such asset and (ii) $[25,000,000], such Fair Market Value shall be determined by (x) a nationally recognized investment banking firm which determination shall be documented in a letter delivered to the Administrative Agent stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view or (y) a written valuation of such asset from a recognized independent third party appraiser reasonably acceptable to the Administrative Agent.

"Fair Value":  the amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements (together with any law implementing such agreements).

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; provided, that if the Federal Funds Effective Rate is less than zero, it shall be deemed to be zero hereunder for all instances.

"Fixed Basket":  as defined in Section 1.6.

"Fixed Basket Item or Event":  as defined in Section 1.6.

"Fixed Charge Coverage Ratio": as of any date of determination, the ratio of (a) Consolidated EBITDA of the Borrower and its Subsidiaries for the most recently ended Test Period to (b) Fixed Charges of the Borrower and its Subsidiaries for such Test Period.  In the event that the Borrower or any of its Subsidiaries incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness or issues or redeems Disqualified Capital Stock subsequent to the commencement of the period for which the Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Fixed Charge Coverage Ratio is being calculated, then the Fixed Charge Coverage Ratio will be calculated on a pro forma basis as if such incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness or issuance or redemption of Disqualified Capital Stock, and the use of the proceeds therefrom, had occurred at the beginning of the Test Period.

"Fixed Charges": for any Test Period, the sum of, without duplication, (a) Consolidated Net Interest Expense and (b) the product of (x) all dividend payments on any series of Disqualified Capital Stock of the Borrower paid, accrued or scheduled to be paid or accrued during the applicable Test Period, times (y) a fraction, the numerator of which is one and the denominator of which is one minus the then current effective consolidated federal, state and local tax rate of the Borrower expressed as a decimal.

"Floor": the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to any Benchmark. With respect to the Adjusted Term SOFR Rate, the "Floor" shall be 1.00%.

["Foreign ABTL Credit Agreement": the asset-based term loan credit agreement, dated as of [●], by and among [Revlon Finance LLC], as the borrower, the parent guarantors, borrowing base guarantors and other guarantors from time to time party thereto, the lenders from time to time party thereto and [●], as administrative agent and collateral agent, as amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.]

["Foreign ABTL Documents": the collective reference to the Foreign ABTL Credit Agreement and any other document, agreement and instrument executed and/or delivered in connection

therewith or relating thereto, together with any amendment, supplement, waiver, or other modification to any of the foregoing.]

["Foreign ABTL Facility": the asset based term loan credit facility made available to [Revlon Finance LLC] pursuant to the Foreign ABTL Credit Agreement, including, as the context may require, any extensions of credit made from time to time thereunder.]

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary in accordance with clause (i) of such definition and each direct or indirect Subsidiary of another Foreign Subsidiary; provided that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary.

"Foreign Subsidiary Holding Company": any Subsidiary of the Borrower which is a Domestic Subsidiary substantially all of the assets of which consist of the Capital Stock (or Capital Stock and Indebtedness) of one or more Foreign Subsidiaries; provided that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary Holding Company.

"Funded Debt":  with respect to any Person, (i) for purposes of the Consolidated Net First Lien Leverage Ratio and the Consolidated Net Secured Leverage Ratio, all Indebtedness of such Person of the types described in clauses (a), (b)(i) and (e) of the definition of "Indebtedness" or, to the extent related to Indebtedness of the types described in the preceding clauses (but without duplication), (d) of the definition of "Indebtedness", in each case, to the extent reflected as indebtedness on such Person's balance sheet and (ii) for purposes of the Consolidated Net Total Leverage Ratio, all Indebtedness of such Person of the types described in clauses (a), (b)(i), (e), (g)(ii), (h) or, to the extent related to Indebtedness of the types described in the preceding clauses (but without duplication), (d) of the definition of "Indebtedness", in each case, to the extent reflected as indebtedness on such Person's balance sheet.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Authority":  any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities exchange, any self-regulatory organization (including the National Association of Insurance Commissioners) and any supranational bodies (including the European Union and the European Central Bank).

"Guarantee": collectively, the guarantee made by the Guarantors under the Guarantee and Collateral Agreement in favor of the Secured Parties, together with each other guarantee delivered pursuant to Section 6.8.

"Guarantee and Collateral Agreement":  the Term Loan Guarantee and Collateral Agreement, dated as of the Closing Date, among Holdings, the Borrower, each Subsidiary Guarantor

37

from time to time party thereto and the Collateral Agent, substantially in the form of Exhibit A, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets or any Investment permitted under this Agreement.  The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

"Hedge Agreements":  all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by the Borrower or any Subsidiary; provided, that no phantom stock, deferred compensation or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of its Subsidiaries shall be a Hedge Agreement.

"Holdings": as defined in the introductory paragraph of this Agreement.

"Immaterial Subsidiary":  PPI Two Corporation, a Delaware corporation, and RML, LLC, a Delaware limited liability company.

"Incremental New Money Commitment Letter": that certain Backstop Commitment Letter, dated as of January 17, 2023, by and among Revlon Consumer Products Corporation, as the company, and the entities party thereto as Backstop Parties (as defined therein), as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms.

"Indebtedness": of any Person,  without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by (i) bonds (excluding surety bonds), debentures, notes or similar instruments, and (ii) surety bonds, (c) all obligations of such Person for the deferred purchase price of Property or services already received, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) [reserved], (g) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Agreement) and (ii) in respect of bankers' acceptances and (h) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock of such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; provided, that Indebtedness shall not include (A) trade and other payables, accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out and other contingent obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (E) obligations owing under any Hedge Agreements or in respect of Cash Management Obligations.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof (or provides for reimbursement to such Person).

"Indebtedness for Borrowed Money":  (a) to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments and (ii) Capital Lease Obligations, (b) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations) and (c) Hedge Agreements; provided, that the Obligations shall not constitute Indebtedness for Borrowed Money.

"Indemnified Liabilities":  as defined in Section 10.5.

"Indemnified Taxes": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Indemnitee":  as defined in Section 10.5.

"Initial Cashless Term Commitment": as to any Initial Term Lender, the obligation of such Initial Term Lender to be deemed to have made an Initial Term Loan to the Borrower pursuant to Section 2.1(a)(i) in the principal amount set forth under the heading "Initial Cashless Term Commitment" opposite such Initial Term Lender's name on Schedule 2.1A to this Agreement. The aggregate principal amount of the Initial Cashless Term Commitments as of the Closing Date is $[●]1,096,527,422.58.

"Initial Funded Term Commitment": as to any Initial Term Lender, the obligation of such Initial Term Lender to make an Initial Term Loan to the Borrower pursuant to Section 2.1(a)(ii) in the principal amount set forth under the heading "Initial Funded Term Commitment" opposite such Initial

Term Lender's name on Schedule 2.1B to this Agreement. The aggregate principal amount of the Initial Funded Term Commitments as of the Closing Date is $[●]275,000,000.

"Initial Term Commitment": an Initial Cashless Term Commitment or an Initial Funded Term Commitment, as the context may require.

"Initial Term Facility": as defined in the definition of "Facility."

"Initial Term Lenders": each Lender that holds an Initial Term Loan or an Initial Term Commitment.

"Initial Term Loans": the Loans made (and/or deemed to have been made) to the Borrower on the Closing Date pursuant to Section 2.1(a).

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Instrument":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, domain names, trade secrets, patents, patent licenses, trademarks, trademark licenses, trade names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreements":  collectively, the ABL Intercreditor Agreement and any Other Intercreditor Agreement.

"Interest Payment Date":  (a) with respect to any SOFR Loan, (i) the last day of the Interest Period applicable to the Borrowing of which such Loan is a part, (ii) in the case of a SOFR Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing and (iii) in addition, the date of any refinancing or conversion of such Borrowing with or to a Borrowing of a different Type and (b) with respect to any ABR Loan, the last Business Day of each calendar quarter.

"Interest Period":  as to any SOFR Borrowing, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is 1, 3 or 6 months thereafter (in each case for so long as such period is available for such SOFR Borrowing), as the Borrower may elect; provided, that if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business

Day.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"Investments": as defined in Section 7.7.

"IRS": the United States Internal Revenue Service.

"Junior Financing": as defined in Section 7.8.

"Junior Financing Documentation": any documentation governing any Junior Financing.

"Latest Maturing Term Loans": at any date of determination, the Tranche (or Tranches) of Term Loans maturing later than all other Term Loans outstanding on such date.

"Latest Maturity Date": at any date of determination, the latest maturity date or termination date applicable to any Loan or Commitment hereunder at such time.

"Lead Arranger": Jefferies Finance LLC, in its capacity as sole lead arranger.

"LCA Election": as defined in Section 1.2(h).

"LCA Test Date": as defined in Section 1.2(h).

"Lenders":  as defined in the preamble hereto.

"Liabilities": the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the Closing Date after giving effect to the consummation of the Transactions determined in accordance with GAAP consistently applied.

"Lien":  any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition":  any acquisition, including by way of merger, amalgamation or consolidation, by one or more of the Borrower and its Subsidiaries of any assets, business or Person permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Subsidiary in writing to the Administrative Agent and Lenders.

"Liquidity": at any time, the sum of (i) all Unrestricted Cash of the Borrower and its Subsidiaries and (ii) the aggregate indebtedness permitted to be borrowed under the ABL Facility Agreement and any other then-existing revolving credit facility or line of credit of the Borrower and its Subsidiaries.

"Loan":  any loan made (or deemed made) by any Lender pursuant to this Agreement.

41

"<u>Loan Documents</u>":  the collective reference to this Agreement, the Intercreditor Agreements, the Security Documents, the Agent Fee Letter and the Notes (if any), together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"<u>Loan Parties</u>":  the Borrower and each Subsidiary Guarantor.

"<u>Mafco</u>": MacAndrews & Forbes Incorporated and its successors.

"<u>Majority Facility Lenders</u>":  with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans outstanding under such Facility (or, in the case of any Facility, prior to any termination of the Commitments under such Facility, the holders of more than 50% of the aggregate Commitments and Term Loans under such Facility); <u>provided</u>, <u>however</u>, that determinations of the "Majority Facility Lenders" shall exclude any Commitments or Loans held by Defaulting Lenders.

"<u>Mandatory Prepayment Date</u>":  as defined in <u>Section 2.12(f)</u>.

"<u>Material Adverse Effect</u>" means: any event, development, occurrence, circumstance, effect, condition, result, state of facts or change (collectively, an "**Event**") after September 20, 2022, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of Holdings and its Subsidiaries, taken as a whole, (b) the material rights and remedies available to the Agents or the Lenders, taken as a whole, or (c) the ability of Holdings and its Subsidiaries, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement or the other Loan Documents,  in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the Closing Date in global, national or regional political conditions (including acts of war, terrorism or natural disasters) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Borrower and its Subsidiaries operate; (ii) any changes after the Closing Date in applicable law or generally accepted accounting principles, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, including, without limitation, the Restructuring Transactions (as defined in the Restructuring Plan); (iv) changes in the market price or trading volume of the claims or equity or debt securities of Holdings and its Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) acts of God, including any natural (including weather-related) or man-made event or disaster, epidemic, pandemic or disease outbreak (including the COVID-19 virus or any strain, mutation or variation thereof); or (vi) any failure by Holdings and its Subsidiaries to meet any internal or published projection for any period (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to other clauses contained in this definition); <u>provided</u> that the exceptions set forth in clauses (i), (ii) and (v) of this definition shall apply to the extent that such Event is disproportionately adverse to Holdings and its Subsidiaries, taken as a whole, as compared to other companies comparable in size and scale to Holdings and its Subsidiaries operating in the industries in which Holdings and its Subsidiaries operate.

"<u>Material Intellectual Property</u>":  any Intellectual Property that is material to, or otherwise required for the operation of, the Business.

"<u>Material Real Property</u>":  (a) any Real Property located in the United States and owned in fee by the Borrower or any Subsidiary Guarantor on the Closing Date having an estimated Fair Market Value exceeding $[10,000,000] and, (b) any after-acquired Real Property located in the United States

owned by a Loan Party having a gross purchase price exceeding $[10,000,000] at the time of acquisition and (c) any Real Property that is subject to a Lien securing the ABL Facility.

"<u>Materials of Environmental Concern</u>":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined, listed or regulated as hazardous, toxic (or words of similar regulatory intent or meaning) under any Environmental Law, or that are regulated pursuant to Environmental Law or which may give rise to any Environmental Liability.

"<u>Maximum Rate</u>":  as defined in <u>Section 10.20</u>.

"<u>Melson Avenue Property</u>": the real property owned and held in fee title by Roux Laboratories, Inc. located at 2210 Melson Avenue, Jacksonville, Duval County, Florida.

"<u>Minimum Extension Condition</u>":  as defined in <u>Section 2.26(g)</u>.

"<u>Moody's</u>":  Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"<u>Mortgage</u>":  any mortgage, deed of trust, hypothec, assignment of leases and rents or other similar document delivered on or after the Closing Date in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, with respect to Mortgaged Properties, each substantially in the form of <u>Exhibit M</u> or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Borrower (taking into account the law of the jurisdiction in which such mortgage, deed of trust, hypothec or similar document is to be recorded), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Mortgaged Properties</u>":  all Material Real Property owned by the Borrower or any Subsidiary Guarantor that is, or is required to be, subject to a Mortgage pursuant to the terms of this Agreement.

"<u>Multiemployer Plan</u>":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>":  (a) in connection with any Asset Sale or any Recovery Event occurring on or after the Closing Date, (I) the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) received by any Loan Party or any Subsidiary and (II) the proceeds in the form of cash and Cash Equivalents received by any Loan Party or any Subsidiary from any sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in connection with any such Asset Sale or Recovery Event, net of (i) (x) selling expenses, attorneys' fees, accountants' fees, investment banking fees, brokers' fees and consulting fees, (y) the principal amount, premium or penalty, if any, interest and other amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder (including because the asset sold is removed from a borrowing base supporting such Indebtedness) on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and (z) other customary fees and expenses actually incurred by any Loan Party or any Subsidiary in connection therewith; (ii) Taxes paid or reasonably estimated to be payable by any Loan Party or any Subsidiary as a result thereof (or, without duplication, any Restricted Payments permitted to be paid pursuant to <u>Section 7.6(c)</u><s>(i) or Section 7.6(c)(ii)(B)</s> arising as a result

43

thereof) and, without duplication, any tax distribution that may be required as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements); (iii) the amount of any liability paid or to be paid or reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (ii) above) (A) associated with the assets that are the subject of such event and (B) retained by the Borrower or any of its Subsidiaries, provided, that the amount of any subsequent reduction of such reserve (other than in connection with a payment in respect of any such liability) shall be deemed to be Net Cash Proceeds of such event occurring on the date of such reduction and (iv) the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (iv)) attributable to minority interests and not available for distribution to or for the account of the Borrower or any Domestic Subsidiary as a result thereof and (b) in connection with any Equity Issuance or issuance or sale of debt securities or instruments or the incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.; provided that no proceeds calculated in accordance with the foregoing clause (a) shall constitute Net Cash Proceeds in any fiscal year until the aggregate amount of all such proceeds, together with the aggregate amount received by the Borrower or any of its Subsidiaries of all cash payments or proceeds calculated in accordance with the definition of Extraordinary Receipts, shall exceed $5,000,000 (with any amount below $5,000,000 in any fiscal year being carried forward to subsequent fiscal years) (and thereafter only such cash payments and proceeds in excess of such amount (including any amounts carried forward from prior fiscal years) shall constitute Net Cash Proceeds).

"New Jersey Property": the real property owned and held in fee title by Revlon Consumer Products LLC located at 196-199 Coit St., Irvington, Essex County, New Jersey.

"New Subsidiary":  as defined in Section 7.2(t).

"Non-Defaulting Lender":  any Lender other than a Defaulting Lender.

"Non-Excluded Subsidiary":  any Subsidiary of the Borrower which is not an Excluded Subsidiary.

"Non-Extending Lender":  as defined in Section 2.26(e).

"Non-Guarantor Subsidiary":  any Subsidiary of the Borrower which is not a Subsidiary Guarantor.

"Non-US Guarantor": any Guarantor not organized under the laws of any jurisdiction within the United States.

"Non-US Lender":  as defined in Section 2.20(e).

"Not Otherwise Applied":  with reference to any proceeds of any transaction or event or of Excess Cash Flow or the Available Amount that is proposed to be applied to a particular use or transaction, that such amount (a) was not required to prepay Loans pursuant to Section 2.12 and (b) has not previously been (and is not simultaneously being) applied to anything other than such particular use or transaction.

"Note":  any promissory note evidencing any Loan, which promissory note shall be in the form of Exhibit J, or such other form as agreed upon by the Administrative Agent and the Borrower.

44

"<u>Obligations</u>":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding) the Loans, and all other obligations and liabilities of the Borrower to the Agents or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Agents or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise and including all indemnity claims of the Lenders pursuant to <u>Section 10.5</u>.

"<u>OFAC</u>": the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Offer Documents</u>": as defined in the definition of "Dutch Auction".

"<u>Other Intercreditor Agreement</u>":  an intercreditor agreement, (a) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a pari passu basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a pari passu basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Administrative Agent, and (b) to the extent in respect of Indebtedness intended to be secured by some or all of the Collateral on a junior priority basis with the Obligations, an intercreditor agreement the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a junior basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Administrative Agent.

"<u>Other Taxes</u>":  any and all present or future stamp, court, intangible, recording, filing or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"<u>Pari Passu Replacement Agreement</u>":  as defined in <u>Section 10.1(h)</u>.

"<u>Parent Company</u>":  any entity that directly or indirectly has beneficial ownership of 100% of the total voting power of the voting stock of Holdings.

"<u>Participant</u>":  as defined in <u>Section 10.6(c)(i)</u>.

"<u>Participant Register</u>":  as defined in <u>Section 10.6(c)(iii)</u>.

"<u>Payment Recipient</u>": as defined in <u>Section 9.12(a)</u>.

"<u>PBGC</u>":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Periodic Term SOFR Determination Day": as defined in the definition of "Term SOFR".

"Permitted Acquisition":  (a) any acquisition or other Investment approved by the Required Lenders, (b) any acquisition or other Investment made solely with the Net Cash Proceeds of any substantially concurrent Equity Issuance or capital contribution (other than Disqualified Capital Stock) and such Equity Issuance or capital contribution is Not Otherwise Applied or (c) any acquisition, in a single transaction or a series of related transactions, of a majority controlling interest in the Capital Stock, or all or substantially all of the assets, of any Person, or of all or substantially all of the assets constituting a division, product line or business line of any Person, in each case to the extent the applicable acquired company or assets engage in or constitute a Permitted Business or Related Business Assets, so long as in the case of any acquisition described in this clause (c), no Event of Default shall be continuing immediately after giving pro forma effect to such acquisition.

"Permitted Business":  (i) the Business or (ii) any business that is a natural outgrowth or a reasonable extension, development or expansion of any such Business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing.

["Permitted Investors":  the collective reference to (i) Glendon Capital Management L.P., Angelo, Gordon & Co., L.P., Nut Tree Capital Management, LP, Oak Hill Advisors, L.P. and [●] (ii)King Street Capital Management, L.P., (ii) any controlled Affiliates or accounts, investment vehicles (including any co-invest vehicles) or funds, advised, co-advised, managed or co-managed by any Person listed in the foregoing clause (i), (iii) the members of management of any Parent Company, Holdings or any of its Subsidiaries that have ownership interests in any Parent Company or Holdings as of the Closing Date, (iii iv) the directors of Holdings or any of its Subsidiaries or any Parent Company as of the Closing Date and (iv v) the members of any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of which any Person described in clause (i), (ii) or, (iii) or (iv) of this definition is a member; provided that, in the case of such group and without giving effect to the existence of such group or any other group, Persons who are either Persons described in clause (i), (ii) or, (iii) or (iv) of this definition have aggregate beneficial ownership of more than 50% of the total voting power of the voting stock of the Borrower or, Holdings ][6] or any Parent Company.

"Permitted Joint Venture":  as defined in Section 7.7(n).

"Permitted Refinancing":  with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness (or of a prior Permitted Refinancing of Indebtedness); provided, that any such refinancing, replacement, modification, refunding, renewal or extension of Indebtedness effected pursuant to a clause in Section 7.2 or 7.3 in reliance on the term "Permitted Refinancing" must comply with the following conditions:

(a)    there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses and by an amount equal to any existing commitment unutilized thereunder and as otherwise permitted under the applicable clause of Section 7.2);

(b)    the Weighted Average Life to Maturity of such Indebtedness is greater than or equal to the shorter of (i)Weighted Average Life to Maturity of the Indebtedness being refinanced (other than a shorter Weighted Average Life to Maturity for customary bridge

---

[6] NTD: Permitted Investors to be determined.

financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced and (ii) the remaining Weighted Average Life to Maturity of the Latest Maturing Term Loans) and such Indebtedness shall not have a final maturity earlier than the maturity date of the Indebtedness being refinanced;

(c)    immediately after giving effect to such refinancing, replacement, refunding, renewal or extension, no Event of Default shall be continuing;

(d)    neither the Borrower nor any Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, modifications, refundings, renewals or extensions except to the extent that such Person was (or would have been required to be) such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, replaced, refunded, renewed or extended; provided, that this clause (d) shall not apply to a Permitted Refinancing permitted under Section 7.2(aa), so long as all such obligors with respect to such Permitted Refinancing also guarantee the Obligations;

(e)    any Liens securing such Permitted Refinancing shall be limited to the assets or property that secured the Indebtedness being refinanced; provided, that Liens in respect of assets or property granted as a result of the operation of after-acquired property clauses shall be permitted to the extent any such assets or property secured (or would have secured) the Indebtedness the subject of the Permitted Refinancing; provided, further, that this clause (e) shall not apply to a Permitted Refinancing permitted under Section 7.2(aa), so long as all such assets or property securing such Permitted Refinancing are also subject to Liens securing the Obligations;

(f)    to the extent the Indebtedness being refinanced is subject to the ABL Intercreditor Agreement or an Other Intercreditor Agreement, to the extent that it is secured by the Collateral, the Permitted Refinancing shall be subject to the ABL Intercreditor Agreement or Other Intercreditor Agreement, as applicable, on terms no less favorable to the Lenders, taken as a whole (as determined in good faith by the Borrower); and

(g)    except as otherwise permitted by this definition of "Permitted Refinancing", the covenants and events of default applicable to such Permitted Refinancing shall be not materially more restrictive, taken as a whole, to the Borrower and its Subsidiaries than the covenants and events of default contained in customary agreements governing similar indebtedness in light of prevailing market conditions at the time of such Permitted Refinancing (as determined in good faith by the Borrower).

"Permitted Refinancing Obligations":  any Indebtedness (which Indebtedness may be unsecured or secured by the Collateral on a pari passu or, at the Borrower's option, junior basis with the Liens securing the Obligations) in accordance with Sections 7.2 and 7.3, including customary bridge financings and any debt securities, in each case issued or incurred by the Borrower or a Guarantor to refinance, extend, renew, replace, modify or refund Indebtedness (and, if such Indebtedness consists of revolving loans, to pro rata reduce the associated revolving commitments) and/or Commitments incurred under this Agreement and the Loan Documents and to pay fees, discounts, accrued interest, premiums and expenses in connection therewith; provided, that, in the case of Indebtedness incurred to refinance any Term Loans (and to pay fees, discounts, premiums and expenses in connection therewith) which is

incurred otherwise than under this Agreement (any such Indebtedness, "Refinancing Debt"), such Refinancing Debt:

(a)    shall not be guaranteed by any Person that is not a Guarantor;

(b)    shall be unsecured or secured by the Collateral on a pari passu or, at the Borrower's option, junior basis with the Liens securing the Obligations;

(c)    shall not be secured (to the extent secured) by any Lien on any asset of any Loan Party that does not also secure the Obligations;

(d)    if secured by Collateral, such Indebtedness (and all related obligations) either shall be incurred under this Agreement on a senior secured pari passu basis with the other Obligations or shall be subject to the terms of an Other Intercreditor Agreement;

(e)    (i) shall have a final maturity no earlier than the maturity date of the Indebtedness being refinanced and shall have a Weighted Average Life to Maturity not shorter than the Weighted Average Life to Maturity of the Indebtedness being refinanced (other than an earlier maturity date and/or shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for an earlier maturity date than the maturity date of the Indebtedness being refinanced or a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced) and (ii) any such Indebtedness that is a revolving credit facility shall not mature prior to the maturity date of the revolving commitments being replaced;

(f)    shall not be subject to amortization prior to the final maturity thereof or any mandatory redemption or prepayment provisions (except customary asset sale, recovery event and change of control provisions), except to the extent any such mandatory redemption or prepayment is required or permitted to be applied on a not less than pro rata basis to the Term Loans and any other Refinancing Debt that, in each case, are secured on a pari passu basis with the Liens securing the Obligations prior to or concurrently with the application to such Permitted Refinancing Obligations;

(g)    except as otherwise permitted by this definition of "Permitted Refinancing Obligations", all terms (other than with respect to pricing, fees and optional prepayments, which terms shall be as agreed by the Borrower and the applicable lenders) applicable to such Refinancing Debt shall be substantially identical to, or (when taken as a whole, as shall be determined in good faith by the Borrower) less favorable to the lenders providing such Refinancing Debt than those applicable to such Indebtedness being refinanced, other than for any covenants and other terms applicable solely to any period after the Latest Maturity Date; and

(h)    there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses).

"Person":  an individual, partnership, corporation, company, limited liability company, unlimited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan":  at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability, including a Multiemployer Plan.  For greater certainty, "Plan" shall not include a Canadian Pension Plan.

"Platform": as defined in Section 10.2(c).

"Pledged Securities":  as defined in the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or any other equivalent term in the other Security Documents, as the context may require.

 "Pledged Stock":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, or any other equivalent term in the other Security Documents, as the context may require.

"PPSA": the Personal Property Security Act (Ontario); provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (a) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario or (b) the Civil Code of Québec, then "PPSA" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"Prepayment Option Notice":  as defined in Section 2.12(f).

"Present Fair Salable Value": the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"Prime Rate": the "U.S. Prime Lending Rate" published in The Wall Street Journal; provided that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent); each change in the Prime Rate shall be effective on the date such change is publicly announced as effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"Proceeding": as defined in Section 10.5(ed).

"Proceeds of Crime Act": the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), including all regulations thereunder, as amended.

"Property":  any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"Public Information": as defined in Section 10.2(c).

"Public Lender":  as defined in Section 10.2(c).

"Qualified Capital Stock":  any Capital Stock that is not Disqualified Capital Stock.

"Qualified Contract": any new intellectual property license entered into by the Borrower or any of its Subsidiaries in respect of any brand so long as an officer of the Borrower has certified to the Administrative Agent that the revenues generated by such license in the next succeeding 12 months would reasonably be expected to exceed $40,000,000.

"Ratio Basket":  as defined in Section 1.6.

"Ratio Basket Item or Event":  as defined in Section 1.6.

"RCP LLC": Revlon Consumer Products LLC, a Delaware limited liability company and successor to RCPC.

"RCPC": as defined in the preamble hereto.

"Real Property":  collectively, all right, title and interest of the Borrower or any of its Subsidiaries in and to any and all parcels of real property owned or leased by the Borrower or any such Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"Recipient": (a) any Lender, (b) the Administrative Agent and (c) the Collateral Agent, as applicable.

"Recovery Event":  any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Subsidiary, in an amount for each such event exceeding $[5,000,000].

"Refinanced Term Loans":  as defined in Section 10.1(c).

"Refinancing Debt":  as defined in the definition of "Permitted Refinancing Obligations".

"Refinancing Term Loans":  as defined in Section 10.1(c).

"Register":  as defined in Section 10.6(b)(iv).

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds or Extraordinary Receipts, as applicable, received by any Loan Party or any Subsidiary thereof for its own account in connection therewith that are not applied to prepay the Term Loans pursuant to Section 2.12 as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  the receipt of Net Cash Proceeds from any Asset Sale or Recovery Event or Extraordinary Receipts, as applicable, occurring after the Closing Date in respect of which a Loan Party has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice signed on behalf of any Loan Party by a Responsible Officer stating that such Loan Party (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event or

Extraordinary Receipts, as applicable to acquire property or make investments used or useful in a Permitted Business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount (or the relevant portion thereof, as contemplated by clause (ii) of the definition of "Reinvestment Prepayment Date") relating thereto less any amount contractually committed by the applicable Loan Party (directly or indirectly through a Subsidiary) prior to the relevant Reinvestment Prepayment Date to be expended prior to the relevant Trigger Date (a "Committed Reinvestment Amount"), or actually expended prior to such date, in each case to acquire assets or make investments useful in a Permitted Business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (i) the date occurring 15 months after such Reinvestment Event and (ii) with respect to any portion of a Reinvestment Deferred Amount, the date that is five Business Days following the date on which any Loan Party or any Subsidiary thereof shall have determined not to acquire assets or make investments useful in a Permitted Business with such portion of such Reinvestment Deferred Amount.

"Related Business Assets":  assets (other than cash and Cash Equivalents) used or useful in a Permitted Business; provided, that any assets received by the Borrower or a Subsidiary in exchange for assets transferred by the Borrower or a Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Subsidiary.

"Related Parties": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Person": as defined in Section 10.5.

"Release":  any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"Relevant Governmental Body": the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"Replaced Lender":  as defined in Section 2.24.

"Reply Amount": as defined in the definition of "Dutch Auction".

"Reply Price": as defined in the definition of "Dutch Auction".

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by the PBGC in accordance with the regulations thereunder.

"Representatives":  as defined in Section 10.14.

"Required Lenders":  at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the aggregate Commitments then in effect and

unpaid principal amount of the Term Loans then outstanding; provided, however, that determinations of the "Required Lenders" shall exclude any Commitments or Loans held by Defaulting Lenders or any Affiliate Lender.

"Requirement of Law":  as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Resolution Authority": an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer":  any officer at the level of Vice President or higher of the relevant Person or, with respect to financial matters, the Chief Financial Officer, Treasurer, Controller or any other Person in the Treasury Department at the level of Vice President or higher of the relevant Person.

"Restricted Payments":  as defined in Section 7.6.

"Restructuring Plan":  the "Plan" as defined in the Restructuring Support Agreement. Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 1860] and all exhibits, supplements, appendices, and schedules thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

"Restructuring Support Agreement": that certain Restructuring Support Agreement, dated as of December 19, 2022 (including all exhibits, annexes, and schedules thereto), by and among the Debtors, certain of the Lenders and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the Closing Date pursuant to the terms thereof.

"Return Bid": as defined in the definition of "Dutch Auction".

"Revlon Holdings": as defined in the preamble hereto.

"Revlon NewCo": Revlon NewCo, LLC, a Delaware limited liability company.

"S&P":  Standard & Poor's Ratings Group, Inc., or any successor to the rating agency business thereof.

"Sanction(s)": any international economic sanction administered or enforced by the U.S. government, including OFAC and the U.S. Department of State, the United Nations Security Council, the European Union, the government of Canada or any agency thereof (including sanctions imposed pursuant to any Canadian Economic Sanctions and Export Laws) or His Majesty's Treasury of the United Kingdom.

"SEC":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"Section 2.26 Additional Amendment": as defined in Section 2.26(c).

"Secured Parties":  collectively, the Lenders, the Administrative Agent, the Collateral Agent, any other holder from time to time of any of the Obligations and, in each case, their respective successors and permitted assigns.

"Securities Act":  the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Security":  as defined in the Guarantee and Collateral Agreement or the PPSA, as applicable.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the ~~Mortgages (if any), the~~ UK Security Agreements, [~~the Cayman Pledge Agreement~~]⁷ and all other security documents (including any Mortgages) hereafter delivered to the Administrative Agent or the Collateral Agent purporting to grant a Lien on any Property of any Loan Party to secure the Obligations.

"Shared EBITDA Cap": an amount when combined with adjustments pursuant to clauses (d), (e), (g), (i) and (~~e~~j) ~~and the proviso in the second to last paragraph~~ of the definition of "Consolidated EBITDA"~~,~~ not to exceed (i) $[~~25,000,000~~]50,000,000 in any Test Period ending on or after June 30, 2023 through June 30, 2024 and (ii) $30,000,000 for each Test Period thereafter.

"Single Employer Plan":  any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability.

"SOFR":  a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator":  the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing":  a Borrowing comprised of SOFR Loans.

"SOFR Loan":  any Loan bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate in accordance with the provisions of Section II, other than pursuant to clause (c) of the definition of "ABR".

"Solvent":  with respect to the Borrower and its Subsidiaries, as of any date of determination, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole Do not have Unreasonably Small Capital; and (iv) the Borrower and its  Subsidiaries taken as a whole ~~Will~~will be able to pay their Liabilities as they mature.

"Specified Existing Tranche":  as defined in Section 2.26(a).

---

⁷ ~~NTD: Cayman Pledge Agreement and related changes to Credit Agreement to be discussed.~~

"<u>Stated Maturity</u>":  with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the re-purchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"<u>Subsidiary</u>":  as to any Person, a corporation, partnership, company, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership, company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; provided, that any joint venture that is not required to be consolidated with the Borrower and its consolidated Subsidiaries in accordance with GAAP shall not be deemed to be a "Subsidiary" for purposes hereof; provided further, that Beautyge Rus Joint Stock Company shall be deemed not to be a Subsidiary of the Borrower so long as any Sanctions are imposed on Russia and the Borrower and its Subsidiaries do not exercise control over such Person.  Unless otherwise qualified, all references to a "<u>Subsidiary</u>" or to "<u>Subsidiaries</u>" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower; provided that, notwithstanding anything herein to the contrary, a "Permitted Joint Venture" shall not be deemed to be a Subsidiary of the Borrower.

"<u>Subsidiary Guarantors</u>":  (a) each Domestic Subsidiary (other than any Excluded Subsidiary), (b) Elizabeth Arden (Canada) Limited, a corporation incorporated under the Canada Business Corporations Act, (c) Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, (d) Revlon Canada, Inc., (e)a corporation amalgamated under the Canada Business Corporations Act, (e) each of the BrandCo Entities and (f) any other Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement and (f) each BrandCo Entity.

"<u>Successor Borrower</u>":  as defined in <u>Section 7.4(j)</u>.

"<u>Successor Holdings</u>":  as defined in <u>Section VIIA</u>.

"<u>Taxes</u>":  all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, fines, additions to tax or penalties applicable thereto.

"<u>Term Loans</u>":  the Initial Term Loans, Extended Loans and/or Refinancing Term Loans in respect of either of the foregoing, as the context may require.

"<u>Term Maturity Date</u>":  (a) with respect to the Initial Term Loans, the fifth anniversary of the Closing Date (or as otherwise provided in <u>Section 2.26</u> for any Extended Tranche), (b) with respect to any Extended Loans, the maturity date set forth in the applicable Extension Amendment and (c) with respect to any Tranche of Refinancing Term Loans, the maturity date set forth in the applicable amendment pursuant to <u>Section 10.1(c)</u>; <u>provided</u> that, in each case of <u>clauses (a)</u>, <u>(b)</u> and <u>(c)</u>, if such date is not a Business Day, the Term Maturity Date will be the next succeeding Business Day.

"<u>Term Prepayment Amount</u>":  as defined in <u>Section 2.12(f)</u>.

"Term SOFR":

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Administrator": CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate": the forward-looking term rate based on SOFR.

"Test Period":  on any date of determination, the period of four consecutive fiscal quarters of the Borrower (in each case taken as one accounting period) most recently ended on or prior to such date for which financial statements have been or are required to be delivered pursuant to Section 6.1, or prior to the first such delivery, delivered under Section 5.1(r).

"Tranche":  with respect to Term Loans or commitments, refers to whether such Term Loans or commitments are (a) the Initial Term Loans, (b) Extended Loans (of the same Extension Series) or (c) Refinancing Term Loans with the same terms and conditions made on the same day.

"Transaction Costs": as defined in the definition of "Transactions."

"Transactions": each of the following transactions:

(a)    the execution, delivery and performance of the Loan Documents;

(b)      the borrowing (and/or deemed borrowing) of the Initial Term Loans on the Closing Date;

(c)      the use of the proceeds thereof;

(d)      the execution, delivery and performance of the ABL Documents, the extensions of credit thereunder on the Closing Date and the use of proceeds thereof;

(e)      [the execution, delivery and performance of the Foreign ABTL Documents, the extensions of credit thereunder on the Closing Date and the use of proceeds thereof;]

(e)      (f) the Restructuring Transactions (as defined in the Restructuring Plan);

(f)      (g) the payment of all fees, costs and expenses incurred in connection with the transactions described in the foregoing provisions of this definition (the "Transaction Costs"); and

(g)      (h) the other transactions contemplated by the Loan Documents or the Restructuring Plan.

"Trigger Date": as defined in Section 2.12(b)an Asset Sale Trigger Date or Extraordinary Receipts Trigger Date, as applicable.

"Type": when used in respect of any Loan or Borrowing, the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined. For purposes hereof, the term "Rate" shall include the Term SOFR and the ABR.

"U.S. Government Securities Business Day": any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"UK Debenture": the English law debenture to be entered into by and among the UK Loan Parties and the Collateral Agent.

"UK Financial Institution": any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended formfrom time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Loan Parties": Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, and any other Loan Party that is incorporated in England and Wales.

"UK Resolution Authority": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

56

"UK Security Agreements": (i) the UK Debenture and (ii) any other security agreements or documents governed by English law executed and delivered by any Loan Party in connection with this Agreement.

"Unadjusted Benchmark Replacement":  the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" or "U.S.":  the United States of America.

"Unrestricted Cash": as at any date of determination, the aggregate amount of cash and Cash Equivalents included in the cash accounts that would be listed on the consolidated balance sheet of the Borrower and its Subsidiaries as at such date, to the extent such cash and Cash Equivalents are not (a) subject to a Lien securing any Indebtedness or other obligations, other than (i) the Obligations or (ii) any such other Indebtedness that is subject to any Intercreditor Agreement or (b) classified as "restricted" (unless so classified solely because of any provision under the Loan Documents or any other agreement or instrument governing other Indebtedness that is subject to any Intercreditor Agreement governing the application thereof or because they are subject to a Lien securing the Obligations or other Indebtedness that is subject to any Intercreditor Agreement).

"US Lender":  as defined in Section 2.20(g).

"USA Patriot Act":  as defined in Section 10.18.

"Weighted Average Life to Maturity": when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Will be able to pay their Liabilities as they mature":  for the period from the Closing Date through the Latest Maturity Date, the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions will have sufficient assets, credit capacity and cash flow to pay their Liabilities as those Liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by the Borrower and its Subsidiaries as reflected in the projected financial statements and in light of the anticipated credit capacity.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority  under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution  or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)    The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The term "license" shall include sub-license.  The term "documents" includes any and all documents whether in physical or electronic form.

(e)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)    Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(g) [Reserved].

(h) [Reserved].

(g)    In connection with any action being taken in connection with a Limited Condition Acquisition, for purposes of determining compliance with any provision of this Agreement which requires that no Default, Event of Default or specified Event of Default, as applicable, has occurred, is continuing or would result from any such action, as applicable, at the option of the Borrower pursuant to an LCA Election such condition shall be deemed satisfied so long as no Default, Event of Default or specified Event of Default, as applicable, exists on the date the definitive agreements for such Limited Condition Acquisition are entered into after giving pro forma effect to such Limited Condition Acquisition and the actions to be taken in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if such Limited Condition Acquisition and other actions had occurred on such date.  For the avoidance of doubt, if the Borrower has exercised its option under the

58

first sentence of this clause (g), and any Default or Event of Default occurs following the date the definitive agreements for the applicable Limited Condition Acquisition were entered into and prior to the consummation of such Limited Condition Acquisition, any such Default or Event of Default shall be deemed not to have occurred or be continuing solely for purposes of determining whether any action being taken in connection with such Limited Condition Acquisition is permitted hereunder.

(h)     In connection with any action being taken solely in connection with a Limited Condition Acquisition, for purposes of:

(i)     determining compliance with any provision of this Agreement which requires the calculation of the Consolidated Net Total Leverage Ratio; or

(ii)     testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated Total Assets);

(i)     in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "LCA Election"), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "LCA Test Date"), and if, after giving pro forma effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the most recent four consecutive fiscal quarters ending prior to the LCA Test Date for which consolidated financial statements of the Borrower are available, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded as a result of fluctuations in any such ratio or basket, including due to fluctuations in Consolidated Total Assets of the Borrower or the Person subject to such Limited Condition Acquisition, at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or basket availability with respect to the incurrence of Indebtedness or Liens, or the making of Restricted Payments, mergers, the conveyance, lease or other transfer of all or substantially all of the assets of the Borrower, the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be calculated on a pro forma basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any Incurrence of Indebtedness and the use of proceeds thereof) have been consummated; provided that the calculation of Consolidated Net Income (and any defined term a component of which is Consolidated Net Income) shall not include the Consolidated Net Income of the Person or assets to be acquired in any Limited Condition Acquisition for usages other than in connection with the applicable transaction pertaining to such Limited Condition Acquisition until such time as such Limited Condition Acquisition is actually consummated.

(j)     (i)  Any references in this Agreement to "Obligations" or "Lenders" (or any similar terms) in the phrase "pari passu basis with the Liens securing the Obligations" or "pari passu with the Liens of the Lenders" (or any similar phrases) or in the phrase "secured on a junior basis with the Liens securing the Obligations" or "junior to the Liens of the Lenders" (or any similar phrases) shall, in each case, be deemed to refer to the Obligations in effect on the Closing Date (i.e., the Initial Term

59

Loans) or the Initial Term Lenders, as applicable, and any other Indebtedness or commitments incurred under this Agreement that is intended to be secured on a pari passu basis with the liens securing the Initial Term Loans or the Initial Term Lenders, as applicable. Any references in this Agreement to "junior or pari passu to the Liens of the lenders under the ABL Facility Agreement" (or any similar phrases) shall, in each case, be deemed to refer to the Liens of such lenders with respect to the ABL Facility First Priority Collateral.

(k)    In this Agreement, (i) any term defined herein by reference to the UCC shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the PPSA, the Bills of Exchange Act (Canada) and the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Administrative Agent, (ii) all references in this Agreement to the United States Copyright Office or the United States Patent and Trademark Office shall be deemed to refer also to the Canadian Intellectual Property Office and/or the applicable divisions thereof, (iii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iv) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, (v) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal, provincial and territorial securities laws in Canada, (vi) all references to "state or federal bankruptcy laws" shall be deemed to refer also to any bankruptcy or insolvency laws in effect in Canada or under Canadian law, and (vii) all calculations of collateral values and Dollar amounts which utilize amounts expressed in Canadian Dollars shall be made using the Dollar equivalent in Dollars of such Canadian Dollar amounts in accordance with the Administrative Agent's customary banking and conversion.

(l)    (j) For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest" and "mortgage" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the UCC or the PPSA or otherwise shall be deemed to include publication under the Civil Code of Québec, (vii) all references to "perfection of" or "perfected" Liens shall be deemed to include a reference to the "opposability" of such Liens to third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall be deemed to include a "mandatary", (xi) "joint and several" shall be deemed to include "solidary", (xii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiii) "beneficial ownership" shall be deemed to include "ownership on behalf of another as mandatary", (xiv) "easement" shall be deemed to include "servitude", (xv) "survey" shall be deemed to include "certificate of location and plan", and (xvi) "fee simple title" shall be deemed to include "absolute ownership". The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated hereunder or relating hereto, including notices, may also be drawn up in the English language only. Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise

seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en la langue anglaise seulement.

1.3    Pro Forma Calculations.  (i) Any calculation to be determined on a "pro forma" basis, after giving "pro forma" effect to certain transactions or pursuant to words of similar import and (ii) the Consolidated Net ~~First Lien Leverage Ratio, the Consolidated Net Secured Leverage Ratio, the Consolidated Net~~ Total Leverage ~~Ratio, and the Fixed Charge Coverage~~ Ratio, in each case, shall be calculated as follows (subject to the provisions of Section 1.2):

(a)    for purposes of making the computation referred to above, in the event that the Borrower or any of its Subsidiaries incurs, assumes, guarantees, redeems, retires, defeases or extinguishes any Indebtedness or enters into, terminates or cancels a Qualified Contract, other than the completion thereof in accordance with its terms, subsequent to the commencement of the period for which such ratio is being calculated but on or prior to or substantially concurrently with or for the purpose of the event for which the calculation is made (a "Calculation Date"), then such calculation shall be made giving pro forma effect to such incurrence, assumption, guarantee, redemption, retirement, defeasance or extinguishment of Indebtedness or entry into, termination or cancellation of such Qualified Contract (other than the completion thereof in accordance with its terms) as if the same had occurred at the beginning of the applicable Test Period; provided, that the aggregate amount of revenues (and related assets) included in such pro forma calculation for any Test Period pursuant to this clause 1.3(a) with respect to Qualified Contracts shall not exceed $50,000,000 in revenues (and any such related assets); provided, further, that for purposes of making the computation of the Consolidated Net ~~First Lien Leverage, Consolidated Net Secured Leverage, Consolidated Net~~ Total Leverage ~~or Fixed Charges~~ for the computation of the Consolidated Net ~~First Lien~~Total Leverage Ratio, ~~Consolidated Net Secured Leverage Ratio,~~the Consolidated Net Total Leverage ~~Ratio or Fixed Charge Coverage Ratio, as applicable, the Consolidated Net First Lien Leverage, Consolidated Net Secured Leverage, Consolidated Net Total Leverage or Fixed Charges, as applicable,~~ shall be the Consolidated Net ~~First Lien Leverage, Consolidated Net Secured Leverage, Consolidated Net~~ Total Leverage ~~or Fixed Charges~~ as of the date the relevant action is being taken giving pro forma effect to any redemption, retirement or extinguishment of Indebtedness in connection with such event; and

(b)    for purposes of making the computation referred to above, if any Investments (including the Transactions), brand acquisitions or Dispositions are made (or committed to be made pursuant to a definitive agreement) subsequent to the commencement of the period for which such calculation is being made but on or prior to or simultaneously with the relevant Calculation Date, then such calculation shall be made giving pro forma effect to such Investments, brand acquisitions and Dispositions as if the same had occurred at the beginning of the applicable Test Period in a manner consistent, where applicable, with the pro forma adjustments set forth in clause (o) of the definition of "Consolidated Net Income". If since the beginning of such period any Person that subsequently became a Subsidiary or was merged or amalgamated with or into the Borrower or any of its Subsidiaries since the beginning of such period shall have made any Investment, brand acquisitions or Disposition that would have required adjustment pursuant to this provision, then such calculation shall be made giving pro forma effect thereto for such Test Period as if such Investment, brand acquisitions or Disposition had occurred at the beginning of the applicable Test Period.

1.4    Exchange Rates; Currency Equivalents.  If any basket is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates.  For purposes of determining the Consolidated Net ~~First Lien Leverage Ratio, the Consolidated Net Secured Leverage Ratio, the Consolidated Net~~ Total Leverage ~~Ratio and the Fixed Charge Coverage~~ Ratio, amounts denominated in a currency other than Dollars will be converted to

61

Dollars for the purposes of calculating ~~any~~the Consolidated Net Total Leverage Ratio~~, the Consolidated Net Secured Leverage Ratio, the Consolidated Net First Lien Leverage Ratio and the Fixed Charge Coverage Ratio~~, at the exchange rate as of the date of calculation, and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Hedge Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

    1.5    [Reserved].

    1.6    Covenants.  For purposes of determining compliance with Section VII (other than Section 7.6 or Sections 7.2(i) or 7.2(aa)), in the event that an item or event (or any portion thereof) meets the criteria of one or more of the categories described in a particular covenant contained in Section VII (other than Section 7.6 or Sections 7.2(i) or 7.2(aa)), the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify (as if incurred at such later time) such item or event (or any portion thereof) and may include the amount and type of such item or event (or any portion thereof) in one or more of the relevant clauses or subclauses, in each case, within such covenant and will be entitled to include such item or event (or any portion thereof) only in one of the relevant clauses or subclauses (or any portion thereof).  In the case of an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that does not rely on criteria based on the Consolidated Net ~~First Lien Leverage Ratio, the Consolidated Net Secured Leverage Ratio, the Consolidated Net~~ Total Leverage ~~Ratio or the Fixed Charge Coverage~~ Ratio (any such item or event, a "Fixed Basket Item or Event" and any such clause, subclause or any portion thereof, a "Fixed Basket") substantially concurrently with an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that relies on criteria based on such financial ratios or tests (any such item or event, a "Ratio Basket Item or Event" and any such clause, subclause or any portion thereof, a "Ratio Basket"), such Ratio Basket Item or Event shall be treated as having been incurred or existing pursuant only to such Ratio Basket without giving pro forma effect to any such Fixed Basket Item or Event (other than a Fixed Basket Item or Event that relies on the term "Permitted Refinancing" or "Permitted Refinancing Obligations") incurred pursuant to or otherwise included in a Fixed Basket substantially concurrently with such Ratio Basket Item or Event when calculating the amount that may be incurred or existing pursuant to any such Ratio Basket. Furthermore, (A) for purposes of Section 7.2, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, in the case of such Indebtedness incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness), on the date that such Indebtedness was incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness); provided that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable exchange rate on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of accrued interest, fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing, (B) for purposes of Sections 7.3, 7.5, 7.6 and 7.7, the amount of any Liens, Dispositions, Restricted Payments and Investments, as applicable, denominated in any currency other than Dollars shall be calculated based on the applicable exchange rate, (C) for purposes of any calculation under Sections 7.2 and 7.3, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with Section 7.2 or 7.3, but for so long as such Indebtedness is outstanding or

in effect, the entire committed amount of such Indebtedness then in effect shall be included in any calculations under Sections 7.2 and 7.3, (D) any cash proceeds of Indebtedness shall be excluded as Unrestricted Cash and not netted for purposes of calculating any financial ratios and tests with respect to any substantially concurrent incurrence of a Ratio Basket Item or Event pursuant to a Ratio Basket and (E) any Fixed Basket Item or Event incurred pursuant to or otherwise included pursuant to a Fixed Basket based on Consolidated Total Assets shall be calculated based upon the Consolidated Total Assets at the time of such incurrence (it being understood that a Default shall be deemed not to have occurred solely to the extent that the Consolidated Total Assets after the time of such incurrence declines).

    1.7  Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

    1.8  Interest Rates.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

SECTION II.    AMOUNT AND TERMS OF COMMITMENTS

2.1    Term Commitments.

(a)    Subject to the terms and conditions hereof (i) to give effect to the full and final satisfaction of the 2020 Term B-1 Loan Claims (as defined in the Restructuring Plan) in accordance with the Restructuring Plan, each Initial Term Lender with an Initial Cashless Term Commitment as of the Closing Date shall [(A)  be automatically deemed to have made a Term Loan in Dollars to the Borrower on the Closing Date in an amount equal to the amount of the Initial Cashless Term Commitment of such Lender [and (B) be bound by the provisions of this Agreement as a Lender hereunder and shall have the obligations of a Lender hereunder by its acceptance of the benefits of this Agreement and the other Loan Documents, and be deemed to have executed and delivered this Agreement, regardless of whether such Lender has executed and delivered a signature page hereto] and (ii) each Initial Term Lender with an Initial Funded Term Commitment as of the Closing Date severally agrees to make a term loan in Dollars to the Borrower on the Closing Date in an amount which will not exceed the Initial Funded Term Commitment of such Lender.  On the Closing Date, all 2020 Term B-1 Loan Claims held by each Initial Term Lender will automatically be deemed satisfied, compromised, settled, released and discharged in full pursuant to an in accordance with the Restructuring Plan.  The Initial Term Loans deemed made pursuant to clause (i) above of this Section 2.1(a) shall be made without any actual funding and, notwithstanding anything to the contrary herein and in accordance with the Restructuring Plan, shall initially be deemed made by Revlon Intermediate Holdings V LLC, Revlon Intermediate Holdings V LLC will immediately thereafter be deemed to contribute and assign such Initial Term Loans to Revlon Intermediate Holdings VI LLC, Revlon Intermediate Holdings VI LLC will immediately thereafter be deemed to transfer and assign such Initial Term Loans to Revlon NewCo and such Initial Term Loans shall immediately thereafter be deemed to have been assigned and distributed by Revlon NewCo on the Closing Date to each Initial Term Lender with an Initial Cashless Term Commitment as of the Closing Date in accordance with the Restructuring Plan.  After giving effect to this Section 2.1(a) and the payment of discounts and premiums pursuant to Section 2.9(a), the aggregate outstanding principal amount of Initial Term Loans shall be $[●]1,400,506,261.43.  The aggregate outstanding principal amount of the Initial Term Loans for all purposes of this Agreement and the other Loan Documents shall be the stated principal amount thereof outstanding from time to time.

(b)    The Initial Term Loans may from time to time be SOFR Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.13.

(c)    The Initial Term Commitment of each Initial Term Lender shall be automatically and permanently reduced to $0 upon the making (or deemed making) of such Initial Term Lender's Initial Term Loans pursuant to Section 2.1(a) on the Closing Date.

2.2    Procedures for Borrowing.

(a)    Each Borrowing (including, for the avoidance of doubt, each Borrowing (and/or deemed Borrowing) of Initial Term Loans on the Closing Date) shall be made upon irrevocable notice by the Borrower to the Administrative Agent.  Each such notice must be in writing and must be received by the Administrative Agent not later than (i) in the case of SOFR Loans, 12:00 Noon (New York City time) three Business Days prior to the requested Borrowing Date (or, solely in the case of the Initial Term Loans borrowed (and/or deemed to be borrowed) on the Closing Date, one Business Day prior to the Closing Date) or (ii) in the case of ABR Loans, 11:00 a.m. (New York City time) on the requested Borrowing Date.  Each notice by the Borrower pursuant to this Section 2.2(a) shall be delivered to the Administrative Agent in the form of a written Committed Loan Notice, appropriately completed and

signed by a Responsible Officer of the Borrower. Each Committed Loan Notice shall specify (i) the requested date of the Borrowing, (ii) the principal amount of Loans to be borrowed, (iii) the Type of Loans to be borrowed and (iv) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice, then the applicable Loans shall be made as ABR Loans. If the Borrower requests a Borrowing of SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, the Borrower will be deemed to have specified an Interest Period of one month.

(b)      Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its ratable share of the applicable Loans. Each Lender shall (except with respect to the Initial Term Loans to be deemed to have been made on the Closing Date in respect of such Lender's Initial Cashless Term Commitment) make (or cause the Escrow Agent to make) the amount of its Loan available to the Administrative Agent in same day funds at the Funding Office not later than (i) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of SOFR Loans or (ii) 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Loan Notice for any Borrowing of ABR Loans. Upon satisfaction of the applicable conditions set forth in Section 5.2 (or, with respect to any Borrowing on the Closing Date, set forth in Section 5.1), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower.

(c)      Except as otherwise provided herein, a SOFR Loan may be continued or converted only on the last day of an Interest Period for such SOFR Loan unless the Borrower pays the amount due under Section 2.222.21 in connection therewith. During the existence of an Event of Default which is continuing, at the election of the Required Lenders, no Loans may be requested as, converted to or continued as SOFR Loans.

2.3      Repayment of Initial Term Loans.  The Initial Term Loans of each Initial Term Lender shall be payable in consecutive quarterly installments on the last Business Day of each March, June, September and December, commencing on [●], 202[●]8September 30, 2025,in an amount equal to (a) with respect to each such calendar quarter ending on or prior to [●], 202[●]9September 30, 2027, an amount equal to one half of one percent (0.50%) of the stated principal amount of the Initial Term Loans funded (and/or deemed to have been funded) on the Closing Date and (b) with respect to each calendar quarter ending after [●], 202[●]10September 30, 2027 and prior to the Term Maturity Date, an amount equal to one quarter of one percent (0.25%) of the stated principal amount of the Initial Term Loans funded (and/or deemed to have been funded) on the Closing Date (which installments shall, to the extent applicable, be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.18(b) or reduced proportionately, to the extent applicable, if an Extension Request with respect to the Initial Term Loans is consummated as provided in the applicable Extension Amendment), with the remaining balance thereof payable on the Term Maturity Date.

2.4      [Reserved].

---

8 NTD: to be the last day of the ninth (9th) full calendar quarter after the Closing Date.

9 NTD: to be the last day of the seventeenth (17th) calendar quarter after the Closing Date.

10 NTD: to be the last day of the seventeenth (17th) calendar quarter after the Closing Date.

65

2.5     [Reserved].

2.6     [Reserved].

2.7     [Reserved].

2.8     Repayment of Loans.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Lender, the principal amount of each outstanding Term Loan of such Lender made (or deemed to have been made) to the Borrower in installments according to the amortization schedule set forth in Section 2.3 and on the Term Maturity Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8.1).  The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the date made until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(b)(iv), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal, interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(c) shall, to the extent permitted by applicable law, be presumptively correct absent demonstrable error of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

2.9     Fees, Premiums and Discounts.

(a)     The Borrower agrees to pay to the Administrative Agent, for the account of each Lender with an Initial Funded Term Commitment, the premiums and discounts in the amounts, on the date or dates and in the manner set forth in the Incremental New Money Commitment Letter and the First Lien Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement); provided that any such discounts and premiums shall be paid in-kind in the form of additional Initial Term Loans in the amounts set forth for each Lender as set forth in Schedule 2.1B.

(b)     The Borrower agrees to pay (x) to the Administrative Agent the fees in the amounts and on the dates as set forth in the Agent Fee Letter and (y) such other fees, discounts and

premiums as agreed in writing to be paid by the Borrower to the Lenders (after giving effect to clause (a) above).

2.10 __Prepayment Premium__. With respect to each repayment or prepayment of Initial Term Loans under Section 2.11 and/or Section 2.12, any other repayment or prepayment of Initial Term Loans upon maturity (scheduled or otherwise), any acceleration of the Initial Term Loans and/or the other Obligations with respect thereto (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law (including any deemed repayment or satisfaction in connection therewith)) and/or any mandatory assignment of the Initial Term Loans of a non-consenting Lender pursuant to Section 2.24, whether in full or in part, in each case, on or prior to the second anniversary of the Closing Date, the Borrower shall be required to pay an amount equal to 1.00% of the amount of the Initial Term Loans repaid, prepaid, accelerated or assigned (the "Applicable Premium"), in each case, concurrently with such repayment, prepayment, acceleration or assignment. For the avoidance of doubt, it is understood and agreed that, if any Initial Term Loans are accelerated or otherwise become due prior to the Term Maturity Date applicable thereto and prior to the second anniversary of the Closing Date, in each case whether in full or in part (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law), the Applicable Premium will also automatically be due and payable as though such Initial Term Loans were being repaid, prepaid or assigned and shall constitute part of the Obligations with respect to such Initial Term Loans. For the avoidance of doubt, the Applicable Premium shall also be due and payable if, prior to the second anniversary of the Closing Date (i) the Initial Term Loans (or any notes representing the Initial Term Loans) are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by another means and/or (ii) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Obligations (and/or this Agreement or the notes evidencing any Obligations) in any insolvency proceeding or other proceeding pursuant to any Debtor Relief Laws, foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by other means or the making of a distribution of any kind in any insolvency proceeding or under any Debtor Relief Law to the Administrative Agent, for the account of the Initial Term Lenders, in full or partial satisfaction of the Obligations occurs. The parties to this Agreement expressly acknowledge and accept the provisions of Section 10.12(e) concerning the Applicable Premium.

2.11 __Optional Prepayments__.

(a) The Borrower may at any time and from time to time prepay the Tranches of Term Loans (subject to Section 2.11(b) below), in whole or in part, without premium or penalty except as specifically provided in Section 2.10, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time, (i) three Business Days prior thereto in the case of SOFR Loans and (ii) one Business Day prior thereto in the case of ABR Loans, which notice shall specify (x) the date and amount of prepayment, (y) the Tranche or Tranches of Term Loans that such prepayment is in respect of and (z) whether the prepayment is of SOFR Loans or ABR Loans; provided, that if a SOFR Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (provided, that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with accrued interest to such date on the

amount prepaid. Partial prepayments of Term Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof, and in each case shall be subject to the provisions of <u>Section 2.18</u>.

(b)     In connection with any optional prepayments by the Borrower of the Term Loans pursuant to <u>Section 2.11(a)</u>, such prepayment shall be applied to the then outstanding Tranches of Term Loans being prepaid on a pro rata basis.

2.12     <u>Mandatory Prepayments</u>.

(a)     ~~If~~<u>Unless the Required Lenders shall otherwise agree, if</u> any Indebtedness (excluding any Indebtedness permitted to be incurred in accordance with <u>Section 7.2 (other than Permitted Refinancing Obligations)</u>) shall be incurred by the Borrower or any Subsidiary, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied not later than one Business Day after the date of receipt of such Net Cash Proceeds toward the prepayment of the Term Loans as set forth in <u>Section 2.12(e)</u>.

(b)     ~~If~~<u>Unless the Required Lenders shall otherwise agree, if</u> on any date the Borrower or any Subsidiary shall for its own account receive Net Cash Proceeds from any Asset Sale or Recovery Event (except to the extent such Asset Sale or Recovery Event, as applicable, relates to any ABL Facility First Priority Collateral so long as such ABL Facility First Priority Collateral secures the ABL Facility), then, unless a Reinvestment Notice shall be delivered to the Administrative Agent in respect thereof, such Net Cash Proceeds shall be applied not later than 10 Business Days after such date toward the prepayment of the Term Loans as set forth in <u>Section 2.12(e)</u>; <u>provided</u>, that, notwithstanding the foregoing, (i) ~~no Reinvestment Notice may be submitted with respect to any Net Cash Proceeds from any Asset Sale or Recovery Event with respect to Property of any BrandCo Entity or any Capital Stock of any BrandCo, (ii)~~ in the event any Asset Sale giving rise to any such Reinvestment Notice consisted solely of Collateral, all of such Net Cash Proceeds shall be applied to acquire property or make investments used or useful in a Permitted Business constituting Collateral, (~~iii~~<u>ii</u>) no Reinvestment Notice may be submitted with respect to Net Cash Proceeds in excess of ~~$100,000,000~~, <u>together with the amount of Extraordinary Receipts for which a Reinvestment Notice has been delivered in accordance with the second proviso of Section 2.12(d),</u> in the aggregate during the term of this Agreement, <u>$100,000,000,</u> (~~iv~~<u>iii</u>) if a Reinvestment Notice has been delivered to the Administrative Agent, the Term Loans shall be prepaid as set forth in <u>Section 2.12(e)</u> by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event on the applicable Reinvestment Prepayment Date and (~~v~~<u>iii</u>) on the date (the "<u>Trigger Date</u>") that is six months after any such Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in <u>Section 2.12(e)</u> by an amount equal to the portion of any Committed Reinvestment Amount with respect to the relevant Reinvestment Event not actually expended by such Trigger Date.

(c)     ~~If~~<u>Unless the Required Lenders shall otherwise agree, if</u>, for any Excess Cash Flow Period, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply an amount equal to (A) the Excess Cash Flow Application Amount, <u>minus</u> (B) the aggregate amount of all prepayments of ABL Loans during such Excess Cash Flow Period to the extent accompanied by permanent optional reductions of the applicable commitments, and all optional prepayments of Term Loans during such Excess Cash Flow Period (excluding any such optional prepayments during such Excess Cash Flow Period which the Borrower elected to apply to the calculation pursuant to this <u>paragraph (c)</u> in a prior Excess Cash Flow Period) and, at the option of the Borrower, optional prepayments of Term Loans after such Excess Cash Flow Period but prior to the time of the Excess Cash Flow Application Date, in each case other than to the extent any such prepayment is funded with the proceeds of long-term Indebtedness, toward the prepayment of Term Loans as set forth

68

in Section 2.12(e), in each case of this clause (B), to the extent not deducted in accordance with clause (b)(iii) of the definition of "Excess Cash Flow". Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than [ten] days after the date on which the financial statements referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Lenders.

(d)    IfUnless the Required Lenders shall otherwise agree, if, on any date, the Borrower or any Subsidiary shall for its own account receive any Extraordinary Receipts, then, unless a Reinvestment Notice shall be delivered to the Administrative Agent in respect thereof, such Extraordinary Receipts shall be applied not later than ten Business Days after such date toward the prepayment of the Loans as set forth in Section 2.12(e).; provided, that, notwithstanding the foregoing, (i) if a Reinvestment Notice has been delivered to the Administrative Agent, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event on the applicable Reinvestment Prepayment Date and (ii) on the date (the "Extraordinary Receipts Trigger Date") that is six months after any such Reinvestment Prepayment Date, the Term Loans shall be prepaid as set forth in Section 2.12(e) by an amount equal to the portion of any Committed Reinvestment Amount with respect to the relevant Reinvestment Event not actually expended by such Extraordinary Receipts Trigger Date; provided further that no Reinvestment Notice may be submitted with respect to Extraordinary Receipts in excess of, together with the amount of Net Cash Proceeds for which a Reinvestment Notice has been delivered in accordance with Section 2.12(b)(ii), $100,000,000 in the aggregate during the term of this Agreement.

(e)    Amounts to be applied in connection with prepayments of Term Loans pursuant to this Section 2.12 shall, subject to the terms of each Intercreditor Agreement, be applied to the prepayment of the Term Loans in accordance with Section 2.18(b) until paid in full. In connection with any mandatory prepayments by the Borrower of the Term Loans pursuant to this Section 2.12, such prepayments shall be applied on a pro rata basis to the then outstanding Term Loans and (to the extent required by the terms thereof) may be applied, along with such prepayments of Term Loans, to purchase, redeem or repay any other Indebtedness secured by the Collateral on a pari passu basis with the Liens securing the Obligations pursuant to one or more Other Intercreditor Agreements, pursuant to the agreements governing such other Indebtedness, on not more than a pro rata basis with respect to such prepayments of Term Loans. Each prepayment of the Term Loans under this Section 2.12 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(f)    Notwithstanding anything to the contrary in Section 2.12 or 2.18, with respect to the amount of any mandatory prepayment pursuant to Section 2.12(b), (c) or (d) (such amount, the "Term Prepayment Amount"), the Borrower may, in its sole discretion, in lieu of applying such amount to the prepayment of Term Loans as provided in paragraph (e) above, not later than 12:00 p.m. (New York City time) on the Business Day prior to the date specified in this Section 2.12 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Lender (which, for avoidance of doubt, includes each Extending Lender) a notice (each, a "Prepayment Option Notice") as described below. As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Lender a Prepayment Option Notice, which shall be in the form of Exhibit I (or such other form approved by the Administrative Agent and the Borrower), and shall include an offer by the Borrower to prepay, on the date (each a "Mandatory Prepayment Date") that is [ten] Business Days after the date of the Prepayment Option Notice, the Term Loans of such Lender by an amount equal to the portion of the Term Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans. Each Lender may reject all or a portion of its Term Prepayment Amount by providing written notice to the Administrative Agent and the Borrower no later than 5:00 p.m. (New York City time) five Business Days after such Lender's receipt of the Prepayment Option Notice (which

69

notice shall specify the principal amount of the Term Prepayment Amount to be rejected by such Lender) (such rejected amounts collectively, the "Declined Amount"); provided, that any Lender's failure to so reject such Term Prepayment Amount shall be deemed an acceptance by such Lender of such Prepayment Option Notice and the amount to be prepaid in respect of Term Loans held by such Lender (each such Lender, an "Accepting Lender"). On the Mandatory Prepayment Date, the Borrower shall pay to the Accepting Lenders (A) the aggregate amount necessary to prepay that portion of the outstanding Term Loans in respect of which such Accepting Lenders have (or are deemed to have) accepted prepayment as described above and (B) concurrently with the prepayment described in the preceding clause (A), the Declined Amount on a pro rata basis among such Accepting Lenders. To the extent that any Accepting Lender rejects all or any portion of its pro rata share of such Declined Amount, any such Declined Amount so rejected may be used by the Borrower for any purpose not prohibited by this Agreement.

(g)     [Reserved].

(h)     Notwithstanding any other provisions of this Section 2.12, (A) to the extent that any or all of the Net Cash Proceeds of any Asset Sale by a Foreign Subsidiary (a "or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) (a "Foreign Asset Sale") or the Net Cash Proceeds of any Recovery Event with respect to  a Foreign Subsidiary (a "or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) (a "Foreign Recovery Event"), in each case giving rise to a prepayment event pursuant to Section 2.12(b) or (d), or Excess Cash Flow derived from a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) giving rise to a prepayment event pursuant to Section 2.12(c), are or is prohibited, restricted or delayed by applicable local law from being repatriated to the United States, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans at the times provided in this Section 2.12 but may be retained by the applicable Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) so long, but only so long, as the applicable local law will not permit or restricts repatriation to the United States (the Borrower hereby agreeing to use commercially reasonable efforts to cause the applicable Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) to promptly take all actions reasonably required by the applicable local law to permit such repatriation), and once such repatriation of any of such affected Net Cash Proceeds or Excess Cash Flow is permitted under the applicable local law, such repatriation will be immediately effected and such repatriated Net Cash Proceeds or Excess Cash Flow will be promptly (and in any event not later than five Business Days after such repatriation) applied (net of additional taxes payable or reserved against as a result thereof including, without duplication, any repatriation costs associated with repatriation of such proceeds from the applicable recipient to the Borrower) to the repayment of the Term Loans in accordance with this Section 2.12 and (B) to the extent that the Borrower has determined in good faith that repatriation of any or all of the Net Cash Proceeds of any Foreign Asset Sale or any Foreign Recovery Event or any Excess Cash Flow derived from a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States) could reasonably be expected to result in a material adverse tax consequence (taking into account any foreign tax credit or benefit, in the Borrower's reasonable judgment, expected to be realized in connection with such repatriation) with respect to such Net Cash Proceeds or Excess Cash Flow, the Net Cash Proceeds or Excess Cash Flow so affected may be retained by the applicable Foreign Subsidiary, (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), provided, that, in the case of this clause (B), on or before the date on which any Net Cash Proceeds so retained would otherwise have been required to be applied to reinvestments or prepayments pursuant to this Section 2.12 (or fifteen months after the date such Excess Cash Flow would have been so required to be applied if it were Net Cash Proceeds), (x) the Borrower shall apply an amount equal to such Net Cash Proceeds or Excess Cash Flow to such reinvestments or prepayments as if such Net Cash Proceeds or Excess Cash Flow had been received by

70

the Borrower rather than such Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), less the amount of additional taxes that would have been payable or reserved against if such Net Cash Proceeds or Excess Cash Flow had been repatriated (or, if less, the Net Cash Proceeds or Excess Cash Flow that would be calculated if received by such Foreign Subsidiary) or (y) such Net Cash Proceeds or Excess Cash Flow shall be applied to the repayment of Indebtedness of a Foreign Subsidiary (or Domestic Subsidiary formed under the laws of a jurisdiction outside of the United States), in each case, other than as mutually agreed by the Borrower and the Administrative Agent.

<p style="text-align:center">2.13    Conversion and Continuation Options.</p>

(a)    The Borrower may elect from time to time to convert SOFR Loans made to the Borrower to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date; provided, that if any such SOFR Loan is so converted on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21. The Borrower may elect from time to time to convert ABR Loans made to the Borrower to SOFR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); provided, that no such ABR Loan under a particular Facility may be converted into a SOFR Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)    Any SOFR Loan may be continued as such by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1 and no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed continuation date, of the length of the next Interest Period to be applicable to such Loans; provided, that if any such SOFR Loan is so continued on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21; provided, further, that no such SOFR Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations; provided, further, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph such SOFR Loans shall be automatically continued as SOFR Loans having an Interest Period of one month's duration on the last day of such then-expiring Interest Period and (ii) if such continuation is not permitted pursuant to the preceding proviso, such SOFR Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period; provided, further, that if the Borrower wishes to, and is otherwise permitted to, request SOFR Loans having an Interest Period other than one, three or six months in duration as provided in the definition of "Interest Period," the applicable notice must be received by the Administrative Agent not later than 11:00 a.m. four Business Days prior to the requested date of such Borrowing, conversion or continuation, whereupon the Administrative Agent shall give prompt notice to the appropriate Lenders of such request and determine whether the requested Interest Period is acceptable to all of them. Not later than 11:00 a.m., three Business Days before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.14    Minimum Amounts and Maximum Number of SOFR Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of SOFR Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that no more than six SOFR Tranches shall be outstanding at any one time.

2.15    Interest Rates and Payment Dates.

(a)    Each SOFR Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day plus the Applicable Margin.

(b)    Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)    [Reserved].Interest shall be payable by the Borrower in immediately available funds in arrears on each applicable Interest Payment Date and, in any event, on the Term Maturity Date, except with respect to interest payable pursuant to Section 2.15(d) which shall be payable in immediately available funds by the Borrower from time to time on demand.

(d)    If all or a portion of the principal amount of any Loan, interest payable on any Loan or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall, unless otherwise agreed by the Required Lenders, automatically bear interest at a rate per annum equal to the rate applicable to SOFR Loans with an Interest Period of one month plus 2.00% from the date of such nonpayment until such amount is paid in full (after as well as before judgment); provided, that no amount shall accrue or be payable pursuant to this Section 2.15(d) to a Defaulting Lender so long as such Lender shall be a Defaulting Lender. Such interest shall be payable in cash by the Borrower from time to time on demand.

2.16    Computation of Interest and Fees.

(a)    Interest and fees and any amounts owed pursuant to Section 10.5(c) payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest on ABR Loans (except for ABR computations in respect of clause (c) of the definition thereof) shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of the Adjusted Term SOFR Rate.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of demonstrable error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a) and Section 2.15(b).

2.17    <u>Inability to Determine Rates; Benchmark Replacement Setting</u>.

(a)    Subject to <u>clauses (b)</u> through <u>(f)</u> of this <u>Section 2.17</u>, if, on or prior to the first day of any Interest Period for any SOFR Loan, (i) the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof, or (ii) the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that the Adjusted Term SOFR Rate for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to <u>clause (ii)</u>, at the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (A) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to <u>Section 2.21</u>. Subject to <u>clauses (b)</u> through <u>(f)</u> of this <u>Section 2.17</u>, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to <u>clause (c)</u> of the definition of "ABR" until the Administrative Agent revokes such determination.

(b)    <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (1) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (2) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(c)    <u>Benchmark Replacement Conforming Changes</u>. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming

Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(d)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.17(e) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.17, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.17.

(e)    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(f)    Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

2.18    Pro Rata Treatment and Payments.

(a)    Except as expressly otherwise provided herein (including as expressly provided in Sections 2.12, 2.19, 2.20, 2.21, 2.22, 2.24, 2.26, 2.27, 10.5, 10.6 and 10.7), each payment (other than prepayments) in respect of principal or interest in respect of any Tranche of Term Loans and each payment in respect of fees payable hereunder with respect to the Term Loans of such Tranche shall be

applied to the amounts of such obligations owing to the Lenders of such Tranche, pro rata according to the respective amounts then due and owing to such Lenders.

(b)     Each mandatory prepayment of the Term Loans shall be allocated among the Tranches of Term Loans then outstanding pro rata, in each case except as affected by the opt-out provision under Section 2.12(f)f; provided, that at the request of the Borrower, in lieu of such application to the Term Loans on a pro rata basis among all Tranches of Term Loans, such prepayment may be applied to any Tranche of Term Loans so long as the maturity date of such Tranche of Term Loans precedes the maturity date of each other Tranche of Term Loans then outstanding or, in the event more than one Tranche of Term Loans shall have an identical maturity date that precedes the maturity date of each other Tranche of Term Loans then outstanding, to such Tranches on a pro rata basis; provided, further, that in connection with a mandatory prepayment under Section 2.12(a) in connection with the incurrence of Permitted Refinancing Obligations, such prepayment shall be allocated to the Tranches of the applicable Refinanced Debtrefinanced by such Permitted Refinancing Obligations (but to the Loans within such Tranches on a pro rata basis). Each optional prepayment of the Term Loans shall be applied to the remaining installments of each outstanding Tranche of Term Loans on a pro rata basis as specified by the Borrower (and absent such specification, in direct order of maturity). Each mandatory prepayment of the Term Loans shall be applied to the remaining installments of each outstanding Tranche of Term Loans on a pro rata basis in direct order of maturity. Amounts repaid or prepaid on account of the Term Loans may not be reborrowed.

(c)     [Reserved].

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees, the Applicable Premium or otherwise, shall be made without setoff, deduction or counterclaim and shall be made prior to 3:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Funding Office, in immediately available funds. Any payment received by the Administrative Agent after 3:00 p.m., New York City time may be considered received on the next Business Day in the Administrative Agent's sole discretion. The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received. If any payment hereunder (other than payments on the SOFR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be presumptively correct in the absence of demonstrable

error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to SOFR Loans with an Interest Period of one month, on demand, from the Borrower.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any Defaulting Lender.

(f)      Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

2.19    Requirements of Law.

(a)      Except with respect to Indemnified Taxes, Excluded Taxes and Other Taxes, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the Closing Date:

(i)      shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by any office of such Lender that is not otherwise included in the determination of the Adjusted Term SOFR Rate hereunder;

(ii)     shall subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liability or capital attributable thereto; or

(iii)    shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender or other Recipient, by an amount which such Lender or other Recipient reasonably deems to be material, of making, converting into, continuing or maintaining SOFR Loans (in each case hereunder), or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within thirty Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this Section 2.19, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any entity controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such entity's capital as a consequence of its obligations hereunder to a level below that which such Lender or such entity could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such entity's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such entity for such reduction.

(c)     A certificate prepared in good faith as to any additional amounts payable pursuant to this Section 2.19 submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of demonstrable error.  Notwithstanding anything to the contrary in this Section 2.19, the Borrower shall not be required to compensate a Lender pursuant to this Section 2.19 for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided, that if the circumstances giving rise to such claim have a retroactive effect, then such 180-day period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section 2.19 shall survive the termination of this Agreement and the payment of the Obligations. Notwithstanding the foregoing, the Borrower shall not be obligated to make payment to any Lender with respect to penalties, interest and expenses if written demand therefor was not made by such Lender within 180 days from the date on which such Lender makes payment for such penalties, interest and expenses.

(d)     Notwithstanding anything in this Section 2.19 to the contrary, solely for purposes of this Section 2.19, (i) the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date.

2.20    Taxes.

(a)     Except as otherwise provided in this Agreement or as required by law, all payments made by or on account of the Borrower or any Loan Party under this Agreement and the other Loan Documents to any Recipient under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes. If applicable law requires withholding or deduction of any Tax from any such payment, the Borrower, any other Loan Party or other withholding agent shall make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law. If any Indemnified Taxes or Other Taxes are required to be deducted or withheld from any such payments, the amounts so payable to the applicable Recipient shall be increased to the extent necessary so that after deduction or withholding of such Indemnified Taxes and Other Taxes (including Indemnified Taxes or Other Taxes

attributable to amounts payable under this Section 2.20(a)) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, the Borrower or any Loan Party under this Agreement and the other Loan Documents shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Taxes are payable by the Borrower or any Loan Party under this Agreement or the other Loan Documents, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower or Loan Party showing payment thereof if such receipt is obtainable, or, if not, such other evidence of payment as may reasonably be required by the Administrative Agent or such Lender.

(d)    The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes, including any amounts payable pursuant to this Section 2.20, payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any incremental Taxes and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability prepared in good faith and delivered to the Borrower by a Recipient (with a copy to the Administrative Agent if applicable) shall be conclusive absent manifest error.

(e)    Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code (a "Non-US Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) (A) (i) two accurate and complete copies of IRS Form W-8ECI, W-8BEN or W-8BEN-E, as applicable, (ii) in the case of a Non-US Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit F and two accurate and complete copies of IRS Form W-8BEN or W-8BEN-E, or any subsequent versions or successors to such forms, in each case properly completed and duly executed by such Non-US Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents, or (iii) IRS Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (i) and (ii) above, provided that if the Non-US Lender is a partnership, and one or more of the partners is claiming portfolio interest treatment, the certificate in the form of Exhibit F may be provided by such Non-US Lender on behalf of such partners) and (B) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made. Such forms shall be delivered by each Non-US Lender on or about the date it becomes a party to this Agreement (or, in the case of any Participant, on or about the date such Participant purchases the related participation). In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent. Each Non-US Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this

paragraph that such Non-US Lender is not legally able to deliver provided that it shall promptly notify the Borrower and the Administrative Agent in writing of such inability.

(f)    [reserved]

(g)    Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "US Lender") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, or any subsequent versions or successors to such form and certify that such Lender is not subject to backup withholding. Such forms shall be delivered by each US Lender on or about the date it becomes a party to this Agreement. In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent. Each US Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower (or any other form of certification adopted by the United States taxing authorities for such purpose).

(h)    If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to this Section 2.20), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid under this Section 2.20 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided, that such indemnifying party, upon the request of such Recipient, agrees to repay the amount paid over to the indemnifying party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority other than any such penalties, interest or other charges resulting from the gross negligence or willful misconduct of the relevant Recipient (as determined by a final and non-appealable judgment of a court of competent jurisdiction)) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority; provided, further, that such Recipient shall, at the indemnifying party's request, provide a copy of any notice of assessment or other evidence of the requirement to pay such refund received from the relevant Governmental Authority (provided that the Recipient may delete any information therein that it deems confidential). This paragraph shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person. In no event will any Recipient be required to pay any amount to an indemnifying party the payment of which would place such Recipient in a less favorable net after-Tax position than such Recipient would have been in if the indemnification payments or additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

(i)    [reserved]

(j)    If a payment made to a Lender under any Loan Document would be subject to withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.

Solely for purposes of this Section 2.20(j), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(k)    To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting the provisions of this Section 2.20, each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c)(iii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (k).

(l)    The agreements in this Section 2.20 shall survive the termination of this Agreement and payment of the Loans and all other amounts payable under any Loan Document, the resignation of the Administrative Agent and any assignment of rights by, or replacement of, any Lender.

(m)    For purposes of this Section 2.20, for the avoidance of doubt, applicable law includes FATCA.

2.21    Indemnity.  Other than with respect to Taxes, which shall be governed solely by Section 2.20, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (other than lost profits, including the loss of the interest rate margin) that such Lender actually sustains or incurs as a consequence of (a) any failure by the Borrower in making a borrowing of, conversion into or continuation of SOFR Loans after the Borrower has given notice requesting the same in accordance with the provisions of this Agreement, (b) any failure by the Borrower in making any prepayment of or conversion from SOFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment, conversion or continuation of SOFR Loans on a day that is not the last day of an Interest Period with respect thereto.  A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this Section 2.21 submitted to the Borrower by any Lender shall be presumptively correct in the absence of demonstrable error.  This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22    Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the Closing Date, shall make it unlawful for any Lender to make or maintain SOFR Loans as contemplated by this Agreement, such Lender shall promptly give notice thereof to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make SOFR Loans, continue SOFR Loans as such and convert ABR Loans to SOFR Loans shall be suspended during the period of such illegality and (b) such Lender's Loans then outstanding as SOFR Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a SOFR Loan occurs on a day which is not the last day of the then current Interest Period with respect

80

thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

        2.23    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to payments of additional amounts pursuant to Section 2.19, 2.20(a) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) that would, in the Lender's judgment, avoid or minimize any amounts payable to such Sections (including by designating another lending office for any Loans affected by such event with the object of avoiding the consequences of such event); provided, that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage or unreimbursed cost or expense; provided, further, that nothing in this Section 2.23 shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a) or 2.22. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation or assignment.

        2.24    Replacement of Lenders.  The Borrower shall be permitted to (a) replace with a financial entity or financial entities or (b) prepay or terminate the Loans or Commitments, as applicable, of any Lender (each such Lender, a "Replaced Lender") that (i) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority, in each case, pursuant to Section 2.19, 2.20 or 2.21 (to the extent a request made by a Lender pursuant to the operation of Section 2.21 is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to Section 2.22, (ii) is a Disqualified Institution or a Defaulting Lender, or (iii) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required Lenders; provided, that:

        (a)    such replacement does not conflict with any Requirement of Law;

        (b)    the replacement financial entity or financial entities shall purchase, at par, all Loans and other amounts owing to such Replaced Lender on or prior to the date of replacement;

        (c)    the Borrower shall be liable to such Replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any SOFR Loan owing to such Replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto;

        (d)    the replacement financial entity or financial entities, (x) if not already a Lender, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such replacement financial institution of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to Section 10.6(b)(i)(2) and (y) shall pay (unless otherwise paid by the Borrower) any processing and recordation fee required under Section 10.6(b)(ii)(2);

        (e)    the Administrative Agent and any replacement financial entity or entities shall execute and deliver, and such Replaced Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Assumption to effect such substitution;

        (f)    the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated;

(g)    in respect of a replacement pursuant to <u>clause (iii)</u> above, the replacement financial entity or financial entities shall consent to such amendment or waiver;

(h)    any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the Replaced Lender;

(i)    if such replacement, prepayment or termination is in connection with a waiver or amendment with respect to any Loan Document prior to the second anniversary of the Closing Date, the Borrower or the replacement Lender shall pay the Replaced Lender a fee equal to the Applicable Premium of the aggregate principal amount of its Term Loans required to be assigned, prepaid or terminated pursuant to this <u>Section 2.24</u>, calculated as if such amount was being prepaid under <u>Section 2.11</u>; and

(j)    in the case of any such replacement resulting from a requirement that the Borrower pay additional amounts pursuant to Section <u>2.19,</u> 2.20 or 2.21, such replacement will result in a reduction in such payments thereafter.

Prepayments pursuant to this <u>Section 2.24</u> (i) shall be accompanied by accrued and unpaid interest on the principal amount so prepaid up to the date of such prepayment and (ii) shall not be subject to the provisions of <u>Section 2.18</u>.  In connection with any such replacement under this <u>Section 2.24</u>, if the Replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Assumption and/or such other documentation and (b) the date as of which all obligations of the Borrower owing to the Replaced Lender relating to the Loans and participations so assigned shall be paid in full to such Replaced Lender, then such Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption and/or such other documentation as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Replaced Lender, and the Administrative Agent shall record such assignment in the Register.

2.25    [Reserved].

2.26    <u>Extension of Term Loans.</u>

(a)    The Borrower may at any time and from time to time request that all or a portion of the Term Loans of one or more Tranches existing at the time of such request (each, an "<u>Existing Tranche</u>", and the Term Loans of such Tranche, the "<u>Existing Loans</u>") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of any Existing Tranche (any such Existing Tranche which has been so extended, an "<u>Extended Tranche</u>"; and the Term Loans of such Extended Tranches, the "<u>Extended Loans</u>") and to provide for other terms consistent with this <u>Section 2.26</u>; <u>provided</u>, that (i) any such request shall be made by the Borrower to all Lenders with Term Loans with a like maturity date (whether under one or more Tranches) on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Term Loans) and (ii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower in its sole discretion.  In order to establish any Extended Tranche, the Borrower shall provide a notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Existing Tranche) (an "<u>Extension Request</u>") setting forth the proposed terms of the Extended Tranche to be established, which terms shall be substantially similar to those applicable to the Existing Tranche from which they are to be extended (the "<u>Specified Existing Tranche</u>"), except (x) all or any of the final maturity or termination dates of such Extended Tranches may be delayed to later

dates than the final maturity or termination dates of the Specified Existing Tranche, (y)(A) the interest margins with respect to the Extended Tranche may be higher or lower than the interest margins for the Specified Existing Tranche and/or (B) additional fees may be payable to the Lenders providing such Extended Tranche in addition to or in lieu of any increased margins contemplated by the preceding clause (A) and/or (C) prepayment premiums may be different and (z) in the case of an Extended Tranche, so long as the Weighted Average Life to Maturity of such Extended Tranche would be no shorter than the remaining Weighted Average Life to Maturity of the Specified Existing Tranche, amortization rates with respect to the Extended Tranche may be higher or lower than the amortization rates for the Specified Existing Tranche, in each case to the extent provided in the applicable Extension Amendment; provided, that, notwithstanding anything to the contrary in this Section 2.26 or otherwise, assignments and participations of Extended Tranches shall be governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions applicable to Term Loans set forth in Section 10.6. No Lender shall have any obligation to agree to have any of its Existing Loans converted into an Extended Tranche pursuant to any Extension Request.  Any Extended Tranche shall constitute a separate Tranche of Loans from the Specified Existing Tranches and from any other Existing Tranches (and any other Extended Tranches as established on such date).

(b)    The Borrower shall provide the applicable Extension Request at least 10 Business Days (or such shorter period as the Administrative Agent may agree to) prior to the date on which Lenders under the applicable Existing Tranche or Existing Tranches are requested to respond. Any Lender (an "Extending Lender") wishing to have all or a portion of its Specified Existing Tranche converted into an Extended Tranche shall notify the Administrative Agent (each, an "Extension Election") on or prior to the date specified in such Extension Request of the amount of its Specified Existing Tranche that it has elected to convert into an Extended Tranche.  In the event that the aggregate amount of the Specified Existing Tranche subject to Extension Elections exceeds the amount of Extended Tranches requested pursuant to the Extension Request, the Specified Existing Tranches subject to Extension Elections shall be converted to Extended Tranches on a pro rata basis based on the amount of Specified Existing Tranches included in each such Extension Election.  In connection with any extension of Loans pursuant to this Section 2.26 (each, an "Extension"), the Borrower shall agree to such procedures regarding timing, rounding and other administrative adjustments to ensure reasonable administrative management of the credit facilities hereunder after such Extension, as may be established by, or acceptable to, the Administrative Agent and the Borrower, in each case acting reasonably to accomplish the purposes of this Section 2.26.

(c)    Extended Tranches shall be established pursuant to an amendment (an "Extension Amendment") to this Agreement (which may include amendments to provisions related to maturity, interest margins, prepayment premiums or fees referenced in clauses (x) and (y) of Section 2.26(a), or, in the case of Extended Tranches, amortization rates referenced in clause (z) of Section 2.26(a), and which, in each case, except to the extent expressly contemplated by the last sentence of this Section 2.26(c) and notwithstanding anything to the contrary set forth in Section 10.1, shall not require the consent of any Lender other than the Extending Lenders with respect to the Extended Tranches established thereby) executed by the Loan Parties, the Administrative Agent, and the Extending Lenders. Subject to the requirements of this Section 2.26 and without limiting the generality or applicability of Section 10.1 to any Section 2.26 Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "Section 2.26 Additional Amendment") to this Agreement and the other Loan Documents; provided, that such Section 2.26 Additional Amendments do not become effective prior to the time that such Section 2.26 Additional Amendments have been consented to (including pursuant to consents applicable to holders of any Extended Tranches provided for in any Extension Amendment) by such of the Lenders, Loan Parties and other parties (if any) as may be required in order for such Section 2.26 Additional Amendments to become effective in accordance with Section 10.1;

83

provided, further, that no Extension Amendment may provide for (i) any Extended Tranche to be secured by any Collateral or other assets of any Loan Party that does not also secure the Existing Tranches or be guaranteed by any Person other than the Guarantors and (ii) so long as any Existing Tranches are outstanding, any mandatory or voluntary prepayment provisions that do not also apply to the Existing Tranches (other than Existing Tranches (as in effect prior to the applicable Extension Amendment) secured on a junior basis by the Collateral or ranking junior in right of payment, which shall be subject to junior prepayment provisions) on at least a pro rata basis (nor otherwise provide for more favorable prepayment treatment for Extending Tranches than such Existing Tranches as contemplated by Section 2.12). Notwithstanding anything to the contrary in Section 10.1, any such Extension Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the reasonable judgment of the Borrower and the Administrative Agent, to effect the provisions of this Section 2.26; provided, that the foregoing shall not constitute a consent on behalf of any Lender to the terms of any Section 2.26 Additional Amendment.

(d)      Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Tranche is converted to extend the related scheduled maturity or termination date(s) in accordance with Section 2.26(a) above (an "Extension Date"), in the case of the Specified Existing Tranche of each Extending Lender, the aggregate principal amount of such Specified Existing Tranche shall be deemed reduced by an amount equal to the aggregate principal amount of the Extended Tranche so converted by such Lender on such date, and such Extended Tranches shall be established as a separate Tranche from the Specified Existing Tranche and from any other Existing Tranches (and any other Extended Tranches so established on such date).

(e)      If, in connection with any proposed Extension Amendment, any Lender declines to consent to the applicable extension on the terms and by the deadline set forth in the applicable Extension Request (each such other Lender, a "Non-Extending Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Extending Lender, replace such Non-Extending Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.6 (with the assignment fee and any other costs and expenses to be paid by the Borrower or the assignee in such instance) all of its rights and obligations under this Agreement to one or more assignees; provided, that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; provided, further, that the applicable assignee shall have agreed to provide Extended Loans on the terms set forth in such Extension Amendment; provided, further, that all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned (including pursuant to Section 2.21 (as though Section 2.21 were applicable) and any premiums payable pursuant to Section 2.10) shall be paid in full by the assignee Lender to such Non-Extending Lender concurrently with such Assignment and Assumption. In connection with any such replacement under this Section 2.26, if the Non-Extending Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption by the later of (A) the date on which the replacement Lender executes and delivers such Assignment and Assumption and (B) the date as of which all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Loans so assigned shall be paid in full to such Non-Extending Lender, then such Non-Extending Lender shall be deemed to have executed and delivered such Assignment and Assumption as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption on behalf of such Non-Extending Lender.

(f)      Following any Extension Date, with the written consent of the Borrower, any Non-Extending Lender may elect to have all or a portion of its Existing Loans deemed to be an Extended Loan under the applicable Extended Tranche on any date (each date a "Designation Date") prior to the maturity or termination date of such Extended Tranche; provided, that such Lender shall have provided written notice to the Borrower and the Administrative Agent at least 10 Business Days prior to such

84

Designation Date (or such shorter period as the Administrative Agent may agree in its reasonable discretion); provided, further, that no greater amount shall be paid by or on behalf of the Borrower or any of its Affiliates to any such Non-Extending Lender as consideration for its extension into such Extended Tranche than was paid to any Extending Lender as consideration for its Extension into such Extended Tranche. Following a Designation Date, the Existing Loans held by such Lender so elected to be extended will be deemed to be Extended Loans of the applicable Extended Tranche, and any Existing Loans held by such Lender not elected to be extended, if any, shall continue to be "Existing Loans" of the applicable Tranche.

(g)    With respect to all Extensions consummated by the Borrower pursuant to this Section 2.26, (i) such Extensions shall not constitute optional or mandatory payments or prepayments for purposes of Sections 2.11 and 2.12 and (ii) no Extension Request is required to be in any minimum amount or any minimum increment, provided, that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Request in the Borrower's sole discretion and which may be waived by the Borrower) of Existing Loans of any or all applicable Tranches be extended. The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this Section 2.26 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Loans on such terms as may be set forth in the relevant Extension Request) and hereby waive the requirements of any provision of this Agreement (including Sections 2.8, 2.11 and 2.12) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.26.

2.27    Defaulting Lenders.

(a)    Defaulting Lender Cure. If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(b)    Defaulting Lender Waterfall. Any payment of principal, interest or other amounts (other than the payment of default interest under Section 2.15(d), which in each case shall be applied pursuant to the provisions of that Section) received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section VIII or otherwise) shall be applied by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent pursuant to Section 9.7; second, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by any Lender against such

85

Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Facility. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to be held as security in a cash collateral account pursuant to this Section 2.27(b) shall be deemed paid to and redirected by such Defaulting Lender and shall satisfy the Borrower's payment obligation in respect thereof in full, and each Lender irrevocably consents hereto.

SECTION III.   [RESERVED]

SECTION IV.   REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower **here**by represents and warrants (as to itself and each of its Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date (after giving effect to the Transactions) and on the date of each borrowing of Loans hereunder that:[11]

4.1    Financial Condition.    The audited consolidated balance sheet of ~~the Borrower~~Revlon Holdings and its consolidated Subsidiaries as at [December 31, 2022][12], and the related statements of income, stockholders' equity and of cash flows for the fiscal year~~[s]~~ ended on such date, reported on by and accompanied by an unqualified (except as stated therein) report from [KPMG LLP], present fairly in all material respects the financial condition of ~~the Borrower~~Revlon Holdings and its consolidated Subsidiaries as at such dates and the results of their operations, their cash flows and their changes in stockholders' equity for the ~~respective~~ fiscal ~~years~~year then ended.    All such financial statements, including the related schedules and notes thereto and year-end adjustments, have been prepared in accordance with GAAP (except as otherwise noted therein).

4.2    No Change.    Since the Disclosure Statement Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

4.3    Existence; Compliance with Law.    Each of the Borrower and its Subsidiaries (other than any Immaterial Subsidiaries) (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where applicable, the equivalent status (if any) in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) has the corporate or other organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be

---

[11] NTD: Reps and warranties subject to review by Revlon.

[12] NTD: Relevant financials TBD for purposes of this representation.

expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or other entity and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

4.4    Corporate Power; Authorization; Enforceable Obligations.

(a)    Each Loan Party has the corporate or other organizational power and authority to execute and deliver, and perform its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect. Each Loan Party has taken all necessary corporate or other action to authorize the execution and delivery of, and the performance of its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    No consent or authorization of, filing with, or notice to, any Governmental Authority is required to be obtained or made by any Loan Party for the extensions of credit hereunder or such Loan Party's execution and delivery of, or performance of its obligations under, or validity or enforceability of, this Agreement or any of the other Loan Documents to which it is party, as against or with respect to such Loan Party, except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) consents, authorizations, filings and notices the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (iii) the filings referred to in Section 4.17.

(c)    Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. Assuming the due authorization of, and execution and delivery by, the parties thereto (other than the applicable Loan Parties), this Agreement constitutes, and each other Loan Document upon execution and delivery by each Loan Party that is a party thereto will constitute, a legal, valid and binding obligation of each such Loan Party, as applicable, that is a party thereto, enforceable against each such Loan Party, as applicable, in accordance with its terms [(provided, that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries, only to the extent enforceability thereof is governed by the Uniform Commercial Code [or the PPSA], as applicable)], except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing.

4.5    No Legal Bar. Assuming the consents, authorizations, filings and notices referred to in Section 4.4(b) are obtained or made and in full force and effect, the execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties thereto, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of (i) the Borrower or (ii) except as would not reasonably be expected to have a Material Adverse Effect, any other Loan Party, (b) except as would not reasonably be expected to have a Material Adverse Effect, violate any Requirement of Law binding on Holdings, the Borrower or any of its Subsidiaries, (c) except as would not reasonably be expected to have a Material Adverse Effect, violate any material Contractual Obligation of Holdings, the Borrower or any of its Subsidiaries

87

or (d) except as would not have a Material Adverse Effect, result in or require the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens permitted by <u>Section 7.3</u>).

   4.6 <u>No Material Litigation</u>. Other than the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect.[13]

   4.7 <u>No Default</u>.  No Default or Event of Default has occurred and is continuing.

   4.8 <u>Ownership of Property; Liens</u>.  Each of the Borrower and its Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all of its Real Property, and good title to, or a valid leasehold interest in, all of its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Real Property or other Property is subject to any Lien, except as permitted by the Loan Documents.  <u>Schedule 4.8</u> sets forth a correct and complete list of all Material Real Property (other than Excluded Real Property) as of the Closing Date.

   4.9 <u>Intellectual Property</u>.  Each of the Borrower and its Subsidiaries owns, or has a valid license or right to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens, except as permitted by the Loan Documents and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  To the Borrower's knowledge, neither the Borrower nor any of its Subsidiaries is infringing, misappropriating, diluting or otherwise violating any Intellectual Property rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect.  The Borrower and its Subsidiaries take all reasonable actions that in the exercise of their reasonable business judgment should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

   4.10 <u>Taxes</u>.  Each of the Borrower and its Subsidiaries (a) has filed or caused to be filed all federal, state, provincial and other Tax returns that are required to be filed and (b) has paid or caused to be paid all taxes shown to be due and payable on said returns and all other taxes, fees or other charges imposed on it or on any of its Property by any Governmental Authority (other than (i) any returns or amounts that are not yet due or (ii) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the Borrower or such Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

   4.11 <u>Federal Regulations</u>.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for any purpose that violates the provisions of the regulations of the Board.

   4.12 <u>ERISA and Canadian Pension Plans</u>.

---

[13] ~~NTD: TBD whether anything need to be scheduled.~~

88

(a)        Except as set forth on Schedule 4.12 or as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect:  (i) neither a Reportable Event nor a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA has occurred during the five-year period prior to the date on which this representation is made with respect to any Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan, and each Single Employer Plan and, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has complied with the applicable provisions of ERISA and, the Code and the Pension Benefits Act (Ontario) and other applicable federal or provincial laws, as applicable; (ii) no termination of a Single Employer Plan or, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen on the assets of any Loan Party or any other Commonly Controlled Entity, during such five-year period; the present value of all accrued benefits under each Single Employer Plan and Canadian Pension Plan (based on those assumptions used to fund such Plans and Canadian Pension Plans Plan) did not, as of [December 31 January 1, 2021][14], exceed the value of the assets of such Single Employer Plan or Canadian Pension Plan allocable to such accrued benefits; (iii) no Loan Party or  any other Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; (iv) no Loan Party or  any other Commonly Controlled Entity would become subject to any liability under ERISA if such Loan Party or  such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made; and (v) no Multiemployer Plan is Insolvent or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA). [No, and (v) as of the Closing Date, no Canadian Pension Plan is a Canadian Multiemployer Multi-employer Plan.]

(b)        The Borrower and its Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any Plan which is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained or contributed to by a Commonly Controlled Entity (other than the Borrower and its Subsidiaries) merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect.

4.13    Investment Company Act.  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

4.14    Subsidiaries.  The Subsidiaries listed on Schedule 4.14 contains a structure chart showing constitute all of the Subsidiaries of the Borrower at the Closing Date.  Schedule 4.14 sets forth as of the Closing Date, together with  the name and jurisdiction of incorporation of each such Subsidiary and, as to each Subsidiary, the breakdown of ownership percentage of each class of Capital Stock of such Subsidiary and whether any such Subsidiary is an Excluded Subsidiary.[15] owned by any Loan Party.

4.15    Environmental Matters.  Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, (A) none of the Borrower or any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any pending or threatened Environmental Liability and (B) to Borrower's knowledge, there are no existing facts or circumstances (including any presence or Release of

---

[14] NTD: Revlon to confirm latest valuation date.

[15] NTD: Rep to be conformed to Revlon structure chart to the extent applicable.

89

Materials of Environmental Concern at any Real Property or any real property formerly owned or operated by Borrower or its Subsidiaries) that are reasonably likely to give rise to any Environmental Liability of Borrower or any of its Subsidiaries.

4.16    Accuracy of Information, etc. As of the Closing Date, no statement or written information (excluding the projections and pro forma financial information referred to below) contained in this Agreement, any other Loan Document or ~~otherwise~~any certificate furnished to the Administrative Agent or the Lenders or any of them (in their capacities as such), by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, including the Transactions, when taken as a whole, contained as of the date such statement, information or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not materially misleading.  As of the Closing Date, the projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

4.17    Security Documents.[16]

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under Article 9 of the UCC (including any proceeds of any such item of Collateral). The Canadian Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under the PPSA (including any proceeds of any such item of Collateral). The Cayman Pledge Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral).

(b)    The UK Security Agreements are effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral).

(c)    In the case of (i) the Pledged Securities described in any Security Document (other than Excluded Collateral), when any stock, shares or share certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the ABL Intercreditor ~~Agreements)~~Agreement) together with any proper indorsements executed in blank and such other actions have been taken with respect to the Pledged Securities of Foreign Subsidiaries as are required under the applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary (it being understood that no such actions under applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary shall be required by any Loan Document other than a registration of a financing statement or similar registration) and the terms of the relevant Security Document and (ii) the other Collateral

---

[16] ~~NTD: Subject to discussion and related revisions regarding Cayman Pledge Agreement.~~

described in the Security Documents (other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified on <u>Schedule 4.17</u> and other filings are filed or registered, as applicable, in the applicable offices or system of registration (or, in the case of other Collateral not in existence on the Closing Date, such other offices or system of registration as may be appropriate) (which financing statements have been duly completed and executed (as applicable) and delivered to the Collateral Agent) and such other filings as are specified on <u>Schedule 4.17</u> are made (or, in the case of other Collateral not in existence on the Closing Date, such other filings as may be appropriate), the Collateral Agent shall have a fully perfected first priority Lien (or, with respect to the ABL Facility First Priority Collateral, a fully perfected second priority lien) in such Collateral (including any proceeds of any item of such Collateral) described in the Security Documents to which the Collateral Agent is a party (to the extent a security interest in such Collateral can be perfected through the filing of such documents and financing statements in the offices specified on <u>Schedule 4.17</u> (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and the other filings specified on <u>Schedule 4.17</u> (or, in the case of other Collateral not in existence on the Closing Date, such other filings or system of registration as may be appropriate), and through the delivery of the Pledged Securities required to be delivered pursuant to the ABL Intercreditor Agreement or any Other Intercreditor Agreement), as security for the Obligations, in each case prior in right to the Lien of any other Person (except (A) in the case of Collateral other than Pledged Securities that comprise stock of wholly-owned Subsidiaries, Liens permitted by <u>Section 7.3</u> and (B) Liens having priority by operation of law) to the extent required by the Security Documents.

(d)      [Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to <u>Section 6.8(b)</u> or <u>Section 6.10(b)</u>, such Mortgage shall be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on the Mortgaged Property described therein and proceeds thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing; and when such Mortgage is filed in the recording office designated by the Borrower and all relevant mortgage taxes and recording charges are duly paid, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Party in such Mortgaged Property and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case subject only to Liens permitted by <u>Section 7.3</u> or other encumbrances or rights permitted by the relevant Mortgage.]

4.18    <u>Solvency.</u>  As of the Closing Date, the Borrower and its Subsidiaries are (on a consolidated basis), and immediately after giving effect to the Transactions to occur on the Closing Date and immediately following the application of the proceeds of each Loan made (or deemed to have been made) on the Closing Date will be, Solvent.

4.19    <u>Anti-Terrorism.</u>  As of the Closing Date, Holdings, the Borrower and its Subsidiaries are in compliance with the USA Patriot Act and Canadian Anti-Money Laundering & Anti-Terrorism Legislation, except as would not reasonably be expected to have a Material Adverse Effect.

4.20    <u>Use of Proceeds.</u>  The Borrower will use the proceeds of the Loans solely in compliance with <u>Section 6.9</u> of this Agreement.

4.21    <u>Labor Matters.</u>  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and

payment made to employees of the Borrower or its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the Borrower or such Subsidiary, as applicable.

4.22    [Reserved].

4.23    Sanctions. No Loan Party nor, to the knowledge of any Loan Party, any Related Party, (i) is currently the target of any Sanctions or (ii) is located or residing in or organized under the laws of any Designated Jurisdiction, and no Loan Party (iii) is or has been (within the previous five years) engaged in any transaction with any Person who is now or was then the target of Sanctions or who is located, residing in or organized under the laws of any Designated Jurisdiction, in each case, in violation of any applicable Sanctions or (iv) is a Person that constitutes a Canadian Blocked Person. No Loan, nor the proceeds from any Loan, has been or will be used by any Loan Party, directly or knowingly indirectly, to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, residing in or organized under the laws of any Designated Jurisdiction or who is the target of any Sanctions, or in any other manner that will, in each case, result in any violation by any party hereto (including any Lender, the Administrative Agent, the Lead Arranger or the Bookrunner) of Sanctions.

4.24    Anti-Corruption Compliance. The Borrower and each of its Subsidiaries (and all Persons acting on behalf of the Borrower and each of its Subsidiaries) are in compliance with applicable Anti-Corruption Laws and has implemented and maintains in effect policies and procedures reasonably designed to facilitate continued compliance. No part of the proceeds of the Loans has been or will be used by the Borrower or its Subsidiaries, directly or indirectly, for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law. Notwithstanding the foregoing, the representations given in this Section 4.24 shall not be made by nor apply to any Person that qualifies as a corporation that is registered or incorporated under the laws of Canada or any province thereof and that carries on business in whole or in part in Canada within the meaning of Section 2 of the Foreign Extraterritorial Measures (United States) Order, 1992 passed under the Foreign Extraterritorial Measures Act (Canada) in so far as such representations would result in a violation of or conflict with the Foreign Extraterritorial Measures Act (Canada) or any similar law.

4.25    Beneficial Ownership Certification. As of (a) the Closing Date, the information included in the Beneficial Ownership Certification delivered pursuant to Section 5.1(i)(B) is true and correct in all respects and (b) as of the date delivered, the information included in each Beneficial Ownership Certification delivered pursuant to Section 6.16 is true and correct in all respects.

SECTION V.    CONDITIONS PRECEDENT

5.1    Conditions to Closing Date. The effectiveness of this Agreement and the agreement of each Initial Term Lender to make the initial extension of credit requested to be made (or to be deemed to be made) by it on the Closing Date is subject to the satisfaction (or waiver), prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)    Credit Agreement; Guarantee and Collateral Agreement and other Security Documents. The Administrative Agent shall have received (i) this Agreement, executed and delivered by

Holdings and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor party thereto, (iii) the UK Security Documents, executed by the relevant Subsidiary Guarantor party ~~thereto~~thereto, (iii) the Canadian Collateral Agreement, executed by each Subsidiary Guarantor party thereto ~~and~~, (iv) the ABL Intercreditor Agreement, executed and delivered by Holdings, the Borrower, each Subsidiary Guarantor, the Collateral Agent and the collateral agent under the ABL Documents.[17] and (v) the Cayman Pledge Agreement executed by Beautyge Brands U.S.A., Inc.

(b)    <u>Representations and Warranties</u>.    Each of the representations and warranties made by any Loan Party in or pursuant to any of the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) on the Closing Date.

(c)    <u>Borrowing Notice</u>.    The Administrative Agent shall have received a Committed Loan Notice from the Borrower with respect to the Initial Term Loans (including, for the avoidance of doubt, with respect to the Initial Terms Loans to be deemed to be made on the Closing Date pursuant to <u>Section 2.1(a)(i)</u> of this Agreement) in accordance with <u>Section 2.2</u>.

(d)    <u>Fees</u>.    (i) The Borrower shall have paid all fees, premiums and discounts due and payable under the Incremental New Money Commitment Letter and the First Lien Exit Facilities Term Sheet (as defined in the Restructuring Support Agreement), (ii) the Administrative Agent (A) shall have received all fees, discounts and premiums due and payable on or prior to the Closing Date in respect of the Initial Term Facility and (B) to the extent invoiced at least two Business Days prior to the Closing Date (or such later date as the Borrower may reasonably agree), shall have been reimbursed for all reasonable and documented out-of-pocket expenses (including the reasonable fees, charges and disbursements of ~~[~~(i) Davis Polk & Wardwell LLP, counsel to the Lenders, (ii) Goodmans LLP, Canadian counsel to the Lenders and (iii)~~] [•]~~ Paul Hastings LLP, counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(e)    <u>Legal Opinion</u>.[18]    The Administrative Agent and each Lender shall have received an executed legal opinion of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, special New York counsel to the Loan Parties, (ii) Osler, Hoskin and Harcourt LLP, special Canadian counsel to the Loan Parties, (iii) Walkers (Cayman) LLP, special Cayman Islands counsel to the Loan Parties and (iv) ~~Freshfields Bruckhaus Deringer~~Davis Polk & Wardwell London LLP, special English counsel to the ~~Loan Parties~~Administrative Agent and the Lenders, in each case, dated as of the Closing Date, addressed to the Agents and the Lenders, and in form and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(f)    <u>No Default</u>.    No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(g)    <u>Closing Certificate</u>.    The Administrative Agent shall have received a certificate of the Borrower, dated as of the Closing Date, substantially in the form of <u>Exhibit C</u>.

---

[17] ~~NTD: Subject to discussion regarding Cayman Pledge Agreement.~~

[18] ~~Note to Draft: local and special counsel TBD.~~

(h)    Secretary / Director Certificates.  Such certificates of good standing (to the extent such concept exists) from the applicable secretary of state or registrar of the state of organization or jurisdiction of incorporation of each Loan Party , certificates of resolutions or board resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date.

(i)    USA Patriot Act; Proceeds of Crime Act; Beneficial Ownership Certification. The Administrative Agent and the Lenders shall have received from the Borrower and each of the Loan Parties, at least 2 Business Days prior to the Closing Date, (A) all documentation and other information reasonably requested by the Administrative Agent or any Lender no less than 7 calendar days prior to the Closing Date that the Administrative Agent or any such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Proceeds of Crime Act and (B) a Beneficial Ownership Certification in relation to the Borrower and each Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation.

(j)    Filings.  [Except as set forth on Schedule 6.10,] there shall have been delivered to the Collateral Agent in proper form for filing (x) each Uniform Commercial Code and PPSA financing statement and each intellectual property security agreement to be filed with the U.S. Patent and Trademark Office and the U.S. Copyright Office or the Canadian Intellectual Property Office, as applicable, in each case as required by the  Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as the case may be,  in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected Lien (or, with respect to the ABL Facility First Priority Collateral, a fully perfected second priority Lien) on the Collateral described therein and (y) each Uniform Commercial Code and PPSA financing statement and each intellectual property security agreement to be filed with the U.S. Patent and Trademark Office, the U.S. Copyright Office and the Canadian Intellectual Property Office, in each case as required by the Security Documents (other than the Guarantee and Collateral Agreement or the Canadian Collateral Agreement) in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected Lien on the Collateral described therein.

(k)    Pledged Stock; Stock Powers.  [Except as set forth on Schedule 6.10,] the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) shall have received the certificates, if any, representing the shares of Pledged Stock held by a Loan Party pledged pursuant to the Guarantee and Collateral Agreement, Canadian Collateral Agreement, any UK Security Agreement or [the Cayman Pledge Agreement] (as applicable), together with an undated stock power or share transfer instrument for each such certificate executed in blank by a duly authorized officer/director of the pledgor thereof.

(l)    Solvency Certificate.  The Administrative Agent shall have received a solvency certificate signed by the chief financial officer on behalf of the Borrower, substantially in the form of Exhibit G, after giving effect to the Transactions or, at the Borrower's option, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing.

(m)    Restructuring Plan Effective Date; Confirmation Order.  (i) All conditions precedent to the confirmation and effectiveness of the Restructuring Plan, as set forth in the Restructuring Plan, shall have been satisfied or waived in accordance with the terms thereof, (ii) the

94

Borrower shall have delivered to the Administrative Agent and the Lenders a docketed copy of the Confirmation Order, and (iii) the effective date under the Restructuring Plan shall have occurred and (iv) no motion, action or proceeding by any creditor or other party in interest to the Chapter 11 Cases which could reasonably be expected to materially adversely affect the Restructuring Plan, the consummation of the Restructuring Plan, the business or operations of Loan Parties or the transactions contemplated by this Agreement or the Restructuring Plan shall be pending.(or occur contemporaneously with the Closing Date).

(n)     Equity Rights Offering.    The Equity Rights Offering (as defined in the Restructuring Support AgreementPlan) shall have been consummated on terms consistent in all respects with the Restructuring Support Agreement, and Holdings shall have received gross proceeds in an amount no less than $670,000,000 from such Equity Rights Offering *minus* the amount of any reduction thereof as set forth in the Restructuring Support Agreement.

(o)     Material Adverse Effect.  Since the Disclosure Statement Date, there shall not have occurred any event, change, occurrence or circumstance that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect.

(p)     Approvals.   The Borrower and the other Loan Parties shall have received all approvals, consents, licenses and permits required in connection with the Facilities, which approvals, consents, licenses and permits remain in full force and effect, and shall have made or given all necessary filings and notices, as are required to consummate the transactions contemplated hereby without the occurrence of any default under or violation of (i) any Requirements of Law or (ii) any agreement, document or instrument to which any Loan Party is a party or by which any of them or their respective Properties is bound..

(q)     EnglishUK Loan Party Approvals.  The Administrative Agent shall have received, in the case of the EnglishUK Loan Party, a certificate from a director of that EnglishUK Loan Party attaching and certifying that the following documents are correct, complete and in full force and effect and have not been amended or superseded as at the date of this Agreement: (i) a copy of the organizational documents of that EnglishUK Loan Party; (ii) a copy of a resolution of the board of directors of that EnglishUK Loan Party; and (iii) a copy of a resolution signed by all the holders of the issued shares in that EnglishUK Loan Party.

(r)     Financial Statements.   The Administrative Agent and the Lenders shall have received (i) audited consolidated balance sheets and related statements of income and cash flows of the BorrowerRevlon, Inc. and its Subsidiaries for the fiscal year ended December 31, 2022, (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the BorrowerRevlon, Inc. and its subsidiaries for each subsequent fiscal quarter (other than fiscal year end) ended at least 45 days before the Closing Date and (iii) copies of satisfactory interim unaudited financial statements for each month ended since the last audited financial statements for which financial statements are available and will include each month ended at least 30 days before the Closing Date.[19]

(s)     Lien Searches. The Collateral Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code or PPSA financing statements will be made to evidence or perfect security interests required to be evidenced or perfected,

---

[19] NTD: Revlon to confirm 2022 audit will be available by closing.

and such search shall reveal no liens on any of the assets of the Loan Parties, except for Liens permitted by Section 7.3 or liens to be discharged on or prior to the Closing Date.

(t)    No Litigation.  Other than the Chapter 11 Cases, as of the Closing Date, there shall not be any litigation, action, suit, investigation or other arbitral, administrative or judicial proceeding pending or known by a Loan Party to be threatened against any Loan Party drawing into question any transaction contemplated by the Loan Documents, or that could reasonably be expected to have a Material Adverse Effect on the Loan Parties and their Subsidiaries, taken as a whole.

(u)    ABL Facility.  The ABL Facility Agreement and the other ABL Documents shall have become effective, and the ~~Borrower shall have received gross proceeds in an amount~~sum of Excess Availability under (and as defined in) the ABL Facility Agreement and cash and Cash Equivalents held by Holdings and its Subsidiaries shall be no less than $[200,000,000~~] under the ABL Facility~~.

~~(v) [Reserved.]~~

~~(w) [New Foreign ABTL Facility.  The Foreign ABTL Credit Agreement and the other Foreign ABTL Documents shall have become effective, and the Borrower shall have received gross proceeds in an amount no less than $[50,000,000] under the Foreign ABTL Facility.]~~

Notwithstanding anything herein to the contrary, to the extent that any security interest in the intended Collateral or any deliverable related to the perfection of security interests in the intended Collateral (other than any Collateral the security interest in which may be perfected by the filing of a Uniform Commercial Code or PPSA financing statement or the possession of stock certificates) is not or cannot be provided and/or perfected on the Closing Date (1) without undue burden or expense or (2) after the Borrower's use of commercially reasonable efforts to do so, then the provision and/or perfection of such security interest(s) or deliverable shall not constitute a condition precedent to the effectiveness of this Agreement and the making (or deemed making) of the initial extension of credit on the Closing Date; provided, that the Borrower hereby agrees to deliver, or cause to be delivered, such documents and instruments, or take or cause to be taken such other actions, in each case, as may be required to create and/or perfect such security interests within sixty (60) days after the Closing Date (subject to extensions approved by the Administrative Agent in its reasonable discretion).

5.2    Conditions to Each Extension of Credit After Closing Date.  The agreement of each Lender to make any Loan hereunder on any date after the Closing Date is subject to the satisfaction (or waiver) of the following conditions precedent:

(a)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date;

(b)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date; and

(c)     Borrowing Notice.  In the case of a borrowing of any Loans, the Administrative Agent shall have received a Committed Loan Notice from the Borrower in accordance with Section 2.2.

Each borrowing of a Loan by the Borrower hereunder after the Closing Date shall constitute a representation and warranty by the Borrower as of the date of such ~~extension of credit~~borrowing that the conditions contained in this Section 5.2 have been satisfied.

## SECTION VI.   AFFIRMATIVE COVENANTS

The Borrower (on behalf of itself and each of its Subsidiaries (other than any Permitted Joint Venture)) hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall, and shall cause (except in the case of the covenants set forth in Section 6.1, Section 6.2, and Section 6.7) each of its Subsidiaries (other than any Permitted Joint Venture) to:

6.1     Financial Statements.  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on the Platform):

(a)     within 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, [2023], (i) a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, [2023], in comparative form the figures as of the end of and for the previous year, reported on without qualification, exception or explanatory paragraph as to "going concern" or arising out of the scope of the audit (other than any such exception or explanatory paragraph (but not qualification) that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity of any Indebtedness occurring within one year from the time such report is delivered), by [KPMG LLP] or other independent certified public accountants of nationally recognized standing and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal year; and

(b)     within 45 days [(or 75 days, in the case of the fiscal ~~quarter~~quarters of the Borrower ending March 31, 2023 and June 30, 2023)] after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the fiscal quarter ending [●]March 31, [2023], (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth, in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal quarter.

All such financial statements shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in clause (b), for customary year-end adjustments and the absence of complete footnotes).  Any financial statements or other deliverables required to be delivered pursuant to this Section 6.1 and any financial statements or reports required to be delivered pursuant to clause (d) of Section 6.2 shall be deemed to have been furnished to the Administrative Agent on the date that (i) such financial statements or deliverable (as applicable) are

97

posted on the SEC's website at www.sec.gov or the website for the Borrower and (ii) the Administrative Agent has been provided written notice of such posting.

Documents required to be delivered pursuant to this Section 6.1 may also be delivered by posting such documents electronically with written notice of such posting to the Administrative Agent, which notice may be provided via electronic mail, and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on the Platform.

6.2    Certificates; Other Information.    Furnish to the Administrative Agent for delivery to each Lender or, in the case of clause (e), to the relevant Lender (in each case, which may be delivered via posting on the Platform):

(a)    each Borrowing Base Certificate (as defined in the ABL Facility Agreement) concurrent with the delivery thereof under the ABL Facility Agreement;

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1, commencing with delivery of financial statements for the first period ending after the Closing Date, (i) a Compliance Certificate of a Responsible Officer on behalf of the Borrower stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing except as specified in such certificate and (ii) to the extent not previously disclosed to the Administrative Agent, (x) a description of any Default or Event of Default that occurred, (y) a description of any new Subsidiary and of any change in the name or jurisdiction of organization of any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date) to the extent not previously disclosed pursuant to Section 6.8 and (z) solely in the case of financial statements delivered pursuant to Section 6.1(a), a listing of any registrations of or applications for Intellectual Property (other than domain names) by any Loan Party filed since the last such report, together with a listing of any intent-to-use applications for trademarks or service marks for which a statement of use or an amendment to allege use has been filed since the last such report;

(c)    not later than 90 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, [2023], a consolidated forecast for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income);

(d)    promptly after the same become publicly available, copies of all financial statements and material reports that Holdings sends to the holders of any class of its publicly traded debt securities or  public equity securities (except for those provided solely to the Permitted Investors), in each case to the extent not already provided pursuant to Section 6.1 or any other clause of this Section 6.2;

(e)    promptly, such additional financial and other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request to the extent such additional financial or other information is reasonably available to, or can be reasonably obtained by, the Borrower; and

(f)    within a reasonable period following the delivery of any financial statements pursuant to Section 6.1, dial-in details in respect of a conference call with Lenders (which may be satisfied by a call with holders of Holdings' or any Parent Company's publicly listed debt or equity

98

securities attended by any Lender) and during which representatives from the Borrower will be available to discuss the details of the relevant financial statements and otherwise address additional matters in a manner consistent with Revlon Holdings' or the Borrower's past practice.

Notwithstanding anything to the contrary in this Section 6.2, (a) none of the Borrower or any of its Subsidiaries will be required to disclose any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information and (b) unless such material is identified in writing by the Borrower as "Public" information, the Administrative Agent shall deliver such information only to "private-side" Lenders (i.e., Lenders that have affirmatively requested to receive information other than Public Information).

Documents required to be delivered pursuant to this Section 6.2 may be delivered by posting such documents electronically and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website or (ii) on which such documents are posted on the Borrower's behalf on the Platform.

6.3    Payment of Taxes.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

6.4    Conduct of Business; Maintenance of Existence; Compliance with Requirements of Law.  (a) Preserve and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 or except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Requirements of Law (including ERISA, Environmental Laws, and the USA Patriot Act and the Proceeds of Crime Act) except to the extent that failure to comply therewith would not reasonably be expected to have a Material Adverse Effect; provided, that with respect to Environmental Laws, none of the Borrower or any Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.5    Maintenance of Property; Insurance.

(a)    Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)    Take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office, the Canadian Intellectual Property Office or any corresponding office or agency in any other applicable jurisdiction, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration offor the Intellectual Property owned by the Borrower or its Subsidiaries, including filing of applications

99

for renewal, affidavits of use and affidavits of incontestability, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(c)     Maintain insurance with financially sound and reputable insurance companies on all its Property that is necessary in, and material to, the conduct of business by the Borrower and its Subsidiaries, taken as a whole, in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and use its commercially reasonable efforts to ensure that all such material insurance policies shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) name the Collateral Agent (or, in the case of the ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) as additional insured party or loss payee.

(d)     With respect to any Mortgaged Properties, if at any time the area in which the Premises (as defined in the Mortgages, if any) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Collateral Agent may from time to time reasonably require, and otherwise to ensure compliance with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

6.6     <u>Inspection of Property; Books and Records; Discussions</u>.

(a)     Keep proper books of records and accounts in a manner to allow financial statements to be prepared in conformity with GAAP (or, with respect to Subsidiaries organized outside of the United States, the local accounting standards applicable to the relevant jurisdiction; <u>provided</u>, that, to the extent that any such Subsidiary is permitted to prepare financial statements in accordance with different local accounting standards, such Subsidiary shall continue to apply the local accounting standard applied as of the Closing Date (as such standard may be updated or revised from time to time and, for the avoidance of doubt, with any discretions, judgments and elections afforded by such local accounting standard, including any changes in the application of such discretions, judgments and elections as such Subsidiary shall determine) except to the extent of changes between local accounting standards required by applicable law or regulation).

(b)     Permit representatives designated by the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) such visits shall be limited to no more than one such visit per calendar year at each facility, and (ii) such visits by the Administrative Agent or its designee shall be at the Administrative Agent's expense, except in the case of the foregoing <u>clauses (i)</u> and <u>(ii)</u> during the continuance of an Event of Default).

(c)     Permit representatives designated by the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers of the Borrower and its Subsidiaries upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions, (ii) such discussions shall be coordinated by the Administrative Agent, and (iii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

(d)     Permit representatives of the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with its independent certified public accountants to the extent permitted by

the internal policies of such independent certified public accountants upon reasonable notice and at such reasonable times during normal business hours (<u>provided</u>, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions and (ii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default).

Notwithstanding anything to the contrary in this Section 6.6, none of the Borrower or any of the Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information.

6.7    Notices.    Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Administrative Agent of:

(a)    the occurrence of any Default or Event of Default;

(b)    any litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)    the occurrence of any Reportable Event, where there is any reasonable likelihood of the imposition of liability on any Loan Party as a result thereof that would reasonably be expected to have a Material Adverse Effect; and

(d)    any other development or event that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth in reasonable detail the occurrence referred to therein and stating what action the Borrower or the relevant Subsidiary proposes to take with respect thereto.

6.8    Additional Collateral, etc.

(a)    With respect to any Property (other than Excluded Collateral) located in the United States (or, with respect to ~~property~~Property of any Non-US Guarantor, any Property (other than Excluded Collateral) located in the jurisdiction of formation of such Non-US Guarantor or any other jurisdiction ~~within the same country of such jurisdiction of formation~~in which such Non-US Guarantor has previously granted a security interest to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party) having a value, individually or in the aggregate, of at least $[10,000,000]  acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than (i) any interests in Real Property and any Property described in paragraph (c) or paragraph (d) of this Section 6.8, (ii) any Property subject to a Lien expressly permitted by Section 7.3(g) or 7.3(y), and (iii) Instruments, Certificated Securities, Securities and Chattel Paper, which are referred to in the last sentence of this paragraph (a)) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly (A) give notice of such Property to the Collateral Agent and execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, UK Security Agreements, ~~[~~the Cayman Pledge Agreement~~]~~ or such other documents as the Collateral Agent reasonably requests to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in such Property and

101

(B) take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Loan Documents and with the priority required by Section 4.17) in such Property (with respect to Property of a type owned by the Borrower or any Subsidiary Guarantor as of the Closing Date to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or other Security Documents or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $[10,000,000] payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security, Security or Chattel Paper (or, if more than $[10,000,000] in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments, Certificated Securities, Securities or Chattel Paper), such Instrument, Certificated Security, Security or Chattel Paper shall be promptly delivered to the Collateral Agent indorsed in a manner reasonably satisfactory to the Collateral Agent to be held as Collateral pursuant to this Agreement (or, in the case of any such Collateral that is ABL Facility First Priority Collateral, delivered to the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement).

(b)    With respect to any fee interest in any Material Real Property acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than Excluded Real Property, unless such Excluded Real Property is subject to a Lien securing the ABL Facility):

(i)    give notice of such acquisition to the Collateral Agent and, if requested by the Collateral Agent (at the direction of the Required Lenders) or the Borrower, execute and deliver a Mortgage (subject to liens permitted by Section 7.3 or other encumbrances or rights permitted by the relevant Mortgage) in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such Real Property (provided that no Mortgage shall be obtained if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such Mortgage are excessive in relation to the value of the security to be afforded thereby);

(ii)    (A) if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), with respect to any Mortgage, provide the Lenders with (1) a lenders' title insurance policy with extended coverage covering such Real Property in an amount equal to the purchase price (if applicable) or the Fair Market Value of the applicable Material Real Property, as determined in good faith by the Borrower and reasonably acceptable to the Administrative Agent, and (2) for real property located in the U.S., an ALTA survey or such survey alternatives (including, without limitation, an express map), or for real property situated in Canada a survey in form and substance acceptable to the Collateral Agent, of such Real Property, together with a surveyor's certificate unless the title insurance policy referred to above shall not contain an exception for any matter shown by a survey (except to the extent an existing survey has been provided and specifically incorporated into such title insurance policy or if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such survey are excessive in relation to the value of the security to be afforded thereby), each in form and substance reasonably satisfactory to the Collateral Agent, and (B) provide to the Administrative Agent evidence of flood hazard insurance if any portion of the improvements on the owned Material Real Property is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the improvements; provided, however, that a portion of such flood hazard insurance may be

102

obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and

    (iii)    if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), deliver to the Collateral Agent customary legal opinions regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters reasonably requested by the Collateral Agent (at the Direction of the Required Lenders), which opinions shall be in form and substance reasonably satisfactory to the Collateral Agent.

    (c)    Except as otherwise contemplated by Section 7.7(p), with respect to (x) any new Domestic Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary that becomes a Non-Excluded Subsidiary) by the Borrower or any Subsidiary Guarantor or (y) any other Subsidiary that the Borrower elects to designate as not constituting an "Excluded Subsidiary" pursuant to clause (y) of the proviso to the definition thereof, promptly:

    (i)    give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent or the Borrower, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, UK Security Agreements, [the Cayman Pledge Agreement] or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary that is owned by the Borrower or such Subsidiary Guarantor (as applicable);

    (ii)    deliver to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement), the certificates, if any, representing such Capital Stock (other than Excluded Collateral), together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the Borrower or such Subsidiary Guarantor (as applicable); and

    (iii)    cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and, where applicable, the Canadian Collateral Agreement and/or the UK Security Agreement, [the Cayman Pledge Agreement] and (B) (x) to take such actions reasonably necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Collateral described in the Guarantee and Collateral Agreement, Canadian Collateral Agreement, the UK Security Agreement or [the Cayman Pledge Agreement] with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in the same type of Collateral as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreement or [the Cayman Pledge Agreement] or by law or as may be reasonably requested by the Collateral Agent and (y) comply with the provisions of Section 6.8(b) with respect to any Material Real Property (other than Excluded Real Property) owned by such new Subsidiary.

Without limiting the foregoing, if the aggregate Consolidated Total Assets or annual consolidated revenues of any Subsidiary listed in the definition of "Immaterial Subsidiary" hereunder shall at any time exceed [1.0]% of Consolidated Total Assets or [1.0]% of annual consolidated revenues, respectively, of

the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), the Borrower shall promptly, (x) rescind the designation as "Immaterial Subsidiary" of such ~~Person~~Subsidiary so that, after giving effect thereto, the aggregate Consolidated Total Assets or annual consolidated revenues, as applicable, of all Subsidiaries so designated (and which designations have not been rescinded) shall not exceed [1.0]% of Consolidated Total Assets or [1.0]% of annual consolidated revenues, respectively, of the Borrower and its Subsidiaries (based on the most recent financial statements delivered pursuant to Section 6.1 prior to such time), as applicable, and (y) to the extent not already effected, (A) cause each affected Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Subsidiary to take such actions to pledge such Capital Stock to the extent required by, and otherwise in accordance with, the Guarantee and Collateral Agreement or the Canadian Collateral Agreement and execute and deliver the documents and other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Collateral.

(d)    Except as otherwise contemplated by Section 7.7(p), with respect to any new first-tier Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any Subsidiary Guarantor, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement and/or any UK Security Agreement or Canadian Collateral Agreement or [ Cayman Pledge Agreement] as the Collateral Agent reasonably deems necessary or reasonably advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by Section 4.17) in the Capital Stock of such new Subsidiary (other than any Excluded Collateral) that is owned by the Borrower or such Subsidiary Guarantor (as applicable) and (ii) deliver to the Collateral Agent (or, in the case of Pledged Securities that are ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) the certificates, if any, representing such Capital Stock (other than any Excluded Collateral), together with undated stock powers/share transfer instruments, in blank, executed and delivered by a duly authorized officer or director of the Borrower or such Subsidiary Guarantor (as applicable).

(e)    Notwithstanding anything in this Section 6.8 or any Security Document to the contrary, (i) ~~no~~other than with respect to Intellectual Property, neither Holdings nor the Borrower nor any of its Restricted Subsidiaries shall be required to take any actions in order to create or perfect the security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties under the laws of any jurisdiction outside the United States (unless, in the case of any Non-US Guarantor, such jurisdiction is the jurisdiction of organization for such Non-US Guarantor or such Non-US Guarantor has previously granted a security interest in such jurisdiction to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party); provided, that notwithstanding anything herein to the contrary, any actions required to be taken under non-United States law for the purpose of perfecting non-United States Intellectual Property shall be limited to those set forth on Schedule 6.10, (ii) no control agreement shall be required with respect to (x) any Excluded Account or (y) any other Deposit Accounts (as defined in the Guarantee and Collateral Agreement) for which control agreements are not required under Section 5.3 of the Guarantee and Collateral Agreement and (iii~~ii~~) no Liens shall be required to be pledged or created with respect to any of the following (other than with respect to any floating charge granted by a UK Loan Party) (collectively, the "Excluded Collateral"):

(A)    ~~(x) unless also constituting ABL Facility First Priority Collateral, assets located outside the United States, (~~y) motor vehicles or other assets subject to certificates

104

of title or (z) any "intent-to-use" application for registration of a trademark or service mark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(B)      any property or asset to the extent that such grant of a security interest is prohibited or effectively restricted by any applicable law (only so long as such prohibition exists) or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws (only so long as such consent requirement exists);

(C)      any Excluded Accounts and any Excluded Equity Securities;

(D)      (w) any assets owned on or acquired after the Closing Date, to the extent that, and for so long as, taking such actions would violate applicable law or regulation (after giving effect to Section 9-406(d), 9-407(a), 9-408 or 9-409 of the Uniform Commercial Code and other applicable law), (x) any assets acquired before or after the Closing Date, to the extent that and for so long as such grant would violate an enforceable Contractual Obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets, (y) any assets (1) owned on the Closing Date or (2) acquired after the Closing Date, in each case in this clause (y), securing Indebtedness of the type permitted pursuant to Section 7.2(c) (or other Indebtedness permitted under Section 7.2(d), 7.2(j), 7.2(t) or 7.2(v) if such Indebtedness is of the type that is contemplated by Section 7.2(c)) that is secured by a Lien permitted by Section 7.3 so long as the documents governing such Lien do not permit the pledge of such assets to the Collateral Agent, or (z) any lease, license or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements, or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate, breach or invalidate such lease, license or agreement or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or applicable law, other than proceeds and receivables thereof, and only for so long such prohibition exists and to the extent such prohibition was not creation in contemplation of such grant;

(E)      (x) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences (including as a result of the operation of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) as reasonably determined in good faith by the Borrower, or (y) any assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein outweigh the value of the security afforded thereby;

(F)      any leasehold interest in Real Property (and any fixtures relating thereto) and any fixtures relating to any owned Real Property to the extent that the Collateral

Agent is not otherwise entitled to a security interest with respect to such owned Real Property under the terms of this Agreement; and

(G)     any owned Real Property other than Material Real Property, but in any event excluding any Excluded Real Property.

(f)     Notwithstanding the foregoing, to the extent any new Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to an acquisition permitted by Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it substantially contemporaneously with the closing of such merger transaction, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective merger transaction shall be required to so comply within ten Business Days (or such longer period as the Administrative Agent shall agree, at the ~~discretion~~direction of the Required Lenders)).

(g)     From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Collateral Agent may reasonably request for the purposes implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the benefit of the Secured Parties, has a perfected Lien pursuant hereto or thereto, including filing any financing or continuation statements or financing statement amendments under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created thereby; provided, that the Loan Parties shall use commercially reasonable efforts to deliver landlord lien waivers, estoppels or collateral access letters if such landlord lien waivers, estoppels or collateral access letters are required or provided under the ABL Documents.  Notwithstanding the foregoing, the provisions of this Section 6.8 shall not apply to assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby.  The Administrative Agent may grant extensions of time or waivers of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents.

(h)     Notwithstanding the foregoing, if (a) the Borrower or any Subsidiary acquires any Material Real Property (other than Excluded Real Property) or (b) the Required Lenders or Administrative Agent shall have notified the Borrower in writing that they have or it has a reasonable belief that either the Borrower or any of its Subsidiaries is in breach of its obligations under Section 6.4 (to the extent applicable to Environmental Law or Releases of Materials of Environmental Concern), then the Borrower shall deliver within 60 days after the Required Lenders or the Administrative Agent, as applicable, requests therefor or such longer period as the Administrative Agent shall agree, at the Borrower's cost and expense, an environmental assessment report, in the case of clause (b) above of a scope reasonably appropriate to address the subject of the Required Lenders' or the Administrative Agent's, as applicable, reasonable belief that such a breach exists, prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent, indicating the presence or absence of Materials of Environmental Concern or noncompliance with Environmental Law and the estimated cost of any compliance, response or other corrective action to address any identified Materials of Environmental Concern, to the extent required by Environmental Law, or noncompliance on such

106

properties. Without limiting the generality of the foregoing, if the Administrative Agent reasonably determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower (which report would be addressed to the Borrower), and the Borrower hereby grants and agrees to cause any Subsidiary that owns or leases any property described in such request to grant the Administrative Agent, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment on behalf of the Borrower. By virtue of the foregoing, the Borrower does not intend to waive the attorney-client privilege with respect to any information or advice provided by the environmental consulting firm.

6.9    Use of Proceeds.  The proceeds of (i) the Initial Term Loans deemed to have been made on the Closing Date pursuant to Section 2.1(a)(i) shall be used to effect the Transactions in accordance with the Restructuring Plan, (ii) the Initial Term Loans funded on the Closing Date pursuant to Section 2.1(a)(ii) shall be used to make payments and distributions under the Restructuring Plan and for general corporate purposes of the Borrower and its Subsidiaries not otherwise prohibited by this Agreement and (iii) any other Loans incurred after the Closing Date shall be used for general corporate purposes of the Borrower and its Subsidiaries not otherwise prohibited by this Agreement.

6.10    [Post-Closing.

(a)    Satisfy the requirements set forth on Schedule 6.10(a), on or before the date set forth opposite such requirements or such later date as consented to by the Administrative Agent in its reasonable discretion.

(b)    [With respect to any Material Real Property identified in Schedule 4.8, satisfy the requirements set forth on Schedule 6.10(b)in Section 6.8 within 90 days of the Closing Date or such later date as consented to by the Administrative Agent in its reasonable discretion.]

6.11    [Reserved].

6.12    Line of Business.  Continue to operate solely as a Permitted Business.

6.13    Credit Ratings[Reserved].  Use commercially reasonable efforts to (a) within 45 calendar days after the Closing Date, obtain a private facility rating with respect to the Initial Term Facility and a private issuer rating with respect to the Borrower, but not, in any such case, a specific rating, from S&P and Moody's and (b) thereafter, maintain each such private facility rating and private issuer rating.

.

6.14    Changes in Jurisdictions of Organization; Name.  Provide prompt written notice to the Collateral Agent of any change of name or change of jurisdiction of organization of any Loan Party, and deliver to the Collateral Agent all additional executed financing statements, financing statement amendments and other documents reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests to the extent provided for in the Security Documents.

6.15    Additional Beneficial Ownership Certification.  At least five (5) days prior to any Person becoming a Borrower, if requested by any Lender, the Borrower [(including, for the avoidance of doubt, any Successor Borrower)] shall cause any such Person that qualifies as a "legal

entity customer" under the Beneficial Ownership Regulation and has not previously delivered a Beneficial Ownership Certification to deliver a Beneficial Ownership Certification to the Administrative Agent and the Lenders.

6.16  People with Significant Control Regime.  (a) Each Loan Party shall, within the relevant timeframe, comply with any notice it receives pursuant to Part 21A of the Companies Act 2006 (UK) from any company incorporated in the United Kingdom whose shares are the subject of a Lien in favor of the Administrative Agent, and (b) promptly provide the Administrative Agent with a copy of that notice.

6.17  Canadian Defined Benefit Pension Plan Reporting.  Furnish to the Administrative Agent, promptly after filing, a copy of the most recently filed actuarial valuation report in respect of any Canadian Defined Benefit Pension Plan.

SECTION VII.  NEGATIVE COVENANTS

The Borrower hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), the Borrower shall not, and shall not permit any of its Subsidiaries (other than any Permitted Joint Venture) to:[20]

7.1  [reservedReserved].

7.2  Indebtedness.  Create, issue, incur, assume, or permit to exist any Indebtedness, except:

(a)  Indebtedness of the Borrower and any of its Subsidiaries pursuant to this Agreement and any other Loan Document;

(b)  unsecured Indebtedness of the Borrower or any of its Subsidiaries owing to the Borrower or any of its Subsidiaries, provided, that any such Indebtedness owing by a non-Loan Party to a Loan Party is permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof); provided, further, that such Indebtedness of the Borrower or any of its Subsidiaries owing to a Loan Party may be secured by Liens permitted pursuant to Section 7.3(ff);

(c)  (i) Capital Lease Obligations, and Indebtedness of the Borrower or any of its Subsidiaries incurred to finance or reimburse the cost of the acquisition, development, construction, purchase, lease, repair, addition or improvement of any property (real or personal), equipment or other assets used or useful in a Permitted Business, whether such property, equipment or assets were originally acquired directly or as a result of the purchase of any Capital Stock of any Person owning such property, equipment or assets, in an aggregate outstanding principal amount for this clause (i) not to exceed the sum of (A) the greater of (x) [10.0]% of Consolidated Total Assets, at the time of incurrence and (y) [10.0]% of Consolidated Total Assets as of the Closing Date plus (B) $[7,500,000], plus (C) for each period of twelve consecutive months after December 31, [2022], an additional $[7,500,000] and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (c)(i) above;

---

[20] NTD: Covenants subject to review.

108

(d)      (i) Indebtedness outstanding or incurred pursuant to facilities outstanding on the Closing Date (after giving effect to the Transactions) or committed to be incurred pursuant to a definitive agreement as of such date and, in each case, up to the aggregate principal amounts listed on Schedule 7.2(d) and any Permitted Refinancing thereof and (ii) Indebtedness incurred in connection with transactions permitted under Section 7.10 and any Permitted Refinancing thereof;

(e)      Guarantee Obligations (i) by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred; provided that any Subsidiary that is not a Guarantor providing such Guarantee Obligations with respect to Indebtedness of the Borrower in reliance on this clause (e) shall also provide a Guarantee with respect to the Obligations on a pari passu basis, (ii) by the Borrower or any Subsidiary Guarantor of obligations of Holdings, any Non-Guarantor Subsidiary or joint venture or other Person that is not a Subsidiary to the extent permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof), (iii) by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary; and (iv) by any Non-Guarantor Subsidiary of the obligations of any other Person that is not a Subsidiary to the extent permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof);

(f)      Indebtedness of the Borrower or any of its Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)      [reserved]Indebtedness consisting of Hedge Agreements permitted pursuant to Section 7.14;

(h)      Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting, ordinary course deferred purchase price, purchase price adjustment or other similar arrangements and other contingent obligations in respect of the Transactions and other acquisitions or Investments permitted by Section 7.7 (other than by reference to Section 7.2 or any clause thereof) (both before or after any liability associated therewith becomes fixed), including any such obligations which may exist on the Closing Date as a result of acquisitions consummated prior to the Closing Date;

(i)      Indebtedness of the Borrower and any of its Subsidiaries constituting (i) Permitted Refinancing Obligations and (ii) Permitted Refinancings in respect of Indebtedness incurred pursuant to the preceding clause (i);

(j)      (i) Indebtedness of the Borrower or any other Loan Party (other than a BrandCo Entity) in an aggregate principal amount (for the Borrower and all such Loan Parties) not to exceed $150,000,000 at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (j)(i) above; provided that (A) proceeds of Indebtedness incurred pursuant to this Section 7.2(j) shall not be used for liability management purposes, (B) no more than $[25,000,000] of such Indebtedness incurred pursuant to this clause (j) may be secured by Collateral on a pari passu basis with the Liens securing the Obligations and (C) to the extent secured, such Indebtedness incurred pursuant to this clause (j) may only be secured pursuant to Section 7.3(g);

(k)      (i) [Indebtedness of Non-Guarantor Subsidiaries that are Foreign Subsidiaries outstanding under the Foreign ABTL Facility (as in effect on the Closing Date), (ii)]Indebtedness of Non-Guarantor Subsidiaries that are Foreign Subsidiaries under local bilateral credit facilities for working capital and general corporate purposes, in an aggregate principal amount, for purposes of this clause (k)(ii), not to exceed $[50,000,000] at any time outstanding and (iiiii) subject to the last sentence

109

of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (k)(i) and clause (k)(ii) above; provided that the aggregate principal amount of Indebtedness incurred under this Section 7.2(k) shall reduce the aggregate principal amount of Indebtedness that may be secured by Liens incurred pursuant to Section 7.3(cc)(B) on a dollar-for-dollar basis;

(l)    Indebtedness of the Borrower or any of its Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid, customs, government, VAT, duty, tariff, appeal and surety bonds, completion guarantees, and other obligations of a similar nature, in each case in the ordinary course of business;

(m)    Indebtedness incurred by the Borrower or any of its Subsidiaries arising from agreements providing for indemnification related to sales, leases or other Dispositions of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary;

(n)    Indebtedness supported by a letter of credit issued under the ABL Facility Agreement (or any other revolving credit or letter of credit facility permitted by this Section 7.2), including in respect of unpaid reimbursement obligations relating thereto, in a principal amount not in excess of the stated amount of such letter of credit;

(o)    Indebtedness issued in lieu of cash payments of Restricted Payments permitted by Section 7.6 (other than by reference to Section 7.2 or any clause thereof);

(p)    [reserved];

(q)    Indebtedness of the Borrower or any Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business or otherwise consistent with industry practice;

(r)    Indebtedness (i) owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business and (ii) in the form of pension and retirement liabilities not constituting an Event of Default, to the extent constituting Indebtedness;

(s)    (i) Guarantee Obligations made in the ordinary course of business; provided, that such Guarantee Obligations are not of Indebtedness for Borrowed Money, (ii) Guarantee Obligations in respect of lease obligations of the Borrower and its Subsidiaries, (iii) Guarantee Obligations in respect of Indebtedness of joint ventures; provided, that the aggregate principal amount of any such Guarantee Obligations under this sub-clause (iii) shall not exceed the greater of (A) $[25,000,000] and (B) [0.83]% of Consolidated Total Assets at the time of such incurrence, at any time outstanding, (iv) Guarantee Obligations in respect of Indebtedness permitted by clause (r)(ii) above and (v) Guarantee Obligations by the Borrower or any of its Subsidiaries of any Subsidiary's purchase obligations under supplier agreements and in respect of obligations of or to customers, distributors, franchisees, lessors, licensees and sublicensees; provided, that such Guarantee Obligations are not of Indebtedness for Borrowed Money;

(t)    (x) Indebtedness (including pursuant to any factoring arrangements) of any Person that becomes a Subsidiary or is merged with or into the Borrower or any of its Subsidiaries after the Closing Date (a "New Subsidiary") or that is associated with assets being purchased or otherwise acquired, in each case, as part of an acquisition, merger or consolidation or amalgamation or other

110

Investment not prohibited hereunder; *provided*, that (A) such Indebtedness exists at the time such Person becomes a Subsidiary or is acquired, merged, consolidated or amalgamated by, with or into the Borrower or such Subsidiary or when such assets are acquired and is not created in contemplation of or in connection with such Person becoming a Subsidiary or with such merger (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such Person becoming a Subsidiary or to facilitate such merger) or such asset acquisition and (B) neither the Borrower nor any of its Subsidiaries (other than the applicable New Subsidiary and its Subsidiaries) shall provide security or any guarantee therefor and (y) Permitted Refinancings of the Indebtedness referred to in clause (x) of this paragraph (t);

(u)    (i) Indebtedness incurred to finance any acquisition or Investment permitted under Section 7.7 to the extent (A) unsecured at all times during the term of this Agreement and (B) in an aggregate outstanding principal amount for all such Indebtedness under this clause (u)(i) not to exceed the greater of (x) $[50,000,000]  and (y) [1.5]% of Consolidated Total Assets at the time of such incurrence, at any time outstanding and (ii) subject to the last sentence of this Section 7.2, Permitted Refinancings in respect of the Indebtedness incurred pursuant to clause (u)(i) above;

(v)    [reserved];

(v) (A) other Indebtedness of the Borrower and its Subsidiaries (other than a BrandCo Entity) so long as at the time of incurrence thereof:

(1)    if unsecured, after giving pro forma effect to the incurrence of such Indebtedness and the intended use of proceeds thereof determined as of the last day of the fiscal quarter most recently then ended for which financial statements have been delivered pursuant to Section 6.1, the Fixed Charge Coverage Ratio of the Borrower and its Subsidiaries shall be no less than [___] to 1.00;

(2)    if secured on a junior basis to the Obligations, after giving pro forma effect to the incurrence of such Indebtedness and the intended use of proceeds thereof determined as of the last day of the fiscal quarter most recently then ended for which financial statements have been delivered pursuant to Section 6.1, the Consolidated Net Secured Leverage Ratio of the Borrower and its Subsidiaries shall be no greater than [___] to 1.00;

(3)    if secured on a pari passu basis with the Obligations, after giving pro forma effect to the incurrence of such Indebtedness and the intended use of proceeds thereof determined as of the last day of the fiscal quarter most recently then ended for which financial statements have been delivered pursuant to Section 6.1, the Consolidated Net First Lien Leverage Ratio of the Borrower and its Subsidiaries shall be no greater than [___] to 1.00;

(4)    no Event of Default shall be continuing immediately after giving effect to the incurrence of such Indebtedness;

(5)    the terms of which Indebtedness do not provide for a maturity date or Weighted Average Life to Maturity earlier than the Latest Maturity Date in effect at such time of incurrence or shorter than the Weighted Average Life to Maturity of the Latest Maturing Term Loans in effect at such time of incurrence (other than an earlier maturity date and/or shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for an earlier maturity date or a shorter Weighted

~~Average Life to Maturity than the Latest Maturity Date or the Weighted Average Life to Maturity of the Latest Maturing Term Loans, as applicable); and~~

~~(6)        any such Indebtedness that is secured shall be subject to an Other Intercreditor Agreement;~~

~~provided, that the amount of Indebtedness which may be incurred pursuant to this paragraph (v) by Non-Guarantor Subsidiaries and any Permitted Refinancings thereof pursuant to clause (B) below shall not exceed, at any time outstanding, $[50,000,000]; and ]²¹~~

~~(B) Permitted Refinancings of any of the Indebtedness referred to in clause (A) of this paragraph (v) subject to the proviso thereof;~~

(w)        (i) Indebtedness representing deferred compensation or stock-based compensation to employees of Holdings, <u>any Parent Company,</u> the Borrower or any Subsidiary incurred in the ordinary course of business and (ii) Indebtedness consisting of obligations of the Borrower or any Subsidiary under deferred compensation or other similar arrangements incurred in connection with the Transactions and any Investment permitted hereunder;

(x)        Indebtedness issued by the Borrower or any of its Subsidiaries to the officers, directors and employees of Holdings, <u>any Parent Company,</u> the Borrower or any Subsidiary of the Borrower or their respective estates, trusts, family members or former spouses, in lieu of or combined with cash payments to finance the purchase of Capital Stock of Holdings<u>, any Parent Company</u> or the Borrower, in each case, to the extent such purchase is permitted by <u>Section 7.6</u>;

(y)        Indebtedness (and Guarantee Obligations in respect thereof) in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(z)        (i) Indebtedness of the Borrower or any of its Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in the ordinary course of business and (ii) Indebtedness of the Borrower or any of its Subsidiaries to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including in respect of intercompany self-insurance arrangements);

(aa)        (i) Indebtedness of the Borrower and any of its Subsidiaries under the ABL Facility Agreement in an aggregate outstanding principal amount not to exceed the greater of (x) $[•]<u>350,000,000</u> and (y) the Borrowing Base (as defined in the ABL Facility Agreement on the Closing Date) and (ii) subject to the last sentence of this <u>Section 7.2</u>, Permitted Refinancings in respect of the Indebtedness incurred pursuant to <u>clause (aa)(i)</u> above;

(bb)        Indebtedness to any Person (other than an Affiliate of the Borrower) in respect of the undrawn portion of the face amount of or unpaid reimbursement obligations in respect of letters of credit not issued under the ABL Facility Agreement for the account of the Borrower or any of its Subsidiaries in an aggregate amount at any one time outstanding not to exceed (x) $[20,000,000~~]~~, plus (y)

---

²¹ ~~Ratio Debt capacity concept TBD.~~

an additional $[30,000,000] to the extent that the amounts incurred under this <u>clause (y)</u> are offset or secured by a counterpart deposit, compensating balance or a pledge of cash deposits;

(cc)    (i) unsecured Indebtedness of the Borrower or a Subsidiary Guarantor (other than the BrandCo Entities) to Holdings, any Parent Company or any Affiliate of the Borrower or, Holdings or any Parent Company in an aggregate principal amount at any time outstanding not to exceed $[75,000,000]; <u>provided</u>, that (x) such Indebtedness is subordinated in right of payment of the Obligations, (y) the maturity date thereof shall not be earlier than the Latest Maturity Date in effect at the time such Indebtedness is incurred and (z) such Indebtedness shall not require the payment of cash interest prior to the Latest Maturity Date in effect at the time such Indebtedness is incurred and (ii) subject to the last sentence of this <u>Section 7.2</u>, Permitted Refinancings in respect of the Indebtedness incurred pursuant to <u>clause (cc)(i)</u> above; and

(dd)    Indebtedness designated as ABL Designated Additional Obligations, ABL Designated Banking Services, ABL Designated L/C Obligations or ABL Designated Swap Obligations in accordance with the ABL Facility; and

(ee)    (dd) all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations described in <u>clauses (a)</u> through <u>(cc)</u> above.

To the extent that any Indebtedness incurred under <u>Section 7.2(c)</u>, <u>(d)</u>, <u>(i)</u>, <u>(j)</u>, <u>(k)</u>, <u>(t)</u>, <u>(u)</u>, <u>(aa)</u> or <u>(cc)</u> is refinanced in a Permitted Refinancing under <u>clause (ii)</u> or other clause of the relevant foregoing <u>Section</u>, then the aggregate outstanding principal amount of such Permitted Refinancing shall be deemed to utilize the related basket under the relevant foregoing <u>Section</u> on a dollar for dollar basis (it being understood that a Default shall be deemed not to have occurred solely to the extent that the incurrence of a Permitted Refinancing would cause the permitted amount under such <u>Section</u> to be exceeded and such excess shall be permitted hereunder).

7.3    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)    Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings; <u>provided</u>, that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, to the extent required by GAAP;

(b)    landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or  that are being contested in good faith by appropriate proceedings;

(c)    (i) pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens incurred in the ordinary course of business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Subsidiaries in respect of such obligations;

(d)    deposits and other Liens to secure the performance of bids, government, trade and other similar contracts (other than for Indebtedness for Borrowed Money), leases, subleases, statutory or regulatory obligations, surety, judgment and appeal bonds, performance bonds and other

113

obligations of a like nature and liabilities to insurance carriers incurred in the ordinary course of business;

(e)    (i) Liens and encumbrances shown as exceptions in the title insurance policies insuring the Mortgages, and (ii) easements, zoning restrictions, rights-of-way, leases, licenses, covenants, conditions, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)    Liens (i) in existence on the Closing Date (after giving effect to the Transactions) listed on Schedule 7.3(f) and, in each case, up to the aggregate principal amounts listed on Schedule 7.3(f) (or to the extent not listed on such Schedule 7.3(f), where the Fair Market Value of the Property to which such Lien is attached is less than $[10,000,000)], in each case securing the obligations that such Liens secured on the Closing Date and any replacements, refinancings and extensions thereof, (ii) securing Indebtedness permitted by Section 7.2(d) and (iii) created after the Closing Date in connection with any refinancing, refundings, or renewals or extensions thereof permitted by Section 7.2(d); provided, that no such Lien is spread to cover any additional Property of the Borrower or any of its Subsidiaries after the Closing Date unless such Lien utilizes a separate basket under this Section 7.3;

(g)    (i) Liens securing Indebtedness of the Borrower or any of its Subsidiaries incurred pursuant to Sections 7.2(c), 7.2(e), and 7.2(i) (provided that no such Liens securing debt pursuant to Section 7.2(i) shall apply to any other Property of the Borrower or any of its Subsidiaries that is not Collateral (or does not concurrently become Collateral) unless such Lien utilizes a separate basket under this Section 7.3) and Sections 7.2(j), 7.2(k), 7.2(r), 7.2(s), 7.2(t) and 7.2(v); provided, that (A) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(k), such Liens do not at any time encumber any Property of the Borrower, or any Subsidiary Guarantor, (B) in the case of any such Liens securing Indebtedness incurred pursuant to Section 7.2(r), such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance, (C) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(t)(x), such Liens exist at the time that the relevant Person becomes a Subsidiary or such assets are acquired and are not created in contemplation of or in connection with such Person becoming a Subsidiary or the acquisition of such assets (except to the extent such Liens secure Indebtedness which refinanced other secured Indebtedness to facilitate such Person becoming a Subsidiary or to facilitate the merger, consolidation or amalgamation or other acquisition of assets referred to in such Section 7.2(t)(x)), (D) in the case of Liens securing Guarantee Obligations pursuant to Section 7.2(e), the underlying obligations are secured by a Lien permitted to be incurred pursuant to this Agreement and (ii) any extension, refinancing, renewal or replacement of the Liens described in clause (i) of this Section 7.3(g) in whole or in part; provided, that such extension, renewal or replacement shall be limited to all or a part of the property which secured (or was permitted to secure) the Lien so extended, renewed or replaced (plus improvements on such property, if any) and (E) in the case of any such Liens securing Indebtedness pursuant to Section 7.2(j), no more than $[25,000,000] of such Indebtedness may be secured by the Collateral on a pari passu basis with the Liens securing the Obligations, and no such Liens shall apply to any other Property of the Borrower or any of its Subsidiaries that is not Collateral;

(h)    Liens created pursuant to the Loan Documents or any other Lien securing all or a portion of the Obligations or any obligations in respect of a Permitted Refinancing thereof in accordance with Section 7.2;

(i)    Liens arising from judgments in circumstances not constituting an Event of Default under Section 8.1(h);

(j)    Liens on Property or assets acquired pursuant to an acquisition permitted under Section 7.7 (and the proceeds thereof) or assets of a Subsidiary in existence at the time such Subsidiary is acquired pursuant to an acquisition permitted under Section 7.7 and not created in contemplation thereof and Liens created after the Closing Date in connection with any refinancing, refundings, replacements or renewals or extensions of the obligations secured thereby permitted hereunder, provided, that no such Lien is spread to cover any additional Property (other than other Property of such Subsidiary or the proceeds or products of the acquired assets or any accessions or improvements thereto and after-acquired property, subjected to a Lien pursuant to terms existing at the time of such acquisition) after the Closing Date (unless such Lien utilizes a separate basket under this Section 7.3);

(k)    (i) Liens on Property of Non-Guarantor Subsidiaries securing Indebtedness or other obligations not prohibited by this Agreement to be incurred by such Non-Guarantor Subsidiaries and (ii) Liens securing Indebtedness or other obligations of the Borrower or any of its Subsidiaries in favor of any Loan Party;

(l)    receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(m)    Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(n)    Liens arising out of consignment or similar arrangements for the sale by the Borrower and its Subsidiaries of goods through third parties in the ordinary course of business or otherwise consistent with past practice;

(o)    Liens solely on any cash earnest money deposits made by the Borrower or any of its Subsidiaries in connection with an Investment permitted by Section 7.7;

(p)    Liens deemed to exist in connection with Investments permitted by Section 7.7(b) that constitute repurchase obligations;

(q)    Liens upon specific items of inventory, equipment or other goods and proceeds of the Borrower or any of its Subsidiaries arising in the ordinary course of business securing such Person's obligations in respect of bankers' acceptances and letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory, equipment or other goods;

(r)    Liens (i) on cash deposits securing any Hedge Agreements permitted hereunder, and not for speculative purposes, in an aggregate amount not to exceed $[10,000,000] at any time outstanding or (ii) securing ~~Hedging~~Hedge Agreements of the Borrower and its Subsidiaries entered into in the ordinary course of business for the purpose of providing foreign exchange for their respective operating requirements or of hedging interest rate or currency exposure, and not for speculative purposes;

(s)    any interest or title of a lessor under any leases or subleases entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and any financing statement filed in connection with any such lease;

(t)    Liens on cash and Cash Equivalents (including the net proceeds of the incurrence of Indebtedness) used to defease or to satisfy and discharge or redeem or repurchase

Indebtedness, provided, that such defeasance or satisfaction and discharge or redemption or repurchase is not prohibited hereunder;

(u)        (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (C) relating to purchase orders and other agreements entered into with distributors, clients, customers, vendors or suppliers of the Borrower or any of its Subsidiaries in the ordinary course of business, (ii) other Liens securing cash management obligations in the ordinary course of business and (iii) Liens encumbering reasonable and customary initial deposits and margin deposits in respect of, and similar Liens attaching to, commodity trading accounts and other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(v)        Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(w)        Liens on Capital Stock in joint ventures and other non-wholly owned entities securing obligations of such joint venture or entity and options, put and call arrangements, rights of first refusal and similar rights relating to Capital Stock in joint ventures and other non-wholly owned entities;

(x)        Liens securing obligations in respect of trade-related letters of credit permitted under Section 7.2 and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(y)        other Liens with respect to obligations the principal amount of which do not exceed $[25,000,000], at any time outstanding; ~~provided, that any such Liens on any Property of the BrandCo Entities (x) shall not secure obligations in excess of $[1,000,000], (y) shall not secure any Indebtedness for Borrowed Money and (z) shall not secure obligations that are secured by any other asset of the Borrower or its Subsidiaries;~~

(z)        ~~non-exclusive~~ licenses, sublicenses, cross-licensing or pooling of, or similar arrangements with respect to, Intellectual Property granted by the Borrower or any of its Subsidiaries which do not interfere in any material respect with the ordinary conduct of the business of the Borrower or such Subsidiary and are not otherwise materially adverse to the interest of the Lenders;

(aa)        Liens arising from precautionary UCC financing statement filings (or other similar filings in non-U.S. jurisdictions) regarding leases, subleases, licenses or consignments, in each case, entered into by the Borrower or any of its Subsidiaries;

(bb)        Liens on cash and Cash Equivalents (and the related escrow accounts) in connection with the issuance into (and pending the release from) escrow of, any Permitted Refinancing Obligations, any Indebtedness permitted under Section 7.2 and, in each case, any Permitted Refinancing thereof;

(cc)        (A) Liens on the Collateral ~~(other than the Collateral of any BrandCo Entity)~~ securing (i) Indebtedness incurred pursuant to Section 7.2(aa), (ii) ABL Designated Banking Services Obligations~~[,][ and]~~ (iii) ABL Designated Swap Obligations ~~[~~, (iv) ABL Designated L/C Obligations and (iv) ABL Designated ~~Specified~~ Additional Obligations~~]~~ and (B) Liens on assets of Foreign Subsidiaries securing Indebtedness incurred pursuant to Section 7.2(aa) for working capital and general corporate purposes, provided that (x) the aggregate principal amount of Indebtedness secured by any such Liens

116

shall reduce the aggregate principal amount of Indebtedness that may be incurred pursuant to Section 7.2(k) and (y) all obligors with respect to such Indebtedness incurred pursuant to this Section 7.3(cc)(B) shall also guarantee the Obligations; provided, further, that any such Liens on such Collateral incurred pursuant to this Section 7.3 (cc) shall be subject to the ABL Intercreditor Agreement;

(dd)    (i) zoning or similar laws or rights reserved to or vested in any Governmental Authority to control or regulate the use of any real property and (ii) Liens in favor of the United States of America for amounts paid by the Borrower or any of its Subsidiaries as progress payments under government contracts entered into by them (provided, that no such Lien described in this clause (ii) shall encumber any Collateral);

(ee)    any extension, renewal or replacement of any Liens permitted by this Section 7.3; provided, that the Liens permitted by this clause (ee) shall not extend to or cover any additional Indebtedness (other than applicable Permitted Refinancings) or property (other than the proceeds or products thereof or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms no broader than the equivalent terms existing at the time of such extension, renewal or replacement, and other than a substitution of like property) unless such Lien uses a separate basket under this Section 7.3;

(ff)    Liens in favor of the Borrower or any Subsidiary Guarantor securing Indebtedness permitted under Section 7.2(b); provided, that to the extent such Liens are on the Collateral such Liens shall be junior to the Liens on the Collateral securing the Obligations and subject to an Other Intercreditor Agreement;

(gg)    Liens on inventory or equipment of the Borrower or any Subsidiary granted in the ordinary course of business to the Borrower's or such Subsidiary's (as applicable) distributor, vendor, supplier, client or customer at which such inventory or equipment is located;

(hh)    other Liens incidental to the conduct of business of the Borrower and its Subsidiaries or the ownership of any of their assets not incurred in connection with Indebtedness, which Liens do not in any case materially detract from the value of the Property subject thereto or interfere with the ordinary course of business of the Borrower or any of its Subsidiaries;

(ii)    [reserved];

(jj)    [reserved];

(kk)    Liens on cash deposits in respect of Indebtedness permitted under Section 7.2(n) or 7.2(bb); provided, that, with respect to Indebtedness permitted under Section 7.2(bb)(y), the amount of any such deposit does not exceed the amount of the Indebtedness such cash deposits secures;

(ll)    [reserved]; and

(mm)    Liens on all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations permitted to be incurred pursuant to Sections 7.2(a) through (cc) and the subject of any Lien permitted pursuant to clauses (a) through (ll) above.

117

~~Notwithstanding anything in this Agreement to the contrary and in addition to the foregoing, no Lien shall be permitted on any assets of the BrandCo Entities, except BrandCo Permitted Liens.~~

7.4    <u>Fundamental Changes</u>.    Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

(a)    (i) any Subsidiary ~~(other than a BrandCo Entity)~~ may be merged, amalgamated or consolidated with or into, or be liquidated into, the Borrower (<u>provided</u>, that the Borrower shall be the continuing or surviving corporation) or (ii) any Subsidiary ~~(other than a BrandCo Entity)~~ may be merged, amalgamated or consolidated with or into, or be liquidated into, any Subsidiary Guarantor (<u>provided</u>, that (x) a Subsidiary Guarantor shall be the continuing or surviving corporation or (y) substantially simultaneously with such transaction, the continuing or surviving corporation shall become a Subsidiary Guarantor and the Borrower shall comply with <u>Section 6.8</u> in connection therewith) ~~or (iii) any Subsidiary may be merged with or into, or be liquidated into, any BrandCo (provided, that a BrandCo shall be the continuing surviving corporation)~~;

(b)    any Non-Guarantor Subsidiary may be merged or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary that is a Subsidiary;

(c)    any Subsidiary ~~(other than a BrandCo Entity)~~ may Dispose of all or substantially all of its assets upon voluntary liquidation or otherwise to any Loan Party;

(d)    any Non-Guarantor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Non-Guarantor Subsidiary that is a Subsidiary or to Holdings;

(e)    Dispositions permitted by <u>Section 7.5</u> (other than <u>Section 7.5(c)</u>) and any merger, dissolution, liquidation, consolidation, amalgamation, investment or Disposition, the purpose of which is to effect a Disposition permitted by <u>Section 7.5</u> (other than <u>Section 7.5(c)</u>), may be consummated;

(f)    any Investment expressly permitted by <u>Section 7.7</u> (other than <u>Section 7.7(o)</u>) may be structured as a merger, consolidation or amalgamation;

(g)    the Borrower and its Subsidiaries may consummate the Transactions;

(h)    any Subsidiary ~~(other than a BrandCo Entity)~~ may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interest of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Subsidiary ~~(other than a BrandCo Entity)~~ is a Loan Party, any assets or business of such Subsidiary not otherwise Disposed of or transferred in accordance with <u>Section 7.4</u> or <u>7.5</u> or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Loan Party after giving effect to such liquidation or dissolution;

(i)    any Escrow Entity may be merged with and into the Borrower or any Subsidiary (<u>provided</u> that the Borrower or such Subsidiary shall be the continuing or surviving entity); and

(j)    if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, any Person may be

118

merged, amalgamated or consolidated with or into the Borrower, <u>provided</u>, that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "<u>Successor Borrower</u>"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, (3) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee and Collateral Agreement confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant to <u>clause (3)</u>, (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to <u>clause (3)</u> and <u>(6)</u> the Successor Borrower shall deliver to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to <u>Section 5.1(e)</u> (it being understood that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement).

        7.5   <u>Dispositions of Property</u>.  Dispose of any of its owned Property (including receivables) whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock (other than directors' qualifying shares) to any Person, except:

        (a)    (i) the Disposition of surplus, obsolete, damaged or worn out Property (including scrap and byproducts) in the ordinary course of business, Dispositions of Property (other than Intellectual Property) no longer used or useful or economically practicable to maintain in the conduct of the business of the Borrower and other Subsidiaries in the ordinary course and Dispositions of Property necessary in order to comply with applicable Requirements of Law or licensure requirements (as determined by the Borrower in good faith), (ii) the sale of defaulted receivables in the ordinary course of business, (iii) abandonment, cancellation or Disposition of any ~~non-Material~~ Intellectual Property in the ordinary course of business and <u>to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith) and</u> (iv) sales, leases or other Dispositions of inventory determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business;

        (b)    (i) the sale of inventory or other Property (other than Intellectual Property) in the ordinary course of business, (ii) the ~~non-exclusive~~ cross-licensing, pooling, sublicensing or licensing of, or similar arrangements (including Disposition of marketing rights) with respect to, Intellectual Property in the ordinary course of business ~~or~~<u>and</u> to the extent not materially disadvantageous to the Lenders <u>(as reasonably determined by the Borrower, acting in good faith)</u>, and (iii) the contemporaneous exchange, in the ordinary course of business, of Property (other than Material Intellectual Property) for Property of a like kind, to the extent that the Property received in such exchange is of a Fair Market Value equivalent to the Fair Market Value of the Property exchanged (<u>provided</u>, that after giving effect to such exchange, the Fair Market Value of the Property of any Loan Party subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

        (c)    Dispositions permitted by <u>Section 7.4</u> (other than <u>Section 7.4(e)</u>);

(d)    the sale or issuance of (i) any Subsidiary's Capital Stock (other than Capital Stock a BrandCo Entity) to any Loan Party and (ii) the Capital Stock of any Non-Guarantor Subsidiary that is a Subsidiary to any other Non-Guarantor Subsidiary that is a Subsidiary or to Holdings;

(e)    any Disposition of assets; provided, that if (i) the total value of the assets subject to such Disposition is in excess of $[20,000,000], it shall be for Fair Market Value, (ii) at least 75% of the total consideration received by the Borrower and its Subsidiaries is in the form of cash or Cash Equivalents (provided that, to the extent such Disposition relates to the Collateral of any BrandCo Entity, 100% of the total consideration received by the Borrower and its Subsidiaries shall be in the form of cash or Cash Equivalents), (iii) no Event of Default then exists or would result from such Disposition (except if such Disposition is made pursuant to an agreement entered into at a time when no Event of Default exists), and (iv) the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith; provided, however, that for purposes of clause (ii) above, the following shall be deemed to be cash (other than with respect to Dispositions of Collateral of any BrandCo Entity): any Designated Non-cash Consideration received by the Borrower or any of its Subsidiaries in such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (e) that is at that time outstanding, not to exceed the greater of (I) $[75,000,000] and (II) [2.0]% of Consolidated Total Assets at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value);

(f)    (i) any Recovery Event; provided, that the requirements of Section 2.12(b) are complied with in connection therewith and (ii) any event that would constitute a Recovery Event but for the Dollar threshold set forth in the definition thereof;

(g)    the leasing, licensing, occupying pursuant to occupancy agreements or sub-leasing of Property that would not materially interfere with the required use of such Property by the Borrower or its Subsidiaries;

(h)    the transfer for Fair Market Value of Property (including Capital Stock of Subsidiaries) to another Person in connection with a joint venture arrangement with respect to the transferred Property; provided, that (i) such transfer is permitted under Section 7.7(k) or (v) and (ii) for the avoidance of doubt, this clause (h) shall be subject to the limitations on Investments in the last paragraph of Section 7.7;

(i)    the sale or discount, in each case without recourse and in the ordinary course of business, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(j)    transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(k)    the Disposition of any Immaterial Subsidiary;

(l)    [reserved];

(m)    the transfer of Property (i) by the Borrower or any Subsidiary Guarantor to any other Loan Party or (ii) from a Non-Guarantor Subsidiary to (A) any Loan Party; provided, that the portion (if any) of such Disposition made for more than Fair Market Value shall constitute an Investment and comply with Section 7.7 or (B) any other Non-Guarantor Subsidiary that is a Subsidiary;

(n)    the Disposition of cash and Cash Equivalents (or the foreign equivalent of Cash Equivalents) in the ordinary course of business;

(o)    (i) Liens permitted by Section 7.3 (other than by reference to Section 7.5 or any clause thereof), (ii) Restricted Payments permitted by Section 7.6 (other than by reference to Section 7.5 or any clause thereof), (iii) Investments permitted by Section 7.7 (other than by reference to Section 7.5 or any clause thereof) and (iv) sale and leaseback transactions permitted by Section 7.10 (other than by reference to Section 7.5 or any clause thereof);

(p)    Dispositions of Investments in joint ventures and other non-wholly owned entities to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements, shareholder agreements and similar binding arrangements; provided that the requirements of Section 2.12(b), to the extent applicable, are complied with in connection therewith;

(q) [reserved];

(q)    (i) Dispositions set forth on Schedule 7.5(q) and (ii) any Disposition that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Disposition is not more disadvantageous to the Lenders than the Dispositions set forth on Schedule 7.5(q), as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such Disposition, or (B) the Required Lenders have consented to such Disposition (such consent not to be unreasonably withheld (in the good faith determination of the Lenders));

(r)    the unwinding of Hedge Agreements permitted hereunder pursuant to their terms;

(s)    the Disposition of assets acquired pursuant to or in order to effectuate a Permitted Acquisition which assets are (i) obsolete or (ii) not used or useful to the core or principal business of the Borrower and the Subsidiaries;

(t)    Dispositions made on the Closing Date to consummate the Transactions;

(u)    [reserved];

(v)    [reserved];

(w)    the sale of services, or the termination of any other contracts, in each case in the ordinary course of business;

(x)    [reserved];

(y)    [reserved];

121

(z)    Dispositions of Property to the extent that (i)(A) such Property is exchanged for credit against the purchase price of similar replacement Property or (B) the proceeds of such Disposition are applied to the purchase price of such replacement Property and (ii) to the extent such Property constituted Collateral, such replacement Property constitutes Collateral as well;

(aa)    any Disposition of Property that represents a surrender or waiver of a contract right or settlement, surrender or release of a contract or tort claim; and

(bb)    Dispositions of Property between or among the Borrower and/or its Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to clauses (a) through (aa) above.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any ~~equity interests~~Capital Stock of any Loan Party ~~are~~is permitted to be ~~Disposed~~disposed of under this Section 7.5, such Disposition shall be of no less than all of the Capital Stock of ~~any~~ such Loan Party, ~~(ii) [neither Holdings, the Borrower nor any Subsidiary may sell, assign, convey, transfer or otherwise Dispose of any Capital Stock of any BrandCo or assets of a BrandCo Entity except to the extent otherwise permitted pursuant to Section 7.5(e) and clause (iii) of this paragraph and, in each case, subject to Section 2.12(b)]~~ and ~~(iii~~ (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and continues to be a Loan Party) and (ii) none of the Borrower or its Subsidiaries shall sell, assign, convey, transfer, license or otherwise ~~Dispose~~dispose of any of its Material Intellectual Property ~~to any Person (other than any BrandCo) nor shall it permit any of its~~(or the Capital Stock of any Loan Party which owns any Material Intellectual Property ~~(whether now owned or hereafter acquired) to be owned, held or exclusively licensed by any Person (other than any BrandCo), except (A) non Material Intellectual Property owned or exclusively licensed by a non Loan Party as of the Closing Date, and (B) Foreign Subsidiaries that are not Loan Parties may own or hold an exclusive license to non Material Intellectual Property in the foreign jurisdictions in which they operate (it being understood that, for the avoidance of doubt, the foregoing restriction in this clause (iii) shall not be construed to limit the ability of the Borrower and its Subsidiaries to engage in Dispositions expressly~~) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this Section 7.5 or Section 7.7, or (B) for Fair Value and on arm's length terms in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under Section 7.5(~~a~~e) ~~with respect to non Material Intellectual Property~~or (p).

7.6    Restricted Payments.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of the Borrower or such Subsidiary (collectively, "Restricted Payments"), except that:

(a)    (i) any Subsidiary may make Restricted Payments to any Loan Party and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b)    the Borrower or any Subsidiary may make Restricted Payments in an aggregate amount not to exceed the Available Amount; provided, that (A) no Event of Default is continuing or would result therefrom and (B) the Consolidated Net Total Leverage Ratio shall not exceed 5.00 to 1.00

on a pro forma basis as of the end of the most recently ended Test Period at the time of such Restricted Payment;

(c)    [the Borrower or any Subsidiary may make, without duplication, ~~[(i) Tax Payments and (ii)~~ Restricted Payments to Holdings or any Parent Company to permit Holdings or such Parent Company to pay (A) franchise and similar taxes and other fees and expenses in connection with the maintenance of its (or any Parent Company's) existence and its (or any Parent Company's) direct or indirect ownership of the Borrower, (B) so long as the Borrower or any of its Subsidiaries is a member of a consolidated, combined, unitary or similar group of which Holdings or any Parent Company is the parent for U.S. federal, state or local ~~income~~ tax purposes ~~(or the Borrower or any of its Subsidiaries are disregarded as separate from Holdings for U.S. federal income tax purposes)~~, Holdings' or such Parent Company's federal, state or local ~~income~~ taxes, as applicable, ~~but only to the extent such income taxes are attributable to the income of the Borrower and its Subsidiaries that are members of such group, determined by taking into account any available net operating loss carryovers or other tax attributes of the Borrower and such Subsidiaries~~; provided, that in each case the amount of such payments with respect to any fiscal year does not exceed the amount that the Borrower and such Subsidiaries would have been required to pay in respect of such ~~income~~ taxes for such fiscal year were the Borrower and such Subsidiaries a consolidated or combined group of which the Borrower was the common parent, less any amounts paid directly by Borrower and such Subsidiaries with respect to such Taxes, ~~or were~~ after taking into account any net operating loss carryovers or other attributes of the Borrower and ~~its applicable~~such Subsidiaries ~~not disregarded as separate from Holdings for U.S. Federal income tax purposes~~; (C) ~~income~~ Taxes of Holdings or any Parent Company arising in connection with the Restructuring Transactions; (D) customary fees, salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, their current and former officers and employees and members of their Board of Directors, (E) ordinary course corporate operating expenses and other fees and expenses required to maintain its corporate existence, (F) fees and expenses to the extent permitted under Section 7.9(b)(i), (G) reasonable fees and expenses incurred in connection with any debt or equity offering by Holdings or any Parent Company, to the extent the proceeds thereof are (or, in the case of an unsuccessful offering, were intended to be) used for the benefit of the Borrower and its Subsidiaries, whether or not completed and (H) reasonable fees and expenses in connection with compliance with reporting and public and limited company obligations under, or in connection with compliance with, federal or state laws (including securities laws, rules and regulations, securities exchange rules and similar laws, rules and regulations) or under this Agreement or any other Loan Document;]²²

(d)    the Borrower may make Restricted Payments in the form of Capital Stock of the Borrower;

(e)    the Borrower and any of its Subsidiaries may make Restricted Payments to, directly or indirectly, purchase the Capital Stock of Holdings, the Borrower, any Parent Company or any Subsidiary from present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary upon the death, disability, retirement or termination of the applicable officer, director, consultant, agent or employee or pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement; provided, that the aggregate amount of payments under this clause (e) in any fiscal year of the Borrower shall not exceed the sum of (i) $[10,000,000] in any fiscal year, plus (ii) any proceeds received from key man life insurance policies, plus (iii) any proceeds received by Holdings ~~or,~~ the Borrower, or any Parent Company during such fiscal year from sales of the Capital Stock of Holdings ~~or,~~

---

²² ~~NTD: Subject to ongoing review pending determination of structure.~~

the Borrower, or any Parent Company to directors, officers, consultants or employees of Holdings, the Borrower, or any Parent Company or any Subsidiary in connection with permitted employee compensation and incentive arrangements; provided, that any Restricted Payments permitted (but not made) pursuant to sub-clause (i), (ii) or (iii) of this clause (e) in any prior fiscal year may be carried forward to any subsequent fiscal year (subject to an annual cap of no greater than $[20,000,000]), and provided, further, that cancellation of Indebtedness owing to the Borrower or any Subsidiary by any member of management of Holdings, any Parent Company, the Borrower or any Subsidiary in connection with a repurchase of the Capital Stock of the Borrower or, Holdings or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.6;

(f)    the Borrower and its Subsidiaries may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, (i) non-cash repurchases of Capital Stock deemed to occur upon exercise of stock options or similar equity incentive awards, if such Capital Stock represents a portion of the exercise price of such options or similar equity incentive awards, (ii) tax payments on behalf of present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary in connection with noncash repurchases of Capital Stock pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement of Holdings, the Borrower, any Parent Company or any Subsidiary, (iii) make-whole or dividend-equivalent payments to holders of vested stock options or other Capital Stock or to holders of stock options or other Capital Stock at or around the time of vesting or exercise of such options or other Capital Stock to reflect dividends previously paid in respect of Capital Stock of the Borrower or, Holdings or any Parent Company and (iv) payments under a Dutch Auction conducted in accordance with the procedures set forth in this Agreement;

(g)    the Borrower may make Restricted Payments in an amount not to exceed the Excluded Contribution Amount within 90 days of receipt thereof, so long as, with respect to any such Restricted Payments, no Event of Default shall have occurred and be continuing or would result therefrom;

(h)    the Borrower may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, payments in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Capital Stock of any such Person;

(i)    [reserved];

(j)    to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted (other than by reference to Section 7.6 or any clause thereof) by any provision of Sections 7.4, 7.5, 7.7 and 7.9;

(k)    (i) any non-wholly owned Subsidiary of the Borrower may declare and pay cash dividends to its equity holders generally so long as the Borrower or its respective Subsidiary which owns the equity interests in the Subsidiary paying such dividend receives at least its proportional share thereof (based upon its relative holding of the equity interests in the Subsidiary paying such dividends and taking into account the relative preferences, if any, of the various classes of equity interest of such Subsidiary), and (ii) any non-wholly owned Subsidiary of the Borrower may make Restricted Payments to one or more of its equity holders (which payments need not be proportional) in lieu of or to effect an earnout so long as (x) such payment is in the form of such Subsidiary's Capital Stock and (y) such Subsidiary continues to be a Subsidiary after giving effect thereto;

124

(l)    the Borrower and its Subsidiaries may make Restricted Payments on or after the Closing Date to consummate the Transactions;

(m)    [reserved];so long as no Event of Default under Section 8.1(a) or 8.1(f) has occurred and is continuing, the Borrower may make Restricted Payments to Holdings or any Parent Company to enable it to make payments to any Parent Company in respect of expenses or indemnification payments on terms reasonably acceptable to the Administrative Agent;

(n)    the payment of dividends and distributions within 60 days after the date of declaration thereof, if at the date of declaration of such payment, such payment would have been permitted pursuant to another clause of this Section 7.6;

(o)    [reserved];

(p)    [reserved]; and

(q)    provided that no Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments in respect of reasonable fees and expenses incurred in connection with any successful or unsuccessful debt or equity offering or any successful or unsuccessful acquisition or strategic transaction of Holdings or any Parent Company.

7.7    Investments.  Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other similar investment in, any other Person (all of the foregoing, "Investments"), except:

(a)    (i) extensions of trade credit in the ordinary course of business, (ii) loans, advances and promotions made to distributors, customers, vendors and suppliers in the ordinary course of business or in accordance with market practices, (iii) purchases and acquisitions of inventory, supplies, materials and equipment, purchases of contract rights, accounts and chattel paper, purchases of put and call foreign exchange options to the extent necessary to hedge foreign exchange exposures or foreign exchange spot and forward contracts, purchases of notes receivable or non-exclusive licenses or leases of Intellectual Property, in each case in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments, (iv) Investments among the Borrower and its Subsidiaries in connection with the sale of inventory and parts in the ordinary course of business and (v) purchases and acquisitions of non-Material Intellectual Property or purchases of non-exclusive contract rights or non-exclusive licenses or leases of Intellectual Property, in each case, in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments;

(b)    Investments in Cash Equivalents (or the foreign equivalent of Cash Equivalents) and Investments that were Cash Equivalents (or the foreign equivalent of Cash Equivalents) when made;

(c)    Investments arising in the ordinary course of business in connection with (i) the incurrence of Indebtedness permitted by Section 7.2 (other than by reference to Section 7.7 or any clause thereof) to the extent arising as a result of Indebtedness among the Borrower or any of its Subsidiaries and Guarantee Obligations permitted by Section 7.2 (other than by reference to Section 7.7 or any clause thereof) and payments made in respect of such Guarantee Obligations, (ii) the forgiveness or conversion to equity of any Indebtedness permitted by Section 7.2 (other than by reference to Section 7.7 or any

clause thereof) and (iii) guarantees by the Borrower or any of its Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(d)      loans and advances to employees, consultants or directors of any Parent Company, Holdings or any of its Subsidiaries in the ordinary course of business in an aggregate amount (for the Borrower and all of its Subsidiaries) not to exceed $[10,000,000] (excluding (for purposes of such cap) tuition advances, travel and entertainment expenses, but including relocation advances) at any one time outstanding;

(e)      Investments (i) (other than those relating to the incurrence of Indebtedness permitted by Section 7.7(c)) by the Borrower or any of its Subsidiaries in the Borrower or any Person that, prior to such Investment, is a Loan Party (or is a Subsidiary that becomes a Loan Party in connection with such Investment), (ii) by the Borrower or any Subsidiary Guarantor in any Non-Guarantor Subsidiaries so long as such Investment is part of a series of Investments by Subsidiaries in other Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Loan Parties, (iii) comprised solely of equity purchases or contributions by the Borrower or any of its Subsidiaries in any other Subsidiary made for tax purposes, so long as the Borrower provides to the Administrative Agent evidence reasonably acceptable to the Administrative Agent that, after giving pro forma effect to such Investments, the granting, perfection, validity and priority of the security interest of the Secured Parties in the Collateral, taken as a whole, is not impaired in any material respect by such Investment and (iv) existing on the Closing Date in any Non-Guarantor Subsidiary;

(f)      Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a Subsidiary or a part of a Subsidiary; provided, that (i) immediately before and after giving effect to any such Permitted Acquisition, no Event of Default shall have occurred and be continuing and (ii) the aggregate amount of consideration paid by the Borrower and its Subsidiaries in connection with Permitted Acquisitions of Persons other than Loan Parties and of Property that does not become Collateral shall not exceed $[50,000,000];

(g)      loans by the Borrower or any of its Subsidiaries to the employees, officers or directors of any Parent Company, Holdings or any of its Subsidiaries in connection with management incentive plans (provided, that such loans represent cashless transactions pursuant to which such employees, officers or directors directly (or indirectly) invest the proceeds of such loans in the Capital Stock of Holdings or a Parent Company);

(h) [reserved];

(h)      (i) Investments set forth on Schedule 7.7(h) and (ii) any Investment that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Investment is not more disadvantageous to the Lenders than the Investments set forth on Schedule 7.7(h), as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such Investment, or (B) the Required Lenders have consented to such Investment (such consent not to be unreasonably withheld (in the good faith determination of the Lenders));

(i)      Investments (including debt obligations) received in the ordinary course of business by the Borrower or any of its Subsidiaries in connection with (w) the bankruptcy or reorganization of suppliers, vendors, distributors, clients, customers and other Persons, (x) settlement of delinquent obligations of, and other disputes with, suppliers, vendors, distributors, clients, customers and

126

other Persons arising in the ordinary course of business, (y) endorsements for collection or deposit and (z) customary trade arrangements with suppliers, vendors, distributors, clients and customers, including consisting of Capital Stock of clients and customers issued to the Borrower or any Subsidiary in consideration for goods provided and/or services rendered;

(j)    Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(k)    Investments in existence on, or pursuant to legally binding written commitments in existence on, the Closing Date (after giving effect to the Transactions) and listed on Schedule 7.7 and, in each case, any extensions, renewals or replacements thereof, so long as the amount of any Investment made pursuant to this clause (k) is not increased (other than pursuant to such legally binding commitments);

(l)    Investments of the Borrower or any of its Subsidiaries under Hedge Agreements permitted hereunder;

(m)    Investments of any Person existing, or made pursuant to binding commitments in effect at the time such Person becomes a Subsidiary or consolidates, amalgamates or merges with the Borrower or any of its Subsidiaries (including in connection with a Permitted Acquisition); provided, that such Investment was not made in anticipation of such Person becoming a Subsidiary or of such consolidation, amalgamation or merger;

(n)    [reserved];Investments in joint ventures in connection with strategic partnerships or expansions of business lines, in each case, for bona fide business purposes, in an aggregate amount not to exceed $20,000,000 (any such joint venture, a "Permitted Joint Venture");

(o)    to the extent constituting Investments, transactions expressly permitted (other than by reference to this Section 7.7 or any clause thereof) under Sections 7.4, 7.5, 7.6 and 7.8;

(p)    Subsidiaries of the Borrower may be established or created, if (i) to the extent such new Subsidiary is a Domestic Subsidiary, the Borrower and such Subsidiary comply with the provisions of Section 6.8(c) and (ii) to the extent such new Subsidiary is a Foreign Subsidiary, the Borrower complies with the provisions of Section 6.8(d); provided, that, in each case, to the extent such new Subsidiary is created solely for the purpose of consummating a merger, consolidation, amalgamation or similar transaction pursuant to an acquisition permitted by this Section 7.7, and such new Subsidiary at no time holds any assets or liabilities other than any consideration contributed to it substantially contemporaneously with the closing of such transactions, such new Subsidiary shall not be required to take the actions set forth in Section 6.8(c) or 6.8(d), as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective transaction shall be required to so comply within ten Business Days or such longer period as the Administrative Agent shall agree);

(q)    Investments arising directly out of the receipt by the Borrower or any of its Subsidiaries of non-cash consideration for any sale of assets permitted under Section 7.5 (other than by reference to Section 7.7 or any clause thereof);

(r)    (i) Investments resulting from pledges and deposits referred to in Sections 7.3(c) and (d) and (ii) cash earnest money deposits made in connection with Permitted Acquisitions or other Investments permitted under this Section 7.7;

127

(s)     Investments in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) consisting of (i) the non-exclusive licensing, sublicensing, cross-licensing, pooling or contribution of, or similar arrangements with respect to, Intellectual Property, in each case, in the ordinary course of business or not otherwise materially adverse to the interest of and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), and (ii) the transfer or licensing of non-U.S. non-Material Intellectual Property to a Foreign Subsidiary in the ordinary course of business or not otherwise materially adverse to the interest of and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith);

(t)     [reserved]Investments made on the Closing Date to consummate the Transactions;

(u)     Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(v)     Investments in an aggregate amount not to exceed the sum of (i)(A) $[75,000,000] minus (B) the aggregate amount of any prepayment, redemption, purchase, defeasement or other satisfaction prior to the scheduled maturity of any Junior Financing pursuant to Section 7.8(a)(iv), plus (ii) so long as no Event of Default shall have occurred and be continuing, an amount equal to the Available Amount; *provided*, that Investments made by any Loan Party pursuant to this clause (v) shall not be in the form of Material Intellectual Property (or of Capital Stock of Subsidiaries owning Material Intellectual Property) in any Non-Guarantor Subsidiary;

(w)     advances of payroll payments to employees, or fee payments to directors or consultants, in the ordinary course of business;

(x)     Investments constituting loans or advances in lieu of Restricted Payments permitted pursuant to Section 7.6;

(y)     [reserved];

(z)     [reserved];

(aa)     Investments to the extent that payment for such Investments is made solely by the issuance of Capital Stock (other than Disqualified Capital Stock) of Holdings (or any Parent Company ) to the seller of such Investments;

(bb)     [reserved];

(cc)     [reserved];

(dd)     the Borrower or any of its Subsidiaries may make Investments in an amount not to exceed the Excluded Contribution Amount within 90 days of the receipt thereof, so long as, with respect to any such Investments, no Event of Default shall have occurred and be continuing or would result therefrom;

(ee)     [reserved];

128

(ff)    the Borrower or any of its Subsidiaries may make Investments in prepaid expenses, negotiable instruments held for collection and lease and utility and worker's compensation deposits provided to third parties in the ordinary course of business;

(gg)    [reserved]; and

(hh)    Investments in [(i) open-market purchases of common stock of Holdings and (ii) ]any other Investment available to highly compensated employees under any "excess 401-(k) plan" of the Borrower (or any of its Domestic Subsidiaries, as applicable), in each case to the extent necessary to permit the Borrower (or such Domestic Subsidiary, as applicable) to satisfy its obligations under such "excess 401-(k) plan" for highly compensated employees; provided, however, that the aggregate amount of such purchases and other Investments under this Section 7.7(hh) together with any Restricted Payments made as permitted under Section 7.6(e) does not exceed the amounts set forth in such section.

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this Section 7.7, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested). Notwithstanding anything in this Agreement to the contrary and in addition to the foregoing, from and after the Closing Date, Investments by Loan Parties in Subsidiaries that are not Guarantors (including at the time of designation as a non-Loan Party) shall not exceed at any time (x) $[25,000,000] (provided that (i) to the extent any such Investment is not in cash, the Fair Market Value of such investment shall be determined by a third party financial advisor of nationally recognized standing and (ii) this paragraph shall not apply to (x) Investments in connection with the sale of inventory and parts in the ordinary course of business and consistent with past practice or y) Investments made pursuant to Sections 7.7(a), (c)(ii) (provided that the forgiveness or conversion to equity of any Indebtedness pursuant to such Section 7.7(c)(ii) shall not be deemed to reduce the amount of any Investment made in connection with the incurrence of such Indebtedness), (c)(iii), (e), (f), (g), (h), (m), (n), (o), (s), (aa) and (dd)), plus (y) the amount of such Investments made pursuant to Section 7.7(v). For the avoidance of doubt, this paragraph shall not restrict Investments in existence on the Closing Date.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, each(i) to the extent any Capital Stock of any Loan Party is permitted to be subject to an Investment under this Section 7.7, such Investment shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and continues to be a Loan Party) and (ii) none of the Borrower or its Subsidiaries shall not make any Investment of Material Intellectual Property in any Person (other than a BrandCo), nor shall it permitthat constitutes a sale, assignment, conveyance, transfer, license or other disposition of any of its Material Intellectual Property (whether now owned or hereafter acquired) to be owned, held or exclusively licensed by any Person (other than a BrandCo), [except (A) non-Material Intellectual Property owned or exclusively licensed by a non-Loan Party as of the Closing Date, and (B) Foreign Subsidiaries that are not Loan Parties may own or hold an exclusive license to non-Material Intellectual Property in the foreign jurisdictions in which they operate].or the Capital Stock of any Loan Party which owns any Material Intellectual Property) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this Section 7.5 or Section 7.7, or (B) for Fair Value and on arm's length terms in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under Section 7.5(e) or (p).

129

7.8    Prepayments, Etc. of Indebtedness; Amendments.

(a)    Optionally prepay, redeem, purchase, defease or otherwise satisfy prior to the day that is 90 days before the scheduled maturity thereof in any manner the principal amount of (x) any Indebtedness that is expressly subordinated by contract in right of payment to the Obligations, (y) (I) any Indebtedness incurred pursuant to Section 7.2 (a), (i), (t) and (v) that is secured by all or any part of the Collateral or (II) any other Indebtedness incurred pursuant to Section 7.2 that is secured by all or a material part of the Collateral, in each case of clauses (I) and (II), on a junior basis relative to the Obligations, but is not also secured by any substantial part of the Collateral on a pari passu or senior basis relative to the Obligations or (z) any Indebtedness incurred pursuant to Section 7.2 that is unsecured (collectively, "Junior Financing") (it being understood, for the avoidance of doubt, that (1) payments of regularly scheduled interest and principal on all of the foregoing shall be permitted and (2) the term "Junior Financing" does not include any Indebtedness under (A) the ABL Facility Agreement or any other Indebtedness subject to the ABL Intercreditor Agreement or (B) this Agreement), or make any payment in violation of any subordination terms of any Junior Financing Documentation, except:

(i)    a prepayment, redemption, purchase, defeasement or other satisfaction of Junior Financing made in an amount not to exceed the Available Amount; provided, that immediately before and immediately after giving pro forma effect to such prepayment, redemption, purchase, defeasement or other satisfaction, no Event of Default shall have occurred and be continuing; provided, further, that use of the Available Amount pursuant to this clause (i) shall be subject to the requirement that immediately after giving effect to any such prepayment, redemption, purchase, defeasement or other satisfaction, the Consolidated Net Total Leverage Ratio shall not exceed 5.00 to 1.00 on a pro forma basis as of the end of the most recently ended Test Period;

(ii)    the conversion of any Junior Financing to Capital Stock (other than Disqualified Capital Stock) or the prepayment, redemption, purchase, defeasement or other satisfaction of Junior Financing in an amount not to exceed the Excluded Contribution Amount (other than Disqualified Capital Stock);

(iii)    the prepayment, redemption, purchase, defeasement or other satisfaction of any Junior Financing with any Permitted Refinancing thereof;

(iv)    the prepayment, redemption, purchase, defeasement or other satisfaction prior to the day that is 90 days before the scheduled maturity of any Junior Financing, in an aggregate amount not to exceed (i) $[75,000,000] minus (ii) the aggregate amount of Investments made pursuant to Section 7.7(v);

(v)    the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness incurred or assumed pursuant to Section 7.2(t);

(vi)    the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness to consummate the Transactions; and

(vii)    the prepayment, redemption, purchase, defeasance or other satisfaction of any intercompany indebtedness (A) owing by a Loan Party to another Loan Party, (B) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Subsidiary that is Non-Guarantor Subsidiary and (C) owing by a Subsidiary that is Non-Guarantor Subsidiary to a Loan Party; and

(viii)    the termination, cancellation, setoff or forgiveness of any intercompany indebtedness outstanding on the Closing Date if the Borrower reasonably determines that such

130

termination, cancellation, setoff or forgiveness occurs in connection with a tax optimization of the Borrower and its Subsidiaries;

provided, that, notwithstanding the foregoing, the Borrower shall not, and shall not permit any of its Subsidiaries to repurchase any Junior Financing of the Borrower (other than pursuant to Section 7.8(a)(vi), 7.8(a)(vii) or 7.8(a)(viii)) prior to the date that is 105 days or more prior to the stated maturity thereof, except to the extent that the Borrower and its Subsidiaries have Liquidity of at least $[200,000,000], after giving pro forma effect to such prepayment, redemption, purchase, defeasance or other satisfaction.

(b)      amend or modify the documentation in respect of any Junior Financing in a manner, taken as a whole (as shall be determined by the Borrower in good faith), that would be materially adverse to the Lenders; provided, that nothing in this Section 7.8(b) shall prohibit the refinancing, replacement, extension or other similar modification of any Indebtedness to the extent otherwise permitted by Section 7.2.

7.9      Transactions with Affiliates.

(a)      Enter into any transaction or series of transactions, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate thereof (other than among Loan Parties or among non-Loan Parties) involving aggregate payments or consideration in excess of $[20,000,000] unless such transaction is (1) otherwise not prohibited under this Agreement and (2) upon terms materially no less favorable when taken as a whole to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; provided with respect to any such transaction involving aggregate payments or consideration in excess of $[25,000,000], the Borrower shall deliver to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view.

(b)      Notwithstanding the foregoing, the Borrower and its Subsidiaries may:

(i)      pay to Holdings or any Parent Company and any of its their Affiliates fees, indemnities and expenses in connection with the Transactions and disclosed to the Administrative Agent prior to the Closing Date;

(ii)      enter into any transaction with an Affiliate that is not prohibited by the terms of this Agreement to be entered into by Holdings, the Borrower or its Subsidiaries;

(iii)      make any Restricted Payment permitted pursuant to Section 7.6 (other than by reference to Section 7.9 or any clause thereof) or any Investment permitted pursuant to Section 7.7;

(iv)      perform their obligations pursuant to the Transactions;

(v)      enter into transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business subject to compliance with this Section 7.9(b);

(vi)    without being subject to the terms of this <u>Section 7.9</u>, enter into any transaction with any Person which is an Affiliate of Holdings or the Borrower only by reason of such Person and Holdings or the Borrower, as applicable, having common directors;

(vii)    issue Capital Stock to any direct or indirect owner of Holdings <u>(including any Parent Company)</u>, or any director, officer, employee or consultant thereof;

(viii)    enter into the transactions allowed pursuant to <u>Section 10.6</u>;

(ix)    enter into transactions set forth on <u>Schedule 7.9</u> and any amendment thereto or replacement thereof so long as such amendment or replacement is not materially more disadvantageous to the Lenders when taken as a whole as compared to the applicable agreement as in effect on the Closing Date as reasonably determined in good faith by the Borrower;

(x)    [reserved]<u>make any Disposition permitted pursuant to Section 7.5(b)(ii) or Section 7.5(q)</u>;

(xi)    enter into and perform their respective obligations under the terms of the Company Tax Sharing Agreement in effect on the Closing Date, or any amendments thereto that do not increase the Borrower's or any Subsidiary Guarantor's obligations thereunder in consultation with the Administrative Agent at the direction of the Required Lenders;

(xii)    enter into any transaction with an officer, director, manager, employee or consultant of Holdings, <u>any Parent Company,</u> the Borrower or any of its Subsidiaries (including compensation or employee benefit arrangements with any such officer, director, manager, employee or consultant) in the ordinary course of business and not otherwise prohibited by the terms of this Agreement;

(xiii)    make payments to Holdings, <u>any Parent Company,</u> the Borrower, any Subsidiary or any Affiliate of any of the foregoing for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments, to the extent the amount thereof either individually or collectively with any related payments exceeds $[20,000,000], shall be subject to compliance with this <u>Section 7.9(b)</u> and the opinion delivery requirement of the proviso in <u>Section 7.9(a)</u>;

(xiv)    enter into any transaction in which the Borrower or any Subsidiary, as the case may be, delivers to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Subsidiary from a financial point of view and meets the requirements of this <u>Section 7.9</u>;

(xv)    enter into any transaction with an Affiliate in which the consideration paid by the Borrower or any Subsidiary consists only of Capital Stock of Holdings;

(xvi)    enter into transactions with customers, clients, suppliers, or purchasers or sellers of goods or services that are Affiliates, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Subsidiaries, as determined in good faith by the Board of Directors or the senior management of the Borrower or Holdings, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xvii)    [reserved]; and

(xviii)    engage in any transaction in the ordinary course of business between the Borrower or a Subsidiary and its own employee stock option plan that is approved by the Borrower or such Subsidiary in good faith.

For the avoidance of doubt, this Section 7.9 shall not restrict or otherwise apply to employment, benefits, compensation, bonus, retention and severance arrangements with, and payments of compensation or benefits (including customary fees, expenses and indemnities) to or for the benefit of, current or former employees, consultants, officers or directors of Holdings or the Borrower or any of its Subsidiaries in the ordinary course of business.

For purposes of this Section 7.9, any transaction with any Affiliate shall be deemed to have satisfied the standard set forth in clause (a)(2) hereof if such transaction is approved by a majority of the Disinterested Directors of the Board of Directors of the Borrower or such Subsidiary, as applicable. "Disinterested Director": with respect to any Person and transaction, a member of the Board of Directors of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding Capital Stock of the Borrower or, Holdings or any Parent Company or any options, warrants or other rights in respect of such Capital Stock.

7.10    Sales and Leasebacks.  Enter into any arrangement with any Person providing for the leasing or licensing or similar arrangement by the Borrower or any of its Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Subsidiaries, except for (i) any such arrangement entered into in the ordinary course of business of the Borrower or any of its Subsidiaries, (ii) sales or transfers by the Borrower or any of its Subsidiaries to any Loan Party, (iii) sales or transfers by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary that is a Subsidiary and (iv) any such arrangement with a Person that is not an Affiliate of the Borrower to the extent that the Fair Market Value of such Property does not exceed $100,000,000, in the aggregate for all such arrangements.

7.11    Changes in Fiscal Periods.  Permit the fiscal year of the Borrower to end on a day other than December 31; provided, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

7.12    Negative Pledge Clauses.  Enter into any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement, other than:

(a)    this Agreement, the other Loan Documents and any Intercreditor Agreement;

(b)    any agreements governing Indebtedness and/or other obligations secured by a Lien permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets subject to such Liens permitted by this Agreement);

(c)     software and other Intellectual Property licenses pursuant to which such Loan Party is the licensee of the relevant software or Intellectual Property, as the case may be (in which case, any prohibition or limitation shall relate only to the assets subject to the applicable license);

(d)     Contractual Obligations incurred in the ordinary course of business which (i) limit Liens on the assets that are the subject of the applicable Contractual Obligation or (ii) contain customary provisions restricting the assignment, transfer or pledge of such agreements;

(e)     any agreements regarding Indebtedness or other obligations of any Non-Guarantor Subsidiary not prohibited under Section 7.2 (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

(f)     prohibitions and limitations in effect on the Closing Date and listed on Schedule 7.12;

(g)     customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(h)     customary provisions restricting the subletting, assignment, pledge or other transfer of any lease governing a leasehold interest;

(i)     customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses, sublicenses, cross license, pooling and similar agreements not prohibited hereunder;

(j)     any agreement in effect at the time any Person becomes a Subsidiary of the Borrower or is merged with or into the Borrower or a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Borrower or a party to such merger;

(k)     restrictions imposed by applicable law or regulation or license requirements;

(l)     restrictions in any agreements or instruments relating to any Indebtedness permitted to be incurred by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancing Obligations and indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) (i) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances contained in this Agreement (as determined in good faith by the Borrower) or (ii) if such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to create and maintain the Liens on the Collateral pursuant to the Security Documents;

(m)     restrictions in respect of Indebtedness secured by Liens permitted by Sections 7.3(g) and 7.3(y) relating solely to the assets or proceeds thereof secured by such Indebtedness;

(n)     customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

134

(o)     restrictions arising in connection with cash or other deposits not prohibited hereunder and limited to such cash or other deposit;

(p)     (i) the ABL Facility and the ABL Documents (in each case, as in effect on the Closing Date) [and (ii) the Foreign ABTL Facility and the Foreign ABTL Credit Agreement (in each case, as in effect on the Closing Date)];

(q)     restrictions and conditions that arise in connection with any Dispositions permitted by Section 7.5; provided, however, that such restrictions and conditions shall apply only to the property subject to such Disposition;

(r)     [reserved]; and

(s)     the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in clauses (a) through (r) above, provided, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.13   Clauses Restricting Subsidiary Distributions.   Enter into any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any of its Subsidiaries or (b) make Investments in the Borrower or any of its Subsidiaries, except for such encumbrances or restrictions existing under or by reason of or consisting of:

(i)     this Agreement or any other Loan Documents and under any Intercreditor Agreement, or any other agreement entered into pursuant to any of the foregoing;

(ii)     provisions limiting the Disposition of assets or property in asset sale agreements, stock sale agreements and other similar agreements, which limitation is in each case applicable only to the assets or interests the subject of such agreements but which may include customary restrictions in respect of a Subsidiary in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary;

(iii)     customary net worth provisions contained in Real Property leases entered into by the Borrower and its Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower to meet its ongoing payment obligations hereunder or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement;

(iv)     agreements related to Indebtedness permitted by this Agreement (including indentures, instruments or agreements governing any Permitted Refinancing Obligations and indentures, instruments or agreements governing any Permitted Refinancings of each of the foregoing) to the extent that (x) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Subsidiaries than the encumbrances and restrictions contained in this Agreement (as determined in good faith by the Borrower) or (y) such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good

135

faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(v)     non-exclusive licenses, sublicenses, cross-licensing or pooling by the Borrower and its Subsidiaries of, or similar arrangements with respect to, Intellectual Property in the ordinary course of business and to the extent not otherwise materially disadvantageous to the Lenders (in which case such restriction shall relate only to such Intellectual Property);

(vi)     Contractual Obligations incurred in the ordinary course of business which include customary provisions restricting the assignment, transfer  or pledge thereof;

(vii)     customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(viii)     customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

(ix)     customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses and similar agreements not prohibited hereunder;

(x)     any agreement in effect at the time any Person becomes a Subsidiary or is merged with or into the Borrower or any Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary or a party to such merger;

(xi)     encumbrances or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)     encumbrances or restrictions imposed by applicable law, regulation or customary license requirements;

(xiii)     [reserved];

(xiv)     any agreement in effect on the Closing Date and described on Schedule 7.13;

(xv)     restrictions or conditions imposed by any obligations secured by Liens permitted pursuant to Section 7.3 (other than obligations in respect of Indebtedness), if such restrictions or conditions apply only to the property or assets securing such obligations and such encumbrances and restrictions are customary for similar obligations in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(xvi)     the ABL Documents [and the Foreign ABTL Documents];

(xvii)     [reserved];

(xviii)     restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Borrower or any of its

136

Subsidiaries is a party entered into in the ordinary course of business; <u>provided</u>, that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Subsidiary that are the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Subsidiary or the assets or property of any other Subsidiary; and

(xix)    the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in <u>clauses (i)</u> through <u>(xviii)</u> above, <u>provided</u>, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

7.14    <u>Limitation on Hedge Agreements</u>.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes.

7.15    <u>Amendment of Company Tax Sharing Agreement</u>.  Amend, modify, change, waive, cancel or terminate any term or condition of the Company Tax Sharing Agreement in a manner adverse to the interests of the Company or the Lenders without the prior written consent of the Required Lenders.

7.16    <u>Canadian Defined Benefit Pension Plans</u>.  Except as disclosed in Schedule 7.16, no Loan Party shall (a) establish, sponsor, maintain, contribute to, participate in or have any liability or obligation under or arising from any Canadian Defined Benefit Pension Plan, without the prior written consent of the Administrative Agent, or (b) consummate any transaction that would result in any Person not already a Subsidiary becoming a Subsidiary if such Person sponsors, maintains or contributes to, participates in or has any liability or obligation under one or more Canadian Defined Benefit Pension Plans, without the prior written consent of the Administrative Agent.

SECTION VIIA.  HOLDINGS NEGATIVE COVENANTS

Holdings hereby covenants and agrees with each Lender that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than contingent or indemnification obligations not then due), unless the Required Lenders shall otherwise consent in writing, (a) Holdings will not create, incur, assume or permit to exist any Lien on any Capital Stock of the Borrower held by Holdings other than Liens created under the Loan Documents or Liens not prohibited by <u>Section 7.3</u> and (b) Holdings shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence; <u>provided</u>, that Holdings may merge with any other person so long as no Default has occurred and is continuing or would result therefrom and (i) Holdings shall be the surviving entity or (ii) if the surviving entity is not Holdings (such other person, "<u>Successor Holdings</u>"), (A) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, and (C) Successor Holdings shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such

137

other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to Section 5.1(e) (it being understood that if the foregoing are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement).

SECTION VIII. EVENTS OF DEFAULT

        8.1    Events of Default.  If any of the following events shall occur and be continuing:

        (a)    The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof, or (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof;

        (b)    Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall in either case prove to have been inaccurate in any material respect (or if qualified by materiality, in any respect) and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished;

        (c)    The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in Section 6.4(a) (solely with respect to maintaining the existence of the Borrower) or Section VII or Holdings shall default in the observance or performance of any agreement contained in Section VIIA;

        (d)    Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section 8.1), and such default shall continue unremedied (i) for a period of six Business Days if such breach relates to the terms or provisions of Section 6.7(a), (ii) for a period of ten days if such breach relates to the terms or provisions of Section 6.13 or (iii) for a period of 30 days, in each case, after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default;

        (e)    The Borrower or any of its Subsidiaries (other than any Permitted Joint Venture) shall:

        (i)    default in making any payment of any principal of any Indebtedness for Borrowed Money (excluding the Loans) on the scheduled or original due date with respect thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created;

        (ii)    default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or

        (iii)    default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness for Borrowed Money to become due prior to its Stated

Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder;

provided, that:

(A)    a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $[50,000,000], and in the case of Indebtedness for Borrowed Money of the types described in clauses (i) and (ii) of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; and

(B)    this paragraph (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other Disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other Disposition is not prohibited hereunder and under the documents providing for such Indebtedness, or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof;

provided, further, that no Event of Default under this clause (e) shall arise or result from:

(1) any default under any financial maintenance covenant contained in the ABL Facility Agreement to the extent that such default does not also result in the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) causing with the giving of notice if required, such Indebtedness to become due prior to its Stated Maturity;

(2) any change of control (or similar event) under any other Indebtedness for Borrowed Money that is triggered due to the Permitted Investors (as defined herein) obtaining the requisite percentage contemplated by such change of control provision, unless both (x) such Indebtedness for Borrowed Money shall become due and payable or shall otherwise be required to be repaid, repurchased, redeemed or defeased, whether at the option of any holder thereof or otherwise and (y) at such time, the Borrower and/or its Subsidiaries would not be permitted to repay such Indebtedness for Borrowed Money in accordance with the terms of this Agreement; or

(3) any event or circumstance related to any Immaterial Subsidiary;

(f)    (i)    Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings or the

Borrower or any of its Subsidiaries (other than any Immaterial Subsidiary (whether or not then designated as such)) shall make a general assignment for the benefit of its creditors;

(ii)    there shall be commenced against Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days;

(iii)    there shall be commenced against Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against substantially all of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof;

(iv)    Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall consent to or approve of, or acquiesce in, any of the acts set forth in clause (i), (ii), or (iii) above; or

(v)    Holdings or the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)    (i)    the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture) shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan;

(ii)    a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA, whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of any Loan Party or any other Commonly Controlled Entity;

(iii)    a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA;

(iv)    any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA;

(v)    any Loan Party or any other Commonly Controlled Entity shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency of, a Multiemployer Plan; or

(vi)     any other event or condition shall occur or exist with respect to a Plan; or

(vii)     any Canadian Defined Benefit Pension Plan shall terminate, in whole or in part, without the prior written consent of the Administrative Agent or the institution of proceedings by any Governmental Authority to terminate a Canadian Defined Benefit Pension Plan, in whole or in part, or have a replacement administrator appointed to administer a Canadian Defined Benefit Pension Plan where, at the time of such termination or appointment, there exists a material wind up deficit in a Canadian Defined Benefit Pension Plan; or

(viii)     any other event or condition shall occur or exist with respect to a Plan or a Canadian Pension Plan; or

(ixviii)     any Lien arises (except for contribution amounts not yet due) in connection with such Plan or Canadian Pension Plan;

and in each case in clauses (i) through (viiviii) above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in any liability of the Borrower or any of its Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(h)     One or more final judgments or decrees shall be entered against the Borrower or any of its Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) pursuant to which the Borrower and any such Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $[50,000,000] or more (net of any amounts which are covered by insurance or an effective indemnity), and all such judgments or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof;

(i)     [Subject to Schedule 6.10,] any limitations expressly set forth herein and the exceptions set forth in the applicable Security Documents:

(i)     any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Guarantor not to be a legal, valid and binding obligation of any party thereto;

(ii)     any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent (or, in the case of the ABL Facility First Priority Collateral, the collateral agent under the ABL Facility Agreement pursuant to the terms of the ABL Intercreditor Agreement) to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement or otherwise or to file UCC continuation statements or PPSA financing change statements or (y) such loss is

covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer; or

(iii)    the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations.

(j)    [Reserved].

(k)    (i) Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or

(ii)    for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than the greater of (x) 3550% of the then outstanding voting securities having ordinary voting power of Holdings and (y) the percentage of the then outstanding voting securities having ordinary voting power of Holdings owned, directly or indirectly, beneficially (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) by the Permitted Investors (it being understood that if any such person or group includes one or more Permitted Investors, the outstanding voting securities having ordinary voting power of Holdings directly or indirectly owned by the Permitted Investors that are part of such person or group shall not be treated as being owned by such person or group for purposes of determining whether this clause (y) is triggered);

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Applicable Premium) shall immediately become due and payable, and (B) if such event is any other Event of Default, with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Applicable Premium) to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section 8.1 or otherwise in any Loan Document, presentment, demand and protest of any kind are hereby expressly waived by the Borrower.

SECTION IX.   THE AGENTS

9.1    Appointment  Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents and each such Lender irrevocably authorizes each such Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably incidental thereto, including the authority to enter into any Intercreditor Agreement (or joinder thereto) and any Extension Amendment.  Notwithstanding any provision to the contrary

142

elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents and the duties of the Agents shall be mechanical and administrative in nature.  Without limiting the generality of the foregoing, the Lenders hereby irrevocably authorize and instruct the Administrative Agent to, without any further consent of any Secured Party, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the ABL Intercreditor Agreement and any Other Intercreditor Agreement with the collateral agent or other representatives of the holders of Indebtedness that is expressly permitted to be secured by a Lien on the Collateral ~~on a pari passu or junior basis~~ under this Agreement <u>(including with respect to the priority of such Lien)</u> and, to the extent applicable, the ABL Intercreditor Agreement, and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.  The Lenders irrevocably agree that (x) the Agents may rely exclusively on a certificate of a Responsible Officer of the Borrower as to whether any such other Liens are permitted and (y) the ABL Intercreditor Agreement and any Other Intercreditor Agreement entered into by the applicable Agent shall be binding on the Lenders, and each Lender hereby agrees that it will take no actions contrary to the provisions of any Intercreditor Agreement.

Without limiting the aforesaid powers of the Agents, for the purposes of holding any hypothec granted to the Attorney (as defined below) pursuant to the laws of the Province of Quebec to secure the prompt payment and performance of any and all Obligations by any Loan Party, each of the Secured Parties hereby irrevocably appoints and authorizes the Collateral Agent and, to the extent necessary, ratifies the appointment and authorization of the Collateral Agent, to act as the hypothecary representative of the creditors as contemplated under Article 2692 of the Civil Code of Quebec (in such capacity, the "Attorney"), and to enter into, to take and to hold on their behalf, for their benefit, any hypothec, and to exercise such powers and duties that are conferred upon the Attorney under any such hypothec. In such capacity, the Attorney shall: (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney pursuant to any such hypothec and applicable law, and (b) benefit from and be subject to all provisions hereof with respect to the Collateral Agent mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Secured Parties and the Loan Parties. Any person who becomes a Secured Party shall be deemed to have consented to and confirmed the Attorney as the hypothecary representative of the Secured Parties and to have ratified, as of the date it becomes a Secured Party, all actions taken by the Attorney in such capacity. The substitution of the Collateral Agent pursuant to the provisions of this Article VIII also shall constitute the substitution of the Attorney.

9.2    <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under the applicable Loan Documents by or through any of its branches, agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.  Each Agent and any such agent or attorney-in-fact may perform any and all of its duties by or through their respective Related Persons.  The exculpatory provisions of this <u>Section</u> shall apply to any such agent or attorney-in-fact and to the Related Persons of each Agent and any such agent or attorney-in-fact, and shall apply to their respective activities as Agent.

9.3    <u>Exculpatory Provisions</u>.  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or

143

willful misconduct) or with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder or the creation, perfection or priority of any Lien purported to be created by the Security Documents or the value or the sufficiency of any Collateral.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party, nor shall any Agent be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability that is not subject to indemnification under <u>Section 10.5</u> or that is contrary to any Loan Document or applicable law.  If either Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Loan Document, such Agent shall be entitled to refrain from such act or taking such action unless and until such Agent shall have received instructions from the Required Lenders; and such Agent shall not incur liability to any Lender by reason of so refraining.  Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against either Agent as a result of such Agent acting or refraining from acting hereunder or under any other Loan Document in accordance with the instructions of the Required Lenders.

9.4    <u>Reliance by the Agents</u>.  The Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agents.  Each Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.  In determining compliance with any conditions hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan.

9.5    <u>Notice of Default</u>.  Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders.  The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified

by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility); provided, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    Non-Reliance on Agents and Other Lenders.    Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

9.7    Indemnification.  The Lenders severally agree to indemnify each Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.  The agreements in this Section 9.7 shall survive the payment of the Loans and all other amounts payable hereunder. Notwithstanding anything to the contrary set forth herein, no Agent shall be required to take, or to omit to take, any action hereunder or under the Loan Documents unless, upon demand, such Agent receives an indemnification satisfactory to it from the Lenders (or, to the extent applicable and acceptable to such Agent, any other Secured Party) against all liabilities, costs and expenses that, by reason of such action or omission, may be imposed on, incurred by or asserted against such Agent or any of its directors, officers, employees and agents. This Section 9.7 shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

9.8    Agent in Its Individual Capacity.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same

145

as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9     Successor Agents.

(a)     Subject to the appointment of a successor as set forth herein, any Agent may resign upon 30 days' notice to the Lenders, the other Agent, and, unless a Default or Event of Default then exists, the Borrower, effective upon appointment of a successor Agent.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint a successor agent for the Lenders, which successor agent shall (unless an Event of Default with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor Agent shall have been so appointed by the Required Lenders with such consent of the Borrower and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation, then the retiring Agent may, on behalf of the Lenders and with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) appoint a successor Administrative Agent and/or Collateral Agent, as the case may be, with the qualifications set forth above.  After any retiring Agent's resignation as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

(b)     If no successor Agent has been appointed pursuant to clause (a) above by the 45th day after the date such notice of resignation was given by or to such Agent, as applicable, such Agent's resignation shall become effective and all payments, communications and determinations provided to be made by, to or through the Agent shall instead be made by or to each Lender directly, and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required Lenders appoint a successor Agent in accordance with Section 9.9(a) above, as applicable; provided that, in the case of any possessory Collateral held by any Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such possessory Collateral until such time as a successor Agent is appointed pursuant to this Section 9.9.

(c)     Any resignation by the Administrative Agent pursuant to this Section 9 shall also constitute its resignation as Collateral Agent.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent and (ii) the retiring Collateral Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.

(d)     Upon a resignation of an Agent pursuant to this Section 9.9, such Agent shall remain indemnified to the extent provided in this Agreement and the other Loan Documents and the provisions of this Section 9 (and the analogous provisions of the other Loan Documents) shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as Agent.

9.10    Certain Collateral Matters.

(a)     The Agents are hereby irrevocably authorized by each of the Lenders to effect any release or subordination of Liens or Guarantee Obligations contemplated by Section 10.15. Upon

request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.10(a).

(b)        Each Lender authorizes and directs the Collateral Agent to enter into or join (x) the Security Documents, the ABL Intercreditor Agreement and any Other Intercreditor Agreement for the benefit of the Lenders and the other Secured Parties and (y) any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to the Security Documents, the ABL Intercreditor Agreement and any Other Intercreditor Agreement in connection with the incurrence by any Loan Party of Indebtedness pursuant to this Agreement, as applicable or to permit such Indebtedness to be secured by a valid, perfected lien.

(c)        Each Lender hereby agrees, and each holder of any Note by the acceptance thereof will be deemed to agree, that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  The Collateral Agent is hereby authorized on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, to take any action with respect to any Collateral or Security Documents to which it is a party, which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents and in the case of the ABL Intercreditor Agreement (or any Other Intercreditor Agreement) to take all actions (and execute all documents) required or deemed advisable by it in accordance with the terms thereof.

(d)        The Collateral Agent shall not have any obligation whatsoever to the Lenders or to any other Person to assure that the Collateral exists or is owned by any Loan Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.10 or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral and that the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

9.11      Agents May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, to the maximum extent permitted by applicable law, each Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether either Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)        to file a proof of claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.9 and 10.5) allowed in such judicial proceeding; and

147

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agents and, if either Agent shall consent to the making of such payments directly to the Lenders, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under Sections 2.9 and 10.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize such Agent to vote in respect of the claim of any Lender or in any such proceeding.

9.12      Lead Arranger and Bookrunner.  Neither the Lead Arranger nor the Bookrunner shall have any duties or responsibilities hereunder in their respective capacities.

9.13      Appointment of ~~Administrative~~Collateral Agent as Security Trustee.

(a)      For the purposes of any Liens or Collateral created under the UK Security Agreements, the following additional provisions shall apply.

(b)      In this Article 9, the following expressions have the following meanings:

"Appointee" means any receiver, administrator or other insolvency officer appointed in respect of any Loan Party or its assets.

"Charged Property" means the assets of the Loan Parties subject to a security interest under the UK Security Agreements.

"Delegate" means any delegate, agent, attorney or co-trustee appointed by the ~~Administrative~~Collateral Agent (in its capacity as security trustee).

(c)      The Secured Parties appoint the ~~Administrative~~Collateral Agent to hold the security interests constituted by the UK Security Agreements on trust for the Secured Parties on the terms of the Loan Documents and the ~~Administrative~~Collateral Agent accepts that appointment.

(d)      The ~~Administrative~~Collateral Agent, its subsidiaries and associated companies may each retain for its own account and benefit any fee, remuneration and profits paid to it in connection with (i) its activities under the Loan Documents; and (ii) its engagement in any kind of banking or other business with any Loan Party.

(e)      Nothing in this Agreement constitutes the ~~Administrative~~Collateral Agent as a trustee or fiduciary of, nor shall the ~~Administrative~~Collateral Agent have any duty or responsibility to, any Loan Party.

(f)      The ~~Administrative~~Collateral Agent shall have no duties or obligations to any other person except for those which are expressly specified in the Loan Documents or mandatorily required by applicable law.

(g)      The ~~Administrative~~Collateral Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to

148

exercise and perform all or any of the duties, rights, powers and discretions vested in it by the UK Security Agreements and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(h)    The ~~Administrative~~Collateral Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the ~~Administrative~~Collateral Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the ~~Administrative~~Collateral Agent thinks fit and with such of the duties, rights, powers and discretions vested in the ~~Administrative~~Collateral Agent by the UK Security Agreements as may be conferred by the instrument of appointment of that person.

(i)    The ~~Administrative~~Collateral Agent shall notify the Secured Parties of the appointment of each Appointee (other than a Delegate).

(j)    The ~~Administrative~~Collateral Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate or Appointee in connection with its appointment.  All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement, as paid or incurred by the ~~Administrative~~Collateral Agent.

(k)    Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together "Rights") of the ~~Administrative~~Collateral Agent (in its capacity as security trustee) under this Agreement, the Intercreditor Agreements and the UK Security Agreements, and each reference to the ~~Administrative~~Collateral Agent (where the context requires that such reference is to the ~~Administrative~~Collateral Agent in its capacity as security trustee) in the provisions of this Agreement, the Intercreditor Agreements and the UK Security Agreements which confer Rights shall be deemed to include a reference to each Delegate and each Appointee.

(l)    Each Secured Party confirms its approval of the UK Security Agreements and authorizes and instructs the ~~Administrative~~Collateral Agent: (i) to execute and deliver the UK Security Agreements; (ii) to exercise the rights, powers and discretions given to the ~~Administrative~~Collateral Agent (in its capacity as security trustee) under or in connection with the UK Security Agreements together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the ~~Administrative~~Collateral Agent (in its capacity as security trustee) on behalf of the Secured Parties under the UK Security Agreements.

(m)    The ~~Administrative~~Collateral Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(n)    Each other Secured Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by a UK Security Agreement and accordingly authorizes: (a) the ~~Administrative~~Collateral Agent to hold such security interest in its sole name (or in the name of any Delegate) as trustee for the Secured Parties; and (b) the Land Registry (or other relevant registry) to register the ~~Administrative~~Collateral Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(o)    Except to the extent that a UK Security Agreement otherwise requires, any moneys which the ~~Administrative~~Collateral Agent receives under or pursuant to a UK Security Agreement may be: (a) invested in any investments which the ~~Administrative~~Collateral Agent selects and which are authorized by applicable law; or (b) placed on deposit at any bank or institution (including the

~~Administrative~~Collateral Agent) on terms that the ~~Administrative~~Collateral Agent thinks fit, in each case in the name or under the control of the ~~Administrative~~Collateral Agent, and the ~~Administrative~~Collateral Agent shall hold those moneys, together with any accrued income (net of any applicable Tax) to the order of the Lenders, and shall pay them to the Lenders on demand.

(p)    On a disposal of any of the Charged Property which is permitted under the Loan Documents, the ~~Administrative~~Collateral Agent shall (at the cost of the Loan Parties) execute any release of the UK Security Agreements or other claim over that Charged Property and issue any certificates of non-crystallisation of floating charges that may be required or take any other action that the ~~Administrative~~Collateral Agent considers desirable.

(q)    The ~~Administrative~~Collateral Agent shall not be liable for (i) any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by a UK Security Agreement; (ii) any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by a UK Security Agreement; (iii) the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Loan Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Loan Document; or (iv) any shortfall which arises on enforcing a UK Security Agreement.

(r)    The ~~Administrative~~Collateral Agent shall not be obligated to (i) obtain any authorization or environmental permit in respect of any of the Charged Property or a UK Security Agreement; (ii) hold in its own possession a UK Security Agreement, title deed or other document relating to the Charged Property or a UK Security Agreement; (iii) perfect, protect, register, make any filing or give any notice in respect of a UK Security Agreement (or the order of ranking of a UK Security Agreement)~~, unless that failure arises directly from its own gross negligence or willful misconduct~~; or (iv) require any further assurances in relation to a UK Security Agreement.

(s)    In respect of any UK Security Agreement, the ~~Administrative~~Collateral Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property; or (ii) make any enquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

(t)    In respect of any UK Security Agreement, the ~~Administrative~~Collateral Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or inadequacy of any insurance; or (ii) the failure of the ~~Administrative~~Collateral Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required Lenders have requested it to do so in writing and the ~~Administrative~~Collateral Agent has failed to do so within fourteen (14) days after receipt of that request.

(u)    Every appointment of a successor ~~Administrative~~Collateral Agent under a UK Security Agreement shall be by deed.

(v)    Section 1 of the Trustee Act 2000 (UK) shall not apply to the duty of the ~~Administrative~~Collateral Agent in relation to the trusts constituted by this Agreement.

(w)    In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 (UK) or the Trustee Act 2000 (UK), the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000 (U.K.).

150

(x)    The perpetuity period under the rule against perpetuities if applicable to this Agreement and any UK Security Agreement shall be 80 years from the Closing Date.

(y)    For the avoidance of doubt, any benefit, right, power and discretion and the benefit of every exculpation afforded to the Collateral Agent applies equally to it as security trustee of the security interests constituted by the UK Security Agreements.

SECTION X.    MISCELLANEOUS

10.1    Amendments and Waivers.

(a)    Except to the extent otherwise expressly set forth in this Agreement (including Sections 2.26, 7.11 and 10.16) or the applicable Loan Documents, neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1.

The Required Lenders and each Loan Party party to the relevant Loan Document may, subject to the acknowledgment of the Administrative Agent, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding, deleting or otherwise modifying any provisions to this Agreement or the other Loan Documents or changing in any manner the rights or obligations of the Agents or the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders or the Administrative Agent may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall:

(A)    forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date or reduce the amount of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest, fee or premium payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (A)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly and adversely affected thereby, which such consent of each Lender directly and adversely affected thereby shall be sufficient to effect such waiver without regard for a Required Lender consent;

(B)    amend, modify or waive any provision of paragraph (a) of this Section 10.1 without the written consent of all Lenders;

(C)    reduce any percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (except as provided in Section 7.4(j)), release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written

151

consent of all Lenders (except as expressly permitted hereby (including pursuant to <u>Section 7.4</u> or <u>7.5</u>) or by any Security Document);

(D)    amend, modify or waive any provision of paragraph (a) or (b) of <u>Section 2.18</u> of this Agreement or <u>Section 6.6</u> of the Guarantee and Collateral Agreement without the written consent of all Lenders directly and adversely affected thereby;

(E)    [reserved];

(F)    reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility, which consent shall be sufficient to effect such waiver under the applicable Facility without regard for a Required Lender consent;

(G)    amend, modify or waive any of the rights or duties of any Agent under this Agreement or any other Loan Document without the written consent of such Agent;

(H)    modify the requirement in Section 10.6(h) (or any other provision of any Loan Document that has the effect of modifying) to conduct a Dutch Auction open to all lenders of the same Tranche on a pro rata basis [or the provisions of <u>Section 10.6(h)(</u>~~iii~~i) or (h)(iv), in each case,] without the written consent of each Lender;

(I)    [release all or substantially all of the value of the Guarantees of the Guarantors, or limit their liability in respect of such Guarantees, without the written consent of each Lender;

(J)    [reserved]; or

(K)    [prior to an Event of Default under <u>Section 8.1(f)</u>, amend or modify any term or provision of any Loan Document to permit the issuance or incurrence of any Indebtedness for borrowed money (including any exchange of existing Indebtedness that results in another class of Indebtedness for borrowed money, but excluding (A) Indebtedness that is expressly permitted by this Agreement as in effect on the Closing Date to be senior to the applicable Tranche of Obligations and/or to be secured by a Lien that is senior to the Lien securing such Tranche of Obligations and (B) for the avoidance of doubt, any "debtor-in-possession" facility (or similar financing under applicable law)) with respect to which (x) the Liens on the Collateral securing the Obligations of any Tranche would be subordinated or (y) all or any portion of the Obligations of any Tranche would be subordinated in right of payment (any such other Indebtedness to which such Liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "<u>Senior Indebtedness</u>"), in each case without the written consent of each Lender of such Tranche directly and adversely affected thereby, unless each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the amount of Obligations that are adversely affected thereby held by each Lender) of the Senior Indebtedness on the same terms (other than bona fide backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "<u>Ancillary Fees</u>") as offered to all other providers (or their Affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior

152

Indebtedness afforded to the providers of the Senior Indebtedness (or any of their Affiliates) in connection with providing the Senior Indebtedness; ] or

~~(J) modify the last paragraph of Section 7.5 or the last paragraph of Section 7.7 to permit (or modify any other provision of any Loan Document that has the effect of permitting) any transfer, exclusive license or other Disposition of Material Intellectual Property to any Person other than a Loan Party, or for any Person other than a Loan Party to at any time own or exclusively license Material Intellectual Property, without the prior written consent of each Lender;~~

provided, further, that, notwithstanding anything herein to the contrary, the Loans held by an Affiliated Lender shall be disregarded in both the numerator and denominator and for all other purposes in the calculation or determination of any Lender vote (and, in the case of a plan of reorganization shall be deemed to have voted its interest in the Term Loans in the same proportion as the other Lenders) (and shall be deemed to have been voted in the same percentage as all other applicable Lenders voted if necessary to give legal effect to this paragraph); provided, further, that, in any event and without limiting the foregoing, the consent of the applicable Majority Facility Lenders shall be required with respect to any amendment that by its terms adversely affects the rights of Lenders under such Facility in respect of payments hereunder in a manner different from such amendment that affects other Facilities.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary herein, any amendment, modification, waiver or other action which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any such Defaulting Lender may not be increased or extended, the maturity of the Loans of any such Defaulting Lender may not be extended, the rate of interest on any of such Loans may not be reduced and the principal amount of any of such Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any such Defaulting Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Defaulting Lender than it is to, other affected Lenders shall require the consent of such Defaulting Lender.

(b)     Notwithstanding the foregoing, this Agreement may be amended with the written consent of the Required Lenders, the Administrative Agent and the Borrower (i) to add one or more additional credit facilities to this Agreement (it being understood that no Lender shall have any obligation to provide or to commit to provide all or any portion of any such additional credit facility) and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (ii) to include appropriately, after the effectiveness of any such amendment (or amendment and restatement), the Lenders holding such

153

credit facilities in any determination of the Required Lenders and Majority Facility Lenders, as applicable.

(c)    In addition, notwithstanding the foregoing, this Agreement may be amended, with the written consent of the Administrative Agent (not to be unreasonably withheld, delayed or conditioned), the Borrower and the Lenders providing the relevant Refinancing Term Loans (as defined below), as may be necessary or appropriate, in the opinion of the Borrower and the Administrative Agent, to provide for the incurrence of Permitted Refinancing Obligations under this Agreement in the form of a new Tranche of Term Loans hereunder ("Refinancing Term Loans"), which Refinancing Term Loans will be used to refinance all or any portion of the outstanding Term Loans of any Tranche ("Refinanced Term Loans"); provided, that:

(i)    the aggregate principal amount of such Refinancing Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans (plus accrued interest, fees, discounts, premiums and expenses);

(ii)    except as otherwise permitted by this clause (c) and the definition of the term "Permitted Refinancing Obligations" (including with respect to maturity and amortization), all terms applicable to such Refinancing Term Loans shall be substantially identical to, or (when taken as a whole, as shall be determined in good faith by the Borrower) less favorable to the Lenders providing such Refinancing Term Loans than, those applicable to such Refinanced Term Loans, other than for any covenants and other terms applicable solely to any period after the Latest Maturity Date; and

(iii)    The Borrower shall notify the Administrative Agent of the date on which the Borrower proposes that such Refinancing Term Loans shall be made, which shall be a date not less than 10 Business Days (or such shorter period as the Administrative Agent may agree to) after the date on which such notice is delivered to the Administrative Agent; provided, that no such Refinancing Term Loans shall be made, and no amendments relating thereto shall become effective, unless the Borrower shall deliver or cause to be delivered, to the extent reasonably requested by the Administrative Agent, customary legal opinions and certified copies of the resolutions or other applicable corporate action of each applicable Loan Party approving its entry into the relevant documents and the transactions contemplated thereby.

(d)    Each Lender hereunder (a) consents to the subordination of the Liens securing the Obligations on the terms set forth in the ABL Intercreditor Agreement, (b) agrees that it will be bound by and will take no actions contrary to the provisions of the ABL Intercreditor Agreement and (c) authorizes and instructs the Administrative Agent and the Collateral Agent to enter into the ABL Intercreditor Agreement, when applicable, on behalf of such Lender. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower and such Secured Parties are intended third party beneficiaries of such provisions and the ABL Intercreditor Agreement.

(e)    Furthermore, notwithstanding the foregoing, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, mistake, omission, defect, or inconsistency, in each case, in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement or any other Loan Document if the same is not objected to in writing by the Required Lenders within five Business Days following receipt of notice thereof; it being understood that posting such

amendment electronically on the Platform to the Required Lenders shall be deemed adequate receipt of notice of such amendment.

(f)    Furthermore, notwithstanding the foregoing, this Agreement may be amended, supplemented or otherwise modified in accordance with Sections 2.26, 7.11 and 10.16.

(g)    [Reserved].

(h)    The Lenders hereby agree that the Borrower may elect at any time after the Closing Date to replace the ABL Facility Agreement with a revolving credit facility or other debt agreement (a "Pari Passu Replacement Agreement") that would be treated as an "ABL Facility Agreement" (as defined in and for the purposes of the applicable provisions of this Agreement) but that would not be asset-based and would be secured by all the Collateral on a pari passu basis with the Obligations that are secured on a first-lien basis pursuant to an Other Intercreditor Agreement, provided that the aggregate principal amount thereunder is permitted by Section 7.2(aa). The Lenders hereby further agree that in connection with the establishment of a Pari Passu Replacement Agreement, this Agreement, the Guarantee and Collateral Agreement and the other Loan Documents may be amended, amended and restated, modified or supplemented to reflect such Pari Passu Replacement Agreement, in each case by the Administrative Agent (or Collateral Agent, as applicable) and the Borrower, but without the consent of any Lender.

10.2    Notices; Electronic Communications.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or posted to the Platform, or three Business Days after being deposited in the mail, postage prepaid, hand delivered or, in the case of telecopy notice, when sent (except in the case of a telecopy notice not given during normal business hours (New York time) for the recipient, which shall be deemed to have been given at the opening of business on the next Business Day for the recipient), addressed as follows in the case of the Borrower or the Agents, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such Person or at such other address as may be hereafter notified by the respective parties hereto:

The Borrower:    [Revlon Consumer Products Corporation]Intermediate Holdings IV LLC
[55 Water St., 43rd Floor
New York, New York 10041-0004
Attention: [Matt Kvarda, Interim Chief Financial Officer]
Telephone: [●](310) 980-8529
Email: mkvarda@alvarezandmarsal.com
Email: [mkvarda@alvarezandmarsal.com]

| With a copy (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention: Thomas V. de la Bastide III<br>Telephone: (212) 373-3031<br>Email: tdelabastide@paulweiss.com |
|---|---|
| Agents: | [Jefferies Finance LLC,<br>as Administrative Agent and each Collateral Agent<br>Jefferies Finance LLC<br>520 Madison Avenue<br>New York, New York 10022<br>Email: JFin.Notices@Jefferies.com<br>Attn: Revlon - Account Manager<br>Fax: (212) 284-3444] |
| With a copy (which shall not constitute notice) to: | [Paul Hastings LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attn: ~~Frank Lopez~~ Kristopher Villareal<br>Email: ~~franklopez~~ krisvillareal@paulhastings.com<br>Telephone: (212) ~~318-6499]~~ 318-6005 |

provided, that any notice, request or demand to or upon the Agents, the Lenders or the Borrower shall not be effective until received.

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by posting to the Platform or by any electronic communications pursuant to procedures approved by the Administrative Agent; provided, that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. Any Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications.

(c)     The Borrower, each Agent and each Lender hereby acknowledges that (i) Holdings, the Borrower and/or the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (ii) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive information other than information that is publicly available, or not material with respect to Holdings, the Borrower or its Subsidiaries, or their respective securities, for purposes of the United States Federal and state securities laws (collectively, "Public Information"). The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that is Public Information and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public Information (although it may be sensitive and proprietary) (provided, however, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in Section 10.14); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a

156

portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; provided, that there is no requirement that the Borrower identify any such information as "PUBLIC."

(d)        THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Persons (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party or any of its Related Persons; provided, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)        Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to such other Person.  Each Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirements of Law, including United States Federal securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain information other than Public Information.

(f)        The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices of borrowing) believed in good faith by the Administrative Agent to be given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.3    No Waiver; Cumulative Remedies.

(a)        No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall

operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.1 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (i) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 10.7(b) (subject to the terms of Section 10.7(a)), or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses; Indemnification.  Except with respect to Taxes which are addressed in Section 2.20, the Borrower agrees:

(a)    to pay or reimburse each Agent and each Lender for all of its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation, execution and delivery of this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of a single firm of counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction as may reasonably be necessary in connection with collateral matters) in connection with all of the foregoing;

(b)    to pay or reimburse each Lender and each Agent for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in Section 10.5(a) above (including all such costs and expenses incurred in connection with any legal proceeding, including any proceeding under any Debtor Relief Law or in connection with any workout or restructuring), including the documented fees and disbursements of (i) a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for the Agents and (ii) a single firm of counsel and, if necessary, a single firm of special regulatory counsel and a single firm of local counsel per material jurisdiction as may reasonably be necessary, for the Lenders, taken as a whole and, in the event of an actual or perceived conflict of interest, where the Agent or Lender affected by such conflict informs the Borrower and thereafter retains its own counsel, one additional counsel for each Lender or Agent or group of Lenders or Agents subject to such conflict; and

(c)    upon request from any Lender who is a depositor under the Escrow Agreement, to pay to such Lender an amount equal to the interest on the amount that such Lender has deposited with

158

the Escrow Agent pursuant to the Escrow Agreement for the period from the date of such deposit through (but excluding) the Closing Date, calculated at the interest rate that is applicable on the Closing Date to the Initial Term Loans made (or deemed made) on the Closing Date; and

(d)    (c) to pay, indemnify or reimburse each Lender, each Agent, the Lead Arranger, the Bookrunner and their respective Affiliates, and their respective partners that are natural persons, members that are natural persons, officers, directors, employees, trustees, advisors, agents and controlling Persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding (any of the foregoing, a "Proceeding") relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents referred to in Section 10.5(a) above and the transactions contemplated hereby and thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the reasonable fees and disbursements and other charges of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this clause (ed), collectively, the "Indemnified Liabilities");

provided, that, the Borrower shall not have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities have resulted from (i) the gross negligence or willful misconduct of such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (ii) a material breach of the Loan Documents by such Indemnitee or its Related Persons (but not an Agent Indemnitee or Related Person of an Agent Indemnitee)  as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto), (iii) disputes solely among Indemnitees or their Related Persons and not arising from any act or omission by Holdings, Borrower or any of its Subsidiaries (it being understood that this paragraph shall not apply to the indemnification of an Agent or a Lead Arranger in a suit involving an Agent or Lead Arranger, in each case, in its capacity as such, unless such suit has resulted from the gross negligence or willful misconduct of such Agent or Lead Arranger as determined by a court of competent jurisdiction in a final non-appealable decision (or settlement tantamount thereto)) or (iv) any settlement of any Proceeding effected without the Borrower's consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with the Borrower's written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, the Borrower shall indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this Section 10.5.

No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other material distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

For purposes hereof, a "Related Person" of an Indemnitee means (i) if the Indemnitee is any Agent or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Agent and its Affiliates and their respective officers, directors, employees, agents and controlling Persons; provided, that solely for purposes of Section 9, references to each Agent's Related Persons shall also include such Agent's trustees and advisors, and (ii) if the Indemnitee is any Lender or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors,

employees, agents and controlling Persons, any of such Lender and its Affiliates and their respective officers, directors, employees, agents and controlling Persons. All amounts due under this Section 10.5 shall be payable promptly after receipt of a reasonably detailed invoice therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to the Borrower at the address thereof set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.

The agreements in this Section 10.5 shall survive repayment of the Obligations.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than in accordance with Section 7.4(j)) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) subject to Sections 2.24 and 2.26(e), no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 10.6.

(b)    (i)    [Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, in compliance with applicable law, assign (other than to any Disqualified Institution or a natural person) to one or more assignees including Holdings or any Subsidiary to the extent contemplated by Sections 10.6(h) (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of, it being understood that it shall be deemed reasonable for the Borrower to withhold such consent in respect of a prospective Lender if the Borrower reasonably believes such prospective Lender would constitute a Disqualified Institution) of:

(1)    the Borrower; provided, that no consent of the Borrower shall be required (x) for an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund (other than a Defaulting Lender) or (y) if an Event of Default has occurred and is continuing; provided, further, that a consent under this clause (1) shall be deemed given if the Borrower shall not have objected in writing to a proposed assignment within fiveten Business Days after receipt by it of a written notice thereof from the Administrative Agent; and]

(2)    the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund (other than a Defaulting Lender).

(ii)    Subject to Sections 2.24 and 2.26(e), assignments shall be subject to the following additional conditions:

(1)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of (I) the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or (II) if earlier, the "trade date" (if any) specified in such Assignment and Assumption) shall not be less than $1,000,000 unless the Borrower and

160

the Administrative Agent otherwise consent; <u>provided</u>, that (1) no such consent of the Borrower shall be required if an Event of Default under <u>Section 8.1(a)</u> or <u>8.1(f)</u> has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent and the Borrower (or, at the Borrower's request, manually) together with a processing and recordation fee of $3,500 to be paid by either the applicable assignor or assignee (which fee may be waived or reduced in the sole discretion of the Administrative Agent); <u>provided</u>, that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(3)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and all applicable tax forms.

For the purposes of this <u>Section 10.6</u>, "<u>Approved Fund</u>" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (I) a Lender, (II) an Affiliate of a Lender, (III) an entity or an Affiliate of an entity that administers or manages a Lender or (IV) an entity or an Affiliate of an entity that is the investment advisor to a Lender. Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Assumption, the Assignee thereunder shall be a party hereto and, to the extent of the Loans and Commitments assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be subject to the obligations under and entitled to the benefits of <u>Sections 2.19</u>, <u>2.20</u>, <u>2.21</u>, <u>10.5</u> and <u>10.14</u>). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this <u>Section 10.6</u> shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this <u>Section 10.6</u> (and will be required to comply therewith), other than any sale to a Disqualified Institution, which shall be null and void.

(iv)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>"). The Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent demonstrable error for such purposes), notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee (except as contemplated by Sections 2.24 and 2.26(e)), the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder) and all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this Section 10.6 (unless waived by the Administrative Agent) and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i)    Any Lender may, without the consent of or notice to any Person, in compliance with applicable law, sell participations (other than to any Disqualified Institution) to one or more banks or other entities (a "Participant"), in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided, that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly and adversely affected thereby pursuant to the proviso to the second sentence of Section 10.1(a) and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section 10.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.19, 2.20 and 2.21 (if such Participant agrees to have related obligations thereunder (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section 10.6.  Notwithstanding the foregoing, no Lender shall be permitted to sell participations under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(ii)    A Participant shall not be entitled to receive any greater payment under Section 2.19, 2.20 or 2.21 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts.  No Participant shall be entitled to the benefits of Section 2.20 unless such Participant complies with Section 2.20(e), (g) or (j), as (and to the extent) applicable, as if such Participant were a Lender (it being understood that the documentation required under Section 2.20 shall be delivered to the participating Lender).

(iii)    Each Lender that sells a participation, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a register on which it enters the name and addresses of each Participant, and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the IRS, any disclosure

162

required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (it its capacity as such) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this Section 10.6 shall not apply to any such pledge or assignment of a security interest; provided, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

(f)    The Borrower may prohibit any assignment if it would require the Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction and the Borrower shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee to determine whether any such filing or qualification is required or whether any assignment is otherwise in accordance with applicable law.

(g)    [Reserved]:

(h)    Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Term Loans of any Tranche hereunder to Holdings or any of its Subsidiaries, but only if:

(i)    such assignment is made pursuant to a Dutch Auction open to all Lenders of the same Tranche on a pro rata basis;

(ii)    no Default or Event of Default shall have occurred and be continuing before or immediately after giving effect to such assignment;

(iii)    the relevant Auction Offeror shall represent and warrant, as of the date of the launch of the Dutch Auction and on the date of any such assignment, that it does not have any material non-public information that has not been disclosed to the Lenders generally (other than to the extent any such Lender does not wish to receive material non-public information with respect to Holdings or its Subsidiaries or any of their respective securities) prior to such date; and

(iv)    immediately and automatically, without any further action on the part of Holdings or any of its Subsidiaries, any Lender, the Administrative Agent or any other Person, upon the effectiveness of such assignment of Term Loans from a Lender to the relevant Auction Offeror, such Term Loans and all rights and obligations as a Lender related thereto shall, for all purposes under this Agreement, the other Loan Documents and otherwise, be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and

163

such Auction Offeror shall neither obtain nor have any rights as a Lender hereunder or under the other Loan Documents by virtue of such assignment.

(i)        Except as provided in Sections 10.6(h), none of Holdings or any of its Subsidiaries may acquire by assignment, participation or otherwise any right to or interest in any of the Commitments or Loans hereunder (and any such attempted acquisition shall be null and void).

(j)        [Reserved].

(k)        Notwithstanding anything to the contrary contained herein, the replacement of any Lender pursuant to Section 2.24 or 2.26(e) shall be deemed an assignment pursuant to Section 10.6(b) and shall be valid and in full force and effect for all purposes under this Agreement.

(l)        Any assignor of a Loan or Commitment or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or purchaser of such participation in the relevant Assignment and Assumption or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution.  None of the Agents shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

10.7    Adjustments; Set off.

(a)        Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this Section 10.7 shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including prepayments received pursuant to Sections 10.6(h)) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant.

(b)        In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or

indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Borrower.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile or electronic (i.e., "pdf" or "tiff") transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    Severability.    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

10.11    GOVERNING LAW.    **THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.**

10.12    Submission to Jurisdiction; Waivers.  Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "New York Supreme Court"), and the United States District Court for the Southern District of New York (the "Federal District Court" and, together with the New York Supreme Court, the "New York Courts"), and appellate courts from either of them; provided, that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this Section 10.12 would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

165

(b)      consents that any such action or proceeding may be brought in the New York Courts and appellate courts from either of them, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law;

(e)      expressly acknowledges and agrees, to the fullest extent it may lawfully do so, that (i) if the payment of any Initial Term Loans is accelerated or any Initial Term Loans otherwise become due and payable (including prior to the Term Maturity Date applicable thereto), including as a result of any Event of Default (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), in each case, prior to the second anniversary of the Closing Date, the Applicable Premium with respect to such Initial Term Loans will also be due and payable as though such Initial Term Loans were otherwise redeemed or repaid, prepaid or mandatorily assigned prior to the second anniversary of the Closing Date, and in all cases the Applicable Premium shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each applicable Lender's lost profits as a result thereof, (ii) such Applicable Premium (x) shall be presumed to be the liquidated damages sustained by each such Lender as the result any redemption (including prior to the Term Maturity Date applicable to such Initial Term Loans) and (y) is reasonable under the circumstances currently existing, (iii) such Applicable Premium shall also be payable in the event that any Initial Term Loans are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means, (iv) THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE APPLICABLE PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION INCLUDING WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION PURSUANT TO ANY INSOLVENCY PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAW, (v) such Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (vi) such Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made, (vii) there has been a course of conduct between the applicable Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay such Applicable Premium, (viii) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this clause (e) and otherwise in this Agreement and (ix) the Borrower's agreement to pay the Applicable Premium to applicable Lenders as herein described is a material inducement to such Lenders to make the Initial Term Loans; and

(f)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section 10.12 any special, exemplary, punitive or consequential damages (provided, that such waiver shall not limit the indemnification obligations of the Loan Parties to the extent such special, exemplary, punitive or consequential damages are included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under Section 10.5).

10.13   <u>Acknowledgments</u>.  The Borrower hereby acknowledges that:

(a)   it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)   neither the Agents nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)   no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders;

(d)   no advisory or agency relationship between it and any Agent or Lender (in their capacities as such) is intended to be or has been created in respect of any of the transactions contemplated hereby,

(e)   the Agents and the Lenders, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship,

(f)   the Borrower is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents,

(g)   each of the Agents and the Lenders is engaged in a broad range of transactions that may involve interests that differ from the interests of the Borrower and none of the Agents or the Lenders has any obligation to disclose such interests and transactions to the Borrower by virtue of any advisory or agency relationship, and

(h)   none of the Agents or the Lenders (in their capacities as such) has advised the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including the validity, enforceability, perfection or avoidability of any aspect of any of the transactions contemplated hereby under applicable law, including the Bankruptcy Code or any consents needed in connection therewith), and none of the Agents or the Lenders (in their capacities as such) shall have any responsibility or liability to the Borrower with respect thereto and the Borrower has consulted with its own advisors regarding the foregoing to the extent it has deemed appropriate.

To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.14   <u>Confidentiality</u>.  Each of the Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished, directly or indirectly, by or on behalf of the Borrower or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby (including any potential amendments, modifications or waivers, or any request therefor), whether furnished before or after the Closing Date ("<u>Confidential Information</u>"), as strictly confidential and not to use Confidential Information for any purpose other than evaluating the Transactions and negotiating, making available and administering this Agreement (the "<u>Agreed Purposes</u>").  Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and

167

each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except:

(1)    to its partners that are natural persons, members that are natural persons, directors, officers, employees, counsel, advisors, trustees and Affiliates (collectively, the "Representatives"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential, with the applicable Agent or Lender responsible for the breach of this Section 10.14 by such Representatives as if they were party hereto);

(2)    to any pledgee referred to in Section 10.6(d) and prospective Lenders and Participants in connection with the secondary trading of the Facilities and Commitments and Loans hereunder (excluding any Disqualified Institution), in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14;

(3)    to any party or prospective party (or their advisors) to any swap, derivative or similar transaction under which payments are made by reference to the Borrower and the Obligations, this Agreement or payments hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this Section 10.14;

(4)    upon the request or demand of any Governmental Authority having or purporting to have jurisdiction over it;

(5)    in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, provided, that in the case of clauses (4) and (5), the disclosing Agent or Lender, as applicable, agrees, to the extent practicable and not prohibited by applicable Requirements of Law, to notify the Borrower prior to such disclosure and cooperate with the Borrower in obtaining an appropriate protective order (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority);

(6)    to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facilities;

(7)    information that has been publicly disclosed other than in breach of this Section 10.14;

(8)    to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or in connection with examinations or audits of such Lender;

(9)    to the extent reasonably required or necessary, in connection with the exercise of any remedy under the Loan Documents; provided, that each Agent and Lender uses commercially

168

reasonable efforts to ensure that such information is kept confidential in connection with such exercise of remedies and the recipient is informed of the confidential nature of the information;

(10)    to the extent the Borrower has consented to such disclosure in writing;

(11)    to any other party to this Agreement;

(12)    to the extent that such information is received from a third party that is not, to such Agent or Lender's knowledge, subject to contractual or fiduciary confidentiality obligations owing to the Borrower and its Affiliates and their Related Parties;

(13)    to the extent that such information is independently developed by such Agent or Lender; or

(14)    by the Administrative Agent to the extent reasonably required or necessary to obtain a CUSIP for any Loans or Commitment hereunder, to the CUSIP Service Bureau.

Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and/or its Affiliates and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement.   All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.  Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this <u>Section 10.14</u> shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

10.15    <u>Release of Collateral and Guarantee Obligations; Subordination of Liens</u>.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents (including by way of merger and including any assets transferred to a Subsidiary that is not a Loan Party in a transaction permitted by this Agreement) or any Loan Party becoming an Excluded Subsidiary (other than pursuant to <u>clause (b)</u> of the definition thereof~~[, unless such Loan Party so becomes such an Excluded Subsidiary as a result of a joint venture or other strategic transaction permitted hereunder that was not entered into for the primary purpose of releasing the Guarantee of such Loan Party])~~ or ceasing to be a Subsidiary (as used in this <u>Section 10.15</u>, "ceasing to be a Subsidiary" with respect to any Loan Party shall mean that no Loan Party or Affiliate thereof shall have retained any direct or indirect equity interests in such Person), all Liens and Guarantees on such assets or all assets of such Excluded Subsidiary or former Subsidiary shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender) execute and deliver all releases reasonably necessary or desirable (i) to evidence the release of Liens created in any Collateral being Disposed of in such Disposition (including any assets of any Loan Party that becomes an Excluded Subsidiary) or of such Excluded Subsidiary or former Subsidiary, as applicable, (ii) to provide notices of the termination

169

of the assignment of any Property for which an assignment had been made pursuant to any of the Loan Documents which is being Disposed of in such Disposition or of such Excluded Subsidiary or former Subsidiary, as applicable, and (iii) to release the  Guarantee and any other obligations under any Loan Document of any Person being Disposed of in such Disposition or which becomes an Excluded Subsidiary or former Subsidiary, as applicable; *provided*, that to the extent the Property being so Disposed of has a Fair Market Value in excess of $[25,000,000], the Borrower shall deliver a  certificate of a Responsible Officer certifying that the Disposition is permitted by the Loan Documents.  Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to the Borrower or any of its Subsidiaries) or of a Loan Party which becomes an Excluded Subsidiary or former Subsidiary, as applicable, shall no longer be deemed to be repeated once such Property is so Disposed of.  In addition, upon the reasonable request of the Borrower in connection with (A) any Lien of the type permitted by Section 7.3(g) on Excluded Collateral to secure Indebtedness to be incurred pursuant to Section 7.2(c) (or pursuant to Section 7.2(d), 7.2(j), or 7.2(v) if such Indebtedness is of the type that is contemplated by Section 7.2(c)) if the holder of such Lien so requires, (B) any Lien securing Indebtedness pursuant to Section 7.2(t)(x) if the holder of such Lien so requires and pursuant to Section 7.2(t)(y) if the holder of such Lien so requires and if the holder of the applicable Indebtedness being refinanced also so requires, and in each case to the extent constituting Excluded Collateral, (C) any Lien of the type permitted by Sections 7.3(o), 7.3(r)(i), 7.3(t) or 7.3(bb), in each case, to the extent the obligations giving rise to such permitted Lien prohibit (or require the release of) the security interest of the Collateral Agent thereon, or Section 7.3(kk) to the extent constituting Excluded Collateral, or (D) the ownership of joint ventures or other entities qualifying under clause (iv) of the definition of Excluded Equity Securities, the Collateral Agent shall execute and deliver all releases necessary or desirable to evidence that no Liens exist on such Excluded Collateral under the Loan Documents.

(b)     Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than any contingent or indemnification obligations not then due) have been paid in full and all Commitments have terminated or expired, upon the request of the Borrower, all Liens and Guarantee Obligations under any Loan Documents shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be contingent or indemnification obligations not then due.  Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(c)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with  any Liens permitted ~~by the Loan Documents~~under Section 7.3(g) securing Indebtedness incurred pursuant to Section 7.2(c), the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to subordinate the Lien on any Collateral to any such Lien permitted ~~under~~by Section 7.3(g).

10.16     Accounting Changes.  In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial ratios, covenants, standards or terms in this Agreement, then following notice either from the Borrower to the Administrative Agent or from the Administrative Agent to the Borrower (which the Administrative Agent shall give at the request of the Required Lenders), the Borrower and the Administrative Agent

170

agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition and covenant capacities shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  If any such notices are given then, regardless of whether such notice is given prior to or following such Accounting Change, until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders and have become effective, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  Any amendment contemplated by the prior sentence shall become effective upon the consent of the Required Lenders, it being understood that a Lender shall be deemed to have consented to and executed such amendment if such Lender has not objected in writing within five Business Days following receipt of notice of execution of the applicable amendment by the Borrower and the Administrative Agent, it being understood that the posting of an amendment referred to in the preceding sentence electronically on the Platform to the Lenders shall be deemed adequate receipt of notice of such amendment.  "<u>Accounting Changes</u>" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC, in each case, occurring after the Closing Date. Without limiting the foregoing, for purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of ~~proposed~~ Accounting Standards Update ~~(ASU)~~No. 2016-02 Leases (Topic ~~840) issued August 17, 2010, or any successor proposal~~842).

10.17   <u>WAIVERS OF JURY TRIAL</u>.  **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND FOR ANY COUNTERCLAIM THEREIN.**

10.18   <u>USA PATRIOT ACT AND CANADIAN ANTI-MONEY LAUNDERING & ANTI-TERRORISM LEGISLATION</u>. (a) The Administrative Agent and each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107 56 (signed into law October 26, 2001)) (the "<u>USA Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of such Loan Parties and other information that will allow the Administrative Agent or such Lender to identify the Loan Parties in accordance with the USA Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender or Agent reasonably promptly upon request from such Lender or Agent.

(b) The Administrative Agent and its successors and assigns may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations and regulations, and they hereby notify the Borrower and each of its Subsidiaries that in order to comply with such legislation, rules and regulations, they may be, among other things, required to obtain, verify and record information pertaining to the Borrower and its Subsidiaries, which information may relate to, among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, and corporate shareholders of Holdings and the Subsidiaries. Each of Holdings and the Borrowers agree to take promptly such actions and to promptly provide, upon reasonable request, such information, access to information and certifications regarding Holdings and the Subsidiaries that are required to enable the Administrative Agent and its successors and assigns to comply with such Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "**know your customer**" rules and regulations. In addition, and to the extent they are required at law to do so, each of

171

Holdings and the Borrowers agree to promptly comply with its obligations under Canadian Anti-Money Laundering & Anti-Terrorism Legislation.

10.19    [Reserved].

10.20    Interest Rate Limitation.  Notwithstanding anything in this Agreement to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 10.20 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

10.21    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.22    Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other notices of borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any

Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(A)    a reduction in full or in part or cancellation of any such liability;

(B)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(C)    the variation of the terms of such liability  in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

10.24    ~~10.24~~  Hypothecary Representative.  Without limiting the generality of any provisions of this Agreement, each Lender hereby appoints and designates the Administrative Agent (or any successor thereto) as hypothecary representative (within the meaning of Article 2692 of the Civil Code of Québec) of the Administrative Agent and the Lenders for the purposes of holding any security granted by any Loan Party under the laws of the Province of Québec as security for any indebtedness or other obligation of any Loan Party and, in such capacity, the Administrative Agent shall hold any such security granted under the laws of the Province of Québec as such hypothecary representative in the exercise of the rights conferred thereunder. The execution by the Administrative Agent, as such hypothecary representative, prior to the date hereof of any deeds of hypothec or other documents is hereby ratified and confirmed. Each assignee Lender that becomes party to this Agreement, by becoming a party to this Agreement, shall be deemed to have ratified and confirmed the appointment of the Administrative Agent (or any successor thereto) as hypothecary representative. In the event of the resignation of the Administrative Agent and appointment of a successor Administrative Agent, such successor Administrative Agent shall also act as the hypothecary representative (without any further act or formality being required to effect such replacement). The Administrative Agent, as such hypothecary representative, shall benefit from and be subject to all provisions hereof with respect to the Administrative Agent, mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to an indemnification by each Lender, and shall be entitled to delegate from time to time any of its powers or duties under any deed of hypothec granted in favour of the Administrative Agent, as such hypothecary representative, on such terms and conditions as it may determine from time to time.

10.25    Emergence Date Transaction Steps.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, the funding (or deemed funding) of the Loans, premiums and discounts hereunder and under the other Loan Documents shall be made in accordance with the Transaction Steps Memorandum included in the Restructuring Plan.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

[REVLON ~~CONSUMER PRODUCTS CORPORATION~~]INTERMEDIATE HOLDINGS IV LLC, as Borrower


By: _____
    Name:
    Title:


[REVLON~~, INC.~~] INTERMEDIATE HOLDINGS III LLC (solely for purposes of Section VIIA), as Holdings


By:
Name:
Title:


REVLON INTERMEDIATE HOLDINGS V LLC,


By: _____
    Name:
    Title:


REVLON INTERMEDIATE HOLDINGS VI LLC,


By: _____
    Name:
    Title:


REVLON NEWCO, LLC,


By: _____
    Name:
    Title:


[Signature Page to Exit Term Credit Agreement (Revlon)]

[Signature Page to Exit Term Credit Agreement (Revlon)]

[Jefferies Finance LLC],
as Administrative Agent and Collateral Agent

By: _____
    Name:
    Title:

[Signature Page to Exit Term Credit Agreement (Revlon)]

[●],
as a Lender

By: _____
    Name:
    Title:

## **Exhibit G**

### **Exit ABL Facility Credit Agreement**

This **Exhibit G** contains the Exit ABL Facility Credit Agreement. Pursuant to Article IV.A.1 of the Plan, on the Effective Date, the Reorganized Debtors shall enter into the Exit ABL Facility Documents, including the Exit ABL Facility Credit Agreement, for the Exit ABL Facility.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit G**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court. Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**EXECUTION VERSION**

---

### ASSET-BASED REVOLVING CREDIT AGREEMENT

among

REVLON INTERMEDIATE HOLDINGS IV LLC,

as Borrower

and

REVLON INTERMEDIATE HOLDINGS III LLC,
as Holdings,

THE LENDERS PARTY HERETO

MIDCAP FUNDING IV TRUST,
as Administrative Agent and Collateral Agent

Dated as of May [2], 2023

---

MIDCAP FINANCIAL TRUST

As Lead Arranger

<u>TABLE OF CONTENTS</u>

<u>Page</u>

Section I. DEFINITIONS ............................................................................................................... 1

    1.1    Defined Terms ................................................................................................ 1
    1.2    Other Definitional Provisions. ..................................................................... 60
    1.3    Pro Forma Calculations ............................................................................... 62
    1.4    Exchange Rates; Currency Equivalents.. .................................................... 63
    1.5    [Reserved]. ................................................................................................... 63
    1.6    Covenants...................................................................................................... 63
    1.7    Interest Rates ................................................................................................ 64

Section II. AMOUNT AND TERMS OF COMMITMENTS .................................................... 65

    2.1    [reserved] ..................................................................................................... 65
    2.2    [reserved] ..................................................................................................... 65
    2.3    [reserved] ..................................................................................................... 65
    2.4    Revolving Commitments .............................................................................. 65
    2.5    Procedure for Borrowing ............................................................................. 66
    2.6    Maturity Extension ....................................................................................... 66
    2.7    Defaulting Lenders ...................................................................................... 67
    2.8    Repayment of Loans .................................................................................... 68
    2.9    Unused Line Fees, etc. ................................................................................. 69
    2.10    Termination or Reduction of Commitments ................................................ 70
    2.11    Optional Prepayments .................................................................................. 70
    2.12    Mandatory Prepayments ............................................................................... 71
    2.13    Conversion and Continuation Options......................................................... 71
    2.14    Minimum Amounts and Maximum Number of SOFR Tranches .................. 72
    2.15    Interest Rates and Payment Dates ............................................................... 72
    2.16    Computation of Interest and Fees ................................................................ 73
    2.17    Benchmark Replacement Setting; Inability to Determine Interest Rate .......... 73
    2.18    Pro Rata Treatment and Payments............................................................... 76
    2.19    Requirements of Law.................................................................................... 77
    2.20    Taxes............................................................................................................. 78
    2.21    Indemnity ..................................................................................................... 81
    2.22    Illegality....................................................................................................... 82
    2.23    Change of Lending Office ............................................................................ 82
    2.24    Replacement of Lenders .............................................................................. 82
    2.25    [Reserved] .................................................................................................... 83
    2.26    [Reserved].................................................................................................... 84
    2.27    Protective Advances .................................................................................... 84
    2.28    MIRE Events................................................................................................ 84
    2.29    Prepayment Premium................................................................................... 84

i

Section III. [Reserved] ................................................................................................................ 85

Section IV. REPRESENTATIONS AND WARRANTIES ......................................................... 85

4.1      Financial Condition ........................................................................................ 85
4.2      No Change .................................................................................................... 86
4.3      Existence; Compliance with Law ................................................................. 86
4.4      Corporate Power; Authorization; Enforceable Obligations .......................... 86
4.5      No Legal Bar ................................................................................................. 87
4.6      No Material Litigation ................................................................................... 87
4.7      No Default ..................................................................................................... 87
4.8      Ownership of Property; Liens ....................................................................... 87
4.9      Intellectual Property ..................................................................................... 87
4.10     Taxes ............................................................................................................ 87
4.11     Federal Regulations ...................................................................................... 88
4.12     ERISA and Canadian Pension Plans ............................................................ 88
4.13     Investment Company Act .............................................................................. 88
4.14     Subsidiaries .................................................................................................. 88
4.15     Environmental Matters. ................................................................................ 88
4.16     Accuracy of Information, etc ........................................................................ 89
4.17     Security Documents ...................................................................................... 89
4.18     Solvency ....................................................................................................... 90
4.19     Anti-Terrorism .............................................................................................. 90
4.20     Use of Proceeds ............................................................................................ 90
4.21     Labor Matters ............................................................................................... 90
4.22     Sanctions ...................................................................................................... 91
4.23     Anti-Corruption Compliance ....................................................................... 91
4.24     Borrowing Base Certificate .......................................................................... 91
4.25     Beneficial Ownership Certification .............................................................. 91

Section V. CONDITIONS PRECEDENT ............................................................................... 91

5.1      Conditions to Initial Loans on the Closing Date .......................................... 91
5.2      Conditions to Each Extension of Credit After Closing Date ........................ 96

Section VI. AFFIRMATIVE COVENANTS ........................................................................... 97

6.1      Financial Statements .................................................................................... 97
6.2      Certificates; Other Information ..................................................................... 99
6.3      Payment of Taxes ........................................................................................ 101
6.4      Conduct of Business; Maintenance of Existence; Compliance with Requirements
         of Law ........................................................................................................ 101
6.5      Maintenance of Property; Insurance ........................................................... 102
6.6      Inspection of Property; Books and Records; Discussions ........................... 102
6.7      Notices ........................................................................................................ 103
6.8      Additional Collateral, etc ........................................................................... 104
6.9      Use of Proceeds .......................................................................................... 110
6.10     Post-Closing ............................................................................................... 110
6.11     [Reserved] .................................................................................................. 110
6.12     Line of Business ......................................................................................... 110

ii

6.13    Changes in Jurisdictions of Organization; Name.......................................................... 110
6.14    Appraisals and Field Examinations .............................................................................. 110
6.15    Control Accounts; Approved Deposit Accounts........................................................... 111
6.16    Landlord Waiver and Bailee's Letters ......................................................................... 112
6.17    [Reserved]..................................................................................................................... 112
6.18    Sanctions; Anti-Corruption Laws ............................................................................... 112
6.19    People's Republic of China .......................................................................................... 113
6.20    People with Significant Control Regime ..................................................................... 113
6.21    Information Technology Systems ................................................................................ 113
6.22    Canadian Defined Benefit Pension Plan Reporting. .................................................... 113

Section VII. NEGATIVE COVENANTS .................................................................................. 113

7.1     Financial Covenant. ...................................................................................................... 114
7.2     Indebtedness.................................................................................................................. 114
7.3     Liens .............................................................................................................................. 119
7.4     Fundamental Changes.................................................................................................... 123
7.5     Dispositions of Property ............................................................................................... 124
7.6     Restricted Payments...................................................................................................... 127
7.7     Investments ................................................................................................................... 130
7.8     Prepayments, Etc. of Indebtedness; Amendments ....................................................... 135
7.9     Transactions with Affiliates ......................................................................................... 136
7.10    Sales and Leasebacks..................................................................................................... 138
7.11    Changes in Fiscal Periods ............................................................................................. 138
7.12    Negative Pledge Clauses............................................................................................... 138
7.13    Clauses Restricting Subsidiary Distributions............................................................... 140
7.14    Limitation on Hedge Agreements ................................................................................. 142
7.15    Amendment of Company Tax Sharing Agreement........................................................ 142
7.16    Anti-Cash Hoarding...................................................................................................... 142
7.17    Canadian Defined Benefit Pension Plans ..................................................................... 142
7.18    Designation of Unrestricted Subsidiaries ..................................................................... 142

SECTION VIIA. HOLDINGS NEGATIVE COVENANTS........................................................ 142

Section VIII. EVENTS OF DEFAULT ...................................................................................... 143

8.1     Events of Default .......................................................................................................... 143

Section IX. THE AGENTS .......................................................................................................... 148

9.1     Appointment .................................................................................................................. 148
9.2     Delegation of Duties ..................................................................................................... 148
9.3     Exculpatory Provisions ................................................................................................. 149
9.4     Reliance by the Agents .................................................................................................. 149
9.5     Notice of Default ........................................................................................................... 150
9.6     Non-Reliance on Agents and Other Lenders ................................................................ 150
9.7     Indemnification.............................................................................................................. 150
9.8     Agent in Its Individual Capacity ................................................................................... 151
9.9     Successor Agents ........................................................................................................... 151
9.10    Authorization to Release Liens and Guarantees ........................................................... 152

9.11    Agents May File Proofs of Claim ................................................................ 152
9.12    Specified Hedge Agreements, Specified Cash Management Obligations and
Specified Additional Obligations ............................................................... 152
9.13    Lead Arranger. ........................................................................................... 154
9.14    Erroneous Payment. ................................................................................... 154
9.15    Appointment of Administrative Agent as Security Trustee ........................... 155

**Section X. MISCELLANEOUS** ....................................................................................... 158

10.1    Amendments and Waivers .......................................................................... 158
10.2    Notices; Electronic Communications .......................................................... 161
10.3    No Waiver; Cumulative Remedies .............................................................. 164
10.4    Survival of Representations and Warranties ................................................ 165
10.5    Payment of Expenses; Indemnification ....................................................... 165
10.6    Successors and Assigns; Participations and Assignments ............................ 166
10.7    Adjustments; Set off .................................................................................. 170
10.8    Counterparts .............................................................................................. 171
10.9    Severability ............................................................................................... 171
10.10   Integration ................................................................................................ 171
10.11   GOVERNING LAW ................................................................................. 171
10.12   Submission to Jurisdiction; Waivers ........................................................... 171
10.13   Acknowledgments ..................................................................................... 172
10.14   Confidentiality .......................................................................................... 173
10.15   Release of Collateral and Guarantee Obligations; Subordination of Liens. ... 175
10.16   Accounting Changes .................................................................................. 176
10.17   WAIVERS OF JURY TRIAL ................................................................... 177
10.18   USA PATRIOT ACT, UK ANTI-MONEY LAUNDERING & ANTI-
TERRORISM LEGISLATION AND CANADIAN ANTI-MONEY
LAUNDERING & ANTI-TERRORISM LEGISLATION ........................... 177
10.19   [Reserved]................................................................................................. 178
10.20   Interest Rate Limitation ............................................................................. 178
10.21   Payments Set Aside ................................................................................... 178
10.22   Electronic Execution of Assignments and Certain Other Documents ........... 178
10.23   Acknowledgement and Consent to Bail-In of Affected Financial Institutions ... 179
10.24   Judgment Currency. ................................................................................... 179
10.25   [Reserved]................................................................................................. 179
10.26   [Reserved]................................................................................................. 179
10.28   Certain ERISA Matters. ............................................................................. 180
10.29   Acknowledgement Regarding Any Supported QFCs ................................... 181

iv

SCHEDULES:

| | |
|---|---|
| 1.1A | Consolidated EBITDA Add-Backs |
| 1.1B | Specified Hedge Agreements, Specified Cash Management Obligations and Specified Additional Obligations |
| 2.1 | Commitments |
| 4.6 | Litigation |
| 4.8 | Material Real Property |
| 4.12 | Material ERISA Events |
| 4.14 | Subsidiaries |
| 4.17 | UCC Filing Jurisdictions |
| 6.10 | Post-Closing Matters |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.5(q) | Legal Entity Rationalization Disposition |
| 7.6(i) | Legal Entity Rationalization Restricted Payments |
| 7.7(h) | Legal Entity Rationalization Investments |
| 7.7(k) | Existing Investments |
| 7.8(a)(viii) | Junior Financing Payments |
| 7.9 | Transactions with Affiliates |
| 7.12 | Existing Negative Pledge Clauses |
| 7.13 | Clauses Restricting Subsidiary Distributions |
| 7.17 | Canadian Defined Benefit Pension Plans |

EXHIBITS:

| | |
|---|---|
| A-1 | Form of Guarantee and Collateral Agreement |
| A-2 | Form of Canadian Collateral Agreement |
| B | Form of Compliance Certificate |
| C | Form of Closing Certificate |
| D | Form of Assignment and Assumption |
| E | Form of Borrowing Notice |
| F-1 | Form of U.S. Tax Compliance Certificate |
| F-2 | Form of U.S. Tax Compliance Certificate |
| F-3 | Form of U.S. Tax Compliance Certificate |
| F-4 | Form of U.S. Tax Compliance Certificate |
| G | Form of Solvency Certificate |
| H | [reserved] |
| I | [reserved] |
| J | Form of Revolving Note |
| K | Form of ABL Intercreditor Agreement |
| L | [reserved] |
| M | Form of Mortgage |
| N | [reserved] |
| O | [reserved] |
| P | Form of Borrowing Base Certificate |
| Q | Certain Borrowing Base Definitions |

ASSET-BASED REVOLVING CREDIT AGREEMENT, dated as of May [2], 2023, among REVLON INTERMEDIATE HOLDINGS IV LLC, a Delaware limited liability company (the "***Company***" or the "***Borrower***"), REVLON INTERMEDIATE HOLDINGS III LLC, a Delaware limited liability company ("***Holdings***"), solely for purposes of **_Section VIIA_**, the several banks and other financial institutions or entities from time to time parties to this Agreement as Lenders, and MIDCAP FUNDING IV TRUST, as Administrative Agent and Collateral Agent.

<p align="center">WITNESSETH:</p>

WHEREAS, on June 15, 2022, Revlon, Inc. ("***Revlon Holdings***"), a Delaware corporation, Revlon Consumer Products Corporation, a Delaware corporation ("***RCPC***"), and certain of RCPC's Subsidiaries (each, a "***Debtor***" and collectively, the "***Debtors***") filed voluntary petitions with the Bankruptcy Court initiating their respective cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (such court, the "***Bankruptcy Court***"; and each such case of RCPC and each other Debtor, a "***Chapter 11 Case***" and collectively, the "***Chapter 11 Cases***") and continued in the possession of their assets and the management of their business pursuant to Section 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Revlon Holdings, in its capacity as foreign representative on behalf of the Debtors' estates, filed an application with the Ontario Superior Court of Justice (Commercial List) in Toronto, Ontario, Canada under Part IV of the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended, to recognize the Chapter 11 Cases as "foreign main proceedings" and grant certain customary related relief (the "***Recognition Proceedings***");

WHEREAS, on April 3, 2023, the Bankruptcy Court entered the Confirmation Order (as defined herein) approving the Restructuring Plan (as defined herein) of the Debtors, and concurrently with the making (and/or deemed making) of the Loans hereunder, the effective date with respect to the Restructuring Plan has occurred. The Confirmation Order was recognized and given full force and effect in Canada pursuant to an order in the Recognition Proceedings granted on April 21, 2023 (the "***Plan Recognition Order***");

WHEREAS, by execution and delivery of this Agreement and the other Loan Documents and entry of the Confirmation Order in respect of the Debtors, Holdings and the Subsidiary Guarantors, as applicable, agree to guarantee the Obligations, and the Borrower and each Guarantor agrees to secure all of the Obligations by granting to the Collateral Agent, for the benefit of the Secured Parties, a lien and security interest in respect of, and on, the Collateral, on and subject to the terms and priorities set forth in the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and in the other Loan Documents, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

<p align="center">**SECTION I.**
**DEFINITIONS**</p>

1.1    **Defined Terms**.  As used in this Agreement, the terms listed in this **Section 1.1** shall have the respective meanings set forth in this **Section 1.1**.

"***ABL DIP Facility***": the Super-Priority Senior Secured Debtor-in-Possession Asset-Based Revolving Credit Agreement, dated as of June 30, 2022 (as amended, supplemented, waived or otherwise modified from time to time), by and among RCPC, as Borrower, Revlon Holdings, as Holdings, the lenders

party thereto from time to time, MidCap Funding IV Trust, as administrative agent and collateral agent, and Crystal Financial LLC d/b/a SLR Credit Solutions, as SISO term loan agent.

"***ABL DIP Fee Letter***": the ABL DIP Credit Agreement – Fee Letter, dated as of June 30, 2022 (as amended, supplemented, waived or otherwise modified from time to time), between MidCap Funding IV Trust and RCPC.

"***ABL Facility First Priority Collateral***": as defined in the ABL Intercreditor Agreement.

"***ABL Intercreditor Agreement***":  the ABL Intercreditor Agreement, dated as of the Closing Date, among the Borrower, Holdings, the Subsidiary Guarantors, the Collateral Agent, the collateral agent under the Term Loan Documents and the other parties from time to time party thereto, substantially in the form of **Exhibit K**, as the same may be amended, supplemented, waived or otherwise modified from time to time.

"***ABR***":  for any day, a rate per annum equal to the highest of

(a)       the Prime Rate in effect on such day,

(b)       the Federal Funds Effective Rate in effect on such day ***plus*** ½ of 1% and

(c)       the Adjusted Term SOFR Rate for a one-month Interest Period ***plus*** 1%.

Any change in the ABR due to a change in the Prime Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted Term SOFR Rate, as the case may be. If the ABR is being used as an alternate rate of interest pursuant to **Section 2.17** (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to **Section 2.17(a)(i)**), then the ABR shall be the greater of **clause (a)** and **(b)** above and shall be determined without reference to **clause (c)** above.  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 2.00%, such rate shall be deemed to be 2.00% for purposes of this Agreement.

"***ABR Loans***":  Loans the rate of interest applicable to which is based upon the ABR.

"***ABR Term SOFR Determination Day***": as defined in the definition of "Term SOFR".

"***Accelerated Maturity Date***":  the date that is 91 days prior to the earliest stated maturity date of the term loans incurred pursuant to the Term Loan Agreement, to the extent such term loans are then outstanding.

"***Account***": as defined in the UCC or the PPSA, as applicable.

"***Account Debtor***": as defined in the UCC or the PPSA, as applicable.

"***Accounting Changes***":  as defined in **Section 10.16**.

"***Additional Lender Expense***": as defined in **Section 10.5(b)**.

"***Additional Obligation Designation Notice***":  as defined in **Section 9.12(c)**.

"***Adjusted Term SOFR Rate***": an interest rate per annum equal to Term SOFR for such Interest Period plus the Term SOFR Adjustment; ***provided*** that, if the Adjusted Term SOFR Rate as so determined

would be less than the Floor, such rate shall be deemed to be equal to the Floor for the purposes of this Agreement.

"***Administrative Agent***": MidCap Funding IV Trust, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors and permitted assigns in such capacity in accordance with **Section 9.9**.

"***Affected Financial Institution***": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, in either case whether by contract or otherwise.

"***Agents***":  the collective reference to the Collateral Agent and the Administrative Agent.

"***Aggregate Exposure***":  with respect to each Revolving Lender at any time, an amount equal to the aggregate amount of such Revolving Lender's Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the amount of such Revolving Lender's outstanding Revolving Loans then outstanding.

"***Aggregate Exposure Percentage***":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the total Aggregate Exposures of all applicable Lenders at such time.

"***Agreed Purposes***":  as defined in **Section 10.14**.

"***Agreement***":  this Asset-Based Revolving Credit Agreement, as amended, restated, supplemented, waived or otherwise modified from time to time.

"***AML Legislation***": as defined in **Section 10.18(b)**.

"***Ancillary Fees***": as defined in **Section 10.1**

"***Anti-Corruption Law***":  the United States Foreign Corrupt Practices Act of 1977, as amended, the Corruption of Foreign Public Officials Act (Canada), as amended, the U.K. Bribery Act 2010 or any applicable law or regulation implementing the OECD Convention on Combatting Bribery of Foreign Public Officials.

"***Applicable Margin***": with respect to the Revolving Loans (i) that are Term SOFR Loans, 4.50% per annum and (ii) that are ABR Loans, 3.50% per annum.

"***Applicable Premium***":  as defined in **Section 2.29**.

"***Appraisal***":  (i) each appraisal delivered to the Administrative Agent prior to the Closing Date for purposes of this Agreement (which the Administrative Agent confirms is satisfactory to it) and (ii) each appraisal that is conducted after the Closing Date pursuant to **Section 6.14** in form and substance reasonably satisfactory to the Administrative Agent and performed by an appraiser that is reasonably satisfactory to the Administrative Agent.

"***Approved Deposit Account***":  a Deposit Account that is the subject of an effective Deposit Account Control Agreement and that is maintained by any Loan Party with a Deposit Account Bank. "Approved Deposit Account" includes all monies on deposit in a Deposit Account and all certificates and instruments, if any, representing or evidencing such Deposit Account.

"***Approved Fund***":  as defined in **Section 10.6(b)**.

"***Approved Securities Intermediary***":  a Securities Intermediary or Commodity Intermediary selected by a Loan Party and reasonably satisfactory to the Administrative Agent.

"***Assignee***":  as defined in **Section 10.6(b)**.

"***Assignment and Assumption***":  an Assignment and Assumption, substantially in the form of **Exhibit D** or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"***Attorney***": as defined in **Section 9.1**.

"***Availability***": at any time, (a) the lesser of (i) the aggregate Revolving Commitments in effect at such time and (ii) the Borrowing Base at such time (based on the Borrowing Base Certificate most recently delivered to the Administrative Agent pursuant to **Section 6.2(g)**, after giving effect to any Eligibility Reserve, Specified Reserve or Dilution Reserve in effect at such time with respect to the Borrowing Base (if any), whether or not reflected on such Borrowing Base Certificate but without duplication), ***minus*** (b) 25,000,000, ***minus*** (c) the aggregate amount of any Availability Reserve in effect at such time with respect to the Borrowing Base.

"***Availability Reserve***":  effective as of five (5) Business Days after the date of written notice of any determination thereof to the Borrower by the Administrative Agent (which notice shall include a reasonable description of the basis for such determination) (the "***Availability Reserve Notice Period***"), such amounts as the Administrative Agent may from time to time establish, in the Administrative Agent's sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, in order to (a) preserve the value of the ABL Facility First Priority Collateral or the Collateral Agent's Lien thereon or (b) provide for the payment of unanticipated liabilities of any Loan Party affecting the ABL Facility First Priority Collateral arising after the Closing Date, in each case based on the analysis of facts or events first occurring or first discovered by the Administrative Agent after the Closing Date or that are materially different from facts or events occurring or known to the Administrative Agent on the Closing Date; ***provided***, ***however***, that such Availability Reserve shall take immediate effect if the Borrower submits a notice of borrowing during the Availability Reserve Notice Period; ***provided further***, ***however***, that

(A)      any Availability Reserve shall have a reasonable relationship to the circumstances, conditions, events or contingencies which are the basis of such Availability Reserve; and

(B)      no such Availability Reserve will be established with respect to (i) such matters that have been taken into account in the calculation of the Borrowing Base, or the determination of any Eligibility Reserve or Dilution Reserve, or (ii) Specified Hedge Agreements, Specified Additional Obligations or Specified Cash Management Obligations.

For the avoidance of doubt, Availability Reserves shall not be established in respect of any eligibility or dilution risks or contingencies, which shall be reserved against by way of Eligibility Reserves or Dilution Reserves, respectively. Notwithstanding anything to the contrary herein, on the Closing Date, there shall be no Availability Reserves other than Availability Reserves established based on changes after the

Commitment Letter Effective Date to the expected results of the field examination most recently conducted prior to the Closing Date.

"***Available Revolving Commitment***":  as to each Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Revolving Lender's Revolving Commitment then in effect over (b) such Revolving Lender's Revolving Loans then outstanding.

"***Available Tenor***": as of any date of determination and with respect to the then-current Benchmark, as applicable, any tenor for such Benchmark or payment period for interest calculated with reference to such Benchmark, as applicable, that is or may be used for determining the length of an Interest Period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to **clause (iv)** of **Section 2.17(a)**.

"***Bail-In Action***": the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"***Bail-In Legislation***":

(a)    with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and

(b)    with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bailee's Letter***": a letter in form and substance reasonably acceptable to the Administrative Agent and executed by any Person (other than the Company or any Subsidiary Guarantor) that is in possession of Inventory or Equipment included in the Borrowing Base on behalf of the Company or any Subsidiary Guarantor pursuant to which such Person acknowledges, among other things, the Collateral Agent's Lien with respect thereto.

"***Bankruptcy Code***": Title 11, U.S.C., as now or hereafter in effect, or any successor thereto.

"***Bankruptcy Court***": as defined in the recitals hereto.

"***Benchmark***": initially, the Term SOFR Reference Rate; ***provided*** that if a replacement of the Benchmark has occurred pursuant to Section 2.17, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to **clause (i)** of **Section 2.17(a)**.

"***Benchmark Replacement***": for any Available Tenor, the first alternative set forth below and (where applicable) in the order set forth below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

(1)    the sum of: (a) Daily Simple SOFR and (b) the related Benchmark Replacement Adjustment;

5

(2)    the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower as the replacement for the then-current Benchmark for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to **clauses (1)** or **(2)** above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor applicable to such Benchmark for the purposes of this Agreement and the other Loan Documents.

"***Benchmark Replacement Adjustment***": with respect to any replacement of the then current Benchmark with an Unadjusted Benchmark Replacement for any applicable Interest Period and Available Tenor for any setting of such Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or  negative value or zero) that has been selected by the Administrative Agent and the Borrower for the applicable Corresponding Tenor giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"***Benchmark Replacement Date***": the earliest to occur of the following events with respect to the then-current Benchmark:

(1)    in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(2)    in the case of clause (3) of the definition of "Benchmark Transition Event", the first date on which all Available Tenors of such Benchmark (or the published component used in the calculation thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (3) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (1) or (2) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Transition Event***": with respect to any Benchmark, the occurrence of one or more of the following events with respect to the then-current Benchmark:

(1)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(2)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), or, if applicable, the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(3)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are no longer representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"***Benchmark Unavailability Period***": with respect to any then-current Benchmark, the period (if any) (x) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with **Section 2.17(a)** and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with **Section 2.17(a)**.

"***Beneficial Ownership Certification***": a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***": 31 C.F.R. § 1010.230.

"***Benefited Lender***":  as defined in **Section 10.7(a)**.

"***Board***":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"***Board of Directors***": (a) with respect to a corporation or company, the board of directors of the corporation or company or any committee thereof duly authorized to act on behalf of such board; (b) with respect to a partnership, the board of directors of the general partner of the partnership, or any committee thereof duly authorized to act on behalf of such board or the board or committee of any Person serving a similar function; (c) with respect to a limited liability company, the managing member or members or any

controlling committee of managing members thereof or any Person or Persons serving a similar function; and (d) with respect to any other Person, the board or committee of such Person serving a similar function.

"***Borrower***":  as defined in the preamble hereto.

"***Borrower Materials***": as defined in **Section 10.2(c)**.

"***Borrowing***": Loans made, converted or continued on the same date and, in the case of SOFR Loans, as to which a single Interest Period is in effect.

"***Borrowing Base***": at any time, the amount equal to:

(a)        85% of the Dollar Equivalent of the face amount of all Eligible Receivables;

(calculated net of all finance charges, late fees and other fees that are unearned, sales, excise or similar taxes, and credits or allowances granted at such time with respect to such Eligible Receivables); *plus*

(b)        with respect to Eligible Inventory (valued, in each case, at the lower of a perpetual inventory at standard cost and market basis), the amount equal to:

(i)        the lesser of (A) 100% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Prime Finished Goods; *plus*

(ii)        the lesser of (A) 100% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Tote Stores Inventory; *plus*

(iii)        the lesser of (A) 50% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Special Markets Inventory; *plus*

(iv)        the lesser of (A) 75% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Work-in-Process Inventory; *plus*

(v)        the lesser of (A) 50% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Raw Materials; *plus*

(vi)        the lesser of (A) 50% or (B) the Net Orderly Liquidation Percentage of the Dollar Equivalent of the value of all Eligible Bulk Inventory; *plus*

(c)        the sum of (1) 65% of the Dollar Equivalent of the Net Orderly Liquidation Value of Eligible Equipment at such time *plus* (2) 65% of the Mortgage Value of Eligible Real Property at such time; *minus*

(d)        [reserved]; *minus*

(e)        in the case of **clauses (a)** through **(c)** above, any Eligibility Reserve in effect at such time with respect to the Borrowing Base; *minus*

(f)        any Specified Reserve and Dilution Reserve in effect at such time with respect to the Borrowing Base.

"***Borrowing Base Certificate***": a certificate of the Company substantially in the form of **Exhibit P** (Form of Borrowing Base Certificate) or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"***Borrowing Date***": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"***BrandCo(s)***": each of (i) Beautyge II, LLC, a Delaware limited liability company, (ii) BrandCo Almay 2020 LLC, a Delaware limited liability company, (iii) BrandCo Charlie 2020 LLC, a Delaware limited liability company, (iv) BrandCo CND 2020 LLC, a Delaware limited liability company, (v) BrandCo Curve 2020 LLC, a Delaware limited liability company, (vi) BrandCo Elizabeth Arden 2020 LLC, a Delaware limited liability company, (vii) BrandCo Giorgio Beverly Hills 2020 LLC, a Delaware limited liability company, (viii) BrandCo Halston 2020 LLC, a Delaware limited liability company, (ix) BrandCo Jean Nate 2020 LLC, a Delaware limited liability company, (x) BrandCo Mitchum 2020 LLC, a Delaware limited liability company, (xi) BrandCo Multicultural Group 2020 LLC, a Delaware limited liability company, (xii) BrandCo PS 2020 LLC, a Delaware limited liability company, (xiii) BrandCo White Shoulders 2020 LLC, a Delaware limited liability company and (xiv) each other Subsidiary of BrandCo Cayman Holdings acquired, formed or otherwise existing after the Closing Date.

"***BrandCo Cayman Holdings***": Beautyge I, an exempted company incorporated in the Cayman Islands.

"***BrandCo Entities***": each BrandCo and BrandCo Cayman Holdings.

"***Business***":  the business activities and operations of the Borrower and/or its Subsidiaries on the Closing Date, after giving effect to the Transactions.

"***Business Day***":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the state where the Administrative Agent's office is located; ***provided*** that, with respect to any Borrowing, prepayment or interest election with respect to any SOFR Loan, the term "Business Day" shall mean any day that is a U.S. Government Securities Business Day.

"***Calculation Date***":  as defined in **Section 1.3(a)**.

"***Canadian Anti-Money Laundering & Anti-Terrorism Legislation***": the Criminal Code (Canada), the Proceeds of Crime Act and any similar Canadian legislation, together with all rules, regulations and interpretations thereunder or related thereto.

"***Canadian Bankruptcy and Insolvency Laws***": any federal or provincial Canadian laws from time to time in effect relating to bankruptcy, winding-up, insolvency, reorganization, receivership, plans of arrangement or relief or protection of debtor, including the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Winding up and Restructuring Act (Canada), the Canada Business Corporations Act, the Business Corporations Act (Ontario) and any other applicable corporations legislation.

"***Canadian Blocked Person***": any Person whose property or interests in property are blocked or subject to blocking pursuant to, or as described in, any Canadian Economic Sanctions and Export Control Laws.

"***Canadian Collateral Agreement***": the ABL Canadian Collateral Agreement, dated as of the Closing Date among Revlon Canada Inc., Elizabeth Arden (Canada) Limited, each other Grantor (as defined therein) from time to time party thereto and the Collateral Agent substantially in the form of **Exhibit A-2**, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"***Canadian Defined Benefit Pension Plan***": a Canadian Pension Plan which contains a "defined benefit provision," as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"***Canadian Economic Sanctions and Export Control Laws***": any Canadian laws, regulations or orders governing transactions in controlled goods or technologies or dealings with countries, entities, organizations, or individuals subject to economic sanctions and similar measures, including, without limitation, the Special Economic Measures Act (Canada), the United Nations Act, (Canada), the Justice for Victims of Corrupt Foreign Officials Act (Canada), the Freezing Assets of Corrupt Foreign Officials Act (Canada), Part II.1 of the Criminal Code (Canada) and the Export and Import Permits Act (Canada), and any related regulations.

"***Canadian Multi-employer Plan***": a Canadian Pension Plan that constitutes a "multi-employer pension plan," as defined in Section 8500(i) of the Income Tax Regulations (Canada).

"***Canadian Pension Plans***": any plan, program or arrangement that is a pension plan that is required to be registered under any applicable Canadian federal, provincial or territorial pension legislation, whether or not registered under any such laws, and includes a "registered pension plan", as that term is defined in subsection 248(1) of the ITA which plan is sponsored, administered or contributed to, or required to be contributed to, by any Loan Party or under which any Loan Party has any actual or potential liability, but for certainty does not include Canadian Multi-employer Plans or plans established by statute, which shall include the Canada Pension Plan maintained by the government of Canada and the Quebec Pension Plan maintained by the Province of Quebec.

"***Capital Expenditure***":  for any period, with respect to any Person, (a) the additions to property, plant and equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person, and other capital expenditures of such Person that are (or should be) set forth in a consolidated statement of cash flows of the Borrower for such period prepared in accordance with GAAP and (b) Capital Lease Obligations incurred by such Person; ***provided***, that in any event the term "Capital Expenditures" shall exclude:  (i) any Permitted Acquisition and any other Investment permitted hereunder; (ii) any expenditures to the extent financed with any Reinvestment Deferred Amount (as defined in the Term Loan Agreement) or the proceeds of any Disposition or Recovery Event that are not required to be applied to prepay Term Loans; (iii) expenditures for leasehold improvements for which such Person is reimbursed in cash or receives a credit; (iv) capital expenditures to the extent they are made with the proceeds of equity contributions (other than in respect of Disqualified Capital Stock) made to the Borrower after the Closing Date; (v) capitalized interest in respect of operating or capital leases; (vi) the book value of any asset owned to the extent such book value is included as a capital expenditure as a result of reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; and (vii) any non-cash amounts reflected as additions to property, plant or equipment on such Person's consolidated balance sheet.

"***Capital Lease Obligations***":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal Property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with

GAAP, ***provided***, that for the purposes of this definition, "GAAP" shall mean, subject to **Section 10.16**, generally accepted accounting principles in the United States as in effect on the Closing Date.

"***Capital Stock***":  any and all shares, interests, participations or other equivalents (however designated) of capital stock or authorized share capital of a corporation or company, and any and all equivalent ownership interests in a Person (other than a corporation).

"***Cash Dominion Period***":  any period after the delivery of the first Borrowing Base Certificate pursuant to **Section 6.2(g)**

(a)    beginning on the first date on which Excess Availability is less than $55,000,000; and

(b)    ending on the first date on which Excess Availability shall have been equal to or greater than $55,000,000 for 30 consecutive Business Days.

"***Cash Equivalents***":

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America or Canada (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America or Canada, as applicable), in each case maturing within 18 months from the date of acquisition thereof;

(b)    certificates of deposit, time deposits and Eurodollar time deposits with maturities of 18 months or less from the date of acquisition, bankers' acceptances with maturities not exceeding 18 months and overnight bank deposits, in each case, with any domestic commercial bank having capital and surplus at the date of acquisition thereof in excess of $250,000,000;

(c)    repurchase obligations with a term of not more than 30 days for underlying securities of the types described in **clauses (a)** and **(b)** above entered into with any financial institution meeting the qualifications specified in **clause (b)** above;

(d)    commercial paper having a rating of at least A-1 from S&P or P-1 from Moody's (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and maturing within 18 months after the date of acquisition and Indebtedness and preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 18 months or less from the date of acquisition;

(e)    readily marketable direct obligations issued by or directly and fully guaranteed or insured by any state of the United States or any political subdivision thereof or any province of Canada or any public instrumentality thereof having one of the two highest rating categories obtainable from either Moody's or S&P with maturities of 18 months or less from the date of acquisition;

(f)    marketable short-term money market and similar securities having a rating of at least P-1 or A-1 from Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another rating agency) and in each case maturing within 18 months after the date of creation or acquisition thereof;

(g)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AA- (or the equivalent thereof) or better by S&P or Aa3 (or the equivalent thereof) or better by Moody's;

(h)    (x) such local currencies in those countries in which the Borrower and its Restricted Subsidiaries transact business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing **clauses (a)** through **(g)** or otherwise customarily utilized in countries in which the Borrower and its Restricted Subsidiaries operate for short term cash management purposes; and

(i)    Investments in funds which invest substantially all of their assets in Cash Equivalents of the kinds described in **clauses (a)** through **(h)** of this definition.

"*Cash Interest Expenses*": for any Test Period, the amount set forth opposite the caption "interest" (or any like caption) under the heading "supplemental schedule of cash flow information" (or any like heading) in the consolidated financial statements of the Borrower and its Restricted Subsidiaries for such Test Period.

"*Cash Management Obligations*":  obligations in respect of any overdraft or other liabilities arising from treasury, depository and cash management services, credit or debit card, or any automated clearing house transfers of funds.

"*Cash Management Provider*":  as defined in the definition of "Specified Cash Management Obligations".

"*Cayman Pledge Agreement*": an equitable mortgage over the shares of BrandCo Cayman Holdings dated as of the Closing Date entered into between Beautyge Brands U.S.A., Inc. and the Collateral Agent.

"*Certificated Security*":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a non-US Guarantor), as the context may require.

"*Chapter 11 Cases*": as defined in the recitals hereto.

"*Charges*":  as defined in **Section 10.20**.

"*Chattel Paper*":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as the context may require.

"*Closing Date*":  May 2, 2023.

"*Code*":  the U.S. Internal Revenue Code of 1986, as amended from time to time (unless otherwise indicated).

"*Collateral*":  all the "Collateral" as defined in any Security Document and all other property that is subject to any Lien in favor of the Secured Parties and/or the Administrative Agent or the Collateral Agent for the benefit of the Secured Parties to secure the Obligations pursuant to any Security Document.

"*Collateral Agent*":  MidCap Funding IV Trust, in its capacity as collateral agent for the Secured Parties under this Agreement and the Security Documents, together with any of its successors and permitted assigns in such capacity in accordance with **Section 9.9**.

"*Commitment*":  as to any Lender, the Revolving Commitments of such Lender.

"***Commitment Letter***": that certain Commitment Letter, dated as of April 24, 2023 ("***Commitment Letter Effective Date***"), by and among Revlon Consumer Products Corporation, as the company, and the Lead Arranger, as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms.

"***Commitment Letter Effective Date***": as defined in the definition of "Commitment Letter".

"***Commodity Exchange Act***": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"***Commodity Intermediary***":  as defined in the UCC.

"***Commonly Controlled Entity***":  an entity, whether or not incorporated, that is under common control with any Loan Party within the meaning of Section 4001 of ERISA or is part of a group that includes any Loan Party and that is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code.

"***Company***":  as defined in the preamble hereto.

"***Company Material Adverse Effect***":  any event, development, occurrence, circumstance, effect, condition, result, state of facts or change (collectively, an "***Event***") after September 20, 2022, which individually, or together with all other Events, has had or would reasonably be expected to have a material and adverse effect on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of Holdings and its Restricted Subsidiaries, taken as a whole, (b) the material rights and remedies available to the Agents or the Lenders, taken as a whole, or (c) the ability of Holdings and its Restricted Subsidiaries, taken as a whole, to perform their respective obligations under, or to consummate the transactions contemplated by, this Agreement or the other Loan Documents,  in each case, except to the extent such Event results from, arises out of, or is attributable to, the following (either alone or in combination): (i) any change after the Closing Date in global, national or regional political conditions (including acts of war, terrorism or natural disasters) or in the general business, market, financial or economic conditions affecting the industries, regions and markets in which the Borrower and its Restricted Subsidiaries operate; (ii) any changes after the Closing Date in applicable law or generally accepted accounting principles, or in the interpretation or enforcement thereof; (iii) the execution, announcement or performance of this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, including, without limitation, the Restructuring Transactions (as defined in the Restructuring Plan); (iv) changes in the market price or trading volume of the claims or equity or debt securities of Holdings and its Restricted Subsidiaries (but not the underlying facts giving rise to such changes unless such facts are otherwise excluded pursuant to the clauses contained in this definition); (v) acts of God, including any natural (including weather-related) or man-made event or disaster, epidemic, pandemic or disease outbreak (including the COVID-19 virus or any strain, mutation or variation thereof); or (vi) any failure by Holdings and its Restricted Subsidiaries to meet any internal or published projection for any period (but not the underlying facts giving rise to such failure unless such facts are otherwise excluded pursuant to other clauses contained in this definition); <u>provided</u> that the exceptions set forth in clauses (i), (ii) and (v) of this definition shall apply to the extent that such Event is disproportionately adverse to Holdings and its Subsidiaries, taken as a whole, as compared to other companies comparable in size and scale to Holdings and its Restricted Subsidiaries operating in the industries in which Holdings and its Restricted Subsidiaries operate.

"***Company Tax Sharing Agreement***":  the Tax Sharing Agreement, dated as of the Closing Date, among RCP LLC, the Company, certain of its Subsidiaries, Revlon NewCo, LLC, a Delaware limited liability company, Revlon Holdings and Mafco, as amended, supplemented or otherwise modified from time to time in accordance with the provisions of **Section 7.15**.

"***Compliance Certificate***":  a certificate duly executed by a Responsible Officer substantially in the form of **Exhibit B** or such other form reasonably acceptable to the Administrative Agent and the Borrower.

"***Confidential Information***":  as defined in **Section 10.14**.

"***Confirmation Order***": the *Findings of Fact, Conclusions of Law, and Order Confirming the Third Amended Joint Plan of Reorganization of Revlon, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1746] which have been entered by the Bankruptcy Court on April 3, 2023.

"***Conforming Changes***": with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.21 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or Benchmark Replacement or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"***Consolidated EBITDA***":  of any Person for any period, shall mean the Consolidated Net Income of such Person and its Restricted Subsidiaries for such period ***plus***, without duplication and, if applicable, except with respect to **clause (n)** of this definition, to the extent deducted in calculating such Consolidated Net Income for such period, the sum of:

(a)    provisions for taxes based on income (or similar taxes in lieu of income taxes), profits, capital (or equivalents), including federal, foreign, state, local, franchise, excise and similar taxes and foreign withholding taxes paid or accrued during such period (including penalties and interest related to taxes or arising from tax examinations);

(b)    Consolidated Net Interest Expense and, to the extent not reflected in such Consolidated Net Interest Expense, any net losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk or foreign exchange rate risk, amortization or write-off of debt discount and debt issuance costs and commissions, premiums, discounts and other fees and charges associated with Indebtedness (including commitment, letter of credit and administrative fees and charges with respect to the Facility and the Term Loan Agreement);

(c)    depreciation and amortization expense and impairment charges (including deferred financing fees, original issue discount, amortization of convertible notes and other convertible debt instruments, capitalized software expenditures, amortization of intangibles (including goodwill), organization costs and amortization of unrecognized prior service costs, and actuarial losses related to pensions, and other post-employment benefits);

14

(d)      subject to the Shared EBITDA Cap, all management, monitoring, consulting and advisory fees, and due diligence expense and other transaction fees and expenses and related expenses paid (or any accruals related to such fees or related expenses) (including by means of a dividend) during such period;

(e)      subject to the Shared EBITDA Cap, any extraordinary, unusual or non-recurring charges (including post-emergence ECIP and employee retention programs solely for the balance of calendar year 2023), expenses or losses (including (x) losses on the books of such Person in respect of sales of assets outside of the ordinary course of business that do not have a negative impact on cash flows for such periods, (y) restructuring and integration costs or reserves, including any retention and severance costs, costs associated with office and facility openings, closings and consolidations, relocation costs, contract termination costs, future lease commitments, excess pension charges and other non-recurring business optimization expenses and legal and settlement costs, and (z) any expenses in connection with the Transactions);

(f)      any other non-cash expenses or losses (other than the accrual of expenses in the ordinary course) including non-cash stock compensation expense, but excluding any such items (i) in respect of which cash was paid in a prior period or will be paid in a future period or (ii) which represent the reversal in such period of any accrual of, or reserve for, anticipated cash charges in any prior period where such accrual or reserve is no longer required, all as determined on a consolidated basis;

(g)      subject to the Shared EBITDA Cap, transaction costs, fees and expenses (other than in respect of the Transactions) (in each case whether or not any transaction is actually consummated) (including those with respect to any amendments or waivers of the Loan Documents or the Term Loan Documents, and those payable in connection with the sale of Capital Stock, recapitalization, the incurrence of Indebtedness permitted by **Section 7.2**, transactions permitted by **Section 7.4**, Dispositions permitted by **Section 7.5**, or any Permitted Acquisition or other Investment permitted by **Section 7.7**);

(h)      accruals and reserves that are established or adjusted within twelve months after the Closing Date and that are so required to be established or adjusted as a result of adoption or modification of accounting policies;

(i)      subject to the Shared EBITDA Cap, all costs and expenses incurred in defending, settling and compromising any pending or threatened litigation claim, action or legal dispute in such period;

(j)      subject to the Shared EBITDA Cap, charges, losses, lost profits, expenses or write-offs to the extent indemnified or insured by a third party, including expenses covered by indemnification provisions in any Qualified Contract or any agreement in connection with the Transactions, a Permitted Acquisition or any other acquisition or Investment permitted by **Section 7.7**, in each case, to the extent that coverage has not been denied (other than any such denial that is being contested by the Borrower and/or its Restricted Subsidiaries in good faith) and so long as such amounts are actually reimbursed to such Person and its Restricted Subsidiaries in cash within six months after the related amount is first added to Consolidated EBITDA pursuant to this **clause (j)** (and to the extent not so reimbursed within six months, such amount not reimbursed shall be deducted from Consolidated EBITDA during the next measurement period); it being understood that such amount may subsequently be included in Consolidated EBITDA in a measurement period to the extent of amounts actually reimbursed;

(k)      any fees, expenses and other transaction costs (whether or not such transactions were consummated) set forth on **Schedule 1.1A** which are incurred through the Closing Date in connection with fresh start accounting, the Chapter 11 Cases, the Transactions, the Restructuring Plan and the transactions contemplated thereby, and any additional amounts in respect of any such fees, expenses and other

transaction costs as may be mutually determined and agreed in good faith by and between the Borrower and the Administrative Agent;

(l)    net realized losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized losses from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized gains from related Hedge Agreements);

(m)    (i) any net realized loss resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized loss resulting in such period from currency translation losses related to currency re-measurements of Indebtedness and (iii) the amount of loss resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(n)    the amount of expected cost savings and other operating improvements and synergies reasonably identifiable and reasonably supportable (as determined by the Borrower or any Restricted Subsidiary in good faith) to be realized as a result of the Transactions, any acquisition or Disposition (including the termination or discontinuance of activities constituting such business), any Investment, operating expense reductions, operating improvements, restructurings, cost savings initiatives, operational changes or similar initiatives or transactions (including resulting from any head count reduction or closure of facilities) taken or committed to be taken during such (or any prior) period (in each case calculated on a pro forma basis as though such cost savings and other operating expense reductions, operating improvements and synergies had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions to the extent already included in the Consolidated Net Income for such period; *provided*, that (i) (A) such cost savings, operating improvements and synergies are reasonably anticipated to result from such actions and (B) actions resulting in such operating expense reductions or other operating improvements, synergies or cost savings are reasonably anticipated to have commenced within 18 months and (ii) no cost savings shall be added pursuant to this clause (n) to the extent already included in clause (e) above with respect to such period; *provided*, *further* that any amount added back to Consolidated EBITDA by the Borrower pursuant to this clause (n) is subject to the prior written consent of the Administrative Agent,

*minus*, to the extent reflected as income or a gain in the statement of such Consolidated Net Income for such period, the sum, without duplication, of:

(A)    the amount of cash received in such period in respect of any non-cash income or gain in a prior period (to the extent such non-cash income or gain previously increased Consolidated Net Income in a prior period);

(B)    net realized gains relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net realized gains from exchange rate fluctuations on intercompany balances and balance sheet items, net of realized losses from related Hedge Agreements);

(C)    (i) any net realized gain resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments), (ii) any net realized gain resulting in such period from currency translation gains related to currency re-measurements of Indebtedness and (iii) the amount of gain resulting in such period from a sale of receivables, payment intangibles and related assets in connection with a receivables financing; and

(D)     any (i) extraordinary, unusual or non-recurring income or gains (including gains on sales of assets outside of the ordinary course of business) and (ii) actuarial gains).

With respect to each joint venture or minority investee of the Borrower or any of its Restricted Subsidiaries, for purposes of calculating Consolidated EBITDA, the amount of EBITDA (calculated in accordance with this definition) attributable to such joint venture or minority investee, as applicable, that shall be counted for such purposes (without duplication of amounts already included in Consolidated Net Income) shall equal the product of (x) the Borrower's or such Restricted Subsidiary's direct and/or indirect percentage ownership of such joint venture or minority investee and (y) the EBITDA (calculated in accordance with this definition) of such joint venture or minority investee, in each case to the extent such Borrower or Subsidiary actually receives any such dividends, return of capital or similar distributions during such period and not in excess thereof.

Unless otherwise qualified, all references to "Consolidated EBITDA" in this Agreement shall refer to Consolidated EBITDA of the Borrower.

Notwithstanding anything to the contrary in the Loan Documents, for purposes of calculating Consolidated EBITDA for any Test Period that includes any of the fiscal quarters ending on the dates set forth in the table below, Consolidated EBITDA for such fiscal quarter shall be as set forth on such table (such amounts, the "*Historical EBITDA Amounts*"):

| Fiscal Quarter Ending | Consolidated EBITDA |
|---|---|
| September 30, 2022 | $50,400,000 |
| December 31, 2022 | $101,200,000 |
| March 31, 2023 | $77,000,000, as such amount shall be updated as mutually agreed in good faith by and between the Borrower and the Administrative Agent |

"*Consolidated Net Income*":  of any Person for any period, the consolidated net income (or loss) of such Person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; *provided*, that in calculating Consolidated Net Income of the Borrower and its consolidated Restricted Subsidiaries for any period:

(a)     the income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is merged into, amalgamated or consolidated with the Borrower or any of its Restricted Subsidiaries shall be excluded;

(b)     the income (or loss) of any Person that is not a subsidiary of such Person, or is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting shall be excluded, except to the extent of dividends, return of capital or similar distributions actually received by such Person or its Restricted Subsidiaries (which dividends, return of capital and distributions shall be included in the calculation of Consolidated Net Income);

(c)     (i) any net unrealized gains and losses resulting from fair value accounting required by FASB ASC 815 (including as a result of the mark-to-market of obligations of Hedge Agreements and other derivative instruments) and (ii) any net unrealized gains and losses resulting in such period from currency

17

translation losses (or similar charges) related to currency re-measurements of Indebtedness or other liabilities or from currency fluctuations, in each case shall be excluded;

(d)      any net unrealized gains and losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830 (including net unrealized gain and losses from exchange rate fluctuations on intercompany balances and balance sheet items) shall be excluded;

(e)      the cumulative effect of a change in accounting principles during such period shall be excluded;

(f)      non-cash interest expense resulting from the application of Accounting Standards Codification Topic 470-20 "Debt—Debt with Conversion Options—Recognition" shall be excluded;

(g)      any charges resulting from the application of FASB ASC 805 "Business Combinations," FASB ASC 350 "Intangibles—Goodwill and Other," FASB ASC 360-10-35-15 "Impairment or Disposal of Long-Lived Assets," FASB ASC 480-10-25-4 "Distinguishing Liabilities from Equity—Overall—Recognition" or FASB ASC 820 "Fair Value Measurements and Disclosures" shall be excluded;

(h)      effects of purchase accounting adjustments (including the effects of such adjustments pushed down to such person and its subsidiaries) in component amounts required or permitted by GAAP, resulting from the application of purchase accounting or the amortization or write-off of any amounts thereof, net of taxes, shall be excluded;

(i)      any income (or loss) for such period attributable to the early extinguishment or buy-back of indebtedness, Hedge Agreements or other derivative instruments shall be excluded;

(j)      any non-cash charges for deferred tax asset valuation allowances shall be excluded;

(k)      any other non-cash charges (including goodwill or asset impairment charges), expenses or losses, including write-offs and write-downs (including in respect of unamortized debt issuance costs and deferred financing fees) and any non-cash cost related to the termination of any employee pension benefit plan (except to the extent such charges, expenses or losses represent an accrual of or reserve for cash expenses in any future period or an amortization of a prepaid cash expense paid in a prior period) shall be excluded;

(l)      non-cash stock-based and other equity-based compensation expenses (including those realized or resulting from stock option plans, employee benefit plans, post-employment benefit plans, grants of sales of stock, stock appreciation or similar rights, stock options, restricted stock, preferred stock or other rights) shall be excluded;

(m)      the Transaction Costs shall be excluded;

(n)      any losses in respect of equity earnings for such period (other than in respect of losses from equity in affiliates) shall be excluded; and

(o)      the consolidated net income (or loss) of any Person or Properties constituting a division or line of business of any business entity, division or line of business or fixed asset, in each case, Disposed of, abandoned, closed or discontinued by Holdings, the Borrower or any of the Restricted Subsidiaries during such period other than in the ordinary course of business, or of any Subsidiary designated as an Unrestricted

Subsidiary during such period, shall be excluded for such period (assuming the consummation of such Disposition or such designation, as the case may be, occurred on the first day of such period).

Unless otherwise qualified, all references to "Consolidated Net Income" in this Agreement shall refer to Consolidated Net Income of the Borrower.

"***Consolidated Net Interest Expense***":  of any Person for any period, (a) the sum of (i) total cash interest expense (including that attributable to Capital Lease Obligations) of such Person and its Restricted Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Restricted Subsidiaries, ***plus*** (ii) all cash dividend payments (excluding items eliminated in consolidation) on any series of Disqualified Capital Stock of such Person made during such period, ***minus*** (b) the sum of (i) total cash interest income of such Person and its Restricted Subsidiaries for such period (excluding any interest income earned on receivables due from customers), in each case determined in accordance with GAAP, ***plus*** (ii) any one time financing fees (to the extent included in such Person's consolidated interest expense for such period), including, with respect to the Borrower, those paid in connection with the Loan Documents or in connection with any amendment thereof.  Unless otherwise qualified, all references to "***Consolidated Net Interest Expense***" in this Agreement shall refer to Consolidated Net Interest Expense of the Borrower and its Restricted Subsidiaries.  For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments actually made or received by the Borrower or any Subsidiary with respect to interest rate Hedge Agreements.

"***Consolidated Net Total Leverage***": at any date, (a) the aggregate principal amount of all Funded Debt of the Borrower and its Restricted Subsidiaries on such date, ***minus*** (b) Unrestricted Cash of the Loan Parties on such date, in each case determined on a consolidated basis in accordance with GAAP.

"***Consolidated Net Total Leverage Ratio***":  as of any date of determination, the ratio of (a) Consolidated Net Total Leverage on such date to (b) Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for the most recently ended Test Period.

"***Consolidated Operating Cash Flow***": as of any date of determination, the Consolidated EBITDA of the Borrower and its Restricted Subsidiaries for the most recently ended Test Period, ***minus*** the Unfinanced Capital Expenditures of the Borrower and its Restricted Subsidiaries during such Test Period.

"***Consolidated Total Assets***": at any date, the total assets of the Borrower and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, as shown on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries for the most recently completed fiscal quarter for which financial statements have been delivered pursuant to **Section 6.1**, or prior to the first such delivery, the financial statements delivered pursuant to **Section 5.1(q)**, determined on a pro forma basis.

"***Contractual Obligation***":  as to any Person, any provision of any security issued by such Person or of any written or recorded agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"***Control Account***":  a Securities Account or Commodity Account (as defined in the Guarantee and Collateral Agreement or any equivalent term as defined in the Canadian Collateral Agreement) (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor) that is the subject of an effective Securities Account Control Agreement and that is maintained by any Loan Party with an Approved Securities Intermediary.  "***Control Account***" includes all Financial Assets held in a Securities Account or a Commodity Account and all certificates and instruments, if any, representing or evidencing the Financial Assets contained therein.

"***Corresponding Tenor***": with respect to any Available Tenor, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"***Covenant Triggering Event***": as defined in the definition of "Liquidity Event Period".

"***Customary Permitted Liens***": Liens permitted by **clauses (a)**, **(b)**, **(c)(i)**, **(d)** and **(e)** of **Section 7.3**.

"***Daily Simple SOFR***": for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; provided, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention in its reasonable discretion.

"***Debt Fund Affiliate***": any Affiliate of a Person that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which such Person does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such Affiliate.

"***Debtor Relief Laws***": the Bankruptcy Code of the United States of America, the Insolvency Act 1986 (UK) (as amended), and all other liquidation, monitorship, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, restructuring plan, voluntary arrangement, administration or similar debtor relief laws of the United States, the United Kingdom or other applicable jurisdictions from time to time in effect, including Canadian Bankruptcy and Insolvency Laws.

"***Debtors***": as defined in the recitals hereto.

"***Default***": any of the events specified in **Section 8.1**, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"***Defaulting Lender***": subject to **Section 2.7(a)**, any Lender that

(a)    has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Protective Advances) within two (2) Business Days of the date when due,

(b)    has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c)        has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this **clause (c)** upon receipt of such written confirmation by the Administrative Agent and the Borrower), or

(d)        has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-in Action; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of **clauses (a)** through **(d)** above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to **Section 2.7(a)**) upon delivery of written notice of such determination to the Borrower and each Lender.

"***Deposit Account***": as defined in the UCC.

"***Deposit Account Bank***": a financial institution selected by a Loan Party and reasonably satisfactory to the Administrative Agent.

"***Deposit Account Control Agreement***": as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"***Designated Additional Obligation Pari Passu Distribution Amount***": as defined in **Section 9.12(c)**.

"***Designated Hedge Pari Passu Distribution Amount***":  as defined in **Section 9.12(b)**.

"***Designated Jurisdiction***": any country or territory that is the target of comprehensive Sanctions (as of the date of this Agreement, Iran, Syria, Cuba, North Korea, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, and the Crimea and non-government controlled areas of the Zaporizhzhia and Kherson regions of Ukraine).

"***Designated Non-cash Consideration***": the Fair Market Value of non-cash consideration received by the Borrower or one of its Restricted Subsidiaries in connection with a Disposition that is so designated as Designated Non-cash Consideration pursuant to an officer's certificate,  setting forth the basis of such valuation, less the amount of cash and Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration within 180 days of receipt thereof.

"***Designated Term Loan Agent***": as defined in the ABL Intercreditor Agreement.

"***Dilution***": as of any date of determination, a percentage concerning dilution of Accounts of the Loan Parties as set forth in the most recent field examination with respect to Eligible Receivables included in the Borrowing Base without duplication of any exclusion from the definition of "Eligible Receivables," during the 12-month period covered by such report.

"***Dilution Reserve***": effective as of five (5) Business Days after the date of written notice of any determination thereof to the Company by the Administrative Agent (which notice shall include a reasonable description of the basis for such determination) (the "***Dilution Reserve Notice Period***"), an amount equal to an amount determined by the Administrative Agent in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, not to exceed the amount sufficient to reduce the advance rate against Eligible Receivables set forth in the definition of the Borrowing Base by one percentage point in the aggregate for each percentage point by which Dilution is in excess of zero percent (0%); ***provided***, ***however***, that such Dilution Reserve shall take immediate effect if the Borrower submits a notice of borrowing during the Dilution Reserve Notice Period.

"***Disclosure Statement Date***": the date of approval by the Bankruptcy Court of the disclosure statement delivered in connection with the Restructuring Plan, which date is September 20, 2022.

"***Disinterested Director***":  as defined in **Section 7.9**.

"***Disposition***":  with respect to any Property, any sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer, exclusive license or other disposition thereof, in each case, to the extent the same constitutes a complete sale, sale and leaseback (or similar license arrangement), assignment, conveyance, transfer or other disposition, as applicable.  The terms "***Dispose***" and "***Disposed of***" shall have correlative meanings.

"***Disqualified Capital Stock***":  Capital Stock that (a) requires the payment of any dividends (other than dividends payable solely in shares of Qualified Capital Stock), (b) matures or is mandatorily redeemable or subject to mandatory repurchase or redemption or repurchase at the option of the holders thereof (other than solely for Qualified Capital Stock), in each case in whole or in part and whether upon the occurrence of any event, pursuant to a sinking fund obligation on a fixed date or otherwise (including as the result of a failure to maintain or achieve any financial performance standards) or (c) are convertible or exchangeable, automatically or at the option of any holder thereof, into any Indebtedness, Capital Stock or other assets other than Qualified Capital Stock, in the case of each of **clauses (a)**, **(b)** and **(c)**, prior to the date that is 91 days after the Latest Maturity Date in effect on the date such Capital Stock is issued (other than (i) upon payment in full of the Obligations (other than (x) indemnification and other contingent obligations not yet due and owing and (y) obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations) or (ii) upon a "change in control"; ***provided***, that any payment required pursuant to this **clause (ii)** is subject to the prior repayment in full of the Obligations (other than (x) indemnification and other contingent obligations not yet due and owing and (y) obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations) that are then accrued and payable and the termination of the Commitments); ***provided***, ***further***, ***however***, that if such Capital Stock is issued to any employee or to any plan for the benefit of employees of Holdings, the Borrower or the Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by Holdings, the Borrower or a Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability.

"***Disqualified Institution***":  (i) those institutions identified by the Borrower in writing to the Administrative Agent prior to the Closing Date and (ii) business competitors of RCP LLC and its Subsidiaries identified by Borrower in writing to the Administrative Agent from time to time and, in the

case of **clauses (i)** and **(ii)** any known Affiliates readily identifiable by name (other than, in the case of **clause (ii)**, any Debt Fund Affiliates).  A list of the Disqualified Institutions will be posted by the Administrative Agent on the Platform and available for inspection by all Lenders.  Any designation of Disqualified Institutions by the Borrower at any time after the Closing Date in accordance with the foregoing shall not apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Facility.

"***Do not have Unreasonably Small Capital***": the Borrower and its Subsidiaries taken as a whole after consummation of the Transactions is a going concern and has sufficient capital to reasonably ensure that it will continue to be a going concern for the period from the Closing Date through the Latest Maturity Date.

"***Dollar Equivalent***": at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in any other currency, the equivalent amount thereof in Dollars at such time on the basis of the Spot Rate (determined in respect of the most recent Revaluation Date) for the purchase of Dollars with such other currency.

"***Dollars***" and "***$***":  dollars in lawful currency of the United States.

"***Domestic Subsidiary***":  any direct or indirect Restricted Subsidiary that (i) is organized under the laws of any jurisdiction within the United States and (ii) is not a direct or indirect Subsidiary of a Foreign Subsidiary; ***provided*** that, for all purposes of this Agreement and the other Loan Documents, each BrandCo Entity shall be treated as a Domestic Subsidiary (unless such BrandCo Entity ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"***EEA Financial Institution***": (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in **clause (a)** of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in **clauses (a)** or **(b)** of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***": any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"***EEA Resolution Authority***": any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***Eligibility Reserve***": effective as of five (5) Business Days after the date of written notice of any determination thereof to the Company by the Administrative Agent (which notice shall include a reasonable description of the basis for such determination) (the "***Eligibility Reserve Notice Period***"), such amounts as the Administrative Agent, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, may from time to time establish, against the gross amounts of Eligible Receivables, Eligible Inventory, Eligible Equipment and Eligible Real Property to reflect risks or contingencies arising after the Closing Date that may adversely affect any one or more class of such items and that have not already been taken into account in the calculation of the Borrowing Base; ***provided*** that no such Eligibility Reserve will be established with respect to such matters that have been taken into account in the determination of any Dilution Reserve or Availability Reserve.  For the avoidance of doubt, Eligibility Reserves shall not be established in respect of any dilution risks or contingencies, which shall be reserved against by way of Dilution Reserves; ***provided***, ***further***, that such

23

Eligibility Reserve shall take immediate effect if the Borrower submits a notice of borrowing during the Eligibility Reserve Notice Period.

"*Eligible Assignee*": any Person that meets the requirements to be an assignee under **Section 10.6(b)** (subject to receipt of such consents, if any, as may be required for the assignment of the applicable Loan or Commitment to such Person under **Section 10.6(b)(i)**).

"*Eligible Bulk Inventory*": the Eligible Inventory of the Company or any Subsidiary Guarantor consisting of "*Bulk,*" as defined in **Exhibit Q**.

"*Eligible Equipment*": the Equipment of the Company or any Subsidiary Guarantor:

(a)    that is owned solely by the Company or such Subsidiary Guarantor;

(b)    with respect to which the Collateral Agent has a valid, perfected and enforceable first-priority Lien (subject to Liens permitted under **Section 7.3**);

(c)    with respect to which no representation or warranty contained in any Loan Document has been breached in any material respect (unless otherwise agreed by the Administrative Agent);

(d)    that is not, in the Administrative Agent's sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, obsolete or unmerchantable; and

(e)    that the Administrative Agent deems to be Eligible Equipment, based on such credit and collateral considerations as the Administrative Agent may, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, deem appropriate.

No Equipment of the Company or any Subsidiary Guarantor shall be Eligible Equipment if such Equipment is located, stored, used or held at the premises of a third party unless (i) the Administrative Agent shall have received a Landlord Waiver or Bailee's Letter or (ii) an Eligibility Reserve reasonably satisfactory to the Administrative Agent shall have been established with respect thereto; *provided*, *however*, that no such exclusion from Eligible Equipment on the basis of this sentence shall be in effect during the first 45 days after the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion).

"*Eligible Finished Goods*": the Eligible Inventory of the Company or any Subsidiary Guarantor that is classified, consistent with past practice, on the Company's or such Subsidiary Guarantor's accounting system as "*finished goods*" (including tote).

"*Eligible In Transit Inventory*": with respect to Company or any Subsidiary Guarantor, without duplication of Eligible Inventory, Inventory that, or as to which:

(a)    is then in transit (whether by vessel, air or land) with a freight carrier, shipping company or other third party which is not an Affiliate of the Company or any Subsidiary Guarantor from a location outside of the continental United States to a location of the Company or any Subsidiary Guarantor within the continental United States, for which the Administrative Agent shall have received such evidence thereof as the Administrative Agent may reasonably require;

(b)      the title thereto has passed to, and such Inventory is owned by, Company or any Subsidiary Guarantor as applicable, and for which the Administrative Agent shall have received such evidence thereof as the Administrative Agent may require;

(c)      either (i) no third party has any right, under applicable law or pursuant to any document relating to the sale of such Inventory, to reclaim, divert the shipment of, reroute, repossess, stop delivery of or otherwise assert any Lien rights or title retention with respect to such in-transit Inventory, (ii) the Administrative Agent has received, (y) a copy of the certificate of marine cargo insurance in connection therewith in which the Administrative Agent has been named as an additional insured and loss payee in a manner acceptable to the Administrative Agent and (z) a copy of the invoice, packing slip and manifest with respect thereto as the Administrative Agent may from time to time reasonably request, or (iii) an Eligibility Reserve in an amount equal to all accrued and unpaid amounts owed by the Company or any of its Subsidiaries to such third party in respect of the transit of such Inventory, or such other amount reasonably satisfactory to the Administrative Agent, shall have been established with respect thereto;

(d)      for which an acceptable document of title has been issued, and in each case as to which the Administrative Agent has control (as defined in the UCC or having similar meaning in any applicable jurisdiction) over the documents of title which evidence ownership of the subject Inventory (such as, if requested by the Administrative Agent, by the delivery of an acceptable lien waiver (unless the reserve described in clause (c) above has been established));

(e)      is insured against types of loss, damage, hazards, and risks, and in amounts, satisfactory to the Administrative Agent and in respect of which the Administrative Agent has been named as additional insured or loss payee;

(f)      shall not have been in transit for more than sixty (60) days;

(g)      is subject to a first priority (subject to any Liens for which the reserve described in clause (c) above has been established), perfected security interest in and Lien upon such goods in favor of the Administrative Agent; and

(h)      it is otherwise deemed Eligible Inventory hereunder, including, without limitation, that such Inventory and documents of title with respect thereto are subject to the reasonable satisfaction of the Administrative Agent, to a first priority (subject to any Liens for which the reserve described in clause (c) above has been established) perfected security interest and Lien in favor of the Administrative Agent.

"*Eligible Inventory*": the Inventory of the Company or any Subsidiary Guarantor (other than any Inventory that has been consigned by the Company or such Subsidiary Guarantor) including raw materials, work-in-process, finished goods (including tote), parts and supplies:

(a)      that is owned solely by the Company or such Subsidiary Guarantor;

(b)      with respect to which the Collateral Agent has a valid, perfected and enforceable first-priority Lien (subject to Customary Permitted Liens and, to the extent a Reserve has been established in respect thereof, other Liens approved by the Administrative Agent);

(c)      with respect to which no representation or warranty contained in any Loan Document has been breached in any material respect (unless otherwise agreed by the Administrative Agent);

(d)      that is not, in the Administrative Agent's sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, obsolete or

unmerchantable (after taking into account, without duplication, slow-moving obsolete inventory deducted from the calculation of the perpetual inventory at standard cost of such Inventory, as applicable);

(e)    with respect to which (in respect of any Inventory labeled with a brand name or trademark and sold by the Company or any Subsidiary Guarantor pursuant to a trademark owned by the Company or such Subsidiary Guarantor or a license granted to the Company or such Subsidiary Guarantor) the Collateral Agent would have rights under such trademark or license pursuant to the Guarantee and Collateral Agreement or other agreement reasonably satisfactory to the Administrative Agent to sell such Inventory in connection with a liquidation thereof;

(f)    that is located in (or, subject to the requirements of clause (iii) of the immediately succeeding sentence below, in transit to)

(i)    the United States, the United Kingdom and, at the Company's option, in Puerto Rico or Canada, or

(ii)    other jurisdictions if acceptable to the Administrative Agent and the Required Lenders in their sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions (which approval, in the case of the Required Lenders, may be given by e-mail from such Lenders (or their counsel));

*provided*, **however**, that, without the prior written consent of the Required Lenders (which consent may be by e-mail from such Lenders (or their counsel)), the aggregate amount of the Borrowing Base consisting of Eligible Inventory under this **clause (f)(ii)** and Eligible Receivables under **clause (f)(ii)** of the definition of "*Eligible Receivables*" attributable to such other jurisdictions, excluding, for the avoidance of doubt, Puerto Rico and Canada, shall not exceed $60,000,000 at any time);

(g)    that is covered by casualty insurance reasonably acceptable to the Administrative Agent; and

(h)    that the Administrative Agent deems to be Eligible Inventory based on such credit and collateral considerations as the Administrative Agent may, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, deem appropriate.

No Inventory of the Company or any Subsidiary Guarantor shall be Eligible Inventory if such Inventory consists of:

(i)    goods returned or rejected by customers other than goods that are undamaged or are resalable in the normal course of business;

(ii)    goods to be returned to suppliers;

(iii)    goods in transit, except that goods in transit that would constitute up to $15,000,000 of Eligible Inventory but for them being in transit in the aggregate at any one time, will not be deemed ineligible if (A) they are in transit to locations within the continental United States owned or, subject to compliance with the requirements set forth in clauses (iv)(A) and (B) below, leased by the Company or any Subsidiary Guarantor, and (B) solely in the case of goods in transit from a location outside the continental United States, such goods constitute Eligible In Transit Inventory; *provided, however*, that notwithstanding anything to the contrary contained herein, any Inventory constituting Eligible In-Transit Inventory shall not be included in the

26

calculation of the Borrowing Base until the Administrative Agent has received a customary desktop field examination with respect to such Eligible In-Transit Inventory reasonably satisfactory to the Administrative Agent and performed by an appraiser that is reasonably satisfactory to the Administrative Agent; or

(iv)    goods located, stored, used or held at the premises of a third party unless (A) the Administrative Agent shall have received a Landlord Waiver or Bailee's Letter or (B) an Eligibility Reserve reasonably satisfactory to the Administrative Agent shall have been established with respect thereto; *provided*, *however*, that no such exclusion from Eligible Inventory on the basis of this **clause (iv)** shall be in effect during the first sixty (60) days after the Closing Date (or such longer date as the Administrative Agent may agree in its sole discretion).

"***Eligible Prime Finished Goods***": Eligible Finished Goods of the Company or any Subsidiary Guarantor (other than Eligible Special Markets Inventory and Eligible Tote Stores Inventory) that are not discontinued, damaged or returned and unsuitable for sale to the Company's or such Subsidiary Guarantor's primary retail customers.

"***Eligible Raw Materials***": the Eligible Inventory of the Company or any Subsidiary Guarantor (other than Eligible Bulk Inventory) that is classified, consistent with past practice, on the Company's or such Subsidiary Guarantor's accounting system as "*raw materials,*" "*components,*" "*supplies*" or "*packaging*".

"***Eligible Real Property***": any parcel of owned Real Property in the United States owned by the Company or any Subsidiary Guarantor as to which each of the following conditions has been satisfied at such time:

(a)    (i) a valid and enforceable first-priority Lien on such parcel of Real Property (subject to Customary Permitted Liens and, to the extent a Reserve has been established in respect thereof, other Liens approved by the Administrative Agent) shall have been granted by the Company or such Subsidiary Guarantor in favor of the Collateral Agent pursuant to a Mortgage and (ii) such Lien shall be in full force and effect in favor of the Collateral Agent at such time; *provided* that (other than with respect to the Melson Avenue Property) this clause (a) shall not apply to any such parcel of Real Property that otherwise satisfies the requirements of this definition until the date that is 90 days (or such longer period as the Administrative Agent may agree in its sole and reasonable discretion) after the Closing Date;

(b)    except as otherwise permitted by the Administrative Agent, the Administrative Agent and, where applicable, the relevant title insurance company shall have received in form and substance reasonably satisfactory to the Administrative Agent, all Mortgage Supporting Documents in respect of such parcel;

(c)    the Administrative Agent shall have received an Appraisal with respect to such parcel of Real Property in form and substance reasonably satisfactory to the Administrative Agent (which shall include the requirement that such Appraisal be compliant with the Financial Institutions Reform, Recovery and Enforcement Act of 1989) and performed by an appraiser that is reasonably satisfactory to the Administrative Agent;

(d)    no condemnation or taking by eminent domain shall have occurred nor shall any notice of any pending or threatened condemnation or other proceeding against such parcel of Real Property been delivered to the owner or lessee of such parcel of Real Property that would materially adversely affect the use, operation or value of such parcel of Real Property;

27

(e)        the mortgagor under the relevant Mortgage encumbering such parcel of Real Property shall comply in all material respects with the terms of such Mortgage (taking into account any applicable grace periods provided therein); and

(f)        the mortgagor has provided to the Administrative Agent evidence of flood hazard insurance if any portion of the improvements on the owned Real Property is currently or at any time in the future identified by the Federal Emergency Management Agency as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any amendment or successor act thereto) or otherwise being designated as a "special flood hazard area or part of a 100 year flood zone", in an amount equal to 100% of the full replacement cost of the improvements; *provided*, *however*, that a portion of such flood hazard insurance may be obtained under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.

"*Eligible Receivable*": the gross outstanding balance of each Account of the Company or any Subsidiary Guarantor arising out of the sale of merchandise, goods or services in the ordinary course of business, that is made by the Company or such Subsidiary Guarantor to a Person that is not an Affiliate of the Company (a "*Receivable*") and that constitutes ABL Facility First Priority Collateral in which the Collateral Agent has a valid, perfected and enforceable first priority Lien; *provided*, *however*, that an Account shall not be an "*Eligible Receivable*" if any of the following shall be true:

(a)        (i) the sale represented by such Account (other than with respect to seasonal dating or promotional sales) is to an Account Debtor and such Account is the earlier of (x) ninety (90) days past the original invoice date thereof and (y) sixty (60) days past due or (ii) the sale represented by such Account is with respect to seasonal dating or promotional sales and such Account is one hundred twenty (120) days past the original invoice date thereof; or

(b)        any representation or warranty contained in this Agreement or any other Loan Document with respect to such specific Account is not true and correct with respect to such Account in any material respect (or if qualified by materiality, in all respects) (unless otherwise agreed by the Administrative Agent); or

(c)        the Account Debtor on such Account has disputed liability or made any claim with respect to any other Account due from such Account Debtor to the Company or such Subsidiary Guarantor but only to the extent of such dispute or claim; or

(d)        the Account Debtor on such Account has (i) filed a petition for bankruptcy or any other relief under the Bankruptcy Code or any other law relating to bankruptcy, insolvency, reorganization or relief of debtors, (ii) made an assignment for the benefit of creditors, (iii) had filed against it any petition or other application for relief under any Debtor Relief Law, (iv) failed, suspended business operations, become insolvent, called a general meeting of its creditors for the purpose of obtaining any financial concession or accommodation or (v) had or suffered a receiver or a trustee to be appointed for all or a significant portion of its assets or affairs and, in each case, such event is continuing; or

(e)        the Account Debtor on such Account or any of its Affiliates is also a supplier to or creditor of the Company or such Subsidiary Guarantor unless such supplier or creditor has executed a no offset letter satisfactory to the Administrative Agent, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions; or

(f)      the sale represented by such Account is to an Account Debtor with a principal place of business located outside the United States, the United Kingdom, or, at the Company's option Puerto Rico or Canada, unless

(i)      the sale is on letter of credit or acceptance terms acceptable to the Administrative Agent, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions and (A) such letter of credit names the Collateral Agent as beneficiary for the benefit of the Secured Parties or (B) the issuer of such letter of credit has consented to the assignment of the proceeds thereof to the Collateral Agent or

(ii)      such sale is to an Account Debtor located in another jurisdiction acceptable to the Administrative Agent and the Required Lenders in their sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions (which approval may be given by e-mail from such Lenders (or their counsel));

*provided*, *however*, that, without the prior written consent of the Required Lenders (which consent may be by e-mail from such Lenders (or their counsel)), the aggregate amount of the Borrowing Base consisting of Eligible Receivables under this **clause (f)(ii)** and Eligible Inventory under **clause (f)(ii)** of the definition of "*Eligible Inventory*" attributable to such other jurisdictions, excluding, for the avoidance of doubt, Canada or Puerto Rico, shall not exceed $60,000,000 at any time; or

(g)      the sale to such Account Debtor on such Account is on a bill on hold, guaranteed sale, sale and return, sale on approval or consignment basis; or

(h)      such Account is subject to a Lien in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties (other than Customary Permitted Liens and, to the extent a Reserve has been established in respect thereof, other Liens approved by the Administrative Agent); or

(i)      such Account is subject to any deduction, offset, counterclaim, return privilege or other conditions other than volume sales discounts given in the ordinary course of the Company's business; *provided*, *however*, that such Account shall be ineligible pursuant to this **clause (i)** only to the extent of such deduction, offset, counterclaim, return privilege or other condition; or

(j)      the Account Debtor on such Account is located in any State of the United States requiring the holder of such Account, as a precondition to commencing or maintaining any action in the courts of such State either to (i) receive a certificate of authorization to do business in such State or be in good standing in such State or (ii) file a Notice of Business Activities Report with the appropriate office or agency of such State, in each case unless the holder of such Account has received such a certificate of authority to do business, is in good standing or, as the case may be, has duly filed such a notice in such State; or

(k)      the sale represented by such Account is denominated in a currency other than Dollars, Pounds, Euros, Canadian Dollars or such other currency acceptable to the Administrative Agent in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions; or

(l)      such Account is not evidenced by an invoice or other writing in form acceptable to the Administrative Agent, in its sole discretion exercised reasonably; or

(m)      the Company or such Subsidiary Guarantor, in order to be entitled to collect such Account, is required to perform any additional service for, or perform or incur any additional obligation to, the Person to whom or to which it was made; or

(n)      (i)      with respect to any Account Debtor with a corporate credit rating of A- or higher from S&P or A3 or higher from Moody's, the total Accounts of such Account Debtor to the Company or such Subsidiary Guarantor that would otherwise constitute Eligible Receivables but for the application of this **clause (n)** represent more than 35% of the Eligible Receivables of the Company and the Subsidiary Guarantors at such time,

(ii)      with respect to any Account Debtor with a corporate credit rating lower than A- but BBB- or higher from S&P or lower than A3 but Baa3 or higher from Moody's, the total Accounts of such Account Debtor to the Company or such Subsidiary Guarantor that would otherwise constitute Eligible Receivables but for the application of this **clause (n)** represent more than 25% of the Eligible Receivables of the Company and the Subsidiary Guarantors at such time or

(iii)      with respect to any Account Debtor with a corporate credit rating lower than BBB- or no rating from S&P or lower than Baa3 or no rating from Moody's, the total Accounts of such Account Debtor to the Company or such Subsidiary Guarantor that would otherwise constitute Eligible Receivables but for the application of this **clause (n)** represent more than 15% of the Eligible Receivables of the Company and the Subsidiary Guarantors at such time, but in each case, only to the extent of such excess;

*provided*, *however*, that (A) at the sole discretion of the Administrative Agent exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, the total Accounts of CVS Caremark Corporation, collectively, as Account Debtors to the Company or any Subsidiary Guarantor that would otherwise constitute Eligible Receivables but for the application of this **clause (n)** may represent up to, but not to exceed, 30% of the Eligible Receivables of the Company and the Subsidiary Guarantors at such time, (B) for purposes of this **clause (n)**, any parent entity of an Account Debtor may satisfy the corporate credit rating conditions in respect of such Account Debtor; *provided* that if both an Account Debtor and the parent of an Account Debtor have corporate credit ratings, the corporate credit rating of the Account Debtor shall govern and (C) in the event of any change to an applicable corporate credit rating scale after the Closing Date, each reference in this **clause (n)** to a corporate credit rating shall be adjusted to the corporate rating under such changed corporate credit rating scale that is equivalent to such corporate credit rating referred to in this **clause (n)** as of the Closing Date (for the avoidance of doubt, corporate credit ratings of an Account Debtor shall be determined on the applicable date of determination); or

(o)      the Administrative Agent, in accordance with its customary criteria, determines, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, deem appropriate, that such Account might not be paid or is otherwise ineligible; or

(p)      more than fifty percent (50%) of the aggregate balance of all Accounts owing from the Account Debtor obligated on the Account are ineligible under subclause (a) above (in which case all Accounts from such Account Debtor shall be ineligible); or

(q)      the Account Debtor is either (A) the Canadian government or any department, agency, or instrumentality of Canada (exclusive, however, of accounts with respect to which the applicable Loan Parties have complied, to the reasonable satisfaction of Administrative Agent, with the Financial Administration Act (Canada)), or (B) any province, territory or other Governmental Authority of Canada (exclusive, however, of accounts with respect to which the applicable Loan Parties have complied, to the reasonable satisfaction of the Administrative Agent, with applicable governmental account assignment legislation of such jurisdictions).

"***Eligible Special Markets Inventory***": Eligible Finished Goods of the Company or any Subsidiary Guarantor consisting of finished goods for "*Special Markets,*" as defined in **Exhibit Q**.

"***Eligible Tote Stores Inventory***": Eligible Finished Goods of the Company or any Subsidiary Guarantor consisting of "*Tote Stores,*" as defined in **Exhibit Q**.

"***Eligible Work-in-Process Inventory***": a class of Eligible Inventory consisting of the Eligible Inventory of the Company or any Subsidiary Guarantor that is classified, consistent with past practice, on the Company's or such Subsidiary Guarantor's accounting system as "*work-in-process*".

"***Entitlement Holder***" as defined in the UCC or the PPSA, as applicable.

"***Entitlement Order***" as defined in the UCC or the PPSA, as applicable.

"***Environmental Laws***":  any and all laws, rules, orders, regulations, statutes, ordinances, codes or decrees (including principles of common law) of any international authority, foreign government, the United States, or any state, provincial, local, municipal or other Governmental Authority, regulating, relating to or imposing liability or standards of conduct concerning pollution, the preservation or protection of the environment, natural resources or human health and safety (as related to Releases of or exposure to Materials of Environmental Concern), as have been, are now, or at any time hereafter are, in effect.

"***Environmental Liability***":  any liability, claim, action, suit, judgment or order under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, to the extent arising from or relating to:  (a) non-compliance with any Environmental Law or any permit, license or other approval required thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Materials of Environmental Concern, (c) exposure to any Materials of Environmental Concern, (d) the Release or threatened Release of any Materials of Environmental Concern, (e) any investigation, remediation, removal, clean-up or monitoring required under Environmental Laws or required by a Governmental Authority (including without limitation Governmental Authority oversight costs that the party conducting the investigation, remediation, removal, clean-up or monitoring is required to reimburse) or (f) any contract, agreement or other consensual arrangement pursuant to which any Environmental Liability under **clause (a)** through **(e)** above is assumed or imposed.

"***Equipment***": as defined in the UCC or the PPSA, as applicable.

"***Equity Issuance***":  any issuance by the Borrower or any Restricted Subsidiary of its Capital Stock in a public or private offering.

"***ERISA***":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"***Erroneous Payment***" has the meaning assigned to it in **Section 9.14(a)**.

"***Erroneous Payment Notice***" has the meaning assigned to it in **Section 9.14(b)**.

"***Escrow Entity***":  any direct or indirect Subsidiary of the Borrower formed solely for the purposes of issuing any bonds, notes, term loans, debentures or other debt.

"***EU Bail-In Legislation Schedule***": the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Event*":  as defined in the definition of "Material Adverse Effect".

"*Event of Default*":  any of the events specified in **Section 8.1**; *provided*, that any requirement set forth therein for the giving of notice, the lapse of time, or both, has been satisfied.

"*Excess Availability*": at any time, (a) the Availability *minus* (b) the aggregate Revolving Loans then outstanding.

"*Exchange Act*": the Securities Exchange Act of 1934, as amended.

"*Excluded Account*": as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"*Excluded Collateral*":  as defined in **Section 6.8(e)**; *provided* that the Borrower may designate in a written notice to the Administrative Agent any asset not to constitute "Excluded Collateral", whereupon the Borrower shall be obligated to comply with the applicable requirements of **Section 6.8** as if it were newly acquired.

"*Excluded Contribution Amount*":  the aggregate amount of Net Cash Proceeds received by the Borrower from Equity Issuances (other than from any of its Subsidiaries or from Disqualified Capital Stock) or capital contributions after the Closing Date, *minus* the aggregate amount of (i) any Investments made pursuant to **Section 7.7(dd)** (net of any return of capital in respect of such Investment or deemed reduction in the amount of such Investment), (ii) [reserved] and (iii) any payments made pursuant to **Section 7.8(a)(ii)**, in each case made during the period commencing on the Closing Date through and including the date of usage of such Excluded Contribution Amount in reliance thereon (without taking account of the intended usage of the Excluded Contribution Amount as of such date), designated as an Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which such Net Cash Proceeds are received by the Borrower, as the case may be.

"*Excluded Equity Securities*": (i) to the extent applicable law requires that any Subsidiary issue directors' qualifying shares, such shares or nominee or other similar shares, (ii) Capital Stock of any first-tier Foreign Subsidiary or any Foreign Subsidiary Holding Company in excess of 66% of the voting Capital Stock of such entity, (iii) any Capital Stock of any Foreign Subsidiary that is not a first-tier Foreign Subsidiary, (iv) any Capital Stock in joint ventures or other entities in which the Loan Parties directly own 50% or less of the Capital Stock, (v) any Capital Stock in Unrestricted Subsidiaries, and (vi) any other Capital Stock owned on or acquired after the Closing Date (other than Capital Stock in a wholly owned Subsidiary) in accordance with this Agreement but only in the case of this **clause (vi)** if, and to the extent that, and for so long as granting a security interest or other Liens therein would violate applicable law or regulation or a shareholder agreement or other Contractual Obligation (in each case, after giving effect to Section 9-406(d), 9-407(a) or 9-408 of the Uniform Commercial Code, if and to the extent applicable, and other applicable law) binding on such Capital Stock and not created in contemplation of such acquisition.

"*Excluded Real Property*":

(a)      any Real Property that is subject to a Lien expressly permitted by **Section 7.3(j)** (solely to the extent that the Indebtedness secured by such Lien would prohibit a Lien on such Real Property to secure the Obligations) or **Section 7.3(g)** (solely to the extent securing Indebtedness under **Sections 7.2(c)** or **7.2(t)**),

(b)        any Real Property with respect to which, in the reasonable judgment of the Borrower and the Administrative Agent, the cost of providing a mortgage on such Real Property in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Lenders therefrom and

(c)        any Real Property to the extent providing a mortgage on such Real Property would

(i)        result in material adverse tax consequences to Holdings or the Borrower or any of its Restricted Subsidiaries as reasonably determined by the Borrower (*provided*, that any such designation of Real Property as Excluded Real Property shall be subject to the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed)),

(ii)        violate any applicable Requirement of Law,

(iii)        be prohibited by any applicable Contractual Obligations (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code) to the extent such prohibition was not created in contemplation of a mortgage on such Real Property or

(iv)        give any other party (other than a Loan Party or a wholly-owned Subsidiary) to any contract, agreement, instrument or indenture governing such Real Property the right to terminate its obligations thereunder (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable law) to the extent such right was not created in contemplation of a mortgage on such Real Property;

*provided* that the Borrower may designate in a written notice to the Administrative Agent any Real Property not to constitute "Excluded Real Property", whereupon the Borrower shall be obligated to comply with the applicable requirements of **Section 6.8** as if it were newly acquired.

"*Excluded Subsidiary*":  any Subsidiary that is

(a)        an Unrestricted Subsidiary or a Permitted Joint Venture,

(b)        not wholly owned directly by the Borrower or one or more of its wholly owned Restricted Subsidiaries,

(c)        an Immaterial Subsidiary,

(d)        a Foreign Subsidiary Holding Company,

(e)        established or created pursuant to **Section 7.7(p)** and meeting the requirements of the proviso thereto; *provided*, that such Subsidiary shall only be an Excluded Subsidiary for the period, as contemplated by **Section 7.7(p)**,

(f)        a Subsidiary that is (i) prohibited by any applicable Requirement of Law from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities but only if, and to the extent that, and for so long as, such prohibition remains in effect and applicable to such Subsidiary, or (ii) which would require governmental (including regulatory) consent, approval, license or authorization to provide a guarantee or grant any Lien unless, such consent, approval, license or authorization has been received but only if, and to the extent that, and for so long as such consent, approval, license or authorization has not been received and continues to be required,

(g)      a Subsidiary that is prohibited from guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities by any Contractual Obligation in existence on the Closing Date (or, in the case of any newly-acquired Subsidiary, in existence at the time of acquisition thereof but not entered into in contemplation thereof) and not created in contemplation of such guarantee, ***provided***, that this **clause (g)** shall not be applicable if (1) the other party to such Contractual Obligation is a Loan Party or a wholly-owned Restricted Subsidiary of the Borrower or (2) consent has been obtained to provide such guarantee or such prohibition is otherwise no longer in effect,

(h)      a Subsidiary with respect to which a guarantee by it of, or granting a Lien on its assets to secure obligations in respect of, the Facilities could reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any related provision) to Holdings or the Borrower or any of its Restricted Subsidiaries, as reasonably determined in good faith by the Borrower in consultation with the Administrative Agent,

(i)      not-for-profit subsidiaries,

(j)      subject to the proviso below, any Foreign Subsidiary or any Domestic Subsidiary of a Foreign Subsidiary that is not a Subsidiary Guarantor as of the Closing Date,

(k)      [reserved], or

(l)      any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences of guaranteeing or granting a Lien on its assets to secure obligations in respect of the Facilities shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom;

***provided***, that (x) if a Subsidiary executes the Guarantee and Collateral Agreement as a "Guarantor," then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guarantee and Collateral Agreement as a "Guarantor" in accordance with the terms hereof and thereof), (y) the Borrower may designate in a written notice to the Administrative Agent a Subsidiary not to constitute an "Excluded Subsidiary" whereupon such Subsidiary shall be obligated to comply with the applicable requirements of **Section 6.8** as if it were newly acquired and (z) in no event shall any Subsidiary that (A) is a Subsidiary Guarantor as of the Closing Date (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder) or (B) is a guarantor under the Term Loan Documents, constitute an "Excluded Subsidiary" under the Loan Documents and no such Subsidiary may be designated an "Excluded Subsidiary" following the Closing Date and each such Subsidiary shall remain a Guarantor hereunder (unless such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder).

"***Excluded Swap Obligation***": with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any "keepwell, support or other agreement" for the benefit of such Guarantor and any and all guarantees of such Guarantor's Swap Obligations by other Loan Parties) at the time the Guarantee of such Guarantor, or a grant by such Guarantor of a security interest, becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes excluded in accordance with the first sentence of this definition.

"**_Excluded Taxes_**": any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to any Recipient, (i) net income Taxes (however denominated), franchise Taxes, and branch profits Taxes, in each case, (A) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, if such Recipient is a Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (B) that are Other Connection Taxes, (ii) in the case of a Lender, any U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Recipient with respect to an applicable interest in a Loan or Commitment or this Agreement pursuant to a law in effect on the date on which (A) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment requested by the Borrower under **Section 2.24**) or (B) such Lender changes its lending office, except in each case to the extent that, pursuant to **Section 2.20**, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (iii) Taxes attributable to such Recipient's failure to comply with paragraph (e) or (g), as applicable, of **Section 2.20**, (iv) any withholding Taxes imposed under FATCA and (v) any Canadian federal withholding Taxes imposed as a result of a Recipient (a) not dealing at arm's length (within the meaning of the ITA) with a Canadian-resident Loan Party, (b) being a "specified non-resident shareholder" (within the meaning of subsection 18(5) of the ITA) of a Canadian-resident Loan Party or (c) not dealing at arm's length with a "specified shareholder" (within the meaning of subsection 18(5) of the ITA) of a Canadian-resident Loan Party, other than, in each case, where the non-arm's length relationship arises, the recipient is a specified non-resident shareholder of a Canadian-resident Loan Party or the recipient does not deal at arm's length with a specified shareholder of a Canadian-resident Loan Party, on account of such recipient executing, delivering, being a party to, engaging in any transactions pursuant to, performing its obligations under, receiving payments under, receiving or perfecting a security interest under, or enforcing, any Loan Document.

"**_Existing Credit Agreements_**": (a) that certain BrandCo Credit Agreement, dated as of May 7, 2020, by and among Revlon Holdings, RCPC, the lenders party thereto, and Jefferies Finance LLC, as administrative agent and collateral agent, (b) that certain Asset-Based Revolving Credit Agreement, dated September 7, 2016, by and among Revlon Holdings, RCPC, each of the other loan parties party thereto, the MidCap Funding IV Trust, as administrative agent, the lenders from time to time party thereto, (c) that certain Term Credit Agreement, dated as of September 7, 2016, among Revlon Holdings, RCPC, the lenders from time to time party thereto and Citibank, N.A., as administrative agent and collateral agent, (d) that certain Super-Priority Senior Secured Debtor-In-Possession Asset-Based Revolving Credit Agreement, dated June 30, 2022, among Revlon Holdings and RCPC, each as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the lenders from time to time party thereto and Midcap Funding IV Trust, as administrative agent and collateral agent and (e) that certain Superpriority Senior Secured Debtor-In-Possession Credit Agreement, dated as of June 17, 2022, among Revlon Holdings and RCPC, each a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, the lenders from time to time party thereto and Jefferies Finance LLC, as administrative agent and collateral agent, in each case, as amended, modified, supplemented, extended, renewed, restated, amended and restated, refinanced, replaced or restructured prior to the Closing Date.

"**_Existing Maturity Date_**": as defined in **Section 2.6(a)**.

"**_Extension Fee_**": a fee in an amount equal to 0.50% of the Commitments at the time of such applicable extension of the Existing Maturity Date, as set forth in **Section 2.6**.

"**_Facility_**": the Revolving Commitments and the extensions of credit made thereunder.

"**_Fair Market Value_**": with respect to any asset, Property (including Capital Stock) or Investment, the fair market value thereof as determined in good faith by the Borrower as the price at which a willing

buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset.

"**_Fair Value_**": the amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

"**_FATCA_**": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code or any U.S. or non-U.S. fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"**_Federal Funds Effective Rate_**":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it; **_provided_**, that if the Federal Funds Effective Rate is less than zero, it shall be deemed to be zero hereunder for all instances other than in the definition of "ABR".

"**_Fee Letter_**": the Fee Letter dated as of April 24, 2023, between Revlon Consumer Products Corporation and the Administrative Agent.

"**_Fee Payment Date_**": (a)  the last Business Day of each March, June, September and December and (b) the last day of the applicable Revolving Commitment Period.

"**_Final DIP Order_**": the _Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief_ entered by the Bankruptcy Court on August 2, 2022 [Docket No. 330].

"**_Financial Assets_**":  the meaning assigned to such term in the UCC or the PPSA, as applicable.

"**_Financial Covenant Fixed Charge Coverage Ratio_**":  as of any date of determination, the ratio of (a) Consolidated Operating Cash Flow of the Borrower and its Restricted Subsidiaries for the most recently ended Test Period to (b) Fixed Charges of the Borrower and its Restricted Subsidiaries for such Test Period.  In the event that the Borrower or any of its Restricted Subsidiaries incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness or issues or redeems Disqualified Capital Stock subsequent to the commencement of the period for which the Financial Covenant Fixed Charge Coverage Ratio is being calculated and on or prior to the date on which the event for which the calculation of the Financial Covenant Fixed Charge Coverage Ratio is being calculated, then the Financial Covenant Fixed Charge Coverage Ratio will be calculated on a pro forma basis as if such incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness or issuance or redemption of Disqualified Capital Stock, and the use of the proceeds therefrom, had occurred at the beginning of the Test Period.

"***Fixed Basket***":  as defined in **Section 1.6**.

"***Fixed Basket Item or Event***":  as defined in **Section 1.6**.

"***Fixed Charges***":  for any Test Period, the sum of, without duplication, (a) Consolidated Net Interest Expense, (b) all dividend payments on any series of Disqualified Capital Stock of the Borrower paid, accrued or scheduled to be paid or accrued during the applicable Test Period, (c) regularly scheduled payments of principal on Indebtedness for borrowed money that were paid or payable (but without duplication) during such Test Period (excluding, for the avoidance of doubt, that attributable to Capital Lease Obligations) and (d) the aggregate amount of cash payments made in respect of Taxes during such Test Period; ***provided*** that, for purposes of determining the amount of debt service for any Test Period that includes any of the fiscal quarters ending September 30, 2022, December 31, 2022, March 31, 2023 or June 30, 2023, such debt service shall be calculated on an annualized basis using only the period of time that has elapsed since the Closing Date.

"***Flood Insurance Laws***":  collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"***Floor***":  the benchmark rate floor, if any, provided in this Agreement initially (as of the execution of this Agreement, the modification, amendment or renewal of this Agreement or otherwise) with respect to any Benchmark. With respect to the Adjusted Term SOFR Rate and any replacement thereof pursuant to the definition of "Benchmark Replacement", the "Floor" shall be 1.75%.

"***Foreign Subsidiary***":  any Restricted Subsidiary of the Borrower that is not a Domestic Subsidiary in accordance with **clause (i)** of such definition and each direct or indirect Restricted Subsidiary of another Foreign Subsidiary; ***provided*** that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary.

"***Foreign Subsidiary Holding Company***":  any Restricted Subsidiary of the Borrower which is a Domestic Subsidiary substantially all of the assets of which consist of the Capital Stock (or Capital Stock and Indebtedness) of one or more Foreign Subsidiaries; ***provided*** that, for all purposes of this Agreement and the other Loan Documents, none of (i) the BrandCo Entities nor (ii) any other Subsidiary that is a Subsidiary Guarantor as of the Closing Date shall constitute a Foreign Subsidiary Holding Company.

"***Funded Debt***":  with respect to any Person, all Indebtedness of such Person of the types described in **clauses (a)**, **(b)(i)**, **(e)**, **(g)(ii)**, **(h)** or, to the extent related to Indebtedness of the types described in the preceding clauses (but without duplication), **(d)** of the definition of "Indebtedness", in each case, to the extent reflected as indebtedness on such Person's balance sheet.

"***Funding Office***":  the office of the Administrative Agent specified in **Section 10.2** or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"***GAAP***":  generally accepted accounting principles in the United States as in effect from time to time.

"***Governmental Authority***": any nation or government, any state, province or other political subdivision thereof and any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and, as to any Lender, any securities exchange, any self-regulatory organization (including the National Association of Insurance Commissioners) and any supranational bodies (including the European Union and the European Central Bank).

"***Guarantee***": collectively, the guarantee made by the Guarantors under the Guarantee and Collateral Agreement in favor of the Secured Parties, together with each other guarantee delivered pursuant to **Section 6.8**.

"***Guarantee and Collateral Agreement***": the ABL Guarantee and Collateral Agreement, dated as of the Closing Date, among Holdings, the Borrower, each Subsidiary Guarantor from time to time party thereto and the Collateral Agent, substantially in the form of **Exhibit A-1**, as the same may be amended, restated, supplemented, waived or otherwise modified from time to time.

"***Guarantee Obligation***": as to any Person (the "***guaranteeing person***"), any obligation of (a) the guaranteeing person or (b) another Person (including any bank under any letter of credit) pursuant to which the guaranteeing person has issued a guarantee, reimbursement, counterindemnity or similar obligation, in either case guaranteeing or by which such Person becomes contingently liable for any Indebtedness (the "***primary obligations***") of any other third Person (the "***primary obligor***") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; ***provided***, ***however***, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets or any Investment permitted under this Agreement. The amount of any Guarantee Obligation of any guaranteeing Person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case, the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such Person in good faith.

"***Guarantors***": the collective reference to Holdings, the Borrower (solely for purposes of any Specified Cash Management Obligations, Specified Hedge Agreements and Specified Additional Obligations entered into by any Subsidiary Guarantor) and the Subsidiary Guarantors.

"***Hedge Agreements***": all agreements with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions, in each case, entered into by the Borrower or any Restricted Subsidiary; ***provided***, that no phantom stock, deferred compensation or similar plan providing for payments only on account of

services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or any of its Subsidiaries shall be a Hedge Agreement.

"***Hedge Bank***":  with respect to any Hedge Agreement entered into by the Borrower or any Subsidiary Guarantor, the counterparty to such Hedge Agreement.

"***Hedge Designation Notice***":  as defined in **Section 9.12(b)**.

"***Hedge Termination Value***":  in respect of any one or more Hedge Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedge Agreements, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in **clause (a)**, the amount(s) determined as the mark-to-market value(s) for such Hedge Agreements, as determined by the counterparty thereto in accordance with the terms thereof and in accordance with customary methods for calculating mark-to-market values under similar arrangements by such counterparty.

"***Holdings***":  as defined in the introductory paragraph of this Agreement.

"***Immaterial Subsidiary***":  on any date, any Restricted Subsidiary of the Borrower designated as such by the Borrower, but only to the extent that such Restricted Subsidiary has less than 1.0% of Consolidated Total Assets and 1.0% of annual consolidated revenues of the Borrower and its Restricted Subsidiaries as reflected on the most recent financial statements delivered pursuant to **Section 6.1** prior to such date, or, prior to the first such delivery, delivered pursuant to **Section 5.1(q)**, determined on a pro forma basis; ***provided***, that at no time shall all Immaterial Subsidiaries have in the aggregate Consolidated Total Assets or annual consolidated revenues (as reflected on the most recent financial statements delivered pursuant to **Section 6.1** prior to such time, or, prior to the first such delivery, delivered pursuant to **Section 5.1(q)**), determined on a pro forma basis, in excess of 1.0% of Consolidated Total Assets or 1.0% of annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries; ***provided further*** that, as of the Closing Date, PPI Two Corporation, a Delaware corporation and RML, LLC, a Delaware limited liability company, are Immaterial Subsidiaries.

"***Indebtedness***":  of any Person without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by (i) bonds (excluding surety bonds), debentures, notes or similar instruments, and (ii) surety bonds, (c) all obligations of such Person for the deferred purchase price of Property or services already received, (d) all Guarantee Obligations by such Person of Indebtedness of others, (e) all Capital Lease Obligations of such Person, (f) the principal component of all obligations, contingent or otherwise, of such Person (i) as an account party in respect of letters of credit (other than any letters of credit, bank guarantees or similar instrument in respect of which a back-to-back letter of credit has been issued under or permitted by this Agreement) and (ii) in respect of bankers' acceptances and (g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Capital Stock of such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference ***plus*** accrued and unpaid dividends; ***provided***, that Indebtedness shall not include (A) trade and other payables, accrued expenses and liabilities and intercompany liabilities arising in the ordinary course of business, (B) prepaid or deferred revenue arising in the ordinary course of business, (C) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy unperformed obligations of the seller of such asset, (D) earn-out and other contingent obligations until such obligations become a liability on the balance sheet of such Person in accordance with GAAP and (E) obligations owing under any Hedge Agreements or in respect of Cash Management Obligations.  The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a

general partner, other than to the extent that the instrument or agreement evidencing such Indebtedness expressly limits the liability of such Person in respect thereof (or provides for reimbursement to such Person).

"***Indebtedness for Borrowed Money***":  (a) to the extent the following would be reflected on a consolidated balance sheet of the Borrower and its Restricted Subsidiaries prepared in accordance with GAAP, the principal amount of all Indebtedness of the Borrower and its Restricted Subsidiaries with respect to (i) borrowed money, evidenced by debt securities, debentures, acceptances, notes or other similar instruments and (ii) Capital Lease Obligations, (b) reimbursement obligations for letters of credit and financial guarantees (without duplication) (other than ordinary course of business contingent reimbursement obligations) and (c) Hedge Agreements; ***provided***, that the Obligations shall not constitute Indebtedness for Borrowed Money.

"***Indemnified Liabilities***":  as defined in **Section 10.5**.

"***Indemnified Taxes***": (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the immediately preceding **clause (a)**, Other Taxes.

"***Indemnitee***":  as defined in **Section 10.5(c)**.

"***Initial Term Loans***": as defined in the Term Loan Agreement.

"***Insolvency***":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"***Insolvent***":  pertaining to a condition of Insolvency.

"***Instrument***":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor), as the context may require.

"***Intellectual Property***":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, domain names, trade secrets, patents, patent licenses, trademarks, trademark licenses, trade names, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"***Intercreditor Agreements***":  collectively, the ABL Intercreditor Agreement and any Junior Intercreditor Agreement.

"***Interest Payment Date***":

(a)        as to any ABR Loan, the last Business Day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan;

(b)        as to any SOFR Loan having an Interest Period of three (3) months or less, the last day of such Interest Period; and

(c)      as to any Loan (other than any Loan that is an ABR Loan), the date of any repayment or prepayment made in respect thereof.

"***Interest Period***":  as to any SOFR Loan, the period commencing on the date of such Borrowing or on the last day of the immediately preceding Interest Period applicable to such Borrowing, as applicable, and ending on the numerically corresponding day (or, if there is no numerically corresponding day, on the last day) in the calendar month that is one (1) or three (3) months thereafter (in each case for so long as such period is available for such SOFR Borrowing), as the Borrower may elect; ***provided***, that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the immediately preceding Business Day and (ii) no Interest Period shall extend beyond the Stated Maturity Date (as such date may be extended in accordance with **Section 2.6**).  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.

"***Inventory***": as defined in the UCC or the PPSA, as applicable.

"***Investments***":  as defined in **Section 7.7**.

"***IRS***": the U.S. Internal Revenue Service.

"***ITA***": the Income Tax Act (Canada), as amended.

"***Junior Financing***": as defined in **Section 7.8**.

"***Junior Financing Documentation***": any documentation governing any Junior Financing.

"***Junior Intercreditor Agreement***":  an intercreditor agreement in respect of Indebtedness intended to be secured by some or all of the Collateral on a junior priority basis with the Obligations, the terms of which are consistent with market terms governing security arrangements for the sharing of liens on a junior basis at the time such intercreditor agreement is proposed to be established in light of the type of Indebtedness to be secured by such liens, as determined in good faith by the Borrower and the Administrative Agent.

"***Landlord Waiver***": a letter in form and substance reasonably acceptable to the Administrative Agent and executed by a landlord in respect of Inventory or Equipment of the Company or any Subsidiary Guarantor located at any leased premises of the Company or such Subsidiary Guarantor pursuant to which such landlord, among other things, waives or subordinates on terms and conditions reasonably acceptable to the Administrative Agent any Lien such landlord may have in respect of such Inventory or Equipment.

"***Latest Maturity Date***": at any date of determination, the latest maturity date or termination date applicable to any Loan or Commitment hereunder at such time.

"***LCA Election***":  as defined in **Section 1.2(h)**.

"***LCA Test Date***":  as defined in **Section 1.2(h)**.

"***Lead Arranger***":  MidCap Financial Trust.

"***Lenders***":  the Revolving Lenders.

"***Liabilities***": the recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the Closing Date after giving effect to the consummation of the Transactions determined in accordance with GAAP consistently applied.

"***Lien***":  any mortgage, pledge, hypothecation, collateral assignment, encumbrance, lien (statutory or other), charge or other security interest or any other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"***Limited Availability Threshold***": as defined in **Section 7.1(b)**.

"***Limited Condition Acquisition***":  any acquisition, including by way of merger, amalgamation or consolidation, by one or more of the Borrower and its Restricted Subsidiaries of any assets, business or Person permitted by this Agreement whose consummation is not conditioned on the availability of, or on obtaining, third party acquisition financing and which is designated as a Limited Condition Acquisition by the Borrower or such Restricted Subsidiary in writing to the Administrative Agent and Lenders.

"***Liquidity Event Period***":  any period after the date on which financial statements for the fiscal quarter ending June 30, 2023 have been or are required to be delivered pursuant to **Section 6.1(b)**:

(a)       beginning on the first date on which Excess Availability is less than $35,000,000 (a "***Covenant Triggering Event***"), and

(b)       ending on the first date on which such Covenant Triggering Event shall cease to exist for 30 consecutive Business Days.

"***Loan***":  any loan or advances made by any Lender to the Borrower pursuant to this Agreement, including Revolving Loans and Protective Advances.

"***Loan Documents***":  the collective reference to this Agreement, the Intercreditor Agreements, the Security Documents, the Fee Letter and the Notes (if any), all Borrowing Base Certificates, and all Compliance Certificates, and any and all other agreements, certificates, notices, instruments and documents previously, now, or hereafter executed by any Loan Party or Subsidiary of a Loan Party and delivered to Agent, any Lender, or any Affiliate of Agent or any Lender in respect of the transactions contemplated by this Agreement, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"***Loan Parties***":  the Borrower and each Subsidiary Guarantor and "***Loan Party***" means any of them.

"***Mafco***": MacAndrews & Forbes Incorporated and its successors.

"***Majority Facility Lenders***":  with respect to any Facility at any time, the holders of more than 50% of the unused Commitments then in effect under such Facility and the aggregate Revolving Loans or the aggregate Loans outstanding, as applicable, under such Facility at such time; ***provided***, ***however***, that determinations of the "Majority Facility Lenders" shall exclude any Commitments or Loans held by Defaulting Lenders.

"***Material Adverse Effect***": any Event, which individually, or together with all other Events, has had a material adverse effect on (a) the business, operations, assets, financial condition or results of

operations of the Borrower and its Restricted Subsidiaries, taken as a whole, or (b) the material rights and remedies available to the Administrative Agent and the Lenders, taken as a whole, or on the ability of the Loan Parties, taken as a whole, to perform their payment obligations to the Lenders, in each case, under the Loan Documents.

"***Material Contracts***": any agreement or contract that is material to, or otherwise required for the operation of, the Business.

"***Material Intellectual Property***": any Intellectual Property that is material to, or otherwise required for the operation of, the Business.

"***Material License Agreement***": each license agreement entered into by a Loan Party as a licensor or licensee in respect of Material Intellectual Property, which generates at least $20,000,000 of annual revenues.

"***Material Real Property***":  (a) any Real Property located in the United States and owned in fee by the Borrower or any Subsidiary Guarantor on the Closing Date having an estimated Fair Market Value exceeding $10,000,000 and (b) any after-acquired Real Property located in the United States owned by a Loan Party having a gross purchase price exceeding $10,000,000 at the time of acquisition.

"***Materials of Environmental Concern***":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products, polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity and any other substances that are defined, listed or regulated as hazardous, toxic (or words of similar regulatory intent or meaning) under any Environmental Law, or that are regulated pursuant to Environmental Law or which may give rise to any Environmental Liability.

"***Maximum Rate***":  as defined in **Section 10.20**.

"***Melson Avenue Property***": the real property owned and held in fee title by Roux Laboratories, Inc. located at 2210 Melson Avenue, Jacksonville, Duval County, Florida.

"***Minimum Deemed Principal Amount***": as defined in **Section 2.15(e)**.

"***MIRE Event***": if there are any Mortgaged Properties at such time included in the Borrowing Base, any increase, extension of the maturity, refinancing, modification or renewal of any of the Commitments or Loans (but excluding for the avoidance of doubt (a) any continuation or conversion of borrowings, (b) the making of any Loan, (c) any reduction or termination of the Commitments or (d) any other amendment).

"***Moody's***":  Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"***Mortgage***":  any mortgage, deed of trust, hypothec, assignment of leases and rents or other similar document delivered on or after the Closing Date in favor of, or for the benefit of, the Collateral Agent for the benefit of the Secured Parties, with respect to Mortgaged Properties, each substantially in the form of **Exhibit M** or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Borrower (taking into account the law of the jurisdiction in which such mortgage, deed of trust, hypothec or similar document is to be recorded), as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"***Mortgage Supporting Documents***": with respect to a Mortgage for a parcel of Real Property, each of the documents required to be delivered pursuant to **Section 6.8(b)(ii)** and **(iii)** with respect to such Mortgage.

"***Mortgage Value***": with respect to any parcel of Eligible Real Property, the value of such parcel of Eligible Real Property set forth in the most recent Appraisal delivered with respect thereto to the Administrative Agent on an "as is" basis.

"***Mortgaged Properties***": all Material Real Property owned by the Borrower or any Subsidiary Guarantor that is, or is required to be, subject to a Mortgage pursuant to the terms of this Agreement.

"***Mortgagee's Title Insurance Policy***": as defined in the definition of Mortgage Supporting Documents.

"***Multiemployer Plan***": a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"***Net Cash Proceeds***": in connection with any Equity Issuance or issuance or sale of debt securities or instruments or the incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, consulting fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"***Net Orderly Liquidation Percentage***": as used to calculate any class of Eligible Inventory in the Borrowing Base in effect at any time, 85% of the net orderly liquidation value of such Eligible Inventory as to which such percentage applies to as a percentage of cost specified for such class of Eligible Inventory in the most recent Appraisal of such class of Inventory of the applicable Loan Party.

"***Net Orderly Liquidation Value***": with regard to any Eligible Equipment, the net orderly liquidation value of such Eligible Equipment, as determined by reference to the most recent Appraisal of such Equipment of the applicable Loan Party.

"***New Subsidiary***": as defined in **Section 7.2(t)**.

"***Non-Defaulting Lender***": any Revolving Lender other than a Defaulting Lender.

"***Non-Excluded Subsidiary***": any Subsidiary of the Borrower which is not an Excluded Subsidiary.

"***Non-Guarantor Subsidiary***": any Subsidiary of the Borrower which is not a Subsidiary Guarantor.

"***Non-Recourse Debt***": Indebtedness (a) with respect to which no default would permit (upon notice, lapse of time or both) any holder of any other Indebtedness of the Borrower or any of its Restricted Subsidiaries the outstanding principal amount of which individually exceeds $25,000,000 to declare a default on such other Indebtedness or cause the payment thereof to be accelerated or payable prior to its stated maturity and (b) as to which the lenders or holders thereof will not have any recourse to the capital stock or assets of the Borrower or any of its Restricted Subsidiaries.

"***Non-US Guarantor***": any Guarantor not organized under the laws of any jurisdiction within the United States.

"***Non-US Lender***": as defined in **Section 2.20(e)**.

"***Not Otherwise Applied***": with reference to any proceeds of any transaction or event that is proposed to be applied to a particular use or transaction, that such amount (a) was not required to prepay

Loans pursuant to **Section 2.12** and (b) has not previously been (and is not simultaneously being) applied to anything other than such particular use or transaction.

"***Note***":  any promissory note evidencing any Loan, which promissory note shall be in the form of **Exhibit J**, or such other form as agreed upon by the Administrative Agent and the Borrower.

"***Obligations***":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed or allowable in such proceeding) the Loans, and all other obligations and liabilities of the Borrower or any Guarantor to the Administrative Agent, the Collateral Agent or to any Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, in each case, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, premiums (including, without limitation, the Applicable Premium), reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of the Administrative Agent's Financial Advisor (solely to the extent consented to in accordance with **Section 10.5**) and counsel to the Administrative Agent or any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise and including all indemnity claims of the Agents and the Lenders pursuant to **Section 10.5**; *provided*, that the "Obligations" shall exclude any obligations in respect of any Specified Hedge Agreement, any Specified Cash Management Obligations and any Specified Additional Obligations.

"***OFAC***": the Office of Foreign Assets Control of the United States Department of the Treasury.

"***Overadvance***": as defined in **Section 2.12(b)**.

"***Overadvance Amount***": as defined in **Section 2.12(b)**.

"***Other Connection Taxes***": with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***":  any and all present or future stamp, court, intangible, recording, filing or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to **Section 2.24**).

"***Parent Company***":  any direct or indirect parent of Holdings.

"***Pari Passu Distribution Additional Obligations***":  as defined in **Section 9.12(c)**.

"***Pari Passu Distribution Hedge Obligations***": as defined in **Section 9.12(b)**.

"***Participant***":  as defined in **Section 10.6(c)(i)**.

"***Participant Register***":  as defined in **Section 10.6(c)(iii)**.

"***PBGC***":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"***Periodic Term SOFR Determination Day***": as defined in the definition of "Term SOFR".

"***Permitted Acquisition***":

(a)        any acquisition or other Investment approved by the Required Lenders,

(b)        any acquisition or other Investment made solely with the Net Cash Proceeds of any substantially concurrent Equity Issuance or capital contribution (other than Disqualified Capital Stock) and such Equity Issuance or capital contribution is Not Otherwise Applied or

(c)        any acquisition, in a single transaction or a series of related transactions, of a majority controlling interest in the Capital Stock, or all or substantially all of the assets, of any Person, or of all or substantially all of the assets constituting a division, product line or business line of any Person, in each case to the extent the applicable acquired company or assets engage in or constitute a Permitted Business or Related Business Assets, so long as in the case of any acquisition described in this **clause (c)**, no Event of Default shall be continuing immediately after giving pro forma effect to such acquisition.

"***Permitted Business***":  (i) the Business or (ii) any business that is a natural outgrowth or a reasonable extension, development or expansion of any such Business or any business similar, reasonably related, incidental, complementary or ancillary to any of the foregoing.

"***Permitted Investors***":  the collective reference to (i) Glendon Capital Management L.P., Angelo, Gordon & Co., L.P., Nut Tree Capital Management, LP, Oak Hill Advisors, L.P. and King Street Capital Management, L.P., (ii) any controlled Affiliates or accounts, investment vehicles (including any co-invest vehicles) or funds, advised, co-advised, managed or co-managed by any Person listed in the foregoing **clause (i)**, (iii) the members of management of any Parent Company, Holdings or any of its Subsidiaries that have ownership interests in any Parent Company or Holdings as of the Closing Date, (iv) the directors of Holdings or any of its Subsidiaries or any Parent Company as of the Closing Date and (v) the members of any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) of which any Person described in **clause (i)**, **(ii)**, **(iii)** or **(iv)** of this definition is a member; ***provided*** that, in the case of such group and without giving effect to the existence of such group or any other group, Persons who are either Persons described in **clause (i)**, **(ii)**, **(iii)** or **(iv)** of this definition have aggregate beneficial ownership of more than 50% of the total voting power of the voting stock of the Borrower, Holdings or any Parent Company.

"***Permitted Joint Venture***":  as defined in **Section 7.7(n)**.

"***Permitted Refinancing***":  with respect to any Person, refinancings, replacements, modifications, refundings, renewals or extensions of Indebtedness (or of a prior Permitted Refinancing of Indebtedness); ***provided***, that any such refinancing, replacement, modification, refunding, renewal or extension of Indebtedness effected pursuant to a clause in **Section 7.2** or **7.3** in reliance on the term "Permitted Refinancing" must comply with the following conditions:

(a)        there is no increase in the principal amount (or accreted value) thereof (except by an amount equal to accrued interest, fees, discounts, redemption and tender premiums, penalties and expenses

and by an amount equal to any existing commitment unutilized thereunder and as otherwise permitted under the applicable clause of **Section 7.2**);

(b)      the Weighted Average Life to Maturity of such Indebtedness is greater than or equal to the Weighted Average Life to Maturity of the Indebtedness being refinanced (other than a shorter Weighted Average Life to Maturity for customary bridge financings, which, subject to customary conditions, would either be automatically converted into or required to be exchanged for permanent financing which does not provide for a shorter Weighted Average Life to Maturity than the Weighted Average Life to Maturity of the Indebtedness being refinanced) and such Indebtedness shall not have a final maturity earlier than the maturity date of the Indebtedness being refinanced;

(c)      immediately after giving effect to such refinancing, replacement, refunding, renewal or extension, no Event of Default shall be continuing;

(d)      neither the Borrower nor any Restricted Subsidiary shall be an obligor or guarantor of any such refinancings, replacements, modifications, refundings, renewals or extensions except to the extent that such Person was (or would have been required to be) such an obligor or guarantor in respect of the applicable Indebtedness being modified, refinanced, replaced, refunded, renewed or extended;

(e)      any Liens securing such Permitted Refinancing shall be limited to the assets or property that secured the Indebtedness being refinanced; ***provided***, that Liens in respect of assets or property granted as a result of the operation of after-acquired property clauses shall be permitted to the extent any such assets or property secured (or would have secured) the Indebtedness the subject of the Permitted Refinancing;

(f)      to the extent the Indebtedness being refinanced is subject to the ABL Intercreditor Agreement or a Junior Intercreditor Agreement, to the extent that it is secured by the Collateral, the Permitted Refinancing shall be subject to the ABL Intercreditor Agreement or a Junior Intercreditor Agreement, as applicable, on terms no less favorable to the Lenders, taken as a whole (as determined in good faith by the Borrower); and

(g)      except as otherwise permitted by this definition of "Permitted Refinancing", the covenants and events of default applicable to such Permitted Refinancing shall be not materially more restrictive, taken as a whole, to the Borrower and its Restricted Subsidiaries than the covenants and events of default contained in customary agreements governing similar indebtedness in light of prevailing market conditions at the time of such Permitted Refinancing (as determined in good faith by the Borrower).

"***Person***":  an individual, partnership, corporation, company, limited liability company, unlimited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"***Plan***":  at a particular time, any employee benefit plan as defined in Section 3(3) of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability, including a Multiemployer Plan. For greater certainty, "Plan" shall not include a Canadian Pension Plan.

"***Plan Recognition Order***": as defined in the recitals hereto.

"***Platform***": as defined in **Section 10.2(c)**.

"*Pledged Securities*":  as defined in the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or any other equivalent term in the other Security Documents, as the context may require.

"*Pledged Stock*":  as defined in the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, or any other equivalent term in the other Security Documents, as the context may require.

"*PPSA*": the Personal Property Security Act (Ontario); *provided* that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by (a) a Personal Property Security Act as in effect in a Canadian jurisdiction other than Ontario or (b) the Civil Code of Québec, then "PPSA" means the Personal Property Security Act as in effect from time to time in such other jurisdiction or the Civil Code of Québec, as applicable, for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority in such Collateral.

"*Present Fair Salable Value*": the amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

"*Prime Rate*": the "U.S. Prime Lending Rate" published in The Wall Street Journal; *provided* that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent); each change in the Prime Rate shall be effective on the date such change is publicly announced as effective. The prime rate is not necessarily the lowest rate charged by any financial institution to its customers.

"*Proceeding*": as defined in **Section 10.5(c)**.

"*Proceeds of Crime Act*": the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada), including all regulations thereunder, as amended.

"*Property*":  any right or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including Capital Stock.

"*Protective Advances*":  means all expenses, disbursements and advances incurred by the Administrative Agent pursuant to the Loan Documents after the occurrence and during the continuance of an Event of Default that the Administrative Agent, in its sole discretion exercised reasonably, deems necessary or desirable to preserve or protect the ABL Facility First Priority Collateral or any portion thereof or to enhance the likelihood, or maximize the amount, of repayment of the Obligations of the Revolving Lenders; *provided*, *however*, that the aggregate principal amount of such Protective Advances shall not exceed the lesser of $10,000,000 and the aggregate amount of the unused Revolving Commitments.

"*Protective Advances Percentage*": as to any Revolving Lender with respect to any Protective Advance, the percentage which such Revolving Lender's undrawn Revolving Commitment at the time such Protective Advance is made then constitutes of the aggregate undrawn Revolving Commitments.

"*PTE*" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"***Public Information***": as defined in **Section 10.2(c)**.

"***Public Lender***":  as defined in **Section 10.2(c)**.

"***Qualified Capital Stock***":  any Capital Stock that is not Disqualified Capital Stock.

"***Qualified Cash***":  the amount of unrestricted cash and Cash Equivalents of the Loan Parties at such time to the extent held in a segregated restricted Deposit Account subject to a Deposit Account Control Agreement under the control of the Collateral Agent and (i) established as a "Qualified Cash Account" for the purposes expressly contemplated under **Section 2.12(b)** from time to time to receive cash and Cash Equivalents from the Company or its Subsidiaries pursuant to **Section 2.12(b)** and (ii) maintained either (x) with the Administrative Agent or (y) with another depository as the Administrative Agent may determine in its sole discretion exercised reasonably so long as such other applicable depository provides daily reports to the Administrative Agent setting forth the balances in such accounts and such information as the Administrative Agent may reasonably request.

"***Qualified Contract***": any new intellectual property license entered into by the Borrower or any of its Restricted Subsidiaries in respect of any brand so long as an officer of the Borrower has certified to the Administrative Agent that the revenues generated by such license in the next succeeding 12 months would reasonably be expected to exceed $40,000,000.

"***Ratio Basket***":  as defined in **Section 1.6**.

"***Ratio Basket Item or Event***":  as defined in **Section 1.6**.

"***RCP LLC***":  Revlon Consumer Products LLC, a Delaware limited liability company and successor to RCPC.

"***RCPC***": as defined in the preamble hereto.

"***Real Property***":  collectively, all right, title and interest of the Borrower or any of its Restricted Subsidiaries in and to any and all parcels of real property owned or leased by the Borrower or any such Restricted Subsidiary together with all improvements and appurtenant fixtures, easements and other property and rights incidental to the ownership, lease or operation thereof.

"***Recipient***": (a) any Lender, (b) the Administrative Agent and (c) any other Agent, as applicable.

"***Recognition Proceedings***": as defined in the recitals hereto.

"***Recovery Event***":  any settlement of or payment in respect of any Property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Restricted Subsidiary, in an amount for each such event exceeding $10,000,000.

"***Register***":  as defined in **Section 10.6(b)(iv)**.

"***Related Business Assets***":  assets (other than cash and Cash Equivalents) used or useful in a Permitted Business; ***provided***, that any assets received by the Borrower or a Restricted Subsidiary in exchange for assets transferred by the Borrower or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"***Related Parties***": with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"***Related Person***": as defined in **Section 10.5**.

"***Release***": any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure or facility.

"***Relevant Governmental Body***": the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board of Governors of the Federal Reserve System or the Federal Reserve Bank of New York, or any successor thereto.

"***Replaced Lender***": as defined in **Section 2.24**.

"***Reportable Event***": any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived by the PBGC in accordance with the regulations thereunder.

"***Representatives***": as defined in **Section 10.14**.

"***Required Lenders***": at any time, the holders of more than 50% of the Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Revolving Loans then outstanding; ***provided***, ***however***, that, in each case, determinations of the "Required Lenders" shall exclude any Revolving Commitments or Revolving Loans held by a Defaulting Lender.

"***Requirement of Law***": as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"***Resignation Effective Date***" as defined in **Section 9.9**.

"***Resolution Authority***" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***": any officer at the level of Vice President or higher of the relevant Person or, with respect to financial matters, the Chief Financial Officer, Treasurer, Controller or any other Person in the Treasury Department at the level of Vice President or higher of the relevant Person.

"***Restricted Payments***": as defined in **Section 7.6**.

"***Restricted Subsidiary***": any Subsidiary of the Borrower which is not an Unrestricted Subsidiary.

"***Restructuring Plan***": the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] and all exhibits, supplements, appendices, and schedules thereto, as may be altered, amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

50

"***Restructuring Support Agreement***": that certain Restructuring Support Agreement, dated as of December 19, 2022 (including all exhibits, annexes, and schedules thereto), by and among the Debtors and the other parties thereto, as amended, restated, supplemented or otherwise modified prior to the Closing Date pursuant to the terms thereof.

"***Revaluation Date***": each date on which a Spot Rate is calculated at the Administrative Agent's discretion.

"***Revolving Commitment Period***": the period from and including the Closing Date to the Revolving Termination Date.

"***Revolving Commitments***":  as to any Revolving Lender, the obligation of such Lender, if any, to make Revolving Loans in an aggregate principal amount not to exceed the amount set forth on **Schedule 2.1** hereto, or, as the case may be, in the Assignment and Assumption pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The aggregate amount of Revolving Commitments as of the Closing Date is $325,000,000.

"***Revolving Lender***":  each Lender that has a Revolving Commitment or that holds Revolving Loans.

"***Revolving Loans***":  as defined in **Section 2.4(a)**.

"***Revolving Percentage***":  as to any Revolving Lender at any time, the percentage which such Lender's Revolving Commitment then constitutes of the aggregate Revolving Commitments or, at any time after the Revolving Commitments shall have expired or terminated, the percentage which such Revolving Lender's Revolving Loans then outstanding constitutes of the aggregate Revolving Loans then outstanding.

"***Revolving Termination Date***":  the earlier of (x) the Stated Maturity Date as such date may be extended in accordance with **Section 2.6** and (y) the Accelerated Maturity Date; ***provided*** that, if such date is not a Business Day, the Revolving Termination Date will be the next succeeding Business Day.

"***S&P***":  Standard & Poor's Ratings Group, Inc., or any successor to the rating agency business thereof.

"***Sanction(s)***": any international economic sanction administered or enforced by the U.S. government, including OFAC and the U.S. Department of State, the United Nations Security Council, the European Union, the government of Canada or any agency thereof (including sanctions imposed pursuant to any Canadian Economic Sanctions and Export Laws) or His Majesty's Treasury of the United Kingdom.

"***SEC***":  the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

"***Secured Obligations***":  the Obligations, together with all obligations in respect of the Specified Hedge Agreements, the Specified Cash Management Obligations and the Specified Additional Obligations; ***provided***, that the "Secured Obligations" shall exclude any Excluded Swap Obligations.

"***Secured Parties***":  collectively, the Lenders, the Administrative Agent, the Collateral Agent, any other holder from time to time of any of the Secured Obligations and, in each case, their respective successors and permitted assigns.

"*Securities Account*":  as defined in the Guarantee and Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor).

"*Securities Account Control Agreement*":  as defined in the Guarantee and Collateral Agreement (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor).

"*Securities Act*":  the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Securities Intermediary*":  the meaning assigned to such term in the UCC.

"*Security*":  as defined in the Guarantee and Collateral Agreement or the PPSA, as applicable.

"*Security Documents*":  the collective reference to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement and all other security documents (including any Mortgages) hereafter delivered to the Administrative Agent or the Collateral Agent purporting to grant a Lien on any Property of any Loan Party to secure the Secured Obligations.

"*Senior Indebtedness*": as defined in **Section 10.1**.

"*Shared EBITDA Cap*": an amount, when combined with adjustments pursuant to clauses (d), (e), (g), (i) and (j) of the definition of Consolidated EBITDA, not to exceed (i) $50,000,000 in any Test Period ending on or after June 30, 2023 through June 30, 2024 and (ii) $30,000,000 for each Test Period thereafter.

"*Single Employer Plan*":  any Plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA and in respect of which any Loan Party or any other Commonly Controlled Entity is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA or has any liability.

"*SOFR*":  a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"*SOFR Administrator*": the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"*SOFR Borrowing*": a Borrowing comprised of SOFR Loans.

"*SOFR Loan*": any Loan bearing interest at a rate determined by reference to the Adjusted Term SOFR Rate in accordance with the provisions of Section II, other than pursuant to clause (c) of the definition of "ABR".

"*SOFR Tranche*":  the collective reference to SOFR Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"*Solvent*":  with respect to the Borrower and its Subsidiaries, as of any date of determination, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole Do not have Unreasonably Small

Capital; and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

"**Specified Additional Obligations**": (a) obligations in an aggregate principal amount not to exceed $15,000,000 at any time outstanding and (b) obligations incurred in reliance on **Section 7.2(dd)** in an aggregate face amount not to exceed $25,000,000 at any time outstanding, that in each case have been designated by the Borrower, by notice to the Administrative Agent, as a Specified Additional Obligation in accordance with **Section 9.12(c)**. The designation of any Specified Additional Obligations shall not create in favor of any party thereto (or their successors or assigns) any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Loan Documents. For the avoidance of doubt, all obligations in existence on the Closing Date listed as such on **Schedule 1.1B** shall constitute Specified Additional Obligations.

"**Specified Cash Limit**": $80,000,000.

"**Specified Cash Management Obligations**": Cash Management Obligations (a) owed by the Borrower or a Restricted Subsidiary to any Person (any such Person, a "**Cash Management Provider**"); *provided*, that First Republic Bank, U.S. Bancorp, Zions Bancorp and Western Alliance Bancorp shall not be eligible to be a Cash Management Provider) and (b) that have been designated by the Borrower, by notice to the Administrative Agent (which notice may be provided via electronic mail), as Specified Cash Management Obligations under this Agreement. The designation of any Cash Management Obligations as Specified Cash Management Obligations shall not create in favor of the Cash Management Provider that is a party thereto (or their successors or assigns) any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Loan Documents. For the avoidance of doubt, all Cash Management Obligations pursuant to agreements in existence on the Closing Date between the Borrower or any Subsidiary Guarantor, on the one hand, and a Cash Management Provider, on the other hand, listed as such on **Schedule 1.1B**, shall constitute Specified Cash Management Obligations.

"**Specified Excluded Cash**": (i) cash or Cash Equivalents located in the People's Republic of China, (ii) cash or Cash Equivalents that are Net Cash Proceeds (as defined in the Term Loan Agreement) of Term Facility First Priority Collateral held by Holdings or any of its Subsidiaries pending reinvestment or prepayment in accordance with Section 2.12 of the Term Loan Agreement, (iii) intraday cash borrowed on the applicable interest or regularly scheduled amortization payment date to be used to pay cash interest or regularly scheduled amortization on such date in respect of Indebtedness for borrowed-money owed to non-Affiliates of the Borrower, and (iv) cash or Cash Equivalents held in Excluded Accounts pursuant to clause (b) of the definition thereof in the Guarantee and Collateral Agreement.

"**Specified Hedge Agreement**": any Hedge Agreement (a) entered into by (i) the Borrower or any Subsidiary Guarantor and (ii) a Hedge Bank, as counterparty and (b) that has been designated by the Borrower, by notice to the Administrative Agent (which notice may be provided via electronic mail), as a Specified Hedge Agreement in accordance with **Section 9.12(b)**; *provided*, that Specified Hedge Agreement shall exclude any Excluded Swap Obligations. The designation of any Hedge Agreement as a Specified Hedge Agreement shall not create in favor of the Hedge Bank that is a party thereto (or their successors or assigns) any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Loan Documents. For the avoidance of doubt, all Hedge Agreements in existence on the Closing Date between the Borrower or any Subsidiary Guarantor, on the one hand, and a Hedge Bank, on the other hand, listed as such on **Schedule 1.1B**, shall constitute Specified Hedge Agreements.

"**Specified Reserve**": effective as of five (5) Business Days after the date of written notice of any determination thereof to the Borrower by the Administrative Agent (which notice shall include a reasonable

description of the basis for such determination) (the "**_Specified Notice Period_**"), such amounts as the Administrative Agent, in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions, may from time to time establish a reserve against the Borrowing Base (or the amount thereof, as the context requires) in respect of (i) Specified Hedge Agreements in effect at such time but only to the extent provided in **Section 9.12**, (ii) Specified Additional Obligations in effect at such time but only to the extent provided in **Section 9.12** and (iii) Specified Cash Management Obligations in effect at such time; **_provided_** that no Specified Reserve shall be imposed in respect of obligations and liabilities of the Borrower and any other Loan Party to any counterparty under Specified Hedge Agreements or Specified Cash Management Obligations except to the extent that the aggregate obligations (valued at the mark to market value thereof) in respect of such Specified Hedge Agreements and Specified Cash Management Obligations exceeds $10,000,000; **_provided_**, **_however_**, that such Specified Reserve shall take immediate effect if the Borrower submits a notice of borrowing during the Specified Reserve Notice Period.

"**_Spot Rate_**": with respect to any currency, the rate determined by the Administrative Agent to be the rate quoted by the Oanda Corporation (or by any other provider of currency exchange rates, as selected by the Administrative Agent) as of which the foreign exchange computation is made; **_provided_**, that the Administrative Agent may obtain such spot rate from another financial institution designated by it if it does not have as of the date of determination a spot buying rate for any such currency.

"**_Stated Maturity_**":  with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the payment of principal of such Indebtedness is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the re-purchase or repayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency).

"**_Stated Maturity Date_**":  the date that is the three year anniversary of the Closing Date.

"**_Subsidiary_**":  as to any Person, a corporation, partnership, company, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the Board of Directors of such corporation, partnership, company or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person; **_provided_**, that any joint venture that is not required to be consolidated with the Borrower and its consolidated Subsidiaries in accordance with GAAP shall not be deemed to be a "Subsidiary" for purposes hereof; **_provided further_**, that Beautyge Rus Joint Stock Company shall be deemed not to be a Subsidiary of the Borrower so long as any Sanctions are imposed on Russia and the Borrower and its Subsidiaries do not exercise control over such Person.  Unless otherwise qualified, all references to a "**_Subsidiary_**" or to "**_Subsidiaries_**" in this Agreement shall refer to a direct or indirect Subsidiary or Subsidiaries of the Borrower; **_provided_** that, notwithstanding anything herein to the contrary, a "Permitted Joint Venture" shall not be deemed to be a Subsidiary of the Borrower.

"**_Subsidiary Guarantors_**":  (a) each Domestic Subsidiary (other than any Excluded Subsidiary), (b) Elizabeth Arden (Canada) Limited, a corporation incorporated under the Canada Business Corporations Act, (c) Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, (d) Revlon Canada Inc., a corporation amalgamated under the Canada Business Corporations Act, (e) each of the BrandCo Entities and (f) any other Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.

"**_Successor Borrower_**":  as defined in **Section 7.4(j)**.

"**_Successor Holdings_**":  as defined in **Section VIIA**.

"***Supermajority Lenders***":  at any time, the holders of at least 66⅔% of the sum of the Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Revolving Loans then outstanding; ***provided***, ***however***, that determinations of the "Supermajority Lenders" shall exclude Revolving Commitments or Revolving Loans held by Defaulting Lenders.

"***Swap Obligations***": with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"***Taxes***":  all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, including any interest, fines, additions to tax or penalties applicable thereto.

"***Term Facility First Priority Collateral***":  as defined in the ABL Intercreditor Agreement.

"***Term Loan Agreement***":  the Term Credit Agreement, dated as of May 2, 2023, by and among the Borrower, Holdings, Jefferies Finance LLC, as administrative agent and collateral agent, and the other financial institutions party thereto, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Term Loan Documents***": the collective reference to the Term Loan Agreement and any other document, agreement and instrument executed and/or delivered in connection therewith or relating thereto, together with any amendment, supplement, waiver, or other modification to any of the foregoing.

"***Term Pari Passu Obligations***":  (i) the Initial Term Loans and (ii) the obligations in respect of Indebtedness permitted to be incurred under **Section 7.2** that is (or is to be) secured on a pari passu basis with the Liens securing the Initial Term Loans and/or other subsequent Term Pari Passu Obligations.

"***Term SOFR***":

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "***Periodic Term SOFR Determination Day***") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "***ABR Term SOFR Determination Day***") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a

Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"***Term SOFR Adjustment***" shall mean, for any calculation with respect to a SOFR Loan, a percentage per annum equal to (i) 0.11448% for 1-month Interest Periods and (ii) 0.26161% for 3-month Interest Periods, as applicable.

"***Term SOFR Administrator***": CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"***Term SOFR Reference Rate***": the forward-looking term rate based on SOFR.

"***Test Period***":  on any date of determination, the period of four consecutive fiscal quarters of the Borrower (in each case taken as one accounting period) most recently ended on or prior to such date for which financial statements have been or are required to be delivered pursuant to **Section 6.1** or, prior to the first such delivery, delivered pursuant to **Section 5.1(q)**.

"***Transaction Costs***": as defined in the definition of "Transactions."

"***Transactions***": each of the following transactions:

(a)    the execution, delivery and performance of the Loan Documents;

(b)    the borrowing of Revolving Loans on the Closing Date in an amount not less than $25,000,000;

(c)    the execution, delivery and performance of the Term Loan Documents and the extensions of credit thereunder on the Closing Date;

(d)    the Restructuring Transactions (as defined in the Restructuring Plan); and

(e)    the payment of all fees, costs and expenses incurred in connection with the transactions described in the foregoing provisions of this definition (the "***Transaction Costs***").

"***Type***":  as to any Loan, its nature as an ABR Loan or SOFR Loan.

"***U.S. Government Securities Business Day***": any day except for (i) a Saturday, (ii) a Sunday or (iii) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"***UK***" and "***United Kingdom***": the United Kingdom of Great Britain and Northern Ireland and, as the context requires, England and Wales.

"***UK Anti-Money Laundering & Anti-Terrorism Legislation***": the Bribery Act 2010 (UK), the Terrorism Act 2000 (UK), the Proceeds of Crime Act 2002 (UK) and any similar English legislation, together with all rules, regulations and interpretations thereunder or related thereto.

"***UK Debenture***": the English law debenture to be entered into by and among the UK Loan Parties and the Collateral Agent.

"***UK Financial Institution***" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"***UK Loan Parties***": Elizabeth Arden (UK) Ltd, a private limited company incorporated in England and Wales with company number 04126357, and any other Loan Party that is incorporated in England and Wales.

"***UK Resolution Authority***": the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"***UK Security Agreements***": (i) the UK Debenture and (ii) any other security agreements or documents governed by English law executed and delivered by any Loan Party in connection with this Agreement.

"***Unadjusted Benchmark Replacement***": the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"***Unfinanced Capital Expenditures***": for any period, the amount equal to Capital Expenditures which are not financed by the incurrence of any Indebtedness (except to the extent funded with the proceeds of the Revolving Loans; it being understood and agreed that, to the extent any Capital Expenditures are financed with Revolving Loans, such Capital Expenditures shall be deemed Unfinanced Capital Expenditures).

"***United States***":  the United States of America.

"***Unrestricted Cash***": as at any date of determination, the aggregate amount of cash and Cash Equivalents included in the cash accounts that would be listed on the consolidated balance sheet of the Borrower and its Restricted Subsidiaries as at such date, to the extent such cash and Cash Equivalents are not (a) subject to a Lien securing any Indebtedness or other obligations, other than (i) the Secured Obligations or (ii) any such other Indebtedness that is subject to any Intercreditor Agreement or (b) classified as "restricted" (unless so classified solely because of any provision under the Loan Documents or any other agreement or instrument governing other Indebtedness that is subject to any Intercreditor Agreement governing the application thereof or because they are subject to a Lien securing the Secured Obligations or other Indebtedness that is subject to any Intercreditor Agreement).

"***Unrestricted Subsidiary***": (i) any Escrow Entity, (ii) any Subsidiary of the Borrower designated as such and listed on **Schedule 4.14** on the Closing Date and (iii) any Subsidiary of the Borrower that is designated by a resolution of the Board of Directors of the Borrower as an Unrestricted Subsidiary, but only to the extent that, in the case of each of **clauses (ii)** and **(iii)**, such Subsidiary:

(a)        has no Indebtedness other than Non-Recourse Debt (other than such Indebtedness to the extent any related obligations of the Borrower or its Restricted Subsidiaries would otherwise be permitted under **Section 7.7**);

(b)        is not party to any agreement, contract, arrangement or understanding with the Borrower or any Restricted Subsidiary unless (x) the terms of any such agreement, contract, arrangement or understanding, taken as a whole (as shall be determined by the Borrower in good faith), are no less favorable to the Borrower or such Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Borrower or (y) the Borrower or any Restricted Subsidiary would be permitted to enter into such agreement, contract, arrangement or understanding with an Unrestricted Subsidiary pursuant to **Section 7.9**;

(c)        is a Person with respect to which neither the Borrower nor any of its Restricted Subsidiaries has any direct or indirect obligation (x) to subscribe for additional Capital Stock or warrants, options or other rights to acquire Capital Stock or (y) to maintain or preserve such Person's financial condition or to cause such Person to achieve any specified levels of operating results, unless, in each case, the Borrower or any Restricted Subsidiary would be permitted to incur any such obligation with respect to an Unrestricted Subsidiary pursuant to **Section 7.7**; and

(d)        does not guarantee or otherwise provide credit support after the time of such designation for any Indebtedness of the Borrower or any of its Restricted Subsidiaries unless it also guarantees or provides credit support in respect of the Obligations, in the case of **clauses (a)**, **(b)** and **(c)**, except to the extent not otherwise prohibited by **Section 7.7**.

If, at any time, any Unrestricted Subsidiary would fail to meet the foregoing requirements as an Unrestricted Subsidiary, it shall thereafter cease to be an Unrestricted Subsidiary for purposes hereof.  Subject to the foregoing, the Borrower may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary or any Restricted Subsidiary to be an Unrestricted Subsidiary; ***provided***, that

(i)        such designation shall only be permitted if no Event of Default would be in existence following such designation,

(ii)        any designation of an Unrestricted Subsidiary as a Restricted Subsidiary shall be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of any outstanding Indebtedness of such Unrestricted Subsidiary,

(iii)        any designation of a Restricted Subsidiary as an Unrestricted Subsidiary shall be deemed to be an Investment in an Unrestricted Subsidiary and shall reduce amounts available for Investments in Unrestricted Subsidiaries permitted by **Section 7.7** in an amount equal to the Fair Market Value of the Subsidiary so designated,

(iv) any designation or re-designation of a Subsidiary as an Unrestricted Subsidiary or Restricted Subsidiary shall be consistent for the purposes of this Agreement and the Term Loan Agreement, and

(v)        if such designation is of a Restricted Subsidiary that

(A)        contributes in excess of 10% of the Borrowing Base immediately prior to the designation of such Subsidiary as an Unrestricted Subsidiary or

58

(B)    owns Intellectual Property such that after giving effect to the designation of such Subsidiary as an Unrestricted Subsidiary Inventory in excess of 10% of the Borrowing Base immediately prior to such designation would no longer constitute Eligible Inventory,

then, in either case, prior to such designation, the Borrower shall deliver to the Administrative Agent an updated Borrowing Base Certificate demonstrating, after giving pro forma effect to such designation as an Unrestricted Subsidiary and any other transactions in connection therewith (including, without limitation, any prepayment or repayment of the Loans and removal from the Borrowing Base of any Inventory that is no longer Eligible Inventory).

Any such Borrowing Base Certificate shall be delivered or caused to be delivered to the Lenders.

(vi)    if such designation occurs during a Liquidity Event Period or a Liquidity Event Period would result therefrom, the Borrower shall have demonstrated compliance with **Section 7.1**, calculating the Financial Covenant Fixed Charge Coverage Ratio on a pro forma basis as if such designation and/or any other transaction in connection therewith shall have occurred at the beginning of the Test Period (and the Borrower shall have delivered to the Administrative Agent such financial information as it may reasonably request demonstrating such compliance).

"*Unused Line Fee Rate*":  a rate equal to 0.50% per annum.

"*US Lender*":  as defined in **Section 2.20(g)**.

"*USA Patriot Act*":  as defined in **Section 10.18**.

"*Weighted Average Life to Maturity*": when applied to any Indebtedness at any date, the number of years obtained by dividing (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"*Will be able to pay their Liabilities as they mature*":  for the period from the Closing Date through the Latest Maturity Date, the Borrower and its Subsidiaries taken as a whole and after giving effect to the consummation of the Transactions will have sufficient assets, credit capacity and cash flow to pay their Liabilities as those Liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by the Borrower and its Subsidiaries as reflected in the projected financial statements and in light of the anticipated credit capacity.

"*Write-Down and Conversion Powers*":  (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.2**     **Other Definitional Provisions.**

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to the Borrower and its Subsidiaries not defined in **Section 1.1** and accounting terms partly defined in **Section 1.1**, to the extent not defined, shall have the respective meanings given to them under GAAP, (ii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," and (iii) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)     The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The term "license" shall include sub-license.  The term "documents" includes any and all documents whether in physical or electronic form.

(e)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(f)     Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

(g)     In connection with any action being taken in connection with a Limited Condition Acquisition, for purposes of determining compliance with any provision of this Agreement which requires that no Default, Event of Default or specified Event of Default, as applicable, has occurred, is continuing or would result from any such action, as applicable, at the option of the Borrower pursuant to an LCA Election such condition shall be deemed satisfied so long as no Default, Event of Default or specified Event of Default, as applicable, exists on the date the definitive agreements for such Limited Condition Acquisition are entered into after giving pro forma effect to such Limited Condition Acquisition and the actions to be taken in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if such Limited Condition Acquisition and other actions had occurred on such date. For the avoidance of doubt, if the Borrower has exercised its option under the first sentence of this **clause (g)**, and any Default or Event of Default occurs following the date the definitive agreements for the applicable Limited Condition Acquisition were entered into and prior to the consummation of such Limited Condition Acquisition, any such Default or Event of Default shall be deemed not to have occurred or be continuing solely for purposes of determining whether any action being taken in connection with such Limited Condition Acquisition is permitted hereunder.

60

(h)    In connection with any action being taken solely in connection with a Limited Condition Acquisition, for purposes of:

(i)    determining compliance with any provision of this Agreement which requires the calculation of the Consolidated Net Total Leverage Ratio or Financial Covenant Fixed Charge Coverage Ratio; or

(ii)    testing availability under baskets set forth in this Agreement (including baskets measured as a percentage of Consolidated Total Assets);

in each case, at the option of the Borrower (the Borrower's election to exercise such option in connection with any Limited Condition Acquisition, an "*LCA Election*"), the date of determination of whether any such action is permitted hereunder shall be deemed to be the date the definitive agreements for such Limited Condition Acquisition are entered into (the "*LCA Test Date*"), and if, after giving pro forma effect to the Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) as if they had occurred at the beginning of the most recent four consecutive fiscal quarters ending prior to the LCA Test Date for which consolidated financial statements of the Borrower are available, the Borrower could have taken such action on the relevant LCA Test Date in compliance with such ratio or basket, such ratio or basket shall be deemed to have been complied with.  For the avoidance of doubt, if the Borrower has made an LCA Election and any of the ratios or baskets for which compliance was determined or tested as of the LCA Test Date are exceeded as a result of fluctuations in any such ratio or basket, including due to fluctuations in Consolidated Total Assets of the Borrower or the Person subject to such Limited Condition Acquisition, at or prior to the consummation of the relevant transaction or action, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations.  If the Borrower has made an LCA Election for any Limited Condition Acquisition, then in connection with any subsequent calculation of any ratio or basket availability with respect to the incurrence of Indebtedness or Liens, or the making of Restricted Payments, mergers, the conveyance, lease or other transfer of all or substantially all of the assets of the Borrower, the prepayment, redemption, purchase, defeasance or other satisfaction of Indebtedness, or the designation of an Unrestricted Subsidiary on or following the relevant LCA Test Date and prior to the earlier of the date on which such Limited Condition Acquisition is consummated or the definitive agreement for such Limited Condition Acquisition is terminated or expires without consummation of such Limited Condition Acquisition, any such ratio or basket shall be calculated on a pro forma basis assuming such Limited Condition Acquisition and other transactions in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof) have been consummated; ***provided*** that the calculation of Consolidated Net Income (and any defined term a component of which is Consolidated Net Income) shall not include the Consolidated Net Income of the Person or assets to be acquired in any Limited Condition Acquisition for usages other than in connection with the applicable transaction pertaining to such Limited Condition Acquisition until such time as such Limited Condition Acquisition is actually consummated (**clauses (g)** and **(h)**, collectively, the "***Limited Condition Acquisition Provision***").

(i)    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

(j)    In this Agreement, (i) any term defined herein by reference to the UCC shall also have any extended, alternative or analogous meaning given to such term in applicable Canadian personal property security and other laws (including, without limitation, the PPSA, the Bills of Exchange Act (Canada) and

the Depository Bills and Notes Act (Canada)), in all cases for the extension, preservation or betterment of the security and rights of the Administrative Agent, (ii) all references in this Agreement to a financing statement, continuation statement, amendment or termination statement shall be deemed to refer also to the analogous documents used under applicable Canadian personal property security laws, (iii) all references to the United States of America, or to any subdivision, department, agency or instrumentality thereof shall be deemed to refer also to Canada, or to any subdivision, department, agency or instrumentality thereof, (iv) all references to federal or state securities law of the United States shall be deemed to refer also to analogous federal, provincial and territorial securities laws in Canada, (v) all references to "state or federal bankruptcy laws" shall be deemed to refer also to any bankruptcy or insolvency laws in effect in Canada or under Canadian law, (vi) all calculations of collateral values and Dollar amounts which utilize amounts expressed in Canadian Dollars shall be made using the Dollar Equivalent in Dollars of such Canadian Dollar amounts in accordance with the Administrative Agent's customary banking and conversion practices and procedures; and (vii) all references to Liens shall be deemed to refer also to hypothecs.

(k)    For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any other Loan Document) and for all other purposes pursuant to which the interpretation or construction of a Loan Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest" and "mortgage" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the UCC or the PPSA or otherwise shall be deemed to include publication under the Civil Code of Québec, (vii) all references to "perfection of" or "perfected" Liens shall be deemed to include a reference to the "opposability" of such Liens to third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (x) an "agent" shall be deemed to include a "mandatary", (xi) "joint and several" shall be deemed to include "solidary", (xii) "gross negligence or willful misconduct" shall be deemed to be "intentional or gross fault", (xiii) "beneficial ownership" shall be deemed to include "ownership on behalf of another as mandatary", (xiv) "easement" shall be deemed to include "servitude", (xv) "survey" shall be deemed to include "certificate of location and plan", and (xvi) "fee simple title" shall be deemed to include "absolute ownership". The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated hereunder or relating hereto, including notices, may also be drawn up in the English language only. Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en la langue anglaise seulement.

1.3    **Pro Forma Calculations.**  (i) Any calculation to be determined on a "pro forma" basis, after giving "pro forma" effect to certain transactions or pursuant to words of similar import and (ii) the Consolidated Net Total Leverage Ratio and the Financial Covenant Fixed Charge Coverage Ratio, in each case, shall be calculated as follows (subject to the provisions of **Section 1.2**):

(a)    for purposes of making the computation referred to above, in the event that the Borrower or any of its Restricted Subsidiaries incurs, assumes, guarantees, redeems, retires, defeases or extinguishes any Indebtedness or enters into, terminates or cancels a Qualified Contract, other than the completion thereof in accordance with its terms, subsequent to the commencement of the period for which such ratio is being calculated but on or prior to or substantially concurrently with or for the purpose of the event for which the calculation is made (a "***Calculation Date***"), then such calculation shall be made giving pro forma effect to such incurrence, assumption, guarantee, redemption, retirement, defeasance or extinguishment of

62

Indebtedness or entry into, termination or cancellation of such Qualified Contract (other than the completion thereof in accordance with its terms) as if the same had occurred at the beginning of the applicable Test Period; ***provided***, that the aggregate amount of revenues (and related assets) included in such pro forma calculation for any Test Period pursuant to this **clause 1.3(a)** with respect to Qualified Contracts shall not exceed $50,000,000 in revenues (and any such related assets); ***provided, further***, that for purposes of making the computation of Consolidated Net Total Leverage or Fixed Charges for the computation of the Consolidated Net Total Leverage Ratio, Financial Covenant Fixed Charge Coverage Ratio, Consolidated Net Total Leverage or Fixed Charges, as applicable, shall be Consolidated Net Total Leverage or Fixed Charges as of the date the relevant action is being taken giving pro forma effect to any redemption, retirement or extinguishment of Indebtedness in connection with such event; and

(b)     for purposes of making the computation referred to above, if any Investments (including the Transactions), brand acquisitions, Dispositions or designations of Unrestricted Subsidiaries or Restricted Subsidiaries are made (or committed to be made pursuant to a definitive agreement) subsequent to the commencement of the period for which such calculation is being made but on or prior to or simultaneously with the relevant Calculation Date, then such calculation shall be made giving pro forma effect to such Investments, brand acquisitions, Dispositions or designations as if the same had occurred at the beginning of the applicable Test Period in a manner consistent, where applicable, with the pro forma adjustments set forth in **clause (o)** of the definition of "Consolidated Net Income". If since the beginning of such period any Person that subsequently became a Restricted Subsidiary or was merged or amalgamated with or into the Borrower or any of its Restricted Subsidiaries since the beginning of such period shall have made any Investment, brand acquisitions or Disposition that would have required adjustment pursuant to this provision, then such calculation shall be made giving pro forma effect thereto for such Test Period as if such Investment, brand acquisitions or Disposition had occurred at the beginning of the applicable Test Period.

**1.4     Exchange Rates; Currency Equivalents**.  The Administrative Agent shall determine the Spot Rates as of each Revaluation Date to be used for calculating Dollar Equivalent amounts of any component of the Borrowing Base.  Such Spot Rates shall become effective as of such Revaluation Date and shall be the Spot Rates employed in converting any amounts between the applicable currencies until the next Revaluation Date to occur.  The Administrative Agent shall notify the Borrower on each Revaluation Date of the Spot Rates determined by it.  Solely for purposes of Section II and related definitional provisions to the extent used in such Section, the applicable amount of any currency (other than Dollars) for purposes of the Loan Documents shall be such Dollar Equivalent amount as so determined by the Administrative Agent and notified to the Borrower in accordance with this **Section 1.4**.  If any basket is exceeded solely as a result of fluctuations in applicable currency exchange rates after the last time such basket was utilized, such basket will not be deemed to have been exceeded solely as a result of such fluctuations in currency exchange rates.  For purposes of determining the Consolidated Net Total Leverage Ratio and the Financial Covenant Fixed Charge Coverage Ratio, amounts denominated in a currency other than Dollars will be converted to Dollars for the purposes of calculating the Consolidated Net Total Leverage Ratio and the Financial Covenant Fixed Charge Coverage Ratio, at the Spot Rate as of the date of calculation, and will, in the case of Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of Hedge Agreements permitted hereunder for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar Equivalent of such Indebtedness.

**1.5     [Reserved]**.

**1.6     Covenants**.  For purposes of determining compliance with **Section 7** (other than **Section 7.6** or **Section 7.2(aa)**), in the event that an item or event (or any portion thereof) meets the criteria of one or more of the categories described in a particular covenant contained in **Section 7** (other than **Section 7.6**

or **Sections 7.2(i)** or **7.2(aa)**), the Borrower may, in its sole discretion, classify and reclassify or later divide, classify or reclassify (as if incurred at such later time) such item or event (or any portion thereof) and may include the amount and type of such item or event (or any portion thereof) in one or more of the relevant clauses or subclauses, in each case, within such covenant and will be entitled to include such item or event (or any portion thereof) only in one of the relevant clauses or subclauses (or any portion thereof).  In the case of an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that does not rely on criteria based on the Financial Covenant Fixed Charge Coverage Ratio (any such item or event, a "*Fixed Basket Item or Event*" and any such clause, subclause or any portion thereof, a "*Fixed Basket*") substantially concurrently with an item or event (or any portion thereof) that is incurred pursuant to or otherwise included in a clause or subclause (or any portion thereof) of a covenant that relies on criteria based on such financial ratios or tests (any such item or event, a "*Ratio Basket Item or Event*" and any such clause, subclause or any portion thereof, a "*Ratio Basket*"), such Ratio Basket Item or Event shall be treated as having been incurred or existing pursuant only to such Ratio Basket without giving pro forma effect to any such Fixed Basket Item or Event (other than a Fixed Basket Item or Event that relies on the term "Permitted Refinancing") incurred pursuant to or otherwise included in a Fixed Basket substantially concurrently with such Ratio Basket Item or Event when calculating the amount that may be incurred or existing pursuant to any such Ratio Basket. Furthermore, (A) for purposes of **Section 7.2**, the amount of any Indebtedness denominated in any currency other than Dollars shall be calculated based on the applicable Spot Rate, in the case of such Indebtedness incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness), on the date that such Indebtedness was incurred (in respect of funded term Indebtedness) or committed (in respect of revolving or delayed draw Indebtedness); *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a currency other than Dollars (or in a different currency from the Indebtedness being refinanced), and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the applicable Spot Rate on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed (i) the outstanding or committed principal amount, as applicable, of such Indebtedness being refinanced plus (ii) the aggregate amount of accrued interest, fees, underwriting discounts, premiums and other costs and expenses incurred in connection with such refinancing, (B) for purposes of **Sections 7.3**, **7.5**, **7.6** and **7.7**, the amount of any Liens, Dispositions, Restricted Payments and Investments, as applicable, denominated in any currency other than Dollars shall be calculated based on the applicable Spot Rate, (C) for purposes of any calculation under **Sections 7.2** and **7.3**, if the Borrower elects to give pro forma effect in such calculation to the entire committed amount of any proposed Indebtedness, whether or not then drawn, such committed amount may thereafter be borrowed and reborrowed, in whole or in part, from time to time, without further compliance with **Section 7.2** or **7.3**, but for so long as such Indebtedness is outstanding or in effect, the entire committed amount of such Indebtedness then in effect shall be included in any calculations under **Sections 7.2** and **7.3**, (D) any cash proceeds of Indebtedness shall be excluded as Unrestricted Cash and netted for purposes of calculating any financial ratios and tests with respect to any substantially concurrent incurrence of a Ratio Basket Item or Event pursuant to a Ratio Basket and (E) any Fixed Basket Item or Event incurred pursuant to or otherwise included pursuant to a Fixed Basket based on Consolidated Total Assets shall be calculated based upon the Consolidated Total Assets at the time of such incurrence (it being understood that a Default shall be deemed not to have occurred solely to the extent that the Consolidated Total Assets after the time of such incurrence declines).

1.7    **Interest Rates**.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate

(including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Adjusted Term SOFR Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR Rate or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## SECTION II.
## AMOUNT AND TERMS OF COMMITMENTS

**2.1**    **[reserved]**.

**2.2**    **[reserved]**.

**2.3**    **[reserved]**.

**2.4**    **Revolving Commitments**.

(a)    **Revolving Loans**

(i)    Subject to the terms and conditions hereof, each Revolving Lender severally agrees to make revolving credit loans in Dollars ("***Revolving Loans***") to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's other Revolving Loans then outstanding, does not exceed the amount of such Lender's Revolving Commitment; ***provided*** that after giving effect to the making and the use of proceeds thereof, the aggregate Revolving Loans shall not exceed the Availability then in effect.

(ii)    During the Revolving Commitment Period, the Borrower may use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.

(iii)    Notwithstanding anything to the contrary herein, prior to the date on which financial statements are delivered or required to be delivered pursuant to **Section 6.1(b)** for the fiscal quarter ended June 30, 2023, the Borrower shall not permit Excess Availability to be less than $35,000,000.

(iv)    The Revolving Loans may from time to time be SOFR Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with **Sections 2.5** and **2.13**.

(b)    [reserved]

(c)        [reserved]

(d)        Notwithstanding the provisions set forth in **Section 2.10**, **Section 2.11** and **Section 2.12** each of which shall not apply to repayments or terminations of Loans or Commitments pursuant to this **Section 2.4(d)**, the Borrower shall repay all outstanding Revolving Loans on the Revolving Termination Date.  For the avoidance of doubt, unless terminated earlier, all Revolving Commitments shall automatically terminate on the Revolving Termination Date with respect to the Facility.

2.5      **Procedure for Borrowing**.

(a)        The Borrower may borrow under the applicable Revolving Commitments during the applicable Revolving Commitment Period on any Business Day; ***provided*** that the Borrower shall give the Administrative Agent irrevocable written notice (which notice must be received by the Administrative Agent in the case of SOFR Loans denominated in Dollars, prior to 12:00 Noon, New York City time, three (3) Business Days prior to the requested Borrowing Date, or in the case of ABR Loans up to $40,000,000, prior to 10:00 a.m., New York City time, on the proposed Borrowing Date, or in the case of ABR Loans in excess of $40,000,000, prior to 1:00 p.m., New York City time, one Business Day prior to the proposed Borrowing Date or, in each case, such later time as the Administrative Agent may agree), specifying (w) the amount and Type of Loans to be borrowed, (x) the requested Borrowing Date, and (y) in the case of SOFR Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor.

 Each borrowing by the Borrower under the Revolving Commitments shall be in an amount equal to (x) in the case of ABR Loans, $250,000 or a whole multiple of $100,000 in excess thereof (or, if the then aggregate Available Revolving Commitments of Revolving Lenders are less than $250,000, such lesser amount) and (y) in the case of SOFR Loans, $1,000,000 or a whole multiple of $100,000 in excess thereof; provided however, the Borrowing by the Borrower under the Revolving Commitments on the Closing Date shall be in an amount not less than $25,000,000.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each applicable Lender thereof.  Each applicable Lender will make the amount of its **pro rata** share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 3:00 p.m., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent.  Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account designated in writing by the Borrower to the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by such Lenders and in like funds as received by the Administrative Agent.  If no election as to the Type of a Loan is specified, then the requested Loan shall be an ABR Loan.  If no Interest Period is specified with respect to any requested SOFR Loan, the Borrower shall be deemed to have selected an Interest Period of one month's duration.

2.6      **Maturity Extension**.

(a)        Subject to the conditions set forth in paragraph (b) below, the Borrower shall have the option (the "***Facility Extension Option***") by written notice to the Administrative Agent and the Lenders to extend the Stated Maturity Date then in effect hereunder for the Facility (any such date, the "***Existing Maturity Date***") to be the date that is one year after the Existing Maturity Date (any such date, the "***Extended Maturity Date***"); ***provided*** that (i) such notice must be received by the Administrative Agent and the Lenders no later than 60 days prior to the Existing Maturity Date and (ii) the Borrower shall not be permitted to submit more than two such requests.

(b)        The extension of the Facility Extension Option by the Borrower shall be subject to satisfaction of the following conditions:

(i)        the Borrower shall pay the Extension Fee on or prior to the Existing Maturity Date;

(ii)       the Borrower shall have been in compliance with a Consolidated Net Total Leverage Ratio not exceeding 4.50:1.00 for the most recently ended Test Period prior to the Existing Maturity Date;

(iii)      the Borrower shall have been in compliance with a Financial Covenant Fixed Charge Coverage Ratio of at least 1.20 to 1.00 for the most recently ended Test Period prior to the Existing Maturity Date;

(iv)      no Default or Event of Default shall have occurred and be continuing on the Existing Maturity Date before or after giving effect to the exercise of the Facility Extension Option;

(v)       each of the representations and warranties made by any Loan Party in or pursuant to any of the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) as of the Existing Maturity Date except to the extent that such representations and warranties expressly relate to an earlier date or period, in which case such representations and warranties shall have been true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) as of such earlier date or respective period; and

(vi)      the Borrower shall have delivered to the Administrative Agent a certificate, dated the Existing Maturity Date and signed by a Responsible Officer of the Borrower, confirming compliance with the conditions set forth in **clauses (ii)**-**(v)** above.

**2.7**    **Defaulting Lenders**.

(a)       **Defaulting Lender Cure**.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Facility, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(b)       **Defaulting Lender Waterfall**.  Any payment of principal, interest or other amounts (other than the payment of (i) unused line fees under **Section 2.9** and (ii) default interest under **Section 2.15(c)**, which in each case shall be applied pursuant to the provisions of those Sections) received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 8** or otherwise) shall be applied by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent pursuant to **Section 9.7**; *second*, as the Borrower may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released in order to satisfy such Defaulting Lender's potential future funding obligations with

respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default exists, to the payment of any amounts owing to the Borrower as a result of any final non-appealable judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided*, that if (x) such payment is a payment of the principal amount of each Revolving Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in **Section 5.2** were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Facility.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender and shall satisfy the Borrower's payment obligation in respect thereof in full, and each Lender irrevocably consents hereto.

   **2.8**    **Repayment of Loans**.

   (a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Lender  the then unpaid principal amount of each Revolving Loan of such Revolving Lender made to the Borrower outstanding on the applicable Revolving Termination Date (or on such earlier date on which the Loans become due and payable pursuant to **Section 8.1**). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans made to the Borrower from time to time outstanding from the date made until payment in full thereof at the rates per annum, and on the dates, set forth in **Section 2.15**.

   (b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest (based on the applicable interest rate and Interest Period) payable and paid to such Lender from time to time under this Agreement.

   (c)    **Register.**  The Administrative Agent, on behalf of the Borrower, shall maintain a Register pursuant to **Section 10.6(b)(iv)**, and a subaccount therein for each Revolving Lender in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal, stated interest and fees, as applicable, due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.  For the avoidance of doubt, in the event of any conflict between the Register and the records maintained by any Revolving Lender, the Register shall control.

   (d)    The entries made in the Register and the accounts of each Lender maintained pursuant to **Section 2.8(c)** shall, to the extent permitted by applicable law, be presumptively correct absent demonstrable error of the existence and amounts of the obligations of the Borrower therein recorded; *provided*, *however*, that the failure of the Administrative Agent or any Lender to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

   (e)    The Company hereby irrevocably waives the right to direct, during a Cash Dominion Period or at any time an Event of Default has occurred and is continuing, the application of all funds in any

Approved Deposit Account and agrees that the Administrative Agent may (in its sole discretion exercised reasonably) and, upon the written direction of the Required Lenders given at any time during such Cash Dominion Period, shall exercise its applicable rights under any Deposit Account Control Agreement (including providing any notices of blockage or control) for each Approved Deposit Account and apply all available funds in any Approved Deposit Account, but in each case without a permanent reduction of Revolving Commitments, on a daily basis (but only so long as such Cash Dominion Period or Event of Default, as the case may be, is continuing) as follows:

> *first*, to repay the outstanding principal amount of any outstanding Protective Advances;

> *second*, to repay the outstanding principal balance of the Revolving Loans until such Revolving Loans shall have been repaid in full and all amounts owing to any Revolving Lender and the Administrative Agent in respect of the Facility.

The Administrative Agent agrees to use its commercially reasonable efforts to apply such funds in accordance with this **Section 2.8(e)**, and the Company consents to such application.  If no Cash Dominion Period or Event of Default shall be continuing, the Administrative Agent shall not exercise control rights under the Deposit Account Control Agreements and shall, upon receipt of three (3) Business Days' prior written notice and a certificate of a Responsible Officer of the Company that no Cash Dominion Period or Event of Default is continuing, cease any enforcement measures in respect of Approved Deposit Accounts in effect at such time, including blockage, dominion or the withdrawal of all notices, instructions or directions provided to any Deposit Account Bank thereunder.  For the avoidance of doubt, funds used to reduce outstanding amounts may be reborrowed, subject to satisfaction of the conditions set forth in **Section 5.2**.

### 2.9    **Unused Line Fees, etc.**

(a)    **Unused Line Fee**

(i)    The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender an unused line fee (the "*Unused Line Fee*"), in Dollars, for the period from and including the Closing Date to the last day of the Revolving Commitment Period (or, if earlier, the termination of all Revolving Commitments), computed at the Unused Line Fee Rate on the actual daily amount of the Available Revolving Commitment (but solely with respect to such Revolving Lender's Revolving Commitment and Revolving Loans) of such Revolving Lender during the period for which payment is made, payable quarterly in arrears on the later of (x) each Fee Payment Date and (y) the date that is two (2) Business Days after the Borrower's receipt from the Administrative Agent of documentation supporting the calculation of such Unused Line Fee; ***provided***, that, the Minimum Deemed Principal Amount shall not be included in the calculation of the Available Revolving Commitment even if such amount is undrawn; ***provided further***, that (A) any Unused Line Fee accrued with respect to any of the Revolving Commitments of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrower so long as such Lender shall be a Defaulting Lender except to the extent that such Unused Line Fee shall otherwise have been due and payable by the Borrower prior to such time and (B) no Unused Line Fee shall accrue on any of the Revolving Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(b)    The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent (including, for the avoidance of doubt, the Fee Letter).

**2.10**    **Termination or Reduction of Commitments**.

(a)    **Reduction of Commitments**

Subject to **Section 2.29** hereof, the Borrower shall have the right, upon not less than two (2) Business Days' notice to the Administrative Agent, to terminate the Revolving Commitments; **provided** that (except as otherwise expressly provided herein) no such termination or reduction of Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans made on the effective date thereof, the total Revolving Loans would exceed the total Revolving Commitments.

Any such partial reduction shall be in an amount equal to $500,000, or a whole multiple of $100,000 in excess thereof, and shall reduce permanently the Revolving Commitments then in effect. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of termination or reduction under this **Section 2.10** if the notice of such termination or reduction stated that such notice was conditioned upon the occurrence or non-occurrence of a transaction or the receipt of a replacement of all, or a portion, of the Revolving Commitments outstanding at such time, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified date) if such condition is not satisfied.

**2.11**    **Optional Prepayments**.

(a)    The Borrower may at any time and from time to time prepay Revolving Loans, in whole or in part, without premium or penalty, upon irrevocable written notice delivered to the Administrative Agent no later than 12:00 Noon, New York City time,

(i)    three (3) Business Days prior thereto, in the case of SOFR Loans, and

(ii)    on the date of prepayment, in the case of ABR Loans, which notice shall specify (x) the date and amount of prepayment, and (y) whether the prepayment is of SOFR Loans or ABR Loans; **provided**, that if a SOFR Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to **Section 2.21**.

Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein (**provided**, that any such notice may state that such notice is conditioned upon the occurrence or non-occurrence of any transaction or the receipt of proceeds to be used for such payment, in each case specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied), together with (except in the case of Revolving Loans that are ABR Loans) accrued interest to such date on the amount prepaid. Partial prepayments of Revolving Loans shall be in an aggregate principal amount of (i) $100,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of ABR Loans) or (ii) $1,000,000 or a whole multiple of $100,000 in excess thereof (in the case of prepayments of SOFR Loans), and in each case shall be subject to the provisions of **Section 2.18**.

(b)    Prepayments under this **Section 2.11** shall be applied,

*first*, to prepay any Protective Advances, and

*second*, to prepay the Revolving Loans and all other amounts owing to any Revolving Lender and the Administrative Agent in respect of the Facility.

**2.12**   **Mandatory Prepayments**.

(a)      To the extent remaining after any prepayments therefrom pursuant to the terms of the Term Loan Agreement and any other Indebtedness intended to be secured by the Term Facility First Priority Collateral on a senior basis to the Liens securing the Obligations, and unless the Required Lenders shall otherwise agree, if any Indebtedness (excluding any Indebtedness permitted to be incurred in accordance with **Section 7.2**) shall be incurred by the Borrower or any Restricted Subsidiary, an amount equal to the lesser of (i) 100% of the Net Cash Proceeds thereof and (ii) the outstanding principal amount of Revolving Loans then outstanding, shall be applied not later than one (1) Business Day after the date of receipt of such Net Cash Proceeds toward the prepayment of the Revolving Loans without a corresponding reduction in the Revolving Commitments, as directed by the Borrower.

(b)      **Prepayments of Loans**

(i)      If, on any date, the aggregate Revolving Loans exceed the Availability at such time (an "*Overadvance*"), the Borrower shall promptly prepay (without a corresponding reduction in the Revolving Commitments) the Revolving Loans to the Administrative Agent, in an aggregate principal amount equal to such excess (such excess, the "*Overadvance Amount*"); *provided*, that if a prepayment pursuant to this **Section 2.12(b)(i)** is required, the Borrower or any Restricted Subsidiary may instead deposit, or cause to be deposited, Qualified Cash in an amount equal to the Overadvance Amount within one (1) Business Day of the determination of such Overadvance, and upon receipt of such Qualified Cash in the applicable Deposit Account, the Borrowing Base shall be recalculated giving a dollar-for-dollar effect to such Qualified Cash to determine if such Overadvance still exists.

(ii)      If, on any date on or after the Closing Date on which Excess Availability is less than 50% of the Borrowing Base in effect at such time, the aggregate amount of cash or Cash Equivalents of Holdings and its Subsidiaries ((x) other than Specified Excluded Cash and (y) based on closing balances on the immediately preceding Business Day) exceeds the Specified Cash Limit, the Borrower shall promptly (A) make payments (other than to Holdings and its Subsidiaries) not prohibited by this Agreement in an amount equal to such excess, or (B) repay (without a corresponding reduction in the Revolving Commitments) the Revolving Loans to the Administrative Agent in an aggregate principal amount equal to the lesser of (i) such excess and (ii) the aggregate principal of any Revolving Loans outstanding.

(c)      Amounts to be applied in connection with prepayments of Loans pursuant to this **Section 2.12** shall be applied,

*first*, to prepay any Protective Advances, and

*second*, to prepay the Revolving Loans and all other amounts owing to any Revolving Lender and the Administrative Agent in respect of the Facility.  Each prepayment of Revolving Loans under this **Section 2.12** shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

**2.13**   **Conversion and Continuation Options**.

(a)       The Borrower may elect from time to time to convert SOFR Loans made to the Borrower to ABR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the Business Day preceding the proposed conversion date; *provided*, that if any such SOFR Loan is so converted on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to **Section 2.21**.  The Borrower may elect from time to time to convert ABR Loans made to the Borrower to SOFR Loans by giving the Administrative Agent prior irrevocable written notice of such election no later than 12:00 Noon, New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor); *provided*, that no such ABR Loan under a particular Facility may be converted into a SOFR Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions.   Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  This **Section 2.13** shall not apply to Protective Advances, which may not be converted or continued.

(b)       Any SOFR Loan may be continued as such by the Borrower giving irrevocable written notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in **Section 1.1** and no later than 12:00 Noon, New York City time, on the third (3) Business Day preceding the proposed continuation date, of the length of the next Interest Period to be applicable to such Loans; *provided*, that if any such SOFR Loan is so continued on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to **Section 2.21**; *provided*, *further*, that no such SOFR Loan under a particular Facility may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations; *provided*, *further*, that (i) if the Borrower shall fail to give any required notice as described above in this paragraph such SOFR Loans shall be automatically continued as SOFR Loans having an Interest Period of one month's duration on the last day of such then-expiring Interest Period and (ii) if such continuation is not permitted pursuant to the preceding proviso, such SOFR Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.

### 2.14    <u>Minimum Amounts and Maximum Number of SOFR Tranches</u>.

Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of SOFR Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that

(a)       after giving effect thereto, the aggregate principal amount of the SOFR Loans comprising each SOFR Tranche shall be equal to $1,000,000 or a whole multiple of $100,000 in excess thereof, and

(b)       no more than six SOFR Tranches of Revolving Loans.

### 2.15    <u>Interest Rates and Payment Dates</u>.

(a)       Each SOFR Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Term SOFR Rate determined for such day *plus* the Applicable Margin.

(b)       Each ABR Loan shall bear interest at a rate per annum equal to the ABR *plus* the Applicable Margin.

(c)        (i) If all or a portion of the principal amount of any Loan or any interest payable on any Loan shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to  the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this **Section 2.15** *plus* 2.00% and (ii) if all or a portion of any Unused Line Fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to ABR Loans *plus* 2.00%, in each case, with respect to **clauses (i)** and **(ii)** above, from the date of such nonpayment until such amount is paid in full (after as well as before judgment); *provided*, that no amount shall be payable pursuant to this **Section 2.15(c)** to a Defaulting Lender so long as such Lender shall be a Defaulting Lender; *provided*, *further*, that no amounts shall accrue pursuant to this **Section 2.15(c)** on any overdue Loan, Unused Line Fee or other amount payable to a Defaulting Lender so long as such Lender shall be a Defaulting Lender.

(d)        Interest shall be payable by the Borrower in arrears on each Interest Payment Date; *provided*, that interest accruing pursuant to **paragraph (c)** of this **Section 2.15** shall be payable from time to time on demand.

(e)        Notwithstanding anything to the contrary in this Agreement (including any prepayment of Revolving Loans pursuant to **Section 2.10** or **Section 2.11**), from and after August 2, 2023, interest shall accrue on each day in accordance with this **Section 2.15** with respect to the greater of (x) the aggregate principal amount of Revolving Loans outstanding on such date and (y) $75,000,000, or such lesser amount as the Required Lenders agree in their sole discretion (the "*Minimum Deemed Principal Amount*").

(f)        [reserved].

(g)        [reserved].

**2.16    Computation of Interest and Fees**.

(a)        Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that interest on ABR Loans (except for ABR computations in respect of **clauses (b)** and **(c)** of the definition thereof) shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of the Adjusted Term SOFR Rate. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)        Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct in the absence of demonstrable error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to **Section 2.15(a)** and **Section 2.15(b)(i)**.

**2.17    Benchmark Replacement Setting; Inability to Determine Interest Rate**.

(a)        **Benchmark Replacement Setting**

(i)        Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior to any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with **clause (1)** of the definition of

"Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with **clause (2)** of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any such Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders. If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(ii)    Benchmark Replacement Conforming Changes.    In connection with the use, administration, adoption or implementation of any Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)    Notices; Standards for Decisions and Determinations.    The Administrative Agent will promptly notify the Borrower and the applicable Lenders of (w) the implementation of any Benchmark Replacement, (x) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement, (y) the removal or reinstatement of any tenor of a Benchmark pursuant to **clause (iv)** below and (z) the commencement of any Benchmark Unavailability Period. For the avoidance of doubt, any notice required to be delivered by the Administrative Agent as set forth in this **Section 2.17(a)** may be provided, at the option of the Administrative Agent (in its sole discretion), in one or more notices and may be delivered together with, or as part of any amendment which implements any Conforming Changes. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this **Section 2.17(a)**, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this **Section 2.17(a)**.

(iv)    Unavailability of Tenor of Benchmark.    Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (x) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (y) if a tenor that was removed pursuant to clause (x) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a

74

Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will no longer be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)    Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, to the extent a component of ABR is based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, such Benchmark or tenor will not be used in any determination of ABR.

(vi)    Disclaimer. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to (w) the administration, submission or any other matter related to the "Term SOFR Reference Rate", "Term SOFR" or with respect to any alternative or successor rate thereto, or replacement rate thereof (including, without limitation any Benchmark Replacement implemented hereunder), (x) the composition or characteristics of any such Benchmark Replacement, including whether it is similar to, or produces the same value or economic equivalence to Term SOFR or any other then-current Benchmark or have the same volume or liquidity as did Term SOFR or any other then-current Benchmark, (y) any actions or use of its discretion or other decisions or determinations made with respect to any matters covered by this **Section 2.17(a)** including, without limitation, whether or not a Benchmark Transition Event has occurred, the removal or lack thereof of unavailable or non-representative tenors, the implementation or lack thereof of any Conforming Changes, the delivery or non-delivery of any notices required by **clause (iii)** above or otherwise in accordance herewith, and (z) the effect of any of the foregoing provisions of this **Section 2.17(a)**.

(b)    Subject to **clause (a)** of this **Section 2.17**, if, on or prior to the first day of any Interest Period for any SOFR Loan, (i) the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof, or (ii) the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that the Adjusted Term SOFR Rate for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent, then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender. Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (ii), at the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (A) the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period.  Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.21. Subject to clauses (a)(ii) through (a)(vi) of this

Section 2.17, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that the "Adjusted Term SOFR Rate" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR" until the Administrative Agent revokes such determination.

**2.18** **Pro Rata Treatment and Payments**.

(a)    **Borrowings, Unused Line Fees and Reduction of Commitments**.

Except as expressly otherwise provided herein (including as expressly provided in **Sections 2.4**, **2.7**, **2.9**, **2.12**, **2.15(c)**, **2.19**, **2.20**, **2.21**, **2.22**, **2.24**, **10.5**, **10.6** and **10.7**), each borrowing by the Borrower from the Revolving Lenders hereunder, each payment by the Borrower on account of the Unused Line Fee and any reduction of the Revolving Commitments shall be made **pro rata** according to the Revolving Percentages of the relevant Revolving Lenders other than reductions of Revolving Commitments pursuant to **Section 2.24**.

(b)    **Principal and Interest**.

Except  as expressly otherwise provided herein (including as expressly provided in **Sections 2.7**, **2.10(b)**, **2.11**, **2.12**, **2.15(c)**, **2.19**, **2.20**, **2.21**, **2.22**, **2.24**, **10.5**, **10.6** and **10.7**), each payment (including prepayments) to be made by the Borrower on account of principal of and interest on the Revolving Loans shall be made **pro rata** according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders.

(c)    All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees, the Applicable Premium, or otherwise shall be made without setoff, deduction or counterclaim and shall be made prior to 3:00 p.m., New York City time, on the due date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Funding Office, in immediately available funds.  Any payment received by the Administrative Agent after 3:00 p.m., New York City time may be considered received on the next Business Day in the Administrative Agent's sole discretion.  The Administrative Agent shall distribute such payments to the relevant Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the SOFR Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a SOFR Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.  During any Cash Dominion Period, solely for purposes of determining the amount of Loans available for borrowing purposes, checks (in addition to immediately available funds applied pursuant to **Section 2.8(e)**) from collections of items of payment and proceeds of any ABL Facility First Priority Collateral shall be applied in whole or in part against the applicable Obligations on the Business Day of receipt, subject to actual collection.   Notwithstanding anything to the contrary, to the extent the Administrative Agent receives a payment or other amount after the date such payment or other amount is due, the Administrative Agent, in its sole discretion, may distribute such payment or other amount to the relevant Lender of record (or other Person of record entitled to such payment) as of the date such payment or other amount is received by the Administrative Agent.

(d)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing

available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be presumptively correct in the absence of demonstrable error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three (3) Business Days after such Borrowing Date, the Administrative Agent shall give notice of such fact to the Borrower and the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrower. Nothing herein shall be deemed to limit the rights of the Administrative Agent or the Borrower against any Defaulting Lender.

(e)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the relevant Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each relevant Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

### 2.19    Requirements of Law.

(a)    Except with respect to Indemnified Taxes, Excluded Taxes and Other Taxes, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority first made, in each case, subsequent to the Closing Date:

(i)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by any office of such Lender that is not otherwise included in the determination of the Adjusted Term SOFR Rate hereunder;

(ii)    shall subject any Recipient to any Taxes on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liability or capital attributable thereto; or

(iii)    shall impose on such Lender any other condition not otherwise contemplated hereunder;

and the result of any of the foregoing is to increase the cost to such Lender or other Recipient, by an amount which such Lender or other Recipient reasonably deems to be material, of making, converting into,

continuing or maintaining SOFR Loans (in each case hereunder), or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, in Dollars, within thirty (30) Business Days after the Borrower's receipt of a reasonably detailed invoice therefor (showing with reasonable detail the calculations thereof), any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this **Section 2.19**, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)    If any Lender shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any entity controlling such Lender with any request or directive regarding capital adequacy or liquidity requirements (whether or not having the force of law) from any Governmental Authority first made, in each case, subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such entity's capital as a consequence of its obligations hereunder to a level below that which such Lender or such entity could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such entity's policies with respect to capital adequacy or liquidity requirements) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a reasonably detailed written request therefor (consistent with the detail provided by such Lender to similarly situated borrowers), the Borrower, shall pay to such Lender, in Dollars, such additional amount or amounts as will compensate such Lender or such entity for such reduction.

(c)    [reserved].

(d)    A certificate prepared in good faith as to any additional amounts payable pursuant to this **Section 2.19** submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of demonstrable error.  Notwithstanding anything to the contrary in this **Section 2.19**, the Borrower shall not be required to compensate a Lender pursuant to this **Section 2.19** for any amounts incurred more than 180 days prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; ***provided***, that if the circumstances giving rise to such claim have a retroactive effect, then such 180-day period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this **Section 2.19** shall survive the termination of this Agreement and the payment of the Obligations.  Notwithstanding the foregoing, the Borrower shall not be obligated to make payment to any Lender with respect to penalties, interest and expenses if written demand therefor was not made by such Lender within 180 days from the date on which such Lender makes payment for such penalties, interest and expenses.

(e)    Notwithstanding anything in this **Section 2.19** to the contrary, solely for purposes of this **Section 2.19**, (i) the Dodd Frank Wall Street Reform and Consumer Protection Act, and all requests, rules, regulations, guidelines and directives promulgated thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have been enacted, adopted or issued, as applicable, subsequent to the Closing Date.

### 2.20    Taxes.

(a)    Except as otherwise provided in this Agreement or as required by law, all payments made by or on account of the Borrower or any Loan Party under this Agreement and the other Loan Documents to any Recipient under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes.  If any Indemnified Taxes or Other Taxes are required to be deducted or

withheld from any such payments, the amounts so payable to the applicable Recipient shall be increased to the extent necessary so that after deduction or withholding of such Indemnified Taxes and Other Taxes (including Indemnified Taxes attributable to amounts payable under this **Section 2.20(a)**) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    In addition, the Borrower or any Loan Party under this Agreement and the other Loan Documents shall pay, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Whenever any Taxes are payable by the Borrower and any Loan Party under this Agreement and the other Loan Documents, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the Administrative Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower or Loan Party showing payment thereof if such receipt is obtainable, or, if not, such other evidence of payment as may reasonably be required by the Administrative Agent or such Lender.    The Borrower and each Loan Party under this Agreement and the other Loan Documents shall indemnify each Recipient, within ten days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes, including any amounts payable pursuant to **Section 2.20(a)**, and for any Indemnified Taxes that become payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower or Loan Party by a Lender  (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    [reserved]

(e)    Each Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, each Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup or similar withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the clause (A) of the following sentence, **Section 2.20(g)**, and **Section 2.20(j)**) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.  Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "*Non-US Lender*") shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) on or about the date on which such Lender become a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers and the Administrative Agent) (A) (i) two properly completed and duly executed copies of (x) IRS Form W-8ECI, or (y) IRS Form W-8BEN or W-8BEN-E (with respect to payments of interest under any Loan Document, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and with respect to any other applicable payments under any Loan Document,

establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty, as applicable, (ii) in the case of a Non-US Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of **Exhibit F-1** or **F-2**, as applicable and two properly completed and duly executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, in each case, claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on all payments by the Borrower or any Loan Party under this Agreement and the other Loan Documents, or (iii) to the extent a Non-US Lender is not the beneficial owner, two properly completed and duly executed copies of IRS Form W-8IMY and all necessary attachments (including the forms and statements described in **clauses (i)** and **(ii)** above, *provided* that if the Non-US Lender is a partnership, and one or more of the partners is claiming portfolio interest treatment, the certificate in the form of **Exhibit F-3** or **F-4**, as applicable, may be provided by such Non-US Lender on behalf of such partners) and (B) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made. Such forms shall be delivered by each Non-US Lender before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Non-US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent. Each Non-US Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-US Lender shall not be required to deliver any form pursuant to this paragraph that such Non-US Lender is not legally able to deliver *provided* that it shall promptly notify the Borrower and the Administrative Agent in writing of such inability.

(f)    [reserved]

(g)    Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Code) (a "*US Lender*") shall deliver to the Borrower and the Administrative Agent two accurate and complete copies of IRS Form W-9, certifying that such Lender is not subject to backup withholding. Such forms shall be delivered by each US Lender on or before the date it becomes a party to this Agreement. In addition, each US Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such US Lender, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent. Each US Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certifications to the Borrower and the Administrative Agent (or any other form of certification adopted by the United States taxing authorities for such purpose).

(h)    If any Recipient determines, in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified pursuant to this **Section 2.20** (including by the payment of additional amounts pursuant to this **Section 2.20**), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid under this **Section 2.20** with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of such Recipient and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, that such indemnifying party, upon the request of such Recipient, agrees to repay the amount paid over to the indemnifying party (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority other than any such penalties, interest or other charges resulting from the gross negligence or

willful misconduct of the relevant Recipient (as determined by a final and non-appealable judgment of a court of competent jurisdiction)) to such Recipient in the event such Recipient is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.  In no event will any Recipient be required to pay any amount to an indemnifying party the payment of which would place such Recipient in a less favorable net after-tax position than such Recipient would have been in if the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

(i)        [reserved]

(j)        If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or Administrative Agent as may be necessary for the Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this **Section 2.20(j)** "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(k)        To the extent required by any applicable laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  Without limiting the provisions of **Section 2.20**, each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower or Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of such Borrower or Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of **Section 10.6(c)(iii)** relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (k).

(l)        The agreements in this **Section 2.20** shall survive the termination of this Agreement and payment of the Loans and all other amounts payable under any Loan Document, the resignation of the Administrative Agent and any assignment of rights by, or replacement of, any Lender.

(m)        For purposes of this **Section 2.20**, applicable law includes FATCA.

**2.21    Indemnity.**  Other than with respect to Taxes, which shall be governed solely by **Section 2.20**, the Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense (other than lost profits, including the loss of Applicable Margin) that such Lender actually sustains or incurs as a consequence of (a) any failure by the Borrower in making a borrowing of, conversion

into or continuation of SOFR Loans after the Borrower has given notice requesting the same in accordance with the provisions of this Agreement, (b) any failure by the Borrower in making any prepayment of or conversion from SOFR Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment, conversion or continuation of SOFR Loans on a day that is not the last day of an Interest Period with respect thereto. A reasonably detailed certificate as to (showing in reasonable detail the calculation of) any amounts payable pursuant to this **Section 2.21** submitted to the Borrower by any Lender shall be presumptively correct in the absence of demonstrable error. This covenant shall survive the termination of this Agreement and the payment of the Obligations.

2.22    **Illegality**. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof, in each case, first made after the Closing Date, shall make it unlawful for any Revolving Lender to make or maintain SOFR Loans as contemplated by this Agreement, such Lender shall promptly give notice thereof to the Administrative Agent and the Borrower, and (a) the commitment of such Lender hereunder to make SOFR Loans, continue SOFR Loans as such and convert ABR Loans to SOFR Loans shall be suspended during the period of such illegality and (b) such Lender's Loans then outstanding as SOFR Loans, if any, shall be converted automatically to ABR Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a SOFR Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to **Section 2.21**.

2.23    **Change of Lending Office**. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of **Section 2.19**, **2.20(a)** or **2.22** with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) that would, in the Lender's judgment, avoid or minimize any amounts payable pursuant to such Sections (including by designating another lending office for any Loans affected by such event with the object of avoiding the consequences of such event); *provided*, that such designation is made on terms that, in the good faith judgment of such Lender, cause such Lender and its lending office(s) to suffer no material economic, legal or regulatory disadvantage or unreimbursed cost or expense; *provided*, *further*, that nothing in this **Section 2.23** shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to **Section 2.19**, **2.20(a)** or **2.22**. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with such designation or assignment.

2.24    **Replacement of Lenders**. Notwithstanding anything to the contrary herein, including the provisions set forth in **Section 2.10**, **Section 2.11** and **Section 2.12** each of which shall not apply to prepayments or termination of Loans or Commitments under this **Section 2.24**, the Borrower shall be permitted to (a) replace with a financial entity or financial entities, or (b) prepay or terminate, without premium or penalty (but subject to **Section 2.21**), the Loans or Commitments, as applicable, of any Lender (each such Lender, a "***Replaced Lender***") that (i) requests reimbursement for amounts owing or otherwise results in increased costs imposed on the Borrower or on account of which the Borrower is required to pay additional amounts to any Governmental Authority, in each case, pursuant to **Section 2.19**, **2.20** or **2.21** (to the extent a request made by a Lender pursuant to the operation of **Section 2.21** is materially greater than requests made by other Lenders) or gives a notice of illegality pursuant to **Section 2.22**, (ii) is a Defaulting Lender, (iii) is, or the Borrower reasonably believes could constitute, a Disqualified Institution, or (iv) has refused to consent to any waiver or amendment with respect to any Loan Document that requires such Lender's consent and has been consented to by the Required Lenders; *provided*, that, in the case of a replacement pursuant to **clause (a)** above:

(A)    such replacement does not conflict with any Requirement of Law;

(B)      the replacement financial entity or financial entities shall purchase, at par, all Loans and other amounts owing to such Replaced Lender on or prior to the date of replacement;

(C)      the Borrower shall be liable to such Replaced Lender under **Section 2.21** (as though **Section 2.21** were applicable) if any SOFR Loan owing to such Replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto;

(D)      the replacement financial entity or financial entities, (x) if not already a Lender, shall be reasonably satisfactory to the Administrative Agent to the extent that an assignment to such replacement financial institution of the rights and obligations being acquired by it would otherwise require the consent of the Administrative Agent pursuant to **Section 10.6(b)(i)(2)** and (y) shall pay (unless otherwise paid by the Borrower) any processing and recordation fee required under **Section 10.6(b)(ii)(2)**;

(E)      the Administrative Agent and any replacement financial entity or entities shall execute and deliver, and such Replaced Lender shall thereupon be deemed to have executed and delivered, an appropriately completed Assignment and Assumption to effect such substitution;

(F)      the Borrower shall pay all additional amounts (if any) required pursuant to **Section 2.19** or **2.20**, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated;

(G)      in the case of any such assignment resulting from a claim for payment under **Section 2.19** or payments required to be made pursuant to **Section 2.20**, such assignment will result in a reduction in such compensation or payments thereafter;

(H)      in respect of a replacement pursuant to **clause (iv)** above, the replacement financial entity or financial entities shall consent to such amendment or waiver; and

(I)      any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the Replaced Lender.

Prepayments pursuant to clause (b) above (i) shall be accompanied by accrued and unpaid interest on the principal amount so prepaid up to the date of such prepayment and (ii) shall not be subject to the provisions of **Section 2.18**.  The termination of the Revolving Commitments of any Lender pursuant to **clause (b)** above shall not be subject to the provisions of Section 2.18.  In connection with any such replacement under this **Section 2.24**, if the Replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption and/or any other documentation necessary to reflect such replacement by the later of (a) the date on which the replacement Lender executes and delivers such Assignment and Assumption and/or such other documentation and (b) the date as of which all obligations of the Borrower owing to the Replaced Lender relating to the Loans and participations so assigned shall be paid in full to such Replaced Lender, then such Replaced Lender shall be deemed to have executed and delivered such Assignment and Assumption and/or such other documentation as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption and/or such other documentation on behalf of such Replaced Lender, and the Administrative Agent shall record such assignment in the Register.

**2.25      [Reserved]**.

**2.26**    **[Reserved]**.

**2.27**    **Protective Advances**.

(a)    Subject to the limitations set forth in the definition of Protective Advances, the Administrative Agent may make Protective Advances.  The Protective Advances shall constitute Obligations for all purposes hereof and the other Loan Documents.  All Protective Advances shall be ABR Loans subject to the Applicable Margin applicable to the Revolving Loans.  At any time that Availability exceeds Revolving Loans then outstanding, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan  to repay such Protective Advance.  At any other time the Administrative Agent may require the Revolving Lenders to fund  their risk participations described in **Section 2.27(b)**.  The Administrative Agent shall endeavor to notify the Borrower promptly after the making of any Protective Advance.

(b)    Upon the making of a Protective Advance by the Administrative Agent in accordance with the terms hereof, each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent, without recourse or warranty, an undivided interest and participation in the applicable Protective Advance, in proportion to its Protective Advances Percentage of such Protective Advance.  From and after the date, if any, on which any Revolving Lender is required to fund its participation in any Protective Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Revolving Lender such Revolving Lender's Protective Advances Percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Protective Advance.

**2.28**    **MIRE Events.**  Each of the parties hereto acknowledges and agrees that each MIRE Event after the Closing Date shall be subject to (and conditioned upon): (1) the delivery to the Collateral Agent of all flood hazard determination certifications, acknowledgements and evidence of flood insurance and other flood-related documentation with respect to Mortgaged Properties or any Real Property that will become Mortgaged Property at such time as required by Flood Insurance Laws and as otherwise reasonably required by the Collateral Agent and (2) the Collateral Agent shall have confirmed that all reasonable flood insurance due diligence with respect to the information delivered pursuant to **clause (1)** has been completed to the reasonable satisfaction of the Collateral Agent and the Lenders (such confirmation not to be unreasonably withheld, conditioned or delayed); *provided*, that the condition in this **clause (2)** shall be deemed satisfied unless the Collateral Agent provides the Borrower with written notice to the contrary within twenty (20) Business Days (or such shorter period agreed to by the Collateral Agent in its reasonable discretion) after the Borrower or the applicable Loan Party has complied with **clause (1)** above.

Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, the Borrower shall give notice to the Administrative Agent of any special flood hazard area status and flood disaster assistance executed by Holdings, the Borrower and any applicable Loan Party.

**2.29**    **Prepayment Premium.**

(a)    In the event that (i) the Revolving Commitments are terminated or reduced (including, without limitation, any automatic termination upon the occurrence of an Event of Default described in **Section 8.1(f)**) under **Section 2.10** or (ii) the Revolving Loans are accelerated upon the occurrence of an Event of Default (including, without limitation, any automatic acceleration upon the occurrence of an Event of Default described in **Section 8.1(f)**), then on the date of such reduction or termination or on the date of such acceleration, as applicable, the Borrower shall be required to pay, for the ratable account of each Lender (x) from and after the Closing Date and prior to the first anniversary of the Closing Date, an amount equal to 2.00% of the amount of the Revolving Commitments so terminated or reduced or the amount of

the Revolving Loans so accelerated, as applicable, (y) from and after the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, an amount equal to 1.00% of the amount of the Revolving Commitments so terminated or reduced or the amount of the Revolving Loans so accelerated, as applicable and (z) from and after the second anniversary of the Closing Date and prior to the third anniversary of the Closing Date, an amount equal to 0.50% of the amount of the Revolving Commitments so terminated or reduced or the amount of the Revolving Loans so accelerated, as applicable (the amounts under clauses (x) through (z) above, collectively, the "***Applicable Premium***").

(b)     The Applicable Premium, if any, shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof. Any Applicable Premium payable in accordance with this **Section 2.29** shall be presumed to be the liquidated damages sustained by each Lender as the result of any of the events described in **clause (a)** above and the Loan Parties agree that such Applicable Premium is reasonable under the circumstances currently existing. For the avoidance of doubt, the Applicable Premium, if any, shall also be payable (A) in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means and/or (B) upon the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations (and/or this Agreement) in any insolvency proceeding or other proceeding pursuant to any debtor relief laws, foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means or the making of a distribution of any kind in any insolvency proceeding to the Administrative Agent, for the account of the Lenders, in full or partial satisfaction of the Obligations. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING LIQUIDATED DAMAGES IN CONNECTION WITH ANY OF THE EVENTS DESCRIBED IN **CLAUSE (a)** ABOVE INCLUDING IN CONNECTION WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION OF THE OBLIGATIONS PURSUANT TO ANY INSOLVENCY PROCEEDING OR OTHER PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAWS OR PURSUANT TO A PLAN OF REORGANIZATION. The Loan Parties expressly agree that: (w) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (x) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (y) there has been a course of conduct between Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium; and (z) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Loan Parties expressly acknowledge that their agreement to pay the Applicable Premium to the Lenders as herein described is a material inducement to Lenders to make the Loans.

### SECTION III.
### [RESERVED]

### SECTION IV.
### REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants (as to itself and each of its Restricted Subsidiaries) to the Agents and each Lender, which representations and warranties shall be deemed made on the Closing Date (after giving effect to the Transactions) and on the date of each borrowing of Loans hereunder that:

**4.1    Financial Condition.** The audited consolidated balance sheet of Revlon Holdings and its consolidated Subsidiaries as at December 31, 2022, and the related statements of income, stockholders'

equity and of cash flows for the fiscal year ended on such date, reported on by and accompanied by an unqualified (except as stated therein) report from KPMG LLP, present fairly in all material respects the financial condition of Revlon Holdings and its consolidated Subsidiaries as at such date and the results of their operations, their cash flows and their changes in stockholders' equity for the fiscal year then ended. All such financial statements, including the related schedules and notes thereto and year-end adjustments, have been prepared in accordance with GAAP (except as otherwise noted therein).

**4.2** **No Change**.  Since the Disclosure Statement Date, there has been no event, development or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

**4.3** **Existence; Compliance with Law.**  Each of the Borrower and its Restricted Subsidiaries (other than any Immaterial Subsidiaries) (a) (i) is duly organized (or incorporated), validly existing and in good standing (or, only where applicable, the equivalent status (if any) in any foreign jurisdiction) under the laws of the jurisdiction of its organization or incorporation, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect, (ii) has the corporate or other organizational power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect and (iii) is duly qualified as a foreign corporation or other entity and in good standing (where such concept is relevant) under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification except, in each case, to the extent that the failure to be so qualified or in good standing (where such concept is relevant) would not have a Material Adverse Effect and (b) is in compliance with all Requirements of Law except to the extent that any such failure to comply therewith would not reasonably be expected to have a Material Adverse Effect.

**4.4** **Corporate Power; Authorization; Enforceable Obligations**.

(a)      Each Loan Party has the corporate or other organizational power and authority to execute and deliver, and perform its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.  Each Loan Party has taken all necessary corporate or other action to authorize the execution and delivery of, and the performance of its obligations under, the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement, except in each case (other than with respect to the Borrower) to the extent such failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)      No consent or authorization of, filing with, or notice to, any Governmental Authority is required to be obtained or made by any Loan Party for the extensions of credit hereunder or such Loan Party's execution and delivery of, or performance of its obligations under, or validity or enforceability of, this Agreement or any of the other Loan Documents to which it is party, as against or with respect to such Loan Party except (i) consents, authorizations, filings and notices which have been obtained or made and are in full force and effect, (ii) consents, authorizations, filings and notices the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect and (iii) the filings referred to in **Section 4.17**.

(c)      Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto.  Assuming the due authorization of, and execution and delivery by, the parties thereto (other than the applicable Loan Parties), this Agreement constitutes, and each other Loan Document upon execution and delivery by each Loan Party that is a party thereto will constitute, a legal, valid and binding

obligation of each such Loan Party, as applicable, that is a party thereto, enforceable against each such Loan Party, as applicable, in accordance with its terms (*provided*, that, with respect to the creation and perfection of security interests with respect to the Capital Stock of Foreign Subsidiaries, only to the extent enforceability thereof is governed by the Uniform Commercial Code or the PPSA, as applicable), except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing.

**4.5      No Legal Bar.**  Assuming the consents, authorizations, filings and notices referred to in **Section 4.4(b)** are obtained or made and in full force and effect, the execution, delivery and performance of this Agreement and the other Loan Documents by the Loan Parties thereto, the borrowings hereunder and the use of the proceeds thereof will not (a) violate the organizational or governing documents of (i) the Borrower or (ii) except as would not reasonably be expected to have a Material Adverse Effect, any other Loan Party, (b) except as would not reasonably be expected to have a Material Adverse Effect, violate any Requirement of Law binding on Holdings, the Borrower or any of its Restricted Subsidiaries, (c) except as would not reasonably be expected to have a Material Adverse Effect, violate any Contractual Obligation of Holdings, the Borrower or any of its Restricted Subsidiaries or (d) except as would not have a Material Adverse Effect, result in or require the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens permitted by **Section 7.3**).

**4.6      No Material Litigation**.  Other than the Chapter 11 Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened against the Borrower or any of its Restricted Subsidiaries or against any of their Properties which, taken as a whole, would reasonably be expected to have a Material Adverse Effect.

**4.7      No Default**.  No Default or Event of Default has occurred and is continuing.

**4.8      Ownership of Property; Liens.**  Each of the Borrower and its Restricted Subsidiaries has good title in fee simple to, or a valid leasehold interest in, all of its Real Property, and good title to, or a valid leasehold interest in, all of its other Property (other than Intellectual Property), in each case, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, and none of such Real Property or other Property is subject to any Lien, except as permitted by the Loan Documents. **Schedule 4.8** sets forth a correct and complete list of all Material Real Property as of the Closing Date.

**4.9      Intellectual Property.**  Each of the Borrower and its Restricted Subsidiaries owns, or has a valid license or right to use, all Intellectual Property necessary for the conduct of its business as currently conducted free and clear of all Liens, except as permitted by the Loan Documents and except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.  To the Borrower's knowledge, neither the Borrower nor any of its Restricted Subsidiaries is infringing, misappropriating, diluting or otherwise violating any Intellectual Property rights of any Person in a manner that would reasonably be expected to have a Material Adverse Effect.  The Borrower and its Restricted Subsidiaries take all reasonable actions that in the exercise of their reasonable business judgment should be taken to protect their Intellectual Property, including Intellectual Property that is confidential in nature, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**4.10      Taxes**.  Each of the Borrower and its Restricted Subsidiaries (a) has filed or caused to be filed all federal, state, provincial and other Tax returns that are required to be filed and (b) has paid or caused to be paid all taxes shown to be due and payable on said returns and all other taxes, fees or other charges imposed on it or on any of its Property by any Governmental Authority (other than (i) any returns

or amounts that are not yet due or (ii) amounts the validity of which are currently being contested in good faith by appropriate proceedings and with respect to which any reserves required in conformity with GAAP have been provided on the books of the Borrower or such Restricted Subsidiary, as the case may be), except in each case where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

**4.11**    **Federal Regulations**.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for any purpose that violates the provisions of the regulations of the Board.

**4.12**    **ERISA and Canadian Pension Plans**.

(a)    Except as set forth on **Schedule 4.12** or as would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect:  (i) neither a Reportable Event nor a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA has occurred during the five-year period prior to the date on which this representation is made with respect to any Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan, and each Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has complied with the applicable provisions of ERISA, the Code and the Pension Benefits Act (Ontario) and other applicable federal or provincial laws, as applicable; (ii) no termination of a Single Employer Plan, Canadian Pension Plan or Canadian Defined Benefit Pension Plan has occurred, and no Lien in favor of the PBGC or a Plan has arisen on the assets of any Loan Party or any other Commonly Controlled Entity, during such five-year period; the present value of all accrued benefits under each Single Employer Plan and Canadian Pension Plan (based on those assumptions used to fund such Plans and Canadian Pension Plan) did not, as of January 1, 2021, exceed the value of the assets of such Single Employer Plan or Canadian Pension Plan allocable to such accrued benefits; (iii) no Loan Party or  any other Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan that has resulted or would reasonably be expected to result in a liability under ERISA; (iv) no Loan Party or  any other Commonly Controlled Entity would become subject to any liability under ERISA if such Loan Party or  such Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made; (v) no Multiemployer Plan is Insolvent or is in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and (v) as of the Closing Date, no Canadian Pension Plan is a Canadian Multi-employer Plan.

(b)    The Borrower and its Restricted Subsidiaries have not incurred, and do not reasonably expect to incur, any liability under ERISA or the Code with respect to any Plan which is subject to Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA that is maintained or contributed to by a Commonly Controlled Entity (other than the Borrower and its Restricted Subsidiaries) merely by virtue of being treated as a single employer under Title IV of ERISA with the sponsor of such plan that would reasonably be likely to have a Material Adverse Effect.

**4.13**    **Investment Company Act.**  No Loan Party is an "investment company," or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

**4.14**    **Subsidiaries.**  The Subsidiaries listed on **Schedule 4.14** constitute all the Subsidiaries of the Borrower at the Closing Date.  **Schedule 4.14** sets forth as of the Closing Date the name and jurisdiction of incorporation of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and the designation of such Subsidiary as a Restricted Subsidiary or an Unrestricted Subsidiary.

**4.15**    **Environmental Matters**.

Other than exceptions to any of the following that would not reasonably be expected to have a Material Adverse Effect, (A) none of the Borrower or any of its Restricted Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law for the operation of the Business; or (ii) has become subject to any pending or threatened Environmental Liability and (B) to the Borrower's knowledge, there are no existing facts or circumstances (including any presence or Release of Materials of Environmental Concern at any Real Property or any real property formerly owned or operated by the Borrower or its Subsidiaries) that are reasonably likely to give rise to any Environmental Liability of the Borrower or any of its Restricted Subsidiaries.

**4.16**    __Accuracy of Information, etc.__    As of the Closing Date, no statement or written information (excluding any projections and pro forma financial information) contained in this Agreement, any other Loan Document or any certificate furnished to the Administrative Agent or the Lenders or any of them (in their capacities as such), by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, including the Transactions, when taken as a whole, contained as of the date such statement, information or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained herein or therein, in light of the circumstances under which they were made, not materially misleading.    As of the Closing Date, any projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Agents and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.

**4.17**    __Security Documents__.

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under Article 9 of the UCC (including any proceeds of any such item of Collateral).  The Canadian Collateral Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) of a type in which a security interest can be created under the PPSA (including any proceeds of any such item of Collateral).  In the case of (i) the Pledged Securities described in the Guarantee and Collateral Agreement and the Canadian Collateral Agreement (in each case, other than Excluded Collateral), when any stock certificates or notes, as applicable, representing such Pledged Securities are delivered to the Collateral Agent (or, in the case of Pledged Securities that are Term Facility First Priority Collateral, the Designated Term Loan Agent) together with any proper indorsements executed in blank and such other actions have been taken with respect to the Pledged Securities of Foreign Subsidiaries as are required under applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary (it being understood that no such actions under applicable Requirements of Law of the jurisdiction of organization of the applicable Foreign Subsidiary shall be required by any Loan Document) and (ii) the other Collateral described in the Guarantee and Collateral Agreement and the Canadian Collateral Agreement (in each case, other than Excluded Collateral), when financing statements in appropriate form are filed in the offices specified on __Schedule 4.17__ (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) (which financing statements have been duly completed and executed (as applicable) and delivered to the Collateral Agent) and such other filings as are specified on __Schedule 4.17__ are made (or, in the case of other Collateral not in existence on the Closing Date, such other filings as may be appropriate), the Collateral Agent shall have a fully

perfected first priority Lien (or, with respect to the Term Facility First Priority Collateral, a fully perfected second priority Lien) on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (including any proceeds of any item of Collateral) (to the extent a security interest in such Collateral can be perfected through the filing of such documents and financing statements in the offices specified on **Schedule 4.17** (or, in the case of other Collateral not in existence on the Closing Date, such other offices as may be appropriate) and the other filings specified on **Schedule 4.17** (or, in the case of other Collateral not in existence on the Closing Date, such other filings as may be appropriate), and through the delivery of the Pledged Securities required to be delivered on the Closing Date), as security for the Secured Obligations, in each case prior in right to the Lien of any other Person (except (i) in the case of Collateral other than Pledged Securities that comprise stock of wholly-owned Subsidiaries, Liens permitted by **Section 7.3** and (ii) Liens having priority by operation of law) to the extent required by the Guarantee and Collateral Agreement or the Canadian Collateral Agreement, as applicable.

(b)      Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to **Section 6.8(b)** or **Section 6.10(b)**, such Mortgage shall be effective to create in favor of the Collateral Agent for the benefit of the Secured Parties a legal, valid and enforceable Lien on the Mortgaged Property described therein and proceeds thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing; and when such Mortgage is filed in the recording office designated by the Borrower and all relevant mortgage taxes and recording charges are duly paid, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Loan Party in such Mortgaged Property and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case subject only to Liens permitted by **Section 7.3** or other encumbrances or rights permitted by the relevant Mortgage.

(c)      Each Security Document (including, for the avoidance of doubt, the Canadian Collateral Agreement, the UK Security Agreements and the Cayman Pledge Agreement) to which a Non-US Guarantor is a party is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein (other than Excluded Collateral) subject to the limitations set forth in such Security Document.

**4.18     Solvency.** As of the Closing Date, the Borrower and its Subsidiaries are (on a consolidated basis), and immediately after giving effect to the Transactions to occur on the Closing Date and immediately following the application of the proceeds of each Loan made (or deemed to have been made) on the Closing Date will be, Solvent.

**4.19     Anti-Terrorism.** As of the Closing Date, Holdings, the Borrower and its Restricted Subsidiaries are in compliance with the USA Patriot Act, UK Anti-Money Laundering & Anti-Terrorism Legislation and Canadian Anti-Money Laundering & Anti-Terrorism Legislation, except as would not reasonably be expected to have a Material Adverse Effect.

**4.20     Use of Proceeds**. The Borrower will use the proceeds of the Loans solely in compliance with **Section 6.9** of this Agreement.

**4.21     Labor Matters**. Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or its Restricted Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of the Borrower or its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from the Borrower or any of its Restricted Subsidiaries on account of employee health

and welfare insurance have been paid or accrued as a liability on the books of the Borrower or such Restricted Subsidiary, as applicable.

4.22    **Sanctions**.  No Loan Party, nor, to the knowledge of any Loan Party, any Related Party (i) is currently the target of any Sanctions, (ii) is located, organized or residing in any Designated Jurisdiction, (iii) is or has been (within the previous five years) engaged in any transaction with any Person who is now or was then the target of Sanctions or who is located, residing in or organized under the laws of any Designated Jurisdiction in violation of any applicable Sanctions or (iv) is a Person that constitutes a Canadian Blocked Person.  No Loan, nor the proceeds from any Loan, has been used by any Loan Party, directly or indirectly, to lend, contribute, provide or has otherwise been made available to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the target of any Sanctions, or in any other manner that will, in each case, result in any violation by any party hereto (including any Lender, Lead Arranger or Administrative Agent) of Sanctions.

4.23    **Anti-Corruption Compliance.**  The Borrower and each of its Subsidiaries (and all Persons acting on behalf of the Borrower and each of its Subsidiaries) are in compliance with applicable Anti-Corruption Laws and has implemented and maintains in effect policies and procedures reasonably designed to facilitate continued compliance.  No part of the proceeds of the Loans has been or will be used by the Borrower or its Subsidiaries, directly or indirectly, for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law. Notwithstanding the foregoing, the representations given in this **Section 4.23** shall not be made by nor apply to any Person that qualifies as a corporation that is registered or incorporated under the laws of Canada or any province thereof and that carries on business in whole or in part in Canada within the meaning of Section 2 of the Foreign Extraterritorial Measures (United States) Order, 1992 passed under the Foreign Extraterritorial Measures Act (Canada) in so far as such representations would result in a violation of or conflict with the Foreign Extraterritorial Measures Act (Canada) or any similar law.

4.24    **Borrowing Base Certificate**.  At the time of delivery of each Borrowing Base Certificate, assuming that any eligibility criteria that require the approval or satisfaction of the Administrative Agent are approved by or satisfactory to the Administrative Agent, the information contained in such Borrowing Base Certificate is accurate and complete in all material respects.

4.25    **Beneficial Ownership Certification.**  As of the Closing Date, the information included in the Beneficial Ownership Certification delivered pursuant to **Section 5.1(i)(B)** is true and correct in all respects.

<div align="center">

**SECTION V.**
**CONDITIONS PRECEDENT**

</div>

5.1    **Conditions to Initial Loans on the Closing Date**.  The effectiveness of this Agreement and the agreement of each Lender to make the initial Loans requested to be made by it is subject to the satisfaction (or waiver), prior to or concurrently with the making of such Loans on the Closing Date, of the following conditions precedent:

(a)    **Credit Agreement; Guarantee and Collateral Agreement**.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by Holdings and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, (iii) the UK Debenture, executed by the relevant Subsidiary Guarantor party thereto,

<div align="center">91</div>

(iv) the Canadian Collateral Agreement, executed by the relevant Subsidiary Guarantors party thereto, (v) the Cayman Pledge Agreement, executed by Beautyge Brands U.S.A, Inc. and (vi) the ABL Intercreditor Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor;

(b)    **Representations and Warranties**.  Each of the representations and warranties made by any Loan Party in  or pursuant to any of the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or a Material Adverse Effect) on the Closing Date;

(c)    **Borrowing Notice**.  The Administrative Agent shall have received a notice of borrowing from the Borrower with respect to the Revolving Loans to be made on the Closing Date, substantially in the form of **Exhibit E**;

(d)    **Fees**.

(i)    The Borrower shall have paid all "Exit Fees"  due and payable under the ABL DIP Fee Letter, and

(ii)    The Administrative Agent shall have received all fees due and payable on or prior to the Closing Date under the Commitment Letter and the Fee Letter and all other fees due and payable on or prior to the Closing Date in respect of the Facility, to the extent invoiced at least two (2) Business Days prior to the Closing Date (or such later date as the Borrower may reasonably agree), shall have been reimbursed for all reasonable and documented out-of-pocket expenses (including the reasonable fees, charges and disbursements of (i) Proskauer Rose LLP, counsel to the Administrative Agent, (ii) Norton Rose Fulbright Canada LLP, Canadian counsel to the Administrative Agent and (iii) Maples and Calder (Cayman) LLP, Cayman Islands, counsel to the Administrative Agent) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document;

(e)    **Legal Opinions**.  The Administrative Agent shall have received an executed legal opinion of (i) Paul, Weiss, Rifkind, Wharton & Garrison LLP, special New York counsel to the Loan Parties, (ii) Osler, Hoskin and Harcourt LLP, special Canadian counsel to the Loan Parties, (iii) Walkers (Cayman) LLP, special Cayman Islands counsel to the Loan Parties, (iv) Akerman LLP, special Florida counsel to the Loan Parties, (v) Morrison & Foerster LLP, special California counsel to the Loan Parties, (vi) Maynard Nexsen PC, special North Carolina counsel to the Loan Parties and (vii) in-house counsel for the Loan Parties, in each case, in form and substance reasonably satisfactory to the Administrative Agent;

(f)    **No Default**.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the Revolving Loans requested to be borrowed on such date;

(g)    **Closing Certificate**.  The Administrative Agent shall have received a certificate of the Borrower, dated as of the Closing Date, substantially in the form of **Exhibit C**;

(h)    **Secretary Certificates; Corporate Deliverables**.

(i)    The Administrative Agent shall have received copies of the certificate or articles of incorporation and by-laws (or other similar governing documents serving the purposes) of Holdings and each Loan Party, certified as of the Closing Date as complete and correct copies thereof by a Responsible Officer, the Secretary, an Assistant Secretary or another authorized representative of Holdings and each Loan Party;

(ii)     The Administrative Agent shall have received a copy of the resolutions or equivalent action, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of Holdings and each Loan Party authorizing, as applicable, the execution and delivery of this Agreement and the other Loan Documents and the performance of this Agreement and the transactions contemplated hereby and thereby, certified by a Responsible Officer, the Secretary, an Assistant Secretary or another authorized representative of Holdings and each Loan Party as of the Closing Date, which certificate shall state that the resolutions or other action thereby certified have not been amended, modified (except as any later such resolution or other action may modify any earlier such resolution or other action), revoked or rescinded and are in full force and effect;

(iii)     The Administrative Agent shall have received such certificates of good standing (to the extent such concept exists) from the applicable secretary of state of the state of organization of each Loan Party, certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(iv)     In relation to the UK Loan Parties, the Administrative Agent shall have received (A) a formalities certificate (signed by a director) for each such UK Loan Party certifying (I) that the borrowing or guaranteeing or securing of the Commitments (as appropriate) would not cause any borrowing or guaranteeing or securing or similar limit binding on it to be exceeded; (II) as to the names and signatures of each officer of each UK Loan Party executing any Loan Document to which it is a party to and a specimen signature, (III) the memorandum of association, articles of association, certificate of incorporation and certificate of change of name (if applicable) of each UK Loan Party attached to such certificate are complete, true and correct copies of such documents and are in full force and effect as at the date of such certification, (IV) that attached thereto is a true and complete copy of (a) resolutions adopted by the board of directors of each such UK Loan Party authorizing, among other things, the execution, delivery and performance of each Loan Document to which it is a party and (b) resolutions adopted by the board of directors of the shareholder of each such UK Loan Party authorizing, among other things, the execution, delivery and performance of each Loan Document to which it is a party, and such resolutions have not been modified, rescinded or amended and are in full force and effect and (V) that each copy document to which the UK Loan Party is party is correct, complete and in full force and effect and has not been amended or superseded as at a date of the certificate, (B) copy of all notices required to be sent by the relevant UK Loan Party subject to a UK Security Agreement, and (C) all share certificates, transfers and stock transfer forms or equivalent duly executed by each such relevant UK Loan Party in blank in relation to the assets subject to or expressed to be subject to a UK Security Agreement and other documents of title or perfection documents required to be provided thereunder.

(i)     **USA Patriot Act; Proceeds of Crime Act; Beneficial Ownership Certification**.  The Lenders shall have received from the Borrower and each of the Loan Parties, at least three (3) Business Days prior to the Closing Date, (A) all documentation and other information reasonably requested by any Lender no less than ten (10) calendar days prior to the Closing Date that such Lender reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and the Proceeds of Crime Act and (B) a Beneficial Ownership Certification in relation to the Borrower and each Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation;

(j)      **Filings**.  Subject to the last paragraph of this **Section 5.1** and except as set forth on **Schedule 6.10**, each Uniform Commercial Code and PPSA financing statement and each intellectual property security agreement required by the Security Documents to be filed with the U.S. Patent and Trademark Office or the U.S. Copyright Office or the Canadian Intellectual Property Office, as applicable, in order to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority perfected Lien (or, with respect to the Term Facility First Priority Collateral, a fully perfected second priority Lien) on the Collateral described therein shall have been delivered to the Collateral Agent in proper form for filing;

(k)      **Pledged Stock; Stock Powers**.  Subject to the last paragraph of this **Section 5.1**, the Collateral Agent (or, in the case of any Pledged Securities that are Term Facility First Priority Collateral, the Designated Term Loan Agent) shall have received the certificates, if any, and the register of members, if applicable, representing the shares of Pledged Stock held by a Loan Party pledged pursuant to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, any UK Security Agreement or the Cayman Pledge Agreement (as applicable), together with an undated stock power or share transfer instrument for each such certificate executed in blank by a duly authorized officer of the pledgor thereof;

(l)      **Solvency Certificate**.  The Administrative Agent shall have received a solvency certificate signed by the chief financial officer on behalf of the Borrower, substantially in the form of **Exhibit G**, after giving effect to the Transactions or, at the Borrower's option, a solvency opinion from an independent investment bank or valuation firm of nationally recognized standing;

(m)      **Restructuring Plan Effective Date; Confirmation Order**.

(i)      All conditions precedent to the confirmation and effectiveness of the Restructuring Plan, as set forth in the Restructuring Plan, shall have been satisfied or waived in accordance with the terms thereof;

(ii)      (A) the Borrower shall have delivered to the Administrative Agent and the Lenders a docketed copy of the Confirmation Order and no stay or injunction (or similar prohibition) shall be in effect with respect thereto, and the Confirmation Order shall not have been reversed, vacated, amended, supplemented or otherwise modified in any matter that could reasonably be expected to materially adversely affect the interests of the Administrative Agent or the Lenders and (B) the Information Officer's Termination Certificate (as defined in the Plan Recognition Order) shall have been served in accordance with the Plan Recognition Order;

(iii)      the effective date under the Restructuring Plan shall have occurred (or occur contemporaneously with the Closing Date); and

(iv)      there shall not be any Bankruptcy Court order or any action, suit, investigation or proceeding pending or, to the knowledge of the Loan Parties, threatened in any court or before any arbitrator or governmental authority that could reasonably be expected to have a Company Material Adverse Effect or to prevent or restrain the consummation of this Agreement and the transactions contemplated hereby;

(n)      **Equity Rights Offering**.  The Equity Rights Offering (as defined in the Restructuring Support Agreement) shall have been consummated on terms consistent in all respects with the Restructuring Support Agreement and in an amount no less than the amount set forth in the Restructuring Plan;

(o)    **Company Material Adverse Effect**. Since the Petition Date, there shall not have occurred any changes, events, circumstances, effects, developments, occurrences or state of facts that, individually or in the aggregate, have had or would reasonably be expected to have a Company Material Adverse Effect;

(p)    **Approvals**. The Borrower and the other Loan Parties shall have received all governmental, shareholder and third party approvals, consents, licenses and permits required in connection with the Facilities, the Transactions and the related financings and transactions contemplated thereby, which such approvals, consents, licenses and permits remain in full force and effect;

(q)    **Financial Statements**. The Administrative Agent shall have received pro forma consolidated financial statements as to Holdings and its Subsidiaries on a consolidated basis giving effect to all elements of the Transactions, and forecasts prepared by management of the Company, each in form and substance reasonably satisfactory to the Administrative Agent, of balance sheets, income statements and cash flow statements on a monthly basis for the first year following the Closing Date and on an annual basis for each year thereafter during the term of this Agreement (it being acknowledged by the Administrative Agent that such condition was satisfied as of the date hereof);

(r)    **Lien Searches**. The Collateral Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code or PPSA financing statements will be made to evidence or perfect security interests required to be evidenced or perfected, and such other jurisdictions as are reasonably requested by the Collateral Agent, and such search shall reveal no liens on any of the assets of the Loan Parties, except for Liens permitted by **Section 7.3** or liens to be discharged on or prior to the Closing Date;

(s)    **No Litigation**. Other than the Chapter 11 Cases, as of the Closing Date, there shall not be any litigation, action, suit, investigation or other arbitral, administrative or judicial proceeding pending or, to the knowledge of the Loan Parties, threatened against any Loan Party or any of their Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Documents, or (b) that could reasonably be expected to have a Material Adverse Effect on the Loan Parties and their Subsidiaries, taken as a whole;

(t)    **Term Loan Facility**. The Administrative Agent shall have received true and correct copies of the Term Loan Documents, which shall be in full force and effect;

(u)    **BrandCo License Agreements**. The applicable Loan Parties shall have entered into amendments to the BrandCo License Agreements (as defined in the Final DIP Order) or a letter agreement with the BrandCos on terms consistent with clause 39(b) of the Final DIP Order relating to the Chapter 11 Cases;

(v)    **Minimum Liquidity**. The sum of Excess Availability and cash and Cash Equivalents held by the Loan Parties and their Subsidiaries shall not be less than $225,000,000;

(w)    **First Lien Indebtedness**. The Borrower and its Subsidiaries shall not have more than $1,400,506,261.43 of outstanding Indebtedness for Borrowed Money secured by first-priority liens on Term Facility First Priority Collateral;

(x)    **Emergence**. The Debtors shall have successfully emerged from the Chapter 11 Cases in accordance with the terms of the Restructuring Plan;

(y)    **Payoff Documentation**. The Borrower shall have delivered to the Administrative Agent customary pay-off letters and other evidence (together with accompanying termination statements and lien

releases) confirming the termination of all obligations and release of all Liens under each of the Existing Credit Agreements;

(z)    **Borrowing Base Certificate**.  The Borrower shall have delivered to the Administrative Agent a Borrowing Base Certificate prepared in accordance with the terms of **Section 6.2(g)**,  prepared as of the end of the week immediately preceding the Closing Date (or such other date as consented to by the Administrative Agent in its reasonable discretion);

(aa)    **Insurance**. Except as set forth on **Schedule 6.10**, the Administrative Agent shall have received evidence of all insurance required to be maintained, and evidence that the Administrative Agent shall have been named as an additional insured and loss payee, as applicable, on all insurance policies covering loss or damage to Collateral and on all liability insurance policies as to which the Administrative Agent has reasonably requested to be so named.

(bb)    **Capital Structure**. The Administrative Agent shall have received and be satisfied with the business plan and shall be satisfied with the capital structure of Holdings and its Subsidiaries and (ii) the Agent shall have received the initial Cash Flow Forecast (it being acknowledged by the Administrative Agent that such condition was satisfied as of the date hereof).

Each of the requirements set forth in **clauses (j)** and **(k)** above (except (a) to the extent that a Lien on such Collateral may under applicable law be perfected on the Closing Date by the filing of financing statements under the Uniform Commercial Code or the PPSA, (b) the delivery of stock certificates of the Borrower and its wholly-owned Domestic Subsidiaries (including Guarantors but other than Immaterial Subsidiaries to the extent stock certificates issued by such entities are not delivered to the Borrower on the Closing Date) to the extent included in the Collateral, with respect to which a Lien may be perfected on the Closing Date by the delivery of a stock certificate and (c) short-form intellectual property filings in respect of U.S. Intellectual Property of the Borrower and its Subsidiaries filed with the U.S. Patent and Trademark Office and the U.S. Copyright Office or the Canadian Intellectual Property Office, as applicable) shall not constitute conditions precedent under this **Section 5.1** after the Borrower's use of commercially reasonable efforts to satisfy such requirements without undue burden or expense; ***provided***, that the Borrower hereby agrees to deliver, or cause to be delivered, such documents and instruments, or take or cause to be taken such other actions, in each case, as may be required to perfect such security interests within forty-five (45) days after the Closing Date (subject to extensions approved by the Administrative Agent in its sole and reasonable discretion).

5.2    **Conditions to Each Extension of Credit After Closing Date.**  The agreement of each Lender to make any Loan hereunder on any date after the Closing Date is subject to the satisfaction (or waiver) of the following conditions precedent:

(a)    **Representations and Warranties**.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect), in each case on and as of such date as if made on and as of such date except to the extent that such representations and warranties relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or Material Adverse Effect) as of such earlier date;

(b)    **No Defaul**t.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date;

(c)    **Borrowing Notic**e.  In the case of a borrowing of any Loans, the Administrative Agent shall have received a notice of borrowing from the Borrower, substantially in the form of **Exhibit E**, in accordance with **Section 2.5**;

(d)    **Borrowing Bas**e.  Commencing on and after the date on which the Borrower is first required to deliver a Borrowing Base Certificate pursuant to **Section 6.2(g)(i)**, the Borrower shall have delivered the Borrowing Base Certificate most recently required to be delivered by **Section 6.2(g)**.  After giving effect to the Loans requested to be made on any such date and the use of proceeds thereof, the aggregate Revolving Loans shall not exceed the Availability then in effect; and

(e)    **Anti-Cash Hoarding**.  Commencing on and after the Closing Date, after giving effect to any payments or prepayments to be made pursuant to **Section 2.12(b)(ii)**, in the case of any borrowing of Loans that would result in Excess Availability being less than 50% of the Borrowing Base in effect at such time, Holdings and its Subsidiaries shall not have more than the Specified Cash Limit in cash or Cash Equivalents ((x) other than Specified Excluded Cash and (y) based on closing balances on the immediately preceding Business Day) before and after the making of such Loan.

Each borrowing of a Loan by the Borrower hereunder after the Closing Date shall constitute a representation and warranty by the Borrower as of the date of such borrowing that the conditions contained in this **Section 5.2** have been satisfied.

Notwithstanding anything herein to the contrary, other than in connection with Protective Advances, at any time during the continuance of a Liquidity Event Period, any condition in this Section 5.2 may not be waived if the Borrower shall not be in pro forma compliance with **Section 7.1** after giving effect to the applicable borrowing.

<div align="center">

**SECTION VI.**
**AFFIRMATIVE COVENANTS**

</div>

The Borrower (on behalf of itself and each of its Restricted Subsidiaries (other than any Permitted Joint Venture)) hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than (i) contingent or indemnification obligations not then due and (ii) obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations), the Borrower shall, and shall cause (except in the case of the covenants set forth in **Section 6.1**, **Section 6.2** and **Section 6.7**) each of its Restricted Subsidiaries (other than any Permitted Joint Venture) to:

**6.1**    **Financial Statements.**  Furnish to the Administrative Agent for delivery to each Lender (which may be delivered via posting on the Platform):

(a)    within ninety (90) days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2023, (i) a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, and, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form and with a consolidated P&L forecast comparison as of the end of and for the previous year, reported on without qualification, exception or explanatory paragraph as to "going concern" or arising out of the scope of the audit (other than any such exception or explanatory paragraph (but not qualification) that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity of any Indebtedness occurring within one year from the time such report is delivered), by KPMG LLP or other independent certified public accountants of

nationally recognized standing and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal year;

(b)        within forty-five (45) days (or in the case of the fiscal quarters of the Borrower ending March 31, 2023 and June 30, 2023, within seventy-five (75) days) after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the fiscal quarter ending March 31, 2023, (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, in comparative form and with a consolidated P&L forecast comparison as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (ii) a management's discussion and analysis of the important operational and financial developments during such fiscal quarter;

(c)        within thirty (30) days after the end of each month of the Borrower, commencing with the month ending April 30, 2023,

(G)        (i) the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statements of income and of cash flows for such month and the portion of the fiscal year through the end of such month, in comparative form and with a consolidated P&L forecast comparison as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as fairly presenting in all material respects the financial condition of the Borrower and its consolidated Subsidiaries in conformity with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes and, with respect to the month ending April 30, 2023, the absence of adjustments reflecting fresh start accounting), and

(ii)        a report of the Cash and Cash Equivalents of the Borrower and its consolidated Subsidiaries as of such month end; *provided* that, during a Cash Dominion Period, the Borrower shall furnish to the Administrative Agent for delivery to each Lender as soon as available, but in any event not later than Monday (or if Monday is not a Business Day, Tuesday) after the end of the last day of each week, a report of the Cash and Cash Equivalents of the Borrower and its consolidated Subsidiaries on a jurisdiction-by-jurisdiction basis in a form reasonably acceptable to the Administrative Agent.

All such financial statements shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as disclosed therein and except in the case of the financial statements referred to in **clauses (b)** and **(c)**, for customary year-end adjustments and the absence of complete footnotes).  Any financial statements or other deliverables required to be delivered pursuant to this **Section 6.1** and any financial statements or reports required to be delivered pursuant to **clause (d)** of **Section 6.2** shall be deemed to have been furnished to the Administrative Agent on the date that (i) such financial statements or deliverable (as applicable) are posted on the SEC's website at www.sec.gov or the website for the Borrower and (ii) the Administrative Agent has been provided written notice of such posting.

Documents required to be delivered pursuant to this **Section 6.1** may also be delivered by posting such documents electronically with written notice of such posting to the Administrative Agent, which notice

may be provided via electronic mail, and if so posted, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on the Platform.

**6.2**     **Certificates; Other Information.**     Furnish to the Administrative Agent for delivery to each Lender, or, in the case of **clause (e)**, to the relevant Lender (in each case, which may be delivered via posting on the Platform):

(a)     promptly after the same become available copies of any amendments, waivers or other modifications of or relating to the Term Loan Facility;

(b)     concurrently with the delivery of any financial statements pursuant to **Section 6.1**, commencing with delivery of financial statements for the first period ending after the Closing Date,

(i)     a Compliance Certificate of a Responsible Officer on behalf of the Borrower

(x)     stating that such Responsible Officer has obtained no knowledge of any Default or Event of Default that has occurred and is continuing except as specified in such certificate and

(y)     containing information and calculations reasonably necessary for determining, on a consolidated basis, the Financial Covenant Fixed Charge Coverage Ratio for the most recently ended Test Period (including, without limitation, the calculation of Consolidated EBITDA and the components thereof and a reconciliation of Consolidated EBITDA hereunder with "EBITDA" as reported by the Borrower in financial statements and other reports posted on the SEC's website or otherwise filed with the SEC); *provided*, that the information in this **clause (y)** shall not be required to be included in such Compliance Certificate with respect to any Test Period if the ratio (expressed as a percentage) of (A) the sum of the amount of Excess Availability for each day in the last fiscal quarter of such Test Period to (B) the sum of the amount of Availability for each such day is greater than or equal to 66-2/3% and

(ii)     to the extent not previously disclosed to the Administrative Agent,

(x)     a description of any Default or Event of Default that occurred,

(y)     a description of any new Subsidiary and of any change in the name or jurisdiction of organization of any Loan Party since the date of the most recent list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date) to the extent not previously disclosed pursuant to **Section 6.8** and

(z)     solely in the case of financial statements delivered pursuant to **Section 6.1(a)**, a listing of any registrations of or applications for Intellectual Property (other than domain names) by any Loan Party filed since the last such report, together with a listing of any intent-to-use applications for trademarks or service marks for which a statement of use or an amendment to allege use has been filed since the last such report;

(c)     not later than sixty (60) days after the end of each fiscal year of Holdings, commencing with the fiscal year ending December 31, 2023, a consolidated forecast for the following fiscal year on a monthly basis (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year and the related consolidated statements of projected cash flow and projected income on a monthly basis);

(d)      promptly after the same become publicly available, copies of all financial statements and material reports that Holdings sends to the holders of any class of its publicly traded debt securities or public equity securities (except for those provided solely to the Permitted Investors), in each case to the extent not already provided pursuant to **Section 6.1** or any other clause of this **Section 6.2**;

(e)      promptly, such additional financial and other information regarding the operations, business affairs and financial condition of the Borrower or any Restricted Subsidiary as the Administrative Agent (for its own account or upon the request from any Lender) may from time to time reasonably request to the extent such additional financial or other information is reasonably available to, or can be reasonably obtained by, the Borrower; *provided*, that such requests shall not be made for the purposes set forth under **Section 6.14**, it being understood that **Section 6.14** shall govern the subject matter thereof exclusively;

(f)      (i)      within a reasonable period following the delivery of any financial statements pursuant to **Section 6.1**, dial-in details in respect of a conference call with Lenders (which may be satisfied by a call with holders of Holdings' or any Parent Company's publicly listed debt or equity securities attended by any Lender) and during which representatives from the Borrower will be available to discuss the details of the relevant financial statements and otherwise address additional matters in a manner consistent with Revlon Holdings' or the Borrower's past practice; and

(ii)      commencing on and after the Closing Date, on periodic intervals as may be reasonably requested by the Administrative Agent, dial-in details in respect of a conference call with the Administrative Agent during which representative from the Borrower and its advisors will be available to discuss the financial performance and liquidity of the Borrower and its Subsidiaries and otherwise address additional related matters as reasonably requested by the Administrative Agent.

(g)      The Company may deliver from time to time a Borrowing Base Certificate, but in any event shall deliver a Borrowing Base Certificate

(i)      calculated as of the last day of each calendar month commencing with April 30, 2023, as soon as available but in any event not later than fifteen (15) days after the end of such calendar month (or, if such date is not a Business Day, the next succeeding Business Day); and

(ii)      after the first Borrowing Base Certificate is delivered or is required to be delivered pursuant to **clause (i)** above, then if an Event of Default has occurred and is continuing or if Excess Availability is less than $65,000,000, not later than the first Thursday (or if such Thursday is not a Business Day, Friday) after the end of the last day of each week (containing available updated figures for Eligible Receivables but not, unless otherwise available, Eligible Inventory),

in each case, executed by a Responsible Officer of the Company. Concurrently with the delivery of any Borrowing Base Certificate pursuant to this **Section 6.2(g)**, commencing with delivery of the Borrowing Base Certificate for the calendar month ending April 30, 2023, the Company shall deliver accounts receivable agings and accounts payable agings (which shall include descriptions of the invoice and due dates or terms thereof), an Inventory roll-forward, a sales flash report and such other supporting documents as may be mutually agreed between the Administrative Agent and the Company.

Notwithstanding anything herein to the contrary, any direct or indirect Disposition outside of the ordinary course of business (whether in one transaction or a series of related transactions) of assets included within the Borrowing Base, including any Intellectual Property with respect to which such Disposition would cause Inventory included in the Borrowing Base to cease to be Eligible Inventory (including, without limitation, any such Disposition by way of Restricted Payment,  Investment in a Person that is not a Loan

Party, any Loan Party ceasing to be a Loan Party, any transactions under **Section 7.4**, or a Disposition of Intellectual Property (including a Disposition or termination of any license to use Intellectual Property) that causes Inventory to cease to be Eligible Inventory), in each case if such assets included within the Borrowing Base and such Inventory ceasing to be Eligible Inventory, in the aggregate, constitute more than 10% of the Borrowing Base prior to giving effect to such Disposition shall be subject to the requirement that, prior to the consummation of such Disposition, the Company shall deliver to the Administrative Agent an updated Borrowing Base Certificate demonstrating, after giving pro forma effect to such Disposition and any transactions in connection therewith (including, without limitation, any prepayment or repayment of the Loans and removal of any Inventory from the Borrowing Base that will no longer constitute Eligible Inventory) and if a Liquidity Event Period exists or would result therefrom, the Company shall have demonstrated compliance with **Section 7.1**, calculating the Financial Covenant Fixed Charge Coverage Ratio on a pro forma basis as if such Disposition, Investment or other transaction, and/or any other transaction in connection therewith, shall have occurred at the beginning of the Test Period (and the Borrower shall have delivered to the Administrative Agent such financial information as it may reasonably request demonstrating such compliance).  The Administrative Agent shall deliver any such Borrowing Base Certificate to the Lenders.

Notwithstanding anything to the contrary in this **Section 6.2**, (a) none of the Borrower or any of its Restricted Subsidiaries will be required to disclose any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information and (b) unless such material is identified in writing by the Borrower as "Public" information, the Administrative Agent shall deliver such information only to "private-side" Lenders (i.e., Lenders that have affirmatively requested to receive information other than Public Information).

Documents required to be delivered pursuant to this **Section 6.2** may be delivered by posting such documents electronically with notice of such posting to the Administrative Agent and if so posted, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website or (ii) on which such documents are posted on the Borrower's behalf on the Platform.

> **6.3**    **Payment of Taxes.**  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its Taxes, governmental assessments and governmental charges (other than Indebtedness), except (a) where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves required in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Restricted Subsidiaries, as the case may be, or (b) to the extent that failure to pay or satisfy such obligations would not reasonably be expected to have a Material Adverse Effect.

> **6.4**    **Conduct of Business; Maintenance of Existence; Compliance with Requirements of Law**.

> (a)    Preserve and keep in full force and effect its corporate or other existence and take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case, as otherwise permitted by **Section 7.4** or except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; and

> (b)    comply with all Requirements of Law (including ERISA, Environmental Laws, the USA Patriot Act and the Proceeds of Crime Act) except to the extent that failure to comply therewith would not

reasonably be expected to have a Material Adverse Effect; *provided*, that with respect to Environmental Laws, none of the Borrower or any Restricted Subsidiary shall be required to undertake any remedial action required by Environmental Laws to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

6.5     **Maintenance of Property; Insurance**.

(a)     Keep all Property useful and necessary in its business in reasonably good working order and condition, ordinary wear and tear excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(b)     Take all commercially reasonable steps, including in any proceeding before the United States Patent and Trademark Office or the United States Copyright Office, the Canadian Intellectual Property Office or any corresponding office or agency in any other applicable jurisdiction, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration for the Material Intellectual Property owned by the Borrower or its Restricted Subsidiaries, including filing of applications for renewal, affidavits of use and affidavits of incontestability, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect.

(c)     Maintain insurance with financially sound and reputable insurance companies on all its Property that is necessary in, and material to, the conduct of business by the Borrower and its Restricted Subsidiaries, taken as a whole, in at least such amounts and against at least such risks as are usually insured against in the same general area by companies engaged in the same or a similar business, and use its commercially reasonable efforts to ensure that all such material insurance policies shall, to the extent customary (but in any event, not including business interruption insurance and personal injury insurance) name the Collateral Agent or, in the case of the Term Facility First Priority Collateral, the Designated Term Loan Agent, as applicable, as additional insured party or loss payee.

(d)     With respect to any Mortgaged Properties, if at any time the area in which the Premises (as defined in the Mortgages, if any) are located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), with respect to which flood insurance has been made available under Flood Insurance Laws, the applicable Loan Party (A) will promptly upon notice thereof obtain and maintain, with financially sound and reputable insurance companies (except to the extent that any insurance company insuring the Mortgaged Property of the Loan Party ceases to be financially sound and reputable after the Closing Date, in which case, such Loan Party shall promptly replace such insurance company with a financially sound and reputable insurance company), flood insurance in such reasonable total amount as the Collateral Agent may from time to time reasonably require (such amount not to exceed 100% of the full replacement cost of the improvements on such Premises), and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws; *provided*, that a portion of such flood insurance may be obtained under the Flood Insurance Laws, (B) promptly upon request of the Collateral Agent or any Lender, will deliver to the Collateral Agent evidence of such compliance in form and substance reasonably acceptable to the Collateral Agent, including, without limitation, evidence of annual renewals of such insurance and (C) name the Collateral Agent as lender loss payee and mortgagee with respect to such flood insurance.

6.6     **Inspection of Property; Books and Records; Discussions**.

(a)     Keep proper books of records and accounts in a manner to allow financial statements to be prepared in conformity with GAAP (or, with respect to Subsidiaries organized outside of the United States, the local accounting standards applicable to the relevant jurisdiction; *provided*, that, to the extent that any

such Subsidiary is permitted to prepare financial statements in accordance with different local accounting standards, such Subsidiary shall continue to apply the local accounting standard applied as of the Closing Date (as such standard may be updated or revised from time to time and, for the avoidance of doubt, with any discretions, judgments and elections afforded by such local accounting standard, including any changes in the application of such discretions, judgments and elections as such Subsidiary shall determine) except to the extent of changes between local accounting standards required by applicable law or regulation).

(b)      Permit representatives designated by the Administrative Agent to visit and inspect any of its properties and examine and make abstracts from any of its books and records upon reasonable notice and at such reasonable times during normal business hours (**_provided_**, that (i) such visits shall be limited to no more than one such visit per calendar year at each facility, (ii) such visits by the Administrative Agent shall be at the Administrative Agent's expense, except in the case of the foregoing **clauses (i)** and **(ii)** during the continuance of an Event of Default and (iii) such visits shall not be for the purposes set forth under **Section 6.14**, it being understood that **Section 6.14** shall govern discussions as set forth thereunder exclusively).

(c)      Permit representatives designated by the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Restricted Subsidiaries with officers of the Borrower and its Restricted Subsidiaries upon reasonable notice and at such reasonable times during normal business hours (**_provided_**, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions, (ii) such discussions shall be coordinated by the Administrative Agent, (iii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default and (iv) such discussions shall not be for the purposes set forth under **Section 6.14**, it being understood that **Section 6.14** shall govern discussions as set forth thereunder exclusively).

(d)      Permit representatives of the Administrative Agent to have reasonable discussions regarding the business, operations, properties and financial and other condition of the Borrower and its Restricted Subsidiaries with its independent certified public accountants to the extent permitted by the internal policies of such independent certified public accountants upon reasonable notice and at such reasonable times during normal business hours (**_provided_**, that (i) a Responsible Officer of the Borrower shall be afforded the opportunity to be present during such discussions, (ii) such discussions shall be limited to no more than once per calendar year except during the continuance of an Event of Default and (iii) such discussions shall not be for the purposes set forth under **Section 6.14**, it being understood that **Section 6.14** shall govern discussions as set forth thereunder exclusively).

Notwithstanding anything to the contrary in this **Section 6.6** or **Section 6.14**, none of the Borrower or any of the Restricted Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discuss, any document, information or other matter that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited or restricted by Requirements of Law or any binding agreement or obligation, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) constitutes classified information.

**6.7**      **Notices.**  Promptly upon a Responsible Officer of the Borrower obtaining knowledge thereof, give notice to the Administrative Agent of:

(a)      the occurrence of any Default or Event of Default;

103

(b)      any litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Restricted Subsidiaries and any other Person, that in either case, would reasonably be expected to have a Material Adverse Effect;

(c)      the occurrence of any Reportable Event, where there is any reasonable likelihood of the imposition of liability on any Loan Party as a result thereof that would reasonably be expected to have a Material Adverse Effect;

(d)      the aggregate Revolving Loans exceed the Availability then in effect as a result of a decrease therein, in which case, the Borrower shall comply with the terms of **Section 2.12(b)**;

(e)      the occurrence of any "default" or "event of default" under and as defined in the Term Loan Agreement;

(f)      any other development or event that has had or would reasonably be expected to have a Material Adverse Effect;

(g)      the beginning or end of a Liquidity Event Period; and

(h)      the beginning or end of a Cash Dominion Period.

Each notice pursuant to **Section 6.7** shall be accompanied by a statement of a Responsible Officer setting forth in reasonable detail the occurrence referred to therein and stating what action the Borrower or the relevant Restricted Subsidiary proposes to take with respect thereto.

**6.8      Additional Collateral, etc**.

(a)      With respect to any Property (other than Excluded Collateral) located in the United States (or with respect to Property of any Non-US Guarantor, any Property (other than Excluded Collateral) located in the jurisdiction of formation of such Non-US Guarantor or any other jurisdiction in which such Non-US Guarantor has previously granted a security interest to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party) having a value, individually or in the aggregate, of at least $10,000,000 acquired after the Closing Date by the Borrower or any Subsidiary Guarantor  (other than (i) any interests in Real Property and any Property described in **paragraph (c)** or **paragraph (d)** of this **Section 6.8**, (ii) any Property subject to a Lien expressly permitted by **Section 7.3(g)** or **7.3(v)**, and (iii) Instruments, Certificated Securities, Securities and Chattel Paper, which are referred to in the last sentence of this **paragraph (a)**)) as to which the Collateral Agent for the benefit of the Secured Parties does not have a perfected Lien, promptly (A) give notice of such Property to the Collateral Agent and execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement or such other documents as the Collateral Agent reasonably requests to grant to the Collateral Agent for the benefit of the Secured Parties a security interest in such Property and (B) take all actions reasonably requested by the Collateral Agent to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Loan Documents and with the priority required by **Section 4.17**) in such Property (with respect to Property of a type owned by the Borrower or any Subsidiary Guarantor as of the Closing Date to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in such Property as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement or other Security Document or by law or as may be reasonably requested by the Collateral Agent.  If any amount in excess of $10,000,000 payable under or in connection with any of the Collateral shall be or become

evidenced by any Instrument, Certificated Security, Security or Chattel Paper (or, if more than $10,000,000 in the aggregate payable under or in connection with the Collateral shall become evidenced by Instruments, Certificated Securities, Securities or Chattel Paper), such Instrument, Certificated Security, Security or Chattel Paper shall be promptly delivered to the Collateral Agent indorsed in a manner reasonably satisfactory to the Collateral Agent to be held as Collateral pursuant to this Agreement (or, in the case of any such Collateral that is Term Facility First Priority Collateral, delivered to the Designated Term Loan Agent).

(b)    With respect to any fee interest in any Material Real Property acquired after the Closing Date by the Borrower or any Subsidiary Guarantor (other than Excluded Real Property), promptly:

(i)    give notice of such acquisition to the Collateral Agent and, if requested by the Collateral Agent (at the direction of the Required Lenders) or the Borrower, execute and deliver a Mortgage (subject to liens permitted by **Section 7.3** or other encumbrances or rights permitted by the relevant Mortgage) in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such Real Property (*provided*, that no Mortgage shall be obtained if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such Mortgage are excessive in relation to the value of the security to be afforded thereby);

(ii)    if a Mortgage has been requested with respect to Material Real Property pursuant to **clause (i)** above, then (A) if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), with respect to any such Mortgage, provide the Lenders with (1) a lenders' title insurance policy with extended coverage covering such Real Property in an amount equal to the purchase price (if applicable) or the Fair Market Value of the applicable Material Real Property, as determined in good faith by the Borrower and reasonably acceptable to the Administrative Agent, and (2) for real property located in the U.S., an ALTA survey or such survey alternatives (including, without limitation, an express map), or for real property situated in Canada, a survey in form and substance acceptable to the Collateral Agent, of such Real Property, together with a surveyor's certificate unless the title insurance policy referred to above shall not contain an exception for any matter shown by a survey (except to the extent an existing survey has been provided and specifically incorporated into such title insurance policy or if the Administrative Agent reasonably determines in consultation with the Borrower that the costs of obtaining such survey are excessive in relation to the value of the security to be afforded thereby), each in form and substance reasonably satisfactory to the Collateral Agent, and (B) comply with the requirements set forth in **Section 6.5(d)** with respect to such Material Real Property; and

(iii)    if reasonably requested by the Collateral Agent (at the direction of the Required Lenders), deliver to the Collateral Agent customary legal opinions regarding the enforceability, due authorization, execution and delivery of the Mortgages and such other matters reasonably requested by the Collateral Agent (at the direction of the Required Lenders), which opinions shall be in form and substance reasonably satisfactory to the Collateral Agent.

(c)    Except as otherwise contemplated by **Section 7.7(p)**, with respect to (x) any new Domestic Subsidiary that is a Non-Excluded Subsidiary created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any Subsidiary that was previously an Excluded Subsidiary that becomes a Non-Excluded Subsidiary) by the Borrower or any Subsidiary Guarantor or (y) any other Subsidiary that the Borrower elects to designate as not constituting an "Excluded Subsidiary" pursuant to **clause (y)** of the proviso to the definition thereof, promptly:

(i)    give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent or the Borrower, execute and deliver to the Collateral Agent such

amendments to the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement or such other documents as the Collateral Agent reasonably deems necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by **Section 4.17**) in the Capital Stock of such new Subsidiary that is owned by the Borrower or such Subsidiary Guarantor (as applicable);

(ii)     deliver to the Collateral Agent (or, in the case of Pledged Securities that are Term Facility First Priority Collateral, the Designated Term Loan Agent), the certificates, if any, representing such Capital Stock (other than Excluded Collateral), together with undated stock powers or share transfer instruments, in blank, executed and delivered by a duly authorized officer or director of the Borrower or such Subsidiary Guarantor (as applicable); and

(iii)     cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and, where applicable, the Canadian Collateral Agreement, the UK Security Agreements or the Cayman Pledge Agreement and (B) (x) to take such actions reasonably necessary to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by **Section 4.17**) in the Collateral described in the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements or the Cayman Pledge Agreement with respect to such new Subsidiary (to the extent the Collateral Agent, for the benefit of the Secured Parties, has a perfected security interest in the same type of Collateral as of the Closing Date), including the filing of Uniform Commercial Code and PPSA financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement or by law or as may be reasonably requested by the Collateral Agent and (y) comply with the provisions of **Section 6.8(b)** with respect to any Material Real Property (other than Excluded Real Property) owned by such new Subsidiary.

Without limiting the foregoing, if (1) the aggregate Consolidated Total Assets or annual consolidated revenues of all Restricted Subsidiaries designated as "Immaterial Subsidiaries" hereunder shall at any time exceed 1.0% of Consolidated Total Assets or 1.0% of annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (based on the most recent financial statements delivered pursuant to **Section 6.1** prior to such time) or (2) if any Restricted Subsidiary shall at any time cease to constitute an Immaterial Subsidiary under the definition of "Immaterial Subsidiary" (based on the most recent financial statements delivered pursuant to **Section 6.1** prior to such time), the Borrower shall promptly, (x) in the case of **clause (1)** above, rescind the designation as "Immaterial Subsidiaries" of one or more of such Restricted Subsidiaries so that, after giving effect thereto, the aggregate Consolidated Total Assets or annual consolidated revenues, as applicable, of all Restricted Subsidiaries so designated (and which designations have not been rescinded) shall not exceed 1.0% of Consolidated Total Assets or 1.0% of annual consolidated revenues, respectively, of the Borrower and its Restricted Subsidiaries (based on the most recent financial statements delivered pursuant to **Section 6.1** prior to such time), and (y) in the case of **clauses (1)** and **(2)** above, to the extent not already effected, (A) cause each affected Restricted Subsidiary to take such actions to become a "Subsidiary Guarantor" hereunder and under the Guarantee and Collateral Agreement and execute and deliver the documents and other instruments referred to in this paragraph (c) to the extent such affected Subsidiary is not otherwise an Excluded Subsidiary and (B) cause the owner of the Capital Stock of such affected Restricted Subsidiary to take such actions to pledge such Capital Stock to the extent required by, and otherwise in accordance with, the Guarantee and Collateral Agreement or the Canadian Collateral Agreement and execute and deliver the documents and other instruments required hereby and thereby unless such Capital Stock otherwise constitutes Excluded Collateral.

(d)　　Except as otherwise contemplated by **Section 7.7(p)**, with respect to any new first-tier Foreign Subsidiary created or acquired after the Closing Date by the Borrower or any Subsidiary Guarantor, promptly (i) give notice of such acquisition or creation to the Collateral Agent and, if requested by the Collateral Agent, execute and deliver to the Collateral Agent such amendments to the Guarantee and Collateral Agreement and/or the Canadian Collateral Agreement, the UK Security Agreements, the Cayman Pledge Agreement or such other documents as the Collateral Agent reasonably deems necessary or reasonably advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected security interest (to the extent required by the Security Documents and with the priority required by **Section 4.17**) in the Capital Stock of such new Subsidiary (other than any Excluded Collateral) that is owned by the Borrower or such Subsidiary Guarantor (as applicable) and (ii) deliver to the Collateral Agent (or, in the case of Pledged Securities that are Term Facility First Priority Collateral, the Designated Term Loan Agent) the certificates, if any, representing such Capital Stock (other than any Excluded Collateral), together with undated stock powers/share transfer instruments, in blank, executed and delivered by a duly authorized officer or director of the Borrower or such Subsidiary Guarantor (as applicable).

(e)　　Notwithstanding anything in this **Section 6.8** or any Security Document to the contrary, (i) other than with respect to Intellectual Property, neither Holdings nor the Borrower nor any of its Restricted Subsidiaries shall be required to take any actions in order to create or perfect the security interest in the Collateral granted to the Collateral Agent for the benefit of the Secured Parties under the laws of any jurisdiction outside the United States (unless, in the case of any Non-US Guarantor, such jurisdiction is the jurisdiction of organization for such Non-US Guarantor or such Non-US Guarantor has previously granted a security interest in such jurisdiction to secure the Obligations, in each case to the extent required by the Security Documents to which such Non-US Guarantor is a party) (***provided***, that notwithstanding anything herein to the contrary, any actions required to be taken under non-United States law for the purpose of perfecting non-United States Intellectual Property shall be limited to those set forth on **Schedule 6.10**), (ii) no control agreement shall be required with respect to (x) any Excluded Account or (y) any other Deposit Accounts for which control agreements are not required under **Section 6.15** and (iii) no Liens shall be required to be pledged or created with respect to any of the following (other than with respect to any floating charge granted by a UK Loan Party) (collectively, the "***Excluded Collateral***"):

(A)　　(x) in the case of assets that would otherwise constitute Term Facility First Priority Collateral, any such asset at any time that does not constitute Term Facility First Priority Collateral at such time (other than in connection with the Discharge of the Term Priority Claims (as defined in the ABL Intercreditor Agreement)), (y) motor vehicles or other assets subject to certificates of title or (z) any "intent-to-use" application for registration of a trademark or service mark filed pursuant to Section 1(b) of the Lanham Act, 15 U.S.C. § 1051, prior to the filing of a "Statement of Use" pursuant to Section 1(d) of the Lanham Act or an "Amendment to Allege Use" pursuant to Section 1(c) of the Lanham Act with respect thereto, solely to the extent, if any, that, and solely during the period, if any, in which, the grant of a security interest therein would impair the validity or enforceability of any registration that issues from such intent-to-use application under applicable federal law;

(B)　　any property or asset to the extent that such grant of a security interest is prohibited or effectively restricted by any applicable law (only so long as such prohibition exists) or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws (only so long as such consent requirement exists);

(C)　　any Excluded Accounts and any Excluded Equity Securities;

(D)　　(w) any assets owned on or acquired after the Closing Date, to the extent that, and only for so long as, taking such actions would violate applicable law or regulation (after giving

effect to Section 9-406(d), 9-407(a), 9-408 or 9-409 of the Uniform Commercial Code and other applicable law), (x) any assets acquired before or after the Closing Date, to the extent that and for so long as such grant would violate an enforceable Contractual Obligation binding on such assets that existed at the time of the acquisition thereof and was not created or made binding on such assets in contemplation or in connection with the acquisition of such assets, (y) any assets (1) owned on the Closing Date or (2) acquired after the Closing Date, in each case in this **clause (y)**, securing Indebtedness of the type permitted pursuant to **Section 7.2(c)** (or other Indebtedness permitted under **Section 7.2(d)**, **7.2(j)** or **7.2(t)** if such Indebtedness is of the type that is contemplated by **Section 7.2(c)**) that is secured by a Lien permitted by **Section 7.3** so long as the documents governing such Lien do not permit the pledge of such assets to the Collateral Agent, or (z) any lease, license or other agreement, any asset embodying rights, priorities or privileges granted under such leases, licenses or agreements, or any property subject to a purchase money security interest or similar arrangement to the extent that a grant of a security interest therein would violate, breach or invalidate such lease, license or agreement or purchase money arrangement or create a right of acceleration, modification, termination or cancellation in favor of any other party thereto (other than any Loan Party) after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code or applicable law, other than proceeds and receivables thereof, and only for so long such prohibition exists and to the extent such prohibition was not creation in contemplation of such grant;

(E)     (x) any assets to the extent a security interest in such assets could reasonably be expected to result in material adverse tax consequences (including as a result of Section 956 of the Code or any similar law or regulation in any applicable jurisdiction) to Holdings, the Borrower and their respective Subsidiaries, taken as a whole, as agreed, as reasonably determined in good faith by the Borrower and the Administrative Agent, or (y) any assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein outweigh the value of the security afforded thereby;

(F)     any leasehold interest in Real Property (and any Fixtures (as defined in the Guarantee and Collateral Agreement) relating thereto) and any fixtures relating to any owned Real Property to the extent that the Collateral Agent is not otherwise entitled to a security interest with respect to such owned Real Property under the terms of this Agreement; and

(G)     any owned Real Property other than Material Real Property, but in any event excluding any Excluded Real Property.

(f)     Notwithstanding the foregoing, to the extent any new Restricted Subsidiary is created solely for the purpose of consummating a merger transaction pursuant to an acquisition permitted by **Section 7.7**, and such new Subsidiary at no time holds any assets or liabilities other than any merger consideration contributed to it substantially contemporaneously with the closing of such merger transaction, such new Subsidiary shall not be required to take the actions set forth in **Section 6.8(c)** or **6.8(d)**, as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective merger transaction shall be required to so comply within ten (10) Business Days (or such longer period as the Administrative Agent shall agree in its sole discretion)).

(g)     From time to time the Loan Parties shall execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take all such actions, as the Collateral Agent may reasonably request for the purposes implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of renewing the rights of the Secured Parties with respect to the Collateral as to which the Collateral Agent, for the benefit of the Secured Parties, has a perfected Lien pursuant hereto or thereto, including, without limitation, filing any financing or continuation statements or

financing statement amendments under the Uniform Commercial Code (or the PPSA and other similar laws) in effect in any jurisdiction with respect to the security interests created thereby and providing an updated perfection certificate (or schedule thereof); ***provided***, that (i) the scope and substance of such updated perfection certificate (or schedule thereof) shall not be broader than that of the perfection certificate (or applicable schedule thereof) delivered by the Borrower on the Closing Date (after giving pro forma effect to the joinder or Disposition of any Guarantors after the Closing Date), (ii) in lieu of providing such updated perfection certificate (or schedule thereof), the Borrower may provide a certification that no changes have occurred since the most recent date on which a perfection certificate (or applicable schedule thereof) was delivered by the Borrower and (iii) no more than one such perfection certificate (or schedule thereof) shall be required  during any 12-month period beginning on the Closing Date or any anniversary thereof; ***provided***, that the Administrative Agent may request additional information, including, an updated perfection certificate (or schedules thereof) if the Borrower or its subsidiaries consummate a material transaction permitted pursuant to **Section 7.4** or Dispose of or acquire material assets of the type identified on the perfection certificate; ***provided***, ***further***, that in no event shall the Loan Parties be required to deliver landlord lien waivers, estoppels or collateral access letters except as set forth in **Section 6.16**. Notwithstanding the foregoing, the provisions of this **Section 6.8** shall not apply to assets as to which the Administrative Agent and the Borrower shall reasonably determine that the costs and burdens of obtaining a security interest therein or perfection thereof outweigh the value of the security afforded thereby.  The Administrative Agent may grant extensions of time or waivers of requirement for the creation or perfection of security interests in or the obtaining of insurance (including title insurance) or surveys with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Loan Documents.

(h)      Notwithstanding the foregoing, if (a) the Borrower or any Restricted Subsidiary acquires any Material Real Property (other than Excluded Real Property) or (b) the Required Lenders or Administrative Agent shall have notified the Borrower in writing that they have or it has a reasonable belief that either the Borrower or any of its Restricted Subsidiaries is in breach of its obligations under **Section 6.4** (to the extent applicable to Environmental Law or Releases of Materials of Environmental Concern), then the Borrower shall deliver within sixty (60) days after the Required Lenders or the Administrative Agent, as applicable, requests therefor or such longer period as the Administrative Agent shall agree, at the Borrower's cost and expense, an environmental assessment report, in the case of **clause (b)** above of a scope reasonably appropriate to address the subject of the Required Lenders' or the Administrative Agent's, as applicable, reasonable belief that such a breach exists, prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent, indicating the presence or absence of Materials of Environmental Concern or noncompliance with Environmental Law and the estimated cost of any compliance, response or other corrective action to address any identified Materials of Environmental Concern, to the extent required by Environmental Law, or noncompliance on such properties.  Without limiting the generality of the foregoing, if the Administrative Agent reasonably determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrower (which report would be addressed to the Borrower), and the Borrower hereby grants and agrees to cause any Subsidiary that owns or leases any property described in such request to grant the Administrative Agent, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment on behalf of the Borrower.  By virtue of the foregoing, the Borrower does not intend to waive the attorney-client privilege with respect to any information or advice provided by the environmental consulting firm.

**6.9**    **Use of Proceeds.**  The proceeds of (i) any Revolving Loans borrowed on the Closing Date pursuant to **Section 2.4(a)** shall be used to effect the Transactions in accordance with the Restructuring Plan, to make payments and distributions under the Restructuring Plan, to pay the Transaction Costs and, to the extent of any excess, for other general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement (including for the avoidance of doubt, to refinance the ABL DIP Facility) and (ii) any other Loans incurred after the Closing Date hereunder shall be used to finance Permitted Acquisitions and Investments permitted hereunder or for other general corporate purposes of the Borrower and its Subsidiaries not prohibited by this Agreement.

**6.10**    **Post-Closing**.

(a)    Satisfy the requirements set forth on **Schedule 6.10**, on or before the date set forth opposite such requirements or such later date as consented to by the Administrative Agent in its reasonable discretion.

(b)    With respect to any Material Real Property identified in **Schedule 4.8**, satisfy the requirements set forth in **Section 6.8(b)** within ninety (90) days of the Closing Date or such later date as consented to by the Administrative Agent in its sole and reasonable discretion; ***provided*** that, with respect to the Melson Avenue Property, such requirements set forth in **Section 6.8(b)** shall be satisfied no later than the date that is ninety (90) days from the termination of the Purchase and Sale Agreement dated November 1, 2022 among Roux Laboratories, Inc., as seller, Mayfair Acquisitions, LLC, as purchaser and Old Republic National Title Insurance Company, as escrow agent, unless, on or prior to the end of such 90-day period Roux Laboratories, Inc. shall have entered into an alternative definitive agreement (for, the avoidance of doubt, a letter of intent or term sheet does not constitute a definitive agreement for these purposes) pursuant to which it shall have agreed to sell the Melson Avenue Property.

**6.11**    **[Reserved].**

**6.12**    **Line of Business.**  Continue to operate solely as a Permitted Business.

**6.13**    **Changes in Jurisdictions of Organization; Name.**  Provide prompt written notice to the Collateral Agent of any change of name or change of jurisdiction of organization of any Loan Party, and deliver to the Collateral Agent all additional executed financing statements, financing statement amendments and other documents reasonably requested by the Collateral Agent to maintain the validity, perfection and priority of the security interests to the extent provided for in the Security Documents.

**6.14**    **Appraisals and Field Examinations**.

(a)    The Company may and, upon request of the Administrative Agent (or if the Administrative Agent has not so requested within five (5) Business Days after receipt of a written request from the Required Lenders, upon the request of the Required Lenders), shall conduct, or cause to be conducted (by professionals selected and engaged by the Administrative Agent), at its expense, and present to the Administrative Agent for approval, (i) Appraisals of the assets included in the Borrowing Base and (ii) such other investigations and reviews as the Administrative Agent (or the Required Lenders) shall request for the purpose of determining the Borrowing Base (which determination shall in each case apply jointly to the foregoing), all upon reasonable notice and at such times during normal business hours and as often as may be reasonably requested; ***provided***, ***however***, that unless a Default or Event of Default shall be continuing, the Administrative Agent and the Lenders shall not request any such Appraisal, investigation and review prior to the first anniversary of the Closing Date and shall request no more than two such Appraisals, investigations and reviews in the aggregate during any 12-month period beginning on an anniversary of the Closing Date.  The Company shall furnish to the Administrative Agent any information that the

Administrative Agent may reasonably request regarding the determination and calculation of the Borrowing Base including correct and complete copies of any invoices, underlying agreements, instruments or other documents and the identity of all Account Debtors in respect of the Accounts referred to therein.  Following the completion of any such Appraisals, investigations or reviews, the reports and results of such Appraisals, investigations or reviews shall be delivered to the Lenders.

(b)        The Administrative Agent may (or if the Administrative Agent has not done so within five (5) Business Days after receipt of a written request from the Required Lenders, Required Lenders  may), at the Company's sole cost and expense, (i) make test verifications of the Accounts and physical verifications of Inventory in any manner and through any medium that the Administrative Agent (or such Lenders) reasonably consider advisable and (ii) caused to be conducted customary field examinations of the ABL Facility First Priority Collateral, and the Company shall furnish all such assistance and information as the Administrative Agent (or, if applicable, the Required Lenders) may reasonably require in connection therewith; ***provided***, ***however***, that unless a Default or Event of Default shall be continuing, the Administrative Agent and the Lenders shall not request any such verifications or customary field examinations prior to the first anniversary of the Closing Date and shall request no more than two such verifications or two such customary field examinations in the aggregate during any 12-month period beginning on an anniversary of the Closing Date.  At any time and from time to time, upon the Administrative Agent's request (or if the Administrative Agent has not so requested within five (5) Business Days after receipt of a written request from the Required Lenders, upon the request of the Required Lenders) and at the expense of the Company, the Company shall furnish to the Administrative Agent or such Lenders, as applicable, reports reasonably satisfactory to the Administrative Agent showing reconciliations, aging and test verifications of, and trial balances for, the Accounts; ***provided***, ***however***, that unless a Default or Event of Default shall be continuing, the Administrative Agent and the Lenders shall not request any such report prior to the first anniversary of the Closing Date and shall request no more than two such reports during any 12-month period beginning on the Closing Date or an anniversary thereof.  Following the completion of any field examinations, the reports and results of such field examinations shall be delivered to the Lenders.

(c)        There shall be at least two appraisals of Inventory, one appraisal of Equipment and one appraisal of Real Property per each 12 month period, in each case, in a manner and cadence consistent with past practice.

(d)        The Loan Parties shall cooperate with, and use commercially reasonable efforts to provide the Administrative Agent, liquidation agents and appraisers with updated information in respect of the calculation of the Borrowing Base as may be requested by them from time to time.

**6.15**    **Control Accounts; Approved Deposit Accounts.**  From and after the date that is forty-five (45) days after the Closing Date or such later date as the Administrative Agent may agree in its sole discretion:

(a)        The Company shall, and shall cause each of the Subsidiary Guarantors to, except cash or Cash Equivalents subject to a Lien permitted under **Section 7.3(c)**, **(d)**, **(g)** (solely to the extent securing Indebtedness permitted pursuant to **Section 7.2(t)** and only to the extent prohibited by the terms of the Indebtedness secured thereby), **(j)** (solely to the extent prohibited by the terms of the Indebtedness secured thereby), **(o)**, **(p)**, **(r)**, **(t)**, **(bb)**, **(kk)** and **(ee)** (with respect to the foregoing clauses), (i) deposit in an Approved Deposit Account all cash and all Proceeds (as defined in the Guarantee and Collateral Agreement) (or such similar term under and as defined in the Security Documents of a Non-US Guarantor) of any Account or General Intangible (as defined in the Guarantee and Collateral Agreement) (or such similar terms under and as defined in the Security Documents of a Non-US Guarantor) they receive from any other Person, (ii) not maintain any funds or other assets in any Securities Accounts that is not a Control

111

Account (except as otherwise provided in **Section 7.3(ii)** of the Guarantee and Collateral Agreement) and (iii) not establish or maintain any Deposit Account other than with a Deposit Account Bank; ***provided***, ***however***, that the Company and the Subsidiary Guarantors may deposit cash into and maintain Excluded Accounts.

(b)    The Company shall, and shall cause each of the Subsidiary Guarantors, to instruct (or, with respect to General Intangibles, use commercially reasonable efforts to instruct) each Account Debtor with a principal place of business located in the jurisdictions permitted in **clause (f)** of the definition of "Eligible Receivables" obligated to make a payment to any of them under any Account or General Intangible to make payment, or to continue to make payment, to an Approved Deposit Account.

(c)    In the event (i) the Company, any Subsidiary Guarantor or any Deposit Account Bank shall, after the date hereof, terminate an agreement with respect to the maintenance of an Approved Deposit Account for any reason, (ii) the Administrative Agent shall demand such termination as a result of the failure of a Deposit Account Bank to comply in any material respect with the terms of the applicable Deposit Account Control Agreement or (iii) the Administrative Agent determines in its sole discretion exercised reasonably that the financial condition of a Deposit Account Bank has materially deteriorated, the Company shall, and shall cause each Subsidiary Guarantor to, notify all of their respective obligors that were making payments to such terminated Approved Deposit Account to make all future payments to another Approved Deposit Account.

(d)    In the event (i) the Company, any Subsidiary Guarantor or any Approved Securities Intermediary shall, after the date hereof, terminate an agreement with respect to the maintenance of a Control Account for any reason, (ii) the Administrative Agent shall demand such termination as a result of the failure of an Approved Securities Intermediary to comply with the terms of the applicable Securities Account Control Agreement or (iii) the Administrative Agent determines in its sole discretion exercised reasonably that the financial condition of an Approved Securities Intermediary has materially deteriorated, the Company shall, and shall cause each Subsidiary to Guarantor to, notify all of its obligors that were making payments to such terminated Control Account to make all future payments to another Control Account.

**6.16    Landlord Waiver and Bailee's Letters.**  Use commercially reasonable efforts to deliver Landlord Waivers and Bailee's Letters pursuant to **Section 6.10** and as the Administrative Agent shall request from time to time in connection with ABL Facility First Priority Collateral included in the Borrowing Base in its sole discretion exercised reasonably and in accordance with customary business practices for comparable asset-based transactions.

**6.17    [Reserved].**

**6.18    Sanctions; Anti-Corruption Laws.**  Maintain in effect policies and procedures designed to promote compliance by Holdings, the Borrower, its Subsidiaries, and their respective directors, officers, employees, and agents with applicable Sanctions and with the Anti-Corruption Laws.  The Borrower will not, directly or indirectly, use the proceeds of the Loans (i) to lend, contribute, provide or otherwise make available such proceeds to fund any activity or business in any Designated Jurisdiction or to fund any activity or business of any Person located, organized or residing in any Designated Jurisdiction or who is the target of any Sanctions, or in any other manner, in each case, that would result in any violation by any party hereto (including any Lender, Lead Arranger or Administrative Agent) of Sanctions or (ii) for any payments to any Person, governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Corruption Law. Notwithstanding the foregoing, the covenants given in this **Section 6.18** shall not be made by nor apply to

any Person that qualifies as a corporation that is registered or incorporated under the laws of Canada or any province thereof and that carries on business in whole or in part in Canada within the meaning of Section 2 of the Foreign Extraterritorial Measures (United States) Order, 1992 passed under the Foreign Extraterritorial Measures Act (Canada) in so far as such representations would result in a violation of or conflict with the Foreign Extraterritorial Measures Act (Canada) or any similar law.

**6.19**    **People's Republic of China.**  Use commercially reasonable efforts to repatriate cash and Cash Equivalents located in the People's Republic of China to the extent (a) reasonably practicable under applicable law and regulation, (b) the Borrower determines (in its good faith judgment) that the amount of cash and Cash Equivalents located in the People's Republic of China at such time exceeds the amount necessary to maintain Holdings and its Subsidiaries' operations in the People's Republic of China in the ordinary course of business and (c) such repatriation does not result in material adverse tax consequences to Holdings or the Borrower or any of its Subsidiaries as reasonably determined by the Borrower in consultation with the Administrative Agent.

**6.20**    **People with Significant Control Regime**.

(a)    Comply with any notice it receives pursuant to Part 21A of the Companies Act 2006 (UK) from any company incorporated in the United Kingdom whose shares are the subject of a Lien in favor of the Administrative Agent, and

(b)    promptly provide the Administrative Agent with a copy of that notice.

**6.21**    **Information Technology Systems.**  Except as would not cause or would not be reasonably expected to result in, individually or in the aggregate, a Material Adverse Effect, (a) maintain the information technology systems used in the business of the Loan Parties and their Subsidiaries so as to operate and perform in all material respects as required to permit the Loan Parties and their Subsidiaries to conduct their business as presently conducted and (b) (i) implement and maintain a reasonable enterprise-wide privacy and information security program with plans, policies and procedures for privacy, physical and cybersecurity, disaster recovery, business continuity and incident response, including reasonable and appropriate administrative, technical and physical safeguards to protect information subject to any applicable data protection laws and the information technology systems of the Loan Parties and their Subsidiaries from any unauthorized access, use, control, disclosure, destruction or modification and (ii) be in compliance with all applicable law and Material Contracts regarding the privacy and security of customer, consumer, patient, employee and other personal data and is compliant with their respective published privacy policies.

**6.22**    **Canadian Defined Benefit Pension Plan Reporting.**

Furnish to the Administrative Agent, promptly after filing, a copy of the most recently filed actuarial valuation report in respect of any Canadian Defined Benefit Pension Plan.

<div align="center">

**SECTION VII.**
**NEGATIVE COVENANTS**

</div>

The Borrower hereby agrees that, from and after the Closing Date, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than (i) contingent or indemnification obligations not then due and (ii) obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations), the Borrower shall not, and shall not permit any of its Restricted Subsidiaries (other than any Permitted Joint Venture) to:

**7.1**    **Financial Covenant.**

(a)    Commencing with the fiscal quarter ending on June 30, 2023, during a Liquidity Event Period, the Borrower shall not permit the Financial Covenant Fixed Charge Coverage Ratio to be less than 1.00 to 1.00 as of the last day of the most recently ended Test Period (commencing with the Test Period ended on or immediately prior to the commencement of such Liquidity Event Period).

(b)    Following a Covenant Triggering Event (or to the extent such borrowing would result in a Covenant Triggering Event), the Borrower shall not be permitted to borrow under the Facility beyond the threshold of Excess Availability listed in clause (a) of the definition of Liquidity Event Period (such threshold, the "*Limited Availability Threshold*"), unless and until it has maintained compliance with a Financial Covenant Fixed Charge Coverage Ratio of not less than 1.00 to 1.00 for two consecutive fiscal quarters and certified such compliance in writing to the Administrative Agent; *provided* that, if the Borrower has maintained compliance with a Financial Covenant Fixed Charge Coverage Ratio of not less than 1.00 to 1.00 for the fiscal quarter ending June 30, 2023 and certified such compliance in writing to the Administrative Agent, then solely with respect to the period from the date on which financial statements are delivered or required to be delivered pursuant to **Section 6.1(b)** for the fiscal quarter ending June 30, 2023 through the date on which financial statements are delivered or required to be delivered pursuant to **Section 6.1(b)** for the fiscal quarter ending September 30, 2023, the Borrower shall be permitted to borrow beyond the Limited Availability Threshold even if such borrowing would result in a Covenant Triggering Event.

**7.2**    **Indebtedness.**    Create, issue, incur, assume, or permit to exist any Indebtedness, except:

(a)    Indebtedness of the Borrower and any of its Restricted Subsidiaries pursuant to this Agreement and any other Loan Document and any Permitted Refinancing thereof;

(b)    unsecured Indebtedness of the Borrower or any of its Restricted Subsidiaries owing to the Borrower or any of its Restricted Subsidiaries, *provided*, that any such Indebtedness owing by a non-Loan Party to a Loan Party is permitted by **Section 7.7** (other than by reference to **Section 7.2** or any clause thereof); *provided*, *further*, that such Indebtedness of the Borrower or any of its Restricted Subsidiaries owing to a Loan Party may be secured by Liens permitted pursuant to **Section 7.3(ff)**;

(c)    (i)    Capital Lease Obligations, and Indebtedness of the Borrower or any of its Restricted Subsidiaries incurred to finance or reimburse the cost of the acquisition, development, construction, purchase, lease, repair, addition or improvement of any property (real or personal), equipment or other assets used or useful in a Permitted Business, whether such property, equipment or assets were originally acquired directly or as a result of the purchase of any Capital Stock of any Person owning such property, equipment or assets, in an aggregate outstanding principal amount for this **clause (i)** not to exceed the sum of (A) the greater of (x) 10.0% of Consolidated Total Assets, at the time of incurrence and (y) 10.0% of Consolidated Total Assets as of the Closing Date *plus* (B) $7,500,000 *plus* (C) for each period of twelve consecutive months after December 31, 2022, an additional $7,500,000, and

(ii)    subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clause (c)(i)** above;

(d)    (i)    Indebtedness outstanding or incurred pursuant to facilities outstanding on the Closing Date (after giving effect to the Transactions) or committed to be incurred pursuant to a definitive agreement as of such date and, in each case, up to the aggregate principal amounts listed on **Schedule 7.2(d)** and any Permitted Refinancing thereof, and

(ii)    Indebtedness incurred in connection with transactions permitted under **Section 7.10** and any Permitted Refinancing thereof;

(e)    Guarantee Obligations

(i)    by the Borrower or any of its Restricted Subsidiaries of obligations of the Borrower or any Subsidiary Guarantor not prohibited by this Agreement to be incurred; *provided* that any such Subsidiary that is not a Guarantor providing such Guarantee Obligations with respect to Indebtedness of the Borrower in reliance on this **clause (e)** shall also provide a Guarantee with respect to the Obligations on a pari passu basis with the Obligations,

(ii)    by the Borrower or any Subsidiary Guarantor of obligations of Holdings, any Non-Guarantor Subsidiary or joint venture or other Person that is not a Subsidiary to the extent permitted by **Section 7.7** (other than by reference to **Section 7.2** or any clause thereof),

(iii)    by any Non-Guarantor Subsidiary of obligations of any other Non-Guarantor Subsidiary; and

(iv)    by any Non-Guarantor Subsidiary of the obligations of any other Person that is not a Subsidiary to the extent permitted by **Section 7.7** (other than by reference to **Section 7.2** or any clause thereof);

(f)    Indebtedness of the Borrower or any of its Restricted Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Restricted Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is promptly repaid;

(g)    Indebtedness consisting of Hedge Agreements permitted pursuant to **Section 7.14**;

(h)    Indebtedness in the form of earn-outs, indemnification, incentive, non-compete, consulting, ordinary course deferred purchase price, purchase price adjustment or other similar arrangements and other contingent obligations in respect of the Transactions and other acquisitions or Investments permitted by **Section 7.7** (other than by reference to **Section 7.2** or any clause thereof) (both before or after any liability associated therewith becomes fixed), including any such obligations which may exist on the Closing Date as a result of acquisitions consummated prior to the Closing Date;

(i)    [reserved]

(j)    (i)    Indebtedness of the Borrower or any other Loan Party in an aggregate principal amount (for the Borrower and all such Loan Parties) not to exceed $150,000,000 at any time outstanding,

(ii)    [reserved]

(iii)    subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clauses (j)(i)** above; *provided* that

(a)    proceeds of Indebtedness incurred pursuant to **Section 7.2(j)(i)** and any Permitted Refinancing thereof pursuant to this Section 7.2(j)(iii) shall not be used for liability management purposes,

(b)      no more than (x) $25,000,000, of such Indebtedness incurred pursuant to **clause (j)(i)** may be secured (1) by the ABL Facility First Priority Collateral on a junior basis with the Liens securing the Obligations and (2) by the Term Facility First Priority Collateral on a senior basis with the Liens securing the Obligations and on a pari passu basis with the Liens securing the obligations under the Term Loan Credit Agreement and

(c)      to the extent secured, such Indebtedness incurred pursuant to **Section 7.2(j)(i)** and any Permitted Refinancing thereof pursuant to this **Section 7.2(j)(iii)** may only be secured pursuant to **Section 7.3(g)**;

(k)      (i)      Indebtedness of Non-Guarantor Subsidiaries that are Foreign Subsidiaries under local or bilateral credit facilities for working capital and general corporate purposes, in an aggregate principal amount, for purposes of this *clause (k)(i)*, not to exceed $50,000,000 at any time outstanding and

(ii)      subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clause (k)(i)** above;

(l)      Indebtedness of the Borrower or any of its Restricted Subsidiaries in respect of workers' compensation claims, bank guarantees, warehouse receipts or similar facilities, property casualty or liability insurance, take-or-pay obligations in supply arrangements, self-insurance obligations, performance, bid, customs, government, VAT, duty, tariff, appeal and surety bonds, completion guarantees, and other obligations of a similar nature, in each case in the ordinary course of business;

(m)      Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries arising from agreements providing for indemnification related to sales, leases or other Dispositions of goods or adjustment of purchase price or similar obligations in any case incurred in connection with the acquisition or Disposition of any business, assets or Subsidiary;

(n)      Indebtedness supported by a letter of credit issued under any revolving credit or letter of credit facility permitted by this **Section 7.2**, including in respect of unpaid reimbursement obligations relating thereto, in a principal amount not in excess of the stated amount of such letter of credit;

(o)      Indebtedness issued in lieu of cash payments of Restricted Payments permitted by **Section 7.6** (other than by reference to **Section 7.2** or any clause thereof);

(p)      [reserved];

(q)      Indebtedness of the Borrower or any Restricted Subsidiary as an account party in respect of trade letters of credit issued in the ordinary course of business or otherwise consistent with industry practice;

(r)      Indebtedness (i) owing to any insurance company in connection with the financing of any insurance premiums permitted by such insurance company in the ordinary course of business and (ii) in the form of pension and retirement liabilities not constituting an Event of Default, to the extent constituting Indebtedness;

(s)      (i)      Guarantee Obligations made in the ordinary course of business; *provided*, that such Guarantee Obligations are not of Indebtedness for Borrowed Money,

116

(ii)     Guarantee Obligations in respect of lease obligations of the Borrower and its Restricted Subsidiaries,

(iii)     Guarantee Obligations in respect of Indebtedness of joint ventures; ***provided***, that the aggregate principal amount of any such Guarantee Obligations under this **sub-clause (iii)** shall not exceed the greater of (A) $25,000,000 and (B) 0.83% of Consolidated Total Assets at the time of such incurrence, at any time outstanding,

(iv)     Guarantee Obligations in respect of Indebtedness permitted by **clause (r)(ii)** above and

(v)     Guarantee Obligations by the Borrower or any of its Restricted Subsidiaries of any Restricted Subsidiary's purchase obligations under supplier agreements and in respect of obligations of or to customers, distributors, franchisees, lessors, licensees and sublicensees; ***provided***, that such Guarantee Obligations are not of Indebtedness for Borrowed Money;

(t)     (x) Indebtedness (including pursuant to any factoring arrangements) of any Person that becomes a Restricted Subsidiary or is merged with or into the Borrower or any of its Restricted Subsidiaries after the Closing Date (a "***New Subsidiary***") or that is associated with assets being purchased or otherwise acquired, in each case, as part of an acquisition, merger or consolidation or amalgamation or other Investment not prohibited hereunder; ***provided***, that (A) such Indebtedness exists at the time such Person becomes a Restricted Subsidiary or is acquired, merged, consolidated or amalgamated by, with or into the Borrower or such Restricted Subsidiary or when such assets are acquired and is not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary or with such merger (except to the extent such Indebtedness refinanced other Indebtedness to facilitate such Person becoming a Restricted Subsidiary or to facilitate such merger) or such asset acquisition and (B) neither the Borrower nor any of its Restricted Subsidiaries (other than the applicable New Subsidiary and its Subsidiaries) shall provide security or any guarantee therefor and (y) Permitted Refinancings of the Indebtedness referred to in **clause (x)** of this paragraph (t);

(u)     (i) Indebtedness incurred to finance any acquisition or Investment permitted under **Section 7.7** to the extent (A) unsecured at all times during the term of this Agreement and (B) in an aggregate outstanding principal amount for all such Indebtedness under this **clause (u)(i)** not to exceed the greater of (x) $50,000,000 and (y) 1.5% of Consolidated Total Assets at the time of such incurrence, at any time outstanding and (ii) subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clause (u)(i)** above;

(v)     [reserved]

(w)     (i) Indebtedness representing deferred compensation or stock-based compensation to employees of Holdings, any Parent Company, the Borrower or any Restricted Subsidiary incurred in the ordinary course of business and (ii) Indebtedness consisting of obligations of the Borrower or any Restricted Subsidiary under deferred compensation or other similar arrangements incurred in connection with the Transactions and any Investment permitted hereunder;

(x)     Indebtedness issued by the Borrower or any of its Restricted Subsidiaries to the officers, directors and employees of Holdings, any Parent Company, the Borrower or any Restricted Subsidiary of the Borrower or their respective estates, trusts, family members or former spouses, in lieu of or combined with cash payments to finance the purchase of Capital Stock of Holdings, any Parent Company or the Borrower, in each case, to the extent such purchase is permitted by **Section 7.6**;

117

(y)     Indebtedness (and Guarantee Obligations in respect thereof) in respect of overdraft facilities, employee credit card programs, netting services, automatic clearinghouse arrangements and other cash management and similar arrangements in the ordinary course of business;

(z)     (i) Indebtedness of the Borrower or any of its Restricted Subsidiaries undertaken in connection with cash management and related activities with respect to any Subsidiary or joint venture in the ordinary course of business and (ii) Indebtedness of the Borrower or any of its Restricted Subsidiaries to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business in connection with the cash management operations (including in respect of intercompany self-insurance arrangements);

(aa)     (i) Indebtedness of the Borrower and any of its Restricted Subsidiaries under the Term Loan Agreement or otherwise in an aggregate outstanding principal amount not to exceed $1,500,506,261.43,  (being the amount outstanding thereunder as of the Closing Date plus $100,000,000), and (ii) subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clause (aa)(i)** above;

(bb)     Indebtedness to any Person (other than an Affiliate of the Borrower) in respect of the undrawn portion of the face amount of or unpaid reimbursement obligations in respect of letters of credit for the account of the Borrower or any of its Subsidiaries in an aggregate amount at any one time outstanding not to exceed (x) $20,000,000, *plus* (y) an additional $30,000,000 to the extent that the amounts incurred under this **clause (y)** are offset or secured by a counterpart deposit, compensating balance or a pledge of cash deposits;

(cc)     (i)     unsecured Indebtedness of the Borrower  or a Subsidiary Guarantor to Holdings, any Parent Company or any Affiliate of the Borrower, Holdings or any Parent Company in an aggregate principal amount at any time outstanding not to exceed $75,000,000; *provided*, that (x) such Indebtedness is subordinated in right of payment of the Obligations, (y) the maturity date thereof shall not be earlier than the Latest Maturity Date in effect at the time such Indebtedness is incurred and (z) such Indebtedness shall not require the payment of cash interest prior to the Latest Maturity Date in effect at the time such Indebtedness is incurred and

(ii)     subject to the last sentence of this **Section 7.2**, Permitted Refinancings in respect of the Indebtedness incurred pursuant to **clause (cc)(i)** above;

(dd)     Indebtedness designated as Specified Additional Obligations, Specified Cash Management Obligations, or Specified Hedge Agreements in accordance with the definitions thereof; and

(ee)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations described in **clauses (a)** through **(dd)** above.

To the extent that any Indebtedness incurred under **Section 7.2(c)**, **(d)**, **(i)**, **(j)(i)**,  **(k)**, **(t)**, **(u)**, **(aa)** or **(cc)** is refinanced in a Permitted Refinancing under **clause (ii)** or other clause of the relevant foregoing Section, then the aggregate outstanding principal amount of such Permitted Refinancing shall be deemed to utilize the related basket under the relevant foregoing Section on a dollar for dollar basis (it being understood that a Default shall be deemed not to have occurred solely to the extent that the incurrence of a Permitted Refinancing would cause the permitted amount under such Section to be exceeded and such excess shall be permitted hereunder).

**7.3**    Liens**.**  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)    Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings; ***provided***, that adequate reserves with respect thereto are maintained on the books of the Borrower or its Restricted Subsidiaries, as the case may be, to the extent required by GAAP;

(b)    landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than sixty (60) days or that are being contested in good faith by appropriate proceedings;

(c)    (i) pledges, deposits or statutory trusts in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens incurred in the ordinary course of business securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to the Borrower or any of its Restricted Subsidiaries in respect of such obligations;

(d)    deposits and other Liens to secure the performance of bids, government, trade and other similar contracts (other than for Indebtedness for Borrowed Money), leases, subleases, statutory or regulatory obligations, surety, judgment and appeal bonds, performance bonds and other obligations of a like nature and liabilities to insurance carriers incurred in the ordinary course of business;

(e)    (i) Liens and encumbrances shown as exceptions in any title insurance policies insuring any Mortgages, and (ii) easements, zoning restrictions, rights-of-way, leases, licenses, covenants, conditions, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(f)    Liens (i) in existence on the Closing Date (after giving effect to the Transactions) listed on **Schedule 7.3(f)** (or to the extent not listed on such **Schedule 7.3(f)**, where the Fair Market Value of the Property to which such Lien is attached is less than $10,000,000), in each case securing the obligations that such Liens secured on the Closing Date and any replacements, refinancings and extensions thereof, (ii) securing Indebtedness permitted by **Section 7.2(d)** and (iii) created after the Closing Date in connection with any refinancing, refundings, or renewals or extensions thereof permitted by **Section 7.2(d)**; ***provided***, that no such Lien is spread to cover any additional Property of the Borrower or any of its Restricted Subsidiaries after the Closing Date unless such Lien utilizes a separate basket under this **Section 7.3**;

(g)    (i)    Liens securing Indebtedness of the Borrower or any of its Restricted Subsidiaries incurred pursuant to **Sections 7.2(c)**, **7.2(e)**, and **7.2(i)** (***provided*** that no such Lien securing debt pursuant to **Section 7.2(i)** shall apply to any other Property of the Borrower or any of its Restricted Subsidiaries that is not Collateral (or does not concurrently become Collateral) unless such Lien utilizes a separate basket under this **Section 7.3**) and **Sections 7.2(j)(i)**, **7.2(k)**, **7.2(r)**, **7.2(s)** and **7.2(t)**; ***provided***, that

(A)    in the case of any such Liens securing Indebtedness pursuant to **Section 7.2(k)**, such Liens do not at any time encumber any Property of the Borrower or any Subsidiary Guarantor,

(B)    in the case of any such Liens securing Indebtedness incurred pursuant to **Section 7.2(r)**, such Liens do not encumber any Property other than cash paid to any such insurance company in respect of such insurance,

(C)      in the case of any such Liens securing Indebtedness pursuant to **Section 7.2(t)(x)**, such Liens exist at the time that the relevant Person becomes a Restricted Subsidiary or such assets are acquired and are not created in contemplation of or in connection with such Person becoming a Restricted Subsidiary or the acquisition of such assets (except to the extent such Liens secure Indebtedness which refinanced other secured Indebtedness to facilitate such Person becoming a Restricted Subsidiary or to facilitate the merger, consolidation or amalgamation or other acquisition of assets referred to in such **Section 7.2(t)(x)**),

(D)      in the case of Liens securing Guarantee Obligations pursuant to **Section 7.2(e)**, the underlying obligations are secured by a Lien permitted to be incurred pursuant to this Agreement and

(E)  in the case of any such Liens securing Indebtedness pursuant to **Section 7.2(j)(i)**, no more than $25,000,000, of such Indebtedness may be secured (1) by the ABL Facility First Priority Collateral on a junior basis with the Liens securing the Obligations and (2) by the Term Facility First Priority Collateral on a senior basis with the Liens securing the Obligations and on a pari passu basis with the Liens securing the obligations under the Term Loan Credit Agreement and

(ii)      any extension, refinancing, renewal or replacement of the Liens described in **clause (i)** of this **Section 7.3(g)** in whole or in part; *provided*, that such extension, renewal or replacement shall be limited to all or a part of the property which secured (or was permitted to secure) the Lien so extended, renewed or replaced (plus improvements on such property, if any);

(h)      Liens created pursuant to the Loan Documents or any other Lien securing all or a portion of the Obligations or any obligations in respect of a Permitted Refinancing thereof in accordance with **Section 7.2**;

(i)      Liens arising from judgments in circumstances not constituting an Event of Default under **Section 8.1(h)**;

(j)      Liens on Property or assets acquired pursuant to an acquisition permitted under **Section 7.7** (and the proceeds thereof) or assets of a Restricted Subsidiary in existence at the time such Restricted Subsidiary is acquired pursuant to an acquisition permitted under **Section 7.7** and not created in contemplation thereof and Liens created after the Closing Date in connection with any refinancing, refundings, replacements or renewals or extensions of the obligations secured thereby permitted hereunder, *provided*, that no such Lien is spread to cover any additional Property (other than other Property of such Restricted Subsidiary or the proceeds or products of the acquired assets or any accessions or improvements thereto and after-acquired property, subjected to a Lien pursuant to terms existing at the time of such acquisition) after the Closing Date (unless such Lien utilizes a separate basket under this **Section 7.3**);

(k)      (i) Liens on Property of Non-Guarantor Subsidiaries securing Indebtedness or other obligations not prohibited by this Agreement to be incurred by such Non-Guarantor Subsidiaries and (ii) Liens securing Indebtedness or other obligations of the Borrower or any of its Restricted Subsidiaries in favor of any Loan Party;

(l)      receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(m)      Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods;

(n)      Liens arising out of consignment or similar arrangements for the sale by the Borrower and its Restricted Subsidiaries of goods through third parties in the ordinary course of business or otherwise consistent with past practice;

(o)      Liens solely on any cash earnest money deposits made by the Borrower or any of its Restricted Subsidiaries in connection with an Investment permitted by **Section 7.7**;

(p)      Liens deemed to exist in connection with Investments permitted by **Section 7.7(b)** that constitute repurchase obligations;

(q)      Liens upon specific items of inventory, equipment or other goods and proceeds of the Borrower or any of its Restricted Subsidiaries arising in the ordinary course of business securing such Person's obligations in respect of bankers' acceptances and letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory, equipment or other goods;

(r)      Liens (i) on cash deposits securing any Hedge Agreements permitted hereunder, and not for speculative purposes, in an aggregate amount not to exceed $10,000,000 at any time outstanding or (ii) securing Hedge Agreements of the Borrower and its Restricted Subsidiaries entered into in the ordinary course of business for the purpose of providing foreign exchange for their respective operating requirements or of hedging interest rate or currency exposure, and not for speculative purposes;

(s)      any interest or title of a lessor under any leases or subleases entered into by the Borrower or any of its Restricted Subsidiaries in the ordinary course of business and any financing statement filed in connection with any such lease;

(t)      Liens on cash and Cash Equivalents (including the net proceeds of the incurrence of Indebtedness) used to defease or to satisfy and discharge or redeem or repurchase Indebtedness, *provided*, that such defeasance or satisfaction and discharge or redemption or repurchase is not prohibited hereunder;

(u)      (i) Liens that are contractual rights of set-off (A) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (B) relating to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Restricted Subsidiaries or (C) relating to purchase orders and other agreements entered into with distributors, clients, customers, vendors or suppliers of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business, (ii) other Liens securing cash management obligations in the ordinary course of business and (iii) Liens encumbering reasonable and customary initial deposits and margin deposits in respect of, and similar Liens attaching to, commodity trading accounts and other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(v)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights;

(w)      Liens on Capital Stock in joint ventures and other non-wholly owned entities securing obligations of such joint venture or entity and options, put and call arrangements, rights of first refusal and similar rights relating to Capital Stock in joint ventures and other non-wholly owned entities;

(x)    Liens securing obligations in respect of trade-related letters of credit permitted under **Section 7.2** and covering the goods (or the documents of title in respect of such goods) financed by such letters of credit and the proceeds and products thereof;

(y)    other Liens with respect to obligations the principal amount of which do not exceed $25,000,000 at any time outstanding;

(z)    licenses, sublicenses, cross-licensing or pooling of, or similar arrangements with respect to, Intellectual Property granted by the Borrower or any of its Restricted Subsidiaries which do not interfere in any material respect with the ordinary conduct of the business of the Borrower or such Restricted Subsidiary and are not otherwise materially adverse to the interest of the Lenders;

(aa)    Liens arising from precautionary UCC financing statement filings (or other similar filings in non-U.S. jurisdictions) regarding leases, subleases, licenses or consignments, in each case, entered into by the Borrower or any of its Restricted Subsidiaries;

(bb)    Liens on cash and Cash Equivalents (and the related escrow accounts) in connection with the issuance into (and pending the release from) escrow of, any Indebtedness permitted under **Section 7.2** and any Permitted Refinancing thereof;

(cc)    (A) Liens on the Collateral securing Indebtedness incurred pursuant to **Section 7.2(aa)**, and (B) Liens on assets of Foreign Subsidiaries securing Indebtedness incurred pursuant to **Section 7.2(aa)** for working capital and general corporate purposes, and all obligors with respect to such Indebtedness incurred pursuant to this **Section 7.3(cc)(B)** shall also guarantee the Obligations; provided, further, that any such Liens on the Collateral incurred pursuant to this **Section 7.3(cc)** shall be subject to the ABL Intercreditor Agreement;

(dd)    (i) zoning or similar laws or rights reserved to or vested in any Governmental Authority to control or regulate the use of any real property and (ii) Liens in favor of the United States of America for amounts paid by the Borrower or any of its Restricted Subsidiaries as progress payments under government contracts entered into by them (*provided*, that no such Lien described in this **clause (ii)** shall encumber any Collateral);

(ee)    any extension, renewal or replacement of any Liens permitted by this **Section 7.3**; *provided*, that the Liens permitted by this **clause (ee)** shall not extend to or cover any additional Indebtedness (other than applicable Permitted Refinancings) or property (other than the proceeds or products thereof or any accessions or improvements thereto and after-acquired property subjected to a Lien pursuant to terms no broader than the equivalent terms existing at the time of such extension, renewal or replacement, and other than a substitution of like property) unless such Lien uses a separate basket under this **Section 7.3**;

(ff)    Liens in favor of the Borrower or any Subsidiary Guarantor securing Indebtedness permitted under **Section 7.2(b)**; *provided*, that to the extent such Liens are on the Collateral such Liens shall be junior to the Liens on the Collateral securing the Obligations and subject to a Junior Intercreditor Agreement;

(gg)    Liens on inventory or equipment of the Borrower or any Restricted Subsidiary granted in the ordinary course of business to the Borrower's or such Restricted Subsidiary's (as applicable) distributor, vendor, supplier, client or customer at which such inventory or equipment is located;

(hh)    other Liens incidental to the conduct of business of the Borrower and its Restricted Subsidiaries or the ownership of any of their assets not incurred in connection with Indebtedness, which Liens do not in any case materially detract from the value of the Property subject thereto or interfere with the ordinary course of business of the Borrower or any of its Restricted Subsidiaries;

(ii)    [reserved];

(jj)    [reserved];

(kk)    Liens on cash deposits in respect of Indebtedness permitted under **Section 7.2(n)** or **7.2(bb)**; *provided*, that, with respect to Indebtedness permitted under **Section 7.2(bb)(y)**, the amount of any such deposit does not exceed the amount of the Indebtedness such cash deposits secures;

(ll)    [reserved]; and

(mm)    Liens on all premiums (if any), interest (including post-petition interest), fees, expenses, charges, accretion or amortization of original issue discount, accretion of interest paid in kind and additional or contingent interest on obligations permitted to be incurred pursuant to **Sections 7.2(a)** through **(dd)** and the subject of any Lien permitted pursuant to **clauses (a)** through **(ll)** above.

### 7.4    Fundamental Changes.

Consummate any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

(a)    (i) any Restricted Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, the Borrower (*provided*, that the Borrower shall be the continuing or surviving corporation) or (ii) any Restricted Subsidiary may be merged, amalgamated or consolidated with or into, or be liquidated into, any Subsidiary Guarantor (*provided*, that (x) a Subsidiary Guarantor shall be the continuing or surviving corporation or (y) substantially simultaneously with such transaction, the continuing or surviving corporation shall become a Subsidiary Guarantor and the Borrower shall comply with **Section 6.8** in connection therewith);

(b)    any Non-Guarantor Subsidiary may be merged or consolidated with or into, or be liquidated into, any other Non-Guarantor Subsidiary that is a Restricted Subsidiary;

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets upon voluntary liquidation or otherwise to any Loan Party;

(d)    any Non-Guarantor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation, dissolution, winding-up or otherwise) to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary or to Holdings;

(e)    Dispositions permitted by **Section 7.5** (other than **Section 7.5(c)**) and any merger, dissolution, liquidation, consolidation, amalgamation, investment or Disposition, the purpose of which is to effect a Disposition permitted by **Section 7.5** (other than **Section 7.5(c)**), may be consummated;

(f)    any Investment expressly permitted by **Section 7.7** (other than **Section 7.7(o)**) may be structured as a merger, consolidation or amalgamation;

(g)        the Borrower and its Restricted Subsidiaries may consummate the Transactions;

(h)        any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interest of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Loan Party, any assets or business of such Restricted Subsidiary not otherwise Disposed of or transferred in accordance with **Section 7.4** or **7.5** or, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Loan Party after giving effect to such liquidation or dissolution;

(i)        any Escrow Entity may be merged with and into the Borrower or any Restricted Subsidiary (***provided*** that the Borrower or such Restricted Subsidiary shall be the continuing or surviving entity);

(j)        if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing or would result therefrom, any Person may be merged, amalgamated or consolidated with or into the Borrower, ***provided***, that (A) the Borrower shall be the surviving entity or (B) if the surviving entity is not the Borrower (such other person, the "***Successor Borrower***"), (1) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (2) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (3) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guarantee and Collateral Agreement confirmed that its guarantee thereunder shall apply to any Successor Borrower's obligations under this Agreement, (4) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to any applicable Security Document affirmed that its obligations thereunder shall apply to its guarantee as reaffirmed pursuant to **clause (3)**, (5) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have affirmed that its obligations under the applicable Mortgage shall apply to its guarantee as reaffirmed pursuant to **clause (3)** and (6) the Successor Borrower shall deliver to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) if requested by the Administrative Agent, an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to **Section 5.1(e)** (it being understood that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement);

7.5    **Dispositions of Property**.

Dispose of any of its owned Property (including receivables) whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock (other than directors' qualifying shares) to any Person, except:

(a)        (i) the Disposition of surplus, obsolete, damaged or worn out Property (including scrap and byproducts) in the ordinary course of business, Dispositions of Property (other than Intellectual Property) no longer used or useful or economically practicable to maintain in the conduct of the business of the Borrower and other Restricted Subsidiaries in the ordinary course and Dispositions of Property necessary in order to comply with applicable Requirements of Law or licensure requirements (as determined by the Borrower in good faith), (ii) the sale of defaulted receivables in the ordinary course of business, (iii) abandonment, cancellation or Disposition of any Intellectual Property in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith) and (iv) sales, leases or other Dispositions of inventory determined by the management of the Borrower to be no longer useful or necessary in the operation of the Business;

(b)      (i) the sale of inventory or other Property (other than Intellectual Property) in the ordinary course of business, (ii) the cross-licensing, pooling, sublicensing or licensing of, or similar arrangements (including Disposition of marketing rights) with respect to, Intellectual Property in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), and (iii) the contemporaneous exchange, in the ordinary course of business, of Property (other than Material Intellectual Property) for Property of a like kind, to the extent that the Property received in such exchange is of a Fair Market Value equivalent to the Fair Market Value of the Property exchanged (*provided*, that after giving effect to such exchange, the Fair Market Value of the Property of any Loan Party subject to Liens in favor of the Collateral Agent under the Security Documents is not materially reduced);

(c)      Dispositions permitted by **Section 7.4** (other than **Section 7.4(e)**);

(d)      the sale or issuance of (i) any Subsidiary's Capital Stock to any Loan Party; *provided*, that the sale or issuance of Capital Stock of an Unrestricted Subsidiary to the Borrower or any of its Restricted Subsidiaries is otherwise permitted by **Section 7.7**, (ii) the Capital Stock of any Non-Guarantor Subsidiary that is a Restricted Subsidiary to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary or to Holdings and (iii) the Capital Stock of any Subsidiary that is an Unrestricted Subsidiary to any other Subsidiary that is an Unrestricted Subsidiary, in each case, including in connection with any tax restructuring activities not otherwise prohibited hereunder;

(e)      any Disposition of assets; *provided*, that

(i)      (x) in respect of ABL Facility First Priority Collateral, if the total value of the assets subject to such Disposition is in excess of $5,000,000, it shall be for Fair Market Value and (y) otherwise, if the total value of the assets subject to such Disposition is in excess of $20,000,000, it shall be for Fair Market Value,

(ii)     at least 75% of the total consideration received by the Borrower and its Restricted Subsidiaries is in the form of cash or Cash Equivalents, and

(iii)    no Event of Default then exists or would result from such Disposition (except if such Disposition is made pursuant to an agreement entered into at a time when no Event of Default exists),

*provided*, *however*, that for purposes of **clause (ii)** above, any Designated Non-cash Consideration received by the Borrower or any of its Restricted Subsidiaries in such Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this **clause (e)** that is at that time outstanding, not to exceed the greater of (I) $75,000,000 and (II) 2.0% of Consolidated Total Assets at the time of the receipt of such Designated Non-cash Consideration (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value);

(f)      (i) any Recovery Event and (ii) any event that would constitute a Recovery Event but for the Dollar threshold set forth in the definition thereof;

(g)      the leasing, licensing, occupying pursuant to occupancy agreements or sub-leasing of Property that would not materially interfere with the required use of such Property by the Borrower or its Restricted Subsidiaries;

(h)      the transfer for Fair Market Value of Property (including Capital Stock of Subsidiaries) to another Person in connection with a joint venture arrangement with respect to the transferred Property; ***provided***, that such transfer is permitted under **Section 7.7(k)** or **(v)** and (ii) for the avoidance of doubt, this **clause (h)** shall be subject to the limitations on Investments in the last paragraph of **Section 7.7**;

(i)      the sale or discount, in each case without recourse and in the ordinary course of business, of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof consistent with customary industry practice (and not as part of any bulk sale or financing of receivables);

(j)      transfers of condemned Property as a result of the exercise of "eminent domain" or other similar policies to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise), and transfers of properties that have been subject to a casualty to the respective insurer of such Property as part of an insurance settlement;

(k)      the Disposition of any Immaterial Subsidiary;

(l)      the Disposition of inventory to Subsidiaries in the ordinary course of business or otherwise consistent with past practice in connection with invoice and product flow models;

(m)      the transfer of Property (i) by the Borrower or any Subsidiary Guarantor to any other Loan Party or (ii) from a Non-Guarantor Subsidiary to (A) any Loan Party; ***provided***, that the portion (if any) of such Disposition made for more than Fair Market Value shall constitute an Investment and comply with **Section 7.7** or (B) any other Non-Guarantor Subsidiary that is a Restricted Subsidiary;

(n)      the Disposition of cash and Cash Equivalents (or the foreign equivalent of Cash Equivalents) in the ordinary course of business;

(o)      (i) Liens permitted by **Section 7.3** (other than by reference to **Section 7.5** or any clause thereof), (ii) Restricted Payments permitted by **Section 7.6** (other than by reference to **Section 7.5** or any clause thereof), (iii) Investments permitted by **Section 7.7** (other than by reference to **Section 7.5** or any clause thereof) and (iv) sale and leaseback transactions permitted by **Section 7.10** (other than by reference to **Section 7.5** or any clause thereof);

(p)      Dispositions of Investments in joint ventures and other non-wholly owned entities to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements, shareholder agreements and similar binding arrangements;

(q)      (i) Dispositions set forth on **Schedule 7.5(q)** and (ii) any Disposition that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Disposition is not more disadvantageous to the Lenders than the Dispositions set forth on **Schedule 7.5(q)**, as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such Disposition, or (B) the Required Lenders have consented to such Disposition (such consent not to be unreasonably, withheld (in the good faith determination of the Lenders));

(r)      the unwinding of Hedge Agreements permitted hereunder pursuant to their terms;

(s)    the Disposition of assets acquired pursuant to or in order to effectuate a Permitted Acquisition which assets are (i) obsolete or (ii) not used or useful to the core or principal business of the Borrower and the Restricted Subsidiaries;

(t)    Dispositions made on the Closing Date to consummate the Transactions;

(u)    [reserved];

(v)    [reserved];

(w)    the sale of services, or the termination of any other contracts, in each case in the ordinary course of business;

(x)    [reserved];

(y)    [reserved];

(z)    Dispositions of Property to the extent that (i)(A) such Property is exchanged for credit against the purchase price of similar replacement Property or (B) the proceeds of such Disposition are applied to the purchase price of such replacement Property and (ii) to the extent such Property constituted Collateral, such replacement Property constitutes Collateral as well;

(aa)    any Disposition of Property that represents a surrender or waiver of a contract right or settlement, surrender or release of a contract or tort claim; and

(bb)    Dispositions of Property between or among the Borrower and/or its Restricted Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted pursuant to **clauses (a)** through **(aa)** above.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any Capital Stock of any Loan Party is permitted to be disposed of under this ***Section 7.5***, such Disposition shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and remains a Loan Party) and (ii) none of the Borrower or its Restricted Subsidiaries shall sell, assign, convey, transfer, license or otherwise dispose of any of its Material Intellectual Property (or the Capital Stock of any Loan Party which owns any Material Intellectual Property) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this ***Section 7.5*** or ***Section 7.7***, or (B) for Fair Value and on arm's length terms in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under ***Section 7.5(e)*** or ***(p)***.

**7.6    Restricted Payments**.

Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any of its Restricted Subsidiaries, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or Property or in obligations of the Borrower or such Restricted Subsidiary (collectively, "***Restricted Payments***"), except that:

(a)      (i) any Restricted Subsidiary may make Restricted Payments to any Loan Party and (ii) Non-Guarantor Subsidiaries may make Restricted Payments to other Non-Guarantor Subsidiaries;

(b)      [reserved];

(c)      the Borrower or any Restricted Subsidiary may make, without duplication,

(i)      Restricted Payments to Holdings or any Parent Company to permit Holdings or such Parent Company to pay

(A)      franchise and similar taxes and other fees and expenses in connection with the maintenance of its (or any Parent Company's) existence and its (or any Parent Company's indirect) direct or indirect ownership of the Borrower,

(B)      so long as the Borrower or any of its Subsidiaries is members of a consolidated, combined, unitary or similar group of which Holdings or any Parent Company is the parent for U.S. federal, state or local tax purposes (or is disregarded as separate from such a member for U.S. federal tax purposes), Holdings' or such Parent Company's federal, state or local income taxes, as applicable; *provided*, that in each case the amount of such payments with respect to any fiscal year does not exceed the lesser of (i) the amount that the Borrower and its Subsidiaries would have been required to pay in respect of such taxes for such fiscal year were the Borrower and its Subsidiaries a consolidated or combined group of which the Borrower was the common parent, and (2) the actual tax liability of Holdings or other the Parent Company, in each case, less any amounts paid directly by Borrower and its Subsidiaries with respect to such Taxes;

(C)      Taxes of Holdings or any Parent Company arising in connection with the Restructuring Transactions;

(D)      customary fees, salary, bonus, severance and other benefits payable to, and indemnities provided on behalf of, their current and former officers and employees and members of their Board of Directors,

(E)      ordinary course corporate operating expenses and other fees and expenses required to maintain its corporate existence,

(F)      fees and expenses to the extent permitted under **clause (i)** of the second sentence of **Section 7.9**,

(G)      reasonable fees and expenses incurred in connection with any debt or equity offering by Holdings or any Parent Company, to the extent the proceeds thereof are (or, in the case of an unsuccessful offering, were intended to be) used for the benefit of the Borrower and its Restricted Subsidiaries, whether or not completed and

(H)      reasonable fees and expenses in connection with compliance with reporting and public and limited company obligations under, or in connection with compliance with, federal or state laws (including securities laws, rules and regulations, securities exchange rules and similar laws, rules and regulations) or under this Agreement or any other Loan Document;

(d)      the Borrower may make Restricted Payments in the form of Capital Stock of the Borrower;

(e)    the Borrower and any of its Subsidiaries may make Restricted Payments to, directly or indirectly, purchase the Capital Stock of Holdings, the Borrower, any Parent Company or any Subsidiary from present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary upon the death, disability, retirement or termination of the applicable officer, director, consultant, agent or employee or pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement; *provided*, that the aggregate amount of payments under this clause (e) in any fiscal year of the Borrower shall not exceed the sum of (i) $10,000,000 in any fiscal year, plus (ii) any proceeds received from key man life insurance policies, plus (iii) any proceeds received by Holdings, the Borrower, or any Parent Company during such fiscal year from sales of the Capital Stock of Holdings, the Borrower or any Parent Company to directors, officers, consultants or employees of Holdings, the Borrower, any Parent Company or any Subsidiary in connection with permitted employee compensation and incentive arrangements; *provided*, that any Restricted Payments permitted (but not made) pursuant to subclause (i), (ii) or (iii) of this clause (e) in any prior fiscal year may be carried forward to any subsequent fiscal year (subject to an annual cap of no greater than $20,000,000); *provided*, *further*, that cancellation of Indebtedness owing to the Borrower or any Subsidiary by any member of management of Holdings, any Parent Company, the Borrower or any Subsidiary in connection with a repurchase of the Capital Stock of the Borrower, Holdings or any Parent Company will not be deemed to constitute a Restricted Payment for purposes of this Section 7.6;

(f)    the Borrower and its Restricted Subsidiaries may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, non-cash repurchases of Capital Stock deemed to occur upon exercise of stock options or similar equity incentive awards, if such Capital Stock represents a portion of the exercise price of such options or similar equity incentive awards,

(g)    tax payments on behalf of present or former officers, directors, consultants, agents or employees (or their estates, trusts, family members or former spouses) of Holdings, the Borrower, any Parent Company or any Subsidiary in connection with noncash repurchases of Capital Stock pursuant to any equity subscription agreement, stock option or equity incentive award agreement, shareholders' or members' agreement or similar agreement, plan or arrangement of Holdings, the Borrower, any Parent company or any Subsidiary;

(h)    make-whole or dividend-equivalent payments to holders of vested stock options or other Capital Stock or to holders of stock options or other Capital Stock at or around the time of vesting or exercise of such options or other Capital Stock to reflect dividends previously paid in respect of Capital Stock of the Borrower, Holdings or any Parent Company;

(i)    [reserved];

(j)    to the extent constituting Restricted Payments, the Borrower and its Restricted Subsidiaries may enter into and consummate transactions expressly permitted (other than by reference to **Section 7.6** or any clause thereof) by any provision of **Sections 7.4**, **7.5**, **7.7** and **7.9**;

(k)    [reserved];

(l)    Borrower may make Restricted Payments to make, or to allow Holdings or any Parent Company to make, payments in cash, in lieu of the issuance of fractional shares, upon the exercise of warrants or upon the conversion or exchange of Capital Stock of any such Person;

(m)    so long as no Event of Default under **Section 8.1(a)** or **8.1(f)** has occurred and is continuing, the Borrower may make Restricted Payments to Holdings or any Parent Company to enable it

to make payments to any Parent Company in respect of expenses or indemnification payments on terms reasonably acceptable to the Administrative Agent;

(n)        (i) any non-wholly owned Restricted Subsidiary of the Borrower may declare and pay cash dividends to its equity holders (excluding any such equity holder that is an Affiliate of the Borrower (other than the Borrower and its Subsidiaries)) generally so long as the Borrower or its respective Subsidiary which owns the equity interests in the Restricted Subsidiary paying such dividend receives at least its proportional share thereof (based upon its relative holding of the equity interests in the Restricted Subsidiary paying such dividends and taking into account the relative preferences, if any, of the various classes of equity interest of such Restricted Subsidiary) and (ii) any non-wholly owned Subsidiary of the Borrower may make Restricted Payments to one or more of its equity holders (which payments need not be proportional) in lieu of or to effect an earnout so long as (x) such payment is in the form of such Subsidiary's Capital Stock and (y) such Subsidiary continues to be a Subsidiary after giving effect thereto;

(o)        [reserved];

(p)        the Borrower and its Restricted Subsidiaries may make Restricted Payments (to the extent such payments would constitute Restricted Payments) pursuant to and in accordance with any Hedge Agreement in connection with a convertible debt instrument; *provided*, that, the aggregate amount of all such Restricted Payments minus cash received from counterparties to such Hedge Agreements upon entering into such Hedge Agreements shall not exceed $5,000,000;

(q)        provided that no Event of Default is continuing or would result therefrom, the Borrower may make Restricted Payments in respect of reasonable fees and expenses incurred in connection with any successful or unsuccessful debt or equity offering or any successful or unsuccessful acquisition or strategic transaction of Holdings or any Parent Company; and

(r)        the Borrower may pay any dividend or make any other distribution within sixty (60) days after the date of declaration of such dividend or distribution, if as of the date of the declaration of such payment, such payment would have been otherwise permitted by any provision of this **Section 7.6**.

## 7.7        **Investments**.

Make any advance, loan, extension of credit (by way of guarantee or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or all or substantially all of the assets constituting an ongoing business from, or make any other similar investment in, any other Person (all of the foregoing, "***Investments***"), except:

(a)        (i) extensions of trade credit in the ordinary course of business, (ii) loans, advances and promotions made to distributors, customers, vendors and suppliers in the ordinary course of business or in accordance with market practices, (iii) purchases and acquisitions of inventory, supplies, materials and equipment, purchases of contract rights, accounts and chattel paper, purchases of put and call foreign exchange options to the extent necessary to hedge foreign exchange exposures or foreign exchange spot and forward contracts, purchases of notes receivable or licenses of Intellectual Property, in each case in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments, (iv) Investments among the Borrower and its Restricted Subsidiaries in connection with the sale of inventory and parts in the ordinary course of business and (v) purchases and acquisitions of Intellectual Property or purchases of contract rights or licenses of Intellectual Property, in each case, in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably

determined by the Borrower, acting in good faith), to the extent such purchases and acquisitions constitute Investments;

(b)        Investments in Cash Equivalents (or the foreign equivalent of Cash Equivalents) and Investments that were Cash Equivalents (or the foreign equivalent of Cash Equivalents) when made;

(c)        Investments arising in the ordinary course of business in connection with (i) the incurrence of Indebtedness permitted by **Section 7.2** (other than by reference to **Section 7.7** or any clause thereof) to the extent arising as a result of Indebtedness among the Borrower or any of its Restricted Subsidiaries and Guarantee Obligations permitted by **Section 7.2** (other than by reference to **Section 7.7** or any clause thereof) and payments made in respect of such Guarantee Obligations, (ii) the forgiveness or conversion to equity of any Indebtedness permitted by **Section 7.2** (other than by reference to **Section 7.7** or any clause thereof) and (iii) guarantees by the Borrower or any of its Restricted Subsidiaries of leases (other than Capital Lease Obligations) or of other obligations that do not constitute Indebtedness;

(d)        loans and advances to employees, consultants or directors of any Parent Company, Holdings or any of its Restricted Subsidiaries in the ordinary course of business in an aggregate amount (for the Borrower and all of its Restricted Subsidiaries) not to exceed $10,000,000 (excluding (for purposes of such cap) tuition advances, travel and entertainment expenses, but including relocation advances) at any one time outstanding;

(e)        Investments (i) (other than those relating to the incurrence of Indebtedness permitted by **Section 7.7(c)**) by the Borrower or any of its Restricted Subsidiaries in the Borrower or any Person that, prior to such Investment, is a Loan Party (or is a Subsidiary that becomes a Loan Party in connection with such Investment), (ii) by the Borrower or any Subsidiary Guarantor in any Non-Guarantor Subsidiaries so long as such Investment is part of a series of Investments by Restricted Subsidiaries in other Restricted Subsidiaries that result in the proceeds of the initial Investment being invested in one or more Loan Parties, (iii) comprised solely of equity purchases or contributions by the Borrower or any of its Restricted Subsidiaries in any other Restricted Subsidiary made for tax purposes, so long as the Borrower provides to the Administrative Agent evidence reasonably acceptable to the Administrative Agent that, after giving pro forma effect to such Investments, the granting, perfection, validity and priority of the security interest of the Secured Parties in the Collateral, taken as a whole, is not impaired in any material respect by such Investment and (iv) existing on the Closing Date in any Non-Guarantor Subsidiary;

(f)        Permitted Acquisitions to the extent that any Person or Property acquired in such acquisition becomes a Restricted Subsidiary or a part of a Restricted Subsidiary; ***provided***, that

(i)        immediately before and after giving effect to any such Permitted Acquisition, no Event of Default shall have occurred and be continuing,

(ii)        after giving pro forma effect to such Permitted Acquisition and any incurrence of any Indebtedness in connection therewith, the Borrower shall be in pro forma compliance with the terms of **Section 7.1**, to the extent then applicable (and the Borrower shall have delivered to the Administrative Agent such financial information as it may reasonably request demonstrating such compliance); and

(iii)        the aggregate amount of consideration paid by the Borrower and its Restricted Subsidiaries in connection with Permitted Acquisitions of Persons other than Loan Parties and of Property that does not become Collateral shall not exceed $50,000,000;

(g)      loans by the Borrower or any of its Restricted Subsidiaries to the employees, officers or directors of any Parent Company, Holdings or any of its Restricted Subsidiaries in connection with management incentive plans (***provided***, that such loans represent cashless transactions pursuant to which such employees, officers or directors directly (or indirectly) invest the proceeds of such loans in the Capital Stock of Holdings or a Parent Company);

(h)      (i) Investments set forth on **Schedule 7.7(h)** and (ii) any Investments that the Borrower, reasonably and in good faith, determines is required in order to comply with the tax ruling that the Loan Parties and their Subsidiaries are negotiating with the Swiss taxing authorities if (A) such Investment is not more disadvantageous to the Lenders than the Investment set forth on **Schedule 7.7(h)**, as reasonably determined by the Borrower, acting in good faith and with such determination evidenced by an officer's certificate delivered to the Administrative Agent at least ten Business Days prior to such Investment, or (B) the Required Lenders have consented to such Investment (such consent not to be unreasonably, withheld (in the good faith determination of the Lenders));

(i)      Investments (including debt obligations) received in the ordinary course of business by the Borrower or any of its Restricted Subsidiaries in connection with (w) the bankruptcy or reorganization of suppliers, vendors, distributors, clients, customers and other Persons, (x) settlement of delinquent obligations of, and other disputes with, suppliers, vendors, distributors, clients, customers and other Persons arising in the ordinary course of business, (y) endorsements for collection or deposit and (z) customary trade arrangements with suppliers, vendors, distributors, clients and customers, including consisting of Capital Stock of clients and customers issued to the Borrower or any Subsidiary in consideration for goods provided and/or services rendered;

(j)      Investments by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary;

(k)      Investments in existence on, or pursuant to legally binding written commitments in existence on, the Closing Date (after giving effect to the Transactions) and listed on **Schedule 7.7(k)** and, in each case, any extensions, renewals or replacements thereof, so long as the amount of any Investment made pursuant to this **clause (k)** is not increased (other than pursuant to such legally binding commitments);

(l)      Investments of the Borrower or any of its Restricted Subsidiaries under Hedge Agreements permitted hereunder;

(m)      Investments of any Person existing, or made pursuant to binding commitments in effect, at the time such Person becomes a Restricted Subsidiary or consolidates, amalgamates or merges with the Borrower or any of its Restricted Subsidiaries (including in connection with a Permitted Acquisition); ***provided***, that such Investment was not made in anticipation of such Person becoming a Restricted Subsidiary or of such consolidation, amalgamation or merger;

(n)      Investments in joint ventures in connection with strategic partnerships or expansions of business lines, in each case, for bona fide business purposes, in an aggregate amount not to exceed $20,000,000 (any such joint venture, a "***Permitted Joint Venture***");

(o)      to the extent constituting Investments, transactions expressly permitted (other than by reference to this **Section 7.7** or any clause thereof) under **Sections 7.4**, **7.5**, **7.6** and **7.8**;

(p)      Subsidiaries of the Borrower may be established or created, if (i) to the extent such new Subsidiary is a Domestic Subsidiary, the Borrower and such Subsidiary comply with the provisions of **Section 6.8(c)** and (ii) to the extent such new Subsidiary is a Foreign Subsidiary, the Borrower complies with the provisions of **Section 6.8(d)**; ***provided***, that, in each case, to the extent such new Subsidiary is

created solely for the purpose of consummating a merger, consolidation, amalgamation or similar transaction pursuant to an acquisition permitted by this **Section 7.7**, and such new Subsidiary at no time holds any assets or liabilities other than any consideration contributed to it substantially contemporaneously with the closing of such transactions, such new Subsidiary shall not be required to take the actions set forth in **Section 6.8(c)** or **6.8(d)**, as applicable, until the respective acquisition is consummated (at which time the surviving entity of the respective transaction shall be required to so comply within ten Business Days or such longer period as the Administrative Agent shall agree);

(q)    Investments arising directly out of the receipt by the Borrower or any of its Restricted Subsidiaries of non-cash consideration for any sale of assets permitted under **Section 7.5** (other than by reference to **Section 7.7** or any clause thereof);

(r)    (i) Investments resulting from pledges and deposits referred to in **Sections 7.3(c)** and **(d)** and (ii) cash earnest money deposits made in connection with Permitted Acquisitions or other Investments permitted under this **Section 7.7**;

(s)    Investments in connection with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) consisting of (i) the licensing, sublicensing, cross-licensing, pooling or contribution of, or similar arrangements with respect to, Intellectual Property, in each case, in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith), and (ii) the transfer or licensing of non-U.S. Intellectual Property to a Foreign Subsidiary in the ordinary course of business and to the extent not materially disadvantageous to the Lenders (as reasonably determined by the Borrower, acting in good faith);

(t)    Investments made on the Closing Date to consummate the Transactions;

(u)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and UCC Article 4 customary trade arrangements with customers;

(v)    Investments in an aggregate amount not to exceed the sum of (i) $75,000,000, *minus* (ii) the aggregate amount of any prepayment, redemption, purchase, defeasement or satisfaction prior to the scheduled maturity of any Junior Financing pursuant to **Section 7.8(a)(iv)**; *provided*, that Investments made by any Loan Party pursuant to this **clause (v)** shall not be in the form of Material Intellectual Property (or of Capital Stock of Subsidiaries owning Material Intellectual Property) in any Non-Guarantor Subsidiary;

(w)    advances of payroll payments to employees, or fee payments to directors or consultants, in the ordinary course of business;

(x)    Investments constituting loans or advances in lieu of Restricted Payments permitted pursuant to **Section 7.6**;

(y)    [reserved];

(z)    [reserved];

(aa)    Investments to the extent that payment for such Investments is made solely by the issuance of Capital Stock (other than Disqualified Capital Stock) of Holdings (or any Parent Company) to the seller of such Investments;

(bb)    [reserved];

(cc)    [reserved];

(dd)    the Borrower or any of its Restricted Subsidiaries may make Investments in an amount not to exceed the Excluded Contribution Amount (to extent Not Otherwise Applied) within 90 days of the receipt thereof, so long as, with respect to any such Investments, no Event of Default shall have occurred and be continuing or would result therefrom;

(ee)    [reserved];

(ff)    the Borrower or any of its Restricted Subsidiaries may make Investments in prepaid expenses, negotiable instruments held for collection and lease and utility and worker's compensation deposits provided to third parties in the ordinary course of business;

(gg)    [reserved]; and

(hh)    Investments in (i) open-market purchases of common stock of Holdings and (ii) any other Investment available to highly compensated employees under any "excess 401-(k) plan" of the Borrower (or any of its Domestic Subsidiaries, as applicable), in each case to the extent necessary to permit the Borrower (or such Domestic Subsidiary, as applicable) to satisfy its obligations under such "excess 401-(k) plan" for highly compensated employees; ***provided***, ***however***, that the aggregate amount of such purchases and other Investments under this **Section 7.7(hh)** together with any Restricted Payments made as permitted under **Section 7.6(e)** does not exceed the amounts set forth in such section.

It is further understood and agreed that for purposes of determining the value of any Investment outstanding for purposes of this **Section 7.7**, such amount shall be deemed to be the amount of such Investment when made, purchased or acquired less any returns on such Investment (not to exceed the original amount invested).

Notwithstanding anything in this Agreement to the contrary and in addition to the foregoing, from and after the Closing Date, Investments by Loan Parties in Subsidiaries that are not Guarantors (including at the time of designation as a non-Loan Party) shall not exceed at any time (x) $25,000,000 (provided that (i) to the extent any such Investment is not in cash, the Fair Market Value of such investment shall be determined by a third party financial advisor of nationally recognized standing and (ii) this paragraph shall not apply to (x) Investments in connection with the sale of inventory and parts in the ordinary course of business and consistent with past practice or (y) Investments made pursuant to **Sections 7.7(a)**, **(c)(ii)** (provided that the forgiveness or conversion to equity of any Indebtedness pursuant to such **Section 7.7(c)(ii)** shall not be deemed to reduce the amount of any Investment made in connection with the incurrence of such Indebtedness), **(c)(iii)**, **(e)**, **(f)**, **(g)**, **(h)**, **(m)**, **(n)**, **(o)**, **(s)**, **(aa)** and **(dd)**)), plus (y) the amount of such Investments made pursuant to Section 7.7(v). For the avoidance of doubt, this paragraph shall not restrict Investments in existence on the Closing Date.

It is further understood and agreed that, notwithstanding anything in this Agreement to the contrary, (i) to the extent any Capital Stock of any Loan Party is permitted to be subject to an Investment under this **Section 7.7**, such Investment shall be of no less than all of the Capital Stock of such Loan Party (except if such Loan Party, after giving effect to such Disposition, continues to be a direct or indirect wholly-owned Subsidiary of the Borrower and remains a Loan Party) and (ii) none of the Borrower or its Subsidiaries shall make any Investment that constitutes a sale, assignment, conveyance, transfer, license or other disposition of any of its Material Intellectual Property (or the Capital Stock of any Loan Party which owns such Material Intellectual Property) to any Person that is not a Loan Party except for any sales, assignments, conveyances, transfers, licenses or other dispositions (A) that are in the ordinary course of business and otherwise permitted by this **Section 7.5** or **Section 7.7**, or (B) for Fair Value and on arm's length terms in connection

134

with a legitimate business purpose (which, for the avoidance of doubt, shall not include any financing arrangement) and (except with respect to any non-exclusive license) in a manner that is otherwise permitted under **Section 7.5(e)** or **(p)**.

**7.8**     **Prepayments, Etc. of Indebtedness; Amendments**.

(a)     Optionally prepay, redeem, purchase, defease or otherwise satisfy prior to the day that is 90 days before the scheduled maturity thereof in any manner the principal amount of

(x)     any Indebtedness that is expressly subordinated by contract in right of payment to the Obligations,

(y)     (I) any Indebtedness incurred pursuant to **Section 7.2(a)**, **(i)**, **(t)** and **(v)** that is secured by all or any part of the Collateral or (II) any other Indebtedness incurred pursuant to **Section 7.2** that is secured by all or a material part of the Collateral, in each case of **clauses (I)** and **(II)**, on a junior basis relative to the Obligations, but is not also secured by any substantial part of the Collateral on a pari passu or senior basis relative to the Obligations or

(z)     any Indebtedness incurred pursuant to **Section 7.2** that is unsecured

(collectively, "*Junior Financing*") (it being understood, for the avoidance of doubt, that (1) payments of regularly scheduled interest and principal on all of the foregoing shall be permitted, (2) the term "Junior Financing" does not include any Indebtedness under (A) the Term Loan Agreement or any other Indebtedness subject to the ABL Intercreditor Agreement or (B) this Agreement), or make any payment in violation of any subordination terms of any Junior Financing Documentation, except:

(i)     [reserved];

(ii)     the conversion of any Junior Financing to Capital Stock (other than Disqualified Capital Stock) or the prepayment, redemption, purchase, defeasement or other satisfaction of Junior Financing in an amount not to exceed the Excluded Contribution Amount (to extent Not Otherwise Applied) (other than Disqualified Capital Stock);

(iii)     the prepayment, redemption, purchase, defeasement or other satisfaction of any Junior Financing with any Permitted Refinancing thereof;

(iv)     the prepayment, redemption, purchase, defeasement or other satisfaction prior to the day that is 90 days before the scheduled maturity of any Junior Financing, in an aggregate amount not to exceed (i) $75,000,000 *minus* (ii) the aggregate amount of Investments made pursuant to **Section 7.7(v)**;

(v)     the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness incurred or assumed pursuant to **Section 7.2(t)**;

(vi)     the prepayment, redemption, purchase, defeasance or other satisfaction of any Indebtedness to consummate the Transactions;

(vii)     the prepayment, redemption, purchase, defeasance or other satisfaction of any intercompany indebtedness (A) owing by a Loan Party to another Loan Party, (B) owing by a Restricted Subsidiary that is Non-Guarantor Subsidiary to a Restricted Subsidiary that is Non-

Guarantor Subsidiary and (C) owing by a Restricted Subsidiary that is Non-Guarantor Subsidiary to a Loan Party;

(viii)    the prepayment, redemption, purchase, defeasance or other satisfaction of any intercompany indebtedness owing by Holdings or any of its Subsidiaries to Holdings or any of its other Subsidiaries in connection with the Restructuring Plan and emergence from any of the Chapter 11 Cases; *provided* that such intercompany indebtedness may be discharged after the emergence from any of the Chapter 11 Cases to the extent (i) necessary to consummate the legal entity rationalization and related transactions described on **Schedule 7.8(a)(viii)** or (ii) settled through setoff or otherwise on a non-cash basis;

*provided*, that, notwithstanding the foregoing, the Borrower shall not, and shall not permit any of its Subsidiaries to repurchase any Junior Financing of the Borrower (other than pursuant to Section 7.8(a)(vi), 7.8(a)(vii) or 7.8(a)(viii)) prior to the date that is 105 days or more prior to the stated maturity thereof, except to the extent that the Borrower and its Subsidiaries have Section 7.8 Liquidity (as defined below) of at least $200,000,000, after giving pro forma effect to such prepayment, redemption, purchase, defeasance or other satisfaction; provided that for purposes hereof, "*Section 7.8 Liquidity*" shall mean, at any time, the sum of (i) all Unrestricted Cash of the Borrower and its Subsidiaries and (ii) the aggregate indebtedness permitted to be borrowed under this Agreement and any other then-existing revolving credit facility or line of credit of the Borrower and its Subsidiaries;

(b)    amend or modify the documentation in respect of any Junior Financing in a manner, taken as a whole (as shall be determined by the Borrower in good faith), that would be materially adverse to the Lenders; *provided*, that nothing in this **Section 7.8(b)** shall prohibit the refinancing, replacement, extension or other similar modification of any Indebtedness to the extent otherwise permitted by **Section 7.2**;

(c)    amend or modify its organizational or governing documents, except for modifications that would not adversely affect the rights and interests of the Administrative Agent or the Lenders in any material respect; and

(d)    amend or modify any Material License Agreement, expect for modifications that would not adversely affect the ability of any Secured Party to liquidate any ABL Facility First Priority Collateral.

**7.9    Transactions with Affiliates**.

(a)    Enter into any transaction or series of transactions, including any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate thereof (other than among Loan Parties or among non-Loan Parties) involving aggregate payments or consideration in excess of $25,000,000 unless such transaction is (1) otherwise not prohibited under this Agreement and (2) upon terms materially no less favorable when taken as a whole to the Borrower or such Restricted Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

(b)    Notwithstanding the foregoing, the Borrower and its Restricted Subsidiaries may:

(i)    pay to Holdings or any Parent Company and any of their Affiliates fees, indemnities and expenses in connection with the Transactions and disclosed to the Administrative Agent prior to the Closing Date;

(ii)    enter into any transaction with an Affiliate that is not prohibited by the terms of this Agreement to be entered into by Holdings, the Borrower or its Restricted Subsidiaries;

(iii)     make any Restricted Payment permitted pursuant to **Section 7.6** (other than by reference to **Section 7.9** or any clause thereof) or any Investment permitted pursuant to **Section 7.7**;

(iv)     perform their obligations pursuant to the Transactions;

(v)     enter into transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business subject to compliance with this **Section 7.9(b)**;

(vi)     without being subject to the terms of this **Section 7.9**, enter into any transaction with any Person which is an Affiliate of Holdings or the Borrower only by reason of such Person and Holdings or the Borrower, as applicable, having common directors;

(vii)     issue Capital Stock to any direct or indirect owner of Holdings (including any Parent Company), or any director, officer, employee or consultant thereof;

(viii)     enter into the transactions allowed pursuant to **Section 10.6**;

(ix)     enter into transactions set forth on **Schedule 7.9** and any amendment thereto or replacement thereof so long as such amendment or replacement is not materially more disadvantageous to the Lenders when taken as a whole as compared to the applicable agreement as in effect on the Closing Date as reasonably determined in good faith by the Borrower;

(x)     make any Disposition permitted pursuant to Section 7.5(b)(ii), Section 7.5(l) or Section 7.5(q);

(xi)     enter into and perform their respective obligations under the terms of the Company Tax Sharing Agreement in effect on the Closing Date, or any amendments thereto that do not increase the Borrower's or any Subsidiary Guarantor's obligations thereunder in consultation with the Administrative Agent at the direction of the Required Lenders;

(xii)     enter into any transaction with an officer, director, manager, employee or consultant of Holdings, any Parent Company, the Borrower or any of its Subsidiaries (including compensation or employee benefit arrangements with any such officer, director, manager, employee or consultant) in the ordinary course of business and not otherwise prohibited by the terms of this Agreement;

(xiii)     make payments to Holdings, any Parent Company, the Borrower, any Restricted Subsidiary or any Affiliate of any of the foregoing for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including in connection with acquisitions or divestitures, which payments, to the extent the amount thereof either individually or collectively with any related payments exceeds $20,000,000, are approved by a majority of the members of the Board of Directors of the Borrower or, other than with respect to payments to Holdings, Holdings in good faith;

(xiv)     enter into any transaction in which the Borrower or any Restricted Subsidiary, as the case may be, delivers to the Administrative Agent a letter from a nationally recognized investment banking firm stating that such transaction is fair to the Borrower or such Restricted Subsidiary from a financial point of view and meets the requirements of this **Section 7.9**;

(xv)    enter into any transaction with an Affiliate in which the consideration paid by the Borrower or any Restricted Subsidiary consists only of Capital Stock of Holdings;

(xvi)    enter into transactions with customers, clients, suppliers, or purchasers or sellers of goods or services that are Affiliates, in each case, in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Restricted Subsidiaries, as determined in good faith by the Board of Directors or the senior management of the Borrower or Holdings, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(xvii)    [reserved]; and

(xviii)    engage in any transaction in the ordinary course of business between the Borrower or a Subsidiary and its own employee stock option plan that is approved by the Borrower or such Subsidiary in good faith.

For the avoidance of doubt, this **Section 7.9** shall not restrict or otherwise apply to employment, benefits, compensation, bonus, retention and severance arrangements with, and payments of compensation or benefits (including customary fees, expenses and indemnities) to or for the benefit of, current or former employees, consultants, officers or directors of Holdings or the Borrower or any of its Restricted Subsidiaries in the ordinary course of business.

For purposes of this **Section 7.9**, any transaction with any Affiliate shall be deemed to have satisfied the standard set forth in **clause (a)(2)** of the first sentence hereof if such transaction is approved by a majority of the Disinterested Directors of the Board of Directors of the Borrower or such Restricted Subsidiary, as applicable. "***Disinterested Director***": with respect to any Person and transaction, a member of the Board of Directors of such Person who does not have any material direct or indirect financial interest in or with respect to such transaction. A member of any such Board of Directors shall not be deemed to have such a financial interest by reason of such member's holding Capital Stock of the Borrower or Holdings or any Parent Company or any options, warrants or other rights in respect of such Capital Stock.

7.10    **Sales and Leasebacks.**  Enter into any arrangement with any Person providing for the leasing or licensing or similar arrangement by the Borrower or any of its Restricted Subsidiaries of real or personal Property which is to be sold or transferred by the Borrower or any of its Restricted Subsidiaries (a) to such Person or (b) to any other Person to whom funds have been or are to be advanced by such Person on the security of such Property or rental obligations of the Borrower or any of its Restricted Subsidiaries, except for (i) any such arrangement entered into in the ordinary course of business of the Borrower or any of its Restricted Subsidiaries, (ii) sales or transfers by the Borrower or any of its Restricted Subsidiaries to any Loan Party, (iii) sales or transfers by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary that is a Restricted Subsidiary and (iv) any such arrangement to the extent that the Fair Market Value of such Property does not exceed $25,000,000, in the aggregate for all such arrangements.

7.11    **Changes in Fiscal Periods.**  Permit the fiscal year of the Borrower to end on a day other than December 31; ***provided***, that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

7.12    **Negative Pledge Clauses.**  Enter into any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property, whether now

138

owned or hereafter acquired, to secure the Obligations or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement, other than:

(a)        this Agreement, the other Loan Documents and any Intercreditor Agreement;

(b)        any agreements governing Indebtedness and/or other obligations secured by a Lien permitted by this Agreement (in which case, any prohibition or limitation shall only be effective against the assets subject to such Liens permitted by this Agreement);

(c)        software and other Intellectual Property licenses pursuant to which such Loan Party is the licensee of the relevant software or Intellectual Property, as the case may be (in which case, any prohibition or limitation shall relate only to the assets subject to the applicable license);

(d)        Contractual Obligations incurred in the ordinary course of business which (i) limit Liens on the assets that are the subject of the applicable Contractual Obligation or (ii) contain customary provisions restricting the assignment, transfer or pledge of such agreements;

(e)        any agreements regarding Indebtedness or other obligations of any Non-Guarantor Subsidiary not prohibited under **Section 7.2** (in which case, any prohibition or limitation shall only be effective against the assets of such Non-Guarantor Subsidiary and its Subsidiaries);

(f)        prohibitions and limitations in effect on the Closing Date and listed on **Schedule 7.12**;

(g)        customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(h)        customary provisions restricting the subletting, assignment, pledge or other transfer of any lease governing a leasehold interest;

(i)        customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses, sublicenses, cross license, pooling and similar agreements not prohibited hereunder;

(j)        any agreement in effect at the time any Person becomes a Subsidiary of the Borrower or is merged with or into the Borrower or a Subsidiary of the Borrower, so long as such agreement was not entered into in contemplation of such Person becoming a Subsidiary of the Borrower or a party to such merger;

(k)        restrictions imposed by applicable law or regulation or license requirements;

(l)        restrictions in any agreements or instruments relating to any Indebtedness permitted to be incurred by this Agreement (i) if the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Restricted Subsidiaries than the encumbrances contained in this Agreement (as determined in good faith by the Borrower) or (ii) if such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to create and maintain the Liens on the Collateral pursuant to the Security Documents;

(m)        restrictions in respect of Indebtedness secured by Liens permitted by **Sections 7.3(g)** and **7.3(y)** relating solely to the assets or proceeds thereof secured by such Indebtedness;

(n)        customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(o)        restrictions arising in connection with cash or other deposits not prohibited hereunder and limited to such cash or other deposit;

(p)        restrictions set forth in any documentation governing Term Pari Passu Obligations, including the Term Loan Documents;

(q)        restrictions and conditions that arise in connection with any Dispositions permitted by **Section 7.5**; *provided*, *however*, that such restrictions and conditions shall apply only to the property subject to such Disposition;

(r)        [reserved]; and

(s)        the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in **clauses (a)** through **(r)** above, *provided*, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

**7.13**    **Clauses Restricting Subsidiary Distributions.**    Enter into any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any of its Restricted Subsidiaries or (b) make Investments in the Borrower or any of its Restricted Subsidiaries, except for such encumbrances or restrictions existing under or by reason of or consisting of:

(i)        this Agreement or any other Loan Documents and under any Intercreditor Agreement, or any other agreement entered into pursuant to any of the foregoing;

(ii)       provisions limiting the Disposition of assets or property in asset sale agreements, stock sale agreements and other similar agreements, which limitation is in each case applicable only to the assets or interests the subject of such agreements but which may include customary restrictions in respect of a Restricted Subsidiary in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary;

(iii)      customary net worth provisions contained in Real Property leases entered into by the Borrower and its Restricted Subsidiaries, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower to meet its ongoing payment obligations hereunder or, in the case of any Subsidiary Guarantor, its obligations under the Guarantee and Collateral Agreement;

(iv)      agreements related to Indebtedness permitted by this Agreement to the extent that (x) the encumbrances and restrictions contained in any such agreement or instrument taken as a whole are not materially more restrictive on the Restricted Subsidiaries than the encumbrances and

restrictions contained in this Agreement (as determined in good faith by the Borrower) or (y) such encumbrances and restrictions are customary for similar financings in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(v)      licenses, sublicenses, cross-licensing or pooling by the Borrower and its Restricted Subsidiaries of, or similar arrangements with respect to, Intellectual Property in the ordinary course of business and to the extent not otherwise materially disadvantageous to the Lenders (in which case such restriction shall relate only to such Intellectual Property);

(vi)      Contractual Obligations incurred in the ordinary course of business which include customary provisions restricting the assignment, transfer or pledge thereof;

(vii)      customary provisions contained in joint venture agreements, shareholder agreements and other similar agreements applicable to joint ventures and other non-wholly owned entities not prohibited by this Agreement;

(viii)      customary provisions restricting the subletting or assignment of any lease governing a leasehold interest;

(ix)      customary restrictions and conditions contained in any agreement relating to any Disposition of Property, leases, subleases, licenses and similar agreements not prohibited hereunder;

(x)      any agreement in effect at the time any Person becomes a Restricted Subsidiary or is merged with or into the Borrower or any Restricted Subsidiary, so long as such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary or a party to such merger;

(xi)      encumbrances or restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(xii)      encumbrances or restrictions imposed by applicable law, regulation or customary license requirements;

(xiii)      [reserved];

(xiv)      any agreement in effect on the Closing Date and described on **Schedule 7.13**;

(xv)      restrictions or conditions imposed by any obligations secured by Liens permitted pursuant to **Section 7.3** (other than obligations in respect of Indebtedness), if such restrictions or conditions apply only to the property or assets securing such obligations and such encumbrances and restrictions are customary for similar obligations in light of prevailing market conditions at the time of incurrence thereof (as determined in good faith by the Borrower) and the Borrower determines in good faith that such encumbrances and restrictions would not reasonably be expected to materially impair the Borrower's ability to pay the Obligations when due;

(xvi)      the Term Loan Documents;

(xvii)      [reserved];

141

(xviii)   restrictions or conditions contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Borrower or any of its Restricted Subsidiaries is a party entered into in the ordinary course of business; ***provided***, that such agreement prohibits the encumbrance of solely the property or assets of the Borrower or such Restricted Subsidiary that are the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of the Borrower or such Restricted Subsidiary or the assets or property of any other Restricted Subsidiary; and

(xix)   the foregoing shall not apply to any restrictions or conditions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or other obligations referred to in **clauses (i)** through **(xviii)** above, ***provided***, that the restrictions and conditions contained in such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in good faith judgment of the Borrower no more restrictive than those restrictions and conditions in effect immediately prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing under the applicable contract, instrument or other obligation.

**7.14**    **Limitation on Hedge Agreements.**    Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes.

**7.15**    **Amendment of Company Tax Sharing Agreement**    Amend, modify, change, waive, cancel or terminate any term or condition of the Company Tax Sharing Agreement in a manner adverse to the interests of the Company or the Lenders without the prior written consent of the Required Lenders.

**7.16**    **Anti-Cash Hoarding.**    On or after the Closing Date, if at any time Excess Availability is less than 50% of the Borrowing Base in effect at such time, after giving effect to any payments or prepayments pursuant to **Section 2.12(b)(ii)**, hold or permit Holdings and its Subsidiaries to hold at any time more than the Specified Cash Limit in cash or Cash Equivalents ((x) other than Specified Excluded Cash and (y) based on closing balances on the immediately preceding Business Day) so long as there are any Revolving Loans outstanding.

**7.17**    **Canadian Defined Benefit Pension Plans.**    Except as disclosed in **Schedule 7.17**, no Loan Party shall (a) establish, sponsor, maintain, contribute to, participate in or have any liability or obligation under or arising from any Canadian Defined Benefit Pension Plan or Canadian Multi-employer Plan, without the prior written consent of the Administrative Agent, or (b) consummate any transaction that would result in any Person not already a Subsidiary becoming a Subsidiary if such Person sponsors, maintains or contributes to, participates in or has any liability or obligation under one or more Canadian Defined Benefit Pension Plans or Canadian Multi-employer Plan, without the prior written consent of the Administrative Agent.

**7.18**    **Designation of Unrestricted Subsidiaries.**    Notwithstanding anything to the contrary herein, in no event shall the Borrower be permitted to designate any Subsidiary that is a "Loan Party" under the Term Loan Documents as an Unrestricted Subsidiary hereunder and each such Subsidiary shall remain a Restricted Subsidiary and Loan Party hereunder unless (i) such Subsidiary ceases to be a Subsidiary as a result of a transaction permitted hereunder or (ii) such Subsidiary shall be designated as an "Unrestricted Subsidiary" under the Term Loan Documents.

**SECTION VIIA.**
**HOLDINGS NEGATIVE COVENANTS**

Holdings hereby covenants and agrees with each Lender that, so long as the Commitments remain in effect or any Loan or other amount is owing to any Lender or any Agent hereunder (other than (i) contingent or indemnification obligations not then due and (ii) obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations), unless the Required Lenders shall otherwise consent in writing, (a) Holdings will not create, incur, assume or permit to exist any Lien on any Capital Stock of the Borrower held by Holdings other than Liens created under the Loan Documents or Liens not prohibited by **Section 7.3** and (b) Holdings shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence; *provided*, that Holdings may merge with any other person so long as no Default has occurred and is continuing or would result therefrom and (i) Holdings shall be the surviving entity or (ii) if the surviving entity is not Holdings (such other person, "***Successor Holdings***"), (A) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, and (C) Successor Holdings shall have delivered to the Administrative Agent (x) an officer's certificate stating that such merger or consolidation does not violate this Agreement or any other Loan Document and (y) if requested by the Administrative Agent, an opinion of counsel to the effect that such merger or consolidation does not violate this Agreement or any other Loan Document and covering such other matters as are contemplated by the opinions of counsel delivered on the Closing Date pursuant to **Section 5.1(e)** (it being understood that if the foregoing are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement).

## SECTION VIII.
## EVENTS OF DEFAULT

**8.1     Events of Default.**  If any of the following events shall occur and be continuing:

(a)     The Borrower shall fail to pay (i) any principal of any Loan when due in accordance with the terms hereof,  (ii) any interest owed by it on any Loan, or any other amount payable by it hereunder or under any other Loan Document, including the Applicable Premium, within five Business Days after any such interest or other amount becomes due in accordance with the terms hereof;

(b)     Any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate or other document furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall in either case prove to have been inaccurate in any material respect (or if qualified by materiality, in any respect) and such inaccuracy is adverse to the Lenders on or as of the date made or deemed made or furnished;

(c)     The Borrower or any Subsidiary Guarantor shall default in the observance or performance of any agreement contained in **Section 6.4(a)** (solely with respect to maintaining the existence of the Borrower) or **Section VII** or Holdings shall default in the observance or performance of any agreement contained in **Section VIIA**;

(d)     Any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document and such default shall continue unremedied (i) for a period of two (2) Business Days if such breach relates to the terms or provisions of **Section 6.2(g)** or **6.7(a)**, (ii) for a period of five (5) Business Days if such breach relates to the terms or provisions of **Section 6.1**, **Section 6.2(b)**, **Section 6.8**, **Section 6.10**, **Section 6.14** or **Section 6.15** or (ii) for a period of thirty (30) days after such Loan Party receives from the Administrative Agent or the Required Lenders notice of the existence of such default;

143

(e)        The Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture) shall:

(i)        default in making any payment of any principal of any Indebtedness for Borrowed Money (excluding the Loans) on the scheduled or original due date with respect thereto beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created;

(ii)        default in making any payment of any interest on any such Indebtedness for Borrowed Money beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness for Borrowed Money was created; or

(iii)        default in the observance or performance of any other agreement or condition relating to any such Indebtedness for Borrowed Money or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event of default shall occur, the effect of which payment or other default or other event of default is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness for Borrowed Money to become due prior to its Stated Maturity or to become subject to a mandatory offer to purchase by the obligor thereunder;

*provided*, that:

(A)        a default, event or condition described in this paragraph shall not at any time constitute an Event of Default unless, at such time, one or more defaults or events of default of the type described in this paragraph shall have occurred and be continuing with respect to Indebtedness for Borrowed Money the outstanding principal amount of which individually exceeds $50,000,000, and in the case of Indebtedness for Borrowed Money of the types described in **clauses (i)** and **(ii)** of the definition thereof, with respect to such Indebtedness which exceeds such amount either individually or in the aggregate; and

(B)        this paragraph (e) shall not apply to (i) secured Indebtedness that becomes due as a result of the sale, transfer, destruction or other Disposition of the Property or assets securing such Indebtedness for Borrowed Money if such sale, transfer, destruction or other Disposition is not prohibited hereunder and under the documents providing for such Indebtedness, or (ii) any Guarantee Obligations except to the extent such Guarantee Obligations shall become due and payable by any Loan Party and remain unpaid after any applicable grace period or period permitted following demand for the payment thereof;

*provided*, *further*, that no Event of Default under this **clause (e)** shall arise or result from

(1)        [reserved],

(2)        any change of control (or similar event) under any other Indebtedness for Borrowed Money that is triggered due to the Permitted Investors (as defined herein) obtaining the requisite percentage contemplated by such change of control provision, unless both (x) such Indebtedness for Borrowed Money shall become due and payable or shall otherwise be required to be repaid, repurchased, redeemed or defeased, whether at the option of any holder thereof or otherwise and (y) at such time, the Borrower and/or its Restricted Subsidiaries would not be permitted to repay such Indebtedness for Borrowed Money in accordance with the terms of this Agreement; or

144

(3)    any event or circumstance related to any Immaterial Subsidiary;

(f)    (i)    Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, administration, moratorium or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment (including by scheme of restructuring plan), winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, administrator, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary (whether or not then designated as such)) shall make a general assignment for the benefit of its creditors;

(ii)    there shall be commenced against Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action of a nature referred to in **clause (i)** above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days;

(iii)    there shall be commenced against Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against substantially all of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof;

(iv)    Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall consent to or approve of, or acquiesce in, any of the acts set forth in **clause (i)**, **(ii)**, or **(iii)** above; or

(v)    Holdings or the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)    (i)    the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture) shall incur any liability in connection with any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan;

(ii)    a failure to meet the minimum funding standards under Section 412 of the Code or Section 302 of ERISA, whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Lien shall arise on the assets of any Loan Party or any other Commonly Controlled Entity;

(iii)    a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is reasonably likely to result in the termination of such Single Employer Plan for purposes of Title IV of ERISA;

145

(iv)    any Single Employer Plan shall terminate in a distress termination under Section 4041(c) of ERISA or in an involuntary termination by the PBGC under Section 4042 of ERISA; or

(v)    any Loan Party or any other Commonly Controlled Entity shall, or is reasonably likely to, incur any liability as a result of a withdrawal from, or the Insolvency of, a Multiemployer Plan;

(vi)    any Canadian Defined Benefit Pension Plan shall terminate, in whole or in part, or the institution of proceedings by any Governmental Authority to terminate a Canadian Defined Benefit Pension Plan, or have a replacement administrator appointed to administer a Canadian Defined Benefit Pension Plan where, at the time of such termination or appointment, there exists a material wind up deficit in a Canadian Defined Benefit Pension Plan; or

(vii)    any Lien arises (except for contribution amounts not yet due) in connection with such Plan or Canadian Pension Plan;

and in each case in **clauses (i)** through **(vii)** above, which event or condition, together with all other such events or conditions, if any, would reasonably be expected to result in any liability of the Borrower or any of its Restricted Subsidiaries that would reasonably be expected to have a Material Adverse Effect;

(h)    One or more final judgments or decrees shall be entered against the Borrower or any of its Restricted Subsidiaries (other than any Permitted Joint Venture or any Immaterial Subsidiary (whether or not then designated as such)) pursuant to which the Borrower and any such Restricted Subsidiaries taken as a whole has a liability (not paid or fully covered by third-party insurance or effective indemnity) of $50,000,000 or more (net of any amounts which have been covered by insurance or an effective indemnity), and all such judgments or decrees shall not have been vacated, discharged, dismissed, stayed or bonded within 60 days from the entry thereof;

(i)    Subject to **Schedule 6.10**, any limitations expressly set forth herein and the exceptions set forth in the applicable Security Documents:

(i)    any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof in accordance with the terms thereof or hereof) to be in full force and effect or shall be asserted in writing by the Borrower or any Guarantor not to be a legal, valid and binding obligation of any party thereto;

(ii)    any security interest purported to be created by any Security Document with respect to any material portion of the Collateral of the Loan Parties on a consolidated basis shall cease to be, or shall be asserted in writing by any Loan Party not to be, a valid and perfected security interest (having the priority required by this Agreement or the relevant Security Document) in the securities, assets or properties covered thereby, except to the extent that (x) any such loss of perfection or priority results from limitations of foreign laws, rules and regulations as they apply to pledges of Capital Stock in Foreign Subsidiaries or the application thereof, or from the failure of the Collateral Agent (or, in the case of the Term Loan Agreement First Priority Collateral, the Designated Term Loan Agent) to maintain possession of certificates actually delivered to it representing securities pledged under the Guarantee and Collateral Agreement or otherwise or to file UCC continuation statements or PPSA financing change statements, (y) such loss is covered by a lender's title insurance policy and the Administrative Agent shall be reasonably satisfied with the credit of such insurer or (z) any such loss of validity, perfection or priority is the result of any failure by the Collateral Agent (or, in the case of the Term Facility First Priority Collateral, the

Designated Term Loan Agent) to take any action necessary to secure the validity, perfection or priority of the security interests; or

     (iii)    the Guarantee Obligations pursuant to the Security Documents by any Loan Party of any of the Obligations shall cease to be in full force and effect (other than in accordance with the terms hereof or thereof), or such Guarantee Obligations shall be asserted in writing by any Loan Party not to be in effect or not to be legal, valid and binding obligations; or

(j)    (i)    Holdings shall cease to own, directly or indirectly, 100% of the Capital Stock of the Borrower; or

     (ii)    for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date, but excluding any employee benefit plan of such person and its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan, and excluding the Permitted Investors) shall become the "beneficial owner" (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date), directly or indirectly, of more than the greater of (x) 50% of the then outstanding voting securities having ordinary voting power of Holdings and (y) the percentage of the then outstanding voting securities having ordinary voting power of Holdings owned, directly or indirectly, beneficially (within the meaning of Rule 13d-3 and 13d-5 of the Exchange Act as in effect on the Closing Date) by the Permitted Investors (it being understood that if any such person or group includes one or more Permitted Investors, the outstanding voting securities having ordinary voting power of Holdings directly or indirectly owned by the Permitted Investors that are part of such person or group shall not be treated as being owned by such person or group for purposes of determining whether this **clause (y)** is triggered);

then, and in any such event, (A) if such event is an Event of Default specified in **clause (i)** or **(ii)** of **paragraph (f)** above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including any Applicable Premium) shall immediately become due and payable and shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to **Section 2.15** plus 2.00%, and (B) if such event is any other Event of Default, either or both of the following actions may be taken:

     (i)    with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and

     (ii)    with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including the Applicable Premium) to be due and payable forthwith, whereupon the same shall immediately become due and payable.

Except as expressly provided above in this **Section 8.1** or otherwise in any Loan Document, presentment, demand and protest of any kind are hereby expressly waived by the Borrower.

## SECTION IX.
## THE AGENTS

**9.1** **Appointment.** Each Lender hereby irrevocably designates and appoints each Agent as the agent of such Lender under the Loan Documents and each such Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of the applicable Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of the applicable Loan Documents, together with such other powers as are reasonably incidental thereto, including the authority to enter into any Intercreditor Agreement.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Agents shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Agents.  Without limiting the generality of the foregoing, the Lenders hereby irrevocably authorize and instruct each Agent to, without any further consent of any Secured Party, enter into (or acknowledge and consent to) or amend, renew, extend, supplement, restate, replace, waive or otherwise modify the ABL Intercreditor Agreement and any Junior Intercreditor Agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is not prohibited (including with respect to priority) under this Agreement and, to the extent applicable, the ABL Intercreditor Agreement, and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof.  The Lenders irrevocably agree that (x) the Agents may rely exclusively on a certificate of a Responsible Officer of the Borrower as to whether any such other Liens are permitted and (y) the ABL Intercreditor Agreement and any Junior Intercreditor Agreement entered into by either Agent shall be binding on the Lenders, and each Lender hereby agrees that it will take no actions contrary to the provisions of any Intercreditor Agreement.

Without limiting the aforesaid powers of the Agents, for the purposes of holding any hypothec granted to the Attorney (as defined below) pursuant to the laws of the Province of Quebec to secure the prompt payment and performance of any and all Obligations by any Loan Party, each of the Secured Parties hereby irrevocably appoints and authorizes the Collateral Agent and, to the extent necessary, ratifies the appointment and authorization of the Collateral Agent, to act as the hypothecary representative of the creditors as contemplated under Article 2692 of the Civil Code of Quebec (in such capacity, the "*Attorney*"), and to enter into, to take and to hold on their behalf, and for their benefit, any hypothec, and to exercise such powers and duties that are conferred upon the Attorney under any such hypothec. In such capacity, the Attorney shall: (a) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the Attorney pursuant to any such hypothec and applicable law, and (b) benefit from and be subject to all provisions hereof with respect to the Collateral Agent mutatis mutandis, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Secured Parties and the Loan Parties. Any person who becomes a Secured Party shall be deemed to have consented to and confirmed the Attorney as the hypothecary representative of the Secured Parties and to have ratified, as of the date it becomes a Secured Party, all actions taken by the Attorney in such capacity. The substitution of the Collateral Agent pursuant to the provisions of this Article IX also shall constitute the substitution of the Attorney.

**9.2** **Delegation of Duties.** Each Agent may execute any of its duties under the applicable Loan Documents by or through any of its branches, agents, sub-agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither Agent shall be responsible for the negligence or misconduct of any agents, sub-agents or attorneys in fact selected by it with reasonable care.  Each Agent and any such agent, sub-agents or attorney-in-fact may perform any and all of its duties by or through their respective Related Persons. Pursuant to the foregoing, MidCap Funding IV Trust, in its capacity as Administrative Agent, hereby appoints MidCap Financial Services, LLC as its sub-agent for

148

purposes of receiving amounts payable to the Administrative Agent under any Loan Document (including amounts payable to the Administrative Agent for the account of any Lender) and performance of any U.S. federal income Tax withholding and/or information reporting obligations associated with receipt of such amounts in accordance with applicable Law. The exculpatory and indemnity provisions of this Section shall apply to any such agent, sub-agent or attorney-in-fact and to the Related Persons of each Agent and any such agent or attorney-in-fact, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  Without limiting the foregoing, for the avoidance of doubt, **Sections 9.3**, **9.7** and **10.5** shall inure to the benefit of any such agent or attorney, mutatis mutandis, as if such agent or attorney in fact was the "Agent".

       **9.3**      **Exculpatory Provisions.**  Neither any Agent nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder or the creation, perfection or priority of any Lien purported to be created by the Security Documents or the value or the sufficiency of any Collateral.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party, nor shall any Agent be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability that is not subject to indemnification under **Section 10.5** or that is contrary to any Loan Document or applicable law.

       **9.4**      **Reliance by the Agents**.

       (a)      The Agents shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agents.

       (b)      Each Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  Each Agent shall be fully justified in failing or refusing to take any action under the applicable Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility) as it deems appropriate or it shall first be indemnified to its satisfaction by the Revolving Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.

       (c)      The Agents shall in all cases be fully protected in acting, or in refraining from acting, under the applicable Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility), and such request

and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

(d)    In determining compliance with any conditions hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.

**9.5    Notice of Default.**    Neither Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders. The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or the Majority Facility Lenders in respect of any Facility); *provided*, that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

**9.6    Non-Reliance on Agents and Other Lenders.**    Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any Affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the applicable Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, Property, financial and other condition and creditworthiness of the Loan Parties and their Affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, Property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any Affiliate of a Loan Party that may come into the possession of either Agent or any of its officers, directors, employees, agents, attorneys in fact or Affiliates.

**9.7    Indemnification.**

(a)    The Revolving Lenders severally agree to indemnify and hold harmless each Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this **Section 9.7(a)** (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of,

the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; ***provided***, that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct.

(b)     The agreements in this **Section 9.7** shall survive the payment of the Loans and all other amounts payable hereunder.

(c)     This **Section 9.7** shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.8     Agent in Its Individual Capacity.**  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under the applicable Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

**9.9     Successor Agents**.

(a)     Subject to the appointment of a successor as set forth herein, any Agent may resign upon thirty (30) days' notice to the Lenders, the Borrower and the other Agent.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint from among the Lenders (or such other person reasonably acceptable to the Borrower) a successor agent for the Lenders, which successor agent shall, unless an Event of Default under **Section 8.1(a)** or **Section 8.1(f)** with respect to the Borrower shall have occurred and be continuing, be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor Agent shall have been so appointed by the Required Lenders (with the consent of the Borrower, as applicable) and shall have accepted such appointment within 30 days after the retiring Agent's giving of notice of resignation (the "***Resignation Effective Date***"), then the retiring Agent may (but shall not be obligated to do so), on behalf of the Lenders and, unless an Event of Default under **Section 8.1(a)** or **Section 8.1(f)** with respect to the Borrower shall have occurred and be continuing, with the consent of the Borrower (such consent not to be unreasonably withheld or delayed), appoint a successor Administrative Agent and/or Collateral Agent, as the case may be,.  Whether or not a successor has been appointed, such Agent's resignation shall become effective in accordance with such notice on the Resignation Effective Date.  After any retiring Agent's resignation as Agent, the provisions of this **Section 9** shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.  If no successor Agent has been appointed and such appointment is effective by the Resignation Effective Date, any other then existing Agent (in the sole discretion of such Agent) may become such successor Agent and, if no other then-existing Agent elects to become such successor Agent, all payments, communications and determinations required to be made by, to or through the retiring Administrative Agent shall instead be made by or to each Lender (and other Persons entitle to payments) directly (and each Lender (and each other Person) will cooperate with the Borrower to enable the Borrower to take such actions), and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document, until such time as the Required Lenders appoint a successor Administrative Agent as provided in this **clause (a)**.

(b)        If at any time the Required Lenders determine that any Person serving as an Agent is a Defaulting Lender, the Required Lenders by notice to the Borrower and such Person may, subject to the appointment of a successor as set forth herein, remove such Person as an Agent.  If such Person is removed as an Agent, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of such retiring Agent, and the retiring Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such retiring Agent or any of the parties to this Agreement or any holders of the Loans.  Such removal will, to the fullest extent permitted by applicable law, be effective on the date a replacement Agent is appointed.

(c)        Any resignation by the Administrative Agent pursuant to this **Section 9** shall also constitute its resignation as Collateral Agent.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (i) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Collateral Agent and (ii) the retiring Collateral Agent shall be discharged from all of its respective duties and obligations hereunder or under the other Loan Documents.

**9.10        Authorization to Release Liens and Guarantees.**  The Agents are hereby irrevocably authorized by each of the Lenders to effect any release or subordination of Liens or Guarantee Obligations contemplated by **Section 10.15**.

**9.11        Agents May File Proofs of Claim.**  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, to the maximum extent permitted by applicable law, each Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether either Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise,

(a)        to file a proof of claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under **Sections 2.9** and **10.5**) allowed in such judicial proceeding; and

(b)        to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Agents and, if either Agent shall consent to the making of such payments directly to the Lenders to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due to such Agent under **Sections 2.9** and **10.5**.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize such Agent to vote in respect of the claim of any Lender or in any such proceeding.

**9.12        Specified Hedge Agreements, Specified Cash Management Obligations and Specified Additional Obligations.**

(a)      Except as otherwise expressly set forth herein or in any Security Documents, to the maximum extent permitted by applicable law, no Person that obtains the benefits of any guarantee by any Guarantor of the Obligations or any Collateral with respect to any Specified Hedge Agreement entered into by it and the Borrower or any Subsidiary Guarantor or with respect to any Specified Cash Management Obligations or Specified Additional Obligations owed by the Borrower or any Subsidiary Guarantor to such Person shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than, if applicable, in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.    Notwithstanding any other provision of this **Section 9** to the contrary, neither Agent shall be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, obligations arising under any Specified Hedge Agreement or with respect to Specified Cash Management Obligations or with respect to Specified Additional Obligations unless such Agent has received written notice of such obligations (together with the information required by **Sections 9.12(b)** and **(c)** below), together with such other supporting documentation as it may request, from the applicable Person to whom such obligations are owed.

(b)      The Borrower and any Hedge Bank may from time to time designate the Hedge Agreement to which they are parties as being a "Specified Hedge Agreement" upon written notice (a "***Hedge Designation Notice***") to the Administrative Agent from the Borrower, which Hedge Designation Notice shall include (i) a description of such Hedge Agreement and (ii) the maximum portion (expressed in Dollars) of the Hedge Termination Value thereunder, if any, that is elected by the Borrower to constitute a "Designated Hedge Pari Passu Distribution Amount" and as to which an equal reserve shall be taken against the Borrowing Base as a Specified Reserve (such portion, a "***Designated Hedge Pari Passu Distribution Amount***" and the obligations under such Specified Hedge Agreement (to the extent a Specified Reserve equal to such Designated Hedge Pari Passu Distribution Amount exists with respect to such Specified Hedge Agreement), "***Pari Passu Distribution Hedge Obligations***"); ***provided***, that no such Designated Hedge Pari Passu Distribution Amount with respect to any Specified Hedge Agreement shall constitute Pari Passu Distribution Hedge Obligations (and no such Specified Reserve shall be established by the Administrative Agent in connection therewith) to the extent that, at the time of delivery of the applicable Hedge Designation Notice and after giving effect to such Designated Hedge Pari Passu Distribution Amount (including any Specified Reserve with respect to such Pari Passu Distribution Hedge Obligations to be established by the Administrative Agent in connection therewith), the difference between Availability and the Revolving Loans then outstanding would be less than zero (it being understood, for the avoidance of doubt, that in such a case (1) a Specified Reserve shall be established in an amount equal to the amount that will cause the difference between Availability and the Revolving Loans then outstanding (after giving effect to such Specified Reserve) to equal zero, (2) the Designated Hedge Pari Passu Distribution Amount in respect of such Specified Hedge Agreement shall be deemed to equal the amount of such Specified Reserve and (3) a portion of the Secured Obligations in respect of such Specified Hedge Agreement equal to the amount of such Specified Reserve shall constitute Pari Passu Distribution Hedge Obligations to the extent such Specified Reserve exists).

(c)      The Borrower and any counterparty may from time to time designate obligations towards such counterparty as being a "Specified Additional Obligation", subject, in the case of principal, to the limitations set forth in the definition thereof, upon written notice (an "***Additional Obligation Designation Notice***") to the Administrative Agent from the Borrower, which Additional Obligation Designation Notice shall include (i) a description of such obligations and (ii) the amount (expressed in Dollars) thereunder, if any, that is elected by the Borrower to constitute a Designated Additional Obligation Pari Passu Distribution Amount and as to which an equal reserve shall be taken against the Borrowing Base as a Specified Reserve (such amount, a "***Designated Additional Obligation Pari Passu Distribution Amount***" and such obligations (to the extent a Specified Reserve equal to such Designated Additional Obligation Pari Passu Distribution Amount exists with respect to such Specified Additional Obligations), "***Pari Passu***

***Distribution Additional Obligations***"); ***provided***, that no such Designated Additional Obligation Pari Passu Distribution Amount with respect to any obligations shall constitute Pari Passu Distribution Additional Obligations (and no such Specified Reserve shall be established by the Administrative Agent in connection therewith) to the extent that, at the time of delivery of the applicable Additional Obligation Designation Notice and after giving effect to such Designated Additional Obligation Pari Passu Distribution Amount (including any Specified Reserve with respect to such Pari Passu Distribution Additional Obligations to be established by the Administrative Agent in connection therewith), the difference between Availability and the Revolving Loans then outstanding would be less than zero (it being understood, for the avoidance of doubt, that in such a case (1) a Specified Reserve shall be established in an amount equal to the amount that will cause the difference between Availability and the Revolving Loans then outstanding (after giving to such Specified Reserve) to equal zero, (2) the Designated Additional Obligation Pari Passu Distribution Amount in respect of such obligations shall be deemed to equal the amount of such Specified Reserve and (3) a portion of the Secured Obligations in respect of such obligations equal to the amount of such Specified Reserve ***plus*** any accrued interest or fees in respect of such Designated Additional Obligation Pari Passu Distribution Amount shall constitute Pari Passu Distribution Additional Obligations to the extent such Specified Reserve exists).

(d)     The Borrower and the applicable Hedge Bank or counterparty, as applicable, may increase, decrease or terminate any Designated Hedge Pari Passu Distribution Amount or Designated Additional Obligation Pari Passu Distribution Amount, as applicable, in respect of a Specified Hedge Agreement or other obligations, respectively, upon written notice to the Administrative Agent, in which case the Administrative Agent shall promptly make a corresponding adjustment to the Specified Reserve with respect thereto; ***provided***, that any increase in a Designated Hedge Pari Passu Distribution Amount or Designated Additional Obligation Pari Passu Distribution Amount, as applicable, shall be deemed to be a new designation of a Designated Hedge Pari Passu Distribution Amount or Designated Additional Obligation Pari Passu Distribution Amount, as applicable, pursuant to a new Hedge Designation Notice or Additional Obligation Designation Notice, respectively, and shall be subject to the limitations set forth in **Section 9.12(b)** or **Section 9.12(c)**, as applicable.  For the avoidance of doubt, obligations under any Hedge Agreement designated pursuant to this **Section 9.12** in excess of the applicable Designated Hedge Pari Passu Distribution Amount, and obligations under any Specified Additional Obligations designated pursuant to this **Section 9.12** in excess of the applicable Designated Additional Obligation Pari Passu Distribution Amount, shall in each case constitute Secured Obligations under a Specified Hedge Agreement or Specified Additional Obligation, as applicable, but shall be entitled to a lesser priority of payment as set forth in **Section 6.6** of the Guarantee and Collateral Agreement.

9.13     **Lead Arranger**.     The Lead Arranger shall not have any duties or responsibilities hereunder.

9.14     **Erroneous Payment**.

(a)     Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender) (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, a "***Erroneous Payment***") within ten (10) Business Days of the making of such Erroneous Payment, and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than five (5) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the last day of such five (5) Business Day period to the date such amount is repaid to the Administrative Agent in

same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)       Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives an Erroneous Payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent (or any of its Affiliates) with respect to such Erroneous Payment (an "***Erroneous Payment Notice***"), (y) that was not preceded or accompanied by an Erroneous Payment Notice, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), in each case, an error has been made (and that it is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment) with respect to such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than five (5) Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the last day of such five (5) Business Day period to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)       The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)       Each party's obligations under this **Section 9.14** shall survive the resignation or replacement of the Administrative Agent, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document

**9.15      Appointment of Administrative Agent as Security Trustee**.

(a)       For the purposes of any Liens or Collateral created under the UK Security Agreements, the following additional provisions shall apply.

(b)       In this Article 9, the following expressions have the following meanings:

"***Appointee***" means any receiver, administrator or other insolvency officer appointed in respect of any Loan Party or its assets.

"***Charged Property***" means the assets of the Loan Parties subject to a security interest under the UK Security Agreements.

"***Delegate***" means any delegate, agent, attorney or co-trustee appointed by the Administrative Agent (in its capacity as security trustee).

(c)      The Secured Parties appoint the Administrative Agent to hold the security interests constituted by the UK Security Agreements on trust for the Secured Parties on the terms of the Loan Documents and the Administrative Agent accepts that appointment.

(d)      The Administrative Agent, its subsidiaries and associated companies may each retain for its own account and benefit any fee, remuneration and profits paid to it in connection with (i) its activities under the Loan Documents; and (ii) its engagement in any kind of banking or other business with any Loan Party.

(e)      Nothing in this Agreement constitutes the Administrative Agent as a trustee or fiduciary of, nor shall the Administrative Agent have any duty or responsibility to, any Loan Party.

(f)      The Administrative Agent shall have no duties or obligations to any other person except for those which are expressly specified in the Loan Documents or mandatorily required by applicable law.

(g)      The Administrative Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to exercise and perform all or any of the duties, rights, powers and discretions vested in it by the UK Security Agreements and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(h)      The Administrative Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the Administrative Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the Administrative Agent thinks fit and with such of the duties, rights, powers and discretions vested in the Administrative Agent by the UK Security Agreements as may be conferred by the instrument of appointment of that person.

(i)      The Administrative Agent shall notify the Secured Parties of the appointment of each Appointee (other than a Delegate).

(j)      The Administrative Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate or Appointee in connection with its appointment.  All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement, as paid or incurred by the Administrative Agent.

(k)      Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together "***Rights***") of the Administrative Agent (in its capacity as security trustee) under the UK Security Agreements, and each reference to the Administrative Agent (where the context requires that such reference is to the Administrative Agent in its capacity as security trustee) in the provisions of the UK Security Agreements which confer Rights shall be deemed to include a reference to each Delegate and each Appointee.

(l)      Each Secured Party confirms its approval of the UK Security Agreements and authorizes and instructs the Administrative Agent: (i) to execute and deliver the UK Security Agreements; (ii) to

exercise the rights, powers and discretions given to the Administrative Agent (in its capacity as security trustee) under or in connection with the UK Security Agreements together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the Administrative Agent (in its capacity as security trustee) on behalf of the Secured Parties under the UK Security Agreements.

(m)    The Administrative Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(n)    Each other Secured Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by a UK Security Agreement and accordingly authorizes: (a) the Administrative Agent to hold such security interest in its sole name (or in the name of any Delegate) as trustee for the Secured Parties; and (b) the Land Registry (or other relevant registry) to register the Administrative Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(o)    Except to the extent that a UK Security Agreement otherwise requires, any moneys which the Administrative Agent receives under or pursuant to a UK Security Agreement may be: (a) invested in any investments which the Administrative Agent selects and which are authorized by applicable law; or (b) placed on deposit at any bank or institution (including the Administrative Agent) on terms that the Administrative Agent thinks fit, in each case in the name or under the control of the Administrative Agent, and the Administrative Agent shall hold those moneys, together with any accrued income (net of any applicable Tax) to the order of the Lenders, and shall pay them to the Lenders on demand.

(p)    On a disposal of any of the Charged Property which is permitted under the Loan Documents, the Administrative Agent shall (at the cost of the Loan Parties) execute any release of the UK Security Agreements or other claim over that Charged Property and issue any certificates of non-crystallisation of floating charges that may be required or take any other action that the Administrative Agent considers desirable.

(q)    The Administrative Agent shall not be liable for (i) any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by a UK Security Agreement; (ii) any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by a UK Security Agreement; (iii) the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Loan Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Loan Document; or (iv) any shortfall which arises on enforcing a UK Security Agreement.

(r)    The Administrative Agent shall not be obligated to (i) obtain any authorization or environmental permit in respect of any of the Charged Property or a UK Security Agreement; (ii) hold in its own possession a UK Security Agreement, title deed or other document relating to the Charged Property or a UK Security Agreement; (iii) perfect, protect, register, make any filing or give any notice in respect of a UK Security Agreement (or the order of ranking of a UK Security Agreement), unless that failure arises directly from its own gross negligence or willful misconduct; or (iv) require any further assurances in relation to a UK Security Agreement.

(s)    In respect of any UK Security Agreement, the Administrative Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property; or (ii) make any enquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

157

(t)        In respect of any UK Security Agreement, the Administrative Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or inadequacy of any insurance; or (ii) the failure of the Administrative Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required Lenders have requested it to do so in writing and the Administrative Agent has failed to do so within fourteen (14) days after receipt of that request.

(u)        Every appointment of a successor Administrative Agent under a UK Security Agreement shall be by deed.

(v)        Section 1 of the Trustee Act 2000 (UK) shall not apply to the duty of the Administrative Agent in relation to the trusts constituted by this Agreement.

(w)        In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 (UK) or the Trustee Act 2000 (UK), the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000 (U.K.).

(x)        The perpetuity period under the rule against perpetuities if applicable to this Agreement and any UK Security Agreement shall be 80 years from the Closing Date.

<div align="center">

**SECTION X.**
**MISCELLANEOUS**

</div>

**10.1      Amendments and Waivers**.

(a)        Except to the extent otherwise expressly set forth in this Agreement (including **Sections 7.11** and **10.16**) or the applicable Loan Documents, neither this Agreement, nor any other Loan Document, nor any terms, conditions or other provisions hereof or thereof may be amended, supplemented,  modified or waived except in accordance with the provisions of this **Section 10.1**.

The Required Lenders and each Loan Party party to the relevant Loan Document may, subject to the acknowledgment of the Administrative Agent, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (i) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding, deleting or otherwise modifying any term, condition or other provisions of this Agreement or any other Loan Documents or changing in any manner the rights or obligations of the Agents or the Lenders or of the Loan Parties or their Subsidiaries hereunder or thereunder or (ii) waive, on such terms and conditions as the Required Lenders may specify in such instrument, any of the requirements of this Agreement or any other Loan Document or any Default or Event of Default and its consequences; *provided*, *however*, that no such waiver and no such amendment, supplement or modification shall:

(A)        forgive or reduce the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest, fee or premium payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders) and (y) that any amendment or modification of defined terms used in the financial ratios in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this **clause (A)**) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly and adversely affected thereby,

<div align="center">158</div>

which such consent of each Lender directly and adversely affected thereby shall be sufficient to effect such waiver without regard for a Required Lender consent;

(B)     amend, modify or waive any provision of paragraph (a) of this **Section 10.1** without the written consent of all Lenders;

(C)     reduce any percentage specified in the definition of Required Lenders or Supermajority Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents (except as provided in **Section 7.4(j)**), release all or substantially all of the Collateral or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders (except as expressly permitted hereby (including pursuant to **Section 7.4** or **7.5**) or by any Security Document);

(D)     amend, modify or waive any provision of **paragraph (a)** or **(b)** of **Section 2.18** of this Agreement or **Section 6.6** of the Guarantee and Collateral Agreement without the written consent of all Lenders directly and adversely affected thereby;

(E)     reduce the number of Appraisals, investigations, reviews, verifications and field examinations conducted and reports provided pursuant to **Section 6.14** without the written consent of Supermajority Lenders;

(F)     reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility, which consent shall be sufficient to effect such waiver under the applicable Facility without regard for a Required Lender consent;

(G)     amend, modify or waive any provision of **Section 9** with respect to any Agent without the written consent of such Agent;

(H)     [reserved];

(I)     [reserved];

(J)     [reserved];

(K)     [reserved]; or

(L)     amend, supplement or otherwise modify or waive any of the terms and provisions (and related definitions) related to the Borrowing Base (including an amendment for the purpose of establishing any additional borrowing base in respect of assets owned by Foreign Subsidiaries) and any provisions (including advance rates) relating to the Availability or Revolving Loans in any manner that has the effect of increasing the amounts available to be borrowed hereunder without the written consent of the Supermajority Lenders; *provided*, *however*, that the foregoing shall not apply to any such waivers, consents or other modifications related to the Borrowing Base or any provisions relating to the Availability or Revolving Loans that have the effect of increasing the amounts available to be borrowed hereunder to the extent expressly permitted hereunder, which waivers, consents or other modifications shall not, for the avoidance of

doubt, constitute amendments, supplements or other modifications subject to this **Section 10.1(a):**

(M)    prior to an Event of Default under Section 8.1(f), amend or modify any term or provision of any Loan Document to permit the issuance or incurrence of any Indebtedness for Borrowed Money (including any exchange of existing Indebtedness that results in another class of Indebtedness for Borrowed Money, but excluding (A) Indebtedness that is expressly permitted by this Agreement as in effect on the Closing Date to be senior to the Obligations and/or to be secured by a Lien that is senior to the Lien securing Obligations and (B) for the avoidance of doubt, any "debtor-in-possession" facility (or similar financing under applicable law)) with respect to which (x) the Liens on the Collateral securing the Obligations would be subordinated or (y) all or any portion of the Obligations would be subordinated in right of payment (any such other Indebtedness to which such Liens securing any of the Obligations or such Obligations, as applicable, are subordinated, "*Senior Indebtedness*"), in each case without the written consent of each Lender directly and adversely affected thereby, unless each adversely affected Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the amount of Obligations that are adversely affected thereby held by each Lender) of the Senior Indebtedness on the same terms (other than bona fide backstop fees and reimbursement of counsel fees and other expenses in connection with the negotiation of the terms of such transaction; such fees and expenses, "*Ancillary Fees*") as offered to all other providers (or their Affiliates) of the Senior Indebtedness and to the extent such adversely affected Lender decides to participate in the Senior Indebtedness, receive its pro rata share of the fees and any other similar benefit (other than Ancillary Fees) of the Senior Indebtedness afforded to the providers of the Senior Indebtedness (or any of their Affiliates) in connection with providing the Senior Indebtedness.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing unless limited by the terms of such waiver; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding anything to the contrary herein, any amendment, modification, waiver or other action which by its terms requires the consent of all Lenders, all Revolving Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders, except that (x) the Commitment of any such Defaulting Lender may not be increased or extended, the maturity of the Loans of any such Defaulting Lender may not be extended, the rate of interest on any of such Loans may not be reduced and the principal amount of any of such Loans may not be forgiven, in each case without the consent of such Defaulting Lender and (y) any amendment, modification, waiver or other action that by its terms adversely affects any such Defaulting Lender in its capacity as a Lender in a manner that differs in any material respect from, and is more adverse to such Defaulting Lender than it is to, other affected Lenders shall require the consent of such Defaulting Lender.

(b)    Any waiver, amendment, supplement or modification otherwise permitted pursuant to **Section 10.1(a)** shall not be permitted to the extent that such waiver, amendment, supplement or modification

(i)        **Revolving Facility**

(A)        amends, supplements or otherwise modifies or waives any of the terms and provisions (and related definitions) related to the Borrowing Base (including an amendment for the purpose of establishing any additional borrowing base in respect of assets owned by Foreign Subsidiaries) or any provisions (including advance rates) relating to the Availability or Revolving Loans, in each case, in any manner that has the effect of increasing the amounts available to be borrowed from the Revolving Lenders hereunder without the written consent of the Supermajority Lenders; ***provided***, that the foregoing shall not apply to any such waivers, consents or other modifications related to the Borrowing Base or any provisions relating to the Availability or Revolving Loans that have the effect of increasing the amounts available to be borrowed hereunder to the extent expressly permitted hereunder with the approval of the Administrative Agent and the Required Lenders, which waivers, consents or other modifications shall not, for the avoidance of doubt, constitute amendments, supplements or other modifications subject to this Section 10.1(b)(i)(A) (for avoidance of doubt, it being understood that this Clause (A) shall not limit the discretion of the Administrative Agent to change, establish or eliminate any reserves in accordance with customary banking practices for comparable asset-based transactions and otherwise consistent with past practices); or

(B)        amends, modifies or waives any provision of **paragraph (b)(i)** of this **Section 10.1** without the written consent of all Revolving Lenders directly and adversely affected thereby.

(ii)        **Additional Supermajority Voting.**  Without the consent of Supermajority Lenders, amend, modify or waive any provision of **Section 6.1**, **6.2(b)**, **6.6** or **6.14**, in each case, in a direct and adverse manner to any non-consenting Revolving Lender.

(c)        Any waiver, amendment, supplement or modification otherwise permitted pursuant to **Section 10.1(a)** shall not be permitted to the extent that such waiver, amendment, supplement or modification, amends, supplements or modifies the rights, duties or obligations of an Agent without the written consent of such Agent directly and adversely affected thereby.

(d)        [reserved].

(e)        Furthermore, notwithstanding the foregoing, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, mistake, omission, defect, or inconsistency, in each case, in any provision of this Agreement or any other Loan Document, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to this Agreement or any other Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof; it being understood that posting such amendment electronically on the Platform to the Required Lenders shall be deemed adequate receipt of notice of such amendment.

(f)        Furthermore, notwithstanding the foregoing, this Agreement may be amended, supplemented or otherwise modified in accordance with **Sections 7.11** and **10.16**.

**10.2        Notices; Electronic Communications**.

(a)        All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or posted to the Platform, or three (3) Business Days after being deposited in the mail, postage prepaid, hand delivered or, in the case of telecopy notice, when sent (except in the case of a telecopy notice not given during normal business hours (New York time) for the recipient, which shall be deemed to have been given at the opening of business on the next Business Day for the recipient), addressed as follows in the case of the Borrower or the Agents, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such Person or at such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| The Borrower: | Revlon Intermediate Holdings IV LLC<br>55 Water St., 43rd Floor<br>New York, New York 10041-0004<br>Attention:  Matt Kvarda, Interim Chief Financial Officer<br>Telephone: (310) 980-8529<br>Email: mkvarda@alvarezandmarsal.com |
| With a copy (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton &Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attention:  Thomas V. de la Bastide III<br>Telecopy:  (212) 492-0031<br>Telephone: (212) 373-3031<br>Email: tdelabastide@paulweiss.com |
| Agents : | For loan borrowing notices, continuations, conversions, and payments:<br><br>MidCap Funding IV Trust<br>c/o MidCap Financial Services, LLC, as Servicer<br>7255 Woodmont Avenue, Suite 300<br>Bethesda, MD 20814<br>Attention:  Portfolio Mgt. – Revlon transaction<br>E-mail:  notices@midcapfinancial.com<br><br>With a copy to:<br><br>MidCap Funding IV Trust<br>c/o MidCap Financial Services, LLC, as Servicer<br>7255 Woodmont Avenue, Suite 300<br>Bethesda, MD 20814<br>Attention:  Legal Group<br>E-mail:  legalnotices@midcapfinancial.com |

With a copy (which shall not       Proskauer Rose LLP
constitute notice) to:                 Eleven Times Square
                             New York City, NY 10036
                             Attn: Andrew Bettwy
                             Tel.: (212) 969-3180
                             E-mail address: abettwy@proskauer.com

*provided*, that any notice, request or demand to or upon the Agents, the Lenders or the Borrower shall not be effective until received.

(b)      Notices and other communications to the Lenders hereunder may be delivered or furnished by posting to the Platform or by any electronic communications pursuant to procedures approved by the Administrative Agent; *provided*, that the foregoing shall not apply to notices pursuant to **Section 2** unless otherwise agreed by the Administrative Agent and the applicable Lender.  Any Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided*, that approval of such procedures may be limited to particular notices or communications.

(c)      The Borrower, each Agent and each Lender hereby acknowledges that (i) Holdings, the Borrower, the Administrative Agent and/or the Lead Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "***Borrower Materials***") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "***Platform***") and (ii) certain of the Lenders (each, a "***Public Lender***") may have personnel who do not wish to receive information other than information that is publicly available, or not material with respect to Holdings, the Borrower or its Subsidiaries, or their respective securities, for purposes of the United States Federal and state securities laws (collectively, "***Public Information***").  The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that is Public Information and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as containing only Public Information (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Confidential Information, they shall be treated as set forth in **Section 10.14**); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information"; *provided*, that there is no requirement that the Borrower identify any such information as "PUBLIC."

(d)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Persons (collectively, the "***Agent Parties***") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or

163

otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent Party or any of its Related Persons; **_provided_**, **_however_**, that in no event shall any Agent Party have any liability to the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(e)     Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to such other Persons.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Requirements of Law, including United States Federal securities laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain information other than Public Information.

(f)     The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices of borrowing) believed in good faith by the Administrative Agent to be given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.3     No Waiver; Cumulative Remedies**.

(a)     No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

(b)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with **Section 8.1** for the benefit of all the Lenders; **_provided_** that the foregoing shall not prohibit (i) each Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) [reserved]; (iii) any Lender from exercising setoff rights in accordance with **Section 10.7(b)** (subject to the terms of **Section 10.7(a)**), or (iv) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law.

**10.4**    **Survival of Representations and Warranties.**    All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

**10.5**    **Payment of Expenses; Indemnification.**    Except with respect to Taxes which are addressed in **Section 2.20**, the Borrower agrees:

(a)    to pay or reimburse each Agent for all of their respective reasonable and documented out-of-pocket costs and expenses incurred in connection with the syndication of the Facilities (other than fees payable to syndicate members), any Appraisals in accordance with the terms hereof, and the development, preparation, execution and delivery of this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith and any amendment, supplement or modification hereto or thereto, and, as to the Agents only, the administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements and other charges of a single firm of counsel to the Agents (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction as may reasonably be necessary) and the reasonable fees and expenses of any agent, sub agent or attorney-in-fact appointed by any Agent, in connection with all of the foregoing, but excluding the fees and disbursements and other charges of any financial advisor or consultant unless the Borrower shall have consented in writing in its sole discretion;

(b)    (i) to pay or reimburse each Lender and each Agent for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement of any rights under this Agreement, the other Loan Documents and any such other documents referred to in **Section 10.5(a)** above (including all such costs and expenses incurred in connection with any legal proceeding, including any proceeding under any Debtor Relief Law or in connection with any workout or restructuring), including the documented fees and disbursements of a single firm of counsel to the Lenders taken as a whole (plus one firm of special regulatory counsel and one firm of local counsel per material jurisdiction); and (ii) to pay or reimburse each Revolving Lender for all other reasonable and documented out-of-pocket costs and expenses incurred in connection with this Agreement, the other Loan Documents or the Facilities (which the Borrower agrees in writing with such Revolving Lender are necessary or appropriate to be incurred by such Revolving Lender in connection with the Facility and notify the Administrative Agent thereof) (each such cost or expense, an "***Additional Lender Expense***"). For the avoidance of doubt, such Additional Lender Expense is a Secured Obligation;

(c)    to pay, indemnify or reimburse each Lender, each Agent, the Lead Arranger and their respective Affiliates, and their respective partners that are natural persons, members that are natural persons, officers, directors, employees, trustees, advisors, agents and controlling Persons (each, an "***Indemnitee***") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, costs, expenses or disbursements arising out of any actions, judgments or suits of any kind or nature whatsoever, arising out of or in connection with any claim, action or proceeding (any of the foregoing, a "***Proceeding***") relating to or otherwise with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents referred to in **Section 10.5(a)** above and the transactions contemplated hereby and thereby, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties and the reasonable fees and disbursements and other charges of any legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower hereunder (all the foregoing in this **clause (c)**, collectively, the "***Indemnified Liabilities***");

165

*provided*, that, the Borrower shall not have any obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities have resulted from (i) the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision, (ii) a material breach of the Loan Documents by such Indemnitee or its Related Persons as determined by a court of competent jurisdiction in a final non-appealable decision, (iii) disputes solely among Indemnitees or their Related Persons and not arising from any act or omission by any Parent Company, Holdings, Borrower or any of its Subsidiaries (it being understood that this **clause (iii)** shall not apply to the indemnification of an Agent or a Lead Arranger in a suit involving an Agent or a Lead Arranger, in each case, in its capacity as such, unless such suit has resulted from the gross negligence, bad faith or willful misconduct of such Agent or Lead Arranger as determined by a court of competent jurisdiction in a final non-appealable decision) or (iv) any settlement of any Proceeding effected without the Borrower's consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with the Borrower's written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, the Borrower shall indemnify and hold harmless each Indemnitee from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this **Section 10.5**.

No Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other material distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement, the other Loan Documents or the transactions contemplated hereby or thereby.

For purposes hereof, a "***Related Person***" of an Indemnitee means (i) if the Indemnitee is any Agent or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Agent and its Affiliates and their respective officers, directors, employees, agents and controlling Persons; ***provided***, that solely for purposes of **Section 9**, references to each Agent's Related Persons shall also include such Agent's trustees and advisors, and (ii) if the Indemnitee is any Lender or any of its Affiliates or their respective partners that are natural persons, members that are natural persons, officers, directors, employees, agents and controlling Persons, any of such Lender and its Affiliates and their respective officers, directors, employees, agents and controlling Persons.  All amounts due under this **Section 10.5** shall be payable promptly after receipt of a reasonably detailed invoice therefor.  Statements payable by the Borrower pursuant to this **Section 10.5** shall be submitted to the Borrower at the address thereof set forth in **Section 10.2**, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent.

The agreements in this **Section 10.5** shall survive repayment of the Obligations.

**10.6**    **Successors and Assigns; Participations and Assignments**.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder (other than in accordance with **Section 7.4(j)**) without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) subject to **Section 2.24**, no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this **Section 10.6**.

(b)    (i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, in compliance with applicable law, assign (other than to any Disqualified Institution or a natural person) to one or more assignees (each, an "***Assignee***"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the

166

prior written consent (such consent not to be unreasonably withheld or delayed, it being understood that it shall be deemed reasonable for the Borrower to withhold such consent in respect of a prospective Lender if the Borrower reasonably believes such prospective Lender would constitute a Disqualified Institution) of:

(1)      the Borrower; *provided*, that no consent of the Borrower shall be required for an assignment of

(x)      Revolving Loans or Revolving Commitments to a Revolving Lender, an Affiliate of a Revolving Lender, or an Approved Fund of a Revolving Lender (other than a Defaulting Lender); or

(y)      any Loan or Commitment to any Person if an Event of Default under **Section 8.1(a)** or **8.1(f)** has occurred and is continuing;

*provided*, *further*, that a consent under this **clause (A)** shall be deemed given if the Borrower shall not have objected in writing to a proposed assignment within ten Business Days after receipt by it of a written notice thereof from the Administrative Agent; and

(2)      the Administrative Agent; *provided*, that no consent of the Administrative Agent shall be required for an assignment to a Lender or an Affiliate or Approved Fund of a Lender (in each case, other than a Defaulting Lender).

(ii)      Subject to **Sections 2.24**, assignments shall be subject to the following additional conditions:

(1)      except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 unless the Borrower and the Administrative Agent otherwise consent; *provided*, that (1) no such consent of the Borrower shall be required if an Event of Default under **Section 8.1(a)** or **8.1(f)** has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(2)      the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent and the Borrower (or, at the Borrower's request, manually) together with a processing and recordation fee of $3,500 to be paid by either the applicable assignor or assignee (which fee may be waived or reduced in the sole discretion of the Administrative Agent); *provided*, that only one such fee shall be payable in the case of contemporaneous assignments to or by two or more related Approved Funds; and

(3)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire and all documentation and other information reasonably determined by the Administrative Agent to be required by applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

For the purposes of this **Section 10.6**, "***Approved Fund***" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (I) a Lender, (II) an Affiliate of a Lender, (III) an entity or an Affiliate of an entity that administers or manages a Lender or (IV) an entity or an Affiliate of an entity that is the investment advisor to a Lender.  Notwithstanding the foregoing, no Lender shall be permitted to make assignments under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be subject to the obligations under and entitled to the benefits of **Sections 2.19**, **2.20**, **2.21**, **10.5** and **10.14**).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this **Section 10.6** shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this **Section 10.6** (and will be required to comply therewith), other than any sale to a Disqualified Institution, which shall be null and void.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "***Register***").  The Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement (and the entries in the Register shall be conclusive absent demonstrable error for such purposes), notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (in respect of its own position), at any reasonable time and from time to time upon reasonable prior notice.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee (except as contemplated by **Section 2.24**), the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder) and all applicable tax forms, the processing and recordation fee referred to in paragraph (b) of this **Section 10.6** (unless, in the case of the processing and recordation fee, waived by the Administrative Agent) and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)    (i)    Any Lender may, without the consent of any Person, in compliance with applicable law, sell participations (other than to any Disqualified Institution) to one or more banks or other entities (a "***Participant***"), in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); ***provided***, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and

the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided*, that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender or each Lender directly and adversely affected thereby pursuant to the proviso to the second sentence of **Section 10.1**  (or each Lender directly and adversely affected thereby pursuant to **Section 10.1(b)(i)** or **(ii)**, as applicable) and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this **Section 10.6**, the Borrower agrees that each Participant shall be entitled to the benefits of **Sections 2.19**, **2.20** and **2.21** (if such Participant agrees to have related obligations thereunder (it being understood that the documentation required under **Section 2.20** shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this **Section 10.6**.  Notwithstanding the foregoing, no Lender shall be permitted to sell participations under this Agreement to any Disqualified Institutions without the written consent of the Borrower.

(ii)    A Participant shall not be entitled to receive any greater payment under **Section 2.19**, **2.20** or **2.21** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent to such greater amounts.  No Participant shall be entitled to the benefits of **Section 2.20** unless such Participant complies with **Section 2.20(e)**, **(g)** or **(j)**, as (and to the extent) applicable, as if such Participant were a Lender (it being understood that the documentation required under **Section 2.20** shall be delivered to the participating Lender).

(iii)    Each Lender that sells a participation, acting solely for U.S. federal income tax purposes as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a register on which it enters the name and addresses of each Participant, and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "***Participant Register***"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  Unless otherwise required by the IRS, any disclosure required by the foregoing sentence shall be made by the relevant Lender directly and solely to the IRS.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (it its capacity as such) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may, without the consent of or notice to the Administrative Agent or the Borrower, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other central banking authority, and this **Section 10.6** shall not apply to any such pledge or assignment of a security interest; *provided*, that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)      The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

(f)      The Borrower may prohibit any assignment if it would require the Borrower to make any filing with any Governmental Authority or qualify any Loan or Note under the laws of any jurisdiction and the Borrower shall be entitled to request and receive such information and assurances as it may reasonably request from any Lender or any Assignee to determine whether any such filing or qualification is required or whether any assignment is otherwise in accordance with applicable law.

(g)      [reserved].

(h)      [reserved].

(i)      None of Holdings or any of its Subsidiaries may acquire by assignment, participation or otherwise any right to or interest in any of the Commitments or Loans hereunder (and any such attempted acquisition shall be null and void).

(j)      [reserved].

(k)      Notwithstanding anything to the contrary contained herein, the replacement of any Lender pursuant to **Section 2.24** shall be deemed an assignment pursuant to **Section 10.6(b)** and shall be valid and in full force and effect for all purposes under this Agreement.

(l)      Any assignor of a Loan or Commitment or seller of a participation hereunder shall be entitled to rely conclusively on a representation of the assignee Lender or purchaser of such participation in the relevant Assignment and Assumption or participation agreement, as applicable, that such assignee or purchaser is not a Disqualified Institution.  None of the Lead Arranger or the Agents shall have any responsibility or liability for monitoring the list or identities of, or enforcing provisions relating to, Disqualified Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Institution or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Institution.

**10.7     Adjustments; Set off**.

(a)      Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "***Benefited Lender***") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by setoff, pursuant to events or proceedings of the nature referred to in **Section 8.1(f)**, or otherwise) in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; ***provided***, ***however***, that (i) if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest and (ii) the provisions of this **Section 10.7** shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a

Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or Participant.

(b)      In addition to any rights and remedies of the Revolving Lenders provided by law, each Revolving Lender shall have the right, without prior notice to the Company, any such notice being expressly waived by the Company to the extent permitted by applicable law, upon any amount becoming due and payable by the Company hereunder (whether at the stated maturity, by acceleration or otherwise) after the expiration of any cure or grace periods, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Revolving Lender or any Affiliate, branch or agency thereof to or for the credit or the account of the Company. Each Revolving Lender agrees promptly to notify the Company and the Administrative Agent after any such setoff and application made by such Revolving Lender; *provided*, that the failure to give such notice shall not affect the validity of such setoff and application.

**10.8**      **Counterparts.**  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by facsimile or electronic (i.e., "pdf" or "tiff") transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

**10.9**      **Severability.**  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.10**      **Integration.**  This Agreement and the other Loan Documents represent the entire agreement of the Borrower, the Agents and the Lenders with respect to the subject matter hereof and thereof.

**10.11**      **GOVERNING LAW.**  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

**10.12**      **Submission to Jurisdiction; Waivers.**  Each party hereto hereby irrevocably and unconditionally:

(a)      submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party to the exclusive general jurisdiction of the Supreme Court of the State of New York for the County of New York (the "***New York Supreme Court***"), and the United States District Court for the Southern District of New York (the "***Federal District Court***" and, together with the New York Supreme Court, the "***New York Courts***"), and appellate courts from either of them; *provided*, that nothing in this Agreement shall be deemed or operate to preclude (i) any Agent from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations (in which case any party shall be entitled to assert any claim or defense, including any claim or defense that this **Section 10.12** would otherwise require to be asserted in a legal action or proceeding in a New York Court), or to enforce a judgment or other court order in favor of the

Administrative Agent or the Collateral Agent, (ii) any party from bringing any legal action or proceeding in any jurisdiction for the recognition and enforcement of any judgment and (iii) if all such New York Courts decline jurisdiction over any person, or decline (or in the case of the Federal District Court, lack) jurisdiction over any subject matter of such action or proceeding, a legal action or proceeding may be brought with respect thereto in another court having jurisdiction;

(b)      consents that any such action or proceeding may be brought in the New York Courts and appellate courts from either of them, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to it at its address set forth in **Section 10.2** or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this **Section 10.12** of any special, exemplary, punitive or consequential damages (***provided***, that such waiver shall not limit the indemnification obligations of the Loan Parties to the extent such special, exemplary, punitive or consequential damages are included in any third party claim with respect to which the applicable Indemnitee is entitled to indemnification under **Section 10.5**).

10.13      **Acknowledgments.**  The Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      neither the Agents nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Agents and Lenders, on the one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor;

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders;

(d)      no advisory or agency relationship between it and any Agent or Lender (in their capacities as such) is intended to be or has been created in respect of any of the transactions contemplated hereby,

(e)      the Agents and the Lenders, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship,

(f)      the Borrower is capable of evaluating and understanding, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents,

(g)      each of the Agents and the Lenders is engaged in a broad range of transactions that may involve interests that differ from the interests of the Borrower and none of the Agents or the Lenders has

172

any obligation to disclose such interests and transactions to the Borrower by virtue of any advisory or agency relationship, and

(h)      none of the Agents or the Lenders (in their capacities as such) has advised the Borrower as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction (including the validity, enforceability, perfection or avoidability of any aspect of any of the transactions contemplated hereby under applicable law, including the Bankruptcy Code or any consents needed in connection therewith), and none of the Agents or the Lenders (in their capacities as such) shall have any responsibility or liability to the Borrower with respect thereto and the Borrower has consulted with its own advisors regarding the foregoing to the extent it has deemed appropriate.

To the fullest extent permitted by law, the Borrower hereby waives and releases any claims that it may have against the Agents and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.14    Confidentiality.**  Each of the Agents and the Lenders agree to treat any and all information, regardless of the medium or form of communication, that is disclosed, provided or furnished, directly or indirectly, by or on behalf of the Borrower or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby (including any potential amendments, modifications or waivers, or any request therefor), whether furnished before or after the Closing Date ("*Confidential Information*"), as strictly confidential and not to use Confidential Information for any purpose other than evaluating the Transactions and negotiating, making available, syndicating and administering this Agreement (the "*Agreed Purposes*").  Without limiting the foregoing, each Agent and each Lender agrees to treat any and all Confidential Information with adequate means to preserve its confidentiality, and each Agent and each Lender agrees not to disclose Confidential Information, at any time, in any manner whatsoever, directly or indirectly, to any other Person whomsoever, except:

(1)      to its partners that are natural persons, members that are natural persons, directors, officers, employees, counsel, advisors, trustees and Affiliates (collectively, the "*Representatives*"), to the extent necessary to permit such Representatives to assist in connection with the Agreed Purposes (it being understood that the Representatives to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential, with the applicable Agent or Lender responsible for the breach of this **Section 10.14** by such Representatives as if they were party hereto);

(2)      to any pledgee referred to in **Section 10.6(d)** and prospective Lenders and Participants in connection with the syndication (including the secondary trading) of the Facilities and Commitments and Loans hereunder (excluding any Disqualified Institution), in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this **Section 10.14**;

(3)      to any party or prospective party (or their advisors) to any swap, derivative or similar transaction under which payments are made by reference to the Borrower and the Obligations, this Agreement or payments hereunder, in each case who are informed of the confidential nature of the information and agree to observe and be bound by standard confidentiality terms at least as favorable to the Borrower and its Affiliates as those contained in this **Section 10.14**;

(4)     upon the request or demand of any Governmental Authority having or purporting to have jurisdiction over it;

(5)     in response to any order of any Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, ***provided***, that in the case of **clauses (4)** and **(5)**, the disclosing Agent or Lender, as applicable, agrees, to the extent practicable and not prohibited by applicable Requirements of Law, to notify the Borrower prior to such disclosure and cooperate with the Borrower in obtaining an appropriate protective order (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority);

(6)     to the extent reasonably required or necessary, in connection with any litigation or similar proceeding relating to the Facilities;

(7)     information that has been publicly disclosed other than in breach of this **Section 10.14**;

(8)     to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or in connection with examinations or audits of such Lender;

(9)     to the extent reasonably required or necessary, in connection with the exercise of any remedy under the Loan Documents; ***provided***, that each Agent and Lender uses commercially reasonable efforts to ensure that such information is kept confidential in connection with such exercise of remedies and the recipient is informed of the confidential nature of the information;

(10)    to the extent the Borrower has consented to such disclosure in writing;

(11)    to any other party to this Agreement;

(12)    to the extent that such information is received from a third party that is not, to such Agent or Lender's knowledge, subject to contractual or fiduciary confidentiality obligations owing to the Borrower and its Affiliates and their Related Parties;

(13)    to the extent that such information is independently developed by such Agent or Lender; or

(14)    by the Administrative Agent to the extent reasonably required or necessary to obtain a CUSIP for any Loans or Commitment hereunder, to the CUSIP Service Bureau.

Each Agent and each Lender acknowledges that (i) Confidential Information includes information that is not otherwise publicly available and that such non-public information may constitute confidential business information which is proprietary to the Borrower and/or its Affiliates and (ii) the Borrower has advised the Agents and the Lenders that it is relying on the Confidential Information for its success and would not disclose the Confidential Information to the Agents and the Lenders without the confidentiality provisions of this Agreement.  All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their Related Parties or their respective securities.  Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a

credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws. Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this **Section 10.14** shall survive with respect to each Agent and Lender until the second anniversary of such Agent or Lender ceasing to be an Agent or a Lender, respectively.

### 10.15    Release of Collateral and Guarantee Obligations; Subordination of Liens.

(a)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property permitted by the Loan Documents (including by way of merger and including any assets transferred to a Subsidiary that is not a Loan Party in a transaction permitted by this Agreement) or any Loan Party becoming an Excluded Subsidiary (other than pursuant to **clause (b)** of the definition thereof, unless such Loan Party so becomes such an Excluded Subsidiary as a result of a joint venture or other strategic transaction otherwise permitted hereunder, but was entered into for the primary purpose of releasing the Guarantee of such Loan Party and not a legitimate business purpose) or ceasing to be a Subsidiary, all Liens and Guarantees on such assets or all assets of such Excluded Subsidiary or former Subsidiary shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement or documentation in respect of Specified Cash Management Obligations or Specified Additional Obligations) execute and deliver all releases reasonably necessary or desirable

(i)    to evidence the release of Liens created in any Collateral being Disposed of in such Disposition (including any assets of any Loan Party that becomes an Excluded Subsidiary) or of such Excluded Subsidiary or former Subsidiary, as applicable,

(ii)    to provide notices of the termination of the assignment of any Property for which an assignment had been made pursuant to any of the Loan Documents which is being Disposed of in such Disposition or of such Excluded Subsidiary or former Subsidiary, as applicable, and

(iii)    to release the Guarantee and any other obligations under any Loan Document of any Person being Disposed of in such Disposition or which becomes an Excluded Subsidiary or former Subsidiary, as applicable.

Any representation, warranty or covenant contained in any Loan Document relating to any such Property so Disposed of (other than Property Disposed of to the Borrower or any of its Restricted Subsidiaries) or of a Loan Party which becomes an Excluded Subsidiary or former Subsidiary, as applicable, shall no longer be deemed to be repeated once such Property is so Disposed of.  In addition, upon the reasonable request of the Borrower in connection with

(A)    any Lien of the type permitted by **Section 7.3(g)** on Excluded Collateral to secure Indebtedness to be incurred pursuant to **Section 7.2(c)** (or pursuant to **Section 7.2(d)** or **7.2(j)** if such Indebtedness is of the type that is contemplated by **Section 7.2(c)**) if the holder of such Lien so requires,

(B)    any Lien securing Indebtedness pursuant to **Section 7.2(t)(x)** if the holder of such Lien so requires and pursuant to **Section 7.2(t)(y)** if the holder of such Lien so requires and if the holder of the applicable Indebtedness being refinanced also so requires, and in each case to the extent constituting Excluded Collateral,

(C)    any Lien of the type permitted by **Sections 7.3(o)**, **7.3(r)(i)**, **7.3(t)** or **7.3(bb)**, in each case, to the extent the obligations giving rise to such permitted Lien prohibit (or require the release of) the security interest of the Collateral Agent thereon and so long as such cash subject to such Lien is not included in the definition of Qualified Cash after giving effect thereto, or **7.3(kk)** to the extent constituting Excluded Collateral, or

(D)    the ownership of joint ventures or other entities qualifying under **clause (iv)** of the definition of Excluded Equity Securities, the Collateral Agent shall execute and deliver all releases necessary or desirable to evidence that no Liens exist on such Excluded Collateral under the Loan Documents.

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than (x) obligations in respect of any Specified Hedge Agreement, Specified Cash Management Obligations or Specified Additional Obligations and (y) any contingent or indemnification obligations not then due) have been paid in full and all Commitments have terminated or expired, upon the request of the Borrower, all Liens and Guarantee Obligations under any Loan Documents shall automatically terminate and the Collateral Agent shall (without notice to, or vote or consent of, any Lender, or any Affiliate of any Lender that is a party to any Specified Hedge Agreement or documentation in respect of Specified Cash Management Obligations or Specified Additional Obligations) take such actions as shall be required to release its security interest in all Collateral, and to release all Guarantee Obligations under any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Specified Hedge Agreements, Specified Cash Management Obligations or Specified Additional Obligations or contingent or indemnification obligations not then due.  Any such release of Guarantee Obligations shall be deemed subject to the provision that such Guarantee Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its Property, or otherwise, all as though such payment had not been made.

(c)    Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Liens permitted under **Section 7.3(g)** securing Indebtedness incurred pursuant to **Section 7.2(c)**, the Collateral Agent shall (without notice to, or vote or consent of, any Lender) take such actions as shall be required to subordinate the Lien on any Collateral to any such Lien permitted under **Section 7.3(g)(i)**.

**10.16**    **Accounting Changes.**  In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial ratios, covenants, standards or terms in this Agreement, then following notice either from the Borrower to the Administrative Agent or from the Administrative Agent to the Borrower (which the Administrative Agent shall give at the request of the Required Lenders), the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrower's financial condition and covenant capacities shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  If any such notices are given then, regardless of whether such notice is given prior to or following such Accounting Change, until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders and have become effective, all financial ratios, covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  Any amendment contemplated by the prior sentence shall become effective upon the consent of the Required Lenders, it being understood that a Lender

176

shall be deemed to have consented to and executed such amendment if such Lender has not objected in writing within five Business Days following receipt of notice of execution of the applicable amendment by the Borrower and the Administrative Agent, it being understood that the posting of an amendment referred to in the preceding sentence electronically on the Platform to the Lenders shall be deemed adequate receipt of notice of such amendment. "**Accounting Changes**" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC, in each case, occurring after the Closing Date. Without limiting the foregoing, for purposes of determining compliance with any provision of this Agreement, the determination of whether a lease is to be treated as an operating lease or capital lease shall be made without giving effect to any change in accounting for leases pursuant to GAAP resulting from the implementation of Accounting Standards Update No. 2016-02, Leases (Topic 842).

**10.17    WAIVERS OF JURY TRIAL.**    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY AND FOR ANY COUNTERCLAIM THEREIN.

**10.18    USA PATRIOT ACT, UK ANTI-MONEY LAUNDERING & ANTI-TERRORISM LEGISLATION AND CANADIAN ANTI-MONEY LAUNDERING & ANTI-TERRORISM LEGISLATION**.

(a)    Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA Patriot Act (Title III of Publ. 107 56 (signed into law October 26, 2001)) (the "**USA Patriot Act**"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of such Loan Parties, as applicable, and other information that will allow such Lender to identify the Loan Parties, as applicable, in accordance with the USA Patriot Act, and the Borrower agrees to provide such information from time to time to any Lender or Agent reasonably promptly upon request from such Lender or Agent.

(b)

(i)    The Administrative Agent and its successors and assigns may be subject to Canadian Anti-Money Laundering & Anti-Terrorism Legislation and "know your customer" rules and regulations  (collectively, including any guidelines or orders thereunder, "**AML Legislation**") , and they hereby notify the Borrower and each of its Subsidiaries that in order to comply with such AML Legislation, they may be, among other things, required to obtain, verify and record information pertaining to the Borrower and its Subsidiaries, which information may relate to, among other things, the names, addresses, corporate directors, corporate registration numbers, corporate tax numbers, and corporate shareholders of Holdings and the Subsidiaries. Each of Holdings and the Borrower agree to take promptly such actions and to promptly provide, upon reasonable request, such information, access to information and certifications regarding Holdings and the Subsidiaries that are required to enable the Administrative Agent and its successors and assigns to comply with such AML Legislation. In addition, and to the extent they are required at law to do so, each of Holdings and the Borrower agree to promptly comply with its obligations under any applicable AML Legislation,  whether now or hereafter in existence

(ii)    If the Administrative Agent has ascertained the identity of any Loan Party or any authorized signatories of any Loan Party for the purposes of applicable AML Legislation, then the Administrative Agent (x) shall be deemed to have done so as an agent for each Secured Party, and

this Agreement shall constitute a "written agreement" in such regard between each Secured Party and the Administrative Agent within the meaning of the applicable AML Legislation; and (y) shall provide to each Secured Party copies of all information obtained in such regard without any representation or warranty as to its accuracy or completeness. Notwithstanding the preceding sentence and except as may otherwise be agreed in writing, each of the Lenders agrees that the Administrative Agent has no obligation to ascertain the identity of the Loan Parties or any authorized signatories of the Loan Parties on behalf of any Lender, or to confirm the completeness or accuracy of any information it obtains from any Loan Party or any such authorized signatory in doing so.

**10.19    [Reserved]**.

**10.20    Interest Rate Limitation.**  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this **Section 10.20** shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**10.21    Payments Set Aside.**  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, ***plus*** interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Effective Rate from time to time in effect.  The obligations of the Lenders, under **clause (b)** of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.22    Electronic Execution of Assignments and Certain Other Documents.**  The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Assumptions, amendments or other notices of borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; ***provided*** that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in

any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

**10.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.** Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

**10.24    Judgment Currency.**

If the Administrative Agent, on behalf of any Lender, obtains a judgment or a judgment against a Loan Party in a currency other than Dollars, the obligations of such Loan Party in respect of any sum adjudged to be due to the Administrative Agent or the Lenders hereunder (the "***Judgment Amount***") shall be discharged only to the extent that, on the Business Day following receipt by the Administrative Agent of the Judgment Amount in such currency, the Administrative Agent, in accordance with normal banking procedures, purchases Dollars with the Judgment Amount in such currency. If the amount of Dollars so purchased is less than the amount of Dollars that could have been purchased with the Judgment Amount on the date or dates the Judgment Amount (excluding the portion of the Judgment Amount which has accrued as a result of the failure of such Loan Party to pay the sum originally due hereunder when (the "***Original Due Date***") it was originally due and owing to the Administrative Agent or any Lender hereunder) was originally due and owing to the Administrative Agent or any Lender hereunder (the "***Loss***"), such Loan Party agrees as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or such Lender, as the case may be, against the Loss, and if the amount of Dollars so purchased exceeds the amount of Dollars that could have been purchased with the Judgment Amount on the Original Due Date, the Administrative Agent or such Lender agrees to remit such excess to such Loan Party.

**10.25    [Reserved].**

**10.26    [Reserved].**

**[Reserved].**

**10.28    Certain ERISA Matters.**

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdings, the Borrower or any other Loan Party (except that the representations in **Section 4.5** are made in reliance on the accuracy and compliance of the representations and covenants made in this **Section 10.28(a)**), that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Plans in connection with the Loans or the Commitments,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender, but only if in substance such other arrangement confirms the absence of an ERISA prohibited transaction.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Holdings, the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

180

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)    no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)    The Administrative Agent hereby informs the Lenders that the Administrative Agent is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

(d)    The representations in this **Section 10.28** are intended to comply with United States Department of Labor Regulations codified at 29 C.F.R. § 2510.3-21(a) and (c)(1) as promulgated on April 8, 2016 (81 Fed. Reg. 20,997). To the extent these regulations are revoked, repealed or no longer effective, these representations shall be deemed to be no longer in effect.

**10.29    Acknowledgement Regarding Any Supported QFCs.**    To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support, "**QFC Credit Support**" and each such QFC a "**Supported QFC**"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "**U.S. Special Resolution Regimes**") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)        In the event a Covered Entity that is party to a Supported QFC (each, a "***Covered Party***") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support may be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)        As used in this **Section 10.29**, the following terms have the following meanings:

"***BHC Act Affiliate***": of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"***Covered Entity***": any of the following:

(i)        a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §252.82(b);

(ii)        a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §47.3(b); or

(iii)        a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §382.2(b).

"***Default Right***" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R §§ 252.81, 47.2 or 382.1, as applicable.

"***QFC***" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

Revlon Intermediate Holdings IV LLC,
as Borrower

By:   _____
      Name:
      Title:

Revlon Intermediate Holdings III LLC  (solely for
purposes of **<u>Section VIIA</u>**),
as Holdings

By:   _____
      Name:
      Title:

Midcap Funding IV Trust, as Administrative Agent and
Collateral Agent

By: _____

     Name:

     Title:

MidCap Financial Trust,
as a Lender

By: _____
       Name:
       Title:

Apollo Debt Solutions BDC,
as a Lender

By: _____
       Name:
       Title:

Apollo Diversified Credit Fund,
as a Lender

By: _____
       Name:
       Title:

Apollo Centre Street Partnership, L.P.,
as a Lender

By: _____
       Name:
       Title:

## **Exhibit I-1**

**New Warrant Agreement**

This **Exhibit I-1** contains the New Warrant Agreement.  All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit I-1**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

*Execution Version*

**WARRANT AGREEMENT**

**dated as of May [2], 2023 between**

**REVLON GROUP HOLDINGS LLC**

**and**

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**

**as Warrant Agent**

**Warrants to Purchase Common Shares**

## TABLE OF CONTENTS

**Page**

**Article 1  Definitions** ....................................................................................................... **1**
    Section 1.1    Certain Definitions ..................................................................1

**Article 2  Warrant Certificates** ..................................................................................... **8**
    Section 2.1    Original Issuance of Warrants ...............................................8
    Section 2.2    Form of Warrants ...................................................................9
    Section 2.3    Execution and Delivery of Warrant Certificates.................9
    Section 2.4    Global Warrant Certificates .................................................10
    Section 2.5    Registration, Transfer, Exchange and Substitution.............12
    Section 2.6    Cancellation of the Warrants ................................................14
    Section 2.7    CUSIP Numbers.....................................................................14
    Section 2.8    Loss or Mutilation .................................................................14
    Section 2.9    Transfer Restrictions .............................................................14

**Article 3  Exercise and Settlement of Warrants** ......................................................... **15**
    Section 3.1    Right to Acquire Common Shares Upon Exercise ...............15
    Section 3.2    Exercise Procedures for Warrants ........................................15
    Section 3.3    Common Shares Issuable .......................................................17
    Section 3.4    Settlement of Warrants ..........................................................17
    Section 3.5    Delivery of Common Shares..................................................18
    Section 3.6    No Fractional Common Shares to Be Issued .........................20
    Section 3.7    Acquisition of Warrants by Company ...................................20
    Section 3.8    Validity of Exercise ..............................................................20
    Section 3.9    Certain Calculations..............................................................20
    Section 3.10    Reservation and Listing of Common Shares .......................21
    Section 3.11    Charges, Taxes and Expenses ..............................................21
    Section 3.12    Cancellation of Warrant Certificates ...................................21
    Section 3.13    Withholding and Reporting Requirements ...........................21

**Article 4  Adjustments** ................................................................................................... **22**
    Section 4.1    Adjustments and Other Rights ..............................................22
    Section 4.2    Common Share Dividends, Distributions, Splits, Subdivisions, Reclassifications or Combinations..........................................22
    Section 4.3    Other Distributions................................................................23
    Section 4.4    Dissolution, Total Liquidation or Winding Up.....................23
    Section 4.5    Successor upon Consolidation, Merger and Sale of Assets ......24
    Section 4.6    Adjustment upon Reorganization Event ...............................24
    Section 4.7    Rounding of Calculations; Minimum Adjustments ..............26
    Section 4.8    Timing of Issuance of Additional Common Shares Upon Certain Adjustments ........................................................................26
    Section 4.9    Statement Regarding Adjustments........................................26
    Section 4.10    Notice of Adjustment Event..................................................26
    Section 4.11    Adjustment Rules...................................................................26
    Section 4.12    Optional Tax Adjustment.......................................................27
    Section 4.13    Stockholder Rights Plans or Equivalent ...............................27

i

## TABLE OF CONTENTS

**Article 5  Other Provisions Relating to Rights of Warrantholders..........................................27**
Section 5.1    No Rights as Unitholders.................................................................27
Section 5.2    Modification/Amendment................................................................27
Section 5.3    Rights of Action..............................................................................28
Section 5.4    Issuance Obligation Remedies.......................................................28
Section 5.5    No Impairment.................................................................................28
Section 5.6    Information Rights...........................................................................29
Section 5.7    LLC Agreement Provisions Binding Upon Exercise.................31

**Article 6  Concerning the Warrant Agent and Other Matters.................................................32**
Section 6.1    Change of Warrant Agent...............................................................32
Section 6.2    Compensation; Further Assurances ..............................................33
Section 6.3    Reliance on Counsel .......................................................................33
Section 6.4    Proof of Actions Taken...................................................................33
Section 6.5    Correctness of Statements..............................................................34
Section 6.6    Validity of Agreement.....................................................................34
Section 6.7    Use of Agents...................................................................................34
Section 6.8    Liability of Warrant Agent..............................................................34
Section 6.9    Legal Proceedings............................................................................35
Section 6.10   Actions as Agent .............................................................................35
Section 6.11   Appointment and Acceptance of Agency ...................................36
Section 6.12   Appointment of Countersigning Agent.......................................36
Section 6.13   Successors and Assigns...................................................................37
Section 6.14   Notices ...............................................................................................37
Section 6.15   Applicable Law; Jurisdiction ........................................................38
Section 6.16   Waiver of Jury Trial ........................................................................38
Section 6.17   Specific Performance ......................................................................39
Section 6.18   Benefit of this Warrant Agreement ..............................................39
Section 6.19   Registered Warrantholder ..............................................................39
Section 6.20   Headings ............................................................................................39
Section 6.21   Counterparts......................................................................................39
Section 6.22   Entire Agreement .............................................................................40
Section 6.23   Severability .......................................................................................40
Section 6.24   Termination.......................................................................................40
Section 6.25   Confidentiality ..................................................................................40
Section 6.26   Representations and Warranties of the Company .......................40

Exhibit A      Form of Warrant Certificate
Exhibit B      Form of Exercise Notice
Exhibit C      Fee Schedule
Exhibit D      Form of Joinder to the LLC Agreement

## WARRANT AGREEMENT

Warrant Agreement (as it may be amended from time to time, this "**Warrant Agreement**"), dated as of May [2], 2023, between Revlon Group Holdings LLC, a Delaware limited liability company (the "**Company**"), and American Stock Transfer & Trust Company, LLC, as warrant agent (the "**Warrant Agent**").

## RECITALS

WHEREAS, pursuant to the Joint Plan of Reorganization (the "**Plan**") of Revlon, Inc. and certain of its debtor affiliates under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") approved by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), certain Warrants (as defined herein) to purchase Common Shares (as defined herein) of the Company shall be issued;

WHEREAS, the Warrants and the Common Shares underlying the Warrants have been offered and sold in reliance on the exemption from the registration requirements of the Securities Act and any applicable state securities or "blue sky" laws afforded by Section 1145(a) of the Bankruptcy Code; and

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows.

## ARTICLE 1

## DEFINITIONS

**Section 1.1    Certain Definitions**.  "**Affiliate**" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agent Members**" has the meaning set forth in Section 2.4(b) hereof.

"**Applicable Procedures**" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Beauty Companies**" has the meaning set forth in the definition of "Competitor" set forth below.

"**Beneficial Owner**" means any Person beneficially owning an interest in a Warrant represented by a Global Warrant Certificate, which interest is credited to the account of a direct or indirect participant in the Depositary for the benefit of such Person through the book-entry system maintained by the Depositary (or its agent).

"**Board**" means the board of managers of the Company from and after the Plan Effective Date.

"**Business Day**" means any day other than a Saturday, a Sunday, a day which is a legal holiday in the State of New York, or a day on which banking institutions and trust companies in the State of New York are authorized or obligated by Law, regulation or executive order to close.

"**Cash Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of fully paid and nonassessable Common Shares equal to the Cash Settlement Share Amount in exchange for payment in cash by the Exercising Owner of the applicable Exercise Price for each such Common Share so receivable upon exercise of such Warrant.

"**Cash Settlement Share Amount**" means, for each Warrant exercised as to which Cash Settlement is applicable, one fully paid and nonassessable Common Share, subject to adjustment in accordance with Article 4.

"**Cashless Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of Common Shares equal to the Cashless Settlement Share Amount without any payment of cash therefor.

"**Cashless Settlement Share Amount**" means for each Warrant exercised as to which an Exercising Owner elects Cashless Settlement, one fully paid and nonassessable Common Share, subject to adjustment in accordance with Article 4, multiplied by a fraction equal to (i) the Fair Market Value (as of the Exercise Date for such Warrant) of one Common Share minus the Exercise Price therefor divided by (ii) such Fair Market Value.  The number of Common Shares issuable upon exercise, on the same Exercise Date, of Warrants as to which Cashless Settlement is applicable shall be aggregated for each Warrantholder, together with cash in lieu of any fractional Common Share, as provided in Section 3.6.  In no event shall the Company deliver a fractional Common Share in connection with an exercise of Warrants as to which Cashless Settlement is applicable.

"**Close of Business**" means 5:00 p.m., New York City time.

"**Closing Date**" means the Plan Effective Date.

2

"**Common Shares**" means the limited liability company interests in the Company designated as the "Common Shares" of the Company and issued on or after the Plan Effective Date.

"**Company**" has the meaning set forth in the Preamble.

"**Company Order**" means a written request or order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, Chief Financial Officer, its Treasurer, any Assistant Treasurer, its Secretary or any Assistant Secretary, and delivered to the Warrant Agent.

"**Company Sale**" means (i) the occurrence of a merger, consolidation, share exchange, business combination or other sale involving the Company and its Subsidiaries or similar corporate transaction involving the Company and its Subsidiaries, whether or not the Company is the surviving entity in any such transaction, other than a transaction which would result in the voting power of the securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or owning entity) at least a majority of the voting power of the securities of the Company or such surviving or owning entity immediately after such transaction, (ii) any Transfer of all (but not less than all) of the outstanding Common Shares in any transaction or series of related transactions or (iii) any direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company followed by a distribution of the proceeds.

"**Competitor**" means (i) any Person that owns or operates assets primarily used in, or that designs, develops, produces, offers for sale or sells products in, the cosmetics, hair color, hair care, fragrances, skincare, or beauty care products businesses (collectively, "**Beauty Companies**") or any Affiliate of such Person, (ii) any Person (together with its Related Persons) that directly or indirectly (A) holds equity interests in any Beauty Company where such equity interests collectively represent greater than 50% of the asset value, or account for greater than 50% of the revenue of, such Person, or (B) controls (as such term is defined in the definition of "Affiliate") any Beauty Company or (iii) any other Person as determined from time to time and posted to a Datasite that the Board determines in good faith poses a material competitive risk to the Company or any of its Subsidiaries; provided that (1) in the case of clause (i), that no Person who has a passive interest in a Beauty Company shall be deemed to be a Competitor of the Company so long as such Person is not involved in the management of or otherwise provides advice or services to such Beauty Company and has not designated, or does not have the right to designate, any member or non-voting observer of the board of directors (or similar governing body) of such Beauty Company and (2) in the case of clauses (i) or (ii), the Board (excluding the vote of any manager appointed by, or otherwise affiliated with, a Competitor (as defined without giving effect to this proviso)) may determine in good faith that a Person that would be a Competitor pursuant to the foregoing clauses (i) or (ii) shall be deemed to not be a Competitor, notwithstanding clauses (i) or (ii) of this definition.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

"**Corporate Agency Office**" has the meaning set forth in Section 2.5(a) hereof.

"**Countersigning Agent**" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"**Datasite**" means a confidential website or other portal, such as (but not limited to) Intralinks or Epiq, where information may be posted.

"**Definitive Warrant Certificate**" means a Warrant Certificate registered in the name of the Warrantholder thereof that does not bear the Global Warrant Legend and that does not have a "Schedule of Decreases of Warrants" attached thereto.

"**Delaware LLC Act**" means the Delaware Limited Liability Company Act, as amended or superseded from time to time.

"**Depositary**" means DTC and its successors as depositary hereunder.

"**Drag-Along Sale**" means any LLC Beneficial Owner(s) and/or LLC Direct Owner(s) holding (directly or indirectly) at least a majority of the aggregate number of Common Shares then issued and outstanding (collectively, the "**Dragging Seller**") agree to a *bona fide* arms'-length negotiated Company Sale to one or more purchasers that are not Related Persons of the Dragging Seller for consideration payable in cash and/or freely tradeable and marketable securities.

"**Dragging Seller**" has the meaning set forth in the definition of "Drag-Along Sale" set forth above.

"**DTC**" means The Depository Trust Company.

"**DTC Participants**" means, collectively, the participants for which DTC holds and provides asset servicing.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Exempt Transaction**" shall mean a merger, reorganization or consolidation that results in the holders of the voting securities of the Company immediately prior thereto continuing to hold immediately following such merger, reorganization or consolidation (either by such voting securities remaining outstanding or being converted into voting securities of the surviving entity or the ultimate parent company of such surviving entity), in substantially the same proportions as prior to such event, more than 50% of the combined voting power of the voting securities of the Company or such surviving entity immediately after such merger or consolidation (or the ultimate parent company of the Company or such surviving entity).

"**Exercise Date**" has the meaning set forth in Section 3.2(d).

"**Exercise Notice**" means, for any Warrant, an exercise notice substantially in the form set forth in Exhibit B

hereto.

"**Exercising Owner**" means any Warrantholder that exercises Warrants pursuant to the terms hereof.

"**Exercise Price**" means $51.59, subject to adjustment as provided in Article 4.

"**Expiration Time**" means the earlier of (i) the Close of Business on May 2, 2028 and (ii) the date of consummation of any Liquidity Event.

"**Fair Market Value,**" as of a specified date, means the price per Common Share or per unit of other securities or other distributed property determined as follows:

(i)     in the case of Common Shares or other securities listed on a National Securities Exchange, the average of the VWAP of a Common Share or a single unit of such other security for the 10 Trading Days immediately preceding the specified date (or if the Common Shares or other securities have been listed for less than 10 Trading Days, the VWAP for such lesser period of time);

(ii)    in the case of Common Shares or other securities that are publicly traded but are not listed on a National Securities Exchange, the average of the reported closing bid and ask prices of a Common Share or a single unit of such other security in the over-the-counter market on which such securities are then traded for the 10 Trading Days immediately preceding the specified date (or if the Common Shares or other securities have been publicly traded (but not listed) for less than 10 Trading Days, the average of the reported closing bid and ask prices for such lesser period of time); or

(iii)   in all other cases, the Fair Market Value per Common Share or per unit of other securities or other distributed property as of a date not earlier than 20 Business Days preceding the specified date as reasonably determined in good faith by the Board, subject to appropriate adjustment for any intervening event or circumstance that would result in an adjustment pursuant to Article 4 hereof that has occurred since the date of the last determination.

For the avoidance of doubt, no third party appraisal shall be required in connection with any Warrant that is exercised using Cashless Settlement.

"**Fundamental Equity Change**" has the meaning set forth in Section 4.5(a) hereof.

"**Funds**" has the meaning set forth in Section 3.2(f) hereof.

"**Funds Account**" has the meaning set forth in Section 3.2(f) hereof.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Global Warrant Certificate**" means a Warrant Certificate deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases of Warrants" attached thereto.

"**Global Warrant Legend**" means the legend set forth in Section 2.4(a).

"**Joinder**" means a joinder to the LLC Agreement substantially in the form of EXHIBIT D attached hereto, or other documentation in form and substance acceptable to the Company in its sole discretion (which may be on a "click-through" or similar basis).

"**Law**" means any federal, state, local, foreign or provincial law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement having the force of law or any undertaking to or agreement with any governmental authority, including common law.

"**Liquidity Event**" means any transaction or series of related transactions that results in (a) a merger, consolidation or combination involving the Company, (b) the sale or exchange of all or substantially all of the equity interests of the Company to one or more third parties (whether by merger, sale, recapitalization, consolidation, combination or otherwise) or (c) the sale, directly or indirectly, by the Company of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole; provided that, notwithstanding the foregoing, no Exempt Transaction shall be a Liquidity Event.

"**LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of the Company, as amended, restated, supplemented or otherwise modified from time to time.

"**LLC Beneficial Owner**" means any Person owning a securities entitlement with respect to Common Shares registered to Cede & Co. (or such other nominee as may be selected by DTC that is the registered holder of Common Shares under the LLC Agreement), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account.

"**LLC Direct Owner**" means, as of any relevant time, any Person who is a party to the LLC Agreement (regardless of whether such person has executed the LLC Agreement) and is a member of the Company.

"**LLC Member**" means Cede & Co. (or such other nominee as may be selected by DTC that is the registered holder of Common Shares under the LLC Agreement on behalf of the LLC Beneficial Owners) and each LLC Direct Owner.

"**National Securities Exchange**" means The New York Stock Exchange (including the NYSE American), The Nasdaq Global Select Market, The Nasdaq Global Market or the Nasdaq Capital Market.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Plan**" has the meaning set forth in the Recitals.

"**Plan Effective Date**" means the "Effective Date" of the Plan as defined therein.

"**Recipient**" has the meaning set forth in Section 3.5(b) hereof.

"**Record Date**" means, with respect to any dividend, distribution, recapitalization, reclassification, split, reverse split, reorganization, consolidation, merger or other transaction or event in which the holders of Common Shares have the right to receive any cash, securities or other property or in which Common Shares (or another applicable security) are exchanged for or converted into, any combination of, cash, securities or other property, the date fixed for determination of holders of Common Shares entitled to receive such cash, securities or other property or participate in such exchange or conversion (whether such date is fixed by the Board or by statute, contract or otherwise).

"**Reference Property**" has the meaning set forth in Section 4.6(a) hereof.

"**Related Persons**" means, with respect to a Person, and without duplication, (i) such Person's Affiliates and (ii) any fund, account, investment vehicle or co-investment vehicle that is controlled, managed, advised or sub-advised by such Person or any of its Affiliates or the same investment manager, advisor or sub-advisor as such Person or any Affiliate of such investment manager, advisor or sub-advisor.

"**Reorganization Event**" has the meaning set forth in Section 4.6(a) hereof.

"**Required Warrantholders**" means Warrantholders holding at least 50.01% of the then-outstanding Warrants, subject to the provisions of Section 5.2(d).

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, (a) in all circumstances other than a Cashless Settlement where Fair Market Value has been determined by the Board pursuant to clause (iii) of the definition thereof, the second Business Day immediately following the Exercise Date for such Warrant, and (b) in the event of a Cashless Settlement where Fair Market Value has been determined by the Board pursuant to clause (iii) of the definition thereof, the second Business Day immediately following receipt by the Exercising Owner of notice of such Fair Market Value.

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which at least a majority of the securities or other interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly beneficially owned or controlled by such party or by any one or more of its subsidiaries, or by such party and one or more of its subsidiaries.

"**Trading Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which securities are not traded on the applicable securities exchange.

"**Transfer**" means a transfer by any Person of the Warrants in any form, including pursuant to a sale, assignment, conveyance, pledge, encumbrance, hypothecation or other disposition of all or any part of a Warrant or any interest therein (including pursuant to any direct or indirect participation right, total return swap or other arrangement that transfers an economic interest in the Warrants).  For the avoidance of doubt, the term "Transfer" includes a transfer of Warrants by a Beneficial Owner through DTC.  The term "Transfer" will include a direct or indirect transfer (or series of related direct or indirect transfers) of any interest in a Warrantholder or Beneficial Owner if the value of the Warrants held (directly or indirectly) by the Warrantholder or Beneficial Owner constitutes more than ten percent (10%) of the value being transferred disregarding any cash, cash equivalents and marketable securities involved in such transfer.  The terms "Transferred" and "Transferring" have meanings correlative to the foregoing.

"**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Unit of Reference Property**" has the meaning set forth in Section 4.6(a) hereof.

"**VWAP**" means, for any Trading Day, the price for securities (including Common Shares) determined by the daily volume-weighted average price per unit of such securities for such Trading Day on the trading market on which such securities are then listed or quoted, in each case, for the regular trading session (without regard to pre-open or after hours trading outside of such regular trading session) as reported on a National Securities Exchange, as published by Bloomberg at 4:15 p.m., New York City time, on such Trading Day.

"**Warrant**" or "**Warrants**" means those certain warrants of the Company to purchase initially up to an aggregate of 6,657,224 Common Shares and which expire at the Expiration Time and are issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth herein.  Each Warrant shall entitle the Warrantholder of the Warrant or the Warrant Certificate evidencing such Warrant upon exercise to purchase one Common Share at the Exercise Price, subject to adjustment pursuant to Article 4.

"**Warrant Agent**" has the meaning set forth in the Preamble.

"**Warrant Agreement**" has the meaning set forth in the Preamble.

"**Warrant Certificates**" means those certain warrant certificates evidencing the Warrants, substantially in the form of EXHIBIT A

attached hereto, except that, in the case of a Definitive Warrant Certificate, such Warrant Certificate shall not bear the Global Warrant Legend and shall not have a "Schedule of Decreases of Warrants" attached thereto.

"**Warrant Register**" has the meaning set forth in Section 2.5(b).

"**Warrantholder**" means any Person in whose name at the time any Warrant or Warrant Certificate is registered upon the Warrant Register.

## ARTICLE 2

## WARRANT CERTIFICATES

### Section 2.1    Original Issuance of Warrants.

(a)    On the Closing Date, one or more Global Warrant Certificates evidencing an aggregate of 6,657,224 Warrants (each such Warrant to be subject to adjustment from time to time as described herein) shall be executed by the Company and delivered to the Warrant Agent for countersignature, along with an Authentication Order, and the Warrant Agent shall countersign and deliver such Global Warrant Certificates for issuance to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the Beneficial Owners of the Warrants, pursuant to the Applicable Procedures of the Depositary on the Closing Date.  Each Warrant Certificate shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one Common Share, subject to adjustment as provided in Article 4.

(b)    Each Warrant shall be exercisable for one fully paid and nonassessable Common Share (subject to adjustment under Article 4) upon payment of the applicable Exercise Price for each such Common Share so receivable upon exercise of such Warrant and compliance with the procedures set forth in this Warrant Agreement.  On the Closing Date, the Warrant Agent shall register all of the Warrants in the Warrant Register.  The Warrants shall be dated as of the Closing Date and, subject to the terms hereof, shall be the only Warrants issued or outstanding under this Warrant Agreement as of the Closing Date.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to their respective benefits under this Warrant Agreement, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.  Each Warrant shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as such Warrant shall have been duly exercised or shall have expired or been cancelled in accordance with the terms hereof.  Each Warrantholder shall be bound by all of the terms and provisions of this Warrant Agreement as fully and effectively as if such Warrantholder had signed the same.

### Section 2.2    Form of Warrants.  The Warrant Certificates evidencing the Warrants shall be in registered form only and substantially in the form attached hereto as EXHIBIT A

### Section 2.3    , shall be dated the date on which countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon as the officers of the Company executing the same may approve based upon written advice of counsel (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Warrant Agreement, the Plan or the Confirmation Order, as may be required to comply with any Law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.

9

**Section 2.4    Execution and Delivery of Warrant Certificates**.

(a)    Warrant Certificates evidencing the Warrants which may be countersigned and delivered under this Warrant Agreement are limited to Warrant Certificates evidencing the Warrants except for Warrant Certificates countersigned and delivered upon registration of transfer of, or in exchange for, or in lieu of, one or more previously countersigned Warrant Certificates pursuant to Section 2.5, Section 2.6, Section 2.9, and Section 3.2(b).

(b)    The Warrant Agent is hereby authorized to countersign and deliver Warrant Certificates as required by Section 2.1, Section 2.5, Section 2.6, Section 2.9, and Section 3.2(b).

(c)    The Warrant Certificates shall be executed in the company name and on behalf of the Company by the Chief Executive Officer or the Chief Financial Officer of the Company under company seal reproduced thereon and attested to by the Secretary or one of the Assistant Secretaries of the Company, either manually or by facsimile signature printed thereon. The Warrant Certificates shall be countersigned by the Warrant Agent, either manually or by facsimile signature, and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be such officer of the Company before countersignature by the Warrant Agent and issue and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by such person as, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company, although at the date of the execution of this Warrant Agreement any such person was not such officer.

**Section 2.5    Global Warrant Certificates**.

(a)    Any Global Warrant Certificate shall bear the legend substantially in the form set forth in EXHIBIT A

(b)     hereto (the "**Global Warrant Legend**").

(c)    So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Warrantholder of such Warrant Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent

10

Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(d)    Any Beneficial Owner of Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through the book-entry system maintained by the Depositary as the Warrantholder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(e)    Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in Section 2.5(f).  Interests of Beneficial Owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

(f)    A Global Warrant Certificate registered in the name of the Depositary or its nominee shall be exchanged for Definitive Warrant Certificates only if the Depositary (i) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (ii) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation in accordance with Section 3.12, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each Beneficial Owner identified by the Depositary, in exchange for such Beneficial Owner's beneficial interest in such Global Warrant Certificate, Definitive Warrant Certificates evidencing, in the aggregate, the number of Warrants theretofore represented by such Global Warrant Certificate with respect to such Beneficial Owner's respective beneficial interest.  Any Definitive Warrant Certificate delivered in exchange for an interest in a Global Warrant Certificate pursuant to this Section 2.5(f) shall not bear the Global Warrant Legend.  Interests in any Global Warrant Certificate may not be exchanged for Definitive Warrant Certificates other than as provided in this Section 2.5(f).

(g)    The Warrantholder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder of a Warrant Certificate is entitled to take under this Warrant Agreement or such Global Warrant Certificate.

(h)    Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate number of outstanding Warrants evidenced thereby may from time to time be reduced to reflect exercises.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the

aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent in accordance with the Applicable Procedures as required by Section 3.2(b).

(i)     The Company initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(j)     Every Warrant Certificate authenticated and delivered in exchange for, or in lieu of, a Global Warrant Certificate or any portion thereof, pursuant to this Section 2.5, Section 2.6(a) or Section 2.9, shall be authenticated and delivered in the form of, and shall be, a Global Warrant Certificate, and a Global Warrant Certificate may not be exchanged for a Definitive Warrant Certificate, in each case, other than as provided in Section 2.5(f).  Whenever any provision herein refers to issuance by the Company and countersignature and delivery by the Warrant Agent of a new Warrant Certificate in exchange for the portion of a surrendered Warrant Certificate that has not been exercised, in lieu of the surrender of any Global Warrant Certificate and the issuance, countersignature and delivery of a new Global Warrant Certificate in exchange therefor, the Warrant Agent may endorse such Global Warrant Certificate to reflect a reduction in the number of Warrants evidenced thereby in the amount of Warrants so evidenced that have been so exercised.

(k)     At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised or expired in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation in accordance with Section 3.12.

**Section 2.6    Registration, Transfer, Exchange and Substitution**.

(a)     The Warrant Agent will maintain an office (the "**Corporate Agency Office**") in the United States of America, where Warrant Certificates may be surrendered for registration of transfer or exchange and where Warrant Certificates may be surrendered for exercise of Warrants evidenced thereby, which office is 6201 15th Avenue, Brooklyn, NY 11219 on the Closing Date.  The Warrant Agent will give prompt written notice to all Warrantholders of any change in the location of such office.

(b)     The Warrant Certificates evidencing the Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent designated for such purpose a warrant register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by Law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates as herein provided.

(c)     Upon surrender for registration of transfer of any Warrant Certificate at the Corporate Agency Office, the Company shall execute, and the Warrant Agent shall countersign and deliver, in the name of the designated transferee or transferees, one or more new Warrant Certificates evidencing a like aggregate number of Warrants.

(d)     At the option of the Warrantholder, Warrant Certificates may be exchanged at the office of the Warrant Agent upon payment of the charges hereinafter provided for other Warrant Certificates evidencing a like aggregate number of Warrants.  Whenever any Warrant Certificates are so surrendered for exchange, the Company shall execute, and the Warrant Agent

shall countersign and deliver, the Warrant Certificates of the same tenor and evidencing the same number of Warrants as evidenced by the Warrant Certificates surrendered by the Warrantholder making the exchange.

(e)    All Warrant Certificates issued upon any registration of transfer or exchange of, or in lieu of, Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange or substitution.

(f)    Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Warrant Agent, duly executed by the Warrantholder thereof or his attorney duly authorized in writing.

(g)    No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; provided, however, to the extent provided in the proviso to Section 3.11, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates, and may subject any such transfer to the payment of unpaid withholding taxes (if any) attributable to the transferor Warrantholder as and to the extent provided in Section 3.13.

(h)    The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Company may request. The Warrant Agent shall also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

(i)    The Warrant Agent shall keep copies of this Warrant Agreement and any notices given to Warrantholders hereunder available for inspection by the Warrantholders during normal business hours at the Corporate Agency Office.  The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agency may request.

(j)    Transfers of the Warrant Certificates evidencing Warrants shall be subject only to the terms of this Warrant Agreement (including without limitation any terms set forth in Section 2.10 or on the relevant Warrant Certificate) and applicable securities Laws.  The Warrant Agent shall register the transfer, from time to time, of any outstanding Warrant Certificates evidencing Warrants upon the Warrant Register, upon delivery of a duly executed assignment, in the form attached hereto as EXHIBIT A

(k)    , and accompanied by appropriate instructions for transfer.  No such transfer shall be effected until, and the transferee shall succeed to the rights of the holder thereof only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.

13

Prior to the registration of any transfer of a Warrant Certificate evidencing a Warrant as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name such Warrant Certificate is registered as the owner thereof and of the Warrants evidenced thereby for all purposes, notwithstanding any notice to the contrary. Subject to Section 3.11, no service charge, tax or governmental payment shall be required of any transferor or transferee in connection with any such transfer or registration of transfer. A party requesting transfer of a Warrant Certificate evidencing a Warrant must provide reasonable and customary evidence of authority if requested by the Warrant Agent.

Section 2.7    **Cancellation of the Warrants**. Any Warrants outstanding as of the Expiration Time shall be automatically cancelled without any further action on the part of the Warrant Agent or any other Person.

Section 2.8    **CUSIP Numbers**. In issuing the Warrants, the Company will use a "CUSIP" number. The Warrant Agent will use CUSIP numbers in notices to Warrantholders. The Company will promptly notify the Warrant Agent in writing of any change in the CUSIP numbers.

Section 2.9    **Loss or Mutilation**.

(a)    If (i) any mutilated Warrant Certificate is surrendered to the Warrant Agent or (ii) both (A) there shall be delivered to the Company and the Warrant Agent (x) a claim by a Warrantholder as to the destruction, loss or wrongful taking of any Warrant Certificate of such Warrantholder and a request thereby for a new replacement Warrant Certificate, and (y) such indemnity bond as may be required by them to save each of them and any agent of either of them harmless and (B) such other reasonable requirements as may be imposed by the Company as permitted by Section 8-405 of the Uniform Commercial Code have been satisfied, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a "protected purchaser" within the meaning of Section 8-405 of the Uniform Commercial Code, the Company shall execute and upon its written request the Warrant Agent shall countersign and deliver to the registered Warrantholder of the lost, wrongfully taken, destroyed or mutilated Warrant Certificate, in exchange therefore or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants and of the same class.

(b)    Upon the issuance of any new Warrant Certificate under this Section 2.9, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other reasonable expenses (including the reasonable fees and expenses of the Warrant Agent and of counsel to the Company) in connection therewith.

(c)    Every new Warrant Certificate executed and delivered pursuant to this Section 2.9 in lieu of any lost, wrongfully taken or destroyed Warrant Certificate shall constitute an additional contractual obligation of the Company, whether or not the allegedly lost, wrongfully taken or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Warrant Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.

(d)    The provisions of this Section 2.9 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, wrongfully taken or destroyed Warrant Certificates.

**Section 2.10    Transfer Restrictions**.

(a)    Notwithstanding anything to the contrary in this Warrant Agreement, no Warrantholder or Beneficial Owner shall Transfer any Warrant to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion).

<div align="center">

**ARTICLE 3**

**EXERCISE AND SETTLEMENT OF WARRANTS**

</div>

**Section 3.1    Right to Acquire Common Shares Upon Exercise**.    Each Warrant Certificate shall, when countersigned by the Warrant Agent, entitle the Warrantholder thereof, subject to the provisions thereof and of this Warrant Agreement, to acquire from the Company, for each Warrant evidenced thereby, one Common Share at the Exercise Price, subject to adjustment as provided in this Warrant Agreement.  The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by Article 4.

**Section 3.2    Exercise Procedures for Warrants**.

(a)    In order to exercise all or any of the Warrants represented by a Warrant Certificate, the Warrantholder thereof must:

(i)    (x) in the case of a Global Warrant Certificate, provide to the Warrant Agent at the Corporate Agency Office a duly completed and executed Exercise Notice as to the number of Warrants being exercised and, if applicable, whether Cashless Settlement is being elected with respect thereto, and deliver such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Definitive Warrant Certificate, at the Corporate Agency Office (A) surrender to the Warrant Agent the Warrant Certificate evidencing such Warrants and (B) deliver to the Warrant Agent a duly completed and executed Exercise Notice as to the Warrantholder's election to exercise the number of the Warrants specified therein and, if applicable, whether Cashless Settlement is being elected with respect thereto, duly executed by such Warrantholder;

(ii)    pay to the Warrant Agent an amount equal to (x) those applicable taxes and charges required to be paid by the Warrantholder, if any, pursuant to Section 3.11 and Section 3.13, prior to, or concurrently with, exercise of such Warrants and (y) except in the case of a Cashless Settlement, the aggregate of the Exercise Price in respect of each Common Share into which such Warrants are exercisable, in case of (x) and (y), by wire transfer in immediately available funds, to the account:

<div align="center">15</div>

JPMORGAN CHASE
ABA#: 021000021
ACCT NAME: AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC
ACCT#: 530354616
Ref: AST as agent for Revlon Group Holdings LLC

of the Warrant Agent at JPMorgan Chase Bank, N.A., or such other account of the Warrant Agent at such banking institution as the Warrant Agent shall have given notice to the Warrantholders in accordance with Section 6.14; and

(iii)    in the case of a Global Warrant Certificate, the exercising Beneficial Owner must, if such Warrantholder (in the case of a Definitive Warrant Certificate) or Beneficial Owner (in the case of a Global Warrant Certificate) is not already party to the LLC Agreement, deliver a duly completed and executed Joinder pursuant to which such Warrantholder (in the case of a Definitive Warrant Certificate) or Beneficial Owner (in the case of a Global Warrant Certificate) agrees to be bound by the LLC Agreement and acknowledges that all Common Shares issued upon such exercise of such Warrants shall be subject to the LLC Agreement, to the Company (with a copy concurrently delivered to the Warrant Agent) prior to, or concurrently with, delivering an Exercise Notice in accordance with Section 3.2(a)(i).

(b)    If fewer than all the Warrants represented by a Warrant Certificate are exercised, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases of Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Definitive Warrant Certificate, such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and for the number of Warrants which were not exercised shall be executed by the Company.  The Warrant Agent shall countersign the new Definitive Warrant Certificate, registered in such name or names, subject to the provisions of Section 2.6 regarding registration of transfer and Section 3.11 regarding payment of governmental charges in respect thereof, as may be directed in writing by the Warrantholder, and shall deliver the new Definitive Warrant Certificate to the Person or Persons in whose name such new Warrant Certificate is so registered.  The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Definitive Warrant Certificates duly executed on behalf of the Company for such purpose.

(c)    Upon due exercise of Warrants evidenced by any Warrant Certificate in conformity with the foregoing provisions of Section 3.2(a), the Warrant Agent shall, when actions specified in Section 3.2(a)(i) have been effected and any payment specified in Section 3.2(a)(ii) is received, deliver to the Company the Exercise Notice received pursuant to Section 3.2(a)(i), deliver or deposit all funds received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account.

(d)    The date on which all of the requirements for exercise set forth in this Section 3.2 in respect of a Warrant have been satisfied is the "**Exercise Date**" with respect to such Warrant (subject to Section 3.2(h)).

(e)      Subject to <u>Section 3.2(g)</u> and <u>Section 3.2(h)</u>, any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and enforceable in accordance with its terms.

(f)      All funds received by the Warrant Agent under this Warrant Agreement that are to be distributed or applied by the Warrant Agent in the performance of services in accordance with this Warrant Agreement (the "**Funds**") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company (the "**Funds Account**").  Until paid pursuant to the terms of this Warrant Agreement, the Warrant Agent will hold the Funds through the Funds Account in deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating), each as reported by Bloomberg Finance L.P. The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.

(g)      Prior to the delivery of any Common Shares upon exercise of a Warrant, the Company shall be obligated to comply with all applicable Laws which require action to be taken by the Company in connection with such delivery.

(h)      Notwithstanding any other provision of this Warrant Agreement, if the exercise of any Warrant is to be made in connection with a Liquidity Event, such exercise may, at the election of the Exercising Owner, be conditioned upon consummation of such transaction or event, in which case such exercise shall not be deemed effective until the consummation of such transaction or event.

(i)      If a Liquidity Event occurs in which the consideration to be paid to holders of Common Shares consists solely of cash in an amount per Common Share that exceeds the Exercise Price then in effect, the Warrants that are otherwise unexercised immediately prior to the effectiveness of such Liquidity Event shall be deemed to be automatically exercised at such time on a Cashless Settlement basis and the Holders of such Warrants shall be entitled to receive for each such Warrant an amount in cash equal to the cash amount per Common Share to be paid to holders of Common Shares in such Liquidity Event *less* the Exercise Price per Common Share then in effect.

(j)      The Warrant Agent shall forward funds deposited in the Funds Account in a given week by the fifth Business Day of the following week by wire transfer to an account designated by the Company.

**Section 3.3      Common Shares Issuable**.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The number of Common Shares "into which each Warrant is exercisable" shall be one Common Share, subject to adjustment as provided in <u>Article 4</u>.

**Section 3.4**      **Settlement of Warrants**.

(a)      Warrants may be exercised using Cash Settlement or Cashless Settlement in accordance with this Article 3 at any time prior to the Expiration Time, either in full or from time to time in part.

(b)      Cash Settlement shall apply to each Warrant unless the Exercising Owner elects for Cashless Settlement to apply upon exercise of such Warrant.  Such election shall be made in the Exercise Notice for such Warrant.

(c)      If Cash Settlement applies to the exercise of a Warrant, upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner the Cash Settlement Share Amount, together with cash in lieu of any fractional Common Share as provided in Section 3.6, on the Settlement Date.

(d)      If Cashless Settlement applies to the exercise of a Warrant:

(i)      The Warrantholder must (A) expressly state in its Exercise Notice its desire to effect a Cashless Settlement and (B) must provide the Exercise Notice to the Warrant Agent at the Corporate Agency Office.

(ii)      Upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner the Cashless Settlement Share Amount on the Settlement Date, together with cash in lieu of any fractional Common Share, as provided in Section 3.6.

(iii)      Upon written request from any Exercising Owner in connection with a Cashless Settlement for which the Fair Market Value is determined pursuant to clause (iii) of the definition thereof, the Company shall notify such Exercising Owner of the Board's determination of such Fair Market Value and provide a brief explanation of the methodology of such determination (without any obligation to disclose any confidential or proprietary information) reasonably promptly after the later of the receipt of such request by the Company and the Board's determination of such Fair Market Value, but in any event within 30 days of such later date.

**Section 3.5**      **Delivery of Common Shares**.

(a)      In connection with the exercise of Warrants, the Warrant Agent shall:

(i)      examine all Exercise Notices and all other documents delivered to it to ascertain whether, on their face, such Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)      where an Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

18

(iii)     inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(iv)     advise the Company with respect to an exercise, as promptly as practicable following the satisfaction of each of the applicable procedures for exercise set forth in Section 3.2(a) of (v) the receipt of such Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (w) the number of Common Shares to be delivered by the Company, (x) the instructions with respect to issuance of the Common Shares, (y) the number of Persons who will become holders of record of the Company (who were not previously holders of record) as a result of receiving Common Shares upon exercise of the Warrants and (z) such other information as the Company shall reasonably require;

(v)     promptly deposit in the Funds Account all Funds received in payment of the applicable Exercise Price in connection with any Cash Settlement of Warrants;

(vi)     provide to the Company, upon the Company's request, the number of Warrants previously exercised, the number of Common Shares issued in connection with such exercises and the number of remaining outstanding Warrants; and

(vii)     provide to the Company, upon the Company's request, any Exercise Notices delivered pursuant to Section 3.2(a) and any documents delivered pursuant to Section 3.5(a)(i).

(b)     With respect to each properly exercised Warrant evidenced by any Warrant Certificate in accordance with this Warrant Agreement, (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Company shall deliver or cause to be delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Shares may not then be held in book-entry form through the facilities of DTC, duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Definitive Warrant Certificates, deliver or cause to be delivered to the Recipient Common Shares in book-entry form on the Common Share registrar maintained by the Warrant Agent for such purpose, or, at the election of the Warrantholder, duly executed certificates representing, in case of (x) or (y), the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised) (A) unless clause (B) is applicable, for the benefit and in the name of the Exercising Owner or (B) for the benefit and in the name of such Person (other than the Exercising Owner) designated by the Exercising Owner submitting the applicable Exercise Notice (the "**Recipient**").  The Person on whose behalf and in whose name any Common Shares are registered shall for all purposes be deemed to have become the holder of record of such Common Shares as of the Close of Business on the applicable Exercise Date.  The Company covenants that all Common Shares which may be issued upon exercise of Warrants will be, upon payment of the Exercise Price (if applicable) and issuance thereof, fully paid and nonassessable, free of preemptive rights and (except as specified in the proviso to Section 3.11) free from all documentary, stamp or similar issue or transfer taxes in respect of the issuance thereof, and all liens, charges and security interests with respect to the issuance thereof.

19

(c)     Promptly after the Warrant Agent has taken the action required by this Section 3.5 (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to the consummation of any exercise of any Warrants.

**Section 3.6     No Fractional Common Shares to Be Issued**.

(a)     Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a Common Share upon exercise of any Warrants.

(b)     If any fraction of a Common Share would, except for the provisions of this Section 3.6, be issuable on the exercise of any Warrants, the Company shall make a cash payment in lieu of issuing such fractional Common Share equal to the Fair Market Value of one Common Share, as determined on the date the Warrant is presented for exercise, multiplied by such fraction, rounded to the nearest whole cent.  All Warrants exercised by a Warrantholder on the same Exercise Date shall be aggregated for purposes of determining the number of Common Shares to be delivered pursuant to Section 3.5(b).

(c)     Each Warrantholder, by its acceptance of an interest in a Warrant, expressly waives its right to any fraction of a Common Share upon its exercise of such Warrant.

**Section 3.7     Acquisition of Warrants by Company**.  The Company shall have the right, except as limited by Law, to purchase or otherwise to acquire one or more Warrants at such times, in such manner and for such consideration as agreed by the Company and the applicable Warrantholder.

**Section 3.8     Validity of Exercise**.  All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in good faith in accordance with the terms of this Warrant Agreement and the Warrants, which determination, absent manifest error, shall be final and binding with respect to the Warrant Agent.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's gross negligence, willful misconduct, bad faith or material breach of this Warrant Agreement (as determined by a court of competent jurisdiction in a final non-appealable judgment) and shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of, such determination by the Company.  The Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Notices with regard to any particular exercise of Warrants.

**Section 3.9     Certain Calculations**.

(a)     The Warrant Agent shall be responsible for performing all calculations, except for the case of Cashless Settlements, required in connection with the exercise and settlement of the Warrants as described in this Article 3.  In connection therewith, the Warrant Agent shall provide prompt written notice to the Company, in accordance with Section 3.5(a)(iv), of the number of Common Shares deliverable upon exercise and settlement of Warrants.  The Company shall be responsible for all calculations and determinations required in connection with any Cashless Settlements and shall provide written notification to the Warrant Agent of the Cashless

20

Settlement Share Amount to be issued on the Settlement Date for any Cashless Settlement.  The Warrant Agent shall not be responsible for performing the calculations set forth in <u>Article 4</u>.

(b)    The Warrant Agent shall not be accountable with respect to the validity or value of any Common Shares that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible, to the extent not arising from the Warrant Agent's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for any failure of the Company to issue, transfer or deliver any Common Shares, or to comply materially with any of the covenants of the Company contained in this <u>Article 3</u> of this Warrant Agreement.

**Section 3.10   <u>Reservation and Listing of Common Shares</u>**.  The Company will at all times reserve and keep available, out of its authorized but unissued Common Shares, solely for the purpose of providing for the exercise of the Warrants, the aggregate number of Common Shares then issuable upon exercise of the Warrants at any time.  The Company will procure, at its sole expense, the listing of the Common Shares issued upon exercise of the Warrants on all National Securities Exchanges on which the Common Shares are then listed.  The Company shall take all action reasonably necessary to ensure that the Common Shares will be issued without violation of any applicable Law or regulation or of any requirement of any securities exchange on which the Common Shares are listed or traded.

**Section 3.11   <u>Charges, Taxes and Expenses</u>**.  Issuance of the Warrant Certificates evidencing Warrants and issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any documentary, stamp or similar issue or transfer tax or other incidental expense in respect of the issuance thereof, all of which taxes and expenses shall be paid by the Company (excluding, for the avoidance of doubt, any income or withholding taxes); <u>provided</u>, <u>however</u>, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of Warrant Certificates evidencing such Warrants or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property in a name or to any Person other than the Warrantholder of the Warrant Certificate surrendered upon exercise or transfer, and the Company shall not be required to issue or deliver Warrant Certificates or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property, as applicable, unless and until the Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have reasonably demonstrated that such tax has been paid.

**Section 3.12   <u>Cancellation of Warrant Certificates</u>**.  Any Definitive Warrant Certificate surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent.  All Warrant Certificates surrendered or delivered to or received by the Warrant Agent for cancellation pursuant to this <u>Section 3.12</u> or <u>Section 2.5(f)</u> or Section <u>2.5(k)</u> shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.  The Warrant Agent shall destroy any such cancelled Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct.

**Section 3.13   <u>Withholding and Reporting Requirements</u>**.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental

authority with respect to the Warrants and this Warrant Agreement, and all distributions, dividends or other payments requiring withholding under applicable law, including, as applicable, deemed distributions or dividends pursuant to the Warrants and any payment of cash in lieu of Common Shares payable in connection with the exercise of a Warrant, will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision hereof to the contrary, each of the Company and the Warrant Agent will be authorized to, at their discretion, (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply any cash amount otherwise deliverable to a Warrantholder (whether pursuant to this Warrant Agreement or otherwise) to pay (or, in the case of the Company, reimburse the Company for) withholding taxes attributable to such Warrantholder, (c) liquidate a portion of any non-cash amount (including Common Shares) otherwise deliverable to a Warrantholder (whether pursuant to this Warrant Agreement or otherwise) to generate sufficient funds to pay (or, in the case of the Company, reimburse the Company for) withholding taxes attributable to such Warrantholder, (d) require reimbursement from any Warrantholder to the extent any withholding is required in respect of such Warrantholder in the absence of any cash or property described in clauses (b) or (c), or (e) establish any other mechanisms it believes are reasonably necessary and appropriate, including requiring Warrantholders to (x) submit appropriate tax and withholding certifications (such as Internal Revenue Service Forms W-9 and the appropriate Internal Revenue Service Forms W-8, as applicable) or any other documentation reasonably requested to comply with any withholding under applicable law or (y) requiring Warrantholders to promptly pay to the Company in cash any withholding tax amount which is or was required to be paid under applicable law with respect to such Warrantholder as a condition of receiving the benefit of any adjustment as provided in this Warrant Agreement.

## ARTICLE 4

## ADJUSTMENTS

**Section 4.1    Adjustments and Other Rights**.  The Exercise Price and the number of Common Shares for which each Warrant is exercisable pursuant to Article 3 of this Warrant Agreement shall be subject to adjustment from time to time in accordance with this Article 4; provided that (i) no single event shall be subject to adjustment under more than one subsection of this Article 4 so as to result in duplication and (ii) if any single event would otherwise require adjustment of the Exercise Price pursuant to more than one such subsection, the adjustment that provides the highest value relative to the rights and interests of each Warrantholder shall be made.

**Section 4.2    Common Share Dividends, Distributions, Splits, Subdivisions, Reclassifications or Combinations**.  If the Company shall (i) declare a dividend or make a distribution on its Common Shares in Common Shares, (ii) split, subdivide, recapitalize, restructure or reclassify the outstanding Common Shares into a greater number of Common Shares or (iii) combine, recapitalize, restructure or reclassify the outstanding Common Shares into a smaller number of Common Shares, in each case other than upon a transaction to which Section 4.5 or Section 4.6 applies, the number of Common Shares issuable upon exercise of a Warrant at the time of the Record Date for such dividend or distribution or the effective date of such split, subdivision, combination, recapitalization, restructuring or reclassification shall be proportionately adjusted so that the Warrantholder, after such date, shall be entitled to purchase the number of Common Shares which such Warrantholder would have owned or been entitled to

22

receive on such date had such Warrant been exercised immediately prior to such date. In such event, the Exercise Price in effect at the time of the Record Date for such dividend or distribution or the effective date of such split, subdivision, combination, recapitalization, restructuring or reclassification shall be adjusted to the number obtained by dividing (x) the product of (i) the number of Common Shares issuable upon the exercise of a Warrant before such adjustment and (ii) the Exercise Price in effect immediately prior to the Record Date or effective date, as the case may be, for such dividend, distribution, split, subdivision, combination, recapitalization, restructuring or reclassification giving rise to this adjustment by (y) the new number of Common Shares issuable upon exercise of a Warrant determined pursuant to the immediately preceding sentence.

**Section 4.3    Other Distributions**. In case the Company shall fix a Record Date for the making of a distribution to all holders of its Common Shares of (a) limited liability company interests of any class other than Common Shares, (b) evidence of indebtedness of the Company or any Subsidiary, (c) other securities, assets or cash (excluding dividends or distributions referred to in Section 4.2) or (d) rights or warrants (other than in connection with the adoption of a stockholder rights plan (or equivalent for entity types other than corporations)), in each such case, the Exercise Price in effect prior thereto shall be reduced immediately thereafter to the price obtained by multiplying the Exercise Price in effect immediately prior thereto by the fraction resulting from dividing (x) an amount equal to the difference resulting from (i) the number of Common Shares outstanding on such Record Date multiplied by the Fair Market Value of the Common Shares on the Business Day immediately prior to such Record Date less (ii) the Fair Market Value of said limited liability company interests, evidences of indebtedness, assets, cash, rights or warrants to be so distributed in the aggregate to all Common Shares outstanding on such Record Date by (y) the number of Common Shares outstanding on such Record Date multiplied by the Fair Market Value of the Common Shares on the trading date immediately prior to such Record Date. Such adjustment shall be made successively whenever such a Record Date is fixed. In such event, the number of Common Shares issuable upon the exercise of a Warrant shall be increased to the number obtained by dividing (x) the product of (i) the number of Common Shares issuable upon the exercise of a Warrant before such adjustment and (ii) the Exercise Price in effect immediately prior to the Record Date for the distribution giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the second preceding sentence. In the event that such distribution is not so made, the Exercise Price and the number of Common Shares issuable upon exercise of a Warrant then in effect shall be readjusted, effective as of the date when the Board determines not to distribute such limited liability company interests, evidences of indebtedness, assets, cash, rights or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Common Shares that would then be issuable upon exercise of a Warrant if such Record Date had not been fixed.

**Section 4.4    Dissolution, Total Liquidation or Winding Up**. If at any time there is a voluntary or involuntary dissolution, total liquidation or winding-up of the Company, then the Company shall provide each Warrantholder with written notice of the date on which such dissolution, liquidation or winding-up shall take place (and, in any event, not less than 30 days before any date set for definitive action). Such notice shall also specify the date as of which the record holders of Common Shares shall be entitled to exchange their Common Shares for securities, money or other property deliverable upon such dissolution, liquidation or winding-up, as the case may be. On such date, each Warrantholder shall be entitled to receive, upon surrender

of its Warrant for each Common Share then receivable upon exercise of such Warrant, the cash, securities or other property, less the Exercise Price for such Warrant then in effect, that such Warrantholder would have been entitled to receive in respect of such Common Share had such Warrant been exercised immediately prior to such dissolution, liquidation or winding-up. Upon receipt of such cash, securities or other property, any and all rights of such Warrantholder to exercise such Warrant shall terminate in their entirety. If the cash, securities or other property distributable in respect of such Common Share in the dissolution, liquidation or winding-up has a Fair Market Value which is less than the Exercise Price for such Warrant then in effect, no such cash, securities or other property shall be delivered to such Warrantholder in respect of such Warrants and such Warrant shall terminate and be of no further force or effect upon the dissolution, liquidation or winding-up.

### Section 4.5    Successor upon Consolidation, Merger and Sale of Assets.

(a)    Other than with respect to a Liquidity Event, the Company may only consolidate or merge with any other Person (a "**Fundamental Equity Change**"), so long as the Company is the surviving Person, or, in the event that the Company is not the surviving Person:

(i)    the successor to the Company assumes all of the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the successor to the Company provides written notice of such assumption to the Warrant Agent.

(b)    In the case of any Fundamental Equity Change other than a Liquidity Event, the successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company; provided, however, such successor entity shall provide the Warrant Agent with any such identifying company information as reasonably required by the Warrant Agent. Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

(c)    If a Liquidity Event is consummated prior to the Expiration Time, then any Warrants that are unexercised prior to the consummation of such Liquidity Event shall be deemed to have expired worthless and will be cancelled for no further consideration.

### Section 4.6    Adjustment upon Reorganization Event.

(a)    If there occurs any Fundamental Equity Change or any recapitalization, reorganization, consolidation, reclassification, change in the outstanding Common Shares (other than changes resulting from a subdivision or combination to which Section 4.2 applies), statutory share exchange, statutory unit exchange or other transaction (in each case, other than a Liquidity Event), in each case as a result of which the Common Shares would be converted into, changed

into or exchanged for stock, other securities, other property or assets (including cash or any combination thereof) (each such event a "**Reorganization Event**"), then following the effective time of the Reorganization Event, the right to receive Common Shares upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, units, other securities or other property or assets (including cash or any combination thereof) that a holder of the number of Common Shares for which one Warrant is exercisable immediately prior to such Reorganization Event would have owned or been entitled to receive in connection with such Reorganization Event (the "**Reference Property**", with a "**Unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one Common Share is entitled to receive).  In the event holders of Common Shares have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Shares that have the right to make such election in such Reorganization Event.  The Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent with this Section 4.6.

(b)    At any time from, and including, the effective time of a Reorganization Event, the number of Common Shares that the Company would have been required to deliver upon exercise of the Warrants shall instead be deliverable in a corresponding number of Units of Reference Property and, in the case of Cashless Settlement, shall be determined based on the Fair Market Value of a Unit of Reference Property.

(c)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this Section 4.6.  If the Reference Property in connection with any Reorganization Event includes shares of stock, units or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholder (for the benefit of the Beneficial Owners under this Warrant Agreement) as the Board shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 4.  In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this Section 4.6, the Company shall promptly file with the Warrant Agent a certificate executed by a duly authorized officer of the Company briefly stating the reasons therefor, the kind or amount of cash, securities or property or assets that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of the amendment to be mailed to the Warrantholder, at its address appearing on the Warrant Register, within five Business Days after execution thereof.

(d)    The above provisions of this Section 4.6 shall similarly apply to successive Reorganization Events.

(e)    If this <u>Section 4.6</u> applies to any event or occurrence, no other provision of this <u>Article 4</u> shall apply to such event or occurrence (other than <u>Section 4.5</u>).

**Section 4.7    Rounding of Calculations; Minimum Adjustments**.    All calculations under this <u>Article 4</u> shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100th) of a share or unit (as applicable), as the case may be.    Any provision of this <u>Article 4</u> to the contrary notwithstanding, no adjustment in the Exercise Price or the number of Common Shares issuable upon the exercise of a Warrant shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a Common Share, respectively, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a Common Share, respectively, or more, subject in all cases to <u>Section 3.6</u>.

**Section 4.8    Timing of Issuance of Additional Common Shares Upon Certain Adjustments**.    In any case in which the provisions of this <u>Article 4</u> shall require that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event (i) issuing to each Warrantholder of a Warrant exercised after such Record Date or date of such agreement and before the occurrence of such event, issuance or sale the additional Common Shares issuable upon such exercise by reason of the adjustment required by such Record Date or agreement over and above the Common Shares issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount of cash in lieu of a fractional Common Share.

**Section 4.9    Statement Regarding Adjustments**.    Whenever the Exercise Price or the number of Common Shares issuable upon exercise of a Warrant shall be adjusted as provided in this <u>Article 4</u>, the Company shall promptly, and in any event within three Business Days, file, at the principal office of the Company, a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Common Shares issuable upon exercise of a Warrant after such adjustment.    The Company shall also cause a copy of such statement to be delivered to each Warrantholder at the address appearing in the Company's records, and shall be available upon request to any Beneficial Owner.

**Section 4.10    Notice of Adjustment Event**.    In the event that (i) the Company shall propose to take any action of the type described in this <u>Article 4</u> or (ii) the Company fixes any Record Date for any event, the Company shall give notice to each Warrantholder, in the manner set forth in <u>Section 4.9</u>, which notice shall specify the Record Date, if any, with respect to any such action and the approximate date on which such action is to take place.    Such notice shall also set forth the facts with respect thereto (including the material terms with respect to any contemplated transaction) and indicate the effect on the Exercise Price and the number, kind or class of shares, units or other securities or property which shall be deliverable upon exercise or exchange of a Warrant, if any.    Such notice shall be given at least 10 Business Days prior to the taking of such proposed action; <u>provided</u> that notice of any Liquidity Event shall be given at least 21 days prior to the taking of such proposed action.    Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.    Nothing herein shall prohibit the Warrantholders from exercising their Warrants during the 10 Business Day period commencing on the date of such notice (21 days in the case of a Liquidity Event).

**Section 4.11    Adjustment Rules**.  Any adjustments pursuant to this <u>Article 4</u> shall be made successively whenever an event referred to herein shall occur.  If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below the par value (if any) of the Common Shares, then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to the par value (if any) of the Common Shares and then, so long as the Company shall have taken any company action which would, in the opinion of its counsel, be necessary in order that the Company may validly issue Common Shares at the Exercise Price as so adjusted in accordance with its obligations under <u>Section 3.9</u>, to such lower par value (if any) as may then be established.

**Section 4.12    Optional Tax Adjustment**.  The Company may at its option, at any time prior to the Expiration Time, increase the number of Common Shares into which each Warrant is exercisable, or decrease the Exercise Price for such Warrant, in addition to those changes otherwise required by this <u>Article 4</u>, as deemed advisable by the Board, in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients or that such tax shall be diminished.

**Section 4.13    Stockholder Rights Plans or Equivalent**.  If the Company has a stockholder rights plan (or equivalent for entity types other than corporations) in effect with respect to the Common Shares, upon exercise of a Warrant the applicable Exercising Owner shall be entitled to receive, in addition to the Common Shares, the rights under such stockholder rights plan (or equivalent for entity types other than corporations), subject to readjustment in the event of the expiration, termination or redemption of such rights.

## ARTICLE 5

## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

**Section 5.1    No Rights as Unitholders**.  Nothing contained in this Warrant Agreement shall be construed as conferring upon any Person, by virtue in and of itself of holding a Warrant Certificate evidencing any Warrant or having a beneficial interest in a Warrant, the right to vote, receive any dividend or other distribution, receive notice of, or attend, any meeting of unitholders or otherwise exercise any rights whatsoever, in each case, as a unitholder of the Company to the extent such vote, dividend, giving of notice, meeting or other exercise of rights (or, if applicable, the relevant Record Date therefor) precedes the Close of Business on the Exercise Date with respect to the exercise of such Warrant.  No Warrantholder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrant Certificate held by such holder.

**Section 5.2    Modification/Amendment**.

(a)    This Warrant Agreement or the Warrants may be modified or amended by the Company and the Warrant Agent, without the consent of any Warrantholder, for the purposes of (i) curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement or (ii) providing for the assumption of the Company's obligations pursuant to <u>Section 4.5</u>; <u>provided</u> that, in each case, any such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect.

27

(b)        This Warrant Agreement or the Warrants may be modified or amended, or noncompliance with any provision of the Warrant Agreement or the Warrants may be waived, only upon the written consent of the Required Warrantholders and the Company; provided, however, that any modification, amendment or waiver that adversely affects the interests of a Warrantholder disproportionately relative to any other Warrantholder (including any Beneficial Owner) in any material respect shall require the written consent of such Warrantholder so affected; provided, further, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected (A) change the Expiration Time to an earlier time or date; or (B) increase the Exercise Price or decrease the number of Common Shares for which a Warrant is exercisable (except as set forth in Article 4) or (C) modify or amend Sections 5.4 or 5.5 hereof.  Any consent delivered by electronic means shall be deemed to constitute written consent.

(c)        Upon execution and delivery of any amendment pursuant to this Section 5.2, such amendment shall be considered a part of this Warrant Agreement for all purposes and every Warrantholder holding a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(d)        In determining whether the Required Warrantholders have concurred in any direction, notice, waiver or consent, Warrants beneficially owned by the Company, any Subsidiary of the Company or any Affiliate of the Company or any Subsidiary of the Company, shall be considered as though not outstanding; provided that, for the purposes of determining whether the Warrant Agent will be protected in conclusively relying on any such direction, notice, waiver or consent, only Warrants that a responsible officer of the Warrant Agent knows are so owned will be so disregarded.

**Section 5.3**        **Rights of Action**.  All rights of action against the Company in respect of this Warrant Agreement are vested in the Warrantholders, and any Warrantholder, without the consent of the Warrant Agent or any other Warrantholder, may, on such Warrantholder's own behalf and for such Warrantholder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Warrantholder's right to exercise such Warrantholder's Warrants in the manner provided in this Warrant Agreement.

**Section 5.4**        **Issuance Obligation Remedies**.  Subject to Section 5.6(c), nothing in this Warrant Agreement shall limit the right of any Warrantholder to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance or injunctive relief with respect to the Company's violation of its obligations under this Warrant Agreement, including, without limitation, any failure by the Company to timely issue Common Shares upon exercise of such Warrant as required pursuant to the terms hereof.

**Section 5.5**        **No Impairment**.

(a)        The Company will not, by amendment to its certificate of formation or LLC Agreement or through reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of the Warrants or this Warrant Agreement, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may

be necessary or appropriate in order to protect the rights of the Warrantholders and the Beneficial Owners under this Warrant Agreement against impairment.

(b)     Without limiting the generality of the foregoing, the Company will (i) not increase the par value (if any) of any Common Shares obtainable upon the exercise of the Warrants and (ii) take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Common Shares upon the exercise of the Warrants.

(c)     Before taking any action that would cause an adjustment reducing the Exercise Price below the then par value (if any) of the Common Shares, the Company will take any company action that may be necessary in order that the Company may validly and legally issue fully paid and non-assessable Common Shares at such adjusted Exercise Price.

**Section 5.6      <u>Information Rights</u>**.

(a)     Warrantholders and Beneficial Owners (other than Competitors) shall, within a reasonable time after the Company's receipt of a written request given to it (with such information as the Company may require) in accordance with <u>Section 6.14</u>, be granted access to, or be provided with, the following; <u>provided</u> that (A) prior to the receipt by any Warrantholder or Beneficial Owner of any of the documents set forth in clauses (i) through (iv) below, or access to the call described in clause (v) below, such Warrantholder or Beneficial Owner shall have delivered to the Company (x) a customary non-disclosure agreement (which may be on a "click-through" or similar basis) in a form reasonably acceptable to the Board and (y) a Joinder or other acknowledgement in writing (which may, at the Company's election, be on a "click-through" or similar basis) that such Warrantholder or Beneficial Owner has received a copy of the LLC Agreement and acknowledges that it shall be bound by the terms and conditions of the LLC Agreement as an LLC Direct Owner or an LLC Beneficial Owner, as applicable, upon issuance of Common Shares upon the exercise of any Warrant directly or indirectly by such Warrantholder or Beneficial Owner, and (B) the documents set forth in clauses (i) through (iii) below may be provided by granting such Warrantholder or Beneficial Owner access to a Datasite and posting such information on such Datasite.  If a Warrantholder or Beneficial Owner does not provide the non-disclosure agreement described in clause (A)(x) of the proviso in the immediately preceding sentence, or the acknowledgment described in clause (A)(y) of the immediately preceding sentence, then the Company's obligation to grant access to such Warrantholder or Beneficial Owner to the documents set forth in clauses (i) through (iv) below, or access to the call described in clause (v) below, shall be deemed satisfied.

(i)     within 90 days after the end of each fiscal year of the Company, commencing with the fiscal year ending December 31, 2023, (A) a copy of the audited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form the figures as of the end of and for the previous year, in

29

each case in accordance with GAAP, and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal year;

(ii)    within 45 days (or 75 days, in the case of the fiscal quarters of the Company ending March 31, 2023 and June 30, 2023) after the end of each of the first three quarterly periods of each fiscal year of the Company, commencing with the fiscal quarter ending March 31, 2023, (A) the unaudited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, in each case in accordance with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal quarter;

(iii)    a copy of the LLC Agreement;

(iv)    whether or not the Company is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, within 5 Business Days from the occurrence of the relevant event, information substantially similar to the information that would have been required to be reported on a Current Report on Form 8-K if the Company were subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, under any of the following items of Form 8-K: Item 1.01 (Entry into a Material Definitive Agreement), Item 2.02 (Termination of a Material Definitive Agreement), Item 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisitions or Dispositions of Assets), Item 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), Item 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), Item 4.01 (Changes in Registrant's Certifying Accountant), Item 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review) or Item 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers) (but in this case only as it relates to the appointment or departure of any Manager or the Chief Executive Officer or Chief Financial Officer of the Company); and

(v)    a quarterly "earnings call" which shall take place as promptly as reasonably practicable after the distribution of the financial statements for the applicable quarter; provided, that the Company shall provide the date and dial-in information for such call and post such information to the Datasite at least three (3) days prior to such call.

(b)    A Warrantholder or Beneficial Owner may provide the information provided pursuant to clauses (i) through (iv) of Section 5.6(a) to any bona fide prospective transferee (other than Competitors) of the Warrants as follows: such Warrantholder or

30

Beneficial Owner shall give notice (or cause notice to be delivered) to the Company of the proposed transferee (and the proposed transferee's e-mail address(es)) and the Company will then send to the proposed transferee by e-mail or other electronic communication a link to a Datasite from which the applicable information and a copy of the LLC Agreement may be accessed subject to such proposed transferee having delivered to the Company (x) a customary non-disclosure agreement in favor of the Company in a form reasonably acceptable to the Board (which may, at the Company's election, be on a "click-through" or similar basis) and (y) an acknowledgement in writing (which may, at the Company's election, be on a "click-through" or similar basis) from such proposed transferee that such proposed transferee has received a copy of the LLC Agreement and acknowledges that such proposed transferee shall be bound by the terms and conditions of the LLC Agreement as an LLC Direct Owner or an LLC Beneficial Owner, as applicable, upon issuance of Common Shares upon the exercise of any Warrant directly or indirectly by such proposed transferee (if such proposed transferee becomes a Warrantholder or Beneficial Owner whether or not it executes a Joinder). If a proposed transferee does not provide the non-disclosure agreement described in clause (x) of the immediately preceding sentence, or the acknowledgment described in clause (y) of the immediately preceding sentence, then the Company's obligation to grant access to such proposed transferee to the applicable information and a copy of the LLC Agreement shall be deemed satisfied. For the avoidance of doubt, the Company shall be under no obligation to provide, or otherwise make available, any information to any proposed transferee if such proposed transferee is deemed to be a Competitor as determined by the Company in its sole and absolute discretion.

(c)    Notwithstanding anything to the contrary in this Warrant Agreement, including without limitation Section 5.4 and Section 6.17, the sole and exclusive remedy for breach of any obligation of the Company under Section 5.6(a) shall be specific performance, and each Warrantholder and each Beneficial Owner hereby waives all other rights and remedies that may be available to it in respect of any such breach to the fullest extent permitted by applicable Law.

(d)    Each Beneficial Owner (other than a Competitor) is hereby expressly made a third-party beneficiary solely for purposes of the rights granted to them pursuant to Section 5.6.

**Section 5.7    LLC Agreement Provisions Binding Upon Exercise**. Each Person that becomes an LLC Member or an LLC Beneficial Owner of the Common Shares issued upon exercise of the Warrants shall automatically become admitted as an LLC Member or an LLC Beneficial Owner, as applicable, upon such Person's receipt of the Common Shares (whether direct or indirect) issued upon exercise of the Warrants without the need to execute the LLC Agreement or a joinder thereto, and shall have all of the rights, and be subject to all of the obligations, set forth in the LLC Agreement with respect to LLC Members and LLC Beneficial Owners, as applicable, and as provided under the Delaware LLC Act. Each Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that such Person: (A) has received (or otherwise had made available to it), read and understood the LLC Agreement, (B) acknowledges and understands that such Person shall have all the rights, and be subject to all the obligations, set forth in the LLC Agreement with respect to LLC Direct Owners and LLC Beneficial Owners and as provided under the Delaware

31

LLC Act, as if such Person had directly executed the LLC Agreement as a party, (C) ratifies and confirms each and every Article, Section and provision of the LLC Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale).  Furthermore, each such Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that the LLC Agreement constitutes the legal, valid and binding obligation of such Person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.

## ARTICLE 6

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

### Section 6.1    Change of Warrant Agent.

(a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder (except for liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct bad faith or material breach of this Warrant Agreement) after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by the Required Warrantholders, then the Required Warrantholders may appoint a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; provided, however, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed; provided, further, that, until such successor warrant agent has been appointed, the Company shall compensate the Warrant Agent in accordance with Section 6.2.

(c)    Any successor warrant agent shall be a corporation or banking association organized, in good standing and doing business under the Laws of the United States of America or any state thereof or the District of Columbia, and authorized under such Laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; provided that such reports are published at least annually pursuant to Law or to the requirements of a federal or state supervising or examining authority.

(d)    After acceptance in writing of such appointment by the successor warrant agent, such successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes

necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations. Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder. As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent and each transfer agent for its Common Shares. Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(e)    Any entity into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor warrant agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided, however, that such entity would be eligible for appointment as a successor warrant agent under Section 6.1(c).

Section 6.2    **Compensation; Further Assurances**.  The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent in accordance with Exhibit C attached hereto and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon written demand for all reasonable and documented expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable and documented compensation, expenses and disbursements of its counsel incurred in connection with the execution and administration of this Warrant Agreement), except any such expense, disbursement or advance as may arise from its or any of their gross negligence, willful misconduct or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.  The Warrant Agent agrees to provide the Company with prior written notice of the retention of counsel whose compensation, expenses and disbursements are to be paid or reimbursed by the Company under this Section 6.2.

Section 6.3    **Reliance on Counsel**.  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

Section 6.4    **Proof of Actions Taken**.  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the

33

good faith of the Warrant Agent, be deemed to be conclusively proved and established by a certificate executed by a duly authorized officer of the Company delivered to the Warrant Agent, and such certificate shall, in the good faith of the Warrant Agent, be relied upon by the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement; provided that in its discretion, the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

Section 6.5    **Correctness of Statements**.  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

Section 6.6    **Validity of Agreement**.  From time to time, the Warrant Agent may apply to any duly authorized officer of the Company for instruction, and the Company shall provide the Warrant Agent with such instructions concerning the services to be provided hereunder.  The Warrant Agent shall not be held to have notice of any change of authority of any Person, until receipt of notice thereof from the Company.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement, nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any Common Shares will, when issued, be validly issued, fully paid and nonassessable.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken or omitted by Warrant Agent in reliance in good faith upon any Company instructions except to the extent that the Warrant Agent had actual knowledge of facts and circumstances that would render such reliance unreasonable.

Section 6.7    **Use of Agents**.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, provided that the Warrant Agent shall remain responsible for the activities or omissions of any such agent or attorney and reasonable care has been exercised in the selection and in the continued employment of such attorney or agent.

Section 6.8    **Liability of Warrant Agent**.  The Warrant Agent shall incur no liability or responsibility to the Company or to any Warrantholder for any action taken or not taken (a) in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, sent and presented by the proper party or parties or (b) in relation to its services under this Warrant Agreement, unless such liability arises out of or is attributable to the Warrant Agent's gross negligence, material breach of this Warrant Agreement, willful misconduct or bad faith.  The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's gross negligence, material breach of this Warrant Agreement, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment).  The Warrant

34

Agent shall be liable hereunder only for its gross negligence, material breach of this Warrant Agreement, fraud, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for which the Warrant Agent is not entitled to indemnification under this Warrant Agreement.  For the avoidance of doubt, this Section 6.8 does not apply to tax matters.

Section 6.9   **Legal Proceedings**.  The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or any Warrantholder shall furnish the Warrant Agent with reasonable indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity.  The Warrant Agent shall promptly notify the Company and each Warrantholder in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Warrant Agreement.

Section 6.10   **Actions as Agent**.

(a)   The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof.  The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement or of the Warrant Certificates, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement or in the Warrant Certificates.  No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent.  The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own gross negligence, willful misconduct or bad faith.

(b)   The Warrant Agent shall not, by countersigning Warrant Certificates or by any other act hereunder, be deemed to make any representations as to validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon).  The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any Common Shares or stock certificates or other securities or property upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to Article 4 hereof or to comply with any of the covenants of the Company contained in Article 4 hereof.

(c)   The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by it in good faith on the belief that any Warrant Certificate or any other documents or any signatures are genuine or properly authorized, (ii) be responsible for any failure on the part of the Company to comply with any of its covenants and obligations contained in this Warrant Agreement or in the Warrant Certificates or (iii) be liable for any act or omission in connection with this Warrant Agreement except for its own gross negligence, bad faith or willful misconduct.

(d)   The Warrant Agent is hereby authorized to accept and protected in accepting instructions with respect to the performance of its duties hereunder by Company Order and to apply to any such officer named in such Company Order for instructions (which instructions

will be promptly given in writing when requested), and the Warrant Agent shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with the instructions in any Company Order.

**Section 6.11    Appointment and Acceptance of Agency**.  The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions set forth in this Warrant Agreement and in the Warrant Certificates or as the Company and the Warrant Agent may hereafter agree, by all of which the Company and the Warrantholders of Warrant Certificates, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Certificates are subject to and governed by this Warrant Agreement or any other terms and conditions hereafter agreed to by the Company and the Warrant Agent.

**Section 6.12    Appointment of Countersigning Agent**.

(a)    The Warrant Agent may appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Certificates issued upon original issue and upon exchange, registration of transfer or pursuant to Section 2.6, and Warrant Certificates so countersigned shall be entitled to the benefits of this Warrant Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.  Wherever reference is made in this Warrant Agreement to the countersignature and delivery of Warrant Certificates by the Warrant Agent or to Warrant Certificates countersigned by the Warrant Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Certificates countersigned by a Countersigning Agent.  Each Countersigning Agent shall be acceptable to the Company and shall at the time of appointment be a corporation doing business under the Laws of the United States of America or any State thereof in good standing, authorized under such Laws to act as Countersigning Agent, and having a combined capital and surplus of not less than $25,000,000.  The combined capital and surplus of any such new Countersigning Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Countersigning Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to Law or to the requirements of a Federal or state supervising or examining authority.

(b)    Any corporation into which a Countersigning Agent may be merged or any corporation resulting from any consolidation to which such Countersigning Agent shall be a party, shall be a successor Countersigning Agent without any further act; provided, that, such corporation would be eligible for appointment as a new Countersigning Agent under the provisions of Section 6.12(a), without the execution or filing of any paper or any further act on the part of the Warrant Agent or the Countersigning Agent.  Any such successor Countersigning Agent shall promptly cause notice of its succession as Countersigning Agent to be given in accordance with Section 6.14 to each Warrantholder of a Warrant Certificate at such Warrantholder's last address as shown on the Warrant Register.

(c)    A Countersigning Agent may resign at any time by giving 30 days' prior written notice thereof to the Warrant Agent and to the Company.  The Warrant Agent may at any

time terminate the agency of a Countersigning Agent by giving 30 days' prior written notice thereof to such Countersigning Agent and to the Company.

(d)    The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this <u>Section 6.12</u> and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of <u>Section 6.2</u>.

(e)    Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth in <u>Section 6.8</u> and <u>Section 6.10</u>.

**Section 6.13    <u>Successors and Assigns</u>**.  All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.  The Warrant Agent may assign this Warrant Agreement or any rights and obligations hereunder, in whole or in part, to an Affiliate thereof with the prior consent of the Company, <u>provided</u> that the Warrant Agent may make such an assignment without consent of the Company to any successor to the Warrant Agent by consolidation, merger or transfer of its assets subject to the terms and conditions of this Warrant Agreement.

**Section 6.14    <u>Notices</u>**.  Any notice or demand authorized by this Warrant Agreement to be given or made to the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent) or electronic mail, as follows:

Revlon Group Holdings LLC
55 Water Street
New York, New York 10041
Attention:    Andrew Kidd, EVP, General Counsel
                    Matthew Kvarda, Interim Chief Financial Officer
Email:          Andrew.Kidd@revlon.com
                    Mkvarda@alvarezandmarsal.com

Any notice or demand authorized by this Warrant Agreement to be given or made to the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company) or electronic mail, as follows:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: General Counsel
Email: legalteamUS@equiniti.com
Email for Warrant exercises: reorgwarrants@equiniti.com

Any notice or demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid or

electronic mail to the last address of the Warrantholder as it shall appear on the Warrant Register, with a copy (which shall not constitute notice) to its counsel listed on such Warrant Register.

Section 6.15 **Applicable Law; Jurisdiction**.    The validity, interpretation and performance of this Warrant Agreement and the Warrant Certificates evidencing the Warrants shall be governed in accordance with the Laws of the State of New York, without giving effect to the principles of conflicts of Laws thereof that would result in the application of Law of another jurisdiction.  The parties hereto irrevocably consent to the exclusive jurisdiction of the courts of the State of New York and any federal court located in such state in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement or the Warrant Certificates issued hereunder.  Each party agrees to commence any such suit, action or proceeding in such court.  Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any suit, action or proceeding with respect to this Warrant Agreement or the Warrant Certificates issued hereunder, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 6.15, that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable Law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Warrant Agreement or the Warrant Certificates issued hereunder, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable Law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction.  Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered mail, postage prepaid, to such party at its mailing address determined in accordance with this Warrant Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party to serve process in any other manner permitted by Law.

Section 6.16 **Waiver of Jury Trial**.    EACH OF THE COMPANY AND THE WARRANT AGENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS WARRANT AGREEMENT OR A WARRANT CERTIFICATE EVIDENCING A WARRANT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS WARRANT AGREEMENT OR A WARRANT CERTIFICATE EVIDENCING A WARRANT.  EACH OF THE COMPANY AND THE WARRANT AGENT CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS WARRANT

AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 6.17** **Specific Performance**.  Each of the Company and the Warrant Agent acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

**Section 6.18** **Benefit of this Warrant Agreement**.  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns and the Warrantholders.  Each Warrantholder, by acceptance of a Warrant Certificate, agrees to all of the terms and provisions of this Warrant Agreement applicable thereto.

**Section 6.19** **Registered Warrantholder**.  Every Warrantholder, by accepting a Warrant Certificate, consents and agrees with the Company, with the Warrant Agent and with every subsequent holder of such Warrant Certificate that, prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrant Certificates are registered in the Warrant Register as the absolute owner thereof and of the Warrants evidenced thereby for all purposes whatsoever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrant Certificates or any Warrants evidenced thereby on the part of any other Person and shall not be liable for any registration of transfer of Warrant Certificates that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

**Section 6.20** **Headings**.  The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

**Section 6.21** **Counterparts**.  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.  A signed copy of this Warrant Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant Agreement.

**Section 6.22    Entire Agreement**.    This Warrant Agreement constitutes the entire agreement of the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof.

**Section 6.23    Severability**.    Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

**Section 6.24    Termination**.    This Warrant Agreement shall terminate at the earlier to occur of (i) the Expiration Time (or, if later, Close of Business on the Settlement Date with respect to all exercises of Warrants as to which the respective Exercise Date is prior to the Expiration Time) and (ii) the date on which all outstanding Warrants have been exercised.  All provisions regarding indemnification, warranty, liability and limits thereon shall survive the termination or expiration of this Warrant Agreement.

**Section 6.25    Confidentiality**.    The Warrant Agent and the Company agree that personal, non-public Warrantholder information which is exchanged or received pursuant to the negotiation or the carrying out of this Warrant Agreement shall remain confidential, and shall not be voluntarily disclosed to any other Person, except disclosures pursuant to bankruptcy proceedings, applicable securities Laws or otherwise as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities.

**Section 6.26    Representations and Warranties of the Company**.    As of the date hereof, the Company hereby represents and warrants to the Warrantholders that (i) it has the power and authority to execute this Warrant Agreement and consummate the transactions contemplated by this Warrant Agreement, (ii) there are no statutory or contractual unitholders' preemptive rights or rights of refusal with respect to the issuance of any Warrants and (iii) the execution and delivery by the Company of this Warrant Agreement and the issuance of the Common Shares upon exercise of any Warrant do not and shall not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any lien, security interest, charge or encumbrance upon the Company's capital stock or assets pursuant to, (D) result in a violation of or (E) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, the Company's certificate of formation or LLC Agreement or any Law in effect as of the date hereof to which the Company is subject, or any agreement, instrument, order, judgment or decree to which the Company is subject as of the date hereof, except for any such authorization, consent, approval, notice or exemption required under applicable securities Laws, except, in the case of clause (iii), where such occurrences would not reasonably be expected, individually or in the aggregate, to result in the inability of the Company to consummate the transactions contemplated by this Warrant Agreement or perform its obligations hereunder.

*[signature pages follow]*

40

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**REVLON GROUP HOLDINGS LLC**

By: _____

Name:

Title:

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**

By: _____

Name:

Title:

EXHIBIT A

**[Face of Warrant Certificate][1]**

**REVLON GROUP HOLDINGS LLC**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON SHARES**

[FACE]

No. [__]                                                    CUSIP No. [_____]

[UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO REVLON GROUP HOLDINGS LLC (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.][2]

---

[1] To be removed in the versions of the Warrant Certificates printed in multiple copies for use by the Warrant Agent in preparing Warrants Certificates for issuance and delivery from time to time to holders.

[2] Include only on Global Warrant Certificate.

A-1

No. [__]                                                    [*insert number of warrants*] Warrants
                                                            CUSIP No. [_____]

THIS CERTIFIES THAT, for value received, [CEDE & CO.]³[_____]⁴, or registered assigns, is the registered owner of the number of Warrants to Purchase Common Shares of Revlon Group Holdings LLC, a Delaware limited liability company (the "**Company**," which term includes any successor thereto under the Warrant Agreement) specified above [or such lesser number as may from time to time be endorsed on the "Schedule of Decreases" attached hereto]⁵, and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Warrantholder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one Common Share of the Company for each Warrant evidenced hereby, at the purchase price of $51.59 per unit (as adjusted from time to time, the "**Exercise Price**"), payable in full at the time of purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Article 4 of the Warrant Agreement.

All Common Shares issuable by the Company upon the exercise of Warrants shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.

Each Person that becomes an LLC Member or an LLC Beneficial Owner of the Common Shares issued upon exercise of the Warrants shall automatically become admitted as an LLC Member or an LLC Beneficial Owner, as applicable, upon such Person's receipt of the Common Shares (whether direct or indirect) issued upon exercise of the Warrants without the need to execute the LLC Agreement or a joinder thereto, and shall have all of the rights, and be subject to all of the obligations, set forth in the LLC Agreement with respect to LLC Members and LLC Beneficial Owners, as applicable, and as provided under the Delaware LLC Act. Each Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that such Person: (A) has received (or otherwise had made available to it), read and understood the LLC Agreement, (B) acknowledges and understands that such Person shall have all the rights, and be subject to all the obligations, set forth in the LLC Agreement with respect to LLC Direct Owners and LLC Beneficial Owners and as provided under the Delaware LLC Act, as if such Person had directly executed the LLC Agreement as a party, (C) ratifies and confirms each and every Article, Section and provision of the LLC Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale). Furthermore, each such Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that the LLC Agreement constitutes the legal, valid and binding obligation of such Person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.

---

³ Include only on Global Warrant Certificate.

⁴ Include only on Definitive Warrant Certificate.

⁵ Include only on Global Warrant Certificate.

Notwithstanding anything to the contrary in the Warrant Agreement, no Warrantholder or Beneficial Owner shall Transfer any Warrant to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion).

Each Warrant evidenced hereby may be exercised by the Warrantholder hereof at the Exercise Price then in effect on any Business Day from and after the Closing Date until the Expiration Time (as defined on the reverse hereof).

Subject to the provisions hereof and of the Warrant Agreement, the Warrantholder of this Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by [providing to the Warrant Agent at its office maintained for such purpose (the "**Corporate Agency Office**") a duly completed and executed Exercise Notice as to the number of Warrants being exercised and, if applicable, whether Cashless Settlement is being elected with respect thereto, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with Applicable Procedures in respect of the exercise of such Warrants][6] [surrendering to the Warrant Agent this Warrant Certificate at the Corporate Agency Office and delivering to the Warrant Agent a duly completed and executed Exercise Notice as to whether Cashless Settlement is being elected with respect thereto][7], together with payment in full to the Warrant Agent of (x) those applicable taxes and charges required to be paid by the Warrantholder, if any, and (y) except in the case of a Cashless Settlement, the aggregate of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise. Any such payment of the Exercise Price (if applicable) is to be by wire transfer in immediately available funds to such account of the Warrant Agent at such banking institution as the Warrant Agent shall have designated from time to time for such purpose.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature of an authorized officer on behalf of the Warrant Agent, this Warrant Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

*[signature pages follow]*

---

[6] Include only on Global Warrant Certificate.

[7] Include only on Definitive Warrant Certificate.

A-3

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed under its company seal.

Dated:  [*insert date*]

<div style="text-align: right">

REVLON GROUP HOLDINGS LLC

By: _____
     Name:
     Title:

</div>

ATTEST:

<div style="text-align: right">

By: _____
     Name:
     Title:

</div>

Countersigned:

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC, as Warrant
Agent

AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC, as Warrant
Agent

<div align="center">OR</div>

By: _____
　　　　　Authorized Agent

By: _____
　　　　　as Countersigning Agent

By: _____
　　　　　Authorized Officer

**[Reverse of Warrant Certificate]**

**REVLON GROUP HOLDINGS LLC**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON SHARES**

The Warrants evidenced hereby are one of a duly authorized issue of Warrants of the Company designated as its Warrants to Purchase Common Shares, limited in aggregate number to [*insert number of warrants*] initially issued under and in accordance with the Warrant Agreement, dated as of May 2, 2023 (the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent (the "**Warrant Agent**," which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Warrant Agent, the Warrantholders of Warrant Certificates and the owners of the Warrants evidenced thereby and of the terms upon which the Warrant Certificates are, and are to be, countersigned and delivered. A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Warrantholder hereof.

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire and all rights of the Warrantholders of Warrant Certificates evidencing such Warrants shall terminate and cease to exist, as of the earlier of (i) 5:00 p.m., New York time, on May 2, 2028 and (ii) the date of consummation of any Liquidity Event (the "**Expiration Time**").

If fewer than all the Warrants represented by a Warrant Certificate are exercised, [the Warrant Agent shall endorse the "Schedule of Decreases of Warrants" attached to the Global Warrant Certificate to reflect the Warrants being exercised.][8] [such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and class and for the number of Warrants which were not exercised shall be executed by the Company upon the written order of the Warrantholder of this Warrant Certificate upon the cancellation hereof.][9]

The Warrant Certificates are issuable only in registered form in denominations of whole numbers of Warrants. Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Warrant Certificate may be exchanged for Warrant Certificates in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Warrant Certificates issued upon exchange or registration of transfer shall evidence the same aggregate number and class of Warrants as this Warrant Certificate. The Company shall cause to be kept at the office of the Warrant Agent the Warrant Register in which,

---

[8] Include only on Global Warrant Certificate.

[9] Include only on Definitive Warrant Certificates.

subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by Law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates. Issuance of the Warrant Certificates evidencing Warrants and issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any documentary, stamp or similar issue or transfer tax or other incidental expense in respect of the issuance thereof, all of which taxes and expenses shall be paid by the Company; provided, however, the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of Warrant Certificates evidencing such Warrants or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property in a name or to any Person other than the Warrantholder of the Warrant Certificate surrendered upon exercise or transfer, and the Company shall not be required to issue or deliver Warrant Certificates or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property, as applicable, unless and until the Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have reasonably determined that such tax has been paid.

Prior to due presentment of this Warrant Certificate for registration of transfer, the Company, the Warrant Agent and any agent of the Company or the Warrant Agent may treat the Person in whose name this Warrant Certificate is registered as the owner hereof for all purposes, and neither the Company, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Warrantholders of Warrant Certificates under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrantholders.

Nothing contained in the Warrant Agreement or this Warrant Certificate shall be construed as conferring upon any Person, by virtue in and of itself of holding a Warrant Certificate evidencing any Warrant or having a beneficial interest in a Warrant, the right to vote, receive any dividend or other distribution, receive notice of, or attend, any meeting of unitholders or otherwise exercise any rights whatsoever, in each case, as a unitholder of the Company to the extent such vote, dividend, giving of notice, meeting or other exercise of rights (or, if applicable, the relevant Record Date therefor) precedes the Close of Business on the Exercise Date with respect to the exercise of such Warrant. No Warrantholder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrant Certificate held by such holder.

This Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the Laws of the State of New York.

All terms used in this Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement. In the event of any conflict between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

<u>Assignment</u>

(Form of Assignment To Be Executed If Warrantholder Desires To Transfer Warrant Certificate)

    FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

<div align="center">
Please insert social security or<br>
other identifying number
</div>

(Please print name and address including zip code)

the Warrants represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Warrant Certificate on the books of the within-named Company with full power of substitution in the premises.

Dated: _____    Signature _____

(Signature must conform in all respects to name of Warrantholder as specified on the face of this Warrant Certificate and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

# [SCHEDULE A

## SCHEDULE OF DECREASES IN WARRANTS

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant following such decrease | Signature of authorized signatory |
|------|------|------|------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  | ][10] |
|  |  |  |  |

[10] Include only on Global Warrant Certificate.

**EXHIBIT B**

## FORM OF EXERCISE NOTICE

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: General Counsel
Email: legalteamUS@equiniti.com
Email for Warrant exercises: reorgwarrants@equiniti.com

Attention:  [Transfer Department]

Re:     Warrant Agreement dated as of May 2, 2023 between Revlon Group Holdings LLC (the "**Company**") and American Stock Transfer & Trust Company, LLC, as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned hereby irrevocably elects to exercise _____ Warrants and receive the consideration deliverable upon exercise thereof pursuant to the following settlement method (check one):

☐     Cash Settlement

☐     Cashless Settlement

If Cash Settlement is elected, the undersigned shall tender payment of the Exercise Price therefor in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a Liquidity Event in accordance with Section 3.2(e) of the Warrant Agreement.

☐     This exercise is being made in connection with a Liquidity Event; provided, that in the event that such transaction shall not be consummated, then this exercise shall be deemed revoked.

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT PRIOR TO THE EXPIRATION TIME.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS AND PHONE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

*[signature page(s) to follow]*

Dated: _____

_____
(Insert Social Security or Other
Identifying Number of Warrantholder)

Name: _____
(Please Print)

Address: _____

_____

Signature
(Signature must conform in all respects to name
of Warrantholder as specified on the face of this
Warrant Certificate and must bear a signature
guarantee by a bank, trust company or member
firm of a U.S. national securities exchange.)

Signature Guaranteed:

Instructions (i) as to denominations and names of Common Shares issuable upon exercise
and as to delivery of such securities and any other property issuable upon exercise and (ii) if
applicable, as to Warrant Certificates evidencing unexercised Warrants:

B-2

**EXHIBIT C**

**Fee Schedule**

The Company shall pay the Warrant Agent for performance of its services under this Warrant Agreement such compensation as follows:

Warrant Agent Acceptance Fee: $5,000.00

Monthly Warrant Agent Fee: $500.00

Per Warrant Exercise Fee: $50.00

Customary Out-of-Pocket Expenses

**EXHIBIT D**

### Form of Joinder to the LLC Agreement

This Joinder Agreement (this "**Joinder Agreement**") is made as of [_____], 20[__] by the undersigned (the "**Owner**") in accordance with the requirement pursuant to the terms of the warrants (the "**Warrants**") of Revlon Group Holdings LLC (the "**Company**"), issued pursuant to the Warrant Agreement (as amended, restated, supplemented or otherwise modified form time to time) dated May 2, 2023 between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent, to become a party to the Amended and Restated Limited Liability Company Agreement of the Company dated as of May 2, 2023 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**LLC Agreement**") in connection with the Owner's receipt of Shares (as defined in the LLC Agreement) upon exercise of such Warrants. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

The Owner hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it has received and reviewed a complete copy of the LLC Agreement and it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, an "Owner" (as defined in the LLC Agreement) for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Owner hereby represents and warrants that (i) the Owner has all requisite power and authority to execute this Joinder Agreement and to perform its obligations under the LLC Agreement and (ii) the execution and delivery of this Joinder Agreement and the performance of Owner's obligations under the LLC Agreement will not conflict with or constitute a default under any material contract to which the Owner is a party, constitute a default under the Owner's governing documents or conflict with or constitute a violation of any applicable law.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

**[*INSERT OWNER*]**

By:_____
Name:
Title:

**<u>Exhibit I-2</u>**

**Blackline comparison to Form of
New Warrant Agreement as filed on April 13, 2023**

*Execution Version*

# WARRANT AGREEMENT

### dated as of May [*insert date*][1]2], 2023 between

### [REVLON GROUP HOLDINGS LLC]

### and

### AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC

### as Warrant Agent

### Warrants to Purchase Common Shares

---

[1] NTD: Warrants to be issued on the Plan Effective Date.

Error! Unknown document property name.

# TABLE OF CONTENTS

**Page**

**Article 1  Definitions** ................................................................................................................ **1**
    Section 1.1    Certain Definitions .................................................................................... 1

**Article 2  Warrant Certificates** ................................................................................................ **~~9~~8**
    Section 2.1    Original Issuance of Warrants .................................................................. ~~9~~8
    Section 2.2    Form of Warrants ...................................................................................... ~~10~~9
    Section 2.3    Execution and Delivery of Warrant Certificates ..................................... ~~10~~9
    Section 2.4    Global Warrant Certificates ..................................................................... ~~11~~10
    Section 2.5    Registration, Transfer, Exchange and Substitution .................................. 12
    Section 2.6    Cancellation of the Warrants .................................................................... 14
    Section 2.7    CUSIP Numbers ....................................................................................... 14
    Section 2.8    Loss or Mutilation .................................................................................... 14
    Section 2.9    Transfer Restrictions ................................................................................ ~~15~~14

**Article 3  Exercise and Settlement of Warrants** ..................................................................... **15**
    Section 3.1    Right to Acquire Common Shares Upon Exercise ................................... 15
    Section 3.2    Exercise Procedures for Warrants ............................................................ 15
    Section 3.3    Common Shares Issuable ........................................................................... ~~18~~17
    Section 3.4    Settlement of Warrants ............................................................................. ~~18~~17
    Section 3.5    Delivery of Common Shares ..................................................................... ~~19~~18
    Section 3.6    No Fractional Common Shares to Be Issued ............................................ 20
    Section 3.7    Acquisition of Warrants by Company ...................................................... ~~21~~20
    Section 3.8    Validity of Exercise ................................................................................. ~~21~~20
    Section 3.9    Certain Calculations ................................................................................. ~~21~~20
    Section 3.10    Reservation and Listing of Common Shares ........................................... 21
    Section 3.11    Charges, Taxes and Expenses .................................................................. ~~22~~21
    Section 3.12    Cancellation of Warrant Certificates ....................................................... ~~22~~21
    Section 3.13    Withholding and Reporting Requirements ............................................... ~~22~~21

**Article 4  Adjustments** ............................................................................................................. **~~23~~22**
    Section 4.1    Adjustments and Other Rights ................................................................. ~~23~~22
    Section 4.2    Common Share Dividends, Distributions, Splits, Subdivisions,
                 Reclassifications or Combinations .......................................................... ~~23~~22
    Section 4.3    Other Distributions ................................................................................... 23
    Section 4.4    Dissolution, Total Liquidation or Winding Up ........................................ ~~24~~23
    Section 4.5    Successor upon Consolidation, Merger and Sale of Assets ...................... 24
    Section 4.6    Adjustment upon Reorganization Event .................................................. ~~25~~24
    Section 4.7    Rounding of Calculations; Minimum Adjustments .................................. 26
    Section 4.8    Timing of Issuance of Additional Common Shares Upon Certain
                 Adjustments ............................................................................................. 26
    Section 4.9    Statement Regarding Adjustments ........................................................... ~~27~~26
    Section 4.10    Notice of Adjustment Event .................................................................... ~~27~~26
    Section 4.11    Adjustment Rules ..................................................................................... ~~27~~26
    Section 4.12    Optional Tax Adjustment ......................................................................... 27
    Section 4.13    Stockholder Rights Plans or Equivalent .................................................. ~~28~~27

## TABLE OF CONTENTS

**Page**

**Article 5  Other Provisions Relating to Rights of Warrantholders** — 2827
Section 5.1    No Rights as Unitholders — 2827
Section 5.2    Modification/Amendment — 2827
Section 5.3    Rights of Action — 2928
Section 5.4    Issuance Obligation Remedies — 2928
Section 5.5    No Impairment — 2928
Section 5.6    Information Rights — 29
Section 5.7    LLC Agreement Provisions Binding Upon Exercise — 3231

**Article 6  Concerning the Warrant Agent and Other Matters** — 32
Section 6.1    Change of Warrant Agent — 32
Section 6.2    Compensation; Further Assurances — 3433
Section 6.3    Reliance on Counsel — 3433
Section 6.4    Proof of Actions Taken — 3433
Section 6.5    Correctness of Statements — 34
Section 6.6    Validity of Agreement — 34
Section 6.7    Use of Agents — 3534
Section 6.8    Liability of Warrant Agent — 3534
Section 6.9    Legal Proceedings — 35
Section 6.10   Actions as Agent — 35
Section 6.11   Appointment and Acceptance of Agency — 36
Section 6.12   Appointment of Countersigning Agent — 36
Section 6.13   Successors and Assigns — 37
Section 6.14   Notices — 37
Section 6.15   Applicable Law; Jurisdiction — 38
Section 6.16   Waiver of Jury Trial — 3938
Section 6.17   Specific Performance — 39
Section 6.18   Benefit of this Warrant Agreement — 39
Section 6.19   Registered Warrantholder — 4039
Section 6.20   Headings — 4039
Section 6.21   Counterparts — 4039
Section 6.22   Entire Agreement — 40
Section 6.23   Severability — 40
Section 6.24   Termination — 40
Section 6.25   Confidentiality — 40
Section 6.26   Representations and Warranties of the Company — 4140

Exhibit AExhibit A    Form of Warrant Certificate
Exhibit BExhibit B    Form of Exercise Notice
Exhibit CExhibit C    Fee Schedule
Exhibit DExhibit D    Form of Joinder to the LLC Agreement

## WARRANT AGREEMENT[2]

Warrant Agreement (as it may be amended from time to time, this "**Warrant Agreement**"), dated as of May [*insert date*2], 2023, between [Revlon Group Holdings LLC], a Delaware limited liability company (the "**Company**"), and American Stock Transfer & Trust Company, LLC, as warrant agent (the "**Warrant Agent**").

## RECITALS

WHEREAS, pursuant to the Joint Plan of Reorganization (the "**Plan**") of Revlon, Inc. and certain of its debtor affiliates under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") approved by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), certain Warrants (as defined herein) to purchase Common Shares (as defined herein) of the Company shall be issued;

WHEREAS, the Warrants and the Common Shares underlying the Warrants have been offered and sold in reliance on the exemption from the registration requirements of the Securities Act and any applicable state securities or "blue sky" laws afforded by Section 1145(a) of the Bankruptcy Code; and

WHEREAS, the Company desires that the Warrant Agent act on behalf of the Company and the Warrant Agent is willing to act, in connection with the issuance, exchange, transfer, substitution and exercise of Warrants.

NOW THEREFORE in consideration of the mutual agreements herein contained, the Company and the Warrant Agent agree as follows.

## ARTICLE 1

## DEFINITIONS

**Section 1.1    Certain Definitions**.  "**Affiliate**" shall mean, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"**Agent Members**" has the meaning set forth in ~~Section 2.4(b)~~ Section 2.4(b) hereof.

---

[2] NTD: Subject to ongoing review by the SteerCo group, the Company and Delaware local counsel.

1

"**Applicable Procedures**" means, with respect to any transfer or exchange of, or exercise of any Warrants evidenced by, any Global Warrant Certificate, the rules and procedures of the Depositary that apply to such transfer, exchange or exercise.

"**Authentication Order**" means a Company Order for authentication and delivery of Warrants.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Beauty Companies**" has the meaning set forth in the definition of "Competitor" set forth below.

"**Beneficial Owner**" means any Person beneficially owning an interest in a Warrant represented by a Global Warrant Certificate, which interest is credited to the account of a direct or indirect participant in the Depositary for the benefit of such Person through the book-entry system maintained by the Depositary (or its agent).

"**Board**" means the board of managers of the Company from and after the Plan Effective Date.

"**Business Day**" means any day other than a Saturday, a Sunday, a day which is a legal holiday in the State of New York, or a day on which banking institutions and trust companies in the State of New York are authorized or obligated by Law, regulation or executive order to close.

"**Cash Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of fully paid and nonassessable Common Shares equal to the Cash Settlement Share Amount in exchange for payment in cash by the Exercising Owner of the applicable Exercise Price for each such Common Share so receivable upon exercise of such Warrant.

"**Cash Settlement Share Amount**" means, for each Warrant exercised as to which Cash Settlement is applicable, one fully paid and nonassessable Common Share, subject to adjustment in accordance with ~~Article 4~~Article 4.

"**Cashless Settlement**" means the settlement method pursuant to which an Exercising Owner shall be entitled to receive from the Company, for each Warrant exercised, a number of Common Shares equal to the Cashless Settlement Share Amount without any payment of cash therefor.

"**Cashless Settlement Share Amount**" means for each Warrant exercised as to which an Exercising Owner elects Cashless Settlement, one fully paid and nonassessable Common Share, subject to adjustment in accordance with ~~Article 4~~Article 4, multiplied by a fraction equal to (i) the Fair Market Value (as of the Exercise Date for such Warrant) of one Common Share minus the Exercise Price therefor divided by (ii) such Fair Market Value.  The number of Common Shares issuable upon exercise, on the same Exercise Date, of Warrants as to which Cashless Settlement is applicable shall be aggregated for each Warrantholder, together with cash

in lieu of any fractional Common Share, as provided in ~~Section 3.6~~Section 3.6.  In no event shall the Company deliver a fractional Common Share in connection with an exercise of Warrants as to which Cashless Settlement is applicable.

"**Close of Business**" means 5:00 p.m., New York City time.

"**Closing Date**" means the Plan Effective Date.

"**Common Shares**" means [the limited liability company interests in the Company designated as the "Common Shares" of the Company and issued on or after the Plan Effective Date][3].

"**Company**" has the meaning set forth in the Preamble.

"**Company Order**" means a written request or order signed in the name of the Company by any two officers, at least one of whom must be its Chief Executive Officer, Chief Financial Officer, its Treasurer, any Assistant Treasurer, its Secretary or any Assistant Secretary, and delivered to the Warrant Agent.

"**Company Sale**" means [(i) the occurrence of a merger, consolidation, share exchange, business combination or other sale involving the Company and its Subsidiaries or similar corporate transaction involving the Company and its Subsidiaries, whether or not the Company is the surviving entity in any such transaction, other than a transaction which would result in the voting power of the securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving or owning entity) at least a majority of the voting power of the securities of the Company or such surviving or owning entity immediately after such transaction, (ii) any Transfer of all (but not less than all) of the outstanding Common Shares in any transaction or series of related transactions or (iii) any direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions, of all or substantially all of the assets of the Company followed by a distribution of the proceeds.][4]

"**Competitor**" means [(i) any Person that owns or operates assets ~~involved in the~~primarily used in, or that designs, develops, produces, offers for sale or sells products in, the cosmetics, hair color, hair care, fragrances, skincare, or beauty care products businesses (collectively, "**Beauty Companies**") or any Affiliate of such Person, (ii) any Person (together with its Related Persons) that directly or indirectly (A) holds equity interests in any Beauty Company where such equity interests collectively represent greater than 50% of the asset value, or account for greater than 50% of the revenue of, such Person, or (B) controls (as such term is defined in the definition of "Affiliate") any Beauty Company or (iii) any other Person as determined from time to time and posted to a Datasite that the Board determines in good faith poses a material competitive risk to the Company or any of its Subsidiaries; underline provided that (1) in

---

[3] ~~NTD: To be confirmed.~~

[4] ~~NTD: To be conformed with the definition in the final version of the LLC Agreement.~~

the case of clause (i), that no Person who has a passive interest in a Beauty Company shall be deemed to be a Competitor of the Company so long as such Person is not involved in the management of or otherwise provides advice or services to such Beauty Company and has not designated, or does not have the right to designate, any member or non-voting observer of the board of directors (or similar governing body) of such Beauty Company and (2) in the case of clauses (i) or (ii), the Board (excluding the vote of any manager appointed by, or otherwise affiliated with, a Competitor (as defined without giving effect to this proviso)) may determine in good faith that a Person that would be a Competitor pursuant to the foregoing clauses (i) or (ii) shall be deemed to not be a Competitor, notwithstanding clauses (i) or (ii) of this definition.]⁵

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby.

"**Corporate Agency Office**" has the meaning set forth in ~~Section 2.5(a)~~Section 2.5(a) hereof.

"**Countersigning Agent**" means any Person authorized by the Warrant Agent to act on behalf of the Warrant Agent to countersign Warrant Certificates.

"**Datasite**" means a confidential website or other portal, such as (but not limited to) Intralinks or Epiq, where information may be posted.

"**Definitive Warrant Certificate**" means a Warrant Certificate registered in the name of the Warrantholder thereof that does not bear the Global Warrant Legend and that does not have a "Schedule of Decreases of Warrants" attached thereto.

"**Delaware LLC Act**" means the Delaware Limited Liability Company Act, as amended or superseded from time to time.

"**Depositary**" means DTC and its successors as depositary hereunder.

"**Drag-Along Sale**" means [any LLC Beneficial Owner(s) and/or LLC Direct Owner(s) holding (directly or indirectly) at least a majority of the aggregate number of Common Shares then issued and outstanding (collectively, the "**Dragging Seller**") agree to a *bona fide* arms'-length negotiated Company Sale to one or more purchasers that are not Related Persons of the Dragging Seller for consideration payable in cash and/or freely tradeable and marketable securities.]⁶

"**Dragging Seller**" has the meaning set forth in the definition of "Drag-Along Sale" set forth above.

---

⁵ ~~NTD: To be conformed with the definition in the final version of the LLC Agreement.~~

⁶ ~~NTD: To be conformed with the definition in the final version of the LLC Agreement.~~

"**DTC**" means The Depository Trust Company.

"**DTC Participants**" means, collectively, the participants for which DTC holds and provides asset servicing.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Exempt Transaction**" shall mean a merger, reorganization or consolidation that results in the holders of the voting securities of the Company immediately prior thereto continuing to hold immediately following such merger, reorganization or consolidation (either by such voting securities remaining outstanding or being converted into voting securities of the surviving entity or the ultimate parent company of such surviving entity), in substantially the same proportions as prior to such event, more than 50% of the combined voting power of the voting securities of the Company or such surviving entity immediately after such merger or consolidation (or the ultimate parent company of the Company or such surviving entity).

"**Exercise Date**" has the meaning set forth in ~~Section 3.2(d)~~Section 3.2(d).

"**Exercise Notice**" means, for any Warrant, an exercise notice substantially in the form set forth in ~~Exhibit B~~Exhibit B hereto.

"**Exercising Owner**" means any Warrantholder that exercises Warrants pursuant to the terms hereof.

"**Exercise Price**" means $~~[insert exercise price]~~[7]51.59, subject to adjustment as provided in ~~Article 4~~Article 4.

"**Expiration Time**" means the earlier of (i) the Close of Business on ~~[insert expiration date]~~[8]May 2, 2028 and (ii) the date of consummation of any Liquidity Event.

"**Fair Market Value,**" as of a specified date, means the price per Common Share or per unit of other securities or other distributed property determined as follows:

(i)     in the case of Common Shares or other securities listed on a National Securities Exchange, the average of the VWAP of a Common Share or a single unit of such other security for the 10 Trading Days immediately preceding the specified date (or if the Common Shares or other securities have been listed for less than 10 Trading Days, the VWAP for such lesser period of time);

(ii)    in the case of Common Shares or other securities that are publicly traded but are not listed on a National Securities Exchange, the average of the reported closing

---

[7] ~~NTD: Initial exercise price per unit to be based on the equity value implied from an enterprise value of $4 billion. *See* the definition of "New Warrants" in the Plan for specifics with respect to the calculation.~~

[8] ~~NTD: To be 5 years after the issue date.~~

bid and ask prices of a Common Share or a single unit of such other security in the over-the-counter market on which such securities are then traded for the 10 Trading Days immediately preceding the specified date (or if the Common Shares or other securities have been publicly traded (but not listed) for less than 10 Trading Days, the average of the reported closing bid and ask prices for such lesser period of time); or

(iii)    in all other cases, the Fair Market Value per Common Share or per unit of other securities or other distributed property as of a date not earlier than 20 Business Days preceding the specified date as reasonably determined in good faith by the Board, subject to appropriate adjustment for any intervening event or circumstance that would result in an adjustment pursuant to Article 4 hereof that has occurred since the date of the last determination.

For the avoidance of doubt, no third party appraisal shall be required in connection with any Warrant that is exercised using Cashless Settlement.

"**Fundamental Equity Change**" has the meaning set forth in ~~Section 4.5(a)~~Section 4.5(a) hereof.

"**Funds**" has the meaning set forth in ~~Section 3.2(f)~~Section 3.2(f) hereof.

"**Funds Account**" has the meaning set forth in ~~Section 3.2(f)~~Section 3.2(f) hereof.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Global Warrant Certificate**" means a Warrant Certificate deposited with or on behalf of and registered in the name of the Depositary or its nominee, that bears the Global Warrant Legend and that has the "Schedule of Decreases of Warrants" attached thereto.

"**Global Warrant Legend**" means the legend set forth in ~~Section 2.4(a)~~Section 2.4(a).

"**Joinder**" means [a joinder to the LLC Agreement substantially in the form of ~~Exhibit D~~Exhibit D attached hereto, or other documentation in form and substance acceptable to the Company in its sole discretion (which may be on a "click-through" or similar basis)]⁹.

"**Law**" means any federal, state, local, foreign or provincial law, statute, ordinance, rule, regulation, judgment, order, injunction, decree or agency requirement having the force of law or any undertaking to or agreement with any governmental authority, including common law.

"**Liquidity Event**" means any transaction or series of related transactions that results in (a) a merger, consolidation or combination involving the Company, (b) the sale or exchange of all or substantially all of the equity interests of the Company to one or more third parties (whether by merger, sale, recapitalization, consolidation, combination or otherwise) or (c) the

---

⁹ ~~NTD: To be revised/updated as needed.~~

sale, directly or indirectly, by the Company of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole; provided that, notwithstanding the foregoing, no Exempt Transaction shall be a Liquidity Event.

"**LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of the Company, as amended, restated, supplemented or otherwise modified from time to time.

[""**LLC Beneficial Owner**" means any Person owning a securities entitlement with respect to Common Shares registered to Cede & Co. (or such other nominee as may be selected by DTC that is the registered holder of Common Shares under the LLC Agreement), as nominee for DTC, which securities entitlement is held directly or indirectly through the book-entry system maintained by DTC and DTC Participants and which securities entitlement has not been credited to any other Person's securities account.

"**LLC Direct Owner**" means, as of any relevant time, any Person who is a party to the LLC Agreement (regardless of whether such person has executed the LLC Agreement) and is a member of the Company.

"**LLC Member**" means Cede & Co. (or such other nominee as may be selected by DTC that is the registered holder of Common Shares under the LLC Agreement on behalf of the LLC Beneficial Owners) and each LLC Direct Owner.][10]

"**National Securities Exchange**" means The New York Stock Exchange (including the NYSE American), The Nasdaq Global Select Market, The Nasdaq Global Market or the Nasdaq Capital Market.

"**Person**" means an individual, partnership, firm, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"**Plan**" has the meaning set forth in the Recitals.

"**Plan Effective Date**" means the "Effective Date" of the Plan as defined therein.

"**Recipient**" has the meaning set forth in Section 3.5(b) hereof.

"**Record Date**" means, with respect to any dividend, distribution, recapitalization, reclassification, split, reverse split, reorganization, consolidation, merger or other transaction or event in which the holders of Common Shares have the right to receive any cash, securities or other property or in which Common Shares (or another applicable security) are exchanged for or converted into, any combination of, cash, securities or other property, the date fixed for determination of holders of Common Shares entitled to receive such cash, securities or other

---

[10] NTD: Definitions to be updated to conform with any relevant updates to the LLC Agreement.

property or participate in such exchange or conversion (whether such date is fixed by the Board or by statute, contract or otherwise).

"**Reference Property**" has the meaning set forth in ~~Section 4.6(a)~~Section 4.6(a) hereof.

"**Related Persons**" means~~[~~, with respect to a Person, and without duplication, (i) such Person's Affiliates and (ii) any fund, account, investment vehicle or co-investment vehicle that is controlled, managed, advised or sub-advised by such Person or any of its Affiliates or the same investment manager, advisor or sub-advisor as such Person or any Affiliate of such investment manager, advisor or sub-advisor.~~]~~[11]

"**Reorganization Event**" has the meaning set forth in ~~Section 4.6(a)~~Section 4.6(a) hereof.

"**Required Warrantholders**" means Warrantholders holding at least 50.01% of the then-outstanding Warrants, subject to the provisions of Section 5.2(d).

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and the related rules and regulations promulgated thereunder.

"**Settlement Date**" means, in respect of a Warrant that is exercised hereunder, (a) in all circumstances other than a Cashless Settlement where Fair Market Value has been determined by the Board pursuant to clause (iii) of the definition thereof, the second Business Day immediately following the Exercise Date for such Warrant, and (b) in the event of a Cashless Settlement where Fair Market Value has been determined by the Board pursuant to clause (iii) of the definition thereof, the second Business Day immediately following receipt by the Exercising Owner of notice of such Fair Market Value.

"**Subsidiary**" means, as to any Person, any corporation, partnership, limited liability company or other organization, whether incorporated or unincorporated, of which at least a majority of the securities or other interests having by their terms voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly beneficially owned or controlled by such party or by any one or more of its subsidiaries, or by such party and one or more of its subsidiaries.

"**Trading Day**" means each Monday, Tuesday, Wednesday, Thursday and Friday, other than any day on which securities are not traded on the applicable securities exchange.

"**Transfer**" means ~~[~~a transfer by any Person of the Warrants in any form, including pursuant to a sale, assignment, conveyance, pledge, encumbrance, hypothecation or other disposition of all or any part of a Warrant or any interest therein (including pursuant to any direct or indirect participation right, total return swap or other arrangement that transfers an economic interest in the Warrants).  For the avoidance of doubt, the term "Transfer" includes a transfer of Warrants by a Beneficial Owner through DTC.  The term "Transfer" will include a direct or

---

[11] ~~NTD: To be conformed with the definition in the final version of the LLC Agreement.~~

indirect transfer (or series of related direct or indirect transfers) of any interest in a Warrantholder or Beneficial Owner if the value of the Warrants held (directly or indirectly) by the Warrantholder or Beneficial Owner constitutes more than ten percent (10%) of the value being transferred disregarding any cash, cash equivalents and marketable securities involved in such transfer.  The terms "Transferred" and "Transferring" have meanings correlative to the foregoing.]12

"**Uniform Commercial Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Unit of Reference Property**" has the meaning set forth in ~~Section 4.6(a)~~Section 4.6(a) hereof.

"**VWAP**" means, for any Trading Day, the price for securities (including Common Shares) determined by the daily volume-weighted average price per unit of such securities for such Trading Day on the trading market on which such securities are then listed or quoted, in each case, for the regular trading session (without regard to pre-open or after hours trading outside of such regular trading session) as reported on a National Securities Exchange, as published by Bloomberg at 4:15 p.m., New York City time, on such Trading Day.

"**Warrant**" or "**Warrants**" means those certain warrants of the Company to purchase initially up to an aggregate of ~~[*insert number of units*]~~6,657,224 Common Shares and which expire at the Expiration Time and are issued pursuant to this Warrant Agreement with the terms, conditions and rights set forth herein.  Each Warrant shall entitle the Warrantholder of the Warrant or the Warrant Certificate evidencing such Warrant upon exercise to purchase one Common Share at the Exercise Price, subject to adjustment pursuant to ~~Article 4~~Article 4.

"**Warrant Agent**" has the meaning set forth in the Preamble.

"**Warrant Agreement**" has the meaning set forth in the Preamble.

"**Warrant Certificates**" means those certain warrant certificates evidencing the Warrants, substantially in the form of ~~Exhibit A~~Exhibit A attached hereto, except that, in the case of a Definitive Warrant Certificate, such Warrant Certificate shall not bear the Global Warrant Legend and shall not have a "Schedule of Decreases of Warrants" attached thereto.

"**Warrant Register**" has the meaning set forth in ~~Section 2.5(b)~~Section 2.5(b).

"**Warrantholder**" means any Person in whose name at the time any Warrant or Warrant Certificate is registered upon the Warrant Register.

---

12 ~~NTD: To be conformed with the definition in the final version of the LLC Agreement.~~

## ARTICLE 2

## WARRANT CERTIFICATES

**Section 2.1    Original Issuance of Warrants**.

(a)    On the Closing Date, one or more Global Warrant Certificates evidencing an aggregate of [*insert number of warrants*]6,657,224 Warrants (each such Warrant to be subject to adjustment from time to time as described herein) shall be executed by the Company and delivered to the Warrant Agent for countersignature, along with an Authentication Order, and the Warrant Agent shall countersign and deliver such Global Warrant Certificates for issuance to the Depositary, or its custodian, for crediting to the accounts of its participants for the benefit of the Beneficial Owners of the Warrants, pursuant to the Applicable Procedures of the Depositary on the Closing Date.  Each Warrant Certificate shall evidence the number of Warrants specified therein, and each Warrant evidenced thereby shall represent the right, subject to the provisions contained herein and therein, to purchase one Common Share, subject to adjustment as provided in Article 4Article 4.

(b)    Each Warrant shall be exercisable for one fully paid and nonassessable Common Share (subject to adjustment under Article 4Article 4) upon payment of the applicable Exercise Price for each such Common Share so receivable upon exercise of such Warrant and compliance with the procedures set forth in this Warrant Agreement.  On the Closing Date, the Warrant Agent shall register all of the Warrants in the Warrant Register.  The Warrants shall be dated as of the Closing Date and, subject to the terms hereof, shall be the only Warrants issued or outstanding under this Warrant Agreement as of the Closing Date.

(c)    All Warrants issued under this Warrant Agreement shall in all respects be equally and ratably entitled to their respective benefits under this Warrant Agreement, without preference, priority, or distinction on account of the actual time of the issuance and authentication or any other terms thereof.  Each Warrant shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as such Warrant shall have been duly exercised or shall have expired or been cancelled in accordance with the terms hereof.  Each Warrantholder shall be bound by all of the terms and provisions of this Warrant Agreement as fully and effectively as if such Warrantholder had signed the same.

**Section 2.2    Form of Warrants**.  The Warrant Certificates evidencing the Warrants shall be in registered form only and substantially in the form attached hereto as Exhibit AExhibit A, shall be dated the date on which countersigned by the Warrant Agent, shall have such insertions as are appropriate or required or permitted by this Warrant Agreement and may have such letters, numbers or other marks of identification and such legends and endorsements typed, stamped, printed, lithographed or engraved thereon as the officers of the Company executing the same may approve based upon written advice of counsel (execution thereof to be conclusive evidence of such approval) and as are not inconsistent with the provisions of this Warrant Agreement, the Plan or the Confirmation Order, as may be required to comply with any Law or with any rule or regulation pursuant thereto or with any rule or regulation of any securities exchange on which the Warrants may be listed, or to conform to usage.

10

**Section 2.3**     **Execution and Delivery of Warrant Certificates**.

(a)     Warrant Certificates evidencing the Warrants which may be countersigned and delivered under this Warrant Agreement are limited to Warrant Certificates evidencing the Warrants except for Warrant Certificates countersigned and delivered upon registration of transfer of, or in exchange for, or in lieu of, one or more previously countersigned Warrant Certificates pursuant to ~~Section 2.4, Section 2.5, Section 2.8, and Section 3.2(b)~~Section 2.4, Section 2.5, Section 2.8, and Section 3.2(b).

(b)     The Warrant Agent is hereby authorized to countersign and deliver Warrant Certificates as required by ~~Section 2.1, Section 2.4, Section 2.5, Section 2.8, and Section 3.2(b)~~Section 2.1, Section 2.4, Section 2.5, Section 2.8, and Section 3.2(b).

(c)     The Warrant Certificates shall be executed in the company name and on behalf of the Company by the Chief Executive Officer or the Chief Financial Officer of the Company under company seal reproduced thereon and attested to by the Secretary or one of the Assistant Secretaries of the Company, either manually or by facsimile signature printed thereon. The Warrant Certificates shall be countersigned by the Warrant Agent, either manually or by facsimile signature, and shall not be valid for any purpose unless so countersigned.  In case any officer of the Company whose signature shall have been placed upon any of the Warrant Certificates shall cease to be such officer of the Company before countersignature by the Warrant Agent and issue and delivery thereof, such Warrant Certificates may, nevertheless, be countersigned by the Warrant Agent and issued and delivered with the same force and effect as though such person had not ceased to be such officer of the Company, and any Warrant Certificate may be signed on behalf of the Company by such person as, at the actual date of the execution of such Warrant Certificate, shall be a proper officer of the Company, although at the date of the execution of this Warrant Agreement any such person was not such officer.

**Section 2.4**     **Global Warrant Certificates**.

(a)     Any Global Warrant Certificate shall bear the legend substantially in the form set forth in ~~Exhibit A~~Exhibit A hereto (the "**Global Warrant Legend**").

(b)     So long as a Global Warrant Certificate is registered in the name of the Depositary or its nominee, members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Warrant Agreement with respect to the Warrants evidenced by such Global Warrant Certificate held on their behalf by the Depositary or its custodian, and the Depositary may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the absolute owner of such Warrants, and as the sole Warrantholder of such Warrant Certificate, for all purposes.  Accordingly, any such Agent Member's beneficial interest in such Warrants will be shown only on, and the transfer of such interest shall be effected only through, records maintained by the Depositary or its nominee or its Agent Members, and neither the Company nor the Warrant Agent shall have any responsibility or liability with respect to such records maintained by the Depositary or its nominee or its Agent Members.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as

between the Depositary and its Agent Members, the operation of customary practices governing the exercise of the rights of a holder of any security.

(c)     Any Beneficial Owner of Warrants evidenced by a Global Warrant Certificate registered in the name of the Depositary or its nominee shall, by acceptance of such beneficial interest, agree that transfers of beneficial interests in the Warrants evidenced by such Global Warrant Certificate may be effected only through the book-entry system maintained by the Depositary as the Warrantholder of such Global Warrant Certificate (or its agent), and that ownership of a beneficial interest in Warrants evidenced thereby shall be reflected solely in such book-entry form.

(d)     Transfers of a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be limited to transfers in whole, and not in part, to the Depositary, its successors, and their respective nominees except as set forth in ~~Section 2.4(e)~~Section 2.4(e).  Interests of Beneficial Owners in a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be transferred in accordance with the Applicable Procedures of the Depositary.

(e)     A Global Warrant Certificate registered in the name of the Depositary or its nominee shall be exchanged for Definitive Warrant Certificates only if the Depositary (i) has notified the Company that it is unwilling or unable to continue as or ceases to be a clearing agency registered under Section 17A of the Exchange Act and (ii) a successor to the Depositary registered as a clearing agency under Section 17A of the Exchange Act is not able to be appointed by the Company within 90 days or the Depositary is at any time unwilling or unable to continue as Depositary and a successor to the Depositary is not able to be appointed by the Company within 90 days.  In any such event, a Global Warrant Certificate registered in the name of the Depositary or its nominee shall be surrendered to the Warrant Agent for cancellation in accordance with ~~Section 3.12~~Section 3.12, and the Company shall execute, and the Warrant Agent shall countersign and deliver, to each Beneficial Owner identified by the Depositary, in exchange for such Beneficial Owner's beneficial interest in such Global Warrant Certificate, Definitive Warrant Certificates evidencing, in the aggregate, the number of Warrants theretofore represented by such Global Warrant Certificate with respect to such Beneficial Owner's respective beneficial interest.  Any Definitive Warrant Certificate delivered in exchange for an interest in a Global Warrant Certificate pursuant to this ~~Section 2.4(e)~~Section 2.4(e) shall not bear the Global Warrant Legend.  Interests in any Global Warrant Certificate may not be exchanged for Definitive Warrant Certificates other than as provided in this ~~Section 2.4(e)~~Section 2.4(e).

(f)     The Warrantholder of a Global Warrant Certificate registered in the name of the Depositary or its nominee may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Warrantholder of a Warrant Certificate is entitled to take under this Warrant Agreement or such Global Warrant Certificate.

(g)     Each Global Warrant Certificate will evidence such of the outstanding Warrants as will be specified therein and each shall provide that it evidences the aggregate number of outstanding Warrants from time to time endorsed thereon and that the aggregate

number of outstanding Warrants evidenced thereby may from time to time be reduced to reflect exercises.  Any endorsement of a Global Warrant Certificate to reflect the amount of any decrease in the aggregate number of outstanding Warrants evidenced thereby will be made by the Warrant Agent in accordance with the Applicable Procedures as required by ~~Section 3.2(b)~~Section 3.2(b).

(h)    The Company initially appoints DTC to act as Depositary with respect to the Global Warrant Certificates.

(i)    Every Warrant Certificate authenticated and delivered in exchange for, or in lieu of, a Global Warrant Certificate or any portion thereof, pursuant to this ~~Section 2.4, Section 2.5(a) or Section 2.8~~Section 2.4, Section 2.5(a) or Section 2.8, shall be authenticated and delivered in the form of, and shall be, a Global Warrant Certificate, and a Global Warrant Certificate may not be exchanged for a Definitive Warrant Certificate, in each case, other than as provided in ~~Section 2.4(e)~~Section 2.4(e).  Whenever any provision herein refers to issuance by the Company and countersignature and delivery by the Warrant Agent of a new Warrant Certificate in exchange for the portion of a surrendered Warrant Certificate that has not been exercised, in lieu of the surrender of any Global Warrant Certificate and the issuance, countersignature and delivery of a new Global Warrant Certificate in exchange therefor, the Warrant Agent may endorse such Global Warrant Certificate to reflect a reduction in the number of Warrants evidenced thereby in the amount of Warrants so evidenced that have been so exercised.

(j)    At such time as all Warrants evidenced by a particular Global Warrant Certificate have been exercised or expired in whole and not in part, such Global Warrant Certificate shall, if not in custody of the Warrant Agent, be surrendered to or retained by the Warrant Agent for cancellation in accordance with ~~Section 3.12~~Section 3.12.

### Section 2.5    Registration, Transfer, Exchange and Substitution.

(a)    The Warrant Agent will maintain an office (the "**Corporate Agency Office**") in the United States of America, where Warrant Certificates may be surrendered for registration of transfer or exchange and where Warrant Certificates may be surrendered for exercise of Warrants evidenced thereby, which office is 6201 15th Avenue, Brooklyn, NY 11219 on the Closing Date.  The Warrant Agent will give prompt written notice to all Warrantholders of any change in the location of such office.

(b)    The Warrant Certificates evidencing the Warrants shall be issued in registered form only.  The Company shall cause to be kept at the office of the Warrant Agent designated for such purpose a warrant register (the "**Warrant Register**") in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by Law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates as herein provided.

(c)    Upon surrender for registration of transfer of any Warrant Certificate at the Corporate Agency Office, the Company shall execute, and the Warrant Agent shall

countersign and deliver, in the name of the designated transferee or transferees, one or more new Warrant Certificates evidencing a like aggregate number of Warrants.

(d)     At the option of the Warrantholder, Warrant Certificates may be exchanged at the office of the Warrant Agent upon payment of the charges hereinafter provided for other Warrant Certificates evidencing a like aggregate number of Warrants.  Whenever any Warrant Certificates are so surrendered for exchange, the Company shall execute, and the Warrant Agent shall countersign and deliver, the Warrant Certificates of the same tenor and evidencing the same number of Warrants as evidenced by the Warrant Certificates surrendered by the Warrantholder making the exchange.

(e)     All Warrant Certificates issued upon any registration of transfer or exchange of, or in lieu of, Warrant Certificates shall be the valid obligations of the Company, evidencing the same obligations, and entitled to the same benefits under this Warrant Agreement, as the Warrant Certificates surrendered for such registration of transfer or exchange or substitution.

(f)     Every Warrant Certificate surrendered for registration of transfer or exchange shall (if so required by the Company or the Warrant Agent) be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Company and the Warrant Agent, duly executed by the Warrantholder thereof or his attorney duly authorized in writing.

(g)     No service charge shall be made for any registration of transfer or exchange of Warrant Certificates; _provided_, _however_, to the extent provided in the proviso to Section 3.11Section 3.11, the Company may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Warrant Certificates, and may subject any such transfer to the payment of unpaid withholding taxes (if any) attributable to the transferor Warrantholder as and to the extent provided in Section 3.13.

(h)     The Warrant Agent shall, upon request of the Company from time to time, deliver to the Company such reports of registered ownership of the Warrants and such records of transactions with respect to the Warrants and the Common Shares as the Company may request.  The Warrant Agent shall also make available to the Company for inspection by the Company's agents or employees, from time to time as the Company may request, such original books of accounts and records maintained by the Warrant Agent in connection with the issuance and exercise of Warrants hereunder, such inspections to occur at the Corporate Agency Office during normal business hours.

(i)     The Warrant Agent shall keep copies of this Warrant Agreement and any notices given to Warrantholders hereunder available for inspection by the Warrantholders during normal business hours at the Corporate Agency Office.  The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agency may request.

14

(j)      Transfers of the Warrant Certificates evidencing Warrants shall be subject only to the terms of this Warrant Agreement (including without limitation any terms set forth in Section 2.9 or on the relevant Warrant Certificate) and applicable securities Laws.  The Warrant Agent shall register the transfer, from time to time, of any outstanding Warrant Certificates evidencing Warrants upon the Warrant Register, upon delivery of a duly executed assignment, in the form attached hereto as ~~Exhibit A~~Exhibit A, and accompanied by appropriate instructions for transfer.  No such transfer shall be effected until, and the transferee shall succeed to the rights of the holder thereof only upon, final acceptance and registration of the transfer in the Warrant Register by the Warrant Agent.  Prior to the registration of any transfer of a Warrant Certificate evidencing a Warrant as provided herein, the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent may treat the Person in whose name such Warrant Certificate is registered as the owner thereof and of the Warrants evidenced thereby for all purposes, notwithstanding any notice to the contrary.   Subject to ~~Section  3.11~~Section 3.11, no service charge, tax or governmental payment shall be required of any transferor or transferee in connection with any such transfer or registration of transfer.  A party requesting transfer of a Warrant Certificate evidencing a Warrant must provide reasonable and customary evidence of authority if requested by the Warrant Agent.

**Section 2.6      Cancellation of the Warrants**.  Any Warrants outstanding as of the Expiration Time shall be automatically cancelled without any further action on the part of the Warrant Agent or any other Person.

**Section 2.7      CUSIP Numbers**.  In issuing the Warrants, the Company will use a "CUSIP" number.  The Warrant Agent will use CUSIP numbers in notices to Warrantholders.  The Company will promptly notify the Warrant Agent in writing of any change in the CUSIP numbers.

**Section 2.8      Loss or Mutilation**.

(a)      If (i) any mutilated Warrant Certificate is surrendered to the Warrant Agent or (ii) both (A) there shall be delivered to the Company and the Warrant Agent (x) a claim by a Warrantholder as to the destruction, loss or wrongful taking of any Warrant Certificate of such Warrantholder and a request thereby for a new replacement Warrant Certificate, and (y) such indemnity bond as may be required by them to save each of them and any agent of either of them harmless and (B) such other reasonable requirements as may be imposed by the Company as permitted by Section 8-405 of the Uniform Commercial Code have been satisfied, then, in the absence of notice to the Company or the Warrant Agent that such Warrant Certificate has been acquired by a "protected purchaser" within the meaning of Section 8-405 of the Uniform Commercial Code, the Company shall execute and upon its written request the Warrant Agent shall countersign and deliver to the registered Warrantholder of the lost, wrongfully taken, destroyed or mutilated Warrant Certificate, in exchange therefore or in lieu thereof, a new Warrant Certificate of the same tenor and for a like aggregate number of Warrants and of the same class.

(b)      Upon the issuance of any new Warrant Certificate under this ~~Section 2.8~~Section 2.8, the Company may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and other reasonable

expenses (including the reasonable fees and expenses of the Warrant Agent and of counsel to the Company) in connection therewith.

(c)     Every new Warrant Certificate executed and delivered pursuant to this ~~Section 2.8~~Section 2.8 in lieu of any lost, wrongfully taken or destroyed Warrant Certificate shall constitute an additional contractual obligation of the Company, whether or not the allegedly lost, wrongfully taken or destroyed Warrant Certificate shall be at any time enforceable by anyone, and shall be entitled to the benefits of this Warrant Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.

(d)     The provisions of this ~~Section  2.8~~Section 2.8 are exclusive and shall preclude (to the extent lawful) all other rights or remedies with respect to the replacement of mutilated, lost, wrongfully taken or destroyed Warrant Certificates.

Section 2.9    **Transfer Restrictions**.

(a)     [Notwithstanding anything to the contrary in this Warrant Agreement, no Warrantholder or Beneficial Owner shall Transfer any Warrant to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion).]¹³

**ARTICLE 3**

**EXERCISE AND SETTLEMENT OF WARRANTS**

Section 3.1    **Right to Acquire Common Shares Upon Exercise**.   Each Warrant Certificate shall, when countersigned by the Warrant Agent, entitle the Warrantholder thereof, subject to the provisions thereof and of this Warrant Agreement, to acquire from the Company, for each Warrant evidenced thereby, one Common Share at the Exercise Price, subject to adjustment as provided in this Warrant Agreement.   The Exercise Price, and the number of Common Shares obtainable upon exercise of each Warrant, shall be adjusted from time to time as required by ~~Article 4~~Article 4.

Section 3.2    **Exercise Procedures for Warrants**.

(a)     In order to exercise all or any of the Warrants represented by a Warrant Certificate, the Warrantholder thereof must:

(i)     (x) in the case of a Global Warrant Certificate, provide to the Warrant Agent at the Corporate Agency Office a duly completed and executed Exercise Notice as to the number of Warrants being exercised and, if applicable, whether Cashless Settlement is being elected with respect thereto, and deliver such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with

---

¹³  NTD: To be conformed with Section 9.1(c) (*other than* the '40 Act prong) of the final version of the LLC Agreement.

16

the Applicable Procedures and otherwise comply with the Applicable Procedures in respect of the exercise of such Warrants or (y) in the case of a Definitive Warrant Certificate, at the Corporate Agency Office (A) surrender to the Warrant Agent the Warrant Certificate evidencing such Warrants and (B) deliver to the Warrant Agent a duly completed and executed Exercise Notice as to the Warrantholder's election to exercise the number of the Warrants specified therein and, if applicable, whether Cashless Settlement is being elected with respect thereto, duly executed by such Warrantholder;

(ii)     pay to the Warrant Agent an amount equal to (x) those applicable taxes and charges required to be paid by the Warrantholder, if any, pursuant to ~~Section 3.11~~Section 3.11 and Section 3.13, prior to, or concurrently with, exercise of such Warrants and (y) except in the case of a Cashless Settlement, the aggregate of the Exercise Price in respect of each Common Share into which such Warrants are exercisable, in case of (x) and (y), by wire transfer in immediately available funds, to the account:

> JPMORGAN CHASE
> ABA#: 021000021
> ACCT NAME: AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC
> ACCT#: 530354616
> Ref: AST as agent for [~~Revlon Group Holdings LLC~~]

of the Warrant Agent at JPMorgan Chase Bank, N.A., or such other account of the Warrant Agent at such banking institution as the Warrant Agent shall have given notice to the Warrantholders in accordance with ~~Section 6.14~~Section 6.14; and

(iii)     in the case of a Global Warrant Certificate, the exercising Beneficial Owner must, if such Warrantholder (in the case of a Definitive Warrant Certificate) or Beneficial Owner (in the case of a Global Warrant Certificate) is not already party to the LLC Agreement, deliver a duly completed and executed Joinder pursuant to which such Warrantholder (in the case of a Definitive Warrant Certificate) or Beneficial Owner (in the case of a Global Warrant Certificate) agrees to be bound by the LLC Agreement and acknowledges that all Common Shares issued upon such exercise of such Warrants shall be subject to the LLC Agreement, to the Company (with a copy concurrently delivered to the Warrant Agent) prior to, or concurrently with, delivering an Exercise Notice in accordance with Section 3.2(a)(i).

(b)     If fewer than all the Warrants represented by a Warrant Certificate are exercised, (i) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Warrant Agent shall endorse the "Schedule of Decreases of Warrants" attached to such Global Warrant Certificate to reflect the Warrants being exercised and (ii) in the case of exercise of Warrants evidenced by a Definitive Warrant Certificate, such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and for the number of Warrants which were not exercised shall be executed by the Company.  The Warrant Agent shall countersign the new Definitive Warrant Certificate, registered in such name or names, subject to the provisions of ~~Section 2.5~~Section 2.5 regarding registration of transfer and

~~Section 3.11~~Section 3.11 regarding payment of governmental charges in respect thereof, as may be directed in writing by the Warrantholder, and shall deliver the new Definitive Warrant Certificate to the Person or Persons in whose name such new Warrant Certificate is so registered. The Company, whenever required by the Warrant Agent, will supply the Warrant Agent with Definitive Warrant Certificates duly executed on behalf of the Company for such purpose.

(c)    Upon due exercise of Warrants evidenced by any Warrant Certificate in conformity with the foregoing provisions of ~~Section 3.2~~Section 3.2(a), the Warrant Agent shall, when actions specified in ~~Section 3.2~~Section 3.2(a)(i) have been effected and any payment specified in ~~Section 3.2~~Section 3.2(a)(ii) is received, deliver to the Company the Exercise Notice received pursuant to ~~Section 3.2~~Section 3.2(a)(i), deliver or deposit all funds received as instructed in writing by the Company and advise the Company by telephone at the end of such day of the amount of funds so deposited to its account.

(d)    The date on which all of the requirements for exercise set forth in this ~~Section 3.2~~Section 3.2 in respect of a Warrant have been satisfied is the "**Exercise Date**" with respect to such Warrant (subject to ~~Section 3.2(h)~~Section 3.2(h)).

(e)    Subject to ~~Section 3.2(g) and Section 3.2(h)~~Section 3.2(g) and Section 3.2(h), any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and enforceable in accordance with its terms.

(f)    All funds received by the Warrant Agent under this Warrant Agreement that are to be distributed or applied by the Warrant Agent in the performance of services in accordance with this Warrant Agreement (the "**Funds**") shall be held by the Warrant Agent as agent for the Company and deposited in one or more bank accounts to be maintained by the Warrant Agent in its name as agent for the Company (the "**Funds Account**").  Until paid pursuant to the terms of this Warrant Agreement, the Warrant Agent will hold the Funds through the Funds Account in deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by S&P (LT Local Issuer Credit Rating), Moody's (Long Term Rating) and Fitch Ratings, Inc. (LT Issuer Default Rating), each as reported by Bloomberg Finance L.P. The Warrant Agent shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by the Warrant Agent in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party.  The Warrant Agent may from time to time receive interest, dividends or other earnings in connection with such deposits.

(g)    Prior to the delivery of any Common Shares upon exercise of a Warrant, the Company shall be obligated to comply with all applicable Laws which require action to be taken by the Company in connection with such delivery.

(h)    Notwithstanding any other provision of this Warrant Agreement, if the exercise of any Warrant is to be made in connection with a Liquidity Event, such exercise may, at the election of the Exercising Owner, be conditioned upon consummation of such transaction or event, in which case such exercise shall not be deemed effective until the consummation of such transaction or event.

(i)     If a Liquidity Event occurs in which the consideration to be paid to holders of Common Shares consists solely of cash in an amount per Common Share that exceeds the Exercise Price then in effect, the Warrants that are otherwise unexercised immediately prior to the effectiveness of such Liquidity Event shall be deemed to be automatically exercised at such time on a Cashless Settlement basis and the Holders of such Warrants shall be entitled to receive for each such Warrant an amount in cash equal to the cash amount per Common Share to be paid to holders of Common Shares in such Liquidity Event *less* the Exercise Price per Common Share then in effect.

(j)     The Warrant Agent shall forward funds deposited in the Funds Account in a given week by the fifth Business Day of the following week by wire transfer to an account designated by the Company.

**Section 3.3     Common Shares Issuable**.  The number of Common Shares "obtainable upon exercise" of Warrants at any time shall be the number of Common Shares into which such Warrants are then exercisable.  The number of Common Shares "into which each Warrant is exercisable" shall be one Common Share, subject to adjustment as provided in ~~Article 4~~Article 4.

**Section 3.4     Settlement of Warrants**.

(a)     Warrants may be exercised using Cash Settlement or Cashless Settlement in accordance with this ~~Article 3~~Article 3 at any time prior to the Expiration Time, either in full or from time to time in part.

(b)     Cash Settlement shall apply to each Warrant unless the Exercising Owner elects for Cashless Settlement to apply upon exercise of such Warrant.  Such election shall be made in the Exercise Notice for such Warrant.

(c)     If Cash Settlement applies to the exercise of a Warrant, upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner the Cash Settlement Share Amount, together with cash in lieu of any fractional Common Share as provided in ~~Section 3.6~~Section 3.6, on the Settlement Date.

(d)     If Cashless Settlement applies to the exercise of a Warrant:

(i)     The Warrantholder must (A) expressly state in its Exercise Notice its desire to effect a Cashless Settlement and (B) must provide the Exercise Notice to the Warrant Agent at the Corporate Agency Office.

(ii)     Upon the proper and valid exercise thereof by an Exercising Owner, the Company shall cause to be delivered to the Exercising Owner the Cashless Settlement Share Amount on the Settlement Date, together with cash in lieu of any fractional Common Share, as provided in ~~Section 3.6~~Section 3.6.

(iii)     Upon written request from any Exercising Owner in connection with a Cashless Settlement for which the Fair Market Value is determined pursuant to clause (iii) of the definition thereof, the Company shall notify such Exercising Owner of the

19

Board's determination of such Fair Market Value and provide a brief explanation of the methodology of such determination (without any obligation to disclose any confidential or proprietary information) reasonably promptly after the later of the receipt of such request by the Company and the Board's determination of such Fair Market Value, but in any event within 30 days of such later date.

**Section 3.5    Delivery of Common Shares**.

(a)    In connection with the exercise of Warrants, the Warrant Agent shall:

(i)    examine all Exercise Notices and all other documents delivered to it to ascertain whether, on their face, such Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)    where an Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(iv)    advise the Company with respect to an exercise, as promptly as practicable following the satisfaction of each of the applicable procedures for exercise set forth in ~~Section 3.2(a)~~Section 3.2(a) of (v) the receipt of such Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (w) the number of Common Shares to be delivered by the Company, (x) the instructions with respect to issuance of the Common Shares, (y) the number of Persons who will become holders of record of the Company (who were not previously holders of record) as a result of receiving Common Shares upon exercise of the Warrants and (z) such other information as the Company shall reasonably require;

(v)    promptly deposit in the Funds Account all Funds received in payment of the applicable Exercise Price in connection with any Cash Settlement of Warrants;

(vi)    provide to the Company, upon the Company's request, the number of Warrants previously exercised, the number of Common Shares issued in connection with such exercises and the number of remaining outstanding Warrants; and

(vii)    provide to the Company, upon the Company's request, any Exercise Notices delivered pursuant to ~~Section 3.2(a)~~Section 3.2(a) and any documents delivered pursuant to Section 3.5(a)(i).

(b)    With respect to each properly exercised Warrant evidenced by any Warrant Certificate in accordance with this Warrant Agreement, (x) in the case of exercise of Warrants evidenced by a Global Warrant Certificate, the Company shall deliver or cause to be

delivered to the Recipient in accordance with the Applicable Procedures Common Shares in book-entry form to be so held through the facilities of DTC in an amount equal to, or, if the Common Shares may not then be held in book-entry form through the facilities of DTC, duly executed certificates representing, or (y) in the case of exercise of Warrants evidenced by Definitive Warrant Certificates, deliver or cause to be delivered to the Recipient Common Shares in book-entry form on the Common Share registrar maintained by the Warrant Agent for such purpose, or, at the election of the Warrantholder, duly executed certificates representing, in case of (x) or (y), the aggregate number of Common Shares issuable upon such exercise (based upon the aggregate number of Warrants so exercised) (A) unless clause (B) is applicable, for the benefit and in the name of the Exercising Owner or (B) for the benefit and in the name of such Person (other than the Exercising Owner) designated by the Exercising Owner submitting the applicable Exercise Notice (the "**Recipient**").  The Person on whose behalf and in whose name any Common Shares are registered shall for all purposes be deemed to have become the holder of record of such Common Shares as of the Close of Business on the applicable Exercise Date.  The Company covenants that all Common Shares which may be issued upon exercise of Warrants will be, upon payment of the Exercise Price (if applicable) and issuance thereof, fully paid and nonassessable, free of preemptive rights and (except as specified in the proviso to ~~Section 3.11~~Section 3.11) free from all documentary, stamp or similar issue or transfer taxes in respect of the issuance thereof, and all liens, charges and security interests with respect to the issuance thereof.

(c)     Promptly after the Warrant Agent has taken the action required by this ~~Section 3.5~~Section 3.5 (or at such later time as may be mutually agreeable to the Company and the Warrant Agent), the Warrant Agent shall account to the Company with respect to the consummation of any exercise of any Warrants.

Section 3.6     **No Fractional Common Shares to Be Issued**.

(a)     Notwithstanding anything to the contrary in this Warrant Agreement, the Company shall not be required to issue any fraction of a Common Share upon exercise of any Warrants.

(b)     If any fraction of a Common Share would, except for the provisions of this ~~Section 3.6~~Section 3.6, be issuable on the exercise of any Warrants, the Company shall make a cash payment in lieu of issuing such fractional Common Share equal to the Fair Market Value of one Common Share, as determined on the date the Warrant is presented for exercise, <u>multiplied by</u> such fraction, rounded to the nearest whole cent.  All Warrants exercised by a Warrantholder on the same Exercise Date shall be aggregated for purposes of determining the number of Common Shares to be delivered pursuant to ~~Section 3.5(b)~~Section 3.5(b).

(c)     Each Warrantholder, by its acceptance of an interest in a Warrant, expressly waives its right to any fraction of a Common Share upon its exercise of such Warrant.

Section 3.7     **Acquisition of Warrants by Company**.  The Company shall have the right, except as limited by Law, to purchase or otherwise to acquire one or more Warrants at

such times, in such manner and for such consideration as agreed by the Company and the applicable Warrantholder.

**Section 3.8    Validity of Exercise**.    All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be determined by the Company in good faith in accordance with the terms of this Warrant Agreement and the Warrants, which determination, absent manifest error, shall be final and binding with respect to the Warrant Agent.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's gross negligence, willful misconduct, bad faith or material breach of this Warrant Agreement (as determined by a court of competent jurisdiction in a final non-appealable judgment) and shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of, such determination by the Company. The Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Exercise Notices with regard to any particular exercise of Warrants.

**Section 3.9    Certain Calculations**.

(a)    The Warrant Agent shall be responsible for performing all calculations, except for the case of Cashless Settlements, required in connection with the exercise and settlement of the Warrants as described in this ~~Article 3~~Article 3.  In connection therewith, the Warrant Agent shall provide prompt written notice to the Company, in accordance with ~~Section 3.5(a)(iv)~~Section 3.5(a)(iv), of the number of Common Shares deliverable upon exercise and settlement of Warrants.    The Company shall be responsible for all calculations and determinations required in connection with any Cashless Settlements and shall provide written notification to the Warrant Agent of the Cashless Settlement Share Amount to be issued on the Settlement Date for any Cashless Settlement.  The Warrant Agent shall not be responsible for performing the calculations set forth in ~~Article 4~~Article 4.

(b)    The Warrant Agent shall not be accountable with respect to the validity or value of any Common Shares that may at any time be issued or delivered upon the exercise of any Warrant, and it makes no representation with respect thereto.  The Warrant Agent shall not be responsible, to the extent not arising from the Warrant Agent's gross negligence, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for any failure of the Company to issue, transfer or deliver any Common Shares, or to comply materially with any of the covenants of the Company contained in this ~~Article 3~~Article 3 of this Warrant Agreement.

**Section 3.10    Reservation and Listing of Common Shares**.  The Company will at all times reserve and keep available, out of its authorized but unissued Common Shares, solely for the purpose of providing for the exercise of the Warrants, the aggregate number of Common Shares then issuable upon exercise of the Warrants at any time.  The Company will procure, at its sole expense, the listing of the Common Shares issued upon exercise of the Warrants on all National Securities Exchanges on which the Common Shares are then listed.  The Company shall take all action reasonably necessary to ensure that the Common Shares will be issued without violation of any applicable Law or regulation or of any requirement of any securities exchange on which the Common Shares are listed or traded.

**Section 3.11  Charges, Taxes and Expenses**.  Issuance of the Warrant Certificates evidencing Warrants and issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any documentary, stamp or similar issue or transfer tax or other incidental expense in respect of the issuance thereof, all of which taxes and expenses shall be paid by the Company (excluding, for the avoidance of doubt, any income or withholding taxes); provided, however, that the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of Warrant Certificates evidencing such Warrants or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property in a name or to any Person other than the Warrantholder of the Warrant Certificate surrendered upon exercise or transfer, and the Company shall not be required to issue or deliver Warrant Certificates or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property, as applicable, unless and until the Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have reasonably demonstrated that such tax has been paid.

**Section 3.12  Cancellation of Warrant Certificates**.  Any Definitive Warrant Certificate surrendered for exercise shall, if surrendered to the Company, be delivered to the Warrant Agent.  All Warrant Certificates surrendered or delivered to or received by the Warrant Agent for cancellation pursuant to this ~~Section 3.12 or Section 2.4(e)~~Section 3.12 or Section 2.4(e) or Section 2.4(j) shall be promptly cancelled by the Warrant Agent and shall not be reissued by the Company.  The Warrant Agent shall destroy any such cancelled Warrant Certificates and deliver its certificate of destruction to the Company, unless the Company shall otherwise direct.

**Section 3.13  Withholding and Reporting Requirements**.  The Company shall comply with all applicable tax withholding and reporting requirements imposed by any governmental authority with respect to the Warrants and this Warrant Agreement, and all distributions, dividends or other payments requiring withholding under applicable law, including, as applicable, deemed distributions or dividends pursuant to the Warrants and any payment of cash in lieu of Common Shares payable in connection with the exercise of a Warrant, will be subject to applicable withholding and reporting requirements.  Notwithstanding any provision hereof to the contrary, each of the Company and the Warrant Agent will be authorized to, at their discretion, (a) take any actions that may be reasonably necessary or appropriate to comply with such withholding and reporting requirements, (b) apply any cash amount otherwise deliverable to a Warrantholder (whether pursuant to this Warrant Agreement or otherwise) to pay (or, in the case of the Company, reimburse the Company for) withholding taxes attributable to such Warrantholder, (c) liquidate a portion of any non-cash amount (including Common Shares) otherwise deliverable to a Warrantholder (whether pursuant to this Warrant Agreement or otherwise) to generate sufficient funds to pay (or, in the case of the Company, reimburse the Company for) withholding taxes attributable to such Warrantholder, (d) require reimbursement from any Warrantholder to the extent any withholding is required in respect of such Warrantholder in the absence of any cash or property described in clauses (b) or (c), or (e) establish any other mechanisms it believes are reasonably necessary and appropriate, including requiring Warrantholders to (x) submit appropriate tax and withholding certifications (such as Internal Revenue Service Forms W-9 and the appropriate Internal Revenue Service Forms W-8, as applicable) or any other documentation reasonably requested to comply with any withholding under applicable law or (y) requiring Warrantholders to promptly pay to the Company in cash

23

any withholding tax amount which is or was required to be paid under applicable law with respect to such Warrantholder as a condition of receiving the benefit of any adjustment as provided in this Warrant Agreement.

## ARTICLE 4

## ADJUSTMENTS

**Section 4.1    Adjustments and Other Rights**.  The Exercise Price and the number of Common Shares for which each Warrant is exercisable pursuant to ~~Article 3~~Article 3 of this Warrant Agreement shall be subject to adjustment from time to time in accordance with this ~~Article 4~~Article 4; provided that (i) no single event shall be subject to adjustment under more than one subsection of this ~~Article 4~~Article 4 so as to result in duplication and (ii) if any single event would otherwise require adjustment of the Exercise Price pursuant to more than one such subsection, the adjustment that provides the highest value relative to the rights and interests of each Warrantholder shall be made.

**Section 4.2    Common Share Dividends, Distributions, Splits, Subdivisions, Reclassifications or Combinations**.  If the Company shall (i) declare a dividend or make a distribution on its Common Shares in Common Shares, (ii) split, subdivide, recapitalize, restructure or reclassify the outstanding Common Shares into a greater number of Common Shares or (iii) combine, recapitalize, restructure or reclassify the outstanding Common Shares into a smaller number of Common Shares, in each case other than upon a transaction to which ~~Section 4.5 or Section 4.6~~Section 4.5 or Section 4.6 applies, the number of Common Shares issuable upon exercise of a Warrant at the time of the Record Date for such dividend or distribution or the effective date of such split, subdivision, combination, recapitalization, restructuring or reclassification shall be proportionately adjusted so that the Warrantholder, after such date, shall be entitled to purchase the number of Common Shares which such Warrantholder would have owned or been entitled to receive on such date had such Warrant been exercised immediately prior to such date.  In such event, the Exercise Price in effect at the time of the Record Date for such dividend or distribution or the effective date of such split, subdivision, combination, recapitalization, restructuring or reclassification shall be adjusted to the number obtained by dividing (x) the product of (i) the number of Common Shares issuable upon the exercise of a Warrant before such adjustment and (ii) the Exercise Price in effect immediately prior to the Record Date or effective date, as the case may be, for such dividend, distribution, split, subdivision, combination, recapitalization, restructuring or reclassification giving rise to this adjustment by (y) the new number of Common Shares issuable upon exercise of a Warrant determined pursuant to the immediately preceding sentence.

**Section 4.3    Other Distributions**.  In case the Company shall fix a Record Date for the making of a distribution to all holders of its Common Shares of (a) limited liability company interests of any class other than Common Shares, (b) evidence of indebtedness of the Company or any Subsidiary, (c) other securities, assets or cash (excluding dividends or distributions referred to in ~~Section 4.2~~Section 4.2) or (d) rights or warrants (other than in connection with the adoption of a stockholder rights plan (or equivalent for entity types other than corporations)), in each such case, the Exercise Price in effect prior thereto shall be reduced immediately thereafter to the price obtained by multiplying the Exercise Price in effect immediately prior thereto by the

fraction resulting from dividing (x) an amount equal to the difference resulting from (i) the number of Common Shares outstanding on such Record Date <u>multiplied by</u> the Fair Market Value of the Common Shares on the Business Day immediately prior to such Record Date less (ii) the Fair Market Value of said limited liability company interests, evidences of indebtedness, assets, cash, rights or warrants to be so distributed in the aggregate to all Common Shares outstanding on such Record Date by (y) the number of Common Shares outstanding on such Record Date <u>multiplied by</u> the Fair Market Value of the Common Shares on the trading date immediately prior to such Record Date.  Such adjustment shall be made successively whenever such a Record Date is fixed.  In such event, the number of Common Shares issuable upon the exercise of a Warrant shall be increased to the number obtained by dividing (x) the product of (i) the number of Common Shares issuable upon the exercise of a Warrant before such adjustment and (ii) the Exercise Price in effect immediately prior to the Record Date for the distribution giving rise to this adjustment by (y) the new Exercise Price determined in accordance with the second preceding sentence.  In the event that such distribution is not so made, the Exercise Price and the number of Common Shares issuable upon exercise of a Warrant then in effect shall be readjusted, effective as of the date when the Board determines not to distribute such limited liability company interests, evidences of indebtedness, assets, cash, rights or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Common Shares that would then be issuable upon exercise of a Warrant if such Record Date had not been fixed.

**Section 4.4    <u>Dissolution, Total Liquidation or Winding Up</u>**.  If at any time there is a voluntary or involuntary dissolution, total liquidation or winding-up of the Company, then the Company shall provide each Warrantholder with written notice of the date on which such dissolution, liquidation or winding-up shall take place (and, in any event, not less than 30 days before any date set for definitive action).  Such notice shall also specify the date as of which the record holders of Common Shares shall be entitled to exchange their Common Shares for securities, money or other property deliverable upon such dissolution, liquidation or winding-up, as the case may be.  On such date, each Warrantholder shall be entitled to receive, upon surrender of its Warrant for each Common Share then receivable upon exercise of such Warrant, the cash, securities or other property, less the Exercise Price for such Warrant then in effect, that such Warrantholder would have been entitled to receive in respect of such Common Share had such Warrant been exercised immediately prior to such dissolution, liquidation or winding-up.  Upon receipt of such cash, securities or other property, any and all rights of such Warrantholder to exercise such Warrant shall terminate in their entirety.  If the cash, securities or other property distributable in respect of such Common Share in the dissolution, liquidation or winding-up has a Fair Market Value which is less than the Exercise Price for such Warrant then in effect, no such cash, securities or other property shall be delivered to such Warrantholder in respect of such Warrants and such Warrant shall terminate and be of no further force or effect upon the dissolution, liquidation or winding-up.

**Section 4.5    <u>Successor upon Consolidation, Merger and Sale of Assets</u>**.

(a)    Other than with respect to a Liquidity Event, the Company may only consolidate or merge with any other Person (a "**Fundamental Equity Change**"), so long as the Company is the surviving Person, or, in the event that the Company is not the surviving Person:

(i)    the successor to the Company assumes all of the Company's obligations under this Warrant Agreement and the Warrants; and

(ii)    the successor to the Company provides written notice of such assumption to the Warrant Agent.

(b)    In the case of any Fundamental Equity Change other than a Liquidity Event, the successor entity shall succeed to and be substituted for the Company with the same effect as if it had been named herein as the Company; provided, however, such successor entity shall provide the Warrant Agent with any such identifying company information as reasonably required by the Warrant Agent.  Such successor entity thereupon may cause to be signed, and may issue any or all of the Warrants issuable pursuant to this Warrant Agreement which theretofore shall not have been signed by the Company; and, upon the order of such successor entity, instead of the Company, and subject to all the terms, conditions and limitations in this Warrant Agreement prescribed, the Warrant Agent shall authenticate and deliver, as applicable, any Warrants that previously shall have been signed and delivered by the officers of the Company to the Warrant Agent for authentication, and any Warrants which such successor entity thereafter shall cause to be signed and delivered to the Warrant Agent for such purpose.

(c)    If a Liquidity Event is consummated prior to the Expiration Time, then any Warrants that are unexercised prior to the consummation of such Liquidity Event shall be deemed to have expired worthless and will be cancelled for no further consideration.

**Section 4.6    Adjustment upon Reorganization Event**.

(a)    If there occurs any Fundamental Equity Change or any recapitalization, reorganization, consolidation, reclassification, change in the outstanding Common Shares (other than changes resulting from a subdivision or combination to which ~~Section 4.2~~Section 4.2 applies), statutory share exchange, statutory unit exchange or other transaction (in each case, other than a Liquidity Event), in each case as a result of which the Common Shares would be converted into, changed into or exchanged for stock, other securities, other property or assets (including cash or any combination thereof) (each such event a "**Reorganization Event**"), then following the effective time of the Reorganization Event, the right to receive Common Shares upon exercise of a Warrant shall be changed to a right to receive, upon exercise of such Warrant, the kind and amount of shares of stock, units, other securities or other property or assets (including cash or any combination thereof) that a holder of the number of Common Shares for which one Warrant is exercisable immediately prior to such Reorganization Event would have owned or been entitled to receive in connection with such Reorganization Event (the "**Reference Property**", with a "**Unit of Reference Property**" meaning the kind and amount of Reference Property that a holder of one Common Share is entitled to receive).  In the event holders of Common Shares have the opportunity to elect the form of consideration to be received in a Reorganization Event, the type and amount of consideration into which the Warrants shall be exercisable from and after the effective time of such Reorganization Event shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Shares that have the right to make such election in such Reorganization Event.  The

26

Company hereby agrees not to become a party to any Reorganization Event unless its terms are consistent with this ~~Section 4.6~~Section 4.6.

(b)    At any time from, and including, the effective time of a Reorganization Event, the number of Common Shares that the Company would have been required to deliver upon exercise of the Warrants shall instead be deliverable in a corresponding number of Units of Reference Property and, in the case of Cashless Settlement, shall be determined based on the Fair Market Value of a Unit of Reference Property.

(c)    On or prior to the effective time of any Reorganization Event, the Company or the successor or purchasing Person, as the case may be, shall execute an amendment to this Warrant Agreement providing that the Warrants shall be exercisable for Units of Reference Property in accordance with the terms of this ~~Section 4.6~~Section 4.6.  If the Reference Property in connection with any Reorganization Event includes shares of stock, units or other securities and assets of a Person other than the successor or purchasing Person, as the case may be, in such Reorganization Event, then the Company shall cause such amendment to this Warrant Agreement to be executed by such other Person and such amendment shall contain such additional provisions to protect the interests of the Warrantholder (for the benefit of the Beneficial Owners under this Warrant Agreement) as the Board shall reasonably consider necessary by reason of the foregoing.  Any such amendment to this Warrant Agreement shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this ~~Article 4~~Article 4.  In the event the Company shall execute an amendment to this Warrant Agreement pursuant to this ~~Section 4.6~~Section 4.6, the Company shall promptly file with the Warrant Agent a certificate executed by a duly authorized officer of the Company briefly stating the reasons therefor, the kind or amount of cash, securities or property or assets that will comprise a Unit of Reference Property after the relevant Reorganization Event, any adjustment to be made with respect thereto and that all conditions precedent have been complied with.  The Company shall cause notice of the execution of the amendment to be mailed to the Warrantholder, at its address appearing on the Warrant Register, within five Business Days after execution thereof.

(d)    The above provisions of this ~~Section 4.6~~Section 4.6 shall similarly apply to successive Reorganization Events.

(e)    If this ~~Section 4.6~~Section 4.6 applies to any event or occurrence, no other provision of this ~~Article 4~~Article 4 shall apply to such event or occurrence (other than ~~Section 4.5~~Section 4.5).

Section 4.7    **Rounding of Calculations; Minimum Adjustments**.  All calculations under this ~~Article 4~~Article 4 shall be made to the nearest one-tenth (1/10th) of a cent or to the nearest one-hundredth (1/100th) of a share or unit (as applicable), as the case may be.  Any provision of this ~~Article 4~~Article 4 to the contrary notwithstanding, no adjustment in the Exercise Price or the number of Common Shares issuable upon the exercise of a Warrant shall be made if the amount of such adjustment would be less than $0.01 or one-tenth (1/10th) of a Common Share, respectively, but any such amount shall be carried forward and an adjustment with respect thereto shall be made at the time of and together with any subsequent adjustment which, together

with such amount and any other amount or amounts so carried forward, shall aggregate $0.01 or 1/10th of a Common Share, respectively, or more, subject in all cases to ~~Section 3.6~~Section 3.6.

**Section 4.8    Timing of Issuance of Additional Common Shares Upon Certain Adjustments**.  In any case in which the provisions of this ~~Article 4~~Article 4 shall require that an adjustment shall become effective immediately after a Record Date for an event, the Company may defer until the occurrence of such event (i) issuing to each Warrantholder of a Warrant exercised after such Record Date or date of such agreement and before the occurrence of such event, issuance or sale the additional Common Shares issuable upon such exercise by reason of the adjustment required by such Record Date or agreement over and above the Common Shares issuable upon such exercise before giving effect to such adjustment and (ii) paying to such Warrantholder any amount of cash in lieu of a fractional Common Share.

**Section 4.9    Statement Regarding Adjustments**.  Whenever the Exercise Price or the number of Common Shares issuable upon exercise of a Warrant shall be adjusted as provided in this ~~Article 4~~Article 4, the Company shall promptly, and in any event within three Business Days, file, at the principal office of the Company, a statement showing in reasonable detail the facts requiring such adjustment and the Exercise Price that shall be in effect and the number of Common Shares issuable upon exercise of a Warrant after such adjustment.  The Company shall also cause a copy of such statement to be delivered to each Warrantholder at the address appearing in the Company's records, and shall be available upon request to any Beneficial Owner.

**Section 4.10    Notice of Adjustment Event**.  In the event that (i) the Company shall propose to take any action of the type described in this ~~Article 4~~Article 4 or (ii) the Company fixes any Record Date for any event, the Company shall give notice to each Warrantholder, in the manner set forth in ~~Section 4.9~~Section 4.9, which notice shall specify the Record Date, if any, with respect to any such action and the approximate date on which such action is to take place.  Such notice shall also set forth the facts with respect thereto (including the material terms with respect to any contemplated transaction) and indicate the effect on the Exercise Price and the number, kind or class of shares, units or other securities or property which shall be deliverable upon exercise or exchange of a Warrant, if any.  Such notice shall be given at least 10 Business Days prior to the taking of such proposed action; _provided_ that notice of any Liquidity Event shall be given at least 21 days prior to the taking of such proposed action.  Failure to give such notice, or any defect therein, shall not affect the legality or validity of any such action.  Nothing herein shall prohibit the Warrantholders from exercising their Warrants during the 10 Business Day period commencing on the date of such notice (21 days in the case of a Liquidity Event).

**Section 4.11    Adjustment Rules**.  Any adjustments pursuant to this ~~Article 4~~Article 4 shall be made successively whenever an event referred to herein shall occur.  If an adjustment in the Exercise Price made hereunder would reduce the Exercise Price to an amount below the par value (if any) of the Common Shares, then such adjustment in the Exercise Price made hereunder shall reduce the Exercise Price to the par value (if any) of the Common Shares and then, so long as the Company shall have taken any company action which would, in the opinion of its counsel, be necessary in order that the Company may validly issue Common Shares at the Exercise Price

as so adjusted in accordance with its obligations under ~~Section 3.9~~Section 3.9, to such lower par value (if any) as may then be established.

**Section 4.12   Optional Tax Adjustment**.  The Company may at its option, at any time prior to the Expiration Time, increase the number of Common Shares into which each Warrant is exercisable, or decrease the Exercise Price for such Warrant, in addition to those changes otherwise required by this ~~Article 4~~Article 4, as deemed advisable by the Board, in order that any event treated for Federal income tax purposes as a dividend of stock or stock rights shall not be taxable to the recipients or that such tax shall be diminished.

**Section 4.13   Stockholder Rights Plans or Equivalent**.   If the Company has a stockholder rights plan (or equivalent for entity types other than corporations) in effect with respect to the Common Shares, upon exercise of a Warrant the applicable Exercising Owner shall be entitled to receive, in addition to the Common Shares, the rights under such stockholder rights plan (or equivalent for entity types other than corporations), subject to readjustment in the event of the expiration, termination or redemption of such rights.

# ARTICLE 5

## OTHER PROVISIONS RELATING TO RIGHTS OF WARRANTHOLDERS

**Section 5.1   No Rights as Unitholders**.  Nothing contained in this Warrant Agreement shall be construed as conferring upon any Person, by virtue in and of itself of holding a Warrant Certificate evidencing any Warrant or having a beneficial interest in a Warrant, the right to vote, receive any dividend or other distribution, receive notice of, or attend, any meeting of unitholders or otherwise exercise any rights whatsoever, in each case, as a unitholder of the Company to the extent such vote, dividend, giving of notice, meeting or other exercise of rights (or, if applicable, the relevant Record Date therefor) precedes the Close of Business on the Exercise Date with respect to the exercise of such Warrant.  No Warrantholder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrant Certificate held by such holder.

**Section 5.2   Modification/Amendment**.

(a)    This Warrant Agreement or the Warrants may be modified or amended by the Company and the Warrant Agent, without the consent of any Warrantholder, for the purposes of (i) curing any ambiguity or correcting or supplementing any defective provision contained in this Warrant Agreement or (ii) providing for the assumption of the Company's obligations pursuant to ~~Section 4.5~~Section 4.5; provided that, in each case, any such modification or amendment does not adversely affect the interests of the Warrantholders in any material respect.

(b)    This Warrant Agreement or the Warrants may be modified or amended, or noncompliance with any provision of the Warrant Agreement or the Warrants may be waived, only upon the written consent of the Required Warrantholders and the Company; provided, however, that any modification, amendment or waiver that adversely affects the interests of a Warrantholder disproportionately relative to any other Warrantholder (including any Beneficial Owner) in any material respect shall require the written consent of such Warrantholder so

29

affected; _provided_, _further_, no such modification, amendment or waiver may, without the written consent or the affirmative vote of each Warrantholder affected (A) change the Expiration Time to an earlier time or date; or (B) increase the Exercise Price or decrease the number of Common Shares for which a Warrant is exercisable (except as set forth in ~~Article 4~~Article 4) or (C) modify or amend Sections 5.4 or 5.5 hereof.  Any consent delivered by electronic means shall be deemed to constitute written consent.

(c)    Upon execution and delivery of any amendment pursuant to this ~~Section 5.2~~Section 5.2, such amendment shall be considered a part of this Warrant Agreement for all purposes and every Warrantholder holding a Warrant Certificate theretofore or thereafter countersigned and delivered hereunder shall be bound thereby.

(d)    In determining whether the Required Warrantholders have concurred in any direction, notice, waiver or consent, Warrants beneficially owned by the Company, any Subsidiary of the Company or any Affiliate of the Company or any Subsidiary of the Company, shall be considered as though not outstanding; _provided_ that, for the purposes of determining whether the Warrant Agent will be protected in conclusively relying on any such direction, notice, waiver or consent, only Warrants that a responsible officer of the Warrant Agent knows are so owned will be so disregarded.

Section 5.3    **Rights of Action**.  All rights of action against the Company in respect of this Warrant Agreement are vested in the Warrantholders, and any Warrantholder, without the consent of the Warrant Agent or any other Warrantholder, may, on such Warrantholder's own behalf and for such Warrantholder's own benefit, enforce and may institute and maintain any suit, action or proceeding against the Company suitable to enforce, or otherwise in respect of, such Warrantholder's right to exercise such Warrantholder's Warrants in the manner provided in this Warrant Agreement.

Section 5.4    **Issuance Obligation Remedies**.  Subject to Section 5.6(c), nothing in this Warrant Agreement shall limit the right of any Warrantholder to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance or injunctive relief with respect to the Company's violation of its obligations under this Warrant Agreement, including, without limitation, any failure by the Company to timely issue Common Shares upon exercise of such Warrant as required pursuant to the terms hereof.

Section 5.5    **No Impairment**.

(a)    The Company will not, by amendment to its certificate of formation or LLC Agreement or through reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of the Warrants or this Warrant Agreement, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such action as may be necessary or appropriate in order to protect the rights of the Warrantholders and the Beneficial Owners under this Warrant Agreement against impairment.

(b)    Without limiting the generality of the foregoing, the Company will (i) not increase the par value (if any) of any Common Shares obtainable upon the exercise of the

Warrants and (ii) take all such actions as may be necessary or appropriate in order that the Company may validly and legally issue fully paid and nonassessable Common Shares upon the exercise of the Warrants.

(c)     Before taking any action that would cause an adjustment reducing the Exercise Price below the then par value (if any) of the Common Shares, the Company will take any company action that may be necessary in order that the Company may validly and legally issue fully paid and non-assessable Common Shares at such adjusted Exercise Price.

**Section 5.6      <u>Information Rights</u>**.

(a)     Warrantholders and Beneficial Owners (other than Competitors) shall, within a reasonable time after the Company's receipt of a written request given to it (with such information as the Company may require) in accordance with <u>Section 6.14</u>, be granted access to, or be provided with, the following; <u>provided</u> that (A) prior to the receipt by any Warrantholder or Beneficial Owner of any of the documents set forth in clauses (i) through (iv) below, or access to the call described in clause (v) below, such Warrantholder or Beneficial Owner shall have delivered to the Company (x) a customary non-disclosure agreement (which may be on a "click-through" or similar basis) in a form reasonably acceptable to the Board and (y) a Joinder or other acknowledgement in writing (which may, at the Company's election, be on a "click-through" or similar basis) that such Warrantholder or Beneficial Owner has received a copy of the LLC Agreement and acknowledges that it shall be bound by the terms and conditions of the LLC Agreement as an LLC Direct Owner or an LLC Beneficial Owner, as applicable, upon issuance of Common Shares upon the exercise of any Warrant directly or indirectly by such Warrantholder or Beneficial Owner, and (B) the documents set forth in clauses (i) through (iii) below may be provided by granting such Warrantholder or Beneficial Owner access to a Datasite and posting such information on such Datasite.  If a Warrantholder or Beneficial Owner does not provide the non-disclosure agreement described in clause (A)(x) of the proviso in the immediately preceding sentence, or the acknowledgement described in clause (A)(y) of the immediately preceding sentence, then the Company's obligation to grant access to such Warrantholder or Beneficial Owner to the documents set forth in clauses (i) through (iv) below, or access to the call described in clause (v) below, shall be deemed satisfied.

(i)     [within 90 days after the end of each fiscal year of the Company, commencing with the fiscal year ending December 31, [2023], (A) a copy of the audited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, <u>setting forth, commencing with the financial statements with respect to the fiscal year ending December 31, 2023, in comparative form the figures as of the end of and for the previous year,</u> in each case, in accordance with GAAP, and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal year;

(ii)     within 45 days [(or 75 days, in the case of the fiscal ~~quarter~~quarters of the Company ending March 31, 2023 and June 30, 2023)] after the end of each of the first three quarterly periods of each fiscal year of the Company, commencing with the fiscal quarter ending [●]March 31, [2023], (A) the unaudited consolidated balance sheet of the Company and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, in each case in accordance with GAAP (subject to normal year-end audit adjustments and the lack of complete footnotes) and (B) a management's discussion and analysis of the material operational and financial developments during such fiscal quarter];

(iii)     a copy of the LLC Agreement;

(iv)     whether or not the Company is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, within 5 Business Days from the occurrence of the relevant event, information substantially similar to the information that would have been required to be reported on a Current Report on Form 8-K if the Company were subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act, under any of the following items of Form 8-K: Item 1.01 (Entry into a Material Definitive Agreement), Item 2.02 (Termination of a Material Definitive Agreement), Item 1.03 (Bankruptcy or Receivership), 2.01 (Completion of Acquisitions or Dispositions of Assets), Item 2.03 (Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant), Item 2.04 (Triggering Events That Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement), Item 4.01 (Changes in Registrant's Certifying Accountant), Item 4.02 (Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review) or Item 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers) (but in this case only as it relates to the appointment or departure of any Manager or the Chief Executive Officer or Chief Financial Officer of the Company); and

(v)     a quarterly "earnings call" which shall take place as promptly as reasonably practicable after the distribution of the financial statements for the applicable quarter; provided, that the Company shall provide the date and dial-in information for such call and post such information to the Datasite at least three (3) days prior to such call.]14

(b)     A Warrantholder or Beneficial Owner may provide the information provided pursuant to clauses (i) through (iv) of Section 5.6(a) to any bona fide prospective transferee (other than Competitors) of the Warrants as follows: such

---

14 ~~NTD: To be conformed with section 11.1(c) of the LLC Agreement, when finalized.~~

Warrantholder or Beneficial Owner shall give notice (or cause notice to be delivered) to the Company of the proposed transferee (and the proposed transferee's e-mail address(es)) and the Company will then send to the proposed transferee by e-mail or other electronic communication a link to a Datasite from which the applicable information and a copy of the LLC Agreement may be accessed subject to such proposed transferee having delivered to the Company (x) a customary non-disclosure agreement in favor of the Company in a form reasonably acceptable to the Board (which may, at the Company's election, be on a "click-through" or similar basis) and (y) an acknowledgement in writing (which may, at the Company's election, be on a "click-through" or similar basis) from such proposed transferee that such proposed transferee has received a copy of the LLC Agreement and acknowledges that such proposed transferee shall be bound by the terms and conditions of the LLC Agreement as an LLC Direct Owner or an LLC Beneficial Owner, as applicable, upon issuance of Common Shares upon the exercise of any Warrant directly or indirectly by such proposed transferee (if such proposed transferee becomes a Warrantholder or Beneficial Owner whether or not it executes a Joinder).  If a proposed transferee does not provide the non-disclosure agreement described in clause (x) of the immediately preceding sentence, or the acknowledgment described in clause (y) of the immediately preceding sentence, then the Company's obligation to grant access to such proposed transferee to the applicable information and a copy of the LLC Agreement shall be deemed satisfied.  For the avoidance of doubt, the Company shall be under no obligation to provide, or otherwise make available, any information to any proposed transferee if such proposed transferee is deemed to be a Competitor as determined by the Company in its sole and absolute discretion.

(c)    Notwithstanding anything to the contrary in this Warrant Agreement, including without limitation Section 5.4 and Section 6.17, the sole and exclusive remedy for breach of any obligation of the Company under Section 5.6(a) shall be specific performance, and each Warrantholder and each Beneficial Owner hereby waives all other rights and remedies that may be available to it in respect of any such breach to the fullest extent permitted by applicable Law.

(d)    Each Beneficial Owner (other than a Competitor) is hereby expressly made a third-party beneficiary solely for purposes of the rights granted to them pursuant to Section 5.6.

**Section 5.7    LLC Agreement Provisions Binding Upon Exercise**.  Each Person that becomes an LLC Member or an LLC Beneficial Owner of the Common Shares issued upon exercise of the Warrants shall automatically become admitted as an LLC Member or an LLC Beneficial Owner, as applicable, upon such Person's receipt of the Common Shares (whether direct or indirect) issued upon exercise of the Warrants without the need to execute the LLC Agreement or a joinder thereto, and shall have all of the rights, and be subject to all of the obligations, set forth in the LLC Agreement with respect to LLC Members and LLC Beneficial Owners, as applicable, and as provided under the Delaware LLC Act.  Each Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that such Person: (A) has received (or otherwise had made available to it), read and understood the LLC Agreement, (B) acknowledges

and understands that such Person shall have all the rights, and be subject to all the obligations, set forth in the LLC Agreement with respect to LLC Direct Owners and LLC Beneficial Owners and as provided under the Delaware LLC Act, as if such Person had directly executed the LLC Agreement as a party and, (C) ratifies and confirms each and every Article, Section and provision of the LLC Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale).  Furthermore, each such Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that the LLC Agreement constitutes the legal, valid and binding obligation of such Person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.

## ARTICLE 6

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

**Section 6.1    Change of Warrant Agent**.

(a)    The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder (except for liability arising as a result of the Warrant Agent's own gross negligence, willful misconduct bad faith or material breach of this Warrant Agreement) after giving 60 days' notice in writing to the Company, except that such shorter notice may be given as the Company shall, in writing, accept as sufficient.  If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor warrant agent in place of the Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 days after it has been notified in writing of such resignation or incapacity by the resigning or incapacitated warrant agent or by the Required Warrantholders, then the Required Warrantholders may appoint a successor warrant agent.

(b)    The Warrant Agent may be removed by the Company at any time upon 30 days' written notice to the Warrant Agent; provided, however, that the Company shall not remove the Warrant Agent until a successor warrant agent meeting the qualifications hereof shall have been appointed; provided, further, that, until such successor warrant agent has been appointed, the Company shall compensate the Warrant Agent in accordance with Section 6.2Section 6.2.

(c)    Any successor warrant agent shall be a corporation or banking association organized, in good standing and doing business under the Laws of the United States of America or any state thereof or the District of Columbia, and authorized under such Laws to exercise corporate trust powers and subject to supervision or examination by federal or state authority and having a combined capital and surplus of not less than $50,000,000.  The combined capital and surplus of any such successor warrant agent shall be deemed to be the combined capital and surplus as set forth in the most recent report of its condition published prior to its appointment; provided that such reports are published at least annually pursuant to Law or to the requirements of a federal or state supervising or examining authority.

(d)      After acceptance in writing of such appointment by the successor warrant agent, such successor warrant agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor warrant agent with like effect as if originally named as warrant agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor warrant agent shall execute and deliver, at the expense of the Company, an instrument transferring to such successor warrant agent all the authority, powers and rights of such predecessor warrant agent hereunder; and upon request of any successor warrant agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing to more fully and effectually vest in and conform to such successor warrant agent all such authority, powers, rights, immunities, duties and obligations.  Upon assumption by a successor warrant agent of the duties and responsibilities hereunder, the predecessor warrant agent shall deliver and transfer, at the expense of the Company, to the successor warrant agent any property at the time held by it hereunder.  As soon as practicable after such appointment, the Company shall give notice thereof to the predecessor warrant agent and each transfer agent for its Common Shares.  Failure to give such notice, or any defect therein, shall not affect the validity of the appointment of the successor warrant agent.

(e)      Any entity into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any Person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor warrant agent under this Warrant Agreement without the execution or filing of any paper or any further act on the part of any of the parties hereto; provided, however, that such entity would be eligible for appointment as a successor warrant agent under ~~Section 6.1(c)~~Section 6.1(c).

**Section 6.2      Compensation; Further Assurances**.  The Company agrees that it will (a) pay the Warrant Agent reasonable compensation for its services as Warrant Agent in accordance with ~~Exhibit C~~Exhibit C attached hereto and, except as otherwise expressly provided, will pay or reimburse the Warrant Agent upon written demand for all reasonable and documented expenses, disbursements and advances incurred or made by the Warrant Agent in accordance with any of the provisions of this Warrant Agreement (including the reasonable and documented compensation, expenses and disbursements of its counsel incurred in connection with the execution and administration of this Warrant Agreement), except any such expense, disbursement or advance as may arise from its or any of their gross negligence, willful misconduct or bad faith, and (b) perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Warrant Agreement.  The Warrant Agent agrees to provide the Company with prior written notice of the retention of counsel whose compensation, expenses and disbursements are to be paid or reimbursed by the Company under this ~~Section 6.2~~Section 6.2.

**Section 6.3      Reliance on Counsel**.  The Warrant Agent may consult with legal counsel (who may be legal counsel for the Company), and the written opinion of such counsel or any advice of legal counsel subsequently confirmed by a written opinion of such counsel shall be full

and complete authorization and protection to the Warrant Agent as to any action taken or omitted by it in good faith and in accordance with such written opinion or advice.

**Section 6.4    Proof of Actions Taken**.  Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent shall deem it necessary or desirable that any matter be proved or established by the Company prior to taking or suffering or omitting any action hereunder, such matter (unless other evidence in respect thereof be herein specifically prescribed) may, in the good faith of the Warrant Agent, be deemed to be conclusively proved and established by a certificate executed by a duly authorized officer of the Company delivered to the Warrant Agent, and such certificate shall, in the good faith of the Warrant Agent, be relied upon by the Warrant Agent for any action taken, suffered or omitted in good faith by it under the provisions of this Warrant Agreement; provided that in its discretion, the Warrant Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable.

**Section 6.5    Correctness of Statements**.  The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Warrant Agreement (except its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only.

**Section 6.6    Validity of Agreement**.  From time to time, the Warrant Agent may apply to any duly authorized officer of the Company for instruction, and the Company shall provide the Warrant Agent with such instructions concerning the services to be provided hereunder.  The Warrant Agent shall not be held to have notice of any change of authority of any Person, until receipt of notice thereof from the Company.  The Warrant Agent shall not be responsible for any breach by the Company of any covenant or condition contained in this Warrant Agreement, nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Shares to be issued pursuant to this Warrant Agreement or any Warrants or as to whether any Common Shares will, when issued, be validly issued, fully paid and nonassessable.  The Warrant Agent and its agents and subcontractors shall not be liable and shall be indemnified by the Company for any action taken or omitted by Warrant Agent in reliance in good faith upon any Company instructions except to the extent that the Warrant Agent had actual knowledge of facts and circumstances that would render such reliance unreasonable.

**Section 6.7    Use of Agents**.  The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys or agents, provided that the Warrant Agent shall remain responsible for the activities or omissions of any such agent or attorney and reasonable care has been exercised in the selection and in the continued employment of such attorney or agent.

**Section 6.8    Liability of Warrant Agent**.  The Warrant Agent shall incur no liability or responsibility to the Company or to any Warrantholder for any action taken or not taken (a) in reliance on any notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument reasonably believed by it to be genuine and to have been signed, sent and presented by the proper party or parties or (b) in relation to its services under this Warrant Agreement, unless such liability arises out of or is attributable to the Warrant Agent's gross negligence,

material breach of this Warrant Agreement, willful misconduct or bad faith. The Company agrees to indemnify the Warrant Agent and save it harmless against any and all losses, expenses and liabilities, including judgments, costs and reasonable counsel fees, for anything done or omitted in good faith by the Warrant Agent in the execution of this Warrant Agreement or otherwise arising in connection with this Warrant Agreement, except as a result of the Warrant Agent's gross negligence, material breach of this Warrant Agreement, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment). The Warrant Agent shall be liable hereunder only for its gross negligence, material breach of this Warrant Agreement, fraud, willful misconduct or bad faith (as determined by a court of competent jurisdiction in a final non-appealable judgment), for which the Warrant Agent is not entitled to indemnification under this Warrant Agreement. For the avoidance of doubt, this Section 6.8 does not apply to tax matters.

Section 6.9    **Legal Proceedings**. The Warrant Agent shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or any Warrantholder shall furnish the Warrant Agent with reasonable indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as the Warrant Agent may consider proper, whether with or without any such security or indemnity. The Warrant Agent shall promptly notify the Company and each Warrantholder in writing of any claim made or action, suit or proceeding instituted against it arising out of or in connection with this Warrant Agreement.

Section 6.10    **Actions as Agent**.

(a)    The Warrant Agent shall act hereunder solely as agent and not in a ministerial or fiduciary capacity, and its duties shall be determined solely by the provisions hereof. The duties and obligations of the Warrant Agent shall be determined solely by the express provisions of the Warrant Agreement or of the Warrant Certificates, and the Warrant Agent shall not be liable except for the performance of such duties and obligations as are specifically set forth in the Warrant Agreement or in the Warrant Certificates. No implied covenants or obligations shall be read into the Warrant Agreement against the Warrant Agent. The Warrant Agent shall not be liable for anything that it may do or refrain from doing in good faith in connection with this Warrant Agreement except for its own gross negligence, willful misconduct or bad faith.

(b)    The Warrant Agent shall not, by countersigning Warrant Certificates or by any other act hereunder, be deemed to make any representations as to validity or authorization of the Warrants or the Warrant Certificates (except as to its countersignature thereon). The Warrant Agent shall not be responsible for any failure of the Company to make any cash payment or to issue, transfer or deliver any Common Shares or stock certificates or other securities or property upon the surrender of any Warrant Certificate for the purpose of exercise or upon any adjustment pursuant to ~~Article 4~~Article 4 hereof or to comply with any of the covenants of the Company contained in ~~Article 4~~Article 4 hereof.

(c)    The Warrant Agent shall not (i) be liable for any recital or statement of fact contained herein or in the Warrant Certificates or for any action taken, suffered or omitted by it in good faith on the belief that any Warrant Certificate or any other documents or any

37

signatures are genuine or properly authorized, (ii) be responsible for any failure on the part of the Company to comply with any of its covenants and obligations contained in this Warrant Agreement or in the Warrant Certificates or (iii) be liable for any act or omission in connection with this Warrant Agreement except for its own gross negligence, bad faith or willful misconduct.

(d)     The Warrant Agent is hereby authorized to accept and protected in accepting instructions with respect to the performance of its duties hereunder by Company Order and to apply to any such officer named in such Company Order for instructions (which instructions will be promptly given in writing when requested), and the Warrant Agent shall not be liable for any action taken or suffered to be taken by it in good faith in accordance with the instructions in any Company Order.

Section 6.11   **Appointment and Acceptance of Agency**.   The Company hereby appoints the Warrant Agent to act as agent for the Company in accordance with the instructions set forth in this Warrant Agreement, and the Warrant Agent hereby accepts the agency established by this Warrant Agreement and agrees to perform the same upon the terms and conditions set forth in this Warrant Agreement and in the Warrant Certificates or as the Company and the Warrant Agent may hereafter agree, by all of which the Company and the Warrantholders of Warrant Certificates, by their acceptance thereof, shall be bound; provided, however, that the terms and conditions contained in the Warrant Certificates are subject to and governed by this Warrant Agreement or any other terms and conditions hereafter agreed to by the Company and the Warrant Agent.

Section 6.12   **Appointment of Countersigning Agent**.

(a)     The Warrant Agent may appoint a Countersigning Agent or Agents which shall be authorized to act on behalf of the Warrant Agent to countersign Warrant Certificates issued upon original issue and upon exchange, registration of transfer or pursuant to Section 2.5, and Warrant Certificates so countersigned shall be entitled to the benefits of this Warrant Agreement equally and proportionately with any and all other Warrant Certificates duly executed and delivered hereunder.   Wherever reference is made in this Warrant Agreement to the countersignature and delivery of Warrant Certificates by the Warrant Agent or to Warrant Certificates countersigned by the Warrant Agent, such reference shall be deemed to include countersignature and delivery on behalf of the Warrant Agent by a Countersigning Agent and Warrant Certificates countersigned by a Countersigning Agent.   Each Countersigning Agent shall be acceptable to the Company and shall at the time of appointment be a corporation doing business under the Laws of the United States of America or any State thereof in good standing, authorized under such Laws to act as Countersigning Agent, and having a combined capital and surplus of not less than $25,000,000.   The combined capital and surplus of any such new Countersigning Agent shall be deemed to be the combined capital and surplus as set forth in the most recent annual report of its condition published by such Countersigning Agent prior to its appointment; provided, however, such reports are published at least annually pursuant to Law or to the requirements of a Federal or state supervising or examining authority.

(b)     Any corporation into which a Countersigning Agent may be merged or any corporation resulting from any consolidation to which such Countersigning Agent shall be a

38

party, shall be a successor Countersigning Agent without any further act; <u>provided</u>, that, such corporation would be eligible for appointment as a new Countersigning Agent under the provisions of ~~Section 6.12(a)~~Section 6.12(a), without the execution or filing of any paper or any further act on the part of the Warrant Agent or the Countersigning Agent.  Any such successor Countersigning Agent shall promptly cause notice of its succession as Countersigning Agent to be given in accordance with ~~Section 6.14~~Section 6.14 to each Warrantholder of a Warrant Certificate at such Warrantholder's last address as shown on the Warrant Register.

(c)    A Countersigning Agent may resign at any time by giving 30 days' prior written notice thereof to the Warrant Agent and to the Company.  The Warrant Agent may at any time terminate the agency of a Countersigning Agent by giving 30 days' prior written notice thereof to such Countersigning Agent and to the Company.

(d)    The Warrant Agent agrees to pay to each Countersigning Agent from time to time reasonable compensation for its services under this ~~Section 6.12~~Section 6.12 and the Warrant Agent shall be entitled to be reimbursed for such payments, subject to the provisions of ~~Section 6.2~~Section 6.2.

(e)    Any Countersigning Agent shall have the same rights and immunities as those of the Warrant Agent set forth in ~~Section 6.8 and Section 6.10~~Section 6.8 and Section 6 10.

**Section 6.13    <u>Successors and Assigns</u>**.    All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.  The Warrant Agent may assign this Warrant Agreement or any rights and obligations hereunder, in whole or in part, to an Affiliate thereof with the prior consent of the Company, <u>provided</u> that the Warrant Agent may make such an assignment without consent of the Company to any successor to the Warrant Agent by consolidation, merger or transfer of its assets subject to the terms and conditions of this Warrant Agreement.

**Section 6.14    <u>Notices</u>**.  Any notice or demand authorized by this Warrant Agreement to be given or made to the Company shall be sufficiently given or made if sent by mail first-class, postage prepaid, addressed (until another address is filed in writing by the Company with the Warrant Agent) or electronic mail, as follows:

~~[~~Revlon Group Holdings LLC~~]~~
55 Water Street
New York, New York 10041
Attention:      Andrew Kidd, EVP, General Counsel
                    Matthew Kvarda, Interim Chief Financial Officer
Email:            Andrew.Kidd@revlon.com
                    Mkvarda@alvarezandmarsal.com

Any notice or demand authorized by this Warrant Agreement to be given or made to the Warrant Agent shall be sufficiently given or made if sent by mail first-class, postage

prepaid, addressed (until another address is filed in writing by the Warrant Agent with the Company) or electronic mail, as follows:

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: General Counsel
Email: legalteamUS@equiniti.com
Email for Warrant exercises: reorgwarrants@equiniti.com

Any notice or demand authorized by this Warrant Agreement to be given or made to any Warrantholder shall be sufficiently given or made if sent by first-class mail, postage prepaid or electronic mail to the last address of the Warrantholder as it shall appear on the Warrant Register, with a copy (which shall not constitute notice) to its counsel listed on such Warrant Register.

Section 6.15  **Applicable Law; Jurisdiction**.    The validity, interpretation and performance of this Warrant Agreement and the Warrant Certificates evidencing the Warrants shall be governed in accordance with the Laws of the State of New York, without giving effect to the principles of conflicts of Laws thereof that would result in the application of Law of another jurisdiction.  The parties hereto irrevocably consent to the exclusive jurisdiction of the courts of the State of New York and any federal court located in such state in connection with any action, suit or proceeding arising out of or relating to this Warrant Agreement or the Warrant Certificates issued hereunder.  Each party agrees to commence any such suit, action or proceeding in such court.  Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any suit, action or proceeding with respect to this Warrant Agreement or the Warrant Certificates issued hereunder, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this ~~Section 6.15~~Section 6.15, that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable Law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Warrant Agreement or the Warrant Certificates issued hereunder, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable Law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is entitled pursuant to the final judgment of any court having jurisdiction.  Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered mail, postage prepaid, to such party at its mailing address determined in accordance with this Warrant Agreement, such service of process to be effective upon acknowledgment of receipt of such registered mail. Nothing herein shall affect the right of any party to serve process in any other manner permitted by Law.

Section 6.16  **Waiver of Jury Trial**.    EACH OF THE COMPANY AND THE WARRANT AGENT ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY

40

WHICH MAY ARISE UNDER THIS WARRANT AGREEMENT OR A WARRANT CERTIFICATE EVIDENCING A WARRANT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PERSON HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PERSON MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS WARRANT AGREEMENT OR A WARRANT CERTIFICATE EVIDENCING A WARRANT.  EACH OF THE COMPANY AND THE WARRANT AGENT CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) SUCH PERSON UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) SUCH PERSON MAKES THIS WAIVER VOLUNTARILY, AND (d) SUCH PERSON HAS BEEN INDUCED TO ENTER INTO THIS WARRANT AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 6.17  **Specific Performance**.  Each of the Company and the Warrant Agent acknowledges that a breach or threatened breach by such party of any of its obligations under this Warrant Agreement would give rise to irreparable harm to the other party hereto for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, the other party hereto shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction.

Section 6.18  **Benefit of this Warrant Agreement**.  Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person other than the parties hereto and the Warrantholders any right, remedy or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their respective successors and permitted assigns and the Warrantholders.  Each Warrantholder, by acceptance of a Warrant Certificate, agrees to all of the terms and provisions of this Warrant Agreement applicable thereto.

Section 6.19  **Registered Warrantholder**.  Every Warrantholder, by accepting a Warrant Certificate, consents and agrees with the Company, with the Warrant Agent and with every subsequent holder of such Warrant Certificate that, prior to due presentment for registration of transfer, the Company and the Warrant Agent may deem and treat the Person in whose name any Warrant Certificates are registered in the Warrant Register as the absolute owner thereof and of the Warrants evidenced thereby for all purposes whatsoever (notwithstanding any notation of ownership or other writing thereon made by anyone other than the Company or the Warrant Agent) and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary or be bound to recognize any equitable or other claim to or interest in any Warrant Certificates or any Warrants evidenced thereby on the part of any other Person and shall not be liable for any registration of transfer of Warrant Certificates that are

registered or to be registered in the name of a fiduciary or the nominee of a fiduciary unless made with actual knowledge that a fiduciary or nominee is committing a breach of trust in requesting such registration of transfer or with such knowledge of such facts that its participation therein amounts to bad faith.

**Section 6.20    Headings**.  The Article and Section headings herein are for convenience only and are not a part of this Warrant Agreement and shall not affect the interpretation thereof.

**Section 6.21    Counterparts**.  This Warrant Agreement may be executed in any number of counterparts on separate counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.  A signed copy of this Warrant Agreement delivered by e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Warrant Agreement.

**Section 6.22    Entire Agreement**.  This Warrant Agreement constitutes the entire agreement of the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the Warrantholders with respect to the subject matter hereof.

**Section 6.23    Severability**.  Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement.

**Section 6.24    Termination**.  This Warrant Agreement shall terminate at the earlier to occur of (i) the Expiration Time (or, if later, Close of Business on the Settlement Date with respect to all exercises of Warrants as to which the respective Exercise Date is prior to the Expiration Time) and (ii) the date on which all outstanding Warrants have been exercised.  All provisions regarding indemnification, warranty, liability and limits thereon shall survive the termination or expiration of this Warrant Agreement.

**Section 6.25    Confidentiality**.  The Warrant Agent and the Company agree that personal, non-public Warrantholder information which is exchanged or received pursuant to the negotiation or the carrying out of this Warrant Agreement shall remain confidential, and shall not be voluntarily disclosed to any other Person, except disclosures pursuant to bankruptcy proceedings, applicable securities Laws or otherwise as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities.

**Section 6.26    Representations and Warranties of the Company**.  As of the date hereof, the Company hereby represents and warrants to the Warrantholders that (i) it has the power and authority to execute this Warrant Agreement and consummate the transactions contemplated by this Warrant Agreement, (ii) there are no statutory or contractual unitholders' preemptive rights or rights of refusal with respect to the issuance of any Warrants and (iii) the

execution and delivery by the Company of this Warrant Agreement and the issuance of the Common Shares upon exercise of any Warrant do not and shall not (A) conflict with or result in a breach of the terms, conditions or provisions of, (B) constitute a default under, (C) result in the creation of any lien, security interest, charge or encumbrance upon the Company's capital stock or assets pursuant to, (D) result in a violation of or (E) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any court or administrative or governmental body or agency pursuant to, the Company's certificate of formation or LLC Agreement or any Law in effect as of the date hereof to which the Company is subject, or any agreement, instrument, order, judgment or decree to which the Company is subject as of the date hereof, except for any such authorization, consent, approval, notice or exemption required under applicable securities Laws, except, in the case of clause (iii), where such occurrences would not reasonably be expected, individually or in the aggregate, to result in the inability of the Company to consummate the transactions contemplated by this Warrant Agreement or perform its obligations hereunder.

*[signature pages follow]*

IN WITNESS WHEREOF, this Warrant Agreement has been duly executed by the parties hereto as of the day and year first above written.

**[REVLON GROUP HOLDINGS LLC]**[15]

By: _____
      Name:
      Title:

---

[15] NTD: Signature block to be confirmed.

*[Signature Page to Warrant Agreement]*

**AMERICAN STOCK TRANSFER & TRUST COMPANY, LLC**

By: _____

Name:

Title:

[*Signature Page to Warrant Agreement*]

EXHIBIT A

**[Face of Warrant Certificate]**[161]

**[REVLON GROUP HOLDINGS LLC]**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON SHARES**

[FACE]

No. [__]                                                                    CUSIP No. [_____]


[UNLESS THIS GLOBAL WARRANT CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("**DTC**"), TO [REVLON GROUP HOLDINGS LLC] (THE "**COMPANY**"), THE CUSTODIAN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

TRANSFER OF THIS GLOBAL WARRANT CERTIFICATE SHALL BE LIMITED TO TRANSFERS IN WHOLE, AND NOT IN PART, TO THE COMPANY, DTC, THEIR SUCCESSORS AND THEIR RESPECTIVE NOMINEES.][172]

---

[161]  To be removed in the versions of the Warrant Certificates printed in multiple copies for use by the Warrant Agent in preparing Warrants Certificates for issuance and delivery from time to time to holders.

[172]  Include only on Global Warrant Certificate.

A-1

No. [____]                                                    [*insert number of warrants*] Warrants

CUSIP No. [_____]

THIS CERTIFIES THAT, for value received, [CEDE & CO.][183][_____][194], or registered assigns, is the registered owner of the number of Warrants to Purchase Common Shares of [Revlon Group Holdings LLC], a Delaware limited liability company (the "**Company**," which term includes any successor thereto under the Warrant Agreement) specified above [or such lesser number as may from time to time be endorsed on the "Schedule of Decreases" attached hereto][205], and is entitled, subject to and upon compliance with the provisions hereof and of the Warrant Agreement, at such Warrantholder's option, at any time when the Warrants evidenced hereby are exercisable, to purchase from the Company one Common Share of the Company for each Warrant evidenced hereby, at the purchase price of $[*insert strike price*]51.59 per unit (as adjusted from time to time, the "**Exercise Price**"), payable in full at the time of purchase, the number of Common Shares into which and the Exercise Price at which each Warrant shall be exercisable each being subject to adjustment as provided in Article 4 Article 4 of the Warrant Agreement.

All Common Shares issuable by the Company upon the exercise of Warrants shall, upon such issuance, be duly and validly issued and fully paid and nonassessable.

[Each Person that becomes an LLC Member or an LLC Beneficial Owner of the Common Shares issued upon exercise of the Warrants shall automatically become admitted as an LLC Member or an LLC Beneficial Owner, as applicable, upon such Person's receipt of the Common Shares (whether direct or indirect) issued upon exercise of the Warrants without the need to execute the LLC Agreement or a joinder thereto, and shall have all of the rights, and be subject to all of the obligations, set forth in the LLC Agreement with respect to LLC Members and LLC Beneficial Owners, as applicable, and as provided under the Delaware LLC Act. Each Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that such Person: (A) has received (or otherwise had made available to it), read and understood the LLC Agreement, (B) acknowledges and understands that such Person shall have all the rights, and be subject to all the obligations, set forth in the LLC Agreement with respect to LLC Direct Owners and LLC Beneficial Owners and as provided under the Delaware LLC Act, as if such Person had directly executed the LLC Agreement as a party and, (C) ratifies and confirms each and every Article, Section and provision of the LLC Agreement and (D) is not a Competitor (except in the case of a Drag-Along Sale). Furthermore, each such Person that becomes an LLC Direct Owner or an LLC Beneficial Owner upon exercise of the Warrants shall be deemed to represent and warrant to the Company that the LLC Agreement constitutes the legal, valid and binding obligation of

---

[183] Include only on Global Warrant Certificate.

[194] Include only on Definitive Warrant Certificate.

[205] Include only on Global Warrant Certificate.

A-2

such Person and it is enforceable against it in accordance with its terms, subject to applicable insolvency, bankruptcy or other laws affecting creditors' rights generally or by general principles of equity.][21]

[Notwithstanding anything to the contrary in the Warrant Agreement, no Warrantholder or Beneficial Owner shall Transfer any Warrant to a Competitor (except pursuant to a Drag-Along Sale) without the prior written consent of the Board (which may be given or withheld in the Board's sole discretion).][22]

Each Warrant evidenced hereby may be exercised by the Warrantholder hereof at the Exercise Price then in effect on any Business Day from and after the Closing Date until the Expiration Time (as defined on the reverse hereof).

Subject to the provisions hereof and of the Warrant Agreement, the Warrantholder of this Warrant Certificate may exercise all or any whole number of the Warrants evidenced hereby by [providing to the Warrant Agent at its office maintained for such purpose (the "**Corporate Agency Office**") a duly completed and executed Exercise Notice as to the number of Warrants being exercised and, if applicable, whether Cashless Settlement is being elected with respect thereto, and delivering such Warrants by book-entry transfer through the facilities of the Depositary, to the Warrant Agent in accordance with the Applicable Procedures and otherwise complying with Applicable Procedures in respect of the exercise of such Warrants][236] [surrendering to the Warrant Agent this Warrant Certificate at the Corporate Agency Office and delivering to the Warrant Agent a duly completed and executed Exercise Notice as to whether Cashless Settlement is being elected with respect thereto][247], together with payment in full to the Warrant Agent of (x) those applicable taxes and charges required to be paid by the Warrantholder, if any, and (y) except in the case of a Cashless Settlement, the aggregate of the Exercise Price as then in effect for each Common Share receivable upon exercise of each Warrant being submitted for exercise.  Any such payment of the Exercise Price (if applicable) is to be by wire transfer in immediately available funds to such account of the Warrant Agent at such banking institution as the Warrant Agent shall have designated from time to time for such purpose.

Reference is hereby made to the further provisions of this Warrant Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Warrant Certificate has been countersigned by the Warrant Agent by manual or facsimile signature of an authorized officer on behalf of the Warrant Agent, this Warrant

---

[21] NTD: To conform to Section 5.7 in the Warrant Agreement.

[22] NTD: To conform to Section 2.9(a) in the Warrant Agreement.

[236] Include only on Global Warrant Certificate.

[247] Include only on Definitive Warrant Certificate.

Certificate shall not be valid for any purpose and no Warrant evidenced hereby shall be exercisable.

[*signature pages follow*]

IN WITNESS WHEREOF, the Company has caused this certificate to be duly executed under its company seal.

Dated:  [*insert date*]

                                        [REVLON GROUP HOLDINGS LLC]25

                              By: _____
                                    Name:
                                    Title:


ATTEST:                       By: _____
                                    Name:
                                    Title:

---

25 NTD: Signature block to be confirmed.

Countersigned:

AMERICAN STOCK TRANSFER &                    AMERICAN STOCK TRANSFER &
TRUST COMPANY, LLC, as Warrant               TRUST COMPANY, LLC, as Warrant
Agent                                        Agent

                                    OR

By: _____                  By: _____
        Authorized Agent                            as Countersigning Agent

                                             By: _____
                                                    Authorized Officer

**[Reverse of Warrant Certificate]**

**[REVLON GROUP HOLDINGS LLC]**

**WARRANT CERTIFICATE**

**EVIDENCING**

**WARRANTS TO PURCHASE COMMON SHARES**

The Warrants evidenced hereby are one of a duly authorized issue of Warrants of the Company designated as its Warrants to Purchase Common Shares, limited in aggregate number to [*insert number of warrants*] initially issued under and in accordance with the Warrant Agreement, dated as of [*insert date*]May 2, 2023 (the "**Warrant Agreement**"), between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent (the "**Warrant Agent**," which term includes any successor thereto permitted under the Warrant Agreement), to which the Warrant Agreement and all amendments thereto reference is hereby made for a statement of the respective rights, limitations of rights, duties and immunities thereunder of the Company, the Warrant Agent, the Warrantholders of Warrant Certificates and the owners of the Warrants evidenced thereby and of the terms upon which the Warrant Certificates are, and are to be, countersigned and delivered.  A copy of the Warrant Agreement shall be available at all reasonable times at the office of the Warrant Agent for inspection by the Warrantholder hereof.

Except as provided in the Warrant Agreement, all outstanding Warrants shall expire and all rights of the Warrantholders of Warrant Certificates evidencing such Warrants shall terminate and cease to exist, as of the earlier of (i) 5:00 p.m., New York time, on [*insert expiration date*][26]May 2, 2028 and (ii) the date of consummation of any Liquidity Event (the "**Expiration Time**").

If fewer than all the Warrants represented by a Warrant Certificate are exercised, [the Warrant Agent shall endorse the "Schedule of Decreases of Warrants" attached to the Global Warrant Certificate to reflect the Warrants being exercised.][278] [such Definitive Warrant Certificate shall be surrendered and a new Definitive Warrant Certificate of the same tenor and class and for the number of Warrants which were not exercised shall be executed by the Company upon the written order of the Warrantholder of this Warrant Certificate upon the cancellation hereof.][289]

The Warrant Certificates are issuable only in registered form in denominations of whole numbers of Warrants.  Upon surrender at the office of the Warrant Agent and payment of the charges specified herein and in the Warrant Agreement, this Warrant Certificate may be

---

[26] NTD: To be 5 years after the issue date.

[278] Include only on Global Warrant Certificate.

[289] Include only on Definitive Warrant Certificates.

exchanged for Warrant Certificates in other authorized denominations or the transfer hereof may be registered in whole or in part in authorized denominations to one or more designated transferees; provided, however, that such other Warrant Certificates issued upon exchange or registration of transfer shall evidence the same aggregate number and class of Warrants as this Warrant Certificate.  The Company shall cause to be kept at the office of the Warrant Agent the Warrant Register in which, subject to such reasonable regulations as the Warrant Agent may prescribe and such regulations as may be prescribed by Law, the Company shall provide for the registration of Warrant Certificates and of transfers or exchanges of Warrant Certificates. Issuance of the Warrant Certificates evidencing Warrants and issuance of Common Shares upon the exercise of the Warrants shall be made without charge for any documentary, stamp or similar issue or transfer tax or other incidental expense in respect of the issuance thereof, all of which taxes and expenses shall be paid by the Company; provided, however, the Company shall not be required to pay any tax that may be payable in respect of any transfer involved in the issuance and delivery of Warrant Certificates evidencing such Warrants or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property in a name or to any Person other than the Warrantholder of the Warrant Certificate surrendered upon exercise or transfer, and the Company shall not be required to issue or deliver Warrant Certificates or Common Shares in book-entry form or any certificates for Common Shares or payment of cash or other property, as applicable, unless and until the Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have reasonably determined that such tax has been paid.

Prior to due presentment of this Warrant Certificate for registration of transfer, the Company, the Warrant Agent and any agent of the Company or the Warrant Agent may treat the Person in whose name this Warrant Certificate is registered as the owner hereof for all purposes, and neither the Company, the Warrant Agent nor any such agent shall be affected by notice to the contrary.

The Warrant Agreement permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Company and the rights of the Warrantholders of Warrant Certificates under the Warrant Agreement at any time by the Company and the Warrant Agent with the consent of the Required Warrantholders.

Nothing contained in the Warrant Agreement or this Warrant Certificate shall be construed as conferring upon any Person, by virtue in and of itself of holding a Warrant Certificate evidencing any Warrant or having a beneficial interest in a Warrant, the right to vote, receive any dividend or other distribution, receive notice of, or attend, any meeting of unitholders or otherwise exercise any rights whatsoever, in each case, as a unitholder of the Company to the extent such vote, dividend, giving of notice, meeting or other exercise of rights (or, if applicable, the relevant Record Date therefor) precedes the Close of Business on the Exercise Date with respect to the exercise of such Warrant.  No Warrantholder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrant Certificate held by such holder.

This Warrant Certificate, each Warrant evidenced thereby and the Warrant Agreement shall be governed by and construed in accordance with the Laws of the State of New York.

All terms used in this Warrant Certificate which are defined in the Warrant Agreement shall have the meanings assigned to them in the Warrant Agreement.  In the event of any conflict between this Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

<u>Assignment</u>

(Form of Assignment To Be Executed If Warrantholder Desires To Transfer Warrant Certificate)

FOR VALUE RECEIVED _____ hereby sells, assigns and transfers unto

Please insert social security or
other identifying number

(Please print name and address including zip code)

the Warrants represented by the within Warrant Certificate and does hereby irrevocably constitute and appoint _____ Attorney, to transfer said Warrant Certificate on the books of the within-named Company with full power of substitution in the premises.

Dated: _____        Signature _____

(Signature must conform in all respects to name of Warrantholder as specified on the face of this Warrant Certificate and must bear a signature guarantee by a bank, trust company or member firm of a U.S. national securities exchange.)

**[SCHEDULE A**

**SCHEDULE OF DECREASES IN WARRANTS**

The following decreases in the number of Warrants evidenced by this Global Warrant Certificate have been made:

| Date | Amount of decrease in number of Warrants evidenced by this Global Warrant Certificate | Number of Warrants evidenced by this Global Warrant following such decrease | Signature of authorized signatory |
|------|------|------|------|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | [29]10 |

---

[29]10 Include only on Global Warrant Certificate.

**EXHIBIT B**

## FORM OF EXERCISE NOTICE

American Stock Transfer & Trust Company, LLC
6201 15th Avenue
Brooklyn, NY 11219
Attention: General Counsel
Email: legalteamUS@equiniti.com
Email for Warrant exercises: reorgwarrants@equiniti.com

Attention:  [Transfer Department]

Re:    Warrant Agreement dated as of [~~*insert date*~~]May 2, 2023 between [Revlon Group
Holdings LLC]~~ ~~(the "**Company**") and American Stock Transfer & Trust Company, LLC,
as Warrant Agent (as it may be supplemented or amended, the "**Warrant Agreement**")

The undersigned hereby irrevocably elects to exercise ____ Warrants and receive the consideration deliverable upon exercise thereof pursuant to the following settlement method (check one):

☐        Cash Settlement

☐        Cashless Settlement

If Cash Settlement is elected, the undersigned shall tender payment of the Exercise Price therefor in accordance with instructions received from the Warrant Agent.

Please check below if this exercise is contingent upon a Liquidity Event in accordance with ~~Section 3.2(e)~~Section 3.2(e) of the Warrant Agreement.

☐        This exercise is being made in connection with a Liquidity Event; provided, that in the event that such transaction shall not be consummated, then this exercise shall be deemed revoked.

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT PRIOR TO THE EXPIRATION TIME.  THE WARRANT AGENT SHALL NOTIFY YOU OF THE ADDRESS AND PHONE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Warrant Agreement.

*[signature page(s) to follow]*

B-1

Dated: _____          Name: _____

_____                      (Please Print)
(Insert Social Security or Other
Identifying Number of Warrantholder)        Address: _____

_____

_____
                                                        Signature
                                        (Signature must conform in all respects to name
                                        of Warrantholder as specified on the face of this
                                        Warrant Certificate and must bear a signature
                                        guarantee by a bank, trust company or member
                                        firm of a U.S. national securities exchange.)

Signature Guaranteed:

     Instructions (i) as to denominations and names of Common Shares issuable upon exercise and as to delivery of such securities and any other property issuable upon exercise and (ii) if applicable, as to Warrant Certificates evidencing unexercised Warrants:

B-2

**EXHIBIT C**

**Fee Schedule**

The Company shall pay the Warrant Agent for performance of its services under this Warrant Agreement such compensation as follows:

Warrant Agent Acceptance Fee: $5,000.00

Monthly Warrant Agent Fee: $500.00

Per Warrant Exercise Fee: $50.00

Customary Out-of-Pocket Expenses

**EXHIBIT D**

**Form of Joinder to the LLC Agreement**

This Joinder Agreement (this "**Joinder Agreement**") is made as of [_____], 20[__] by the undersigned (the "**Owner**") in accordance with the requirement pursuant to the terms of the warrants (the "**Warrants**") of ~~[Revlon Group Holdings LLC]~~[30] (the "**Company**"), issued pursuant to the Warrant Agreement (as amended, restated, supplemented or otherwise modified form time to time) dated ~~[*insert date of Warrant Agreement*]~~[31]May 2, 2023 between the Company and American Stock Transfer & Trust Company, LLC, as warrant agent, to become a party to the Amended and Restated Limited Liability Company Agreement of the Company dated as of ~~[*insert date of LLC Agreement*]~~[32]May 2, 2023 (as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**LLC Agreement**") in connection with the Owner's receipt of Shares (as defined in the LLC Agreement) upon exercise of such Warrants. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the LLC Agreement.

The Owner hereby acknowledges, agrees and confirms that, by its execution of this Joinder Agreement, it has received and reviewed a complete copy of the LLC Agreement and it shall become a party to the LLC Agreement and shall be fully bound by and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, an "Owner" (as defined in the LLC Agreement) for all purposes thereof and entitled to all the rights incidental thereto, as of the date first written above.

The Owner hereby represents and warrants that (i) the Owner has all requisite power and authority to execute this Joinder Agreement and to perform its obligations under the LLC Agreement and (ii) the execution and delivery of this Joinder Agreement and the performance of Owner's obligations under the LLC Agreement will not conflict with or constitute a default under any material contract to which the Owner is a party, constitute a default under the Owner's governing documents or conflict with or constitute a violation of any applicable law.

IN WITNESS WHEREOF, the undersigned has executed this Joinder Agreement as of the date first written above and hereby authorizes this signature page to be attached to a counterpart of the LLC Agreement.

**[*INSERT OWNER*]**

---

[30] ~~NTD: To update and/or remove brackets when confirmed.~~

[31] ~~NTD: Insert date when available.~~

[32] ~~NTD: Insert date when available.~~

D-1

By:_____
Name:
Title:

D-2

## Exhibit L-1

### PI Settlement Fund Agreement

This **Exhibit L-1** contains the PI Settlement Fund Agreement.  Pursuant to Article IV.R of the Plan, on the Effective Date, solely in the event that Class 9(a) votes to accept the Plan and the Creditors' Committee Settlement Conditions are satisfied, the PI Settlement Fund shall be established in accordance with the terms of the PI Settlement Fund Agreement and the Plan.  The PI Settlement Fund Agreement shall be (a) drafted by the Creditors' Committee, (b) in form and substance acceptable to the Debtors and Required Consenting 2020 B-2 Lenders, and (c) in substantially the form included in the Plan Supplement.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit L-1**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST**

**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST AGREEMENT**

**Dated as of May [2], 2023**

*Pursuant to the Revised Third Amended Joint Plan of Reorganization*
*of Revlon, Inc. and its Debtor Affiliates under*
*Chapter 11 of the Bankruptcy Code Dated May 1, 2023*

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ..................................................................3

    1.1        Creation and Name ............................................................3

    1.2        Purposes.................................................................................3

    1.3        Transfer of Assets ...............................................................5

    1.4        Acceptance of Assets and Assumption of Liabilities. ..................5

    1.5        Jurisdiction ...........................................................................6

ARTICLE II POWERS AND TRUST ADMINISTRATION ...............................6

    2.1        Powers. ..................................................................................6

    2.2        General Administration. ....................................................10

    2.3        Medicare Reporting Obligations. ....................................14

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS ...................14

    3.1        Accounts. ............................................................................14

    3.2        Investment Guidelines. .....................................................15

    3.3        Payment of Operating Expenses........................................16

    3.4        Payment of Talc Claims. ..................................................17

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE..........................................18

    4.1        Number ...............................................................................18

    4.2        Term of Service. ................................................................18

    4.3        Compensation and Expenses of the Trustee.....................19

    4.4        Standard of Care; Exculpation. ........................................20

    4.5        Protective Provisions..........................................................21

    4.6        Indemnification. .................................................................23

    4.7        Trustee Independence .........................................................25

    4.8        No Bond ..............................................................................25

    4.9        Delaware Trustee................................................................25

i

ARTICLE V TRUST ADVISORY COMMITTEE.....................................................31

    5.1      Members.......................................................................31

    5.2      Duties............................................................................31

    5.3      Term of Office..............................................................31

    5.4      Appointment of Successors. ........................................32

    5.5      Compensation and Expenses of the TAC....................33

    5.6      No Bond .......................................................................33

    5.7      Procedures for Obtaining Consent of the TAC ...........33

ARTICLE VI GENERAL PROVISIONS .........................................................35

    6.1      Irrevocability ...............................................................35

    6.2      Term; Termination. .....................................................35

    6.3      Amendments................................................................36

    6.4      Severability..................................................................37

    6.5      Notices.........................................................................37

    6.6      Successors and Assigns ...............................................40

    6.7      Limitation on Talc Claims Interests for Securities Laws Purposes.............40

    6.8      Exemption from Registration ......................................40

    6.9      Entire Agreement; No Waiver.....................................41

    6.10      Headings. .....................................................................41

    6.11      Governing Law ............................................................41

    6.12      Dispute Resolution ......................................................42

    6.13      Effectiveness ...............................................................44

    6.14      Counterpart Signatures ................................................44

EXHIBIT 1  PI TRUST DISTRIBUTION PROCEDURES .....................................2

EXHIBIT 2    CERTIFICATE OF TRUST OF OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST ...............................................................3

EXHIBIT 3  INVESTMENT GUIDELINES ................................................5

ii

## OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST AGREEMENT

This Old RevCo Talc Personal Injury Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1860] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 22-10760 (DSJ) in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") by Wilmington Trust, National Association (the "**Delaware Trustee**"), the Trustee identified on the signature pages hereof (the "**Trustee**"), and the members of the Trust Advisory Committee identified on the signature pages hereof (the "**TAC**" and, together with the Delaware Trustee and the Trustee, the "**Parties**").

## RECITALS

**WHEREAS,** the Plan contemplates the creation of the Old RevCo Talc Personal Injury Liquidating Trust (provided for and referred to in the Plan as the PI Settlement Fund) (the "**PI Trust**");

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** pursuant to the Plan, the PI Trust is established to administer distributions to the eligible holders of Class 9(a) Talc Personal Injury Claims ("**Talc Claims**") in accordance with the Plan, the Confirmation Order and this Trust Agreement;

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

**WHEREAS,** the Trustee shall administer the PI Trust in accordance with the terms of the Plan, this Trust Agreement and the PI Claims Trust Distribution Procedures (the "**TDP**"), attached hereto as **<u>Exhibit 1</u>**; and

**WHEREAS,** pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" (a "**Qualified Settlement Fund**") within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("**IRC**") (the "**QSF Regulations**"). For the avoidance of doubt, the PI Trust is not intended to constitute either (i) a "Section 524(g) trust" within the meaning of the Bankruptcy Code, or (ii) a "grantor trust" within the meaning of Section 1.671- 4(a) of the Treasury Regulations.

**NOW, THEREFORE,** it is hereby agreed as follows:

# ARTICLE I

## AGREEMENT OF TRUST

1.1    **Creation and Name.**  There is hereby created a trust known as the "Old RevCo Talc Personal Injury Liquidating Trust." The Trustee of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include the Trustee acting on behalf of the PI Trust. It is the intention of the Parties that the PI Trust constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that this Trust Agreement constitute the governing instrument of the PI Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

1.2    **Purposes**.  The purposes of the PI Trust are to

(a)    receive the Talc Personal Injury Settlement Distribution (the "**Settlement Consideration**") pursuant to the terms of the Plan and the Confirmation Order;

(b)    hold, manage, protect and invest the Settlement Consideration, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**") in accordance with the terms of the Plan, the Confirmation Order, this Trust Agreement and the TDP (the "**Governing Documents**") for the benefit of the Beneficial Owners (as defined herein);

(c)    administer, process and resolve Talc Claims pursuant to the TDP;

3

(d)        qualify at all times as a Qualified Settlement Fund within the meaning of QSF Regulations;

(e)        engage in any lawful activity that is appropriate and in furtherance of the purposes of the PI Trust to the extent consistent with the Plan, the Confirmation Order and this Trust Agreement; and

(f)        make distributions of Trust Assets to eligible holders of Talc Claims in accordance with and subject to the terms of this Trust Agreement, the Plan and the TDP with the objective of treating all eligible holders of Talc Claims fairly, equitably, and reasonably in light of the Trust Assets available to resolve such Talc Claims.

1.3     **Transfer of Assets.** Pursuant to, and in accordance with Article IV.R of the Plan, the PI Trust has received the Settlement Consideration to fund the PI Trust. The Settlement Consideration and any other assets to be transferred to the PI Trust under the Plan will be transferred to the PI Trust free and clear of any liens or other claims by the Debtors, the Reorganized Debtors, any creditor, or other entity. For the avoidance of doubt, the Settlement Consideration transferred to fund the PI Trust shall not include the Retained Preference Actions, provided, however, that the Settlement Consideration shall include an interest in the Retained Preference Action Net Proceeds, as a result of which the PI Trust shall receive a transfer of assets arising in respect of such Retained Preference Action Net Proceeds, if any, in accordance with the terms of the Plan.

1.4     **Acceptance of Assets and Assumption of Liabilities.**

(a)     In furtherance of the purposes of the PI Trust, the PI Trust hereby expressly accepts the transfer to the PI Trust of the Settlement Consideration and any other transfers by the GUC Trust from the GUC Trust/PI Fund Operating Reserve contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

(b)     In furtherance of the purposes of the PI Trust, except as otherwise provided in this Trust Agreement and the TDP, the PI Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Talc Claim immediately before the Effective Date to the extent necessary to administer such Claims in accordance with this Trust Agreement, the TDP and the Plan.

5

(c)     Notwithstanding anything to the contrary herein, no provision herein or in the TDP shall be construed or implemented in a manner that would cause the PI Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations.

(d)     In this Trust Agreement and the TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Trust (the "**Beneficial Owners**") shall be deemed to be the holders of Talc Claims; provided that (i) the holders of Talc Claims, as such Beneficial Owners, shall have only such rights with respect to the PI Trust and its assets as are set forth in the TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Trust, shall be deemed to apply to the holders of Talc Claims in their capacity as Beneficial Owners.

1.5     **Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the PI Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the PI Trust.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

2.1     **Powers.**

(a)     The Trustee is and shall act as a fiduciary to the PI Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee

6

shall, at all times, administer the PI Trust in accordance with the purposes set forth in Section 1.2

above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the

Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are

necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each

power expressly granted in this Section 2.1, any power reasonably incidental thereto and not

inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted

under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in

the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any

court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as

limited below or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the Settlement Consideration and exercise all

rights with respect thereto;

(ii)     invest the monies held from time to time by the PI Trust in

accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)     obtain payment of expenses and other obligations of the PI

Trust, from the GUC Trust/PI Fund Operating Reserve as set forth in the Plan and this Trust

Agreement;

7

(iv)     establish such funds, reserves, and accounts within the PI Trust, as the Trustee deems useful in carrying out the purposes of the PI Trust;

(v)     participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the Talc Claims;

(vi)     establish, supervise, and administer the PI Trust and the TDP, and make distributions to all eligible holders of Talc Claims pursuant to the terms of this Trust Agreement, the Plan and the TDP;

(vii)     appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(viii)     obtain payment from the GUC Trust/PI Fund Operating Reserve for the reasonable compensation to any of the PI Trust's employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the PI Trust requires;

(ix)     obtain payment from the GUC Trust/PI Fund Operating Reserve to compensate the Trustee, the Delaware Trustee, and their employees, consultants, advisors,

8

independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(x)       record all expenses (including taxes) incurred by the PI Trust on the books and records (and report on all applicable tax returns) as expenses of the PI Trust; provided however that, the PI Trust shall periodically provide all invoices or other documentation with respect to such expenses to the GUC Administrator and the GUC Administrator shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay such expenses;

(xi)       enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xii)       in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiii)       obtain the consent of the TAC with respect to the matters set forth in Section 2.2(e) below; and

9

(xiv)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the PI Trust.

2.2    **General Administration.**

(a)    The Trustee shall act in accordance with the Governing Documents and shall implement the TDP in accordance with its terms. In the event of a conflict between the terms of this Trust Agreement and the TDP, the terms of this Trust Agreement shall control. In the event of a conflict between the terms or provisions of the (i) Plan, (ii) this Trust Agreement or (iii) the TDP, the terms of the Plan shall have first priority, followed in priority by the Trust Agreement, and lastly by the TDP. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall cause to be paid timely from the GUC Trust/PI Fund Operating Reserve all taxes required to be paid by the PI Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the PI Trust as a Qualified Settlement Fund within the meaning of the

QSF Regulations, (iv) take no action that could cause the PI Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (v) be treated as the "administrator" of the PI Trust within the meaning under Section 1.468B-2(k)(3) of the Treasury Regulations.

(c)    The Trustee shall timely account to the Bankruptcy Court as follows:

(i)    The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the PI Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants. The Trustee shall provide a copy of such Annual Report to the Reorganized Debtors and the TAC when such report is filed with the Bankruptcy Court.

(ii)    Simultaneously with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Talc Claims resolved during the period covered by the Annual Report (the "**Claims Report**"). The Trustee shall provide a copy of such Claims Report to the Reorganized Debtors and the TAC when such report is filed with the Bankruptcy Court.

11

(d)     The Trustee shall consult with the TAC on the matters set forth in the TDP.

(e)     The Trustee shall be required to obtain the consent of the TAC, pursuant to the consent process set forth in Section 5.7 below:

(i)     to change the form of Acceptance and Release under the TDP;

(ii)     to commence and/or participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(iii)     to modify the compensation of the Trustee;

(iv)     to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(v)     to effectuate any material amendment of this Trust Agreement, or any amendment of the TDP, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(f)     The Trustee shall be required to obtain the consent of the Reorganized Debtors, which shall not be unreasonably withheld or delayed:

(i)     absent further order of the Bankruptcy Court, to commence and/or participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, with the exception of (i) any proceeding brought against the PI Trust by any entity; (ii) any motion or proceeding in the Chapter 11 Cases relating to or in connection with Talc

12

Claims; or (iii) any proceeding to enforce the rights of the PI Trust under or relating to the Plan, Definitive Documents, and/or this Trust Agreement;

(ii)    to materially modify the compensation of the Trustee;

(iii)    to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(iv)    to make any amendment or modification of this Trust Agreement, or Exhibit hereto, or TDP, or Schedule thereto, that directly or indirectly affects the rights, duties, immunities, interests or liabilities of the Reorganized Debtors, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(g)    The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by two or more members of the TAC. Meetings may be held in person, by telephone or video conference, or by a combination of the foregoing.

(h)    All Trust Assets shall be part of the PI Trust or otherwise shall be segregated from any assets of Revlon, Inc. (or any persons related to Revlon, Inc. within the meaning of Section 1.468B-1(d)(2) of the Treasury Regulations).

(i)    Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his or her position as such.

13

2.3    **Medicare Reporting Obligations.**

(a)    The PI Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

(b)    The PI Trust shall timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Trust or with respect to contributions to the PI Trust. The PI Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

**ARTICLE III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

3.1    **Accounts.**

(a)    The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the PI Trust with one or more financial depository institutions (each a "**Financial Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Reorganized Debtors or their affiliated persons.

14

Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(b)    The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a).

(c)    The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the Beneficial Owners and the payment of PI Trust operating expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

3.2    **Investment Guidelines.**

(a)    The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3** (the "**Investment Guidelines**").

(b)    In the event the PI Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the PI Trust of the

15

"prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)    Cash proceeds received by the PI Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the PI Trust as set forth in Section 1.2 above.

3.3    **Payment of Operating Expenses**

All operating expenses of the PI Trust shall be paid by the PI Trust solely from, and after receipt of funds from, the GUC Trust/PI Fund Operating Reserve as provided in the Plan. The PI Trust shall periodically provide all invoices or other documentation with respect to such expenses to the GUC Administrator and the GUC Administrator shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay such expenses.[2] None of the Trustee, Delaware Trustee, the TAC, the Beneficial Owners nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any operating expense or other liability of the PI Trust. Except as expressly set forth in the Plan, none of the Debtors or Reorganized Debtors, nor any of their officers, agents, advisors, professionals or employees shall be liable for the payment of any operating expense or other liability of the PI Trust, the Trustee or the TAC. To the extent that the Trustee determines that GUC Trust/PI Fund Operating Reserve is likely to incur a cash shortfall prior to the termination and winding up of the GUC Trust and/or the PI Trust (after taking into

---

[2]. Nothing in this Trust Agreement shall preclude the Trustee and the PI Trustee from establishing appropriate and efficient cash management/accounting systems which may include the advancement of funds from the GUC Trust/PI Fund Operating Reserve to the PI Trust from time to time.

16

account additional funding of the GUC Trust/PI Fund Operating Reserve as contemplated by the Plan), the Trustee may determine to establish cash reserves from the corpus of the Trust, which cash reserves shall be allocated equitably to the Beneficial Owners by the Trustee in his or her judgment.

3.4    **Payment of Talc Claims.**

The Trustee will make distributions to the Beneficial Owners in a fair, consistent and equitable manner in accordance with this Trust Agreement, the TDP, the Plan and the Confirmation Order. All payments with respect to Talc Claims shall be made by the PI Trust solely out of the Trust Assets. If the Trustee determines immediately prior to the Dissolution Date, in his or her discretion, that all Talc Claims have been paid in full, or that making further payments with respect to Talc Claims is not cost-effective with respect to the final amounts to be paid to Beneficial Owners, and that adequate provision has been made for all final obligations of the PI Trust, the Trustee shall have the authority to direct the remaining Trust Assets to a tax-exempt organization benefiting mesothelioma victims, as selected by the Trustee in his or her discretion.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1     **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.9,

there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

4.2     **Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his

or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal

pursuant to Section 4.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 6.2

below.

(b)     The Trustee may resign at any time upon written notice to the Reorganized

Debtors and the TAC with such notice filed with the Bankruptcy Court. Such notice shall specify

a date when such resignation shall take effect, which shall not be less than ninety (90) days after

the date such notice is given, where practicable.

(c)     The Trustee may be removed by the unanimous consent of the TAC in the

event the Trustee becomes unable to discharge his or her duties hereunder due to accident,

physical deterioration, mental incompetence or for other good cause, provided the Trustee has

received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud,

self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a

felony in each case whether or not connected to the PI Trust, or a consistent pattern of neglect

and failure to perform or participate in performing the duties of Trustee hereunder. For the

avoidance of doubt, any removal of a Trustee by the TAC pursuant to this Section 4.2(c) shall

18

require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)    In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the unanimous consent of the TAC, subject to the approval of the Bankruptcy Court. In the event the TAC cannot agree on a successor Trustee, the provisions of Section 6.12 below shall apply.

(e)    Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)    Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the PI Trust pursuant to Section 6.2 below.

4.3    **Compensation and Expenses of the Trustee.**

(a)    The Trustee shall receive compensation for his or her services as Trustee on matters related to the operation of the Trust in the amount of $600 per hour, plus an annual stipend of $25,000 (pro-rated for partial years), which shall be paid in equal quarterly instalments. The compensation payable to the Trustee hereunder shall be reviewed every year by

19

the TAC and may be appropriately adjusted for changes in the cost of living. The PI Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date (such amount not to exceed $25,000), which shall be paid promptly after the Effective Date.

(b)　　The PI Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder.

(c)　　The PI Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3. The PI Trust shall provide quarterly reports to the Reorganized Debtors for a description of the amounts paid under this Section 4.3.

4.4　　**Standard of Care; Exculpation.**

(a)　　As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, (iii) the TAC and its members, and (iv) the officers, employees, consultants, advisors, and agents of each of the PI Trust, the Trustee, and the TAC**.**

(b)　　To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the PI Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or

20

inactions in their capacity as Trust Indemnified Parties, or on behalf of the PI Trust, and for any

other liabilities, losses, damages, claims, costs and expenses arising out of or due to the

implementation or administration of the Plan or the Trust Agreement (other than taxes in the

nature of income taxes imposed on compensation paid to such persons), in each case except for

any actions or inactions found by Final Order to be arising out of their willful misconduct, bad

faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified

Parties shall be satisfied from the PI Trust.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have

duties (including fiduciary duties) or liability related thereto, to the PI Trust or the Beneficial

Owners, it is hereby understood and agreed by the Parties that such duties and liabilities are

eliminated to the fullest extent permitted by applicable law, and replaced by the duties and

liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified

Parties; provided, however, that with respect to the Trust Indemnified Parties other than the

Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to

the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)    The PI Trust will maintain appropriate insurance coverage for the

protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

4.5    **Protective Provisions.**

(a)    Every provision of this Trust Agreement relating to the conduct or

affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to

the provisions of this Section 4.5.

(b)      In the event the Trustee retains counsel (including at the expense of the PI Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)      No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)      No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)      In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in

22

good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

4.6 **Indemnification.**

(a) To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the PI Trust.

(b) Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the PI Trust shall be paid by the PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the PI Trust. The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs and fees

23

(including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)     The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

24

4.7    **Trustee Independence.**   The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors. The Trustee shall not act as an attorney, agent, or other professional for any person who holds a Talc Claim. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

4.8    **No Bond.**   Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.9    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.9, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.9(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the PI Trust for the sole and limited purpose of

25

fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the PI Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the PI Trust or the Beneficial Owners, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the

26

written direction of the Trustee. The Delaware Trustee may, at the expense of the PI Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.9(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; _provided_ that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.9(d) below; _provided_ _further_ that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the PI Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the

27

Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the PI Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the PI Trust and the Delaware Trustee, which compensation shall be paid by the PI Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

28

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the PI Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or

29

communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

## ARTICLE V

## TRUST ADVISORY COMMITTEE

5.1    **Members.**  The TAC shall consist of three (3) members.  To the extent that a member of the TAC elects to resign from the TAC in accordance with Section 5.3(b) below or is removed pursuant to Section 5.3(c) below, a successor shall be appointed pursuant to Section 5.4(a).

5.2    **Duties.**  The members of the TAC shall serve in a fiduciary capacity, representing the interests of all holders of Talc Claims. The TAC shall have no fiduciary obligations or duties to any party other than the holders of Talc Claims. The Trustee must obtain the consent of the TAC on matters identified in Section 2.2(e) above. Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the TDP, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties hereto or any Beneficial Owner of the PI Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in the Governing Documents.

5.3    **Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal

31

pursuant to Section 5.3(c) below, or (iv) the termination of the PI Trust pursuant to Section 6.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other member of the TAC and the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the recommendation of the remaining member of the TAC with the approval of the Trustee.

5.4    **Appointment of Successors.**

(a)    If a member of the TAC dies, resigns pursuant to Section 5.3(b) above, or is removed pursuant to Section 5.3(c) above, the vacancy shall be filled with an individual selected by the remaining TAC members with the approval of the Trustee, provided however, that if the remaining TAC members and the Trustee cannot agree on the successor the matter shall be resolved pursuant to Section 6.12 below.

(b)    Each successor TAC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal pursuant to Section 5.3(c) above, or (iv) the termination of the PI Trust pursuant to Section 6.2 below.

32

(c)      No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.

5.5      **Compensation and Expenses of the TAC.**   The members of the TAC shall not receive compensation from the PI Trust for their services as TAC members but shall be reimbursed for all reasonable out-of-pocket costs or expenses incurred in connection with the performance of such member's duties hereunder. A description of the amounts paid under this Section 5.5 shall be included in the Annual Report and shall be included in quarterly reports provided to the Reorganized Debtors.

5.6      **No Bond.**   The members of the TAC shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.7      **Procedures for Obtaining Consent of the TAC**

(a)      Where the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(e) above, the TDP or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TAC with reasonable access to the professionals or experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with

33

the Trustee. In instances also requiring consent of the Reorganized Debtors, whose consent shall not be unreasonably denied or delayed, such notices and information provided to the TAC shall also be provided to the Reorganized Debtors.

(b)     The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within five (5) business days of receiving the original request for consent from the Trustee. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within five (5) days of receiving notice regarding such request, then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(c)     If, after following the procedures specified in Section 5.7, the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.12. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC's reasonable objection.

(d)     Action by the TAC shall require the affirmative vote of the majority of the TAC members then in office.

34

# ARTICLE VI

## GENERAL PROVISIONS

6.1     **Irrevocability**.  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

6.2     **Term; Termination.**

(a)     The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     The PI Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of the PI Trust, wherein (i) all reasonably expected assets have been collected, (ii) all payments with respect to Talc Claims under Section 3.4 above have been made, (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining obligations and operating expenses in a manner consistent with Governing Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the PI Trust by the Trustee and payment of all of the PI Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the PI Trust shall be distributed or disbursed in accordance with Section 3.4.

(d)     Following the dissolution and distribution of the assets of the PI Trust, the PI Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

6.3     **Amendments**.  Any amendment to or modification of this Trust Agreement may be made in writing and only pursuant to an order of the Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement with the unanimous consent of the TAC from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; (ii) amendments permitted pursuant to Section 6.1 of the TDP, or (iii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, the TDP may be amended in writing by the Trustee with the consent of the TAC without an order of the Bankruptcy Court, provided, however, the amended TDP shall be filed with the Bankruptcy Court within thirty (30) days following the effective date of such amended TDP. Notwithstanding the foregoing, (i) no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order, other than, with the Reorganized Debtors' consent, to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this

36

Trust Agreement; (ii) neither this Trust Agreement, the TDP, nor any Exhibit to this Trust Agreement or the TDP shall be modified or amended in any way that could jeopardize, impair, or modify the PI Trust's Qualified Settlement Fund status under the QSF Regulations; and (iii) any amendment or modification of this Trust Agreement, or Exhibit hereto, or the TDP, or Schedule thereto, affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. The Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment or modification to the Trust Agreement or any Exhibit thereto, or the TDP or any Schedule thereto, and if the Reorganized Debtors reasonably and in good faith advise the Trustee in writing that the proposed amendment or modification affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors, then the Reorganized Debtors' consent (which shall not be unreasonably denied or delayed) shall be required for such proposed amendment or modification. Any dispute between the Trustee and the Reorganized Debtors with respect to this Section 6.3 shall be resolved by the Bankruptcy Court.

6.4    **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

6.5    **Notices.**

(a)    Notices to persons asserting Talc Claims shall be given in accordance with such person's claims form submitted to the PI Trust with respect to his or her Talc Claim.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses

designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in

writing to each of the other Parties listed below in compliance with the terms hereof.

    To the PI Trust:

        David Gordon, Trustee
        c/o DJO Services, LLC
        4460 Redwood Hwy., Suite 16-518
        San Rafael, CA 94903
        dgordon@djoservicesllc.com

    With a copy (which shall not constitute notice) to:

        FrankGecker LLP
        Attn: Joseph D. Frank
            Jeremy C. Kleinman
        1327 West Washington Blvd, Suite 5G-H
        Chicago, IL 60607
        jfrank@fgllp.com
        jkleinman@fgllp.com

    To the Delaware Trustee;

        Wilmington Trust, N.A.
        1100 North Market Street
        Wilmington, DE 19890
        Attn: Russell L. Crane
        Email: rcrane@wilmingtontrust.com

    With a copy (which shall not constitute notice) to:

        Morris James, LLP
        500 Delaware Avenue, Suite 1500
        Wilmington, DE 19801
        Attn: Ross Antonacci, Esq.
        Email: rantonacci@morrisjames.com

    To the TAC:

        Aleksandra Sikorska
        c/o Meirowitz & Wasserberg LLP
        1 Financial Plaza Ste. 804

Ft. Lauderdale, FL 33394
aleksandra@mwinjurylaw.com

--and--

Chris McKean
c/o MRHFM LLC
1015 Locust St. Ste. 1200
St. Louis, MO 63101
cmckean@mrhfmlaw.com

--and—

Maura Kolb
c/o Lanier Law Firm
10940 W. Sam Houton
Pkwy N. Ste. 100
Houston, TX 77064
Maura.Kolb@LanierLawFirm.com

To the Reorganized Debtors:

RCP LLC
55 Water St., 43rd Floor
New York, New York 10041
Attention: Andrew Kidd, General Counsel
Email: Andrew.kidd@revlon.com

With a copy (which shall not constitute notice) to:

Paul Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Irene Blumberg
Email: iblumberg@paulweiss.com

(c)     All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

39

6.6    **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Reorganized Debtors (which shall be a third-party beneficiary hereof), the PI Trust, the TAC, the Delaware Trustee, the Trustee, and their respective successors and assigns, except that neither the PI Trust, the TAC, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.9(d), and in the case of the Trustee in accordance with Section 4.2(d) above, and in the case of the TAC members in accordance with Section 5.4(b) above.

6.7    **Limitation on Talc Claims Interests for Securities Laws Purposes**. Talc Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

6.8    **Exemption from Registration**. The Parties hereto intend that the interests of the Beneficial Owners under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the PI Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

40

6.9     **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein (including the TDP), and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

6.10    **Headings.**    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

6.11    **Governing Law**. The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the PI Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval

41

concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, or the TAC, set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the PI Trust.

6.12   **Dispute Resolution**.

(a)     Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 6.12 shall not apply to the Delaware Trustee or to the Reorganized Debtors in any respect or any dispute with respect to the resolution of Talc Claims which shall be governed exclusively by the TDP. This Section 6.12 shall not apply to any matters as between the GUC Trust or the Trustee, on the one hand, and the PI Trust or the PI Trustee, on the other hand, related to or arising from the GUC Trust/PI Fund Operating Reserve.

(b)     **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute

42

("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)     **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d).

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have

43

jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the PI Trust. Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

6.13    **Effectiveness**. This Trust Agreement shall become effective on the Effective Date.

6.14    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day

of _____, 2023.


**TRUSTEE**


_____
Name: David J. Gordon

**DELAWARE TRUSTEE**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By:_____
    Name: Russell L. Crane
    Title:   Vice President

**TRUST ADVISORY COMMITTEE**

_____
Maura Kolb


_____
Chris McKean


_____
Aleksandra Sikorska

# EXHIBIT 1

## PI TRUST DISTRIBUTION PROCEDURES

**REVLON TALC PERSONAL INJURY LIQUIDATING TRUST
DISTRIBUTION PROCEDURES**

# TABLE OF CONTENTS

**Clause**                                                                                          **Page**

**SECTION I INTRODUCTION** ..................................................................................1

    1.1.      Purpose. ....................................................................................1

**SECTION II PAYMENT OF TALC CLAIMS** ........................................................2

    2.1.      Claims Liquidation Procedures ...................................................2
    2.2.      Initial Distribution ....................................................................2
    2.3.      Application of Payment Percentage .............................................2
    2.4.      Requirement of Release................................................................3

**SECTION III RESOLUTION OF TALC CLAIMS** ................................................3

    3.1.      Effect of Statutes of Limitation and Repose. ...............................3
    3.2.      Resolution Process ....................................................................4
    3.3.      Talc Claims Determination Process .............................................5
    3.4.      Evidentiary Requirements. .........................................................11
    3.5.      Right to Alternative Dispute Resolution. .....................................15

**SECTION IV CLAIMS MATERIALS** ....................................................................16

    4.1.      Claims Materials. ......................................................................16
    4.2.      Content of Claims Materials........................................................16
    4.3.      Withdrawal of Claims ...............................................................16
    4.4.      Confidentiality of Claimants' Submissions.................................16

**SECTION V GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS**.17

    5.1.      Showing Required ....................................................................17
    5.2.      Costs Considered......................................................................17
    5.3.      Third-Party Services................................................................17
    5.4.      Punitive Damages ....................................................................18

**SECTION VI MISCELLANEOUS** .........................................................................18

    6.1.      Amendments.............................................................................18
    6.2.      Severability..............................................................................19
    6.3.      Governing Law ........................................................................19
    6.4.      Extensions of Time....................................................................19

    **SCHEDULE 1 RELEASE AND INDEMNITY AGREEMENT** ...................................20

    **CERTIFICATION** ....................................................................................25

    **SCHEDULE 2 DEFINITIONS** ....................................................................28

i

## REVLON TALC PERSONAL INJURY LIQUIDATING TRUST DISTRIBUTION PROCEDURES

The Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust contained herein set forth procedures for resolution of Talc Personal Injury Claims, as defined in and to the extent provided in connection with the *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed February 21, 2023 [Docket No. 1507] (as it may be amended or modified), as provided in the Revlon Talc Personal Injury Liquidating Trust Agreement.[1] The Trustee of the PI Trust shall implement and administer this TDP in consultation with the Trust Advisory Committee in accordance with the Trust Agreement.[2]

## SECTION I

## INTRODUCTION

**1.1.    Purpose.** This TDP has been adopted pursuant to the Trust Agreement. The purpose of this TDP is to provide fair, equitable and substantially similar treatment for and

---

[1]    Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Trust Agreement or Plan, as applicable.

[2]    This TDP is established solely to implement the Plan and Plan Settlement. Nothing in this TDP or any other Definitive Document is intended to be, nor shall it be construed as, an admission by the Debtors as to any Talc Claim, nor shall any Definitive Document, including this TDP, or any component thereof be admissible as evidence of, or have any *res judicata, collateral estoppel*, or other preclusive or precedential effect regarding, (i) any alleged asbestos contamination in any product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (ii) any liability of the Debtors, or the amount of any alleged liability, in respect of any personal injury actually or allegedly caused by any talc-containing allegedly asbestos-contaminated product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility. Likewise, no decision of the Trustee or TAC to approve or make any distribution upon any Talc Claim shall be admissible as evidence of, or have any *res judicata, collateral estoppel*, or other preclusive or precedential effect regarding, liability to be imposed against Revlon, Inc., its Affiliates, or any other entity other than the PI Trust. The order of the Bankruptcy Court confirming the Plan shall constitute findings and orders with regard to the foregoing paragraph.

1

among each holder of a Talc Claim (a "**Claimant**") in an efficient manner. To achieve maximum fairness and efficiency, this TDP is founded on the following principles:

(a)      Objective eligibility criteria;

(b)      Clear and reliable proof requirements;

(c)      Administrative transparency;

(d)      Rigorous review processes that generate consistent outcomes regardless of the asserted amount of the Talc Claim; and

(e)      Independence of the Trustee and the Trust's professionals.

## SECTION II

## PAYMENT OF TALC CLAIMS

**2.1.    Claims Liquidation Procedures**. The PI Trust shall take all reasonable steps to resolve Talc Claims as efficiently and expeditiously as possible at each stage of claims processing.

**2.2.    Initial Distribution**. The Trustee intends to make only a single distribution to all or substantially all holders of eligible Talc Claims with Final Determinations at the end of the Claims Determination Process for all eligible Talc Claims; provided, however, if the Trustee determines to proceed to a distribution on account of substantially all holders of eligible Talc Claims with Final Determinations, the Trustee shall establish adequate reserves for Talc Claims that have not yet received a Final Determination. Notwithstanding any provision in the Trust Agreement, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

**2.3.    Application of Payment Percentage**. At the end of the Claims Determination Process for all or substantially all holders of eligible Talc Claims with Final Determinations, the Trustee shall set a payment percentage to be applied to all Final Determinations, based on

his or her estimate of the PI Trust's assets and liabilities, if any, as well as the then-estimated value on account of all Final Determinations (the "**Payment Percentage**"). Each Claimant with a Final Determination will receive a distribution from the PI Trust equal to his or her Final Determination multiplied by the Payment Percentage, in each case in accordance with Section 2.4 hereof.

2.4. **Requirement of Release.** The PI Trust shall make payment of the Payment Percentage on account of a Final Determination to a Claimant (or such Claimant's counsel on account of such Claimant) only after the PI Trust has received a properly executed release from the Claimant in the form attached hereto as Schedule 1, as may be amended in accordance with Section 6.1 hereof or by order of the Bankruptcy Court.

<div align="center">

**SECTION III**

**RESOLUTION OF TALC CLAIMS**

</div>

3.1. **Effect of Statutes of Limitation and Repose.** All Talc Claims must meet either (i) the applicable federal, state or foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, in the case of claims first filed in the tort system against the Debtors prior to the Petition Date, or (ii) the applicable federal, state or foreign statute of limitation that was in effect at the time of the filing of a proof of claim in the Debtors' Chapter 11 Cases, in the case of claims not filed against the Debtors in the tort system prior to the Petition Date. Notwithstanding the foregoing, the relevant statute of limitation shall be deemed tolled, with respect to a Claimant, as of the earliest of: (A) the actual filing by such Claimant of the claim against the Debtors prior to the Petition Date, whether in the tort system or by submission of the claim to the Debtors pursuant to an administrative settlement agreement; (B) the date provided by an agreement or otherwise, by the Debtors and such Claimant, prior to the Petition Date for the tolling of the claim against

<div align="center">3</div>

the Debtors, provided such tolling was still in effect on the Petition Date; or (C) the Petition Date.

If a Talc Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of limitation at the time of the tolling event, it shall be treated as a timely filed Talc Claim (i) if it was timely filed in accordance with the Bar Date Order, or (ii) upon entry of an Order of the Bankruptcy Court, following notice to interested parties including but not limited to the Trustee and the Reorganized Debtors, permitting such Talc Claim to be deemed timely filed for the purposes of this TDP.

**3.2.** **Resolution Process**. Within three (3) months after the Effective Date, the Trustee shall adopt written procedures for reviewing and liquidating Talc Claims pursuant to this TDP. Such procedures shall require Claimants to file a claim submission in form approved by the Trustee (the "**Claim Submission Form**"), together with the required supporting documentation, in accordance with the provisions of Sections 4.1 and 4.2 below, not later than a date to be determined by the Trustee in consultation with the TAC, which date shall be no less than four (4) months after the Effective Date. It is anticipated that the PI Trust shall provide an initial response to the Claimant within one hundred eighty (180) days of receiving the Claim Submission Form.

The Claim Submission Form shall require the Claimant to elect either Matrix Review in accordance with Section 3.3.1.7 or, if ineligible for Matrix Review, Individual Review in accordance with Section 3.3.3. The Claim Submission Form shall require a Claimant electing Matrix Review to assert his or her Talc Claim for the highest Mesothelioma Compensation Level ("**MCL**") for which the Talc Claim qualifies at the time of filing.

Notwithstanding a Claimant's timely filing of a Talc Claim pursuant to Section 3.1 hereof, if a Claimant does not submit a completed Claim Submission Form prior to the deadline set by the Trustee, the Claimant's claim shall be disallowed (a "**Disallowed Claim**"); provided, however, the Trustee shall have the discretion to waive any deficiency of any Claim Submission Form that the Trustee determines in his or her discretion to be appropriate for an extended Claim Submission Form deadline.  For the avoidance of doubt, no more than one Talc Claim may be asserted on behalf of any IP, and the Trustee shall have the discretion to disallow any Talc Claim or portion thereof that is duplicative of another Talc Claim asserted on behalf of any IP.

### 3.3.    Talc Claims Determination Process

#### 3.3.1    Review Process.

##### 3.3.1.1    In General. This TDP will govern the process by which each Talc Claim is reviewed, including determining whether a Talc Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment (the "**Claims Determination Process**"). After the Trust has fully evaluated a Talc Claim, the Trust will issue a notice to the Claimant explaining the review result. If the Talc Claim has been approved and is eligible for payment, then the notice will include the specific amount that the Trust has approved (the "**Approved Claim Amount**"). If the Claimant accepts the Approved Claim Amount, it becomes the final determination of the Talc Claim (the "**Final Determination**"). If the Talc Claim is missing documents or information required for the Trust to fully evaluate the Talc Claim (a "**Deficient Claim**"), the notice will explain what is required and provide a timeline within which the Claimant may resolve the deficiencies. If the Talc Claim is ineligible for

payment from the PI Trust pursuant to this TDP, the notice will explain the reason(s) that the Talc Claim is ineligible and deemed a Disallowed Claim.

**3.3.1.2    Pre-Petition Settled Claims.** The Claim Submission Form shall permit Claimants to submit a Talc Claim subject to a settlement agreement with the Debtors that was fully executed on or before June 15, 2022 (respectively, a "**Pre-Petition Settled Claim**" and a "**Pre-Petition Settlement Agreement**").

**3.3.1.3**    A Claimant with a Pre-Petition Settled Claim may elect the Approved Claim Amount to be (i) the unpaid amount agreed to in the Pre-Petition Settlement Agreement (the "**Settlement Value**"), or alternatively, (ii) the "**TDP Matrix Value**". If the Claimant elects the Approved Claim Amount to be the TDP Matrix Value rather than the Settlement Value, the Claimant shall be bound by the MCL either (x) as identified in the Pre-Petition Settlement Agreement or, (y) if not so identified in the Pre-Petition Settlement Agreement, as asserted by the Claimant in writing in litigation or negotiations with the Debtors; provided, however, in the case of either (x) or (y) such Claimant shall be required to satisfy the Medical/Exposure Criteria set forth for Matrix Review in this TDP, including in accordance with Section 3.3.1.7 hereof. For the avoidance of doubt, for Claimants with a Pre-Petition Settled Claim electing a TDP Matrix Value, any applicable Adjustment Factors shall be applied as of the date of the Trustee's review of the Talc Claim.

**3.3.1.4**    A Claimant with a Pre-Petition Settled Claim that cannot demonstrate assertion of an MCL in accordance with Section 3.3.1.3 shall be bound by such Settlement Value.

**3.3.1.5**    Notwithstanding the foregoing, a Claimant asserting a Pre-Petition Settled Claim, who is determined by the PI Trust not to have a qualifying Pre-Petition

Settled Claim, may nevertheless proceed with a Talc Claim in accordance the procedures set forth in this TDP for Talc Claims that are not Pre-Petition Settled Claims.

**3.3.1.6    Matrix    Review:    MCLs,    Scheduled    Values    and Medical/Exposure Criteria.** Claimants with Talc Claims in connection with malignant mesothelioma diagnosis shall be eligible for Matrix Review.  The Matrix Review of this TDP establishes a schedule of two talc-related "**MCLs**" for Claimants in connection with a malignant mesothelioma diagnosis of the Claimant's injured party ("**IP**"); each MCL has "**Medical/Exposure Criteria**" and "**Scheduled Values**." For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

**3.3.1.7**    "**Matrix Review**" shall mean the review and valuation of Talc Claims in accordance with the schedule set forth in this Section 3.3.1.7; the Scheduled Value, subject to modification for "Adjustment Factors" as set forth in Section 3.3.2, shall be the Approved Claim Amount.  The two MCLs covered by this TDP, together with the Medical/Exposure Criteria and the Scheduled Values for each, are set forth below.

| MCL | SCHEDULED VALUE | MAXIMUM VALUE | MEDICAL/EXPOSURE CRITERIA |
|-----|-----------------|---------------|---------------------------|
| Level 1 | $350,000 | $700,000 | (1) Diagnosis of malignant mesothelioma; (2) At least three years of regular and routine Debtor Cosmetic Talc Exposure; Debtor Cosmetic Talc Exposure comprises 50-100% of Total Talc Exposure. |

| | | | |
|---|---|---|---|
| | | | (3) Subject to 75% reduction in Matrix Value for extremely nominal Non-Talc Asbestos-Containing Product Exposure. |
| Level 2 | $50,000 | $100,000 | (1) Diagnosis of malignant mesothelioma; (2) At least three years of regular and routine Debtor Cosmetic Talc Exposure; Debtor Cosmetic Talc Exposure comprises less than 50% of Total Talc Exposure. (3) Subject to 75% reduction in Matrix Value for extremely nominal Non-Talc Asbestos-Containing Product Exposure. |

An "**Extraordinary Claim**" shall require regular and routine Debtor Cosmetic Talc Exposure comprising 90% or more of the IP's Total Talc Exposure, and no Non-Talc Asbestos-Containing Product Exposure. Such Extraordinary Claim shall be entitled to up to two times the TDP Matrix Value for MCL 1 (for the avoidance of doubt, the TDP Matrix Value shall include the application of all Adjustment Factors, but shall not exceed the Maximum Value, provided that an Extraordinary Claim may receive a TDP Matrix Value up to two times greater than the Maximum Value for MCL 1). For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

### 3.3.2    Adjustment Factors to Scheduled Values.

The Trustee shall determine the Approved Claim Amount based on the determination of the Claimant's appropriate Scheduled Value pursuant to section 3.3.1.7 above and additionally Adjustment Factors.  Adjustment Factors shall be with respect to the IP. Adjustment Factors shall be (i) Age Factor, (ii) Dependents Factor, and (iii) Economic Loss Factor. Adjustment Factors shall be a multiplier of the Claimant's Scheduled Value; after the multiplier(s), the Approved Claim Amount shall be the lesser of (i) the product of the Scheduled Values and Adjustment Factors and (ii) the Maximum Value.

### 3.3.2.1    Age Factor

The Trustee will determine the Age Factor based on the earlier of the IP's first diagnosis of talc-related malignancy and the IP's death date (the "**IP Age**"). The Trustee will assign an Age Factor in the following manner:

| Age Factor | Age |
|---|---|
| 0.5 | Over 80 years old |
| 0.75 | 71-80 years old |
| 1.0 | 65-70 years old |
| 1.25 | 46-64 years old |
| 1.5 | 45 years old or under |

### 3.3.2.2    Dependents Factor

The Trustee will determine a "**Dependents Factor**" based on the IP's dependents (including spouses, minor children, adult disabled dependent children, and dependent minor grandchildren) in the following manner:

9

| Dependents Factor | Dependents |
|---|---|
| 0.5 | No dependents |
| 0.75 | No spouse, other dependents |
| 1.0 | Spouse, no other dependents |
| 1.25 | Spouse and other dependents |

### 3.3.2.3    Economic Loss Factor

Claimants may elect (but are not required) to document economic losses related to the IP's loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. Subject to review and substantiation of such documents, the Trust will assign an "**Economic Loss Factor**" in the following manner:

| Economic Loss Factor | Documented Economic Loss |
|---|---|
| 1.0 | <$200,000 |
| 1.0 + .001 for every thousand dollars of economic loss above $200,000, up to $450,000 | $200,000 - $450,000 |
| 1.25 | >$450,000 |

### 3.3.3    Individual Review.

In lieu of Matrix Review and Adjustment Factors, a Claimant, either (i) by choice following rejection of the Approved Claim Amount and prior to commencing arbitration pursuant to section 3.5 hereof or (ii) due to ineligibility for Matrix Review, may elect to have an individual review (the "**Individual Review**").   Individual Review shall be mandatory for all Claimants not eligible for Matrix Review due to the absence of a

malignant mesothelioma diagnosis.  For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

Prior to the commencement of Individual Review, the Trustee shall require the Claimant to provide (i) such additional medical and other evidence deemed appropriate pursuant to Section 3.4 hereof, including evidence relevant to the Adjustment Factors set forth above, which for the avoidance of doubt shall include (i) a "**Linking Report**" of a qualified expert concerning the causes of the IP's injury, and (ii) a non-refundable commencement fee of $50.  In the event an Individual Review results in an Approved Claim Award and a Final Determination, the Trustee shall add $50 to the amount to be disbursed to the Claimant pursuant to Section 2.4 as a rebate of such commencement fee.

### 3.4.    Evidentiary Requirements.

#### 3.4.1    Evidence.

**3.4.1.1    In General.**  All diagnoses of a talc-related malignancy, whether or not relating to asbestos contamination, shall be based upon either (i) a physical examination of the IP by the physician providing the diagnosis of the talc-related or asbestos-related disease, or (ii) a diagnosis of such malignancy by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations. All diagnoses of a malignancy shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to allegedly asbestos-

contaminated talc or talc-containing products and the diagnosis, or (ii) a history of the IP's

exposure.[3]

### 3.4.1.2    Pre-Petition Claimant Submissions.

If a Claimant with a Talc Claim arising from a claim that was filed against the Debtors or any other defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the Claimant or his or her counsel who conducted a physical examination of the IP as described in Section 3.4.l.1, or if the Claimant has filed such medical evidence and/or a diagnosis of the talc-related disease by a physician not engaged by the Claimant or his or her counsel who conducted a physical examination of the Claimant with another talc-related personal injury settlement trust that requires such evidence, without regard to whether the Claimant or counsel engaged the diagnosing physician, the Claimant shall provide such medical evidence to the PI Trust.

### 3.4.1.3    Credibility of Medical Evidence.

Before making any payment to a Claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the Talc Claim is credible and consistent with recognized medical standards. To the extent consistent with recognized medical standards, the PI Trust may (i) require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence (for the avoidance of doubt, this clause (i) does not apply to reliable medical evidence of a diagnosis of mesothelioma), and (ii) may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence that is (i) of a kind

---

[3]    All diagnoses of mesothelioma shall be presumed to be based on findings that the disease involves a malignancy. However, the Trust may rebut such presumptions.

shown to have been received in evidence by a state or federal judge at trial, (ii) consistent with evidence submitted to the Debtors to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the talc-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may rebut the presumption. In addition, Claimants who otherwise meet the requirements of this TDP for a Final Determination shall be paid in accordance with this TDP regardless of the results in any litigation at any time between the Claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be used by either the Claimant or the PI Trust in the Claims Determination Process of any Talc Claims under this TDP.

### 3.4.2 Exposure Evidence.

**3.4.2.1    In General.** As set forth in Section 3.3.3 above, to qualify for any MCL or Approved Claim Amount through Individual Review, the Claimant must demonstrate a minimum exposure to talc-containing products, or to conduct that exposed the Claimant to a talc-containing allegedly asbestos-contaminated product, for which the Debtors have liability. Any claim based on conspiracy theories that involve no exposure to a talc-containing allegedly asbestos-contaminated product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors are not compensable under this TDP. To meet the exposure requirements set forth in Section 3.3.1 above, the Claimant must show Debtor Cosmetic Talc Exposure as defined in Section 3.4.2.2 below.

**3.4.2.2    Debtor Cosmetic Talc Exposure.** The Claimant must demonstrate meaningful and credible evidence of (a) exposure of the IP to a talc-containing cosmetic product manufactured, sold, supplied, produced, distributed, released, advertised or

13

marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (b) conduct for which the Debtor has legal responsibility that exposed the IP to such talc-containing cosmetic product (in either case, "**Debtor Cosmetic Talc Exposure**"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the IP, by an affidavit or sworn statement of a family member in the case of a deceased or incapacitated IP (providing the PI Trust finds such evidence reasonably reliable), or by other credible evidence.

        **3.4.2.3   Non-Debtor Exposure.** The Claim Submission Form may require that a Claimant include an estimation of all Non-Debtor Cosmetic Talc Exposure of the IP to talc, asbestos and asbestos-containing products known to cause the malignancy for which the IP has been diagnosed.

        **3.4.2.4   Non-Talc Asbestos-Containing Product Exposure.** The specific exposure information required by the PI Trust to review a Talc Claim shall be set forth on the Claim Submission Form. The PI Trust can also require submission of other or additional evidence of exposure, and may seek and review evidence from additional sources, when it deems such to be necessary to assess the entirety of the IP's exposure to talc, asbestos, and related products in connection with a Talc Claim against the Debtors.

        Evidence submitted by a Claimant to establish proof of Debtor Cosmetic Talc Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system. The PI Trust has no need for, and therefore Claimants are not required to furnish the PI Trust with evidence of, exposure to specific allegedly asbestos-contaminated talc or talc-containing products other than those for which the Debtors have legal responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Debtors' products in the Claimant's underlying tort action, or to other bankruptcy trusts, does

14

not preclude the Claimant from having an eligible Talc Claim under this TDP, provided the Claimant satisfies the medical and exposure requirements of this TDP.

      **3.5.**    **Right to Alternative Dispute Resolution.** The Trustee, with the consent of the TAC, shall develop and adopt "**ADR Procedures**," which shall provide for binding arbitration to resolve disputes for which the relevant parties cannot otherwise reach a resolution. ADR Procedures shall apply only with respect to (a) the amount of the Approved Claim Amount, and/or (b) whether the IP's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim; the costs of the ADR Procedures shall be allocated by the arbitrator between the Claimant and the Trust. The ADR Procedures may be modified by the Trust, with the consent of the TAC, and subject to the procedures and requirements for amendment of this TDP set forth in Section 6.1 hereof.  Not later than one (1) month following the Trustee's issuance of an Approved Claim Amount for any Talc Claim, the Claimant may request arbitration pursuant to the ADR Procedures. The decision of the arbitrator after arbitration shall be final and any Approved Claim Amount determined by the arbitrator (which may be zero) shall be treated in accordance with Section 3.3.1.1 hereof.

      In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 3.4 above. In an arbitration involving any such claim, the Trustee shall not offer into evidence or describe any model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the Claimant or his or her counsel ten days prior to the arbitration proceeding. The Claimant and his or her counsel may use the data that is provided by the Trust in the arbitration and shall agree to otherwise maintain the confidentiality of such information.

## SECTION IV

## CLAIMS MATERIALS

**4.1.    Claims Materials**. The Trustee shall prepare suitable and efficient "**Claims Materials**" for all Talc Claims and shall make available such Claims Materials to Talc Claimants.

**4.2.    Content of Claims Materials**. The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed Claim Submission Form. The Claim Submission Form shall require the Claimant to either (i) assert the highest MCL for which the Talc Claim qualifies at the time of filing under Matrix Review or (ii) if ineligible for Matrix Review, request Individual Review. The Claim Submission Form shall also include a certification by the Claimant or his or her attorney sufficient to meet the requirements of Rule l l(b) of the Federal Rules of Civil Procedure, as if the completed Claim Submission Form were a filing subject to that rule.

**4.3.    Withdrawal of Claims**. Except for (a) Talc Claims held by representatives of deceased or incompetent individuals for which court or probate approval of the PI Trust's offer is required and (b) Talc Claims subject to potential or pending dispute or entry of a binding award pursuant to Section 3.5 hereof, a Talc Claim shall be deemed to have been withdrawn and shall be deemed a Disallowed Claim if the Claimant does not accept the PI Trust's Approved Claim Amount.

**4.4.    Confidentiality of Claimants' Submissions**. All submissions to the PI Trust by a Claimant, including the Claim Submission Form and materials related thereto, are intended by the parties to be confidential. The PI Trust will preserve the confidentiality of such Claimant submissions, and shall disclose the contents thereof only with the permission of the Claimant to such other persons as authorized by the Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court or any other court of competent

16

jurisdiction. Furthermore, the PI Trust shall provide counsel for the Claimant of the applicable

Talc Claim a copy of any such subpoena upon being served. The PI Trust shall, on its own

initiative, or upon request of the Claimant in question, take all necessary and appropriate steps

to preserve any privileges. On the Dissolution Date or as soon as reasonably practicable

thereafter, after the wind-up of the affairs of the PI Trust by the Trustee, the Trustee shall

arrange for the proper destruction of all documents and records submitted by Claimants.

<div align="center">

**SECTION V**

**GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS**

</div>

**5.1.    Showing Required**. To establish an eligible Talc Claim, a Claimant must meet

the requirements set forth in this TDP.

**5.2.    Costs Considered**. Notwithstanding any provisions of this TDP to the contrary,

the Trustee shall give appropriate consideration to the cost of investigating and uncovering

invalid Talc Claims and other transactions costs of the PI Trust so that administration of the

PI Trust is not impaired by such processes with respect to issues related to the validity of the

medical evidence supporting a Talc Claim. Nothing herein shall prevent the Trustee, in

appropriate circumstances, from contesting the validity of any Talc Claim against the PI Trust

whatever the costs, or declining to accept medical evidence from sources that the Trustee has

determined to be unreliable.

**5.3.    Third-Party Services**. Nothing in this TDP shall preclude the PI Trust from

contracting with another talc claims resolution organization to provide services to the PI Trust

so long as decisions about the categorization and liquidated value of Talc Claims are based

on the relevant provisions of this TDP, including the MCLs, Scheduled Values and Medical/Exposure Criteria set forth above.

**5.4.    Punitive Damages**. In no circumstance shall the Trustee assign any Talc Claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs) and any Talc Claim for such amounts shall be deemed a Disallowed Claim.

<div align="center">

**SECTION VI**

**MISCELLANEOUS**

</div>

**6.1.    Amendments.** Except as otherwise provided in this TDP or the Trust Agreement, with the consent of the TAC, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided that (i) permission of the Bankruptcy Court shall be required to amend the methodology for valuing Talc Claims in Matrix Review, including but not limited to the Scheduled Values, MCLs, Medical/Exposure Criteria, or Adjustment Factors; (ii) the Trustee must obtain the unanimous consent of the TAC prior to making or seeking Bankruptcy Court authority for any amendment, modification, deletion or addition to this TDP; (iii) the Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment, modification, deletion or addition to this TDP, and shall obtain the consent of the Reorganized Debtors for any amendment, modification, deletion or addition that the Reorganized Debtors reasonably determine affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors; and (iv) such amendments, modifications, deletions, or additions shall not contravene the Plan or Confirmation Order.

**6.2.**    **Severability.** Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.

**6.3.**    **Governing Law**. This TDP shall be governed by, and construed in accordance with, the substantive laws of the State of Delaware, without regard to any choice of law rules.

**6.4.**    **Extensions of Time**. Upon written request, the Trustee may in his or her discretion grant extensions of time for any time deadline or time limit identified herein to any Claimant.

## **SCHEDULE 1**
## **RELEASE AND INDEMNITY AGREEMENT**

## REVLON TALC PERSONAL INJURY LIQUIDATING TRUST

## RELEASE AND INDEMNITY AGREEMENT

NOTICE: THIS IS A BINDING DOCUMENT THAT AFFECTS YOUR LEGAL RIGHTS. PLEASE CONSULT YOUR ATTORNEY IN CONNECTION WITH EXECUTING THIS DOCUMENT. IF YOU DO NOT PRESENTLY HAVE AN ATTORNEY, YOU MAY WISH TO CONSIDER CONSULTING ONE.

All capitalized terms not defined herein shall have the respective meanings ascribed to them in either (i) *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1507], as the same may be amended or modified from time to time (the "Plan") filed in Bankruptcy Case No. 22-10760 (DSJ) before the United States Bankruptcy Court for the Southern District of New York, confirmed by order on [•] [Docket No. [•] (the "Confirmation Order") or (ii) the Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust (the "TDP") filed as a supplement to the Plan.

WHEREAS, the undersigned, who is either the "Injured Party" or the/an "Official Representative"[4] (either being referred to herein as the "Claimant"), has filed a claim (the "Claim") with the Revlon Talc Personal Injury Liquidating Trust (the "PI Trust") pursuant to the TDP filed as part of the Plan, and such Claim asserts a Talc Personal Injury Claim arising out of exposure to talc-containing allegedly asbestos-contaminated products or conduct for which Revlon, Inc., et al (the "Debtors") are alleged to have legal responsibility; and

WHEREAS, the Claimant has agreed to settle and compromise the Injured Party's Claim for and in consideration of the allowance of the Claim by the PI Trust, at a liquidated value of $_____, on account of which the Claimant shall receive distributions pursuant to the Plan and TDP including but not limited to application of the Payment Percentage, and otherwise in accordance with the terms set forth therein and herein.

NOW, THEREFORE, the Claimant hereby agrees as follows:

1.    On behalf of the Injured Party, the Injured Party's estate, the Injured Party's heirs, and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby fully and finally voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Debtors, the Reorganized Debtors, the PI Trust, the Trust Advisory Committee, and their respective settlors, trustors, trustees, directors, officers, agents, consultants, financial advisors, servants, employees, attorneys, heirs, executors (collectively the "Releasees") from and with respect to any and all

---

[4]    The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate, or the Injured Party's heirs.

claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys, and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (the "Released Claims"), arising from, relating to, resulting from or in any way connected to, in whole or in part, the Claimant's Talc Personal Injury Claim, the Releasees' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP or the Plan, and any and all other orders of any court of competent jurisdiction relating to the Releasees and/or their duties and responsibilities, from the beginning of time through the execution date of this Release and Indemnity Agreement (this "Release"). The Claimant covenants and agrees that the Claimant will honor the Release as set forth in the preceding sentence and, further, that the Claimant will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Releasee based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

2.    Without limiting the foregoing, and notwithstanding anything to the contrary herein, the Release shall not apply in favor of the PI Trust as to the Claimant's right to payment of the Claimant's allowed Talc Personal Injury Claim, solely as provided through the Plan and TDP and as set forth in paragraph 7 below.

3.    The Claimant intends this Release and Indemnity Agreement to be as broad and comprehensive as possible so that the Releasees shall never be liable, directly or indirectly, to the Injured Party or the Injured Party's heirs, legal representatives, successors or assigns, or any other person or entity claiming by, through, under, or on behalf of the Injured Party, for or on account of any Released Claim, except as expressly provided herein, whether the same is now known or unknown or may now be latent or may in the future appear to develop, including all spousal claims for the Injured Party's claims. If the Claimant is an Official Representative, the Claimant represents and warrants that the Claimant has all requisite legal authority to act for, bind and accept payment on behalf of the Injured Party and all heirs of the Injured Party on account of any Released Claim and hereby agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorney's fees and costs, the Releasees from any loss, cost, damage, or expense arising out of or in connection with the rightful claim of any other Entity to payments with respect to the Injured Party's Released Claim.

4.    This Release and Indemnity Agreement is not intended to bar any cause of action, right, lien, or claim that the Claimant may have against any alleged tortfeasor other than the Releasees.  It is expressly not intended to bar any cause of action, right, lien or claim

that the Claimant may have against any insurer of the Releasees or any commercial counterparties thereof engaged in the manufacturing, distribution or sale of materials alleged to have caused harm to the Claimant.[5] The Claimant hereby expressly reserves all his or her rights against such persons or entities. This Release and Indemnity Agreement is not intended to release or discharge any Talc Personal Injury Claim or potential Talc Personal Injury Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to allegedly asbestos-contaminated talc or talc-containing products.

5.     The Claimant represents and warrants that all Valid Liens,[6] subrogation, conditional payment, and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Claimant under this Release and Indemnity Agreement or from other funds or proceeds to the extent permitted under applicable lien settlement agreements or under applicable law. It is further agreed and understood that no Releasee shall have any liability to the Claimant or any other person or entity in connection with such liens or conditional payment or reimbursement claims and that the Claimant will indemnify and hold the Releasees harmless from any and all such alleged liability as provided in the following sentence. The Claimant will indemnify and hold the Releasees harmless, to the extent of the amount of payment hereunder, excluding attorneys' fees and costs, from any and all liability arising from subrogation, conditional payment, indemnity, or contribution claims related to the Released Claim and from any and all compensation or medical payments due, or claimed to be due, under any applicable law, regulation, or contract related to the Released Claim.

6.     It is further agreed and understood that if the Claimant has filed a civil action against the PI Trust, the Claimant shall dismiss such civil action and obtain the entry of an Order of Dismissal with Prejudice with respect to any Released Claim no later than 30 days after the date hereof.

7.     The Claimant understands that the Released Claim is being resolved by the PI Trust, and a liquidated value ($_____) has been established for such Claim. The Claimant acknowledges that, pursuant to the TDP, after the liquidated value of the Claim is determined pursuant to the procedures set forth in the TDP, the Claimant ultimately shall receive a pro rata share of that value based on the PI Settlement Fund Assets available for the payment of Claims. The Claimant further acknowledges that the Claimant may receive payment in one or more distributions, subject to determination by the Trustee, as provided in the TDP.

8.     The Claimant understands, represents, and warrants that this Release and Indemnity Agreement is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Releasees. Neither this Release and Indemnity Agreement, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be

---

[5]   For the avoidance of doubt, this Release does not include a release with respect to any of the Excluded Parties (as defined in the Plan).

[6]   A "Valid Lien" is a lien that is permitted by applicable law and with respect to which the lien holder has taken all steps necessary under the terms of the documents creating the lien and under applicable law to perfect the lien.

admissible as evidence against the PI Trust or other Releasee in any suit, claim, or proceeding of any nature except to enforce this Release and Indemnity Agreement. However, this Release and Indemnity Agreement is and may be asserted by the Releasees as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Talc Personal Injury Claim released herein, except as expressly provided in this Release and Indemnity Agreement.

9.      The Claimant (a) represents that no judgment debtor has satisfied in full the PI Trust's liability with respect to the Injured Party's Talc Personal Injury Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Claimant has not entered into a release (other than this Release and Indemnity Agreement) that discharges or releases the PI Trust's liability to the Claimant with respect to the Injured Party's Talc Personal Injury Claim.

10.     The Claimant represents that he or she understands that this Release and Indemnity Agreement constitutes a final and complete release of the Releasees with respect to the Injured Party's Released Claim, except as expressly provided herein. The Claimant has relied solely on his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent, and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Releasees and the legal consequences of this Release and Indemnity Agreement, and not on any statement or representation made by or on behalf of the PI Trust or other Releasee.

11.     In further consideration of the benefit of a distribution from the PI Trust on account of the Claimant's Talc Personal Injury Claim, as of the date hereof, the Claimant shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of the Releasees arising from the Claimant's failure to comply with the terms of this Release and Indemnity Agreement.

12.     This Release and Indemnity Agreement contains the entire agreement between the parties and supersedes all prior or contemporaneous oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Claim.

13.     This Release and Indemnity Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of DELAWARE, without giving effect to the principles of conflicts of law thereof, and shall be binding on the Injured Party and his or her heirs, legal representatives, successors and assigns.

14.     TO THE EXTENT APPLICABLE, THE CLAIMANT HEREBY WAIVES ALL RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, AND ANY SIMILAR LAWS OF ANY OTHER STATE. CALIFORNIA CIVIL CODE SECTION 1542 STATES:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF

EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTORS.

THE CLAIMANT UNDERSTANDS AND ACKNOWLEDGES THAT BECAUSE OF THE CLAIMANT'S WAIVER OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, EVEN IF THE INJURED PARTY SHOULD EVENTUALLY SUFFER ADDITIONAL DAMAGES, THE INJURED PARTY WILL NOT BE ABLE TO MAKE ANY CLAIM AGAINST THE RELEASEES FOR THOSE DAMAGES, EXCEPT AS EXPRESSLY PROVIDED HEREIN. THE CLAIMANT ACKNOWLEDGES THAT HE OR SHE INTENDS THESE CONSEQUENCES.

15.     The Claimant authorizes payment pursuant to Paragraph 7 to the Claimant or the Claimant's counsel, as agent for the Claimant, if applicable.

16.     The Claimant acknowledges that the PI Trust has no obligation to pay the Claimant until the PI Trust receives the executed Release and Indemnity Agreement from the Claimant.

17.     The Claimant acknowledges that the PI Trust is not providing any tax advice with respect to the receipt of any distribution on account of the Claimant's Talc Personal Injury Claim or any component thereof, and understands and agrees that the Claimant shall be solely responsible for compliance with all tax laws with respect to such distribution, to the extent applicable.  The Claimant additionally hereby represents and certifies to the PI Trust that, in respect of the Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b) and/or 42 U.S.C. § 1396a(a)(25), or any related statutes, rules, regulations, or guidance, in connection with, or relating to, the Claim, including all Medicare and/or Medicaid Secondary Payer-related obligations.

## <u>CERTIFICATION</u>

I state that I have carefully read the foregoing Release and Indemnity Agreement and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Claim is true according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Release and Indemnity Agreement.

I am:     _____ the Injured Party


_____     the Official Representative of the Injured Party, the Injured Party's Estate, or the Injured Party's Heirs.


EXECUTED this ____day of _____ .20___

_____

Signature of the Claimant

Name of the Claimant:   _____   SSN:__

Name of the Injured Party if different from the Claimant: _____

SSN of the Injured Party if different from the Claimant:_____

SWORN to and subscribed before me this _____ day of _____20__


_____

Notary Public

My commission expires: _____

-OR-

Signatures of two persons unrelated to the Claimant by blood or marriage who witnessed the signing of this Release and Indemnity Agreement


_____                    _____

Witness Signature                                         Witness Signature

## SCHEDULE 2
## DEFINITIONS

1. "Adjustment Factors" means the Adjustment Factors for Matrix Review set forth in Section 3.3.2 of the TDP.

2. "ADR Procedures" means procedures for alternative dispute resolution of certain issues as set forth in Section 3.5 of the TDP.

3. "Approved Claim Amount" means the specific amount that the PI Trust has approved following the Claims Determination Process as to any Talc Claim.

4. "Bar Date Order" means the *Order (I) Establishing Deadlines for (A) Submitting Proofs of Claim and (B) Requests for Payment Under Bankruptcy Code Section 503(b)(9), (II) Approving the Form, Manner and Notice Thereof, and (III) Granting Related Relief*, Docket No. 688.

5. "Claim Submission Form" means the claim submission in form approved by the Trustee for review and liquidation of Talc Claims as described at Section 3.2 of the TDP.

6. "Claimant" means any holder of a Talc Claim, including in their capacity as successor, or authorized representative of an IP.

7. "Claims Materials" means materials suitable and efficient for the Trustee to substantiate a Talc Claim of any Claimant with the PI Trust.

8. "Claims Determination Process" means the process by which each Talc Claim is reviewed, including determining whether a Talc Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment.

9. "Debtor Cosmetic Talc Exposure" means exposure (a) to a talc-containing, allegedly asbestos-contaminated powdered cosmetic product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (b) to conduct for which the Debtor has legal responsibility that exposed the Claimant to a talc-containing, allegedly asbestos-contaminated powdered cosmetic product.

10. "Debtors" means Revlon, Inc. *et al.*, debtors in jointly administered chapter 11 lead case no. 22-10760-(DSJ) (Bankr. S.D.N.Y.). A complete list of debtor entities is available on the website of Revlon Inc.'s claims and noticing agent at https://cases.ra.kroll.com/Revlon.

11. "Dependents Factor" means the Adjustment Factor pertaining to the IP's spouse or other dependents, including minor children, adult disabled dependent children, and dependent minor grandchildren, as set forth in Section 3.3.2.2 of the TDP.

12. "Deficient Claim" means a Talc Claim in respect of which the Trustee has not been provided documents or information sufficient to evaluate or approve the Claim.

13. "Disallowed Claim" means a Talc Claim that has been disallowed and on account of which the Claimant shall not receive a distribution from the Trust.

14. "Economic Loss Factor" means the Adjustment Factor pertaining to the IP's economic loss related to lost earnings, pension, social security, home services, medical expenses, and funerary expenses in connection with the IP's allegedly asbestos-contaminated talc-related malignancy, as set forth in Section 3.3.2.3 of the TDP.

15. "Extraordinary Claim" means a Talc Claim arising from regular and routine Debtor Cosmetic Talc Exposure comprising 90% or more of the IP's Total Talc Exposure, and no Non-Talc Asbestos-Containing Product Exposure, entitling the holder of such Extraordinary Claim to up to two times the TDP Matrix Value for MCL 1, as set forth in Section 3.3.1.7.

16. "Final Determination" means an Approved Claim Amount that has been accepted by the Claimant.

17. "Individual Review" means the Talc Claim review process set forth in Section 3.3.3 of the TDP.

18. "IP" means the party injured by exposure to allegedly asbestos-contaminated talc in connection with any Talc Claim.

19. "IP Age" means the earlier of (i) the date of the IP's first diagnosis of allegedly asbestos-contaminated talc-related malignancy or (ii) the date of death of the IP.

20. "Linking Report" means a report by a qualified expert establishing talc exposure as the cause of the IP's alleged malignancy.

21. "Matrix Review" means the review and valuation of Talc Claims in accordance with the schedule set forth in Section 3.3.1.7.

22. "Maximum Value" means the highest permissible TDP Matrix Value for a Talc Claim as pertaining to such Talc Claim's MCL.

23. "MCL" means Mesothelioma Compensation Level; the two compensation levels for Matrix Review of Talc Claimants as set forth at Section 3.3.1.6 of the TDP.

24. "Medical/Exposure Criteria" means the medical and exposure requirements pertaining to each MCL as set forth at Sections 3.3.1.6 and 3.3.1.7 of the TDP.

25. "Mesothelioma Compensation Level" means MCL.

26. "Non-Debtor Cosmetic Talc Exposure" means exposure to talc-containing powdered cosmetic products that is not Debtor Cosmetic Talc Exposure.

27. "Non-Talc Asbestos-Containing Product Exposure" means the entirety of the IP's exposure to non-talc asbestos products.

28.  "Payment Percentage" means the pro rata payment percentage to be applied to all Final Determinations, based on the Trustee's estimate of the PI Trust's assets and liabilities, if any, as well as the then-estimated value on account of all Final Determinations.

29.  "PI Trust" means the Revlon Talc Personal Injury Liquidating Trust.

30.  "Plan" means the *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed February 21, 2023 [Docket No. 1507] (as it may be amended or modified).

31.  "Pre-Petition Settled Claim" means a Talc Claim liquidated by a Pre-Petition Settlement Agreement.

32.  "Pre-Petition Settlement Agreement" means a settlement agreement liquidating a Talc Claim that was fully executed on or before June 15, 2022.

33.  "Scheduled Values" means the liquidated values of each MCL as set forth at Section 3.3.1.7 of the TDP.

34.  "Settlement Value" means the liquidated amount of a Talc Claim pursuant to a Pre-Petition Settlement Agreement.

35.  "TAC" means the Trust Advisory Committee of the PI Trust, as defined in the Trust Agreement.

36.  "Talc Claims" means Talc Personal Injury Claims, as such term is defined in the Plan.

37.  "TDP" means the Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust, as may be amended, modified, or supplemented from time to time, as defined in the Trust Agreement.

38.  "TDP Matrix Value" means, for any Talc Claim subject to Matrix Review, the Scheduled Value multiplied by the Adjustment Factors.

39.  "Total Talc Exposure" means the entirety of the IP's exposure to talc-containing allegedly asbestos-contaminated powdered cosmetic products in connection with a Talc Claim.

40.  "Trust Agreement" means the Revlon Talc Personal Injury Liquidating Trust Agreement executed in connection with the Plan.

41.  "Trustee" means the trustee of the PI Trust, as defined in the Trust Agreement.

**EXHIBIT 2**

**CERTIFICATE OF TRUST OF OLD REVCO TALC PERSONAL INJURY LIQUIDATING
TRUST**

### CERTIFICATE OF TRUST OF THE
### OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST

This Certificate of Trust of the OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

Name. The name of the statutory trust formed hereby is:

**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST**

Delaware Trustee. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

Wilmington Trust, National Association
Rodney Square North, 1100 North Market Street
Wilmington, DE 19890
Attention: Russell L. Crane

Effective Date. This Certificate of Trust shall be effective on May 2, 2023

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEE:

DELAWARE TRUSTEE:

WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Delaware Trustee

By: _____

_____
David J. Gordon, in his capacity as a trustee and not individually.

Name: Russell L. Crane
Title:   Vice President

## EXHIBIT 3

### INVESTMENT GUIDELINES

**In General**. Only the following investments will be permitted:

(i)    Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

(ii)    U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

(iii)    Repurchase agreements for U.S. Treasury bills, bonds, and notes;

(iv)    AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

(v)    Open-ended mutual funds owning only assets described in subparts (i) through (iv) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment. The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis. If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period. Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited. Investment in non-U.S. dollar denominated bonds is prohibited. The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U809).

See example fund-level requirements table on following page.

## Fund Level Requirements

1. OTC Derivatives Counterparty Exposure – Not allowed
2. Non-U.S. dollar denominated bonds – Not allowed

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
| | | | |
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | x | | |
| | | | |
| **DERIVATIVES:** | | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | |
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |
| | | | |
| **OTHER:** | | | |
| Bank Loans | | x | |
| Convertibles (e.g., Lyons) | | x | |
| Municipal Bonds | X | | |
| Preferred Stock | | x | |
| Private Placements (excluding 144A) | X | | |
| Rule 144A Issues | X | | |
| Zero Coupon Bonds | X | | |
| Commodities | | X | |
| Catastrophe Bonds | | X | |

**<u>Exhibit L-2</u>**

**Blackline comparison to PI Settlement Fund Agreement as filed on March 31, 2023**

**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST**

**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST AGREEMENT**

**Dated as of May [2], 2023**

*Pursuant to the Revised Third Amended Joint Plan of Reorganization*
*of Revlon, Inc. and its Debtor Affiliates under*
*Chapter 11 of the Bankruptcy Code Dated [   ]May 1, 2023*

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ........................................................................... 2

    1.1       Creation and Name ........................................................................................ 2

    1.2       Purposes ........................................................................................................ 3

    1.3       Transfer of Assets ........................................................................................ 4

    1.4       Acceptance of Assets and Assumption of Liabilities. ................................. 4

    1.5       Jurisdiction .................................................................................................... 5

ARTICLE II POWERS AND TRUST ADMINISTRATION ....................................... 5

    2.1       Powers. .......................................................................................................... 5

    2.2       General Administration. ................................................................................ 9

    2.3       Medicare Reporting Obligations. ............................................................... 13

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS ........................... 13

    3.1       Accounts. ..................................................................................................... 13

    3.2       Investment Guidelines. ............................................................................... 14

    3.3       Payment of Operating Expenses ................................................................ 15

    3.4       Payment of Talc Claims. ............................................................................ 16

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE ................................................. 17

    4.1       Number ....................................................................................... ~~17~~16

    4.2       Term of Service. ......................................................................... ~~17~~16

    4.3       Compensation and Expenses of the Trustee. ............................................. 18

    4.4       Standard of Care; Exculpation. .................................................................. 19

    4.5       Protective Provisions. ................................................................. ~~21~~20

    4.6       Indemnification. ......................................................................... ~~22~~21

    4.7       Trustee Independence ................................................................. ~~24~~23

    4.8       No Bond ..................................................................................... ~~24~~23

    4.9       Delaware Trustee. ...................................................................... ~~24~~23

i

ARTICLE V TRUST ADVISORY COMMITTEE .................................................... ~~29~~28

    5.1        Members ......................................................................................... ~~29~~28

    5.2        Duties ............................................................................................. ~~29~~28

    5.3        Term of Office. .............................................................................. ~~30~~29

    5.4        Appointment of Successors. ........................................................... ~~30~~29

    5.5        Compensation and Expenses of the TAC ...................................... ~~31~~30

    5.6        No Bond ......................................................................................... ~~31~~30

    5.7        Procedures for Obtaining Consent of the TAC .............................. ~~31~~30

ARTICLE VI GENERAL PROVISIONS ............................................................... ~~33~~32

    6.1        Irrevocability ................................................................................. ~~33~~32

    6.2        Term; Termination. ....................................................................... ~~33~~32

    6.3        Amendments ................................................................................. ~~34~~33

    6.4        Severability .................................................................................. ~~36~~34

    6.5        Notices. ......................................................................................... ~~36~~34

    6.6        Successors and Assigns ................................................................. 37

    6.7        Limitation on Talc Claims Interests for Securities Laws Purposes ...... 37

    6.8        Exemption from Registration ........................................................ ~~38~~37

    6.9        Entire Agreement; No Waiver ....................................................... 38

    6.10      Headings. ....................................................................................... ~~39~~38

    6.11      Governing Law ............................................................................. ~~39~~38

    6.12      Dispute Resolution ....................................................................... ~~40~~39

    6.13      Effectiveness ................................................................................. ~~42~~41

    6.14      Counterpart Signatures ................................................................. ~~42~~41

EXHIBIT 1  PI TRUST DISTRIBUTION PROCEDURES ................................. ~~44~~45

EXHIBIT 2   CERTIFICATE OF TRUST OF OLD REVCO TALC PERSONAL INJURY
         LIQUIDATING TRUST ................................................................. ~~45~~78

EXHIBIT 3  INVESTMENT GUIDELINES ....................................................... ~~46~~80

## OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST AGREEMENT

This Old RevCo Talc Personal Injury Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the *Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and ~~its~~Its Debtor Affiliates ~~under~~Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. ~~[•]~~1860] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 22-10760 (DSJ) in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") by Wilmington Trust, National Association (the "**Delaware Trustee**"), the Trustee identified on the signature pages hereof (the "**Trustee**"), and the members of the Trust Advisory Committee identified on the signature pages hereof (the "**TAC**" and, together with the Delaware Trustee and the Trustee, the "**Parties**").[2]

### RECITALS

**WHEREAS,** the Plan contemplates the creation of the Old RevCo Talc Personal Injury Liquidating Trust (provided for and referred to in the Plan as the PI Settlement Fund) (the "**PI Trust**");

**WHEREAS,** the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS,** pursuant to the Plan, the PI Trust is established to administer distributions to the eligible holders of Class 9(a) Talc Personal Injury Claims ("**Talc Claims**") in accordance with the Plan, the Confirmation Order and this Trust Agreement;

---

[1]  All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

[2]  ~~The initial Trustee shall be David J. Gordon, represented by FrankGecker LLP.  The initial members of the TAC shall be Maura Kolb, Chris McKean, and Aleksandra Sikorska.~~

**WHEREAS,** the Trustee shall administer the PI Trust in accordance with the terms of the Plan, this Trust Agreement and the PI Claims Trust Distribution Procedures (the "**TDP**"), attached hereto as **Exhibit 1**; and

**WHEREAS,** pursuant to the Plan, the PI Trust is intended to qualify as a "qualified settlement fund" (a "**Qualified Settlement Fund**") within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code ("**IRC**") (the "**QSF Regulations**"). For the avoidance of doubt, the PI Trust is not intended to constitute either (i) a "Section 524(g) trust" within the meaning of the Bankruptcy Code, or (ii) a "grantor trust" within the meaning of Section 1.671- 4(a) of the Treasury Regulations.

**NOW, THEREFORE,** it is hereby agreed as follows:

# ARTICLE I

# AGREEMENT OF TRUST

1.1     **Creation and Name.**  There is hereby created a trust known as the "Old RevCo Talc Personal Injury Liquidating Trust." The Trustee of the PI Trust may transact the business and affairs of the PI Trust in the name of the PI Trust, and references herein to the PI Trust shall include the Trustee acting on behalf of the PI Trust. It is the intention of the Parties that the PI Trust constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that this Trust Agreement constitute the governing instrument of the PI Trust. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

1.2     **Purposes.**  The purposes of the PI Trust are to

(a)     receive the Talc Personal Injury Settlement Distribution (the "**Settlement Consideration**") pursuant to the terms of the Plan and the Confirmation Order;

(b)     hold, manage, protect and invest the Settlement Consideration, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**") in accordance with the terms of the Plan, the Confirmation Order, this Trust Agreement and the TDP (the "**Governing Documents**") for the benefit of the Beneficial Owners (as defined herein);

(c)     administer, process and resolve Talc Claims pursuant to the TDP;

(d)     qualify at all times as a Qualified Settlement Fund within the meaning of QSF Regulations;

(e)     engage in any lawful activity that is appropriate and in furtherance of the purposes of the PI Trust to the extent consistent with the Plan, the Confirmation Order and this Trust Agreement; and

(f)     make distributions of Trust Assets to eligible holders of Talc Claims in accordance with and subject to the terms of this Trust Agreement, the Plan and the TDP with the objective of treating all eligible holders of Talc Claims fairly, equitably, and reasonably in light of the Trust Assets available to resolve such Talc Claims.

1.3    **Transfer of Assets.**  Pursuant to, and in accordance with Article IV.R of the Plan, the PI Trust has received the Settlement Consideration to fund the PI Trust.  The Settlement Consideration and any other assets to be transferred to the PI Trust under the Plan will be transferred to the PI Trust free and clear of any liens or other claims by the Debtors, the Reorganized Debtors, any creditor, or other entity. For the avoidance of doubt, the Settlement Consideration transferred to fund the PI Trust shall not include the Retained Preference Actions, provided, however, that the Settlement Consideration shall include an interest in the Retained Preference Action Net Proceeds, as a result of which the PI Trust shall receive a transfer of assets arising in respect of such Retained Preference Action Net Proceeds, if any,  in accordance with the terms of the Plan.

1.4    **Acceptance of Assets and Assumption of Liabilities.**

(a)    In furtherance of the purposes of the PI Trust, the PI Trust hereby expressly accepts the transfer to the PI Trust of the Settlement Consideration and any other transfers by the GUC Trust from the GUC Trust/PI Fund Operating Reserve contemplated by the Plan in the time and manner as, and subject to the terms, contemplated in the Plan.

(b)    In furtherance of the purposes of the PI Trust, except as otherwise provided in this Trust Agreement and the TDP, the PI Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Talc Claim immediately before the Effective Date to the extent necessary to administer such Claims in accordance with this Trust Agreement, the TDP and the Plan.

(c)    Notwithstanding anything to the contrary herein, no provision herein or in the TDP shall be construed or implemented in a manner that would cause the PI Trust to fail to qualify as a Qualified Settlement Fund under the QSF Regulations.

(d)    In this Trust Agreement and the TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

(e)    To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PI Trust (the "**Beneficial Owners**") shall be deemed to be the holders of Talc Claims; provided that (i) the holders of Talc Claims, as such Beneficial Owners, shall have only such rights with respect to the PI Trust and its assets as are set forth in the TDP and (ii) no greater or other rights, including upon dissolution, liquidation, or winding up of the PI Trust, shall be deemed to apply to the holders of Talc Claims in their capacity as Beneficial Owners.

1.5    **Jurisdiction**. The Bankruptcy Court shall have continuing jurisdiction over the PI Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the PI Trust.

## ARTICLE II

## POWERS AND TRUST ADMINISTRATION

2.1     **Powers.**

(a)     The Trustee is and shall act as a fiduciary to the PI Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the PI Trust in accordance with the purposes set forth in Section 1.2 above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the PI Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)     receive and hold the Settlement Consideration and exercise all rights with respect thereto;

(ii)        invest the monies held from time to time by the PI Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)        obtain payment of expenses and other obligations of the PI Trust, from the GUC Trust/PI Fund Operating Reserve as set forth in the Plan and this Trust Agreement;

(iv)        establish such funds, reserves, and accounts within the PI Trust, as the Trustee deems useful in carrying out the purposes of the PI Trust;

(v)        participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the Talc Claims;

(vi)        establish, supervise, and administer the PI Trust and the TDP, and make distributions to all eligible holders of Talc Claims pursuant to the terms of this Trust Agreement, the Plan and the TDP;

(vii)        appoint such officers and retain such employees, consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the PI Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(viii)    obtain payment from the GUC Trust/PI Fund Operating Reserve for the reasonable compensation to any of the PI Trust's employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the PI Trust requires;

(ix)    obtain payment from the GUC Trust/PI Fund Operating Reserve to compensate the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(x)    record all expenses (including taxes) incurred by the PI Trust on the books and records (and report on all applicable tax returns) as expenses of the PI Trust; provided however that, the PI Trust shall periodically provide all invoices or other documentation with respect to such expenses to the GUC Administrator and the GUC Administrator shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay such expenses;

(xi)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the PI Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xii)    in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined

in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiii)    obtain the consent of the TAC with respect to the matters set forth in Section 2.2(e) below; and

(xiv)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The Trustee shall not have the power to guarantee any debt of other persons.

(e)    The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the PI Trust.

2.2    **General Administration.**

(a)    The Trustee shall act in accordance with the Governing Documents and shall implement the TDP in accordance with its terms. In the event of a conflict between the terms of this Trust Agreement and the TDP, the terms of this Trust Agreement shall control. In the event of a conflict between the terms or provisions of the (i) Plan, (ii) this Trust Agreement or (iii) the TDP, the terms of the Plan shall have first priority, followed in priority by the Trust

Agreement, and lastly by the TDP. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)     The Trustee shall (i) timely file such income tax and other returns and statements required to be filed and shall cause to be paid timely from the GUC Trust/PI Fund Operating Reserve all taxes required to be paid by the PI Trust, (ii) comply with all applicable reporting and withholding obligations, (iii) satisfy all requirements necessary to qualify and maintain qualification of the PI Trust as a Qualified Settlement Fund within the meaning of the QSF Regulations, (iv) take no action that could cause the PI Trust to fail to qualify as a Qualified Settlement Fund within the meaning of the QSF Regulations, and (v) be treated as the "administrator" of the PI Trust within the meaning under Section 1.468B-2(k)(3) of the Treasury Regulations.

(c)     The Trustee shall timely account to the Bankruptcy Court as follows:

(i)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the PI Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants. The Trustee shall provide a copy of such Annual

Report to the Reorganized Debtors and the TAC when such report is filed with the Bankruptcy Court.

(ii)     Simultaneously with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of Talc Claims resolved during the period covered by the Annual Report (the "**Claims Report**"). The Trustee shall provide a copy of such Claims Report to the Reorganized Debtors and the TAC when such report is filed with the Bankruptcy Court.

(d)     The Trustee shall consult with the TAC on the matters set forth in the TDP.

(e)     The Trustee shall be required to obtain the consent of the TAC, pursuant to the consent process set forth in Section 5.7 below:

(i)     to change the form of Acceptance and Release under the TDP;

(ii)     to commence and/or participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding;

(iii)     to modify the compensation of the Trustee;

(iv)     to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(v)     to effectuate any material amendment of this Trust Agreement, or any amendment of the TDP, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(f)     The Trustee shall be required to obtain the consent of the Reorganized Debtors, which shall not be unreasonably withheld or delayed:

(i)        absent further order of the Bankruptcy Court, to commence and/or participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, with the exception of (i) any proceeding brought against the PI Trust by any entity; (ii) any motion or proceeding in the Chapter 11 Cases relating to or in connection with Talc Claims; or (iii) any proceeding to enforce the rights of the PI Trust under or relating to the Plan, Definitive Documents, and/or this Trust Agreement;

(ii)        to materially modify the compensation of the Trustee;

(iii)        to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(iv)        to make any amendment or modification of this Trust Agreement, or Exhibit hereto, or TDP, or Schedule thereto, that directly or indirectly affects the rights, duties, immunities, interests or liabilities of the Reorganized Debtors, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(g)        The Trustee shall meet with the TAC no less often than quarterly. The Trustee shall meet in the interim with the TAC when so requested by two or more members of the TAC. Meetings may be held in person, by telephone or video conference, or by a combination of the foregoing.

14

(h)     All Trust Assets shall be part of the PI Trust or otherwise shall be segregated from any assets of Revlon, Inc. (or any persons related to Revlon, Inc. within the meaning of Section 1.468B-1(d)(2) of the Treasury Regulations).

(i)     Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his or her position as such.

### 2.3     **Medicare Reporting Obligations.**

(a)     The PI Trust shall register as a Responsible Reporting Entity (**"RRE"**) under the reporting provisions of Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (Pub. L. 110-173) (**"MMSEA"**).

(b)     The PI Trust shall timely submit all reports that are required under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the PI Trust or with respect to contributions to the PI Trust. The PI Trust, in its role as an RRE, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

# ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

3.1    **Accounts.**

(a)    The Trustee shall maintain one or more accounts (the "**Trust Accounts**")
on behalf of the PI Trust with one or more financial depository institutions (each a "**Financial
Institution**"). Candidates for the positions of Financial Institution shall fully disclose to the
Trustee any interest in or relationship with the Reorganized Debtors or their affiliated persons.
Any such interest or relationship shall not be an automatic disqualification for the position, but
the Trustee shall take any such interest or relationship into account in selecting a Financial
Institution.

(b)    The Trustee may replace any retained Financial Institution with a
successor Financial Institution at any time, and such successor shall be subject to the
considerations set forth in Section 3.1(a).

(c)    The Trustee may, from time to time, create such accounts and reasonable
reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem
necessary, prudent or useful in order to provide for distributions to the Beneficial Owners and the
payment of PI Trust operating expenses and may, with respect to any such account or reserve,
restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such
Trust Subaccounts established by the Trustee shall be held as Trust Assets and are not intended

to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

3.2      **Investment Guidelines.**

(a)      The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3** (the "**Investment Guidelines**").

(b)      In the event the PI Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the PI Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)      Cash proceeds received by the PI Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the PI Trust as set forth in Section 1.2 above.

3.3      **Payment of Operating Expenses**

All operating expenses of the PI Trust shall be paid by the PI Trust solely from, and after receipt of funds from, the GUC Trust/PI Fund Operating Reserve as provided in the Plan. The PI Trust shall periodically provide all invoices or other documentation with respect to such expenses to the GUC Administrator and the GUC Administrator shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay such expenses.[32] None of the Trustee, Delaware Trustee, the TAC, the

---

[32]. Nothing in this Trust Agreement shall preclude the Trustee and the PI Trustee from establishing appropriate and efficient cash management/accounting systems which may include the advancement of funds from the GUC Trust/PI Fund Operating

Beneficial Owners nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any operating expense or other liability of the PI Trust. Except as expressly set forth in the Plan, none of the Debtors or Reorganized Debtors, nor any of their officers, agents, advisors, professionals or employees shall be liable for the payment of any operating expense or other liability of the PI Trust, the Trustee or the TAC. To the extent that the Trustee determines that GUC Trust/PI Fund Operating Reserve is likely to incur a cash shortfall prior to the termination and winding up of the GUC Trust and/or the PI Trust (after taking into account additional funding of the GUC Trust/PI Fund Operating Reserve as contemplated by the Plan), the Trustee may determine to establish cash reserves from the corpus of the Trust, which cash reserves shall be allocated equitably to the Beneficial Owners by the Trustee in his or her judgment.

3.4     **Payment of Talc Claims.**

The Trustee will make distributions to the Beneficial Owners in a fair, consistent and equitable manner in accordance with this Trust Agreement, the TDP, the Plan and the Confirmation Order. All payments with respect to Talc Claims shall be made by the PI Trust solely out of the Trust Assets. If the Trustee determines immediately prior to the Dissolution Date, in his or her discretion, that all Talc Claims have been paid in full, or that making further payments with respect to Talc Claims is not cost-effective with respect to the final amounts to be paid to Beneficial Owners, and that adequate provision has been made for all final obligations of the PI Trust, the Trustee shall have the authority to direct the remaining Trust Assets to a

---

management/accounting systems which may include the advancement of funds from the GUC Trust/PI Fund Operating Reserve to the PI Trust from time to time.

tax-exempt organization benefiting mesothelioma victims, as selected by the Trustee in his or her discretion.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

4.1     **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.9, there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

4.2     **Term of Service.**

(a)     The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the PI Trust pursuant to Section 6.2 below.

(b)     The Trustee may resign at any time upon written notice to the Reorganized Debtors and the TAC with such notice filed with the Bankruptcy Court. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed by the unanimous consent of the TAC in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a

felony in each case whether or not connected to the PI Trust, or a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder. For the avoidance of doubt, any removal of a Trustee by the TAC pursuant to this Section 4.2(c) shall require the approval of the Bankruptcy Court and shall take effect at such time as the Bankruptcy Court shall determine.

(d)     In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the unanimous consent of the TAC, subject to the approval of the Bankruptcy Court. In the event the TAC cannot agree on a successor Trustee, the provisions of Section 6.12 below shall apply.

(e)     Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the PI Trust pursuant to Section 6.2 below.

4.3    **Compensation and Expenses of the Trustee.**

(a)    The Trustee shall receive compensation for his or her services as Trustee on matters related to the operation of the Trust in the amount of $600 per hour, plus an annual stipend of $25,000 (pro-rated for partial years), which shall be paid in equal quarterly instalments. The compensation payable to the Trustee hereunder shall be reviewed every year by the TAC and may be appropriately adjusted for changes in the cost of living. The PI Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date, (such amount not to exceed $25,000), which shall be paid promptly after the Effective Date.

(b)    The PI Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder.

(c)    The PI Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3. The PI Trust shall provide quarterly reports to the Reorganized Debtors for a description of the amounts paid under this Section 4.3.

4.4    **Standard of Care; Exculpation.**

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, (iii) the TAC and its members, and (iv) the officers, employees, consultants, advisors, and agents of each of the PI Trust, the Trustee, and the TAC.

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the PI Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the PI Trust.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the PI Trust or the Beneficial Owners, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The PI Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

4.5     **Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the PI Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)      No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)      In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

### 4.6    **Indemnification.**

(a)      To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the PI Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case,

except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the PI Trust.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the PI Trust shall be paid by the PI Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the PI Trust. The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)      The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from

the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust

Agreement shall not affect any indemnification rights or obligations in existence at such time. In

making a determination with respect to entitlement to indemnification of any Trust Indemnified

Party hereunder, the person, persons or entity making such determination shall presume that such

Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any

person seeking to overcome such presumption shall have the burden of proof to overcome the

presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights

which any Trust Indemnified Party may otherwise have at law or in equity, including common

law rights to indemnification or contribution.

4.7    **Trustee Independence.**  The Trustee shall not, during the term of his or her

service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any

other professional for the Reorganized Debtors. The Trustee shall not act as an attorney, agent, or

other professional for any person who holds a Talc Claim. For the avoidance of doubt, this

Section 4.7 shall not be applicable to the Delaware Trustee.

4.8    **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post

any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.9    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with

the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at

least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.9, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.9(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)     The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the PI Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the PI Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the PI Trust or the Beneficial Owners, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly

set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or

omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things

enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any

such permissive rights, the Delaware Trustee shall not be answerable for other than its willful

misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no

obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the

request or direction of the Trustee or any other person pursuant to the provisions of this Trust

Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee

security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs,

expenses and liabilities that may be incurred by it in compliance with such request or direction.

The Delaware Trustee shall be entitled to request and receive written instructions from the

Trustee and shall have no responsibility or liability for any losses or damages of any nature that

may arise from any action taken or not taken by the Delaware Trustee in accordance with the

written direction of the Trustee. The Delaware Trustee may, at the expense of the PI Trust,

request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and

shall incur no liability and shall be fully protected in acting or refraining from acting in

accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes

the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is

appointed by the Trustee in accordance with the terms of Section 4.9(d) below. The Delaware

Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice

to the Trustee; provided that such resignation shall not become effective unless and until a

successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.9(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the PI Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the PI Trust in accordance with Section 3810 of the Act.

(e)    Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)    The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the PI Trust and the Delaware Trustee, which compensation shall be paid by the PI Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the PI Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability

30

in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

**ARTICLE V**

**TRUST ADVISORY COMMITTEE**

5.1    **Members.**  The TAC shall consist of three (3) members.  To the extent that a member of the TAC elects to resign from the TAC in accordance with Section 5.3(b) below or is removed pursuant to Section 5.3(c) below, a successor shall be appointed pursuant to Section 5.4(a).

5.2    **Duties.**  The members of the TAC shall serve in a fiduciary capacity, representing the interests of all holders of Talc Claims. The TAC shall have no fiduciary obligations or duties to any party other than the holders of Talc Claims. The Trustee must obtain the consent of the TAC on matters identified in Section 2.2(e) above. Where provided in the TDP, certain other actions by the Trustee are also subject to the consent of the TAC. Except for the duties and obligations expressed in this Trust Agreement and the TDP, there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the TAC. To the extent that, at law or in equity, the TAC has duties (including fiduciary duties) and liabilities relating thereto to the PI Trust, the other Parties hereto or any Beneficial Owner of the PI Trust, it is hereby understood and agreed by the other Parties hereto that such duties and liabilities are replaced by the duties and liabilities of the TAC expressly set forth in the Governing Documents.

5.3    **Term of Office.**

(a)    Each member of the TAC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) below, (iii) his or her removal

pursuant to Section 5.3(c) below, or (iv) the termination of the PI Trust pursuant to Section 6.2 below.

(b)    A member of the TAC may resign at any time by written notice to the other member of the TAC and the Trustee. Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)    A member of the TAC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause. Such removal may be made by the recommendation of the remaining member of the TAC with the approval of the Trustee.

5.4    **Appointment of Successors.**

(a)    If a member of the TAC dies, resigns pursuant to Section 5.3(b) above, or is removed pursuant to Section 5.3(c) above, the vacancy shall be filled with an individual selected by the remaining TAC members with the approval of the Trustee, provided however, that if the remaining TAC members and the Trustee cannot agree on the successor the matter shall be resolved pursuant to Section 6.12 below.

(b)    Each successor TAC member shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 5.3(b) above, (iii) his or her removal

pursuant to Section 5.3(c) above, or (iv) the termination of the PI Trust pursuant to Section 6.2 below.

(c)    No successor TAC member shall be liable personally for any act or omission of his or her predecessor TAC member. No successor TAC member shall have any duty to investigate the acts or omissions of his or her predecessor TAC member.

5.5    **Compensation and Expenses of the TAC.**  The members of the TAC shall not receive compensation from the PI Trust for their services as TAC members but shall be reimbursed for all reasonable out-of-pocket costs or expenses incurred in connection with the performance of such member's duties hereunder. A description of the amounts paid under this Section 5.5 shall be included in the Annual Report and shall be included in quarterly reports provided to the Reorganized Debtors.

5.6    **No Bond.**  The members of the TAC shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

5.7    **Procedures for Obtaining Consent of the TAC**

(a)    Where the Trustee is required to obtain the consent of the TAC pursuant to Section 2.2(e) above, the TDP or otherwise, the Trustee shall provide the TAC with a written notice stating that its consent is being sought pursuant to that provision, describing in detail the nature and scope of the action the Trustee proposes to take, and explaining in detail the reasons why the Trustee desires to take such action. The Trustee shall provide the TAC as much relevant information concerning the proposed action as is reasonably practicable under the circumstances.

The Trustee shall also provide the TAC with reasonable access to the professionals or experts retained by the PI Trust and its staff (if any) as the TAC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TAC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee. In instances also requiring consent of the Reorganized Debtors, whose consent shall not be unreasonably denied or delayed, such notices and information provided to the TAC shall also be provided to the Reorganized Debtors.

(b)      The TAC must consider in good faith and in a timely fashion any request for its consent by the Trustee and must in any event advise the Trustee in writing of its consent or objection to the proposed action within five (5) business days of receiving the original request for consent from the Trustee. The TAC may not withhold its consent unreasonably. If the TAC decides to withhold consent, it must explain in detail its objections to the proposed action. If the TAC does not advise the Trustee in writing of its consent or objections to the proposed action within five (5) days of receiving notice regarding such request, then consent of the TAC to the proposed action shall be deemed to have been affirmatively granted.

(c)      If, after following the procedures specified in Section 5.7, the TAC continues to object to the proposed action and to withhold its consent to the proposed action, the Trustee and the TAC shall resolve their dispute pursuant to Section 6.12. The TAC shall bear the burden of proving that it reasonably withheld its consent. If the TAC meets that burden, the PI Trust shall then bear the burden of showing why it should be permitted to take the proposed action notwithstanding the TAC's reasonable objection.

(d)    Action by the TAC shall require the affirmative vote of the majority of the TAC members then in office.

## ARTICLE VI

## GENERAL PROVISIONS

6.1    **Irrevocability**.  To the fullest extent permitted by applicable law, the PI Trust is irrevocable.

6.2    **Term; Termination.**

(a)    The term for which the PI Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)    The PI Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Bankruptcy Court approves the dissolution upon the satisfaction of the purposes of the PI Trust, wherein (i) all reasonably expected assets have been collected, (ii) all payments with respect to Talc Claims under Section 3.4 above have been made, (iii) necessary arrangements and reserves been made to discharge all anticipated remaining obligations and operating expenses in a manner consistent with Governing Documents, and (iv) a final accounting has been filed and approved by the Bankruptcy Court (the "**Dissolution Date**").

(c)    On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the PI Trust by the Trustee and payment of all of the PI Trust's

liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the PI Trust shall be distributed or disbursed in accordance with Section 3.4.

(d)      Following the dissolution and distribution of the assets of the PI Trust, the PI Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PI Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PI Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

6.3    **Amendments**.  Any amendment to or modification of this Trust Agreement may be made in writing and only pursuant to an order of the Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement with the unanimous consent of the TAC from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; (ii) amendments permitted pursuant to Section 6.1 of the TDP, or (iii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, the TDP may be amended in writing by the Trustee with the consent of the TAC without an order of the Bankruptcy Court, provided, however, the amended TDP shall be filed with the Bankruptcy Court within thirty (30) days following the effective date of such amended TDP. Notwithstanding the foregoing, (i) no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order, other than, with the Reorganized Debtors' consent, to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; (ii) neither this Trust Agreement, the TDP, nor any Exhibit to this Trust Agreement or the TDP shall be modified or amended in any way that could jeopardize, impair, or modify the PI Trust's Qualified Settlement Fund status under the QSF Regulations; and (iii) any amendment or modification of this Trust Agreement, or Exhibit hereto, or the TDP, or Schedule thereto, affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. The Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment or modification to the

Trust Agreement or any Exhibit thereto, or the TDP or any Schedule thereto, and if the Reorganized Debtors reasonably and in good faith advise the Trustee in writing that the proposed amendment or modification affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors, then the Reorganized Debtors' consent (which shall not be unreasonably denied or delayed) shall be required for such proposed amendment or modification. Any dispute between the Trustee and the Reorganized Debtors with respect to this Section 6.3 shall be resolved by the Bankruptcy Court.

6.4    **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

6.5    **Notices.**

(a)    Notices to persons asserting Talc Claims shall be given in accordance with such person's claims form submitted to the PI Trust with respect to his or her Talc Claim.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the PI Trust:

David Gordon, Trustee
c/o DJO Services, LLC
4460 Redwood Hwy., Suite 16-518
San Rafael, CA 94903
dgordon@djoservicesllc.com

39

With a copy (which shall not constitute notice) to:

> FrankGecker LLP
> Attn: Joseph D. Frank
>         Jeremy C. Kleinman
> 1327 West Washington Blvd, Suite 5G-H
> Chicago, IL 60607
> jfrank@fgllp.com
> jkleinman@fgllp.com

To the Delaware Trustee;

> Wilmington Trust, N.A.
> 1100 North Market Street
> Wilmington, DE 19890
> Attn: Russell L. Crane
> Email: rcrane@wilmingtontrust.com

With a copy (which shall not constitute notice) to:

> Morris James, LLP
> 500 Delaware Avenue, Suite 1500
> Wilmington, DE 19801
> Attn: Ross Antonacci, Esq.
> Email: rantonacci@morrisjames.com

To the TAC:

> Aleksandra Sikorska
> c/o Meirowitz & Wasserberg LLP
> 1 Financial Plaza Ste. 804
> Ft. Lauderdale, FL 33394
> aleksandra@mwinjurylaw.com

With a copy to:

> --and--
> Chris McKean
> c/o MRHFM LLC
> 1015 Locust St. Ste. 1200
> St. Louis, MO 63101
> cmckean@mrhfmlaw.com

40

--and—

Maura Kolb
c/o Lanier Law Firm
10940 W. Sam Houston
Pkwy N. Ste. 100
Houston, TX 77064
Maura.Kolb@LanierLawFirm.com

To the Reorganized Debtors:

RCP LLC
55 Water St., 43rd Floor
New York, New York 10041
Attention: Andrew Kidd, General Counsel
Email: Andrew.kidd@revlon.com

With a copy (which shall not constitute notice) to:

Paul Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Irene Blumberg
Email: iblumberg@paulweiss.com

(c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

6.6      **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Reorganized Debtors (which shall be a third-party beneficiary hereof), the PI Trust, the TAC, the Delaware Trustee, the Trustee, and their respective successors and assigns, except that neither the PI Trust, the TAC, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.9(d), and in the case of the Trustee in accordance with Section 4.2(d) above, and in the case of the TAC members in accordance with Section 5.4(b) above.

6.7      **Limitation on Talc Claims Interests for Securities Laws Purposes**. Talc Claims, and any interests therein, (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

6.8    **Exemption from Registration**. The Parties hereto intend that the interests of the Beneficial Owners under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the PI Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

6.9    **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein (including the TDP), and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

6.10    **Headings.**    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

6.11    **Governing Law**. The validity and construction of this Trust Agreement and all

amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the

rights of all Parties hereto and the effect of every provision hereof shall be subject to and

construed according to the laws of the State of Delaware without regard to the conflicts of law

provisions thereof that would purport to apply the law of any other jurisdiction; provided,

however, that the Parties hereto intend that the provisions hereof shall control and there shall not

be applicable to the PI Trust, the Trustee, the Delaware Trustee, the TAC, or this Trust

Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining

to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing

with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees

and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or

employees of a trust; (c) the necessity for obtaining court or other governmental approval

concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other

sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of

receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible

nature, amount, or concentration of trust investments or requirements relating to the titling,

storage, or other manner of holding of trust assets; (g) the existence of rights or interests

(beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to

terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or

responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are

inconsistent with the limitations on liability or authorities and powers of the Trustee, the

Delaware Trustee, or the TAC, set forth or referenced in this Trust Agreement. Section 3540 of

the Act shall not apply to the PI Trust.

6.12    **Dispute Resolution**.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 6.12 shall not apply to the Delaware Trustee or to the Reorganized Debtors in any respect or any dispute with respect to the resolution of Talc Claims which shall be governed exclusively by the TDP. This Section 6.12 shall not apply to any matters as between the GUC Trust or the Trustee, on the one hand, and the PI Trust or the PI Trustee, on the other hand, related to or arising from the GUC Trust/PI Fund Operating Reserve.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by

serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d).

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the PI Trust. Each counterparty shall respond to the motion within

the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

6.13    **Effectiveness**. This Trust Agreement shall become effective on the Effective Date.

6.14    **Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day of _____, 2023.

~~TRUSTEE~~                                    ~~DELAWARE~~ TRUSTEE

_____              ~~[_____]~~
~~Name:~~

                                       ~~By:~~_____
                                       Name: David J. Gordon
                                           ~~Title:~~

**DELAWARE TRUSTEE**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By: _____
    Name: Russell L. Crane
    Title:   Vice President

**TRUST ADVISORY COMMITTEE**

**TRUST ADVISORY COMMITTEE**

_____

Maura Kolb

_____

Chris McKean

_____

Aleksandra Sikorska

**EXHIBIT 1**

**PI TRUST DISTRIBUTION PROCEDURES**

*BR Draft 3.28.23*

# REVLON TALC PERSONAL INJURY LIQUIDATING TRUST DISTRIBUTION PROCEDURES

*BR Draft 3.28.23*

# TABLE OF CONTENTS

**Clause**                                                                                                    **Page**

**SECTION I INTRODUCTION** ........................................................................................ **1**
    1.1.       Purpose. ........................................................................................................ 1

**SECTION II PAYMENT OF TALC CLAIMS** ............................................................... **2**
    2.1.       Claims Liquidation Procedures ..................................................................... 2
    2.2.       Initial Distribution ........................................................................................ 2
    2.3.       Application of Payment Percentage ............................................................... 2
    2.4.       Requirement of Release ................................................................................. 3

**SECTION III RESOLUTION OF TALC CLAIMS** ....................................................... **3**
    3.1.       Effect of Statutes of Limitation and Repose. ............................................... 3
    3.2.       Resolution Process ........................................................................................ 4
    3.3.       Talc Claims Determination Process .............................................................. 5
    3.4.       Evidentiary Requirements. ............................................................................ 11
    3.5.       Right to Alternative Dispute Resolution. ...................................................... 15

**SECTION IV CLAIMS MATERIALS** ............................................................................ **16**
    4.1.       Claims Materials ........................................................................................... 16
    4.2.       Content of Claims Materials .......................................................................... 16
    4.3.       Withdrawal of Claims ................................................................................... 16
    4.4.       Confidentiality of Claimants' Submissions .................................................. 16

**SECTION V GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS** **17**
    5.1.       Showing Required .......................................................................................... 17
    5.2.       Costs Considered ........................................................................................... 17
    5.3.       Third-Party Services ...................................................................................... 17
    5.4.       Punitive Damages .......................................................................................... 18

**SECTION VI MISCELLANEOUS** ................................................................................. **18**
    6.1.       Amendments. ................................................................................................. 18
    6.2.       Severability. .................................................................................................. 19
    6.3.       Governing Law .............................................................................................. 19
    6.4.       Extensions of Time ........................................................................................ 19

**SCHEDULE 1 RELEASE AND INDEMNITY AGREEMENT** ................................ 20

**CERTIFICATION** ........................................................................................................... 25

**SCHEDULE 2 DEFINITIONS** ...................................................................................... 28

i

## REVLON TALC PERSONAL INJURY LIQUIDATING TRUST
## DISTRIBUTION PROCEDURES

The Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust contained herein set forth procedures for resolution of Talc Personal Injury Claims, as defined in and to the extent provided in connection with the *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed February 21, 2023 [Docket No. 1507] (as it may be amended or modified), as provided in the Revlon Talc Personal Injury Liquidating Trust Agreement.[1] The Trustee of the PI Trust shall implement and administer this TDP in consultation with the Trust Advisory Committee in accordance with the Trust Agreement.[2]

---

[1]    Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Trust Agreement or Plan, as applicable.

[2]    This TDP is established solely to implement the Plan and Plan Settlement. Nothing in this TDP or any other Definitive Document is intended to be, nor shall it be construed as, an admission by the Debtors as to any Talc Claim, nor shall any Definitive Document, including this TDP, or any component thereof be admissible as evidence of, or have any *res judicata*, *collateral estoppel*, or other preclusive or precedential effect regarding, (i) any alleged asbestos contamination in any product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (ii) any liability of the Debtors, or the amount of any alleged liability, in respect of any personal injury actually or allegedly caused by any talc-containing allegedly asbestos-contaminated product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility. Likewise, no decision of the Trustee or TAC to approve or make any distribution upon any Talc Claim shall be admissible as evidence of, or have any *res judicata*, *collateral estoppel*, or other preclusive or precedential effect regarding, liability to be imposed against Revlon, Inc., its Affiliates, or any other entity other than the PI Trust. The order of the Bankruptcy Court confirming the Plan shall constitute findings and orders with regard to the foregoing paragraph.

*BR Draft 3.28.23*

# SECTION I

## INTRODUCTION

**1.1.** **Purpose.** This TDP has been adopted pursuant to the Trust Agreement. The purpose of this TDP is to provide fair, equitable and substantially similar treatment for and among each holder of a Talc Claim (a "**Claimant**") in an efficient manner. To achieve maximum fairness and efficiency, this TDP is founded on the following principles:

(a)     Objective eligibility criteria;

(b)     Clear and reliable proof requirements;

(c)     Administrative transparency;

(d)     Rigorous review processes that generate consistent outcomes regardless of the asserted amount of the Talc Claim; and

(e)     Independence of the Trustee and the Trust's professionals.

*BR Draft 3.28.23*

**SECTION II**

**PAYMENT OF TALC CLAIMS**

2.1.    **Claims Liquidation Procedures**. The PI Trust shall take all reasonable steps to resolve Talc Claims as efficiently and expeditiously as possible at each stage of claims processing.

2.2.    **Initial Distribution**. The Trustee intends to make only a single distribution to all or substantially all holders of eligible Talc Claims with Final Determinations at the end of the Claims Determination Process for all eligible Talc Claims; provided, however, if the Trustee determines to proceed to a distribution on account of substantially all holders of eligible Talc Claims with Final Determinations, the Trustee shall establish adequate reserves for Talc Claims that have not yet received a Final Determination. Notwithstanding any provision in the Trust Agreement, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

2.3.    **Application of Payment Percentage**.    At the end of the Claims Determination Process for all or substantially all holders of eligible Talc Claims with Final Determinations, the Trustee shall set a payment percentage to be applied to all Final Determinations, based on his or her estimate of the PI Trust's assets and liabilities, if any, as well as the then-estimated value on account of all Final Determinations (the "**Payment Percentage**").  Each Claimant with a Final Determination will receive a distribution from the PI Trust equal to his or her Final Determination multiplied by the Payment Percentage, in each case in accordance with Section 2.4 hereof.

**2.4.    Requirement of Release.** The PI Trust shall make payment of the Payment Percentage on account of a Final Determination to a Claimant (or such Claimant's counsel on account of such Claimant) only after the PI Trust has received a properly executed release from the Claimant in the form attached hereto as Schedule 1, as may be amended in accordance with Section 6.1 hereof or by order of the Bankruptcy Court.

## SECTION III

## RESOLUTION OF TALC CLAIMS

**3.1.    Effect of Statutes of Limitation and Repose.** All Talc Claims must meet either (i) the applicable federal, state or foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, in the case of claims first filed in the tort system against the Debtors prior to the Petition Date, or (ii) the applicable federal, state or foreign statute of limitation that was in effect at the time of the filing of a proof of claim in the Debtors' Chapter 11 Cases, in the case of claims not filed against the Debtors in the tort system prior to the Petition Date. Notwithstanding the foregoing, the relevant statute of limitation shall be deemed tolled, with respect to a Claimant, as of the earliest of: (A) the actual filing by such Claimant of the claim against the Debtors prior to the Petition Date, whether in the tort system or by submission of the claim to the Debtors pursuant to an administrative settlement agreement; (B) the date provided by an agreement or otherwise, by the Debtors and such Claimant, prior to the Petition Date for the tolling of the claim against the Debtors, provided such tolling was still in effect on the Petition Date; or (C) the Petition Date.

If a Talc Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal, state or foreign statute of

*BR Draft 3.28.23*

limitation at the time of the tolling event, it shall be treated as a timely filed Talc Claim (i) if it was timely filed in accordance with the Bar Date Order, or (ii) upon entry of an Order of the Bankruptcy Court, following notice to interested parties including but not limited to the Trustee and the Reorganized Debtors, permitting such Talc Claim to be deemed timely filed for the purposes of this TDP.

3.2.    **Resolution Process**. Within three (3) months after the Effective Date, the Trustee shall adopt written procedures for reviewing and liquidating Talc Claims pursuant to this TDP. Such procedures shall require Claimants to file a claim submission in form approved by the Trustee (the "**Claim Submission Form**"), together with the required supporting documentation, in accordance with the provisions of Sections 4.1 and 4.2 below, not later than a date to be determined by the Trustee in consultation with the TAC, which date shall be no less than four (4) months after the Effective Date. It is anticipated that the PI Trust shall provide an initial response to the Claimant within one hundred eighty (180) days of receiving the Claim Submission Form.

The Claim Submission Form shall require the Claimant to elect either Matrix Review in accordance with Section 3.3.1.7 or, if ineligible for Matrix Review, Individual Review in accordance with Section 3.3.3. The Claim Submission Form shall require a Claimant electing Matrix Review to assert his or her Talc Claim for the highest Mesothelioma Compensation Level ("**MCL**") for which the Talc Claim qualifies at the time of filing.

Notwithstanding a Claimant's timely filing of a Talc Claim pursuant to Section 3.1 hereof, if a Claimant does not submit a completed Claim Submission Form prior to the deadline set by the Trustee, the Claimant's claim shall be disallowed (a "**Disallowed Claim**"); provided, however, the Trustee shall have the discretion to waive any deficiency

*BR Draft 3.28.23*

of any Claim Submission Form that the Trustee determines in his or her discretion to be appropriate for an extended Claim Submission Form deadline.  For the avoidance of doubt, no more than one Talc Claim may be asserted on behalf of any IP, and the Trustee shall have the discretion to disallow any Talc Claim or portion thereof that is duplicative of another Talc Claim asserted on behalf of any IP.

*BR Draft 3.28.23*

### 3.3.    Talc Claims Determination Process

#### 3.3.1    Review Process.

**3.3.1.1    In General.** This TDP will govern the process by which each Talc Claim is reviewed, including determining whether a Talc Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment (the "**Claims Determination Process**"). After the Trust has fully evaluated a Talc Claim, the Trust will issue a notice to the Claimant explaining the review result. If the Talc Claim has been approved and is eligible for payment, then the notice will include the specific amount that the Trust has approved (the "**Approved Claim Amount**"). If the Claimant accepts the Approved Claim Amount, it becomes the final determination of the Talc Claim (the "**Final Determination**"). If the Talc Claim is missing documents or information required for the Trust to fully evaluate the Talc Claim (a "**Deficient Claim**"), the notice will explain what is required and provide a timeline within which the Claimant may resolve the deficiencies. If the Talc Claim is ineligible for payment from the PI Trust pursuant to this TDP, the notice will explain the reason(s) that the Talc Claim is ineligible and deemed a Disallowed Claim.

**3.3.1.2    Pre-Petition Settled Claims.** The Claim Submission Form shall permit Claimants to submit a Talc Claim subject to a settlement agreement with the Debtors that was fully executed on or before June 15, 2022 (respectively, a "**Pre-Petition Settled Claim**" and a "**Pre-Petition Settlement Agreement**").

*BR Draft 3.28.23*

**3.3.1.3**    A Claimant with a Pre-Petition Settled Claim may elect the Approved Claim Amount to be (i) the unpaid amount agreed to in the Pre-Petition Settlement Agreement (the "**Settlement Value**"), or alternatively, (ii) the "**TDP Matrix Value**". If the Claimant elects the Approved Claim Amount to be the TDP Matrix Value rather than the Settlement Value, the Claimant shall be bound by the MCL either (x) as identified in the Pre-Petition Settlement Agreement or, (y) if not so identified in the Pre-Petition Settlement Agreement, as asserted by the Claimant in writing in litigation or negotiations with the Debtors; provided, however, in the case of either (x) or (y) such Claimant shall be required to satisfy the Medical/Exposure Criteria set forth for Matrix Review in this TDP, including in accordance with Section 3.3.1.7 hereof. For the avoidance of doubt, for Claimants with a Pre-Petition Settled Claim electing a TDP Matrix Value, any applicable Adjustment Factors shall be applied as of the date of the Trustee's review of the Talc Claim.

**3.3.1.4**    A Claimant with a Pre-Petition Settled Claim that cannot demonstrate assertion of an MCL in accordance with Section 3.3.1.3 shall be bound by such Settlement Value.

**3.3.1.5**    Notwithstanding the foregoing, a Claimant asserting a Pre-Petition Settled Claim, who is determined by the PI Trust not to have a qualifying Pre-Petition Settled Claim, may nevertheless proceed with a Talc Claim in accordance the procedures set forth in this TDP for Talc Claims that are not Pre-Petition Settled Claims.

*BR Draft 3.28.23*

**3.3.1.6    Matrix    Review:    MCLs,    Scheduled    Values    and Medical/Exposure Criteria.** Claimants with Talc Claims in connection with malignant mesothelioma diagnosis shall be eligible for Matrix Review.  The Matrix Review of this TDP establishes a schedule of two talc-related "**MCLs**" for Claimants in connection with a malignant mesothelioma diagnosis of the Claimant's injured party ("**IP**"); each MCL has "**Medical/Exposure Criteria**" and "**Scheduled Values**." For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

**3.3.1.7**    "**Matrix Review**" shall mean the review and valuation of Talc Claims in accordance with the schedule set forth in this Section 3.3.1.7; the Scheduled Value, subject to modification for "Adjustment Factors" as set forth in Section 3.3.2, shall be the Approved Claim Amount.  The two MCLs covered by this TDP, together with the Medical/Exposure Criteria and the Scheduled Values for each, are set forth below.

| MCL | SCHEDULED VALUE | MAXIMUM VALUE | MEDICAL/EXPOSURE CRITERIA |
|---|---|---|---|
| Level 1 | $350,000 | $700,000 | (1) Diagnosis of malignant mesothelioma; (2) At least three years of regular and routine Debtor Cosmetic Talc Exposure; Debtor Cosmetic Talc Exposure comprises 50-100% of Total Talc Exposure. (3) Subject to 75% reduction in Matrix Value for extremely nominal Non-Talc Asbestos-Containing Product Exposure. |

*BR Draft 3.28.23*

| Level 2 | $50,000 | $100,000 | (1) Diagnosis of malignant mesothelioma; (2) At least three years of regular and routine Debtor Cosmetic Talc Exposure; Debtor Cosmetic Talc Exposure comprises less than 50% of Total Talc Exposure. (3) Subject to 75% reduction in Matrix Value for extremely nominal Non-Talc Asbestos-Containing Product Exposure. |

An "**Extraordinary Claim**" shall require regular and routine Debtor Cosmetic Talc Exposure comprising 90% or more of the IP's Total Talc Exposure, and no Non-Talc Asbestos-Containing Product Exposure. Such Extraordinary Claim shall be entitled to up to two times the TDP Matrix Value for MCL 1 (for the avoidance of doubt, the TDP Matrix Value shall include the application of all Adjustment Factors, but shall not exceed the Maximum Value, provided that an Extraordinary Claim may receive a TDP Matrix Value up to two times greater than the Maximum Value for MCL 1). For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

### 3.3.2    Adjustment Factors to Scheduled Values.

The Trustee shall determine the Approved Claim Amount based on the determination of the Claimant's appropriate Scheduled Value pursuant to section 3.3.1.7 above and additionally Adjustment Factors.   Adjustment Factors shall be with respect to the IP.

*BR Draft 3.28.23*

Adjustment Factors shall be (i) Age Factor, (ii) Dependents Factor, and (iii) Economic Loss Factor. Adjustment Factors shall be a multiplier of the Claimant's Scheduled Value; after the multiplier(s), the Approved Claim Amount shall be the lesser of (i) the product of the Scheduled Values and Adjustment Factors and (ii) the Maximum Value.

### 3.3.2.1    Age Factor

The Trustee will determine the Age Factor based on the earlier of the IP's first diagnosis of talc-related malignancy and the IP's death date (the "**IP Age**"). The Trustee will assign an Age Factor in the following manner:

| Age Factor | Age |
| --- | --- |
| 0.5 | Over 80 years old |
| 0.75 | 71-80 years old |
| 1.0 | 65-70 years old |
| 1.25 | 46-64 years old |
| 1.5 | 45 years old or under |

### 3.3.2.2    Dependents Factor

The Trustee will determine a "**Dependents Factor**" based on the IP's dependents (including spouses, minor children, adult disabled dependent children, and dependent minor grandchildren) in the following manner:

| Dependents Factor | Dependents |
| --- | --- |
| 0.5 | No dependents |
| 0.75 | No spouse, other dependents |
| 1.0 | Spouse, no other dependents |

*BR Draft 3.28.23*

| 1.25 | Spouse and other dependents |

### 3.3.2.3    Economic Loss Factor

Claimants may elect (but are not required) to document economic losses related to the IP's loss of earnings, pension, social security, home services, medical expenses, and funerary expenses. Subject to review and substantiation of such documents, the Trust will assign an "**Economic Loss Factor**" in the following manner:

| Economic Loss Factor | Documented Economic Loss |
|---|---|
| 1.0 | <$200,000 |
| 1.0 + .001 for every thousand dollars of economic loss above $200,000, up to $450,000 | $200,000 - $450,000 |
| 1.25 | >$450,000 |

### 3.3.3    Individual Review.

In lieu of Matrix Review and Adjustment Factors, a Claimant, either (i) by choice following rejection of the Approved Claim Amount and prior to commencing arbitration pursuant to section 3.5 hereof or (ii) due to ineligibility for Matrix Review, may elect to have an individual review (the "**Individual Review**").  Individual Review shall be mandatory for all Claimants not eligible for Matrix Review due to the absence of a malignant mesothelioma diagnosis.  For the avoidance of doubt, a Talc Claim of an IP with more than extremely nominal Non-Talc Asbestos-Containing Product Exposure (as determined by the Trustee in his or her sole discretion) is not eligible for compensation from the PI Trust under this TDP and shall be deemed a Disallowed Claim.

*BR Draft 3.28.23*

Prior to the commencement of Individual Review, the Trustee shall require the Claimant to provide (i) such additional medical and other evidence deemed appropriate pursuant to Section 3.4 hereof, including evidence relevant to the Adjustment Factors set forth above, which for the avoidance of doubt shall include (i) a "**Linking Report**" of a qualified expert concerning the causes of the IP's injury, and (ii) a non-refundable commencement fee of $50.  In the event an Individual Review results in an Approved Claim Award and a Final Determination, the Trustee shall add $50 to the amount to be disbursed to the Claimant pursuant to Section 2.4 as a rebate of such commencement fee.

**3.4.    Evidentiary Requirements.**

**3.4.1    Evidence.**

**3.4.1.1    In General.** All diagnoses of a talc-related malignancy, whether or not relating to asbestos contamination, shall be based upon either (i) a physical examination of the IP by the physician providing the diagnosis of the talc-related or asbestos-related disease, or (ii) a diagnosis of such malignancy by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations. All diagnoses of a malignancy shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to allegedly asbestos-contaminated talc or talc-containing products and the diagnosis, or (ii) a history of the IP's exposure.[3]

**3.4.1.2    Pre-Petition Claimant Submissions.** If a Claimant with a Talc Claim arising from a claim that was filed against the Debtors or any other defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the Claimant or his or her counsel who conducted a physical examination of the IP as described in Section 3.4.l.1, or if the Claimant has filed such medical evidence and/or a diagnosis of the talc-related disease by a physician not engaged by the Claimant or his or her counsel who conducted a physical examination of the Claimant with another talc-related personal injury settlement trust that requires such evidence, without regard to whether the Claimant or counsel engaged the diagnosing physician, the Claimant shall provide such medical evidence to the PI Trust.

---

[3] All diagnoses of mesothelioma shall be presumed to be based on findings that the disease involves a malignancy. However, the Trust may rebut such presumptions.

*BR Draft 3.28.23*

**3.4.1.3   Credibility of Medical Evidence.** Before making any payment to a Claimant, the PI Trust must have reasonable confidence that the medical evidence provided in support of the Talc Claim is credible and consistent with recognized medical standards. To the extent consistent with recognized medical standards, the PI Trust may (i) require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence (for the avoidance of doubt, this clause (i) does not apply to reliable medical evidence of a diagnosis of mesothelioma), and (ii) may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence that is (i) of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) consistent with evidence submitted to the Debtors to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the talc-related disease in question before a state or federal judge, is presumptively reliable, although the PI Trust may rebut the presumption. In addition, Claimants who otherwise meet the requirements of this TDP for a Final Determination shall be paid in accordance with this TDP regardless of the results in any litigation at any time between the Claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be used by either the Claimant or the PI Trust in the Claims Determination Process of any Talc Claims under this TDP.

**3.4.2   Exposure Evidence.**

*BR Draft 3.28.23*

**3.4.2.1    In General.** As set forth in Section 3.3.3 above, to qualify for any MCL or Approved Claim Amount through Individual Review, the Claimant must demonstrate a minimum exposure to talc-containing products, or to conduct that exposed the Claimant to a talc-containing allegedly asbestos-contaminated product, for which the Debtors have liability. Any claim based on conspiracy theories that involve no exposure to a talc-containing allegedly asbestos-contaminated product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors are not compensable under this TDP. To meet the exposure requirements set forth in Section 3.3.1 above, the Claimant must show Debtor Cosmetic Talc Exposure as defined in Section 3.4.2.2 below.

**3.4.2.2    Debtor Cosmetic Talc Exposure.** The Claimant must demonstrate meaningful and credible evidence of (a) exposure of the IP to a talc-containing cosmetic product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (b) conduct for which the Debtor has legal responsibility that exposed the IP to such talc-containing cosmetic product (in either case, "**Debtor Cosmetic Talc Exposure**"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the IP, by an affidavit or sworn statement of a family member in the case of a deceased or incapacitated IP (providing the PI Trust finds such evidence reasonably reliable), or by other credible evidence.

**3.4.2.3    Non-Debtor Exposure.** The Claim Submission Form may require that a Claimant include an estimation of all Non-Debtor Cosmetic Talc Exposure of the IP to talc, asbestos and asbestos-containing products known to cause the malignancy for which the IP has been diagnosed.

*BR Draft 3.28.23*

        **3.4.2.4    Non-Talc Asbestos-Containing Product Exposure.** The specific exposure information required by the PI Trust to review a Talc Claim shall be set forth on the Claim Submission Form. The PI Trust can also require submission of other or additional evidence of exposure, and may seek and review evidence from additional sources, when it deems such to be necessary to assess the entirety of the IP's exposure to talc, asbestos, and related products in connection with a Talc Claim against the Debtors.

        Evidence submitted by a Claimant to establish proof of Debtor Cosmetic Talc Exposure is for the sole benefit of the PI Trust, not third parties or defendants in the tort system. The PI Trust has no need for, and therefore Claimants are not required to furnish the PI Trust with evidence of, exposure to specific **allegedly asbestos-contaminated** talc or talc-containing products other than those for which the Debtors have legal responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Debtors' products in the Claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the Claimant from having an eligible Talc Claim under this TDP, provided the Claimant satisfies the medical and exposure requirements of this TDP.

*BR Draft 3.28.23*

**3.5.     Right to Alternative Dispute Resolution.** The Trustee, with the consent of the TAC, shall develop and adopt "**ADR Procedures,**" which shall provide for binding arbitration to resolve disputes for which the relevant parties cannot otherwise reach a resolution. ADR Procedures shall apply only with respect to (a) the amount of the Approved Claim Amount, and/or (b) whether the IP's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim; the costs of the ADR Procedures shall be allocated by the arbitrator between the Claimant and the Trust. The ADR Procedures may be modified by the Trust, with the consent of the TAC, and subject to the procedures and requirements for amendment of this TDP set forth in Section 6.1 hereof.  Not later than one (1) month following the Trustee's issuance of an Approved Claim Amount for any Talc Claim, the Claimant may request arbitration pursuant to the ADR Procedures. The decision of the arbitrator after arbitration shall be final and any Approved Claim Amount determined by the arbitrator (which may be zero) shall be treated in accordance with Section 3.3.1.1 hereof.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 3.4 above. In an arbitration involving any such claim, the Trustee shall not offer into evidence or describe any model or assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the Claimant or his or her counsel ten days prior to the arbitration proceeding. The Claimant and his or her counsel may use the data that is provided by the Trust in the arbitration and shall agree to otherwise maintain the confidentiality of such information.

*BR Draft 3.28.23*

## SECTION IV

## CLAIMS MATERIALS

**4.1.    Claims Materials**. The Trustee shall prepare suitable and efficient "**Claims Materials**" for all Talc Claims and shall make available such Claims Materials to Talc Claimants.

**4.2.    Content of Claims Materials**. The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed Claim Submission Form. The Claim Submission Form shall require the Claimant to either (i) assert the highest MCL for which the Talc Claim qualifies at the time of filing under Matrix Review or (ii) if ineligible for Matrix Review, request Individual Review. The Claim Submission Form shall also include a certification by the Claimant or his or her attorney sufficient to meet the requirements of Rule 1 1(b) of the Federal Rules of Civil Procedure, as if the completed Claim Submission Form were a filing subject to that rule.

**4.3.    Withdrawal of Claims**. Except for (a) Talc Claims held by representatives of deceased or incompetent individuals for which court or probate approval of the PI Trust's offer is required and (b) Talc Claims subject to potential or pending dispute or entry of a binding award pursuant to Section 3.5 hereof, a Talc Claim shall be deemed to have been withdrawn and shall be deemed a Disallowed Claim if the Claimant does not accept the PI Trust's Approved Claim Amount.

**4.4.    Confidentiality of Claimants' Submissions**. All submissions to the PI Trust by a Claimant, including the Claim Submission Form and materials related thereto, are intended by the parties to be confidential. The PI Trust will preserve the confidentiality of such Claimant submissions, and shall disclose the contents thereof only with the permission

*BR Draft 3.28.23*

of the Claimant to such other persons as authorized by the Claimant, or in response to a valid subpoena of such materials issued by the Bankruptcy Court or any other court of competent jurisdiction. Furthermore, the PI Trust shall provide counsel for the Claimant of the applicable Talc Claim a copy of any such subpoena upon being served. The PI Trust shall, on its own initiative, or upon request of the Claimant in question, take all necessary and appropriate steps to preserve any privileges. On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the PI Trust by the Trustee, the Trustee shall arrange for the proper destruction of all documents and records submitted by Claimants.

## SECTION V

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**5.1.    Showing Required**. To establish an eligible Talc Claim, a Claimant must meet the requirements set forth in this TDP.

**5.2.    Costs Considered**. Notwithstanding any provisions of this TDP to the contrary, the Trustee shall give appropriate consideration to the cost of investigating and uncovering invalid Talc Claims and other transactions costs of the PI Trust so that administration of the PI Trust is not impaired by such processes with respect to issues related to the validity of the medical evidence supporting a Talc Claim. Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any Talc Claim against the PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable.

*BR Draft 3.28.23*

**5.3.     Third-Party Services**. Nothing in this TDP shall preclude the PI Trust from contracting with another talc claims resolution organization to provide services to the PI Trust so long as decisions about the categorization and liquidated value of Talc Claims are based on the relevant provisions of this TDP, including the MCLs, Scheduled Values and Medical/Exposure Criteria set forth above.

**5.4.     Punitive Damages**. In no circumstance shall the Trustee assign any Talc Claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs) and any Talc Claim for such amounts shall be deemed a Disallowed Claim.

## SECTION VI

## MISCELLANEOUS

**6.1.     Amendments.** Except as otherwise provided in this TDP or the Trust Agreement, with the consent of the TAC, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided that (i) permission of the Bankruptcy Court shall be required to amend the methodology for valuing Talc Claims in Matrix Review, including but not limited to the Scheduled Values, MCLs, Medical/Exposure Criteria, or Adjustment Factors; (ii) the Trustee must obtain the unanimous consent of the TAC prior to making or seeking Bankruptcy Court authority for any amendment, modification, deletion or addition to this TDP; (iii) the Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment, modification, deletion or addition to this TDP, and shall obtain the consent of the Reorganized Debtors for any amendment, modification, deletion or addition

BR Draft 3.28.23

that the Reorganized Debtors reasonably determine affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors; and (iv) such amendments, modifications, deletions, or additions shall not contravene the Plan or Confirmation Order.

6.2.    **Severability.** Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP.

6.3.    **Governing Law**. This TDP shall be governed by, and construed in accordance with, the substantive laws of the State of Delaware, without regard to any choice of law rules.

6.4.    **Extensions of Time**. Upon written request, the Trustee may in his or her discretion grant extensions of time for any time deadline or time limit identified herein to any Claimant.

*BR Draft 3.28.23*

## SCHEDULE 1
## RELEASE AND INDEMNITY AGREEMENT

*BR Draft 3.28.23*

## REVLON TALC PERSONAL INJURY LIQUIDATING TRUST

### RELEASE AND INDEMNITY AGREEMENT

NOTICE: THIS IS A BINDING DOCUMENT THAT AFFECTS YOUR LEGAL RIGHTS. PLEASE CONSULT YOUR ATTORNEY IN CONNECTION WITH EXECUTING THIS DOCUMENT. IF YOU DO NOT PRESENTLY HAVE AN ATTORNEY, YOU MAY WISH TO CONSIDER CONSULTING ONE.

All capitalized terms not defined herein shall have the respective meanings ascribed to them in either (i) *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 1507], as the same may be amended or modified from time to time (the "Plan") filed in Bankruptcy Case No. 22-10760 (DSJ) before the United States Bankruptcy Court for the Southern District of New York, confirmed by order on [•] [Docket No. [•] (the "Confirmation Order") or (ii) the Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust (the "TDP") filed as a supplement to the Plan.

WHEREAS, the undersigned, who is either the "Injured Party" or the/an "Official Representative"[4] (either being referred to herein as the "Claimant"), has filed a claim (the "Claim") with the Revlon Talc Personal Injury Liquidating Trust (the "PI Trust") pursuant to the TDP filed as part of the Plan, and such Claim asserts a Talc Personal Injury Claim arising out of exposure to talc-containing allegedly asbestos-contaminated products or conduct for which Revlon, Inc., et al (the "Debtors") are alleged to have legal responsibility; and

WHEREAS, the Claimant has agreed to settle and compromise the Injured Party's Claim for and in consideration of the allowance of the Claim by the PI Trust, at a liquidated value of $_____, on account of which the Claimant shall receive distributions pursuant to the Plan and TDP including but not limited to application of the Payment Percentage, and otherwise in accordance with the terms set forth therein and herein.

NOW, THEREFORE, the Claimant hereby agrees as follows:

1. On behalf of the Injured Party, the Injured Party's estate, the Injured Party's heirs, and/or anyone else claiming rights through the Injured Party, now and in the future, the Claimant hereby fully and finally voluntarily, intentionally, knowingly, absolutely, unconditionally, irrevocably, and fully waive, release, remit, acquit, forever discharge, and covenant not to knowingly sue or continue prosecution against the Debtors, the Reorganized Debtors, the PI Trust, the Trust Advisory Committee, and their

---

[4]    The "Official Representative" is the/a person who under applicable state law or legal documentation has the authority to represent the Injured Party, the Injured Party's estate, or the Injured Party's heirs.

respective settlors, trustors, trustees, directors, officers, agents, consultants, financial advisors, servants, employees, attorneys, heirs, executors (collectively the "Releasees") from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment or performances, rights of offset or recoupment, costs, expenses, attorneys, and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or any other legal or equitable theory of recovery (the "Released Claims"), arising from, relating to, resulting from or in any way connected to, in whole or in part, the Claimant's Talc Personal Injury Claim, the Releasees' duties and responsibilities under the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the TDP, the Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the TDP or the Plan, and any and all other orders of any court of competent jurisdiction relating to the Releasees and/or their duties and responsibilities, from the beginning of time through the execution date of this Release and Indemnity Agreement (this "Release"). The Claimant covenants and agrees that the Claimant will honor the Release as set forth in the preceding sentence and, further, that the Claimant will not (i) knowingly institute or continue prosecution of a lawsuit or other action against any Releasee based upon, arising out of, or relating to any Released Claims released hereby, (ii) knowingly participate, assist, or cooperate in any such action, or (iii) knowingly encourage, assist and/or solicit any third party to institute any such action.

2. Without limiting the foregoing, and notwithstanding anything to the contrary herein, the Release shall not apply in favor of the PI Trust as to the Claimant's right to payment of the Claimant's allowed Talc Personal Injury Claim, solely as provided through the Plan and TDP and as set forth in paragraph 7 below.

3. The Claimant intends this Release and Indemnity Agreement to be as broad and comprehensive as possible so that the Releasees shall never be liable, directly or indirectly, to the Injured Party or the Injured Party's heirs, legal representatives, successors or assigns, or any other person or entity claiming by, through, under, or on behalf of the Injured Party, for or on account of any Released Claim, except as expressly provided herein, whether the same is now known or unknown or may now be latent or may in the future appear to develop, including all spousal claims for the Injured Party's claims. If the Claimant is an Official Representative, the Claimant represents and warrants that the Claimant has all requisite legal authority to act for, bind and accept payment on behalf of the Injured Party and all heirs of the Injured Party on account of any Released Claim and hereby agrees to indemnify and hold harmless, to the extent of payment hereunder, excluding attorney's fees and costs, the Releasees from any loss,

*BR Draft 3.28.23*

cost, damage, or expense arising out of or in connection with the rightful claim of any other Entity to payments with respect to the Injured Party's Released Claim.

4. This Release and Indemnity Agreement is not intended to bar any cause of action, right, lien, or claim that the Claimant may have against any alleged tortfeasor other than the Releasees.  It is expressly not intended to bar any cause of action, right, lien or claim that the Claimant may have against any insurer of the Releasees or any commercial counterparties thereof engaged in the manufacturing, distribution or sale of materials alleged to have caused harm to the Claimant.[5] The Claimant hereby expressly reserves all his or her rights against such persons or entities. This Release and Indemnity Agreement is not intended to release or discharge any Talc Personal Injury Claim or potential Talc Personal Injury Claim that the Injured Party's heirs (if any), spouse (if any), the Official Representative (if any) or the Official Representative's heirs (if any) (other than the Injured Party) may have as a result of their own exposure to allegedly asbestos-contaminated talc or talc-containing products.

5. The Claimant represents and warrants that all Valid Liens,[6] subrogation, conditional payment, and reimbursement claims relating to benefits paid to or on account of the Injured Party in connection with, or relating to, the Claim have been resolved or will be resolved from the net proceeds of the settlement payment to the Claimant under this Release and Indemnity Agreement or from other funds or proceeds to the extent permitted under applicable lien settlement agreements or under applicable law. It is further agreed and understood that no Releasee shall have any liability to the Claimant or any other person or entity in connection with such liens or conditional payment or reimbursement claims and that the Claimant will indemnify and hold the Releasees harmless from any and all such alleged liability as provided in the following sentence. The Claimant will indemnify and hold the Releasees harmless, to the extent of the amount of payment hereunder, excluding attorneys' fees and costs, from any and all liability arising from subrogation, conditional payment, indemnity, or contribution claims related to the Released Claim and from any and all compensation or medical payments due, or claimed to be due, under any applicable law, regulation, or contract related to the Released Claim.

6. It is further agreed and understood that if the Claimant has filed a civil action against the PI Trust, the Claimant shall dismiss such civil action and obtain the entry of an Order of Dismissal with Prejudice with respect to any Released Claim no later than 30 days after the date hereof.

7. The Claimant understands that the Released Claim is being resolved by the PI Trust, and a liquidated value ($_____) has been established for such Claim. The Claimant acknowledges that, pursuant to the TDP, after the liquidated value of the Claim

---

[5]   For the avoidance of doubt, this Release does not include a release with respect to any of the Excluded Parties (as defined in the Plan).

[6]   A "Valid Lien" is a lien that is permitted by applicable law and with respect to which the lien holder has taken all steps necessary under the terms of the documents creating the lien and under applicable law to perfect the lien.

*BR Draft 3.28.23*

is determined pursuant to the procedures set forth in the TDP, the Claimant ultimately shall receive a pro rata share of that value based on the PI Settlement Fund Assets available for the payment of Claims. The Claimant further acknowledges that the Claimant may receive payment in one or more distributions, subject to determination by the Trustee, as provided in the TDP.

8. The Claimant understands, represents, and warrants that this Release and Indemnity Agreement is a compromise of a disputed claim and not an admission of liability by, or on the part of, the Releasees. Neither this Release and Indemnity Agreement, the compromise and settlement evidenced hereby, nor any evidence relating thereto, will ever be admissible as evidence against the PI Trust or other Releasee in any suit, claim, or proceeding of any nature except to enforce this Release and Indemnity Agreement. However, this Release and Indemnity Agreement is and may be asserted by the Releasees as an absolute and final bar to any claim or proceeding now pending or hereafter brought by or on behalf of the Injured Party with respect to the Talc Personal Injury Claim released herein, except as expressly provided in this Release and Indemnity Agreement.

9. The Claimant (a) represents that no judgment debtor has satisfied in full the PI Trust's liability with respect to the Injured Party's Talc Personal Injury Claim as the result of a judgment entered in the tort system, and (b) upon information and belief, represents that the Claimant has not entered into a release (other than this Release and Indemnity Agreement) that discharges or releases the PI Trust's liability to the Claimant with respect to the Injured Party's Talc Personal Injury Claim.

10.    The Claimant represents that he or she understands that this Release and Indemnity Agreement constitutes a final and complete release of the Releasees with respect to the Injured Party's Released Claim, except as expressly provided herein. The Claimant has relied solely on his or her own knowledge and information, and the advice of his or her attorneys (if any), as to the nature, extent, and duration of the Injured Party's injuries, damages, and legal rights, as well as the alleged liability of the Releasees and the legal consequences of this Release and Indemnity Agreement, and not on any statement or representation made by or on behalf of the PI Trust or other Releasee.

11.    In further consideration of the benefit of a distribution from the PI Trust on account of the Claimant's Talc Personal Injury Claim, as of the date hereof, the Claimant shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including costs of defense and attorneys' fees of the Releasees arising from the Claimant's failure to comply with the terms of this Release and Indemnity Agreement.

12.    This Release and Indemnity Agreement contains the entire agreement between the parties and supersedes all prior or contemporaneous oral or written agreements or understandings relating to the subject matter hereof between or among any of the parties hereto, including, without limitation, any prior agreements or understandings with respect to the liquidation of the Claim.

*BR Draft 3.28.23*

13.     This Release and Indemnity Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of DELAWARE, without giving effect to the principles of conflicts of law thereof, and shall be binding on the Injured Party and his or her heirs, legal representatives, successors and assigns.

14.     TO THE EXTENT APPLICABLE, THE CLAIMANT HEREBY WAIVES ALL RIGHTS UNDER SECTION 1542 OF THE CALIFORNIA CIVIL CODE, AND ANY SIMILAR LAWS OF ANY OTHER STATE. CALIFORNIA CIVIL CODE SECTION 1542 STATES:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTORS.

THE CLAIMANT UNDERSTANDS AND ACKNOWLEDGES THAT BECAUSE OF THE CLAIMANT'S WAIVER OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, EVEN IF THE INJURED PARTY SHOULD EVENTUALLY SUFFER ADDITIONAL DAMAGES, THE INJURED PARTY WILL NOT BE ABLE TO MAKE ANY CLAIM AGAINST THE RELEASEES FOR THOSE DAMAGES, EXCEPT AS EXPRESSLY PROVIDED HEREIN. THE CLAIMANT ACKNOWLEDGES THAT HE OR SHE INTENDS THESE CONSEQUENCES.

15.     The Claimant authorizes payment pursuant to Paragraph 7 to the Claimant or the Claimant's counsel, as agent for the Claimant, if applicable.

16.     The Claimant acknowledges that the PI Trust has no obligation to pay the Claimant until the PI Trust receives the executed Release and Indemnity Agreement from the Claimant.

17.     The Claimant acknowledges that the PI Trust is not providing any tax advice with respect to the receipt of any distribution on account of the Claimant's Talc Personal Injury Claim or any component thereof, and understands and agrees that the Claimant shall be solely responsible for compliance with all tax laws with respect to such distribution, to the extent applicable.  The Claimant additionally hereby represents and certifies to the PI Trust that, in respect of the Claim, the Claimant has paid or will provide for the payment and/or resolution of any obligations owing or potentially owing under 42 U.S.C. § 1395y(b) and/or 42 U.S.C. § 1396a(a)(25), or any related statutes, rules, regulations, or guidance, in connection with, or relating to, the Claim, including all Medicare and/or Medicaid Secondary Payer-related obligations.

## **CERTIFICATION**

I state that I have carefully read the foregoing Release and Indemnity Agreement and know the contents thereof, and I sign the same as my own free act. I additionally certify, under penalty of perjury, that the information that has been provided to support the Claim is true

*BR Draft 3.28.23*

according to my knowledge, information, and belief, and further that I have the authority as the Claimant to sign this Release and Indemnity Agreement.

I am:    _____ the Injured Party


_____    the Official Representative of the Injured Party, the Injured Party's Estate, or the Injured Party's Heirs.


EXECUTED this ____day of _____ .20___


_____

Signature of the Claimant

Name of the Claimant:    _____    SSN:__

Name of the Injured Party if different from the Claimant: _____

_____SSN of the Injured Party if different

from the Claimant:_____

SWORN to and subscribed before me this _____ day of _____20__


_____

Notary Public

*BR Draft 3.28.23*

My commission expires: _____

-OR-

Signatures of two persons unrelated to the Claimant by blood or marriage who witnessed the signing of this Release and Indemnity Agreement

_____                    _____

Witness Signature                                                  Witness Signature

*BR Draft 3.28.23*

## SCHEDULE 2
## DEFINITIONS

1.    "Adjustment Factors" means the Adjustment Factors for Matrix Review set forth in Section 3.3.2 of the TDP.

2.    "ADR Procedures" means procedures for alternative dispute resolution of certain issues as set forth in Section 3.5 of the TDP.

3.    "Approved Claim Amount" means the specific amount that the PI Trust has approved following the Claims Determination Process as to any Talc Claim.

4.    "Bar Date Order" means the *Order (I) Establishing Deadlines for (A) Submitting Proofs of Claim and (B) Requests for Payment Under Bankruptcy Code Section 503(b)(9), (II) Approving the Form, Manner and Notice Thereof, and (III) Granting Related Relief*, Docket No. 688.

5.    "Claim Submission Form" means the claim submission in form approved by the Trustee for review and liquidation of Talc Claims as described at Section 3.2 of the TDP.

6.    "Claimant" means any holder of a Talc Claim, including in their capacity as successor, or authorized representative of an IP.

7.    "Claims Materials" means materials suitable and efficient for the Trustee to substantiate a Talc Claim of any Claimant with the PI Trust.

8.    "Claims Determination Process" means the process by which each Talc Claim is reviewed, including determining whether a Talc Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment.

9.    "Debtor Cosmetic Talc Exposure" means exposure (a) to a talc-containing, allegedly asbestos-contaminated powdered cosmetic product manufactured, sold, supplied, produced, distributed, released, advertised or marketed by the Debtors or for which the Debtors otherwise have legal responsibility, or (b) to conduct for which the Debtor has legal responsibility that exposed the Claimant to a talc-containing, allegedly asbestos-contaminated powdered cosmetic product.

10.   "Debtors" means Revlon, Inc. *et al.*, debtors in jointly administered chapter 11 lead case no. 22-10760-(DSJ) (Bankr. S.D.N.Y.). A complete list of debtor entities is available on the website of Revlon Inc.'s claims and noticing agent at https://cases.ra.kroll.com/Revlon.

11.   "Dependents Factor" means the Adjustment Factor pertaining to the IP's spouse or other dependents, including minor children, adult disabled dependent children, and dependent minor grandchildren, as set forth in Section 3.3.2.2 of the TDP.

*BR Draft 3.28.23*

12.    "Deficient Claim" means a Talc Claim in respect of which the Trustee has not been provided documents or information sufficient to evaluate or approve the Claim.

13.    "Disallowed Claim" means a Talc Claim that has been disallowed and on account of which the Claimant shall not receive a distribution from the Trust.

14.    "Economic Loss Factor" means the Adjustment Factor pertaining to the IP's economic loss related to lost earnings, pension, social security, home services, medical expenses, and funerary expenses in connection with the IP's allegedly asbestos-contaminated talc-related malignancy, as set forth in Section 3.3.2.3 of the TDP.

15.    "Extraordinary Claim" means a Talc Claim arising from regular and routine Debtor Cosmetic Talc Exposure comprising 90% or more of the IP's Total Talc Exposure, and no Non-Talc Asbestos-Containing Product Exposure, entitling the holder of such Extraordinary Claim to up to two times the TDP Matrix Value for MCL 1, as set forth in Section 3.3.1.7.

16.    "Final Determination" means an Approved Claim Amount that has been accepted by the Claimant.

17.    "Individual Review" means the Talc Claim review process set forth in Section 3.3.3 of the TDP.

18.    "IP" means the party injured by exposure to allegedly asbestos-contaminated talc in connection with any Talc Claim.

19.    "IP Age" means the earlier of (i) the date of the IP's first diagnosis of allegedly asbestos-contaminated talc-related malignancy or (ii) the date of death of the IP.

20.    "Linking Report" means a report by a qualified expert establishing talc exposure as the cause of the IP's alleged malignancy.

21.    "Matrix Review" means the review and valuation of Talc Claims in accordance with the schedule set forth in Section 3.3.1.7.

22.    "Maximum Value" means the highest permissible TDP Matrix Value for a Talc Claim as pertaining to such Talc Claim's MCL.

23.    "MCL" means Mesothelioma Compensation Level; the two compensation levels for Matrix Review of Talc Claimants as set forth at Section 3.3.1.6 of the TDP.

24.    "Medical/Exposure Criteria" means the medical and exposure requirements pertaining to each MCL as set forth at Sections 3.3.1.6 and 3.3.1.7 of the TDP.

25.    "Mesothelioma Compensation Level" means MCL.

BR Draft 3.28.23

26.    "Non-Debtor Cosmetic Talc Exposure" means exposure to talc-containing powdered cosmetic products that is not Debtor Cosmetic Talc Exposure.

27.    "Non-Talc Asbestos-Containing Product Exposure" means the entirety of the IP's exposure to non-talc asbestos products.

28.    "Payment Percentage" means the pro rata payment percentage to be applied to all Final Determinations, based on the Trustee's estimate of the PI Trust's assets and liabilities, if any, as well as the then-estimated value on account of all Final Determinations.

29.    "PI Trust" means the Revlon Talc Personal Injury Liquidating Trust.

30.    "Plan" means the *First Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code*, filed February 21, 2023 [Docket No. 1507] (as it may be amended or modified).

31.    "Pre-Petition Settled Claim" means a Talc Claim liquidated by a Pre-Petition Settlement Agreement.

32.    "Pre-Petition Settlement Agreement" means a settlement agreement liquidating a Talc Claim that was fully executed on or before June 15, 2022.

33.    "Scheduled Values" means the liquidated values of each MCL as set forth at Section 3.3.1.7 of the TDP.

34.    "Settlement Value" means the liquidated amount of a Talc Claim pursuant to a Pre-Petition Settlement Agreement.

35.    "TAC" means the Trust Advisory Committee of the PI Trust, as defined in the Trust Agreement.

36.    "Talc Claims" means Talc Personal Injury Claims, as such term is defined in the Plan.

37.    "TDP" means the Trust Distribution Procedures of the Revlon Talc Personal Injury Liquidating Trust, as may be amended, modified, or supplemented from time to time, as defined in the Trust Agreement.

38.    "TDP Matrix Value" means, for any Talc Claim subject to Matrix Review, the Scheduled Value multiplied by the Adjustment Factors.

39.    "Total Talc Exposure" means the entirety of the IP's exposure to talc-containing **allegedly asbestos-contaminated** powdered cosmetic products in connection with a Talc Claim.

40.    "Trust Agreement" means the Revlon Talc Personal Injury Liquidating Trust Agreement executed in connection with the Plan.

*BR Draft 3.28.23*

41.    "Trustee" means the trustee of the PI Trust, as defined in the Trust Agreement.

**EXHIBIT 2**

**CERTIFICATE OF TRUST OF OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST**

### CERTIFICATE OF TRUST OF THE
### OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST

This Certificate of Trust of the OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

Name. The name of the statutory trust formed hereby is:
**OLD REVCO TALC PERSONAL INJURY LIQUIDATING TRUST**

Delaware Trustee. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

Wilmington Trust, National Association
Rodney Square North, 1100 North Market Street
Wilmington, DE 19890
Attention: Russell L. Crane

Effective Date. This Certificate of Trust shall be effective on May 2, 2023

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEE:

DELAWARE TRUSTEE:

WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity, but solely as
Delaware Trustee

By: _____

_____
David J. Gordon, in his capacity as a trustee and not individually.

Name: Russell L. Crane
Title:   Vice President

## EXHIBIT 3

### INVESTMENT GUIDELINES

**In General**. Only the following investments will be permitted:

(i)    Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

(ii)    U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

(iii)    Repurchase agreements for U.S. Treasury bills, bonds, and notes;

(iv)    AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

(v)    Open-ended mutual funds owning only assets described in subparts (i) through (iv) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment. The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis. If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period. Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited. Investment in non-U.S. dollar denominated bonds is prohibited. The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U809).

See example fund-level requirements table on following page.

# Fund Level Requirements

1. OTC Derivatives Counterparty Exposure – Not allowed
2. Non-U.S. dollar denominated bonds – Not allowed

| TYPE OF INVESTMENT | ELIGIBLE | PROHIBITED | COMMENTS |
|---|---|---|---|
| | | | |
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | x | | |
| | | | |
| **DERIVATIVES:** | | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | |
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |
| | | | |
| **OTHER:** | | | |
| Bank Loans | | x | |
| Convertibles (e.g., Lyons) | | x | |
| Municipal Bonds | X | | |
| Preferred Stock | | x | |
| Private Placements (excluding 144A) | X | | |
| Rule 144A Issues | X | | |
| Zero Coupon Bonds | X | | |
| Commodities | | X | |
| Catastrophe Bonds | | X | |

64990842 v5-WorkSiteUS-038528/0001
64990842 v6-WorkSiteUS-038528/0001

## Exhibit N-1

### GUC Trust Agreement

This **Exhibit N-1** contains the GUC Trust Agreement.  Pursuant to Article IV.R. of the Plan, on the Effective Date, solely in the event that any Class of General Unsecured Claims votes to accept the Plan and the Creditors' Committee Settlement Conditions are satisfied, the GUC Trust shall be established in accordance with the GUC Trust Agreement.  The GUC Trust Agreement shall be (a) drafted by the Creditors' Committee, (b) in form and substance acceptable to the Debtors and Required Consenting 2020 B-2 Lenders, and (c) in substantially the form included in the Plan Supplement.

All parties reserve all rights, in accordance with the consent and approval rights provided under the Plan or the Restructuring Support Agreement, to amend, revise, or supplement the Plan Supplement, and any of the documents and designations contained herein, including this **Exhibit N-1**, at any time before the Effective Date of the Plan, or any such other date as may be provided for by order of the Bankruptcy Court.  Each of the documents contained in the Plan Supplement and its amendments remain subject to certain consent and approval rights to the extent provided in the Plan or the Restructuring Support Agreement.

**OLD REVCO GUC LIQUIDATING TRUST**

**OLD REVCO GUC LIQUIDATING TRUST AGREEMENT**

**Dated as of May [2], 2023**

*Pursuant to the Revised Third Amended Joint Plan of*
*Reorganization of Revlon, Inc.*
*and its Debtor Affiliates under Chapter 11*
*of the Bankruptcy Code Dated May 1, 2023*

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ...................................................................2

    1.1       Creation and Name ......................................................................2

    1.2       Purposes...........................................................................................2

    1.3       Transfer of Assets...........................................................................4

    1.4       Acceptance of Assets and Assumption of Liabilities. ..................5

    1.5       Jurisdiction ......................................................................................6

ARTICLE II POWERS, TRUST ADMINISTRATION, AND REPORTING .............6

    2.1       Powers. .............................................................................................6

    2.2       General Administration. ...............................................................10

    2.3       Reporting. ......................................................................................11

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS .........................12

    3.1       Accounts. .......................................................................................12

    3.2       Investment Guidelines. .................................................................13

    3.3       Payment of Operating Expenses...................................................14

    3.4       Distributions to GUC Trust Beneficiaries. ..................................15

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE................................................18

    4.1       Number ..........................................................................................18

    4.2       Term of Service. ............................................................................18

    4.3       Compensation and Expenses of the Trustee.................................19

    4.4       Standard of Care; Exculpation. ....................................................20

    4.5       Protective Provisions.....................................................................21

    4.6       Indemnification. ............................................................................23

    4.7       Trustee Independence ...................................................................24

    4.8       No Bond .........................................................................................25

    4.9       Burden of Proof ............................................................................25

i

4.10       Reliance by the Trustee ...........................................................................25

4.11       Books and Records ...................................................................................26

4.12       Delaware Trustee.......................................................................................26

ARTICLE V TAX MATTERS ...............................................................................31

5.1        Treatment of Settlement Consideration Transfer .......................................31

5.2        Income Tax Status. ....................................................................................32

5.3        Tax Returns. ..............................................................................................32

5.4        Withholding of Taxes and Reporting Related to GUC Trust Operations ...34

5.5        Valuation ...................................................................................................35

5.6        Expedited Determination of Taxes ............................................................35

ARTICLE VI GENERAL PROVISIONS ................................................................35

6.1        Irrevocability .............................................................................................35

6.2        Term; Termination. ...................................................................................35

6.3        Amendments...............................................................................................37

6.4        Severability................................................................................................38

6.5        Notices. ......................................................................................................38

6.6        Successors and Assigns ..............................................................................40

6.7        Limitation on GUC Trust Interests for Securities Laws Purposes .............40

6.8        Exemption from Registration .....................................................................40

6.9        Entire Agreement; No Waiver....................................................................41

6.10       Headings.....................................................................................................41

6.11       Governing Law...........................................................................................41

6.12       Dispute Resolution .....................................................................................42

6.13       Effectiveness ..............................................................................................44

6.14       Counterpart Signatures ..............................................................................44

EXHIBIT 1  CERTIFICATE OF TRUST OF THE OLD REVCO GUC LIQUIDATING TRUST47

EXHIBIT 2  INVESTMENT GUIDELINES ............................................................49

## OLD REVCO GUC LIQUIDATING TRUST AGREEMENT

This Old Revco GUC Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 1860] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 22-10760 (DSJ) in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") by Wilmington Trust, National Association (the "**Delaware Trustee**") and the Trustee identified on the signature pages hereof (the "**Trustee**" and, together with the Delaware Trustee, the "**Parties**").

## RECITALS

**WHEREAS**, the Plan contemplates the creation of the Old Revco GUC Liquidating Trust (the "**GUC Trust**");

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS**, pursuant to the Plan, the GUC Trust is established to liquidate the GUC Trust Assets as set forth in the Plan (the "**Settlement Consideration**") and make distributions ("**GUC Trust Distributions**") to the holders of Allowed Claims in Classes 9(b) and 9(c) (the "**GUC Trust Beneficiaries**" and the interests in the GUC Trust held by such GUC Trust Beneficiaries, the "**GUC Trust Interests**") in accordance with the Plan, the Confirmation Order and this Trust Agreement;

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

1

**WHEREAS**, the Trustee shall administer the GUC Trust in accordance with the terms of the Plan and this Trust Agreement; and

**WHEREAS**, pursuant to the Plan, the GUC Trust is intended to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, and a "grantor trust" for United States federal income tax purposes, pursuant to Sections 671-679 of the Internal Revenue Code (the "**IRC**"), with the GUC Trust Beneficiaries treated as the grantors of the GUC Trust, except with respect to any Disputed Ownership Fund pursuant to Section 5.3(c).

**NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

1.1    <u>**Creation and Name.**</u>  There is hereby created a trust known as the "Old Revco GUC Liquidating Trust." The Trustee of the GUC Trust may transact the business and affairs of the GUC Trust in the name of the GUC Trust, and references herein to the GUC Trust shall include the Trustee acting on behalf of the GUC Trust. It is the intention of the Parties that the GUC Trust qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and that this Trust Agreement constitute the governing instrument of the GUC Trust, except with respect to any Disputed Ownership Fund. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 1**.

1.2    <u>**Purposes**</u>.  The purposes of the GUC Trust are to:

(a)    receive the Settlement Consideration pursuant to the terms of the Plan and the Confirmation Order;

2

(b)      hold, manage, protect and invest the Settlement Consideration, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**"), and monetize any non-liquid Trust Assets, in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement (the "**Governing Documents**") for the benefit of the GUC Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the GUC Trust;

(c)      administer, dispute, object to, compromise, or otherwise resolve all Non-Qualified Pension Claims, and Trade Claims (the "**Beneficiary Claims**"), *provided* that to the extent set forward in the Plan, the Debtors, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting BrandCo Lenders and in consultation with the Creditors' Committee, or the Reorganized Debtors, in consultation with the Trustee, may elect to administer, dispute, object to, compromise, or otherwise resolve any such Beneficiary Claim;

(d)      commence and pursue the Retained Preference Actions, and manage and administer any proceeds thereof in accordance with the Plan, including, as required under the Plan, transferring 18.77% of all Retained Preference Action Net Proceeds to the Reorganized Debtors, subject to timely receipt of payment instructions therefrom, not later than fifteen (15) business days after the receipt thereof;

(e)      hold and maintain the GUC Trust/PI Fund Operating Reserve to pay the GUC Trust/PI Fund Operating Expenses, which reserve shall be (a) funded (i) by the Debtors or

3

the Reorganized Debtors as expressly set forth in the Plan, and (ii) from proceeds of Retained

Preference Actions recovered by the GUC Trust, (b) held in a segregated account and

administered by the Trustee for the GUC Trust and as agent for the PI Trust on and after the

Effective Date (subject to any agreement reached by the Trustee and the PI Trustee as to how to

administer, or as ordered by the Bankruptcy Court), and (c) allocated as between the GUC Trust

and the PI Trust by the Trustee and PI Claims Administrator as determined from time to time (or

as ordered by the Bankruptcy Court);

(f)　　　satisfy and pay the GUC Trust/PI Fund Operating Expenses from the GUC

Trust/PI Fund Operating Reserve in accordance with the Plan and this Trust Agreement;

(g)　　　qualify at all times as a "liquidating trust" within the meaning of Section

301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership

Fund;

(h)　　　make distributions of Trust Assets to GUC Trust Beneficiaries in

accordance with and subject to the terms of this Trust Agreement and the Plan; and

(i)　　　engage in any lawful activity that is appropriate and in furtherance of the

purposes of the GUC Trust to the extent consistent with the Plan, the Confirmation Order and

this Trust Agreement.

**1.3**　　　**Transfer of Assets.**　　　Pursuant to, and in accordance with Article IV.R of

the Plan, the GUC Trust has received the Settlement Consideration to fund the GUC Trust. The

Settlement Consideration and any other assets to be transferred to the GUC Trust under the Plan

4

will be transferred to the GUC Trust free and clear of any liens or other claims by the Debtors,

the Reorganized Debtors, any creditor, or other entity. As required under the Plan, the GUC

Trust shall transfer 18.77% of all Retained Preference Action Net Proceeds to the Reorganized

Debtors, subject to timely receipt of payment instructions therefrom, within fifteen (15) business

days after the receipt thereof.

**1.4**      **Acceptance of Assets and Assumption of Liabilities.**

(a)      In furtherance of the purposes of the GUC Trust, the GUC Trust hereby

expressly accepts the transfer to the GUC Trust of the Settlement Consideration in the time and

manner as, and subject to the terms, contemplated in the Plan.

(b)      In furtherance of the purposes of the GUC Trust, except as otherwise

provided in this Trust Agreement or the Plan, the GUC Trust shall have and retain any and all

rights and defenses the Debtors had with respect to any Beneficiary Claims immediately before

the Effective Date to the extent necessary to administer such Claims in accordance with this

Trust Agreement and the Plan.

(c)      Notwithstanding anything to the contrary herein, no provision herein shall

be construed or implemented in a manner that would cause the GUC Trust to fail to qualify as a

"liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations,

except with respect to any Disputed Ownership Fund.

(d)     In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

**1.5     Jurisdiction**.  The Bankruptcy Court shall have continuing jurisdiction over the GUC Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the GUC Trust.

## ARTICLE II

## POWERS, TRUST ADMINISTRATION, AND REPORTING

**2.1     Powers.**

(a)     The Trustee is and shall act as a fiduciary to the GUC Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the GUC Trust in accordance with the purposes set forth in Section 1.2 above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the GUC Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)     Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)        Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)        receive and hold the Settlement Consideration and exercise all rights with respect thereto;

(ii)        invest the monies held from time to time by the GUC Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)        administer the GUC Trust/PI Fund Operating Reserve for the benefit of the GUC Trust, including any Disputed Ownership Fund thereof, and the PI Trust as set forth in the Plan;[2]

(iv)        incur expenses and other obligations of the GUC Trust necessary to carry out the purposes of the GUC Trust in accordance with the Plan, and pay or satisfy such obligations from the GUC Trust/PI Fund Operating Reserve as set forth in the Plan;

(v)        establish such funds, reserves, and accounts within the GUC Trust, as the Trustee deems useful in carrying out the purposes of the GUC Trust;

(vi)        sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the Beneficiary Claims;

---

[2]        The PI Trust shall periodically provide all invoices or other documentation with respect to its expenses to the Trustee and the Trustee shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay its expenses. Nothing in this Trust Agreement shall preclude the Trustee and the PI Trustee from establishing appropriate and efficient cash management/accounting systems which may include the advancement of funds from the GUC Trust/PI Fund Operating Reserve to the PI Trust from time to time.

(vii)     establish, supervise, and administer the GUC Trust and make distributions to GUC Trust Beneficiaries pursuant to the terms of this Trust Agreement and the Plan;

(viii)     appoint such officers and retain such consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(ix)     pay reasonable compensation from the GUC Trust/PI Fund Operating Reserve for any of the GUC Trust's consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires;

(x)     pay reasonable compensation from the GUC Trust/PI Fund Operating Reserve for the Trustee, the Delaware Trustee, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xi)     cooperate with the Reorganized Debtors to the extent set forth in the Plan, with respect to all administrative responsibilities that are provided in the Plan and this

8

Trust Agreement, including the Reorganized Debtors' filing of the applicable operating report and administering the closure of the Chapter 11 Cases;[3]

(xii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the GUC Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xiii)    in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiv)    commence and pursue the Retained Preference Actions, and manage and administer any proceeds thereof in accordance with the Plan; and

(xv)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

---

[3]    For the avoidance of doubt, the GUC Trust shall not be required to incur any expense arising from the Reorganized Debtors' obligations of filing and/or administering the Chapter 11 Cases; provided that in the event the Reorganized Debtors are prevented from seeking final certification and closing of the Chapter 11 Cases due solely to the activities of and/or by request of the GUC Trust or the PI Trust, any of the Chapter 11 Cases identified by the Trustee and so requested shall remain open, provided further that the GUC Trust and/or the PI Trust, as applicable, shall thereafter be responsible for all statutory fees and any ongoing reporting required (if any) for maintaining the Chapter 11 Cases until such time that the Trustee, by and through appropriate parties and professionals, seeks authority from the Bankruptcy Court to close such Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

(d)    The GUC Trust shall not have the power to guarantee any debt of other persons.

(e)    The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the GUC Trust.

### 2.2    General Administration.

(a)    The Trustee shall act in accordance with the Governing Documents. In the event of a conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall (i) timely file such tax returns and pay any taxes imposed on the GUC Trust in accordance with Section 5.3, (ii) comply with all applicable reporting and withholding obligations in accordance with Section 5.4, (iii) satisfy all requirements necessary to qualify and maintain qualification of the GUC Trust as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund, and (iv) take no action that could cause the GUC Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(c)    The Trustee shall be required to obtain the consent of the Reorganized Debtors, which shall not be unreasonably withheld or delayed:

10

(i)        to materially modify the compensation of the Trustee;

(ii)       to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(iii)      to make any amendment or modification of this Trust Agreement, or Exhibit hereto, that directly or indirectly affects the rights, duties, immunities, interests or liabilities of the Reorganized Debtors, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(d)       Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his position as such.

## 2.3    Reporting.

(a)       The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

(b)       The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the GUC Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified

11

public accountants.  The Annual Report shall be made available to the Reorganized Debtors and

the GUC Trust Beneficiaries by means of actual notice, provided, however, the Trustee may post

the Annual Report on a website maintained by the GUC Trust in lieu of actual notice to each

GUC Trust Beneficiary (unless otherwise required by law).

## ARTICLE III

## ACCOUNTS, INVESTMENTS, AND PAYMENTS

### 3.1    Accounts.

(a)    The Trustee shall maintain one or more accounts (the "**Trust Accounts**")

on behalf of the GUC Trust with one or more financial depository institutions (each a "**Financial**

**Institution**").

(b)    Candidates for the positions of Financial Institution shall fully disclose to

the Trustee any interest in or relationship with the Reorganized Debtors or their affiliated

persons. Any such interest or relationship shall not be an automatic disqualification for the

position, but the Trustee shall take any such interest or relationship into account in selecting a

Financial Institution.

(c)    The Trustee may replace any retained Financial Institution with a

successor Financial Institution at any time, and such successor shall be subject to the

considerations set forth in Section 3.1(a) above.

(d)    The Trustee may, from time to time, create such accounts and reasonable

reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem

necessary, prudent or useful in order to provide for distributions to the GUC Trust Beneficiaries and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and, except as specifically designated as such in accordance with the provisions of Section 5.3(c) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

### 3.2     Investment Guidelines.

(a)     The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 2** (the "**Investment Guidelines**").

(b)     In the event the GUC Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the GUC Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)     Cash proceeds received by the GUC Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the GUC Trust as set forth in Section 1.2 above.

13

### 3.3    Payment of Operating Expenses.

All operating expenses of the GUC Trust shall be paid from the GUC Trust/PI Fund Operating Reserve as provided in the Plan. None of the Trustee, Delaware Trustee, the GUC Trust Beneficiaries, nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any operating expense or other liability of the GUC Trust. Except as expressly set forth in the Plan, none of the Debtors or Reorganized Debtors, nor any of their officers, agents, advisors, professionals or employees shall be liable for the payment of any operating expense or other liability of the GUC Trust or the Trustee. To the extent that the Trustee determines that GUC Trust/PI Fund Operating Reserve is likely to incur a cash shortfall prior to the termination and winding up of the GUC Trust and/or the PI Trust (after taking into account additional funding of the GUC Trust/PI Fund Operating Reserve as contemplated by the Plan), the Trustee may determine to establish cash reserves from the corpus of the GUC Trust, which cash reserves shall be allocated equitably to the GUC Trust Beneficiaries by the Trustee in his or her judgment.[4]

---

[4]    The Trustee's determination of an anticipated cash shortfall shall take into consideration the GUC Trust/PI Fund Operating Reserves applicable to the PI Trust to the extent appropriate (i.e., to the extent the PI Trustee determines it is likely that the PI Trust shall incur a similar cash shortfall); to the extent appropriate, a cash reserve from the corpus of the PI Trust applicable to a cash shortfall at the PI Trust shall also be allocated equitably to the PI Trust Beneficiaries by the PI Trustee in his or her judgment.

14

### 3.4    Distributions to GUC Trust Beneficiaries.

(a)    The Trustee will make distributions to GUC Trust Beneficiaries in a fair, consistent and equitable manner in accordance with this Trust Agreement, the Plan and the Confirmation Order.

(b)    Distributions to GUC Trust Beneficiaries shall be made, as determined by the Trustee in his or her discretion subject to the terms of the Plan, provided, however, the GUC Trust must distribute at least annually to the GUC Trust Beneficiaries its net income plus all net proceeds from the sale of assets, except that the GUC Trust may retain an amount of net proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims and contingent liabilities (including disputed claims).

(c)    The GUC Trust may withhold or deduct from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding in accordance with Section 5.4 below). Any Trust Assets which are undistributable in accordance with this Section 3.4 as of the termination of the GUC Trust shall (i) revert to the GUC Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary); (ii) the Beneficiary Claim with respect to such undistributable amount shall be released, settled, compromised and forever barred, and (iii) the undistributable amount shall be reallocated to the other Beneficiary Claims, in accordance with provisions of the Plan and this Trust Agreement.

(d)     The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to GUC Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under this Trust Agreement.

(e)     Subject to Bankruptcy Rule 9010, any distribution to a GUC Trust Beneficiary shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the schedules if no proof of Claim is filed with the Trustee (as to Beneficiary Claims administered by the GUC Trust) and the Trustee has not received a written notice of a change of address. Except as set forth in the Plan, if any GUC Trust Distribution or other communication from the GUC Trust is returned as undeliverable, no further GUC Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address. Undeliverable GUC Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a GUC Trust Distribution becomes deliverable or (ii) such undeliverable GUC Trust Distribution becomes an Unclaimed Distribution pursuant to the provisions of the Plan and this Trust Agreement. Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any GUC Trust Beneficiary.

(f)     After final GUC Trust Distributions have been made in accordance with the Plan, the Confirmation Order and this Trust Agreement, and adequate provision has been made for all final obligations of the GUC Trust, the Trustee shall have the authority to direct

16

the remaining Trust Assets to a tax-exempt organization as selected by the Trustee in his or her discretion.

(g)   Checks issued to GUC Trust Beneficiaries shall be null and void if not negotiated within one hundred eighty (180) calendar days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Trustee by the GUC Trust Beneficiary to whom such check was originally issued.   Any Beneficiary Claim in respect of such a voided check shall be made within one hundred eighty (180) calendar days after the date of issuance of such check.   If no request is made as provided in the preceding sentence, the check shall be deemed undistributable and shall be subject to the provisions of Section 3.4(c).

(h)   Cash payments to foreign GUC Trust Beneficiaries may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(i)   The Trustee shall have the discretion to determine the timing of GUC Trust Distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

(j)   Notwithstanding any provision in the Trust Agreement, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

17

## ARTICLE IV

### TRUSTEE; DELAWARE TRUSTEE

**4.1**   **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.12 below, there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

**4.2**   **Term of Service.**

(a)   The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the GUC Trust pursuant to Section 6.2 below.

(b)   The Trustee may resign at any time upon written notice to the Reorganized Debtors with such notice filed with the Bankruptcy Court. Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)   The Trustee may be removed by the Bankruptcy Court in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the GUC Trust, or (ii) a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder.

18

(d)      In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the Bankruptcy Court.

(e)      Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)      Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the GUC Trust pursuant to Section 6.2 below.

**4.3      Compensation and Expenses of the Trustee.**

(a)      The Trustee shall be compensated for his or her service as Trustee in the amount of $750 per hour for services in 2023 (subject to annual increases consistent with the Trustee's practice), paid monthly.

(b)      The GUC Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder. The GUC Trust will reimburse the Trustee for fees

19

and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date (such amount not to exceed $50,000), which shall be paid promptly after the Effective Date.

(c)    The GUC Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3. The GUC Trust shall provide quarterly reports to the Reorganized Debtors for a description of the amounts paid under this Section 4.3.

4.4    **Standard of Care; Exculpation.**

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, and (iii) the officers, employees, consultants, advisors, and agents of each of the GUC Trust and the Trustee.

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the GUC Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for

20

any actions or inactions found by Final Order to be arising out of their willful misconduct, bad

faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified

Parties shall be satisfied from the GUC Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have

duties (including fiduciary duties) or liability related thereto, to the GUC Trust or the GUC Trust

Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are

eliminated to the fullest extent permitted by applicable law, and replaced by the duties and

liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified

Parties; provided, however, that with respect to the Trust Indemnified Parties other than the

Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to

the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)     The GUC Trust will maintain appropriate insurance coverage for the

protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

**4.5     Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or

affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to

the provisions of this Section 4.5.

(b)     In the event the Trustee retains counsel (including at the expense of the

GUC Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect

to all communications with such counsel, and in no event shall the Trustee be deemed to have

waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)     In the exercise or administration of the GUC Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

22

**4.6**     **Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust Assets.

(b)     Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the GUC Trust shall be paid by the GUC Trust from the GUC Trust/PI Fund Operating Reserve in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the GUC Trust. The Trustee may, in his or her discretion, authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs) to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

23

(c)    The Trustee is authorized, but not required, to purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include insurance with respect to liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)    The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)    The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**4.7**    **Trustee Independence.**    The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors. The Trustee shall not act as an attorney, agent, or

24

other professional for any GUC Trust Beneficiary or any holder of any Beneficiary Claim. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

      **4.8**    <u>**No Bond.**</u>  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

      **4.9**    <u>**Burden of Proof**</u>.  In any proceeding brought by any of the Debtors, or any other person who is bound by this Trust Agreement challenging any action, determination or failure to act of the Trustee in discharge of his or her duties under this Trust Agreement on the basis that such action, determination or failure constitutes gross negligence, willful misconduct or fraud, the person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act constituted gross negligence, willful misconduct, or fraud. Notwithstanding anything to the contrary in this Trust Agreement or any duty otherwise existing at law or equity, each determination, action or failure to act of the Trustee in the discharge of his or her duties under this Trust Agreement is, to the extent consistent with this Trust Agreement, hereby deemed to not constitute a breach of this Trust Agreement or any duty hereunder or existing at law, in equity or otherwise.

      **4.10**    <u>**Reliance by the Trustee**</u>.  The Trustee may absolutely rely, and shall be fully protected in acting or refraining from acting if he or she relies upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he or she has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.  In the absence of gross negligence, willful

25

misconduct, or fraud in respect of the Trustee's duties as found by a final and non-appealable court of competent jurisdiction, or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if applicable, not acting) thereon. The Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Trust Agreement, the Plan or any other document executed in connection therewith, and the Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

4.11    **Books and Records**. Upon notice to the Reorganized Debtors and the PI Trust, the Trustee shall be free, in his or her discretion to abandon, destroy or otherwise dispose of any books and records in his possession that the Trustee deems not necessary for the continued administration of the Plan and not required to be retained under applicable law, without the need for any order of the Bankruptcy Court, and shall have no liability for same.  This notice provision shall not create any right by any third party to access to privileged or confidential information held by the GUC Trust.

4.12    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall

cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.12, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.12(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)   The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein. The Delaware Trustee shall be a trustee of the GUC Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the GUC Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the GUC Trust or the GUC Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to

27

any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the GUC Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.12(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.12(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled

to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the GUC Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the GUC Trust in accordance with Section 3810 of the Act.

(e)    Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust

29

business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)    The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the GUC Trust and the Delaware Trustee, which compensation shall be paid by the GUC Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the GUC Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no

30

responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)    The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

## ARTICLE V
## TAX MATTERS

**5.1**    **Treatment of Settlement Consideration Transfer.**  For all United States federal income tax purposes, all Parties shall treat the transfer of the Settlement Consideration to the GUC Trust as (i) a transfer of the Settlement Consideration (subject to any obligations related to those assets) directly to the GUC Trust Beneficiaries, followed by (ii) the transfer by such GUC Trust Beneficiaries of such Settlement Consideration to the GUC Trust in exchange for GUC Trust Interests (other than the Trust Assets allocable to Disputed Claims and held as a "disputed

ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations ("**Disputed Ownership Fund**")). Accordingly, the GUC Trust Beneficiaries shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Settlement Consideration (other than the Trust Assets allocable to the Disputed Ownership Fund).

5.2    **Income Tax Status.**

(a)    For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and other than as provided pursuant to Section 5.3(c), this GUC Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671-679 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

(b)    The GUC Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

5.3    **Tax Returns.**

(a)    In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Trustee shall file with the IRS annual tax returns for the GUC Trust on Form 1041 as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. In addition, the Trustee shall file in a timely manner for the GUC Trust such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes

shown as due thereon. The GUC Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is respect of any assets allocable to, or retained on account of, the Disputed Ownership Fund) will be allocated to the GUC Trust Beneficiaries in accordance with their relative ownership of GUC Trust Interests. Within a reasonable time following the end of the taxable year, the GUC Trust shall send to each GUC Trust Beneficiary a separate statement setting forth such GUC Trust Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such GUC Trust Beneficiary to report such items on his/her applicable income tax return.

(b)      The GUC Trust shall be responsible for payment, from the GUC Trust/PI Fund Operating Reserve, of any taxes imposed on the GUC Trust (including any taxes imposed on the Disputed Ownership Fund) or the Trust Assets. In accordance therewith, any taxes imposed on the Disputed Ownership Fund or its assets will be paid from the GUC Trust/PI Fund Operating Reserve.

(c)      The Trustee may timely elect to treat any Trust Assets allocable to Disputed Claims to a Disputed Ownership Fund, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a Disputed Ownership Fund election is made, all parties (including the Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing. The GUC Trust shall file all income tax returns with respect to any income attributable to the Disputed Ownership Fund and shall pay from the GUC Trust/PI Fund Operating Reserve all U.S. federal, state and local income taxes attributable to such Disputed Ownership Fund based on the items of income, deduction, credit, or loss allocable thereto.

33

**5.4**    **Withholding of Taxes and Reporting Related to GUC Trust Operations**.  The

GUC Trust shall comply with all withholding, deduction and reporting requirements imposed by

any federal, state, local or foreign taxing authority, and all distributions made by the GUC Trust

shall be subject to any applicable withholding, deduction and reporting requirements. The

Trustee shall be authorized to take any and all actions that may be necessary or appropriate to

comply with any such withholding, deduction, payment, and reporting requirements. All

amounts properly withheld or deducted from distributions to a GUC Trust Beneficiary as

required by applicable law and paid over to the applicable taxing authority for the account of

such GUC Trust Beneficiary shall be treated as part of the GUC Trust Distribution to such GUC

Trust Beneficiary. To the extent that the operation of the GUC Trust or the liquidation of the

Trust Assets creates a tax liability imposed on the GUC Trust, the GUC Trust shall timely pay

such tax liability and any such payment shall be considered a cost and expense of the operation

of the GUC Trust payable without Bankruptcy Court order. Any federal, state or local

withholding taxes or other amounts required to be withheld under applicable law shall be

deducted from distributions hereunder. All GUC Trust Beneficiaries shall be required to provide

any information necessary to effect the withholding and reporting of such taxes. The Trustee

may require each GUC Trust Beneficiary to furnish to the GUC Trust (or its designee) its social

security number or employer or taxpayer identification number as assigned by the IRS and

complete any related documentation (including but not limited to a Form W-8BEN, Form W-

8BENE-E, or Form W-9) (the "**Tax Documents**"). The Trustee may condition any and all

distributions to any GUC Trust Beneficiary upon the timely receipt of properly executed Tax

Documents and receipt of such other documents as the Trustee reasonably requests, and in

accordance with the Plan. Notwithstanding any of the foregoing provisions of this Section 5.4,

34

Section V.C of the Plan shall apply to distributions to be made from the GUC Trust that constitute "Wage Distributions" (as defined in the Plan) and for the avoidance of doubt, neither the GUC Trust nor the GUC Trust/PI Fund Operating Reserve shall bear any liability for the employer portion of any payroll taxes applicable to Wage Distributions, which shall be borne by the Reorganized Debtor.

5.5    **Valuation.**  Within 180 days after the Effective Date, the Trustee shall make a good faith valuation of the Trust Assets.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal income tax purposes. The Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the GUC Trust that are required by any governmental unit.

5.6    **Expedited Determination of Taxes**.  The Trustee may request an expedited determination of taxes of the GUC Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the termination of the GUC Trust.

<div align="center">

**ARTICLE VI**

**GENERAL PROVISIONS**

</div>

6.1    **Irrevocability**.  To the fullest extent permitted by applicable law, the GUC Trust is irrevocable.

6.2    **Term; Termination.**

<div align="center">35</div>

(a)     The term for which the GUC Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)     The Trustee shall make continuing efforts to monetize any non-liquid Trust Assets.

(c)     The Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Retained Preference Actions is not likely to yield sufficient additional Cash to justify further pursuit of such claims, or (b) all distributions of Cash and other Trust Assets required to be made by the Trustee under the Plan and this Trust Agreement have been made in accordance with provisions of the Plan and this Trust Agreement, provided, however, that in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets (the "**Dissolution Date**").

(d)     On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the GUC Trust by the Trustee and payment of all of the liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the GUC Trust shall be distributed or disbursed in accordance with Section 3.4 and Section 5.3(c) above.

36

(e)        Following the dissolution and distribution of the assets of the GUC Trust,

the GUC Trust shall terminate, and the Trustee shall execute and cause a Certificate of

Cancellation of the Certificate of Trust of the GUC Trust to be filed in accordance with the Act.

Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the

GUC Trust as a separate legal entity shall continue until the filing of such Certificate of

Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware

Trustee for its records promptly following such filing.

**6.3**      **Amendments**.  Any amendment to or modification of this Trust Agreement may

be made in writing and only pursuant to an order of the Bankruptcy Court; provided, however,

the Trustee may amend this Trust Agreement from time to time without the consent, approval or

other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications

or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this

Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines

contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or

foreign governmental entity. Notwithstanding the foregoing, no amendment or modification of

this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the

Plan or the Confirmation Order other than, with the Reorganized Debtors' consent, to make

minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate

the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust

Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way

that could jeopardize, impair, or modify the GUC Trust's "liquidating trust" status. Any

amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall

require the Delaware Trustee's written consent. The Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment or modification to the Trust Agreement or any Exhibit thereto, and if the Reorganized Debtors reasonably and in good faith advise the Trustee in writing that the proposed amendment or modification affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors, then the Reorganized Debtors' consent (which shall not be unreasonably denied or delayed) shall be required for such proposed amendment or modification. Any dispute between the Trustee and the Reorganized Debtors with respect to this Section 6.3 shall be resolved by the Bankruptcy Court.

**6.4**      **Severability**. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.5**      **Notices.**

(a)      Notices to GUC Trust Beneficiaries shall be given in accordance with such person's claims form submitted to the GUC Trust.

(b)      Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the GUC Trust:

    Alan D. Halperin, Trustee
    c/o Halperin Battaglia Benzija LLP

40 Wall Street 37th Fl.
New York, NY 10005
Email: ahalperin@halperinlaw.net

With a copy (which shall not constitute notice) to:

Halperin Battaglia Benzija LLP
40 Wall Street 37th Floor
New York, NY 10005
Attn: Donna H. Lieberman, Esq.
Email: dlieberman@halperinlaw.net

To the Delaware Trustee:

Wilmington Trust, N.A.
1100 North Market Street
Wilmington, DE 19890
Attn: Russell L. Crane
Email: rcrane@wilmingtontrust.com

With a copy (which shall not constitute notice) to:

Morris James, LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Attn: Ross Antonacci, Esq.
Email: rantonacci@morrisjames.com

To the Reorganized Debtors:

RCP LLC
55 Water St., 43rd Floor
New York, New York 10041
Attention: Andrew Kidd, General Counsel
Email: Andrew.kidd@revlon.com

With a copy (which shall not constitute notice) to:

Paul Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attention: Irene Blumberg
Email: iblumberg@paulweiss.com

39

(c)      All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

**6.6**      **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Reorganized Debtors (which shall be a third-party beneficiary hereof), the GUC Trust, the Delaware Trustee, the Trustee, and their respective successors and assigns, except that neither the GUC Trust, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.12 (d), and in the case of the Trustee in accordance with Section 4.2(d) above.

**6.7**      **Limitation on GUC Trust Interests for Securities Laws Purposes**. GUC Trust Interest (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.8**      **Exemption from Registration**. The Parties hereto intend that the interests of the GUC Trust Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and

40

sale under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**6.9** **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10** **Headings.** The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11** **Governing Law**. The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the GUC Trust, the Trustee, the Delaware Trustee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court

41

or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Delaware Trustee set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the GUC Trust.

**6.12** **Dispute Resolution**.

(a)      Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 6.12 shall not apply to the Delaware Trustee or to the Reorganized Debtors in any respect. This Section 6.12 shall not apply to any matters as between the GUC Trust or Trustee, on the one hand, and the PI Trust or PI Trustee, on the other hand, related to or arising from the GUC Trust/PI Fund Operating Reserve.

42

(b)      **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)      **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing

43

party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d) below.

(d)     **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the GUC Trust. Each counterparty shall respond to the motion within the time period allowed by the rules of the court, and the disputing party may file a reply memorandum, to the extent permitted by the rules of the court.

**6.13   Effectiveness**. This Trust Agreement shall become effective on the Effective Date.

**6.14   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

44

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day

of _____, 2023.

**TRUSTEE**

_____

Alan D. Halperin

**DELAWARE TRUSTEE**

**WILMINGTON TRUST, NATIONAL ASSOCIATION**

By:_____
    Name: Russell L. Crane
    Title:   Vice President

**EXHIBIT 1**

**CERTIFICATE OF TRUST OF THE OLD REVCO GUC LIQUIDATING TRUST**

## CERTIFICATE OF TRUST OF THE
## OLD REVCO GUC LIQUIDATING TRUST

This Certificate of Trust of the OLD REVCO GUC LIQUIDATING TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

Name. The name of the statutory trust formed hereby is:
### OLD REVCO GUC LIQUIDATING TRUST

Delaware Trustee. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

Wilmington Trust, National Association
Rodney Square North, 1100 North Market Street
Wilmington, DE 19890
Attention: Russell L. Crane

Effective Date. This Certificate of Trust shall be effective on May 2, 2023.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

TRUSTEE:                                         DELAWARE TRUSTEE:

                                                WILMINGTON TRUST, NATIONAL
                                                ASSOCIATION, not in its individual
                                                capacity, but solely as
                                                Delaware Trustee

By: _____

_____        Name: Russell L. Crane
Alan D. Halperin, in his capacity as a trustee   Title:   Vice President
and not individually.

48

**EXHIBIT 2**

**INVESTMENT GUIDELINES**

Consistent with the provisions of Rev. Proc. 94-45 and notwithstanding any other provision of the Trust Agreement, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

**<u>Exhibit N-2</u>**

**Blackline comparison to GUC Trust Agreement as filed on March 31, 2023**

**OLD REVCO GUC LIQUIDATING TRUST**

**OLD REVCO GUC LIQUIDATING TRUST AGREEMENT**

**Dated as of [ ]May ___, 2023**

*Pursuant to the Revised Third Amended Joint Plan of*
*Reorganization of Revlon, Inc.*
*and its Debtor Affiliates under Chapter 11*
*of the Bankruptcy Code Dated [ ]May 1, 2023*

# TABLE OF CONTENTS

**Page**

ARTICLE I AGREEMENT OF TRUST ........................................................................ 2

    1.1      Creation and Name ..................................................................... 2

    1.2      Purposes ..................................................................................... 2

    1.3      Transfer of Assets. ..................................................................... 4

    1.4      Acceptance of Assets and Assumption of Liabilities. ................ 5

    1.5      Jurisdiction ................................................................................ 6

ARTICLE II POWERS, TRUST ADMINISTRATION, AND REPORTING ................ 6

    2.1      Powers. ....................................................................................... 6

    2.2      General Administration. ............................................................. 10

    2.3      Reporting. ................................................................................... 11

ARTICLE III ACCOUNTS, INVESTMENTS, AND PAYMENTS ............................ 12

    3.1      Accounts. .................................................................................... 12

    3.2      Investment Guidelines. .............................................................. 13

    3.3      Payment of Operating Expenses. ............................................... 13

    3.4      Distributions to GUC Trust Beneficiaries. ................................ 14

ARTICLE IV TRUSTEE; DELAWARE TRUSTEE ................................................... 17

    4.1      Number ....................................................................................... 17

    4.2      Term of Service. ........................................................................ 17

    4.3      Compensation and Expenses of the Trustee. ............................. 19

    4.4      Standard of Care; Exculpation. .................................................. 20

    4.5      Protective Provisions. ................................................................ 21

    4.6      Indemnification. ......................................................................... 22

    4.7      Trustee Independence ................................................................. 24

    4.8      No Bond ...................................................................................... 24

    4.9      Burden of Proof ......................................................................... 24

i

4.10     Reliance by the Trustee ................................................................ 25

4.11     Books and Records ........................................................................ 26

4.12     Delaware Trustee. .......................................................................... 26

ARTICLE V TAX MATTERS .................................................................... 31

5.1      Treatment of Settlement Consideration Transfer ....................... 31

5.2      Income Tax Status. ....................................................................... 31

5.3      Tax Returns. .................................................................................. 32

5.4      Withholding of Taxes and Reporting Related to GUC Trust Operations .. 33

5.5      Valuation ...................................................................................... 34

5.6      Expedited Determination of Taxes ............................................. 35

ARTICLE VI GENERAL PROVISIONS ................................................... 35

6.1      Irrevocability ................................................................................ 35

6.2      Term; Termination. ....................................................................... 35

6.3      Amendments ................................................................................. 37

6.4      Severability .................................................................................. 38

6.5      Notices. ......................................................................................... 38

6.6      Successors and Assigns ............................................................... 39

6.7      Limitation on GUC Trust Interests for Securities Laws Purposes ... 3940

6.8      Exemption from Registration ....................................................... 3940

6.9      Entire Agreement; No Waiver ..................................................... 40

6.10     Headings. ....................................................................................... 4041

6.11     Governing Law .............................................................................. 4041

6.12     Dispute Resolution ....................................................................... 4142

6.13     Effectiveness ................................................................................. 4344

6.14     Counterpart Signatures ................................................................ 4344

EXHIBIT 1  CERTIFICATE OF TRUST OF THE OLD REVCO GUC LIQUIDATING TRUST 4547

EXHIBIT 2  INVESTMENT GUIDELINES .......................................... 4649

## OLD REVCO GUC LIQUIDATING TRUST AGREEMENT

This Old Revco GUC Liquidating Trust Agreement (this "**Trust Agreement**"), dated the date set forth on the signature page hereof and effective as of the Effective Date, is entered into pursuant to the Revised Third Amended Joint Plan of Reorganization of Revlon, Inc. and ~~its~~Its Debtor Affiliates ~~under~~Pursuant to Chapter 11 of the Bankruptcy Code [Docket No. ~~1507~~1860] (as may be further amended or modified, the "**Plan**"),[1] in Case No. 22-10760 (DSJ) in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") by Wilmington Trust, National Association (the "**Delaware Trustee**") and the Trustee identified on the signature pages hereof (the "**Trustee**" and, together with the Delaware Trustee, the "**Parties**").[2]

### RECITALS

**WHEREAS**, the Plan contemplates the creation of the Old Revco GUC Liquidating Trust (the "**GUC Trust**");

**WHEREAS**, the Confirmation Order has been entered by the Bankruptcy Court;

**WHEREAS**, pursuant to the Plan, the GUC Trust is established to liquidate the GUC Trust Assets as set forth in the Plan (the "**Settlement Consideration**") and make distributions ("**GUC Trust Distributions**") to the holders of Allowed Claims in Classes 9(b) and 9(c) (the "**GUC Trust Beneficiaries**" and the interests in the GUC Trust held by such GUC Trust

---

[1] All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference. All capitalized terms not defined herein or in the Plan, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Bankruptcy Rules, and such definitions are incorporated herein by reference.

[2] ~~The initial Trustee shall be Alan Halperin.~~

Beneficiaries, the "**GUC Trust Interests**") in accordance with the Plan, the Confirmation Order and this Trust Agreement;

      **WHEREAS**, the Trustee shall administer the GUC Trust in accordance with the terms of the Plan and this Trust Agreement; and

      **WHEREAS**, pursuant to the Plan, the GUC Trust is intended to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, and a "grantor trust" for United States federal income tax purposes, pursuant to Sections 671-679 of the Internal Revenue Code (the "**IRC**"), with the GUC Trust Beneficiaries treated as the grantors of the GUC Trust, except with respect to any Disputed Ownership Fund pursuant to Section 5.3(c).

      **NOW, THEREFORE,** it is hereby agreed as follows:

## ARTICLE I

## AGREEMENT OF TRUST

**1.1    Creation and Name.**  There is hereby created a trust known as the "Old Revco GUC Liquidating Trust." The Trustee of the GUC Trust may transact the business and affairs of the GUC Trust in the name of the GUC Trust, and references herein to the GUC Trust shall include the Trustee acting on behalf of the GUC Trust. It is the intention of the Parties that the GUC Trust qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations and that this Trust Agreement constitute the governing instrument of the GUC Trust, except with respect to any Disputed Ownership Fund. The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 1**.

**1.2    Purposes**.  The purposes of the GUC Trust are to:

(a)    receive the Settlement Consideration pursuant to the terms of the Plan and the Confirmation Order;

(b)    hold, manage, protect and invest the Settlement Consideration, together with any income or gain earned thereon and proceeds derived therefrom (collectively, the "**Trust Assets**"), and monetize any non-liquid Trust Assets, in accordance with the terms of the Plan, the Confirmation Order and this Trust Agreement (the "**Governing Documents**") for the benefit of the GUC Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or

business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the GUC Trust;

(c)    administer, dispute, object to, compromise, or otherwise resolve all Non-Qualified Pension Claims, and Trade Claims (the "**Beneficiary Claims**"), *provided* that to the extent set forward in the Plan, the Debtors, with the consent (not to be unreasonably withheld, conditioned, or delayed) of the Required Consenting BrandCo Lenders and in consultation with the Creditors' Committee, or the Reorganized Debtors, in consultation with the Trustee, may elect to administer, dispute, object to, compromise, or otherwise resolve any such Beneficiary Claim;

(d)    commence and pursue the Retained Preference Actions, and manage and administer any proceeds thereof in accordance with the Plan, including, as required under the Plan, transferring 18.77% of all Retained Preference Action Net Proceeds to the Reorganized Debtors, subject to timely receipt of payment instructions therefrom, not later than fifteen (15) business days after the receipt thereof;

(e)    hold and maintain the GUC Trust/PI Fund Operating Reserve to pay the GUC Trust/PI Fund Operating Expenses, which reserve shall be (a) funded (i) by the Debtors or the Reorganized Debtors as expressly set forth in the Plan, and (ii) from proceeds of Retained Preference Actions recovered by the GUC Trust, (b) held in a segregated account and administered by the Trustee for the GUC Trust and as agent for the PI Trust on and after the Effective Date (subject to any agreement reached by the Trustee and the PI Trustee as to how to administer, or as ordered by the Bankruptcy Court), and (c) allocated as between the GUC Trust

and the PI Trust by the Trustee and PI Claims Administrator as determined from time to time (or as ordered by the Bankruptcy Court);

(f)    satisfy and pay the GUC Trust/PI Fund Operating Expenses from the GUC Trust/PI Fund Operating Reserve in accordance with the Plan and this Trust Agreement;

(g)    qualify at all times as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund;

(h)    make distributions of Trust Assets to GUC Trust Beneficiaries in accordance with and subject to the terms of this Trust Agreement and the Plan; and

(i)    engage in any lawful activity that is appropriate and in furtherance of the purposes of the GUC Trust to the extent consistent with the Plan, the Confirmation Order and this Trust Agreement.

    **1.3**    **Transfer of Assets.**        Pursuant to, and in accordance with Article IV.R of the Plan, the GUC Trust has received the Settlement Consideration to fund the GUC Trust. The ~~Trust Assets~~Settlement Consideration and any other assets to be transferred to the GUC Trust under the Plan will be transferred to the GUC Trust free and clear of any liens or other claims by the Debtors, the Reorganized Debtors, any creditor, or other entity. As required under the Plan, the GUC Trust shall transfer 18.77% of all Retained Preference Action Net Proceeds to the Reorganized Debtors, subject to timely receipt of payment instructions therefrom, within fifteen (15) business days after the receipt thereof.

    **1.4**    **Acceptance of Assets and Assumption of Liabilities.**

    (a)    In furtherance of the purposes of the GUC Trust, the GUC Trust hereby expressly accepts the transfer to the GUC Trust of the Settlement Consideration in the time and manner as, and subject to the terms, contemplated in the Plan.

    (b)    In furtherance of the purposes of the GUC Trust, except as otherwise provided in this Trust Agreement or the Plan, the GUC Trust shall have and retain any and all rights and defenses the Debtors had with respect to any Beneficiary Claims immediately before the Effective Date to the extent necessary to administer such Claims in accordance with this Trust Agreement and the Plan.

    (c)    Notwithstanding anything to the contrary herein, no provision herein shall be construed or implemented in a manner that would cause the GUC Trust to fail to qualify as a

"liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(d)    In this Trust Agreement, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

1.5    **Jurisdiction**.  The Bankruptcy Court shall have continuing jurisdiction over the GUC Trust, provided, however, that the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the GUC Trust.

# ARTICLE II

## POWERS, TRUST ADMINISTRATION, AND REPORTING

2.1    **Powers.**

(a)    The Trustee is and shall act as a fiduciary to the GUC Trust in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order. The Trustee shall, at all times, administer the GUC Trust in accordance with the purposes set forth in Section 1.2 above and the Plan. Subject to the limitations set forth in this Trust Agreement and the Plan, the Trustee shall have the power to take any and all actions that, in the judgment of the Trustee, are necessary or proper to fulfill the purposes of the GUC Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and not inconsistent with the requirements of Section 2.2 below, and any trust power now or hereafter permitted under the laws of the State of Delaware.

(b)        Except as required by applicable law or as otherwise specified herein or in the Plan or the Confirmation Order, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(c)        Without limiting the generality of Section 2.1(a) above, and except as limited below or by the Plan, the Trustee shall have the power to:

(i)        receive and hold the Settlement Consideration and exercise all rights with respect thereto;

(ii)        invest the monies held from time to time by the GUC Trust in accordance with the Investment Guidelines pursuant to Section 3.2 below;

(iii)        administer the GUC Trust/PI Fund Operating Reserve for the benefit of the GUC Trust, including any Disputed Ownership Fund thereof, and the PI Trust as set forth in the Plan;[32]

(iv)        incur expenses and other obligations of the GUC Trust necessary to carry out the purposes of the GUC Trust in accordance with the Plan, and pay or satisfy such obligations from the GUC Trust/PI Fund Operating Reserve as set forth in the Plan;

---

[32]        The PI Trust shall periodically provide all invoices or other documentation with respect to its expenses to the Trustee and the Trustee shall timely remit to the PI Trust such amounts solely from the GUC Trust/PI Fund Operating Reserve so as to enable the PI Trust to timely pay its expenses. Nothing in this Trust Agreement shall preclude the Trustee and the PI Trustee from establishing appropriate and efficient cash management/accounting systems which may include the advancement of funds from the GUC Trust/PI Fund Operating Reserve to the PI Trust from time to time.

(v)      establish such funds, reserves, and accounts within the GUC Trust, as the Trustee deems useful in carrying out the purposes of the GUC Trust;

(vi)      sue and be sued and participate, as a party or otherwise, in any judicial, administrative, arbitrative, or other proceeding, as required to reconcile, administer, or defend against the Beneficiary Claims;

(vii)      establish, supervise, and administer the GUC Trust and make distributions to GUC Trust Beneficiaries pursuant to the terms of this Trust Agreement and the Plan;

(viii)      appoint such officers and retain such consultants, advisors, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(ix)      pay reasonable compensation from the GUC Trust/PI Fund Operating Reserve for any of the GUC Trust's consultants, advisors, independent contractors, experts, and agents for legal, financial, administrative, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the GUC Trust requires;

(x)      pay reasonable compensation from the GUC Trust/PI Fund Operating Reserve for the Trustee, the Delaware Trustee, and their employees, consultants,

advisors, independent contractors, experts and agents, and reimburse the Trustee and the Delaware Trustee for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xi)    cooperate with the Reorganized Debtors to the extent set forth in the Plan, with respect to all administrative responsibilities that are provided in the Plan and this Trust Agreement, including the Reorganized Debtors' filing of the applicable operating report and administering the closure of the Chapter 11 Cases;[43]

(xii)    enter into such other arrangements with third parties as the Trustee deems useful in carrying out the purposes of the GUC Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement or the Plan;

(xiii)    in accordance with Section 4.4 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 4.4 below), to the fullest extent that a statutory trust organized under the laws of the State of Delaware is from time to time entitled to defend, indemnify, hold harmless, and/or insure its directors, trustees, officers, employees, consultants, advisors, agents, and

---

[43]    For the avoidance of doubt, the GUC Trust shall not be required to incur any expense arising from the Reorganized Debtors' obligations of filing and/or administering the Chapter 11 Cases; provided that in the event the Reorganized Debtors are prevented from seeking final certification and closing of the Chapter 11 Cases due solely to the activities of and/or by request of the GUC Trust or the PI Trust, any of the Chapter 11 Cases identified by the Trustee and so requested shall remain open, provided further that the GUC Trust and/or the PI Trust, as applicable, shall thereafter be responsible for all statutory fees and any ongoing reporting required (if any) for maintaining the Chapter 11 Cases until such time that the Trustee, by and through appropriate parties and professionals, seeks authority from the Bankruptcy Court to close such Chapter 11 Cases in accordance with the Bankruptcy Code and the Bankruptcy Rules.

representatives. No party shall be indemnified in any way for any liability, expense, claim, damage, or loss for which he or she is liable under Section 4.4 below;

(xiv)    commence and pursue the Retained Preference Actions, and manage and administer any proceeds thereof in accordance with the Plan; and

(xv)    exercise any and all other rights, and take any and all other actions as are permitted, of the Trustee in accordance with the terms of this Trust Agreement and the Plan.

(d)    The GUC Trust shall not have the power to guarantee any debt of other persons.

(e)    The Trustee shall endeavor to make timely distributions and not unduly prolong the duration of the GUC Trust.

## 2.2    General Administration.

(a)    The Trustee shall act in accordance with the Governing Documents. In the event of a conflict between the terms of this Trust Agreement and the Plan, the terms of the Plan shall control. For the avoidance of doubt, this Trust Agreement shall be construed and implemented in accordance with the Plan, regardless of whether any provision herein explicitly references the Plan.

(b)    The Trustee shall (i) timely file such tax returns and pay any taxes imposed on the GUC Trust in accordance with Section 5.3, (ii) comply with all applicable

reporting and withholding obligations in accordance with Section 5.4, (iii) satisfy all requirements necessary to qualify and maintain qualification of the GUC Trust as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund, and (iv) take no action that could cause the GUC Trust to fail to qualify as a "liquidating trust" within the meaning of Section 301.7701-4(d) of the Treasury Regulations, except with respect to any Disputed Ownership Fund.

(c)     The Trustee shall be required to obtain the consent of the Reorganized Debtors, which shall not be unreasonably withheld or delayed:

(i)     to materially modify the compensation of the Trustee;

(ii)     to acquire an interest in and/or merge with and/or contract with another settlement trust; or

(iii)     to make any amendment or modification of this Trust Agreement, or Exhibit hereto, that directly or indirectly affects the rights, duties, immunities, interests or liabilities of the Reorganized Debtors, which in each case shall be in accordance with Section 6.3; provided that no such amendment shall be in contravention of the Plan.

(d)     Other than the obligations of the Trustee specifically set forth in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee shall have no obligations of any kind or nature with respect to his position as such.

**2.3**     **Reporting.**

(a)     The Trustee shall timely prepare, file and distribute such statements, reports and submissions to the extent required by applicable law.

(b)     The Trustee shall cause to be prepared and filed with the Bankruptcy Court, as soon as available, and in any event no later than one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the GUC Trust (including, without limitation, a special-purpose statement of assets, liabilities and net claimants' equity, a special-purpose statement of changes in net claimants' equity and a special-purpose statement of cash flows). The Trustee shall not be required to obtain an audit of the Annual Report by a firm of independent certified public accountants. The Annual Report shall be made available to the Reorganized Debtors and the GUC Trust Beneficiaries by means of actual notice, provided, however, the Trustee may post the Annual Report on a website maintained by the GUC Trust in lieu of actual notice to each GUC Trust Beneficiary (unless otherwise required by law).

<div align="center">

**ARTICLE III**

**ACCOUNTS, INVESTMENTS, AND PAYMENTS**

</div>

**3.1**     **Accounts.**

(a)     The Trustee shall maintain one or more accounts (the "**Trust Accounts**") on behalf of the GUC Trust with one or more financial depository institutions (each a "**Financial Institution**").

<div align="center">

13

</div>

(b)      Candidates for the positions of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Reorganized Debtors or their affiliated persons. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting a Financial Institution.

(c)      The Trustee may replace any retained Financial Institution with a successor Financial Institution at any time, and such successor shall be subject to the considerations set forth in Section 3.1(a) above.

(d)      The Trustee may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as he or she may deem necessary, prudent or useful in order to provide for distributions to the GUC Trust Beneficiaries and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Trustee shall be held as Trust Assets and, except as specifically designated as such in accordance with the provisions of Section 5.3(c) below, are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the IRC or Treasury Regulations.

**3.2      Investment Guidelines.**

(a)      The Trustee may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 2** (the "**Investment Guidelines**").

14

(b)      In the event the GUC Trust holds any non-liquid assets, the Trustee shall own, protect, oversee, and monetize such non-liquid assets in accordance with the Governing Documents. This Section 3.2(b) is intended to modify the application to the GUC Trust of the "prudent person" rule, "prudent investor" rule and any other rule of law that would require the Trustee to diversify the Trust Assets.

(c)      Cash proceeds received by the GUC Trust in connection with its monetization of the non-liquid Trust Assets shall be invested in accordance with the Investment Guidelines until needed for the purposes of the GUC Trust as set forth in Section 1.2 above.

**3.3      Payment of Operating Expenses.**

All operating expenses of the GUC Trust shall be paid from the GUC Trust/PI Fund Operating Reserve as provided in the Plan. None of the Trustee, Delaware Trustee, the GUC Trust Beneficiaries, nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any operating expense or other liability of the GUC Trust. Except as expressly set forth in the Plan, none of the Debtors or Reorganized Debtors, nor any of their officers, agents, advisors, professionals or employees shall be liable for the payment of any operating expense or other liability of the GUC Trust or the Trustee. To the extent that the Trustee determines that GUC Trust/PI Fund Operating Reserve is likely to incur a cash shortfall prior to the termination and winding up of the GUC Trust and/or the PI Trust (after taking into account additional funding of the GUC Trust/PI Fund Operating Reserve as contemplated by the Plan), the Trustee may determine to establish cash reserves from the corpus of the GUC Trust,

which cash reserves shall be allocated equitably to the GUC Trust Beneficiaries by the Trustee in

his or her judgment.[64]

**3.4    Distributions to GUC Trust Beneficiaries.**

(a)    The Trustee will make distributions to GUC Trust Beneficiaries in a fair,

consistent and equitable manner in accordance with this Trust Agreement, the Plan and the

Confirmation Order.

(b)    Distributions to GUC Trust Beneficiaries shall be made, as determined by

the Trustee in his or her discretion subject to the terms of the Plan, provided, however, the GUC

Trust must distribute at least annually to the GUC Trust Beneficiaries its net income plus all net

proceeds from the sale of assets, except that the GUC Trust may retain an amount of net

proceeds or net income reasonably necessary to maintain the value of its assets or to meet claims

and contingent liabilities (including disputed claims).

(c)    The GUC Trust may withhold or deduct from amounts distributable to any

Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by

any law, regulation, rule, ruling, directive, or other governmental requirement (including,

without limitation, tax withholding in accordance with Section 5.4 below). Any Trust Assets

which are undistributable in accordance with this Section 3.4 as of the termination of the GUC

Trust shall (i) revert to the GUC Trust (notwithstanding any applicable federal or state escheat,

---

[64]    The Trustee's determination of an anticipated cash shortfall shall take into consideration the GUC Trust/PI Trust
Operating Reserves applicable to the PI Trust to the extent appropriate (i.e., to the extent the PI Trustee determines it is
likely that the PI Trust shall incur a similar cash shortfall); to the extent appropriate, a cash reserve from the corpus of
the PI Trust applicable to a cash shortfall at the PI Trust shall also be allocated equitably to the PI Trust Beneficiaries
by the PI Trustee in his or her judgment.

abandoned, or unclaimed property laws to the contrary); (ii) the Beneficiary Claim with respect to such undistributable amount shall be released, settled, compromised and forever barred, and (iii) the undistributable amount shall be reallocated to the other Beneficiary Claims, in accordance with provisions of the Plan and this Trust Agreement.

(d)     The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to GUC Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under this Trust Agreement.

(e)     Subject to Bankruptcy Rule 9010, any distribution to a GUC Trust Beneficiary shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the schedules if no proof of Claim is filed with the Trustee (as to Beneficiary Claims administered by the GUC Trust) and the Trustee has not received a written notice of a change of address. Except as set forth in the Plan, if any GUC Trust Distribution or other communication from the GUC Trust is returned as undeliverable, no further GUC Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address. Undeliverable GUC Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a GUC Trust Distribution becomes deliverable or (ii) such undeliverable GUC Trust Distribution becomes an Unclaimed Distribution pursuant to the

provisions of the Plan and this Trust Agreement.  Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any GUC Trust Beneficiary.

(f)    After final GUC Trust Distributions have been made in accordance with the Plan, the Confirmation Order and this Trust Agreement, and adequate provision has been made for all final obligations of the GUC Trust, the Trustee shall have the authority to direct the remaining Trust Assets to a tax-exempt organization as selected by the Trustee in his or her discretion.

(g)    Checks issued to GUC Trust Beneficiaries shall be null and void if not negotiated within one hundred eighty (180) calendar days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Trustee by the GUC Trust Beneficiary to whom such check was originally issued.  Any Beneficiary Claim in respect of such a voided check shall be made within one hundred eighty (180) calendar days after the date of issuance of such check.  If no request is made as provided in the preceding sentence, the check shall be deemed undistributable and shall be subject to the provisions of Section 3.4(c).

(h)    Cash payments to foreign GUC Trust Beneficiaries may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(i)    The Trustee shall have the discretion to determine the timing of GUC Trust Distributions in the most efficient and cost-effective manner possible; provided,

however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

(j)    Notwithstanding any provision in the Trust Agreement, the Plan or the Confirmation Order to the contrary, the Trustee, in the Trustee's sole discretion, may decline to make any distribution of $100 or less, due to the economic inefficiency of making a distribution of such a *de minimis* amount.

## ARTICLE IV

## TRUSTEE; DELAWARE TRUSTEE

**4.1**    **Number**.  In addition to the Delaware Trustee appointed pursuant to Section 4.12 below, there shall be one (1) Trustee who shall be the person named on the signature pages hereof.

**4.2**    **Term of Service.**

(a)    The Trustee shall serve from the Effective Date until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the GUC Trust pursuant to Section 6.2 below.

(b)    The Trustee may resign at any time upon written notice to the Reorganized Debtors with such notice filed with the Bankruptcy Court. Such notice shall specify a date when

19

such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)    The Trustee may be removed by the Bankruptcy Court in the event the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided the Trustee has received reasonable notice and an opportunity to be heard. Other good cause shall mean (i) fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony, in each case whether or not connected to the GUC Trust, or (ii) a consistent pattern of neglect and failure to perform or participate in performing the duties of Trustee hereunder.

(d)    In the event of any vacancy in the office of the Trustee, including the death, resignation or removal of any Trustee, such vacancy shall be filled by the Bankruptcy Court.

(e)    Immediately upon the appointment of any successor Trustee pursuant to Section 4.2(d) above, all rights, titles, duties, powers and authority of the predecessor Trustee hereunder shall be vested in and undertaken by the successor Trustee without any further act. No successor Trustee shall be liable personally for any act or omission of his or her predecessor Trustee. No predecessor Trustee shall be liable personally for any act or omission of his or her successor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of his or her predecessor Trustee.

(f)     Each successor Trustee shall serve until the earliest of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) above, (iii) his or her removal pursuant to Section 4.2(c) above, and (iv) the termination of the GUC Trust pursuant to Section 6.2 below.

### 4.3     <u>Compensation and Expenses of the Trustee.</u>

(a)     The Trustee shall be compensated for his or her service as Trustee in the amount of $750 per hour for services in 2023 (subject to annual increases consistent with the Trustee's practice), paid monthly.

(b)     The GUC Trust will promptly reimburse the Trustee for all reasonable and documented out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of his or her duties hereunder. The GUC Trust will reimburse the Trustee for fees and expenses incurred prior to the Effective Date in connection with this Trust Agreement and effectuating a timely, orderly, and efficient transition of duties and obligations to the Trustee as of the Effective Date (such amount not to exceed $50,000), which shall be paid promptly after the Effective Date.

(c)     The GUC Trust shall include in the Annual Report a description of the amounts paid under this Section 4.3. The GUC Trust shall provide quarterly reports to the Reorganized Debtors for a description of the amounts paid under this Section 4.3.

**4.4**    **Standard of Care; Exculpation.**

(a)    As used herein, the term "**Trust Indemnified Party**" shall mean each of (i) the Trustee, (ii) the Delaware Trustee, and (iii) the officers, employees, consultants, advisors, and agents of each of the GUC Trust and the Trustee.

(b)    To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the GUC Trust, except those acts found by a final order of a court of competent jurisdiction ("**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the Plan or this Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case except for any actions or inactions found by Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the GUC Trust.

(c)    To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the GUC Trust or the GUC Trust Beneficiaries, it is hereby understood and agreed by the Parties that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and

liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that with respect to the Trust Indemnified Parties other than the Delaware Trustee the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 4.4 and its subparts.

(d)    The GUC Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her discretion.

**4.5    Protective Provisions.**

(a)    Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 4.5.

(b)    In the event the Trustee retains counsel (including at the expense of the GUC Trust), the Trustee shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee in the performance of duties hereunder. A successor Trustee shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Party or other person may raise any exception to the attorney-client privilege described herein as any such exceptions are hereby waived by all Parties.

(c)     No Trust Indemnified Party shall be personally liable under any circumstances, except for his or her own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(d)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(e)     In the exercise or administration of the GUC Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**4.6     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all

of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the

GUC Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out

of or due to the implementation or administration of the Plan or the Trust Agreement (other than

taxes in the nature of income taxes imposed on compensation paid to such persons), in each case,

except for any actions or inactions found by Final Order to be arising out of their willful

misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the

Trust Indemnified Parties shall be satisfied from the Trust Assets.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs)

incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or

proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the

GUC Trust shall be paid by the GUC Trust from the GUC Trust/PI Fund Operating Reserve in

advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the

Trust Indemnified Parties, to repay such amount in the event that it shall be determined

ultimately by Final Order that the Trust Indemnified Parties or any other potential indemnitee are

not entitled to be indemnified by the GUC Trust. The Trustee may, in his or her discretion,

authorize an advance of reasonable expenses, costs and fees (including attorneys' fees and costs)

to be incurred by or on behalf of the Trust Indemnified Parties, as set forth herein.

(c)      The Trustee is authorized, but not required, to purchase and maintain

appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as

determined by the Trustee, which may include insurance with respect to liability asserted against

or incurred by such individual in that capacity or arising from his or her status as a Trust

Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

4.7    **Trustee Independence.**  The Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as an officer or as any other professional for the Reorganized Debtors. The Trustee shall not act as an attorney, agent, or other professional for any GUC Trust Beneficiary or any holder of any Beneficiary Claim. For the avoidance of doubt, this Section 4.7 shall not be applicable to the Delaware Trustee.

4.8    **No Bond.**  Neither the Trustee nor the Delaware Trustee shall be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

4.9    **Burden of Proof**.  In any proceeding brought by any of the Debtors, or any other person who is bound by this Trust Agreement challenging any action, determination or failure to act of the Trustee in discharge of his or her duties under this Trust Agreement on the basis that such action, determination or failure constitutes gross negligence, willful misconduct or fraud, the person bringing or prosecuting such proceeding shall have the burden of proving that such determination, action or failure to act constituted gross negligence, willful misconduct, or fraud. Notwithstanding anything to the contrary in this Trust Agreement or any duty otherwise existing at law or equity, each determination, action or failure to act of the Trustee in the discharge of his or her duties under this Trust Agreement is, to the extent consistent with this Trust Agreement, hereby deemed to not constitute a breach of this Trust Agreement or any duty hereunder or existing at law, in equity or otherwise.

**4.10** __Reliance by the Trustee__.  The Trustee may absolutely rely, and shall be fully protected in acting or refraining from acting if he or she relies upon any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order or other instrument or document that he or she has no reasonable belief to be other than genuine and to have been signed or presented other than by the proper party or parties or, in the case of facsimile transmissions, to have been sent other than by the proper party or parties, in each case without obligation to satisfy itself that the same was given in good faith and without responsibility for errors in delivery, transmission or receipt.   In the absence of gross negligence, willful misconduct, or fraud in respect of the Trustee's duties as found by a final and non-appealable court of competent jurisdiction, or material breach of this Trust Agreement, the Trustee may rely as to the truth of statements and correctness of the facts and opinions expressed therein and shall be fully protected personally in acting (or, if applicable, not acting) thereon. The Trustee shall have the right at any time to seek and rely upon instructions from the Bankruptcy Court concerning this Trust Agreement, the Plan or any other document executed in connection therewith, and the Trustee shall be entitled to rely upon such instructions in acting or failing to act and shall not be liable for any act taken or not taken in reliance thereon.

4.11    **Books and Records**. Upon notice to the Reorganized Debtors and the PI Trust, the Trustee shall be free, in his or her discretion to abandon, destroy or otherwise dispose of any books and records in his possession that the Trustee deems not necessary for the continued administration of the Plan and not required to be retained under applicable law, without the need for any order of the Bankruptcy Court, and shall have no liability for same.  This notice provision shall not create any right by any third party to access to privileged or confidential information held by the GUC Trust.

4.12    **Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee to serve in accordance with the requirements of the Act. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. If at any time the Delaware Trustee shall cease to be eligible to serve as Delaware Trustee in accordance with the provisions of this Section 4.12, it shall resign immediately in the manner and with the effect hereinafter specified in Section 4.12(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth

29

herein. The Delaware Trustee shall be a trustee of the GUC Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the GUC Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the GUC Trust or the GUC Trust Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any Trustee. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction.

The Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the GUC Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)    The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 4.12(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 4.12(d) below; provided further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee. If the Trustee does not act within such sixty (60) day period, the Delaware Trustee, at the expense of the GUC Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)    Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing

31

Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the GUC Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the GUC Trust and the Delaware Trustee,

which compensation shall be paid by the GUC Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)    The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the GUC Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

## ARTICLE V

## TAX MATTERS

**5.1**    **Treatment of Settlement Consideration Transfer.**  For all United States federal income tax purposes, all Parties shall treat the transfer of the Settlement Consideration to the GUC Trust as (i) a transfer of the Settlement Consideration (subject to any obligations related to those assets) directly to the GUC Trust Beneficiaries, followed by (ii) the transfer by such GUC Trust Beneficiaries of such Settlement Consideration to the GUC Trust in exchange for GUC Trust Interests (other than the Trust Assets allocable to Disputed Claims and held as a "disputed ownership fund" within the meaning of Section 1.468B-9 of the Treasury Regulations ("**Disputed Ownership Fund**")). Accordingly, the GUC Trust Beneficiaries shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Settlement Consideration (other than the Trust Assets allocable to the Disputed Ownership Fund).

**5.2**    **Income Tax Status.**

(a)    For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable) and other than as provided pursuant to Section 5.3(c), this GUC Trust shall be treated as a liquidating trust pursuant to Section 301.7701-4(d) of the Treasury Regulations and as a grantor trust pursuant to Sections 671-679 of the IRC. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent

with this Trust Agreement, this Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

(b)    The GUC Trust shall at all times to be administered so as to constitute a domestic trust for United States federal income tax purposes.

**5.3    Tax Returns.**

(a)    In accordance with Section 6012 of the IRC and Section 1.671-4(a) of the Treasury Regulations, the Trustee shall file with the IRS annual tax returns for the GUC Trust on Form 1041 as a grantor trust pursuant to Section 1.671-4(a) of the Treasury Regulations. In addition, the Trustee shall file in a timely manner for the GUC Trust such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. The GUC Trust's items of taxable income, gain, loss, deduction, and/or credit (other than such items is respect of any assets allocable to, or retained on account of, the Disputed Ownership Fund) will be allocated to the GUC Trust Beneficiaries in accordance with their relative ownership of GUC Trust Interests.  Within a reasonable time following the end of the taxable year, the GUC Trust shall send to each GUC Trust Beneficiary a separate statement setting forth such GUC Trust Beneficiary's items of income, gain, loss, deduction or credit and will instruct each such GUC Trust Beneficiary to report such items on his/her applicable income tax return.

(b)    The GUC Trust shall be responsible for payment, from the GUC Trust/PI Fund Operating Reserve, of any taxes imposed on the GUC Trust (including any taxes imposed

on the Disputed Ownership Fund) or the Trust Assets.  In accordance therewith, any taxes imposed on the Disputed Ownership Fund or its assets will be paid from the GUC Trust/PI Fund Operating Reserve.

(c)    The Trustee may timely elect to treat any Trust Assets allocable to Disputed Claims to a Disputed Ownership Fund, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.  If a Disputed Ownership Fund election is made, all parties (including the Trustee and the holders of GUC Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing. The GUC Trust shall file all income tax returns with respect to any income attributable to the Disputed Ownership Fund and shall pay from the GUC Trust/PI Fund Operating Reserve all U.S. federal, state and local income taxes attributable to such Disputed Ownership Fund based on the items of income, deduction, credit, or loss allocable thereto.

**5.4**      **Withholding of Taxes and Reporting Related to GUC Trust Operations.**  The

GUC Trust shall comply with all withholding, deduction and reporting requirements imposed by

any federal, state, local or foreign taxing authority, and all distributions made by the GUC Trust

shall be subject to any applicable withholding, deduction and reporting requirements. The

Trustee shall be authorized to take any and all actions that may be necessary or appropriate to

comply with any such withholding, deduction, payment, and reporting requirements. All amounts

properly withheld or deducted from distributions to a GUC Trust Beneficiary as required by

applicable law and paid over to the applicable taxing authority for the account of such GUC

Trust Beneficiary shall be treated as part of the GUC Trust Distribution to such GUC Trust

Beneficiary. To the extent that the operation of the GUC Trust or the liquidation of the Trust

Assets creates a tax liability imposed on the GUC Trust, the GUC Trust shall timely pay such tax

liability and any such payment shall be considered a cost and expense of the operation of the

GUC Trust payable without Bankruptcy Court order. Any federal, state or local withholding

taxes or other amounts required to be withheld under applicable law shall be deducted from

distributions hereunder. All GUC Trust Beneficiaries shall be required to provide any

information necessary to effect the withholding and reporting of such taxes. The Trustee may

require each GUC Trust Beneficiary to furnish to the GUC Trust (or its designee) its social

security number or employer or taxpayer identification number as assigned by the IRS and

complete any related documentation (including but not limited to a Form W-8BEN, Form

W-8BENE-E, or Form W-9) (the "**Tax Documents**"). The Trustee may condition any and all

distributions to any GUC Trust Beneficiary upon the timely receipt of properly executed Tax

Documents and receipt of such other documents as the Trustee reasonably requests, and in

accordance with the Plan. Notwithstanding any of the foregoing provisions of this Section 5.4, Section V.C of the Plan shall apply to distributions to be made from the GUC Trust that constitute "Wage Distributions" (as defined in the Plan) and for the avoidance of doubt, neither the GUC Trust nor the GUC Trust/PI Fund Operating Reserve shall bear any liability for the employer portion of any payroll taxes applicable to Wage Distributions, which shall be borne by the Reorganized Debtor.

**5.5** **Valuation.** Within 180 days after the Effective Date, the Trustee shall make a good faith valuation of the Trust Assets. Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties for all United States federal income tax purposes. The Trustee also shall file (or cause to be filed) any other statements, returns or disclosures relating to the GUC Trust that are required by any governmental unit.

**5.6** **Expedited Determination of Taxes**. The Trustee may request an expedited determination of taxes of the GUC Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the GUC Trust for all taxable periods through the termination of the GUC Trust.

<div align="center">

**ARTICLE VI**

**GENERAL PROVISIONS**

</div>

**6.1** **Irrevocability**. To the fullest extent permitted by applicable law, the GUC Trust is irrevocable.

**6.2** **Term; Termination.**

(a)      The term for which the GUC Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)      The Trustee shall make continuing efforts to monetize any non-liquid Trust Assets.

(c)      The Trustee and the GUC Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Retained Preference Actions is not likely to yield sufficient additional Cash to justify further pursuit of such claims, or (b) all distributions of Cash and other Trust Assets required to be made by the Trustee under the Plan and this Trust Agreement have been made in accordance with provisions of the Plan and this Trust Agreement, provided, however, that in no event shall the GUC Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension ~~(not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the GUC Trust as a liquidating trust for federal income tax purposes)~~ is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets (the "**Dissolution Date**").

(d)      On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the affairs of the GUC Trust by the Trustee and payment of all of the

40

liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the GUC Trust shall be distributed or disbursed in accordance with Section 3.4 and Section 5.3(c) above.

(e)    Following the dissolution and distribution of the assets of the GUC Trust, the GUC Trust shall terminate, and the Trustee shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the GUC Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the GUC Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

**6.3**    **Amendments**.  Any amendment to or modification of this Trust Agreement may be made in writing and only pursuant to an order of the Bankruptcy Court; provided, however, the Trustee may amend this Trust Agreement from time to time without the consent, approval or other authorization of, but with notice to, the Bankruptcy Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Trustee to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing, no amendment or modification of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Plan or the Confirmation Order other than, with the Reorganized Debtors' consent, to make minor modifications or clarifying amendments as necessary to enable the Trustee to effectuate the provisions of this Trust Agreement. Notwithstanding the foregoing, neither this Trust Agreement, nor any Exhibit to this Trust Agreement, shall be modified or amended in any way that could jeopardize, impair, or modify the GUC Trust's "liquidating trust" status. Any amendment affecting the rights, duties, immunities or liabilities of the Delaware Trustee shall require the Delaware Trustee's written consent. The Trustee shall provide at least ten (10) business days' written notice to the Reorganized Debtors prior to making any amendment or modification to the Trust Agreement or any Exhibit thereto, and if the Reorganized Debtors reasonably and in good faith advise the Trustee in writing that the proposed amendment or modification affects, directly or indirectly, any right, duty, immunity, interest or liability of the Reorganized Debtors, then the Reorganized Debtors' consent (which shall not be unreasonably denied or delayed) shall be required for such proposed amendment or modification. Any dispute

between the Trustee and the Reorganized Debtors with respect to this Section 6.3 shall be resolved by the Bankruptcy Court.

**6.4**    <u>**Severability**</u>. Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**6.5**    <u>**Notices.**</u>

(a)    Notices to GUC Trust Beneficiaries shall be given in accordance with such person's claims form submitted to the GUC Trust.

(b)    Any notices or other communications required or permitted hereunder to the following Parties shall be in writing and delivered to the addresses or e-mail addresses designated below, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties listed below in compliance with the terms hereof.

To the GUC Trust:

> Alan D. Halperin, Trustee
> c/o Halperin Battaglia Benzija LLP
> 40 Wall Street 37th Fl.
> New York, NY 10005
> Email: ahalperin@halperinlaw.net

With a copy (which shall not constitute notice) to:

> Halperin Battaglia Benzija LLP
> 40 Wall Street 37th Floor
> New York, NY 10005
> Attn: Donna H. Lieberman, Esq.
> Email: dlieberman@halperinlaw.net

To the Delaware Trustee:

> Wilmington Trust, N.A.
> 1100 North Market Street
> Wilmington, DE 19890
> Attn: Russell L. Crane
> Email: rcrane@wilmingtontrust.com

With a copy (which shall not constitute notice) to:

> Morris James, LLP
> 500 Delaware Avenue, Suite 1500
> Wilmington, DE 19801
> Attn: Ross Antonacci, Esq.
> Email: rantonacci@morrisjames.com

To the Reorganized Debtors:

> RCP LLC
> 55 Water St., 43rd Floor
> New York, New York 10041
> Attention: Andrew Kidd, General Counsel
> Email: Andrew.kidd@revlon.com

With a copy (which shall not constitute notice) to:

> Paul Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019
> Attention: Irene Blumberg
> Email: iblumberg@paulweiss.com

(c)    All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses.

44

**6.6**    **Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Reorganized Debtors (which shall be a third-party beneficiary hereof), the GUC Trust, the Delaware Trustee, the Trustee, and their respective successors and assigns, except that neither the GUC Trust, the Delaware Trustee, nor the Trustee, may assign or otherwise transfer any of their rights or obligations, if any, under this Trust Agreement except in the case of the Delaware Trustee in accordance with Section 4.12 (d), and in the case of the Trustee in accordance with Section 4.2(d) above.

**6.7**    **Limitation on GUC Trust Interests for Securities Laws Purposes**. GUC Trust Interest (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will, under the laws of descent and distribution or otherwise by operation of law; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**6.8**    **Exemption from Registration**. The Parties hereto intend that the interests of the GUC Trust Beneficiaries under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the exemption provisions of Section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the GUC Trust Interests will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**6.9**    **Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein, and in the documents referred to herein (including the Plan), and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power, or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**6.10**    **Headings.**    The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**6.11**   **Governing Law**. The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all Parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction; provided, however, that the Parties hereto intend that the provisions hereof shall control and there shall not be applicable to the GUC Trust, the Trustee, the Delaware Trustee, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of Trustee accounts or schedules of Trustee fees and charges; (b) affirmative requirements to post bonds for the Trustee, officers, agents, or employees of a trust; (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property; (d) fees or other sums payable to the Trustee, officers, agents, or employees of a trust; (e) the allocation of receipts and expenditures to income or principal; (f) restrictions or limitations on the permissible nature, amount, or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets; (g) the existence of rights or interests (beneficial or otherwise) in trust assets; (h) the ability of beneficial owners or other persons to terminate or dissolve a trust; or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of the Trustee or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee or the Delaware Trustee set forth or referenced in this Trust Agreement. Section 3540 of the Act shall not apply to the GUC

Trust.

**6.12    Dispute Resolution**.

(a)    Unless otherwise expressly provided for herein, the dispute resolution procedures of this Section 6.12 shall be the exclusive mechanism to resolve any dispute arising under or with respect to this Trust Agreement. For the avoidance of doubt, this Section 6.12 shall not apply to the Delaware Trustee or to the Reorganized Debtors in any respect. This Section 6.12 shall not apply to any matters as between the GUC Trust or Trustee, on the one hand, and the PI Trust or PI Trustee, on the other hand, related to or arising from the GUC Trust/PI Fund Operating Reserve.

(b)    **Informal Dispute Resolution**. Any dispute under this Trust Agreement shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when a disputing party sends to the counterparty or counterparties a written notice of dispute ("**Notice of Dispute**"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed thirty (30) days from the date the Notice of Dispute is received by the counterparty or counterparties, unless that period is modified by written agreement of the disputing party and counterparty or counterparties. If the disputing party and the counterparty or counterparties cannot resolve the dispute by informal negotiations, then the disputing party may invoke the formal dispute resolution procedures as set forth below.

(c)    **Formal Dispute Resolution**. The disputing party shall invoke formal dispute resolution procedures, within the time period provided in the preceding subparagraph, by

serving on the counterparty or counterparties a written statement of position regarding the matter in dispute ("**Statement of Position**"). The Statement of Position shall include, but need not be limited to, any factual data, analysis or opinion supporting the disputing party's position and any supporting documentation and legal authorities relied upon by the disputing party. Each counterparty shall serve its Statement of Position within thirty (30) days of receipt of the disputing party's Statement of Position, which shall also include, but need not be limited to, any factual data, analysis or opinion supporting the counterparty's position and any supporting documentation and legal authorities relied upon by the counterparty. If the disputing party and the counterparty or counterparties are unable to consensually resolve the dispute within thirty (30) days after the last of all counterparties have served its Statement of Position on the disputing party, the disputing party may file with the Bankruptcy Court a motion for judicial review of the dispute in accordance with Section 6.12(d) below.

(d)    **Judicial Review**. The disputing party may seek judicial review of the dispute by filing with the Bankruptcy Court (or, if the Bankruptcy Court shall not have jurisdiction over such dispute, such court as has jurisdiction pursuant to Section 1.5 above) and serving on the counterparty or counterparties and the Trustee, a motion requesting judicial resolution of the dispute. The motion must be filed within forty-five (45) days of receipt of the last counterparty's Statement of Position pursuant to the preceding subparagraph. The motion shall contain a written statement of the disputing party's position on the matter in dispute, including any supporting factual data, analysis, opinion, documentation and legal authorities, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly administration of the GUC Trust. Each counterparty shall respond to the motion

within the time period allowed by the rules of the court, and the disputing party may file a reply

memorandum, to the extent permitted by the rules of the court.

    **6.13**    **Effectiveness**. This Trust Agreement shall become effective on the Effective

Date.

    **6.14**    **Counterpart Signatures**. This Trust Agreement may be executed in any number

of counterparts and by different Parties on separate counterparts (including by PDF transmitted

by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts

shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement this _____ day of _____, 2023.

**TRUSTEE**

_____

Alan D. Halperin

Draft 3/28/23

**TRUSTEE**                                    **DELAWARE TRUSTEE**

_____               [_____]
Name:

                                              **WILMINGTON TRUST, NATIONAL
                                              ASSOCIATION**

                                              By:_____
                                                  Name: Russell L. Crane
                                                  Title:  Vice President

52

#9664817v32

Draft 3/28/23

# EXHIBIT 1

## CERTIFICATE OF TRUST OF THE OLD REVCO GUC LIQUIDATING TRUST

#9664817v32

## CERTIFICATE OF TRUST OF THE
## OLD REVCO GUC LIQUIDATING TRUST

This Certificate of Trust of the OLD REVCO GUC LIQUIDATING TRUST (the "*Trust*") is being duly executed and filed by the undersigned Trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

Name. The name of the statutory trust formed hereby is:
## OLD REVCO GUC LIQUIDATING TRUST

Delaware Trustee. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:
Wilmington Trust, National Association
Rodney Square North, 1100 West Market Street
Wilmington, DE 19890
Attention: Russell L. Crane

Effective Date. This Certificate of Trust shall be effective on May 2, 2023.
IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEE: | DELAWARE TRUSTEE: |
|---|---|
| | WILMINGTON TRUST, NATIONAL ASSOCIATION, not in its individual capacity, but solely as Delaware Trustee |
| | By: _____ |
| _____ | |
| Alan D. Halperin, in his capacity as a trustee and not individually. | Name: Russell L. Crane |
| | Title: Vice President |

54

Draft 3/28/23

## EXHIBIT 2

## INVESTMENT GUIDELINES

Consistent with the provisions of Rev. Proc. 94-45 and notwithstanding any other provision of the Trust Agreement, the investment powers of the Trustee, other than those reasonably necessary to maintain the value of the assets and to further the liquidating purpose of the trust, must be limited to powers to invest in demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills.

65001219 v1-WorkSiteUS-038528/0001

#9664817v32